**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Counsel for the Charitable Defendants

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-sgj11 |
| | § | |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor | § | |

| | | |
|---|---|---|
| **MARC S. KIRSCHNER, AS** | § | |
| **LITIGATION TRUSTEE OF THE** | § | **Adversary No. 21-03076-sgj** |
| **LITIGATION SUB-TRUST** | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| **JAMES D. DONDERO; MARK A.** | § | |
| **OKADA; SCOTT ELLINGTON; ISAAC** | § | |
| **LEVENTON; GRANT JAMES SCOTT** | § | |

i

III; FRANK WATERHOUSE; STRAND §
ADVISORS, INC.; NEXPOINT §
ADVISORS, L.P.; HIGHLAND §
CAPITAL MANAGEMENT FUND §
ADVISORS, L.P.; DUGABOY §
INVESTMENT TRUST AND NANCY §
DONDERO, AS TRUSTEE OF §
DUGABOY INVESTMENT TRUST; §
GET GOOD TRUST AND GRANT §
JAMES SCOTT III, AS TRUSTEE OF §
GET GOOD TRUST; HUNTER §
MOUNTAIN INVESTMENT TRUST; §
MARK & PAMELA OKADA FAMILY §
TRUST – EXEMPT TRUST #1 AND §
LAWRENCE TONOMURA AS §
TRUSTEE OF MARK & PAMELA §
OKADA FAMILY TRUST – EXEMPT §
TRUST #1; MARK & PAMELA OKADA §
FAMILY TRUST – EXEMPT TRUST #2 §
AND LAWRENCE TONOMURA IN HIS §
CAPACITY AS TRUSTEE OF MARK & §
PAMELA OKADA FAMILY TRUST – §
EXEMPT TRUST #2; CLO HOLDCO, §
LTD.; CHARITABLE DAF HOLDCO, §
LTD.; CHARITABLE DAF FUND, LP.; §
HIGHLAND DALLAS FOUNDATION; §
RAND PE FUND I, LP, SERIES 1; §
MASSAND CAPITAL, LLC; MASSAND §
CAPITAL, INC.; SAS ASSET §
RECOVERY, LTD.; AND CPCM, LLC, §
§

      **Defendants.**

## APPENDIX IN SUPPORT OF MOTION TO DISMISS
## AND MOTION FOR MORE DEFINITE STATEMENT

CLO HoldCo, Ltd. ("CLO HoldCo"), Charitable DAF HoldCo, Ltd. ("DAF HoldCo"),

Charitable DAF Fund, L.P. ("DAF Fund"), and Highland Dallas Foundation ("HDF," together

with CLO HoldCo, DAF HoldCo, DAF Fund, and HDF, the "Charitable Defendants"), file this

*Appendix* in support of their *Motion to Dismiss and Motion for More Definite Statement*:

| Exhibit | Description | Pages |
|---------|-------------|-------|
| A | Declaration of Louis Phillips | 00001-00005 |
| A-1 | Relevant Excerpts from Second Amended Service Agreement | 00006-00018 |
| A-2 | Termination Notices | 00019-00020 |
| A-3 | HarbourVest Claims | 00021-00074 |
| A-4 | Settlement Motion, HarbourVest Response, and Settlement Agreement | 00075-00158 |
| A-5 | Plan and Confirmation Order | 00159-00319 |
| A-6 | Schedules of Retained Causes of Action | 00320-00387 |
| A-7 | Partial Final Award in Redeemer Arbitration | 00388-00449 |
| A-8 | Omnibus Reply in Support of Rule 2004 Exam | 00450-00462 |
| A-9 | HarbourVest Settlement Transcript | 00462-00635 |
| B | Dugaboy Note and Payment Schedule | 00636-00638 |

Respectfully submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was served through this Court's CM/ECF Service on counsel for the Plaintiff and all Defendants on this July 11, 2022.

*/s/ Louis M. Phillips*

**KELLY HART PITRE**

Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**

Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Counsel for the Charitable Defendants

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-sgj11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Chapter 11** |
| | § | |
| **Debtor** | § | |
| | | |
| **MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST** | § | **Adversary No. 21-03076-sgj** |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |

i

**vs.** §
§
**JAMES D. DONDERO; MARK A.** §
**OKADA; SCOTT ELLINGTON; ISAAC** §
**LEVENTON; GRANT JAMES SCOTT** §
**III; FRANK WATERHOUSE; STRAND** §
**ADVISORS, INC.; NEXPOINT** §
**ADVISORS, L.P.; HIGHLAND CAPITAL** §
**MANAGEMENT FUND ADVISORS,** §
**L.P.; DUGABOY INVESTMENT TRUST** §
**AND NANCY DONDERO, AS TRUSTEE** §
**OF DUGABOY INVESTMENT TRUST;** §
**GET GOOD TRUST AND GRANT** §
**JAMES SCOTT III, AS TRUSTEE OF** §
**GET GOOD TRUST; HUNTER** §
**MOUNTAIN INVESTMENT TRUST;** §
**MARK & PAMELA OKADA FAMILY** §
**TRUST – EXEMPT TRUST #1 AND** §
**LAWRENCE TONOMURA AS** §
**TRUSTEE OF MARK & PAMELA** §
**OKADA FAMILY TRUST – EXEMPT** §
**TRUST #1; MARK & PAMELA OKADA** §
**FAMILY TRUST – EXEMPT TRUST #2** §
**AND LAWRENCE TONOMURA IN HIS** §
**CAPACITY AS TRUSTEE OF MARK &** §
**PAMELA OKADA FAMILY TRUST –** §
**EXEMPT TRUST #2; CLO HOLDCO,** §
**LTD.; CHARITABLE DAF HOLDCO,** §
**LTD.; CHARITABLE DAF FUND, LP.;** §
**HIGHLAND DALLAS FOUNDATION;** §
**RAND PE FUND I, LP, SERIES 1;** §
**MASSAND CAPITAL, LLC; MASSAND** §
**CAPITAL, INC.; SAS ASSET** §
**RECOVERY, LTD.; AND CPCM, LLC,** §
§
     **Defendants.** §

000002

### DECLARATION OF LOUIS M. PHILLIPS IN SUPPORT OF MOTION
### TO DISMISS AND MOTION FOR MORE DEFINITE STATEMENT

I, Louis M. Phillips, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as follows:

1. I am an attorney in the law firm of Kelly Hart Pitre ("Firm"), counsel to CLO HoldCo, Ltd. ("CLO HoldCo"), Charitable DAF HoldCo, Ltd. ("DAF HoldCo"), Charitable DAF Fund, L.P. ("DAF Fund"), and Highland Dallas Foundation ("HDF," together with CLO HoldCo, DAF HoldCo, DAF Fund, and HDF, the "Charitable Defendants"), and I submit this *Declaration* ("Declaration") in support of the *Motion to Dismiss and Motion for More Definite Statement* (the "Motion to Dismiss") and *Brief in Support* ("Brief in Support") (collectively, the "Dismissal Filings").[1] As stated in the Dismissal Filings, the documents submitted in this Declaration and in the Appendix are being provided to the Court pursuant to Local Bankruptcy Rule 7007-2(g) because these documents are referenced in the Complaint and are central to the Trustee's Causes of Action Against the Charitable Defendants. *See Phalanx Grp. Int'l v. Critical Sols. Int'l*, No. 3:18-CV-0244-B, 2019 WL 954727, at *3 (N.D. Tex. Feb. 26, 2019) (explaining that in the context of 12(b) a court may review the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint) (citing *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019) and *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)). Because these documents are being provided with the Dismissal Filings and referred to in the Complaint and central to the Trustee's claims, the Court may consider these documents without converting the Dismissal filing into one for summary judgment. *Causey v. Sewell Cadillac–Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir.2004) (citation omitted).

---

[1] Capitalized terms not otherwise defined herein take their meaning from the Dismissal Filings

000003

2.       Unless stated otherwise, this Declaration is based on my personal knowledge and review of the documents listed below.

3.       Attached hereto as **Exhibit A-1** are relevant excerpts from that certain *Second Amended and Restated Service Agreement, Dated January 1, 2017 between Highland Capital Management, L.P., and Charitable DAF Fund, L.P., Charitable DAF GP, LLC* (the "Service Agreement"), and *Second Amended and Restated Investment Advisory Agreement, Dated January 1, 2017 between Highland Capital Management, L.P. and Charitable DAF Fund, L.P., and Charitable DAF GP, LLC* (the "Advisory Agreement"). *See* Amended Complaint, ¶¶21, 22.

4.       Attached hereto as **Exhibit A-2** are a true and correct copies of that certain Termination Notice of the Service Agreement and that certain Termination Notice of the Advisory Agreement. *See* Amended Complaint, ¶¶21, 22.

5.       Attached hereto as **Exhibit A-3** are true and correct copies of the HarbourVest Claims. *See* Amended Complaint, ¶¶213, 395.

6.       Attached hereto as **Exhibit A-4** are a true and correct copies of the Settlement Motion, the HarbourVest Response, and the Settlement Agreement. *See* Amended Complaint, ¶¶213, 395.

7.       Attached hereto as **Exhibit A-5** are true and correct copies of the Plan and Confirmation Order. *See* Amended Complaint, ¶¶36, 37, 38.

8.       Attached hereto as **Exhibit A-6** are true and correct copies of the various Schedules of Retained Causes of Action. *See* Amended Complaint, ¶¶37, 38

9.       Attached hereto as **Exhibit A-7** is a true and correct copy of the Partial Final Award in the Redeemer Arbitration. *See* Amended Complaint, ¶¶87, 88, 90, 320.

10.       Attached hereto as **Exhibit A-8** is a true and correct copy of the *Omnibus Reply of the Trustee in support of Motion For Entry of an Order Authorizing the Examination of Rule 2004*

*Parties pursuant to Rule 2004 of the Federal Rules off Bankruptcy Procedure* [Bankruptcy Case, Dkt. No. 2741]. *See* Amended Complaint, ¶¶87, 88, 90, 320.

11.    Attached hereto as **Exhibit A-9** is a true and correct copy of the *Transcript of Hearing before the Bankruptcy Court on January 17, 2021* [Bankruptcy Case, Dkt. No. 1765]. *See* Amended Complaint, ¶¶213, 395.

**Dated: July 11, 2022**                                              */s/ Louis M. Phillips*
                                                                      Louis M. Phillips

000005

**SECOND AMENDED AND RESTATED SERVICE AGREEMENT**

THIS SECOND AMENDED AND RESTATED SERVICE AGREEMENT (this "***Agreement***") entered into to be effective from the 1st day of January, 2017 (the "***Effective Date***") by and among Highland Capital Management, L.P., a Delaware limited partnership ("***HCMLP***"), Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership (the "***Fund***"), Charitable DAF GP, LLC, a Delaware limited liability company (the "***General Partner***"), and any affiliate of the General Partner that becomes a party hereto. Each of the signatories hereto is individually a "***Party***" and collectively, the "***Parties***".

RECITALS

A. HCMLP, the Fund and the General Partner entered into that certain Shared Services Agreement dated January 1, 2012 (the "***Original Agreement***");

B. The Parties amended and restated the Original Agreement in its entirety on the terms as set forth in that certain Amended and Restated Agreement effective as of July 1, 2014 (the "***Existing Agreement***");

C. The Parties desire to amend and restated the Existing Agreement in its entirety on the terms set forth herein;

C. Since the inception of the Fund, the Parties have intended that the Fund and the General Partner would incur reasonable arm's-length fees in connection with the operation of the Fund and management and reporting activities with respect to Fund assets;

D. HCMLP has incurred and will continue to incur substantial expenses on behalf of the Fund and the General Partner in performing the Services (as defined below);

E. The Parties agree that it is in their mutual best interests for HCMLP to continue to provide the Services to the General Partner, the Fund and other Recipients (as defined below) and for HCMLP to be provided sufficient financial incentives to continue to provide the Services;

F. The General Partner and the Fund desire to provide HCMLP sufficient compensation for performing the Services and to reimburse HCMLP for expenses incurred on their behalf;

G. During the Term (as defined below), HCMLP will provide to the General Partner, on behalf of the Fund and/or its subsidiaries, certain services as more fully described herein, subject to the terms and conditions set forth herein.

AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, and the Existing Agreement is hereby amended and restated in its entirety as follows:

ARTICLE I
DEFINITIONS

"***Advisory Agreement***" means that certain Second Amended and Restated Investment Advisory Agreement, dated effect as of the Effective Date, by and among the Parties, as amended, restated, modified and supplemented from time to time.

EXHIBIT A-1

000006

"**_Affiliate_**" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person.  The term "**_control_**" (including, with correlative meanings, the terms "**_controlled by_**" and "**_under common control with_**") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"**_Agreement_**" has the meaning set forth in the preamble.

"**_Change_**" has the meaning set forth in Section 2.02(a).

"**_Change Request_**" has the meaning set forth in Section 2.02(b).

"**_Code_**" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"**_Dispute_**" has the meaning set forth in Section 7.14.

"**_Effective Date_**" has the meaning set forth in the preamble.

"**_Enforcement Court_**" has the meaning set forth in Section 7.14.

"**_Existing Agreement_**" has the meaning set forth in the recitals.

"**_Fund_**" has the meaning set forth in the preamble.

"**_General Partner_**" has the meaning set forth in the preamble.

"**_Governmental Entity_**" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"**_HCMLP_**" has the meaning set forth in the preamble.

"**_Liabilities_**" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"**_Loss_**" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "**_Loss_**" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"**_Management Fee_**" has the meaning set forth in the Advisory Agreement.

 "**_New Service_**" has the meaning set forth in Section 2.03.

"**_Original Agreement_**" has the meaning set forth in the recitals. "**_Party_**" or "**_Parties_**" has the

000007

meaning set forth in the preamble.

"***Person***" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"***Recipient***" means the General Partner, the Fund, and any of the Fund's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Services.

"***Service Provider***" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Services.

"***Service Standards***" has the meaning set forth in Section 4.01.

"***Services***" shall have the meaning set forth in Section 2.01.

"***Subsidiary***" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"***Tax***" or "***Taxes***" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Services; and (ii) tax-related surcharges or fees that are related to the Services identified and authorized by applicable tariffs.

"***Term***" has the meaning set forth in Section 5.01.

ARTICLE II
SERVICES

Section 2.01    Services.  During the Term, Service Provider will provide Recipient with Services, each as requested by Recipient and as described more fully on **Annex A** attached hereto (the "***Services***").

Section 2.02    Changes to the Services.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Service in order to reflect new procedures, processes or other methods of providing such Service, including modifying the applicable fees for such Service to reflect the then current fair market value of such service (a "***Change***").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "***Change Request***").

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Service in any material respect or increase Recipient's cost for such Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the

3

implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    New Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Services not otherwise specifically listed in Section 2.01 (a "*New Service*").  Any agreement between the Parties on the terms for a New Service must be in accordance with the provisions of Article III and Article IV hereof, will be deemed to be an amendment to this Agreement and such New Service will then be a "*Service*" for all purposes of this Agreement.

Section 2.04    Subcontractors.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

ARTICLE III
PAYMENT OF FEES; TAXES

Section 3.01    Management Fee.  The Fund shall pay the Service Provider the Management Fee in accordance with the terms and subject to the conditions set forth in the Advisory Agreement.

Section 3.02    Taxes.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Services provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Services as a result of such payment by Recipient.  Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Services, costs for which such Taxes are levied.  Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider.  In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name.  Service Provider's authorization will not be unreasonably withheld.  Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings.  However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time.  Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings.  Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property.  Recipient agrees to indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

4

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers to be effective from the Effective Date.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: Strand Advisors, Inc., its general partner

By:_____
Name: James Dondero
Title: President
Date: 6/21/17

**CHARITABLE DAF GP, LLC**

By:_____
Name: Grant J. Scott
Title: Managing Member
Date:

**CHARITABLE DAF FUND, L.P.**

By: Charitable DAF GP, LLC, its general partner

By:_____
Name: Grant J. Scott
Title: Managing Member
Date:

9

000010

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers to be effective from the Effective Date.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: Strand Advisors, Inc., its general partner

By:_____

Name: James Dondero

Title: President

Date:

**CHARITABLE DAF GP, LLC**

By:_____

Name: Grant J. Scott

Title: Managing Member

Date: 6/21/2017

**CHARITABLE DAF FUND, L.P.**

By: Charitable DAF GP, LLC, its general partner

By:_____

Name: Grant J. Scott

Title: Managing Member

Date: 6/21/2017

9

SECOND AMENDED AND RESTATED
INVESTMENT ADVISORY AGREEMENT

THIS SECOND AMENDED AND RESTATED INVESTMENT ADVISORY AGREEMENT (this "***Agreement***"), dated to be effective from January 1, 2017 (the "***Effective Date***") is entered into by and between **Charitable DAF Fund, L.P.**, a Cayman Islands exempted limited partnership (the "***Fund***"), **Charitable DAF GP, LLC**, a limited liability company organized under the laws of the State of Delaware (the "***General Partner***"), the general partner of the Fund, and **Highland Capital Management, L.P.**, a limited partnership organized under the laws of the State of Delaware (the "***Investment Advisor***").   Each of the signatories hereto is sometimes referred to herein individually as a "***Party***" and collectively as the "***Parties***."

RECITALS

WHEREAS, the Fund, the General Partner and the Investment Advisor entered into that certain Investment Advisory Agreement dated January 1, 2012 (the "***Original Agreement***");

WHEREAS, the Parties amended and restated the Original Agreement in its entirety on the terms set forth in that certain Amended and Restated Investment Advisory Agreement dated July 1, 2014 (the "***Existing Agreement***");

WHEREAS, the parties desire to amend and restate the Existing Agreement in its entirety with the terms as set forth in this Agreement effective as of the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree, and the Existing Agreement is hereby amended and restated in its entirety, as follows:

1.     <u>Investment Advisory Services</u>.   Subject to Section 7, the Investment Advisor shall act as investment advisor to the Fund, the General Partner with respect to the Fund and its subsidiaries and shall provide investment advice with respect to the investment and reinvestment of the cash, Financial Instruments and other properties comprising the assets and liabilities of the Fund and its subsidiaries.

2.     <u>Custody</u>.  The Financial Instruments shall be held in the custody of Jefferies & Company, Inc. or one or more banks selected by the General Partner (each such bank, a "Custodian").  The General Partner will notify the Investment Advisor promptly of the proposed selection of any other Custodians. The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the General Partner. At no time shall the Investment Advisor have possession of or maintain custody over any of the Financial Instruments.  The Investment Advisor shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

3.    <u>Authority of the Investment Advisor</u>.  Subject to Section 7 of this Agreement, the Investment Advisor shall advise the General Partner on behalf of the Fund and/or its subsidiaries with respect to:

(a)    investing, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "***Financial Instruments***"), and the sale of Financial Instruments short and covering such sales.

(b)    engaging in such other lawful Financial Instruments transactions;

(c)    research and analysis;

(d)    purchasing Financial Instruments and holding them for investment;

(e)    entering into contracts for or in connection with investments in Financial Instruments;

(f)    investing in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

(g)     possessing, transferring, mortgaging, pledging or otherwise dealing in, and exercising all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Fund and/or its subsidiaries;

(h)     lending, either with or without security, any Financial Instruments, funds or other properties of the Funds, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Fund;

(i)     opening, maintaining and closing accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)     opening, maintaining and closing accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

(k)     combining purchase or sale orders on behalf of the Fund with orders for other accounts to which the Investment Advisor or any of its affiliates provides investment services ("***Other Accounts***") and allocating the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts;

(l)     entering into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Fund and Other Accounts and are allocated among such accounts using an average price;

(m)     organizing one or more corporations and other entities formed to hold record title, as nominee for the Fund and/or its subsidiaries (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Fund and/or its subsidiaries;

(n)     causing the Fund and/or its subsidiaries to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Investment Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)     engaging personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants and investment bankers); and

(p)     voting of Financial Instruments, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

4.     <u>Policies of the Fund</u>.  The activities engaged in by the Investment Advisor on behalf of the Fund and/or its subsidiaries shall be subject to the policies and control of the General Partner.

000014

The Investment Advisor shall submit such periodic reports to the General Partner regarding the Investment Advisor's activities hereunder as the General Partner may reasonably request and a representative of the Investment Advisor shall be available to meet with the General Partner and/or any other representative of the Fund or its subsidiaries as reasonably requested by the General Partner.

In furtherance of the foregoing, the General Partner hereby appoints the Investment Advisor as the Fund's attorney-in-fact, with full power of authority to act in the Fund's name and on its behalf with respect to the Fund, as follows:

(a)  to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner;

(b)  to execute and combine purchase or sale orders on behalf of the Fund with orders for Other Accounts and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts; *provided, however*, that such purchase or sale orders shall be market rates;

(c)  to direct the Custodian to deliver funds or the Financial Instruments, but only in the course of effecting trading and investment transactions for the Fund and subject to such restrictions as may be contained in the custody agreement between the Custodian and the Fund;

(d)  to enter into contracts, provide certifications or take any other actions necessary to effect any of the foregoing transactions; and

(e)  to select brokers on the basis of best execution and in consideration of relevant factors, including, but not limited to, price quotes; the size of the transaction; the nature of the market for the security; the timing of the transaction; the difficulty of execution; the broker-dealer's expertise in the relevant market or sector; the extent to which the broker-dealer makes market in the security or has an access to such market; the broker-dealer's skill in positioning the relevant market; the broker-dealer's facilities, reliability, promptness and financial stability; the broker-dealer's reputation for diligence and integrity (including in correcting errors); confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; and other factors deemed appropriate by the Investment Advisor.

5.  <u>Valuation of Financial Instruments</u>.  Financial Instruments will be valued in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided to the General Partner upon request.

6.  <u>Status of the Investment Advisor</u>.  The Investment Advisor shall, for all purposes, be an independent contractor and not an employee of the General Partner or the Fund or its subsidiaries, nor shall anything herein be construed as making the Fund or its subsidiaries or the General Partner, a partner, member or co-venturer with the Investment Advisor or any of its affiliates or clients.  The Investment Advisor shall have no authority to act for, represent, bind or obligate the Fund or its subsidiaries or the General Partner except as specifically provided herein.

7.    <u>Investments</u>.    ALL ULTIMATE INVESTMENT DECISIONS WITH RESPECT TO THE FUND AND ITS SUBSIDIARIES SHALL AT ALL TIMES REST SOLELY WITH THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY, IT BEING EXPRESSLY UNDERSTOOD THAT THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY SHALL BE FREE TO ACCEPT AND OR REJECT ANY OF THE ADVICE RENDERED BY THE INVESTMENT MANAGER HEREUNDER FOR ANY REASON OR FOR NO REASON.

8.    <u>Reimbursement by the General Partner</u>.    The Investment Advisor may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the General Partner with respect to the Fund and/or its subsidiaries (any such appointee, a "***Sub-Advisor***"), including, but not limited to, any affiliate of the Investment Advisor, but payment for any such services shall be assumed by the Investment Advisor, and, therefore, neither the General Partner nor the Fund or any of its subsidiaries shall have any liability therefor; *provided, however*, that the Investment Advisor, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the General Partner with respect to the Fund and/or its subsidiaries hereunder, and the Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

9.    <u>Expenses</u>.

(a)    The Fund shall pay or reimburse the Investment Advisor and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Fund, any taxes imposed upon the Fund (including, but not limited to, collateralized debt obligations managed by the Investment Advisor or its affiliates), fees relating to valuing the Financial Instruments, and extraordinary expenses.  In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Investment Advisor.  For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Investment Advisor's advised accounts, such expenses shall be allocated pro rata among such accounts.

000016

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its general partner

By:_____

Name: James Dondero
Title: President
Date: 6/21/17

CHARITABLE DAF GP, LLC

By:_____

Name: Grant J. Scott
Title: Managing Member
Date:

CHARITABLE DAF FUND, L.P.

By: Charitable DAF GP, LLC, its general
partner

By:_____

Name: Grant J. Scott
Title: Managing Member
Date:

14

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its general partner

By:_____

Name: James Dondero
Title: President
Date:

CHARITABLE DAF GP, LLC

By:_____

Name: Grant J. Scott
Title: Managing Member
Date: 6/21/2017

CHARITABLE DAF FUND, L.P.

By: Charitable DAF GP, LLC, its general partner

By:_____

Name: Grant J. Scott
Title: Managing Member
Date: 6/21/2017

14

November 30, 2020

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention: Grant Scott

> **RE:** **Termination of Second Amended and Restated Investment Advisory Agreement, dated January 1, 2017, by and among Highland Capital Management, L.P. ("HCMLP"), Charitable DAF Fund, L.P., and Charitable DAF GP, LLC (the "Agreement").**

To Whom It May Concern:

As set forth in Section 13 of the Agreement, the Agreement is terminable at will upon at least 90 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement. Such termination will be effective 90 days from the date hereof. HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

DOCS_NY:41559.1 36027/002

EXHIBIT A-2

000019

November 30, 2020

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention: Grant Scott

> **RE: Termination of Second Amended and Restated Service Agreement, dated January 1, 2017, by and among Highland Capital Management, L.P. ("HCMLP"), Charitable DAF Fund, L.P., and Charitable DAF GP, LLC (the "Agreement").**

To Whom It May Concern:

As set forth in Section 5.02 of the Agreement, the Agreement is terminable at will upon at least 60 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement. Such termination will be effective January 31, 2021. HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

Claim #143  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor _____Highland Capital Management, L.P._____

United States Bankruptcy Court for the: _____Northern_____ District of _____Texas_____
                                                                              (State)

Case number _____19-34054_____

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| **Part 1:** | **Identify the Claim** |
|---|---|

**1. Who is the current creditor?**

HarbourVest 2017 Global Fund L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

HarbourVest 2017 Global Fund L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone _____2129096000_____
Contact email _____eweisgerber@debevoise.com_____

Where should payments to the creditor be sent? (if different)

See summary page

Contact phone _____6173483773_____
Contact email _____agoren@harbourvest.com_____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
         MM  /  DD  /  YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

1934054200408000000000055

Official Form 410

**Proof of Claim**

**EXHIBIT A-3**

page 1

000021

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

6.  **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7.  **How much is the claim?**    $ _See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8.  **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

9.  **Is all or part of the claim secured?**

☑ No

☐ Yes.    The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                                    $_____

**Amount of the claim that is secured:**        $_____

**Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
19340542004080000000000055

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**  A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No  ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No  ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.  $_____ |
|---|---|

---

**Part 3:**  **Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ___04/08/2020___
MM / DD / YYYY

___/s/Michael Pugatch___
Signature

**Print the name of the person who is completing and signing this claim:**

Name ___Michael Pugatch___
First name   Middle name   Last name

Title ___Managing Director - Company: HarbourVest 2017 Global Fund L.P., by Harb...___

Company ___by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL...___
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone _____

1934054200408000000000055

000023

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global Fund L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest 2017 Global Fund L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 4:40:16 p.m. Eastern Time | |
| **Title:** | |
| Managing Director - Company: HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its Gen Partner | |
| **Company:** | |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member | |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## <u>ANNEX TO PROOF OF CLAIM</u>

1.     This annex (the "<u>Annex</u>") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "<u>Proof of Claim</u>") and describes in more detail the claims of HarbourVest 2017 Global Fund L.P. (the "<u>Claimant</u>") against the debtor Highland Capital Management, L.P. (the "<u>Debtor</u>").

2.     The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "<u>Acis</u>"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("<u>CLO</u>") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("<u>Involuntary Petition Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("<u>Confirmation Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3. Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4. Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5. The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

000026

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

3

000027

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8. Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9. This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10. This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11. The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

000028

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12. In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13. The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14. Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

000029

| **Fill in this information to identify the case:** |
|---|

Debtor      Highland Capital Management, L.P.

United States Bankruptcy Court for the:   Northern      District of   Texas

                                                           (State)

Case number    19-34054

## Official Form 410
# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| **Part 1:** | **Identify the Claim** |
|---|---|

**1. Who is the current creditor?**

HarbourVest 2017 Global AIF L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| HarbourVest 2017 Global AIF L.P.<br>Attn: Erica Weisgerber<br>Debevoise and Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022, U.S.A. | See summary page |
| Contact phone   2129096000 | Contact phone   6173483773 |
| Contact email   eweisgerber@debevoise.com | Contact email   agoren@harbourvest.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No

☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____
                                                       MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

1934054200408000000000059

000030

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6.** **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7.** **How much is the claim?**

$ _See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

**9.** **Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10.** **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11.** **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200408000000000059

Official Form 410

**Proof of Claim**

page 2

000031

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
| | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

| | |
|---|---|
| **13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No |
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. |
| | $ _____ |

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ___04/08/2020___
MM / DD / YYYY

___/s/Michael Pugatch___
Signature

**Print the name of the person who is completing and signing this claim:**

Name ___Michael Pugatch___
First name          Middle name          Last name

Title ___Managing Director-Company: HarbourVest 2017 Global AIF L.P., by HarbourV___

Company ___Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investme___
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone _____

1934054200408000000000059

Official Form 410                    Proof of Claim                    page 3

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| |
|---|
| **Disbursement/Notice Parties:** |
| HarbourVest 2017 Global AIF L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 |
| **Phone:** |
| 6173483773 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| agoren@harbourvest.com |
| **DISBURSEMENT ADDRESS** |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** / **Uniform Claim Identifier:** |
| See Annex | No |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | |
| No | **Amount Unsecured:** |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 4:49:59 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HarbourVest 2017 Global AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative |
| **Company:** |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.       This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest 2017 Global AIF L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.       The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018. The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business. *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

2

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

000036

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8. Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9. This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10. This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11. The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

000037

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12. In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13. The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14. Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

000038

Claim #149 Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___ District of ___Texas___
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---------|--------------------|

**1. Who is the current creditor?**

HarbourVest Partners L.P. on behalf of funds and accounts under management
Name of the current creditor (the person or entity to be paid for this claim)

Other names the current creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|-----------------------------------------------|---------------------------------------------------------------|
| See summary page | See summary page |

Contact phone 2129096000        Contact phone 6173483773
Contact email eweisgerber@debevoise.com        Contact email agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No

☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

1934054200408000000000061

Official Form 410                    **Proof of Claim**

page 1

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No |
| | | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | | |
|---|---|---|
| 7. | **How much is the claim?** | $ _See Annex_____. **Does this amount include interest or other charges?** |
| | | ☐ No |
| | | ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. | **What is the basis of the claim?** |

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

| | |
|---|---|
| 9. | **Is all or part of the claim secured?** |

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

| | | |
|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No |
| | | ☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |

| | | |
|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No |
| | | ☐ Yes. Identify the property: _____ |

1934054200408000000000061

000040

<table>
<tr><td>

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

</td><td>

☒ No

☐ Yes. *Check all that apply:*

</td><td>**Amount entitled to priority**</td></tr>
</table>

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.    $ _____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☒ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$ _____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/08/2020
                    MM / DD / YYYY

/s/Michael Pugatch
Signature

**Print the name of the person who is completing and signing this claim:**

Name    Michael Pugatch
        First name        Middle name        Last name

Title    Managing Director

Company    HarbourVest Partners L.P., on behalf of funds and accounts under manage
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone    _____

1934054200408000000000061    .

000041

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest Partners L.P. on behalf of funds and accounts under management | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest Partners L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 5:06:59 p.m. Eastern Time | |
| **Title:** | |
| Managing Director | |
| **Company:** | |
| HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its Gen Partner | |

VN: EA86458428780C11DA6B606EDE1FA40A

000042

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Partners L.P. on behalf of funds and accounts under management (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant manages investment funds that are limited partners in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018. The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business. *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third*

000043

*Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

000044

5.     The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.     This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.   The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

3

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor, as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

000046

11. The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12. In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13. The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14. Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

5

000047

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern District of Texas |
| | (State) |
| Case number | 19-34054 |

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

| 1. | Who is the current creditor? | HarbourVest Dover Street IX Investment L.P. |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor |

| 2. | Has this claim been acquired from someone else? | ☑ No |
|---|---|---|
| | | ☐ Yes. From whom? |

| 3. | Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|---|
| | | See summary page | See summary page |
| | | Contact phone 2129096000 | Contact phone 6173483773 |
| | | Contact email eweisgerber@debevoise.com | Contact email agoren@harbourvest.com |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| 4. | Does this claim amend one already filed? | ☑ No |
|---|---|---|
| | | ☐ Yes. Claim number on court claims registry (if known) _____ Filed on ___/___/_____ MM / DD / YYYY |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? |

1934054200408000000000060

Official Form 410

**Proof of Claim**

page 1

000048

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br><br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

7. **How much is the claim?** $ <u>See Annex</u>. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>See Annex</u>

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200408000000000060

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No<br><br>☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |
| **13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ | |

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/08/2020
                    MM / DD / YYYY

/s/Michael Pugatch
Signature

**Print the name of the person who is completing and signing this claim:**

Name        Michael Pugatch
            First name          Middle name          Last name

Title       Managing Director-Company: HarbourVest Dover Street IX Investment L.P.,

Company     Inv Fund Mgr. by HarbourVest Partners L.P., its Duly Appointed Investme
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone    _____

1934054200408000000000060

## KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |

**District:**

Northern District of Texas, Dallas Division

| **Creditor:** | **Has Supporting Documentation:** |
|---|---|
| HarbourVest Dover Street IX Investment L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest Dover Street IX Investment L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| **Other Names Used with Debtor:** | **Amends Claim:** | |
|---|---|---|
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 4:59:00 p.m. Eastern Time | |
| **Title:** | |
| Managing Director-Company: HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners Ireland Limited, its Alter | |
| **Company:** | |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr | |

VN: 2FF3E3B762AB4570A51AF333808C6C3D

000051

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Dover Street IX Investment L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

000053

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.     This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.     Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

3

000054

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8. Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9. This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10. This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11. The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

4

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

*** 

5

Claim #153  Date Filed: 4/8/2020

| Fill in this information to identify the case: | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern    District of Texas |
| | (State) |
| Case number | 19-34054 |

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1:    Identify the Claim

| | | |
|---|---|---|
| 1. | Who is the current creditor? | HV International VIII Secondary L.P. |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor |

| | | |
|---|---|---|
| 2. | Has this claim been acquired from someone else? | ☑ No |
| | | ☐ Yes.   From whom? |

| | | | |
|---|---|---|---|
| 3. | Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | HV International VIII Secondary L.P. Attn: Erica Weisgerber Debevoise and Plimpton LLP 919 Third Avenue New York, NY 10022, U.S.A. | See summary page |
| | | Contact phone  2129096000 | Contact phone  6173483773 |
| | | Contact email  eweisgerber@debevoise.com | Contact email  agoren@harbourvest.com |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| | | |
|---|---|---|
| 4. | Does this claim amend one already filed? | ☑ No |
| | | ☐ Yes.   Claim number on court claims registry (if known) _____   Filed on ___/___/_____  MM / DD / YYYY |

| | | |
|---|---|---|
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
| | | ☐ Yes. Who made the earlier filing? |

1934054200408000000000065

Official Form 410                **Proof of Claim**

page 1

000057

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?**

$ _See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200408000000000065

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☒ No | | | |
|---|---|---|---|---|
| | ☐ Yes. *Check all that apply:* | | **Amount entitled to priority** | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $ _____ | |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $ _____ | |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $ _____ | |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $ _____ | |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $ _____ | |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | | $ _____ | |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | | |

| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No | |
|---|---|---|
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | |
| | $ _____ | |

---

### Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _04/08/2020_
                  MM / DD / YYYY

_/s/Michael Pugatch_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name        __Michael Pugatch_____
            First name        Middle name        Last name

Title       __Managing Director-Company: HV International VIII Secondary L.P., by HI__

Company     __by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL__
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone _____

1934054200408000000000065 .

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HV International VIII Secondary L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HV International VIII Secondary L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 5:16:54 p.m. Eastern Time | |
| **Title:** | |
| Managing Director-Company: HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, | |
| **Company:** | |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member | |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HV International VIII Secondary L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018. The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business. *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g., id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3. Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4. Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5. The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

000062

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.        This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.        Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

3

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.      This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.      The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

000064

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

000065

Claim #154  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor _____Highland Capital Management, L.P._____

United States Bankruptcy Court for the: _Northern_____ District of _Texas___
                                                                    (State)

Case number _____19-34054_____

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---------|--------------------|

| 1. | Who is the current creditor? | HarbourVest Skew Base AIF L.P. |
|----|------------------------------|--------------------------------|
|    |                              | Name of the current creditor (the person or entity to be paid for this claim) |
|    |                              | Other names the creditor used with the debtor |

**2. Has this claim been acquired from someone else?**
☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

HarbourVest Skew Base AIF L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone  2129096000
Contact email  eweisgerber@debevoise.com

Where should payments to the creditor be sent? (if different)

See summary page

Contact phone  6173483773
Contact email  agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**
☑ No
☐ Yes.  Claim number on court claims registry (if known) _____   Filed on ___/___/_____
                                                                          MM  /  DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes. Who made the earlier filing? _____

1934054200408000000000064

Official Form 410                    **Proof of Claim**                    page 1

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No |
| | | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

7. **How much is the claim?**   $ _See Annex_____. **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200408000000000064

Official Form 410     **Proof of Claim**     page 2

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No<br><br>☐ Yes. *Check all that apply:*        **Amount entitled to priority**<br><br>   ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____<br><br>   ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____<br><br>   ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____<br><br>   ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____<br><br>   ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____<br><br>   ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.    $_____<br><br>   * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. |
| **13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>   $_____ |

---

**Part 3:**   Sign Below

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br><br>☒ I am the creditor's attorney or authorized agent.<br><br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br><br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date   <u>04/08/2020</u><br>               MM / DD / YYYY<br><br><br>    <u>/s/Michael Pugatch</u><br>      Signature<br><br>**Print the name of the person who is completing and signing this claim:**<br><br>Name    <u>Michael Pugatch</u><br>        First name             Middle name            Last name<br><br>Title    <u>Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVe</u><br><br>Company    <u>Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investme</u><br>          Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address<br><br><br>Contact phone    _____      |

1934054200408000000000064   .

---

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest Skew Base AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HarbourVest Skew Base AIF L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** **Uniform Claim Identifier:** |
| See Annex | No |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** |
| No | **Amount Unsecured:** |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 5:11:50 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative Inv |
| **Company:** |
| Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. |  |

## ANNEX TO PROOF OF CLAIM

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Skew Base AIF L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018. The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business. *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings

in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.  Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.  Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.  The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

2

000071

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

3

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8. Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9. This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10. This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11. The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

000073

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.


***

000074

Docket #1057  Date Filed: 09/11/2020

**CROWE & DUNLEVY, P.C.**
Vickie L. Driver
State Bar No. 24026886
2525 McKinnon Street, Suite 425
Dallas, TX 75201
Telephone: 214-420-2142
Email: vickie.driver@crowedunlevy.com

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (*pro hac vice pending*)
Erica S. Weisgerber (*pro hac vice pending*)
Daniel E. Stroik (*pro hac vice pending*)
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
Email: nlabovitz@debevoise.com
Email: eweisgerber@debevoise.com
Email: destroik@debevoise.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

--------------------------------------------------------------------- x
: 
In re:                                                            :  Chapter 11
                                                                  : 
**HIGHLAND CAPITAL MANAGEMENT, L.P.,**                            :  Case No. 19-34054
                                                                  : 
        Debtor.                                                   : 
                                                                  : 
                                                                  : 
                                                                  : 
--------------------------------------------------------------------- x

**HARBOURVEST RESPONSE TO DEBTOR'S FIRST OMNIBUS OBJECTION TO CERTAIN (A) DUPLICATE CLAIMS; (B) OVERSTATED CLAIMS; (C) LATE-FILED CLAIMS; (D) SATISFIED CLAIMS; (E) NO-LIABILITY CLAIMS; AND (F) INSUFFICIENT-DOCUMENTATION CLAIMS**

1934054200911000000000019

EXHIBIT A-4    000075

## TABLE OF CONTENTS

OVERVIEW ..................................................................................................................1

FACTUAL BACKGROUND ..........................................................................................3

BASIS FOR RELIEF ...................................................................................................11

THE CLAIM OBJECTION IS IMPROPER AND SHOULD BE DENIED .............................11

THE HARBOURVEST CLAIMS ARE VALID AND SHOULD BE ALLOWED ...................13

    A.    Fraud, Fraudulent Inducement, Fraudulent Concealment, Fraudulent
           Misrepresentation, and Negligent Misrepresentation ...........................................13

    B.    Breach of Fiduciary Duties and Misuse of Fund Assets .....................................16

    C.    Securities Claims ...........................................................................................21

    D.    RICO Claims ................................................................................................23

    E.    Unfair Prejudice ...........................................................................................23

PRAYER FOR RELIEF ...............................................................................................25

000076

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Durant*, 550 S.W.3d 605 (Tex. 2018) ....................................................................14

Bench Ruling & Mem. Of L. in Supp. of: (A) Final Approval of Disclosure Statement; & (B) Confirmation of Ch. 11 Tr.'s Third Am. Joint Plan, In re Acis Capital Mgmt., No. 18-30264-sgj11 (Bankr. N.D. Tex. Jan. 31, 2019), ECF No. 827 .....................................................passim

*Carlyle Capital Corporation Ltd. v. Conway & Others*, Royal Court of Guernsey, 4 September 2017, Judgment 38/2017 ................................................................................................................16

*Derry v. Peek* (1889) 14 AC (HL) 337.........................................................................................14

*Doyle v. Olby (Ironmongers) Ltd.* (1969) 2 W.L.R. 673.............................................................14

Findings of Fact & Conclusions of L. in Supp. of Ord. for Relief Issued After Trial on Contested Involuntary Bankr. Pets., *In re Acis Capital Mgmt., L.P.*, No. 18-30264-sgj11, (Bankr. N.D. Tex. Apr. 13, 2018), ECF No. 118 .....................................................................3, 4, 5, 10

*Hall v. Cable & Wireless Plc* (2009) EWHC 1793 (Comm) .......................................................15

*In re Armstrong*, 320 B.R. 97 (Bankr. N.D. Tex. 2005) .............................................................12

*In re Skyport Glob. Commc'ns, Inc.*, No. 08-36737, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011)................................................................................................................................................21

*In re Today's Destiny, Inc.*, No. 05-90080, 2008 WL 5479109 (Bankr. S.D. Tex. Nov. 26, 2008) ...............................................................................................................................................................12

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648 (Tex. 2018) ............13

*Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444 (Tex. App. 2018).....................................21

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011)........................................................22

*Matter of Fid. Holding Co.*, 837 F.2d 696 (5th Cir. 1988)..........................................................12

*Prodefin Trading Ltd. v. Midland Res. Holding Ltd.*, Royal Court of Guernsey, 14 February 2017, Judgment 7/2017 ................................................................................................................24

*Re Bird Precision Bellows Ltd.* (1985) 3 All ER 523 ..................................................................24

*Re Little Olympian Each-Ways Ltd.* (1994) 2 BCLC 420............................................................24

## Statutes

11 U.S.C. §§ 501, 502 ....................................................................................................................11

15 U.S.C. § 78j................................................................................................................................22

15 U.S.C. § 78t................................................................................................................................22

18 U.S.C. § 152................................................................................................................................23

18 U.S.C. § 1962..............................................................................................................................23

18 U.S.C. § 1964..............................................................................................................................23

Companies (Guernsey) Law 2008 § 132 .......................................................................................16

Companies (Guernsey) Law 2008 § 349 .......................................................................................24

Companies (Guernsey) Law 2008 § 350 .......................................................................................24

Tex. Rev. Civ. Stat. Ann. art. 581-33............................................................................................21

## Other Authorities

41 Tex. Jur. 3d Fraud & Deceit § 10..............................................................................................14

41 Tex. Jur. 3d Fraud & Deceit § 16......................................................................................14

41 Tex. Jur. 3d Fraud & Deceit § 8................................................................................ 13, 14

**Rules**

17 C.F.R. § 240.10b-5......................................................................................................22

Fed. R. Bankr. P. 3001(f) (2020) .....................................................................................11

000078

HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P.,[1] HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P., on behalf of funds and accounts under management (collectively, "**HarbourVest**") file this Response (the "**Response**") to the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906] (the "**Claim Objection**"), filed by Highland Capital Management, L.P. (the "**Debtor**" or "**Highland**"), and respectfully state as follows:

### Overview

1. HarbourVest's claims against Highland arise out of its November 15, 2017 investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("**HCLOF**") to acquire a 49% interest as a minority, passive investor (the "**Investment**"). Highland's actions preceding and following the Investment caused serious injury to HarbourVest, leading to damages well in excess of $100 million. On April 8, 2020, HarbourVest timely filed its proofs of claim, which are listed in the Debtor's claims register as claims number 143, 147, 149, 150, 153, and 154 (the "**Proofs of Claim**"), describing its claims (the "**HarbourVest Claims**").

2. After HarbourVest filed its Proofs of Claim, Highland filed the Claim Objection—an omnibus objection to 92 claims. Despite being a bare-bones, omnibus objection, the Claim Objection ostensibly contains substantive (though paper-thin) objections to dozens of claims, including HarbourVest's, tucked in among procedural and technical objections to other claims.

---

[1] HV International Secondary L.P.'s claim (#153) was not objected to by Highland, but is included herein out of an abundance of caution.

1

3.      The Claim Objection states that "each claim listed on Schedule 6 to the Order [including the HarbourVest Claims] erroneously asserts a claim against the Debtor which has no basis in the Books and Records and is not an obligation of the Debtor."  Claim Obj. ¶ 22.[2] Schedule 6 further lists the HarbourVest Claims as purportedly having "[n]o liability on the Debtor's books and records."  Claim Obj. Sched. 6.  That is the entirety of Highland's objection with respect to the HarbourVest Claims.  Highland makes no attempt to rebut *any* of the factual or legal bases of the well-founded HarbourVest Claims, and indeed filed the Claim Objection before even meaningfully engaging with HarbourVest regarding the HarbourVest Claims.[3]

4.      In addition to being deficient on its face and procedurally improper, the Claim Objection is simply inaccurate.  As described below, the HarbourVest Claims are indeed obligations of Highland, and Highland is well aware of the factual bases for them—namely, the misrepresentations, omissions, and other misconduct of Highland both prior to and during HarbourVest's Investment.  Highland's failure to book a liability associated with the damages its fraud and misconduct caused is no defense to the liability itself.

5.      The Claim Objection does not rebut HarbourVest's *prima facie* case for its Claims and fails on its face.  For the avoidance of doubt, however, this Response provides additional details regarding the HarbourVest Claims[4]—details of which Highland is well aware, clearly establishing HarbourVest's right to significant damages from Highland's misconduct and fraudulent inducement of HarbourVest's Investment in a fund that has merely served as a pawn

---

[2]     All citations herein to "A__" refer to Appendix A, filed concurrently herewith.  Due to their length, certain documents contained in the Appendix have been provided in excerpted form only.  Full copies are available upon request.

[3]     To the extent that Highland raises any substantive objections in a reply to this Response, HarbourVest expressly reserves its rights to move to strike and/or submit additional briefing as appropriate.

[4]     HarbourVest is supplementing its Proofs of Claim with these additional details.

2

in Highland's feud with a former employee (who Highland also defrauded). The Claim Objection should be overruled, and the HarbourVest Claims should be allowed.

### Factual Background

6.   The events giving rise to HarbourVest's claims begin in June 2016, when Highland terminated the employment of Joshua Terry ("**Terry**"), the employee who managed Highland's CLO business and served as CLO manager for Acis Capital Management L.P. ("**Acis LP**").[5] Litigation ensued between Terry and Highland in or around September 2016, with Terry claiming his termination was unlawful. 4/13/2018 Involuntary Ruling at 4.

7.   Around that time, on October 7, 2016, Acis LP sold Highland a participation interest in its expected future cash flow in CLO Collateral Management Agreements for $666,655 plus a $12,666,446 note payable from Highland to Acis LP (the "**Highland Note**"). *Id.* at 17. On May 31, 2017, a $3,370,694 payment was made on the Highland Note. *Id.*

8.   By summer 2017, HarbourVest was engaged in preliminary discussions with Highland regarding the Investment. On September 8, 2017, Highland sent HarbourVest a draft term sheet, which identified the target fund as "Acis Loan Funding, Ltd." and the fund's portfolio manager as Acis LP. As described below, during the course of negotiations, Highland unilaterally changed the name of the target fund (referred to herein as HCLOF) from "Acis Loan Funding, Ltd." to "Highland CLO Funding, Ltd." and swapped out Acis LP for Highland HCF Advisor, Ltd. ("**Highland HCF**") as portfolio manager, under false pretenses.

9.   On October 20, 2017, Terry won an arbitration award of $7,949,749.15 plus post-award interest against Acis (the "**Arbitration Award**"). 4/13/2018 Involuntary Ruling, at 4.

---

[5]   Findings of Fact & Conclusions of L. in Supp. of Ord. for Relief Issued After Trial on Contested Involuntary Bankr. Pets. at 3–4, *In re Acis Capital Mgmt., L.P.*, No. 18-30264-sgj11, (Bankr. N.D. Tex. Apr. 13, 2018), ECF No. 118 (hereinafter the "4/13/2018 Involuntary Ruling").

HarbourVest did not become aware of many of the facts described herein until long after their occurrence. HarbourVest's investigation of its claims and the surrounding factual circumstances is continuing.

000081

Shortly thereafter, Highland orchestrated several transfers (the "**Transfers**") that siphoned assets away from Acis.

10.    On October 24, 2017, HCLOF acquired HCLOF shares owned by Acis LP for $991,180.13.  *Id.* at 17–18.  As this Court previously described: "[n]o credible business justification was offered for this transaction, other than mostly uncorroborated (and self-serving) statements from Highland witnesses that Acis LP was 'toxic' in the market place (due to the litigation with Mr. Terry) and this was a step in the process of extricating Acis LP from the CLO business." *Id.* at 18.

11.    Thereafter, on October 27, 2017, Acis's portfolio management rights for HCLOF were transferred to Highland HCF.  *Id.* at 19.  Highland HCF entered into a Portfolio Management Agreement with HCLOF that superseded and replaced the HCLOF portfolio management agreements with Acis.  *Id.* at 19.  On November 3, 2017, Acis LP transferred its interest in the Highland Note to Highland CLO Management, Ltd.  *Id.* at 19–20.  The balance owing on the Note was over $9 million, but Acis received no consideration for the transfer. 1/31/2019 Confirmation Ruling, at 20–21, n.37.

12.    During diligence and negotiations preceding HarbourVest's Investment, Highland hid from HarbourVest its effort to strip Acis of assets.  When Highland changed HCLOF's portfolio manager from an Acis-branded entity to a Highland-branded entity, in addition to other structural changes, Highland stated that its reason for doing so was "reputational harm" to Acis LP from the Terry Arbitration Award.

13.    Further concealing its true motive—denuding Acis of value—Highland informed HarbourVest that, in lieu of redemptions, resetting the CLOs was necessary and that it would be easier to reset under the "Highland" CLO brand than the Acis CLO brand.  Through November

2017, Highland continued its misrepresentations and omissions regarding the Arbitration Award and structural changes to the HCLOF investment to conceal the true purpose of these maneuvers and their implications for the Investment. In reliance on these misrepresentations, HarbourVest finalized the Investment on November 15, 2017.

14. Highland's misrepresentations continued after the initial Investment was made. On November 27, 2017, in an email to HarbourVest attaching a Wall Street Journal article regarding the Terry Arbitration Award, Highland again assuaged HarbourVest's concerns regarding the dispute with Terry, claiming it "has no impact on our investment activities."

15. On December 18, 2017, a final judgment confirming the Terry Arbitration Award was entered in state court. 4/13/2018 Involuntary Ruling, at 4. On the same day, Mark Okada (a Highland founder) and Dugaboy Investment Trust (a family trust of Highland founder Jim Dondero) conveyed their limited partnership interests in Acis LP, 25% and 74.9%, respectively, to Neutra, Ltd. ("**Neutra**"), a company controlled by Highland.[6]

16. On December 19, 2017, Acis LP and Highland CLO Holdings Ltd. ("**Highland Holdings**") entered into 2017-7 Assignment and Transfer Agreement, which transferred to Highland Holdings all of Acis LP's interest in the Master Sub-Advisory Agreement and Staff and Services Agreement to manage Acis CLO 2017-7's portfolio to Highland Holdings. 4/13/2018 Involuntary Ruling, at 21. The agreement also transferred to Highland Holdings all of Acis LP's indirect equity interests in Acis CLO Management, allegedly for forgiveness of $2.8 million owed by Acis LP to Highland under the Shared Services Agreement and Sub-Advisory Agreement for CLO-7. *Id.*.

---

[6]     Bench Ruling & Mem. Of L. in Supp. of: (A) Final Approval of Disclosure Statement; & (B) Confirmation of Ch. 11 Tr.'s Third Am. Joint Plan at 16, *In re Acis Capital Mgmt.*, No. 18-30264-sgj11 (Bankr. N.D. Tex. Jan. 31, 2019), ECF No. 827 (hereinafter "1/31/2019 Confirmation Ruling"); 4/13/2018 Involuntary Ruling at 22.

000083

17.     On January 24, 2018, after Mr. Terry became aware of the Transfers involving Acis LP and HCLOF, he requested a temporary restraining order from the Texas state court that confirmed his arbitration award.  Plaintiff's Application for TRO, *Terry v. Acis Capital Mgmt, L.P.*, No. 17-15244 (Dist. Ct. Tex. Jan. 24, 2018), A156.  The state court ordered, with the agreement of Acis, that no CLO management contracts or money would be transferred away from Acis for a period of time.  Transcript of Hearing held on January 24, 2018 at 42-43, *Terry v. Acis Capital Mgmt, L.P.*, No. 17-15244 (Dist. Ct. Tex. Jan. 24, 2018), A225–26.

18.     On January 30, 2018, Terry filed involuntary bankruptcy petitions (together, the "**Acis Bankruptcy**") against Acis LP and its general partner, Acis Capital Management G.P. LLC ("**Acis GP**") , stating that the ongoing transfers and restructuring efforts were part of an "orchestrated, sophisticated effort to denude the Alleged Debtors of their assets and value." 4/13/2018 Involuntary Ruling, at 23.  On April 13, 2018, this Court issued a ruling in the Acis Bankruptcy concluding that the involuntary bankruptcy case was appropriately filed and that a "chapter 7 trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP" *Id.*, at 53.  On May 14, 2018, Robin Phelan was appointed as trustee (the "**Acis Trustee**") to oversee the Acis Bankruptcy.[7]

19.     Finally called to account for the Transfers, Highland again defaulted to its *modus operandi*: deception.  Highland made numerous fraudulent statements, including to this Court, accusing HarbourVest of causing the Transfers that denuded Acis LP, including the following:

- **Prior to the appointment of the Acis Trustee, Highland-controlled Acis falsely claimed that HarbourVest invested in HCLOF only on the condition that Acis would not have anything to do with the CLOs going forward, and that HarbourVest would demand its money back if a reset transaction was done with Acis:**

---

[7]     Chapter 11 Notice of Appointment of Tr. and of Amount of Bond, *In re Acis Capital Mgmt.*, No. 18-30264-sgj11 (Bankr. N.D. Tex. May 14, 2018), ECF No. 213, A230.

6

- "In May 2017, a private equity firm expressed an interest in making a $150 million investment in [HCLOF]. [HCLOF] was the investment vehicle used for the various Acis CLOs, including CLO-3. However, one of the conditions demanded by [HarbourVest] in making its investment was that [HCLOF] would instruct the reissuance of certain CLOs, including CLO-3 and would sever any continuing connection that Acis had with the CLOs, including removing it as Collateral Manager. [HCLOF] issued this instruction requested by [HarbourVest] on October 6, 2017 (two weeks *prior* to the arbitration award)."[8]

- **Highland witnesses claimed that HarbourVest said, with absolute certainty, that it had no interest in doing business with Acis because the Acis brand was toxic, including**:

  - Highland General Counsel Scott Ellington testified that HarbourVest had communicated to Highland that the Acis brand was "so toxic that it's impossible to sell the bonds with Acis as the manager," that "nothing can be associated with the Acis brand and be managed as a CLO or marketed as a CLO" and that they said "categorically, with absolute certainty, if there's any relation to Acis, the Acis brand, the Acis structure, we have no interest in doing business with you at all."[9]

  - Mr. Ellington further testified that HarbourVest had "demanded" that Highland "call the deal and terminate the [collateral management agreements] or transfer the [collateral management agreements]" and that "their only directive was call and get rid of Acis or get rid of Acis or we're not doing the deal through a reset."[10]

  - Highland CEO Jim Dondero claimed that the "Boston investor" deal was "all dependent upon getting as far away from Acis as possible and a new collateral manager."[11]

- **Highland witnesses claimed that HarbourVest had the ability to control and dictate the terms of any reset transactions, including**:

---

[8] Joint Obj. of Alleged Debtors to Emergency Mot. of Petitioning Creditor to Abrogate or Modify 11 U.S.C. § 303(F), Prohibit Transfer of Assets, and Impose, Inter Alia, 11 U.S.C. § 363 at ¶ 31, *In re Acis Capital Mgmt, L.P.* No. 18-30264-sgj11 (Bankr. N.D. Tex. Feb. 5, 2018), ECF No. 16 (emphasis in original), A247.

[9] Transcript of Hearing held on February 7, 2018, at 55–57, No. 18-30264-sgj11 (Bankr. N.D. Tex. Feb. 12, 2018), ECF No. 28 (hereinafter "2/7/2018 Acis Bankruptcy Transcript") (Testimony of Highland General Counsel Scott Ellington), A271–73.

[10] 2/7/2018 Acis Bankruptcy Transcript at 202–04, A276–78.

[11] Transcript of Hearing held on March 23, 2018 at 143–44, No. 18-30264-sgj11 (Bankr. N.D. Tex. Mar. 27, 2018), ECF No. 99 (Testimony of Highland CEO Jim Dondero), A288–89; *see also* 1/31/2019 Confirmation Ruling at 27, n. 56.

000085

- Mr. Ellington testified that because HarbourVest "would be putting in additional capital in connection with any reset CLOs, it had the ability to 'start calling the shots' and dictate the terms of any reset transactions." 2/7/2018 Acis Bankruptcy Transcript at 226, A281.

20. These and other statements led the Acis Trustee to investigate HarbourVest as the alleged perpetrator of the Transfers. Ultimately, the Acis Trustee served HarbourVest with broad Rule 2004 discovery requests seeking extensive information related to the Investment and a deposition of a corporate representative. HarbourVest complied with the Acis Trustee's requests, producing significant documentation and sitting for a deposition in the Acis Bankruptcy.

21. The HarbourVest investigation was not the only expensive sideshow that Highland's litigious behavior caused in the Acis Bankruptcy. At each step of the case, Highland and a veritable parade of its affiliates (Neutra, HCLOF, Highland HCF, CLO Holdco) filed objections and motions impeding the orderly progress of Acis's chapter 11 proceedings. To make matters worse, HarbourVest was effectively forced to foot the bill: many of the legal fees incurred by Highland and its affiliates were funded from the coffers of HCLOF, depleting the value of HarbourVest's Investment.

22. Despite Highland's assurance that the Terry Arbitration Award and related restructuring efforts would have no impact on Highland's investment activities or HarbourVest's Investment, Highland's misconduct and fraudulent Transfers necessitated a variety of injunctions that significantly impaired both the ability of HCLOF to operate as expected and the value of HarbourVest's investment. The below timeline details some of the constraints on HCLOF caused by Highland's misconduct and the additional litigation generated by it:

8

a. On April 30, 2018, HCLOF sent five notices requesting optional redemption, ordering a liquidation of the CLOs.[12]

b. On May 22, 2018, the Acis Trustee warned that HCLOF's attempted optional redemption notices violated the automatic stay.[13]

c. On May 30, 2018, Highland and HCLOF initiated adversary proceedings alleging that the Acis Trustee breached the applicable portfolio management agreements by failing to effectuate optional redemptions pursuant to the notices.[14]

d. On May 31, 2018, this Court issued a *sue sponte* temporary restraining order in the Acis Bankruptcy preventing any action in furtherance of the optional redemptions or other liquidation of the Acis CLOs.[15]

e. On June 14, 2018, HCLOF withdrew the optional redemption notices.[16]

f. On June 15, 2018, the TRO expired and HCLOF gave notice to the Acis Trustee that it was requesting an optional redemption. *Id.* at 3-4. However, the request was ultimately withdrawn on July 6, 2018.[17]

g. On June 21, 2018, the Acis Trustee filed an adversary proceeding against Highland seeking an injunction preventing Highland/HCLOF from taking steps towards a redemption.[18]

h. On July 10, 2018, this Court issued an injunction preventing optional redemptions while the Acis Trustee attempted to confirm a plan or otherwise resolve the Acis Bankruptcy.[19]

i. On August 30, 2018, this Court denied confirmation of the First Amended Joint Plan for the Debtors and ruled that the preliminary injunction must stay in place.

---

[12] Verified Original Compl. & Application for TRO & Prelim. Inj. at 14, *Phelan v. Highland Capital Mgmt, L.P.*, Adv. No. 18-03212-sgj (Bankr. N.D. Tex. June 21, 2018) (hereinafter "Acis Trustee Complaint"), A304.

[13] *Id.* at 14, 33.

[14] *Highland Capital Mgmt, L.P. v. Phelan*, Adv. No. 18-03078-sgj (Bankr. N.D. Tex.).

[15] Status Conference, *In re Acis Capital Mgmt., L.P.*, No. 18-30264-sgj11, (Bankr. N.D. Tex. May 31, 2018) ("Court issued Section 105 extraordinary TRO"); *see also* Temporary Restraining Order, *In re Acis Capital Mgmt., L.P.*, No. 18-30264-sgj11, (Bankr. N.D. Tex. June 6, 2018), ECF No. 256, A330.

[16] Acis Trustee Complaint at 3, A293.

[17] Highland CLO Funding, Ltd.'s Mot. to Dissolve Prelim. Inj. & Lift Automatic Stay at 5, *Phelan v. Highland Capital Mgmt, L.P.*, Adv. No. 18-03212-sgj (Bankr. N.D. Tex. Oct. 11, 2018), A344.

[18] *Phelan v. Highland Capital Mgmt, L.P.*, Adv. No. 18-03212-sgj (Bankr. N.D. Tex.).

[19] Prelim. Inj. Order at 10, *Phelan v. Highland Capital Mgmt, L.P.*, Adv. No. 18-03212-sgj (Bankr. N.D. Tex. July 10, 2018), ECF No. 21, A376.

000087

    j.     On March 20, 2019, following confirmation, HCLOF sent a letter to Acis LP stating that it is "neither interested in pursuing, nor able to pursue, a reset transaction."[20]

Highland's fraudulent scheme resulted in severe constraints on the HCLOF investment, including on its ability to redeem, refinance or reset the applicable CLOs, which is and was a critical element of maintaining and growing the value of the Investment. Rather than attempt to mitigate losses, Highland doubled down, further entrenching itself in its litigation positions.

23.     Highland concealed its Transfer scheme from HarbourVest before the Investment through a series of fraudulent actions, omissions, and misrepresentations, concealing the truth to lock HarbourVest into a long-term, illiquid investment that was—as a result of Highland's improper behavior—destined to fail. Had HarbourVest been properly informed of the full extent of behind-the-scenes transfers occurring involving Acis and HCLOF, and the true reasons they were made, it would never have made the Investment, and therefore would have avoided the severe price of being tangled up in Highland's web.

24.     One need look no farther than the rulings and filings in the Acis Bankruptcy to reach the conclusion that Highland's behavior was improper, illegal, and indeed, fraudulent:

- <u>April 13, 2018</u>: The Court ruled that Joshua Terry filed involuntary bankruptcy petitions against Acis LP and Acis GP due to a good faith belief that these transfers were part of an "***orchestrated, sophisticated effort to denude the Alleged Debtors of their assets*** and value." 4/13/2018 Involuntary Ruling, at 23.

- <u>July 2, 2018</u>: The Acis Trustee filed counterclaims against Highland, HCLOF, Highland HCF, Highland CLO Management, Ltd., and Highland Holdings ***alleging they orchestrated a systematic transfer of value away from Acis to other Highland entities*** after Terry's termination in 2016 through the period when the Terry Arbitration Award was issued to make Acis judgment-proof.[21]

---

[20]    Letter from M Maloney, King & Spalding LLP, to B. Shaw, Rogge Dunn Group (Mar. 20, 2019), A383.

[21]    Def.'s Answer, Affirmative Defenses, Counterclaims, & Third Party Claims at 17-18, *Acis Capital Mgmt GP, L.L.C. v. Highland Capital Mgmt, L.P.*, Adv. No. 18-03078-sgj (Bankr. N.D. Tex. July 2, 2018), ECF No. 23, A403–04.

10

- <u>Aug. 30, 2018</u>: Judge Jernigan ruled that preliminary injunction must stay in place because the "***evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value***." 8/30/2018 Plan Ruling at 6.

- <u>January 31, 2019</u>: This Court confirmed Acis's Third Amended Plan and concluded that: "The record contains substantial evidence of both ***intentional and constructive fraudulent transfers*** with regard to the Equity/ALF PMA and other assets. The ***numerous prepetition transfers*** that occurred around the time of and after the Terry Arbitration Award ***appear more likely than not to have been made to deprive the Debtor-Acis of value and with actual intent to hinder, delay or defraud the Debtors' creditors***. Highland's only purported business justifications for the prepetition transfers were that the Passive Investor demanded it and that the Debtor-Acis's brand was toxic in the market place. However, ***these business justifications were not supported (and, in fact, were contradicted) by the evidence***." 1/31/2019 Confirmation Ruling, at 27.

- <u>June 20, 2019</u>: The Acis Trustee filed an amended complaint asserting among other things, ***claims for intentional and constructive fraudulent transfer based on the prepetition transfers involving Acis***.[22]

25.    On October 16, 2019, Highland itself filed for bankruptcy in Delaware, *In Re Highland Capital Mgmt, L.P.*, No. 19-12239-css (Bankr. D. Del.), and on December 4, 2019, on motion of the Official Committee of Unsecured Creditors, its case was transferred to this Court.[23]

26.    On April 8, 2020, due to its damages sustained from the misconduct described above, HarbourVest filed its Proofs of Claim against Highland.

## Basis for Relief

## The Claim Objection Is Improper and Should Be Denied

27.    HarbourVest's Proofs of Claim have *prima facie* validity, and the Debtor must produce evidence sufficient to overcome this presumption. *See* 11 U.S.C. §§ 501, 502 (2020); Fed. R. Bankr. P. 3001(f) (2020) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim"); *see also*

---

[22]    Second Am. Compl. at 42-84, *Acis Capital Mgmt GP, L.L.C. v. Highland Capital Mgmt, L.P.*, Adv. No. 18-03078-sgj (Bankr. N.D. Tex. June 20, 2019), ECF No. 157, A466–508.

[23]    Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas, *In Re Highland Capital Mgmt, L.P.*, No. 19-12239-css (Bankr. D. Del. Dec. 4, 2019), ECF No. 184, A534.

000089

*Matter of Fid. Holding Co.*, 837 F.2d 696 (5th Cir. 1988) ("a correctly-filed proof of claim establishes a *prima facie* case against the debtor's assets"); *In re Armstrong*, 320 B.R. 97, 102 (Bankr. N.D. Tex. 2005) (same).  "Conclusory statements are insufficient to rebut [Rule] 3001(f)'s presumption."  *In re Today's Destiny, Inc.*, No. 05-90080, 2008 WL 5479109, at *4 (Bankr. S.D. Tex. Nov. 26, 2008).  Instead, the objecting party must put forth "evidence at least equal in probative force to that offered by the proof of claim." *Id.* (citations omitted).

28.    Highland's Claim Objection fails to put forward any evidence regarding the HarbourVest Claims.  It is a mere denial of the validity of the HarbourVest Claims, based on Highland's own say-so.  It fails to refute—or even address—the legal sufficiency of the HarbourVest Claims.  Highland cannot evade substantial claims by one of its largest creditors based on its illegal conduct with a one-sentence, unsupported, and blanket denial.  The Claim Objection should be overruled as to HarbourVest's Proofs of Claim as failing to satisfy even the most minimal legal requirements to object to a claim.

29.    The Claim Objection is also procedurally improper.  While styled as an "omnibus" objection pursuant to Bankruptcy Rule 3007(d), Highland's "no liability" objection has no basis at all in the rule.[24]  This is not just a procedural nicety.  Highland's attempt to style its conclusory-but-substantive denial of liability as a procedural objection buried in an omnibus objection underscores Highland's lack of substantive defenses on the merits of the claims in addition to its disregard for the bankruptcy process.

---

[24]    Federal Rule of Bankruptcy Procedure 3007(d) provides that "objections to more than one claim may be joined in an omnibus objection if all the claims were filed by the same entity, or the objections are based solely on the grounds that the claims should be disallowed, in whole or in part, because: (1) they duplicate other claims; (2) they have been filed in the wrong case; (3) they have been amended by subsequently filed proofs of claim; (4) they were not timely filed; (5) they have been satisfied or released during the case in accordance with the Code, applicable rules, or a court order; (6) they were presented in a form that does not comply with applicable rules, and the objection states that the objector is unable to determine the validity of the claim because of the noncompliance; (7) they are interests, rather than claims; or (8) they assert priority in an amount that exceeds the maximum amount under §507 of the Code."

12

### <u>The HarbourVest Claims Are Valid and Should Be Allowed</u>

30.     Highland has failed to carry its burden to rebut the *prima facie* case for the HarbourVest Claims.  Accordingly, the HarbourVest Claims should be allowed in full.  For clarity of the record, the HarbourVest Claims are described in detail below.

31.     In general, the HarbourVest Claims result from (i) Highland's material misrepresentations and omissions relating to the Investment, including the existence and purpose of Highland's scheme to denude Acis and avoid payment of the Arbitration Award; (ii) Highland's gross mismanagement of the HCLOF Investment; (iii) Highland's misuse of fund assets and improper charges to HCLOF; and (iv) Highland's continued fraudulent conduct and misrepresentations during the Acis bankruptcy.  Specifically, based on the above-described facts, HarbourVest has claims for, among other things: Fraud, Fraudulent Concealment, Fraudulent Inducement, Fraudulent Misrepresentation, Negligent Misrepresentation; Breach of Fiduciary Duties; Misuse of Fund Assets; U.S. State and Federal Securities Law Claims; Violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("**RICO**"); and Unfair Prejudice under the Guernsey Companies Law.

> **A.      Fraud, Fraudulent Inducement, Fraudulent Concealment, Fraudulent Misrepresentation, and Negligent Misrepresentation**

32.     A plaintiff pleading common law *fraud* must show (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.  41 Tex. Jur. 3d Fraud & Deceit § 8 (Aug. 2020); *see also JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018).  ***Fraudulent inducement*** occurs

000091

when, through fraud, a defendant induces another to enter into a contract through the use of fraudulent misrepresentations. 41 Tex. Jur. 3d Fraud & Deceit § 8; *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

33. Similarly, claims for *fraudulent concealment* or *fraud by omission* will lie where (1) the defendant concealed from or failed to disclose material facts to the plaintiff that the defendant had a duty to disclose; (2) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (3) the defendant was deliberately silent when the defendant had a duty to speak; (4) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (5) the plaintiff relied on the defendant's nondisclosure; and (6) the plaintiff was injured as a result of acting without the undisclosed facts. 41 Tex. Jur. 3d Fraud & Deceit § 16.

34. Similarly, under Guernsey law, a plaintiff may have a claim for *fraudulent misrepresentation* against a defendant that makes statements that he knows to be (or is reckless as to whether they are) false with the intent that they shall be acted on by another, who suffers damages as a result of reliance on those statements. *Derry v. Peek* (1889) 14 AC (HL) 337 (appeal taken from Eng.), A14. Damages extend to the loss actually suffered by the person as a result of the misrepresentation. *Doyle v. Olby (Ironmongers) Ltd.* (1969) 2 W.L.R. 673, A59.

35. *Negligent misrepresentation* is established when (1) the defendant made a representation in the course of the defendant's business; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. 41 Tex. Jur. 3d Fraud & Deceit § 10. Liability for negligent misstatements may also be asserted under Guernsey

14

law where shareholders suffer financial loss as a result of acquiring shares in reliance on any misstatements made carelessly, if the defendant owes the shareholder a duty of care.[25] *Hall v. Cable & Wireless Plc* (2009) EWHC 1793 (Comm), A75.

36.     Highland's conduct prior to the Investment presents a textbook case of fraud, fraudulent inducement, and fraudulent concealment and fraud by omission.  As Highland and HarbourVest were negotiating the terms of the Investment, Highland both concealed and misrepresented the nature of the Transfers undertaken to deprive Acis of assets and Highland's true intentions with respect to the Terry dispute and Arbitration Award.  These facts were material: indeed, HarbourVest expressed concern and requested further information regarding the Transfers, the Arbitration Award, and their implications for HCLOF and the Investment's closing date was delayed.  The nature and intent behind the Transfers, and Highland's plan to use HCLOF to fund its feud with Terry, were material facts misrepresented and concealed from HarbourVest in order to induce HarbourVest to invest with HCLOF.

37.     Highland's    multiple,    purposeful,    knowing,    reckless,    and/or    negligent misrepresentations and omissions include:

- Highland never informed HarbourVest that Highland had no intention of paying the Arbitration Award and was undertaking steps to ensure that Mr. Terry could not collect on his judgment;

- Highland did not inform HarbourVest that it undertook the Transfers to siphon assets away from Acis LP and that such transfers would prevent Mr. Terry from collecting on the Arbitration Award.  Instead, Highland simply did not inform HarbourVest and represented to HarbourVest that the reason for changing the portfolio manager for HCLOF was because Acis was "toxic" in the industry and alleged reputational issues relating to Acis would detrimentally affect the HCLOF investment;

---

[25]     As discussed below, during the course of the Investment, Highland owed fiduciary duties to HarbourVest as a "shadow director" or "de facto" director of HCLOF.

000093

- Highland indicated to HarbourVest that the dispute with Mr. Terry (which appeared on a litigation schedule presented to HarbourVest during diligence) would have no impact on investment activities;

- Highland expressed confidence in the ability of HCLOF to reset or redeem the CLOs, notwithstanding that Highland was using HCLOF as part of its scheme to avoid paying the Arbitration Award.

38.     Even assuming Highland's statements did not rise to the level of fraud (though they do), such statements were at minimum made negligently by Highland.

39.     In reliance on Highland's misrepresentations and omissions, HarbourVest invested in HCLOF.  Had these misrepresentations and omissions not occurred, HarbourVest would not have made the Investment.

40.     HarbourVest has been injured from the Investment: not only has the Investment failed to accrue value, its value plummeted.  The Investment's current value is far less than HarbourVest's initial contribution.  This enormous decline can be traced directly back to the fraudulent Transfer scheme that Highland hid from HarbourVest behind a smokescreen of misstatements and omissions, and Highland's subsequent conduct in connection therewith.  The situation has been further compounded by HCLOF's use to fund Highland's litigation and HarbourVest incurring its own out-of-pocket fees and expenses from the fallout.

**B.     Breach of Fiduciary Duties and Misuse of Fund Assets**

41.     Under Guernsey law, Highland constituted both a "shadow director" and a de facto director of HCLOF.  A shadow director is a person in accordance with whose directions or instructions the directors of the company are accustomed to act.  Companies (Guernsey) Law 2008 § 132(1).  A "de facto" director is a person or entity that similarly has practical decision-making control over a company under Guernsey law.  *Carlyle Capital Corporation Ltd. v. Conway & Others*, Royal Court of Guernsey, 4 September 2017, Judgment 38/2017, A2.  As a

16

shadow director and/or de facto director, Highland owed fiduciary duties to HarbourVest, which it breached by the conduct described herein.

42. At all times, Highland exercised complete control over HCLOF and over its Guernsey directors. Highland directed HCLOF's nominal directors, who acted in accordance with Highland's instructions, and Highland itself acted on behalf of HCLOF. Indeed, this Court has previously recognized evidence demonstrating that HCLOF operated at the behest of Highland, not its nominal directors:

- "It was enormously clear to the court. . . that the two Directors of HCLOF Guernsey are—stated in the kindest way possible—mere 'figureheads' for HCLOF Guernsey and they defer to Highland entirely to tell them what to do, what to say, and when." 1/31/2019 Confirmation Ruling, at 14.

- HCLOF Guernsey was "absolutely, beyond any reasonable doubt, controlled by Highland." 1/31/2019 Confirmation Ruling, at 17.

- The evidence was overwhelming that "(a) the HCLOF Guernsey Directors do whatever they are told to do by Highland; (b) they do not talk to anyone else but Highland; (c) they have never challenged Highland; (d) they let Highland pick and consult with their lawyers; and (e) they were not made aware by Highland of the Terry Arbitration Award, the Terry Judgment, the involuntary bankruptcy petitions, or pleadings that lawyers filed in the Bankruptcy Cases on HCLOF Guernsey's behalf…[Bill Scott] confirmed that all investment decisions were made by Highland." 1/31/2019 Confirmation Ruling, at 46.

- Ms. Bestwick "testified that she had never talked to the Passive Investor (who, of course, is a 49% owner of HCLOF Guernsey) or Grant Scott (the trustee of the charitable organization that owns 49% of HCLOF Guernsey). She reiterated that she only talks to Highland employees. . . . She testified that she learned of the Terry Arbitration Award in mid-April 2018 (some six months after the fact) and '[y]ou'd have to ask Highland' why it did not inform her sooner. Her testimony was clear that she defers to Highland on everything, stating that as directors they were 'heavily reliant on our service providers, and that means Highland.' With regard to a lawsuit that HCLOF Guernsey filed against Mr. Terry in Guernsey during the Bankruptcy Cases, she testified that it was neither her nor the other director, William Scott's, idea." 1/31/2019 Confirmation Ruling, at 43–44.

- Highland's expert, "Mr. Castro, testified that the 'actual humans' who would make the decision for HCLOF Guernsey as to whether to request an optional redemption of the Acis CLOs were not the HCLOF Guernsey directors but, rather, Highland executives Mr. Dondero, Mr. Okada, and Highland employee Mr. Covitz (acting for Highland HCF). Moreover, Mr. Alpern credibly testified that, before the Terry Arbitration Award, the Debtor-Acis, as the portfolio manager under the Equity/ALF PMA, rather than the

17

000095

HCLOF Guernsey's directors, issued the notices of optional redemption for HCLOF Guernsey." 1/31/2019 Confirmation Ruling, at 23.

43.    Highland's complete control of HCLOF is further confirmed by the deposition testimony of HCLOF's nominal directors.  In a deposition in the Acis Bankruptcy, HCLOF's then-Director Heather Bestwick testified that:

- She first learned about the Terry arbitration award from Highland in April 2018 and did not need to do any further independent verification because the directors relied on Highland to keep them updated.[26]

- She was unable to remember a time she disagreed with Mr. Scott or Highland.  *Id*. at 48:10–49:12, A539.

- Highland is involved in any substantive conversation about HCLOF, and Bestwick relied on Highland's advice and judgment as to what was in the best interest of investors.  *Id*. 50:10–24, 58:12–59:20, 67:13–68:7, 138:4–21 & 172:9–173:6, A540, 542, 544, 552 & 560.

- She lacked a command of the fees that Acis and Highland were receiving from HCLOF, and did not know whether Highland Capital might have differing interests from Highland HCF.  *Id.* at 99:10–100:11 & 155:13–20, A547, 556.

- Conversations with Highland were the extent of the due diligence done with respect to a new portfolio manager.  *Id*. 200:14–201:20, A562.

44.    Similarly, HCLOF then-Director William Scott testified that:

- The directors had "no knowledge" of litigation with Terry or the arbitration award until 2018; the litigation did not cause him to second-guess his relationship with Highland.[27]

- The directors went with the counsel selected by Highland to represent HCLOF.  *Id*. at 91:25–94:25, A566–67.

- Investment decisions for HCLOF are formulated by Highland; the role of the directors is just to "police" the performance of the service providers, and he has never disagreed with Ms. Bestwick or Highland on HCLOF matters.  *Id*. at 102:16–104:1, 105:22–107:17, A570–71.

---

[26]    Bestwick Dep. Tr. 60:18–61:19, 130:14–131:12, 133:4–133:21, 135:21–136:2, 136:17–137:5, 138:17–21, *In re Acis Capital Mgmt., L.P.*, No. 18-30264-sgj11 (Bankr. N.D. Tex. Dec. 3, 2018), A542–43, 550–52.

[27]    W. Scott Dep. Tr. 135:9–136:24, *In re Acis Capital Mgmt., L.P.*, No. 18-30264-sgj11 (Bankr. N.D. Tex. Dec. 3, 2018), A574.

18

- He did not take any steps to investigate the Terry situation; he got all information he knows about it from Highland. *Id.* at 140:13–145:5, A575–76.

- Highland has not made key information available to the directors of HCLOF. *Id.* at 263:20–265:23, A584. Scott himself lacked information about the various Transfers in 2017 that were conducted by Highland. *Id.* at 214:19–216:14, 220:6–221:11, A579–80.

45.     As a "shadow director" or "de facto" director of HCLOF, Highland breached several duties, including its duty of care, its duty to exercise powers for a proper purpose, its duty to avoid/mitigate conflicts of interest, and its duty to act in good faith and in the best interests of the company. Highland breached its fiduciary duties as a shadow/ de facto director as set out below.

46.     Highland is liable for breach of fiduciary duty for its continued misrepresentations and omissions relating to the Arbitration Award and the Transfers, including following HarbourVest's Investment, its conduct of litigation relating to Mr. Terry and the Acis Bankruptcy, and its mismanagement of HCLOF following the Investment.

47.     This includes the massive legal fees that were charged to HCLOF by Highland and Highland-related entities in furtherance of Highland's scheme. Since at least 2018, immense and unwarranted legal fees were borne by HCLOF's investors for Highland's scorched-earth litigation relating to Terry and the Acis Bankruptcy, including significant litigation costs that were not in the interests of HCLOF.

48.     As this Court noted, the Acis Bankruptcy proceedings "have been astonishingly contentious," with Highland, HCLOF, and Neutra "in 'lockstep' with one another in objecting to virtually every position taken by the Chapter 11 Trustee," and the Highland entities "have opposed virtually every action taken by the Chapter 11 Trustee during the Bankruptcy Cases, resulting in many long hearings." 1/31/2019 Confirmation Ruling, at 3, 11. This extensive litigation has spanned multiple jurisdictions (United States and Guernsey) and venues (state

000097

court, federal bankruptcy court, federal district and appellate courts), and included appeals of nearly every substantive ruling during the Acis Bankruptcy. HCLOF's investors—including HarbourVest—bore millions of dollars of legal fees incurred by numerous parties, including attorneys' fees for (i) HCLOF, (ii) Highland, (iii) Acis, (iv) Highland HCF and (v) various affiliated persons, entities and experts.

49.    No justifiable basis existed for Highland to cause HCLOF to pay Highland-related parties' expenses and fees arising from the Acis Bankruptcy. Those fees were grossly inappropriate, excessive, and unreasonable, caused by Highland's own malfeasance, and they are not covered under the HCLOF governing documents.

50.    On this point, it is worth underscoring that, to HarbourVest's knowledge, HCLOF has, to date, incurred more than **$15 million** in legal fees since 2018, much of which appears to be related to fighting an **$8 million** Arbitration Award. Even if such fees could appropriately be charged to HCLOF (and they cannot), the amount of legal fees incurred is grossly unreasonable. Highland's use of HCLOF assets to pay these astounding legal fees creates liability for its misuse of fund assets in gross breach of its duties as a sub-advisor and as a shadow / de facto director.

51.    In addition to the improper legal expenses, Highland's gross mismanagement of HCLOF includes Highland (i) directing the Trustee to sell numerous loans during the Acis Bankruptcy and (ii) failing to reset the CLOs and or consider alternatives in light of the court-ordered injunction on resets.[28]

---

[28]    *See, e.g.*, Acis Trustee Complaint at 29, n. 46 ("Defendants have options available that immediately mitigate any purported damage. Namely, Defendants could (1) authorize a 'refinance' or 'reset' transaction or (2) sell their equity to a third party in an amount that exceeds what they would receive in an Optional Redemption."), A319; Second Am. Compl. at 24–28, *Acis Capital Mgmt GP, L.L.C. v. Highland Capital Mgmt, L.P.*, Adv. No. 18-03078-sgj (Bankr. N.D. Tex. June 20, 2019), ECF No. 157 (Highland Capital "grossly mismanaged the CLOs" when it "failed to purchase a single loan for the CLOs . . . [and] in an apparent tactical move to accumulate cash in the CLOs . . . ordered that the Trustee sell numerous loans." When the Trustee found new parties to perform services under the Sub Agreements, Highland Capital "offered to provide the same services it was providing Acis for 17.5 basis points less than it previously charged, a tacit acknowledgement that

20

000098

### C.    Securities Claims

52.    HarbourVest also has state and federal securities fraud claims against Highland.

53.    Under the Texas Securities Act (the "**TSA**"), "[a] person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security." Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) (West).  Hence, "to recover under the TSA, a buyer of a security must prove that the security was sold by means of (1) an untrue statement of material fact or (2) an omission to state a material fact that is necessary in order to make the statements made not misleading." *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App. 2018).  A plaintiff need not show reliance, loss causation, or damages under the TSA.  *See id.*; *In re Skyport Glob. Commc'ns, Inc.*, No. 08-36737, 2011 WL 111427, at *47 (Bankr. S.D. Tex. Jan. 13, 2011).  In addition to primary violators, "[a] person who directly or indirectly controls a seller, buyer, or issuer of a security" or "who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security," is liable under the TSA "jointly and severally with the seller, buyer, or issuer and to the same extent as if he were the seller, buyer, or issuer."  Tex. Rev. Civ. Stat. Ann. art. 581-33 (F) (West).

54.    Section 10(b) of the Securities Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative

---

Highland had grossly overcharged Acis."), A448–52; 1/31/19 Confirmation Ruling at 29–30 ("[I]n this court's view, there is no real harm to Highland or the Co-Defendants because they can ask for a reset under the Plan. Mr. Scott, a director of HCLOF Guernsey, testified that HCLOF Guernsey can sell its interest in the subordinated notes in the market."); 1/31/19 Confirmation Ruling at 20 ("[A]fter Mr. Terry was terminated, the fees owed by the Debtor-Acis to Highland under these agreements shot up to an enormously higher level.").

000099

or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). And Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), makes it unlawful for "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange," to "employ any device, scheme, or artifice to defraud"; "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading"; or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

55.     The Supreme Court has recognized an implied private cause of action to enforce Section 10(b) and its implementing regulation, Rule 10b-5. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011). To state a claim under Section 10(b) and Rule 10b-5 based on an alleged misrepresentation or omission, a plaintiff must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (citations omitted). Joint and several liability for violations of Section 10(b) and Rule 10b-5 extends to "[e]very person who, directly or indirectly, controls any person liable under" Section 10(b) and Rule 10b-5 "to the same extent as such controlled person." 15 U.S.C. § 78t(a).

56.     Here, Highland, in connection with its sale of HCLOF shares to HarbourVest, made material misrepresentations and omitted material facts, as detailed above. That is sufficient to state a claim under the TSA. Those material misrepresentations and omitted

22

material facts likewise state a claim under federal law for the recovery of damages caused by Highland's fraud, because they were made with the intent to deceive HarbourVest, were relied upon by HarbourVest, and caused substantial losses to HarbourVest's investment.

**D.  RICO Claims**

57.     RICO makes it unlawful, among other things, for a person associated with an enterprise to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity.  *See* 18 U.S.C. § 1962(c).  Under RICO, any person injured in his business or property by reason of such a violation may recover treble damages and reasonable attorney's fees.  *See* 18 U.S.C. § 1964(c).

58.     Here, Highland engaged in a pattern of racketeering activity involving numerous predicate acts over multiple years, including mail, wire, and bankruptcy fraud, as part of a scheme to defraud Terry, obstruct the enforcement of his judgment, and obtain investor funding to further finance the scheme.  Highland committed these violations through its control of and conduct of the affairs of multiple enterprises, including Acis.

59.     In furtherance of that scheme, Highland committed further predicate acts of fraud and bankruptcy fraud as described at length herein, including when, prior to the appointment of the Acis Trustee, Highland caused Acis to make false statements with respect to HarbourVest in the Acis bankruptcy proceedings.  *See* 18 U.S.C. § 152(2), (3).  Highland's statements were made with knowledge of their falsity and caused HarbourVest significant damages as detailed above, including significant and unwarranted fees and expenses from the Acis Trustee's investigation, and Highland is liable for its pattern of deceptive and fraudulent behavior.

**E.  Unfair Prejudice**

60.     HarbourVest also has claims against Highland for unfair prejudice under Guernsey law.  Under Section 349 of the Companies (Guernsey) Law 2008, shareholders may

23

apply for relief where the affairs of a company have been conducted in a manner that is unfairly prejudicial to the applicant. § 349(1)(a). To succeed on such an application, the applicant need show only that: (1) the acts or omissions of which he complains of were acts of the Company, including acts taken by the board or a shadow director; (2) the conduct of those affairs has caused prejudice to the applicant's interests as a member of the Company, and (3) the prejudice is unfair. *Prodefin Trading Ltd. v. Midland Res. Holding Ltd.*, Royal Court of Guernsey, 14 February 2017, Judgment 7/2017, A91.

61. The court's remedial powers for an unfair prejudice claim are broad. Section 350 of the Guernsey Companies Law provides: "[i]f the Court is satisfied that an application under section 349 is well founded it may make such order as it thinks fit for giving relief in respect of the matters complained of." Such relief may include ordering a buyout of the applicant's interests as a member of the Company at a price adjusted to reflect what the value of such interests *would have been* had the prejudicial conduct not taken place. *Id.*; see also *Re Bird Precision Bellows Ltd.* (1985) 3 All ER 523, A117. Relief is commonly granted against those who have caused the unfairly prejudicial conduct, including non-members of the company, where it is just to do so. *Re Little Olympian Each-Ways Ltd.* (1994) 2 BCLC 420, A140.

62. HarbourVest has been unfairly prejudiced by the full range of Highland's actions and behavior described above, including (i) the fraudulent Transfers immediately preceding and following the Investment, as well as misrepresentations and omissions regarding those Transfers and the Arbitration Award; (ii) breaches of fiduciary duty by Highland as shadow or de facto director of the Company; (iii) misuse of fund assets and legal fee charges to HCLOF; (iv) mismanagement of the HCLOF investment by Highland; and (v) Highland's false statements about HarbourVest, including to this Court, accusing HarbourVest of perpetrating the Transfers.

24

Such actions warrant relief based upon what the value of HarbourVest's interests in HCLOF *would have been* had Highland not engaged in such misconduct—a value that far exceeds the Investment's current value.

### Prayer for Relief

63.    HarbourVest respectfully requests: (i) this Court deny and overrule the Claim Objection with respect to HarbourVest's Proof of Claim, (ii) sustain and allow HarbourVest's Proofs of Claim, and (iii) grant HarbourVest such other and further relief to which it may be justly entitled, both at law and in equity.

Dated:   Dallas, Texas                          */s/ Vickie L. Driver*
             September 11, 2020              Vickie L. Driver (No. 24026886)
                                                            Crowe & Dunlevy, P.C.


**CROWE & DUNLEVY, P.C.**
Vickie L. Driver
2525 McKinnon Street, Suite 425
Dallas, TX 75201
Telephone: 214-420-2142
vickie.driver@crowedunlevy.com

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (*pro hac vice pending*)
Erica S. Weisgerber (*pro hac vice pending*)
Daniel E. Stroik (*pro hac vice pending*)
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
Email: nlabovitz@debevoise.com
Email: eweisgerber@debevoise.com
Email: destroik@debevoise.com

*Attorneys for HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P., on behalf of funds and accounts under management*

25

000103

Docket #1625 Date Filed: 12/23/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING**
**SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)**
**AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



¦1934054201223000000000013¦
000104

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest").  In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

2

## RELEVANT BACKGROUND

### A. Procedural Background

3. On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4. On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5. On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6. On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7. In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8. On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9. The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

DOCS_NY:41802.6 36027/002

### B. Overview of HarbourVest's Claims

10.     HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.     In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.     HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

4

C.      **Summary of HarbourVest's Factual Allegations**

14.     At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP").  Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.     The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court.  Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.     HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.     For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes").  The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award.  The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.     In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

000108

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19.    Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20.    After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof.  The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21.    On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC.  *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case").  The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee").  A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

000109

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.     The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.     On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.     The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF."  *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.     HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25.    Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.    On September 11, 2020, HarbourVest filed its Response.  The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.    On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion").  In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.    Settlement Discussions**

28.    In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.    In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims.  In the pursuit thereof, the parties and their

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30. During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31. After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

**F.** **Summary of Settlement Terms**

32. The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

*See generally* Morris Dec. Exhibit 1.

## **BASIS FOR RELIEF REQUESTED**

33.      Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.      Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.      In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36. There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37. First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38. The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39. Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40. Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

<u>**NO PRIOR REQUEST**</u>

41. No previous request for the relief sought herein has been made to this, or any other, Court.

<u>**NOTICE**</u>

42. Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:41802.6 36027/002

000116

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "Debtor"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "HarbourVest Party," and collectively, "HarbourVest"), on the other hand. Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "Bankruptcy Court");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("HCLOF") and acquired an a 49.98% ownership interest in HCLOF (the "HarbourVest Interests");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "HarbourVest Claims"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response");

**WHEREAS**, on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion" and together with the HarbourVest Response, the "HarbourVest Pleadings");

1

**EXECUTION VERSION**

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

    (a) In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i) an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii) an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b) On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

    (a) Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

2

**EXECUTION VERSION**

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

**EXECUTION VERSION**

4.     <u>**Representations and Warranties**</u>. Subject in all respects to Section 3 hereof:

(a)     each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)     the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.     <u>**Plan Support.**</u>

**(a)**     Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) <u>not</u> (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; <u>provided</u>, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)     In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)     The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "<u>Support Termination Event</u>"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.    **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.    **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.    **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9. **Advice of Counsel**. Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10. **Entire Agreement**. This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11. **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12. **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13. **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

**EXECUTION VERSION**

      14.      **Governing Law; Venue; Attorneys' Fees and Costs**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

7

**EXECUTION VERSION**

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its: CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

US-DOCS\115534291.12

000124

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

9

000125

# Exhibit A

000126

**TRANSFER AGREEMENT**

**FOR ORDINARY SHARES OF**

**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of December [__], 2020 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following:  HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c.  Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d.  Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e.  This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2.  <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b.  This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c.  The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d.  The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e.  The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 183646253v.3

000128

3.  <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4.  <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5.  <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

   Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6.  <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

ActiveUS 183646253v.3

000129

b.   The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c.   This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d.   The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e.   This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f.   Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g.   This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 183646253v.3

**000130**

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.


**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its:  Member


By: _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer


**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**


By: _____

Name:  James P. Seery, Jr.

Title:  President


**FUND:**
**Highland CLO Funding, Ltd.**


By: _____

Name:

Title:

ActiveUS 183646253v.3

**000131**

*[Additional Signatures on Following Page]*

ActiveUS 183646253v.3

000132

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By:  HarbourVest Partners, LLC


By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest 2017 Global AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
        Its General Partner


By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
       Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
       Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
       Its General Partner


By: _____

Name: Michael Pugatch

Title: Managing Director

7

000133

**HarbourVest 2017 Global Fund L.P.**

By:     HarbourVest 2017 Global Associates L.P.
          Its General Partner

By:     HarbourVest GP LLC
          Its General Partner

By:     HarbourVest Partners, LLC
          Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

8

**Exhibit A**

| **Transferee Name** | **Number of Shares** | **Percentage** |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | [_____] | [_____] |
| HarbourVest 2017 Global AIF L.P. | [_____] | [_____] |
| HarbourVest 2017 Global Fund L.P. | [_____] | [_____] |
| HV International VIII Secondary L.P. | [_____] | [_____] |
| HarbourVest Skew Base AIF L.P. | [_____] | [_____] |

ActiveUS 183646253v.3

000135





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 20, 2021**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | § Case No. 19-34054-sgj11 |
| Debtor. | § |
| | § |

## ORDER APPROVING DEBTOR'S SETTLEMENT
## WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
## AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.



Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "Morris Declaration"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "Dondero Objection"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "Trusts' Objection"), filed by the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "CLOH Objection" and collectively, with the Dondero Objection and the Trusts' Objection, the "Objections"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Debtor's Reply"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "HarbourVest Reply"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "Hearing"), including assessing the credibility of the witnesses; and (j) the

2

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **Exhibit 1**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

DOCS_NY:41987.4 36027/002

4.    All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5.    The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6.    Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7.    The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

4

000139

# <u>EXHIBIT 1</u>

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "Debtor"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "HarbourVest Party," and collectively, "HarbourVest"), on the other hand. Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "Bankruptcy Court");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("HCLOF") and acquired an a 49.98% ownership interest in HCLOF (the "HarbourVest Interests");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "HarbourVest Claims"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response");

**WHEREAS**, on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion" and together with the HarbourVest Response, the "HarbourVest Pleadings");

1

EXECUTION VERSION

WHEREAS, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

WHEREAS, the Debtor disputes the HarbourVest Claims;

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

WHEREAS, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

WHEREAS, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

NOW THEREFORE, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.  **Settlement of Claims.**

    (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests.  The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2.  **Releases.**

    (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

2

**EXECUTION VERSION**

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii)  each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

US-DOCS\115534291.12

EXECUTION VERSION

4. **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)    each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)    the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5. **Plan Support.**

(a)    Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)    In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)    The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6. **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims. Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7. **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8. **Notice**. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.     **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

US-DOCS\115534291.12

**000146**

**EXECUTION VERSION**

      14.     <u>**Governing Law; Venue; Attorneys' Fees and Costs**</u>. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

US-DOCS\115534291.12

**000147**

**EXECUTION VERSION**

**IT IS HEREBY AGREED.**

                     **HIGHLAND CAPITAL MANAGEMENT, L.P.**

                     By:     /s/ James P. Seery, Jr.
                     Name:  James P. Seery, Jr.
                     Its:     CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name:  Michael Pugatch
Its:     Managing Director

US-DOCS\115534291.12

000148

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

9

000149

# Exhibit A

**TRANSFER AGREEMENT
FOR ORDINARY SHARES OF
HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of January \_\_\_\_, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on <u>Exhibit A</u> hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. <u>Transfer of Shares and Advisory Board</u>

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c.  Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of  the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d.  Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e.  This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2.  <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b.  This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c.  The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d.  The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e.  The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 184668980v.2

3. <u>Transferors' Representations and Warranties</u>. Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

c. As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>. Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

a. each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

b. the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

Prior to the Effective Date the Transferee shall procure that:

c. the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

a. Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

3

000153

b.   The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c.   This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d.   The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e.   This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f.   Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g.   This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 184668980v.2

**000154**

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its:  Member

By:  _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By:  _____

Name:  James P. Seery, Jr.

Title:  President

**FUND:**
**Highland CLO Funding, Ltd.**

By:  _____

Name:

Title:

*[Additional Signatures on Following Page]*

5

**000155**

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

6

**HarbourVest 2017 Global Fund L.P.**

By:    HarbourVest 2017 Global Associates L.P.
        Its General Partner

By:    HarbourVest GP LLC
        Its General Partner

By:    HarbourVest Partners, LLC
        Its Managing Member


By: _____

Name: Michael Pugatch

Title: Managing Director


*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

7

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|-----------------|------------------|------------|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

ActiveUS 184668980v.2

000158

Docket #1943  Date Filed: 02/22/2021



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 22, 2021**

_____    **United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |

**ORDER (I) CONFIRMING THE FIFTH AMENDED**
**PLAN OF REORGANIZATION OF HIGHLAND CAPITAL**
**MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF**

The Bankruptcy Court[2] having:

a.    entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "<u>Disclosure Statement Order</u>"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below).  The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

EXHIBIT A-5



1934054210222000000000000018

*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "Disclosure Statement") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.  set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "Objection Deadline"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, supplemented or modified, the "Plan");

c.  set January 5, 2021, at 5:00 p.m. prevailing Central Time, as the deadline for voting on the Plan (the "Voting Deadline") in accordance with the Disclosure Statement Order;

d.  initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.  reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "Confirmation Hearing Notice"), the form of which is attached as Exhibit 1-B to the Disclosure Statement Order;

f.  reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "Plan Supplements");

g.  reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.   reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.   reviewed: (i) the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.     reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.     conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.     heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.    considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

DOCS_SF:104487.21 36027/002

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.     **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.     **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

000163

for this process, among other duties specified in the Plan's Claimant Trust Agreement.  There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3.    **Confirmation Requirements Satisfied.**  The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7.  Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code.  The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4.    **Not Your Garden Variety Debtor**.  The Debtor's case is not a garden variety chapter 11 case.  The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940.  It was founded in 1993 by James Dondero and Mark Okada.  Mark Okada resigned from his role with Highland prior to the

000164

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020, pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for and/or control numerous non-debtor entities in the complex Highland enterprise.

       5.      **The Debtor**. The Debtor is headquartered in Dallas, Texas. As of the Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned: (a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general partner.

       6.      **The Highland Enterprise.** Pursuant to various contractual arrangements, the Debtor provides money management and advisory services for billions of dollars of assets, including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these assets are managed by the Debtor pursuant to shared services agreements with certain affiliated entities, including other affiliated registered investment advisors. In fact, there are approximately 2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

7. **Debtor's Operational History.** The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.  For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business.  The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits."  The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8. **Not Your Garden Variety Creditor's Committee**.  The Debtor and this chapter 11 case are not garden variety for so many reasons.  One of the most obvious standouts in this case is the creditor constituency.  The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11.  For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  The Debtor also did not have problems with its trade vendors or landlords.

000166

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a.    **The Redeemer Committee of the Highland Crusader Fund (the "<u>Redeemer Committee</u>")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b.    **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("<u>Acis</u>")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c.   **UBS Securities LLC and UBS AG London Branch ("UBS").** UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d.   **Meta-E Discovery ("Meta-E").** Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9.   **Other Key Creditor Constituents.** In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

10

000168

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10. **Other Claims Asserted.** Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11. **Not Your Garden Variety Post-Petition Corporate Governance Structure**. Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

11

000169

Delaware to Dallas.  Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

12.    **Post-Petition Corporate Governance Settlement with Committee.**  After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5]  As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand.  As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor. The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

DOCS_SF:104487.21 36027/002

000170

13.    **Appointment of Independent Directors.**    As part of the Bankruptcy Court-approved settlement, three eminently qualified independent directors were chosen to lead Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are each technically independent directors of Strand (Mr. Dondero had previously been the sole director of Strand and, thus, the sole person in ultimate control of the Debtor).  The three independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr. Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.  Suffice it to say that this settlement and the appointment of the independent directors changed the entire trajectory of the case and saved the Debtor from the appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent directors.  They were the right solution at the right time.  Because of the unique character of the Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent directors was a far better outcome for creditors than the appointment of a conventional chapter 11 trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in particular, knew and had vast experience at prominent firms with high-yield and distressed investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis, the former affiliate of Highland that the Bankruptcy Court presided over and which company was

000171

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience. While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland complex shortly after he was appointed (which the Bankruptcy Court had to address). The Acis trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14. **Conditions Required by Independent Directors.** Given the experiences in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer, as it would be in an ordinary chapter 11 case. The independent board members were stepping into a morass of problems. Naturally, they were worried about getting sued no matter how defensible their efforts—given the litigation culture that enveloped Highland historically. Based on the record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything always ended in litigation at Highland. The Bankruptcy Court heard credible testimony that none of the independent directors would have taken on the role of independent director without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent directors without the Bankruptcy Court's prior authority. This gatekeeper provision was also

14

000172

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on July 16, 2020.[7] The gatekeeper provisions in both the January 9 Order and July 16 Order are precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine" (first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)). The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16 Order, and no one appealed either of those orders. As noted above, Mr. Dondero signed the Stipulation that led to the settlement that was approved by the January 9 Order. The Bankruptcy Court finds that, like the Committee, the independent board members have been resilient and unwavering in their efforts to get the enormous problems in this case solved. They seem to have at all times negotiated hard and in good faith, which culminated in the proposal of the Plan currently before the Bankruptcy Court. As noted previously, they completely changed the trajectory of this case.

15. **Not Your Garden Variety Mediators.** And still another reason why this was not your garden variety case was the mediation effort. In the summer of 2020, roughly nine months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis, UBS, the Redeemer Committee, and Mr. Dondero. The Bankruptcy Court selected co-mediators because mediation among these parties seemed like such a Herculean task—especially during COVID-19 where people could not all be in the same room. Those co-mediators were: Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

DOCS_SF:104487.21 36027/002

**000173**

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16. **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**. Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

DOCS_SF:104487.21 36027/002

000174

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned and/or controlled by him and that filed the following objections:

a. *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b. *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c. A *Joinder to the Objection filed at 1670 by: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d. *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e. *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676]. The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17. **Questionability of Good Faith as to Outstanding Confirmation Objections.** Mr. Dondero and the Dondero Related Entities technically have standing to object to the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections. In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors. Mr. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan. As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring. The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18.     **Remote Interest of Outstanding Confirmation Objectors.** To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately. First, Mr. Dondero has a pending objection to the Plan. Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture). Mr. Dondero owns no equity in the Debtor directly. Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor. Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good"). The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor. *See* Disclosure Statement at 7, n.3. The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero. Get Good

18

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which the Debtor believes arise from Get Good's equity security interests and are subject to subordination as set forth in its Confirmation Brief. Dugaboy filed three claims against the Debtor: (a) an administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor asserts should be subordinated. Another group of objectors that has joined together in one objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See* Docket No. 1863. The Bankruptcy Court understands they assert disputed administrative expense claims against the estate that were filed shortly before the Confirmation Hearing on January 23, 2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No. 1888]. At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and Funds that the Funds have independent board members that run the Funds, but the Bankruptcy Court was not convinced of their independence from Mr. Dondero because none of the so-called independent board members have ever testified before the Bankruptcy Court and all have been engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request, and he is currently employed by Mr. Dondero. Moreover, Dustin Norris, a witness in a prior proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

DOCS_SF:104487.21 36027/002

000177

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities. Finally, various NexBank entities objected to the Plan. The Bankruptcy Court does not believe they have liquidated claims against the Debtor. Mr. Dondero appears to be in control of these entities as well.

19. **Background Regarding Dondero Objecting Parties.** To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith. Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero. In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence. Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing. The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20. **Other Confirmation Objections.** Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

000178

Debtor release provisions. In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

a. *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

b. *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

c. *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

d. *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679]. This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

e. *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

f. *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678]. This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

21. **Capitalized Terms.** Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

DOCS_SF:104487.21 36027/002

22.     **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.     **Chapter 11 Petition.**  On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.     **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

22

000180

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25. **Plan Supplement Documents.** Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements. The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26. **Retained Causes of Action Adequately Preserved.** The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27. **Plan Modifications Are Non-Material.** In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the "Plan Modifications"). Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. None of the modifications set forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because, among other things, they do not materially adversely change the treatment of the claims of any creditors or interest holders who have not accepted, in writing, such supplements and modifications. Among other things, there were changes to the projections that the Debtor filed shortly before the Confirmation Hearing (which included projected distributions to creditors and a comparison of projected distributions under the Plan to potential distributions under a hypothetical chapter 7 liquidation). The Plan Supplements and Plan Modifications did not mislead or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan. Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021 [Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors or interest holders but, rather, simply update the estimated distributions based on Claims that were settled in the interim and provide updated financial data. The filing and notice of the Plan Supplements and Plan Modifications were appropriate and complied with the requirements of

DOCS_SF:104487.21 36027/002

000182

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required. The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code. The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28. **Notice of Transmittal, Mailing and Publication of Materials.** As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29. **Voting.** The Bankruptcy Court has reviewed and considered the Voting Certifications. The procedures by which the Ballots for acceptance or rejection of the Plan were

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30.    **Bankruptcy Rule 3016(a).**  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31.    **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**  As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32.    **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).**  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33.    **Classification of Secured Claims.**  Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors.  Class 3 (Other

000184

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34.    **Classification of Priority Claims.**  Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims.  Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35.    **Classification of Unsecured Claims.**  Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8.  Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims).  The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor.  Class 8 Creditors

DOCS_SF:104487.21 36027/002

000185

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36.     **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37.     **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

000187

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39.     **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).** Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan. Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40.     **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).** Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes. Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41.     **No Discrimination (11 U.S.C. § 1123(a)(4)).** The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan. Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

42. **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**  Article IV of the Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the establishment of:  (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor; and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are included in the Plan Supplements.

a.    **The Claimant Trust.**  The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner).  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.  Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement.  The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b.    **The Litigation Sub-Trust.**  The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement.    The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

DOCS_SF:104487.21 36027/002

      c.    **The Reorganized Debtor**.   The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action.  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan.  The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors.  Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests).  Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan.  Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents.  Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

      43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).**  The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code.  Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

44. **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).** Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee. The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board. The Claimant Trust Oversight Board will consist of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker. Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee. Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors. They are therefore intimately familiar with the Debtor, its business, and assets. The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties. The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

45.    **Selection of Trustees.**  The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee.  As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record.  The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan. Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee.  Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks.  Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally.  Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date.  The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae.  Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

34

000192

Confirmation Hearing and in the Confirmation Brief. Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries. The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders. Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46.     **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47.     **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.** Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order. In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

35

000193

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not

entitled to vote on the Plan pursuant to the Disclosure Statement Order.  The Disclosure Statement

Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity

Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan,

and the deadlines for voting on and objecting to the Plan.  The Debtor and KCC each complied

with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying

sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and

Publication.  The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides

that the same disclosure statement must be transmitted to each holder of a claim or interest in a

particular class.  The Debtor caused the same Disclosure Statement to be transmitted to all holders

of Claims and Equity Interests entitled to vote on the Plan.  The Debtor has complied in all respects

with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure

Statement Order.  The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain

Dondero Related Entities that the changes made to certain assumptions and projections from the

Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation

Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the

Plan.  The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to

the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections.

Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the

changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial

Projections do not constitute materially adverse change to the treatment of Claims or Equity

Interests. Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data. Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets. The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48. **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).** The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

    a.    The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

37

b.     The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.     Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.     While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.     On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation. As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.     On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero. The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.     The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020. The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.     Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.     Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

DOCS_SF:104487.21 36027/002

49. **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**
Article II.B of the Plan provides that Professionals will file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such claims. The procedures set forth in the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

50. **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).** Article IV.B of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee and the members thereto. For the reasons more fully explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation of any insider to be employed or retained by the Reorganized Debtor, if applicable, and compensation for any such insider. The appointment of such individuals is consistent with the interests of Claims and Equity Interests and with public policy. Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

51. **No Rate Changes (11 U.S.C. § 1129(a)(6)).** The Plan does not provide for any rate change that requires regulatory approval. Section 1129(a)(6) of the Bankruptcy Code is thus not applicable.

52.   **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**  The "best interests" test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  On October 15, 2020, the Debtor filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its advisors and which was attached as Exhibit C to the Disclosure Statement.  On January 29, 2021, in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor provided an updated version of the Liquidation Analysis to the then-objectors of the Plan, including Mr. Dondero and the Dondero Related Entities.  On February 1, 2021, the Debtor filed the Amended Liquidation Analysis/Financial Projections.   The Amended Liquidation Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues, and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in market conditions and other factors; (3) expected revenues and expenses arising in connection with the Debtor's continued management of the CLOs pursuant to management agreements that the Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding two or three employees to assist in the management of the CLOs, the Debtor also increased modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and professional fees; and (5) an increase in projected recoveries on notes resulting from the

acceleration of term notes owed to the Debtor by the following Dondero Related Entities: NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC). Under the Plan, as of the Confirmation Date, (a) Class 7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b) Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on account of their Claims. Under a hypothetical chapter 7 liquidation, all general unsecured creditors are projected to receive approximately 55% on account of their Claims. The Bankruptcy Court finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation based on Mr. Seery's testimony, including the following credible reasons he posited, among others:

a.    The nature of the Debtor's assets is complex. Certain assets relate to complicated real estate structures and private equity investments in operating businesses. Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

b.    Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

c.    A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

d.    The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

e.    The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.    **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).**  Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan.  Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.    **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).**  The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

42

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55.     **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).** Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider. Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56.     **Feasibility (11 U.S.C. § 1129(a)(11)).** Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor. The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets. The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan. The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors. Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note. The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date. Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

000201

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the Claimant Trust Agreement. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57. **Payment of Fees (11 U.S.C. § 1129(a)(12)).** All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code. The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.

58. **Retiree Benefits.** The Plan provides for the assumption of the Pension Plan (to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the Bankruptcy Code). Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to the extent applicable.

59. **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).** Sections 1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii) is not a nonprofit corporation (section 1129(a)(16)).

60. **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. § 1129(b)).** The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11, which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

44

000202

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy Code.

    a.    <u>Class 8</u>.  The Plan is fair and equitable with respect to Class 8 General Unsecured Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

    b.    <u>Class 10 and Class 11</u>.   There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly, and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10, and 11.

61. **Only One Plan (11 U.S.C. § 1129(c)).** The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62. **Principal Purpose (11 U.S.C. § 1129(d)).** Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds. Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63. **Satisfaction of Confirmation Requirements.** Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64. **Good Faith Solicitation (11 U.S.C. § 1125(e)).** The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65. **Discharge (11 U.S.C. § 1141(d)(3)).** The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code. Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

46

000204

in the same manner as the Debtor did prior to Plan confirmation, which includes the management of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund. Although the Plan projects that it will take approximately two years to monetize the Debtor's assets for fair value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be monetizing their assets, there is no specified time frame by which this process must conclude. Mr. Seery's credible testimony demonstrates that the Debtor will continue to engage in business after consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66. **Retention of Jurisdiction.** The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the Bankruptcy Code to the maximum extent under applicable law.

67. **Additional Plan Provisions (11 U.S.C. § 1123(b)).** The Plan's provisions are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68. **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).** The Debtor has exercised reasonable business judgment with respect to the rejection of the Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation Order, and such rejections are justified and appropriate in this Chapter 11 Case. The Debtor also filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No. 1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts"). With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8] Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69.     **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).** All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70.     **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).** The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876].

000206

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71. **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties. Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties. The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties. The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases. The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

DOCS_SF:104487.21 36027/002

000207

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.  The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions").  Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date.  The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring.    The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

   72. **Exculpation.** Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision").    As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent.  First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order.  The January 9 Order was not appealed.  In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence.  Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73.  **Existing Exculpation of Independent Directors.**  The Bankruptcy Court also finds and concludes that  it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order.  The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

DOCS_SF:104487.21 36027/002

000209

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987).  The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

> 74.    **The Exculpation Provision Complies with Applicable Law.**  Separate

and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), for several reasons:

a.    First, the statutory basis for *Pacific Lumber'*s denial of exculpation for certain parties other than a creditors' committee and its members is that section 524(e) of the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific Lumber*, 253 F.3d. at 253.  However, *Pacific Lumber* does not prohibit all exculpations under the Bankruptcy Code and the court in such case specifically approved the exculpations of a creditors' committee and its members on the grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers, implies committee members have qualified immunity for actions within the scope of their duties…. [I]f members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al, Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008]).  *Pacific Lumber's* rationale for permitted exculpation of creditors' committees and their members (which was clearly policy-based and based on a creditors' committee qualified immunity flowing from their duties under section 1103(c) of the Bankruptcy Code and their disinterestedness and importance in chapter 11 cases) does not preclude exculpation to other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members.  The Independent Directors, and by extension the Chief Executive Officer and Chief Restructuring Officer, were not

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order.  The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee.  In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation.  The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order.  Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process.  The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors.  The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity.  Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.  Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252.  If ever there was a risk of that happening in a chapter 11 reorganization, it is this one.  Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down."  The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

000211

75.    **Injunction.**  Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision").  The Injunction Provision is necessary to implement the provisions in the Plan.  Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value.  In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities.  Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero,  it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors.  The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142.  The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release."  The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law.   The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76.    **Gatekeeper Provision**.  Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision").   The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties.  Thereafter, if the Bankruptcy Court determines that the action is

54

000212

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan. The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77. **Factual Support for Gatekeeper Provision.** The facts supporting the need for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade. Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor. During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

000213

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the Dondero Related Entities be able to continue their litigation against the Debtor and its successors post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and (vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc. No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

78.    **Findings Regarding Dondero Post-Petition Litigation.**  The Bankruptcy Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down the place."  The Bankruptcy Court concludes that without appropriate protections in place, in the form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more hospitable to his claims.  The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that the threat of continued litigation by Mr. Dondero and his related entities after the Effective Date will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79.     **Necessity of Gatekeeper Provision.**  The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles.  The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance.  Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision.  Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll*) 850 F.3d 811 (5th Cir. 2017).  Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.  Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

000215

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective

Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between

Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such

agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80. **Statutory Authority to Approve Gatekeeper Provision.** The

Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under

sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a). The Gatekeeper Provision is also

within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126

(1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to

deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue

Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir.

2017).

81. **Jurisdiction to Implement Gatekeeper Provision.** The Bankruptcy Court

finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision

as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under

*United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d

296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge

Techs., Inc.)*, 430 F.3d 260 (5th Cir. 2005). Based upon the rationale of the Fifth Circuit in *Villegas

v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a

gatekeeper does not violate *Stern v. Marshall.* The Bankruptcy Court's determination of whether

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82.     **Resolution of Objections of Scott Ellington and Isaac Leventon**.  Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

a.     Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00.  Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection.  If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

b.     Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

c.     The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims.  The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.    The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims. As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.    Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant. Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan. Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan. If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims). In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims. Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.    Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7). If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.  The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date. If the Debtor does not make an election, then Option A will apply.

h.  Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.  Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.  The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.  For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court

at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

    **A.**    **Confirmation of the Plan.** The Plan is approved in its entirety and

**CONFIRMED** under section 1129 of the Bankruptcy Code. The terms of the Plan, including the

000219

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

B.      **Findings of Fact and Conclusions of Law**.  The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

C.      **Objections**.  Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference.  All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

D.      **Plan Supplements and Plan Modifications.**  The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

DOCS_SF:104487.21 36027/002

000220

sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The Plan Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the Bankruptcy Code. Accordingly, the Plan, as modified, is properly before the Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

**E. Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have accepted the Plan as modified by the Plan Modifications. No holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

**F. Vesting of Assets in the Reorganized Debtor.** Except as otherwise provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan upon the Effective Date. The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

000221

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

    **G.**    **Effectiveness of All Actions.**  All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

    **H.**    **Restructuring Transactions.**  The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

I.    **Preservation of Causes of Action.**  Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order).  In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

J.    **Independent Board of Directors of Strand.**  The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors.  For avoidance of doubt, the Assumed Contracts

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

**K.** **Cancellation of Equity Interests and Issuance of New Partnership Interests.** On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement. As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

66

Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

L. **Transfer of Assets to Claimant Trust.** On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax. Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

M. **Transfer of Estate Claims to Litigation Sub-Trust**. On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses. The Litigation Trustee will

000225

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor or Committee, as applicable, in any litigation commenced prior to the Effective Date in which Estate Claims are asserted.

        **N.**     **Compromise of Controversies.** In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

        **O.**     **Objections to Claims**. The Claims Objection Deadline shall be the date that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise provided under the Plan.

        **P.**     **Assumption of Contracts and Leases.** Effective as of the date of this Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the Plan. Each Assumed Contract shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to any of the

68

000226

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not

be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or

amount of any Claims that may arise in connection therewith. Assumption of the Assumed

Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to

the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether

monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed

Contracts.

> **Q.** **Rejection of Contracts and Leases.** Unless previously assumed during the

pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and

Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant

to the terms of the Plan. To the extent that any party asserts any damages resulting from the

rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty**

**(30) days** following entry of this Confirmation Order, or such claim will be forever barred and

disallowed against the Reorganized Debtor.

> **R.** **Assumption of Issuer Executory Contracts.** On the Confirmation Date,

the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer

Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.

In full and complete satisfaction of its obligation to cure outstanding defaults under section

365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a

cumulative amount of $525,000 (the "Cure Amount") as follows:

   a.   $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

   b.   $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

   **S.    Release of Issuer Claims.**  Effective as of the Confirmation Date, and to

the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and

former advisors, trustees, directors, officers, managers, members, partners, employees,

beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

DOCS_SF:104487.21 36027/002

000228

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

   **T.**   **Release of Debtor Claims against Issuer Released Parties.** Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts. Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

U. **Authorization to Consummate.** The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan. The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

V. **Professional Compensation.** All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

000230

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

W. **Release, Exculpation, Discharge, and Injunction Provisions. The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

X. **Discharge of Claims and Termination of Interests.** To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**Y.     Exculpation.**    Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

Z. **Releases by the Debtor.** On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person. Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

**AA. Injunction. Upon entry of this Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan. Except as expressly provided in the Plan, this Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property. Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

DOCS_SF:104487.21 36027/002

000235

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

BB. **Duration of Injunction and Stays.** Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.

CC. **Continuance of January 9 Order and July 16 Order.** Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 shall remain in full force and effect from the Confirmation Date and following the Effective Date.

DD. **No Governmental Releases.** Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

DOCS_SF:104487.21 36027/002

000236

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

EE. **Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

000237

including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

FF.     **Cancellation of Notes, Certificates and Instruments.**     Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the

000238

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

GG.    **Documents, Mortgages, and Instruments.**    Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

HH.    **Post-Confirmation Modifications.**    Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

II.    **Applicable Nonbankruptcy Law.**    The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

JJ.    **Governmental Approvals Not Required.**    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

81

000239

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

**KK.** **Notice of Effective Date.** As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c). Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

**LL.** **Substantial Consummation.** On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

**MM.** **Waiver of Stay.** For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

DOCS_SF:104487.21 36027/002

**000240**

NN.     **References to and Omissions of Plan Provisions.** References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO.     **Headings.** Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP.     **Effect of Conflict.** This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order. If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control. If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ.     **Resolution of Objection of Texas Taxing Authorities.** Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes. The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

000241

applicable nonbankruptcy law. In the event the 2020 taxes are paid after February 1, 2021, the Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor reserve any all rights and defenses in connection therewith.

a.      The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law. The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan. The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b.      The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full. In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default. Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default. If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith. The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

DOCS_SF:104487.21 36027/002

000242

**RR.    Resolution of Objections of Scott Ellington and Isaac Leventon.**

Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all respects.  The Debtor may, only with the consent of the Committee, elect Option B for a Senior Employee Claimant by written notice to such Senior Employee Claimant on or before the occurrence of the Effective Date.  If the Debtor does not elect Option B, then Option A will govern the treatment of the Liquidated Bonus Claims.

    a.    Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

    b.    The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

    c.    Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan.  Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

    d.    The Senior Employees' Objection is deemed withdrawn.

**SS.    No Release of Claims Against Senior Employee Claimants**.  For the avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

000243

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released Party" under the Plan.

**TT.** **Resolution of Objection of Internal Revenue Service.** Notwithstanding any other provision or term of the Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the "IRS Claim"):

(a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

(1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

(2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

(3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

UU. **IRS Proof of Claim.** Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

DOCS_SF:104487.21 36027/002

000245

**VV.    CLO Holdco, Ltd. Settlement**    Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25,2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW.    Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.    Payment of Statutory Fees; Filing of Quarterly Reports.**  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.  The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY.    Dissolution of the Committee**.  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

DOCS_SF:104487.21 36027/002

000246

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

**ZZ. Miscellaneous.** After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

000247

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post confirmation reporting requirements.

### ###END OF ORDER###

DOCS_SF:104487.21 36027/002

000248

**<u>Exhibit A</u>**

**Fifth Amended Plan (as Modified)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ...............................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law....................1

    B.    Defined Terms ......................................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS.................16

    A.    Administrative Expense Claims..........................................................16

    B.    Professional Fee Claims .....................................................................17

    C.    Priority Tax Claims............................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND EQUITY INTERESTS .................................................................18

    A.    Summary...........................................................................................18

    B.    Summary of Classification and Treatment of Classified Claims and Equity Interests ...............................................................................18

    C.    Elimination of Vacant Classes ...........................................................19

    D.    Impaired/Voting Classes ....................................................................19

    E.    Unimpaired/Non-Voting Classes ........................................................19

    F.    Impaired/Non-Voting Classes.............................................................19

    G.    Cramdown.........................................................................................19

    H.    Classification and Treatment of Claims and Equity Interests..............19

    I.    Special Provision Governing Unimpaired Claims................................24

    J.    Subordinated Claims..........................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ....................................24

    A.    Summary...........................................................................................24

    B.    The Claimant Trust ...........................................................................25

        1.    Creation and Governance of the Claimant Trust and Litigation Sub-Trust.................................................................................25

        2.    Claimant Trust Oversight Committee.....................................26

000251

**Page**

3.    Purpose of the Claimant Trust. ...............................................27

4.    Purpose of the Litigation Sub-Trust........................................27

5.    Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6.    Compensation and Duties of Trustees. ....................................29

7.    Cooperation of Debtor and Reorganized Debtor. ...................29

8.    United States Federal Income Tax Treatment of the Claimant Trust. ....................................................................................29

9.    Tax Reporting. ..........................................................................30

10.    Claimant Trust Assets. ............................................................30

11.    Claimant Trust Expenses. .......................................................31

12.    Trust Distributions to Claimant Trust Beneficiaries. ..............31

13.    Cash Investments. ...................................................................31

14.    Dissolution of the Claimant Trust and Litigation Sub-Trust. .................31

C.    The Reorganized Debtor .....................................................................32

1.    Corporate Existence ................................................................32

2.    Cancellation of Equity Interests and Release..........................32

3.    Issuance of New Partnership Interests .....................................32

4.    Management of the Reorganized Debtor ..................................33

5.    Vesting of Assets in the Reorganized Debtor ..........................33

6.    Purpose of the Reorganized Debtor .........................................33

7.    Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets ...................................33

D.    Company Action ..................................................................................34

E.    Release of Liens, Claims and Equity Interests....................................35

F.    Cancellation of Notes, Certificates and Instruments...........................35

000252

                                                                                    **Page**

G.    Cancellation of Existing Instruments Governing Security Interests..................35

H.    Control Provisions ........................................................................................35

I.     Treatment of Vacant Classes ........................................................................36

J.     Plan Documents ............................................................................................36

K.    Highland Capital Management, L.P. Retirement Plan and Trust ......................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
              LEASES ................................................................................................37

A.    Assumption, Assignment, or Rejection of Executory Contracts and
       Unexpired Leases..........................................................................................37

B.    Claims Based on Rejection of Executory Contracts or Unexpired
       Leases............................................................................................................38

C.    Cure of Defaults for Assumed or Assigned Executory Contracts and
       Unexpired Leases..........................................................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS...........................................39

A.    Dates of Distributions ...................................................................................39

B.    Distribution Agent ........................................................................................39

C.    Cash Distributions.........................................................................................40

D.    Disputed Claims Reserve ..............................................................................40

E.    Distributions from the Disputed Claims Reserve ...............................................40

F.    Rounding of Payments...................................................................................40

G.    *De Minimis* Distribution ..............................................................................41

H.    Distributions on Account of Allowed Claims.....................................................41

I.     General Distribution Procedures....................................................................41

J.     Address for Delivery of Distributions.................................................................41

K.    Undeliverable Distributions and Unclaimed Property ........................................41

L.    Withholding Taxes.........................................................................................42

- iii -

**Page**

M.     Setoffs ....................................................................................................... 42

N.     Surrender of Cancelled Instruments or Securities ................................... 42

O.     Lost, Stolen, Mutilated or Destroyed Securities .................................... 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
         UNLIQUIDATED AND DISPUTED CLAIMS ............................................ 43

A.     Filing of Proofs of Claim ........................................................................ 43

B.     Disputed Claims ....................................................................................... 43

C.     Procedures Regarding Disputed Claims or Disputed Equity Interests .............. 43

D.     Allowance of Claims and Equity Interests ............................................. 44

       1.     Allowance of Claims ..................................................................... 44

       2.     Estimation ..................................................................................... 44

       3.     Disallowance of Claims ................................................................ 44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ............................................. 45

A.     Conditions Precedent to the Effective Date ........................................... 45

B.     Waiver of Conditions ............................................................................... 46

C.     Dissolution of the Committee .................................................................. 46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................ 47

A.     General ...................................................................................................... 47

B.     Discharge of Claims ................................................................................. 47

C.     Exculpation ............................................................................................... 47

D.     Releases by the Debtor ............................................................................. 48

E.     Preservation of Rights of Action ............................................................. 49

       1.     Maintenance of Causes of Action ................................................ 49

       2.     Preservation of All Causes of Action Not Expressly Settled or
              Released ......................................................................................... 49

000254

**Page**

F.  Injunction ................................................................................................................50

G.  Duration of Injunctions and Stays.......................................................................51

H.  Continuance of January 9 Order ..........................................................................51

ARTICLE X. BINDING NATURE OF PLAN ...................................................................51

ARTICLE XI. RETENTION OF JURISDICTION..............................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ...........................................................54

A.  Payment of Statutory Fees and Filing of Reports ..............................................54

B.  Modification of Plan .............................................................................................54

C.  Revocation of Plan ...............................................................................................54

D.  Obligations Not Changed....................................................................................55

E.  Entire Agreement ..................................................................................................55

F.  Closing of Chapter 11 Case .................................................................................55

G.  Successors and Assigns........................................................................................55

H.  Reservation of Rights............................................................................................55

I.  Further Assurances................................................................................................56

J.  Severability ...........................................................................................................56

K.  Service of Documents ...........................................................................................56

L.  Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
    the Bankruptcy Code............................................................................................57

M.  Governing Law .....................................................................................................58

N.  Tax Reporting and Compliance ...........................................................................58

O.  Exhibits and Schedules ........................................................................................58

P.  Controlling Document .........................................................................................58

000255

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.     Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**B.**    **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.    "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.    "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.    "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.    "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.    "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

2

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.      "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.      "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.      "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.      "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

000258

15.     "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16.     "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19.     "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims.  The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20.     "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21.     "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22.     "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23.     "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

4

24.     "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25.     "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26.     "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27.     "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28.     "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29.     "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30.     "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

000260

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

000261

42.     "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43.     "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44.     "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved.  As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45.     "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46.     "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47.     "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48.     "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49.     "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50.     "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be:  (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

7

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51.    "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52.    "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53.    "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54.    "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55.    "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56.    "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57.    "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58.    "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59.    "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60.    "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61.    "*Estate Claims*" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [D.I. 354].

000263

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

000264

69.    "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.    "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.    "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.    "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.    "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.    "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.    "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.    "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.    "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.    "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.    "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.    "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

10

81.    "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.    "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.    "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.    "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.    "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.    "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.    "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.    "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.    "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.    "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.    "Petition *Date*" means October 16, 2019.

92.    "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

11

000266

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

000267

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

13

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109. "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110. "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111. "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

14

117. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128. "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129. "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

15

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.      Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

000271

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.  **Professional Fee Claims**

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.  **Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

000272

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

### A.      Summary

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

### B.      Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
| --- | --- | --- | --- |
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

18

C.    **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

D.    **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

E.    **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

F.    **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

G.    **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.    **Classification and Treatment of Claims and Equity Interests**

1.    *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

19

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2. *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3. *Class 3 – Other Secured Claims*

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

000275

4.   _Class 4 – Priority Non-Tax Claims_

- _Classification_:  Class 4 consists of the Priority Non-Tax Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- _Impairment and Voting_:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.   _Class 5 – Retained Employee Claims_

- _Classification_:  Class 5 consists of the Retained Employee Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- _Impairment and Voting_:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.   _Class 6 – PTO Claims_

- _Classification_:  Class 6 consists of the PTO Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- _Impairment and Voting_:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6

000276

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7. *Class 7 – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. *Class 8 – General Unsecured Claims*

- *Classification*: Class 8 consists of the General Unsecured Claims.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

000277

9.    *Class 9 – Subordinated Claims*

- •   *Classification*: Class 9 consists of the Subordinated Claims.

  *Treatment*: On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- •   *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.    *Class 10 – Class B/C Limited Partnership Interests*

- •   *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

- •   *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- •   *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.    *Class 11 – Class A Limited Partnership Interests*

- •   *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

000278

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I. Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## J. Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

## A. Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

24

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.  The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement.  Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.**    **The Claimant Trust**[2]

1.    _Creation and Governance of the Claimant Trust and Litigation Sub-Trust._

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries.  Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

000280

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2. *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

000281

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.     *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.     *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.     *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

000282

(i)     the payment of the Claimant Trust Expenses;

(ii)     the payment of other reasonable expenses of the Claimant Trust;

(iii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)     the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)     the orderly monetization of the Claimant Trust Assets;

(vi)     litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)     the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)     the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)     the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)     the payment of other reasonable expenses of the Litigation Sub-Trust;

000283

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.     *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.     *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.     *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer

29

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.    _Tax Reporting._

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.    _Claimant Trust Assets._

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

000285

11. *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12. *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13. *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14. *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

000286

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C. **The Reorganized Debtor**

### 1. *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2. *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3. *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

000287

4.      *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.      *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.      *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.      *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

33

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.**     **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

000289

### E.  Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F.  Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G.  Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H.  Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

000290

**I.      Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

**J.      Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

**K.      Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

000291

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.     Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

37

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.**     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.**     **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

000293

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B.    Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

39

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.   **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D.   **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E.   **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests.  If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F.   **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

000295

**G.** ***De Minimis* Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**H.** **Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**I.** **General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

**J.** **Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K.** **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

000296

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.**     **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.**     **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.**     **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

000297

**O.**     **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

**A.**     **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**     **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.**     **Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

000298

**D.** **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1. *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2. *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3. *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

44

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

### ARTICLE VIII.
### EFFECTIVENESS OF THIS PLAN

**A.**     **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

000300

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.    Waiver of Conditions

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.    Dissolution of the Committee

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

46

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A.    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C.    Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing

47

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.      **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

000303

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

**E.**     **Preservation of Rights of Action**

    1.     *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

    2.     *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

000304

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.**     **Injunction**

    **Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

    **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

    **The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

    **Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

000305

**(i)** first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and **(ii)** specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

### G.    Duration of Injunctions and Stays

ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

### H.    Continuance of January 9 Order

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.


### ARTICLE X.
### BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

000306

## ARTICLE XI.
## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof*; provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

52

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

53

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

**A.**    **Payment of Statutory Fees and Filing of Reports**

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed. The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**B.**    **Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

**C.**    **Revocation of Plan**

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee. If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

**D.      Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**E.      Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**F.      Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

**G.      Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**H.      Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

000310

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

**I.      Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**J.      Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.      Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

**If to the Claimant Trust:**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700

000311

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
           Ira D. Kharasch, Esq.
           Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
           Ira D. Kharasch, Esq.
           Gregory V. Demo, Esq.

**L.**     **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

57

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.**     **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.**     **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.**     **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**     **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

000313

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

**<u>Exhibit B</u>**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1.    Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2.    Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3.    Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4.    Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5.    Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6.    Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7.    Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8.    Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9.    Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10.   Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11.   Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12.   Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13.   Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14.   Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15.   Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16.   Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17.   Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18.   Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

36. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

3

51. Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52. Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53. Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54. Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55. Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56. Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57. Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58. Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59. Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60. Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

DOCS_NY:42355.1 36027/002

000319

### Schedule of Causes of Action

The Causes of Action shall include, *without limitation*, any cause of action based on the following:

breach of fiduciary duties, breach of duty of care, breach of duty of loyalty, usurpation of corporate opportunities, breach of implied covenant of good faith and fair dealing, conversion, misappropriation of assets, misappropriation of trade secrets, unfair competition, breach of contract, breach of warranty, fraud, constructive fraud, negligence, gross negligence, fraudulent conveyance, fraudulent transfer, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, fraudulent inducement, tortious interference, *quantum meruit*, unjust enrichment, abuse of process, alter ego, business disparagement, indemnity, claims for recovery of distributions or dividends, claims for indemnification, promissory estoppel, quasi-contract claims, any counterclaims, equitable subordination, avoidance actions provided for under sections 544 or 547 of the Bankruptcy Code, claims brought under state law, claims brought under federal law, claims under any common-law theory of tort or law or equity, and any claims similar in nature to the foregoing claims.

The Causes of Action shall include, *without limitation*, any cause of action against the following persons and entities:

James Dondero, Mark Okada, Grant Scott, John Honis, any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, Nexbank Capital, Inc. Highland Capital Management Services, Inc., NexPoint Advisors GP, LLC, NexPoint Advisors, L.P., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on the attached **Annex 1** hereto, any current or former employee of the Debtor, and any entity directly or indirectly owned, controlled, or operated for the benefit of the foregoing persons or entities.

The Causes of Action shall include, *without limitation*, any cause of action arising from the following transactions:

The transfer of ownership interests in the Debtor to Hunter Mountain Investment Trust, the creation or transfer of any notes receivable from the Debtor or from any entity related to the Debtor, the creation or transfer of assets to or from any charitable foundation or trust, the formation, performance, or breach of any contract for the Debtor to provide investment management, support services, or any other services, and the distribution of assets or cash from the Debtor to partners of the Debtor.

## Annex 1

11 Estates Lane, LLC

1110 Waters, LLC

140 Albany, LLC

1525 Dragon, LLC

17720 Dickerson, LLC

1905 Wylie LLC

2006 Milam East Partners GP, LLC

2006 Milam East Partners, L.P.

201 Tarrant Partners, LLC

2014 Corpus Weber Road LLC

2325 Stemmons HoldCo, LLC

2325 Stemmons Hotel Partners, LLC

2325 Stemmons TRS, Inc.

300 Lamar, LLC

3409 Rosedale, LLC

3801 Maplewood, LLC

3801 Shenandoah, L.P.

3820 Goar Park LLC

400 Seaman, LLC

401 Ame, L.P.

4201 Locust, L.P.

4312 Belclaire, LLC

5833 Woodland, L.P.

5906 DeLoache, LLC

5950 DeLoache, LLC

7758 Ronnie, LLC

7759 Ronnie, LLC

AA Shotguns, LLC

Aberdeen Loan Funding, Ltd.

Acis CLO 2017-7 Ltd

Acis CLO Management GP, LLC

Acis CLO Management GP, LLC *(fka Acis CLO Opportunity Funds GP, LLC)*

Acis CLO Management Holdings, L.P.

Acis CLO Management Intermediate Holdings I, LLC

Acis CLO Management Intermediate Holdings II, LLC

Acis CLO Management, LLC *(fka Acis CLO Opportunity Funds SLP, LLC)*

Acis CLO Trust

Acis CLO Value Fund II Charitable DAF Ltd.

Acis CMOA Trust

Advisors Equity Group LLC

Alamo Manhattan Hotel I, LLC (Third Party)

Allenby, LLC

Allisonville RE Holdings, LLC

AM Uptown Hotel, LLC

Apex Care, L.P

Asbury Holdings, LLC *(fka HCSLR Camelback Investors (Delaware), LLC)*

Ascendant Advisors

Atlas IDF GP, LLC

Atlas IDF, LP

BB Votorantim Highland Infrastructure, LLC

BDC Toys Holdco, LLC

Beacon Mountain, LLC

Bedell Trust Ireland Limited (Charitable trust account)

Ben Roby (third party)

BH Equities, LLC

BH Heron Pointe, LLC

BH Hollister, LLC

BH Willowdale Manager, LLC

Big Spring Partners, LLC

Blair Investment Partners, LLC

Bloomdale, LLC

Brave Holdings III Inc.

Brentwood CLO, Ltd.

Brentwood Investors Corp.

Brian Mitts

Bristol Bay Funding Ltd.

Bristol Bay Funding, Ltd.

BVP Property, LLC

C-1 Arbors, Inc.

C-1 Cutter's Point, Inc.

C-1 Eaglecrest, Inc.

C-1 Silverbrook, Inc.

Cabi Holdco GP, LLC

Cabi Holdco I, Ltd

Cabi Holdco I, Ltd.

Cabi Holdco, L.P.

California Public Employees' Retirement System

Camelback Residential Investors, LLC

Camelback Residential Investors, LLC *(fka Sevilla Residential Partners, LLC)*

Camelback Residential Partners, LLC

Capital Real Estate - Latitude, LLC

Castle Bio Manager, LLC

Castle Bio, LLC

CG Works, Inc.

CG Works, Inc. (fka Common Grace Ventures, Inc.)

Charitable DAF Fund, L.P.

Charitable DAF GP, LLC

Charitable DAF HoldCo, Ltd

Charitable DAF HoldCo, Ltd.

Claymore Holdings, LLC

CLO HoldCo, Ltd

CLO Holdco, Ltd.

Corbusier, Ltd.

Cornerstone Healthcare Group Holding, Inc.

Corpus Weber Road Member LLC

CP Equity Hotel Owner, LLC

CP Equity Land Owner, LLC

CP Equity Owner, LLC

CP Hotel TRS, LLC

CP Land Owner, LLC

CP Tower Owner, LLC

CRE - Lat, LLC

Credit Suisse, Cayman Islands Branch

Crossings 2017 LLC

Crown Global Insurance Company (third party)

Dallas Cityplace MF SPE Owner LLC

Dallas Lease and Finance, L.P.

Dana Scott Breault

James Dondero

Reese Avry Dondero

Jameson Drue Dondero

Dana Sprong (Third Party)

David c. Hopson

De Kooning, Ltd.

deKooning, Ltd.

DFA/BH Autumn Ridge, LLC

Dolomiti, LLC

DrugCrafters, L.P.

Dugaboy Investment Trust

Dugaboy Management, LLC

Dugaboy Project Management GP, LLC

Eagle Equity Advisors, LLC

Eames, Ltd.

Eastland CLO, Ltd.

Eastland Investors Corp.

EDS Legacy Heliport, LLC

EDS Legacy Partners Owner, LLC

EDS Legacy Partners, LLC

Empower Dallas Foundation, Inc.

ENA 41, LLC

Entegra Strat Superholdco, LLC

Entegra-FRO Holdco, LLC

Entegra-FRO Superholdco, LLC

Entegra-HOCF Holdco, LLC

Entegra-NHF Holdco, LLC

Entegra-NHF Superholdco, LLC

Entegra-RCP Holdco, LLC

Estates on Maryland Holdco, LLC

Estates on Maryland Owners SM, Inc.

Estates on Maryland Owners, LLC

Estates on Maryland, LLC

Falcon E&P Four Holdings, LLC

Falcon E&P One, LLC

Falcon E&P Opportunities Fund, L.P.

Falcon E&P Opportunities GP, LLC

Falcon E&P Royalty Holdings, LLC

Falcon E&P Six, LLC

Falcon E&P Two, LLC

Falcon Four Midstream, LLC

Falcon Four Upstream, LLC

Falcon Incentive Partners GP, LLC

Falcon Incentive Partners, LP

Falcon Six Midstream, LLC

Flamingo Vegas Holdco, LLC *(fka Cabi Holdco, LLC)*

Four Rivers Co-Invest GP, LLC

Four Rivers Co-Invest, L.P.

000322

FRBH Abbington SM, Inc.
FRBH Abbington, LLC
FRBH Arbors, LLC
FRBH Beechwood SM, Inc.
FRBH Beechwood, LLC
FRBH C1 Residential, LLC
FRBH Courtney Cove SM, Inc.
FRBH Courtney Cove, LLC
FRBH CP, LLC
FRBH Duck Creek, LLC
FRBH Eaglecrest, LLC
FRBH Edgewater JV, LLC
FRBH Edgewater Owner, LLC
FRBH Edgewater SM, Inc.
FRBH JAX-TPA, LLC
FRBH Nashville Residential, LLC
FRBH Regatta Bay, LLC
FRBH Sabal Park SM, Inc.
FRBH Sabal Park, LLC
FRBH Silverbrook, LLC
FRBH Timberglen, LLC
FRBH Willow Grove SM, Inc.
FRBH Willow Grove, LLC
FRBH Woodbridge SM, Inc.
FRBH Woodbridge, LLC
Freedom C1 Residential, LLC
Freedom Duck Creek, LLC
Freedom Edgewater, LLC
Freedom JAX-TPA Residential, LLC
Freedom La Mirage, LLC
Freedom LHV LLC
Freedom Lubbock LLC
Freedom Miramar Apartments, LLC
Freedom Sandstone, LLC
Freedom Willowdale, LLC
Fundo de Investimento em Direitos Creditorios BB Votorantim Highland Infraestrutura
G&E Apartment REIT The Heights at Olde Towne, LLC
G&E Apartment REIT The Myrtles at Olde Towne, LLC
GAF REIT, LLC
GAF Toys Holdco, LLC

Gardens of Denton II, L.P.
Gardens of Denton III, L.P.
Gleneagles CLO, Ltd.
Goverannce RE, Ltd.
Governance Re, Ltd.
Governance, Ltd.
Grant Scott
Grant Scott, Trustee of The SLHC Trust
Grayson CLO, Ltd.
Grayson Investors Corp.
Greater Kansas City Community Foundation (third party)
Greenbriar CLO, Ltd.
Greg Busseyt
Gunwale LLC
Gunwale, LLC
Hakusan, LLC
Hammark Holdings LLC
Hampton Ridge Partners, LLC
Harbourvest Entities
Harko, LLC
Harry Bookey/Pam Bookey (third party)
Haverhill Acquisition Co., LLC
Haygood, LLC
HB 2015 Family LP (third party)
HCBH 11611 Ferguson, LLC
HCBH Buffalo Pointe II, LLC
HCBH Buffalo Pointe III, LLC
HCBH Buffalo Pointe, LLC
HCBH Hampton Woods SM, Inc.
HCBH Hampton Woods, LLC
HCBH Overlook SM, Inc.
HCBH Overlook, LLC
HCBH Rent Investors, LLC
HCMS Falcon GP, LLC
HCMS Falcon, L.P.
HCO Holdings, LLC
HCOF Preferred Holdings, L.P.
HCOF Preferred Holdings, LP
HCOF Preferred Holdings, Ltd.
HCRE 1775 James Ave, LLC
HCRE Addison TRS, LLC

HCRE Addison, LLC *(fka HWS Addison, LLC)*

HCRE Hotel Partner, LLC *(fka HCRE HWS Partner, LLC)*

HCRE Las Colinas TRS, LLC

HCRE Las Colinas, LLC *(fka HWS Las Colinas, LLC)*

HCRE Plano TRS, LLC

HCRE Plano, LLC *(fka HWS Plano, LLC)*

HCREF-I Holding Corp.

HCREF-II Holding Corp.

HCREF-III Holding Corp.

HCREF-IV Holding Corp.

HCREF-IX Holding Corp.

HCREF-V Holding Corp.

HCREF-VI Holding Corp.

HCREF-VII Holding Corp.

HCREF-VIII Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

HCREF-XIII Holding Corp.

HCREF-XIV Holding Corp.

HCREF-XV Holding Corp.

HCSLR Camelback Investors (Cayman), Ltd.

HCSLR Camelback, LLC

HCT Holdco 2 Ltd.

HCT Holdco 2, Ltd.

HE 41, LLC

HE Capital 232 Phase I Property, LLC

HE Capital 232 Phase I, LLC

HE Capital Asante, LLC

HE Capital Fox Trails, LLC

HE Capital KR, LLC

HE Capital, LLC

HE CLO Holdco, LLC

HE Mezz Fox Trails, LLC

HE Mezz KR, LLC

HE Peoria Place Property, LLC

HE Peoria Place, LLC

Heron Pointe Investors, LLC

Hewett's Island CLO I-R, Ltd.

HFP Asset Funding II, Ltd.

HFP Asset Funding III, Ltd.

HFP CDO Construction Corp.

HFP GP, LLC

HFRO Sub, LLC

Hibiscus HoldCo, LLC

Highland - First Foundation Income Fund

Highland 401(k) Plan

Highland 401K Plan

Highland Argentina Regional Opportunity Fund GP, LLC

Highland Argentina Regional Opportunity Fund, L.P.

Highland Argentina Regional Opportunity Fund, Ltd.

Highland Argentina Regional Opportunity Master Fund, L.P.

Highland Brasil, LLC

Highland Capital Brasil Gestora de Recursos *(fka Highland Brasilinvest Gestora de Recursos, LTDA; fka HBI Consultoria Empresarial, LTDA)*

Highland Capital Management (Singapore) Pte Ltd

Highland Capital Management AG

Highland Capital Management AG (Highland Capital Management SA) (Highland Capital Management Ltd)

Highland Capital Management Fund Advisors, L.P.

Highland Capital Management Fund Advisors, L.P. *(fka Pyxis Capital, L.P.)*

Highland Capital Management Korea Limited

Highland Capital Management Latin America, L.P.

Highland Capital Management LP Retirement Plan and Trust

Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.

Highland Capital Management Real Estate Holdings I, LLC

Highland Capital Management Real Estate Holdings II, LLC

Highland Capital Management Services, Inc.

Highland Capital Management, L.P.

Highland Capital Management, L.P. Charitable Fund

Highland Capital Management, L.P. Retirement Plan and Trust

Highland Capital Management, L.P., as trustee of Acis CMOA Trust and nominiee for and on behalf of Highland CLO Assets Holdings Limited

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominiee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, LP

Highland Capital Management, LP Charitable Fund

Highland Capital Multi-Strategy Fund, LP

Highland Capital of New York, Inc.

Highland Capital Special Allocation, LLC

Highland CDO Holding Company

Highland CDO Opportunity Fund GP, L.P.

Highland CDO Opportunity Fund, L.P.

Highland CDO Opportunity Fund, Ltd.

Highland CDO Opportunity GP, LLC

Highland CDO Opportunity Master Fund, L.P.

Highland CDO Trust

Highland CLO 2018-1, Ltd.

Highland CLO Assets Holdings Limited

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd. *(fka Acis Loan Funding, Ltd.)*

Highland CLO Gaming Holdings, LLC

Highland CLO Holdings Ltd.

Highland CLO Holdings, Ltd. (as of 12.19.17)

Highland CLO Management Ltd.

Highland CLO Trust

Highland Credit Opportunities CDO Asset Holdings GP, Ltd.

Highland Credit Opportunities CDO Asset Holdings, L.P.

Highland Credit Opportunities CDO Financing, LLC

Highland Credit Opportunities CDO, Ltd.

Highland Credit Opportunities Holding Corporation

Highland Credit Opportunities Japanese Feeder Sub-Trust

Highland Credit Opportunities Japanese Unit Trust (Third Party)

Highland Credit Strategies Fund, L.P.

Highland Credit Strategies Fund, Ltd.

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Master Fund, L.P.

Highland Dallas Foundation, Inc.

Highland Dynamic Income Fund GP, LLC

Highland Dynamic Income Fund GP, LLC *(fka Highland Capital Loan GP, LLC)*

Highland Dynamic Income Fund, L.P.

Highland Dynamic Income Fund, L.P. *(fka Highland Capital Loan Fund, L.P.)*

Highland Dynamic Income Fund, Ltd.

Highland Dynamic Income Fund, Ltd. *(fka Highland Loan Fund, Ltd.)*

Highland Dynamic Income Master Fund, L.P.

Highland Dynamic Income Master Fund, L.P. *(fka Highland Loan Master Fund, L.P.)*

Highland Employee Retention Assets LLC

Highland Energy Holdings, LLC

Highland Energy MLP Fund *(fka Highland Energy and Materials Fund)*

Highland Equity Focus Fund, L.P.

Highland ERA Management, LLC

Highland eSports Private Equity Fund

Highland Financial Corp.

Highland Financial Partners, L.P.

Highland Fixed Income Fund

Highland Flexible Income UCITS Fund

Highland Floating Rate Fund

Highland Floating Rate Opportunites Fund

Highland Floating Rate Opportunities Fund

Highland Fund Holdings, LLC

Highland Funds I

Highland Funds II

Highland Funds III

Highland GAF Chemical Holdings, LLC

Highland General Partner, LP

Highland Global Allocation Fund

Highland Global Allocation Fund
*(fka Highland Global Allocation Fund II)*

Highland GP Holdings, LLC

Highland HCF Advisor Ltd.

Highland HCF Advisor, Ltd., as Trustee for
and on behalf of Acis CLO Trust, as nominee
for and on behalf of Highland CLO Funding,
Ltd. (as of 3.29.18)

Highland Healthcare Equity Income and
Growth Fund

Highland iBoxx Senior Loan ETF

Highland Income Fund

Highland Income Fund  *(fka Highland
Floating Rate Opportunities Fund)*

Highland Kansas City Foundation, Inc.

Highland Latin America Consulting, Ltd.

Highland Latin America GP, Ltd.

Highland Latin America LP, Ltd.

Highland Latin America Trust

Highland Legacy Limited

Highland LF Chemical Holdings, LLC

Highland Loan Funding V, LLC

Highland Loan Funding V, Ltd.

Highland Long/Short Equity Fund

Highland Long/Short Healthcare Fund

Highland Marcal Holding, Inc.

Highland Merger Arbitrage Fund

Highland Multi Strategy Credit Fund GP, L.P.

Highland Multi Strategy Credit Fund GP, L.P.
*(fka Highland Credit Opportunities CDO GP,
L.P.)*

Highland Multi Strategy Credit Fund, L.P.

Highland Multi Strategy Credit Fund, L.P. *(fka
Highland Credit Opportunities Fund, L.P., fka
Highland Credit Opportunities CDO, L.P.)*

Highland Multi Strategy Credit Fund, Ltd.

Highland Multi Strategy Credit Fund, Ltd. *(fka
Highland Credit Opportunities Fund, Ltd.)*

Highland Multi Strategy Credit GP, LLC

Highland Multi Strategy Credit GP, LLC *(fka
Highland Credit Opportunities CDO GP, LLC)*

Highland Multi-Strategy Fund GP, LLC

Highland Multi-Strategy Fund GP, LP

Highland Multi-Strategy IDF GP, LLC

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Master Fund, LP

Highland Multi-Strategy Onshore Master
SubFund II, LLC

Highland Multi-Strategy Onshore Master
Subfund, LLC

Highland Opportunistic Credit Fund

Highland Park CDO 1, Ltd.

Highland Park CDO I, Ltd.

Highland Premier Growth Equity Fund

Highland Premium Energy & Materials Fund

Highland Prometheus Feeder Fund I, L.P.

Highland Prometheus Feeder Fund I, LP

Highland Prometheus Feeder Fund II, L.P.

Highland Prometheus Feeder Fund II, LP

Highland Prometheus Master Fund, L.P.

Highland Receivables Finance I, LLC

Highland Restoration Capital Partners GP,
LLC

Highland Restoration Capital Partners Master,
L.P.

Highland Restoration Capital Partners
Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Santa Barbara Foundation, Inc.

Highland Select Equity Fund GP, L.P.

Highland Select Equity Fund, L.P.

Highland Select Equity GP, LLC

Highland Select Equity Master Fund, L.P.

Highland Small-Cap Equity Fund

Highland Socially Responsible Equity Fund

Highland Socially Responsible Equity Fund
*(fka Highland Premier Growth Equity Fund)*

Highland Special Opportunities Holding
Company

Highland SunBridge GP, LLC

Highland Tax-Exempt Fund

Highland TCI Holding Company, LLC

Highland Total Return Fund

Highland's Roads Land Holding Company,
LLC

Hirst, Ltd.

HMCF PB Investors, LLC

HMx2 Investment Trust
(Matt McGraner)

Hockney, Ltd.

HRT North Atlanta, LLC

HRT Timber Creek, LLC

HRTBH North Atlanta, LLC

HRTBH Timber Creek, LLC

Huber Funding LLC

Hunter Mountain Investment Trust

HWS Investors Holdco, LLC

Internal Investors

Intertrust

James D. Dondero
Reese Avry Dondero
Jameson Drue Dondero

James Dondero

James Dondero and Mark Okada

James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Japan Trustee Services Bank, Ltd.

Jasper CLO, Ltd.

Jewelry Ventures I, LLC

JMIJM, LLC

Joanna E. Milne Irrevocable Trust dated Nov
25 1998 (third party)

John Honis

John L. Holt, Jr.

John R. Sears, Jr.

Karisopolis, LLC

Keelhaul LLC

KHM Interests, LLC (third party)

Kuilima Montalban Holdings, LLC

Kuilima Resort Holdco, LLC

KV Cameron Creek Owner, LLC

Lakes at Renaissance Park Apartments
Investors, L.P.

Lakeside Lane, LLC

Landmark Battleground Park II, LLC

Lane Britain

Larry K. Anders

LAT Battleground Park, LLC

LAT Briley Parkway, LLC

Lautner, Ltd.

Leawood RE Holdings, LLC

Liberty Cayman Holdings, Ltd.

Liberty CLO Holdco, Ltd.

Liberty CLO, Ltd.

Liberty Sub, Ltd.

Long Short Equity Sub, LLC

Longhorn Credit Funding LLC

Longhorn Credit Funding LLC - A

Longhorn Credit Funding LLC - B

Longhorn Credit Funding LLC (LHB)

Longhorn Credit Funding, LLC

Lurin Real Estate Holdings V, LLC

Maple Avenue Holdings, LLC

MaplesFS Limited

Marc C. Manzo

Mark and Pam Okada Family Trust - Exempt
Descendants' Trust

Mark and Pam Okada Family Trust - Exempt
Trust #2

Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust

Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust #2

Mark and Pamela Okada Family Trust -
Exempt Trust #2

Mark K. Okada

Mark Okada

Mark Okada and Pam Okada
Mark Okada and Pam Okada, as joint owners
Mark Okada/Pamela Okada
Markham Fine Jewelers, L.P.
Markham Fine Jewelers, LP
Matt McGraner
Meritage Residential Partners, LLC
MGM Studios HoldCo, Ltd.
Michael Rossi
ML CLO XIX Sterling (Cayman), Ltd.
N/A
Nancy Dondero
NCI Apache Trail LLC
NCI Assets Holding Company LLC
NCI Country Club LLC
NCI Fort Worth Land LLC
NCI Front Beach Road LLC
NCI Minerals LLC
NCI Royse City Land LLC
NCI Stewart Creek LLC
NCI Storage, LLC
Neil Labatte
Neutra, Ltd.
New Jersey Tissue Company Holdco, LLC
*(fka Marcal Paper Mills Holding Company, LLC)*

NexAnnuity Holdings, Inc.
NexBank Capital Trust I
NexBank Capital, Inc.
NexBank Land Advisors, Inc.
NexBank Securities Inc.
NexBank Securities, Inc.

NexBank SSB
NexBank Title, Inc.
(dba NexVantage Title Services)
NexBank, SSB
NexPoint Advisors GP, LLC
NexPoint Advisors, L.P.
NexPoint Capital REIT, LLC
NexPoint Capital, Inc.
NexPoint Capital, Inc. *(fka NexPoint Capital, LLC)*

NexPoint CR F/H DST, LLC
NexPoint Credit Strategies Fund
NexPoint Discount Strategies Fund
*(fka NexPoint Discount Yield Fund)*

NexPoint DRIP
NexPoint Energy and Materials Opportunities
Fund *(fka NexPoint Energy Opportunities Fund)*

NexPoint Event-Driven Fund
*(fkaNexPoint Merger Arbitrage Fund)*

NexPoint Flamingo DST
NexPoint Flamingo Investment Co, LLC
NexPoint Flamingo Leaseco, LLC
NexPoint Flamingo Manager, LlC
NexPoint Flamingo Property Manager, LlC
NexPoint Healthcare Opportunities Fund
NexPoint Hospitality Trust
NexPoint Hospitality, Inc.
NexPoint Hospitality, LLC
NexPoint Insurance Distributors, LLC
NexPoint Insurance Solutions GP, LLC
NexPoint Insurance Solutions GP, LLC
*(fka Highland Capital Insurance Solutions GP, LLC)*

NexPoint Insurance Solutions, L.P.
*(fka Highland Capital Insurance Solutions, L.P.)*

NexPoint Latin American Opportunities Fund
NexPoint Legacy 22, LLC
NexPoint Lincoln Porte Equity, LLC
NexPoint Lincoln Porte Manager, LLC
NexPoint Lincoln Porte, LLC
*(fka NREA Lincoln Porte, LLC)*

NexPoint Multifamily Capital Trust, Inc.
NexPoint Multifamily Capital Trust, Inc.
*(fka NexPoint Multifamily Realty Trust, Inc., fka Highland Capital Realty Trust, Inc.)*

NexPoint Multifamily Operating Partnership, L.P.

NexPoint Peoria, LLC
NexPoint Polo Glen DST
NexPoint Polo Glen Holdings, LLC
NexPoint Polo Glen Investment Co, LLC

NexPoint Polo Glen Leaseco, LLC

NexPoint Polo Glen Manager, LLC

NexPoint RE Finance Advisor GP, LLC

NexPoint RE Finance Advisor, L.P.

NexPoint Real Estate Advisors GP, LLC

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors III, L.P.

NexPoint Real Estate Advisors IV, L.P.

NexPoint Real Estate Advisors V, L.P.

NexPoint Real Estate Advisors VI, L.P.

NexPoint Real Estate Advisors VII GP, LLC

NexPoint Real Estate Advisors VII, L.P.

NexPoint Real Estate Advisors VIII, L.P.

NexPoint Real Estate Advisors, L.P.

NexPoint Real Estate Capital, LLC

NexPoint Real Estate Capital, LLC *(fka Highland Real Estate Capital, LLC, fka Highland Multifamily Credit Fund, LLC)*

NexPoint Real Estate Finance OP GP, LLC

NexPoint Real Estate Finance Operating Partnership, L.P.

NexPoint Real Estate Finance, Inc.

NexPoint Real Estate Opportunities, LLC

NexPoint Real Estate Opportunities, LLC *(fka Freedom REIT LLC)*

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Strategies Fund

NexPoint Residential Trust Inc.

NexPoint Residential Trust Operating Partnership GP, LLC

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust, Inc.

NexPoint Securities, Inc. *(fka Highland Capital Funds Distributor, Inc.) (fka Pyxis Distributors, Inc.)*

NexPoint Strategic Income Fund *(fka NexPoint Opportunistic Credit Fund, fka NexPoint Distressed Strategies Fund)*

NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund *(fka NexPoint Credit Strategies Fund)*

NexPoint Texas Multifamily Portfolio DST *(fka NREA Southeast Portfolio Two, DST)*

NexPoint WLIF I Borrower, LLC

NexPoint WLIF I, LLC

NexPoint WLIF II Borrower, LLC

NexPoint WLIF II, LLC

NexPoint WLIF III Borrower, LLC

NexPoint WLIF III, LLC

NexPoint WLIF, LLC (Series I)

NexPoint WLIF, LLC (Series II)

NexPoint WLIF, LLC (Series III)

NexStrat LLC

NexVest, LLC

NexWash LLC

NFRO REIT Sub, LLC

NFRO TRS, LLC

NHF CCD, Inc.

NHT 2325 Stemmons, LLC

NHT Beaverton TRS, LLC *(fka NREA Hotel TRS, Inc.)*

NHT Beaverton, LLC

NHT Bend TRS, LLC

NHT Bend, LLC

NHT Destin TRS, LLC

NHT Destin, LLC

NHT DFW Portfolio, LLC

NHT Holdco, LLC

NHT Holdings, LLC

NHT Intermediary, LLC

NHT Nashville TRS, LLC

NHT Nashville, LLC

NHT Olympia TRS, LLC

NHT Olympia, LLC

NHT Operating Partnership GP, LLC

NHT Operating Partnership II, LLC

NHT Operating Partnership, LLC

NHT Salem, LLC

NHT SP Parent, LLC
NHT SP TRS, LLC
NHT SP, LLC
NHT Tigard TRS, LLC
NHT Tigard, LLC
NHT TRS, Inc.
NHT Uptown, LLC
NHT Vancouver TRS, LLC
NHT Vancouver, LLC
NLA Assets LLC
NMRT TRS, Inc.
NREA Adair DST Manager, LLC
NREA Adair Investment Co, LLC
NREA Adair Joint Venture, LLC
NREA Adair Leaseco Manager, LLC
NREA Adair Leaseco, LLC
NREA Adair Property Manager LLC
NREA Adair, DST
NREA Ashley Village Investors, LLC
NREA Cameron Creek Investors, LLC
NREA Cityplace Hue Investors, LLC
NREA Crossing Investors LLC
NREA Crossings Investors, LLC
NREA Crossings Ridgewood Coinvestment, LLC *(fka NREA Crossings Ridgewood Investors, LLC)*

NREA DST Holdings, LLC
NREA El Camino Investors, LLC
NREA Estates Inc.
NREA Estates Investment Co, LLC
NREA Estates Leaseco, LLC
NREA Estates Manager, LLC
NREA Estates Property Manager, LLC
NREA Estates, DST
NREA Gardens DST Manager LLC
NREA Gardens DST Manager, LLC
NREA Gardens Investment Co, LLC
NREA Gardens Leaseco Manager, LLC
NREA Gardens Leaseco, LLC
NREA Gardens Property Manager, LLC
NREA Gardens Springing LLC
NREA Gardens Springing Manager, LLC
NREA Gardens, DST

NREA Hidden Lake Investment Co, LLC
NREA Hue Investors, LLC
NREA Keystone Investors, LLC
NREA Meritage Inc.
NREA Meritage Investment Co, LLC
NREA Meritage Leaseco, LLC
NREA Meritage Manager, LLC
NREA Meritage Property Manager, LLC
NREA Meritage, DST
NREA Oaks Investors, LLC
NREA Retreat Investment Co, LLC
NREA Retreat Leaseco, LLC
NREA Retreat Manager, LLC
NREA Retreat Property Manager, LLC
NREA Retreat, DST
NREA SE MF Holdings LLC
NREA SE MF Holdings, LLC
NREA SE MF Investment Co, LLC
NREA SE MF Investment Co, LLC
NREA SE Multifamily LLC
NREA SE Multifamily, LLC
NREA SE One Property Manager, LLC
NREA SE Three Property Manager, LLC
NREA SE Two  Property Manager, LLC
NREA SE1 Andros Isles Leaseco, LLC
NREA SE1 Andros Isles Manager, LLC
NREA SE1 Andros Isles, DST
(Converted from DK Gateway Andros, LLC)

NREA SE1 Arborwalk Leaseco, LLC
NREA SE1 Arborwalk Manager, LLC
NREA SE1 Arborwalk, DST
(Converted from MAR Arborwalk, LLC)

NREA SE1 Towne Crossing Leaseco, LLC
NREA SE1 Towne Crossing Manager, LLC
NREA SE1 Towne Crossing, DST
(Converted from Apartment REIT Towne Crossing, LP)

NREA SE1 Walker Ranch Leaseco, LLC
NREA SE1 Walker Ranch Manager, LLC
NREA SE1 Walker Ranch, DST
(Converted from SOF Walker Ranch Owner, L.P.)

NREA SE2 Hidden Lake Leaseco, LLC

NREA SE2 Hidden Lake Manager, LLC
NREA SE2 Hidden Lake, DST
NREA SE2 Hidden Lake, DST
(Converted from SOF Hidden Lake SA Owner, L.P.)

NREA SE2 Vista Ridge Leaseco, LLC
NREA SE2 Vista Ridge Manager, LLC
NREA SE2 Vista Ridge, DST
NREA SE2 Vista Ridge, DST
(Converted from MAR Vista Ridge, L.P.)

NREA SE2 West Place Leaseco, LLC
NREA SE2 West Place Manager, LLC
NREA SE2 West Place, DST
(Converted from Landmark at West Place, LLC)

NREA SE3 Arboleda Leaseco, LLC
NREA SE3 Arboleda Manager, LLC
NREA SE3 Arboleda, DST
(Converted from G&E Apartment REIT Arboleda, LLC)

NREA SE3 Fairways Leaseco, LLC
NREA SE3 Fairways Manager, LLC
NREA SE3 Fairways, DST
(Converted from MAR Fairways, LLC)

NREA SE3 Grand Oasis Leaseco, LLC
NREA SE3 Grand Oasis Manager, LLC
NREA SE3 Grand Oasis, DST
(Converted from Landmark at Grand Oasis, LP)

NREA Southeast Portfolio One Manager, LLC
NREA Southeast Portfolio One, DST
NREA Southeast Portfolio One, DST
NREA Southeast Portfolio Three Manager, LLC
NREA Southeast Portfolio Three, DST
NREA Southeast Portfolio Three, DST
NREA Southeast Portfolio Two Manager, LLC
NREA Southeast Portfolio Two, DST
NREA Southeast Portfolio Two, LLC
NREA SOV Investors, LLC
NREA Uptown TRS, LLC
NREA VB I LLC
NREA VB II LLC

NREA VB III LLC
NREA VB IV LLC
NREA VB Pledgor I LLC
NREA VB Pledgor I, LLC
NREA VB Pledgor II LLC
NREA VB Pledgor II, LLC
NREA VB Pledgor III LLC
NREA VB Pledgor III, LLC
NREA VB Pledgor IV LLC
NREA VB Pledgor IV, LLC
NREA VB Pledgor V LLC
NREA VB Pledgor V, LLC
NREA VB Pledgor VI LLC
NREA VB Pledgor VI, LLC
NREA VB Pledgor VII LLC
NREA VB Pledgor VII, LLC
NREA VB SM, Inc.
NREA VB V LLC
NREA VB VI LLC
NREA VB VII LLC
NREA Vista Ridge Investment Co, LLC
NREC AR Investors, LLC
NREC BM Investors, LLC
NREC BP Investors, LLC
NREC Latitude Investors, LLC
NREC REIT Sub, Inc.
NREC TRS, Inc.
NREC WW Investors, LLC
NREF OP I Holdco, LLC
NREF OP I SubHoldco, LLC
NREF OP I, L.P.
NREF OP II Holdco, LLC
NREF OP II SubHoldco, LLC
NREF OP II, L.P.
NREF OP IV REIT Sub TRS, LLC
NREF OP IV REIT Sub, LLC
NREF OP IV, L.P.
NREO NW Hospitality Mezz, LLC
NREO NW Hospitality, LLC
NREO Perilune, LLC
NREO SAFStor Investors, LLC
NREO TRS, Inc.
NRESF REIT Sub, LLC

NXRT Abbington, LLC
NXRT Atera II, LLC
NXRT Atera, LLC
NXRT AZ2, LLC
NXRT Barrington Mill, LLC
NXRT Bayberry, LLC
NXRT Bella Solara, LLC
NXRT Bella Vista, LLC
NXRT Bloom, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine LP, LLC
NXRT Brandywine LP, LLC
NXRT Brentwood Owner, LLC
NXRT Brentwood, LLC
NXRT Cedar Pointe Tenant, LLC
NXRT Cedar Pointe, LLC
NXRT Cityview, LLC
NXRT Cornerstone, LLC
NXRT Crestmont, LLC
NXRT Crestmont, LLC
NXRT Enclave, LLC
NXRT Glenview, LLC
NXRT H2 TRS, LLC
NXRT Heritage, LLC
NXRT Hollister TRS LLC
NXRT Hollister, LLC
NXRT LAS 3, LLC
NXRT Master Tenant, LLC
NXRT Nashville Residential, LLC
NXRT Nashville Residential, LLC *(fka Freedom Nashville Residential, LLC)*
NXRT North Dallas 3, LLC
NXRT Old Farm, LLC
NXRT Pembroke Owner, LLC
NXRT Pembroke, LLC
NXRT PHX 3, LLC
NXRT Radbourne Lake, LLC
NXRT Rockledge, LLC
NXRT Sabal Palms, LLC
NXRT SM, Inc.

NXRT Steeplechase, LLC
NXRT Stone Creek, LLC
NXRT Summers Landing GP, LLC
NXRT Summers Landing LP, LLC
NXRT Torreyana, LLC
NXRT Vanderbilt, LLC
NXRT West Place, LLC
NXRTBH AZ2, LLC
NXRTBH Barrington Mill Owner, LLC
NXRTBH Barrington Mill SM, Inc.
NXRTBH Barrington Mill, LLC
NXRTBH Bayberry, LLC
NXRTBH Cityview, LLC
NXRTBH Colonnade, LLC
NXRTBH Cornerstone Owner, LLC
NXRTBH Cornerstone SM, Inc.
NXRTBH Cornerstone, LLC
NXRTBH Dana Point SM, Inc.
NXRTBH Dana Point, LLC
NXRTBH Foothill SM, Inc.
NXRTBH Foothill, LLC
NXRTBH Heatherstone SM, Inc.
NXRTBH Heatherstone, LLC
NXRTBH Hollister Tenant, LLC
NXRTBH Hollister, LLC
NXRTBH Madera SM, Inc.
NXRTBH Madera, LLC
NXRTBH McMillan, LLC
NXRTBH North Dallas 3, LLC
NXRTBH Old Farm II, LLC
NXRTBH Old Farm Tenant, LLC
NXRTBH Old Farm, LLC
NXRTBH Radbourne Lake, LLC
NXRTBH Rockledge, LLC
NXRTBH Sabal Palms, LLC
NXRTBH Steeplechase, LLC
(dba Southpoint Reserve at Stoney Creek)-VA
NXRTBH Stone Creek, LLC
NXRTBH Vanderbilt, LLC
NXRTBH Versailles SM, Inc.
NXRTBH Versailles, LLC
Oak Holdco, LLC
Oaks CGC, LLC

Okada Family Revocable Trust
Oldenburg, Ltd.
Pam Capital Funding GP Co. Ltd.
Pam Capital Funding, L.P.
PamCo Cayman Ltd.
Park West 1700 Valley View Holdco, LLC
Park West 2021 Valley View Holdco, LLC
Park West Holdco, LLC
Park West Portfolio Holdco, LLC
Participants of Highland 401K Plan
Patrick Willoughby-McCabe
PCMG Trading Partners XXIII, L.P.
PCMG Trading Partners XXIII, LP
PDK Toys Holdco, LLC
Pear Ridge Partners, LLC
Penant Management GP, LLC
Penant Management LP
PensionDanmark Holding A/S
PensionDanmark
Pensionsforsikringsaktieselskab
Peoria Place Development, LLC
(30% cash contributions - profit participation
only)
Perilune Aero Equity Holdings One, LLC
Perilune Aviation LLC
PetroCap Incentive Holdings III. L.P.
PetroCap Incentive Partners II GP, LLC
PetroCap Incentive Partners II, L.P.
PetroCap Incentive Partners III GP, LLC
PetroCap Incentive Partners III, LP
PetroCap Management Company LLC
PetroCap Partners II GP, LLC
PetroCap Partners II, L.P.
PetroCap Partners III GP, LLC
PetroCap Partners III, L.P.
Pharmacy Ventures I, LLC
Pharmacy Ventures II, LLC
Pollack, Ltd.
Powderhorn, LLC
PWM1 Holdings, LLC
PWM1, LLC
Quest IRA, Inc FBO Jennifer G. Terry, IRA
#1467511

Quest, IRA, Inc. FBO Joshua N. Terry, IRA
#1467711
RADCO - Bay Meadows, LLLP
RADCO - Bay Park, LLLP
RADCO NREC Bay Meadows Holdings, LLC
RADCO NREC Bay Park Holdings, LLC
Ramarim, LLC
Rand Advisors Series I Insurance Fund
Rand Advisors Series II Insurance Fund
Rand Advisors, LLC
Rand PE Fund I, L.P.
Rand PE Fund I, L.P. - Series 1
Rand PE Fund Management, LLC
Rand PE Holdco, LLC
Realdania
Red River CLO, Ltd.
Red River Investors Corp.
Riverview Partners SC, LLC
Rockwall CDO II Ltd.
Rockwall CDO II, Ltd.
Rockwall CDO, Ltd.
Rockwall Investors Corp.
Rothko, Ltd.
RTT Bella Solara, LLC
RTT Bloom, LLC
RTT Financial, Inc.
RTT Hollister, LLC
RTT Rockledge, LLC
RTT Torreyana, LLC
SALI Fund Partners, LLC
San Diego County Employees Retirement
Association
Sandstone Pasadena Apartments, LLC
Sandstone Pasadena, LLC
Santa Barbara Foundation (third party)
Saturn Oil & Gas LLC
SBC Master Pension Trust
Scott Matthew Siekielski
SE Battleground Park, LLC
SE Battleground Park, LLC
SE Glenview, LLC
SE Governors Green Holdings, L.L.C.

SE Governors Green Holdings, L.L.C. *(fka SCG Atlas Governors Green Holdings, L.L.C.)*

SE Governors Green I, LLC

SE Governors Green II, LLC

SE Governors Green II, LLC

SE Governors Green REIT, L.L.C.

SE Governors Green REIT, L.L.C. *(fka SCG Atlas Governors Green REIT, L.L.C.)*

SE Governors Green, LLC *(fka SCG Atlas Governors Green, L.L.C.)*

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles LP, LLC

SE Gulfstream Isles LP, LLC

SE Heights at Olde Towne, LLC

SE Heights at Olde Towne, LLC

SE Lakes at Renaissance Park GP I, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park LP, LLC

SE Lakes at Renaissance Park LP, LLC

SE Multifamily Holdings LLC

SE Multifamily Holdings, LLC

SE Multifamily REIT Holdings LLC

SE Myrtles at Olde Towne, LLC

SE Myrtles at Olde Towne, LLC

SE Oak Mill I Holdings, LLC

SE Oak Mill I Holdings, LLC *(fka SCG Atlas Oak Mill I Holdings, L.L.C.)*

SE Oak Mill I Owner, LLC *(fka SCG Atlas Oak Mill I, L.L.C.)*

SE Oak Mill I REIT, LLC

SE Oak Mill I REIT, LLC *(fka SCG Atlas Oak Mill I REIT, L.L.C.)*

SE Oak Mill I, LLC

SE Oak Mill I, LLC

SE Oak Mill II Holdings, LLC

SE Oak Mill II Holdings, LLC *(fka SCG Atlas Oak Mill II Holdings, L.L.C.)*

SE Oak Mill II Owner, LLC *(fka SCG Atlas Oak Mill II, L.L.C.)*

SE Oak Mill II REIT, LLC

SE Oak Mill II REIT, LLC *(fka SCG Atlas Oak Mill II REIT, L.L.C.)*

SE Oak Mill II, LLC

SE Oak Mill II, LLC

SE Quail Landing, LLC

SE River Walk, LLC

SE Riverwalk, LLC

SE SM, Inc.

SE Stoney Ridge Holdings, L.L.C. *(fka SCG Atlas Stoney Ridge Holdings, L.L.C.)*

SE Stoney Ridge Holdings, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge REIT, L.L.C. *(fka SCG Atlas Stoney Ridge REIT, L.L.C.)*

SE Stoney Ridge REIT, LLC

SE Stoney Ridge, LLC *(fka SCG Atlas Stoney Ridge, L.L.C.)*

SE Victoria Park, LLC

SE Victoria Park, LLC

Sentinel Re Holdings, Ltd.

Sentinel Reinsurance Ltd.

SFH1, LLC

SFR WLIF I, LLC *(fka NexPoint WLIF I, LLC)*

SFR WLIF II, LLC *(NexPoint WLIF II, LLC)*

SFR WLIF III, LLC *(NexPoint WLIF III, LLC)*

SFR WLIF Manager, LLC *(NexPoint WLIF Manager, LLC)*

SFR WLIF, LLC *(NexPoint WLIF, LLC)*

SFR WLIF, LLC Series I

SFR WLIF, LLC Series II

SFR WLIF, LLC Series III

SH Castle BioSciences, LLC

Small Cap Equity Sub, LLC

Socially Responsible Equity Sub, LLC

SOF Brandywine I Owner, L.P.

SOF Brandywine II Owner, L.P.

SOF-X GS Owner, L.P.

Southfork Cayman Holdings, Ltd.

Southfork CLO, Ltd.

Specialty Financial Products Designated Activity Company *(fka Specialty Financial Products Limited)*

Spiritus Life, Inc.

SRL Sponsor LLC

SRL Whisperwod LLC

SRL Whisperwood Member LLC

SRL Whisperwood Venture LLC

SSB Assets LLC

Starck, Ltd.

Stemmons Hospitality, LLC

Steve Shin

Stonebridge Capital, Inc.

Stonebridge-Highland Healthcare Private Equity Fund

Strand Advisors III, Inc.

Strand Advisors IV, LLC

Strand Advisors IX, LLC

Strand Advisors V, LLC

Strand Advisors XIII, LLC

Strand Advisors XVI, Inc.

Strand Advisors, Inc.

Stratford CLO, Ltd.

Summers Landing Apartment Investors, L.P.

Term Loan B
(10% cash contributions - profit participation only)

The Dallas Foundation

The Dallas Foundation (third party)

The Dondero Insurance Rabbi Trust

The Dugaboy Investment Trust

The Dugaboy Investment Trust U/T/A Dated Nov 15, 2010

The Get Good Non-Exempt Trust No. 1

The Get Good Non-Exempt Trust No. 2

The Get Good Trust

The Mark and Pamela Okada Family Trust - Exempt Descendants' Trust

The Mark and Pamela Okada Family Trust - Exempt Trust #2

The Ohio State Life Insurance Company

The Okada Family Foundation, Inc.

The Okada Insurance Rabbi Trust

The SLHC Trust

The Trustees of Columbia University in the City of New York

The Twentysix Investment Trust (Third Party Investor)

Thomas A. Neville

Thread 55, LLC

Tihany, Ltd.

Todd Travers

Tranquility Lake Apartments Investors, L.P.

Tuscany Acquisition, LLC

Uptown at Cityplace Condominium Association, Inc.

US Gaming OpCo, LLC

US Gaming SPV, LLC

US Gaming, LLC

Valhalla CLO, Ltd.

VB GP LLC

VB Holding, LLC

VB One, LLC

VB OP Holdings LLC

VBAnnex C GP, LLC

VBAnnex C Ohio, LLC

VBAnnex C, LP

Ventoux Capital, LLC (Matt Goetz)

VineBrook Annex B, L.P.

VineBrook Annex I, L.P.

VineBrook Homes Merger Sub II LLC

VineBrook Homes Merger Sub LLC

VineBrook Homes OP GP, LLC

VineBrook Homes Operating Partnership, L.P.

VineBrook Homes Trust, Inc.

VineBrook Partners I, L.P.

VineBrook Partners II, L.P.

VineBrook Properties, LLC

Virginia Retirement System

Vizcaya Investment, LLC

Wake LV Holdings II, Ltd.
Wake LV Holdings, Ltd.
Walter Holdco GP, LLC
Walter Holdco I, Ltd.
Walter Holdco, L.P.
Warhol, Ltd.
Warren Chang
Westchester CLO, Ltd.
William L. Britain
Wright Ltd.
Wright, Ltd.
Yellow Metal Merchants, Inc.

Schedule of Causes of Action

The Causes of Action shall include, *without limitation*, any cause of action based on the following:

breach of fiduciary duties, breach of duty of care, breach of duty of loyalty, usurpation of corporate opportunities, breach of implied covenant of good faith and fair dealing, conversion, misappropriation of assets, misappropriation of trade secrets, unfair competition, breach of contract, breach of warranty, fraud, constructive fraud, negligence, gross negligence, fraudulent conveyance, fraudulent transfer, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, fraudulent inducement, tortious interference, *quantum meruit*, unjust enrichment, abuse of process, alter ego, substantive consolidation, recharacterization, business disparagement, indemnity, claims for recovery of distributions or dividends, claims for indemnification, promissory estoppel, quasi-contract claims, any counterclaims, equitable subordination, avoidance actions provided for under sections 544 or 547 of the Bankruptcy Code, claims brought under state law, claims brought under federal law, claims under any common-law theory of tort or law or equity, and any claims similar in nature to the foregoing claims.

The Causes of Action shall include, *without limitation*, any cause of action against the following persons and entities:

James Dondero, Mark Okada, Grant Scott, John Honis, any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, Nexbank Capital, Inc. Highland Capital Management Services, Inc., NexPoint Advisors GP, LLC, NexPoint Advisors, L.P., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on the attached **Annex 1** hereto, any current or former employee of the Debtor, and any entity directly or indirectly owned, controlled, or operated for the benefit of the foregoing persons or entities.

The Causes of Action shall include, *without limitation*, any cause of action arising from the following transactions:

The transfer of ownership interests in the Debtor to Hunter Mountain Investment Trust, the creation or transfer of any notes receivable from the Debtor or from any entity related to the Debtor, the creation or transfer of assets to or from any charitable foundation or trust, the formation, performance, or breach of any contract for the Debtor to provide investment management, support services, or any other services, and the distribution of assets or cash from the Debtor to partners of the Debtor.

**Annex 1**

11 Estates Lane, LLC

1110 Waters, LLC

140 Albany, LLC

1525 Dragon, LLC

17720 Dickerson, LLC

1905 Wylie LLC

2006 Milam East Partners GP, LLC

2006 Milam East Partners, L.P.

201 Tarrant Partners, LLC

2014 Corpus Weber Road LLC

2325 Stemmons HoldCo, LLC

2325 Stemmons Hotel Partners, LLC

2325 Stemmons TRS, Inc.

300 Lamar, LLC

3409 Rosedale, LLC

3801 Maplewood, LLC

3801 Shenandoah, L.P.

3820 Goar Park LLC

400 Seaman, LLC

401 Ame, L.P.

4201 Locust, L.P.

4312 Belclaire, LLC

5833 Woodland, L.P.

5906 DeLoache, LLC

5950 DeLoache, LLC

7758 Ronnie, LLC

7759 Ronnie, LLC

AA Shotguns, LLC

Aberdeen Loan Funding, Ltd.

Acis CLO 2017-7 Ltd

Acis CLO Management GP, LLC

Acis CLO Management GP, LLC (*fka Acis CLO Opportunity Funds GP, LLC*)

Acis CLO Management Holdings, L.P.

Acis CLO Management Intermediate Holdings I, LLC

Acis CLO Management Intermediate Holdings II, LLC

Acis CLO Management, LLC (*fka Acis CLO Opportunity Funds SLP, LLC*)

Acis CLO Trust

Acis CLO Value Fund II Charitable DAF Ltd.

Acis CMOA Trust

Advisors Equity Group LLC

Alamo Manhattan Hotel I, LLC (Third Party)

Allenby, LLC

Allisonville RE Holdings, LLC

AM Uptown Hotel, LLC

Apex Care, L.P

Asbury Holdings, LLC (*fka HCSLR Camelback Investors (Delaware), LLC*)

Ascendant Advisors

Atlas IDF GP, LLC

Atlas IDF, LP

BB Votorantim Highland Infrastructure, LLC

BDC Toys Holdco, LLC

Beacon Mountain, LLC

Bedell Trust Ireland Limited (Charitable trust account)

Ben Roby (third party)

BH Equities, LLC

BH Heron Pointe, LLC

BH Hollister, LLC

BH Willowdale Manager, LLC

Big Spring Partners, LLC

Blair Investment Partners, LLC

Bloomdale, LLC

Brave Holdings III Inc.

Brentwood CLO, Ltd.

Brentwood Investors Corp.

Brian Mitts

Bristol Bay Funding Ltd.

Bristol Bay Funding, Ltd.

BVP Property, LLC

C-1 Arbors, Inc.

C-1 Cutter's Point, Inc.

C-1 Eaglecrest, Inc.

C-1 Silverbrook, Inc.

Cabi Holdco GP, LLC

Cabi Holdco I, Ltd

Cabi Holdco I, Ltd.

Cabi Holdco, L.P.

California Public Employees' Retirement System

Camelback Residential Investors, LLC

Camelback Residential Investors, LLC
*(fka Sevilla Residential Partners, LLC)*

Camelback Residential Partners, LLC

Capital Real Estate - Latitude, LLC

Castle Bio Manager, LLC

Castle Bio, LLC

CG Works, Inc.

CG Works, Inc.
(fka Common Grace Ventures, Inc.)

Charitable DAF Fund, L.P.

Charitable DAF GP, LLC

Charitable DAF HoldCo, Ltd

Charitable DAF HoldCo, Ltd.

Claymore Holdings, LLC

CLO HoldCo, Ltd

CLO Holdco, Ltd.

Corbusier, Ltd.

Cornerstone Healthcare Group Holding, Inc.

Corpus Weber Road Member LLC

CP Equity Hotel Owner, LLC

CP Equity Land Owner, LLC

CP Equity Owner, LLC

CP Hotel TRS, LLC

CP Land Owner, LLC

CP Tower Owner, LLC

CRE - Lat, LLC

Credit Suisse, Cayman Islands Branch

Crossings 2017 LLC

Crown Global Insurance Company (third party)

Dallas Cityplace MF SPE Owner LLC

Dallas Lease and Finance, L.P.

Dana Scott Breault
James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Dana Sprong (Third Party)

David c. Hopson

De Kooning, Ltd.

deKooning, Ltd.

DFA/BH Autumn Ridge, LLC

Dolomiti, LLC

DrugCrafters, L.P.

Dugaboy Investment Trust

Dugaboy Management, LLC

Dugaboy Project Management GP, LLC

Eagle Equity Advisors, LLC

Eames, Ltd.

Eastland CLO, Ltd.

Eastland Investors Corp.

EDS Legacy Heliport, LLC

EDS Legacy Partners Owner, LLC

EDS Legacy Partners, LLC

Empower Dallas Foundation, Inc.

ENA 41, LLC

Entegra Strat Superholdco, LLC

Entegra-FRO Holdco, LLC

Entegra-FRO Superholdco, LLC

Entegra-HOCF Holdco, LLC

Entegra-NHF Holdco, LLC

Entegra-NHF Superholdco, LLC

Entegra-RCP Holdco, LLC

Estates on Maryland Holdco, LLC

Estates on Maryland Owners SM, Inc.

Estates on Maryland Owners, LLC

Estates on Maryland, LLC

Falcon E&P Four Holdings, LLC

Falcon E&P One, LLC

Falcon E&P Opportunities Fund, L.P.

Falcon E&P Opportunities GP, LLC

Falcon E&P Royalty Holdings, LLC

Falcon E&P Six, LLC

Falcon E&P Two, LLC

Falcon Four Midstream, LLC

Falcon Four Upstream, LLC

Falcon Incentive Partners GP, LLC

Falcon Incentive Partners, LP

Falcon Six Midstream, LLC

Flamingo Vegas Holdco, LLC *(fka Cabi Holdco, LLC)*

Four Rivers Co-Invest GP, LLC

Four Rivers Co-Invest, L.P.

FRBH Abbington SM, Inc.

FRBH Abbington, LLC

FRBH Arbors, LLC

FRBH Beechwood SM, Inc.

FRBH Beechwood, LLC

FRBH C1 Residential, LLC

FRBH Courtney Cove SM, Inc.

FRBH Courtney Cove, LLC

FRBH CP, LLC

FRBH Duck Creek, LLC

FRBH Eaglecrest, LLC

FRBH Edgewater JV, LLC

FRBH Edgewater Owner, LLC

FRBH Edgewater SM, Inc.

FRBH JAX-TPA, LLC

FRBH Nashville Residential, LLC

FRBH Regatta Bay, LLC

FRBH Sabal Park SM, Inc.

FRBH Sabal Park, LLC

FRBH Silverbrook, LLC

FRBH Timberglen, LLC

FRBH Willow Grove SM, Inc.

FRBH Willow Grove, LLC

FRBH Woodbridge SM, Inc.

FRBH Woodbridge, LLC

Freedom C1 Residential, LLC

Freedom Duck Creek, LLC

Freedom Edgewater, LLC

Freedom JAX-TPA Residential, LLC

Freedom La Mirage, LLC

Freedom LHV LLC

Freedom Lubbock LLC

Freedom Miramar Apartments, LLC

Freedom Sandstone, LLC

Freedom Willowdale, LLC

Fundo de Investimento em Direitos Creditorios BB Votorantim Highland Infraestrutura

G&E Apartment REIT The Heights at Olde Towne, LLC

G&E Apartment REIT The Myrtles at Olde Towne, LLC

GAF REIT, LLC

GAF Toys Holdco, LLC

Gardens of Denton II, L.P.

Gardens of Denton III, L.P.

Gleneagles CLO, Ltd.

Goverannce RE, Ltd.

Governance Re, Ltd.

Governance, Ltd.

Grant Scott

Grant Scott, Trustee of The SLHC Trust

Grayson CLO, Ltd.

Grayson Investors Corp.

Greater Kansas City Community Foundation (third party)

Greenbriar CLO, Ltd.

Greg Busseyt

Gunwale LLC

Gunwale, LLC

Hakusan, LLC

Hammark Holdings LLC

Hampton Ridge Partners, LLC

Harbourvest Entities

Harko, LLC

Harry Bookey/Pam Bookey (third party)

Haverhill Acquisition Co., LLC

Haygood, LLC

HB 2015 Family LP (third party)

HCBH 11611 Ferguson, LLC

HCBH Buffalo Pointe II, LLC

HCBH Buffalo Pointe III, LLC

HCBH Buffalo Pointe, LLC

HCBH Hampton Woods SM, Inc.

HCBH Hampton Woods, LLC

HCBH Overlook SM, Inc.

HCBH Overlook, LLC

HCBH Rent Investors, LLC

HCMS Falcon GP, LLC

HCMS Falcon, L.P.

HCO Holdings, LLC

HCOF Preferred Holdings, L.P.

HCOF Preferred Holdings, LP

HCOF Preferred Holdings, Ltd.

HCRE 1775 James Ave, LLC

HCRE Addison TRS, LLC

HCRE Addison, LLC (*fka HWS Addison, LLC*)

HCRE Hotel Partner, LLC (*fka HCRE HWS Partner, LLC*)

HCRE Las Colinas TRS, LLC

HCRE Las Colinas, LLC (*fka HWS Las Colinas, LLC*)

HCRE Plano TRS, LLC

HCRE Plano, LLC (*fka HWS Plano, LLC*)

HCREF-I Holding Corp.

HCREF-II Holding Corp.

HCREF-III Holding Corp.

HCREF-IV Holding Corp.

HCREF-IX Holding Corp.

HCREF-V Holding Corp.

HCREF-VI Holding Corp.

HCREF-VII Holding Corp.

HCREF-VIII Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

HCREF-XIII Holding Corp.

HCREF-XIV Holding Corp.

HCREF-XV Holding Corp.

HCSLR Camelback Investors (Cayman), Ltd.

HCSLR Camelback, LLC

HCT Holdco 2 Ltd.

HCT Holdco 2, Ltd.

HE 41, LLC

HE Capital 232 Phase I Property, LLC

HE Capital 232 Phase I, LLC

HE Capital Asante, LLC

HE Capital Fox Trails, LLC

HE Capital KR, LLC

HE Capital, LLC

HE CLO Holdco, LLC

HE Mezz Fox Trails, LLC

HE Mezz KR, LLC

HE Peoria Place Property, LLC

HE Peoria Place, LLC

Heron Pointe Investors, LLC

Hewett's Island CLO I-R, Ltd.

HFP Asset Funding II, Ltd.

HFP Asset Funding III, Ltd.

HFP CDO Construction Corp.

HFP GP, LLC

HFRO Sub, LLC

Hibiscus HoldCo, LLC

Highland - First Foundation Income Fund

Highland 401(k) Plan

Highland 401K Plan

Highland Argentina Regional Opportunity Fund GP, LLC

Highland Argentina Regional Opportunity Fund, L.P.

Highland Argentina Regional Opportunity Fund, Ltd.

Highland Argentina Regional Opportunity Master Fund, L.P.

Highland Brasil, LLC

Highland Capital Brasil Gestora de Recursos (*fka Highland Brasilinvest Gestora de Recursos, LTDA; fka HBI Consultoria Empresarial, LTDA*)

Highland Capital Management (Singapore) Pte Ltd

Highland Capital Management AG

Highland Capital Management AG (Highland Capital Management SA) (Highland Capital Management Ltd)

Highland Capital Management Fund Advisors, L.P.

Highland Capital Management Fund Advisors, L.P. (*fka Pyxis Capital, L.P.*)

Highland Capital Management Korea Limited

Highland Capital Management Latin America, L.P.

Highland Capital Management LP Retirement Plan and Trust

Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.

Highland Capital Management Real Estate Holdings I, LLC

Highland Capital Management Real Estate Holdings II, LLC

Highland Capital Management Services, Inc.

Highland Capital Management, L.P.

Highland Capital Management, L.P. Charitable Fund

Highland Capital Management, L.P. Retirement Plan and Trust

Highland Capital Management, L.P., as trustee of Acis CMOA Trust and nominiee for and on behalf of Highland CLO Assets Holdings Limited

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominiee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, LP

Highland Capital Management, LP Charitable Fund

Highland Capital Multi-Strategy Fund, LP

Highland Capital of New York, Inc.

Highland Capital Special Allocation, LLC

Highland CDO Holding Company

Highland CDO Opportunity Fund GP, L.P.

Highland CDO Opportunity Fund, L.P.

Highland CDO Opportunity Fund, Ltd.

Highland CDO Opportunity GP, LLC

Highland CDO Opportunity Master Fund, L.P.

Highland CDO Trust

Highland CLO 2018-1, Ltd.

Highland CLO Assets Holdings Limited

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd. *(fka Acis Loan Funding, Ltd.)*

Highland CLO Gaming Holdings, LLC

Highland CLO Holdings Ltd.

Highland CLO Holdings, Ltd. (as of 12.19.17)

Highland CLO Management Ltd.

Highland CLO Trust

Highland Credit Opportunities CDO Asset Holdings GP, Ltd.

Highland Credit Opportunities CDO Asset Holdings, L.P.

Highland Credit Opportunities CDO Financing, LLC

Highland Credit Opportunities CDO, Ltd.

Highland Credit Opportunities Holding Corporation

Highland Credit Opportunities Japanese Feeder Sub-Trust

Highland Credit Opportunities Japanese Unit Trust (Third Party)

Highland Credit Strategies Fund, L.P.

Highland Credit Strategies Fund, Ltd.

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Master Fund, L.P.

Highland Dallas Foundation, Inc.

Highland Dynamic Income Fund GP, LLC

Highland Dynamic Income Fund GP, LLC *(fka Highland Capital Loan GP, LLC)*

Highland Dynamic Income Fund, L.P.

Highland Dynamic Income Fund, L.P. *(fka Highland Capital Loan Fund, L.P.)*

Highland Dynamic Income Fund, Ltd.

Highland Dynamic Income Fund, Ltd. *(fka Highland Loan Fund, Ltd.)*

Highland Dynamic Income Master Fund, L.P.

Highland Dynamic Income Master Fund, L.P. *(fka Highland Loan Master Fund, L.P.)*

Highland Employee Retention Assets LLC

Highland Energy Holdings, LLC

Highland Energy MLP Fund *(fka Highland Energy and Materials Fund)*

Highland Equity Focus Fund, L.P.

Highland ERA Management, LLC

Highland eSports Private Equity Fund

Highland Financial Corp.

Highland Financial Partners, L.P.

Highland Fixed Income Fund

Highland Flexible Income UCITS Fund

Highland Floating Rate Fund

Highland Floating Rate Opportunites Fund

Highland Floating Rate Opportunities Fund

Highland Fund Holdings, LLC

Highland Funds I

Highland Funds II

Highland Funds III

Highland GAF Chemical Holdings, LLC

Highland General Partner, LP

Highland Global Allocation Fund

Highland Global Allocation Fund *(fka Highland Global Allocation Fund II)*

Highland GP Holdings, LLC

Highland HCF Advisor Ltd.

Highland HCF Advisor, Ltd., as Trustee for and on behalf of Acis CLO Trust, as nominee for and on behalf of Highland CLO Funding, Ltd. (as of 3.29.18)

Highland Healthcare Equity Income and Growth Fund

Highland iBoxx Senior Loan ETF

Highland Income Fund

Highland Income Fund  *(fka Highland Floating Rate Opportunities Fund)*

Highland Kansas City Foundation, Inc.

Highland Latin America Consulting, Ltd.

Highland Latin America GP, Ltd.

Highland Latin America LP, Ltd.

Highland Latin America Trust

Highland Legacy Limited

Highland LF Chemical Holdings, LLC

Highland Loan Funding V, LLC

Highland Loan Funding V, Ltd.

Highland Long/Short Equity Fund

Highland Long/Short Healthcare Fund

Highland Marcal Holding, Inc.

Highland Merger Arbitrage Fund

Highland Multi Strategy Credit Fund GP, L.P.

Highland Multi Strategy Credit Fund GP, L.P. *(fka Highland Credit Opportunities CDO GP, L.P.)*

Highland Multi Strategy Credit Fund, L.P.

Highland Multi Strategy Credit Fund, L.P. *(fka Highland Credit Opportunities Fund, L.P., fka Highland Credit Opportunities CDO, L.P.)*

Highland Multi Strategy Credit Fund, Ltd.

Highland Multi Strategy Credit Fund, Ltd. *(fka Highland Credit Opportunities Fund, Ltd.)*

Highland Multi Strategy Credit GP, LLC

Highland Multi Strategy Credit GP, LLC *(fka Highland Credit Opportunities CDO GP, LLC)*

Highland Multi-Strategy Fund GP, LLC

Highland Multi-Strategy Fund GP, LP

Highland Multi-Strategy IDF GP, LLC

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Master Fund, LP

Highland Multi-Strategy Onshore Master SubFund II, LLC

Highland Multi-Strategy Onshore Master Subfund, LLC

Highland Opportunistic Credit Fund

Highland Park CDO 1, Ltd.

Highland Park CDO I, Ltd.

Highland Premier Growth Equity Fund

Highland Premium Energy & Materials Fund

Highland Prometheus Feeder Fund I, L.P.

Highland Prometheus Feeder Fund I, LP

Highland Prometheus Feeder Fund II, L.P.

Highland Prometheus Feeder Fund II, LP

Highland Prometheus Master Fund, L.P.

Highland Receivables Finance I, LLC

Highland Restoration Capital Partners GP, LLC

Highland Restoration Capital Partners Master, L.P.

Highland Restoration Capital Partners Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Santa Barbara Foundation, Inc.

Highland Select Equity Fund GP, L.P.

Highland Select Equity Fund, L.P.

Highland Select Equity GP, LLC

Highland Select Equity Master Fund, L.P.

Highland Small-Cap Equity Fund

Highland Socially Responsible Equity Fund

Highland Socially Responsible Equity Fund
*(fka Highland Premier Growth Equity Fund)*

Highland Special Opportunities Holding Company

Highland SunBridge GP, LLC

Highland Tax-Exempt Fund

Highland TCI Holding Company, LLC

Highland Total Return Fund

Highland's Roads Land Holding Company, LLC

Hirst, Ltd.

HMCF PB Investors, LLC

HMx2 Investment Trust
(Matt McGraner)

Hockney, Ltd.

HRT North Atlanta, LLC

HRT Timber Creek, LLC

HRTBH North Atlanta, LLC

HRTBH Timber Creek, LLC

Huber Funding LLC

Hunter Mountain Investment Trust

HWS Investors Holdco, LLC

Internal Investors

Intertrust

James D. Dondero
Reese Avry Dondero
Jameson Drue Dondero

James Dondero

James Dondero and Mark Okada

James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Japan Trustee Services Bank, Ltd.

Jasper CLO, Ltd.

Jewelry Ventures I, LLC

JMIJM, LLC

Joanna E. Milne Irrevocable Trust dated Nov 25 1998 (third party)

John Honis

John L. Holt, Jr.

John R. Sears, Jr.

Karisopolis, LLC

Keelhaul LLC

KHM Interests, LLC (third party)

Kuilima Montalban Holdings, LLC

Kuilima Resort Holdco, LLC

KV Cameron Creek Owner, LLC

Lakes at Renaissance Park Apartments Investors, L.P.

Lakeside Lane, LLC

Landmark Battleground Park II, LLC

Lane Britain

Larry K. Anders

LAT Battleground Park, LLC

LAT Briley Parkway, LLC

Lautner, Ltd.

Leawood RE Holdings, LLC

Liberty Cayman Holdings, Ltd.

Liberty CLO Holdco, Ltd.

Liberty CLO, Ltd.

Liberty Sub, Ltd.

Long Short Equity Sub, LLC

Longhorn Credit Funding LLC

Longhorn Credit Funding LLC - A

Longhorn Credit Funding LLC - B

Longhorn Credit Funding LLC (LHB)

Longhorn Credit Funding, LLC

Lurin Real Estate Holdings V, LLC

Maple Avenue Holdings, LLC

MaplesFS Limited

Marc C. Manzo

Mark and Pam Okada Family Trust - Exempt Descendants' Trust

Mark and Pam Okada Family Trust - Exempt Trust #2

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust #2

Mark and Pamela Okada Family Trust - Exempt Trust #2

Mark K. Okada

Mark Okada

Mark Okada and Pam Okada
Mark Okada and Pam Okada, as joint owners
Mark Okada/Pamela Okada
Markham Fine Jewelers, L.P.
Markham Fine Jewelers, LP
Matt McGraner
Meritage Residential Partners, LLC
MGM Studios HoldCo, Ltd.
Michael Rossi
ML CLO XIX Sterling (Cayman), Ltd.
N/A
Nancy Dondero
NCI Apache Trail LLC
NCI Assets Holding Company LLC
NCI Country Club LLC
NCI Fort Worth Land LLC
NCI Front Beach Road LLC
NCI Minerals LLC
NCI Royse City Land LLC
NCI Stewart Creek LLC
NCI Storage, LLC
Neil Labatte
Neutra, Ltd.
New Jersey Tissue Company Holdco, LLC
*(fka Marcal Paper Mills Holding Company, LLC)*

NexAnnuity Holdings, Inc.
NexBank Capital Trust I
NexBank Capital, Inc.
NexBank Land Advisors, Inc.
NexBank Securities Inc.
NexBank Securities, Inc.

NexBank SSB
NexBank Title, Inc.
(dba NexVantage Title Services)

NexBank, SSB
NexPoint Advisors GP, LLC
NexPoint Advisors, L.P.
NexPoint Capital REIT, LLC
NexPoint Capital, Inc.
NexPoint Capital, Inc. *(fka NexPoint Capital, LLC)*

NexPoint CR F/H DST, LLC
NexPoint Credit Strategies Fund
NexPoint Discount Strategies Fund
*(fka NexPoint Discount Yield Fund)*
NexPoint DRIP
NexPoint Energy and Materials Opportunities
Fund *(fka NexPoint Energy Opportunities Fund)*

NexPoint Event-Driven Fund
*(fkaNexPoint Merger Arbitrage Fund)*
NexPoint Flamingo DST
NexPoint Flamingo Investment Co, LLC
NexPoint Flamingo Leaseco, LLC
NexPoint Flamingo Manager, LlC
NexPoint Flamingo Property Manager, LlC
NexPoint Healthcare Opportunities Fund
NexPoint Hospitality Trust
NexPoint Hospitality, Inc.
NexPoint Hospitality, LLC
NexPoint Insurance Distributors, LLC
NexPoint Insurance Solutions GP, LLC
NexPoint Insurance Solutions GP, LLC
*(fka Highland Capital Insurance Solutions GP, LLC)*

NexPoint Insurance Solutions, L.P.
*(fka Highland Capital Insurance Solutions, L.P.)*

NexPoint Latin American Opportunities Fund
NexPoint Legacy 22, LLC
NexPoint Lincoln Porte Equity, LLC
NexPoint Lincoln Porte Manager, LLC
NexPoint Lincoln Porte, LLC
*(fka NREA Lincoln Porte, LLC)*
NexPoint Multifamily Capital Trust, Inc.
NexPoint Multifamily Capital Trust, Inc.
*(fka NexPoint Multifamily Realty Trust, Inc., fka Highland Capital Realty Trust, Inc.)*

NexPoint Multifamily Operating Partnership, L.P.

NexPoint Peoria, LLC
NexPoint Polo Glen DST
NexPoint Polo Glen Holdings, LLC
NexPoint Polo Glen Investment Co, LLC

NexPoint Polo Glen Leaseco, LLC

NexPoint Polo Glen Manager, LLC

NexPoint RE Finance Advisor GP, LLC

NexPoint RE Finance Advisor, L.P.

NexPoint Real Estate Advisors GP, LLC

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors III, L.P.

NexPoint Real Estate Advisors IV, L.P.

NexPoint Real Estate Advisors V, L.P.

NexPoint Real Estate Advisors VI, L.P.

NexPoint Real Estate Advisors VII GP, LLC

NexPoint Real Estate Advisors VII, L.P.

NexPoint Real Estate Advisors VIII, L.P.

NexPoint Real Estate Advisors, L.P.

NexPoint Real Estate Capital, LLC

NexPoint Real Estate Capital, LLC *(fka Highland Real Estate Capital, LLC, fka Highland Multifamily Credit Fund, LLC)*

NexPoint Real Estate Finance OP GP, LLC

NexPoint Real Estate Finance Operating Partnership, L.P.

NexPoint Real Estate Finance, Inc.

NexPoint Real Estate Opportunities,  LLC

NexPoint Real Estate Opportunities, LLC *(fka Freedom REIT LLC)*

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Strategies Fund

NexPoint Residential Trust Inc.

NexPoint Residential Trust Operating Partnership GP, LLC

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust, Inc.

NexPoint Securities, Inc. *(fka Highland Capital Funds Distributor, Inc.) (fka Pyxis Distributors, Inc.)*

NexPoint Strategic Income Fund *(fka NexPoint Opportunistic Credit Fund, fka NexPoint Distressed Strategies Fund)*

NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund *(fka NexPoint Credit Strategies Fund)*

NexPoint Texas Multifamily Portfolio DST *(fka NREA Southeast Portfolio Two, DST)*

NexPoint WLIF I Borrower, LLC

NexPoint WLIF I, LLC

NexPoint WLIF II Borrower, LLC

NexPoint WLIF II, LLC

NexPoint WLIF III Borrower, LLC

NexPoint WLIF III, LLC

NexPoint WLIF, LLC (Series I)

NexPoint WLIF, LLC (Series II)

NexPoint WLIF, LLC (Series III)

NexStrat LLC

NexVest, LLC

NexWash LLC

NFRO REIT Sub, LLC

NFRO TRS, LLC

NHF CCD, Inc.

NHT 2325 Stemmons, LLC

NHT Beaverton TRS, LLC *(fka NREA Hotel TRS, Inc.)*

NHT Beaverton, LLC

NHT Bend TRS, LLC

NHT Bend, LLC

NHT Destin TRS, LLC

NHT Destin, LLC

NHT DFW Portfolio, LLC

NHT Holdco, LLC

NHT Holdings, LLC

NHT Intermediary, LLC

NHT Nashville TRS, LLC

NHT Nashville, LLC

NHT Olympia TRS, LLC

NHT Olympia, LLC

NHT Operating Partnership GP, LLC

NHT Operating Partnership II, LLC

NHT Operating Partnership, LLC

NHT Salem, LLC

NHT SP Parent, LLC
NHT SP TRS, LLC
NHT SP, LLC
NHT Tigard TRS, LLC
NHT Tigard, LLC
NHT TRS, Inc.
NHT Uptown, LLC
NHT Vancouver TRS, LLC
NHT Vancouver, LLC
NLA Assets LLC
NMRT TRS, Inc.
NREA Adair DST Manager, LLC
NREA Adair Investment Co, LLC
NREA Adair Joint Venture, LLC
NREA Adair Leaseco Manager, LLC
NREA Adair Leaseco, LLC
NREA Adair Property Manager LLC
NREA Adair, DST
NREA Ashley Village Investors, LLC
NREA Cameron Creek Investors, LLC
NREA Cityplace Hue Investors, LLC
NREA Crossing Investors LLC
NREA Crossings Investors, LLC
NREA Crossings Ridgewood Coinvestment, LLC *(fka NREA Crossings Ridgewood Investors, LLC)*

NREA DST Holdings, LLC
NREA El Camino Investors, LLC
NREA Estates Inc.
NREA Estates Investment Co, LLC
NREA Estates Leaseco, LLC
NREA Estates Manager, LLC
NREA Estates Property Manager, LLC
NREA Estates, DST
NREA Gardens DST Manager LLC
NREA Gardens DST Manager, LLC
NREA Gardens Investment Co, LLC
NREA Gardens Leaseco Manager, LLC
NREA Gardens Leaseco, LLC
NREA Gardens Property Manager, LLC
NREA Gardens Springing LLC
NREA Gardens Springing Manager, LLC
NREA Gardens, DST

NREA Hidden Lake Investment Co, LLC
NREA Hue Investors, LLC
NREA Keystone Investors, LLC
NREA Meritage Inc.
NREA Meritage Investment Co, LLC
NREA Meritage Leaseco, LLC
NREA Meritage Manager, LLC
NREA Meritage Property Manager, LLC
NREA Meritage, DST
NREA Oaks Investors, LLC
NREA Retreat Investment Co, LLC
NREA Retreat Leaseco, LLC
NREA Retreat Manager, LLC
NREA Retreat Property Manager, LLC
NREA Retreat, DST
NREA SE MF Holdings LLC
NREA SE MF Holdings, LLC
NREA SE MF Investment Co, LLC
NREA SE MF Investment Co, LLC
NREA SE Multifamily LLC
NREA SE Multifamily, LLC
NREA SE One Property Manager, LLC
NREA SE Three Property Manager, LLC
NREA SE Two Property Manager, LLC
NREA SE1 Andros Isles Leaseco, LLC
NREA SE1 Andros Isles Manager, LLC
NREA SE1 Andros Isles, DST
(Converted from DK Gateway Andros, LLC)
NREA SE1 Arborwalk Leaseco, LLC
NREA SE1 Arborwalk Manager, LLC
NREA SE1 Arborwalk, DST
(Converted from MAR Arborwalk, LLC)
NREA SE1 Towne Crossing Leaseco, LLC
NREA SE1 Towne Crossing Manager, LLC
NREA SE1 Towne Crossing, DST
(Converted from Apartment REIT Towne Crossing, LP)
NREA SE1 Walker Ranch Leaseco, LLC
NREA SE1 Walker Ranch Manager, LLC
NREA SE1 Walker Ranch, DST
(Converted from SOF Walker Ranch Owner, L.P.)
NREA SE2 Hidden Lake Leaseco, LLC

NREA SE2 Hidden Lake Manager, LLC
NREA SE2 Hidden Lake, DST
NREA SE2 Hidden Lake, DST
(Converted from SOF Hidden Lake SA Owner, L.P.)

NREA SE2 Vista Ridge Leaseco, LLC
NREA SE2 Vista Ridge Manager, LLC
NREA SE2 Vista Ridge, DST
NREA SE2 Vista Ridge, DST
(Converted from MAR Vista Ridge, L.P.)

NREA SE2 West Place Leaseco, LLC
NREA SE2 West Place Manager, LLC
NREA SE2 West Place, DST
(Converted from Landmark at West Place, LLC)

NREA SE3 Arboleda Leaseco, LLC
NREA SE3 Arboleda Manager, LLC
NREA SE3 Arboleda, DST
(Converted from G&E Apartment REIT Arboleda, LLC)

NREA SE3 Fairways Leaseco, LLC
NREA SE3 Fairways Manager, LLC
NREA SE3 Fairways, DST
(Converted from MAR Fairways, LLC)

NREA SE3 Grand Oasis Leaseco, LLC
NREA SE3 Grand Oasis Manager, LLC
NREA SE3 Grand Oasis, DST
(Converted from Landmark at Grand Oasis, LP)

NREA Southeast Portfolio One Manager, LLC
NREA Southeast Portfolio One, DST
NREA Southeast Portfolio One, DST
NREA Southeast Portfolio Three Manager, LLC
NREA Southeast Portfolio Three, DST
NREA Southeast Portfolio Three, DST
NREA Southeast Portfolio Two Manager, LLC
NREA Southeast Portfolio Two, DST
NREA Southeast Portfolio Two, LLC
NREA SOV Investors, LLC
NREA Uptown TRS, LLC
NREA VB I LLC
NREA VB II LLC

NREA VB III LLC
NREA VB IV LLC
NREA VB Pledgor I LLC
NREA VB Pledgor I, LLC
NREA VB Pledgor II LLC
NREA VB Pledgor II, LLC
NREA VB Pledgor III LLC
NREA VB Pledgor III, LLC
NREA VB Pledgor IV LLC
NREA VB Pledgor IV, LLC
NREA VB Pledgor V LLC
NREA VB Pledgor V, LLC
NREA VB Pledgor VI LLC
NREA VB Pledgor VI, LLC
NREA VB Pledgor VII LLC
NREA VB Pledgor VII, LLC
NREA VB SM, Inc.
NREA VB V LLC
NREA VB VI LLC
NREA VB VII LLC
NREA Vista Ridge Investment Co, LLC
NREC AR Investors, LLC
NREC BM Investors, LLC
NREC BP Investors, LLC
NREC Latitude Investors, LLC
NREC REIT Sub, Inc.
NREC TRS, Inc.
NREC WW Investors, LLC
NREF OP I Holdco, LLC
NREF OP I SubHoldco, LLC
NREF OP I, L.P.
NREF OP II Holdco, LLC
NREF OP II SubHoldco, LLC
NREF OP II, L.P.
NREF OP IV REIT Sub TRS, LLC
NREF OP IV REIT Sub, LLC
NREF OP IV, L.P.
NREO NW Hospitality Mezz, LLC
NREO NW Hospitality, LLC
NREO Perilune, LLC
NREO SAFStor Investors, LLC
NREO TRS, Inc.
NRESF REIT Sub, LLC

NXRT Abbington, LLC
NXRT Atera II, LLC
NXRT Atera, LLC
NXRT AZ2, LLC
NXRT Barrington Mill, LLC
NXRT Bayberry, LLC
NXRT Bella Solara, LLC
NXRT Bella Vista, LLC
NXRT Bloom, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine LP, LLC
NXRT Brandywine LP, LLC
NXRT Brentwood Owner, LLC
NXRT Brentwood, LLC
NXRT Cedar Pointe Tenant, LLC
NXRT Cedar Pointe, LLC
NXRT Cityview, LLC
NXRT Cornerstone, LLC
NXRT Crestmont, LLC
NXRT Crestmont, LLC
NXRT Enclave, LLC
NXRT Glenview, LLC
NXRT H2 TRS, LLC
NXRT Heritage, LLC
NXRT Hollister TRS LLC
NXRT Hollister, LLC
NXRT LAS 3, LLC
NXRT Master Tenant, LLC
NXRT Nashville Residential, LLC
NXRT Nashville Residential, LLC *(fka Freedom Nashville Residential, LLC)*
NXRT North Dallas 3, LLC
NXRT Old Farm, LLC
NXRT Pembroke Owner, LLC
NXRT Pembroke, LLC
NXRT PHX 3, LLC
NXRT Radbourne Lake, LLC
NXRT Rockledge, LLC
NXRT Sabal Palms, LLC
NXRT SM, Inc.

NXRT Steeplechase, LLC
NXRT Stone Creek, LLC
NXRT Summers Landing GP, LLC
NXRT Summers Landing LP, LLC
NXRT Torreyana, LLC
NXRT Vanderbilt, LLC
NXRT West Place, LLC
NXRTBH AZ2, LLC
NXRTBH Barrington Mill Owner, LLC
NXRTBH Barrington Mill SM, Inc.
NXRTBH Barrington Mill, LLC
NXRTBH Bayberry, LLC
NXRTBH Cityview, LLC
NXRTBH Colonnade, LLC
NXRTBH Cornerstone Owner, LLC
NXRTBH Cornerstone SM, Inc.
NXRTBH Cornerstone, LLC
NXRTBH Dana Point SM, Inc.
NXRTBH Dana Point, LLC
NXRTBH Foothill SM, Inc.
NXRTBH Foothill, LLC
NXRTBH Heatherstone SM, Inc.
NXRTBH Heatherstone, LLC
NXRTBH Hollister Tenant, LLC
NXRTBH Hollister, LLC
NXRTBH Madera SM, Inc.
NXRTBH Madera, LLC
NXRTBH McMillan, LLC
NXRTBH North Dallas 3, LLC
NXRTBH Old Farm II, LLC
NXRTBH Old Farm Tenant, LLC
NXRTBH Old Farm, LLC
NXRTBH Radbourne Lake, LLC
NXRTBH Rockledge, LLC
NXRTBH Sabal Palms, LLC
NXRTBH Steeplechase, LLC
(dba Southpoint Reserve at Stoney Creek)-VA
NXRTBH Stone Creek, LLC
NXRTBH Vanderbilt, LLC
NXRTBH Versailles SM, Inc.
NXRTBH Versailles, LLC
Oak Holdco, LLC
Oaks CGC, LLC

000349

Okada Family Revocable Trust
Oldenburg, Ltd.
Pam Capital Funding GP Co. Ltd.
Pam Capital Funding, L.P.
PamCo Cayman Ltd.
Park West 1700 Valley View Holdco, LLC
Park West 2021 Valley View Holdco, LLC
Park West Holdco, LLC
Park West Portfolio Holdco, LLC
Participants of Highland 401K Plan
Patrick Willoughby-McCabe
PCMG Trading Partners XXIII, L.P.
PCMG Trading Partners XXIII, LP
PDK Toys Holdco, LLC
Pear Ridge Partners, LLC
Penant Management GP, LLC
Penant Management LP
PensionDanmark Holding A/S
PensionDanmark Pensionsforsikringsaktieselskab
Peoria Place Development, LLC (30% cash contributions - profit participation only)
Perilune Aero Equity Holdings One, LLC
Perilune Aviation LLC
PetroCap Incentive Holdings III. L.P.
PetroCap Incentive Partners II GP, LLC
PetroCap Incentive Partners II, L.P.
PetroCap Incentive Partners III GP, LLC
PetroCap Incentive Partners III, LP
PetroCap Management Company LLC
PetroCap Partners II GP, LLC
PetroCap Partners II, L.P.
PetroCap Partners III GP, LLC
PetroCap Partners III, L.P.
Pharmacy Ventures I, LLC
Pharmacy Ventures II, LLC
Pollack, Ltd.
Powderhorn, LLC
PWM1 Holdings, LLC
PWM1, LLC
Quest IRA, Inc FBO Jennifer G. Terry, IRA #1467511

Quest, IRA, Inc. FBO Joshua N. Terry, IRA #1467711
RADCO - Bay Meadows, LLLP
RADCO - Bay Park, LLLP
RADCO NREC Bay Meadows Holdings, LLC
RADCO NREC Bay Park Holdings, LLC
Ramarim, LLC
Rand Advisors Series I Insurance Fund
Rand Advisors Series II Insurance Fund
Rand Advisors, LLC
Rand PE Fund I, L.P.
Rand PE Fund I, L.P. - Series 1
Rand PE Fund Management, LLC
Rand PE Holdco, LLC
Realdania
Red River CLO, Ltd.
Red River Investors Corp.
Riverview Partners SC, LLC
Rockwall CDO II Ltd.
Rockwall CDO II, Ltd.
Rockwall CDO, Ltd.
Rockwall Investors Corp.
Rothko, Ltd.
RTT Bella Solara, LLC
RTT Bloom, LLC
RTT Financial, Inc.
RTT Hollister, LLC
RTT Rockledge, LLC
RTT Torreyana, LLC
SALI Fund Partners, LLC
San Diego County Employees Retirement Association
Sandstone Pasadena Apartments, LLC
Sandstone Pasadena, LLC
Santa Barbara Foundation (third party)
Saturn Oil & Gas LLC
SBC Master Pension Trust
Scott Matthew Siekielski
SE Battleground Park, LLC
SE Battleground Park, LLC
SE Glenview, LLC
SE Governors Green Holdings, L.L.C.

SE Governors Green Holdings, L.L.C.
*(fka SCG Atlas Governors Green Holdings, L.L.C.)*

SE Governors Green I, LLC

SE Governors Green II, LLC

SE Governors Green II, LLC

SE Governors Green REIT, L.L.C.

SE Governors Green REIT, L.L.C.
*(fka SCG Atlas Governors Green REIT, L.L.C.)*

SE Governors Green, LLC
*(fka SCG Atlas Governors Green, L.L.C.)*

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles LP, LLC

SE Gulfstream Isles LP, LLC

SE Heights at Olde Towne, LLC

SE Heights at Olde Towne, LLC

SE Lakes at Renaissance Park GP I, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park LP, LLC

SE Lakes at Renaissance Park LP, LLC

SE Multifamily Holdings LLC

SE Multifamily Holdings, LLC

SE Multifamily REIT Holdings LLC

SE Myrtles at Olde Towne, LLC

SE Myrtles at Olde Towne, LLC

SE Oak Mill I Holdings, LLC

SE Oak Mill I Holdings, LLC *(fka SCG Atlas Oak Mill I Holdings, L.L.C.)*

SE Oak Mill I Owner, LLC *(fka SCG Atlas Oak Mill I, L.L.C.)*

SE Oak Mill I REIT, LLC

SE Oak Mill I REIT, LLC *(fka SCG Atlas Oak Mill I REIT, L.L.C.)*

SE Oak Mill I, LLC

SE Oak Mill I, LLC

SE Oak Mill II Holdings, LLC

SE Oak Mill II Holdings, LLC *(fka SCG Atlas Oak Mill II Holdings, L.L.C.)*

SE Oak Mill II Owner, LLC *(fka SCG Atlas Oak Mill II, L.L.C.)*

SE Oak Mill II REIT, LLC

SE Oak Mill II REIT, LLC *(fka SCG Atlas Oak Mill II REIT, L.L.C.)*

SE Oak Mill II, LLC

SE Oak Mill II, LLC

SE Quail Landing, LLC

SE River Walk, LLC

SE Riverwalk, LLC

SE SM, Inc.

SE Stoney Ridge Holdings, L.L.C. *(fka SCG Atlas Stoney Ridge Holdings, L.L.C.)*

SE Stoney Ridge Holdings, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge REIT, L.L.C. *(fka SCG Atlas Stoney Ridge REIT, L.L.C.)*

SE Stoney Ridge REIT, LLC

SE Stoney Ridge, LLC *(fka SCG Atlas Stoney Ridge, L.L.C.)*

SE Victoria Park, LLC

SE Victoria Park, LLC

Sentinel Re Holdings, Ltd.

Sentinel Reinsurance Ltd.

SFH1, LLC

SFR WLIF I, LLC
*(fka NexPoint WLIF I, LLC)*

SFR WLIF II, LLC
*(NexPoint WLIF II, LLC)*

SFR WLIF III, LLC
*(NexPoint WLIF III, LLC)*

SFR WLIF Manager, LLC
*(NexPoint WLIF Manager, LLC)*

SFR WLIF, LLC
*(NexPoint WLIF, LLC)*

SFR WLIF, LLC Series I

SFR WLIF, LLC Series II

SFR WLIF, LLC Series III

SH Castle BioSciences, LLC

Small Cap Equity Sub, LLC

Socially Responsible Equity Sub, LLC

SOF Brandywine I Owner, L.P.

**000351**

SOF Brandywine II Owner, L.P.

SOF-X GS Owner, L.P.

Southfork Cayman Holdings, Ltd.

Southfork CLO, Ltd.

Specialty Financial Products Designated Activity Company *(fka Specialty Financial Products Limited)*

Spiritus Life, Inc.

SRL Sponsor LLC

SRL Whisperwod LLC

SRL Whisperwood Member LLC

SRL Whisperwood Venture LLC

SSB Assets LLC

Starck, Ltd.

Stemmons Hospitality, LLC

Steve Shin

Stonebridge Capital, Inc.

Stonebridge-Highland Healthcare Private Equity Fund

Strand Advisors III, Inc.

Strand Advisors IV, LLC

Strand Advisors IX, LLC

Strand Advisors V, LLC

Strand Advisors XIII, LLC

Strand Advisors XVI, Inc.

Strand Advisors, Inc.

Stratford CLO, Ltd.

Summers Landing Apartment Investors, L.P.

Term Loan B
(10% cash contributions - profit participation only)

The Dallas Foundation

The Dallas Foundation (third party)

The Dondero Insurance Rabbi Trust

The Dugaboy Investment Trust

The Dugaboy Investment Trust U/T/A Dated Nov 15, 2010

The Get Good Non-Exempt Trust No. 1

The Get Good Non-Exempt Trust No. 2

The Get Good Trust

The Mark and Pamela Okada Family Trust - Exempt Descendants' Trust

The Mark and Pamela Okada Family Trust - Exempt Trust #2

The Ohio State Life Insurance Company

The Okada Family Foundation, Inc.

The Okada Insurance Rabbi Trust

The SLHC Trust

The Trustees of Columbia University in the City of New York

The Twentysix Investment Trust
(Third Party Investor)

Thomas A. Neville

Thread 55, LLC

Tihany, Ltd.

Todd Travers

Tranquility Lake Apartments Investors, L.P.

Tuscany Acquisition, LLC

Uptown at Cityplace Condominium Association, Inc.

US Gaming OpCo, LLC

US Gaming SPV, LLC

US Gaming, LLC

Valhalla CLO, Ltd.

VB GP LLC

VB Holding, LLC

VB One, LLC

VB OP Holdings LLC

VBAnnex C GP, LLC

VBAnnex C Ohio, LLC

VBAnnex C, LP

Ventoux Capital, LLC
(Matt Goetz)

VineBrook Annex B, L.P.

VineBrook Annex I, L.P.

VineBrook Homes Merger Sub II LLC

VineBrook Homes Merger Sub LLC

VineBrook Homes OP GP, LLC

VineBrook Homes Operating Partnership, L.P.

VineBrook Homes Trust, Inc.

VineBrook Partners I, L.P.

VineBrook Partners II, L.P.

VineBrook Properties, LLC

Virginia Retirement System

Vizcaya Investment, LLC

Wake LV Holdings II, Ltd.
Wake LV Holdings, Ltd.
Walter Holdco GP, LLC
Walter Holdco I, Ltd.
Walter Holdco, L.P.
Warhol, Ltd.
Warren Chang
Westchester CLO, Ltd.
William L. Britain
Wright Ltd.
Wright, Ltd.
Yellow Metal Merchants, Inc.

### Schedule of Causes of Action

The Causes of Action shall include, *without limitation*, any cause of action based on the following:

breach of fiduciary duties, breach of duty of care, breach of duty of loyalty, usurpation of corporate opportunities, breach of implied covenant of good faith and fair dealing, conversion, misappropriation of assets, misappropriation of trade secrets, unfair competition, breach of contract, breach of warranty, fraud, constructive fraud, negligence, gross negligence, fraudulent conveyance, fraudulent transfer, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, fraudulent inducement, tortious interference, *quantum meruit*, unjust enrichment, abuse of process, alter ego, substantive consolidation, recharacterization, business disparagement, indemnity, claims for recovery of distributions or dividends, claims for indemnification, promissory estoppel, quasi-contract claims, any counterclaims, equitable subordination, avoidance actions provided for under sections 544 or 547 of the Bankruptcy Code, claims brought under state law, claims brought under federal law, claims under any common-law theory of tort or law or equity, and any claims similar in nature to the foregoing claims.

The Causes of Action shall include, *without limitation*, any cause of action against the following persons and entities:

James Dondero, Mark Okada, Grant Scott, John Honis, any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, Nexbank Capital, Inc. Highland Capital Management Services, Inc., NexPoint Advisors GP, LLC, NexPoint Advisors, L.P., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on the attached **Annex 1** hereto, any current or former employee of the Debtor, and any entity directly or indirectly owned, controlled, or operated for the benefit of the foregoing persons or entities.

The Causes of Action shall include, *without limitation*, any cause of action arising from the following transactions:

The transfer of ownership interests in the Debtor to Hunter Mountain Investment Trust, the creation or transfer of any notes receivable from the Debtor or from any entity related to the Debtor, the creation or transfer of assets to or from any charitable foundation or trust, the formation, performance, or breach of any contract for the Debtor to provide investment management, support services, or any other services, and the distribution of assets or cash from the Debtor to partners of the Debtor.

**Annex 1**

11 Estates Lane, LLC
1110 Waters, LLC
140 Albany, LLC
1525 Dragon, LLC
17720 Dickerson, LLC
1905 Wylie LLC
2006 Milam East Partners GP, LLC
2006 Milam East Partners, L.P.
201 Tarrant Partners, LLC
2014 Corpus Weber Road LLC
2325 Stemmons HoldCo, LLC
2325 Stemmons Hotel Partners, LLC
2325 Stemmons TRS, Inc.
300 Lamar, LLC
3409 Rosedale, LLC
3801 Maplewood, LLC
3801 Shenandoah, L.P.
3820 Goar Park LLC
400 Seaman, LLC
401 Ame, L.P.
4201 Locust, L.P.
4312 Belclaire, LLC
5833 Woodland, L.P.
5906 DeLoache, LLC
5950 DeLoache, LLC
7758 Ronnie, LLC
7759 Ronnie, LLC
AA Shotguns, LLC
Aberdeen Loan Funding, Ltd.
Acis CLO 2017-7 Ltd
Acis CLO Management GP, LLC
Acis CLO Management GP, LLC (*fka Acis CLO Opportunity Funds GP, LLC*)
Acis CLO Management Holdings, L.P.
Acis CLO Management Intermediate Holdings I, LLC
Acis CLO Management Intermediate Holdings II, LLC
Acis CLO Management, LLC (*fka Acis CLO Opportunity Funds SLP, LLC*)
Acis CLO Trust

Acis CLO Value Fund II Charitable DAF Ltd.
Acis CMOA Trust
Advisors Equity Group LLC
Alamo Manhattan Hotel I, LLC (Third Party)
Allenby, LLC
Allisonville RE Holdings, LLC
AM Uptown Hotel, LLC
Apex Care, L.P
Asbury Holdings, LLC (*fka HCSLR Camelback Investors (Delaware), LLC*)
Ascendant Advisors
Atlas IDF GP, LLC
Atlas IDF, LP
BB Votorantim Highland Infrastructure, LLC
BDC Toys Holdco, LLC
Beacon Mountain, LLC
Bedell Trust Ireland Limited (Charitable trust account)
Ben Roby (third party)
BH Equities, LLC
BH Heron Pointe, LLC
BH Hollister, LLC
BH Willowdale Manager, LLC
Big Spring Partners, LLC
Blair Investment Partners, LLC
Bloomdale, LLC
Brave Holdings III Inc.
Brentwood CLO, Ltd.
Brentwood Investors Corp.
Brian Mitts
Bristol Bay Funding Ltd.
Bristol Bay Funding, Ltd.
BVP Property, LLC
C-1 Arbors, Inc.
C-1 Cutter's Point, Inc.
C-1 Eaglecrest, Inc.
C-1 Silverbrook, Inc.
Cabi Holdco GP, LLC
Cabi Holdco I, Ltd
Cabi Holdco I, Ltd.

Cabi Holdco, L.P.

California Public Employees' Retirement System

Camelback Residential Investors, LLC

Camelback Residential Investors, LLC *(fka Sevilla Residential Partners, LLC)*

Camelback Residential Partners, LLC

Capital Real Estate - Latitude, LLC

Castle Bio Manager, LLC

Castle Bio, LLC

CG Works, Inc.

CG Works, Inc. (fka Common Grace Ventures, Inc.)

Charitable DAF Fund, L.P.

Charitable DAF GP, LLC

Charitable DAF HoldCo, Ltd

Charitable DAF HoldCo, Ltd.

Claymore Holdings, LLC

CLO HoldCo, Ltd

CLO Holdco, Ltd.

Corbusier, Ltd.

Cornerstone Healthcare Group Holding, Inc.

Corpus Weber Road Member LLC

CP Equity Hotel Owner, LLC

CP Equity Land Owner, LLC

CP Equity Owner, LLC

CP Hotel TRS, LLC

CP Land Owner, LLC

CP Tower Owner, LLC

CRE - Lat, LLC

Credit Suisse, Cayman Islands Branch

Crossings 2017 LLC

Crown Global Insurance Company (third party)

Dallas Cityplace MF SPE Owner LLC

Dallas Lease and Finance, L.P.

Dana Scott Breault

James Dondero

Reese Avry Dondero

Jameson Drue Dondero

Dana Sprong (Third Party)

David c. Hopson

De Kooning, Ltd.

deKooning, Ltd.

DFA/BH Autumn Ridge, LLC

Dolomiti, LLC

DrugCrafters, L.P.

Dugaboy Investment Trust

Dugaboy Management, LLC

Dugaboy Project Management GP, LLC

Eagle Equity Advisors, LLC

Eames, Ltd.

Eastland CLO, Ltd.

Eastland Investors Corp.

EDS Legacy Heliport, LLC

EDS Legacy Partners Owner, LLC

EDS Legacy Partners, LLC

Empower Dallas Foundation, Inc.

ENA 41, LLC

Entegra Strat Superholdco, LLC

Entegra-FRO Holdco, LLC

Entegra-FRO Superholdco, LLC

Entegra-HOCF Holdco, LLC

Entegra-NHF Holdco, LLC

Entegra-NHF Superholdco, LLC

Entegra-RCP Holdco, LLC

Estates on Maryland Holdco, LLC

Estates on Maryland Owners SM, Inc.

Estates on Maryland Owners, LLC

Estates on Maryland, LLC

Falcon E&P Four Holdings, LLC

Falcon E&P One, LLC

Falcon E&P Opportunities Fund, L.P.

Falcon E&P Opportunities GP, LLC

Falcon E&P Royalty Holdings, LLC

Falcon E&P Six, LLC

Falcon E&P Two, LLC

Falcon Four Midstream, LLC

Falcon Four Upstream, LLC

Falcon Incentive Partners GP, LLC

Falcon Incentive Partners, LP

Falcon Six Midstream, LLC

Flamingo Vegas Holdco, LLC *(fka Cabi Holdco, LLC)*

Four Rivers Co-Invest GP, LLC

Four Rivers Co-Invest, L.P.

FRBH Abbington SM, Inc.

FRBH Abbington, LLC

FRBH Arbors, LLC

FRBH Beechwood SM, Inc.

FRBH Beechwood, LLC

FRBH C1 Residential, LLC

FRBH Courtney Cove SM, Inc.

FRBH Courtney Cove, LLC

FRBH CP, LLC

FRBH Duck Creek, LLC

FRBH Eaglecrest, LLC

FRBH Edgewater JV, LLC

FRBH Edgewater Owner, LLC

FRBH Edgewater SM, Inc.

FRBH JAX-TPA, LLC

FRBH Nashville Residential, LLC

FRBH Regatta Bay, LLC

FRBH Sabal Park SM, Inc.

FRBH Sabal Park, LLC

FRBH Silverbrook, LLC

FRBH Timberglen, LLC

FRBH Willow Grove SM, Inc.

FRBH Willow Grove, LLC

FRBH Woodbridge SM, Inc.

FRBH Woodbridge, LLC

Freedom C1 Residential, LLC

Freedom Duck Creek, LLC

Freedom Edgewater, LLC

Freedom JAX-TPA Residential, LLC

Freedom La Mirage, LLC

Freedom LHV LLC

Freedom Lubbock LLC

Freedom Miramar Apartments, LLC

Freedom Sandstone, LLC

Freedom Willowdale, LLC

Fundo de Investimento em Direitos Creditorios BB Votorantim Highland Infraestrutura

G&E Apartment REIT The Heights at Olde Towne, LLC

G&E Apartment REIT The Myrtles at Olde Towne, LLC

GAF REIT, LLC

GAF Toys Holdco, LLC

Gardens of Denton II, L.P.

Gardens of Denton III, L.P.

Gleneagles CLO, Ltd.

Goverannce RE, Ltd.

Governance Re, Ltd.

Governance, Ltd.

Grant Scott

Grant Scott, Trustee of The SLHC Trust

Grayson CLO, Ltd.

Grayson Investors Corp.

Greater Kansas City Community Foundation (third party)

Greenbriar CLO, Ltd.

Greg Busseyt

Gunwale LLC

Gunwale, LLC

Hakusan, LLC

Hammark Holdings LLC

Hampton Ridge Partners, LLC

Harbourvest Entities

Harko, LLC

Harry Bookey/Pam Bookey (third party)

Haverhill Acquisition Co., LLC

Haygood, LLC

HB 2015 Family LP (third party)

HCBH 11611 Ferguson, LLC

HCBH Buffalo Pointe II, LLC

HCBH Buffalo Pointe III, LLC

HCBH Buffalo Pointe, LLC

HCBH Hampton Woods SM, Inc.

HCBH Hampton Woods, LLC

HCBH Overlook SM, Inc.

HCBH Overlook, LLC

HCBH Rent Investors, LLC

HCMS Falcon GP, LLC

HCMS Falcon, L.P.

HCO Holdings, LLC

HCOF Preferred Holdings, L.P.

HCOF Preferred Holdings, LP

HCOF Preferred Holdings, Ltd.

HCRE 1775 James Ave, LLC

HCRE Addison TRS, LLC

HCRE Addison, LLC *(fka HWS Addison, LLC)*

HCRE Hotel Partner, LLC *(fka HCRE HWS Partner, LLC)*

HCRE Las Colinas TRS, LLC

HCRE Las Colinas, LLC *(fka HWS Las Colinas, LLC)*

HCRE Plano TRS, LLC

HCRE Plano, LLC *(fka HWS Plano, LLC)*

HCREF-I Holding Corp.

HCREF-II Holding Corp.

HCREF-III Holding Corp.

HCREF-IV Holding Corp.

HCREF-IX Holding Corp.

HCREF-V Holding Corp.

HCREF-VI Holding Corp.

HCREF-VII Holding Corp.

HCREF-VIII Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

HCREF-XIII Holding Corp.

HCREF-XIV Holding Corp.

HCREF-XV Holding Corp.

HCSLR Camelback Investors (Cayman), Ltd.

HCSLR Camelback, LLC

HCT Holdco 2 Ltd.

HCT Holdco 2, Ltd.

HE 41, LLC

HE Capital 232 Phase I Property, LLC

HE Capital 232 Phase I, LLC

HE Capital Asante, LLC

HE Capital Fox Trails, LLC

HE Capital KR, LLC

HE Capital, LLC

HE CLO Holdco, LLC

HE Mezz Fox Trails, LLC

HE Mezz KR, LLC

HE Peoria Place Property, LLC

HE Peoria Place, LLC

Heron Pointe Investors, LLC

Hewett's Island CLO I-R, Ltd.

HFP Asset Funding II, Ltd.

HFP Asset Funding III, Ltd.

HFP CDO Construction Corp.

HFP GP, LLC

HFRO Sub, LLC

Hibiscus HoldCo, LLC

Highland - First Foundation Income Fund

Highland 401(k) Plan

Highland 401K Plan

Highland Argentina Regional Opportunity Fund GP, LLC

Highland Argentina Regional Opportunity Fund, L.P.

Highland Argentina Regional Opportunity Fund, Ltd.

Highland Argentina Regional Opportunity Master Fund, L.P.

Highland Brasil, LLC

Highland Capital Brasil Gestora de Recursos *(fka Highland Brasilinvest Gestora de Recursos, LTDA; fka HBI Consultoria Empresarial, LTDA)*

Highland Capital Management (Singapore) Pte Ltd

Highland Capital Management AG

Highland Capital Management AG (Highland Capital Management SA) (Highland Capital Management Ltd)

Highland Capital Management Fund Advisors, L.P.

Highland Capital Management Fund Advisors, L.P. *(fka Pyxis Capital, L.P.)*

Highland Capital Management Korea Limited

Highland Capital Management Latin America, L.P.

Highland Capital Management LP Retirement Plan and Trust

Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.

Highland Capital Management Real Estate Holdings I, LLC

Highland Capital Management Real Estate Holdings II, LLC

Highland Capital Management Services, Inc.

Highland Capital Management, L.P.

**000358**

Highland Capital Management, L.P. Charitable Fund

Highland Capital Management, L.P. Retirement Plan and Trust

Highland Capital Management, L.P., as trustee of Acis CMOA Trust and nominiee for and on behalf of Highland CLO Assets Holdings Limited

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominiee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, LP

Highland Capital Management, LP Charitable Fund

Highland Capital Multi-Strategy Fund, LP

Highland Capital of New York, Inc.

Highland Capital Special Allocation, LLC

Highland CDO Holding Company

Highland CDO Opportunity Fund GP, L.P.

Highland CDO Opportunity Fund, L.P.

Highland CDO Opportunity Fund, Ltd.

Highland CDO Opportunity GP, LLC

Highland CDO Opportunity Master Fund, L.P.

Highland CDO Trust

Highland CLO 2018-1, Ltd.

Highland CLO Assets Holdings Limited

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd. *(fka Acis Loan Funding, Ltd.)*

Highland CLO Gaming Holdings, LLC

Highland CLO Holdings Ltd.

Highland CLO Holdings, Ltd. (as of 12.19.17)

Highland CLO Management Ltd.

Highland CLO Trust

Highland Credit Opportunities CDO Asset Holdings GP, Ltd.

Highland Credit Opportunities CDO Asset Holdings, L.P.

Highland Credit Opportunities CDO Financing, LLC

Highland Credit Opportunities CDO, Ltd.

Highland Credit Opportunities Holding Corporation

Highland Credit Opportunities Japanese Feeder Sub-Trust

Highland Credit Opportunities Japanese Unit Trust (Third Party)

Highland Credit Strategies Fund, L.P.

Highland Credit Strategies Fund, Ltd.

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Master Fund, L.P.

Highland Dallas Foundation, Inc.

Highland Dynamic Income Fund GP, LLC

Highland Dynamic Income Fund GP, LLC *(fka Highland Capital Loan GP, LLC)*

Highland Dynamic Income Fund, L.P.

Highland Dynamic Income Fund, L.P. *(fka Highland Capital Loan Fund, L.P.)*

Highland Dynamic Income Fund, Ltd.

Highland Dynamic Income Fund, Ltd. *(fka Highland Loan Fund, Ltd.)*

Highland Dynamic Income Master Fund, L.P.

Highland Dynamic Income Master Fund, L.P. *(fka Highland Loan Master Fund, L.P.)*

Highland Employee Retention Assets LLC

Highland Energy Holdings, LLC

Highland Energy MLP Fund *(fka Highland Energy and Materials Fund)*

Highland Equity Focus Fund, L.P.

Highland ERA Management, LLC

Highland eSports Private Equity Fund

Highland Financial Corp.

Highland Financial Partners, L.P.

Highland Fixed Income Fund

Highland Flexible Income UCITS Fund

Highland Floating Rate Fund

Highland Floating Rate Opportunites Fund

Highland Floating Rate Opportunities Fund

Highland Fund Holdings, LLC

Highland Funds I

Highland Funds II

Highland Funds III

Highland GAF Chemical Holdings, LLC

Highland General Partner, LP

Highland Global Allocation Fund

Highland Global Allocation Fund
*(fka Highland Global Allocation Fund II)*

Highland GP Holdings, LLC

Highland HCF Advisor Ltd.

Highland HCF Advisor, Ltd., as Trustee for
and on behalf of Acis CLO Trust, as nominee
for and on behalf of Highland CLO Funding,
Ltd. (as of 3.29.18)

Highland Healthcare Equity Income and
Growth Fund

Highland iBoxx Senior Loan ETF

Highland Income Fund

Highland Income Fund  *(fka Highland
Floating Rate Opportunities Fund)*

Highland Kansas City Foundation, Inc.

Highland Latin America Consulting, Ltd.

Highland Latin America GP, Ltd.

Highland Latin America LP, Ltd.

Highland Latin America Trust

Highland Legacy Limited

Highland LF Chemical Holdings, LLC

Highland Loan Funding V, LLC

Highland Loan Funding V, Ltd.

Highland Long/Short Equity Fund

Highland Long/Short Healthcare Fund

Highland Marcal Holding, Inc.

Highland Merger Arbitrage Fund

Highland Multi Strategy Credit Fund GP, L.P.

Highland Multi Strategy Credit Fund GP, L.P.
*(fka Highland Credit Opportunities CDO GP,
L.P.)*

Highland Multi Strategy Credit Fund, L.P.

Highland Multi Strategy Credit Fund, L.P. *(fka
Highland Credit Opportunities Fund, L.P., fka
Highland Credit Opportunities CDO, L.P.)*

Highland Multi Strategy Credit Fund, Ltd.

Highland Multi Strategy Credit Fund, Ltd. *(fka
Highland Credit Opportunities Fund, Ltd.)*

Highland Multi Strategy Credit GP, LLC

Highland Multi Strategy Credit GP, LLC *(fka
Highland Credit Opportunities CDO GP, LLC)*

Highland Multi-Strategy Fund GP, LLC

Highland Multi-Strategy Fund GP, LP

Highland Multi-Strategy IDF GP, LLC

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Master Fund, LP

Highland Multi-Strategy Onshore Master
SubFund II, LLC

Highland Multi-Strategy Onshore Master
Subfund, LLC

Highland Opportunistic Credit Fund

Highland Park CDO 1, Ltd.

Highland Park CDO I, Ltd.

Highland Premier Growth Equity Fund

Highland Premium Energy & Materials Fund

Highland Prometheus Feeder Fund I, L.P.

Highland Prometheus Feeder Fund I, LP

Highland Prometheus Feeder Fund II, L.P.

Highland Prometheus Feeder Fund II, LP

Highland Prometheus Master Fund, L.P.

Highland Receivables Finance I, LLC

Highland Restoration Capital Partners GP,
LLC

Highland Restoration Capital Partners Master,
L.P.

Highland Restoration Capital Partners
Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Santa Barbara Foundation, Inc.

Highland Select Equity Fund GP, L.P.

Highland Select Equity Fund, L.P.

Highland Select Equity GP, LLC

Highland Select Equity Master Fund, L.P.

Highland Small-Cap Equity Fund

Highland Socially Responsible Equity Fund

Highland Socially Responsible Equity Fund
(*fka Highland Premier Growth Equity Fund*)

Highland Special Opportunities Holding Company

Highland SunBridge GP, LLC

Highland Tax-Exempt Fund

Highland TCI Holding Company, LLC

Highland Total Return Fund

Highland's Roads Land Holding Company, LLC

Hirst, Ltd.

HMCF PB Investors, LLC

HMx2 Investment Trust
(Matt McGraner)

Hockney, Ltd.

HRT North Atlanta, LLC

HRT Timber Creek, LLC

HRTBH North Atlanta, LLC

HRTBH Timber Creek, LLC

Huber Funding LLC

Hunter Mountain Investment Trust

HWS Investors Holdco, LLC

Internal Investors

Intertrust

James D. Dondero
Reese Avry Dondero
Jameson Drue Dondero

James Dondero

James Dondero and Mark Okada

James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Japan Trustee Services Bank, Ltd.

Jasper CLO, Ltd.

Jewelry Ventures I, LLC

JMIJM, LLC

Joanna E. Milne Irrevocable Trust dated Nov 25 1998 (third party)

John Honis

John L. Holt, Jr.

John R. Sears, Jr.

Karisopolis, LLC

Keelhaul LLC

KHM Interests, LLC (third party)

Kuilima Montalban Holdings, LLC

Kuilima Resort Holdco, LLC

KV Cameron Creek Owner, LLC

Lakes at Renaissance Park Apartments Investors, L.P.

Lakeside Lane, LLC

Landmark Battleground Park II, LLC

Lane Britain

Larry K. Anders

LAT Battleground Park, LLC

LAT Briley Parkway, LLC

Lautner, Ltd.

Leawood RE Holdings, LLC

Liberty Cayman Holdings, Ltd.

Liberty CLO Holdco, Ltd.

Liberty CLO, Ltd.

Liberty Sub, Ltd.

Long Short Equity Sub, LLC

Longhorn Credit Funding LLC

Longhorn Credit Funding LLC - A

Longhorn Credit Funding LLC - B

Longhorn Credit Funding LLC (LHB)

Longhorn Credit Funding, LLC

Lurin Real Estate Holdings V, LLC

Maple Avenue Holdings, LLC

MaplesFS Limited

Marc C. Manzo

Mark and Pam Okada Family Trust - Exempt Descendants' Trust

Mark and Pam Okada Family Trust - Exempt Trust #2

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust #2

Mark and Pamela Okada Family Trust - Exempt Trust #2

Mark K. Okada

Mark Okada

000361

Mark Okada and Pam Okada
Mark Okada and Pam Okada, as joint owners
Mark Okada/Pamela Okada
Markham Fine Jewelers, L.P.
Markham Fine Jewelers, LP
Matt McGraner
Meritage Residential Partners, LLC
MGM Studios HoldCo, Ltd.
Michael Rossi
ML CLO XIX Sterling (Cayman), Ltd.
N/A
Nancy Dondero
NCI Apache Trail LLC
NCI Assets Holding Company LLC
NCI Country Club LLC
NCI Fort Worth Land LLC
NCI Front Beach Road LLC
NCI Minerals LLC
NCI Royse City Land LLC
NCI Stewart Creek LLC
NCI Storage, LLC
Neil Labatte
Neutra, Ltd.
New Jersey Tissue Company Holdco, LLC
*(fka Marcal Paper Mills Holding Company, LLC)*

NexAnnuity Holdings, Inc.
NexBank Capital Trust I
NexBank Capital, Inc.
NexBank Land Advisors, Inc.
NexBank Securities Inc.
NexBank Securities, Inc.

NexBank SSB
NexBank Title, Inc.
(dba NexVantage Title Services)
NexBank, SSB
NexPoint Advisors GP, LLC
NexPoint Advisors, L.P.
NexPoint Capital REIT, LLC
NexPoint Capital, Inc.
NexPoint Capital, Inc. *(fka NexPoint Capital, LLC)*

NexPoint CR F/H DST, LLC
NexPoint Credit Strategies Fund
NexPoint Discount Strategies Fund
*(fka NexPoint Discount Yield Fund)*
NexPoint DRIP
NexPoint Energy and Materials Opportunities Fund *(fka NexPoint Energy Opportunities Fund)*

NexPoint Event-Driven Fund
*(fkaNexPoint Merger Arbitrage Fund)*

NexPoint Flamingo DST
NexPoint Flamingo Investment Co, LLC
NexPoint Flamingo Leaseco, LLC
NexPoint Flamingo Manager, LlC
NexPoint Flamingo Property Manager, LlC
NexPoint Healthcare Opportunities Fund
NexPoint Hospitality Trust
NexPoint Hospitality, Inc.
NexPoint Hospitality, LLC
NexPoint Insurance Distributors, LLC
NexPoint Insurance Solutions GP, LLC
NexPoint Insurance Solutions GP, LLC
*(fka Highland Capital Insurance Solutions GP, LLC)*

NexPoint Insurance Solutions, L.P.
*(fka Highland Capital Insurance Solutions, L.P.)*

NexPoint Latin American Opportunities Fund
NexPoint Legacy 22, LLC
NexPoint Lincoln Porte Equity, LLC
NexPoint Lincoln Porte Manager, LLC
NexPoint Lincoln Porte, LLC
*(fka NREA Lincoln Porte, LLC)*
NexPoint Multifamily Capital Trust, Inc.
NexPoint Multifamily Capital Trust, Inc.
*(fka NexPoint Multifamily Realty Trust, Inc., fka Highland Capital Realty Trust, Inc.)*

NexPoint Multifamily Operating Partnership, L.P.
NexPoint Peoria, LLC
NexPoint Polo Glen DST
NexPoint Polo Glen Holdings, LLC
NexPoint Polo Glen Investment Co, LLC

NexPoint Polo Glen Leaseco, LLC
NexPoint Polo Glen Manager, LLC
NexPoint RE Finance Advisor GP, LLC
NexPoint RE Finance Advisor, L.P.
NexPoint Real Estate Advisors GP, LLC
NexPoint Real Estate Advisors II, L.P.
NexPoint Real Estate Advisors II, L.P.
NexPoint Real Estate Advisors III, L.P.
NexPoint Real Estate Advisors IV, L.P.
NexPoint Real Estate Advisors V, L.P.
NexPoint Real Estate Advisors VI, L.P.
NexPoint Real Estate Advisors VII GP, LLC
NexPoint Real Estate Advisors VII, L.P.
NexPoint Real Estate Advisors VIII, L.P.
NexPoint Real Estate Advisors, L.P.
NexPoint Real Estate Capital, LLC
NexPoint Real Estate Capital, LLC *(fka Highland Real Estate Capital, LLC, fka Highland Multifamily Credit Fund, LLC)*
NexPoint Real Estate Finance OP GP, LLC
NexPoint Real Estate Finance Operating Partnership, L.P.
NexPoint Real Estate Finance, Inc.
NexPoint Real Estate Opportunities,  LLC
NexPoint Real Estate Opportunities, LLC *(fka Freedom REIT LLC)*
NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)
NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)
NexPoint Real Estate Strategies Fund
NexPoint Residential Trust Inc.
NexPoint Residential Trust Operating Partnership GP, LLC
NexPoint Residential Trust Operating Partnership, L.P.
NexPoint Residential Trust Operating Partnership, L.P.
NexPoint Residential Trust, Inc.
NexPoint Securities, Inc.
*(fka Highland Capital Funds Distributor, Inc.)*
*(fka Pyxis Distributors, Inc.)*

NexPoint Strategic Income Fund
*(fka NexPoint Opportunistic Credit Fund, fka NexPoint Distressed Strategies Fund)*
NexPoint Strategic Opportunities Fund
NexPoint Strategic Opportunities Fund
*(fka NexPoint Credit Strategies Fund)*
NexPoint Texas Multifamily Portfolio DST
*(fka NREA Southeast Portfolio Two, DST)*
NexPoint WLIF I Borrower, LLC
NexPoint WLIF I, LLC
NexPoint WLIF II Borrower, LLC
NexPoint WLIF II, LLC
NexPoint WLIF III Borrower, LLC
NexPoint WLIF III, LLC
NexPoint WLIF, LLC (Series I)
NexPoint WLIF, LLC (Series II)
NexPoint WLIF, LLC (Series III)
NexStrat LLC
NexVest, LLC
NexWash LLC
NFRO REIT Sub, LLC
NFRO TRS, LLC
NHF CCD, Inc.
NHT 2325 Stemmons, LLC
NHT Beaverton TRS, LLC
*(fka NREA Hotel TRS, Inc.)*
NHT Beaverton, LLC
NHT Bend TRS, LLC
NHT Bend, LLC
NHT Destin TRS, LLC
NHT Destin, LLC
NHT DFW Portfolio, LLC
NHT Holdco, LLC
NHT Holdings, LLC
NHT Intermediary, LLC
NHT Nashville TRS, LLC
NHT Nashville, LLC
NHT Olympia TRS, LLC
NHT Olympia, LLC
NHT Operating Partnership GP, LLC
NHT Operating Partnership II, LLC
NHT Operating Partnership, LLC
NHT Salem, LLC

000363

NHT SP Parent, LLC
NHT SP TRS, LLC
NHT SP, LLC
NHT Tigard TRS, LLC
NHT Tigard, LLC
NHT TRS, Inc.
NHT Uptown, LLC
NHT Vancouver TRS, LLC
NHT Vancouver, LLC
NLA Assets LLC
NMRT TRS, Inc.
NREA Adair DST Manager, LLC
NREA Adair Investment Co, LLC
NREA Adair Joint Venture, LLC
NREA Adair Leaseco Manager, LLC
NREA Adair Leaseco, LLC
NREA Adair Property Manager LLC
NREA Adair, DST
NREA Ashley Village Investors, LLC
NREA Cameron Creek Investors, LLC
NREA Cityplace Hue Investors, LLC
NREA Crossing Investors LLC
NREA Crossings Investors, LLC
NREA Crossings Ridgewood Coinvestment, LLC *(fka NREA Crossings Ridgewood Investors, LLC)*

NREA DST Holdings, LLC
NREA El Camino Investors, LLC
NREA Estates Inc.
NREA Estates Investment Co, LLC
NREA Estates Leaseco, LLC
NREA Estates Manager, LLC
NREA Estates Property Manager, LLC
NREA Estates, DST
NREA Gardens DST Manager LLC
NREA Gardens DST Manager, LLC
NREA Gardens Investment Co, LLC
NREA Gardens Leaseco Manager, LLC
NREA Gardens Leaseco, LLC
NREA Gardens Property Manager, LLC
NREA Gardens Springing LLC
NREA Gardens Springing Manager, LLC
NREA Gardens, DST

NREA Hidden Lake Investment Co, LLC
NREA Hue Investors, LLC
NREA Keystone Investors, LLC
NREA Meritage Inc.
NREA Meritage Investment Co, LLC
NREA Meritage Leaseco, LLC
NREA Meritage Manager, LLC
NREA Meritage Property Manager, LLC
NREA Meritage, DST
NREA Oaks Investors, LLC
NREA Retreat Investment Co, LLC
NREA Retreat Leaseco, LLC
NREA Retreat Manager, LLC
NREA Retreat Property Manager, LLC
NREA Retreat, DST
NREA SE MF Holdings LLC
NREA SE MF Holdings, LLC
NREA SE MF Investment Co, LLC
NREA SE MF Investment Co, LLC
NREA SE Multifamily LLC
NREA SE Multifamily, LLC
NREA SE One Property Manager, LLC
NREA SE Three Property Manager, LLC
NREA SE Two  Property Manager, LLC
NREA SE1 Andros Isles Leaseco, LLC
NREA SE1 Andros Isles Manager, LLC
NREA SE1 Andros Isles, DST
(Converted from DK Gateway Andros, LLC)
NREA SE1 Arborwalk Leaseco, LLC
NREA SE1 Arborwalk Manager, LLC
NREA SE1 Arborwalk, DST
(Converted from MAR Arborwalk, LLC)
NREA SE1 Towne Crossing Leaseco, LLC
NREA SE1 Towne Crossing Manager, LLC
NREA SE1 Towne Crossing, DST
(Converted from Apartment REIT Towne Crossing, LP)
NREA SE1 Walker Ranch Leaseco, LLC
NREA SE1 Walker Ranch Manager, LLC
NREA SE1 Walker Ranch, DST
(Converted from SOF Walker Ranch Owner, L.P.)
NREA SE2 Hidden Lake Leaseco, LLC

NREA SE2 Hidden Lake Manager, LLC
NREA SE2 Hidden Lake, DST
NREA SE2 Hidden Lake, DST
(Converted from SOF Hidden Lake SA Owner, L.P.)

NREA SE2 Vista Ridge Leaseco, LLC
NREA SE2 Vista Ridge Manager, LLC
NREA SE2 Vista Ridge, DST
NREA SE2 Vista Ridge, DST
(Converted from MAR Vista Ridge, L.P.)

NREA SE2 West Place Leaseco, LLC
NREA SE2 West Place Manager, LLC
NREA SE2 West Place, DST
(Converted from Landmark at West Place, LLC)

NREA SE3 Arboleda Leaseco, LLC
NREA SE3 Arboleda Manager, LLC
NREA SE3 Arboleda, DST
(Converted from G&E Apartment REIT Arboleda, LLC)

NREA SE3 Fairways Leaseco, LLC
NREA SE3 Fairways Manager, LLC
NREA SE3 Fairways, DST
(Converted from MAR Fairways, LLC)

NREA SE3 Grand Oasis Leaseco, LLC
NREA SE3 Grand Oasis Manager, LLC
NREA SE3 Grand Oasis, DST
(Converted from Landmark at Grand Oasis, LP)

NREA Southeast Portfolio One Manager, LLC
NREA Southeast Portfolio One, DST
NREA Southeast Portfolio One, DST
NREA Southeast Portfolio Three Manager, LLC
NREA Southeast Portfolio Three, DST
NREA Southeast Portfolio Three, DST
NREA Southeast Portfolio Two Manager, LLC
NREA Southeast Portfolio Two, DST
NREA Southeast Portfolio Two, LLC
NREA SOV Investors, LLC
NREA Uptown TRS, LLC
NREA VB I LLC
NREA VB II LLC

NREA VB III LLC
NREA VB IV LLC
NREA VB Pledgor I LLC
NREA VB Pledgor I, LLC
NREA VB Pledgor II LLC
NREA VB Pledgor II, LLC
NREA VB Pledgor III LLC
NREA VB Pledgor III, LLC
NREA VB Pledgor IV LLC
NREA VB Pledgor IV, LLC
NREA VB Pledgor V LLC
NREA VB Pledgor V, LLC
NREA VB Pledgor VI LLC
NREA VB Pledgor VI, LLC
NREA VB Pledgor VII LLC
NREA VB Pledgor VII, LLC
NREA VB SM, Inc.
NREA VB V LLC
NREA VB VI LLC
NREA VB VII LLC
NREA Vista Ridge Investment Co, LLC
NREC AR Investors, LLC
NREC BM Investors, LLC
NREC BP Investors, LLC
NREC Latitude Investors, LLC
NREC REIT Sub, Inc.
NREC TRS, Inc.
NREC WW Investors, LLC
NREF OP I Holdco, LLC
NREF OP I SubHoldco, LLC
NREF OP I, L.P.
NREF OP II Holdco, LLC
NREF OP II SubHoldco, LLC
NREF OP II, L.P.
NREF OP IV REIT Sub TRS, LLC
NREF OP IV REIT Sub, LLC
NREF OP IV, L.P.
NREO NW Hospitality Mezz, LLC
NREO NW Hospitality, LLC
NREO Perilune, LLC
NREO SAFStor Investors, LLC
NREO TRS, Inc.
NRESF REIT Sub, LLC

NXRT Abbington, LLC
NXRT Atera II, LLC
NXRT Atera, LLC
NXRT AZ2, LLC
NXRT Barrington Mill, LLC
NXRT Bayberry, LLC
NXRT Bella Solara, LLC
NXRT Bella Vista, LLC
NXRT Bloom, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine LP, LLC
NXRT Brandywine LP, LLC
NXRT Brentwood Owner, LLC
NXRT Brentwood, LLC
NXRT Cedar Pointe Tenant, LLC
NXRT Cedar Pointe, LLC
NXRT Cityview, LLC
NXRT Cornerstone, LLC
NXRT Crestmont, LLC
NXRT Crestmont, LLC
NXRT Enclave, LLC
NXRT Glenview, LLC
NXRT H2 TRS, LLC
NXRT Heritage, LLC
NXRT Hollister TRS LLC
NXRT Hollister, LLC
NXRT LAS 3, LLC
NXRT Master Tenant, LLC
NXRT Nashville Residential, LLC
NXRT Nashville Residential, LLC *(fka Freedom Nashville Residential, LLC)*
NXRT North Dallas 3, LLC
NXRT Old Farm, LLC
NXRT Pembroke Owner, LLC
NXRT Pembroke, LLC
NXRT PHX 3, LLC
NXRT Radbourne Lake, LLC
NXRT Rockledge, LLC
NXRT Sabal Palms, LLC
NXRT SM, Inc.

NXRT Steeplechase, LLC
NXRT Stone Creek, LLC
NXRT Summers Landing GP, LLC
NXRT Summers Landing LP, LLC
NXRT Torreyana, LLC
NXRT Vanderbilt, LLC
NXRT West Place, LLC
NXRTBH AZ2, LLC
NXRTBH Barrington Mill Owner, LLC
NXRTBH Barrington Mill SM, Inc.
NXRTBH Barrington Mill, LLC
NXRTBH Bayberry, LLC
NXRTBH Cityview, LLC
NXRTBH Colonnade, LLC
NXRTBH Cornerstone Owner, LLC
NXRTBH Cornerstone SM, Inc.
NXRTBH Cornerstone, LLC
NXRTBH Dana Point SM, Inc.
NXRTBH Dana Point, LLC
NXRTBH Foothill SM, Inc.
NXRTBH Foothill, LLC
NXRTBH Heatherstone SM, Inc.
NXRTBH Heatherstone, LLC
NXRTBH Hollister Tenant, LLC
NXRTBH Hollister, LLC
NXRTBH Madera SM, Inc.
NXRTBH Madera, LLC
NXRTBH McMillan, LLC
NXRTBH North Dallas 3, LLC
NXRTBH Old Farm II, LLC
NXRTBH Old Farm Tenant, LLC
NXRTBH Old Farm, LLC
NXRTBH Radbourne Lake, LLC
NXRTBH Rockledge, LLC
NXRTBH Sabal Palms, LLC
NXRTBH Steeplechase, LLC
(dba Southpoint Reserve at Stoney Creek)-VA
NXRTBH Stone Creek, LLC
NXRTBH Vanderbilt, LLC
NXRTBH Versailles SM, Inc.
NXRTBH Versailles, LLC
Oak Holdco, LLC
Oaks CGC, LLC

Okada Family Revocable Trust
Oldenburg, Ltd.
Pam Capital Funding GP Co. Ltd.
Pam Capital Funding, L.P.
PamCo Cayman Ltd.
Park West 1700 Valley View Holdco, LLC
Park West 2021 Valley View Holdco, LLC
Park West Holdco, LLC
Park West Portfolio Holdco, LLC
Participants of Highland 401K Plan
Patrick Willoughby-McCabe
PCMG Trading Partners XXIII, L.P.
PCMG Trading Partners XXIII, LP
PDK Toys Holdco, LLC
Pear Ridge Partners, LLC
Penant Management GP, LLC
Penant Management LP
PensionDanmark Holding A/S
PensionDanmark Pensionsforsikringsaktieselskab
Peoria Place Development, LLC (30% cash contributions - profit participation only)
Perilune Aero Equity Holdings One, LLC
Perilune Aviation LLC
PetroCap Incentive Holdings III. L.P.
PetroCap Incentive Partners II GP, LLC
PetroCap Incentive Partners II, L.P.
PetroCap Incentive Partners III GP, LLC
PetroCap Incentive Partners III, LP
PetroCap Management Company LLC
PetroCap Partners II GP, LLC
PetroCap Partners II, L.P.
PetroCap Partners III GP, LLC
PetroCap Partners III, L.P.
Pharmacy Ventures I, LLC
Pharmacy Ventures II, LLC
Pollack, Ltd.
Powderhorn, LLC
PWM1 Holdings, LLC
PWM1, LLC
RADCO - Bay Meadows, LLLP
RADCO - Bay Park, LLLP

RADCO NREC Bay Meadows Holdings, LLC
RADCO NREC Bay Park Holdings, LLC
Ramarim, LLC
Rand Advisors Series I Insurance Fund
Rand Advisors Series II Insurance Fund
Rand Advisors, LLC
Rand PE Fund I, L.P.
Rand PE Fund I, L.P. - Series 1
Rand PE Fund Management, LLC
Rand PE Holdco, LLC
Realdania
Red River CLO, Ltd.
Red River Investors Corp.
Riverview Partners SC, LLC
Rockwall CDO II Ltd.
Rockwall CDO II, Ltd.
Rockwall CDO, Ltd.
Rockwall Investors Corp.
Rothko, Ltd.
RTT Bella Solara, LLC
RTT Bloom, LLC
RTT Financial, Inc.
RTT Hollister, LLC
RTT Rockledge, LLC
RTT Torreyana, LLC
SALI Fund Partners, LLC
San Diego County Employees Retirement Association
Sandstone Pasadena Apartments, LLC
Sandstone Pasadena, LLC
Santa Barbara Foundation (third party)
Saturn Oil & Gas LLC
SBC Master Pension Trust
Scott Matthew Siekielski
SE Battleground Park, LLC
SE Battleground Park, LLC
SE Glenview, LLC
SE Governors Green Holdings, L.L.C.
SE Governors Green Holdings, L.L.C.
*(fka SCG Atlas Governors Green Holdings, L.L.C.)*
SE Governors Green I, LLC
SE Governors Green II, LLC

SE Governors Green II, LLC

SE Governors Green REIT, L.L.C.

SE Governors Green REIT, L.L.C.
*(fka SCG Atlas Governors Green REIT, L.L.C.)*

SE Governors Green, LLC
*(fka SCG Atlas Governors Green, L.L.C.)*

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles LP, LLC

SE Gulfstream Isles LP, LLC

SE Heights at Olde Towne, LLC

SE Heights at Olde Towne, LLC

SE Lakes at Renaissance Park GP I, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park LP, LLC

SE Lakes at Renaissance Park LP, LLC

SE Multifamily Holdings LLC

SE Multifamily Holdings, LLC

SE Multifamily REIT Holdings LLC

SE Myrtles at Olde Towne, LLC

SE Myrtles at Olde Towne, LLC

SE Oak Mill I Holdings, LLC

SE Oak Mill I Holdings, LLC *(fka SCG Atlas Oak Mill I Holdings, L.L.C.)*

SE Oak Mill I Owner, LLC *(fka SCG Atlas Oak Mill I, L.L.C.)*

SE Oak Mill I REIT, LLC

SE Oak Mill I REIT, LLC *(fka SCG Atlas Oak Mill I REIT, L.L.C.)*

SE Oak Mill I, LLC

SE Oak Mill I, LLC

SE Oak Mill II Holdings, LLC

SE Oak Mill II Holdings, LLC *(fka SCG Atlas Oak Mill II Holdings, L.L.C.)*

SE Oak Mill II Owner, LLC *(fka SCG Atlas Oak Mill II, L.L.C.)*

SE Oak Mill II REIT, LLC

SE Oak Mill II REIT, LLC *(fka SCG Atlas Oak Mill II REIT, L.L.C.)*

SE Oak Mill II, LLC

SE Oak Mill II, LLC

SE Quail Landing, LLC

SE River Walk, LLC

SE Riverwalk, LLC

SE SM, Inc.

SE Stoney Ridge Holdings, L.L.C. *(fka SCG Atlas Stoney Ridge Holdings, L.L.C.)*

SE Stoney Ridge Holdings, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge REIT, L.L.C. *(fka SCG Atlas Stoney Ridge REIT, L.L.C.)*

SE Stoney Ridge REIT, LLC

SE Stoney Ridge, LLC *(fka SCG Atlas Stoney Ridge, L.L.C.)*

SE Victoria Park, LLC

SE Victoria Park, LLC

Sentinel Re Holdings, Ltd.

Sentinel Reinsurance Ltd.

SFH1, LLC

SFR WLIF I, LLC
*(fka NexPoint WLIF I, LLC)*

SFR WLIF II, LLC
*(NexPoint WLIF II, LLC)*

SFR WLIF III, LLC
*(NexPoint WLIF III, LLC)*

SFR WLIF Manager, LLC
*(NexPoint WLIF Manager, LLC)*

SFR WLIF, LLC
*(NexPoint WLIF, LLC)*

SFR WLIF, LLC Series I

SFR WLIF, LLC Series II

SFR WLIF, LLC Series III

SH Castle BioSciences, LLC

Small Cap Equity Sub, LLC

Socially Responsible Equity Sub, LLC

SOF Brandywine I Owner, L.P.

SOF Brandywine II Owner, L.P.

SOF-X GS Owner, L.P.

Southfork Cayman Holdings, Ltd.

Southfork CLO, Ltd.

000368

Specialty Financial Products Designated Activity Company *(fka Specialty Financial Products Limited)*

Spiritus Life, Inc.

SRL Sponsor LLC

SRL Whisperwod LLC

SRL Whisperwood Member LLC

SRL Whisperwood Venture LLC

SSB Assets LLC

Starck, Ltd.

Stemmons Hospitality, LLC

Steve Shin

Stonebridge Capital, Inc.

Stonebridge-Highland Healthcare Private Equity Fund

Strand Advisors III, Inc.

Strand Advisors IV, LLC

Strand Advisors IX, LLC

Strand Advisors V, LLC

Strand Advisors XIII, LLC

Strand Advisors XVI, Inc.

Strand Advisors, Inc.

Stratford CLO, Ltd.

Summers Landing Apartment Investors, L.P.

Term Loan B
(10% cash contributions - profit participation only)

The Dallas Foundation

The Dallas Foundation (third party)

The Dondero Insurance Rabbi Trust

The Dugaboy Investment Trust

The Dugaboy Investment Trust U/T/A Dated Nov 15, 2010

The Get Good Non-Exempt Trust No. 1

The Get Good Non-Exempt Trust No. 2

The Get Good Trust

The Mark and Pamela Okada Family Trust - Exempt Descendants' Trust

The Mark and Pamela Okada Family Trust - Exempt Trust #2

The Ohio State Life Insurance Company

The Okada Family Foundation, Inc.

The Okada Insurance Rabbi Trust

The SLHC Trust

The Trustees of Columbia University in the City of New York

The Twentysix Investment Trust (Third Party Investor)

Thomas A. Neville

Thread 55, LLC

Tihany, Ltd.

Todd Travers

Tranquility Lake Apartments Investors, L.P.

Tuscany Acquisition, LLC

Uptown at Cityplace Condominium Association, Inc.

US Gaming OpCo, LLC

US Gaming SPV, LLC

US Gaming, LLC

Valhalla CLO, Ltd.

VB GP LLC

VB Holding, LLC

VB One, LLC

VB OP Holdings LLC

VBAnnex C GP, LLC

VBAnnex C Ohio, LLC

VBAnnex C, LP

Ventoux Capital, LLC
(Matt Goetz)

VineBrook Annex B, L.P.

VineBrook Annex I, L.P.

VineBrook Homes Merger Sub II LLC

VineBrook Homes Merger Sub LLC

VineBrook Homes OP GP, LLC

VineBrook Homes Operating Partnership, L.P.

VineBrook Homes Trust, Inc.

VineBrook Partners I, L.P.

VineBrook Partners II, L.P.

VineBrook Properties, LLC

Virginia Retirement System

Vizcaya Investment, LLC

Wake LV Holdings II, Ltd.

Wake LV Holdings, Ltd.

Walter Holdco GP, LLC

Walter Holdco I, Ltd.

Walter Holdco, L.P.

000369

Warhol, Ltd.
Warren Chang
Westchester CLO, Ltd.
William L. Britain
Wright Ltd.
Wright, Ltd.
Yellow Metal Merchants, Inc.

Schedule of Causes of Action

The Causes of Action shall include, *without limitation*, any cause of action based on the following:

breach of fiduciary duties, breach of duty of care, breach of duty of loyalty, usurpation of corporate opportunities, breach of implied covenant of good faith and fair dealing, conversion, misappropriation of assets, misappropriation of trade secrets, unfair competition, breach of contract, breach of warranty, fraud, constructive fraud, negligence, gross negligence, fraudulent conveyance, fraudulent transfer, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, fraudulent inducement, tortious interference, *quantum meruit*, unjust enrichment, abuse of process, alter ego, substantive consolidation, recharacterization, business disparagement, indemnity, claims for recovery of distributions or dividends, claims for indemnification, promissory estoppel, quasi-contract claims, any counterclaims, equitable subordination, avoidance actions provided for under sections 544 or 547 of the Bankruptcy Code, claims brought under state law, claims brought under federal law, claims under any common-law theory of tort or law or equity, and any claims similar in nature to the foregoing claims.

The Causes of Action shall include, *without limitation*, any cause of action against the following persons and entities:

James Dondero, Mark Okada, Grant Scott, John Honis, any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, Nexbank Capital, Inc. Highland Capital Management Services, Inc., NexPoint Advisors GP, LLC, NexPoint Advisors, L.P., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on the attached **Annex 1** hereto, any current or former employee of the Debtor, and any entity directly or indirectly owned, controlled, or operated for the benefit of the foregoing persons or entities.

The Causes of Action shall include, *without limitation*, any cause of action arising from the following transactions:

The transfer of ownership interests in the Debtor to Hunter Mountain Investment Trust, the creation or transfer of any notes receivable from the Debtor or from any entity related to the Debtor, the creation or transfer of assets to or from any charitable foundation or trust, the formation, performance, or breach of any contract for the Debtor to provide investment management, support services, or any other services, and the distribution of assets or cash from the Debtor to partners of the Debtor.

**Annex 1**

11 Estates Lane, LLC

1110 Waters, LLC

140 Albany, LLC

1525 Dragon, LLC

17720 Dickerson, LLC

1905 Wylie LLC

2006 Milam East Partners GP, LLC

2006 Milam East Partners, L.P.

201 Tarrant Partners, LLC

2014 Corpus Weber Road LLC

2325 Stemmons HoldCo, LLC

2325 Stemmons Hotel Partners, LLC

2325 Stemmons TRS, Inc.

300 Lamar, LLC

3409 Rosedale, LLC

3801 Maplewood, LLC

3801 Shenandoah, L.P.

3820 Goar Park LLC

400 Seaman, LLC

401 Ame, L.P.

4201 Locust, L.P.

4312 Belclaire, LLC

5833 Woodland, L.P.

5906 DeLoache, LLC

5950 DeLoache, LLC

7758 Ronnie, LLC

7759 Ronnie, LLC

AA Shotguns, LLC

Aberdeen Loan Funding, Ltd.

Acis CLO 2017-7 Ltd

Acis CLO Management GP, LLC

Acis CLO Management GP, LLC *(fka Acis CLO Opportunity Funds GP, LLC)*

Acis CLO Management Holdings, L.P.

Acis CLO Management Intermediate Holdings I, LLC

Acis CLO Management Intermediate Holdings II, LLC

Acis CLO Management, LLC *(fka Acis CLO Opportunity Funds SLP, LLC)*

Acis CLO Trust

Acis CLO Value Fund II Charitable DAF Ltd.

Acis CMOA Trust

Advisors Equity Group LLC

Alamo Manhattan Hotel I, LLC (Third Party)

Allenby, LLC

Allisonville RE Holdings, LLC

AM Uptown Hotel, LLC

Apex Care, L.P

Asbury Holdings, LLC *(fka HCSLR Camelback Investors (Delaware), LLC)*

Ascendant Advisors

Atlas IDF GP, LLC

Atlas IDF, LP

BB Votorantim Highland Infrastructure, LLC

BDC Toys Holdco, LLC

Beacon Mountain, LLC

Bedell Trust Ireland Limited (Charitable trust account)

Ben Roby (third party)

BH Equities, LLC

BH Heron Pointe, LLC

BH Hollister, LLC

BH Willowdale Manager, LLC

Big Spring Partners, LLC

Blair Investment Partners, LLC

Bloomdale, LLC

Brave Holdings III Inc.

Brentwood CLO, Ltd.

Brentwood Investors Corp.

Brian Mitts

Bristol Bay Funding Ltd.

Bristol Bay Funding, Ltd.

BVP Property, LLC

C-1 Arbors, Inc.

C-1 Cutter's Point, Inc.

C-1 Eaglecrest, Inc.

C-1 Silverbrook, Inc.

Cabi Holdco GP, LLC

Cabi Holdco I, Ltd

Cabi Holdco I, Ltd.

Cabi Holdco, L.P.

California Public Employees' Retirement System

Camelback Residential Investors, LLC

Camelback Residential Investors, LLC
*(fka Sevilla Residential Partners, LLC)*

Camelback Residential Partners, LLC

Capital Real Estate - Latitude, LLC

Castle Bio Manager, LLC

Castle Bio, LLC

Cayco Admin Ltd.

Cayco Insolvency Ltd.

CG Works, Inc.

CG Works, Inc.
(fka Common Grace Ventures, Inc.)

Charitable DAF Fund, L.P.

Charitable DAF GP, LLC

Charitable DAF HoldCo, Ltd

Charitable DAF HoldCo, Ltd.

Claymore Holdings, LLC

CLO HoldCo, Ltd

CLO Holdco, Ltd.

Corbusier, Ltd.

Cornerstone Healthcare Group Holding, Inc.

Corpus Weber Road Member LLC

CP Equity Hotel Owner, LLC

CP Equity Land Owner, LLC

CP Equity Owner, LLC

CP Hotel TRS, LLC

CP Land Owner, LLC

CP Tower Owner, LLC

CRE - Lat, LLC

Credit Suisse, Cayman Islands Branch

Crossings 2017 LLC

Crown Global Insurance Company (third party)

Dallas Cityplace MF SPE Owner LLC

Dallas Lease and Finance, L.P.

Dana Scott Breault

James Dondero

Reese Avry Dondero

Jameson Drue Dondero

Dana Sprong (Third Party)

David c. Hopson

De Kooning, Ltd.

deKooning, Ltd.

DFA/BH Autumn Ridge, LLC

Dolomiti, LLC

DrugCrafters, L.P.

Dugaboy Investment Trust

Dugaboy Management, LLC

Dugaboy Project Management GP, LLC

Eagle Equity Advisors, LLC

Eames, Ltd.

Eastland CLO, Ltd.

Eastland Investors Corp.

EDS Legacy Heliport, LLC

EDS Legacy Partners Owner, LLC

EDS Legacy Partners, LLC

Empower Dallas Foundation, Inc.

ENA 41, LLC

Entegra Strat Superholdco, LLC

Entegra-FRO Holdco, LLC

Entegra-FRO Superholdco, LLC

Entegra-HOCF Holdco, LLC

Entegra-NHF Holdco, LLC

Entegra-NHF Superholdco, LLC

Entegra-RCP Holdco, LLC

Estates on Maryland Holdco, LLC

Estates on Maryland Owners SM, Inc.

Estates on Maryland Owners, LLC

Estates on Maryland, LLC

Falcon E&P Four Holdings, LLC

Falcon E&P One, LLC

Falcon E&P Opportunities Fund, L.P.

Falcon E&P Opportunities GP, LLC

Falcon E&P Royalty Holdings, LLC

Falcon E&P Six, LLC

Falcon E&P Two, LLC

Falcon Four Midstream, LLC

Falcon Four Upstream, LLC

Falcon Incentive Partners GP, LLC

Falcon Incentive Partners, LP

Falcon Six Midstream, LLC

Flamingo Vegas Holdco, LLC *(fka Cabi Holdco, LLC)*

Four Rivers Co-Invest GP, LLC
Four Rivers Co-Invest, L.P.
FRBH Abbington SM, Inc.
FRBH Abbington, LLC
FRBH Arbors, LLC
FRBH Beechwood SM, Inc.
FRBH Beechwood, LLC
FRBH C1 Residential, LLC
FRBH Courtney Cove SM, Inc.
FRBH Courtney Cove, LLC
FRBH CP, LLC
FRBH Duck Creek, LLC
FRBH Eaglecrest, LLC
FRBH Edgewater JV, LLC
FRBH Edgewater Owner, LLC
FRBH Edgewater SM, Inc.
FRBH JAX-TPA, LLC
FRBH Nashville Residential, LLC
FRBH Regatta Bay, LLC
FRBH Sabal Park SM, Inc.
FRBH Sabal Park, LLC
FRBH Silverbrook, LLC
FRBH Timberglen, LLC
FRBH Willow Grove SM, Inc.
FRBH Willow Grove, LLC
FRBH Woodbridge SM, Inc.
FRBH Woodbridge, LLC
Freedom C1 Residential, LLC
Freedom Duck Creek, LLC
Freedom Edgewater, LLC
Freedom JAX-TPA Residential, LLC
Freedom La Mirage, LLC
Freedom LHV LLC
Freedom Lubbock LLC
Freedom Miramar Apartments, LLC
Freedom Sandstone, LLC
Freedom Willowdale, LLC
Fundo de Investimento em Direitos Creditorios BB Votorantim Highland Infraestrutura
G&E Apartment REIT The Heights at Olde Towne, LLC
G&E Apartment REIT The Myrtles at Olde Towne, LLC

GAF REIT, LLC
GAF Toys Holdco, LLC
Gardens of Denton II, L.P.
Gardens of Denton III, L.P.
Gleneagles CLO, Ltd.
Goverannce RE, Ltd.
Governance Re, Ltd.
Governance, Ltd.
Grant Scott
Grant Scott, Trustee of The SLHC Trust
Grayson CLO, Ltd.
Grayson Investors Corp.
Greater Kansas City Community Foundation (third party)
Greenbriar CLO, Ltd.
Greg Busseyt
Gunwale LLC
Gunwale, LLC
Hakusan, LLC
Hammark Holdings LLC
Hampton Ridge Partners, LLC
Harko, LLC
Harry Bookey/Pam Bookey (third party)
Haverhill Acquisition Co., LLC
Haygood, LLC
HB 2015 Family LP (third party)
HCBH 11611 Ferguson, LLC
HCBH Buffalo Pointe II, LLC
HCBH Buffalo Pointe III, LLC
HCBH Buffalo Pointe, LLC
HCBH Hampton Woods SM, Inc.
HCBH Hampton Woods, LLC
HCBH Overlook SM, Inc.
HCBH Overlook, LLC
HCBH Rent Investors, LLC
HCMS Falcon GP, LLC
HCMS Falcon, L.P.
HCO Holdings, LLC
HCOF Preferred Holdings, L.P.
HCOF Preferred Holdings, LP
HCOF Preferred Holdings, Ltd.
HCRE 1775 James Ave, LLC
HCRE Addison TRS, LLC

HCRE Addison, LLC (fka HWS Addison, LLC)

HCRE Hotel Partner, LLC (fka HCRE HWS Partner, LLC)

HCRE Las Colinas TRS, LLC

HCRE Las Colinas, LLC (fka HWS Las Colinas, LLC)

HCRE Plano TRS, LLC

HCRE Plano, LLC (fka HWS Plano, LLC)

HCREF-I Holding Corp.

HCREF-II Holding Corp.

HCREF-III Holding Corp.

HCREF-IV Holding Corp.

HCREF-IX Holding Corp.

HCREF-V Holding Corp.

HCREF-VI Holding Corp.

HCREF-VII Holding Corp.

HCREF-VIII Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

HCREF-XIII Holding Corp.

HCREF-XIV Holding Corp.

HCREF-XV Holding Corp.

HCSLR Camelback Investors (Cayman), Ltd.

HCSLR Camelback, LLC

HCT Holdco 2 Ltd.

HCT Holdco 2, Ltd.

HE 41, LLC

HE Capital 232 Phase I Property, LLC

HE Capital 232 Phase I, LLC

HE Capital Asante, LLC

HE Capital Fox Trails, LLC

HE Capital KR, LLC

HE Capital, LLC

HE CLO Holdco, LLC

HE Mezz Fox Trails, LLC

HE Mezz KR, LLC

HE Peoria Place Property, LLC

HE Peoria Place, LLC

Heron Pointe Investors, LLC

Hewett's Island CLO I-R, Ltd.

HFP Asset Funding II, Ltd.

HFP Asset Funding III, Ltd.

HFP CDO Construction Corp.

HFP GP, LLC

HFRO Sub, LLC

Hibiscus HoldCo, LLC

Highland - First Foundation Income Fund

Highland 401(k) Plan

Highland 401K Plan

Highland Argentina Regional Opportunity Fund GP, LLC

Highland Argentina Regional Opportunity Fund, L.P.

Highland Argentina Regional Opportunity Fund, Ltd.

Highland Argentina Regional Opportunity Master Fund, L.P.

Highland Brasil, LLC

Highland Capital Brasil Gestora de Recursos (fka Highland Brasilinvest Gestora de Recursos, LTDA; fka HBI Consultoria Empresarial, LTDA)

Highland Capital Management (Singapore) Pte Ltd

Highland Capital Management AG

Highland Capital Management AG (Highland Capital Management SA) (Highland Capital Management Ltd)

Highland Capital Management Fund Advisors, L.P.

Highland Capital Management Fund Advisors, L.P. (fka Pyxis Capital, L.P.)

Highland Capital Management Korea Limited

Highland Capital Management Latin America, L.P.

Highland Capital Management LP Retirement Plan and Trust

Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.

Highland Capital Management Real Estate Holdings I, LLC

Highland Capital Management Real Estate Holdings II, LLC

Highland Capital Management Services, Inc.

Highland Capital Management, L.P.

**000375**

Highland Capital Management, L.P. Charitable Fund

Highland Capital Management, L.P. Retirement Plan and Trust

Highland Capital Management, L.P., as trustee of Acis CMOA Trust and nominiee for and on behalf of Highland CLO Assets Holdings Limited

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominiee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, LP

Highland Capital Management, LP Charitable Fund

Highland Capital Multi-Strategy Fund, LP

Highland Capital of New York, Inc.

Highland Capital Special Allocation, LLC

Highland CDO Holding Company

Highland CDO Opportunity Fund GP, L.P.

Highland CDO Opportunity Fund, L.P.

Highland CDO Opportunity Fund, Ltd.

Highland CDO Opportunity GP, LLC

Highland CDO Opportunity Master Fund, L.P.

Highland CDO Trust

Highland CLO 2018-1, Ltd.

Highland CLO Assets Holdings Limited

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd. *(fka Acis Loan Funding, Ltd.)*

Highland CLO Gaming Holdings, LLC

Highland CLO Holdings Ltd.

Highland CLO Holdings, Ltd. (as of 12.19.17)

Highland CLO Management Ltd.

Highland CLO Trust

Highland Credit Opportunities CDO Asset Holdings GP, Ltd.

Highland Credit Opportunities CDO Asset Holdings, L.P.

Highland Credit Opportunities CDO Financing, LLC

Highland Credit Opportunities CDO, Ltd.

Highland Credit Opportunities Holding Corporation

Highland Credit Opportunities Japanese Feeder Sub-Trust

Highland Credit Opportunities Japanese Unit Trust (Third Party)

Highland Credit Strategies Fund, L.P.

Highland Credit Strategies Fund, Ltd.

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Master Fund, L.P.

Highland Dallas Foundation, Inc.

Highland Dynamic Income Fund GP, LLC

Highland Dynamic Income Fund GP, LLC *(fka Highland Capital Loan GP, LLC)*

Highland Dynamic Income Fund, L.P.

Highland Dynamic Income Fund, L.P. *(fka Highland Capital Loan Fund, L.P.)*

Highland Dynamic Income Fund, Ltd.

Highland Dynamic Income Fund, Ltd. *(fka Highland Loan Fund, Ltd.)*

Highland Dynamic Income Master Fund, L.P.

Highland Dynamic Income Master Fund, L.P. *(fka Highland Loan Master Fund, L.P.)*

Highland Employee Retention Assets LLC

Highland Energy Holdings, LLC

Highland Energy MLP Fund *(fka Highland Energy and Materials Fund)*

Highland Equity Focus Fund, L.P.

Highland ERA Management, LLC

Highland eSports Private Equity Fund

Highland Financial Corp.

Highland Financial Partners, L.P.

Highland Fixed Income Fund

Highland Flexible Income UCITS Fund

Highland Floating Rate Fund

Highland Floating Rate Opportunites Fund

Highland Floating Rate Opportunities Fund

Highland Fund Holdings, LLC

Highland Funds I

Highland Funds II

Highland Funds III

Highland GAF Chemical Holdings, LLC

Highland General Partner, LP

Highland Global Allocation Fund

Highland Global Allocation Fund
*(fka Highland Global Allocation Fund II)*

Highland GP Holdings, LLC

Highland HCF Advisor Ltd.

Highland HCF Advisor, Ltd., as Trustee for
and on behalf of Acis CLO Trust, as nominee
for and on behalf of Highland CLO Funding,
Ltd. (as of 3.29.18)

Highland Healthcare Equity Income and
Growth Fund

Highland iBoxx Senior Loan ETF

Highland Income Fund

Highland Income Fund  *(fka Highland
Floating Rate Opportunities Fund)*

Highland Kansas City Foundation, Inc.

Highland Latin America Consulting, Ltd.

Highland Latin America GP, Ltd.

Highland Latin America LP, Ltd.

Highland Latin America Trust

Highland Legacy Limited

Highland LF Chemical Holdings, LLC

Highland Loan Funding V, LLC

Highland Loan Funding V, Ltd.

Highland Long/Short Equity Fund

Highland Long/Short Healthcare Fund

Highland Marcal Holding, Inc.

Highland Merger Arbitrage Fund

Highland Multi Strategy Credit Fund GP, L.P.

Highland Multi Strategy Credit Fund GP, L.P.
*(fka Highland Credit Opportunities CDO GP,
L.P.)*

Highland Multi Strategy Credit Fund, L.P.

Highland Multi Strategy Credit Fund, L.P. *(fka
Highland Credit Opportunities Fund, L.P., fka
Highland Credit Opportunities CDO, L.P.)*

Highland Multi Strategy Credit Fund, Ltd.

Highland Multi Strategy Credit Fund, Ltd. *(fka
Highland Credit Opportunities Fund, Ltd.)*

Highland Multi Strategy Credit GP, LLC

Highland Multi Strategy Credit GP, LLC *(fka
Highland Credit Opportunities CDO GP, LLC)*

Highland Multi-Strategy Fund GP, LLC

Highland Multi-Strategy Fund GP, LP

Highland Multi-Strategy IDF GP, LLC

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Master Fund, LP

Highland Multi-Strategy Onshore Master
SubFund II, LLC

Highland Multi-Strategy Onshore Master
Subfund, LLC

Highland Opportunistic Credit Fund

Highland Park CDO 1, Ltd.

Highland Park CDO I, Ltd.

Highland Premier Growth Equity Fund

Highland Premium Energy & Materials Fund

Highland Prometheus Feeder Fund I, L.P.

Highland Prometheus Feeder Fund I, LP

Highland Prometheus Feeder Fund II, L.P.

Highland Prometheus Feeder Fund II, LP

Highland Prometheus Master Fund, L.P.

Highland Receivables Finance I, LLC

Highland Restoration Capital Partners GP,
LLC

Highland Restoration Capital Partners Master,
L.P.

Highland Restoration Capital Partners
Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Santa Barbara Foundation, Inc.

Highland Select Equity Fund GP, L.P.

Highland Select Equity Fund, L.P.

Highland Select Equity GP, LLC

Highland Select Equity Master Fund, L.P.

Highland Small-Cap Equity Fund

Highland Socially Responsible Equity Fund

Highland Socially Responsible Equity Fund
*(fka Highland Premier Growth Equity Fund)*

Highland Special Opportunities Holding Company

Highland SunBridge GP, LLC

Highland Tax-Exempt Fund

Highland TCI Holding Company, LLC

Highland Total Return Fund

Highland's Roads Land Holding Company, LLC

Hinduja Bank (Switzerland) Ltd

Hirst, Ltd.

HMCF PB Investors, LLC

HMx2 Investment Trust
(Matt McGraner)

Hockney, Ltd.

HRT North Atlanta, LLC

HRT Timber Creek, LLC

HRTBH North Atlanta, LLC

HRTBH Timber Creek, LLC

Huber Funding LLC

Hunter Mountain Investment Trust

HWS Investors Holdco, LLC

Internal Investors

Intertrust

James D. Dondero
Reese Avry Dondero
Jameson Drue Dondero

James Dondero

James Dondero and Mark Okada

James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Japan Trustee Services Bank, Ltd.

Jasper CLO, Ltd.

Jewelry Ventures I, LLC

JMIJM, LLC

Joanna E. Milne Irrevocable Trust dated Nov 25 1998 (third party)

John Honis

John L. Holt, Jr.

John R. Sears, Jr.

Karisopolis, LLC

Keelhaul LLC

KHM Interests, LLC (third party)

Kuilima Montalban Holdings, LLC

Kuilima Resort Holdco, LLC

KV Cameron Creek Owner, LLC

Lakes at Renaissance Park Apartments Investors, L.P.

Lakeside Lane, LLC

Landmark Battleground Park II, LLC

Lane Britain

Larry K. Anders

LAT Battleground Park, LLC

LAT Briley Parkway, LLC

Lautner, Ltd.

Leawood RE Holdings, LLC

Liberty Cayman Holdings, Ltd.

Liberty CLO Holdco, Ltd.

Liberty CLO, Ltd.

Liberty Sub, Ltd.

Long Short Equity Sub, LLC

Longhorn Credit Funding LLC

Longhorn Credit Funding LLC - A

Longhorn Credit Funding LLC - B

Longhorn Credit Funding LLC (LHB)

Longhorn Credit Funding, LLC

Lurin Real Estate Holdings V, LLC

Maple Avenue Holdings, LLC

MaplesFS Limited

Marc C. Manzo

Mark and Pam Okada Family Trust - Exempt Descendants' Trust

Mark and Pam Okada Family Trust - Exempt Trust #2

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust #2

Mark and Pamela Okada Family Trust - Exempt Trust #2

Mark K. Okada

000378

Mark Okada
Mark Okada and Pam Okada
Mark Okada and Pam Okada, as joint owners
Mark Okada/Pamela Okada
Markham Fine Jewelers, L.P.
Markham Fine Jewelers, LP
Matt McGraner
Meritage Residential Partners, LLC
MGM Studios HoldCo, Ltd.
Michael Rossi
ML CLO XIX Sterling (Cayman), Ltd.
N/A
Nancy Dondero
NCI Apache Trail LLC
NCI Assets Holding Company LLC
NCI Country Club LLC
NCI Fort Worth Land LLC
NCI Front Beach Road LLC
NCI Minerals LLC
NCI Royse City Land LLC
NCI Stewart Creek LLC
NCI Storage, LLC
Neil Labatte
Neutra, Ltd.
New Jersey Tissue Company Holdco, LLC
*(fka Marcal Paper Mills Holding Company, LLC)*

NexAnnuity Holdings, Inc.
NexBank Capital Trust I
NexBank Capital, Inc.
NexBank Land Advisors, Inc.
NexBank Securities Inc.
NexBank Securities, Inc.

NexBank SSB
NexBank Title, Inc.
(dba NexVantage Title Services)
NexBank, SSB
NexPoint Advisors GP, LLC
NexPoint Advisors, L.P.
NexPoint Capital REIT, LLC
NexPoint Capital, Inc.

NexPoint Capital, Inc. *(fka NexPoint Capital, LLC)*
NexPoint CR F/H DST, LLC
NexPoint Credit Strategies Fund
NexPoint Discount Strategies Fund *(fka NexPoint Discount Yield Fund)*
NexPoint DRIP
NexPoint Energy and Materials Opportunities Fund *(fka NexPoint Energy Opportunities Fund)*
NexPoint Event-Driven Fund *(fkaNexPoint Merger Arbitrage Fund)*
NexPoint Flamingo DST
NexPoint Flamingo Investment Co, LLC
NexPoint Flamingo Leaseco, LLC
NexPoint Flamingo Manager, LlC
NexPoint Flamingo Property Manager, LlC
NexPoint Healthcare Opportunities Fund
NexPoint Hospitality Trust
NexPoint Hospitality, Inc.
NexPoint Hospitality, LLC
NexPoint Insurance Distributors, LLC
NexPoint Insurance Solutions GP, LLC
NexPoint Insurance Solutions GP, LLC *(fka Highland Capital Insurance Solutions GP, LLC)*
NexPoint Insurance Solutions, L.P. *(fka Highland Capital Insurance Solutions, L.P.)*
NexPoint Latin American Opportunities Fund
NexPoint Legacy 22, LLC
NexPoint Lincoln Porte Equity, LLC
NexPoint Lincoln Porte Manager, LLC
NexPoint Lincoln Porte, LLC *(fka NREA Lincoln Porte, LLC)*
NexPoint Multifamily Capital Trust, Inc.
NexPoint Multifamily Capital Trust, Inc. *(fka NexPoint Multifamily Realty Trust, Inc., fka Highland Capital Realty Trust, Inc.)*
NexPoint Multifamily Operating Partnership, L.P.
NexPoint Peoria, LLC
NexPoint Polo Glen DST

000379

NexPoint Polo Glen Holdings, LLC

NexPoint Polo Glen Investment Co, LLC

NexPoint Polo Glen Leaseco, LLC

NexPoint Polo Glen Manager, LLC

NexPoint RE Finance Advisor GP, LLC

NexPoint RE Finance Advisor, L.P.

NexPoint Real Estate Advisors GP, LLC

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors III, L.P.

NexPoint Real Estate Advisors IV, L.P.

NexPoint Real Estate Advisors V, L.P.

NexPoint Real Estate Advisors VI, L.P.

NexPoint Real Estate Advisors VII GP, LLC

NexPoint Real Estate Advisors VII, L.P.

NexPoint Real Estate Advisors VIII, L.P.

NexPoint Real Estate Advisors, L.P.

NexPoint Real Estate Capital, LLC

NexPoint Real Estate Capital, LLC *(fka Highland Real Estate Capital, LLC, fka Highland Multifamily Credit Fund, LLC)*

NexPoint Real Estate Finance OP GP, LLC

NexPoint Real Estate Finance Operating Partnership, L.P.

NexPoint Real Estate Finance, Inc.

NexPoint Real Estate Opportunities, LLC

NexPoint Real Estate Opportunities, LLC *(fka Freedom REIT LLC)*

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Strategies Fund

NexPoint Residential Trust Inc.

NexPoint Residential Trust Operating Partnership GP, LLC

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust, Inc.

NexPoint Securities, Inc. *(fka Highland Capital Funds Distributor, Inc.) (fka Pyxis Distributors, Inc.)*

NexPoint Strategic Income Fund *(fka NexPoint Opportunistic Credit Fund, fka NexPoint Distressed Strategies Fund)*

NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund *(fka NexPoint Credit Strategies Fund)*

NexPoint Texas Multifamily Portfolio DST *(fka NREA Southeast Portfolio Two, DST)*

NexPoint WLIF I Borrower, LLC

NexPoint WLIF I, LLC

NexPoint WLIF II Borrower, LLC

NexPoint WLIF II, LLC

NexPoint WLIF III Borrower, LLC

NexPoint WLIF III, LLC

NexPoint WLIF, LLC (Series I)

NexPoint WLIF, LLC (Series II)

NexPoint WLIF, LLC (Series III)

NexStrat LLC

NexVest, LLC

NexWash LLC

NFRO REIT Sub, LLC

NFRO TRS, LLC

NHF CCD, Inc.

NHT 2325 Stemmons, LLC

NHT Beaverton TRS, LLC *(fka NREA Hotel TRS, Inc.)*

NHT Beaverton, LLC

NHT Bend TRS, LLC

NHT Bend, LLC

NHT Destin TRS, LLC

NHT Destin, LLC

NHT DFW Portfolio, LLC

NHT Holdco, LLC

NHT Holdings, LLC

NHT Intermediary, LLC

NHT Nashville TRS, LLC

NHT Nashville, LLC

NHT Olympia TRS, LLC

NHT Olympia, LLC

NHT Operating Partnership GP, LLC

NHT Operating Partnership II, LLC
NHT Operating Partnership, LLC
NHT Salem, LLC
NHT SP Parent, LLC
NHT SP TRS, LLC
NHT SP, LLC
NHT Tigard TRS, LLC
NHT Tigard, LLC
NHT TRS, Inc.
NHT Uptown, LLC
NHT Vancouver TRS, LLC
NHT Vancouver, LLC
NLA Assets LLC
NMRT TRS, Inc.
NREA Adair DST Manager, LLC
NREA Adair Investment Co, LLC
NREA Adair Joint Venture, LLC
NREA Adair Leaseco Manager, LLC
NREA Adair Leaseco, LLC
NREA Adair Property Manager LLC
NREA Adair, DST
NREA Ashley Village Investors, LLC
NREA Cameron Creek Investors, LLC
NREA Cityscape Hue Investors, LLC
NREA Crossing Investors LLC
NREA Crossings Investors, LLC
NREA Crossings Ridgewood Coinvestment, LLC *(fka NREA Crossings Ridgewood Investors, LLC)*

NREA DST Holdings, LLC
NREA El Camino Investors, LLC
NREA Estates Inc.
NREA Estates Investment Co, LLC
NREA Estates Leaseco, LLC
NREA Estates Manager, LLC
NREA Estates Property Manager, LLC
NREA Estates, DST
NREA Gardens DST Manager LLC
NREA Gardens DST Manager, LLC
NREA Gardens Investment Co, LLC
NREA Gardens Leaseco Manager, LLC
NREA Gardens Leaseco, LLC
NREA Gardens Property Manager, LLC

NREA Gardens Springing LLC
NREA Gardens Springing Manager, LLC
NREA Gardens, DST
NREA Hidden Lake Investment Co, LLC
NREA Hue Investors, LLC
NREA Keystone Investors, LLC
NREA Meritage Inc.
NREA Meritage Investment Co, LLC
NREA Meritage Leaseco, LLC
NREA Meritage Manager, LLC
NREA Meritage Property Manager, LLC
NREA Meritage, DST
NREA Oaks Investors, LLC
NREA Retreat Investment Co, LLC
NREA Retreat Leaseco, LLC
NREA Retreat Manager, LLC
NREA Retreat Property Manager, LLC
NREA Retreat, DST
NREA SE MF Holdings LLC
NREA SE MF Holdings, LLC
NREA SE MF Investment Co, LLC
NREA SE MF Investment Co, LLC
NREA SE Multifamily LLC
NREA SE Multifamily, LLC
NREA SE One Property Manager, LLC
NREA SE Three Property Manager, LLC
NREA SE Two  Property Manager, LLC
NREA SE1 Andros Isles Leaseco, LLC
NREA SE1 Andros Isles Manager, LLC
NREA SE1 Andros Isles, DST
(Converted from DK Gateway Andros, LLC)

NREA SE1 Arborwalk Leaseco, LLC
NREA SE1 Arborwalk Manager, LLC
NREA SE1 Arborwalk, DST
(Converted from MAR Arborwalk, LLC)

NREA SE1 Towne Crossing Leaseco, LLC
NREA SE1 Towne Crossing Manager, LLC
NREA SE1 Towne Crossing, DST
(Converted from Apartment REIT Towne Crossing, LP)

NREA SE1 Walker Ranch Leaseco, LLC
NREA SE1 Walker Ranch Manager, LLC

000381

NREA SE1 Walker Ranch, DST
(Converted from SOF Walker Ranch Owner, L.P.)

NREA SE2 Hidden Lake Leaseco, LLC

NREA SE2 Hidden Lake Manager, LLC

NREA SE2 Hidden Lake, DST

NREA SE2 Hidden Lake, DST
(Converted from SOF Hidden Lake SA Owner, L.P.)

NREA SE2 Vista Ridge Leaseco, LLC

NREA SE2 Vista Ridge Manager, LLC

NREA SE2 Vista Ridge, DST

NREA SE2 Vista Ridge, DST
(Converted from MAR Vista Ridge, L.P.)

NREA SE2 West Place Leaseco, LLC

NREA SE2 West Place Manager, LLC

NREA SE2 West Place, DST
(Converted from Landmark at West Place, LLC)

NREA SE3 Arboleda Leaseco, LLC

NREA SE3 Arboleda Manager, LLC

NREA SE3 Arboleda, DST
(Converted from G&E Apartment REIT Arboleda, LLC)

NREA SE3 Fairways Leaseco, LLC

NREA SE3 Fairways Manager, LLC

NREA SE3 Fairways, DST
(Converted from MAR Fairways, LLC)

NREA SE3 Grand Oasis Leaseco, LLC

NREA SE3 Grand Oasis Manager, LLC

NREA SE3 Grand Oasis, DST
(Converted from Landmark at Grand Oasis, LP)

NREA Southeast Portfolio One Manager, LLC

NREA Southeast Portfolio One, DST

NREA Southeast Portfolio One, DST

NREA Southeast Portfolio Three Manager, LLC

NREA Southeast Portfolio Three, DST

NREA Southeast Portfolio Three, DST

NREA Southeast Portfolio Two Manager, LLC

NREA Southeast Portfolio Two, DST

NREA Southeast Portfolio Two, LLC

NREA SOV Investors, LLC

NREA Uptown TRS, LLC

NREA VB I LLC

NREA VB II LLC

NREA VB III LLC

NREA VB IV LLC

NREA VB Pledgor I LLC

NREA VB Pledgor I, LLC

NREA VB Pledgor II LLC

NREA VB Pledgor II, LLC

NREA VB Pledgor III LLC

NREA VB Pledgor III, LLC

NREA VB Pledgor IV LLC

NREA VB Pledgor IV, LLC

NREA VB Pledgor V LLC

NREA VB Pledgor V, LLC

NREA VB Pledgor VI LLC

NREA VB Pledgor VI, LLC

NREA VB Pledgor VII LLC

NREA VB Pledgor VII, LLC

NREA VB SM, Inc.

NREA VB V LLC

NREA VB VI LLC

NREA VB VII LLC

NREA Vista Ridge Investment Co, LLC

NREC AR Investors, LLC

NREC BM Investors, LLC

NREC BP Investors, LLC

NREC Latitude Investors, LLC

NREC REIT Sub, Inc.

NREC TRS, Inc.

NREC WW Investors, LLC

NREF OP I Holdco, LLC

NREF OP I SubHoldco, LLC

NREF OP I, L.P.

NREF OP II Holdco, LLC

NREF OP II SubHoldco, LLC

NREF OP II, L.P.

NREF OP IV REIT Sub TRS, LLC

NREF OP IV REIT Sub, LLC

NREF OP IV, L.P.

NREO NW Hospitality Mezz, LLC

NREO NW Hospitality, LLC

NREO Perilune, LLC
NREO SAFStor Investors, LLC
NREO TRS, Inc.
NRESF REIT Sub, LLC
NXRT Abbington, LLC
NXRT Atera II, LLC
NXRT Atera, LLC
NXRT AZ2, LLC
NXRT Barrington Mill, LLC
NXRT Bayberry, LLC
NXRT Bella Solara, LLC
NXRT Bella Vista, LLC
NXRT Bloom, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP I, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine GP II, LLC
NXRT Brandywine LP, LLC
NXRT Brandywine LP, LLC
NXRT Brentwood Owner, LLC
NXRT Brentwood, LLC
NXRT Cedar Pointe Tenant, LLC
NXRT Cedar Pointe, LLC
NXRT Cityview, LLC
NXRT Cornerstone, LLC
NXRT Crestmont, LLC
NXRT Crestmont, LLC
NXRT Enclave, LLC
NXRT Glenview, LLC
NXRT H2 TRS, LLC
NXRT Heritage, LLC
NXRT Hollister TRS LLC
NXRT Hollister, LLC
NXRT LAS 3, LLC
NXRT Master Tenant, LLC
NXRT Nashville Residential, LLC
NXRT Nashville Residential, LLC *(fka Freedom Nashville Residential, LLC)*
NXRT North Dallas 3, LLC
NXRT Old Farm, LLC
NXRT Pembroke Owner, LLC
NXRT Pembroke, LLC
NXRT PHX 3, LLC

NXRT Radbourne Lake, LLC
NXRT Rockledge, LLC
NXRT Sabal Palms, LLC
NXRT SM, Inc.
NXRT Steeplechase, LLC
NXRT Stone Creek, LLC
NXRT Summers Landing GP, LLC
NXRT Summers Landing LP, LLC
NXRT Torreyana, LLC
NXRT Vanderbilt, LLC
NXRT West Place, LLC
NXRTBH AZ2, LLC
NXRTBH Barrington Mill Owner, LLC
NXRTBH Barrington Mill SM, Inc.
NXRTBH Barrington Mill, LLC
NXRTBH Bayberry, LLC
NXRTBH Cityview, LLC
NXRTBH Colonnade, LLC
NXRTBH Cornerstone Owner, LLC
NXRTBH Cornerstone SM, Inc.
NXRTBH Cornerstone, LLC
NXRTBH Dana Point SM, Inc.
NXRTBH Dana Point, LLC
NXRTBH Foothill SM, Inc.
NXRTBH Foothill, LLC
NXRTBH Heatherstone SM, Inc.
NXRTBH Heatherstone, LLC
NXRTBH Hollister Tenant, LLC
NXRTBH Hollister, LLC
NXRTBH Madera SM, Inc.
NXRTBH Madera, LLC
NXRTBH McMillan, LLC
NXRTBH North Dallas 3, LLC
NXRTBH Old Farm II, LLC
NXRTBH Old Farm Tenant, LLC
NXRTBH Old Farm, LLC
NXRTBH Radbourne Lake, LLC
NXRTBH Rockledge, LLC
NXRTBH Sabal Palms, LLC
NXRTBH Steeplechase, LLC
(dba Southpoint Reserve at Stoney Creek)-VA
NXRTBH Stone Creek, LLC
NXRTBH Vanderbilt, LLC

NXRTBH Versailles SM, Inc.
NXRTBH Versailles, LLC
Oak Holdco, LLC
Oaks CGC, LLC
Okada Family Revocable Trust
Oldenburg, Ltd.
Pam Capital Funding GP Co. Ltd.
Pam Capital Funding, L.P.
PamCo Cayman Ltd.
Park West 1700 Valley View Holdco, LLC
Park West 2021 Valley View Holdco, LLC
Park West Holdco, LLC
Park West Portfolio Holdco, LLC
Participants of Highland 401K Plan
Patrick Willoughby-McCabe
PCMG Trading Partners XXIII, L.P.
PCMG Trading Partners XXIII, LP
PDK Toys Holdco, LLC
Pear Ridge Partners, LLC
Penant Management GP, LLC
Penant Management LP
PensionDanmark Holding A/S
PensionDanmark
Pensionsforsikringsaktieselskab
Peoria Place Development, LLC
(30% cash contributions - profit participation
only)
Perilune Aero Equity Holdings One, LLC
Perilune Aviation LLC
PetroCap Incentive Holdings III. L.P.
PetroCap Incentive Partners II GP, LLC
PetroCap Incentive Partners II, L.P.
PetroCap Incentive Partners III GP, LLC
PetroCap Incentive Partners III, LP
PetroCap Management Company LLC
PetroCap Partners II GP, LLC
PetroCap Partners II, L.P.
PetroCap Partners III GP, LLC
PetroCap Partners III, L.P.
Pharmacy Ventures I, LLC
Pharmacy Ventures II, LLC
Pollack, Ltd.
Powderhorn, LLC

PWM1 Holdings, LLC
PWM1, LLC
RADCO - Bay Meadows, LLLP
RADCO - Bay Park, LLLP
RADCO NREC Bay Meadows Holdings, LLC
RADCO NREC Bay Park Holdings, LLC
Ramarim, LLC
Rand Advisors Series I Insurance Fund
Rand Advisors Series II Insurance Fund
Rand Advisors, LLC
Rand PE Fund I, L.P.
Rand PE Fund I, L.P. - Series 1
Rand PE Fund Management, LLC
Rand PE Holdco, LLC
Realdania
Red River CLO, Ltd.
Red River Investors Corp.
Riverview Partners SC, LLC
Rockwall CDO II Ltd.
Rockwall CDO II, Ltd.
Rockwall CDO, Ltd.
Rockwall Investors Corp.
Rothko, Ltd.
RTT Bella Solara, LLC
RTT Bloom, LLC
RTT Financial, Inc.
RTT Hollister, LLC
RTT Rockledge, LLC
RTT Torreyana, LLC
SALI Fund Partners, LLC
SAS Management
SAS Asset Recovery Ltd.

San Diego County Employees Retirement
Association
Sandstone Pasadena Apartments, LLC
Sandstone Pasadena, LLC
Santa Barbara Foundation (third party)
Saturn Oil & Gas LLC
SBC Master Pension Trust
Scott Matthew Siekielski
SE Battleground Park, LLC
SE Battleground Park, LLC

SE Glenview, LLC

SE Governors Green Holdings, L.L.C.

SE Governors Green Holdings, L.L.C. *(fka SCG Atlas Governors Green Holdings, L.L.C.)*

SE Governors Green I, LLC

SE Governors Green II, LLC

SE Governors Green II, LLC

SE Governors Green REIT, L.L.C.

SE Governors Green REIT, L.L.C. *(fka SCG Atlas Governors Green REIT, L.L.C.)*

SE Governors Green, LLC *(fka SCG Atlas Governors Green, L.L.C.)*

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles LP, LLC

SE Gulfstream Isles LP, LLC

SE Heights at Olde Towne, LLC

SE Heights at Olde Towne, LLC

SE Lakes at Renaissance Park GP I, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park LP, LLC

SE Lakes at Renaissance Park LP, LLC

SE Multifamily Holdings LLC

SE Multifamily Holdings, LLC

SE Multifamily REIT Holdings LLC

SE Myrtles at Olde Towne, LLC

SE Myrtles at Olde Towne, LLC

SE Oak Mill I Holdings, LLC

SE Oak Mill I Holdings, LLC *(fka SCG Atlas Oak Mill I Holdings, L.L.C.)*

SE Oak Mill I Owner, LLC *(fka SCG Atlas Oak Mill I, L.L.C.)*

SE Oak Mill I REIT, LLC

SE Oak Mill I REIT, LLC *(fka SCG Atlas Oak Mill I REIT, L.L.C.)*

SE Oak Mill I, LLC

SE Oak Mill I, LLC

SE Oak Mill II Holdings, LLC

SE Oak Mill II Holdings, LLC *(fka SCG Atlas Oak Mill II Holdings, L.L.C.)*

SE Oak Mill II Owner, LLC *(fka SCG Atlas Oak Mill II, L.L.C.)*

SE Oak Mill II REIT, LLC

SE Oak Mill II REIT, LLC *(fka SCG Atlas Oak Mill II REIT, L.L.C.)*

SE Oak Mill II, LLC

SE Oak Mill II, LLC

SE Quail Landing, LLC

SE River Walk, LLC

SE Riverwalk, LLC

SE SM, Inc.

SE Stoney Ridge Holdings, L.L.C. *(fka SCG Atlas Stoney Ridge Holdings, L.L.C.)*

SE Stoney Ridge Holdings, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge REIT, L.L.C. *(fka SCG Atlas Stoney Ridge REIT, L.L.C.)*

SE Stoney Ridge REIT, LLC

SE Stoney Ridge, LLC *(fka SCG Atlas Stoney Ridge, L.L.C.)*

SE Victoria Park, LLC

SE Victoria Park, LLC

Sentinel Re Holdings, Ltd.

Sentinel Reinsurance Ltd.

Sentinel Reinsurance Limited

SFH1, LLC

SFR WLIF I, LLC *(fka NexPoint WLIF I, LLC)*

SFR WLIF II, LLC *(NexPoint WLIF II, LLC)*

SFR WLIF III, LLC *(NexPoint WLIF III, LLC)*

SFR WLIF Manager, LLC *(NexPoint WLIF Manager, LLC)*

SFR WLIF, LLC *(NexPoint WLIF, LLC)*

SFR WLIF, LLC Series I

SFR WLIF, LLC Series II

SFR WLIF, LLC Series III

SH Castle BioSciences, LLC

Small Cap Equity Sub, LLC
Socially Responsible Equity Sub, LLC
SOF Brandywine I Owner, L.P.
SOF Brandywine II Owner, L.P.
SOF-X GS Owner, L.P.
Southfork Cayman Holdings, Ltd.
Southfork CLO, Ltd.
Specialty Financial Products Designated Activity Company (fka Specialty Financial Products Limited)

Spiritus Life, Inc.
SRL Sponsor LLC
SRL Whisperwod LLC
SRL Whisperwood Member LLC
SRL Whisperwood Venture LLC
SSB Assets LLC
Starck, Ltd.
Stemmons Hospitality, LLC
Steve Shin
Stonebridge Capital, Inc.
Stonebridge-Highland Healthcare Private Equity Fund
Strand Advisors III, Inc.
Strand Advisors IV, LLC
Strand Advisors IX, LLC
Strand Advisors V, LLC
Strand Advisors XIII, LLC
Strand Advisors XVI, Inc.
Strand Advisors, Inc.
Stratford CLO, Ltd.
Summers Landing Apartment Investors, L.P.
Term Loan B
(10% cash contributions - profit participation only)

The Dallas Foundation
The Dallas Foundation (third party)
The Dondero Insurance Rabbi Trust
The Dugaboy Investment Trust
The Dugaboy Investment Trust U/T/A Dated Nov 15, 2010
The Get Good Non-Exempt Trust No. 1
The Get Good Non-Exempt Trust No. 2
The Get Good Trust

The Mark and Pamela Okada Family Trust - Exempt Descendants' Trust
The Mark and Pamela Okada Family Trust - Exempt Trust #2
The Ohio State Life Insurance Company
The Okada Family Foundation, Inc.
The Okada Insurance Rabbi Trust
The SLHC Trust
The Trustees of Columbia University in the City of New York
The Twentysix Investment Trust
(Third Party Investor)
Thomas A. Neville
Thread 55, LLC
Tihany, Ltd.
Todd Travers
Tranquility Lake Apartments Investors, L.P.
Tuscany Acquisition, LLC
Uptown at Cityplace Condominium Association, Inc.
US Gaming OpCo, LLC
US Gaming SPV, LLC
US Gaming, LLC
Valhalla CLO, Ltd.
VB GP LLC
VB Holding, LLC
VB One, LLC
VB OP Holdings LLC
VBAnnex C GP, LLC
VBAnnex C Ohio, LLC
VBAnnex C, LP
Ventoux Capital, LLC
(Matt Goetz)
VineBrook Annex B, L.P.
VineBrook Annex I, L.P.
VineBrook Homes Merger Sub II LLC
VineBrook Homes Merger Sub LLC
VineBrook Homes OP GP, LLC
VineBrook Homes Operating Partnership, L.P.
VineBrook Homes Trust, Inc.
VineBrook Partners I, L.P.
VineBrook Partners II, L.P.
VineBrook Properties, LLC

Virginia Retirement System
Vizcaya Investment, LLC
Wake LV Holdings II, Ltd.
Wake LV Holdings, Ltd.
Walter Holdco GP, LLC
Walter Holdco I, Ltd.
Walter Holdco, L.P.
Warhol, Ltd.
Warren Chang
Westchester CLO, Ltd.
William L. Britain
Wright Ltd.
Wright, Ltd.
Yellow Metal Merchants, Inc.

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

                    Claimant,

v.                                         Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                    Respondent.

**PARTIAL FINAL AWARD**

        WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

I.      Introduction
        A.      The Parties
                1.      Claimant is a Committee of Redeemers in the Highland Crusader Fund (the "Committee"). Pursuant to the Joint Plan of Distribution of the Crusader Funds ("the Plan") and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors ("the Scheme")[1], HC300, the Committee was elected from among the investors in the Crusader Fund to oversee the management of the Crusader Fund by Highland Capital Management, L.P. (Highland Capital). The Plan and the Scheme are the governing documents which contain the arbitration agreements giving rise to this arbitration. The Committee is represented by Terri Mascherin, Andrew Vail, and Shaun Van Horn of Jenner & Block LLP.

                2.      Respondent, or Highland, is an investment manager and, until July 2016, served as such for the Highland Crusader Funds ("Crusader Funds" or the "Funds") that were formed between 2000 and 2002. The Funds consisted of one "Onshore Fund" and two "Offshore Funds," and the capital that was raised through these entities was pooled into a "Master

---

[1] The Plan was implemented with respect to Highland Crusader Offshore Funds by a "Scheme of Arrangement" ("Scheme") sanctioned by the Supreme Court of Bermuda. The Scheme incorporates the Plan and, unless otherwise noted, the Plan and Scheme contain effectively identical provisions. Unless the context requires otherwise, we will refer primarily to the Plan.

EXHIBIT A-7

000388

Fund." The capital was invested primarily in "undervalued senior secured loans and other securities of financially troubled firms" among other asset types. HC-17, at HC-117.0010[2]. Highland is represented by Gary Cruciani, Travis DeArmand, Michael Fritz of McKool Smith, LLP.

B.    The Arbitrators
1.    The three arbitrators, whose appointment was formalized by the International Center for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), were David M. Brodsky, Chair, John S. Martin, Jr., and Michael D. Young.

II.    Background of the Dispute
A.    The 2008 Financial Crisis
1.    From 2000 until 2007, the Crusader Funds had double-digit annual returns, but in September and October 2008, as the financial markets in the United States began to fail, Highland Capital was flooded with redemption requests from Crusader Fund investors, as the Crusader Funds' assets lost significant value.

2.    On October 15, 2008, Highland Capital placed the Crusader Funds in wind-down, "compulsorily redeeming" Crusader Fund's limited partnership interests. Highland Capital also declared that it would liquidate the remaining assets and distribute the proceeds to investors. However, disputes over the appropriate distribution of the assets arose between those investors who had voluntarily redeemed their interests earlier in 2008 but had not yet been paid their redemption amount ("Prior Redeemers") and those who were compulsorily redeemed in October 2008 ("Compulsory Redeemers") (collectively, the "Redeemers").

B.    The Plan and Scheme
1.    At about the same time, an investor raised allegations of misconduct by Highland Capital and filed a wind-up petition in the Supreme Court of Bermuda. In 2011, after several years of negotiations among the Prior Redeemers, Compulsory Redeemers, and Highland, the Plan and Scheme were adopted and became effective in August 2011. The adoption of the Scheme and Plan was to "enable the orderly management, sale, and distribution of the assets" by Highland and the right of the Redeemers Committee to oversee Highland's services. HC-300 at 300.017.

---

[2] There are three sets of exhibits that will be referred to herein, Joint Exhibits (referred to as JX- —), Redeemer Committee Exhibits (RC- —), and Highland Capital Exhibits (HC- __).

2

2.      Central to the Scheme and Plan was the role of the Redeemer Committee, which was created so as to allow the investors in the Funds to have a greater level of influence over the affairs of Highland Capital than an ordinary creditors' committee would have in the liquidation of the Fund; that increased "level of influence" was particularly manifest in the Committee's ability to approve or disapprove of actions that Highland was contemplating taking, right of first refusal on other activities Highland wished to engage in, and the Committee's ability to terminate the services of Highland on 30 days' notice "with or without Cause." HC-300 at 300.016. Thus, the relationship between the Redeemer Committee and Highland, although grounded in contract, was designed to become one of mutual cooperation and confidence.

3.      Pursuant to §2.04 of the Plan, a ten-person committee of Crusader Fund investors, composed of five representatives of the Prior Redeemers and five representatives of the Compulsory Redeemers, was created. HC-300, § 2.04. As part of the Plan and Scheme, Highland Capital continued to serve as the investment manager for the Crusader Funds. As part of its duties as investment manager, Highland Capital was to liquidate fund assets and distribute the proceeds to the Crusader Fund investors pursuant to an agreed 43-month distribution schedule. In addition, as an incentive to Highland in its liquidation of assets, the Scheme and Plan provided that the Deferred Fees would be paid to Highland if it completed the full liquidation.

4.      It is not disputed that, between October 2011 and January 2013, Highland Capital distributed in excess of $1.2 billion to the Crusader Fund investors. It is also not disputed that the Crusader Funds were not completely liquidated when Highland paid itself the Deferred Fees in January and April 2016 and the Funds remain unliquidated as of the time of these hearings.

C.     The Arbitration Agreement

1.      Sections 2.09 and 9.03 set forth the terms and conditions by which these disputes are to be resolved in arbitration. Section 2.09 provides, in relevant part, that "in the event of a dispute between the Crusader Funds or the Redeemer Committee and HCMLP, ... the applicable representatives shall confer in god faith in an attempt to resolve the dispute...If the dispute cannot be resolved by mediation it will be referred to arbitration in accordance with Section 9.03."

2.      Section 9.03 provides, in relevant part, that "Any dispute referred to in Section 2.09...shall be subject to and decided by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof pursuant to applicable law. Arbitration shall be conducted in New York, New York."

D.     Termination of Highland Capital and Ensuing Litigation

3

1.     For reasons set forth below, disputes began to arise between the Redeemer Committee and Highland Capital, culminating in the termination of Highland Capital as investment manager by letter and notice dated July 5, 2016, for cause and without cause, with termination being effective on August 4, 2016, RC-318. Highland Capital was replaced as investment manager by Alvarez & Marsal CRT Management, LLC ("A&M"). JX-31.

2.     On July 5, 2016, the Committee filed a Notice of Claim before the AAA, commencing an arbitration against Highland, RC-319, and also commenced litigation in Delaware Chancery Court, inter alia, to obtain a status quo order in aid of the arbitration. On July 8, 2016, a Vice Chancellor entered an oral status quo order in aid of this arbitration, pending the adjudication of the Committee's request for interim relief by an AAA arbitrator on an emergency basis pursuant to AAA Rule 38. On August 2, 2016, an Emergency Interim Order was entered by an Emergency Arbitrator appointed by the ICDR, which order replicated the oral status quo order entered in Delaware Chancery Court.

3.     On July 21, 2016, Highland filed its Answering Statement, denying the claims and asserting affirmative defenses.

E.     The Arbitration

1.     This Tribunal was established as of October 31, 2016. The parties consented to the appointment of the Tribunal.

2.     On October 14, 2016, Claimant filed an Amended Notice of Claim, seeking specific performance, injunctive relief, declaratory relief, money damages, and disgorgement arising out of the allegedly willful misconduct and violations of fiduciary and contractual duties by Highland Capital as investment manager of the Highland Crusader Fund. Claimant sought four species of relief: (a) an award requiring Highland Capital to provide to the Committee all information about the Fund and its assets as required by Section 2.05 of the Plan and Section 4.6 of the Scheme; (b) an award of money damages, including disgorgement, for Highland Capital's allegedly willful misconduct and breaches of its fiduciary and contractual duties, and for any unjust enrichment; (c) an injunction requiring Highland to return the so-called Deferred Fees and Distribution Fees to the Crusader Fund; and (d) declarations that the Consenting Compulsory Redeemers are entitled to payment of the Deferred Fee Account, and that Highland is not entitled to advancement of expenses and legal fees.

4

3.      On December 14, 2016, Respondent filed a motion for partial summary adjudication, seeking dismissal of those claims seeking monetary damages, seeking relief as both breaches of contract and of fiduciary duties, and seeking relief barred by the applicable Statute of Limitations; by Order of March 1, 2017, we denied such motions without prejudice to their being renewed upon the development of a fuller record.

4.      On February 16, 2017, Claimant filed a motion for partial summary adjudication, seeking an order compelling Highland to comply with its alleged contractual obligation under the Plan and Scheme to provide the Committee with the Crusader Fund's books, records and other information from 2011 to 2016. By Order, dated April 21, 2017, we entered a Partial Final Award, granting the relief sought by Claimant, and ordering Highland, inter alia, to produce non-privileged documents, as described in the Order.

5.      On April 11, 2017, Respondent moved for Summary Adjudication of its counterclaim for advancement to defend against the claims brought by the Claimant in the Arbitration and in the parallel Delaware action, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., C.A. No. 12533-VCG (Del. Ch.) (the "Delaware Action"). Respondent sought a mandatory injunction requiring the Fund to escrow and segregate Crusader Fund assets to cover its indemnification and advancement rights. By Order and Partial Final Award in favor of Claimant, dated July 20, 2017, we denied Highland's motions for advancement in this Arbitration and in the parallel Delaware Action and for the mandatory injunction, on the ground that the "inter-party indemnification exception" applies.

6.      On December 8, 2017, Highland moved to amend its Counterclaims against the Redeemer Committee of the Highland Crusader Fund and for leave to file a third party demand for arbitration against Alvarez & Marsal CRF Management, LLC ("A&M CRF"), Alvarez & Marsal North America, LLC ("A&M NA"), and House Hanover, LLC ("House Hanover"). On January 11, 2018, following a pre-hearing conference call, Respondent filed a revised proposed amended Counterclaim against the Committee alone, raising counterclaims of breach of the covenant of good faith and fair dealing in the its performance and enforcement of the Plan, breach of its fiduciary duty, and aiding and abetting the breach of fiduciary duty by A&M CRF, A&M NA and House Hanover.

7.      By Order dated January 25, 2018, we granted the motion to amend Highland's counterclaims that raised direct claims of breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing arising out of the so-called Deferred Fees allegedly owed to Highland, and denied the balance of Highland's request for leave to file Counterclaims and Third Party Claims.

8.      On February 1, 2018, Respondent filed an Amended Answer and Counterclaims, seeking an order that the Committee account to Highland as an investor therein for all payments, gains, profits, and advantages obtained as a result of the Committee's alleged wrongful actions; that the Committee pay money damages, disgorge, and make restitution to Highland for damages arising from the Committee's alleged breaches of contract, breaches of the covenant of good faith and fair dealing, and breaches of fiduciary duty, including by awarding Highland the Deferred Fees allegedly improperly withheld, as well as an award of Highland's fees and expenses, including reasonable attorneys' fees incurred in this action; and such other relief as the Panel deems fair and equitable.

9.      On February 15, 2018, Claimant moved to strike portions of the Counterclaims on the grounds that certain of the new pleadings went beyond the limitations set by the Panel in the January 25 Order by including allegations that relate directly to claims the Panel had ordered not be included in the revised Counterclaim.  By Order dated April 1, 2018, we granted the motion of the Claimant to strike portions of the Counterclaim and directed Respondent to submit a revised Counterclaim to Claimant and the Panel.

10.     By Order dated March 19, 2018, we directed that "any party wishing to make a motion shall write a letter to the Panel, with copy to opposing counsel, seeking permission to make such motion..."

11.     By letter dated March 28, 2018, Highland requested permission to file a motion for partial summary adjudication with respect to the Committee's breach of fiduciary duty claims that accrued before July 5, 2013, which Highland contends are barred by the statute of limitations.  By Order dated April 5, 2018, relying upon AAA Commercial Arbitration Rule 33, we denied Highland's application to make a motion for partial summary adjudication, without prejudice to their doing so at the close of the Committee's main case at the hearing, if such factual and legal issues were briefed in the Pre-Hearing Briefs.

12.     On April 5, 2018, Respondent filed its revised Amended Counterclaims, seeking relief, as earlier, for alleged breaches of contract, of fiduciary duty, and of the covenant of good faith and fair dealing.

6

13.     On July 12, 2018, Highland moved to strike what it characterized as a new claim by the Committee.  The Committee opposed the motion. By Order dated July 22, 2018, the motion to strike was denied.

14.     On August 19, 2018, after a series of discovery motions were decided, the Parties entered into a Joint Proposed Pre-Hearing Consent Order, which was So Ordered by the Panel.

F.     Hearing Dates and Witnesses

1.     An evidentiary hearing was held in New York, N. Y. on September 12-14, 17-18, 20-21, and 24-25, 2018.

2.     Claimant presented the oral testimony of Eric Felton, Burke Montgomery, David Morehead, and Brian Zambie, all Members of the Redeemer Committee; Steven Varner, Alvarez & Marsal ("A&M"); Robert Collins, PriceWaterhouseCoopers; and two experts, Scott Meadow, Analysis Group; and Basil Imburgia, FTI Consulting.

3.     Respondent presented the oral testimony of Isaac Leventon, Esq., Highland internal counsel; Brant Behr, Redeemer Committee Member; Matt Jameson, formerly employed by Highland Capital; Scott Ellington, General Counsel, Highland Capital; the deposition testimony of Thomas Sargent, the Compliance Officer of Highland; and two experts, James Finkel, Duff and Phelps, and Karl Snow, Bates and White.

G.     Post-Hearing

1.     On October 24, 2018, Claimant filed its Post-Hearing Memorandum on its Claims and Respondent filed its Post-Hearing Memorandum on its Counterclaim.

2.     On November 17, 2018, Claimant filed its Reply to Respondent's Post-Hearing Memorandum and Respondent filed its Reply to Claimant's Post-Hearing Memorandum.

3.     On November 30, 2018, the Panel heard closing arguments from counsel to the Parties.

4.     On December 10, 2018, the Parties filed Supplemental Post-Trial Memoranda, dealing with questions asked by the Panel during closing arguments.

5.     On December 12, 2018, the record was declared closed.

7

6.  On January 5, 2019, at the request of the Panel, the Parties consented to the adjournment of the timing of the award from January 11, 2019 to February 28, 2019. On February 25, at the request of the Panel, the Parties consented to the extension of the deadline to March 7, 2019.

H.  Issues to be Determined

1.  Claimant has pleaded four claims of breaches of fiduciary duty and of breaches of contract, arising out of similar fact patterns, as follows:

    a)  The taking of the Deferred Fees;
    b)  The payment of Distribution Fees;
    c)  The purchase of Plan claims without Redeemer Committee approval; and
    d)  The transfer of Barclays' Fund interests without Redeemer Committee approval.

2.  Separately, Claimant has pleaded claims of breach of fiduciary duty, as follows:

    a)  Engaging in related party transactions without Redeemer Committee approval
    b)  Refusing to settle claims brought by Credit Suisse;
    c)  Refusing to resolve the claims brought by UBS, which included a Temporary Restraining Order ("TRO"); and
    d)  Failing to make a good faith effort to sell the Cornerstone asset.

3.  In addition, Claimant seeks a declaratory judgment that there should be an immediate distribution of the Deferred Fee Account to the Consenting Compulsory Redeemers.

4.  Respondent has pleaded one counterclaim against the Redeemer Committee, alleging that the Committee breached its contractual and fiduciary duties by delaying liquidation of the Fund's assets after July 2016, and depriving Respondent of its right to receive the remaining funds in the Deferred Fees account payable upon complete liquidation of the Fund.

8

5.      Both Claimant and Respondent have also made claims for the recovery of their attorneys' fees and costs.

I.      Applicable Law

1.      At the outset, we address which law applies to which claims.  It is not in dispute that Claimant's breach of contract claims are governed by the law of New York State.  However, Claimant contends that the law of New York State also applies to the breach of fiduciary duty claims, as the breaches are claimed to arise from Highland's relationship with the Fund and its investors under the Plan, which provides for New York law. Respondent argues that any fiduciary duties owed by Highland arise under its services as investment manager of the Crusader Fund, and, thus, are governed by the law governing the Fund's Governing Documents, the state of Delaware.

2.      Although there are few, if any, significant differences between New York and Delaware regarding fiduciary duties of entities in the position of Highland vis-a-vis its investors and the Committee, we find that the governing law on the breach of fiduciary duty claims is most appropriately that of New York, the state whose law governs regarding the Plan and rights of the parties under the Plan.

III.    Discussion of The Issues

A.      We recognize and appreciate the exemplary efforts by counsel for each Party. The results set forth herein are not a reflection of any difference in the quality of those presentations, but of our review of the evidentiary record and of the relevant law.

B.      Taking of Deferred Fees

1.      When the Plan and Scheme were adopted, a prominent feature was the creation of a Deferred Fee Account which was designed to provide an incentive to Highland to liquidate expeditiously the Crusader Fund of its assets. Deferred Fees were annual performance fees payable to Highland but deferred until, as, and when there would be a "complete liquidation" of the Crusader Funds' assets," Scheme §1.5.2, Plan §2.02, HC-300.

9

2.      The evidence is uncontested that, as of the close of the hearing record in this matter, the Crusader Funds have not been completely liquidated. It is also uncontested that, on January 21 and April 6, 2016, Highland distributed to itself a total of $32,313,000 in Deferred Fees. JX-25 at 14; JX-26 at 13.  Highland's stated rationale, or "position," for making the payment without there first having been complete liquidation was set forth in the financial statements of the Funds for the year-end 2015, issued on April 22, 2016: the UBS TRO "prevented the full liquidation" and that Highland "would have received the Deferred Fees...but-for the impact of the restraining order still in place." Thus, Highland "believe[d] its right to receive the [Deferred Fees] crystalized as of the date the [TRO] was lifted," or January 21, 2016, JX-025.0010.

3.      The core of Highland's position was that, in January 2016, it sought, received, and relied on the advice of its outside counsel Akin Gump that the UBS TRO created an impossibility for it to have earned the Deferred Fees, thus allowing the self-payment. However, based upon the evidence heard, we do not find that Highland relied upon any such advice in executing its plan to take the Deferred Fees.

4.      We find that in January 2016, Highland's CEO James Dondero raised the possibility of taking the Deferred Fees before complete liquidation with Thomas Surgent, a Deputy General Counsel and Chief Compliance Officer at Highland, who then discussed the idea with Highland's General Counsel, Scott Ellington. Surgent Dep. 133:4-19.  Mr. Ellington testified that, in January 2016, he and others spoke on several occasions with lawyers from Akin Gump regarding the premature taking of the Deferred Fees, and that he received the advice that "the deferred fees could be taken under the circumstances," that it was a "calculated risk," and that, if successfully challenged, Highland would owe only "nominal interest." Tr. 10 167:14-168:25; 167:14-168:25.

5.      However, Mr. Ellington's testimony is not supported by the hourly billing records of Akin Gump, which do not show any time being billed in January 2016 for anything having to do with this or any other Highland-related issue. RC-523; Tr. 11 136:9-14. Furthermore, Highland's Assistant General Counsel, Isaac Leventon, testified that neither he, nor, he was certain, anyone else at Highland, consulted with outside counsel in January 2016 regarding taking the Deferred Fees.  Tr. 7 236:11-24.  When Highland executed on its "position" by paying itself the Deferred Fees in January and again in early April, Highland did not disclose the self-payment to its independent auditor or the Redeemer Committee.

10

6.      It was not until April 11, 2016, almost a week after it took the second tranche of Deferred Fees that Highland belatedly informed its independent auditor, PriceWaterhouse Coopers (PwC), of what it had done by sending it draft financial statements for the year ending December 31, 2015, in which Highland disclosed, without explanation, a "change ... related to how [they were] ... treating the deferred fee distribution." RC-288. On April 12, a meeting was held between Highland and PwC, at which PwC sought an explanation from Highland for the change in position and asked for a memorandum from Highland's counsel and a "copy of the letter that was sent [to the Redeemers Committee] notifying them of the position," JX-28.

7.      On April 12, Highland proceeded to have, apparently for the first time in 2016, discussions with Akin Gump about a justification for its taking the Deferred Fees prior to "complete liquidation." According to Akin Gump's billable time records, on April 12, there was a telephone "call with Thomas Surgent regarding interpretation of distribution plan and charging of fees during period of TRO." Following that call, on April 19, there was another call with Mr. Surgent and Mr. Leventon "regarding audit disclosures with respect to legal doctrine applicable to fee dispute…," following which an Akin Gump attorney started to draft a memo on the "impossibility" issue. After further calls and discussions regarding the drafting of the disclosure to the auditor, a memorandum was finalized and sent to PwC on April 22, 2016, the day that the financials were issued. See RC-523; Tr. 11 136:9-14.)

8.      Although Mr. Ellington testified the Akin Gump memo was "entirely generated by Akin Gump," without any participation by anyone from Highland, Tr. 10 189:14-21, there is contrary and indisputable evidence that, in fact, someone at Highland drafted footnotes to the financials that were then provided to Akin Gump and appear in the Akin Gump memo, see Tr. 7 283:19-284:9; compare RC-289 with HC-277.  Further, Mr. Leventon exchanged with Akin Gump and commented upon at least four separate drafts of the Akin Gump memo before it was finalized. RC-291; RC-295; -RC300; RC-302; JX-29; Tr. 7 291:4-295:19.

9.      We find that Highland made a deliberate and calculated decision to make no disclosure to the Committee of the actual taking of the Deferred Fees until the issuance of the 2015 financial statements on April 22, 2016, but that, in the course of communicating with PwC about its "position," Highland allowed PwC to conclude that it had informed the Redeemer Committee of its position regarding the payment of the Deferred Fees, and did not correct the misimpression. RC-441. It did so to induce PwC to provide the opinion Highland needed to have clean financials.

11

10.     This was not the first time that Highland had sought to use the so-called "impossibility defense" as a basis for suspending its obligations under the Plan. In 2013, Highland had proposed to use the doctrine in an attempt to avoid making distributions pursuant to the Realization Schedule, attached to the Plan and Scheme. Highland's then-outside counsel, Christopher Panos, now a federal bankruptcy judge, was asked to provide an opinion to allow such action but he expressed strong reservations about the use of that doctrine in an affirmative context, RC-153.

11.     Thereafter, Highland tried to secure another opinion that would be more supportive of its position and received a PowerPoint presentation from Akin Gump in November 2014, HC-356, that provided some additional arguments but, ultimately, focused on the doctrine being able to be used only as a defense, see, e.g., HC-356 at 16.

12.     Finally, when in early 2015, Highland asserted to Committee counsel that, by reason of the UBS TRO, "all applicable distribution dates, distribution thresholds and fees payable" were tolled, by reason of the UBS TRO, JX-22, Committee counsel had strongly rejected such use of the TRO to attempt to justify Highland's failure to meet "either the Realisation Schedule or the distribution threshold for the Deferred Fee Account." RC-219.

13.     Notwithstanding two prior and unsuccessful attempts to use the doctrine to evade its obligations, Highland was not deterred and in late 2015 and early 2016, with the assistance of its inside counsel, but not on the advice of Akin Gump,planned for and then executed on the strategy to take the Deferred Fees.

14.     Under New York law, the doctrine of impossibility does not create an affirmative right to engage in any conduct; rather, under certain circumstances, it acts as a defense to claims of breach of contract. When an unforeseeable event, such as an injunction, occurs, and the actions of the non-performing contract party have not contributed to the occurrence, and the occurrence renders the performance of a contractual obligation objectively impossible, a party's contractual obligation can be excused. Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902 (1987) ("While such defenses [as impossibility] have been recognized in the common law, they have been applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances"); JJ. Cassone Bakery, Inc. v. Consolidated Edison Co. of New York, Inc., 168 Misc.2d 272, 278, 638 N.Y.S.2d 898 (N.Y. Sup. 1996), rev'd in part on other grounds, 240 A.D.2d 634, 659 N.Y.S.2d 293 (2d Dept. 1997).  Absent such factors, the doctrine of impossibility is not available to excuse a party's performance and cannot be used to justify affirmative conduct.

12

15.     Highland attempts to squeeze itself into the four conditions, but its effort fails.  First, Highland argues that it is defending itself against accusations of breach of contract by invoking, defensively, the impossibility defense.  But it is Highland's illegitimate use of the impossibility defense to justify an affirmative act — the taking of the Deferred Fees — that is under attack, not its citation of the impossibility defense in 2018 as a defense to its breach of contract in 2016.

16.     Highland also argues that the TRO "rendered the complete liquidation of the Fund under the Plan's Realization Schedule objectively impossible." Closing Brief at 61. But Highland confuses the Realization Schedule which deals with timely distributions with the Deferred Fees which come into play only upon complete liquidation of the Fund with no deadline. Plan §2.02; Scheme §1.5.2.  In any case, when the UBS TRO was dissolved on January 21, 2016, there was nothing that prevented Highland from completing the liquidation.

13

17.     None of the factors allowing the doctrine of impossibility apply to the taking of the Deferred Fees.  Indeed, we find that Highland — and its inside counsel —knew none of the factors were applicable when Highland asserted the defense. First, the UBS TRO was not unforeseeable; in fact, as Mr. Panos had advised his client in 2013, "UBS had already filed suit and was threatening to get an injunction at the time of the approval of the Scheme."  Second, Highland's own acts gave rise to the UBS TRO, as it was UBS's accusation of Highland's fraudulent transfer of assets that gave rise to the TRO, as Mr. Panos again had advised Highland.  Third, as Mr. Leventon himself testified at the hearings, "the TRO did not do away with Highland's obligation to complete liquidation of the fund." Tr. 7 262:6-10. Finally, the doctrine of impossibility gives rise to no affirmative rights to take action in violation of a contract. Once again, Mr. Panos had given this critical advice to Highland in 2013.

18.     We have considered the other elements of Highland's defense to this claim and find them similarly wanting. We find that Highland's paying itself the Deferred Fees in 2016 constituted a breach of both the Scheme and Plan.  Given that finding, we need not reach the issue of whether the self-payment also constituted a breach of fiduciary duty by Highland to the Committee.

19.     As to remedy, under New York law, damages may be awarded for a breach of contract based upon the damages suffered by the claimant. Here, the damage suffered is the full amount of the Deferred Fees prematurely taken, plus prejudgment interest from the date of the taking.  "Prejudgment interest is generally granted 'in order to compensate the injured party for the loss, over a period of time, of the use of the property to which it was entitled.'" Panix Prods., Ltd v. Lewis, 2003 WL 21659370, at *2 (S.D.N.Y. 2003)(citing Lewis v. S.L. & E., Inc. 831 F.2d 37, 40 (2d Cir.1987)).  Although Respondent has raised good arguments as to why the interest rate should be nominal at best, we exercise our discretion to award statutory pre-judgment interest at 9% from the date of the taking, so as to measure as accurately as possible the totality of the damage that we perceive the Fund suffered by reason of the Deferred Fees being taken prematurely.

20.     Respondent also argues that the Tribunal lacks the authority to order a return of the moneys taken.  But measuring the damages suffered by the Fund by referencing the full amount of the Deferred Fees taken is not the same as literally ordering a return of the moneys. It is an appropriate measure of the damages because the Fees were to have stayed within the Fund until they were appropriately earned, and while in the Fund, they were to serve as a protection and cushion against creditors. In addition, very importantly, keeping the Deferred Fees was to have acted as an incentive to Highland to complete liquidation of the portfolio, an event that had not occurred when Highland was terminated and still has not occurred. Taking the Deferred Fees deprived the investors of all of those benefits. The Deferred Fees in the amount of $33,313,000 should be returned in full, and with full statutory interest of 9% from the dates of taking in January and April 2016 through the date of this Partial Final Award.

14

C.      Distribution Fees

1.      Under the Plan, Highland was to receive fees in the amount of 125 basis points based on "all amounts actually Distributed to Redeemers during each quarter following the
Effective Date . . . provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over.)" (Emphasis added) (Plan §2.01; Scheme §4.4.)

2.      Claimant alleges that Highland breached the provisions of the Plan by paying itself distribution fees totaling $14.5 million despite not having "actually" distributed to the Redeemers each quarter the minimum required to have been paid by the Realisation Schedule (Plan Appx. A). The Committee alleges that Highland paid itself distribution fees eight times, but that the only time Highland met or exceeded the goals set by the Realization Schedule was in the quarters ending January 31, 2013, and April 30, 2013. Other than those two quarters, Claimant contends that Highland missed the target in every other time period. Claimant also charged Highland with a breach of fiduciary duty, arising out of similar facts.

3.      The Committee alleges that six of the distribution fee payments were improper because Highland improperly calculated the amount paid to the Redeemers in one or more of the following ways: (1) in treating Deferred Fees as Distributions; (2) in withholding tax obligations from payments to Redeemers, but counted them for purposes of qualifying for its fee; (3) in improperly including amounts that it reserved to pay Barclays, amounts used to pay the Barclays settlement, and amounts paid to its affiliate Eames in its calculation of Distributions; and (4) in borrowing on margin and improperly treating such borrowings as "excess cash" under the Plan and, therefore, as Distributions.

4.      In addition, Claimant argues that if Highland missed any quarterly hurdle set in the Realisation Schedule, its deficiency would carry over to the next quarter, giving Highland an accordingly higher hurdle, or watermark, to meet in that next quarter. In other words, Claimant urges that the Realisation Schedule was intended to be cumulative.

5.      Cumulative Quarterly Hurdles

     a)      Starting with the last issue first, the language in the Plan in question is as follows: "HCMLP will receive fees in cash ... (b) provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over)." HC-300 at 74 (emphasis added). Plan §2.01.

15

b)      Claimant argues that, although the foregoing language is not explicit regarding both the positive and negative cumulative nature of the Realisation Schedule, there is evidence sufficient to establish that requirement from the text itself and from the testimony of those who negotiated the clause in the Plan, citing the testimony of Mr. Montgomery ("The Realisation Schedule was a cumulative concept. 100 million during one period, 100 million to the next, 200 million during the next. . . . it was designed to be cumulative. It was a stack.") Tr. 3 307:5-19.  The Committee also points out that Highland kept internal accounting schedules that treated the Schedule as cumulative, including RC-364 at pp. 10, 23, 36, 49, 62, 75, 88, 101, 114, 127, 140; see also Tr. 4 196:17-197:19; Tr. 9 256:14-259.

c)      Finally, the Committee urges that there would be "perverse incentives" if Highland were allowed to treat the Schedule as cumulative if it got ahead of the distribution schedule but not if it fell behind, because if Highland knew it could not make a quarterly target, it would have the incentive to skip that quarter and wait until the next quarter where it would meet the Realisation Schedule for only that quarter. This would have the undesirable effect of delaying liquidation but not adversely affecting Highland's receipt of incentive fees.

d)      Highland strongly urges that the clause in question is unambiguous in requiring only a positive carry-forward, with no hint that a failure to meet a quarterly hurdle imposed an obligation to reach a high water mark that would meet both the prior hurdle and the present quarterly hurdle. In addition, Highland argues that, as Mr. Montgomery conceded on cross-examination, the Plan could have contained a cumulative shortfall provision, but that the inclusion of such language was never discussed with Highland, Tr. 3 at 308:7-13, and such could have been incorporated into the Plan had that been the Parties' intent.

e)      Highland also criticizes the Committee's "perverse incentive" argument, arguing, first, that Highland was highly incentivized to liquidate as quickly as possible so it could receive Distribution Fees during the pendency of the 36-month Realisation Schedule (§2.02) and obtain the $10 million Deferred Fee by distributing $1.7 billion within 43 months of the Plan's Effective Date (§6.02); and, secondly, "if Highland fell too far behind," it would lose its incentive to continue expeditious liquidation of the Fund's assets. Respondent's Post-Hearing Brief at 57. See Tr. Day 12 at 169:3-18 (Snow).

16

f)      In interpreting the section of the Plan, it is significant that the language regarding a positive carry-forward appears in a parenthetical phrase, not in the main operative text. Without considering the parenthetical, we read the main operative text as setting a test that Highland has to meet — each quarter, assets "equal to or in excess of the amount scheduled in the Realisation Schedule" must be distributed to Redeemers, or else Highland will not "receive fees in cash" that quarter.  Thus, each separate quarter, Highland has to make a required distribution or will not be paid fees.  But if each quarter there is a test that Highland has to meet, it would defeat the purpose of the quarterly test for Highland to be able to garner fees by just meeting the goal for one particular quarter without regard to how it had performed the prior quarter. Without a reward or a penalty each quarter dependent upon whether it met (or exceeded) the goal, Highland could undermine the objective of the clause. The supplemental parenthetical phrase simply makes explicit one benefit to Highland of overachieving such quarterly goal. We conclude that §2.01 requires both a positive and negative cumulative process.

g)      To read it otherwise would create a perverse incentive of encouraging Highland to skip quarters. The contrary is not true: by having both a positive and negative cumulative obligation, Highland loses no incentive to continue to liquidate, perhaps at a faster pace than it in fact adopted, if it were to fall behind.

h)      Though we reach our conclusion without need to rely on extrinsic evidence, we note that our interpretation is supported by Mr. Montgomery's testimony regarding Highland's request to include a parenthetical to make clear that it would not lose the benefit of an over-distribution and could carry it forward. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

D.    Deferred Fees as Distributions

1.      With respect to Highland's treating Deferred Fees as Distributions, the Committee urges that Deferred Fees being reserved in an account for possible later distribution were not amounts "actually Distributed" or the kind of Distributions made to Redeemers as part of the return to them of their investment.

2.      Highland defends on the basis that the Committee's position that Deferred Fees should not be included in calculating Distribution Fees is inconsistent with the parties' course of performance. From the outset, Highland argues that it included Deferred Fees in its calculation of Distribution Fees and gave written notice of its inclusion to the Committee on at least four occasions. HC-552; HC-591; HC-592; HC-593. However, Highland is not making the argument that the Plan was amended by what it says was its known conduct.

17

3.      Highland also argues that its successor, A&M, also included Deferred Fees in its calculation of Distribution Fees based upon the substantively identical language in the A&M investment management agreement, HC-56 at 6, and received a Distribution Fee based on that calculation in October 2016.

4.      We find that whether Highland's conduct was disclosed to the Committee or whatever A&M may have done are both irrelevant to the issue in this case, because, as we analyze the evidence adduced, the only relevant issue is whether including Deferred Fees in the calculation of Distribution Fees is authorized by the language of the Plan, and we find that it is not.

5.      The Plan sets forth a program of fees capable of being paid to Highland: if Highland met certain quarterly goals of distributions made to Redeemers, as set forth in the Realisation Schedule, it was entitled to receipt of certain Distribution Fees; if it distributed at least $1.7 billion to the Redeemers prior to the 43d month following the Effective Date, it was entitled to receive payment of the fees in the Deferred Fee Account in accordance with Section 2.02 of the Plan.

6.      The Plan distinguished what Highland had to do to qualify to receive each category of Fees. With respect to Deferred Fees, the Plan provides that "Highland shall not be deemed to be a Redeemer in respect of the deferred fees." We read that sentence as making clear that Highland's setting aside of Deferred Fees into a account that it might eventually be able to draw upon should not be construed as a form of distribution such that, if it were a Redeemer, it could be construed as an "actual" distribution.  Because Highland is not "deemed to be a Redeemer," its payment to a fund is not equivalent to a Distribution to an investor.

7.      We find that this language is not ambiguous and does not allow for the practice used by Highland to beef up the amount of Distribution Fees it received.

18

E.  Withholding Taxes as Distributions

1.  The evidence at the hearing was that, as required in the Plan, HC-300 at 80, Highland took into account the amount of taxes that should be withheld and paid those amounts to the appropriate taxing authorities; however, Highland also included those withheld amounts in the calculation of amounts "actually" distributed to Redeemers.  The Committee contends that such withheld amounts were not "actually Distributed to Redeemers," and points out that, in fact, only a subset of Redeemers — the Offshore Fund investors — were subject to tax withholding, RC-62; Tr. 9 275:5-23, while some investors were nonprofits that did not pay taxes at all,  Tr. 12 167:5-24.  The Committee also points out that, when first informed in 2012 that Highland had counted tax withholdings toward the May 1, 2012 Distribution, the Committee objected, demanding successfully that Highland make up that shortfall. RC-68; Tr. 3 301:6-12; Tr. 9 278:4-279:16.

2.  Highland makes two points in its defense: first, tax withholdings made on behalf of an employee are considered "compensation," so tax withholdings for Crusader investors should also be treated in a "common-sense manner" as "distributions" to those investors; and second, Highland disclosed its methodology in at least one monthly report in November 2013, HC-591 at 14 (Nov. 2013 Summary Report), to which the Committee never objected.

3.  We need not consider either of these defenses because we find the language of the Plan supports the treatment by Highland of these amounts. As stated above, "Distributions" is defined as "Amounts to be paid to Redeemers under the Plan, including amounts to be paid to Redeemers under the Scheme..." §1.01. The operative language regarding withholding for taxes is as follows: "In connection with ... all Distributions to be made hereunder, the Crusader Funds shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any ... taxing authority, and all Distributions hereunder shall be subject to any such withholding ... requirements. The Crusader Funds are hereby authorized to take any and all actions that may be necessary or appropriate to comply with any such requirements."

4.  Read together, we find that "the amounts paid to Redeemers" were "subject to ... withholding requirements" and thus, were appropriately included within the calculation of amounts distributed to Redeemers, even if, in fact, it was an indirect payment. We find for Highland on this branch of the Committee's claim.

19

F.      Payments to Barclays and Eames as Distributions

1.      In 2006 and 2007, Barclays and a Highland affiliate entered into two securities transactions — a prepaid forward transaction and an accreting strike option transaction.  In connection with those two transactions, Barclays became an investor in the Highland Funds. JX-5. In late 2008, Barclays submitted redemptions for its full interests in the Highland Funds, which Highland did not honor. Litigation between Barclays and Highland entities ensued. When the Plan and Scheme were adopted, Barclays did not consent and became what it is referred to as a Non-Consenting Redeemer. HC-300, at HC-300.0075.

2.      Thereafter, when Fund assets were disposed of and amounts distributed to Redeemers, no amounts were actually paid to Barclays; instead, amounts equivalent to those that Barclays would have received if it was a Consenting Redeemer were paid into the Redeemer Trust Account. That Account was set up for the purpose of segregating the deposited funds so they could be "used to pay all costs of HCM-Related Parties and the Redeemer Committee to defend, respond to, settle and satisfy any Claims by Crusader Fund Redeemers excluding Plan Claims ("Redeemer Claims") and … to defend, respond to, settle and satisfy any such Redeemer Claims in advance of any amounts otherwise properly available for such purposes out of the assets of the Crusader Funds."  Plan 6.01.

3.      Notwithstanding such amounts remained in a designated account at a major financial institution, Highland treated such reserves as "actual" Distributions and paid itself fees based on the amounts reserved. The Committee argues that amounts reserved in the Redeemer Trust Account were not "actually Distributed" and that fees taken by Highland for such deposits were taken in breach of the Plan.

4.      We find that Highland's treatment of the reserves as Distributions violated the terms of the Plan.

5.      In July 2012, Highland, Barclays, and other entities entered into a settlement agreement, resolving all of the claims between and among them. JX-5. As part of the settlement, Barclays received both the cash reserved since August 2011 and several additional cash distributions expected between July and December 2012, essentially the exact distribution amounts that it was entitled to as a Consenting Redeemer. Tr. Day 9 at 146:12-19 (Palmer); HC-275; HC Demo 10 at 4.  Pursuant to the settlement, Barclays became a Consenting Redeemer, see JX-5 at 12 (§ 11.3). Highland treated such portion of the settlement payments as "Distributions" and paid itself the fees associated with that amount of Distributions. The Committee contends that any payments to Barclays were in settlement of various claims, in exchange for which there was a "relinquishment and/or abandonment" of all of Barclays' rights and interests in the Highland Funds, JX-5 at 3, and, thus, such payments were not Distributions.

20

000407

6.      Finally, as part of the settlement, the two limited partner interests that Barclays had in the Funds were transferred to a newly-formed and wholly-owned affiliate of Highland, Eames; amounts equivalent to what Barclays would have received as an investor after the settlement were paid to Eames, totaling $35.1 million, and Highland treated such amounts as Distributions and paid itself the appropriate fees.  The Committee urges that the transfer of LP interests was in violation of Section 2.05(f) which gives that the Committee "the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims," HC-300, and that the transfer was explicitly disapproved, RC-79 ("The Crusader Redeemer Committee does not believe that Highland has the right to take assignment of Barclays' interest in the Crusader Fund. The Committee believes its approval is required for any such assignment under the Plan/Scheme, and the Committee is not willing to approve that assignment."). Furthermore, the Barclays Settlement Agreement provided that the settlement was subject to Highland's receiving all necessary approvals under the Crusader Plan of Liquidation, which the Committee contends Highland did not receive. HC-330, §12.3.2, at HC-330.0014.

7.      Highland argues, first, that the Committee's right to approve or disapprove of the transfer of interests under Section 2.05(f) is not applicable because under Section 2.05(g)[3], the Barclays settlement did not give Barclays more than it would have received as a Consenting Compulsory Redeemer; that, in any case, 2.05(f) is subject to the "reasonableness" test under Section 2.07[4]; and, finally, that it was entitled to keep the LP interests because the LP interests were in the Redeemer Trust account, citing to HC-275. We find that Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer. Its rejection was reasonable in that it was acting in the best interests of the other investors to have a smaller investment base that would have a greater portion of the asset distributions. The accounting ledger maintained by Highland, which created much confusion at the hearing, was not evidence that the LP interests were in the Redeemer Trust account; we agree with the Committee that the spreadsheet was an accounting convenience for Highland.

8.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

---

[3] "The Redeemer Committee will have, subject to the execution and delivery of customary and reasonable confidentiality agreements:... (g) the authority to approve or disapprove any settlement by the Crusader Funds with Barclays that would be in excess of what Barclays would receive as a Consenting Compulsory Redeemer..."

[4] "The approval of the Redeemer Committee with respect to any matter submitted for approval under Sections 2.05 or 2.06 shall not be unreasonably withheld."

000408

9.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

10.     Finally, we find that when Barclays received the amounts, as part of the Settlement Agreement, that had been set aside in 2012 as if Barclays was then a Consenting Redeemer, it did not receive such amounts as Distributions "actually" paid to a Redeemer but rather as part of the Settlement amount. Although Barclays was "deemed" to have become a "Consenting Redeemer," it had that status only for the moment in time sufficient to transfer its LP interests to Eames. As the Settlement Agreement noted, "certain payments will be made by the Highland Entities to Barclays … in consideration of the settlement of the Claims hereunder and the assignment, relinquishment and/or abandonment by Barclays of all rights and interests it had in the Fund Interests…" HC-330 at HC-330.0003. Highland breached the Plan by treating the amounts paid to Barclays as if they had been received as a Consenting Compulsory Redeemer as Distributions.

11.     We conclude that it was improper for Highland to include in the calculation of the amounts distributed to the Redeemers:

a)      The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

b)      The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims; and

c)      The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames.

22

G.      Margin Borrowings as Distributions

1.      In January and April 2012, Highland caused the Fund to borrow $60 million from its Jefferies brokerage account to distribute to Redeemers. The Committee contends that it did so because Highland had not liquidated enough assets to meet the Realisation Schedule. After learning about the loans in September 2012, the Committee protested and directed Mr. Dondero at the September 2012 meeting to take no further margin loans without its consent. Tr. 2 353:2-22; RC-85; JX-8. The Committee contends that Highland's taking such margin loans to reach the Realisation Schedule and then paying itself Distribution Fees based on having reached the quarterly goal with the assistance of the margin borrowing breached the Plan because the margin borrowing did not constitute Excess Cash resulting from the liquidation of assets from which Distributions must come. Plan §§1.01, 3.01; Scheme §§2.4.1, 2.4.2.

2.      Highland maintains that, as it was authorized under the Plan, to engage in margin borrowing, and that amounts were actually distributed to the Redeemers, such payments to the Redeemers were appropriately treated as Distributions qualifying it to receive Distribution Fees.

3.      We find that such margin borrowings, which were authorized under the Plan, did not qualify as the type of Distribution that would entitle Highland to receive a Distribution Fee. The plain language of the Plan requires that any Distribution Fee be paid to Highland only upon the appropriate amount of Excess Cash having been accumulated from the sale of "assets equal to or in excess of the amount scheduled in the Realisation Schedule…" The "assets" referred to are the "assets, respectively, of the Onshore Fund, Offshore Fund I and Offshore Fund II…" §2.01. No such assets were sold and therefore no Excess Cash was accumulated to be distributed to the Redeemers.

23

4.      The Committees expert, Mr. Imburgia, determined that the result of Highland's including the above improper items in the calculation of Distributions to Redeemers in calculating its entitlement to Distribution Fees, resulted in Highland paying itself Distribution Fees to which it was not entitled by an overpayment of $14,452,275 in Distribution Fees. The Committee is entitled to judgment in that amount plus interest at the rate of 9% from the date of each improper fee. RX 408, Schedule 2.1

H.      Purchase of Plan Claims[5]

1.      From December 2013 through January 2016, Highland purchased twenty-seven Plan Claims from Crusader investors for itself, without the approval of the Committee [ Tr. 5 50:5-8.] The Committee contends that such purchases breached the Plan, because if it had known that the Plan Claims were available for sale, it would have exercised its ROFR. Tr. 3 163:11-24; Tr. 4 389:3-390:23. The Committee urges that the UBS TRO, said by Highland to block any purchases by the Fund during its pendency, does not in fact bar such purchases; in any event, the Committee points out that it is conceded that the Fund had assets other than the allegedly restrained assets with which to make purchases outside of the restrained assets. The Committee seeks damages equivalent to the value of the Claims at the time they were sold, any profits or benefits realized by Highland, and pre-judgment interest at 9%, for a total of $8,897,899 plus interest.

2.      Highland raises a number of defenses. First, it argues that, during the period that the TRO was in effect, the Committee agreed with the advice given by the Fund's (and Highland's) counsel in the UBS case, Lackey Hershman, that the TRO, at minimum, prevented the Fund from spending cash to buy-out other investors before UBS's claims were resolved. See Tr. Day 7 at 319:17-332:3. Thus, Highland contends that the Committee cannot prove it would have purchased the Claims had they been offered to it.

---

[5] Plan §1.01: "Plan Claim. The claim of a Redeemer to payment of, or based upon, the Redemption Amount relating to the redemption of its shares or withdrawal of its capital account balance, as the case may be, in the Crusader Funds as detailed in Section 4.01."

000411

3.      But the record doesn't support that interpretation. First, refuting the idea that the Committee agreed with the advice being relayed to them is the exchange of correspondence between counsel for the Committee counsel and Highland set forth in RC-360, in which Committee counsel rejected the advice said to have been received from outside counsel, and stated how the Plan Claims should be dealt with if Highland were to persist in asserting that the TRO so blocked the Committee's exercise of its ROFR: "the Committee does not agree with Highland's interpretation of the UBS TRO because the expenditure of money to redeem interests is not a "Distribution" and, in any event, if Highland feels strongly that it cannot use the Funds' assets in this way, any acquisition of the interests by Highland or an affiliate is subject to the Committee's exercising its rights under Section 5.04 when the TRO is lifted or when the interests can, in Highland's opinion, be acquired by the Fund consistent with the UBS TRO. Otherwise, the Committee did not approve of the transfer of the Scheme Claims." RC-360 at 87-88.

4.      Furthermore, before the TRO, when presented with the opportunity to purchase Plan Claims, the Committee exercised its right of first refusal (ROFR) on five occasions, see RC-358. During the pendency of the TRO, the Committee was informed about only five of twenty-eight Plan Claims purchases and disapproved each of the purchases by Highland, but the disapprovals were ignored. The Committee informed Highland that it disagreed about the scope of the TRO but that if Highland, as Fund Manager believed the TRO prevented the Fund from purchasing the Plan Claims, then it would be consistent with the Committee's ROFR for the right to be exercised when the TRO was lifted. HC-580.

5.      We find that the Committee would have exercised its ROFR if it had been given full information and had not Highland been preventing the exercise of the ROFR by invoking the TRO and misrepresenting to buyers that it had the ROFR.

25

6.     As a second defense, Highland contends that during the period that the UBS TRO was in effect, it relied on advice of counsel that the TRO prevented the Crusader Fund from acquiring any Plan Claims, thus opening the door for Highland to purchase the Plan Claims that would otherwise have been subject to the Committee's ROFR under §§2.05(f)[6] and 5.04[7] of the Plan.

7.     Mr. Leventon testified that the TRO was obtained by UBS in response to UBS's allegation that Crusader Funds had participated in a fraudulent transfer of assets from a UBS debtor; the TRO restricted transfer of assets but because those assets had been acquired about four years previously and disposed of in the ordinary course of business, "the UBS TRO was essentially designed to 'collateralize' UBS against the March 25, 2009 asset transfer. And if they couldn't be collateralized with those exact assets and the exact actual cash ... or cash equivalent, then it had to be collateralized with something else. And that something else was the assets of the fund." Day 7 at 328:12-20.  That testimony would suggest that from the moment that the TRO went into effect, the Fund was under constraints not to purchase any Plan Claims or other assets.

8.     But this explanation is not convincing.  Regarding the advice received from Lackey Hershman, Mr. Leventon testified that the majority of the advice received was orally and over time, and that the advice was "an evolving interpretation" that "crystallized...in the first quarter of 2014." Id. at 330:9-17.  The advice consisted of "a bunch of verbal conversations, but a lot of that advice is embodied in that memo [HC259] that Lackey wrote to the Crusader Fund. Because we wanted the Committee to understand our quandary."  Day 7 at 319:17-332:3 (Emphasis added).

---

[6] Plan §2.07(f): "The Redeemer Committee shall have ... the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims; provided that such proposed assignment or transfer shall be deemed to be rejected if not affirmatively approved in writing within 30 days of submission to the Redeemer Committee..."

[7] Plan § 5.04: "No assignment or transfer of a Plan Claim after the Effective Date may be purchased by [Highland] or its affiliates without such Plan Claim first being offered to, and rejected by, the Crusader Funds."

26

9. The Lackey Hershman memo, dated July 23, 2014, HC-259, deals only with the practical consequences of seeking an amendment to the UBS TRO while an appeal was pending, and does not provide any advice regarding the scope or interpretation of the UBS TRO.[8] Notably, there is no other document from Lackey Hershman presented at the hearing, even including emails, that supports Mr. Leventon's explanation.

10. Perhaps in recognition of the thin basis for its claim that it relied on the advice of counsel, Highland requests that the Panel draw no inferences from the "relatively few written communications on this issue," because there was, Highland contends, "unrebutted testimony" of the "contemporaneous advice of counsel." Highland points to a letter from an internal counsel at Highland to the Committee that cites advice from outside counsel regarding the effect of the TRO on the Committee's ability to purchase Plan Claims, RC-360 ("outside counsel to HCMLP has advised that the temporary restraining order which has been imposed by the Court in UBS Securities LLC et al. v. Highland Capital Management, L.P. prohibits the Crusader Funds from purchasing the Scheme Claims using assets of the Crusader Funds").

11. The statement by internal counsel is the type of hearsay that was received in evidence only because this was an arbitration but to which, under the circumstances, we accord little substantive weight. We find more persuasive the absence of any writing, even an e-mail, directly from the law firm regarding the scope of the TRO and restrictions against the Fund using its assets to purchase Plan Claims or similar items.

12. Further, we find that, even before the TRO went into effect, and thus well before any advice from counsel would have been received, Highland was laying the groundwork for purchasing the Plan Claims for itself and bypassing the Committee's ROFR.

---

[8] On questioning by members of the Panel, Mr. Leventon referred to the Lackey Hershman memo in broad terms:

"As set forth in the Lackey memorandum, which we all have, Lackey reported that UBS said that, Crusader and Highland Credit Strategies could neither distribute cash to anybody, nor sell assets, nor make any payments outside of the normal course of business...ARBITRATOR BRODSKY: Is the Lackey Hershman memo you're referring to the one that is HC-259, dated July 23, 2014? THE WITNESS: I believe that's correct. ARBITRATOR BRODSKY: I don't see any reference to conversations relayed to you by counsel about what UBS said. I see a sentence on page RC-3208 at the top, it says, 'UBS counsel stated that they're not willing to enter into such a stipulation unless Crusader provided detailed discovery of its cash and asset holdings," et cetera, et cetera. Is that what you were referring to? THE WITNESS: Yes. They were not willing to modify the TRO in order to permit the sale of assets unless Credit Strategies, Crusader and other defendants handed over detailed financial information that they would not otherwise be entitled to in discovery. And we were advised that that was a prohibitive risk."

Day 8 170:10-17, 173:4-174:7.

000414

13.     On May 29, 2013, Highland caused the Board of the Master Fund, which it controlled, to adopt a resolution, as follows:  "Whereas, ... (2) certain investors from time-to-time desire to sell their interests as redeemed, unpaid shareholders, in the Company ... (any such shares, 'Offered Shares'); (3) one or more principal accounts (the "Related Accounts') in which James Dondero ... and/or Highland ... have material, direct and indirect, financial and ownership interests, have enters a bid to purchase certain of Offered Shares; (4) the bid of the Related Account(s) is equal to or greater than the highest bid; ...Now Therefore Resolved That (1) the undersigned Directors hereby consent to the Proposed Transaction and any future transfers of Offered Shares to the Related Account(s)..." RC-276 at 5; Tr. 7 63:25-68:14.

14.     This pre-approval of transfers of interests in the Fund to Mr. Dondero, Highland, or its affiliates does not reference the Committee's ROFR, but it enabled Highland, falsely, to claim that it had a ROFR.  Using that Resolution, Mr. Leventon informed multiple investors interested in possible transfers of their interests, that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. RC276[9]; RC280; RC434. This conduct alone constituted a breach of the Plan, because it deprived the Committee from having any insight into the transactions as to which the Plan gave them rights to purchase the underlying interests.

15.     Furthermore, by the time Highland received the Lackey Hershman memo in July 23, 2014, Highland had purchased fourteen Plan Claims, nine of which were not disclosed to the Committee. Thereafter, Highland purchased another thirteen Plan Claims without any disclosure to the Committee. Mr. Leventon testified that the only reason for Highland not to consult the Committee about the 27 purchases in 2013, 2014, and 2015 was its interpretation of the TRO. Day 7, 172:2-10.

16.     Additional actions by Highland further demonstrate that the reliance on the TRO was a facade, designed to enable Highland to attempt to purchase a majority interest in the Fund without the Committee's knowledge. In May 2014 and again in January 2016, Highland hired a broker to solicit all Fund investors, except those who were on the Committee, to buy their interests at half or approximately half of the NAV that Highland had itself set. RC417; Tr. 7 95:8-20, 96:8-23; RC425.

---

[9] "By way of Written Resolution, the Board of Directors of [the Fund] determined that if the Investment Manager or an affiliate offers to purchase the shares in the Fund, then that bid shall be accepted if it is the highest bid. See Written Resolution of the Directors of the Fund dated May 29, 2013. The Board may, in its absolute discretion, approve transfers. ... Accordingly, the Investment Manager, as authorized by the applicable documents, hereby bids 60.25 cents of NAV for purchase of 100% of Crown Alpha's capital balance as of the November 2015 NAV date"

28

17.      The broker, Wake2O, used talking points drafted by Highland that misrepresented on whose behalf Wake2O was acting, represented, without apparent foundation, that the offering price of 50% or 55% of NAV was "[t]he current best market bid" and that price would go down in the future, and, finally, that the TRO prevented the Fund from making distributions and that the Fund held many illiquid assets. RC420; Tr. 7 101:4-11 ("Q: And so one of the things that Highland wanted Wake to convey to investors was, hey, you might want to sell your interest in Crusader because right now there's this TRO and you're not going to be able to get any distributions, right?  A.· · That's probably a fair paraphrasing.").

18.      Throughout Wake2O's engagements, it was under pressure from Highland's CEO to pursue investors so that Highland could obtain a greater share of the Fund. See, e.g., RC-250 ("[K]eep pushing as much and many as quickly as possible....")(August 2015); and RC-426 ("Our CEO is keen on starting the process as soon as possible. Please let us know if we can start Monday.") (January 2016); Tr. 7 135:6-137:18.

19.      It was also in this period that Highland undertook a renewed effort to keep the Redeemers Committee in the dark about their purchasing activities. Mr. Leventon was significantly involved in providing direction, as well as drafting talking points, to Wake2O to "reach out to all non-committee members," (emphasis added); Tr. 7 146:16-149:7.  Highland offered Wake2O an incentive fee to acquire interests representing $200 million of NAV, but made clear to Wake2O that they should try to achieve that goal without contacting members of the Redeemer Committee. Tr. 7 157:13-161:2. The amount of $200 million was not an accidental target; it was just $4 million of NAV more than what the Redeemer Committee held, Tr. 7 155:15-23.  Wake2O's efforts resulted in the acquisition by Highland of a significant number of Plan Claims, amounting to just shy of $200 million, RC418; RC360; RC419; RC422; RC423; RC424.

29

20.     Finally, Highland continued misrepresenting to investors that it had a ROFR and never mentioned in its communications that the Committee was the entity actually possessing that right.  Mr. Leventon was the principal instrument through which this misrepresentation and omission were communicated, Tr. 55:19-25 ("Q. Mr. Leventon, have you ever sent an e-mail to an investor telling the investor that Highland Capital has a right of first refusal in the event the investor wants to sell its interest in the fund? A. With respect to the Crusader Fund, I don't recall having done so."); but see RC-276; RC-280; RC434; Tr. 7 74:22-76:23.)[10]

21.     Based upon the testimony at the hearing, we have serious doubts about the scope of the advice given, if any.  In addition, as now conceded, there were adequate untainted funds under the control of the Crusader Funds to have enabled the Committee to exercise its ROFR as to the Plain Claims, had they been informed in a timely way, as mandated by the Plan. 10/24/18 Highland Ltr. to Panel at 2; RC-408 at 37.

22.     Further, from our examination of the language[11] in the TRO, we conclude that the restrained assets were narrowly circumscribed, and the broad position taken by Highland was not well-grounded. The TRO restrained the Crusader Fund only from transferring or disposing of property received, or its cash equivalent, in March 2009 "from Highland Financial Partners, L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009." JX13; RC134. The TRO did not preclude the Fund's sale of unrestricted assets or use of a significant amount of cash in the Fund. JX13.

23.     We also find that Highland's reliance on the UBS TRO was pretextual to support Highland's true goal of benefiting itself over the interests of the Fund and the Committee. We find that Highland breached the Plan and Scheme by its actions and injured the Committee by its breach. We also found that Highland breached its fiduciary duty to the Committee by so acting.

---

[10] It appears that Mr. Leventon was also involved in a misrepresentation to the Committee about the purchase of a Plan Claim after the TRO had expired. In June 2016, he requested the Committee's approval for the purchase of a Plan Claim by an entity he described as a third party that was not affiliated with Highland. But in the course of soliciting the sale of the Plan Claim, Mr. Leventon represented that Highland was exercising a ROFR on behalf of itself or its affiliates. Tr. 7 87:6-89:11; RC-434. In fact, we find that the third party, Charitable DAF Fund, L.P. ("DAF"), was an affiliate of Highland. RC-435; Tr. 7 82:1384:21.  Based on what Mr. Leventon stated, the Committee approved the transfer. RC-316.

[11] "ORDERED, that pending the hearing on this motion, Defendants Highland Crusader Offshore Partners, L.P., and Highland Credit Strategies Master Fund, L.P., are temporarily restrained from transferring or otherwise disposing of property received (or if property has already been transferred or disposed to, the cash equivalent) in March 2009 from Highland Financial Partner,s L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009."

000417

24.     In the calculation of damages owed to the Redeemer Committee by Highland, we have assumed that any Plan or Scheme Claims purchased by Highland would have been purchased at the same discounted price as Highland did. However, the damages methodology used by the Committee's expert witness on damages makes the assumption that the fair market value of each of the Plan Claims was the NAV that Highland had established in each of the relevant months. We do not adopt this methodology because of the uncertainty as to whether a discount should be applied to the NAV in calculating the appropriate fair market value.

25.     Rather, we adopt the alternative approach suggested by the Committee, which is rescission.  We order Highland to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase. We will leave the hearing open until the parties have worked out the exact financial details to comply with this order.

I.     Related Party Transactions

1.     The Committee contends that Highland breached its fiduciary duties by engaging in multiple related-party transactions without seeking or gaining the approval of the Committee  The Plan provision in questions requires the Committee's approval of "all transactions between the Crusader Funds and any other HCM-Related Party, while it serves as investment manager of the Crusader Funds, including any 'cross trade' between the Crusader Funds and any other account managed or advised by HCMLP," Plan §2.06; Scheme §4.7.1 (emphasis added).

2.     First, we must resolve the interpretation question left open by the Order of March 1, 2017, denying Respondent's motion for partial summary adjudication regarding these claims. We found that the language cited above was ambiguous because while Respondent argued that "Crusader Funds" is defined as meaning only four entities, the Master Fund, Onshore Fund, Offshore Fund I and Offshore Fund II, Id., § 1.01, and does not include Crusader Fund "portfolio companies" and other affiliated "entities," Claimant argued that if Crusader Fund meant only those four entities, there would be no meaning to the "including 'cross trades' language of §2.06, because none of the four entities directly owns assets and thus could not engage in cross trades with each other or with any other account managed by Highland. Thus, the language 'including "cross trades" must refer to entities broader than just the defined entities within Crusader Funds, or else that portion of §2.06(a) prohibiting cross trades would be read out of the Plan. Accordingly, we denied without prejudice the motion to dismiss the breach of contract and fiduciary duty claims based on the so-called affiliate transactions until after the record has been more fully developed.

31

3.      At the hearing, testimony was taken from two Redeemer Committee members, Messrs. Montgomery and Behr, regarding the drafting of the section in question. Mr. Montgomery testified that he negotiated the terms of the Plan with Michael Colvin, who was then Highland's General Counsel, telling him that the Committee "needed a related-party transaction prohibition, and he agreed to that. And the understanding was that it included everything on the Highland side and everything on the Crusader side… we thought there was agreement that it was including everything on the Highland side and everything on the Crusader side…" Tr. 2, 234:2-6, 235:2-5. Although in response to a question from a member of the Panel, Mr. Montgomery could not recall the specific language he and Mr. Colvin used to convey this understanding, and on cross-examination, he could not provide a reason for how the specific clause was drafted on this point, we credit Mr. Montgomery's testimony on this point.

4.      Although of limited evidentiary significance, Mr. Behr's testimony that before the adoption of the Plan and Scheme he had had discussions with someone at Highland, whom he recalled was Mr. Colvin, about concerns regarding Highland expensing board fees paid to its portfolio companies, Tr. 9 76:17-25, 77:2, supported Mr. Montgomery's testimony, cited above, that the subject of prohibiting certain related party transactions was part of the negotiations over the Plan. His recollection was supported in part by his contemporaneous notes of having raised that subject in the negotiations. HC508 at 142.

32

5.      In addition, the Committee makes the point that the occasional course of conduct between the parties before the relationship between the parties became a matter of some dispute reflected the belief that the Plan and Scheme required that Highland seek the Committee's approval before engaging in transactions that involved entities other than the four specific Crusader Fund entities in the definition. See, e.g., Tr. 4 213:6-9.[12] Under the established law relating to contract interpretation, "How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed." Gulf Ins. Co. v. Transatlantic Reinsurance Co., 886 N.Y.S.2d 133, 143 (First Dept. 2009); "[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.' … 'Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.'" Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (First Dept. 1999).

6.      Based on the foregoing evidence, we resolve the ambiguity in favor of a broad definition of the term "Crusader Funds" to include not only the four specific entities named in §2.06 but also the Crusader Fund "portfolio companies" and other affiliated "entities. The Committee contends that Highland engaged in two types of transactions that required but did not receive its consent: (1) transactions between Highland affiliates and Fund portfolio companies, and (2) transactions directly between Highland affiliates and the Fund entities.

J.      Related Party Transactions with Portfolio Companies.

1.      The Committee contends that Highland breached §2.06 by causing Fund portfolio companies to pay board fees, advisory fees and D&O insurance premiums.

2.      Highland responds that transactions between Highland affiliates and Fund portfolio companies were expressly disclosed to the Fund's investors, see HC-230 at 34-36, and that the investors specifically agreed such transactions were permissible, see HC-118 at 7. Accordingly, Highland urges that there can be no fiduciary duty breaches.

3.      Furthermore, Highland urges that the claims arose in 2011 or 2012, and in any case were disclosed to Highland counsel by April 6, 2013, JX-12, and, thus, would be barred by the three-year statute of limitations. Highland characterizes the proof regarding such claims as failing to establish more than the occurrence of "isolated or sporadic acts."

---

[12] We note that one of Highland's outside counsel also occasionally used the term "Crusader Funds" or "Crusader" when describing transactions between portfolio companies and Highland affiliates, RC83 at 2-3; see JX12; JX10.

000420

4.      The Committee claims that the statute of limitations should be tolled under the "continuing violation doctrine," which applies where "separate violations of the same type, or character, are repeated over time," and not where the claims are "based on a single decision that results in lasting negative effects." Moses v. Revlon, 2016 U.S. Dist. LEXIS 106431, *18 (S.D.N.Y. 2016).  Under prevailing New York law, "The continuing violations doctrine 'will toll the limitations period to the date of the commission of the last wrongful act where there is a series of continuing wrongs.' Shelton v. Elite Model Mgt., 11 Misc.3d 345, 361 (Sup Ct, New York County 2005); 78/79 York Assoc. v. Rand, 175 Misc.2d 960, 966 (Civ Ct, New York County 1998) … However, 'it will only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct.' Selkirk v. State of New York, 249 A.D.2d 818, 819 (3d Dept 1998)." Pankin v. Perlongo, 2012 WL 7868667, at *2 (Sup. Ct. N.Y. Cnty. 2012).

5.      The evidence brought forth by the Committee failed to show that the payments made by Highland for insurance premiums or for advisory fees were parts of a series of continuing wrongs. Rather, there appear to have been a series of discrete payments made in no regular or consistent pattern and in no similar amounts.13 Under the circumstances, we find in favor of Highland on these claims. We do not reach the issue of whether disclosure to investors would bar a claim for breach of fiduciary duty.

K.      Related Party Transactions with Highland Affiliates

1.      The Committee contends that in 2013 and 2014, without seeking its permission as required under §2.06, Highland sold shares in four CLO assets held by the Master Fund, known as Eastland CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO, Ltd. (the "CLOs"), in what it characterizes as "pre-approved" transactions to Highland affiliates, without seeking the Committee's approval, as required by §2.06(a), which, as noted above, prohibits "any 'cross-trades' between the Crusader Funds and any other account managed or advised by HCMLP."

2.      The proof at the hearing showed that, with no disclosure to the Committee, Highland sold CLOs to brokers it used for other securities transactions who, within a very short time of purchasing the CLOs, sold some or all of the CLOs to Highland affiliates.14 The Committee urges that such sales were breaches of fiduciary duty as well as breaches of the Plan.

---

13 Insurance premiums were paid on behalf of four entities (American Home Patient, Inc., Cornerstone Healthcare, Nex-Tech Aerospace, and Trussway Holdings) in 2011 and 2012; no payment to any of the entities was the same as to any other entity. RC355, Schedule 6.1. As to the portfolio company advisory fees, various fees were paid over varying years between 2011 and 2016 by six different portfolio entities to Barrier or NexBank as advisors; with the exception of two years for one of the entities, each payment of an advisory fee was of a different amount.

14 As set forth in the Expert Report of Basil Imburgia, RC408, Highland engaged in the following transactions:
- It sold 32,500 shares of Grayson CLO at a settlement amounts of $560 and $570 per share, of which $25,500 were sold to NexPoint, with a reported value of $570 per share, Table 19;
- It sold 32,250 shares of Eastland CLO at settlement amounts of $611.40 and $613.90, of which 25,250 were sold to NexPoint, with a reported value of $730 and $670, Table 20;

34

3.     Highland contends that the sales in question were not cross trades but were rather "market-bearing transactions" between Highland and an independent financial institution, which then sold to a Highland affiliate. But this contention is belied by the fact that the transactions bore all of the hallmarks of pre-arranged trades, designed to avoid obtaining the consent of the Committee. See JX-30 at 3 ("Trading assets between two affiliated accounts through a broker may be considered a Cross Trade…"). Indeed, Mr. Dondero, the Chief Executive Officer, is heard on a tape made by then-Chief Portfolio Manager Joshua Terry, suggesting "run[ning a CLO trade] through some broker," RC-263A. By using a middleman between itself and its affiliate, Highland sought to avoid the description of a "cross trade," but the reality is that the transactions were effectively cross trades and we will treat them as such.

4.     That said, however, the substance of the transaction, arguably, benefitted the Committee, because assets of the Fund were liquidated, which was a principal goal of the Plan and Scheme.  Yet the problem with these transactions is that Highland had a perfectly clear path to effectuate these trades without any question being raised as to their bona fides – it could have sought the consent of the Committee under §2.06, which consent could not be unreasonably withheld under §2.07, HC-300. We find that Highland's failure to do so constitutes a breach of the Plan.

5.     We are left with the question of whether Highland's roundabout trading method caused any damage to the Fund.  It appears Highland sold the CLOs to a broker for one value and then the broker turned around and sold the CLOs to the Highland affiliate for a higher value. Thus, the Fund received less than it was entitled to receive had the transaction been done without the middleman, and the damage to the Fund is the difference in the two values. While the Committee's expert Basil Imburgia did not use that methodology to calculate the damages associated with these trades, the information on the price paid to the funds and the price paid to the broker is set forth in the expert report of Highland's expert, Mr. Snow, HC-526 at 41.  The Committee contends that the difference is approximately $450,000. The Committee is entitled to judgment for the amount of the difference with interest from the date of the sale from the funds, Since none of the experts did the appropriate calculation, as with other items, we leave it for the parties to confer and agree upon the total amount of damages including 9% interest and we will leave the record open to resolve that amount.

---

- It sold 31,000 shares of Greenbriar at settlement amounts of $713.60 and $665.00, of which all of the shares were sold to NexPoint at reported values of $730.00 and $670.00, Table 21; and
- It sold 31,500 shares of Stratford at settlement amounts of $661.70 and $660.00, of which 25,500 were sold to NexPoint at reported values of $724.49 and $665.00, Schedule 22.

L.        Failure to Settle Credit Suisse Trades/Litigation

1.        The Committee contends that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, both by failing to settle two trades Highland made on behalf of the Fund in September 2008 with Credit Suisse (relating to the purchase from Credit Suisse of syndicated loans in the amount of $23.5/9 for properties known as Goldfield and Westgate) and by failing to settle the litigation initiated by Credit Suisse in July 2013 regarding the same trades. The Committee asserts that, despite clear legal authority requiring that Highland settle the trades and the subsequent litigation, Highland refused to do so because it sought to use its refusal to settle the trades and litigation as leverage against Credit Suisse with respect to other claims not involving the Fund that Highland had against Credit Suisse. Thus, the Committee contends Highland put its own interests ahead of the interests of the Fund. Consequently, the Committee further alleges, that by its delaying the settlement of the trades and then of the litigation, Highland caused the Fund to incur seven-plus years of statutory interest that could have been avoided but which the Fund had to pay in January 2016 when the trades and the litigation were ultimately settled.

2.        Highland poses multiple defenses to the Committee contentions. First, Highland argues that the Committee's claim first accrued in 2008 when it allegedly failed to settle the trades and therefore was released by Section 7.01 of the Plan,[15] releasing Highland from all claims, known or unknown, "from the beginning of the world to the Effective Date" of the Plan in August 2011. Second, Highland contends that even if this claim was resurrected after the effective date of the Plan and Scheme, said claim would have arisen in 2011 and was thus barred by the three years statute of limitations for breach of fiduciary duty claims. Third, Highland argues that it did not breach its fiduciary duty as it was only exercising its legitimate business judgment in not settling the trades or the litigation and that the Committee has otherwise failed to show that Highland committed willful misconduct in this regard. Finally, Highland asserts that if the Tribunal finds that it breached its fiduciary duty, any damages that might be owing should be at a reduced amount from what the Committee claims.

---

[15] Section 7.01 provides, as follows: "Section7.01. Upon the Effective Date, each of the Consenting Redeemers, for themselves and on behalf of any of their respective officers, directors, shareholders, partners, members, employees, affiliates, investors, agents and representatives and any other person or entity entitled to assert a Claim (defined below) by, through, under, or on behalf of any Consenting Redeemer, hereby releases each of the HCM-Related Parties and each of the other Consenting Redeemers, from any and all accounts, actions, agreements, causes of action, claims, contracts, covenants, controversies, damages, debts, demands, executions, expenses, judgments, liabilities, obligations, omissions, promises, representations, and fights to payment, and all other liabilities of every kind, nature and description whatsoever, liquidated and unliquidated, fixed and contingent, matured and unmatured, disputed and undisputed, legal and equitable, state and federal, secured and unsecured, accrued and unaccmed, known and unknown, choate and inchoate (each, a "Claim"), which each Consenting Redeemer has, may have or ever had against any or all of the HCM-Related Parties and the other Consenting Redeemers from the beginning of the world to the Effective Date related to each of the Crusader

36

Funds, including without limitation its administration and wind-down; provided, however, that such release shall not operate to release any claims arising from this Plan or based on larceny within the meaning of Section 155.05 of the New York Penal Code ("Larceny Claims"), provided that such exception shall not apply to Larceny Claims within the scope of knowledge of the releasing party as of the Effective Date. The benefit of the release in this Section 7.01, as it related to the HCM-Related Parties, is held in trust by the Crusader Funds for the HCM-Related Parties, and the Crusader Funds hereby assign the benefit of the release in this Section 7.01 in their favor."

37

3.     With respect to the issue of the release, the Tribunal concludes that Section 7.01 releases any claims that the Committee might have with respect to the failure by Highland to settle the Credit Suisse trades through the Effective Date of the Plan, but the Committee has not released any claims that arose after the Effective Date of the Plan. The Tribunal need not decide whether the continuous post-August 2011 failure to settle the trades automatically gives rise to new post-Effective Date claims; once Credit Suisse commenced litigation in July 2013 and the Committee renewed its demand that Highland settle the trades  and the litigation, and once Highland again failed to do so, a new claim arose, at least as of that point in time. This new claim would not be released under Section 7.01 since it arose after the Effective Date of the Plan. Accordingly, Tribunal views Highland's continuous failure to settle the trades and litigation after July 2013 (until January 2016, and subject to the temporary withdrawal by the Committee of its demand that Highland settle the trades and litigation in September of 2013, as discussed below) as the potentially actionable conduct that the Tribunal will analyze below.

4.     As to the statute of limitations issue, the Tribunal agrees with Highland that a three years statute of limitations applies to breach of fiduciary duty claims and therefore any conduct outside the three years limitations period is not actionable.  The Committee filed in this Arbitration its breach of fiduciary claim with respect to the unsettled Credit Suisse trades and litigation on July 5, 2016. Consequently, given the application of the statute of limitations, any claim for relief for any period prior to July 5, 2013 is barred by the statute of limitations and the Tribunal will not consider conduct prior to this date to be actionable nor will it consider any claim for damages for the period prior to July 5, 2013.

5.     The Tribunal finds that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, by failing to settle the two subject trades with Credit Suisse. The Tribunal finds that, whatever strategy Highland intended or whatever judgment calls it made, or purported to make, with respect to the settlement of these trades, it was under a clear legal obligation to settle the trades but failed to do so.

38

000425

6.      Highland's then General Counsel admitted to at least a general awareness of the legal obligation under the LSTA regime to settle trades promptly (and to litigate later if there is a dispute regarding same). Tr. 10 288:2-12, 290:13-22, 291:15-20; and there is other evidence to the same effect. See, e.g., JX-12 at RC00100770-771. Despite this clear legal obligation, and despite Committee requests that it do so, Highland refused to settle the trades in order to provide itself with leverage vis-a-vis Credit Suisse on another dispute. Even if, as argued by Highland, its prevailing on this other dispute would advantage the Fund, once the Committee demanded that Highland settle the trades, as it first did during the limitations period on August 7, 2013, Highland should have done so given both the acknowledged weakness in its defenses and that its purported goal in not doing so at least primarily advantaged itself and not the Fund (even if the Fund might have gained some marginal potential advantage if Highland prevailed in the other dispute). In light of the preceding, Highland's refusal to settle the trades constitutes willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors.

7.      The Tribunal finds that the actionable willful misconduct by Highland for which damages will be due occurred during the period September 8, 2014 through January 14, 2016. The reason for the end date is clear and undisputed: on that date, Highland caused the Fund to pay for the trades and the interest due. As for the start date, the earliest possible start date, in light of the above analysis, is August 7, 2013 which is when the Committee first demanded during the limitations period that the trades be settled. But, in September 2013, counsel for the parties interacted and the Committee withdrew its demand that Highland settle the trades. HC-476a. The Committee argues that it was not apprised by Highland of relevant information at the time, and therefore the Fund should not be bound by its agent's withdrawal of the demand, but the Tribunal concludes that, notwithstanding Highland's failure to provide this information, the Committee's counsel independently analyzed the relevant issues and the Committee is responsible for the decisions flowing from that analysis. On or around September 8, 2014, after the trial court entered summary judgment in favor of Credit Suisse in the litigation, the Committee reinstated its demand that Highland settle the trades; since Highland did not do so until January 14, 2016, it is, under our analysis above, responsible for damages accruing during the period from September 8, 2014 through January 14, 2016.

39

8.      The Tribunal adopts the damages theory advanced by the Committee: the pre-judgment interest that the Fund had to pay during September 8, 2014 through January 14, 2016, minus the gain it achieved during the same period by virtue of having the use of the subject $23.5 million. However, neither party presented a damages analysis consistent with the preceding parameter. Accordingly, the Tribunal directs that the Parties jointly confer to calculate an amount of damages that takes into account the following parameters: (i) the damages period is between September 8, 2014 and January 14 , 2016; (ii) the 9% statutory interest (ordered by the New York State Supreme Court in September 2014) is to be applied on a simple basis to the total principal amount due ($23.5 million); (iii) the amount of the "off-set" is to be calculated using the factor utilized by Claimant's expert – the Treasury Yield Rates for the damages periods specified in (i); and (iv) 9% statutory, pre-judgment interest is to be applied on a simple basis to the result of the calculations in (i) – (iii) from January 14, 2016 to the date of this Partial Final Award.

M.      The Delay in Settling the UBS Litigation

1.      As noted above, Highland, Crusader and Credit Strategies were parties to an action commenced by UBS which alleged that certain securities had been fraudulently transferred by Highland to the funds. As a result, the funds were enjoined from transferring the subject assets during the course of the litigation.

2.      In May 2015, UBS, Highland, Crusader and Credit Strategies reached an agreement in principle to settle the litigation. Under the terms of that agreement Crusader was to pay UBS $25 million and Highland was to pay $35.75 million. A separate agreement between the Committee and Highland provided that, no sooner than December 30, 2016, Highland could recapture $33.75 million through incentive fees that could be generated through the liquidation of Crusader assets. RC-227.

3.      The settlement agreement was to be finalized on May 30, 2015, but Highland refused to go through with the settlement because Credit Strategies would not release claims against Highland. Tr. 3 21:10-22:3; Tr. 3 24:16-25:6; Tr. 10 316:20-317:23. Ultimately the Committee negotiated a its own settlement, pursuant to which Crusader paid UBS $25 million on July 1, 2015, and an additional amount of $30 million on December 29, 2015.

4.      The Committee argues that, had Highland not blown up the original settlement, it would not have had to pay the $30 million to UBS on December 29, 2015, and it would have retained those funds at least until December 30, 2016, when that amount might have been transferred to Highland if it had earned that amount in incentive fees. The Committee, therefore, seeks as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

40

5.     Highland denies that it has any liability and asserts that is protected by the business judgment rule. It also argues that 9% interest is not appropriate. Further, Highland urges that the Committee's expert did not otherwise account for the fact that Highland might have earned $33.75 million in incentive compensation and, therefore, there was a net benefit to the fund.

6.     There is no basis for Highland's claim that its conduct is protected by the business judgment rule. In deciding whether or not to settle the UBS litigation, Highland was acting as a fiduciary with respect to Crusader and had a fiduciary duty not to place its own interests above that of Crusader. As the New York Court of Appeals stated in Birnbaum v. Birnbaum, 73 N.Y. 461, 466 (1989):"It is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interest the fiduciary is to protect . . . . This is a sensitive and ' inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a  fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty. (Citations omitted.)"

7.     Thus, Highland was not free to place its own interests above that of Crusader and had an obligation to settle UBS's claims against Crusader regardless of its concerns about possible claims against it by Credit Strategies.

8.     There can be no question that Highland's action in refusing to settle with UBS resulted in Crusader being deprived the use of $30 million in cash between July 1, 2015 and December 30, 2016, the first day on which Highland would have been entitled to receive any of the incentive fees. Here, as with the Deferred Fees, it is appropriate to award interest on that amount at the rate of 9% to compensate Crusader for that loss.

41

9.     The problem with Highland's claim that it might have earned an incentive fees of $33.75 million is that Highland offered no evidence that would suggest that its incentives fees would ever have reached even the $30 million amount that the Committee is willing to concede might have been reached. Since the original settlement agreement was negotiated at a time when there was no plan in place to terminate Highland as the fund manager, the incentive fee structure was based on events that would ultimately occur in periods after the Committee terminated Highland. Since neither party made any effort at the hearing to calculate incentive fees, it seems apparent that such a calculation was not possible. In these circumstances, the Committee's assumption that Highland would have earned $30 million in incentive fees by December 29, 2016 is generous and there is no basis for a finding that Highland would have earned more than that in incentive fees.

10.     We award Claimant as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

N.     Cornerstone

1.     Highland Cornerstone Healthcare Group ("Cornerstone") is a company that owns Long Term Acute Care (LTAC) hospitals in which the Fund owns a minority equity interest. At the time of the adoption of the Plan and Scheme, Highland owned or controlled 100% of the shares of Cornerstone. Two groups of funds, Crusader Funds and Highland Credit Strategies Fund ("Credit Strat"), owned more than 50% of the shares of Cornerstone. Between 2011 and 2013, Highland was secretly engaged in the process of valuing and, eventually, selling the interest held by Credit Strat in Cornerstone. In September 2013, after a process in which the Credit Strat Redeemer Committee was kept completely in the dark as to the sales process that was underway, and which was later found to be unfair to the investors in Credit Strat, see RC-306, Highland arranged for the purchase of Credit Strat's interest by Cornerstone itself at the price of $2,956.03 per share, see JX-16. This price was below the most recent mark set by Highland, and below the value of between $3,424 and $4,434 per share that Highland's investment bankers, Houlihan Lokey, found to be fair for the purchase of the minority interest, see HC-431.

42

2.      Following the purchase of the Credit Strat interest, the Crusader Funds owned 41.8% of Cornerstone, see RC-138 at 7. The Crusader Funds learned of the sale and made known their interest to Highland in having their interest in Cornerstone sold.  But when Highland offered to buy their interest for the same price of $2,956.03 per share as the Credit Strat interest, the Committee engaged Ernst & Young ("E&Y") as its advisor to analyze the offer and prepare a response. E&Y prepared two analyses of the value of the Cornerstone asset. The first, HC-577, found that, as of the fall of 2013, "Cornerstone's offer to purchase Crusader's share for $43.8 mm is below Crusader's current carrying value and at the low end of the range of values developed in this Report" and that "based on information provided and reviewed to date it would appear that the lower end of the range is more reasonable to expect that (sic) the higher end of the range," Id. at 5.

3.      The Committee then requested that E&Y prepare a supplemental report, and, in January 2014, E&Y rendered a second report, finding that Cornerstone underperformed expectations for 2013 and that the changes occurring in the healthcare field were creating uncertainty in the industry in which Cornerstone operated.  HC-577 at 19. E&Y reduced its range to $44 million to $63 million, by imposing a discount from its prior range as of year-end 2013 by 10% to 25%. In discussions with counsel to the Committee, E&Y suggested countering with a purchase price in the range of $50 million to $54 million "for negotiation purposes." Id.

4.      Thereafter, on March 28, 2014, after the Committee had considered its options, it made a counter-offer within the range suggested by E&Y at $52,342,188, or $3,529 per share, plus a 50% recapture provision in the event of a sale within three years. JX-18.  The counter-offer was at the 2013 year-end market value, as calculated by Highland. Id. Highland never responded to this counter-offer despite repeated overtures to Highland by the Committee, and despite the desire of the Claimant Redeemer Committee and the mandate of the Scheme and Plan to liquidate all of the assets of the Crusader Fund, the interest in Cornerstone held by the Crusader Funds has not been sold.

5.      Claimant contends that the failure of Highland, during the period it was the investment manager of the Funds, to make any good faith effort to sell the Funds' shares in Cornerstone, constituted a breach of fiduciary duty.

6.      As part of its claim of breach of fiduciary duty, the Committee urges that Highland is collaterally estopped from denying the findings of the arbitration tribunal in the arbitration brought by the Redeemer Committee of Credit Strat arbitration tribunal regarding, inter alia, the Cornerstone transaction. RC-306 (4/6/16 Credit Strategies Fund Final Award).

43

7.      In particular, as it bears on this dispute, the Committee contends that Highland is estopped from denying the following findings: (1) Highland controlled Cornerstone; (2) the per share price at which Highland sold Credit Strat's interest was unfair; and (3) a price of $3,929 per share was a fair price, based upon the Houlihan Lokey valuation.

8.      Highland contends that the Credit Strat Tribunal's findings do not bind Highland in this proceeding, because the two arbitration proceedings deal with "fundamentally different" issues, such that collateral estoppel does not apply.

9.      First, Highland urges that the Credit Strat Tribunal was dealing with the ramifications of a consummated sale, where it found that Highland controlled both Cornerstone's offer and Credit Strat's acceptance. HC-220 at 8, 30, whereas in this proceeding, the evidence is that Cornerstone made an offer to the Committee, but Highland had no role in the Crusader Fund's evaluation of or counter to that offer and no sale occurred.

10.      Secondly, Highland points out that in Credit Strat, the retention of Houlihan Lokey and the entire process that Houlihan Lokey engaged in was a secret that the Credit Strat Committee was unaware of, whereas in this proceeding, the Houlihan report as well as other financial information was made available to the Crusader Committee, HC-577 at 577.0002, Tr. Day 5 at 114:12-117:18 (Zambie).

11.      The doctrine of collateral estoppel requires that an issue being litigated in the second case be the same as was fully litigated by the same party in the first action. Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002) ("[C]ollateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate.") (internal quotations and citations omitted).

12.      Although there are differences in the way in which the sale process took place, we do not find that such differences obscure the fact that some issues are substantially identical in both proceedings.

44

13.     The principal finding that we think is binding on Highland in this proceeding is that the price of $3,929 per share, based upon Houlihan Lokey's valuation, was a fair price. Claimant also argues that Respondent is bound by the finding that the offering price Highland made for the Credit Strat position, which was the same price as offered to the Redeemers Committee here, was unfair. But we think that finding would fly in the face of Claimant's own adviser, E&Y, who found that such a price was at the low end of a fair range. Accordingly, we do not think it appropriate to adopt such a finding as binding in this proceeding.

14.     Highland also contends that, with respect to the possible sale of the Cornerstone interest, it was not in a fiduciary relationship with the Committee, which was relying on EY for negotiating assistance, not on Highland, as Highland was sitting opposite to the Committee in the negotiation. Tr. Day 5 at 116:10-117:18 (Zambie).

15.     While the Committee was not relying on Highland for financial advice or guidance with respect to Cornerstone in the period between the Fall of 2013, when an offer of $2,956.03 per share was made, and the early Spring of 2014, when the counter-proposal were made, the Committee did rely on Highland, in its role as investment manager, both before and after those dates, to liquidate the Fund as rapidly as possible.

16.     But by Highland's choosing to have the Crusader Funds, along with several other entities controlled by Highland, invest in Cornerstone, Highland voluntarily placed itself in a conflict position: it owed fiduciary obligations to the Crusader Funds to maximize the liquidation process, while being the control person of Cornerstone whose own interests were to have any purchase price be as low as possible. As investment manager, Highland was obligated to be fully responsible to the Committee, but could not do so as long as it also continued to play an active role as controlling party of Cornerstone with respect to the Committee's desire to sell.

17.     The hearing record is that, other than making the offer in September 2013, Highland took no steps to market or sell the Fund's interest in Cornerstone. Tr. 1 347:16-349:2; 364:12-22. At meetings held with representatives of the Committee, the Committee asked about plans to sell assets and Highland never discussed, or appeared to have a plan by which it proposed to sell the Cornerstone asset. Tr. 1 349:4-22; 365:13-17; Tr. 4 55:14-20; RC-317 at 2("Mr. Jameson noted that for the remainder of the portfolio, formal strategies for disposition are not in place."). When Committee representatives met periodically with Jim Dondero, the CEO, he made it clear that he ran the sales operation completely and did not wish to be questioned or have the portfolio managers questioned as to the timing of any particular sale.

45

18.     We find that Highland had a fiduciary duty not to place its own interests above that of Crusader, Birnbaum v. Birnbaum, 73 N.Y. at 466 (1989), but rather to subordinate its own economic interests behind its fiduciary obligation to the Crusader Funds. Guth v. Loft, 5 A.2d 503, 510 (Del. 1939) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."); Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del.1983) ("There is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."); see also Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618 (Del. 2013).  Highland's failure to subordinate its own interests to those of the Committee led directly to its failure to engage in a fair negotiating process with the Committee. By failing to do so, Highland breached its fiduciary duty to the Fund.  Caruso v. Metex Corp., 1992 WL 237299, at *16 (E.D.N.Y. July 30, 1992), People ex rel. Spitzer v. Grasso, 50 A.D.3d 535, 546 (1st Dep't 2008). That breach of fiduciary duty was a continuing offense through the period of time that Highland was the investment manager of the Crusader Fund, as Highland never itself took, or authorized Cornerstone to take, any action in response to the counter-offer that was made in February 2014.

19.     Highland argues that the Committee must overcome the business judgment rule that "the defendant [fiduciaries] have acted on an informed basis and in the honest belief they acted in the best interest of the [client]," citing CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd., No. 03 CIV. 7936 (DAB), 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 4, 2007), in turn citing Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984)("While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made 'on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company,' unless the plaintiff shows that the presumption does not apply.").

20.     But here, we find that Highland's decisions regarding the purchase of the Cornerstone shares from the Crusader Funds — from the offer to purchase, the ignoring of the counteroffer, and the failure to engage in or authorize a negotiation process — were made with the willful intent to benefit itself and not the Crusader Funds investors. See JX-19; Tr. 1 379:17-380:8.  The Business Judgment Rule does not protect Highland or its officers from scrutiny for alleged breaches of fiduciary duty under these circumstances.

46

21.     The question then is what is the appropriate price at which the sale should take place. "[I]n determining whether a fiduciary has acted prudently, a court may examine a fiduciary's conduct throughout the entire period during which the investment at issue was held. The court may then determine, within that period, the 'reasonable time' within which divesture of the imprudently held investment should have occurred. What constitutes a reasonable time will vary from case to case and is not fixed or arbitrary. The test remains 'the diligence and prudence of prudent and intelligent [persons] in the management of their own affairs' (id., at 511 [citations omitted])." Matter of Estate of Janes, 90 N.Y.2d 4, 54 (1997); Public Service Co. of Colorado v. Chase Manhattan Bank, N.A., 577 F.Supp. 92, 107 (S.D.N.Y.1983) (Lumbard, CJ, sitting by designation)("where there is no sale, it is impossible to fix exactly the moment by which the loan should have been sold or the amount that could have been obtained; "[p]robably the only rule is that the court will use its common sense and determine what under all the circumstances it is fair to say that the trustee ought to have received if he had done his duty in selling the property within a reasonable time," (quoting Scott on Trusts)).

22.     To satisfy its obligation under the Plan to liquidate the Fund's assets as rapidly and as fairly as possible, Highland did not have "to cause Cornerstone to purchase the Fund's Cornerstone shares for a specific price and at the specific time demanded by the Committee…," Highland Post-Hearing Brief at 11, but it did have a duty to place the Funds' interest above its own and to obtain the best price possible for the Funds' Cornerstone interest. Thus, when it decided it wished to make an offer to purchase the Funds' Cornerstone shares, it was obligated to do so at the fair market value and not to attempt to take advantage of the fact that it had placed the funds in a position where it was the only available buyer.

23.     Highland argues that it makes no sense to assess damages based upon a hypothetical sale of the Cornerstone asset, because, first, since the shares have never been sold, there is no realized loss; and, second, "other than Cornerstone's $43.8 million offer, there is no evidence of any other willing buyer for Cornerstone's assets at any price."

24.     We reject the first argument because it ignores what we have found to be the breach of fiduciary duty —the obligation to pursue and consummate a sale at a fair and reasonable price. The Fund was damaged by reason of Highland's failure to fulfill that obligation.

47

25.     As to the second argument, Highland defeats its own argument by pointing out that, in the real world, there is only Cornerstone available as a buyer.  But, because of Highland's own financial objectives, there has been no indication since April 2014 when it failed to authorize a counteroffer that Highland was interested in directing Cornerstone, which it controlled, to make an offer to purchase the shares at anything other than a bargain basement and unfair price.

26.     Using our equitable powers, we believe that a fair price can be derived by using the fair market value of the shares of $3,929 per share, based upon Houlihan's valuation prepared on July 15, 2013, adjusted downward by 10-25% by the year-end discount caused by several factors cited by E&Y. The average of that discount results in a fair market valuation of $3,241.43, which amount is what we find should have been offered to pay for the Cornerstone shares.

27.     We order that Highland pay to the Committee $3,241.43 per share, or $48,070,407, and order that the Committee simultaneously cause the Crusader Fund to surrender its interest in Cornerstone to Highland.

28.     With respect to an award of pre-judgment interest, "[a]lthough an action for breach of fiduciary duty is generally considered of an equitable nature, '[e]ven on [such] a claim with equitable underpinnings ... prejudgment interest [is] mandatory where the only relief sought was compensatory damages.' Lewis v. S.L. & E., Inc. 831 F.2d 37, 39 (2d Cir.1987) (citing Spector v. Mermelstein, 485 F.2d 474, 481 (2d Cir.1973))(emphasis added).

29.     Regarding the rate of pre-judgment interest to be applied, Claimant argues for the application of New York's statutory rate of interest of 9% as most appropriate. Under CPLR §5001(a), "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." See  212 Inv. Corp. v. Kaplan, 16 Misc. 3d 1125(A), at *9 (Sup. Ct. N.Y. Cnty. 2007); Panix Prods., Ltd v. Lewis, id; Summa Corp. v. Trans World Airlines, 540 A.2d 403, 409 (Del. 1988).

30.     Under CPLR §5004, New York applies pre-judgment interest at 9%, simple annual interest. Under the circumstances here, where the breach of fiduciary duty deprived the investors of the Crusader Funds of a significant distribution and partial return of their equity, we exercise our "broad discretion, subject to principles of fairness, in fixing the rate to be applied," Summa Corp. v. Trans World Airlines, Inc., id., and we award interest at the statutory rate of 9%, simple annual interest, pursuant to New York law, from April 15, 2014, through the date of this Partial Final Award. We pick this date as it is the date by which we believe Highland and/or Cornerstone (as controlled by Highland) should have responded to the Committee offer.

IV.     The Return of the Deferred Fees

48

A.      Under §§2.02 and 6.02 of the Plan, if Highland distributed $1.7 billion within 43 months of the Plan's Effective Date, Highland could obtain $10 million in Deferred Fees that had been placed in the special account at the outset to incentivize Highland's rapid liquidation.  There is no question that Highland did not meet that goal by the 43rd month and, thus, in Count Three of its Amended Demand, the Committee seeks the immediate return to the Fund of those proceeds by a declaration that the Fund should distribute the right to receive payment in respect of the funds in the Deferred Fee Account to the Consenting Compulsory Redeemers.

B.      Highland objects on the ground that the UBS TRO eliminated the 47-month schedule applicable to the Deferred Fee Account, invoking the Impossibility Doctrine, discussed in detail above, and argues that, upon the eventual complete liquidation of the Fund, it will be entitled to the $10 million in the Deferred Fee Account.

C.      For reasons set forth earlier, we reject the argument that, under the Impossibility Doctrine, Highland was relieved of the requirement that it achieve complete liquidation of the Fund within 43 months, and, thus, is entitled to the $10 million in Deferred Fees upon complete liquidation. Highland had the opportunity to achieve the complete liquidation despite the duration of the UBS TRO, but chose, for its own reasons, not to do so. The Impossibility Doctrine does not provide a basis for granting Highland affirmative relief.

D.      We order the return to the Crusader Fund the $10 million in the Deferred Fee Account.

V.      Counterclaims

A.      Respondent has brought two principal counterclaims: first, it seeks to recover the remainder of Deferred Fees to which it says it is entitled now because Claimant should have completed the complete liquidation of the Fund's assets by December 31, 2017, at the latest; and, second, it seeks damages against the Committee for breach of the Plan and of its fiduciary duties to Highland by failing to oversee A&M's liquidation of Fund assets and for approving, without adequate, if any, scrutiny, A&M's fees, said to be exorbitant.

B.      As to the breach of fiduciary duty claim, the fiduciary duty relation is said to arise from Highland's status as an investor in the Crusader Funds.  Highland's Post-Hearing Brief at 3-5. However, we have previously stricken those portions of Highland's Amended Counterclaim that alleged it was suing as an investor. Panel Order, April 1, 2018, at 4. Furthermore, even assuming that, as an investor, Highland had standing to bring a claim for breach of fiduciary duty, as stated below, we find that no breach of duty has been proved with respect to any of the allegations in Respondent's Amended Counterclaim.

49

000436

C.      Specifically, we have examined the record thoroughly and, aside from the testimony of Highland's expert, James Finkel, and its former portfolio manager, Mr. Jameson, there is insufficient evidence of a purposeful and wrongful delay in liquidation or a failure by the Committee to oversee and scrutinize A&M's performance, nor any activity of A&M that the Committee aided and abetted that was proved wrongful.

D.      Mr. Finkel had a distinguished thirty-plus year career in capital markets, investment banking, and investment advisory work, including as a liquidator of the assets of alternative investment funds. But his opinion that Highland or any reasonable manager or liquidator would have completed liquidation by the end of 2017, at the latest, was not based on anything more than his unverified judgment, and not on a close examination of the facts in this record. For example, he conceded that, in reaching his opinions, he didn't consider the amount of information A&M provided to investors, didn't review A&M's time records or evaluate the quality of the work performed by A&M, and didn't consider the consequences of the lack of cooperation of Highland with A&M, among other critical deficiencies. Tr.10 367:10-372:3. Similarly, his opinion that, because of what he regarded as a flawed compensation structure, A&M's primary focus was on the time it spent on projects, rather than on results achieved, was based on one assumption that time-based work is, inevitably, less likely to be focused, an assumption that we reject as a sound basis of criticism of A&M's contribution. We find that Mr. Finkel's opinions were not soundly based and we reject them.

50

E.      Mr. Jameson worked for Highland for almost seven years as co-head of Private Equity, responsible for sourcing and executing private equity investments and monetizing existing portfolio companies. He testified that he was aware of the UBS TRO and had been advised that he could not sell assets during its pendency. He was aware that Cornerstone did not comply with requests by A&M for information but did not think he had the power to direct Cornerstone to do so Tr 10 28:18-30:3. He also testified that, had Highland remained as its investment manager, it would have sold the Cornerstone asset by December 31, 2017, and that Highland Capital's purchase of Cornerstone from the Crusader Fund at a negotiated price around the mark set by Highland would have been logical. Tr. 10 30:4-35:23. He also testified, in response to questioning by the Tribunal, that little, if anything, would have changed in Highland's ability to negotiate a sale with the Committee when it was replaced by A&M as its investment manager, Tr. 10 119:8-121:23.  On balance, despite Mr. Jameson's on-the-ground role as portfolio manager, his testimony did not support the allegations of Highland in its counterclaims; if anything, his intimate understanding of the Cornerstone asset and how Highland controlled the process by which Cornerstone was or wasn't being marketed supported the Committee's contentions that Highland could have negotiated a fair disposition of the Cornerstone asset had it chosen to do so.

F.      As to an alleged delay in the liquidation of the Fund's assets, the weight of the credible evidence is that Highland, not A&M, was responsible for any delay in liquidating the balance of the assets in the Crusader Fund after Highland was discharged and A&M was retained.

1.      We note that we have previously found that Highland, after refusing to respond to numerous requests by the Committee for books and records, should make a thorough search of its books and records and produce all non-privileged documents in its possession, custody, or control on certain relevant topics. Thus, we rejected several arguments put up by Highland to prevent the Committee and A&M from gaining access to critical books and records. Order and Partial Award, April 21, 2017.

51

2.      But, even when ordered to do so, Highland again refused to produce documents on at least two other occasions, requiring additional motions addressed to this Tribunal, Order, June 20, 2017; Order, October 21, 2017.

3.      In addition, there was unrebutted testimony that Highland produced "hundreds of thousands" of documents in single-page PDF format, requiring the better part of three or more months of A&M's time to correlate and organize. Tr. 6 25:4-19.

4.      By contrast, other than Mr. Finkel's testimony, there was little or no evidence of A&M's procrastinating or proceeding with deliberate slowness or that the Committee failed in its oversight of A&M.

5.      We have considered all of the other factual and legal arguments made by Highland in support of its counterclaims and conclude that Highland is not entitled to recover the remaining Deferred Fees being held in the Fund's cash account and that the Committee did not breach Sections 2.02 of the Plan and 1.5.2 of the Scheme, the covenant of good faith and fair dealing, or its fiduciary duties to Highland and other investors. We dismiss Highland's counterclaims in their entirety.

VI.     Attorneys' Fees and Other Costs

A.      Both parties have requested attorneys' fees relating to all claims asserted in the Amended Demand, Highland's Answer, Highland's Amended Counterclaims, and Claimant's Answer to the Counterclaims. Am. Dem. at 53-54; Highland Answer, October 16, 2016, at 21-22; Highland Am. Counterclaim, April 15, 2018; Committee Answer to Counterclaims. Under AAA Commercial Arbitration Rules, Rule 47(d)(ii), those mutual demands for attorneys' fees submitted the issue to arbitration and gave this Panel the authority to award attorneys' fees, in its discretion. AAA Rule 47(d)(ii). "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." R.F. Lafferty & Co., Inc. v. Winter, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted).

B.      The Committee urges that an award of attorneys' fees to it is justified by Highland's having "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," InterChem 59 Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005) (citation omitted), and that the record shows numerous examples of Highland acting in bad faith.

52

000439

C.     Highland acknowledges the Tribunal's discretion to order an award of attorneys' fees but opposes an imposition of attorneys' fees here. First, Highland argues that denying the Committee's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." HC-300 at 86. But this section of the Plan does not deal with the issue of fee-shifting being ordered by an arbitral tribunal. Nor, given Rule 47(d)(ii), would an order of this Tribunal shifting the responsibility of fees from one party to another be contrary to the so-called American rule, as both parties have sought this relief which is authorized under the prevailing rules of this Tribunal.

D.     Second, Highland urges that the only basis upon which the Committee is seeking an award is that Highland allegedly engaged in bad faith and vexatious conduct, citing only InterChem Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005).  Highland points out that the Court in InterChem Asia justified an arbitrator's imposition of an award of attorneys' fees because of one party's "bad faith" conduct during the arbitration, principally concerning discovery issues. Here, the Committee cites seven examples of alleged bad faith, but only one dealt with such conduct during the arbitration, "failing to provide the Committee with the books and records of the Fund, resulting in an extensive discovery process, producing records as single-paged TIFs, and resulting in a Panel ruling against them," citing the Tribunal's Panel Opinion and Final Partial Award, dated April 17, 2017.

E.     We are exercising our discretion to grant Claimant's request for attorneys' fees and costs and to deny Respondent's request for the same relief. We do not base our award on any concern of bad faith or oppressive conduct by Highland's able trial counsel, who acted professionally throughout these proceedings. However, with respect to each of the claims on which we have determined that the Committee is entitled to prevail, we have noted above the many occasions where, during the time it was investment manager and thereafter, Highland engaged in conduct that breached the Plan, breached fiduciary duties, involved secrecy, misrepresentations, and false statements by the most senior executives, and constituted willful misconduct. Furthermore, large portions of the defense set forth by Highland's witnesses were unworthy of belief and reflect the fact that Highland knew that it had no legitimate defense to many of the Committee's claims.  Accordingly, in our discretion, based on the foregoing, we award Claimant its legal fees and costs for the litigation of this arbitration.

VII.     CONCLUSION AND AWARD

A.     With respect to the claims below for which we find liability and direct the payment of damages and interest, if the Parties are not able to agree on the amount of damages or interest, we direct them to submit simultaneous briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award; there will be no reply briefs unless otherwise directed.

B.     We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of contract claims as follows:

53

1. The taking of the Deferred Fees: We order that, within twenty (20) days of the date of this Partial Final Award, Respondent, Highland Capital Management, pay to the Claimant the Deferred Fees in the amount of $33,313,000, with statutory interest of 9%, calculated on a simple basis, from the dates of taking in January and April 2016 through the date of this Partial Final Award.

2. The payment of Distribution Fees: As found above, with respect to each of the following categories, we find that the Respondent is liable for damages in the amount set forth in the Expert Report of Claimant's damages expert, Basil Imburgia, $14,452,275, plus 9% interest, calculated on a simple basis, from the respective dates such Fees were taken:

 a) The Distribution Fees attributable to the payment of Deferred Fees;

 b) The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

 c) The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims;

 d) The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames;

 e) The Distribution Fees attributable to the amount of margin borrowings; and

 f) The Distribution Fees attributable to the cumulative nature of the calculation, as discussed above.

000441

C.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of fiduciary duty claims as follows:

       1.      Engaging in related party transactions without Redeemer Committee approval:

       2.      Purchase of Plan claims without Redeemer Committee approval: Within twenty (20) days of the date of this Partial Final Award, we order Respondent, Highland Capital Management, to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase, calculated on a simple basis;

       3.      Sale of CLO interests - The Committee is entitled to judgment for the amount of the difference between the sale and repurchase prices with interest from the date of the sale from the funds. We direct the Parties promptly to confer and agree upon the total amount of damages including 9% interest, calculated on a simple basis; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

       4.      Failure to settle Credit Suisse claims: We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on this claim and direct the Parties promptly to confer to calculate an amount of damages that takes into account the parameters set forth in the body of this Award; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

       5.      The UBS litigation: We find in favor of Claimant, Redeemers Committee of the Highland Crusader Fund, and award damages in the amount of 9% simple interest on $30 million from December 29, 2015 to December 30, 2016, which shall be paid to the Redeemer Committee by Highland Capital Management within twenty (20) days of the date of this Partial Final Award; and

       6.      The Cornerstone Asset: We find in favor of Claimant and direct Highland Capital Management, within twenty (20) days of the date of this Partial Final Award, to pay the Redeemer Committee the amount of $48,070,407, plus interest at 9%, on simple basis, in return for which the Fund will transfer title to the shares to Highland.

D.      We grant Claimant's request for a declaratory judgment, seeking the immediate distribution of the Deferred Fee Account, and order the payment of the $10 million in the Account to the Committee for disbursal to the Consenting Compulsory Redeemers within twenty (20) days of the date of this Partial Final Award.

000442

E.      We find against Respondent on its counterclaim and dismiss the counterclaim with prejudice.

F.      We grant Claimant's request for reasonable attorneys' fees and costs and deny Respondent's request for an award of attorneys' fees and costs. With respect to the amount of fees and expenses that Claimant seeks, the parties should promptly confer to determine whether they can agree on an amount. If the parties can not agree, Claimant shall file an affidavit or petition setting out its claim with appropriate documentation within fifteen (15) days of the date of this Award, unless counsel agree otherwise. Respondent shall respond within fifteen (15) days thereafter, unless counsel agree otherwise. There will be no reply opportunity absent leave of the Tribunal.

G.      We will leave the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal.

000443

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

54

000444

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

State of NEW YORK )

) SS:

County of NEW YORK )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

_3/6/19_
Date

_[signature]_
David M. Brodsky, Chairperson

State of NEW YORK )

) SS:

County of NEW YORK )

On this _6_ day of MARCH, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_[signature]_
Notary Public

MEENA M. GULATI
Notary Public, State of New York
No. 01GU6110472
Qualified in New York County
Commission Expires August 2, 20 21

State of FLORIDA )
) SS.
County of LEE )

I, JOHN S. MARTIN, JR., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

Date  March 5, 2019                                        _____
                                                                    John S. Martin, Jr.

State of Florida )
) SS.
County of Lee )

On this 5th day of MARCH, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

000448

State of NEW YORK )
                                    ) SS:
County of NEW YORK )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.


3-5-19                              _Michael Young_
Date                               Michael D. Young


State of NEW YORK )
                                    ) SS.
County of NEW YORK )

On this 5 day of MARCH, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.


_Vickie L. Johnston_
Notary Public
VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO61?0068
Qualified in Queens County
My Commission Expires 04-19-20

Docket #2741  Date Filed: 08/18/2021

SIDLEY AUSTIN LLP
Penny P. Reid
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

Matthew A. Clemente (admitted *pro hac vice*)
Dennis M. Twomey (admitted *pro hac vice*)
Alyssa Russell (admitted *pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Susheel Kirpalani (*pro hac vice* pending)
Deborah J. Newman (*pro hac vice* pending)
Benjamin I. Finestone (*pro hac vice* pending)
Jordan Harap (*pro hac vice* pending*)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone:  (212) 849-7000

*Counsel for Marc S. Kirschner, as Litigation
Trustee of the Highland Capital Management,
L.P. Litigation Sub-Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

EXHIBIT A-8



1934054210818000000000000005

**OMNIBUS REPLY OF THE LITIGATION TRUSTEE IN SUPPORT OF MOTION FOR
ENTRY OF AN ORDER AUTHORIZING THE EXAMINATION OF RULE 2004
PARTIES PURSUANT TO RULE 2004 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE**[2]

Marc S. Kirschner, as trustee (the "Litigation Trustee") of the Litigation Sub-Trust[3]

established pursuant to the *Fifth Amended Plan of Reorganization of Highland Capital*

*Management, L.P.*, files this omnibus reply (the "Reply") to the objections of certain Rule 2004

Parties.[4] In support of this Reply, the Litigation Trustee respectfully states as follows:

1.     The Committee filed the Rule 2004 Motion to ensure that the Litigation Trustee is

able to obtain documentary and testimonial evidence relating to potential estate causes of action

---

[2] Capitalized terms not defined in this Reply have the meaning ascribed to them in the Rule 2004 Motion (Dkt. 2620).

[3] The Effective Date of the Plan occurred on August 11, 2021. *See* Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (Dkt. 2700). As such, the Litigation Trustee has substituted for the Committee and Litigation Advisor as Movant in connection with the Rule 2004 Motion. The Litigation Sub-Trust was created to investigate and litigate all Estate Claims and Causes of Action. Any argument that the Litigation Trustee does not have standing to pursue Rule 2004 discovery is contrary to the express language of the Plan and clearly without merit.

[4] *See* Limited Objection of James Dondero to the Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Dondero Objection") (Dkt. 2714); Limited Objection to the Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Trusts' Objection") (Dkt. 2715); Objection of the Advisors to the Committee's Motion for Rule 2004 Examination (the "Advisors' Objection") (Dkt. 2716); Limited Objection of NexPoint Strategic Opportunities Fund to Committee's Rule 2004 Motion for Examination of Various Entities (the "NSOF Objection") (Dkt. 2717); Objection to the Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Charities' Objection") (Dkt. 2718); Limited Objection and Reservation of Rights of Mark Okada and Certain Affiliated Entities to Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Okada Objection") (Dkt. 2721); NexPoint Re Entities' Joinder to Objections to the Committee's and Litigation Advisor's Rule 2004 Motion (the "Joinder") (Dkt. 2722); the Reservation of Rights and Limited Objection of Nancy Dondero to Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Nancy Dondero Objection") (Dkt. 2723); Objection to the Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order (the "Foundations' Objection") (Dkt. 2724); the Reservation of Rights Regarding Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Former Employees' Objection") (Dkt. 2725); Grant Scott's Limited Objection to the Official Committee of Unsecured Creditors' Emergency Motion for Rule 2004 Examination (the "Scott Objection") (Dkt. 2726).

000451

that are not currently in the Debtor's or Litigation Trustee's possession, custody, or control.  The

Litigation Trustee submits this Reply in response to the Dondero Objection, the Trusts' Objection,

the Advisors' Objection, the NSOF Objection, the Charities' Objection, the Okada Objection, the

Nancy Dondero Objection, the Foundations' Objection, the Former Employees' Objection, and

the Scott Objection (collectively, the "Objections," and the parties on whose behalf the Objections

were filed, the "Objectors").

2.    *First*, as counsel for the Litigation Trustee has clarified numerous times to counsel

for the Objectors, through the Rule 2004 Motion, the Litigation Trustee requests only that the

Court authorize service of subpoenas on the Rule 2004 Parties pursuant to Rule 2004.  The

Litigation Trustee does not request that the Court (i) compel the production of any particular

documents; (ii) determine the permissible scope of any depositions; or (iii) limit the ability of any

Rule 2004 Party to object to any forthcoming subpoena's relevance or scope.  Rather, if the

Litigation Trustee's Motion is granted, the Litigation Trustee intends to meet and confer with

counsel for the Rule 2004 Parties in order to understand the materials that each of their clients

currently have within their possession, custody, or control; to address any objections as to scope

or relevance; and to address any other topics that will facilitate efficiency in the discovery process

and the Litigation Trustee's investigation.  In the event that all objections are not so resolved, then

the Rule 2004 Parties' right to quash and/or limit the scope of the subpoenas (and the Litigation

Trustee's right to move to compel production) will be preserved.  For the avoidance of doubt, the

Trustee submits as **<u>Exhibit A</u>** to this Reply a revised proposed order granting the Rule 2004

Motion, specifically stating that "[a]ll rights of any party to object in accordance with the

applicable rules to scope, timing, or logistics of the subpoenas or to seek to compel production of

3

documents or attendance at deposition are reserved until such time as such objections or motions would be due after service of the subpoenas."

3. **Second**, the Litigation Trustee does not seek any documents or other evidence that he already has or is able to access from the Debtor. Indeed, as stated repeatedly throughout the Rule 2004 Motion, the Litigation Trustee seeks only "documents that are not currently in the Debtor's possession." *See* Rule 2004 Motion ¶¶ 24, 29, 39, 40; *see also id.* ¶ 65 ("Disclosure on these examination topics solely from the Debtor is insufficient because the matters at issue … involve suspicions of misconduct that may hinder voluntary and full disclosure by knowledgeable persons and entities currently affiliated with the Debtor. ***The examination will seek information that is not currently in the Debtor's possession.***") (emphasis added). While the Litigation Trustee has gained access to information in the Debtors' possession—some of which was produced pursuant to the Committee's *Emergency Motion to Compel Production by the Debtor* (Dkt. No. 808) (the "Motion to Compel") or other discovery requests, and some of which became available to the Litigation Trustee only recently upon the Effective Date)—it has become clear to the Litigation Trustee that certain Debtor transactions cannot be fully understood absent additional information from other parties. Accordingly, the Litigation Trustee seeks authority to propound discovery under Rule 2004 to obtain information that cannot be obtained from the Debtor. To the extent any recipient of any Rule 2004 discovery certifies that it does not have within its (or his or her) possession, custody, or control requested information that is not also (or exclusively) maintained by the Debtor, the Litigation Trustee does not intend to continue to pursue Rule 2004 discovery from that party.

4. **Third**, many Objectors point to the length of time since the Estate Claims were allocated to the Committee as a basis to deny discovery under Rule 2004. However, the

000453

investigation conducted prior to the engagement of the Litigation Advisor was limited to a high

level review of specific transactions and an investigation into the facts set forth in the CLO Holdco

Adversary Proceeding.  The Committee never filed a motion for production under Rule 2004

before the filing of this Motion, because it was always the Committee's intention that the claims

would be investigated primarily by the Litigation Trustee upon his engagement.  Prior to the

Effective Date, the Committee's access to data was largely limited to portions of certain custodial

files maintained by the Debtor, information produced by the Debtor in connection with the

Committee's Motion to Compel, and certain documents produced by CLO Holdco.  The

Committee never took a Rule 2004 deposition, or otherwise engaged in any discovery from the

Rule 2004 Parties.  As a result, the Objectors' position that the Rule 2004 discovery is unnecessary,

because the Committee has already conducted an expansive investigation of estate causes of

action, is simply inaccurate.

5.    ***Fourth***, the Charities' Objection alleges that the Litigation Trustee seeks "to use

Rule 2004 to evade the application of the Federal Rules of Procedure to a pending proceeding."

(Charities' Objection ¶ 3).  This is untrue.  The Litigation Trustee enters this case cognizant of its

peculiar procedural posture, wherein the Committee has commenced one action (the "CLO Holdco

Action") focused on a small subset of the potential estate causes of action that the Litigation

Trustee may assert in furtherance of his mandate to monetize estate claims for the benefit of the

beneficiaries of the Litigation Sub-Trust.  In recognition of the need to separate the matters that

are currently pending from the much broader set of topics that the Litigation Trustee is

investigating, the Committee noted in the Rule 2004 Motion that "[t]o the extent any of the Rule

2004 Parties overlap with any defendants in [the CLO Holdco Action], the Committee and the

Litigation Advisor have attempted to craft requests that will not touch upon topics properly

5

reserved for discovery through the adversary proceeding." Likewise, the Requests themselves include an instruction omitting any such material, and the individual requests have also been crafted to avoid overlap. The Litigation Trustee intends to meet and confer on the proper scope of discovery with all Rule 2004 Parties, and recognizes that discovery requests directed at certain defendants in the ongoing adversary proceeding may need to be narrower than Rule 2004 would otherwise permit. The pendency of the claims asserted in the CLO Holdco Action, however, is not a valid basis for precluding the Litigation Trustee from investigating other potential estate causes of action, and the impact of the pending proceeding on the parameters of the Litigation Trustee's subpoenas will only ever ripen into a dispute before this Court if the parties are unable to reach agreement following entry of the Rule 2004 order.

6. *Fifth*, several Objectors incorrectly assert that the Litigation Trustee is not permitted to pursue Rule 2004 discovery because of this Court's order in *In re ADPT DFW Holdings LLC,* No. 17-31432-sgj11 (Mar. 27, 2018). However, in *ADPT*, the Court denied Rule 2004 discovery due to the "unique facts" present in that case, including the significant investigation of claims and causes of action that had already occurred during the bankruptcy case and led to the identification of specific claims, and the fact that there were no deadlines for filing complaints. (*See* Dondero Objection, Ex. A at 65:21-25, 66:11, 94:10-25, 95:1-6). Here, pursuant to the terms of the Plan, the Litigation Trustee is tasked with ***investigating*** and prosecuting claims and causes of action for the benefit of the Debtor's creditors. (Plan at 10). The Litigation Trustee is seeking Rule 2004 discovery to assist with that investigation. As explained above, the Committee's investigation to date has been limited. Further, while the Committee (and the Litigation Trustee) have identified certain suspicious transactions through their review of documents produced by the Debtor, their understanding of these transactions is limited to the Debtor's perspective only.

000455

Discovery from non-Debtor entities and individuals will allow the Litigation Trustee to better understand the purpose and impact of these transactions, and to fill in gaps in the Debtor's information before he is required to prosecute claims.[5] Finally, as this Court knows, the Litigation Trustee is facing the fast-approaching end of the two-year tolling of statutes of limitations for many potential claims. Rule 2004 discovery will allow the Litigation Trustee to continue a targeted investigation to bring as many potential causes of action as possible within applicable time constraints and to maximize recoveries for the Debtor's creditors. *See In re Mirant Corp.*, 326 B.R. 354, 357 (Bankr. N.D. Tex. 2005) (granting Rule 2004 discovery, noting that "[d]iscovery now, not later, may be critical to ensure that no viable cause of action is lost"); *UBS Securities, LLC, et. al. v. Highland Capital Management, L.P.*, Adv. Pro. No. 213020-SGJ, Hr. Tr. dated June 24, 2021, at 60:10-25 (THE COURT: "[N]owhere in [Rule 2004] is there a reference to it has to be aimed towards maximizing assets. … [I]t can relate to the acts of the debtor, financial condition of the debtor, conduct, property. I mean, it's pretty broad. And I've looked at this before, and I don't think it's limited to pre-confirmation.").

7.    ***Sixth***, the Trusts' Objection incorrectly alleges that the Reorganized Debtor, rather than the Claimant Trust, possesses breach of fiduciary duty claims. This reading contradicts the plain text of the Plan. Pursuant to the Plan, the Claimant Trust Assets transferred to the Claimant Trust include all "Causes of Action," (*see* Plan § I.B at ¶ 26) which are defined broadly to include "any action, claim … cause of action … of any kind whatsoever … (including, without limitation,

---

[5]   For example, the Charities appear to object to Rule 2004 discovery against the Dallas Foundation, the Kansas City Community Foundation, and the Santa Barbara Foundation because they "have storied histories of giving completely unrelated to the Debtor[.]" The fact that these foundations are Rule 2004 Parties does not mean they are the targets of the Litigation Trustee's investigation or any future lawsuit. Rather, the Litigation Trustee seeks Rule 2004 discovery because they received transfers that were made by the Debtor and/or its affiliates that fall within the scope of the Litigation Trustee's investigation. *See* Rule 2004 Motion ¶ 45 ("The relationship of these Highland Charities and Trusts to the Debtor is unclear at this time, but there appear to have been tens of millions of dollars of distributions of funds from the Debtor to certain of the Highland Charities and Trusts, either directly or indirectly, that need to be assessed for their propriety and reasonableness.").

000456

under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity … include[ing], without limitation … any claims under any state or foreign law." (Plan § I.B. at ¶ 19). Moreover, "[t]he Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement." (*Id.*). The very first causes of action set forth on the schedule of Causes of Action filed with the Plan Supplement are those based on "breach of fiduciary duties, breach of duty of care, breach of duty of loyalty, [and] usurpation of corporate opportunities." (*See* Ex. DD (Schedule of Causes of Action at Dkt. 1875-3)). Although they do not say so explicitly, the Trusts appear to argue that a parenthetical clause—which operates to ensure that claims that cannot be transferred are nevertheless preserved—in fact operates to nullify an express transfer made pursuant to the terms of the Plan and Plan Supplement. That argument misreads the Plan.

8.      Moreover, because the transferred "Causes of Action" include all claims and causes of action "whether arising before, on, or after the Petition Date" (Plan § I.B at ¶ 19), the Court should deny Nancy Dondero's request to limit "[t]he requested time period for requested documents … to the prepetition period." (*See* Nancy Dondero Objection at n. 5).

9.      Finally, the Charities' concern that the Movants are seeking a "Section 546 extension" (*See* Charities' Objection ¶ 81) is misplaced; nowhere in the Rule 2004 Motion does the Litigation Trustee seek such relief.

## CONCLUSION AND REQUESTED RELIEF

WHEREFORE, for these reasons, the Litigation Trustee respectfully requests that the Court grant the Rule 2004 Motion and enter an order in a form that is substantially similar to **Exhibit A** to this Reply.

000457

Dated: August 18, 2021
Dallas, Texas

Respectfully submitted,

SIDLEY AUSTIN LLP
/s/ *Paige Holden Montgomery*
Paige Holden Montgomery
Penny P. Reid
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

Matthew A. Clemente (admitted *pro hac vice*)
Dennis M. Twomey (admitted *pro hac vice*)
Alyssa Russell (admitted *pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Susheel Kirpalani (*pro hac vice* pending)
Deborah J. Newman (*pro hac vice* pending)
Benjamin I. Finestone (*pro hac vice* pending)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone:  (212) 849-7000

*Counsel for Marc S. Kirschner, as Litigation*
*Trustee of the Highland Capital Management,*
*L.P. Litigation Sub-Trust*

000458

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on August 18, 2021.

/s/ *Paige Holden Montgomery*
Paige Holden Montgomery

000459

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, | ) | Case No. 19-34054-sgj11 |
| L.P., [1] | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

**ORDER GRANTING THE MOTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS AND THE LITIGATION ADVISOR FOR ENTRY OF AN
ORDER AUTHORIZING THE EXAMINATION OF RULE 2004 PARTIES PURSUANT
TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Upon the consideration of the *Motion of the Official Committee of Unsecured Creditors*

*and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties*

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

000460

*Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* (the "<u>Motion</u>"),[1] it is hereby

**ORDERED** that:

1.     The Rule 2004 Motion[2] is **GRANTED** as set forth herein.

2.     The Litigation Sub-Trust is authorized, pursuant to Bankruptcy Rules 2004 and 9016, to issue subpoenas for the Requests substantially in the forms attached as Exhibits 2-14 to the Motion and for attendance at oral examination on the Examination Topics.

3.     All rights of any party to object in accordance with the applicable rules to scope, timing, or logistics of the subpoenas or to seek to compel production of documents or attendance at deposition are reserved until such time as such objections or motions would be due after service of the subpoenas.

4.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # # End of Order # # #

---

[1] On August 11, 2021, the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>") went effective (the "<u>Effective Date</u>").  On the Effective Date, the official committee of unsecured creditors in the above-referenced bankruptcy case was dissolved pursuant to the terms of the Plan.  (Plan at 47.)  Pursuant to the terms of the Plan, the Litigation Sub-Trust (as defined in the Plan) was formed and the Litigation Trustee is now tasked with investigating and prosecuting the Estate Claims.  (*See id.* at 26; *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)* [Docket No. 1811], Exhibit T [Docket No. 1811-4 at Article II, Section 2.2].)

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Respectfully submitted,

SIDLEY AUSTIN LLP
/s/ *Paige Holden Montgomery*
Paige Holden Montgomery
Penny P. Reid
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

      -and-

Matthew A. Clemente (admitted *pro hac vice*)
Dennis M. Twomey (admitted *pro hac vice*)
Alyssa Russell (admitted *pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

      -and-

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Susheel Kirpalani (*pro hac vice* pending)
Deborah J. Newman (*pro hac vice* pending)
Benjamin I. Finestone (*pro hac vice* pending)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone:  (212) 849-7000

*Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Capital Management, L.P. Litigation Sub-Trust*

Docket #1765 Date Filed: 01/17/2021

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
 2
                                  )    Case No. 19-34054-sgj-11
 3   In Re:                       )    Chapter 11
                                  )
 4   HIGHLAND CAPITAL             )    Dallas, Texas
     MANAGEMENT, L.P.,            )    Thursday, January 14, 2021
 5                                )    9:30 a.m. Docket
             Debtor.             )
 6                                )    - MOTION TO PREPAY LOAN
                                  )      [1590]
 7                                )    - MOTION TO COMPROMISE
                                  )      CONTROVERSY [1625]
 8                                )    - MOTION TO ALLOW CLAIMS OF
                                  )      HARBOURVEST [1207]
 9   _____)

10                      TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11                  UNITED STATES BANKRUPTCY JUDGE.

12   WEBEX APPEARANCES:

13   For the Debtor:           Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
14                             10100 Santa Monica Blvd.,
                                 13th Floor
15                             Los Angeles, CA  90067-4003
                               (310) 277-6910
16
     For the Debtor:           John A. Morris
17                             Gregory V. Demo
                               PACHULSKI STANG ZIEHL & JONES, LLP
18                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
19                             (212) 561-7700

20   For the Official Committee Matthew A. Clemente
     of Unsecured Creditors:   SIDLEY AUSTIN, LLP
21                             One South Dearborn Street
                               Chicago, IL  60603
22                             (312) 853-7539

23   For CLO Holdco, Ltd.:     John J. Kane
                               KANE RUSSELL COLEMAN LOGAN, P.C.
24                             901 Main Street, Suite 5200
                               Dallas, TX  75202
25                             (214) 777-4261
```



1934054210117000000000001

EXHIBIT A-9

000463

2

```
1   APPEARANCES, cont'd.:

2   For James Dondero:        John T. Wilson
                              D. Michael Lynn
3                             John Y. Bonds, III
                              Bryan C. Assink
4                             BONDS ELLIS EPPICH SCHAFER
                                 JONES, LLP
5                             420 Throckmorton Street,
                                 Suite 1000
6                             Fort Worth, TX  76102
                              (817) 405-6900
7
    For Get Good Trust and    Douglas S. Draper
8   Dugaboy Investment Trust: HELLER, DRAPER & HORN, LLC
                              650 Poydras Street, Suite 2500
9                             New Orleans, LA  70130
                              (504) 299-3300
10
    For HarbourVest, et al.:  Erica S. Weisgerber
11                            M. Natasha Labovitz
                              Daniel E. Stroik
12                            DEBEVOISE & PLIMPTON, LLP
                              919 Third Avenue
13                            New York, NY  10022
                              (212) 909-6621
14
    For Highland CLO Funding, Rebecca Matsumura
15  Ltd.:                     KING & SPALDING, LLP
                              500 West 2nd Street, Suite 1800
16                            Austin, TX  78701
                              (512) 457-2024
17
    Recorded by:              Michael F. Edmond, Sr.
18                            UNITED STATES BANKRUPTCY COURT
                              1100 Commerce Street, 12th Floor
19                            Dallas, TX  75242
                              (214) 753-2062
20
    Transcribed by:           Kathy Rehling
21                            311 Paradise Cove
                              Shady Shores, TX  76208
22                            (972) 786-3063

23

24
           Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

000464

3

1          DALLAS, TEXAS - JANUARY 14, 2021 - 9:41 A.M.

2          THE CLERK:  All rise.  The United States Bankruptcy

3     Court for the Northern District of Texas, Dallas Division, is

4     now in session, the Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6     right.  We're a little late getting started because we had

7     lots of reading material for the Court today.  All right.

8     This is Judge Jernigan, and we have a couple of Highland

9     settings.  The HarbourVest matters are the primary thing we

10    have set today, and then we also have a Debtor's motion

11    pursuant to protocols for authority for Highland Multi-Strat

12    to prepay a loan.

13        All right.  Well, let's get a few appearances.  First, for

14    the Debtor team, who do we have appearing this morning?

15         MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

16    Pomerantz, John Morris, and Greg Demo here on behalf of the

17    Debtor.

18         THE COURT:  Okay.  Thank you.

19        All right.  We have objections on HarbourVest.  Who do we

20    have appearing for Mr. Dondero this morning?

21         MR. WILSON:  Your Honor, it's John Wilson, and I'm

22    also joined by Michael Lynn, John Bonds, and Bryan Assink.

23         THE COURT:  Okay.  I'm sorry.  Could -- the court

24    reporter does yeoman's work in this case.  Let me just make

25    sure we got all three of those names.  Say again, Mr. Wilson.

4

1        MR. WILSON:  John Bonds and Michael Lynn and Bryan

2   Assink.

3        THE COURT:  Oh, okay.  So, see, I thought I heard

4   somebody Wilson in all of that, which was why I was pressing

5   the issue.

6     All right.  Is Mr. Dondero present on the video for

7   today's hearing?

8        MR. WILSON:  I believe he is, Your Honor.

9        THE COURT:  Mr. Dondero, could you confirm that you

10  are out there?  (No response.)  Okay.  My court reporter says

11  he sees the name out there.  Is he in your office?

12       MR. WILSON:  Your Honor, he is appearing remotely

13  from my office.  I'm not sure exactly where he's appearing

14  from.

15       THE COURT:  Okay.  Well, Mr. Dondero, if you're out

16  there and you're speaking up to confirm you're present, we're

17  not hearing you.  Maybe your device is on mute.  So please

18  unmute yourself.

19     (No response.)

20       THE COURT:  All right.  I'm going to take some other

21  appearances and you -- you need to try to communicate with

22  your client and let him know I need to confirm he's present.

23  Okay?

24     All right.  Meanwhile, let's go to our other Objectors.

25  CLO Holdco.  Who do we have appearing today?

5

1        MR. KANE: John Kane; Kane Russell Coleman & Logan;

2 on behalf of CLO Holdco.

3        THE COURT: All right. Thank you, Mr. Kane.

4    We had an objection from Dugaboy Investment Trust and Get

5 Good Trust. Who do we have appearing?

6        MR. DRAPER: Douglas Draper, Your Honor, for -- for

7 Draper.

8        THE COURT: All right. Thank you, Mr. Draper.

9    All right. I think those were the only written objections

10 we had. Mr. Pomerantz, do you confirm, we don't have any

11 other objectors for the motions set, correct?

12        MR. POMERANTZ: Your Honor, there was those three.

13        THE COURT: I'm sorry. I didn't catch your full

14 sentence.

15        MR. POMERANTZ: That is correct, Your Honor. There

16 were three objections to the motion.

17        THE COURT: Okay. Mr. Clemente, you're there for the

18 Creditors' Committee?

19        MR. CLEMENTE: Yes. Good morning, Your Honor. Matt

20 Clemente on behalf of the Official Committee of Unsecured

21 Creditors.

22        THE COURT: All right. Good morning. Thank you.

23 All right. We have a lot of other folks on the video. I'm

24 not going to go ahead and take a roll call of other lawyers.

25        MS. WEISGERBER: Your Honor?

6

 1          THE COURT:  Yes?

 2          MS. WEISGERBER:  Excuse me, Your Honor.  It's Erica

 3  Weisgerber from Debevoise on behalf of HarbourVest.

 4          THE COURT:  Okay.

 5          MS. WEISGERBER:  And I'm joined by Natasha Labovitz

 6  and Dan Stroik --

 7          THE COURT:  Okay.

 8          MS. WEISGERBER:  -- from Debevoise as well.

 9          THE COURT:  Thank you.  I was neglectful in not

10  getting your appearance, because, of course, you're at the

11  front and center of this motion to compromise, and I did see

12  that you filed a reply brief yesterday afternoon.  Okay.

13  Thank you.

14     All right.  Do we have -- do we have Mr. Dondero on the

15  line?  I'm going to check again.

16     (No response.)

17          THE COURT:  Mr. Dondero's counsel, I cannot hear you,

18  so please unmute your device.

19          MR. WILSON:  Your Honor, it appears to me that Mr.

20  Dondero's device was unmuted as soon as you asked if he was

21  available.  I sent him a communication a second ago asking if

22  he's having technical difficulties.  I have not received a

23  response, so I --

24          MR. DONDERO:  Hello.  Can anybody hear me?

25          THE COURT:  Oh.

7

1          MR. WILSON:  Okay.  I hear him.

2          THE COURT:  Mr. Dondero?

3          MR. DONDERO:  Hello?

4          THE COURT:  Is that you?

5          MR. DONDERO:  Yeah, it is.  I've been on.  I've heard

6  everything since the beginning.  It's just we've had technical

7  difficulties.  I couldn't use the Highland offices.  We've

8  been trying to set up something else.

9          THE COURT:  All right.

10          MR. DONDERO:  But I'm on now, if -- yes.

11          THE COURT:  All right.  Very good.  Well, I'm glad

12  we've got you.

13      All right.  Well, Mr. Pomerantz, how did you want to

14  proceed this morning?

15          MR. POMERANTZ:  Your Honor, we could take up the

16  HarbourVest motion first, and I will turn it over to John

17  Morris.  He and Greg Demo will be handling that.  And then

18  after that we can handle the other motion, which is unopposed.

19          THE COURT:  All right.  Mr. Morris?

20          MR. KANE:  Your Honor, this is -- sorry.  This is

21  John Kane for CLO Holdco.  Just very briefly, if I may.  And

22  this will affect, I think, the Debtor's case in chief, so I'll

23  expedite things a little bit, I believe.

24      CLO Holdco has had an opportunity to review the reply

25  briefing, and after doing so has gone back and scrubbed the

8

1  HCLOF corporate documents. Based on our analysis of Guernsey

2  law and some of the arguments of counsel in those pleadings

3  and our review of the appropriate documents, I obtained

4  authority from my client, Grant Scott, as Trustee for CLO

5  Holdco, to withdraw the CLO Holdco objection based on the

6  interpretation of the member agreement.

7  THE COURT: All right. Well, thank you for that, Mr.

8  Kane. I think that -- that eliminates one of the major

9  arguments that we had anticipated this morning. So, thank you

10  for that.

11  Any other housekeeping matters that maybe someone had that

12  I didn't ask about?

13  MS. MATSUMURA: Yes, Your Honor. This is Rebecca

14  Matsumura from King & Spalding representing Highland CLO

15  Funding, Ltd. I just wanted to put on the record, we -- our

16  client had requested that some of its organizational documents

17  be filed under seal. But we have given permission for the

18  parties to present the relevant excerpts, to the extent it's

19  still relevant after Mr. Kane's announcement, in court. And

20  we'd just ask that the underlying documents remain sealed, but

21  we're not going to object if they show them on a PowerPoint or

22  anything like that.

23  So, to the extent that you had that on your radar, I just

24  wanted to clear that up for the proceedings.

25  THE COURT: All right. Well, I did sign an order

9

1  late last night.  I don't know if it's popped up on the

2  docket.

3          MS. MATSUMURA:  Yes, Your Honor.  That's what this

4  referred to.  That was what -- these are the documents that

5  were being sealed.  And so I just wanted to note, if you --

6  you know, if the Debtor puts up an excerpt of those documents

7  and you're like, wait a minute, didn't I seal those, that we

8  were the party that requested them be under seal and we're

9  fine with them being shown in court, as long as the underlying

10  documents aren't publicly accessible.

11          THE COURT:  Okay.  Got you.  Thank you.

12      All right.  Any other housekeeping matters?

13          MR. MORRIS:  Yes, Your Honor.  This is John Morris

14  from Pachulski Stang for the Debtor.  Good morning.

15          THE COURT:  Good morning.

16          MR. MORRIS:  The only other matter that I wanted to

17  raise, and I can do it now or I can do it later, or Your Honor

18  may tell me that it's not appropriate to do at this time, is

19  to schedule the Debtor's motion to hold Mr. Dondero in

20  contempt for violation of the TRO.

21          THE COURT:  All right.  Well, let's do that at the

22  conclusion today.  And please make sure I do it.  I think I

23  was going to address this last Friday, and we went very late

24  and it slipped off my radar screen.  But I did see from my

25  courtroom deputy that you all were reaching out to her

1   yesterday to get this set, and then Mr. Dondero's counsel

2   reached out to her and said, We're going to file an objection

3   to a setting next Wednesday, or I think you had asked for a

4   setting next Tuesday or Wednesday.

5          MR. MORRIS:  I did.

6          THE COURT:  And I don't -- I don't know if that

7   response/objection was ever filed last night.  I haven't seen

8   it if it was.  So, we'll -- please, make sure I don't forget.

9   We'll take that up at the end of today's matters.  All right.

10  Well, --

11         MR. MORRIS:  All right.  So, --

12         MS. WEISGERBER:  Your Honor, one last housekeeping

13  item from -- I'm joined this morning by Michael Pugatch of

14  HarbourVest, who will present some testimony this morning.  I

15  just want to confirm he's on the line and confirm no

16  objections to him sitting in for the rest of the hearing.

17         THE COURT:  All right.  Mr. Pugatch, this is Judge

18  Jernigan.  Could you respond?  Are you there with us?

19         MR. PUGATCH:  Yes.  Good morning, Your Honor.  Mike

20  Pugatch from HarbourVest here.

21         THE COURT:  All right.  Very good.  I think we had

22  you testify once before in the Acis matter, if I'm not

23  mistaken.  Maybe.  Maybe not.  Maybe I saw a video deposition.

24  I can't remember.

25     All right.  So, we're going to let Mr. Pugatch sit in on

11

1　this.  Anyone want to say anything about that?  I consider him

2　a party representative, so I don't -- I don't think anyone

3　could invoke the Rule.

4　　　All right.  Very good.  Well, let's go forward if there

5　are no more housekeeping matters.

6　　　　　MR. MORRIS:  Okay.

7　　　　　THE COURT:  Mr. Morris?

8　　　　　MR. MORRIS:  Thank you.  Thank you very much, Your

9　Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the

10　Debtor.

11　　　It's a rather straightforward motion today.  It's a motion

12　under Rule 9019, pursuant to which the Debtor requests the

13　Court's authority and approval to enter into a settlement

14　agreement with HarbourVest that will resolve a number of

15　claims that HarbourVest has filed against the Debtor.

16　　　What I -- the way I propose to proceed this morning, Your

17　Honor, is to give what I hope is an informative but relatively

18　brief opening statement.  I'll defer to HarbourVest and its

19　counsel as to whether they want to make a presentation in

20　advance of the offer of evidence.  Any objecting party, I

21　suppose, should then be given the opportunity to present their

22　case to the Court.  Then the Debtor will call Jim Seery, the

23　Debtor's CEO and CRO.  We will offer documents into evidence.

24　I would propose then that the objecting parties take the

25　opportunity to ask Mr. Seery any questions they'd like on the

12

1   matter.

2       After the Debtor rests, I think HarbourVest would like to

3   put Mr. Pugatch on the stand to offer some testimony on their

4   behalf.  And I think that that will conclude the case.  We can

5   finish up with some closing arguments as to what we believe

6   the evidence showed, but that's the way that I'd like to

7   proceed, if that's okay with the Court.

8               THE COURT:  All right.  That sounds fine.

9               OPENING STATEMENT ON BEHALF OF THE DEBTOR

10              MR. MORRIS:  Okay.  So, as I said, Your Honor, this

11  is a -- this should be a very straightforward motion under

12  Rule 9019.  The standard is well-known to the Court.  There

13  are four elements to a 9019 motion.  The Debtor clearly has

14  the burden of proof on each one.  And we easily meet that

15  burden, Your Honor.

16      The standard, just to be clear, the first part is that we

17  have to establish a probability of success, with due

18  consideration for uncertainty of law and fact.  The second one

19  is the complexity, likely duration, expense and inconvenience

20  of the litigation.  The third part of the test is the

21  paramount interest of creditors.  And the fourth part of the

22  test is whether or not the proposed settlement was reached

23  after arm's-length negotiations.

24      The Debtor believes that it easily meets this standard,

25  and frankly, is a little bit frustrated that it's being forced

1  to incur the expense by Mr. Dondero in going through this

2  process.

3      A plain reading, a fair reading of the economics here

4  relative to the claim shows that this is a very reasonable

5  settlement.  I don't need to go beyond that, Your Honor.  I

6  don't even need to use the word reasonable.  It surely meets

7  the lowest standard.

8      We've prepared a couple of demonstrative exhibits, Your

9  Honor.  I'm going to use them with Mr. Seery.  But I'd like to

10  just put one up on the screen now, if I may.

11      Ms. Canty, can you please put up Demonstrative Exhibit #3?

12      Demonstrative Exhibit #3 is an outline of the economics of

13  the settlement.  It includes the various pieces, the

14  components that the parties have agreed to.  And it shows, at

15  least from the Debtor's perspective, just what HarbourVest is

16  being given here.

17      Up on the screen is a demonstrative exhibit.  It has

18  citations to the evidence that will be admitted by the Court.

19  The first line shows that HarbourVest will receive a $45

20  million allowed general unsecured nonpriority claim.  And that

21  -- that can be found at Debtor's Exhibit EE, Exhibit 1, at

22  Page 2.

23      That claim is discounted by the expected recovery that

24  general unsecured creditors are supposed to get.  As of

25  November, in the liquidation analysis that was part of the

14

1    disclosure statement -- that's the citation in the footnote --

2    the Debtor believed that unsecured creditors were estimated to

3    recover approximately eighty-seven and a half cents on the

4    dollar.  And so we just did the arithmetic there to get to the

5    net economic value of the proposed general unsecured claim.

6         And from that, we reduced $22-1/2 million because that is

7    the net asset value of HarbourVest's interest in HCLOF, which,

8    pursuant to the settlement agreement, it will transfer back to

9    the Debtor, so that the net economic value is approximately

10   $16.8 million.

11        You will hear testimony from Mr. Seery that this number

12   is, in fact, overstated, and it's overstated because, since

13   the time the disclosure statement was filed in November, a

14   number of events have occurred that will -- that have caused

15   the estimated recovery percentage to be reduced from

16   approximately 87-1/2 percent to something lower than that.  We

17   don't have the exact number, Your Honor, but Mr. Seery will --

18   and the evidence will show that there's been more expenses,

19   that there's been some resolution of certain claims.  There's

20   been some positive issues, too.  But that number is probably

21   in the 70s somewhere.

22        And in any event, I think the point here is, Your Honor,

23   HarbourVest invested $80 million in HCLOF, which was going to

24   participate in the investment in CLOs.  They filed a claim for

25   $300 million, through treble damages and other claims.  But

15

1   the net economic impact of this is going to be somewhere

2   probably in between $12 and $14 million.  I'll let Mr. Seery

3   give more precision to that.  And it represents less than -- a

4   less than five percent recovery on the total claim.

5        And we think it's important for the Court to keep that in

6   mind.  What are the economics here?  Are we overpaying?  Is

7   this an unreasonable settlement?  And I think the evidence

8   will show that the Debtor is not, but that this settlement

9   that you see before you was the product of arm's length, and

10  I'm going to go in reverse order of the four-part test under

11  9019.

12       So, the last part is whether or not the settlement, the

13  proposed settlement was the product of arm's-length

14  negotiation.  You'll hear lots of evidence that this

15  settlement that's up on the screen right now very much was the

16  product of arm's-length negotiation.

17       The third part of the test, Your Honor, is whether it

18  meets the paramount interest of creditors.  You know,

19  regrettably, Mr. Dondero is the only purported creditor who is

20  objecting here.  He may have done so through different

21  vehicles, but every objecting party here is a debtor [sic]

22  owned and controlled by Mr. Dondero.  No other creditor -- not

23  the Creditors' Committee, UBS, Acis, Mr. Terry, Mr. Daugherty

24  -- nobody is objecting to this settlement except for Mr.

25  Dondero.  And we believe that that highlights the Debtor's

16

1 ability to meet the third prong of the test, and that is these

2 are -- this settlement is in the paramount interest of

3 creditors.

4      Again, going in reverse, the second part of the test is

5 the complexity, duration, and expense of litigation.  There

6 will be no disputed evidence that we meet -- the Debtor easily

7 meets this prong of the test.  The evidence is going to show

8 that HarbourVest's claim is based on fraud, fraud in the

9 inducement, fraudulent statements and omissions, the kind of

10 case, Your Honor, that I'm sure you're familiar with that is

11 incredibly fact-intensive, that will be incredibly difficult

12 to navigate through.  It will be prolonged, it will be

13 expensive, because you're necessarily relying on he said/she

14 said, basically.  And so we're going to have to get testimony

15 from every person that spoke in connection with the events

16 leading up to the transaction.  So we think the second prong

17 will be easily met, Your Honor.

18      And then the last prong -- the first prong, if you will --

19 is the likelihood of success on the merits.  We think that the

20 settlement, the economic recovery that's up on the screen

21 here, which ultimately will be less than five percent of the

22 claimed amount, in and of itself shows that the settlement is

23 consistent with the Debtor's perception of its likely success

24 on the merits.  I'm certain that HarbourVest disagrees, but

25 that's okay, we're here today and that's the Debtor's view,

17

1   and the Court is here to assess the Debtor's business judgment

2   and whether the Debtor has properly analyzed the issues and

3   gone through the process. And the evidence will show

4   conclusively that it will. That it has.

5       Mr. Seery will testify at some length as to the risks that

6   he saw. I think that you'll hear counsel for Mr. Dondero ask

7   both Mr. Seery and Mr. Pugatch a number of questions designed

8   to elicit testimony about this defense or that defense. And

9   it's a little -- it's a little ironic, Your Honor, because,

10  really, every defense that they're going to try to suggest to

11  the Court was a valid defense is a defense that the Debtor

12  considered. In fact, it's, you know, it's a little spooky,

13  how they've -- how they've been able to identify kind of the

14  arguments that the Debtor had already considered in the

15  prosecution of their objections here.

16      But be that as it may, the evidence will conclusively show

17  that the Debtor acted consistent with its fiduciary duties,

18  acted in the best interests of the Debtor's estate, acted

19  completely appropriately here in getting yet another very

20  solid achievement for the Debtor, leaving very few claims that

21  are disputed at this point, all but one of which I believe are

22  in the hands of Mr. Dondero.

23      So, that's what we think that the evidence will show.

24      I do want to express my appreciation to Mr. Kane for

25  reflecting on the arguments that we made with respect to the

18

1   ability of the Debtor to engage in the transfer or the

2   acquisition of the asset from HarbourVest.  I would -- I would

3   respectfully request that we just enter into a short

4   stipulation on the record reflecting that the Debtor's

5   acquisition of HarbourVest's interests in HCLOF is compliant

6   with all of the applicable agreements between the parties.

7       And with that, Your Honor, I look forward to putting Mr.

8   Seery on the stand and presenting the Debtor's case.

9           THE COURT:  All right.  Other opening statements?

10          OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11          MR. KANE:  Yes, Your Honor.  Sorry.  John Kane on

12  behalf of CLO Holdco.

13      In response to Mr. Morris, I'm not going to enter into a

14  stipulation on behalf of my client, but the Debtor is

15  compliant with all aspects of the contract.  We withdrew our

16  objection, and we believe that's sufficient.

17          THE COURT:  All right.  Well, I'm content with that.

18      Other opening statements?

19          OPENING STATEMENT ON BEHALF OF HARBOURVEST

20          MS. WEISGERBER:  Your Honor, Erica Weisgerber on

21  behalf of HarbourVest.

22      HarbourVest joins in Mr. Morris's comments in support of

23  the settlement, and we believe that the question of whether

24  the settlement between HarbourVest and the Debtor satisfies

25  the Rule 9019 standard is not even a close one.

1    Some Objectors have made arguments about the merits of

2  HarbourVest's claims, which is why we're here.  As Your Honor

3  will hear this morning, HarbourVest has meaningful and

4  meritorious claims against Highland, but made the business

5  decision to avoid the time, expense, and inherent risk of

6  litigation in the interest of preserving value, both for

7  itself and for the estate.

8    Today, Michael Pugatch, a managing director of

9  HarbourVest, will testify before the Court.  He'll explain

10  that HarbourVest claims against Highland arise out of certain

11  misrepresentations and omissions by Highland to HarbourVest in

12  connection with HarbourVest's purchase of an interest in

13  HCLOF, one of Highland's managed funds.  Those

14  misrepresentations and omissions, as Your Honor will hear,

15  relate to Highland's litigation with its former employee,

16  Joshua Terry, and transfers that were conducted in 2017 to

17  strip Acis of value and prevent Mr. Terry from collecting on

18  an $8 million judgment.

19    Mr. Pugatch will further explain that HarbourVest would

20  not have invested in HCLOF had it known the underlying facts

21  about those Acis transfers.

22    Mr. Pugatch will also testify that not only did

23  HarbourVest not know about those transfers, it learned about

24  those transfers when it was accused of orchestrating the

25  transfers itself in the Acis bankruptcy.  Your Honor will hear

1  that the Acis trustee sought extensive discovery from

2  HarbourVest after numerous accusations that HarbourVest was

3  behind the transfers.

4      Mr. Pugatch will also testify that Highland charged legal

5  fees for itself and its affiliates to HCLOF, essentially

6  forcing HCLOF to fund the litigation involving the Acis

7  bankruptcy and Mr. Terry.

8      In total, HarbourVest's claims for damages are over a

9  hundred million dollars in investment-related losses, lost

10  profits, legal fees inappropriately charged to HCLOF, its own

11  legal fees.  And that's before interest or trebling damages.

12      But HarbourVest stands ready to litigate its claims, but

13  following hard-fought and extensive negotiations with the

14  Debtors, the parties reached the settlement that's now before

15  the Court.  Mr. Pugatch's testimony regarding the strong

16  factual bases for HarbourVest's claims against Highland and

17  its recoverable damages will further underscore the risks that

18  the Debtors faced if they chose to litigate these claims, and

19  why this settlement is fair, equitable, and in the best

20  interest of the estate.

21          THE COURT:  All right.  Thank you, Counsel.

22      Other opening statements?

23    OPENING STATEMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

24          MR. DRAPER:  Your Honor, this is Douglas Draper on

25  behalf of one of the Objectors.  I'd like to just make a few

21

1  comments with respect to what I've heard and what the Court is

2  going to hear.

3      The first issue I'd like to address is the comment by

4  counsel for the Debtor that no other party has objected.  The

5  9019 motion is one of the issues that this Court has to rule

6  on, whether or not there was an objection or not.  So the fact

7  that this may be -- bankruptcy is not a popularity contest and

8  not an issue of who votes for what and doesn't vote.  This,

9  along with the 1129(a) tests, are clearly within your

10  province, and you need to listen carefully because you'll have

11  to make your own independent analysis whether my objection is

12  correct or incorrect.

13      Two other points I'd like to make that I think are very

14  salient.  Number one is, if you look at the Debtor's

15  disclosure statement, it basically took the position that the

16  HarbourVest claim is of little or no value.  And lo and

17  behold, thirty days later, there's a settlement that brings

18  about a significant recovery to HarbourVest.  The timing is

19  interesting, and I think the Court needs to pay careful

20  attention to what transpired between the two dates.

21      And then the last point I'd like to make is, as you listen

22  to the evidence, and what I learned abundantly clear from

23  hearing the depositions, is that the claim of HarbourVest, if

24  there is a claim at all, is probably one hundred percent --

25  should be subordinated in that it appears to arise out of the

22

1    purchase or sale of a security.  And, again, I would ask the

2    Court to listen carefully to this because that's what it

3    appears to be and that's what the evidence is going to show to

4    the Court.

5              THE COURT:  All right.  Mr. Draper, let me clarify

6    something I'm not sure if I heard you say or not.  Were you

7    saying that the Court still needs to drill down on the issue

8    of whether the Debtor can acquire HarbourVest's interest in

9    HCLOF?

10             MR. DRAPER:  No.

11             THE COURT:  Okay.  I was confused whether you were

12   saying I needed to take an independent look at that, now that

13   the objection has been withdrawn of Holdco.  You are not

14   pressing that issue?

15             MR. DRAPER:  No, I am not.  Basically, I think it's

16   the fairness of the settlement.  I think the transferability

17   of the interest is separate and apart from the fairness of the

18   settlement itself.  I think the fairness -- the

19   transferability was a contractual issue between two parties

20   that the Court does not have to drill down on.

21             THE COURT:  All right.  I have another question for

22   you.  I want to clarify your client's standing.  Tell me --

23   I'm looking through a chart I printed out a while back.  I

24   guess Dugaboy Investment Trust filed a couple of proofs of

25   claim; is that right?

23

1        MR. DRAPER:  Yes.

2        THE COURT:  Okay.  What --

3        MR. DRAPER:  And objections are pending.

4        THE COURT:  Pardon?

5        MR. DRAPER:  Objections to those claims are pending

6   before the Court, Your Honor, --

7        THE COURT:  Okay.

8        MR. DRAPER:  -- and have not been litigated.

9        THE COURT:  And what about Get Good Trust?

10        MR. DRAPER:  Get Good Trust has a proof of claim also

11   that objections are pending to.  Pending.

12        THE COURT:  Okay.  I don't want to get too

13   sidetracked here, but I know standing was -- was mentioned as

14   a legal argument today.  What is the basis for those proofs of

15   claim?

16        MR. DRAPER:  The first one is, with respect to the

17   proof of claim for Dugaboy, there is an investment that

18   Dugaboy made that was then funneled, we believe, up to the

19   Debtor.  And the -- the loan that exists, we believe is a

20   Debtor loan, as opposed to a loan to the entity that we made

21   the loans to.

22      And, again, it's a matter that the Court is going to hear.

23   The claim may or may not be allowed.  It has not been

24   disallowed yet.

25      The second part to the Dugaboy ownership is we own an

24

1  interest in the Debtor.  And so we are, in fact, a party in

2  interest.

3            THE COURT:  Okay.

4            MR. DRAPER:  It may be a small interest, but it is an

5  interest.

6            THE COURT:  It has a limited partnership interest in

7  the Debtor?

8            MR. DRAPER:  Yes.

9            THE COURT:  Is that correct?

10            MR. DRAPER:  Yes.

11            THE COURT:  Okay.  Well, I'll move forward.  Thank

12  you.

13      Does that cover -- any other opening statements?  I think

14  that covered everyone who was -- who filed some sort of

15  pleading today.  No.

16            MR. WILSON:  Your Honor, John Wilson on behalf of --

17            THE COURT:  I'm sorry.  I'm sorry.

18            MR. WILSON:  -- Mr. Dondero.

19            THE COURT:  I missed Mr. Dondero's counsel.  I knew

20  we had visited at some point this morning.  I just got

21  confused there.  Go ahead, Mr. Wilson.

22            MR. WILSON:  No problem, Your Honor.  I was just

23  going to say that we will reserve our comments until after the

24  conclusion of the testimony.

25            THE COURT:  All right.  Very well.

1    Mr. Morris, you may call your first witness.

2         MR. MORRIS:  Thank you, Your Honor.  Before I do,

3    just two very, very quick points.

4         THE COURT:  Okay.

5         MR. MORRIS:  To be clear, Dugaboy's interest in the

6    Debtor is 0.1866 percent.  Less than two-tenths of one

7    percent.

8    Secondly, the argument that Mr. Draper just made with

9    respect to subordination is one that appears in nobody's

10   papers.  And, in fact, not only doesn't it appear in anybody's

11   papers, but Mr. Dondero, I believe, specifically took issue

12   with the fact that a portion of the consideration that

13   HarbourVest would receive would be on a subordinated basis,

14   and he would -- and I think he took the position there is no

15   basis to give them a subordinated claim.

16   So, I just wanted to point those items out to the Court,

17   not that I think either one makes a large difference today,

18   but I do want to deal with the facts.

19        THE COURT:  Thank you.

20        MR. MORRIS:  The Debtor would call -- you're welcome,

21   Your Honor.  The Debtor calls Mr. James Seery.

22        THE COURT:  All right.  Mr. Seery, welcome back to

23   virtual court.  If you could say, "Testing, one, two" so I can

24   see you and swear you in.

25        MR. SEERY:  Testing, one, two.

Seery - Direct                                    26

1        THE COURT:  All right.  I heard you but I'm not yet

2   seeing your video.  Is your video turned on?

3        MR. SEERY:  Video is on.  Yes, Your Honor.

4        THE COURT:  Okay.  I see you now.  Please raise your

5   right hand.

6            JAMES SEERY, DEBTOR'S WITNESS, SWORN

7        THE COURT:  Thank you.  Mr. Morris?

8        MR. MORRIS:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10  BY MR. MORRIS:

11  Q    Good morning, Mr. Seery.  Can you hear me?

12  A    I can.  Thank you, Mr. Morris.

13  Q    Okay.  Let's just cut to the chase here.  Are you familiar

14  with HarbourVest's claims filed against the Debtor?

15  A    I am, yes.

16  Q    And did you personally review them?

17  A    I did, yes.

18  Q    Do you recall that over the summer the Debtor objected to

19  HarbourVest's claim?

20  A    Yes, we did.

21  Q    Why -- can you explain to the judge why Harbour -- why the

22  Debtor objected to HarbourVest's claim last summer?

23  A    Sure.  The HarbourVest claims, I believe there are about

24  six of them, initially were filed, and they were -- they were

25  relatively vague in terms of what the specifics of the claims

Seery - Direct                            27

1  were.

2      So, we saw the claims but didn't, frankly, pay a lot of

3  attention to the underlying transaction that was referred to

4  in the proofs of claim and the losses that HarbourVest had

5  claimed to suffer -- to suffer with respect to their purchase

6  of securities related to HCLOF and the damages caused by the

7  Acis case.  So we filed a pretty pro forma objection.  I

8  believe it was a simply stated objection that we didn't have

9  any record that there was anything in the Debtor's books and

10  records that they had a valid claim for any amount against the

11  Debtor.

12  Q   Are you aware that HarbourVest subsequently filed a

13  response to the Debtor's objection to their claims?

14  A   Yes.  Yes, I am aware.

15  Q   And did you familiarize yourself with that particular

16  response?

17  A   I did indeed.  It was a pretty extensive response, really

18  developing the full panoply of their claims, which included

19  claims for expenses relating to the Acis case, which

20  HarbourVest viewed as being improperly charged to HCLOF by its

21  manager, which is effectively Highland.  Those expenses,

22  HarbourVest took the view, were excessive, had nothing to do

23  with the investment, and were simply a pursuit of a personal

24  vendetta against Mr. Terry and his interests by Mr. Dondero,

25  and using HCLOF's money to actually pursue those interests.

Seery - Direct                    28

1    In addition, and this was the first time we saw that,

2  HarbourVest brought forth its claims that it was entitled to

3  effectively rescind the transaction.  And I say rescind the

4  transaction:  In security parlance, they claim that they were

5  induced by fraud, I think as most are -- to enter into the

6  transaction.

7    As most are aware, the liability limitations in the OMs

8  and the exculpation in the documents are pretty broad, and

9  HarbourVest's position was that they weren't going to be

10  subject to those limitations because the actual transaction

11  that they entered into was a fraud on them, designed by Mr.

12  Dondero, Mr. Ellington, and the Highland team.

13  Q   All right.  Let's talk about your understanding, the

14  Debtor's understanding of the factual background to

15  HarbourVest's claim.  What is your understanding of the

16  investment that HarbourVest made?

17  A   Well, HarbourVest made an investment in the Highland CLO

18  business.  The Highland CLO business was -- was Acis.  And

19  effectively, the business had been separated, but in name

20  only.  Acis was just a shell, with a few partners --

21  obviously, Mr. Terry as well -- but it was all Highland

22  personnel doing all the work.

23    And what they were trying to do with Acis was, in essence,

24  resuscitate a business that had been in a bit of a decline

25  from its pre-crisis heyday.

1    They were looking to take additional outside capital.

2    They would -- they would pay down or take money out of the

3    transaction, Highland would, or ultimately Mr. Dondero, and

4    they would -- they would seek to invest in Acis CLOs,

5    Highland's 1.0 CLOs.  And then with respect to the Acis CLOs,

6    and potentially new CLOs, but with the Acis CLOs, they'd seek

7    to reset those and capture what they thought would be an

8    opportunity in the market to -- to really use the assets that

9    were there, not have to gather assets in the warehouse but be

10    able to use those assets to reset them to market prices for

11    the liabilities and then make money on the equity.

12    Q    Do you have an understanding --

13    A    Then --

14    Q    I'm sorry.  Go ahead.

15    A    Why don't I continue?  So, the transaction, they found

16    HarbourVest as a potential investor, and the basis of the

17    transaction was that they would make an investment into Acis.

18        Shortly before the transaction, and while they were doing

19    diligence, Mr. Terry received his arbitration award.  I

20    believe that was in October of 2017.  The transaction with

21    HarbourVest closed in mid- to late November of 2017.  But Mr.

22    Terry was not an integral part.  Indeed, he wasn't going to be

23    a key man.  He had been long gone from Highland by that time.

24        What the -- I think you asked me originally what the basis

25    of their claim was.  The transaction went forward, and the

Seery - Direct                    30

1   basis of their claim is that they really were never -- nothing

2   was disclosed to them about the nature of the dispute with Mr.

3   Terry other than in the highest-level terms; the animosity

4   with respect to which that dispute was held by Highland and

5   potentially Mr. Terry; and really, how those costs would be

6   borne and risks be borne by the investment that they were

7   making.

8       That was, in essence, the transaction and the high-level

9   view of their claim.

10  Q   Okay.  Just a few very specific facts.  Do you have an

11  understanding as to how much HarbourVest invested and what

12  they got in exchange for that investment?

13  A   Yeah.  HarbourVest invested in a couple tranches, and I

14  forget the exact dates, but approximately $75 million

15  originally, and then they added another five.  Some

16  distributions were made in the first half of 2018, putting

17  their net investment in the mid-seventies on the investment,

18  which now is worth about 22-1/2 million bucks.

19  Q   And what percentage interest in HCLOF did HarbourVest

20  acquire, to the best of your knowledge?

21  A   They have 49.98 percent of HCLOF.  HCLOF, just to refresh

22  -- the Court is, I think, well aware of this, but to refresh,

23  is a Guernsey entity.  Not -- not atypical for structures of

24  this type to use offshore jurisdictions and sell the

25  securities under -- at least to U.S. -- can't sell them to

Seery - Direct                     31

 1   U.S. investors unless they qualify, and these are sold under

 2   Reg S to -- to investors that otherwise qualify.  And

 3   HarbourVest was investing in that transaction through the

 4   Guernsey structure.

 5   Q    And do you have an understanding as to who owned the 50-

 6   plus percent of HCLOF that HarbourVest was not going to

 7   acquire?

 8   A    Yeah.  There's -- you can tell by the name.  HCLOF is

 9   Highland CLO Funding.  This is a Highland vehicle.  So

10   Highland owned and controlled the vehicle.  The DAF, which is

11   -- which is Dondero-controlled trusts, have the -- 49 percent.

12   Highland has, I believe, around .63-65 percent directly.  And

13   then Highland employees at the time who were involved in the

14   business owned another small percentage.

15       So the majority was going to be controlled by Highland

16   through its control of DAF and its control of the employees

17   that worked for it.  HarbourVest would be a minority investor.

18   Q    Okay.  And I believe you testified that the investment was

19   made in mid-November; is that right?

20   A    That's correct.  I think it was the 15th, may have been

21   the 17th of November.

22   Q    And do you recall when in October the Terry arbitration

23   award was rendered?

24   A    It was about a month before.  I think it was right around

25   the 20th, the 17th to the 20th.  I may be slightly wrong on

Seery - Direct                                    32

1  each of those dates.

2  Q    Okay.  What is your understanding as to what happened

3  after the issuance of the award that is the basis or at least

4  one of the bases for HarbourVest's claim?

5  A    I don't think there's -- I don't think there's any

6  dispute.  And there certainly are judicial findings.  Dondero

7  and Highland went about stripping Acis of all of its assets.

8  So, remember that Acis is not a separate standalone company,

9  in any event.  It's controlled and dominated completely by

10 Highland at the time.  But it did have contracts.  And those

11 contracts had value.

12     So the first idea was to strip out the management contract

13 and put it into a separate vehicle, which we called HCF

14 Advisor, which Highland still owns.  The second piece was to

15 strip out some valuable assets, the risk retention piece,

16 which was a loan that in essence was equity that Highland had

17 put into Acis but structured as a loan, as many of the

18 transactions we'll see down the road are, in order to deal

19 with some -- avoid taxes in any way possible.  And that

20 structure, that value moved value out of Acis for the express

21 purpose of trying to run, in essence, the Highland business

22 back in Highland.

23     Remember, as I said, Acis is just a Highland business

24 moved to a separate shell.  When Mr. Terry got his arbitration

25 award against Acis and was seeking to enforce it, it was

Seery - Direct                          33

1  pretty straightforward, let's take all the assets -- Dondero

2  scheme -- let's take all the assets and move them back into

3  Highland so Terry can't get anything.

4  Q    And how does that scheme relate to the HarbourVest claim,

5  to the best of your knowledge?

6  A    Well, HarbourVest -- HarbourVest's position is that they

7  invested in Acis and -- and whether Acis was called Acis or

8  called Highland, it doesn't really matter; there were valuable

9  assets in the -- in the entity that they were going to be

10 investing in through the equity in these CLOs and some of the

11 debt securities in those CLOs.

12    And then the stripping out and the fraudulent conveyances

13 out of Acis caused them damages because that's what left the

14 damage to Mr. Terry.

15    The quick math on Acis, by the way, is Acis has probably

16 lost, total damages, 175 million bucks.  And that's pretty

17 easy.  DAF lost 50.  HarbourVest lost 50.  Fifteen million of

18 fees charged to HCLOF.  Another five million of fees, at

19 least, incurred by Mr. Terry.  Ten million that went to Mr.

20 Terry, 15 to Highland fees, another five, plus Mr. Terry's

21 settlement in this case, over eight million bucks.

22    So HarbourVest's position, which, on a factual basis, you

23 know, is problematic for the estate, is, wait a second, we

24 invested in this vehicle with Highland.  That was supposed to

25 invest in Highland CLOs.  They were called Acis, but they were

Seery - Direct                     34

1  Highland CLOs.  And then you went about causing tremendous
2  damage to that vehicle that we ultimately were investing in,
3  and then charge us for the pleasure.
4  Q    You used the phrase earlier "OM," I believe.
5  A    Offering memorandum.
6  Q    Offering memorandum?  Can you just explain to the Court
7  your understanding of what an offering memorandum is?
8  A    Typically, under U.S. law, and foreign jurisdictions have
9  similar laws, you have to have a document that explains the
10 securities that you're selling.  And it goes into extreme
11 detail about the securities and the risks related to those
12 securities.
13     And the idea is not to have a document that tells you
14 whether it's a good investment or a bad investment, but it's a
15 document that discloses to the potential investor all of the
16 risks with respect to that security or related to the
17 investment over the duration of the security.  It doesn't
18 predict the future, but it's supposed to make sure that it
19 gives you a very clean view of the past and a very clean view
20 of what the facts from the past are and how they would
21 implicate the future of the investment.
22 Q    And in the course of its diligence, did the Debtor have an
23 opportunity to review the offering memorandum in the context
24 of the claims that were being asserted by HarbourVest?
25 A    Oh, absolutely.  It was originally effectively -- it's an

Seery - Direct                              35

1   HCLOF offering memorandum.  But as I said, HCLOF was managed

2   and controlled by Highland, and Highland originally prepared

3   it.  And then, of course, in connection with -- with this

4   dispute and these claims, we reviewed it, both myself and my

5   legal team.

6   Q    All right.

7            MR. MORRIS:  Your Honor, the offering memorandum is

8   on the Debtor's exhibit list, and I think this is an

9   appropriate time to move into evidence Debtor's Exhibits A

10  through EE, all of which appear at Docket No. 1732.

11           THE COURT:  1732?

12           MR. MORRIS:  It's the Debtor's Second Amended Witness

13  and Exhibit List.

14           THE COURT:  All right.  Any objection to admission of

15  A through EE?

16           MR. DRAPER:  Douglas Draper.  No objection, Your

17  Honor.

18           THE COURT:  All right.  Mr. --

19           MR. MORRIS:  May I proceed?

20           THE COURT:  Yeah.  Mr. Wilson, did you want to

21  confirm no objection?

22      (Echoing.)

23           THE COURT:  All right.  Hearing no objection,

24  Debtor's A through EE are admitted.

25      (Debtor's Exhibits A through EE are received into

Seery - Direct                                    36

1   evidence.)

2           THE COURT:  Go ahead, Mr. Morris.

3           MR. MORRIS:  Thank you, Your Honor.  The offering

4   memorandum itself is one of the documents that we filed under

5   seal, and we did so at the request of counsel to HCLOF.  But

6   HCLOF has consented to our sharing up on the screen certain

7   very limited provisions of the document, without waiving the

8   request that the agreement otherwise be maintained under seal.

9           THE COURT:  All right.

10          MR. MORRIS:  So may I proceed on that basis, Your

11  Honor?

12          THE COURT:  You may.  Uh-huh.

13          MR. MORRIS:  Okay.  Ms. Canty, can you please put up

14  on the screen Demonstrative Exhibit #1?  Okay.  Can we just --

15  is there a way to just expand that just a bit, Ms. Canty?

16  Thank you very much.  And if we could just scroll it up?

17  Thank you very much.  Perfect.

18      Okay.  So, Your Honor, this, as the footnote says, is an

19  excerpt from the offering memorandum that can be found at

20  Debtor's Exhibit AA.  Double A.  And this particular portion

21  of the offering memorandum is at Page 35.

22          THE COURT:  Okay.

23  BY MR. MORRIS:

24  Q   Mr. Seery, have you seen this portion of the offering

25  memorandum before?

Seery - Direct                    37

1  A    Yes, I have.  But before I continue, I just -- I should

2  have checked.  Are you able to hear me clearly?  Am I speaking

3  too quickly or am I cutting out?  I just want to make sure.

4  I'm using a different set of audio today.

5            THE COURT:  All right.

6            MR. MORRIS:  That's fine.

7            THE COURT:  I hear you very well.

8            MR. MORRIS:  Yeah.

9            THE COURT:  So I think we're good right now.  Thank

10  you.

11            THE WITNESS:  Yeah.  Thank you, Your Honor.  I was

12  just checking.

13            THE COURT:  Okay.

14            THE WITNESS:  In response to your question, Mr.

15  Morris, yes, I have seen this before.

16  BY MR. MORRIS:

17  Q    Okay.  And can you -- did you form a view in doing the due

18  diligence as to the adequacy of this disclosure?

19  A    Yes, I did.

20  Q    Can you share your -- or share with Judge Jernigan the

21  Debtor's view as to the adequacy of this disclosure concerning

22  the litigation between Highland and Acis?

23  A    With respect to the litigation between Highland and Acis,

24  or, really, between Acis, Highland, and Highland's principals

25  and Acis's principal, totally inadequate.  The disclosure here

Seery - Direct                    38

1  is very high-level.  And if there were no other litigation

2  going on, it might serve to suffice.  It basically says, In

3  our business, because we invest in distressed loans, there's a

4  lot of litigation around distressed investments, and that's

5  what we have.  And then it says, We've talked with the

6  investor about other things and we're -- we think that's

7  enough.

8  Q    Is there anything in this portion or anywhere in the

9  offering memorandum that you're aware of that disclosed to

10 HarbourVest that in the weeks leading up to the investment

11 Highland was engaged in the fraudulent transfer of assets away

12 from Acis?

13 A    No.  And I apologize, because I think it's -- I've

14 conflated two provisions.  This one only deals with the very

15 high-level nature of the business.  It doesn't give any

16 indication that there's any material litigation going on

17 elsewhere with respect to Acis.

18     I believe there's another provision that says, We -- we

19 have talked to -- oh, here -- I'm sorry.  It is here.

20 Shareholders have had an opportunity to discuss with Highland

21 to their satisfaction all litigation matters against Highland

22 and its affiliates unrelated to its distressed business.

23     That, in my opinion, is wholly inadequate.

24 Q    Okay.

25          MR. MORRIS:  And let's put up -- actually, let's just

000500

Seery - Direct                                    39

1   move on.

2   BY MR. MORRIS:

3   Q    Let's go to the settlement itself.

4        MR. MORRIS:  Can we put back up Demonstrative Exhibit

5   #3?

6   BY MR. MORRIS:

7   Q    Mr. Seery, can you see that?

8   A    Yes, I can.

9   Q    Does this generally describe the net economic recovery of

10  the HarbourVest settlement based on estimated recoveries for

11  general unsecured creditors as of November 2020?

12  A    As of November 2020, it does.  And you alluded to this in

13  your opening, but to be clear, the numbers have shifted.

14  Costs have increased.  The -- so the -- effectively, the

15  numerator, in terms of distributable value that we estimate,

16  is lower.  And settlements, the denominator, have also

17  increased.  So the claims against the estate that have been

18  recognized have increased.  And that, that probably takes it

19  down closer, in our view, to about seventy cents distribution,

20  a number closer to nine to ten million, maybe a little bit

21  less.

22       However, there's also some additional value that we -- we

23  believe we will recover directly.  There are north of $150

24  million of intercompany notes owed by Dondero entities to

25  Highland.  A number of those notes are demand notes, and we've

Seery - Direct                          40

1    already made demand.  We'll be initiating actions next week.

2    So those are -- those value, we believe, we'll recover

3    directly from Mr. Dondero and from related entities.

4        To the extent those related entities don't have value, we

5    feel very strongly about our ability to pierce the veil and

6    reach in to Mr. Dondero.  And then his assets, either his

7    personal assets or the assets that he claims are in trusts.

8        In addition, there are a significant amount of notes that

9    were extended in two -- I believe around 2017, for no

10   consideration.  Those notes were demand notes, I believe, and

11   then extended it 30 years.  So they have 2047 maturities.

12   Those were probably going to have to be subject to fraudulent

13   conveyance type actions or -- or some sort of sale at a very

14   discounted value because third parties wouldn't want long-

15   dated notes with Mr. Dondero as the counterparty for very much

16   money.

17       Those -- they defaulted on some of those parties, so we

18   effectively turned them into demand notes.  We've accelerated,

19   and we'll be bringing actions against those entities next week

20   as well.

21       So I think (garbled) have come up, so I apologize.  One

22   way of saying I think the sixteen and a half is a bit high

23   right now, based upon what we know, but the value is going to

24   be higher than our estimate a couple of weeks ago because we

25   do believe we'll be able to recover on the notes.

1      One additional caveat, just to be fully transparent here.

2   This summary with the 16.8 doesn't include the subordinated

3   piece of this -- of this claim and our resolution.  That --

4   recovery of that piece will be dependent upon the success of

5   litigations.

6      In order for the subordinated piece to get paid, all

7   general unsecured claims in Class -- Classes 7 and 8 will have

8   to be paid in full.  And then -- and then the subordinated

9   class in Class 9, which we believe UBS will have a piece of,

10  and HarbourVest will have a piece of by this settlement, those

11  will be able to recover, and those will be based upon other

12  claims of action against -- primarily against related parties.

13  Q   And then that last point, is that what's reflected in

14  Footnote 3 on this page?

15  A   That's correct, yes.

16  Q   Okay.  And just for the record, there's a reduction in

17  value of $22-1/2 million.  Do you see that?

18  A   Yes.

19  Q   And can you just explain to the Court what that is and how

20  that value was arrived at?

21  A   Yes.  I may be getting slightly ahead of you, Mr. Morris.

22  But to give the Court a reflection of the transaction -- and

23  we can go into the details in a moment -- ultimately, the

24  transaction we structured we think is very fair both

25  economically to the Debtor, but there -- there is some

Seery - Direct                              42

1    complexity to it to satisfy some of HarbourVest's concerns

2    that they be able to effectively rescind the transaction, at

3    least from an optical perspective.  Value was important, but

4    optics were as well.  The twenty-two and a half is the current

5    -- actually, the November value of HCL -- the HarbourVest

6    interests in HCLOF.  And that's based upon Highland's

7    evaluation of those interests.

8        So we do believe that that is a fair value as of that

9    date.  It has not gone done.  It hasn't gone up explosively,

10   either, but it hasn't gone down.  We think that's good, real

11   value.  That value is in the Acis CLOs, the equity in those

12   CLOs, which is 2 through 6, that we -- we will be working with

13   the HCLOF folks to get Mr. Terry to monetize those assets and

14   those longer-dated CLOs.

15       In addition, I think it's 85 percent of the equity in Acis

16   7 -- Acis 7 is managed by Highland -- that is also beyond its

17   reinvestment period.  And in talking to the directors -- and

18   they're new directors, and I'll get to that in a minute, for

19   HCLOF -- they'll seek to push Highland, which is the

20   reorganized Highland, to monetize that asset, with due regard

21   to fair value.

22       In addition, Harbour -- HCLOF owned a significant amount

23   of the preferred or equity pieces, if you will, in the

24   Highland CLO, 1.0 CLOs.  As we've talked about, those are not

25   really CLOs.  Those are effectively closed-end funds with

Seery - Direct                                     43

1  illiquid assets, primarily illiquid assets in them.  We've had

2  some dispute in front of the Court about selling the liquid

3  assets in them, which we can go into it another time.  Those

4  are being liquidated in the market at fair value.

5      But HCLOF also is a significant holder of those preferred

6  shares, and those directors would -- have indicated to me that

7  they would like to see those interests also monetized.

8  Q   All right.  Let's shift gears for a moment to talk about

9  the diligence that the Debtor did before entering into this

10 agreement.  Can you just describe for the Court generally the

11 diligence that was undertaken at your direction?

12 A   Well, when we first received the reply to our objection,

13 we dug into that reply and the specifics in it very

14 aggressively.  So we reviewed all of the underlying documents

15 related to the original transaction.  We discussed with

16 counsel the legal basis for the HarbourVest claims.  We

17 interviewed our own HCMLP employees who were involved in the

18 transaction and tested their recollection, specifically around

19 who dealt with HarbourVest, who had the discussions with

20 HarbourVest, what was disclosed to HarbourVest with respect to

21 the Terry dispute and the Acis litigation.

22     We also had done, as I think the Court is well aware from

23 prior 9019 testimony, extensive work around the transfers and

24 the issues related to Acis.  So we were familiar with their

25 impact on HCLOF.

Seery - Direct                               44

1    We also did extensive work valuing the remaining HCLOF

2    interests to get a good feel of not only how much HarbourVest

3    originally invested, but how much they actually lost in this

4    transaction.  And as I said, their original investment was

5    around, in total, in two tranches, about $80 million, of which

6    they got about $5 million back, and they've lost $22 million.

7    So it -- I mean, remaining with $22 million.  So they've lost,

8    you know, in excess of $50 million.

9    Q    Do you recall whether the Debtor reviewed and analyzed all

10   of the documents that were cited in HarbourVest's response to

11   the Debtor's objection to the HarbourVest proofs of claim?

12   A    Yeah.  I think -- I forget, to be honest, which -- exactly

13   what documents were in there.  But we went through their

14   objection with a fine-toothed comb, not only with respect to

15   the issues related to the Acis case, but also their references

16   to Guernsey law, other U.S. law, any of the documents between

17   the parties.  And obviously, as I mentioned before, the

18   offering memorandum.

19        MR. MORRIS:  Your Honor, I would just note for the

20   record that Debtor's Exhibits I through X are all of the

21   documents that are cited in HarbourVest's response to the

22   Debtor's objection to the HarbourVest proofs of claim, and

23   those are the documents that Mr. Seery just referred to.

24        THE COURT:  All right.

25        MR. MORRIS:  Just, they're in evidence now, and I

Seery - Direct                                    45

1  just wanted the Court to understand why they're in evidence.

2          THE COURT:  Okay.  Thank you.

3          MR. MORRIS:  You're welcome.

4  BY MR. MORRIS:

5  Q    Let's talk about the Debtor and whether or not it had or

6  has any viable defenses.  Did the Debtor form any views as to

7  whether or not it had any defenses to the HarbourVest claims?

8  A    Yes, we did.

9  Q    Can you describe for the Court the defenses that were

10  reviewed and analyzed by the Debtor?

11  A    Yeah.  I think we -- we had very significant defenses.

12  So, first and foremost, with respect to the original proof of

13  claim, as I mentioned earlier, it alluded to the expenses and

14  the overcharge.  And I think with respect to the 15 million of

15  fees that were charged to HCLOF by Highland, we didn't have a

16  lot of defenses to that claim.

17      It's pretty clear, by any fair view of the Acis case, that

18  HCLOF, as the investor in the Acis CLOs and the Highland CLOs,

19  had no real responsibility for fighting with Acis and Josh

20  Terry and shouldn't have been charged those fees.  I don't --

21  I don't think there's a legitimate investor that would

22  actually think that that was an appropriate amount to be

23  charged to a fund.

24      However, the claim was not as broad -- the proof of claim

25  was not as fulsome in terms of discussing and only vaguely

Seery - Direct                              46

1    referred to other damages.  So we did -- we did, as a

2    threshold matter, think about whether we could argue that it

3    was time-barred because they had not met their obligations to

4    fully disclose under the proof of claim.

5        Secondly, we considered the defenses to the overall claim

6    of fraudulent inducement.  Our perspective was that if we

7    could stop the claim of fraudulent inducement, the damages

8    would likely be limited to the 15 and maybe some -- some other

9    damages.  With respect to the 15, again, the problem that we

10   had when we got past -- past motions for summary judgment is

11   the factual predicate for our defense was going to be that we

12   divulged these things to HarbourVest and that they did not

13   reasonably -- it was -- reasonably rely on some failure to

14   divulge because they're a sophisticated investor.

15       The problem with that defense is that our witnesses, which

16   really would have primarily been Mr. Dondero and Mr.

17   Ellington, and one other employee who runs the CLO business,

18   Mr. Covitz, would not be pretty good.  They've been -- two of

19   them have been in front of this Court and they're not viewed

20   favorably and their testimony would be challenged and

21   potentially suspect.

22       So that gave us a real focus on trying to make sure that

23   we could, if we had to litigate, that we would litigate around

24   the fraudulent inducement.

25       As I said, reasonable reliance, what was disclosed, lack

1   of digging into the public record, because you don't have to

2   go far on Google to find "fraud" within two words of

3   "Highland," and the tremendous, you know, litigious nature of

4   Highland.  You know, even at that point, when this investment

5   was made, aside from Mr. Terry's arbitration, which by that

6   point, at least by the time (inaudible) was public, there was,

7   you know, significant public disclosure around the Credit

8   Strat and the litigation, the Crusader litigation, the UBS

9   litigation, the, gosh knows, the Daugherty litigation.

10      So our defense was going to be that you should have

11  figured this out, you're a sophisticated investor, and you

12  should have been able to figure out that there was significant

13  risk that, with respect to Mr. Terry, that Mr. Dondero would

14  not stop litigating and that those costs would put significant

15  risk on the investment.

16      The problem with that, as I mentioned earlier, is that the

17  OM is wholly deficient.  If you have a typical risk factor in

18  the offering memorandum, you would have disclosed that there

19  was a litigation with Mr. Terry, a former partner in the

20  business, and that the Debtor had no intention of settling it.

21  There was no intention of settling.  That litigation would go

22  on.  It could go on for years and it could result in

23  bankruptcy or attachments and other risks to the business, and

24  that the investor should be fully aware that the Offeror does

25  not intend to be involved in any -- or the manager, in any

Seery - Direct                                              48

1   settlement with Mr. Terry, and the fact it undermined the
2   investment.  That wasn't there.
3       But that was our preliminary focus, to try to stop fraud
4   in the inducement.  And then we -- we had specific facts
5   related to that.  You know, once they knew about the
6   bankruptcy in HarbourVest of -- I'm sorry, of Acis,
7   HarbourVest made a second funding, which was there was a -- it
8   was an initial $75 million draw, and then a second, I believe,
9   about a $5 million draw, which was in -- I believe in
10  February.  And they made it without -- without objection, and
11  that was after the commencement of the bankruptcy.
12      In addition, they were -- they were active in the
13  bankruptcy, so the -- some of the things that happened in the
14  bankruptcy, there were many opportunities to settle that case,
15  from our examination, all of which were turned down to -- by
16  Mr. Dondero.  But you don't see HarbourVest pounding the table
17  to settle, either, either with respect to the Oaktree
18  transaction or any other transaction.
19      Now, HarbourVest's defense to that is, well, we were
20  taking advice and all of our information from Highland, and we
21  were getting that information directly from senior folks at
22  Highland why -- what the value was and why we shouldn't do
23  those things.  We thought that that would mitigate some of the
24  arguments that -- some of the damages that we might have, I'm
25  sorry, if we -- if we lost.

Seery - Direct                    49

1     But the focus at that point, you know, our legal strategy,

2  was can we stop HarbourVest at the very forefront to say,

3  You've got to come into the factual realm and get out of the

4  fraud in the inducement realm.  And then the defenses and the

5  exculpations and the liability limitations in the documents

6  would also come into play.

7     So that -- those are some of the defenses that we focused

8  on and our analytical thinking around them.

9  Q   So, if the Debtor had viable defenses, why is it settling?

10 A   Well, this is a significant claim.  And we -- we looked at

11 it with respect to both the impact on the case, but, really,

12 the merits of the claim.

13    As I said, there's really little dispute that the legal

14 fees should not have been charged to HarbourVest.  We think

15 based upon the testimony in Acis, the suspect credibility of

16 those who would have been our witnesses, and the experience in

17 Acis that the Court has had in terms of the completely hell-

18 bent on litigation, it would be hard for anyone to justifiably

19 defend those fees being charged.  So, as an initial matter, we

20 had exposure there.

21    In addition, if HarbourVest got by our defense of -- was

22 able, for example, to claim fraud in the inducement, then we

23 were open to significant damages.

24    We really didn't put much value, frankly, on the RICO part

25 of it.  We think that that's waved around often to show treble

Seery - Direct                    50

1  damages.  Although in this case certainly somebody could lay

2  out the predicate acts and put forth a RICO-type argument, we

3  just didn't think that that had real merit in this commercial

4  dispute, even with a fraud claim.

5      But even without the trebling of the damages, there's no

6  dispute that HarbourVest lost more than $50 million in this

7  investment.  You know, we -- we thought about that risk as

8  well.

9      In addition, because the case would really be fact-based,

10 even if we had a high degree of confidence based upon our

11 discussions with our employees and the factual testimony, it

12 was going to be expensive to litigate this case, and time-

13 consuming.

14     And so we looked at the economic value, the potential

15 risks, and the actual value that we were giving up, and found

16 this to be an extremely, extremely reasonable settlement.

17     Importantly, and I think what drove it, you -- one of --

18 one of the things that drove it is another one of our defenses

19 on why, notwithstanding their -- what they held out as

20 meritorious claims, I don't think HarbourVest really wanted to

21 publicly litigate this claim.  And we were aggressive in our

22 discussions with HarbourVest of how we would litigate it,

23 which would be quite publicly.

24     Now, that may or may not be fair, but that does put risk

25 on the counterparty.  And so I think that helped drive the

Seery - Direct                    51

1  settlement.

2      In addition, the structure of the settlement we think is

3  extremely favorable to the Debtor and to the estate because,

4  rather than taking the full claim and putting it into a senior

5  unsecured position, we have bifurcated it.  We did think about

6  whether this was a claim that could be subordinated under 510.

7  There won't be any arguments, I would be surprised if there's

8  arguments today that we didn't actually give to the Highland

9  employees who have given them to Mr. Dondero's respective

10 counsel.

11     We did structure it in a way that we thought gave

12 HarbourVest the opportunity to effectively claim a rescission,

13 even though that's not really what it is, and then be able to

14 claim that their recovery is based on the bankruptcy, which it

15 is, but not really dilute all the other stakeholders in the

16 case.

17     (Pause.)

18         THE COURT:  Mr. Morris?  Anything else?

19         MR. MORRIS:  I can hear you, Your Honor.

20         THE COURT:  Okay.

21         MR. MORRIS:  I can hear you.

22         THE COURT:  Okay.  Now can you --

23         MR. MORRIS:  I got cut off from Mr. Seery for a

24 moment.

25         THE COURT:  Okay.

Seery - Direct                        52

1   BY MR. MORRIS:

2   Q    Okay.  I appreciate that.  Are you done giving the

3   Debtor's basis for entering into this settlement, Mr. Seery,

4   if you can hear me?

5   A    I think so, but I think as the Court has probably seen, I

6   can go on.

7   Q    Yes.

8   A    So I will try to be -- I'll try to be more concise.  But

9   this was a -- this was a difficult settlement.  We felt good

10  about our defenses.  Felt that we could -- we could try them.

11  But it would be extremely expensive, time-consuming, and there

12  would be a lot of risk.  And settling at a level which we

13  believe is actually below the damages that were clearly caused

14  only by the fees was a -- was a -- is a -- is a very

15  reasonable settlement.

16  Q    Okay.  Let's just talk about the process by which we got

17  to the settlement.  Do you recall generally when the

18  settlement negotiations have -- were commenced?

19  A    I believe it was -- was late summer, early -- early fall.

20  Q    Okay.  Before I move on, I just want to go back to the

21  Acis matter that you were talking about, one last issue.  Do

22  you know how, if at all, the injunction that was entered in

23  the Acis bankruptcy impacted or related to the HarbourVest

24  claims?

25  A    Yeah.  I -- yes, I do.  And I believe it -- it did.  I

Seery - Direct                                        53

1    think there's an argument, and we analyzed it thoroughly, that
2    the injunction effectively caused a lot of the damages.
3    Because if you look at the values of the equity that
4    HarbourVest had, the -- and HCLOF had in the CLOs, it went
5    down dramatically after the Trustee in the Acis case took over
6    and then subsequently, when the case was reorganized and Mr.
7    Terry took over, you know, with Brigade as the sub-advisor.
8        Now, that would -- you know, we would -- we could
9    certainly attempt to throw, in our defense, the causation at
10   Mr. Terry's feet or at Mr. Phelan's feet.  HarbourVest's
11   retort is that none of this would have occurred but for the
12   burn-it-down litigation that Mr. Dondero engaged in with
13   Highland.
14       In addition, in Mr. Terry's defense, you know, he did try
15   multiple times with HCLOF, tried to petition, if you will, the
16   HCLOF entity to -- and directors, former directors, to reset
17   the CLOs to make them more economically viable, based upon the
18   current level of asset returns versus the debt costs in the
19   CLOs.  And that was rejected by the HCLOF and the Debtor as
20   the controlling party of HCLOF.  So, we thought about those
21   risks.
22       You know, similarly, the economic values in Acis 7 went
23   down pretty significantly from that date as well.  So I think
24   there's -- there are some defenses, but that's really Mr.
25   Terry's issue, not our issue.  So we thought about those

Seery - Direct                                      54

1  issues, we analyzed them, and we certainly did all the work

2  around month-to-month reductions in NAVs and how different

3  events in the Acis case might have -- might have caused those

4  and was that some sort of break from the original

5  transgression that HarbourVest claims, which was the

6  fraudulent inducement.

7  Q    Do you recall that in November HarbourVest's motion under

8  3018 was scheduled to be heard?

9  A    Yes.

10 Q    And can you just tell the Court your understanding of what

11 the 3018 motion was about?

12 A    Well, the 3018 motion was going to be on voting.  And we

13 took the view that it really was not -- it shouldn't have been

14 that big an issue and HarbourVest should have been content

15 with just taking their actual losses of roughly a $50-$60

16 million claim for voting purposes and then we would move on.

17      HarbourVest was very insistent that they have a $300

18 million claim, because they took the position -- and with

19 extensive documentation; not only the pleadings they filed,

20 but also detailed decks that were prepared by their counsel,

21 which they had presented to us on the merits of their claim --

22 that they were going to litigate for -- the 3018 and for the

23 full $300 million value.

24      And that became the genesis, if you will, of the

25 negotiations to settle.

Seery - Direct                           55

1    So, we started talking about the 3018.  It was very

2   contentious.  My apologies to Ms. Weisgerber and her counsel,

3   her partners, because it was a significant and contentious

4   negotiating call.  But the reasons for that I think were that

5   -- their insistence on litigating the 3018 and our view that

6   this was just, you know, another -- another of a series of

7   delays and costs in this case that we really were hoping to

8   avoid.

9    That led to Mr. Pugatch and I stepping away from counsel,

10   no offense to counsel, you know, ours and his, to begin

11   negotiations around the potential for a settlement.  First, it

12   started with a 3018, and then, you know, argued that we would,

13   if we got past the 3018, we were going to litigate this,

14   because we effectively had -- thought we could get everyone

15   else done at -- in and around that time.  And I think we were

16   also probably a little bit optimistic about UBS at that time

17   and the mediation, which subsequently we have settled.  But

18   that was the genesis of those settlements.

19   Q    And how did the structure, how did the Debtor and

20   HarbourVest derive at the structure whereby there is a general

21   unsecured claim, there is a subordinated piece, and there's

22   the takeback of the HCLOF interest?

23   A    Well, as I outlined, we -- we aggressively set forth our

24   various defenses.  Their position was that they -- they should

25   never have been in this transaction before.  And they --

000517

1  HarbourVest is, in essence, a fund of funds, and they have

2  investors, and it certainly wouldn't be their, I'm sure, the

3  best-performing asset in their portfolio, to have made this

4  investment and lost $50 million over this period of time.  So

5  they felt strongly that they should never have been in this

6  investment, and but for the failure to disclose and the

7  improper disclosures, they would not have been in this

8  investment.

9       So, optically, getting out of it was important to them,

10  and that led to our idea and construction of a subordinated

11  claim and the transfer of the HCLOF interests to the estate.

12      Importantly, the HCLOF interests, as I mentioned, are --

13  the investments are in the Acis CLOs controlled by Acis and

14  Mr. Terry.  The reorganized Acis.  As well as the 1.0 CLOs and

15  the Acis 7.

16      So we were keenly focused on, if we were going to get that

17  interest, would we then have the majority control in HCLOF,

18  which we will, and would we be able to drive the recoveries,

19  as opposed to what Highland typically does in these

20  investments is use other people's money, drive down the value,

21  and then try to buy back the interest on the cheap.

22  Q   Just in terms of timing, because I think there was a

23  suggestion in one of the openings that there was something

24  untoward about the timing here:  At the time the liquidation

25  analysis was prepared on November 24th, had the Debtor reached

Seery - Direct                          57

1  any agreement in principle with HarbourVest?

2  A    If we had, it would have been reflected, so I don't -- I

3  don't think we were agreed by then.  I don't recall the

4  specific dates, but if we had, it would have -- it would have

5  been reflected.

6  Q    If I can refresh your recollection that the motion was

7  filed on December 24th, does that help form your understanding

8  or refresh your recollection that there was no agreement in

9  principle on November 24th?

10  A    Yeah.  Well, I'm quite sure there was no agreement in

11  principle or we would have reflected it minimally by a

12  footnote.  There's -- there's no chance.  It's a material

13  reduction in the claims pool that we were previously telling

14  people that, at least for purposes of distribution, like UBS

15  and a couple others we said we thought we would get to zero

16  on.  So we didn't calculate in that amount.  So I'm quite sure

17  we didn't have a deal when we filed the disclosure statement.

18       In terms of the timing, anyone who's done this business

19  for any degree of time knows that the crucible of bankruptcy

20  brings people to the settlement when they see something

21  happening in the case, and not before.  I think HarbourVest

22  looked at our -- this is my supposition -- HarbourVest looked

23  at our plan, our ability to get this done, our settlement with

24  Redeemer, our settlement with Mr. Terry and Acis, and saw that

25  this plan was coming together, and if they didn't think about

Seery - Direct                           58

1   the settlement, they were going to think about not only the

2   risks that we laid forth for them with respect our defenses,

3   but also the opportunity to litigate with the Claimant Trustee

4   over a long period of time, which couldn't have been

5   particularly appetizing.

6   Q    Can you describe for the Court the role played by the

7   independent board of Strand, the general partner of the

8   Debtor, in analyzing and participating in the approval

9   process?

10  A    Yes.  I think, as the Court is aware and I've testified

11  before, Mr. Russell Nelms and Mr. John Dubel are fellow

12  independent directors with me, appointed pursuant to the Court

13  order.  They are kept abreast of every detail, and -- along

14  the way, not just in a summary form at the end.  We have

15  reviewed and analyzed collectively each of the issues.  Mr.

16  Dubel has extensive experience in these types of litigation

17  matters.  Obviously, Mr. Nelms, from his -- both his practice

18  and his time on the bench, has a keen insight into how to

19  resolve and what the risks and benefits are from settling

20  litigation.  So I consult them every step of the way.

21  Q    And as part of this process, did the Debtor reach out to

22  the directors of HCLOF?

23  A    Yes, we did.  So, we reached out and we've had several

24  conversations on video chats with the directors.  The

25  directors of HCLOF are two new gentlemen, Mr. Richard Boleat

Seery - Direct                              59

1   and Mr. Dicky Burwood.  They are extremely professional.  They

2   are exceptionally well-informed.  They are truly careful, and

3   I would say very experienced professional not only directors,

4   but experienced in -- in these matters, both in respect of

5   structured finance as well as these types of vehicles and

6   litigation.

7       They were appointed by the old directors, Scott and

8   Bestwick, and they have been in control.  They have outside

9   counsel, which is King & Spalding in the U.S.  They have

10  Guernsey counsel.  They have accountants and professional

11  advisors, and are being, in my opinion, exceptionally careful.

12  I've got -- very quickly developed a lot of respect for them,

13  and we consulted with them on this settlement and how it would

14  work.

15      They've been very clear that they represent HCLOF and they

16  work for the benefit of the equity, whomever owns it, and

17  taking a view that they would like to see these assets

18  monetized swiftly, with due regard to value, for the benefit

19  of the equity.

20  Q   And is it your understanding that the directors of HCLOF

21  approved of this transaction?

22  A   They -- I don't know that their approval was required.

23  It's really -- there are a number of hoops to jump through

24  under the documentation, including opinion of outside counsel

25  that we received from WilmerHale in terms of the effectiveness

1  of the transfer under the documents.  We had a negotiation

2  with -- with those directors, and making sure that we did

3  everything correct -- correctly, excuse me -- with respect to

4  the requirements for the transfer under the documents.  And

5  they've indicated their support and acknowledgement that we're

6  doing it correctly.

7      I don't know if it's fair to say they approved it.  I'd

8  just have to go check the documents.  But they certainly

9  support it.  And I think they generally support our position

10  with respect to how to move forward with the assets.

11  Q   I appreciate that.  I guess I meant approval with a small

12  a and not a capital A.

13      You mentioned WilmerHale.  Who do they represent in all of

14  this?

15  A   WilmerHale is the Debtor's outside corporate counsel, in

16  particular with respect to the fund issues that we don't

17  handle in-house.  We have significant support for fund issues

18  from the expertise of Mr. Surgent, who's been the CCO, and he

19  is also a lawyer, with respect to, you know, some of the

20  difficult fund issues that Highland has.  But when we use

21  outside counsel, we use WilmerHale for that, and they've been

22  -- they've been exceptional.

23  Q   Okay.  Just the last two points that were made in Mr.

24  Dondero's objection, I believe.  Did the Debtor overpay in

25  this settlement in order to gain the support of HarbourVest in

Seery - Direct                    61

1  connection with its -- with the Debtor's attempt to get its

2  plan confirmed?

3  A    Not in any way.  My -- I believe the settlement is

4  extremely reasonable.  As I testified, it's -- it's less than

5  the -- the actual value going out, depending on unless there's

6  successful litigation, and there well could be, is less than

7  on a pro forma basis the fees that were taken and charged to

8  HCLOF.  We didn't do this for votes.  We will have Class 2,

9  Class 7, Class 8, and Class 9.  So I don't think that's a --

10 there's no vote purchasing, I think you called it.  No, not at

11 all.

12 Q    Yeah.  Well, on that topic, I think the phrase that was

13 used was gerrymandering.  Are you aware of the argument that's

14 been made that the subordinated claim was dropped in there in

15 order to gerrymander a positive vote for the impaired class of

16 Class 9, I believe?

17 A    In a word, I would say that's preposterous.  The -- as I

18 said, we have a number of classes that will vote for the plan.

19 The plan is -- the plan is a monetization plan.  And if -- if

20 the creditors determine that they don't want to pursue this

21 plan, we'll go forward with another -- we'll try to get

22 another plan.  We tried to have a grand bargain plan.  We

23 tried to have a pot plan, as I've testified previously.  I'm

24 quite certain that I've done more work on that than anyone

25 else, including Mr. Dondero and anybody who works for him.

Seery - Direct                                      62

1  And he hasn't been willing to do that.

2      This is a -- this is a plan that's come together.  We

3  think it's going to be in the best interests of the estate.

4  That'll be confirmation next week.  Or two weeks, I guess.

5  But I don't see how this is any way related -- this settlement

6  is not any way related to the voting on that -- on that -- on

7  that plan.

8  Q   Just to put the finest point on it, is the Debtor relying

9  on Class 9 to be the impaired consenting class?

10 A   No.  I think -- I think what I've -- as I said, I believe

11 we already have the votes in Class -- I think it's 2 or 3, 7,

12 8, and -- and 9 will vote in favor as well.  So that won't be

13 an issue.

14         MR. MORRIS:  Your Honor, I have no further questions

15 of Mr. Seery.

16         THE COURT:  All right.  Pass the witness.  I'll ask

17 HarbourVest counsel first:  Do you have any questions of Mr.

18 Seery?

19         MS. WEISGERBER:  No, Your Honor.

20         THE COURT:  All right.  Thank you.

21     What about cross-examination?  Mr. Dondero's counsel?

22                    CROSS-EXAMINATION

23 BY MR. WILSON:

24 Q   Mr. Seery, how are you doing today?

25 A   I'm well, thank you.

Seery - Cross                              63

1  Q   I'm John Wilson, and I represent Jim Dondero.  I have a
2  few questions for you today.
3      Now, the HarbourVest proof of claims were filed on April
4  8th, 2020; is that your recollection?
5  A   I believe that's correct.  I don't recall the specific
6  date.
7  Q   Okay.  And do you know when you first became aware of the
8  HarbourVest claims?
9  A   I believe it was early in the summer when we filed the
10 omnibus objection.  It may have been in late spring, shortly
11 after that.  I don't recall the specific date of the filing.
12 Q   And before the time of the filing of the omnibus
13 objection, did Highland educate itself regarding the
14 HarbourVest proof of claims?
15 A   I'm sorry, could you say that again?  I didn't quite
16 understand it.
17 Q   Before the omnibus objection was filed, did HarbourVest --
18 I'm sorry, did Highland educate itself on the HarbourVest
19 proof of claims?
20 A   Not especially, no.
21 Q   Okay.  And -- but at some point, Highland did investigate
22 those proofs of claim, correct?
23 A   That's correct.
24 Q   And when would you -- when do you recall that that
25 investigation began?

Seery - Cross                          64

1   A    I don't recall the date, but the triggering event was

2   HarbourVest's response to our omnibus objection.

3   Q    Okay.  And that would have been filed September 11th of

4   2020?

5   A    I'll take your representation.  I don't -- I don't recall

6   the specific date.

7   Q    Okay.  And so when you began to investigate the

8   HarbourVest claims, what was your initial reaction?

9   A    My initial reaction was that the -- the larger claims that

10  they were asserting -- the fraud in the inducement, the RICO

11  -- that those claims were, in my view, attorney-made and that

12  when we dug in and did the work, we saw that HarbourVest

13  clearly lost north of $50 million on the investment.  We had

14  just started to uncover the fee issue and saw the risk we had

15  there.

16      But I thought the bulk of those claims were attorney-made.

17  Clever, but attorney-made, as opposed to what I would think

18  are more legitimate.  And so we started to develop our

19  defenses around that.

20  Q    And was your initial reaction that the HarbourVest claims

21  were largely worthless?

22  A    I think with respect to the claim around the fees, I

23  believed there was significant risk.  With respect to the

24  other claims, I thought our defenses would make them

25  worthless, yes.

Seery - Cross                                    65

1   Q    And did you ever represent to any party that the

2   HarbourVest claim was worth, at most, $5 million?

3   A    I think I represented often, including to HarbourVest,

4   that it was worth nothing.  I don't recall if I specifically

5   said $5 million.  $5 million would have been a nominal amount

6   to -- which is litigation costs.  So it may -- it may have

7   been in my models that I put in that as a settlement amount,

8   but I -- I thought that there were valid and good defenses to

9   those larger claims.

10  Q    And you recognize that HarbourVest was a large,

11  sophisticated investor, correct?

12  A    Yes.  I think they manage north of -- right around a

13  hundred billion dollars.

14  Q    And you recognize that HarbourVest routinely structured

15  complex customized investments, correct?

16  A    I believe that -- I don't know the intricate part of their

17  businesses, but as a fund of funds who does creative

18  investments, I think that they do do quite a bit of that.

19  This, I believe, was their first investment in the CLO space.

20  Q    And it was not -- or I should say, you did not believe

21  that HarbourVest was simply a passive investor in HCLOF,

22  correct?

23  A    I don't think that that's true, no.

24  Q    You don't -- you don't believe that you denied their claim

25  to be a passive investor?

Seery - Cross                           66

1  A    Oh, I think -- I'm sure that in defense of their claims I

2  would argue that they were -- they were more than a passive

3  investor.  But it was pretty clear when you look at the

4  structure of what they invested that there was an intent that

5  they be passive on their part.  They didn't take a majority

6  interest.

7       In fact, Highland made it clear in the structure of the

8  deal that they couldn't -- it would be hard for them to get a

9  majority interest because Highland entities would control that

10 and Dondero-controlled entities or individuals would control

11 the majority.

12      I think that they -- they had hoped to be a passive

13 investor.

14 Q    But was it not your position that HarbourVest was actually

15 an active, involved investor?

16 A    I think our defense was going to be that they knew exactly

17 what was going on, that they participated, that they were

18 active, and that, indeed, that they were in and around some of

19 the subsequent issues in the Acis case.

20 Q    And you understood that HarbourVest played a material role

21 in the various outcomes in the Acis bankruptcy case, correct?

22 A    I don't believe that to be correct, no.

23 Q    Have you ever made that representation to anyone before?

24 A    Not -- not that I recall.

25 Q    Well, do you recall giving statements to a reporter named

1  Syed Khaderi?

2  A    I've never spoken to a reporter named Syed Khaderi in my

3  life.

4  Q    Well, did you participate in the preparation of statements

5  to be given to Syed Khaderi?

6  A    I've never heard of Syed Khaderi, nor have I participated

7  in any preparation of statements.  I don't know who that is.

8           MR. WILSON:  All right.  I'm going to have Bryan

9  Assink put on the screen a document.

10     And Bryan, can you go to Page 7?  Bottom of -- the top of

11 Page 7.  Well, actually, before you do that, go to the very

12 top of the document.

13 BY MR. WILSON:

14 Q    Now, Mr. Seery, are you familiar with Lucy Bannon?

15 A    Yes.

16 Q    And who is Lucy Bannon?

17 A    She is the Highland public relations person.

18           MR. WILSON:  Okay.  Now go back to Page 7.

19 BY MR. WILSON:

20 Q    Now, do you -- do you see on your screen an email of

21 September 14th from Syed Khaderi that says, Hi, Lucy, how are

22 you?

23 A    Yes.

24 Q    Have you seen this email before?

25 A    Not that I recall, no.

Seery - Cross                            68

1   Q    All right.  It continues on that, I saw the filing on

2   Friday about HarbourVest claims against Highland for a CLO

3   investment, and I'm looking to put out a report tomorrow

4   morning London time.  Ahead of that, I wanted to check if

5   Highland would like to comment on the matter.

6            MR. MORRIS:  Your Honor, this is -- the Debtor

7   respectfully objects.  A, this document is not in evidence.

8   B, it's rank hearsay.

9            THE COURT:  Response, Mr. Wilson?

10           MR. WILSON:  Your Honor, I am attempting to

11  authenticate this document, but I'm using it in rebuttal to

12  the testimony that Mr. Seery just offered.

13           THE COURT:  All right.  I'll allow it.  Overrule the

14  objection.

15           MR. WILSON:  All right.  Thank you, Your Honor.

16  BY MR. WILSON:

17  Q    All right.  Now, if we -- and oh, that September 14th

18  date, that was three days after the September 11th date that

19  we discussed was the date that HarbourVest filed its response

20  to the omnibus objection, correct?

21  A    Yes.  If that's the date that they filed it, then I -- if

22  you're representing that, I concede that the 14th is three

23  days after the 11th.

24  Q    All right.  And if you go back to the first page of this,

25  it looks like, on the following day, Lucy Bannon sends an

Seery - Cross                69

1   email to you, and is that your email address,

2   jpseeryjr@gmail.com?

3   A    That's correct, yes.

4   Q    And do you recall receiving this email from Lucy Bannon?

5             MR. MORRIS:  Your Honor, I renew my objection that

6   this is hearsay.  He's not rebutting anything that Mr. Seery

7   testified to.  He testified that he'd never heard of the

8   gentleman at the bottom of the document.  There's nothing in

9   this document that rebuts Mr. Seery's testimony at all.

10            THE COURT:  Response, Mr. Wilson?

11            MR. WILSON:  Well, I'm not -- I'm not trying to rebut

12  his statement that he hadn't -- that he hadn't heard of Syed

13  Khaderi.  My rebuttal is attempted to -- attempting to show

14  that he has made various statements that he denied.

15            THE COURT:  I'll overrule the objection.

16  BY MR. WILSON:

17  Q    All right.  So, back to this exhibit, Mr. Seery.  You

18  recall receiving this email from Lucy Bannon on Tuesday,

19  September 15, 2020?

20  A    Not specifically.  But to be clear, I recall talking to

21  Lucy Bannon about the HCMLP dispute with HarbourVest.

22  Q    Okay.  And --

23            MR. WILSON:  Bryan, can you go down to the next page?

24  Scroll down to where -- the James Seery email.

25  BY MR. WILSON:

Seery - Cross                              70

1  Q    Do you see this email on your screen that's dated

2  September 15, 2020 at 10:33 p.m.?

3  A    Yes, I do.

4  Q    And do you recall sending this email to Lucy?

5  A    Not specifically, no.

6  Q    Well, do you deny that you sent this email to Lucy?

7  A    It appears to be my email.

8          MR. WILSON:  Your Honor, we would move to admit this

9  document into evidence as Dondero Exhibit Letter N.

10          THE COURT:  Any objections?

11          MR. MORRIS:  I would consent to the admission of Mr.

12  Seery's email, but the balance of it ought to be excluded as

13  hearsay.

14          THE COURT:  What about that?

15          MR. WILSON:  Well, Your Honor, I think that this

16  document -- and I'll get into this in a little more detail in

17  a second -- but I think this document is a combination of the

18  work product of Lucy Bannon and Mr. Seery in preparing a

19  response for the reporter who requested comment from Highland.

20          THE COURT:  Okay.  I --

21          MR. MORRIS:  Your Honor, um, --

22          THE COURT:  Go ahead.

23          MR. MORRIS:  I just -- I do question how they got

24  this document, but that's for another day.  That's number one.

25  Number two, in addition to the hearsay argument, I just --

Seery - Cross                    71

1  relevance grounds.

2         THE COURT:  Okay.  I'll allow the portion that is the

3  communication of Seery, that portion of Exhibit N.  All right?

4         MR. WILSON:  Okay.  With due -- thank you, Your

5  Honor.  With due respect, I -- to use that portion, I need to

6  refer to the portion below it, because he says, Good to submit

7  with your final edit/revisions.  And so we need to know what

8  those final edit/revisions are, which are contained in the

9  email directly below that on the document that was four

10  minutes earlier in time.

11         THE COURT:  All right.  Fair enough.  That'll be

12  allowed.

13         MR. WILSON:  All right.  Thank you, Your Honor.

14     (James Dondero's Exhibit N is received into evidence as

15  specified.)

16         MR. WILSON:  So, Bryan, now can you scroll to the

17  next page?  Oh, actually, let's just -- let's just stop at the

18  top -- at the bottom of the page.  What's this statement?

19  BY MR. WILSON:

20  Q   So, to be clear, Mr. Seery, when -- in response to Mr.

21  Khaderi's request for information and comment, you prepared

22  actually two responses, and one of those was a statement on

23  the record attributed to a spokesperson for HCMLP or something

24  along those lines.  And then --

25         MR. WILSON:  Can you scroll down to that next page?

Seery - Cross                                72

1  BY MR. WILSON:

2  Q    And this says -- I think part of this got cut off for some

3  reason, but it looks like the official statement is in

4  quotation marks.  It says, "We dispute the allegations made in

5  the filing and believe the underlying claims are invalid and

6  will be found to be without merit.  Our focus continues to be

7  treating all valid claims in a transparent, orderly, and

8  equitable manner, and vigorously disputing meritless in the

9  court.  That focus will assure that HCMLP's reorganization

10 process -- progress is towards an efficient and equitable

11 resolution."

12     And then below that there's another section of this email

13 that says, Background/Clarification, Not for Attribution.  And

14 do you know the purpose of this second section of the

15 response?

16 A    Do I know the purpose of that?  Yes.

17 Q    And what would that purpose be?

18 A    Ms. Bannon was speaking on background to reporters.  As I

19 said earlier, I've -- I never heard of the gentleman from

20 London.  If he's at the bottom of the email, I didn't pay any

21 mind, never heard of him.  Nor have I heard it since.  Ms.

22 Bannon didn't ever reference the specific person.

23     But she is the public relations person.  So, as I

24 testified earlier, she does communicate with the press.  And

25 as I previously testified when Mr. Morris questioned me, one

Seery - Cross                          73

1  of our tactics and our defenses for HarbourVest was going to

2  be that we were going to be very public and aggressive about

3  the investment and it would have a negative impact or negative

4  perspective for viewers, in our opinion, about HarbourVest's

5  investment.

6  Q    All right.  Well, look with me in the middle of that

7  paragraph right after the closed parenthetical, where it says,

8  "But it's important to note the background of HarbourVest's

9  active and deep involvement in the investment of which it now

10 complains."

11     And so it was your position that HarbourVest had an active

12 and deep involvement in the investment, correct?

13 A    No.  I don't think that's correct.  Ms. Bannon prepared

14 the statement, it was a litigation defense on background, and

15 that's our -- that was our position for this purpose.  It was

16 not my view that they were active and deeply involved.  They

17 were certainly involved.  There's no doubt about it.  But they

18 got all their information, in our estimation and our research,

19 from Highland.

20 Q    But in any event, you would agree with me that four

21 minutes after receiving this email, you approved this

22 statement to go out to the reporter, correct?

23 A    No, that's not correct.  That's -- this portion is on

24 background.  That statement doesn't go out.  The previous

25 statement was the official statement.  This is the background

Seery - Cross                                  74

1  discussion that she would have.  So, no, she was not

2  authorized in any way whatsoever to send that out.  She was

3  authorized to have conversations with those general facts.

4            MR. WILSON:  Okay.  Bryan, go to the top, or the

5  bottom of the page immediately preceding that.  That's it.

6  Yes, that's it right there.

7  BY MR. WILSON:

8  Q   Now, you'll see that this email from Lucy Bannon on

9  September 15, 2020 at 10:29 p.m. starts off, "Jim, let me know

10  what you think of the below.  And, again, the first would be

11  on the record and the second will be sent for information

12  purposes to ensure accuracy, not for attribution."

13       So the intent was that this -- that this entire statement

14  be sent to the reporter, correct?

15  A   I don't believe that's correct.  I think when she goes on

16  background she doesn't send them a written doc.  It's got to

17  be clear to the reporter, at least my understanding is that

18  what on background means -- I've been involved with this

19  before -- is that typically that's done orally.  I don't know

20  if she's done it in a written statement before.  I have never

21  seen that done in a written statement before.  You give the

22  official statement and then you walk the reporter through your

23  other views on background.  And you're not quoted.  And it's

24  usually attributed to a source with knowledge.

25  Q   Okay.  We'll come back to that in a minute.  The next

Seery - Cross                          75

1   sentence after the one I just read to you --
2            MR. WILSON:  Go back to where we were on the
3   background.
4   BY MR. WILSON:
5   Q   Now, we just read you the sentence that starts with, "Then
6   it's important."  The following sentence says, "HarbourVest
7   was not simply invested in HCLOF as an ignorant,
8   unsophisticated, passive investor, but was an active and
9   informed participant in the inception of its investment
10  through all of the Acis bankruptcy proceedings, and
11  HarbourVest played a material role in various outcomes related
12  to that case and its impact on HCLOF."
13        And is it -- did you not just tell me before we
14  investigated this document that HarbourVest did not play a
15  material role in the various outcomes of the Acis bankruptcy?
16  A   I don't know exactly what I said, but I think that's
17  correct, after we'd done the research on it, yeah.
18  Q   But you took the position in this email that you approved
19  to go out to a reporter that says that -- that HarbourVest was
20  an active and informed participant in the inception of -- of
21  its investment through all of the Acis bankruptcy proceedings
22  and played a material role in various outcomes related to that
23  case and its impact on HCLOF.  Can we agree with that?
24  A   Yes.
25  Q   And then the final sentence of this paragraph says that,

Seery - Cross                                    76

1   We believe that neither the facts nor the law support

2   HarbourVest's, quote, We-were-too-lazy-to-know allegations.

3       Whose words were those, "We-were-too-lazy-to-know

4   allegations"?

5   A    I don't recall.  They may be mine.  It's aggressive the

6   way I am, so that -- that may well be the case.

7           MR. WILSON:  All right.  Go -- go down to the next

8   page.

9   BY MR. WILSON:

10  Q    And with respect your comment that that second paragraph

11  would not have gone to the reporter, look at this email in the

12  middle of the page from Lucy Bannon to Syed Khaderi, September

13  16, 2020, at 1:51 a.m.  And --

14          MR. MORRIS:  Your Honor, this I will object to as

15  hearsay.  There is no witness here to testify to anything on

16  this document.

17          THE COURT:  All right.  How about that?

18          MR. WILSON:  Well, it's -- well, scroll up just a

19  little bit.  This email at the top of the page is three

20  minutes after the one in the middle of the page, where Lucy

21  Bannon is forwarding this to James Seery, saying, See below

22  for responses sent to *Creditflux*.  Will follow up with the

23  story when it runs or with any other updates.

24          MR. MORRIS:  Your Honor, these --

25          MR. WILSON:  So I think this --

Seery - Cross                    77

1          MR. MORRIS:  These documents don't appear on the

2    witness list.  They're not being offered to impeach anything.

3    They're just -- he's taking discovery as we sit here.

4          MR. WILSON:  Your Honor, in response, I'm simply

5    trying to rebut the statements that Mr. Seery made.  In fact,

6    he told me just a minute ago that that second paragraph would

7    not have gone out to the reporter.  However, this email from

8    Lucy Bannon to Syed Khaderi directly rebuts that statement.

9          THE COURT:  But your whole purpose in this line of

10   questioning, with an undisclosed document, is to rebut the

11   earlier testimony he gave before you even put this exhibit in

12   front of him.

13         MR. WILSON:  I'm trying to rebut multiple statements

14   that Mr. Seery has made today, and I think it -- you know, if

15   he's going to testify that this information did not go out to

16   a reporter, I think I'm allowed to rebut that to demonstrate

17   that it did.

18         THE COURT:  All right.  Why didn't you disclose this

19   in advance?  It's feeling less and less like an impeachment

20   document the more we go through it.

21         MR. WILSON:  Your Honor, I did not -- I did not

22   actually have this document at the time we filed our witness

23   and exhibit list, but I would also say that I didn't have any

24   purpose to use it if I didn't need it for rebuttal.

25         THE COURT:  Okay.  First off, you're supposed to

Seery - Cross                          78

1  disclose all exhibits you anticipate using except those for

2  purposes of impeachment.  Okay?  Not rebuttal, to be

3  technical.

4     So, if you didn't disclose this exhibit, the only way you

5  can use it, subject to other possible objections, is if you're

6  impeaching a statement.  And I'm just saying I think we're

7  going beyond trying to impeach the original statement and now

8  we're trying to impeach statements he's made after seeing

9  portions of the document.

10    What did you mean, you didn't have this document in time

11  to disclose it?

12          MR. WILSON:  Well, I actually just received this

13  document this morning, Your Honor.

14          THE COURT:  Where did you receive it from?

15          MR. MORRIS:  From who?

16          MR. WILSON:  I -- I honestly do not know the source

17  of this document, although it was provided to me by my client.

18          MR. MORRIS:  Your client being Mr. Dondero?

19          THE COURT:  Could you answer that, Mr. Wilson?

20          MR. WILSON:  Yes, that's -- yes, that's correct.

21          THE COURT:  All right.  I will -- that's --

22          MR. MORRIS:  Your Honor, I'd like to --

23          THE COURT:  That's a different can of worms.  But for

24  now, I sustain the objection.  You're done questioning on this

25  document.

Seery - Cross                                    79

1          MR. WILSON:  That's fine, Your Honor.  I can move on.

2     BY MR. WILSON:

3     Q    Now, Mr. Seery, you would agree with me that whether or

4     not HarbourVest played an active role in the Acis bankruptcy,

5     it was kept apprised of the -- of the ongoings in the

6     bankruptcy?  (Pause.)  I'm sorry.  Could you hear that?

7     A    Yes.  My understanding is that -- that they were.

8     Q    And in fact, did Highland have weekly conference calls

9     with HarbourVest during the Acis bankruptcy to discuss what

10    was going on in the bankruptcy?

11    A    I don't know if they were weekly.  I've been told that

12    they had regular calls updating HarbourVest, yes.

13    Q    Okay.  And did Highland produce over 40,000 pages of

14    documents to HarbourVest related to the Acis bankruptcy?

15    A    I'm not aware of that, no.

16    Q    Have those documents been provided to you?

17    A    I hope not.

18    Q    So, in your role --

19    A    I'm sorry.  I don't -- I didn't receive 40,000 documents

20    from anybody.

21    Q    Well, did you receive any number of documents that were

22    provided by Highland to HarbourVest during the Acis

23    bankruptcy?

24    A    I wasn't involved in this during the Acis bankruptcy.  I'm

25    sorry.

1  Q   Well, I'm referring to, after you became involved in this

2  Highland bankruptcy, whether you were provided with these

3  documents that were sent from Highland to HarbourVest.

4  A   I don't -- I don't know what the documents are.  I've

5  reviewed tons of documents with respect to the HarbourVest

6  claims, but I don't know of the documents to which you're

7  referring.

8  Q   Okay.  And after you performed your investigation into the

9  HarbourVest claim, what was your opinion as to the cause in

10  the reduction in value of HarbourVest's investment in HCLOF?

11  A   I think the main cause of the reduction in the investment

12  was the imposition of the Trustee and the failure of Highland

13  HCLOF and then subsequently with the injunction to reset the

14  CLOs.

15      You know, these are -- these are some of the worst-

16  performing CLOs in the market because they weren't reset.  And

17  when the liabilities of the CLOs are set at a level to match

18  assets, and then liability -- the assets run off, and the

19  asset financings or the new deals come in at much lower

20  levels, and the obligations of the CLO are not reset, the

21  arbitrage that is the CLO shrinks.  And that's what happened

22  to these CLOs.

23  Q   And during the course of the Acis bankruptcy, Acis and

24  Brigade were given management responsibilities over the CLOs

25  and HCLOF, correct?

1  A    I believe that the Trustee had the overall, and then

2  subsequently, with the confirmation of the plan, they took it

3  over.  So I think that ultimately Mr. Terry had the management

4  authority, full management authority, and some advice through

5  Brigade.  But I think technically it wasn't actually during

6  the Chapter 7.  The Chapter 7 proceeding, I believe that Mr.

7  Phelan had the actual authority.

8      (Echoing.)

9  Q    I'm sorry.  And so your testimony is that Mr. Phelan had

10  the actual authority but he delegated that authority to Josh

11  Terry and Brigade?

12  A    I think that's fair, yes.

13  Q    And do you know when that occurred?

14  A    I believe that the control of the CLOs was in July of

15  2018, and then the ultimate confirmation of the case was at

16  the very beginning of '19.

17  Q    So, after being instituted as portfolio manager, and

18  during the time when Acis and Brigade were working under the

19  direction of the Trustee, who would have receive the fees for

20  managing those portfolios?

21  A    I believe -- I don't know.  I believe the -- that the Acis

22  estate would have received those fees.

23  Q    And who -- and so is that your testimony, that prior to

24  confirmation the Acis estate would have received the

25  management fees?

Seery - Cross                    82

1   A    I believe that -- I believe they would have if they were

2   the manager, yeah.

3   Q    Okay.  And who would have received the fees after

4   confirmation?

5   A    Acis.

6   Q    Okay.  And who would have had the discretion to set the

7   amount of those management fees?

8   A    They would be agreed to in the -- in the investment

9   management agreement.

10  Q    They would be agreed to?

11  A    Yes.  As far as I've seen, I've -- I haven't seen

12  unilateral ability of a manager to set fees at its -- at its

13  whim.

14  Q    So is it your understanding that Acis and Brigade ended up

15  charging substantially more fees than Highland had charged

16  when it was under Highland's management?

17  A    I think the fees were -- the fees were -- the fees were

18  set by the agreement.

19          MR. MORRIS:  Your Honor, I just object to the line of

20  questioning on relevance grounds.  This is a 9019 hearing,

21  Your Honor.  How -- I just don't think this has any relevance

22  at all.

23          THE COURT:  All right.  Mr. Wilson, what is the

24  relevance?

25          MR. WILSON:  The relevance is that Mr. Seery has

Seery - Cross                    83

1   testified that these Acis CLOs were among the worst-performing

2   in the market, and frankly, we would agree with that, and I'm

3   trying to get his understanding as to why, because I think

4   there's direct relevance in the reason that the value of the

5   HarbourVest investment diminished.

6         MR. MORRIS:  I don't think that was his testimony,

7   Your Honor.  But at the end of the day, Your Honor has heard

8   the litany of reasons why the Debtor is entering into this

9   agreement.  I just, I just think it's irrelevant, Your Honor.

10         THE COURT:  All right.  Mr. Wilson, I barely think

11   this is relevant.  I mean, I'm going to give you some benefit

12   of the doubt on that because of, you know, the testimony that

13   HarbourVest lost $50 million of value and --

14     (Echoing.)

15         THE COURT:  -- maybe that shouldn't, you know, lie at

16   the feet of Highland.  I think the compromise reflects that

17   they don't -- it doesn't lie entirely at the feet of Highland.

18   But, you know, maybe two or three more questions.

19         MR. WILSON:  Yes.  Thank you, Your Honor.  And I

20   didn't have very much more on this point.  But to be a hundred

21   percent honest, I can't remember my question right before the

22   objection.

23         THE WITNESS:  I think you were asking me about the

24   fees and somehow alluding or implying that the manager could

25   unilaterally set fees.

1    The fees are set in the investment management contract.

2  The manager doesn't get to wake up on Wednesday and say, you

3  know, I'd like another half a basis point.  It doesn't work

4  that way.

5  BY MR. WILSON:

6  Q    But you would agree with me that the fees and expenses

7  charged to an investment would impact the performance of that

8  investment in the market?

9  A    Absolutely.

10  Q    Would you also agree with me that there was one CLO -- and

11  I think you referred to it in your direct testimony -- but CLO

12  7, which continued to be managed by Highland?

13  A    That's correct.

14  Q    And is it fair to say that CLO 7 exceeded the performance

15  of the CLOs that were managed by Acis and Brigade?

16  A    I think that's fair.  I don't -- I don't recall the

17  magnitude, but I think it's outperformed those -- those CLOs,

18  yes.

19  Q    All right.  Well, thank you.  I want to turn your

20  attention to the portion of the settlement agreement that

21  deals with voting of the HarbourVest claim.  How did

22  HarbourVest's commitment to vote for the plan become a part of

23  the settlement?

24  A    Pretty straightforward negotiation.  We -- in negotiating

25  the settlement, one of the key factors was the cost and

Seery - Cross                                        85

1  expense of the litigation, in addition to the risk on the --

2  on the fees, and whether we could wrap this up in a global

3  settlement now.  So in my experience, it's fairly typical, we

4  would try to do this in every settlement, have the settling

5  party, be that the claimant, agree to support the case and the

6  plan.

7       You know, we did not do that with the Committee members,

8  although we wanted to.  (Echoing) I frankly still wish I had.

9  Those little -- little bits that have been difficult

10 (echoing).  The Committee members have a different interest in

11 (echoing) than their more global interest for creditors at

12 large, which is more difficult than traditionally in

13 bankruptcy cases, less likely to have a Committee member, a

14 sitting Committee member, actually support the (echoing) of

15 the plan.

16          THE COURT:  Mr. Wilson, could you be careful to put

17 your device on mute every time you're not talking?  Because

18 we're getting some feedback loop from you when Mr. Seery

19 answers your questions.  Okay?

20     (Echoing continues.)

21          THE COURT:  Like right now.  I'm hearing feedback of

22 my own voice through your speakers.

23     Right, Mike?  Isn't that what --

24          A VOICE:  I am, too.

25          THE COURT:  Yes.  Okay.  So please be sure you put

Seery - Cross                                86

1   your device on mute whenever you are not speaking.  All right.
2   Go ahead.
3   BY MR. WILSON:
4   Q    I mean, I think you just answered this question, but there
5   was -- there was no similar voting provision in the Acis or
6   the Redeemer settlements, correct?
7   A    There is not, no.  And just as a -- by way of explanation,
8   if it's okay, the reason was my counsel advised against it.  I
9   did ask for it.
10  Q    Your counsel advised against putting that voting
11  requirement in the Acis and Redeemer settlements?
12  A    For the reasons I stated.  And in my experience, that's
13  consistent, where sitting members of Committees don't
14  generally sign up to resolve their own claims and support the
15  plan because of their larger fiduciary duties to the creditor
16  body as a whole.
17  Q    And during the settlement negotiations of the HarbourVest
18  claim, was this commitment to vote a topic of discussion?
19  A    Not -- not particularly, no.  It was pretty clear that
20  HarbourVest, if they were going to agree to the settlement and
21  the numbers, could see structure.  Obviously, it wanted to
22  understand what the potential distributions would be under the
23  plan, but this was not a hotly-negotiated point.
24  Q    And would you consider HarbourVest's commitment to vote
25  for the plan an important part of the settlement?

1  A    I think it's an important part of the settlement, that the

2  part of the settlement is the subordinated claim.  We could

3  put that into presumably any plan.  But our plan does -- does

4  have a Class 9 for that.  So I think it's a -- it's a part of

5  the settlement that is important or we wouldn't have included

6  it.  It clearly wraps everything up and moves us towards

7  confirmation.

8  Q    And would you have made the deal with HarbourVest if they

9  had pushed back on the commitment to vote for the plan?

10  A    Yeah, I would have.

11  Q    All right.  Thank you.

12         MR. WILSON:  No further questions.

13         THE COURT:  All right.  Mr. Draper, anything from

14  you?

15         MR. DRAPER:  Yes, Your Honor.

16                      CROSS-EXAMINATION

17  BY MR. DRAPER:

18  Q    Mr. Seery, I may not understand the settlement, and I

19  apologize, but the way I think the settlement reads, the

20  interest that you're acquiring, you have the right to place in

21  any entity.  Is that my -- is that correct?

22  A    I don't recall the -- the specifics, but just from a

23  structural standpoint, we wanted to be able to put it into a

24  subsidiary as opposed to putting it directly in HCMLP.  If we

25  couldn't do that, we would -- we would put it into HCMLP.  So

Seery - Cross                           88

1   there wasn't a -- I don't recall the actual specifics, but we
2   certainly thought about holding that interest in a -- in a
3   subsidiary, just to have a cleaner hold.
4   Q   Why aren't you putting it into the Debtor so the Court and
5   the estate have jurisdiction over that?
6   A   I think the Court certainly has jurisdiction over an
7   entity that the estate owns a hundred percent of.  I don't
8   think that's -- that's even a close call.  So the important --
9   Q   Now, --
10  A   Can I finish?
11  Q   Sure.
12  A   You asked me why.  To the extent that somebody thinks that
13  problematic, I will consent to the Court having complete
14  jurisdiction over it, since I control it a hundred percent.
15  Q   No.  The real reason is, if I remember correctly, Mr.
16  Dondero and Judge Lynn filed a motion to have some say or some
17  information as to sales by subsidiaries, and I think you took
18  the position that they weren't entitled to it.  And so my
19  concern was that putting this in a subsidiary in a sense gave
20  you unfettered control without any review of the item.
21  A   I don't -- I don't think that's the case where we --
22  there's a directly-held subsidiary where we own a hundred
23  percent of it.  I don't think that that's the case.
24  Q   Okay.  But you're willing to (a) put this into the Debtor,
25  number one; and number two, have the estate and have the Court

1  have complete control over the disposition of it and its

2  actions, correct?

3  A    That's not correct, no.

4  Q    What -- what is incorrect about my statement?

5  A    The debtor-in-possession has control of its assets.  The

6  Court doesn't have complete control over its assets.  There's

7  --

8  Q    Well, --

9  A    -- issues -- hold on a second.  This is not -- this is not

10 a game and a trap.  We put it in a subsidiary for specific

11 reasons.  You asked why.  I'm giving you the why.  It's not to

12 hide it from anybody.  We're not going to sell the asset

13 unless somebody comes up with a great price for it.  We're

14 going to monetize the assets.  We're going to control HCLOF by

15 a majority.

16 Q    But, again, the issue is, if it's in the estate, the Court

17 has supervision over it.  If it's not in the estate, the Court

18 has no supervision of it.

19 A    I don't think that's correct, because the Court has

20 supervision over the estate, which owns a hundred percent of

21 the special-purpose entity that will own the shares.

22 Q    Okay.  All right.  Now, let's talk about the $15 million

23 that you discussed and the legal fees that were incurred.  Is

24 that the total amount that was spent, or is -- or is that --

25 was the total amount $30 million and HarbourVest was only

Seery - Cross                          90

1   responsible for one half of it or functionally took the brunt

2   of one half of it?

3   A    I think the total amount is between $15 and $20 million.

4   I don't have the exact numbers.

5   Q    So, in fact, the HarbourVest loss due to its ownership

6   would have been one half of that, not $15 million?

7   A    Well, the vehicle lost the money.  HarbourVest owned 49.98

8   percent of it, and Highland controlled the rest.  So if you

9   allocate it that way, I suppose that would be a -- that's how

10  you would divide it, in -- roughly in half, yes.

11  Q    And so HarbourVest's actual dollar loss due to the legal

12  fees is really the 49-point-whatever percent of $15 million,

13  not $15 million?

14  A    I don't know if -- I certainly would argue that.  I don't

15  think that HarbourVest has that position.

16  Q    Okay.  Now, in connection -- you were asked a question

17  about the documentation that was provided by Highland to

18  HarbourVest both during the bankruptcy of Acis and before.

19  You have control over the Harbour -- over the Highland server,

20  correct?

21  A    I'm sorry.  Can -- can we do two things?  One is, Mr.

22  Draper, I can't see you, so it would be better if I could see

23  you during the questioning.

24  Q    Okay.

25  A    And could you repeat the question?

1  Q   All right.  I'll be happy to.  You were asked a question

2  about the documentation that was provided by Highland to

3  HarbourVest during the Acis bankruptcy and meetings that took

4  place between the parties.  Correct?

5  A   Yes.

6  Q   And you stated you were unaware of the material that was

7  sent over?

8  A   I think I testified that I didn't receive the 40,000

9  documents that were mentioned.

10 Q   Did you do any search or order a search of the Highland

11 server to see what material was sent over by any party to

12 HarbourVest to analyze what -- what information they had

13 available to them and what was provided to them?

14 A   Yes, we did a search.

15 Q   And did you review the documentation that was sent over?

16 A   The -- the documentation that we looked at was very

17 specific to the investment and to the OM.  So we didn't look

18 for the -- the supposed 40,000 documents, no.

19 Q   Did you look for the material that was provided to them

20 during the Acis bankruptcy and the periodic meetings that you

21 discussed?  Or that you testified to earlier?

22 A   The answer is no.

23 Q   One last question.  I think, and just so I understand your

24 testimony, you've broken out the HarbourVest claim into two

25 pieces.  One is the legal fee amount that we've just

1  discussed, and I gather the other piece of that is the fraud
2  in the inducement to enter into the CLO purchase?
3  A    It's -- it's more -- it's much more than that.
4  Q    Okay.  Well, let me say it in a different way.  The other
5  part of it is the losses as a result of the fraud in the
6  inducement to purchase the interest?
7  A    I don't think that's -- that's fair.  If I could explain?
8  Q    Sure.
9  A    Yeah.  The legal fee piece is pretty clear.  The other
10 piece starts with fraud in the inducement, but it's extensive
11 fraud claims.  Fraud in the inducement, as I testified
12 earlier, would get them around the exculpation and liability
13 limitations in the OM.  You don't get around all of those with
14 just the fraud.  And so that's -- that's the split of that
15 claim.  So the fraud in the inducement contains fraud
16 allegations.  Even if you didn't have inducement, you'd have
17 other potential fraud claims.
18 Q    But let me state it in a different fashion.  But for the
19 investment, the fraud that you allege wouldn't have occurred?
20 A    I -- HarbourVest alleges it.
21 Q    No, I'm just -- in your analysis of the claim, but for the
22 inducement, the rest of the damages wouldn't have flowed?
23 A    That's HarbourVest's position, yes.  But for the fraud,
24 they wouldn't have made the investment.
25 Q    All right.

1          MR. DRAPER:  I have nothing further for this witness.

2          THE COURT:  All right.  Any redirect, Mr. Morris?

3          MR. MORRIS:  Just a few very questions, Your Honor.

4    Just a very few questions.

5                    REDIRECT EXAMINATION

6    BY MR. MORRIS:

7    Q    Mr. Seery,  you were asked about that document that Lucy

8    prepared.  Do you remember that?

9    A    Yes, I do.

10   Q    In your experience, don't defendants often deny liability

11   before entering into settlements, or even worse, getting

12   adverse judgments entered against them?

13   A    Of course.  Yes.

14   Q    Okay.  And in response to Mr. Draper's questions, isn't

15   the Guernsey claim another claim that the Debtor took into

16   account in assessing the potential risks of this settlement?

17   A    There's a number of claims contained in it.  As I

18   mentioned earlier, I mentioned the RICO claim.  But there is a

19   Guernsey shadow director claim, which is not dissimilar to

20   U.S. claims that somebody effectively controls an enterprise,

21   notwithstanding them not having the official role.

22   Q    Okay.

23          MR. MORRIS:  I have nothing further, Your Honor.

24          THE COURT:  All right.  Any recross on that redirect?

25   All right.

Seery - Redirect                          94

1           MR. WILSON:  No, Your Honor.

2           MR. DRAPER:  No, Your Honor.

3           THE COURT:  Thank you.  Mr. Seery, that concludes

4    your testimony.  Thank you.

5           THE WITNESS:  Thank you, Your Honor.

6           THE COURT:  We need to take a bathroom break.  Before

7    we do, I just want to be clear with what we have left.  As I

8    understood it, we were having Mr. Pugatch from HarbourVest.

9    Mr. Morris, will that conclude the Debtor's evidence?

10   (Pause.)  Okay.  You were on mute, but I think you were saying

11   yes.

12          MR. MORRIS:  Sorry.  But to be clear, Debevoise is

13   going to be putting their witness on the stand.

14          THE COURT:  Okay.

15          MR. MORRIS:  But it's part of the evidence in support

16   of the motion.

17          THE COURT:  All right.  Do the Objectors have any

18   witnesses today?

19          MR. WILSON:  Your Honor, Mr. Dondero intends to

20   examine Mr. Pugatch, but if he's going to be called by his

21   counsel, then we will do that as a cross-examination.

22          THE COURT:  All right.

23          MR. DRAPER:  This is Douglas Draper.  I have no

24   witnesses.

25          THE COURT:  Okay.  All right.  Well, I'm asking --

95

1  well, I do want to ask: Can we get a time estimate

2  potentially for Mr. Pugatch?

3          MS. WEISGERBER: For my examination, Your Honor,

4  twenty minutes, perhaps.

5          THE COURT: Okay.

6          MS. WEISGERBER: Or less.

7          THE COURT: All right. Well, let me tell you what

8  we're going to do. We're going to take a ten-minute bathroom

9  break. But I have a 1:30 hearing and I have a 2:00 o'clock.

10  Well, I have a 1:30 docket, multiple matters, and a 2:00

11  o'clock docket. So, you know, I'm really intending that we

12  get finished in time to give me and my staff a little bit of a

13  lunch break before launching into the 1:30 docket, so I'm

14  hopeful we can get done around 1:00-ish. If we can't, then

15  we're going to have to reconvene, I'm going to say probably

16  3:00-ish Central time. So let's hope we can get through

17  everything. All right? Ten-minute break.

18          THE CLERK: All rise.

19      (A recess ensued from 11:58 a.m. until 12:08 p.m.)

20          THE CLERK: All rise.

21          THE COURT: All right. Please be seated. We're

22  going back on the record in the Highland matters. Do we have

23  everyone? It looks like we do. Ms. Weisgerber is going to

24  call the next witness; is that correct?

25          MS. WEISGERBER: Yes, Your Honor. We call Michael

1  Pugatch of HarbourVest to the stand.

2          THE COURT:  All right.  Mr. Pugatch, if you could

3  turn on your video and say, "Testing one, two."

4          MR. PUGATCH:  Two.

5          THE COURT:  All right.  There you are.  Please raise

6  your right hand.

7          MICHAEL PUGATCH, HARBOURVEST'S WITNESS, SWORN

8          THE COURT:  Thank you.  You may proceed.

9          MS. WEISGERBER:  Thank you, Your Honor.

10                      DIRECT EXAMINATION

11 BY MS. WEISGERBER:

12 Q    Good morning.  Can you please state your name for the

13 record?

14 A    Sure.  It's Michael Pugatch.

15 Q    And where do you work, Mr. Pugatch?

16 A    HarbourVest Partners.

17 Q    And what is your title?

18 A    I'm a managing director in our secondary investment

19 group.

20 Q    Did HarbourVest file claims in the Highland bankruptcy,

21 Mr. Pugatch?

22 A    We did, yes.  Several claims, in fact.

23 Q    What was the basis for those claims?

24 A    Yeah.  Among other things, fraudulent inducement based on

25 misrepresentations and omissions on the part of Highland in

Pugatch - Direct                                97

1   connection with our original investment, mismanagement at the

2   HCLOF level, including inappropriate fees that were charged

3   to investors, among a number of other items as well.

4   Q    Can you explain what you mean by misrepresentations made

5   to HarbourVest by Highland?

6   A    Yeah, sure.  So, you know, based on a number of

7   statements that were made to us around the litigation

8   involving Mr. Terry, some of the intentions found, the

9   structural changes that came to light with respect to HCLOF

10  and our investment, as well as the fact that the arbitration

11  award specifically against Mr. Terry would have no impact or

12  implication on Highland's sale or business.

13  Q    And can you explain what you mean by omissions made by

14  Highland to HarbourVest?

15  A    Sure.  So I would say, really, the implications behind

16  the structural changes that were made at the time of our

17  investment into HCLOF.  Also, the intention, clear intentions

18  that Highland had to never, in fact, pay the arbitration

19  award that came to light during our due diligence period to

20  Mr. -- to Mr. Terry as part of the investment.  And

21  ultimately the -- what Highland went about doing in terms of

22  stripping assets of Acis that led to the material value

23  declines and destruction of value that we've experienced

24  since our investment.

25  Q    You mentioned a diligence period.  Did HarbourVest

1  conduct diligence on the investment?

2  A    We did.  We conducted very detailed due diligence, as we

3  do for all of our investments.  That diligence period lasted

4  several months ahead of our investment decision.

5  Q    And did HarbourVest conduct that diligence by itself?

6  A    No.  So, in addition to internal investment professionals

7  at HarbourVest, we engage with outside advisors, both

8  consultants as well as legal advisors, in connection with

9  that due diligence.

10 Q    And did Highland answer all of HarbourVest's questions

11 during that diligence period?

12 A    They did.  And they were numerous.  But yes, they

13 answered all the questions that we had for them.

14 Q    Was the Terry dispute part of HarbourVest's diligence?

15 A    It was.  That came up as one of the outstanding items of

16 litigation as part of our due diligence.

17 Q    I'm going to ask my colleague to pull up on the screen an

18 exhibit that was on our exhibit list as Items -- Exhibits 34

19 and 35.  It's an August 15, 2017 email from Brad Eden to

20 Dustin Willard.  Mr. Pugatch, do you recognize this document?

21 A    I do, yes.

22 Q    And what is it?

23 A    This was an email sent to us during our due diligence

24 period in response to a request for more information on the

25 outstanding litigation that Highland was involved with.

Pugatch - Direct                    99

1          MS. WEISGERBER:  And if my colleague can just scroll

2    to the attachment to that email.

3    BY MS. WEISGERBER:

4    Q    And do you recall the attachment as well, Mr. Pugatch?

5    A    Yes, I do.

6          MS. WEISGERBER:  And if you can scroll back up to the

7    first email.

8    BY MS. WEISGERBER:

9    Q    Who is Dustin Willard?

10   A    Yes.  Dustin is a colleague of mine at HarbourVest who

11   worked closely with me on this investment.

12   Q    And you said that this document was shared with

13   HarbourVest during the diligence period before the HCLOF

14   investment?

15   A    It was, correct.

16   Q    Is it typical during diligence to receive a description

17   of litigation such as this?

18   A    It is.  It's a question that we always ask.  Certainly a

19   component of our diligence to understand any outstanding

20   litigation on the part of our counterparty or manager that

21   we're investing in.

22         MS. WEISGERBER:  Your Honor, I'd move to offer this

23   exhibit into evidence.

24         THE COURT:  Any objection?

25         MR. DRAPER:  No objection, Your Honor.

Pugatch - Direct                    100

1        MR. MORRIS:  No objection from the Debtor, Your

2   Honor.

3        THE COURT:  All right.  What is the letter or number

4   for this exhibit?

5        MS. WEISGERBER:  It's HarbourVest Exhibit 34.

6        THE COURT:  All right.  So HarbourVest Exhibit 34 is

7   admitted.

8      (HarbourVest's Exhibit 34 is received into evidence.)

9        THE COURT:  And I need to be clear where it appears

10  on the docket.  Can someone tell me?

11       MS. WEISGERBER:  So, it's identified on our exhibit

12  list, not -- it's not attached to the exhibits.  It is on the

13  docket.  We were -- when we initially filed the exhibit list,

14  we were working out confidentiality issues.  But it was

15  subsequently filed with our reply last night.  It's at Docket

16  No. 1735 --

17       THE COURT:  All right.

18       MS. WEISGERBER:  -- at Pages A -- Pages A345 to A350.

19       THE COURT:  All right.  Very well.  Thank you.

20  BY MS. WEISGERBER:

21  Q    Mr. Pugatch, we'll just scroll down to the second page of

22  the attachment.  Can you describe generally what the

23  litigation says regarding the Terry dispute?

24  A    Yes.  Generally speaking, this dispute was described as

25  an employee dispute, employment agreement dispute, with Mr.

1  Terry, who was a former employee of Highland involved in

2  their CLO business, and is described by Highland to us really

3  having to do with a series of false claims, in their opinion,

4  but having to do with a disgruntled former employee.

5  Q    And did it strike you as an unusual or significant

6  dispute?

7  A    No.  I would say we often -- we'll see, you know, former

8  employees with, you know, claims against a former employer in

9  connection with wrongful termination.  I wouldn't say it's

10 extremely common, but certainly not entirely out of the

11 ordinary.  And based on the explanations that we'd received

12 from Highland, seemed to be more of an ordinary-course type

13 former employee litigation suit.

14 Q    Based on what you now know about the Terry dispute, do

15 you believe that this was an adequate disclosure regarding

16 the dispute?

17 A    I would say very clearly not, you know, based on the

18 facts that came to light subsequently, the various rulings in

19 connection with the Acis bankruptcy case.  What was very

20 clearly not stated are the actual facts and implications of

21 the ongoing litigation with Mr. Terry.

22         MS. WEISGERBER:  I'd ask my colleague to put up the

23 next exhibit.  Okay.  So, this is on a HarbourVest exhibit

24 list, which is Document No. 1723.  It's Exhibit 36 on that.

25 Same issue with respect to initially not filed, but it is on

Pugatch - Direct                    102

1  the docket at our response last evening at ECF No. 1735 at

2  Page A351.

3          THE COURT:  Page what?

4          MS. WEISGERBER:  A351.

5          THE COURT:  A351.  Thank you.

6          MS. WEISGERBER:  You're welcome.

7  BY MS. WEISGERBER:

8  Q    Mr. Pugatch, I just put up a November 29, 2017 email from

9  Hunter Covitz to Dustin Willard, Michael Pugatch, and Nick

10 Bellisario.  Do you recall this document?

11 A    I do, yes.

12 Q    And what is this document?

13 A    This was an email sent to us by Highland a couple weeks

14 after we closed on our investment on the (inaudible) in

15 response to a *Wall Street Journal* article that had come out

16 regarding Highland, a number of actions that they had taken,

17 and what Highland was articulating to us, a number of false

18 claims that had been made about Highland's prior actions, and

19 specifically trying to explain some of that and also share

20 with HarbourVest a letter that was being sent to the editor

21 of the *Wall Street Journal* highlighting, in their view, some

22 of the inaccuracies around the reporting.

23 Q    And did you receive this document?

24 A    We did, yes.

25          MS. WEISGERBER:  I'd move to offer this, so

Pugatch - Direct                                    103

1   HarbourVest Exhibit 36, into evidence.

2           THE COURT:  Any objections?

3           MR. WILSON:  Your Honor, John Wilson.  I would object

4   as to the relevance of this document.

5           THE COURT:  All right.  What's your response?

6           MS. WEISGERBER:  Your Honor, it shows

7   misrepresentations that the witness will testify how it

8   relates back to prior representations prior to HarbourVest's

9   investment, as well as misrepresentations at that time.

10          THE COURT:  Okay.  I overrule the objection.  I'm

11  going to admit it.

12      (HarbourVest's Exhibit 36 is received into evidence.)

13  BY MS. WEISGERBER:

14  Q   Mr. Pugatch, can you describe generally -- we spoke about

15  this a little bit -- just what this communication from

16  Highland was conveying to HarbourVest at the time?

17  A   Yes.  Specifically, again, responding to this *Wall Street*

18  *Journal* article that had been published, trying to defend,

19  again, Highland's own views why there were inaccuracies in

20  the reporting.  But importantly, from our perspective, trying

21  to reassure us as to the fact that, you know, these

22  accusations would have no bearing and any results from it

23  would have no bearing on their ongoing business or

24  partnership or the investment that we had made in HCLOF.

25          MS. WEISGERBER:  And if you can scroll to the second

1  page.

2  BY MS. WEISGERBER:

3  Q   We'll just look at the last paragraph of another email

4  from Mr. Covitz.  Can you just read that first sentence of

5  the last paragraph?

6  A   Sure.  (reading)  While the dispute has no impact on our

7  investment activities, as always, we welcome any questions

8  you may have.

9  Q   Mr. Pugatch, was this email and the discussion regarding

10 the Terry dispute consistent with the representations made to

11 you prior to HarbourVest's investment into HCLOF?

12 A   It was, yes.  Both the message, the lack of any impact

13 that ultimately the dispute with Mr. Terry, the arbitration

14 award would have around Highland's ongoing CLO business, or

15 HCLOF specifically, was all, you know, very clear in this

16 document, but all consistent with the representations that

17 had been made to us leading up to our investment in the

18 middle of November 2017 as well.

19 Q   Thank you.

20        MS. WEISGERBER:  And you can take down the exhibit,

21 Emily.  Thank you.

22 BY MS. WEISGERBER:

23 Q   You mentioned, Mr. Pugatch, an arbitration award to Mr.

24 Terry.  How did you learn about that arbitration award?

25 A   That was initially disclosed to us by Highland as we were

Pugatch - Direct                              105

1  in the late stages of our diligence and closing process on

2  the investment into HCLOF.

3  Q    And generally, what did Highland tell you about the

4  arbitration award?

5  A    We were aware of its existence.  We were aware of the

6  quantum of the award, I think it was around an $8 million

7  arbitration award in the favor of Mr. Terry, and that was

8  following the litigation around the wrongful termination and

9  employee dispute that Highland had described to us

10 previously.

11 Q    Did you ask to see a copy of the arbitration award?

12 A    No, we did not.

13 Q    Why not?

14 A    Ultimately, we -- you know, the explanations that

15 Highland had provided to us all seemed very reasonable.  We

16 relied on their representations that this was, again, nothing

17 more than a dispute with a former disgruntled employee, in

18 their words, that had no bearing or, you know, would not have

19 any bearing on our investment in HCLOF or their ongoing CLO

20 business, which all very clearly was not the case, as

21 we've -- as we've learned over the last several years.

22 Q    Following learning about the arbitration award, did

23 HarbourVest do other diligence?

24 A    We did.  So, in addition to asking questions related to

25 the arbitration award and any impact that it would have, we

Pugatch - Direct                                106

1  also spent some time diligencing a couple of structural

2  changes that were proposed by Highland, and, in fact, ended

3  up delaying the closing of our investment by about two weeks

4  as we vetted some of those structural changes that Highland

5  had proposed.  Vetted those both, you know, internally with

6  Highland directly and with external counsel in order to make

7  sure that those structural changes were in fact legally sound

8  in ultimately making our investment.

9  Q    And were those changes proposed following the arbitration

10 award?

11 A    They were, yes.

12 Q    Did Highland tell you the reason for the structural

13 changes?

14 A    Yeah.  So, so some of this -- and specifically, this

15 involved a change of the portfolio manager at the HCLOF level

16 that was really in connection with a rebranding as Highland

17 was going through a rebuild of its CLO business and wanting

18 to align, from a brand perspective, their business on an

19 ongoing basis with the Highland brand as opposed to the Acis

20 brand.  But more specifically, in the case of a late change

21 from a structured standpoint, the -- part of the intention

22 and the investment thesis of HCLOF was to pursue a reset, a

23 refinancing of all the underlying CLOs as they approached the

24 end of their investment period or came out of their

25 investment period.

Pugatch - Direct                107

1    And in connection with that, in light of the arbitration

2   award, Highland's view was that there may be difficulties in

3   the market in resetting certain of those Acis CLOs with the

4   Acis brand associated with them, given, again, the existence

5   of the arbitration award and concerns in the market around

6   the Acis brand reputation.

7   Q    And what did they tell you was the market view of Acis,

8   or the Acis brand?

9   A    Yeah.  Their view or their concern was that the, you

10  know, because of the existence of that arbitration award, the

11  brand would be viewed as toxic.

12  Q    Didn't this put you on notice that perhaps there was

13  something wrong with the structural changes?

14  A    I mean, we -- I mean, short answer, no.  We ultimately

15  asked questions, we diligenced the legal structure, but

16  relied on the representations that were made to us by

17  Highland around the rationale for the structural changes,

18  that these are all changes that were within a Highland-

19  managed vehicle or sat below the vehicle that we were

20  investing in, and so ultimately were in Highland's purview,

21  was the representations that we relied on.

22  Q    And did HarbourVest alone do that diligence of the

23  structural changes?

24  A    So, no.  I mean, in connection with the diligence that we

25  did internally and with Highland directly, we engaged with

Pugatch - Direct                                    108

1    outside counsel who was working with us at the time to vet

2    those structural changes as well.

3    Q   Did HarbourVest rely on Highland's representations

4    regarding the arbitration award and the structural changes in

5    making its investment in HCLOF?

6    A   We did, absolutely.

7    Q   If Highland had disclosed the nature of the structural

8    changes, of removing Acis as the portfolio manager and

9    related transfers, would HarbourVest have proceeded with its

10   investment?

11   A   Definitively, no, we would not have.

12   Q   Why not?

13   A   I think the reality is if we had understood the intent,

14   you know, that Highland was ultimately undertaking here, we

15   would not have wanted to be any part of this, and certainly

16   getting dragged into all of this, the hassle, the value

17   destruction that we've seen on behalf of the investors and

18   the funds that we manage.  And I would say, lastly, we just

19   full stop would not have done business with a firm who

20   engages with this type of behavior, had we actually known the

21   truth.

22   Q   Mr. Pugatch, are you familiar with the bankruptcy that

23   followed of Acis?

24   A   Yes.

25   Q   And what was your -- or, did HarbourVest participate in

Pugatch - Direct                              109

1  that bankruptcy?

2  A   So, initially, no.  Subsequently, we ended up getting

3  dragged into that on account of a number of misstatements by

4  Highland about the role that HarbourVest had played as part

5  of our investment into HCLOF and some of that structure and

6  the structural changes that I alluded to.

7  Q   How did HarbourVest learn about those misstatements in

8  the bankruptcy about HarbourVest's role?

9  A   So, ultimately, those came to light on -- you know, on

10 account of the ongoing proceedings within the Acis bankruptcy

11 process, and specifically brought to light to us by the Acis

12 trustee at the time, who decided to pursue, you know, further

13 diligence or discovery around the claims that Highland had

14 made around HarbourVest's involvement in those changes.

15 Q   And what is your understanding of what the allegations

16 were that caused the Acis trustee to investigate HarbourVest?

17 A   Sure.  So, you know, our understanding was that Highland

18 had made statements, again, false statements that HarbourVest

19 had actually instructed some of those structural changes,

20 that we were the ones that had said that we would not do

21 business with Acis and had ordered some of the underlying

22 transfer of assets or, again, structural changes, that, you

23 know, very clearly I would say were not the case.  Also, that

24 HarbourVest was -- was calling the shots as it relates to any

25 of the ongoing management or future resets of the CLOs.

Pugatch - Direct                                110

1   Q    Did HarbourVest instruct any of those structural changes

2   or transfers to occur?

3   A    We did not.  Absolutely not.

4   Q    Why didn't HarbourVest itself appear in the Acis

5   bankruptcy and file a claim?

6   A    Yeah.  HarbourVest's role, again, in HCLOF, we were a

7   passive investor in a Highland-managed company.  We had no

8   direct interaction with or relationship with Acis.  There was

9   really no reason for us to be directly involved until we were

10  subsequently dragged into involvement on account of those

11  misstatements.  And then at that point our focus really

12  pivoted to, you know, whether we needed to defend ourselves

13  against those accusations that had been made by Highland and

14  after a request for further information in discovery by the

15  Acis trustee.

16  Q    Did HCLOF participate in the Acis bankruptcy?

17  A    They did, yes.

18  Q    Did HCLOF incur fees for participating in the Acis

19  bankruptcy?

20  A    Yes.  In fact, very meaningful fees, to the tune of well

21  in excess of $15 million of legal fees, as we understand it,

22  that have been incurred, largely in connection with the

23  ongoing Acis bankruptcy and Highland's continued pursuit of

24  and in connection with the litigation with Mr. Terry, which

25  we firmly believe was entirely inappropriate that HCLOF and

Pugatch - Direct                              111

1  ultimately investors in HCLOF bear those expenses, which were

2  not just expenses of HCLOF but of Highland and a number of

3  other Highland affiliates.

4  Q    Do those expenses form a basis of separate claims filed

5  by HarbourVest against Highland?

6  A    They do, yes.  One of the multiple claims that we had

7  filed against Highland.

8  Q    And a few more questions, just for the record, Mr.

9  Pugatch.  How much did HarbourVest initially invest in HCLOF?

10 A    Sure.  So, our initial investment in November of 2017 was

11 right about $73-1/2 million, I believe.

12 Q    Did HarbourVest invest any additional money in HCLOF?

13 A    We did.  There was a subsequent capital call investment

14 of about $5 million, bringing our total investment to just

15 under $80 million in aggregate.

16 Q    When HarbourVest initially made the investment, did it

17 anticipate making a profit on it?

18 A    We did, yes.

19 Q    How much did HarbourVest anticipate earning from the

20 investment?

21 A    Yeah.  So, our -- based on the original $73-1/2 million

22 investment, we had expected a total return of about $137

23 million on that -- on that investment.

24 Q    What was that projection based on?

25 A    So, that projection was based on materials that we had

Pugatch - Direct                          112

1    received from Highland, their internal projection models on

2    the future performance of the underlying CLOs that we were

3    acquiring exposure to through our investment in HCLOF, and

4    was one of the inputs or formed the basis in connection with

5    our diligence that we ultimately ran different sensitivities

6    -- projections around and helped employ -- helped inform our

7    investment thesis.

8    Q    Do you know the current value of HarbourVest's investment

9    in HCLOF?

10   A    Yes.  The current value is right around $22-1/2 million.

11   Q    So roughly how much has the investment itself decreased

12   from HarbourVest's initial investment?

13   A    So, net of what was about $4-1/2 million of distributions

14   that we received early on in the investment, we've lost, to

15   date, in excess of $50 million on our original investment.

16   Q    And just for -- to close out, Mr. Pugatch, knowing all

17   that you know, if HarbourVest had known that -- about the

18   nature of the transfers by Acis or Highland's intent with

19   respect to the arbitration award, would HarbourVest have made

20   this investment?

21   A    No.  The reality is, had we known the truth, or even had

22   a sense of the truth, the true intentions behind some of

23   those transfers and ultimately what would have happened, we

24   never would have made this investment, full stop.

25   Q    Thank you, Mr. Pugatch.

Pugatch - Cross                    113

1          THE COURT:  All right.  I didn't hear you, Ms.

2     Weisgerber.  Do you pass the witness?

3          MS. WEISGERBER:  Yes, I pass the witness.

4          THE COURT:  All right.  Thank you.

5       Mr. Morris, any examination from you?

6          MR. MORRIS:  No, thank you, Your Honor.

7          THE COURT:  All right.

8       (Interruption.)

9          THE COURT:  All right.  I'm not sure whose voice that

10    was, but please, again, mute your devices when you're not

11    talking.

12      Any cross-examination of Mr. Pugatch?  I'll start with

13    you, Mr. Wilson.

14         MR. WILSON:  Yes, Your Honor.

15         THE COURT:  Okay.

16                    CROSS-EXAMINATION

17    BY MR. WILSON:

18    Q   How are you -- I guess we're afternoon now.  How are you

19    this afternoon, Mr. Pugatch?

20    A   I'm doing well.  Yourself?

21    Q   I'm doing well as well.  Do you recall that on Monday of

22    this week I took your deposition?

23    A   Yes, I do.

24    Q   And so you understand that my name is John Wilson and I

25    represent Jim Dondero, who has filed an objection to the 9019

Pugatch - Cross                    114

1    motion filed by the Debtor?

2         I've got a few questions for you today.  Has HarbourVest

3    been around for over 35 years?

4    A    We have, yes.

5    Q    And does HarbourVest have ten offices around the world?

6    A    Correct, yes.

7    Q    And does HarbourVest employ over 150 investment

8    professionals?

9    A    Yes.

10   Q    Does HarbourVest have over $74 billion in assets under

11   management?

12   A    Correct, yes.

13   Q    And is HarbourVest's client base largely comprised of

14   institutional investors?

15   A    Also correct.

16   Q    And you would agree with me that HarbourVest is a

17   sophisticated investor, right?

18   A    I would, yes.

19   Q    How long have you worked for HarbourVest?

20   A    I've been employed by HarbourVest for 17 years now.

21   Q    And how long have you been a managing director?

22   A    I've been a managing director for approximately six

23   years.

24   Q    And you were, in fact, the managing director for the

25   investment that HarbourVest made in Highland CLO Funding,

Pugatch - Cross                                    115

1   Ltd., which has been referred to today as HCLOF, correct?

2   A    I was, correct.

3   Q    And HarbourVest, I think you just testified, invested

4   approximately $73 million as its initial investment in HCLOF?

5   A    Yes, correct.

6   Q    And before HarbourVest made that investment, it had made

7   many investments of this type, correct?

8   A    Yeah.  We've made hundreds of investments into

9   partnerships over our history, correct.

10  Q    So HarbourVest was well-experienced in evaluating and

11  deciding whether to invest in large investments, correct?

12  A    It was, yes.

13  Q    Now, in your -- and by your, I mean HarbourVest -- in the

14  response to the Debtor's omnibus objection, it says that by

15  summer 2017 HarbourVest was engaged in preliminary

16  discussions with Highland regarding the investment.  Is that

17  a correct statement?

18  A    Correct, yes.

19  Q    And, in fact, those talks began in the second quarter of

20  2017, correct?

21  A    Yes.

22  Q    And so the investment closed ultimately on November 15th,

23  2017?

24  A    Yes, that's correct.

25  Q    So it's fair to say that HarbourVest considered and

1   evaluated this transaction for over six months before

2   investing its $73 million, right?

3   A    From the time of the initial conversations that we had

4   with Highland, yes.

5   Q    And one of the reasons that it took over six months to

6   complete the investment is that HarbourVest performs due

7   diligence before it makes an investment, correct?

8   A    Correct.

9   Q    And when you're performing due diligence -- well, first

10  off, you would agree with me that that's a common practice

11  amongst sophisticated investors such as HarbourVest, correct?

12  A    To perform due diligence?

13  Q    Yes.

14  A    Yes.

15  Q    And describe -- describe what HarbourVest does in a

16  general sense when it performs its due diligence.

17  A    Sure.  So, we spend time with the manager -- in this

18  case, Highland -- certainly around the investment thesis, the

19  opportunity, receive materials around the underlying assets.

20  We take that and perform our own independent due diligence

21  around the value of those assets, perform due diligence on

22  the manager itself, the go-forward opportunity.  In many

23  cases, and certainly in this case, engage with outside

24  advisors to assist with that due diligence.  It's a very

25  robust and thorough process.

Pugatch - Cross                    117

1  Q    And by outside advisors, are you referring to the outside

2  counsel that you testified about earlier?

3  A    Yes.  Both outside counsel and outside consultants.

4  Q    Okay.  And so did you say that it's typical to engage

5  outside counsel when performing due diligence?

6  A    Yes.

7  Q    And which outside counsel did you retain with respect to

8  this due diligence?

9  A    Debevoise and Plimpton as well as Milbank.

10 Q    And during the course of HarbourVest's due diligence, did

11 it identify some items of concern?

12 A    As with any investment, there are always items that are

13 identified that require further diligence, risks that are

14 identified that we look to mitigate through our due

15 diligence, et cetera.

16 Q    And if Harbour -- I'm sorry, did you say something else?

17 A    No.

18 Q    You were finished?  Okay.  Now, if HarbourVest identifies

19 an item of concern, is it typical to request additional

20 information regarding those items of concern?

21 A    It is, yes.

22 Q    And so that actually happened with respect to the HCLOF

23 investment, correct?

24 A    In certain cases, yes.

25 Q    HarbourVest identified several litigation matters that it

1  had questions about, correct?

2  A    Correct.  As we would with any investment.

3  Q    And it went back to Highland and asked them to explain

4  their position on those litigation matters?

5  A    Correct.

6  Q    And one of those litigation matters was the Joshua Terry

7  litigation, correct?

8  A    Yes.

9  Q    And at the time that HarbourVest was considering this

10  investment, beginning in the second quarter and continuing

11  through the summer, that Josh Terry litigation had not

12  resulted in an award or a final judgment, correct?

13  A    Correct.

14  Q    And I think we looked earlier at a document that your

15  counsel admitted as HarbourVest Exhibits 34 and 35.  There

16  was an email from a HarbourVest -- or, I'm sorry, from a

17  Highland representative to a HarbourVest representative that

18  was discussing Highland's position on the litigation,

19  including the Terry litigation, correct?

20  A    Are you referring to the document that we looked at

21  earlier?

22  Q    I am.  And I can put it on the screen if we need to.

23  A    No.  Right, I recall that, and yes, that's correct.

24  Q    Okay.  And just to be clear, that document, which stated

25  Highland's positions on the -- and summaries of the

1  litigation, was issued months before the arbitration award to

2  Josh Terry, correct?

3  A    I don't remember the exact timing, but it was certainly

4  during our due diligence period and prior to the arbitration

5  award, yes.

6  Q    Well, it seems to me that that email that you -- your

7  counsel admitted as an exhibit was issued in August of 2017.

8  Does that sound right to you?

9  A    If that's what the email said, yes.

10  Q    And if the Terry arbitration award came out in October,

11  then you would agree with me that that is several months

12  prior to the -- or at least two months prior to the

13  arbitration award?

14  A    Yes.

15  Q    And so when HarbourVest made requests of Highland to

16  provide information regarding its items of concern, Highland

17  complied with those requests, correct?

18  A    It did, correct.

19  Q    And was there ever a time when HarbourVest requested

20  Highland to provide information and that information was not

21  provided?

22  A    Our requests for information, or at least, you know,

23  responses or color to a question, were always met either

24  with, you know, written or verbal communication back to us,

25  yeah.

Pugatch - Cross                    120

1  Q   And you would agree with me that, in fact, HarbourVest
2  delayed the closing of the investment by two weeks to
3  continue its due diligence, correct?
4  A   Correct, related to the structural changes that were made
5  close to closing.  That's right.
6  Q   And after conducting that due diligence, HarbourVest
7  satisfied itself that the investment was sound?
8  A   That the legal structure that had been put in place in
9  connection with those proposed changes by Highland was -- was
10 legally sound, yes, and on the back of, again, statements and
11 misrepresentations on the part of Highland around the nature
12 and potential impact to their ongoing CLO business and HCLOF.
13         MR. WILSON:  Well, I'm going to object to the latter
14 part of your response as nonresponsive.
15         THE COURT:  Sustained.
16 BY MR. WILSON:
17 Q   Now, after you conducted the due diligence, HarbourVest
18 made the investment of $73 million on November 15th, 2017,
19 correct?
20 A   Correct.
21 Q   And so I think you testified earlier that prior to that
22 investment HarbourVest had become aware that that Josh Terry
23 litigation had resulted in an arbitration award, correct?
24 A   Yes.
25 Q   But I think you've also testified that HarbourVest did

Pugatch - Cross                              121

1   not request that Highland provide a copy of the arbitration

2   award, correct?

3   A    That's correct.

4   Q    And you further testified that you were represented by

5   outside counsel at the time, correct?

6   A    Correct.

7   Q    And as of Monday of this week, you had not reviewed that

8   arbitration award; is that correct?

9   A    That's correct.

10  Q    Have you reviewed that arbitration award since Monday of

11  this week?

12  A    I have not.

13  Q    But in any event, you testified that Highland told you

14  about the award?

15  A    Yes.

16  Q    And they told you the amount of the award?

17  A    Yes.

18  Q    And then they told you that the award had been converted

19  to a judgment?

20  A    When you say the award had been converted to a judgment,

21  can you be more specific?

22  Q    Well, I don't know how familiar you are with the

23  litigation process, but in this instance, that award was

24  taken to a court and the court entered a judgment on the

25  arbitration award.  Did you -- were you aware of that?

Pugatch - Cross                              122

1   A    I don't recall the specific legal terms of judgment

2   against it.  I was award of the existence of the arbitration

3   award and the -- and the obligation for Highland to comply

4   with that arbitration award.

5   Q    And HarbourVest did not make an appearance in the Acis

6   bankruptcy, right?

7   A    We did not.

8   Q    But you were aware of the Acis bankruptcy, correct?

9   A    Yes.

10  Q    And you were kept apprised of the Acis bankruptcy by

11  Highland individuals, correct?

12  A    We had conversations with a couple of Highland

13  individuals throughout the Acis bankruptcy process, yes.

14  Q    Right.  And in fact, you testified that you participated

15  in regular conference calls with Highland regarding that

16  bankruptcy?

17  A    That's correct, yes.

18  Q    And do you recall having been provided with over 40,000

19  documents by Highland related to the Acis bankruptcy?

20  A    I do not recall that, no.

21  Q    Would those documents have been provided to your outside

22  counsel, had you received them?

23  A    I don't know the answer to that.

24  Q    Did the outside counsel that represented you in the due

25  diligence continue to represent you throughout the Acis

Pugatch - Cross                               123

1  bankruptcy?

2  A    They did.  One of the counsels did, correct.

3  Q    And which counsel was that?

4  A    Debevoise.

5  Q    So was your counsel actively involved with monitoring the

6  Acis bankruptcy?

7  A    They were, yes, particularly after we were ultimately

8  accused of having something to do with the original structure

9  and -- as a result of misstatements by Highland.

10 Q    Did your counsel attend hearings in the Acis bankruptcy?

11 A    I don't recall.

12 Q    Are you familiar with the PACER system?

13 A    I am not.

14 Q    Now, I think that HarbourVest has been described as a

15 passive investor.  You recall that description of HarbourVest

16 in this instance?

17 A    Yes.

18 Q    But, in fact, HarbourVest invested substantial assets

19 such that it owned a 49.98 percent share of HCLOF.  Would you

20 agree with that?

21 A    That's correct.

22 Q    And in fact, the next largest investor was CLO Holdco,

23 which owned 49.02 percent of the shares, correct?

24 A    That sounds right.

25 Q    And there was an advisory board that was created pursuant

Pugatch - Cross                                        124

1   to the formation documents of this investment, correct?

2   A    That's correct.

3   Q    And in fact, that advisory board only had two members,

4   and one was a representative of HarbourVest and one was a

5   representative of CLO Holdco, correct?

6   A    Correct.

7   Q    And the advisor -- I'm sorry, the portfolio manager was

8   not allowed to disregard the recommendations of the advisory

9   board, correct?

10  A    With respect to the limited set of items that the

11  advisory board could opine on, that is correct.

12  Q    All right.  I want to go over a couple of the

13  misrepresentations that HarbourVest has identified in its

14  filings related to its claim.  The first one is -- and just

15  for the record, I'm reading from Docket No. 1057 filed on

16  September 11, 2020, HarbourVest Response to Debtor's First

17  Omnibus Objection.

18      But the first misrepresentation identified in that

19  document says that Highland never informed HarbourVest that

20  Highland had no intention of paying the arbitration award.

21  And was -- was Highland obligated to pay the Josh Terry

22  arbitration award against Acis?

23           MR. MORRIS:  Objection to the question to the extent

24  it calls for a legal conclusion.

25           THE COURT:  Sustained.

1            MS. WEISGERBER:  Join in that objection.

2            THE COURT:  Sustained.  I think --

3    BY MR. WILSON:

4    Q    Your understanding was --

5            MR. WILSON:  I'm sorry, Judge?

6            THE COURT:  I sustained the objection as calling for

7    a legal conclusion.  So, next question.

8            MR. WILSON:  Yes, I -- I heard that.  Thank you, Your

9    Honor.

10   BY MR. WILSON:

11   Q    In your understanding, was Highland responsible for

12   paying the arbitration award to Josh Terry?

13   A    My understanding is on the account of the fact that Acis

14   --

15           MS. WEISGERBER:  Objection, Your Honor.  Objection,

16   Your Honor, same basis.

17           THE COURT:  Sustained.  It was essentially the same

18   question.

19           MR. WILSON:  Well, Your Honor, I didn't ask --

20           THE COURT:  It was essentially the same question, Mr.

21   Wilson.  Move on.

22           MR. WILSON:  Okay.

23   BY MR. WILSON:

24   Q    The next misrepresentation identified by HarbourVest said

25   that Highland did not inform HarbourVest that it undertook

Pugatch - Cross                          126

1  the transfers to siphon assets away from Acis, LP and that

2  such transfers would prevent Mr. Terry from collecting on the

3  arbitration award.  So the basis for that allegation would be

4  that Highland was siphoning assets from Acis to avoid having

5  Acis pay the arbitration award, correct?

6  A   That -- that would be the implication, yes.

7  Q   Okay.  And then that misrepresentation continues on and

8  says that Highland represented to HarbourVest that it was

9  changing the portfolio manager because Acis was toxic.  And

10 do you recall that representation being made to you?

11 A   Yes, I do.

12 Q   And would you agree with me that whether or not Acis is

13 toxic in the industry would be an opinion?

14 A   I suppose it would be an opinion, but by the manager of

15 the vehicle responsible for managing the HCLOF investment and

16 the underlying CLOs.  Yeah, we viewed the Acis name and the

17 Highland name as synonymous, if you will.  I mean, Acis was a

18 subsidiary of Highland.  For all intents and purposes, it was

19 the same from our perspective as we made the investment into

20 HCLOF.

21 Q   So did HarbourVest have an independent understanding of

22 whether or not the Acis name was toxic in the industry?

23 A   We did not, no.  We relied on Highland's views of that as

24 manager of HCLOF.

25         MR. WILSON:  Your Honor, just a brief housekeeping

Pugatch - Cross                 127

1   item.  Did you say that we need to be done at 1:00 o'clock?

2          THE COURT:  Well, I said I really wanted you to be

3   done by 1:00 o'clock because I have a 1:30 docket and a 2:00

4   o'clock docket and I'd rather not have to hang up 70-

5   something people and reconnect them again at 3:00 o'clock.

6   How close are you to being finished?

7          MR. WILSON:  Well, --

8          THE COURT:  This is going at a very slow pace.

9          MR. WILSON:  Well, I apologize for that, Your Honor.

10  I think I've got at least ten more minutes, but -- but I know

11  we also have closing remarks.  And I was just going to ask if

12  Your Honor had a preference of --

13         THE COURT:  Keep going.

14         MR. WILSON:  -- of breaking now --

15         THE COURT:  Keep -- let's --

16         MR. WILSON:  -- or keep going?  Okay.

17         THE COURT:  Let's talk fast and try to get through.

18  You know, even if I'm sacrificing lunch today, I don't want

19  to inconvenience 75 people this way.  So we'll just probably

20  start our 1:30 hearing a little late and inconvenience those

21  people.

22     All right.  Go ahead.

23         MR. WILSON:  All right.  Thank you, Your Honor.

24  BY MR. WILSON:

25  Q   Did Acis form its -- I can't recall if you answered this

Pugatch - Cross                    128

1   question, but did Acis form its own opinion on whether or not

2   -- I'm sorry, strike that.  Did HarbourVest form its own

3   opinion on whether or not the Acis name was toxic in the

4   industry?

5           MS. WEISGERBER:  Objection, --

6           THE WITNESS:  We did not.  We didn't have a basis.

7           THE COURT:  I'm sorry, did I have an objection?

8   BY MR. WILSON:

9   Q   You did not --

10          THE COURT:  Did I have an objection?

11          MS. WEISGERBER:  Yeah.  Objection.  Yes.  Objection,

12  asked and answered, Your Honor.

13          THE COURT:  Overruled.  He can answer.

14  BY MR. WILSON:

15  Q   Okay.  But --

16  A   We did not.

17  Q   Did Highland have the ability to investigate the Acis

18  name and make its own determination of whether that name was

19  toxic?  I'm sorry, I think I'm misspeaking.  HarbourVest.

20  A   HarbourVest had the ability to do that, yes.

21  Q   I apologize I misspoke.  I meant HarbourVest.  Did

22  HarbourVest have the ability to investigate that name and

23  determine if it was toxic?

24  A   It was irrelevant to our investment thesis.  And as I

25  said before, Acis was a subsidiary of Highland.  We viewed

1  them as interchangeable in the context of our investment.

2  Q   Okay.  The next misrepresentation that you refer to says

3  that Highland indicated to HarbourVest that the dispute with

4  Mr. Terry would have no impact on its investment activities.

5  Would you agree with me that that is also an opinion?

6  A   It was a statement that --

7         MS. WEISGERBER:  Your Honor, I'm going to object to

8  the extent these questions are seeking a legal conclusion

9  regarding, you know, if something's an opinion or not.

10        THE COURT:  Okay.  Overruled.  He can answer.

11        THE WITNESS:  It was -- it was a statement that was

12 made to us by Highland and represented in multiple different

13 formats as fact.  And a representation that we relied on in

14 connection with our investment.

15 BY MR. WILSON:

16 Q   And finally, the misrepresentation, the last

17 misrepresentation identified, is that Highland expressed

18 confidence in the ability of HCLOF to reset or redeem the

19 CLOs.  Would you agree with me that that statement is an

20 opinion?

21 A   On the basis that it was the core investment thesis of

22 the -- of the investment of HCLOF.  Again, whether that's

23 legally viewed as an opinion or a fact, it  was -- it was

24 certainly the investment thesis that we made the investment

25 predicated upon.

Pugatch - Cross                          130

1  Q    And you just testified that you thought that Acis and

2  Highland were interchangeable from the perspective of the

3  investment opportunity, correct?

4  A    Correct.

5  Q    But you also accepted Highland's recommendation because

6  HarbourVest agreed that the change in the -- to a Highland

7  manager made commercial sense, correct?

8  A    We took at face value what Highland recommended because

9  this all had to do with the structuring of an entity that

10 they fully managed with respect to multiple underlying

11 subsidiaries that weren't managed by Highland.

12 Q    But would you agree that, at the time, you -- HarbourVest

13 thought that made commercial sense?

14 A    It did not seem unreasonable to us based on the

15 explanation we were given.

16 Q    Okay.

17         MR. WILSON:  I want to refer to HarbourVest Exhibit

18 39.

19      (Pause.)

20         THE COURT:  What are we waiting on?  What are we

21 waiting on?

22         MR. WILSON:  I'm trying to get the document on the

23 screen, Your Honor.

24      (Pause.)

25         THE COURT:  We can't hear you.  We can't hear you.

1        MR. WILSON:  I'm sorry.  I'm sorry, Your Honor.  I'm

2   speaking with my --

3        THE COURT:  Okay.

4        MR. WILSON:  -- co-counsel here.

5        THE COURT:  All right.

6      (Pause.)

7        MS. WEISGERBER:  Mr. Wilson, is it 39 or 38 that

8   you're referring to?

9        MR. WILSON:  39.   HarbourVest 9019 motion on the

10  main -- on the Dondero file.  And then there's the -- it's --

11  it's John  -- and then there's the HarbourVest, and then the

12  exhibits are all in one file.

13       MS. WEISGERBER:  Mr. Wilson, I'll just note that 39

14  was subject to confidentiality based on HCLOF's request.

15  HCLOF's counsel is present.  I think they know it's an

16  excerpt.  But I'd just -- that for HCLOF's counsel.

17       MR. WILSON:  Well, is there an objection to showing

18  this document on the screen?  Yes.  All right.  We're not

19  going to put Document 39 on the screen.

20       A VOICE:  Yes.

21       MR. WILSON:  All right.  Scroll down to the next

22  page.

23  BY MR. WILSON:

24  Q   This is a -- this is a document that was produced to us

25  this week, the Highland production.  It appears to be a

1  Highland CLO Funding, Ltd. Statement of Operations for the

2  Year Ended 31 December 2017.  Do you see at the top of that --

3  at the top of that document where it says total investment

4  income of $26 million?

5  A    I do, yes.

6  Q    And total expenses were roughly $1.8 million?

7  A    Yes.

8  Q    And then net change and unrealized depreciation on

9  investments and net realized loss on investments was $4.26

10 million cumulative, resulting in a net increase in net assets

11 resulting from operations of $20.224 million.  Do you agree

12 with that?

13 A    Yes.

14 Q    Okay.

15         MR. WILSON:  Go to the next one.

16 BY MR. WILSON:

17 Q    And you understand that, in the course of the Acis

18 bankruptcy, the portfolio managers for certain of the CLOs

19 were changed by the Trustee, correct?

20 A    Yes, around the underlying CLOs.  That's -- that's my

21 understanding, yes.

22 Q    And, in fact, Mr. Seery testified earlier today that that

23 occurred in the summer of 2018, correct?

24         MR. WILSON:  Scroll.

25         THE WITNESS:  I don't recall the timing, but that's

Pugatch - Cross                          133

1  what he testified to.

2  BY MR. WILSON:

3  Q    Well, this document is HarbourVest Exhibit 40, and this is

4  the statement of operations for the financial year ended 31

5  December 2018.  Here, the total investment income is only

6  $11.1 million.  Do you see that?

7  A    I do.

8  Q    And do you see where the expenses have increased to $13.6

9  million?

10  A    I do, yes.

11         MR. WILSON:  Okay.  Scroll down some more.

12  BY MR. WILSON:

13  Q    And do you see where it says net change and unrealized

14  loss on investments of $48.47 million?

15  A    Yes.

16  Q    And so after Acis and Brigade took over the managements of

17  these CLOs, we had a net decrease in net assets resulting from

18  operations of $52.483 million in the year 2018, correct?

19         MS. WEISGERBER:  Objection, Your Honor.  Assumes a

20  fact not in evidence.

21         THE COURT:  Overruled.  He --

22         MR. WILSON:  Your Honor, --

23         THE COURT:  We're just looking at this statement and

24  testifying about it says, so I overrule the objection.

25         MR. WILSON:  Thank you, Your Honor.  Thank you, Your

Pugatch - Cross                                    134

1  Honor.  I'm now going to turn to HarbourVest Exhibit 41.  All

2  right.  I'll --

3  BY MR. WILSON:

4  Q    Did you answer the question, Mr. Pugatch?

5  A    No, I -- I would agree with the second part of your

6  statement that for the year 2018 the -- the loss was $52

7  million.  I don't -- I don't believe that jives with the first

8  part of your statement that that was after Acis and Brigade

9  took over.  As I understand, that was in the middle of the

10 year.

11 Q    But in any event, Acis and Brigade had been managing this

12 for at least six months of 2018 when that loss occurred,

13 correct?

14 A    They had been managing a portion of the underlying CLO

15 portfolio held by Highland CLO Funding.

16 Q    All right.  We're now looking at Exhibit #41, which is the

17 Draft Unaudited Statement of Comprehensive Income, 31 December

18 2019.  Total income has now dropped to $4.664 million.

19       MR. WILSON:  And scroll down.

20 BY MR. WILSON:

21 Q    Expenditures are at $3.645 million.  And then it says

22 investment gains and losses net out to $11.493 million, a

23 negative $11.493 million.  And --

24       MR. WILSON:  Scroll down to the --

25 BY MR. WILSON:

Pugatch - Cross                    135

1  Q    And so would you agree with me that in the year 2019,

2  HCLOF showed a net loss of $10.476 million?

3  A    Yes, that's what the financial statements say.

4  Q    And in this year, the Acis CLOs were solely managed by

5  Acis and Brigade, correct?

6  A    The Acis CLOs were.  Yes, correct.

7  Q    All right.

8         MR. WILSON:  Now, go to 42.

9  BY MR. WILSON:

10  Q    Now, this is HarbourVest #42.

11         MR. WILSON:  Go down to the next page.

12  BY MR. WILSON:

13  Q    And this is the Highland CLO Funding, Ltd. Unaudited

14  Condensed Statement of Operations for the Financial Period

15  Ended 30 June 2020.  And so this is just half a year of

16  operations.  And would you -- and this actually has a

17  comparison between 2019 and 2020.  But do you see where it

18  says investment income has dropped from a million dollars in

19  the first half of 2019 to $381,000 in the first half of 2020?

20  A    Yes.

21         MR. WILSON:  Okay.  Scroll down.

22  BY MR. WILSON:

23  Q    And do you see where, in the first half of 2019, total

24  expenses were $1.85 million, and then in the first half of

25  2020 total expenses were $2.16 million?  Do you see that?

Pugatch - Cross                          136

1  A    I do.

2  Q    And if you go down below that, where it says Net Realized

3  and Unrealized Gain/Loss on Investments, the first half of

4  2019 HCLOF lost $12 million, and in the first half of 2020 it

5  lost $39.472 million?

6           MR. MORRIS:  Your Honor, I'm going to object.  It's

7  John Morris for the Debtor.  I'm happy to stipulate.  In fact,

8  he can offer this document into evidence.  There's no

9  foundation that Mr. Pugatch has any particularized knowledge

10  about any of the numbers behind this.  All he's asking him to

11  do is to confirm what the document says.  It says what it

12  says.  But this -- I'll object on that basis, Your Honor.

13           THE COURT:  All right.  Mr. Wilson, what about it?

14  You're just getting him to read numbers off of these exhibits.

15           MR. WILSON:  Well, --

16           THE COURT:  Shall we just --

17           MR. WILSON:  -- I understood --

18           THE COURT:  -- by stipulation get them into evidence?

19           MR. WILSON:  Well, --

20           MR. MORRIS:  No objection, Your Honor.

21           MS. WEISGERBER:  No objection.

22           THE COURT:  All right.  So these are exhibits what?

23  We've gone through 39, 41, and I don't know what else.  40,

24  maybe?

25           MR. WILSON:  It was Exhibits 39, 40, 41, and 42 that

Pugatch - Cross                    137

1  were on the HarbourVest exhibit list.

2          THE COURT:  All right.  Those will be admitted, and

3  we've already discussed what docket entry number they appear

4  at.

5      (HarbourVest's Exhibits 39 through 42 are received into

6  evidence.)

7          THE COURT:  All right.  Anything else?  You told me

8  you had 10 more minutes about 15 minutes ago.

9          MR. WILSON:  Well, I'm sorry if I -- I think I had

10 said I had at least ten more minutes, and I was looking at the

11 -- it was 10:50 [sic] and you wanted to quit at 1:00.  So I do

12 have longer than that.  I'm sorry, Your Honor.

13         THE COURT:  Well, --

14         MR. WILSON:  But --

15         THE COURT:  -- I feel like I'm being --

16         MR. WILSON:  -- I'll try to proffer --

17         THE COURT:  Okay, Mr. Wilson, let me just tell you

18 something.  I feel like I'm being disrespected now, and the

19 parties are.  We really need to pick up the pace.  I've told

20 you I've got a 1:30 docket -- with four or five matters on it,

21 by the way.  I've got a 2:00 o'clock docket.  I'm starting

22 them late.  No one advised my courtroom deputy that we were

23 going to need all day today for this, okay?  So you've got

24 five more minutes to wrap it up, and then, of course, I have

25 to go to Mr. Draper and see if he has cross.  All right?  So

Pugatch - Cross                      138

1  please don't test my patience any more.  Five minutes to

2  finish.

3          MR. DRAPER:  Judge, I have no questions.

4          THE COURT:  I didn't hear you, Mr. Draper.  What did

5  you say?

6          MR. DRAPER:  I have no questions.

7          THE COURT:  All right.  Very good.

8          MR. WILSON:  I apologize, Your Honor.  I was actually

9  trying to be respectful of your time when I informed you that

10 I had at least ten more minutes left at 12:50, but I will try

11 to be as expedient as I can as I finish up.

12 BY MR. WILSON:

13 Q   And I don't see you on my screen.

14         MR. WILSON:  You can take that document down.

15         THE WITNESS:  Here.

16 BY MR. WILSON:

17 Q   Mr. Pugatch, do you have an opinion as to what caused

18 these incredible losses of value at HCLOF?

19         MS. WEISGERBER:  Objection to the extent it calls for

20 a legal conclusion.

21         THE COURT:  Overruled.  He can answer.

22         THE WITNESS:  I would say that there's no one cause

23 for the decline in value.  I can point to a number of

24 different things, including the exorbitant fees that were

25 charged to HCLOF, including the inability to be able to re --

Pugatch - Cross                          139

1  refinance the CLOs on the part of HCLOF, all of which stems

2  from the actions that Highland took prior to our investment in

3  HCLOF.

4  BY MR. WILSON:

5  Q   And you've -- I think it's been referenced several times

6  in HarbourVest's arguments that -- that the reset was a

7  fundamental -- the inability to get a reset was a fundamental

8  cause of the loss in value.  Is that -- is that HarbourVest's

9  position?

10 A   That -- that is a part of the -- the cause in the

11 declining value of the CLOs, yes.

12 Q   And you would agree with me that a reset is fundamentally

13 a reset of interest rates, correct?

14 A   Of the interest rates of the liabilities of the -- the

15 timing for repayment of those liabilities, yes.

16 Q   Now, just say with -- for the sake of a hypothetical

17 example.  If you had a home that was valued at $5 million, or

18 let's just say $500,000, let's make it more realistic.  If you

19 had a $500,000 home and you had a mortgage on that home at

20 five percent interest, your inability to refinance that home

21 at a lower interest rate would not affect the underlying value

22 of that home, correct?

23         MS. WEISGERBER:  Objection, Your Honor. Hypothetical.

24 And objection to relevance as well.

25         THE COURT:  Sustained.

1              MS. WEISGERBER:  Calls for speculation.

2              THE COURT:  Sustained.

3    BY MR. WILSON:

4    Q    Is there any reason to believe that the change in the

5    interest rate would have prevented the massive losses of

6    investment value that occurred in HCLOF?

7              MS. WEISGERBER:  Object on the same grounds.

8              THE COURT:  Sustained.

9              THE WITNESS:  The short -- the short answer is yes,

10   with a -- with the amount of leverage --

11             MS. WEISGERBER:  I --

12             THE WITNESS:  -- that exists.  Oh, sorry.

13             MS. WEISGERBER:  The objection was sustained.

14             THE COURT:  Yeah, I sustained the objection.  That

15   means you don't answer.

16             THE WITNESS:  I'm sorry, Your Honor.

17   BY MR. WILSON:

18   Q    So, would you agree with me that if the expenses and the

19   fees charged by the portfolio manager increased dramatically,

20   that would -- that would impact the value of the investment,

21   correct?

22             MS. WEISGERBER:  Objection on the same grounds, and

23   relevance.  This is a 9019 hearing, Your Honor.  We are not

24   here to try every minutia.  And in fact, we're trying to avoid

25   a trial on the merits.  And it feels like we're getting a bit

Pugatch - Cross                                    141

1  far afield now.

2          THE COURT:  I sustain.

3          MR. WILSON:  All right.  I'll pass the witness.

4          THE COURT:  All right.  Mr. Draper said he had no

5  cross.  So, any redirect, Ms. Weisgerber?

6          MS. WEISGERBER:  No, Your Honor.

7          THE COURT:  All right.  Mr. Morris, did you have any

8  redirect?

9          MR. MORRIS:  I do not, Your Honor.  I have a very

10  brief closing and then some additional remarks if -- if we

11  finish.

12          THE COURT:  All right.  So, Mr. Pugatch, that

13  concludes your testimony.  Thank you.  You're excused if you

14  want to be.

15      All right.  So, as I understood it, there would be no more

16  evidence after this.

17          MR. WILSON:  Well, Your Honor, along those lines, as

18  a housekeeping measure, I think everything on my exhibit list

19  is included on someone else's exhibit list, but just for belt

20  and suspenders I would move to admit all of the exhibits on

21  the -- on Mr. Dondero's exhibit list.

22          THE COURT:  Well, is that agreed or not?  Because we

23  didn't have a witness to get them in.

24          MR. MORRIS:  No objection, Your Honor.

25          THE COURT:  Any objection?  All right.  If there's no

142

1   objection, I'll --

2           MR. MORRIS:  Your Honor, --

3           THE COURT:  I'm sorry.  Was there an objection?  I

4   will admit Dondero Exhibits A through M, and those appear at

5   Docket Entry 1721, correct, Mr. Wilson?

6           MR. WILSON:  That is correct, Your Honor.

7           THE COURT:  All right.

8           MR. WILSON:  That is correct, Your Honor.

9      (James Dondero's Exhibits A through M are received into

10  evidence.)

11          MR. WILSON:  And one final matter is, during the

12  examination of Mr. Seery, you at least partially admitted

13  Dondero's Exhibit N, and I was wondering if we need to -- how

14  we'd need to submit that for the record.

15          THE COURT:  Okay.  First, I'm confused.  I think you

16  said Mr. Terry's testimony.  You --

17          MR. WILSON:  I said Seery.  I'm sorry.

18          THE COURT:  Oh, Seery?

19          MR. WILSON:  Or I may have said Terry, but I meant to

20  say Seery.

21          THE COURT:  Okay.  Maybe you said it.  Okay.  During

22  Mr. Seery's testimony -- oh, the email that I admitted a

23  portion of?

24          MR. WILSON:  That is -- that's correct, Your Honor.

25          THE COURT:  What -- what are you asking?  It's not in

143

1   your notebook.  Are you asking do you need to separately

2   submit it or what?

3           MR. WILSON:  Yeah, I was just asking what the Court's

4   preference on how we submit that for the -- put it in the

5   record.

6           THE COURT:  Okay.  That was so garbled I didn't hear

7   you.  You need to file that on the docket as a supplemental

8   exhibit that was admitted, okay?

9           MR. WILSON:  Okay.  Thank you, Your Honor.

10          THE COURT:  All right.  Closing arguments?  Mr.

11  Morris?

12          CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

13          MR. MORRIS:  Yes, very briefly, Your Honor.  The

14  Debtor easily meets the standard here.  The settlement

15  consideration relative to the claim establishes and reflects

16  the likelihood of success on the merits.

17      You know, I've never -- I did hear Mr. Pugatch in the

18  deposition the other day, but I otherwise haven't heard from

19  him.  I found him to be incredibly credible, Your Honor, and I

20  regret the fact that he and HarbourVest are being blamed twice

21  here.  The fact that they got 40,000 documents or didn't read

22  the arbitration award, it's just -- it's a shame that they're

23  being dragged through this yet again.

24      The fact is, Your Honor, there is no evidence that they

25  made the disclosures that HarbourVest claims -- complains

144

1  about.  They just don't.  The fraudulent transfers led to the

2  bankruptcy, led to the appointment of a trustee, led to --

3  right?  So, so it's -- that's why -- but they're getting

4  something for their claim.

5      It was a hard negotiation, Your Honor.  There is no

6  dispute that if we litigated this it would be complex.  It

7  would fact-intensive.  The Debtor would be forced to rely upon

8  witnesses who are no longer employed by it.  That it would be

9  expensive, for sure.  There's no dispute about any of that.

10  There's no dispute that the creditor body has spoken loudly

11  here by unanimously refraining from objecting except for Mr.

12  Dondero and the entities controlled by him.

13      And you heard Mr. Seery's testimony.  I think he

14  exhaustively informed the Court as to the process by which the

15  transaction was analyzed and negotiated, and there's no

16  evidence to the contrary that this was an arm's-length

17  negotiation.

18      Unless Your Honor has any questions, we would request that

19  the motion be granted.

20          THE COURT:  Thank you.  Ms. Weisgerber, your closing

21  argument?

22              CLOSING ARGUMENT ON BEHALF OF HARBOURVEST

23          MS. WEISGERBER:  Sure.  Thank you, Your Honor.  I'll

24  also be brief.  We again join in Mr. Morris's arguments and

25  comments.

1    The Court has now heard testimony from Mr. Pugatch

2    regarding the factual detail underlying HarbourVest's claims.

3    The Court has also heard about the significant damages that

4    HarbourVest stands to recover for those claims.  And

5    HarbourVest came to this Court ready to litigate.  It would --

6    it's ready to do so if needed.  It believes it would prevail

7    on its claims if it had to do so.

8        But the Court also heard from Mr. Seery about his

9    understanding of HarbourVest's claims, his calculus, and his

10   decision to settle them.  And we submit that nothing further

11   is needed by this Court in order to approve the settlement.

12   This is a question of the Debtor's business judgment.  We're

13   not here to have a trial on the merits of HarbourVest's

14   claims.  The Objectors have made various arguments, including

15   about the cause of HarbourVest's damages.  But even the nature

16   of the legal claims that HarbourVest is asserting, some do not

17   require a loss causation.  So we submit that's not even

18   relevant to the merits of the claims.

19       The settlement is clearly in the best interest of the

20   estate, and we respectfully request that the Court approve it.

21           THE COURT:  Thank you.  All right.  Mr. Wilson, your

22   closing argument?

23           MR. LYNN:  Michael Lynn.  I will give the closing

24   argument, if that's satisfactory to the Court.

25           THE COURT:  All right.  Go ahead.

1          CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

2          MR. LYNN:  Good afternoon, Your Honor.  I just want

3    to make a few points, and I'll try to do it as quickly as

4    possible.

5       First, I feel compelled to address the argument of the

6    Debtor that Mr. Dondero is repeating his litigious behavior

7    from the Acis case.  I don't know about the Acis case.  I

8    wasn't involved except very, very peripherally.  But with

9    respect to this case, we have only taken positions in court

10   that we believed -- that is, his lawyers -- believed were

11   warranted by law, facts as we knew them, and that are

12   consistent with professionalism.  I'd be glad to explain any

13   position we took.

14      Often, through the Debtor's very persuasive powers, we

15   never had the chance to explain our position previously to the

16   Court.  In fact, for the most part, as today, we have been

17   reactive rather than commencing proceedings.  In fact, during

18   the first seven months of this case, we only appeared in court

19   a few times, when we felt we had to -- for example, when

20   discovery was being sought by the Creditors' Committee that we

21   feared might invade privilege.  Then, much to the Debtor's

22   fury, we opposed the Acis 9019.  We did so because we thought

23   it was too much.

24      Since, as the Court can see, the principal instigators of

25   litigation have been the Debtor, and to a lesser extent, the

147

1  Committee.

2      Indeed, in an apparent effort to drown Mr. Dondero and his

3  counsel in litigation, the Debtor has repeatedly sought court

4  action on a very short fuse, claiming need for expedited

5  hearing.

6      Perhaps the most startling example of this is the recent

7  contempt motion, for which there is no good reason for a quick

8  hearing.  Resolution of that motion is not necessary to reach

9  the confirmation hearing.  The motion could be heard after the

10  confirmation hearing.  There is no need to put Mr. Dondero and

11  his professionals in a position where they have to respond in

12  a couple of days, two business days, and then will have two

13  days to prepare for trial.

14      Second, Your Honor, Mr. Seery has repeatedly asserted,

15  contrary to today's motion, that the HarbourVest claim was of

16  no merit.  That is why, when he came in to settle for tens of

17  millions of dollars, we opposed this motion.  It appears that

18  the motion is occurring without any cross-party discovery.

19  There is no consideration, apparently, of trying dispositive

20  -- dispositive motions first.  There is no consideration for

21  junior classes of equity, which Mr. Seery has previously

22  opined were in the money.  This, even though there's no reason

23  that this settlement is necessary pre-confirmation, unless Mr.

24  Seery wants HarbourVest's vote.

25      Third, for whatever reason, that seems to be the driving

148

1   factor for settling.  On its face, the vote seems to be a key
2   factor of the settlement.  About the longest provision of the
3   settlement agreement relates to voting.  The motion itself --
4   in the motion itself, five of seven bullet points cited by the
5   Debtor for approval of the settlement deal with and emphasize
6   support of the plan or the vote that is to be cast for the
7   plan.
8       If the settlement is a good deal, it didn't need to have
9   as one of its parts the requirement that HarbourVest vote for
10  the plan.
11      Your Honor, I'll stop there.  I know Your Honor would like
12  to get just a few minutes before your 1:30 docket.  I've been
13  there and I understand that, and I do apologize for taking the
14  time we have, but I think that responsibility is shared with
15  the Debtor and HarbourVest.
16      Thank you, Your Honor.
17          THE COURT:  All right.  Thank you for that.
18      Mr. Draper, any closing argument from you?
19    CLOSING ARGUMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS
20          MR. DRAPER:  Yes, I have three comments.  The first
21  is the claim -- the loss claim, absent the fraud claim, is, at
22  best, $7 million.  I think Mr. Seery's argument that a hundred
23  -- one hundred percent is attributable to there is just wrong.
24  If he and I both invested in a company 50-50 and it goes
25  broke, we only lost 50 cents each.

149

1      Number two, I think the Court heard the evidence.  I think

2  this is, at best, a subordinated claim under 5 -- under the

3  Bankruptcy Code.  It's really a "But for the

4  misrepresentations, we wouldn't have invested."

5      And the last one is the -- Judge Lynn represented the

6  voting, so I won't deal with that.  But the one that troubles

7  me the most is the fact that this asset that is ultimately

8  being paid for in claim dollars that's being transferred over

9  to the Debtor and being put it outside the estate, outside the

10  purview of this Court, and placed in some subsidiary, this --

11  this transaction, if it is approved, must -- should contain a

12  provision that the asset that's being acquired come into the

13  Debtor and be owned by the Debtor.

14          THE COURT:  All right.

15          MR. DRAPER:  I have nothing further, Your Honor.

16          THE COURT:  Thank you, Mr. Draper.

17      Mr. Morris, you get the last word since it's your motion.

18          MR. MORRIS:  Very quickly, Your Honor.  The

19  subordination argument doesn't hold water.  This is not a

20  claim against the Debtor for the security; it's a claim for

21  fraud.  Okay?  So, so 510(b), if it was a claim against HCLOF,

22  that might make sense, but this is a claim against the Debtor.

23  And it's a Debtor -- it's a claim for fraud.  That's number

24  one.

25      Number two, we need to keep this exactly as it's been

 1  structured in order to avoid litigation.  Mr. Seery told the

 2  Court.  I'm sure the Court can make its own assessment as to

 3  Mr. Seery's credibility as to whether or not the Debtor is

 4  intending to somehow get this asset beyond the Court.

 5      But there are reasons why we've done this, Your Honor.

 6  They could have made an objection on that basis.  In fact, if

 7  they did, it would be overruled, because there's no -- there's

 8  no basis for this Court to find that somehow the Debtor and

 9  Mr. Seery are doing something untoward to get assets away from

10  this Court's jurisdiction.

11      You know, I don't know what to say about Mr. Lynn's

12  commentary.  Much of it had nothing to do with any evidence in

13  the record.

14      The fact remains, Your Honor, that this settlement is

15  fair.  It's reasonable.  It's in the best interest of the

16  estate.  And we would respectfully request that the Court

17  grant the motion.

18          THE COURT:  All right.  Thank you.  Well, I

19  appreciate all the arguments and evidence I have heard today.

20  I'm going to be brief in my ruling here, but I reserve the

21  right to supplement in a more fulsome written order, which I'm

22  going to instruct Mr. Morris to submit.  I am approving the

23  motion to compromise the HarbourVest claim today, and I guess

24  subsumed in that is granting the motion to allow their claim

25  for 3018 voting purposes.

1     I in all ways find this compromise to meet the required

2     legal standard set forth in such cases as *TMT Trailer Ferry*,

3     *AWECO*, and *Foster Mortgage*, numerous other Fifth Circuit

4     cases.

5          First, I'm going to specifically say for the record that I

6     found both witnesses today, Mr. Seery and Mr. Pugatch, to be

7     very credible.  Very credible testimony and meaningful

8     testimony was provided to the Court today.  And based on that

9     testimony, I find, first, that this compromise was the product

10    of arm's-length negotiations.  It was a hard-fought

11    negotiation, as far as I'm concerned.  The Debtor objected to

12    these numerous HarbourVest proofs of claim.  The Debtor did

13    not want to allow HarbourVest a significant claim for voting

14    purposes.  I duly note the statements made in the disclosure

15    statement before this compromise was reached suggesting, you

16    know, the Debtor didn't think HarbourVest should have a large

17    claim.

18         That is consistent with everything I typically see in a

19    bankruptcy case when there's a claim objection.  The objector

20    vehemently denies the claimant should have a proof of claim,

21    and then people sit down and think about the risks and rewards

22    of litigating things.  And I believe very fervently that's

23    what happened here.  There were good-faith, arm's-length

24    negotiations that resulted in this proposed compromise.

25         I find the compromise -- and I'll add to that point, on

152

1   the good-faith point, I find nothing sinister or improper

2   about the fact that the compromise includes a commitment of

3   HarbourVest to vote in favor of the plan.  Again, we see this

4   a lot.  You know, there's even a buzz word that doesn't even

5   exist in the Bankruptcy Code:  "plan support agreement."  You

6   know, we see those a lot -- you know, oftentimes negotiated

7   before the case, but sometimes after.  You know, it may be

8   improper in certain situations, but there was nothing here

9   that troubles me about that component of the compromise.

10      I find the compromise to meet the paramount interest of

11  creditors here.  Notably, we have very large creditors in this

12  case who have not objected.  The *Foster Mortgage* case from the

13  Fifth Circuit tells me I am supposed to consider support or

14  opposition of creditors.  No opposition of UBS.  No opposition

15  of the Redeemer Committee Crusader Fund.  No opposition from

16  Josh Terry or Acis.  No opposition from Daugherty.

17      But moreover, when considering the paramount interest of

18  creditors, I find this compromise to be in all ways fair and

19  equitable and in the best interest of the estate, and

20  certainly within the range of reasonableness.  The evidence

21  showed that HarbourVest asserted over $300 million.  Over $300

22  million.  Granted, that was based on all kinds of legal

23  theories that would be contested and expensive to litigate,

24  but the evidence also showed that they invested over $70

25  million.  You know, close to $75 million.  I forget the exact

153

1  number.  $75 or $80 million, somewhere in that range.  And now

2  the credible evidence is that investment is worth about $22

3  million.

4      So, certainly, while the claim may not have, at the

5  ultimate end of the day in litigation, resulted in a $300

6  million proof of claim, certainly, certainly there were strong

7  arguments for a very sizeable claim, more than this compromise

8  amount.  So it's certainly fair and equitable and reasonable

9  when considering the complexity and duration of further

10  litigation, the risks and rewards, the expense, delay, and

11  likely success.

12      A couple of last things I'm going to say are these.  I

13  understand, you know, there is vehement disagreement on the

14  part of our Objectors to the notion that Highland might have

15  caused a $50 million loss to HarbourVest.  But I will tell

16  you, for what it's worth -- I want the record clear that this

17  is part of my evaluation of the reasonableness of the

18  settlement -- my reaction is that, indeed, Highland's

19  litigation strategy in the Acis case caused HCLOF to lose a

20  huge portion of its value, to the detriment of HarbourVest.

21  You know, whether all evidence at the end of the day would

22  convince me of that, I don't know, but that's -- that is

23  definitely this judge's impression.

24      I'm very sympathetic to HarbourVest.  It appears in all

25  ways from the record, not just the record before me today, but

1  the record in the Acis case that I presided over, that

2  Highland back then would have rather spent HarbourVest's

3  investment for HCLOF legal fees than let Josh Terry get paid

4  on his judgment. They were perfectly happy to direct the

5  spending of other people's money, is what the record suggested

6  to me.

7      And then, you know, I have alluded to this very recently,

8  as recently as last Friday: I can still remember Mr.

9  Ellington sitting on the witness stand over here to my left

10 and telling the Court, telling the parties under oath, that

11 HarbourVest -- he didn't use its name back then, okay? For

12 the first phase of the Acis case, or most of the Acis case, we

13 were told it was an investor from Boston. And at some point

14 someone even said their name begins with H. I mean, it seemed

15 almost humorous. But Mr. Ellington said it was they,

16 HarbourVest, the undisclosed investor, who was insistent that

17 the Acis name was toxic, and so that's what all of this had

18 been about: the rebranding, the wanting to extract or move

19 things away from Acis.

20     So, you know, I have heard for the -- well, at least the

21 second time today, from Mr. Pugatch, what I perceive to be

22 very credible testimony that that's just not the way it

23 happened.

24     And I guess the last thing I want to say here today, and

25 you know, I guess I have multiple reasons for saying this, not

1  just in connection with approving the settlement, you know,

2  I've heard about how the Acis CLOs, the HCLOF CLOs have lost,

3  you know, a crazy amount of value, that they underperform in

4  the market, that, you know, during the Acis/Brigade tenure

5  and, you know, they should have been reset.  You know, I hope

6  those who have not been around as long as some of us in this

7  whole saga know that the -- Mr. Terry, Mr. Phelan, I think

8  Brigade, they all desperately wanted to reset these things,

9  but it was HCLOF, I believe directed by Highland, that wanted

10 to redeem, wanted to liquidate, take the pot of money,

11 warehouse it, and then do their own thing.

12     And there was, I think, from my vantage point, a

13 monumental effort to try to get everyone to the table to do

14 reasonable resets that would be good for the stakeholders at

15 HCLOF and be good for the creditors of Acis, including Josh

16 Terry.  That was always the balancing act that most of us were

17 focused on during the Acis bankruptcy.  But Highland, I

18 believe, directing HCLOF's strategy, just did not want the

19 resets to happen.

20     So, again, part of me, I suppose, just wants to make the

21 record clear on something that I fear not everyone is clear

22 about.  And I say that because the comment was made that the

23 injunctions, the preliminary injunctions sought by the Acis

24 trustee caused the plummet in value, and I think that's just

25 not an accurate statement.  I think litigation strategies are

1   what caused the plummet in value, and that's why I think

2   ultimately HarbourVest would potentially have a meritorious

3   claim here in a significant amount if this litigation were to

4   go forward.

5       So, I approve this under 9019.  And again, Mr. Morris,

6   you'll upload an order.

7       It is now 1:41, so let's as quickly as possible hear the

8   other motion that I don't think had any objections.  Mr.

9   Morris?

10          MR. MORRIS:  Your Honor, just -- yes, just very

11  quickly, just four things.

12      With respect to the order, I just want to make it clear

13  that we are going to include a provision that specifically

14  authorizes the Debtor to engage in -- to receive from

15  HarbourVest the asset, you know, the HCLOF interest, and that

16  that's consistent with its obligations under the agreement.

17      The objection has been withdrawn, I think the evidence is

18  what it is, and we want to make sure that nobody thinks that

19  they're going to go to a different court somehow to challenge

20  the transfer.  So I just want to put the Court on notice and

21  everybody on notice that we are going to put in a specific

22  finding as to that.

23          THE COURT:  All right.  Fair --

24          MR. MORRIS:  Number two is --

25          THE COURT:  Fair enough.  I do specifically approve

157

1    that mechanism and find it is appropriate and supported by the

2    underlying agreements.

3        And just so you know, I spent some time noodling this

4    yesterday before I knew it was going to be settled, so I'm not

5    just casually doing that.  I think it's fine.

6        Okay.  Next?

7            MR. MORRIS:  Thank you very much, Your Honor.  Number

8    two, with respect to the motion to pay, there is no objection.

9    If we can just submit an order.  Or if Your Honor has other

10   guidance for us, we're happy to take it.

11           THE COURT:  Okay.  Does anyone have anything they

12   want to say about that motion?

13       Again, I looked at it.  I didn't see any objections.  I

14   didn't see any problem with it.  It's -- you know, you're

15   going through this exercise because of the earlier protocol

16   order.

17           MR. MORRIS:  Correct.

18           THE COURT:  All right.  Well, if there's nothing,

19   then, I will approve that, finding there is good cause to

20   grant that motion.

21           MR. MORRIS:  Okay.

22           THE COURT:  All right.  Is the only other

23   housekeeping matter --

24           MR. MORRIS:  I --

25           THE COURT:  -- we have the contempt motion?

1        MR. MORRIS:  It is, and I do -- I do have to point

2   out how troubled the Debtor is to learn that Mr. Dondero was

3   still receiving documents from Highland as late as this

4   morning.  It's got to be a violation of both the TRO -- I

5   guess it's now the preliminary injunction.

6       I would respectfully request -- I know that time is what

7   it is -- but maybe Mr. Dondero can answer now where he got the

8   document, who he got the document from, what other documents

9   he's gotten from the Debtor since Your Honor ordered him not

10  to communicate with the Debtor's employees.

11      This is not saying hello in the hallway.  I mean, this is

12  just -- it is really troubling, Your Honor, and it's why we

13  need the contempt motion heard as soon as possible.

14          THE COURT:  Well, Mr. Wilson, do you want to address

15  that?  I think the words I heard were that you just got the

16  document this morning, and you got it from Mr. Dondero, but we

17  don't know where and when Mr. Dondero got it.  Mr. Wilson, are

18  you there?

19          MR. LYNN:  I'm afraid I'm back, Your Honor.

20          THE COURT:  Okay.

21          MR. LYNN:  I am not sure whether Mr. Dondero had it

22  in his files from some -- from back before he was asked not to

23  communicate with members or with employees of the Debtor.  I

24  believe -- I believe he's with us, though I don't think he's

25  available by video.

159

1      Are you there, Mr. Dondero?

2            THE COURT:  We can't hear you, Mr. Dondero.

3            MR. DONDERO:  Judge?

4            THE COURT:  Oh, go ahead.

5            MR. DONDERO:  Can you hear me now?

6            THE COURT:  Yes.

7            MR. DONDERO:  Yes, I -- I -- when I moved offices, I

8   found it in a stack of paper, and --

9            MR. LYNN:  I understand it shows that his microphone

10  is working.

11           THE COURT:  Okay.  Go ahead.

12           MR. DONDERO:  Can you hear me?

13           THE COURT:  Yes, go ahead.

14           MR. DONDERO:  Yeah, I -- I'm sitting in new offices.

15  I've got everything in boxes.  I was going through everything

16  yesterday, and I found those emails in a stack of papers and I

17  sent them over because I thought they would be relevant

18  relative to Seery's initial impression.

19           THE COURT:  Okay.  Well, let's talk about the timing

20  of this hearing.  Mr. Morris, I'm going to -- I'm going to ask

21  you why --

22           MR. LYNN:  Michael Lynn, Your Honor.  I don't want to

23  waste the Court's time.  We have not made available anything

24  to the Court objecting to the expedited hearing on the

25  contempt motion.  We've been here.

160

1    I would say to Your Honor that if Mr. Dondero is indeed in

2    contempt, or was in contempt toward the motion, which has

3    nothing to do with the document that was presented as Dondero

4    Exhibit N, there is no need to hear this on an expedited

5    basis.

6        Every time we turn around, Your Honor, the Debtor is

7    asking that something be heard on an expedited basis.  And we

8    have not opposed that.  We have not fought that, to speak of,

9    to date.  But this is getting a little ridiculous.  We're

10   within days of confirmation of the Debtor's plan, and it is

11   simply a means of causing pain and suffering to Mr. Dondero

12   and those who are working with him and for him.  And he does

13   have employees at NexPoint who are assisting him.

14       So we most strongly object to being put on a schedule

15   where we are expected to get a response to the contempt motion

16   on file by Monday, today being Thursday, and a weekend

17   intervening.  And we strongly object to any setting of this

18   contempt motion on Tuesday or Wednesday.  It is absurd, and it

19   is done solely, solely, Your Honor, to cause pain.

20           THE COURT:  All right.

21           MR. MORRIS:  Your Honor, if I may?

22           THE COURT:  Please.

23           MR. MORRIS:  Just very briefly, we had a hearing the

24   other day.  The evidence is the exact same.  The evidence is

25   crystal clear that the violations are meaningful, they're

161

1    substantial, and they are repeated.

2        After the TRO was entered into, Mr. Dondero and only Mr.

3    Dondero chose to interfere with the Debtor's business.  Mr.

4    Dondero and only Mr. Dondero chose to communicate with the

5    Debtor's employees, not about saying hello in the hallway but

6    about coordinating a legal defense strategy against the

7    Debtor.

8        The need is immediate, Your Honor, and I would

9    respectfully request that the hearing be set for Tuesday or

10   Wednesday.  They've had this motion now since the 7th of

11   January.  They had a full evidentiary hearing, so they know

12   most of the evidence that's going to be presented.  They have

13   a whole team of -- they have an army of lawyers, Your Honor,

14   and half a dozen firms working on behalf of Mr. Dondero and

15   his interests.  For him to cry here, for him to cry that this

16   is too much is really -- it's obscene.  It just is.

17            THE COURT:  All right.  I'm going to say a couple --

18            MR. LYNN:  That is absurd.

19            THE COURT:  I'm going to say a couple of things.  One

20   is that I -- well, the one time I remember getting reversed

21   for holding someone in contempt of court, the District Court

22   felt like I had not given enough notice of that.  The District

23   Courts, what they think is reasonable notice, is sometimes

24   very different from what the bankruptcy judges think.  We're

25   used to going very lickety-split fast in the bankruptcy

162

1  courts.  And the Courts of Appeals, District Court, Courts of

2  Appeals obviously, for good reason, are very concerned about

3  due process in this kind of context.  So I'm sensitive to

4  that.

5      I'm also sensitive to the fact that it is monetary damages

6  that are being sought here to purge the contempt.  Okay?  The

7  shifting of attorneys' fees is basically what I understand is

8  being sought at this point.  You know, we have a preliminary

9  injunction halting behavior at this point, and so I think

10  that's another reason I'm hesitant to give an emergency

11  hearing.  I feel like monetary damages can wait and we can

12  give 21-plus days' notice of the hearing.

13      But I'm going to throw this out there as well.  If I do

14  feel like there is a showing of contempt, if I do feel like

15  the phone -- as I told you the other day, I'm very, very

16  fixated on the phone that may have been destroyed or thrown

17  away, maybe at Mr. Dondero's suggestion.  I mean, the

18  potential monetary sanction here may be very, very large if

19  the evidence plays out in the way I fear it might play out.

20  So I need to make sure everybody has adequate time to prepare

21  for that hearing and make sure I get all the evidence I need

22  to see.  All right?  Contempt of court is very, very, very,

23  very serious, and I don't think anyone would deny that.

24      So, with that, it was filed what day?  January 4th?  Is

25  that what I heard?  Or --

163

1          MR. MORRIS:  January 7th, I believe, Your Honor.

2          THE COURT:  January 7th?  All right.  Well, Traci,

3     are you there?  Hopefully, you're not in a hunger coma at this

4     point.

5          THE CLERK:  I am here.

6          THE COURT:  Okay.  We have -- we're going to have to

7     go to that first week of February, right?  Because we've got

8     the confirmation hearing that, you know, late in January, and

9     then --

10          THE CLERK:  Yes.  Uh-huh.

11          THE COURT:  Okay.  Do you have an available date to

12     give right now?

13          THE CLERK:  How about -- if you're willing to hear

14     them on Friday, February 5th.

15          THE COURT:  Okay.  I can do that.  February 5th at

16     9:30.  Any -- anybody want to argue about that?

17          MR. MORRIS:  Thank you, Your Honor.  That's

18     acceptable to the Debtor.

19          THE COURT:  Okay.  Mr. Lynn, is that good with you?

20          MR. LYNN:  We'll do that, Your Honor.  I would say,

21     by the way, that I'll be happy to buy Mr. Seery, out of my own

22     pocket, five cell phones, which ought to make up for the one

23     that was lost, though I recognize that those cell phones will

24     not have on them the privileged information, the conversations

25     between his lawyers and Mr. Dondero that I imagine he was

164

1  looking forward to seeing.

2       THE COURT:  Well, I wouldn't want him to see that

3  information, but I do think he's entitled to any nonprivileged

4  information, texting, or calls that are on that phone.  So,

5  again, I'm either going to hear good explanations for that or

6  not, but it's something very concerning to me.

7     All right.  So we have a game plan.

8     I'm going to ask, Did we have good-faith negotiations

9  between Dondero and the Committee and anything positive to

10  report?  I'll ask Mr. Lynn and Mr. Clemente to weigh in.

11       MR. CLEMENTE:  Yes, Your Honor.  I'll go first, Your

12  Honor.  Mr. Lynn and I have exchanged several emails over the

13  weekend, and the message that I sent to Mr. Lynn was very

14  clear.  There had been a term sheet that Mr. Seery had sent

15  back to Mr. Dondero.  I had asked Mr. Lynn to take a pencil

16  out and be very specific as to what it was Mr. Dondero was

17  prepared to do in connection with the pot plan.  I instructed

18  him that some of the issues that the Committee still has is

19  obviously the overall value, along with the concept that's

20  signing up to a promise from Mr. Dondero to comply with

21  (indiscernible) as part of that value.  As Your Honor may

22  understand, the Committee is obviously very skeptical of Mr.

23  Dondero's future performance under an agreement that he enters

24  into.

25     Those are but a couple of issues, Your Honor, that I

1  advised Mr. Lynn were very concerning to the Committee.  And I

2  suggested to him that if he wanted to move things forward, the

3  best way to do it would be to come to us with a fulsome term

4  sheet that explained exactly what it was in clear and precise

5  detail that Mr. Dondero was proposing, and that would be the

6  best way to move the process forward, Your Honor.

7          THE COURT:  All right.  Mr. Lynn, anything to add to

8  that?

9          MR. LYNN:  Well, Your Honor, my experience in

10  negotiations is that it is useful to agree on substantive

11  terms, or at least be in the ballpark, before term sheets are

12  exchanged.  Long ago, a term sheet was prepared and presented

13  to the Committee.  Ultimately, I think it was rejected, though

14  I don't know if we ever received a formal rejection.

15      I explained in my emails, which I'm happy to share with

16  the Court if Your Honor wants to see them, why I was reluctant

17  to try to put into a term sheet form the proposal that I

18  suggested to Mr. Clemente.  As I said, I'm more than happy to

19  provide you with that email chain and let you form your own

20  judgment, Your Honor, as to whether we're proceeding in good

21  faith.

22          THE COURT:  All right.  Well I'm not going to ask --

23          MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

24  Pomerantz.

25          THE COURT:  -- to see any of that.  Mr. Pomerantz?

1          MR. POMERANTZ:  May I just be heard real quickly?

2          THE COURT:  Sure.

3          MR. POMERANTZ:  Your Honor, we also took Your Honor's

4    comments to heart.  We, Mr. Seery and I, had an over-an-hour

5    conversation with Mr. Lynn and with Mr. Bonds.  We provided

6    them with our thoughts as to what they needed to do in order

7    to move forward.  Of course, it's not really the Debtor to

8    agree.  It's the creditors to agree.  But as Mr. Seery has

9    testified many times before and as I have told the Court, we

10   would support a plan that the Committee and Mr. Dondero could

11   get behind.

12      So we again -- I'm not going to divulge the nature of

13   those communications, but we suggested several things that Mr.

14   Dondero could do in order to move the ball forward, and

15   unfortunately, we have not seen any of those things done thus

16   far.  So we are, at this point, not optimistic that there will

17   be a grand bargain plan.

18          THE COURT:  All right.

19          MR. DONDERO:  Your Honor, could I comment for a

20   second?  This is Mr. Dondero.

21          THE COURT:  If you and your counsel want you to

22   comment, you can comment.

23          MR. DONDERO:  I'd love to do a pot plan.  I would

24   love to reach some kind of settlement and everybody move on

25   with their lives.  The estate started with $360 million of

1 third-party assets and $90 million of notes. The $360 million

2 of third-party assets are down to $130 million.

3      MR. POMERANTZ: Again, Your Honor, I must interrupt.

4 I did this at the last hearing, and it's not my practice to

5 interrupt, but issues regarding what the value is or not, it's

6 going to require a response, and that's not really before Your

7 Honor. I think before Your Honor is --

8      MR. DONDERO: Okay.

9      MR. POMERANTZ: -- have there been negotiations?

10 Have they been in good faith? If Mr. Dondero wanted to

11 address that, that's fine, but I object to having any

12 discussion at this point, especially with Mr. Dondero not even

13 under oath, on what the nature of the value of the assets and

14 why they have changed and what not.

15      THE COURT: Well, --

16      MR. POMERANTZ: It's just not appropriate.

17      THE COURT: I understand --

18      MR. DONDERO: Okay. Can I --

19      THE COURT: Stop.

20      MR. DONDERO: Can I -- can I finish?

21      THE COURT: Let me please respond to that. I

22 understand your concern, but I've heard from Mr. Seery

23 testimony many months ago about the value plummeting during

24 the case. And I asked why, and I got some explanations. This

25 is not evidence. This is just, you know, this is not going to

168

1  be binding in any way.  Mr. Dondero can speak as to what he

2  thinks, you know, the situation is.

3      Go ahead, Mr. Dondero.

4          MR. DONDERO:  Okay.  I'm not trying to fixate on the

5  numbers.  And as far as the third-party assets are, we would

6  be willing to pay -- I would be willing to pay for those.  I'd

7  be willing to pay more, and even some value for the affiliate

8  notes that were really part of compensation agreements

9  throughout the history of Highland and avoid the POC

10 arguments.  I'd be willing to pay for the assets and I'd be

11 willing to pay even more than that.

12     I have no transparency in terms of what the assets are,

13 and there's no fulsome discussion in terms of, well, here are

14 the assets, here are the notes, here's what we think the

15 values are, can you get to this number?  It's just a -- you --

16 the -- it -- I don't view there is good-faith negotiations

17 going on because it's always just a:  You need to put a big

18 number on a piece of paper; otherwise, you're going to get run

19 over.

20     And there's no back and forth going on, but it's not due

21 to a lack of willingness on my part.  And maybe there needs to

22 be a committee set up.  Maybe there needs to be, I don't know,

23 a mediator or an examiner or somebody to try and push through

24 the pot plan, but there's nothing happening.  People are not

25 returning the judge's calls, I mean, Mr. Lynn's calls, or my

169

1  calls.  They're -- there's -- despite efforts of our -- of my

2  own and a willingness of my own, there's no negotiations of

3  any sort going on at the moment.

4         THE COURT:  All right.  I don't want anyone to

5  respond to that.  I know people have different views of what's

6  going on.  But let me just say a couple of things, and then

7  we're done.

8     We do have a Committee in this case.  We have a Committee

9  with very sophisticated members and very sophisticated

10  professionals.  Okay?  That's who I wanted you to be talking

11  to before the end of the day Tuesday.

12     We have had co-mediators in this case.  Okay?  And, you

13  know, I identified very sophisticated human beings for that

14  role.  Okay?  And in fact, there ended up being settlements

15  that flowed out of the co-mediator process.

16     We're now 15 months into the case.  There are major,

17  significant compromises now:  HarbourVest, UBS, Acis, Terry,

18  and Redeemer Committee.  I hate to use a worn-out metaphor,

19  but the train is leaving the station.  We've got confirmation.

20  I've pushed out two weeks.  I mean, you all are either going

21  to get there in the next few days or we're just going to go

22  forward with I think what everyone, you know, would rather be

23  a pot plan, but if we can't get there, we're just going to

24  have to consider the plan that's on the table now.  Okay?

25     You know, the Committee, again, they're sophisticated.

170

1   They can compare apples to oranges and decide whether the plan

2   on the table, with its risks of future litigation and

3   recoveries, whether it's better or worse than whatever

4   consideration you're offering, Mr. Dondero.

5        And you know, as we all know, there is distrust here,

6   there, and everywhere among these parties.  So I can totally

7   understand them, you know, taking a hard line:  We either get

8   all cash or we're just not going to mess with it.  We don't

9   want to risk broken promises.  We'd rather just do litigation.

10       So, anyway, that's as much as I'm going to say except I am

11  going to further direct good-faith negotiations.  It sounds

12  like to me a written term sheet might be the appropriate next

13  step, given where I've heard things are at the moment.  But,

14  you know, I guess we don't have any hearings between now and

15  the 26th, right?  No Highland hearings that I can think of

16  between now and the 26th.

17            MR. POMERANTZ:  I don't think so.

18            MR. MORRIS:  I think that's correct, Your Honor.

19            THE COURT:  So you have all this time --

20            MR. MORRIS:  At the moment.

21            THE COURT:  You have all this time to negotiate and

22  simultaneously get ready for the confirmation hearing without

23  any other battles.  So I know you will use the time well.

24       All right.  We're adjourned.

25            THE CLERK:  All rise.

171

1        MR. BONDS:  Thank you, Your Honor.

2      (Proceedings concluded at 2:04 p.m.)

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                    **01/16/2021**

24   _____     _____
   Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber

172

INDEX

PROCEEDINGS                                          3

OPENING STATEMENTS

- By Mr. Morris                                     12
- By Mr. Kane                                       18
- By Ms. Weisgerber                                 18
- By Mr. Draper                                     20

WITNESSES

Debtor's Witnesses

James Seery
- Direct Examination by Mr. Morris                  26
- Cross-Examination by Mr. Wilson                   62
- Cross-Examination by Mr. Draper                   87
- Redirect Examination by Mr. Morris               93

HarbourVest's Witnesses

Michael Pugatch
- Direct Examination by Ms. Weisgerber              96
- Cross-Examination by Mr. Wilson                  113

EXHIBITS

Debtor's Exhibits A through EE              Received  35

James Dondero's Exhibits A through M       Received 142
James Dondero's Exhibit N (as specified)   Received  71

HarbourVest's Exhibit 34                    Received 100
HarbourVest's Exhibit 36                    Received 103
HarbourVest's Exhibits 39 through 42        Received 137

CLOSING ARGUMENTS

- By Mr. Morris                                    143
- By Ms. Weisgerber                                144
- By Mr. Lynn                                      146
- By Mr. Draper                                    148

173

1                                    INDEX
                                     Page 2
2

3     RULINGS

4     Motion to Compromise Controversy with HarbourVest 2017      150
      Global Fund L.P., HarbourVest 2017 Global AIF L.P.,
5     HarbourVest Dover Street IX Investment L.P., HV
      International VIII Secondary L.P., HarbourVest Skew Base
6     AIF L.P., and HarbourVest Partners L.P. filed by Debtor
      Highland Capital Management, L.P. (1625)

7     Motion to Allow Claims of HarbourVest Pursuant to Rule      150
      3018(a) of the Federal Rules of Bankruptcy Procedure for
8     Temporary Allowance of Claims for Purposes of Voting to
      Accept or Reject the Plan filed by Creditor HarbourVest
9     et al. (1207)

10    Debtor's Motion Pursuant to the Protocols for Authority     157
      for Highland Multi-Strategy Credit Fund, L.P. to Prepay
11    Loan (1590)

12    END OF PROCEEDINGS                                          171

13    INDEX                                                   172-173

14

15

16

17

18

19

20

21

22

23

24

25

## PROMISSORY NOTE

**$24,198,069.28**                                                                                    **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in its entirety that certain promissory note dated December 28, 2016, in the original face amount of $23,817,639.58, from The Dugaboy Investment Trust, as Maker, and The Get Good Non-Exempt Trust as Payee (collectively, the "**Prior Note**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

WHEREAS, The Get Good Non-Exempt Trust sold, transferred and assigned 97.6835% of its interest in the Prior Note to Highland Capital Management, L.P. pursuant to that Purchase and Sale Agreement dated December 28, 2016 between Highland Capital Management, L.P. and The Get Good Non-Exempt Trust.

FOR VALUE RECEIVED, THE DUGABOY INVESTMENT TRUST ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. and THE GET GOOD NON-EXEMPT TRUST (collectively, the "**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY FOUR MILLION, ONE HUNDRED NINETY EIGHT THOUSAND, SIXTY NINE AND 28/100 DOLLARS ($24,198,069.28), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of two and seventy-five hundredths percent (2.75%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.      <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

2.1      <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. 97.6835% of each Annual Installment shall be paid to Highland Capital Management, L.P. and the remaining 2.3165% shall be paid to The Get Good Non-Exempt Trust. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2      <u>Final Payment Date</u>.  The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

EXHIBIT B

000636

3. **Prepayment Allowed; Renegotiation Discretionary.** Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4. **Acceleration Upon Default.** Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. **Waiver.** Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. **Attorneys' Fees.** If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. **Limitation on Agreements.** All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. **Governing Law.** This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9. **Prior Note.** The original of the Prior Note superseded hereby shall be marked "VOID" by Payee.

MAKER:

THE DUGABOY INVESTMENT TRUST

By: _____
Name: Nancy Dondero
Title: Trustee

**Dugaboy $24.2M**

| | | 5/31/2017 | 97.6885% HCM | 2.3165% Get Good | | | |
|---|---|---|---|---|---|---|---|
| Closing Date | | | | | | | |
| Total Commitment | $ | 24,268,622 | $ 23,706,439.07 | $ 562,182.62 | | | |
| Rate | | 3.260% | | | | | |

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal | Total Paid | Expected Interest Payment Income | Accrued | Minimum Cumulative Principal | Aggregate Principal Paid Down | Shortfall of Minimum | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/31/2017 | - | | | 23,706,439.07 | | 23,706,439.07 | | | | | | | |
| 5/31/2017 | | | | 23,706,439.07 | | 23,706,439.07 | | | | | | | |
| 6/30/2017 | 63,520.27 | | 63,520.27 | 23,706,439.07 | | 23,706,439.07 | | | | | | | |
| 7/31/2017 | 65,637.61 | | 129,157.88 | 23,706,439.07 | | 23,706,439.07 | | | | | | | |
| 8/4/2017 | 8,469.37 | (441,854.32) | (304,227.08) | 23,706,439.07 | (845,879.76) | 22,860,559.31 | | | | | | | |
| 8/31/2017 | 55,128.40 | | (249,098.68) | 22,860,559.31 | | 22,860,559.31 | | | | | | | |
| 9/30/2017 | 61,253.77 | | (187,844.91) | 22,860,559.31 | | 22,860,559.31 | | | | | | | |
| 10/31/2017 | 63,295.57 | | (124,549.34) | 22,860,559.31 | | 22,860,559.31 | | | | | | | |
| 11/30/2017 | 61,253.77 | | (63,295.57) | 22,860,559.31 | | 22,860,559.31 | | | | | | | |
| 12/31/2017 | 63,295.57 | | (0.00) | 22,860,559.31 | | 22,860,559.31 | | - | (63,295.57) | 808,954.06 | 1,408,062.38 | - | - |
| 1/31/2018 | 63,295.57 | | 63,295.56 | 22,860,559.31 | | 22,860,559.31 | | | | | | | |
| 2/28/2018 | 57,170.19 | | 120,465.75 | 22,860,559.31 | | 22,860,559.31 | | | | | | | |
| 3/31/2018 | 63,295.57 | | 183,761.31 | 22,860,559.31 | | 22,860,559.31 | | | | | | | |
| 4/30/2018 | 61,253.77 | | 245,015.09 | 22,860,559.31 | | 22,860,559.31 | | | | | | | |
| 5/23/2018 | 46,961.23 | (2,195,708.85) | (1,903,732.54) | 22,860,559.31 | (1,304,291.15) | 21,556,268.16 | | | | | | | |
| 5/31/2018 | 15,402.40 | | (1,888,330.14) | 21,556,268.16 | | 21,556,268.16 | | | | | | | |
| 6/30/2018 | 57,758.99 | | (1,830,571.15) | 21,556,268.16 | | 21,556,268.16 | | | | | | | |
| 7/31/2018 | 59,684.29 | | (1,770,886.87) | 21,556,268.16 | | 21,556,268.16 | | | | | | | |
| 8/31/2018 | 59,684.29 | | (1,711,202.58) | 21,556,268.16 | | 21,556,268.16 | | | | | | | |
| 9/30/2018 | 57,758.99 | | (1,653,443.59) | 21,556,268.16 | | 21,556,268.16 | | | | | | | |
| 10/31/2018 | 59,684.29 | | (1,593,759.31) | 21,556,268.16 | | 21,556,268.16 | | | | | | | |
| 11/30/2018 | 57,758.99 | | (1,536,000.32) | 21,556,268.16 | | 21,556,268.16 | | | | | | | |
| 12/31/2018 | 59,684.29 | | (1,476,316.03) | 21,556,268.16 | | 21,556,268.16 | | - | (1,536,000.32) | 1,617,908.11 | 2,712,353.53 | - | - |
| 1/31/2019 | 59,684.29 | | (1,416,631.75) | 21,556,268.16 | | 21,556,268.16 | | | | | | | |
| 2/28/2019 | 53,908.39 | | (1,362,723.36) | 21,556,268.16 | | 21,556,268.16 | | | | | | | |
| 3/31/2019 | 59,684.29 | | (1,303,039.07) | 21,556,268.16 | | 21,556,268.16 | | | | | | | |
| 4/18/2019 | 34,655.39 | | (1,268,383.68) | 21,556,268.16 | (3,000,000.00) | 18,556,268.16 | | | | | | | |
| 4/30/2019 | 19,888.25 | | (1,248,495.43) | 18,556,268.16 | | 18,556,268.16 | | | | | | | |
| 5/31/2019 | 51,377.99 | | (1,197,117.44) | 18,556,268.16 | | 18,556,268.16 | | | | | | | |
| 6/30/2019 | 49,720.63 | | (1,147,396.81) | 18,556,268.16 | | 18,556,268.16 | | | | | | | |
| 7/31/2019 | 51,377.99 | | (1,096,018.83) | 18,556,268.16 | | 18,556,268.16 | | | | | | | |
| 8/13/2019 | 21,545.61 | | (1,074,473.22) | 18,556,268.16 | (155,000.00) | 18,401,268.16 | | | | | | | |
| 8/28/2019 | 24,652.66 | | (1,049,820.56) | 18,401,268.16 | | 18,401,268.16 | | | | | | | |
| 8/31/2019 | 4,910.44 | | (1,044,910.13) | 18,326,268.16 | (75,000.00) | 18,326,268.16 | | | | | | | |
| 9/11/2019 | 18,004.93 | | (1,026,905.20) | 18,326,268.16 | (40,000.00) | 18,286,268.16 | | | | | | | |
| 9/30/2019 | 31,031.55 | | (995,873.65) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 10/15/2019 | 24,498.59 | | (971,375.06) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 10/31/2019 | 26,131.83 | | (945,243.23) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 11/30/2019 | 48,997.18 | | (896,246.05) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 12/31/2019 | 50,630.42 | | (845,615.63) | 18,286,268.16 | | 18,286,268.16 | | - | (896,246.05) | 2,426,862.17 | $ 5,982,353.53 | $ - | - |
| 1/31/2020 | 50,630.42 | | (794,985.22) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 2/29/2020 | 47,363.94 | | (747,621.28) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 3/31/2020 | 50,630.42 | | (696,990.86) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 4/30/2020 | 48,997.18 | | (647,993.68) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 5/31/2020 | 50,630.42 | | (597,363.26) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 6/30/2020 | 48,997.18 | | (548,366.08) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 7/31/2020 | 50,630.42 | | (497,735.67) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 8/31/2020 | 50,630.42 | | (447,105.25) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 9/30/2020 | 48,997.18 | | (398,108.07) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 10/31/2020 | 50,630.42 | | (347,477.65) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 11/30/2020 | 48,997.18 | | (298,480.47) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 12/31/2020 | 50,630.42 | | (247,850.05) | 18,286,268.16 | | 18,286,268.16 | | - | (247,850.05) | 3,235,816.23 | 5,982,353.53 | - | - |
| 1/31/2021 | 50,630.42 | | (197,219.64) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 2/28/2021 | 45,730.70 | | (151,488.94) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 3/31/2021 | 50,630.42 | | (100,858.52) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 4/30/2021 | 48,997.18 | | (51,861.34) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 5/31/2021 | 50,630.42 | | (1,230.92) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 6/30/2021 | 48,997.18 | | 47,766.26 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 7/31/2021 | 50,630.42 | | 98,396.68 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 8/31/2021 | 50,630.42 | | 149,027.09 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 9/30/2021 | 48,997.18 | | 198,024.27 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 10/31/2021 | 50,630.42 | | 248,654.69 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 11/30/2021 | 48,997.18 | | 297,651.87 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 12/30/2021 | 48,997.18 | (348,282.29) | (1,633.24) | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 12/31/2021 | 1,633.24 | | (0.00) | 18,286,268.16 | | 18,286,268.16 | | - | (0.00) | 4,044,770.28 | 5,982,353.53 | - | (0.00) |
| 1/31/2022 | 50,630.42 | | 50,630.42 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 2/28/2022 | 45,730.70 | | 96,361.12 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 3/31/2022 | 50,630.42 | | 146,991.53 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 4/30/2022 | 48,997.18 | | 195,988.71 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 5/31/2022 | 50,630.42 | | 246,619.13 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 6/30/2022 | 48,997.18 | | 295,616.31 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 7/31/2022 | 50,630.42 | | 346,246.73 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 8/31/2022 | 50,630.42 | | 396,877.15 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 9/30/2022 | 48,997.18 | | 445,874.33 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 10/31/2022 | 50,630.42 | | 496,504.74 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 11/30/2022 | 48,997.18 | | 545,501.92 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 12/31/2022 | 50,630.42 | | 596,132.34 | 18,286,268.16 | | 18,286,268.16 | | - | 596,132.34 | 4,853,724.34 | 5,982,353.53 | - | 596,132.34 |
| 1/31/2023 | 50,630.42 | | 646,762.76 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 2/28/2023 | 45,730.70 | | 692,493.46 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 3/31/2023 | 50,630.42 | | 743,123.88 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 4/30/2023 | 48,997.18 | | 792,121.06 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 5/31/2023 | 50,630.42 | | 842,751.47 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 6/30/2023 | 48,997.18 | | 891,748.65 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 7/31/2023 | 50,630.42 | | 942,379.07 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 8/31/2023 | 50,630.42 | | 993,009.49 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 9/30/2023 | 48,997.18 | | 1,042,006.67 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 10/31/2023 | 50,630.42 | | 1,092,637.09 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 11/30/2023 | 48,997.18 | | 1,141,634.26 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 12/31/2023 | 50,630.42 | | 1,192,264.68 | 18,286,268.16 | | 18,286,268.16 | | - | 1,192,264.68 | 5,662,678.39 | 5,982,353.53 | - | 1,192,264.68 |
| 1/31/2024 | 50,630.42 | | 1,242,895.10 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 2/29/2024 | 47,363.94 | | 1,290,259.04 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 3/31/2024 | 50,630.42 | | 1,340,889.46 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 4/30/2024 | 48,997.18 | | 1,389,886.64 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 5/31/2024 | 50,630.42 | | 1,440,517.05 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 6/30/2024 | 48,997.18 | | 1,489,514.23 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 7/31/2024 | 50,630.42 | | 1,540,144.65 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 8/31/2024 | 50,630.42 | | 1,590,775.07 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 9/30/2024 | 48,997.18 | | 1,639,772.25 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 10/31/2024 | 50,630.42 | | 1,690,402.67 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 11/30/2024 | 48,997.18 | | 1,739,399.85 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 12/31/2024 | 50,630.42 | | 1,790,030.26 | 18,286,268.16 | | 18,286,268.16 | | - | 1,790,030.26 | 6,471,632.45 | 5,982,353.53 | 489,278.92 | 2,279,309.18 |
| 1/31/2025 | 50,630.42 | | 1,840,660.68 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 2/28/2025 | 45,730.70 | | 1,886,391.38 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |
| 3/31/2025 | 50,630.42 | | 1,937,021.80 | 18,286,268.16 | | 18,286,268.16 | | | | | | | |