**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Anna Deknatel (*pro hac vice* application pending)
Aaron M. Lawrence (*pro hac vice* application pending)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

**SIDLEY AUSTIN LLP**
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Marc S. Kirschner, as Litigation*
*Trustee of the Highland Litigation Sub-Trust*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST, | |
| Plaintiff, | |
| v. | |
| JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA | Adv. Pro. No. 21-03076-sgj |

---

[1]  The last four digits of the Reorganized Debtor's taxpayer identification number are (8357).  The Reorganized Debtor is a Delaware limited partnership.  The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.

OKADA FAMILY TRUST – EXEMPT TRUST
#2 AND LAWRENCE TONOMURA IN HIS
CAPACITY AS TRUSTEE OF MARK &
PAMELA OKADA FAMILY TRUST –
EXEMPT TRUST #2; CLO HOLDCO, LTD.;
CHARITABLE DAF HOLDCO, LTD.;
CHARITABLE DAF FUND, LP.; HIGHLAND
DALLAS FOUNDATION; RAND PE FUND I,
LP, SERIES 1; MASSAND CAPITAL, LLC;
MASSAND CAPITAL, INC.; AND SAS ASSET
RECOVERY, LTD.,

        Defendants.

**THE LITIGATION TRUSTEE'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND THE CLO HOLDCO DEFENDANTS'
<u>MOTION FOR A MORE DEFINITIVE STATEMENT</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................2

RELEVANT BACKGROUND ...................................................................................6

    A.    DONDERO EXPLOITS AND ABUSES HIS DOMINATION AND
CONTROL OF HCMLP TO BENEFIT HIMSELF AND EVADE ITS
CREDITORS, WITH THE SUPPORT AND ASSISTANCE OF HCMLP
AGENTS AND DONDERO-RELATED ENTITIES ....................................6

        1.    In A Scheme To Evade HCMLP's Creditors, Dondero Creates
"Lifeboats" To Usurp HCMLP's Business................................7

        2.    Dondero, Ellington, And Leventon Cause HCMLP To Engage In
Misconduct That Results In Significant Additional Liability To
The Company............................................................................10

        3.    Dondero And His Loyalists Engage In Other Misconduct That
Harms HCMLP .......................................................................17

        4.    Dondero Hopelessly Commingles And Exploits HCMLP And The
Other Entities In His Enterprise For His Own Personal Benefit ...............18

        5.    HCMLP Was Insolvent, Inadequately Capitalized, And/Or
Intended To Incur Debts Beyond Its Ability To Pay Well Before
The Redeemer Committee Arbitration Award Forced It Into
Bankruptcy..............................................................................21

    B.    THE COURT CONFIRMS HCMLP'S PLAN, WHICH PROVIDES FOR
THE CREATION OF THE LITIGATION SUB-TRUST TO PURSUE
ESTATE CAUSES OF ACTION ..........................................................22

    C.    THE LITIGATION SUB-TRUST COMMENCES THIS ADVERSARY
PROCEEDING FOR THE BENEFIT OF CREDITORS .....................................23

ARGUMENT ........................................................................................................24

II.    AS THE COURT HAS ALREADY HELD, THE COURT HAS SUBJECT
MATTER JURISDICTION OVER THIS PROCEEDING ..............................24

III.    ALL OF THE COMPLAINT'S CLAIMS ARE SUFFICIENTLY STATED...................25

    A.    THE TRUSTEE HAS STANDING TO PURSUE ALL CLAIMS ......................26

        1.    All Of The Complaint's Claims Were Retained Under The Plan.............26

        2.    The Trustee Has Standing To Assert Breach Of Fiduciary Duty
Claims .....................................................................................29

        3.    The Assignment Agreement Is Not An Impermissible Plan
Modification.............................................................................30

    B.    THE COMPLAINT'S BREACH OF FIDUCIARY DUTY CLAIMS ARE
SUFFICIENTLY PLED.........................................................................32

1.      The Complaint States Claims For Breach Of Fiduciary Duty
        Against Strand, Dondero, Ellington, Leventon, And Okada Under
        Delaware Law ........................................................................................32

2.      The Breach Of Fiduciary Duty Claims Are Consistent With The
        LPA And Delaware Law..........................................................................35

        (a)     Claims Against Strand And Dondero ...........................................35

        (b)     Claims Against Ellington, Leventon, And Okada ........................39

3.      The Complaint Also States Claims For Breach Of The Fiduciary
        Duties That Ellington and Leventon Owed As Attorneys Under
        Texas Law...............................................................................................42

4.      Dondero's Domination Of HCMLP Did Not Relieve Ellington,
        Leventon, And Okada Of Their Fiduciary Obligations ...........................44

5.      The Complaint Adequately Pleads That HCMLP Was Insolvent
        When Okada Accepted Or Caused The Other Okada Defendants
        To Accept The Distributions...................................................................45

C.      THE COMPLAINT'S CLAIMS FOR AIDING AND ABETTING OR
        KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY
        ARE SUFFICIENTLY PLED...................................................................48

        1.      The Complaint Adequately Alleges Damages ..........................................49

                (a)     Ellington and Leventon.................................................................49

                (b)     The Lifeboats ................................................................................50

        2.      The Complaint Adequately Alleges Knowing Participation In The
                Breaches..................................................................................................51

D.      THE COMPLAINT'S CIVIL CONSPIRACY CLAIMS ARE
        SUFFICIENTLY PLED............................................................................54

        1.      Ellington And Leventon Acted Outside The Scope Of Their
                Authority To Conspire Against HCMLP...................................................54

        2.      The Trustee Sufficiently Alleges A Meeting Of The Minds ....................56

E.      THE AIDING AND ABETTING/KNOWING PARTICIPATION AND
        CIVIL CONSPIRACY CLAIMS ARE NOT BARRED AS DERIVATIVE
        OF FRAUDULENT TRANSFER CLAIMS .............................................57

F.      THE COMPLAINT'S EQUITABLE MONEY HAD AND RECEIVED
        CLAIMS ARE ADEQUATELY PLED .....................................................58

        1.      The Trustee Properly Pleads Equitable Claims For Money Had
                And Received On Unjust Enrichment Theories.........................................60

        2.      The Trustee Sufficiently Alleges That Defendants Received
                Money That Rightfully Belongs To HCMLP ............................................61

3.   The Trustee's Money Had And Received/Unjust Enrichment
Claims Are Not Precluded By Contracts .......................................62

4.   The Trustee Has Stated A Claim For Money Had And
Received/Unjust Enrichment Claim Against CLO Holdco ......................64

5.   The Trustee's Money Had And Received/Unjust Enrichment
Claim Against CLO Holdco Is Not Barred By Affirmative
Defenses ...............................................................................67

G.   THE BREACH OF FIDUCIARY DUTY, AIDING AND
ABETTING/KNOWING PARTICIPATION, CIVIL CONSPIRACY,
AND EQUITABLE MONEY HAD AND RECEIVED CLAIMS ARE
NOT BARRED BY STATUTES OF LIMITATIONS ...............................69

H.   STRAND'S LIABILITY AS HCMLP'S GENERAL PARTNER IS
SUFFICIENTLY PLED ...................................................................75

1.   The LPA Does Not Shield Strand From Its Liability As General
Partner .................................................................................75

I.   THE COMPLAINT'S ALTER EGO CLAIMS ARE SUFFICIENTLY
PLED ........................................................................................76

1.   Alter Ego Is An Independent Cause Of Action Under Delaware
Law ....................................................................................76

2.   The Trustee Has Sufficiently Pled Alter Ego Claims Against
Dondero And Strand ...............................................................78

3.   The Trustee Has Adequately Pled Reverse Veil Piercing Claims
Against Dugaboy and the Lifeboats ............................................82

J.   THE COMPLAINT'S AVOIDANCE CLAIMS ARE ADEQUATELY
PLED ........................................................................................88

1.   The Trustee Has Sufficiently Pled A Triggering Creditor For Each
Challenged Transfer ...............................................................89

2.   The Trustee May Stand In The Shoes Of The IRS, As A Future
Creditor, To Avoid Transfers Made Prior To 2015 ..........................90

(a)   The Trustee May Stand In The IRS's Shoes To Pursue The
Avoidance Of Transfers Made Prior To 2015 .......................90

(b)   The IRS May Avoid Transfers Made Prior To The Accrual
Of Its Claim As A "Future Creditor" ................................96

3.   The Complaint Adequately Alleges A Lack Of Reasonably
Equivalent Value In Exchange For The Alleged Expense Transfers ........99

4.   The Intentional Fraudulent Transfer Claims Are Sufficiently Pled .........100

5.   The Complaint Adequately Alleges Due Diligence And
Consideration Of Known Defenses In Support Of The Preference
Claims .................................................................................103

K.      THE COMPLAINT'S CLAIM FOR TORTIOUS INTERFERENCE IS
        ADEQUATELY PLED .......................................................................................104

L.      THE COMPLAINT'S CLAIMS FOR CONVERSION ARE
        ADEQUATELY PLED .......................................................................................106

M.      THE MOTION FOR A MORE DEFINITIVE STATEMENT SHOULD
        BE DENIED BECAUSE THE CLAIM AGAINST CLO HOLDCO IS
        SUFFICIENTLY PLED.......................................................................................109

IV.    CONCLUSION...........................................................................................................111

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*360 Sec. Partners, LLC v. Hammond*,
 2022 WL 3159274 (N.D. Tex. Aug. 8, 2022) .................................................................... 34

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*,
 554 F. Supp. 2d 538 (D. Del. 2008) ................................................................................ 35

*Adidas Am. Inc. v. Shoebacca Ltd.*,
 2021 WL 4399745 (N.D. Tex. Sept. 27, 2021) ................................................................ 54

*Agredano v. State Farm Lloyds*,
 975 F.3d 504 (5th Cir. 2020) ........................................................................................ 103

*AHAB v. SAAD, CICA Civil Appeal*,
 No.: 15 of 2018 (21 December 2021) ............................................................................ 109

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
 166 F.3d 772 (5th Cir. 1999) .......................................................................................... 66

*Aldous v. Darwin Nat'l Assurance Co.*,
 2015 WL 1879677 (N.D. Tex. Apr. 24, 2015) ................................................................ 60

*Alexander v. AmeriPro Funding, Inc.*,
 848 F.3d 698 (5th Cir. 2017) .......................................................................................... 26

*Allen v. Encore Energy Partners, L.P.*,
 72 A.3d 93 (Del. 2013) .................................................................................................. 105

*Am. Res. Techs., Inc. v. Oden*,
 2014 WL 12580475 (N.D. Tex. Feb. 11, 2014) ............................................................... 65

*Archer v. Med. Protective Co. of Fort Wayne, Indiana*,
 2004 WL 1194455 (N.D. Tex. May 28, 2004) ................................................................ 42

*ASARCO LLC v. Americas Mining Corp.*,
 396 B.R. 278 (S.D. Tex. 2008) ....................................................................................... 68

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ........................................................................................................ 26

*Askanase v. Fatjo*,
 828 F. Supp. 465 (S.D. Tex. 1993) ................................................................................. 74

*Assure re Intermediaries, Inc. v. W. Surplus Lines Agency, Inc.*,
 2021 WL 2402485 (N.D. Tex. June 11, 2021) ................................................................ 60

*Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*,
　　173 F. Supp. 3d 363 (N.D. Tex. 2016) ............................................. 67

*Bank of Saipan v. CNG Fin. Corp.*,
　　380 F.3d 836 (5th Cir. 2004) .................................................. 66, 67

*Bates Energy Oil & Gas v. Complete Oilfield Servs.*,
　　361 F. Supp. 3d 633 (W.D. Tex. 2019) ........................................ 61

*Baty v. ProTech Ins. Agency*,
　　63 S.W.3d 841 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ......................... 104

*Bay  Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*,
　　2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009) ................................. 35, 36

*Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*,
　　296 F.3d 164 (3d Cir. 2002) .................................................. 81

*Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*,
　　284 S.W.3d 416 (Tex. App.—Austin 2009, no pet.) ....................................... 42

*Bell Atl. Corp. v. Twombly*,
　　550 U.S. 544 (2007) ........................................................ 26

*Black v. Experian Info. Sols., Inc.*,
　　2022 WL 2305778 (S.D. Tex. June 27, 2022) ............................................ 110

*Blair v. Infineon Techs. AG*,
　　720 F. Supp. 2d 462 (D. Del. 2010) ............................................. 80

*Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTechIdentification Beams Sys., LLC*,
　　566 B.R. 815 (W.D. Tex. 2017) ................................................ 50

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*,
　　491 B.R. 335 (S.D.N.Y. 2013) ................................................. 83

*Cede & Co. v. Technicolor, Inc.*,
　　634 A.2d 345 (Del. 1993) .................................................... 34

*Cent. Tex. Express Metalwork v. Chaves*,
　　2021 WL 3631009 (S.D. Tex. July 7, 2021) ............................................. 52

*Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Grp. Glob. I LLC*,
　　2019 WL 148454 (D. Del. Jan. 9, 2019) ........................................ 80, 81, 82, 85

*Conceal City, L.L.C. v. Looper L. Enf't, LLC*,
　　917 F. Supp. 2d 611 (N.D. Tex. 2013) .......................................... 56

*Conoco, Inc. v. Fortune Prod. Co.*,
   35 S.W.3d 23 (Tex. App.—Houston [1st Dist.] 1998) .................................................. 62

*Cont'l Ins. Co. v. Rutledge & Co.*,
   750 A.2d 1219 (Del. Ch. 2000) .......................................................... 32, 33, 34, 37

*Craig's Stores of Tex., Inc. v. Bank of La.* (*In re Craig's Stores of Tex., Inc.*),
   266 F.3d 388 (5th Cir. 2001) .............................................................. 24, 25

*Crosse v. BCBSD, Inc.*,
   836 A.2d 492 (Del. 2003) ........................................................................ 76

*Crouch v. Trinque*,
   262 S.W.3d 417 (Tex. App.—Eastland 2008, no pet.) .................................................. 54

*CSH Theatres, L.L.C. v. Nederlander of San Francisco Assocs.*,
   2018 WL 3646817 (Del. Ch. July 31, 2018) .................................................. 32

*Cypress/Spanish Ft. I, L.P. v. Prof'l Serv. Indus. Inc.*,
   814 F. Supp. 2d 698 (N.D. Tex. 2011) ........................................................ 73

*DCHC Liquidating Trust v. HCA Inc.* (*In re Greater Se. Cmty. Hosp. Corp. I*),
   365 B.R. 293 (Bankr. D.D.C. 2006) ........................................................ 98

*Del. State Univ. Student Hous. Found. v. Ambling Mgmt. Co.*,
   556 F. Supp. 2d 367 (D. Del. 2008) ........................................................ 104

*Dohmen v. Goodman*,
   234 A.3d 1161 (Del. 2020) ........................................................................ 33

*Edgewater Growth Capital Partners. L.P. v. H.I.G. Capital Inc.*,
   2010 WL 720150 (Del. Ch. Mar. 3, 2010) ........................................................ 58

*Faulkner v. Lone Star Car Brokering, LLC* (*In re Reagor-Dykes Motors, LP*),
   2021 WL 2546664 (Bankr. N.D. Tex. June 21, 2021) .................................................. 103

*F.D.I.C. v. Nathan*,
   804 F. Supp. 888 (S.D. Tex. 1992) .......................................................... 44, 70, 74

*F.D.I.C. v. Shrader & York*,
   777 F. Supp. 533 (S.D. Tex. 1991) ........................................................ 73, 74

*F.D.I.C. v. Shrader & York*,
   991 F.2d 216 (5th Cir. 1993) ........................................................ 73, 74

*F.D.I.C. v. Howse*,
   736 F. Supp. 1437 (S.D. Tex. 1990) ........................................................ 70

*Feeley v. NHAOCG, LLC,*
    62 A.3d 649 (Del. Ch. 2012) .................................................................. 36

*Fid. Nat'l Info. Services, Inc. v. Plano Encryption Techs., LLC,*
    2016 WL 1650763 (D. Del. Apr. 25, 2016),
    *report and recommendation adopted,* 2016 WL 11695472 (D. Del. June 23, 2016) ...... 78

*First United Pentecostal Church of Beaumont v. Parker,*
    514 S.W.3d 214 (Tex. 2017) .................................................................. 44

*Fortune Prod. Co. v. Conoco, Inc.,*
    52 S.W.3d 671 (Tex. 2000) .................................................................. 64

*Friddle v. Fisher,*
    378 S.W.3d 475 (Tex. App.—Texarkana 2012, pet. denied) ......................................... 70

*Gadsden v. Home Pres. Co.,*
    2004 WL 485468 (Del. Ch. Feb. 20, 2004),
    *judgment entered,* (Del. Ch. 2004) .................................................................. 78

*Gatz Props., LLC v. Auriga Cap. Corp.,*
    59 A.3d 1206 (Del. 2012) .................................................................. 39

*Gibson v. Wells Fargo Bank, N.A.,*
    2016 WL 11755377 (N.D. Tex. June 9, 2016) ........................................................... 106

*Gordon v. Sig Sauer, Inc.,*
    2019 WL 4572799 (S.D. Tex. Sept. 20, 2019) .............................................. 69

*Gregory v. Allstate Ins. Co.,*
    2016 WL 4617404 (S.D. Tex. Sept. 2, 2016) ................................................. 70

*GXG, Inc. v. Texacal Oil & Gas,*
    977 S.W.2d 403 (Tex. App..—Corpus Christi–Edinburg 1998, pet. denied) ................. 55

*Halliburton Energy Servs., Inc. v. NL Indus.,*
    648 F. Supp. 2d 840 (S.D. Tex. 2009) .................................................................. 62

*Harrington v. State Farm Fire & Cas. Co.,*
    563 F.3d 141 (5th Cir. 2009) .................................................................. 26

*HHH Farms, L.L.C. v. Fannin Bank,*
    2022 WL 175967 (Tex. App.—Texarkana Jan. 20, 2022, pet. filed),
    *reconsideration denied* (Mar. 1, 2022),
    *reh'g denied* (Mar. 1, 2022) .................................................................. 106

*Highland Capital Mgmt., L.P. v. Highland Capital Mgmt. Fund Advisors, L.P.,*
    Adv. Pro. No. 21-03010-sgj (Bankr. N.D. Tex. Aug. 30, 2022) ..................................... 63

*Highland Capital Mgmt., L.P. v. NexPoint Advisors, L.P.*,
Adv. Pro. 21-03005-sgj (Bankr. N.D. Tex. July 19, 2022)............................................ 10

*Hollis v. Hill*,
232 F.3d 460 (5th Cir. 2000) ........................................................................................ 32

*Hopkins v. Cornerstone Am.*,
2009 WL 10721229 (N.D. Tex. June 15, 2009) ............................................................ 63

*In re AMC Inv'rs, LLC*,
637 B.R. 43 (Bankr. D. Del. 2022) ................................................................................ 72

*In re Am. Hous. Found.*,
2011 WL 4625349 (Bankr. N.D. Tex. Sept. 30, 2011)................................................... 58

*In re Arbco Cap. Mgmt., LLP*,
498 B.R. 32 (Bankr. S.D.N.Y. 2013)............................................................................. 52

*In re ATP Oil & Gas Corp.*,
711 Fed. Appx. 216 (5th Cir. 2017)............................................................................... 47

*In re Behrends*,
2017 WL 4513071 (Bankr. D. Colo. Apr. 10, 2017)...................................................... 95

*In re BFN Operations LLC*,
607 B.R. 551 (Bankr. N.D. Tex. 2018)........................................................................... 26

*In re Boston Celtics Ltd. P'ship S'holders Litig.*,
1999 WL 641902 (Del. Ch. Aug. 6, 1999) .................................................................... 33

*In re BP p.l.c. Secs. Litig.*,
51 F. Supp. 3d 693 (2014) ............................................................................................. 72

*In re Buckhead Am. Corp.*,
178 B.R. 956 (D. Del. 1994)........................................................................................... 80

*In re Christopher*,
85 F.3d 626 (5th Cir. 1996) ..................................................................................... 54, 66

*In re Crescent Resources, LLC*,
2012 WL 195528 (Bankr. W.D. Tex. Jan. 23, 2012)................................................ 46, 47

*In re CVAH, Inc.*,
570 B.R. 816 (Bankr. D. Idaho 2017).............................................................. 94, 95, 97

*In re Equip. Acquisition Res., Inc.*,
742 F.3d 743 (7th Cir. 2014) ......................................................................................... 91

*In re Essar Steel Minn. LLC*,
    602 B.R. 600 (Bankr. D. Del. 2019) ............................................................ 77

*In re Essential Fin. Educ., Inc.*,
    629 B.R. 401 (Bankr. N.D. Tex. 2021) ........................................................ 89

*In re Gaither*,
    595 B.R. 201 (Bankr. D.S.C. 2018) ............................................................ 94

*In re Genter*,
    2021 WL 1112538 (Bankr. N.D. Tex. Mar. 23, 2021) ................................ 48

*In re Giant Gray, Inc.*,
    629 B.R. 814 (Bankr. S.D. Tex. 2020) ........................................................ 89

*In re Highland Capital Mgmt, LP*,
    2022 WL 270862 (Bankr. N.D. Tex. Jan. 28, 2022)..................................... 31

*In re Houston Drywall, Inc.*,
    2008 WL 2754526 (Bankr. S.D. Tex. July 10, 2008)................................... 98

*In re IFS Fin. Corp.*,
    2007 WL 1308321 (Bankr. S.D. Tex. May 3, 2007) .................................... 68

*In re J&M Sales Inc.*,
    2022 WL 532721 (Bankr. D. Del. Feb. 22, 2022) ........................................ 93

*In re Kaiser*,
    525 B.R. 697 (Bankr. N.D. Ill. 2014) ........................................ 92, 94, 95, 96

*In re Kipnis*,
    555 B.R. 877 (Bankr. S.D. Fla. 2016)........................................ 93, 94, 95, 96

*In re Life Partners Holdings, Inc.*,
    926 F.3d 103 (5th Cir 2019) ...................................................................... 100

*In re Maxus Energy Corp.*,
    2022 WL 2240122 (Bankr. D. Del. June 22, 2022)..................................... 95

*In re Metro Storage Int'l LLC v. Harron*,
    275 A.3d 810 (Del. Ch. 2022)...................................................................... 39

*In re Mirant Corp.*,
    675 F.3d 530 (5th Cir. 2012) ...................................................................... 92

*In re Musselwhite*,
    2021 WL 4342902 (Bankr. E.D.N.C. Sept. 23, 2021)............................. 93, 96

*In re Northstar Offshore Grp., LLC,*
616 B.R. 695 (Bankr. S.D. Tex. 2020) ........................................................... 98

*In re Omanski,*
2022 WL 4281472 (Bankr. S.D.N.Y. Sept. 15, 2022) .................................... 92

*In re Opus E., LLC,*
528 B.R. 30 (Bankr. D. Del. 2015),
*aff'd sub nom In re Opus E., LLC,* 2016 WL 1298965 (D. Del. Mar. 31, 2016)
*aff'd sub nom. In re Opus E. LLC,* 698 F. App'x 711 (3d Cir. 2017)...................... 78, 87

*In re Parkcentral Glob. Litig.,*
2010 WL 3119403 (N.D. Tex. Aug 5, 2010) ................................................... 39

*In re Physiotherapy Holdings, Inc.,*
2017 WL 5163515 (Bankr. D. Del. Nov. 6, 2017) ........................................ 75

*In re Sherali,*
490 B.R. 104 (Bankr. N.D. Tex. 2013) ......................................................... 107

*In re SI Restructuring Inc.,*
714 F.3d 860 (5th Cir. 2013) ................................................................... 27, 28

*In re Sierra Steel, Inc.,*
96 B.R. 275 (B.A.P. 9th Cir. 1989) ............................................................... 48

*In re Silver State Holdings, Assignee-7901 Boulevard 26 LLC,*
2020 WL 7414434 (Bankr. N.D. Tex. Dec. 17, 2020) .................................. 58

*In re Simplexity, LLC,*
2017 WL 65069 (Bankr. D. Del. Jan. 5, 2017) ............................................. 35

*In re Smith,*
2022 WL 1814415 (Bankr. D. Kan. June 2, 2022) .................................... 93, 96

*In re Taylor, Bean & Whitaker Mortg. Corp.,*
2018 WL 6721987 (Bankr. M.D. Fla. Sept. 28, 2018) .................................. 98

*In re Texas Rangers Baseball Partners,*
498 B.R. 679 (Bankr. N.D. Tex 2013) ....................................... 100, 101, 102

*In re The Heritage Org., L.L.C.,*
413 B.R. 438 (Bankr. N.D. Tex. 2009) ...................................................... 75, 89

*In re TMST, Inc.,*
610 B.R. 807 (Bankr. D. Md. 2019) ......................................................... 102

*In re TOCFHBI, Inc.,*
413 B.R. 523 (Bankr. N.D. Tex. 2009) ...................................................... 57

*In re Trailhead Eng'g LLC*,
    2020 WL 7501938 (Bankr. S.D. Tex. Dec. 21, 2020) .................................................. 103

*In re Turner & Cook, Inc.*,
    507 B.R. 101 (Bankr. D. Vt. 2014) ....................................................................... 48

*In re TXCO Res., Inc.*,
    475 B.R. 781 (Bankr. W.D. Tex. 2012) ..................................................................... 69

*In re USACafes, L.P. Litig.*,
    600 A.2d 43 (Del. Ch. 1991) .................................................................................... 33

*In re Vaughan Co.*,
    498 B.R. 297 (Bankr. D.N.M. 2013) ............................................... 92, 93, 94, 95, 96, 98

*In re Verizon Ins. Coverage Appeals*,
    222 A.3d 566 (Del. 2019) ....................................................................................... 76

*In re Webster*,
    629 B.R. 654 (Bankr. N.D. Ga. 2021) ...................................................................... 95

*In re Winstar Commc'ns, Inc.*,
    435 B.R. 33 (Bankr. D. Del. 2010) ......................................................................... 73

*In re Reagor-Dykes Motors, LP*,
    2020 WL 4939180 (Bankr. N.D. Tex. Aug. 24, 2020) ................................................. 100

*Ins. Distrib. Consulting, LLC v. Freedom Equity Grp., LLC*,
    2020 WL 5803249 (S.D. Tex. Sept. 4, 2020) ............................................................ 26

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
    741 A.2d 377 (Del. Ch. 1999) ................................................................................ 52

*Janvey v. Alguire*,
    846 F. Supp. 2d 662 (N.D. Tex. 2011) .................................................................... 100

*Janvey v. Suarez*,
    978 F. Supp. 2d 685 (N.D. Tex. 2013) ..................................................................... 70

*Janvey v. Willis of Colorado Inc.*,
    2014 WL 12670763 (N.D. Tex. Dec. 5, 2014) ............................................................ 50

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*,
    160 S.W.2d 509 (Tex. 1942) ................................................................................... 44

*Kuhl v. City of Garland*,
    1999 WL 173969 (Tex. App.—Dallas Mar. 31, 1999, no pet.) ...................................... 103

*Lamie v. United States Trustee*,
  540 U.S. 526 (2004) .......................................................... 95

*Lewis v. Davis*,
  199 S.W.2d 146 (Tex. 1947) .............................................. 68

*Liberty Ins. Corp. v. Omni Constr. Co.*,
  2022 WL 2373734 (S.D. Tex. June 9, 2022)
  *report and recommendation adopted*, 2022 WL 2359643 (S.D. Tex. June 29, 2022) ... 110

*Life Partners Creditors' Tr. v. Black Diamond Lifeplan Fund*,
  2017 WL 9934885 (N.D. Tex. Nov. 27, 2017) ...................... 68

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
  594 F.3d 383 (5th Cir. 2010) ...................................... 26, 46

*Mack v. Newton*,
  737 F.2d 1343 (5th Cir. 1984) ...................................... 57, 58

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) ................................................. 49

*Manichaean Capital, LLC v. Exela Techs., Inc.*,
  251 A.3d 694 (Del. Ch. 2021) ........................ 83, 84, 85, 86, 88

*Mason v. Network of Wilmington, Inc.*,
  2005 WL 1653954 (Del. Ch. July 1, 2005) ......................... 82

*Massey v. Armco Steel Co.*,
  652 S.W.2d 932 (Tex. 1983) ............................................... 54

*Matter of Highland Capital Mgmt., L.P.*,
  2022 WL 4093167 (5th Cir. Sept. 7, 2022) ......................... 38

*Matter of Okedokun*,
  968 F.3d 378 (5th Cir. 2020) ................................ 65, 66, 106

*Mayers v. Addison Brown, LLC*,
  2020 WL 7646973 (N.D. Tex. 2020) .................................. 60

*Mendez v. Semi Express, LLC*,
  2022 WL 1138148 (S.D. Tex. Apr. 18, 2022) ..................... 110

*Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N.A.*,
  800 F. App'x 239 (5th Cir. 2020) ...................................... 60

*Midwestern Cattle Mktg., LLC v. Legend Bank, N.A.*,
  999 F.3d 970 (5th Cir. 2021) ............................................. 60

*Miller v. Am. Real Estate Partners, L.P.*,
    2001 WL 1045643 (Del. Ch. Sept. 6, 2001) ............................................. 35, 40

*Mitchell v. E-Z Way Towers, Inc.*,
    269 F.2d 126 (5th Cir. 1959) ........................................................................ 110

*Moran v. Williamson*,
    498 S.W.3d 85 (Tex. App.—Houston [1st Dist.] 2016, pet. denied)............................. 62

*Morrison v. Berry*,
    2020 WL 2843514 (Del. Ch. June 1, 2020) ................................................. 51, 52

*Murphy Oil USA, Inc. v. Love's Travel Stops & Country Stores, Inc.*,
    2021 WL 824647 (N.D. Tex. Mar. 3, 2021),
    *aff'd*, 2022 WL 796179 (5th Cir. Mar. 15, 2022) .................................. 106, 107

*Murphy v. Gruber*,
    241 S.W.3d 689 (Tex. App.—Dallas 2007, pet. denied)................................. 42

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
    537 F.3d 168 (2d Cir. 2008).......................................................................... 79

*Off. Stanford Invr's Comm. v. Greenberg Traurig, LLP*,
    2014 WL 12572881 (N.D. Tex. Dec. 17, 2014) ............................................ 69

*Off. Stanford Invr's Comm. v. Willis of Colorado, Inc.*,
    2015 WL 13742125 (N.D. Tex. Feb. 4, 2015)................................................ 50

*Orthodontic Ctrs. of Texas, Inc. v. Wetzel*,
    410 F. App'x 795 (5th Cir. 2011) ................................................................. 68

*Outokumpu Eng'g Enters. v. Kvaerner EnviroPower, Inc.*,
    685 A.2d 724 (Del. Super. Ct. 1996) ........................................................... 83

*Pettit v. Tabor*,
    2020 WL 216025 (Tex. App.—Texarkana Jan. 15, 2020, pet. denied).......................... 63

*Philips N. Am. LLC v. Image Tech. Consulting LLC*,
    2022 WL 2972226 (N.D. Tex. July 26, 2022) ............................................. 110

*Quadrant Structured Products Co. v. Vertin*,
    102 A.3d 155 (Del. Ch. 2014)....................................................................... 58

*Reneker v. Offill*,
    2009 WL 804134 (N.D. Tex. Mar. 26, 2009) ............................................... 50

*Rodriguez v. Sarabyn*,
    129 F.3d 760 (5th Cir. 1997) .................................................................. 55, 67

*Rotstain v. Trustmark Nat'l Bank*,
    2022 WL 179609 (N.D. Tex. Jan. 20, 2022) ...................................... 106, 107

*S.E.C. v. Antar*,
    120 F. Supp. 2d 431 (D.N.J. 2000) ................................................................. 48

*S.V. v. R.V.*,
    933 S.W.2d 1 (Tex. 1996) ................................................................................ 70

*Sandvik AB v. Advent Int'l Corp.*,
    83 F. Supp 2d 442 (D. Del. 1999),
    *aff'd*, 220 F3d 99 (3d Cir Del 2000) .............................................................. 76

*Schueller v. Cordrey*,
    2017 WL 3635570 (Del. Super. Ct. Aug. 23, 2017),
    *aff'd*, 195 A.3d 33 (Del. 2018) ....................................................................... 39

*Sci. Accessories Corp. v. Summagraphics Corp.*,
    425 A.2d 957 (Del. 1980) ................................................................................ 33

*Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*,
    347 B.R. 17 (Bankr. W.D. Pa. 2006) ............................................................... 97

*Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan*,
    883 F.2d 345 (5th Cir. 1989) .......................................................................... 32

*Spivey v. Robertson*,
    197 F.3d 772 (5th Cir. 1999) .......................................................................... 26

*Straehla v. AL Glob. Servs., LLC*,
    619 S.W.3d 795 (Tex. App.—San Antonio 2020, pet. denied) ...................... 49

*Synergy Strategic Sols., LLC v. Totus Sols., Inc.*,
    2019 WL 1406599 (N.D. Tex. 2019) ............................................................... 65

*Tener v. Short Carter Morris, LLP*,
    2014 WL 4259885 (Tex. App.—Houston [1st Dist.] Aug. 28, 2014, no pet.) .......... 42, 43

*Texas Pac. Coal & Oil Co. v. Belcher*,
    265 S.W. 1081 (Tex. Civ. App.—Amarillo 1924, no writ) ............................. 54

*Thorpe by Castleman v. CERBCO, Inc.*,
    676 A.2d 436 (Del. 1996) ................................................................................ 34

*Tijerina-Salazar v. Venegas*,
    2022 WL 1927007 (W.D. Tex. June 3, 2022) ................................................. 63

*Tompkins v. Cyr*,
　　995 F. Supp. 664 (N.D. Tex. 1998) ............................................................... 56

*Trevino v. Merscorp, Inc.*,
　　583 F. Supp. 2d 521 (D. Del. 2008)................................................... 77, 78, 79

*Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*,
　　2009 WL 1387115 (Del. Ch. May 18, 2009),
　　*aff'd*, 988 A.2d 938 (Del. 2010) ................................................................ 33, 44

*UBS Secs. LLC v. Highland Capital Mgmt., L.P.*,
　　923 N.Y.S.2d 312 (Sup. Ct. 2011),
　　*aff'd in part, modified in part*, 93 A.D.3d 489, 940 N.Y.S.2d 74 (2012) ...................... 75

*UBS Secs. LLC v. Highland Capital Mgmt., L.P.* (*In re Highland Capital Mgmt., L.P.*),
　　Adv. Pro. No. 21-03020-sgj (Bankr. N.D. Tex. Aug. 10, 2022)...................................... 99

*United States v. Fernon*,
　　640 F.2d 609 (5th Cir. 1981) ......................................................................... 97

*United States v. Golden Acres, Inc.*,
　　702 F. Supp. 1097 (D. Del. 1988)................................................................... 79

*United States v. Evans*,
　　340 F. App'x 990 (5th Cir. 2009) ................................................................... 91

*United States v. Garcia Abrego*,
　　141 F.3d 142 (5th Cir. 1998) ....................................................................... 109

*United States v. Ron Pair Enters.*,
　　489 U.S. 235 (1989)....................................................................................... 95

*USPPS, Ltd. v. Avery Dennison Corp.*,
　　326 F. App'x 842 (5th Cir. 2009) ................................................................... 70

*Villanueva v. Gonzalez*,
　　123 S.W.3d 461 (Tex. App.—San Antonio 2003, no pet.)............................................ 64

*VTX Commc'ns, LLC v. AT&T Inc.*,
　　2020 WL 4465968 (S.D. Tex. Aug. 4, 2020) ............................................... 35, 36, 41, 71

*Wallace ex rel Cencom Cable Income Partners II, Inc.*,
　　752 A.2d 1175 (Del. Ch. 1999)................................................................... 33, 77

*Williams v. Aire Serv, LLC*,
　　2019 WL 13150027 (W.D. Tex. July 25, 2019) ................................................ 107

*Ye v. Zhang*,
   2021 WL 5862093 (S.D. Tex. June 8, 2021) ................................................. 67

*Zacarias v. Stanford Int'l Bank, Ltd.*,
   945 F.3d 883 (5th Cir. 2019) ....................................................................... 50

*Ziegler v. Bank of Am. Nat'l Tr. & Sav. Ass'n.*,
   182 F.3d 913 (5th Cir. 1999) ................................................................. 70, 73

## **Statutory Authorities**

11 U.S.C. § 544 ................................................ 90, 91, 92, 93, 94, 95, 96, 97

11 U.S.C. § 546(a) .................................................................................... 91

28 U.S.C. § 3003(c) ................................................................................. 92

28 U.S.C. § 6502 ................................................................................ 91, 92

6 Del. C. §  1501 et seq. ........................................................................... 75

Delaware Uniform Partnership Law § 15-306 ............................................ 75

Delaware Revised Uniform Limited Partnership Act § 17-403 ................ 75, 76

Tex. Civ. Prac. & Rem. Code § 134.005 .................................................. 107

Tex. Penal Code § 31.03(a) .................................................................... 107

## **Rules and Regulations**

FED. R. BANKR. P. 7009 ........................................................................ 100

FED. R. BANKR. P. 7012(b) ...................................................................... 25

FED. R. CIV. P. 8(a)(2) .................................................................. 25, 26, 100

FED. R. CIV. P. 9(b) ................................................................. 100, 101, 102

## **Additional Authorities**

RESTATEMENT (SECOND) OF AGENCY ................................................... 55, 67

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT ............ 69

Marc S. Kirschner (the "Trustee"), the Litigation Trustee of the Litigation Sub-Trust established pursuant to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (as amended, the "Plan"), through his undersigned counsel, hereby files this response in opposition (the "Opposition")[2] to (i) the Motions to Dismiss the Trustee's Amended Complaint (the "Complaint") filed by Defendants Isaac Leventon (Dkt. Nos. 172 and 173)[3] ("Leventon Br."); Scott Ellington (Dkt. Nos. 175 and 176) ("Ellington Br."); CLO Holdco, Ltd. ("CLO Holdco"), Charitable DAF Holdco, Ltd. ("DAF Holdco"), Charitable DAF Fund, LP (the "DAF"), and Highland Dallas Foundation, Inc. ("Highland Dallas," and together with the other Defendants listed after Ellington, the "CLO Holdco Defendants") (Dkt. Nos. 178, 179, and 191) ("CLO Holdco Defs. Br."); Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NexPoint," and together with HCMFA, the "Advisors" or "Lifeboats") (Dkt. Nos. 182 and 183) ("Lifeboats Br."); Mark Okada, Mark & Pamela Okada Family Trust Exempt Trust # 1 and Lawrence Tonomura in his capacity as Trustee, and Mark & Pamela Okada Family Trust Exempt Trust # 2 and Lawrence Tonomura in his capacity as Trustee (together, the "Okada Defendants") (Dkt. Nos. 185 and 186) ("Okada Defs. Br."); and James D. Dondero, Dugaboy Investment Trust ("Dugaboy") and Nancy Dondero in her capacity as Trustee, Get Good Trust ("Get Good") and Grant Scott in his capacity as Trustee, Hunter Mountain Investment Trust ("Hunter Mountain"), Rand PE Fund I, L.P., Series 1 ("Rand"), and Strand Advisors, Inc. ("Strand," and together with the Defendants listed after the Okada

---

[2] This Opposition is supported by the contemporaneously filed Appendix in Support of the Litigation Trustee's Response in Opposition to Defendants' Motions to Dismiss and the CLO Holdco Defendants' Motion for a More Definitive Statement ("Appendix" or "App.").

[3] Cites to the docket in this adversary proceeding, Adv. Pro. No. 21-03076-sgj, are cited as "Dkt. No. __." Cites to docket entries in the main bankruptcy proceeding, *In re Highland Capital Mgmt., L.P.*, No. 19-34054-sg11 (Bankr. N.D. Tex.) are cited as "Bk. Dkt. No. __."

Defendants, the "Dondero Defendants") (Dkt. Nos. 189 and 190) ("Dondero Defs. Br."), and (ii) the Motion for a More Definitive Statement filed by the CLO Holdco Defendants.[4]

In support of this Opposition, the Trustee respectfully states as follows:

## PRELIMINARY STATEMENT[5]

1.      The Complaint sets forth in exacting detail how Defendant James Dondero abused and exploited his domination and control over Highland Capital Management, L.P. ("HCMLP" or the "Debtor") to reap as many personal benefits from the company as possible, to the detriment of the company and its creditors.  In 2011, faced with lawsuits threatening to impose hundreds of millions of dollars of damages on HCMLP, Dondero devised a plan to evade the impact of any judgments by simply transferring HCMLP's business to other "Lifeboat" entities he owned and controlled.  The Lifeboats conducted their business through HCMLP's employees, operated out of HCMLP's office, and in several cases, simply took over HCMLP's contracts, diverting the resulting fees away from HCMLP while HCMLP continued to provide the underlying services. The Lifeboats were effectively HCMLP in every respect but one: they would not be answerable, at least as conceived, for HCMLP's liabilities, including the litigation judgments that Dondero knew would inevitably be imposed.  Thus, Dondero ensured that the Lifeboats collected the lion's share of profits for the management services HCMLP provided, while HCMLP bore the majority of expenses.

---

[4]   Defendants Massand Capital, Inc. ("Massand Capital") and Massand Capital, LLC ("Massand LLC" and together with Massand Capital, "Massand") have neither filed nor joined any motion to dismiss and are subject to a default order.  Dkt. No. 197.  Defendant SAS Asset Recovery Ltd. ("SAS"), which is a foreign entity, was recently served via the Hague Convention (Dkt. No. 204), and  has not yet appeared and has neither filed nor joined any motions to dismiss.  Defendant Grant Scott filed an answer rather than moving against the Complaint.  Dkt. No. 181.  For purposes of this Opposition, except where otherwise stated, these parties are not included in the definition of Defendants.

[5]   Capitalized terms not defined in the Preliminary Statement are defined later in this brief.

2.      The creation of the Lifeboats all but guaranteed HCMLP's demise, rendering it insolvent, inadequately capitalized, and unable to pay its debts as they came due for the rest of its corporate existence, but for a brief respite between late 2013 and 2015 due largely to proprietary trading and improved market conditions.  In the years that followed the Lifeboats' creation, Dondero continued to divert value away from HCMLP for his own personal benefit, and, when it suited him, to exploit HCMLP's role as manager of other Dondero entities to divert value from those entities as well.  This included paying tens of millions of dollars in distributions to Dondero and his HCMLP co-founder, Defendant Mark Okada, at a time when they each knew HCMLP was insolvent; causing the fraudulent transfers of assets worth at least $100 million out of HCMLP-managed funds to an entity owned by Dondero and Defendant Scott Ellington to evade pending litigation claims—and concealing those transfers from HCMLP's independent board following HCMLP's bankruptcy filing; using HCMLP as a vehicle to fraudulently induce a $75 million investment into a Dondero entity; siphoning funds out of HCMLP for use by other Dondero entities, in exchange for artificially low interest, long-term notes that Dondero later purported to extend by 30 years or retroactively forgive; and replacing HCMLP's liquid assets with an illiquid, below-market note, the payment of which fell within Dondero's sole discretion.  Dondero was aided at almost every turn by HCMLP attorneys Defendants Ellington and Isaac Leventon, whose loyalties—in contrast to their fiduciary duties—ran to Dondero, rather than to HCMLP.

3.      Indeed, Defendants' motions to dismiss the Complaint lay bare Defendants' view that Dondero, his colleagues, and their affiliated entities could do whatever they pleased with HCMLP's assets.  Defendants argue that the limited partnership agreement governing HCMLP permitted Dondero and the HCMLP general partner through which he acted, Defendant Strand, to establish competing entities regardless of the one-sided and self-dealing nature of the so-called

3

competition, and insulated Dondero and his affiliated entities and individuals from all liability whatsoever.  The actual agreement, however, says no such thing.  Rather, the agreement leaves intact Strand's and Dondero's fiduciary duties to refrain from engaging in "gross negligence or willful or wanton misconduct," imposes liability where Strand acts in bad faith in connection with a conflict of interest between HCMLP and Strand or any of its affiliates, and does nothing to relieve HCMLP's officers and agents of their fiduciary duties under governing state law, or to insulate Strand or any other of Dondero's entities from their statutory or common law liability for HCMLP's debts.  The conduct alleged in the Complaint is exactly the kind of grossly negligent, willful, wanton, and bad faith conduct by Dondero and Strand necessary for the assertion of breach of fiduciary duty claims against them, and amply supports claims for breach of the fiduciary duties owed by Ellington, Leventon, and Okada, who often participated in such breaches alongside Dondero.  Claims for aiding and abetting and knowing participation in breaches of fiduciary duty are also stated against Ellington, Leventon and Okada, as well as against the Lifeboats, whose actions also give rise to claims of tortious interference with HCMLP's prospective business relations and alter ego liability.

4.      Defendants' other arguments fare no better.  The Court has already addressed, and rejected, Defendants' repeated refrain that the Court lacks subject matter jurisdiction over this action.  Moreover, Defendants' arguments that the Trustee lacks standing to pursue the claims under HCMLP's Plan because (i) the Plan's list of retained causes of action was ***too comprehensive*** to be effective, (ii) the Reorganized Debtor retained breach of fiduciary duty claims that—***unlike those asserted here***—could not be transferred to the Claimant Trust (if any), and (iii) an assignment agreement between the Litigation Sub-Trust and Claimant Trust constitutes

an impermissible plan modification ***notwithstanding that it was expressly contemplated by the Plan***, cannot withstand even the barest of scrutiny.

5.      Further, given Dondero's absolute control over HCMLP and his and the other fiduciary Defendants' complete abandonment of HCMLP's interests, the discovery rule and doctrine of adverse domination apply squarely to toll the statutes of limitations governing the breach of fiduciary duty, aiding and abetting/knowing participation, civil conspiracy, and equitable money had and received claims, and any defenses predicated on attributing Defendants' conduct to HCMLP are foreclosed.  The Trustee is also free to challenge fraudulent transfers made prior to the four-year period before the Petition Date, under well settled law providing that a trustee may stand in the shoes of the IRS, which is not bound by state statutes of limitation and, like any other creditor, may exercise rights as a future creditor.  And Defendants' myriad assertions that the Complaint fails to sufficiently allege certain statutory or common law elements, or that a more definitive statement is required with respect to claims against the CLO Holdco Defendants, fall flat in face of the Complaint's detailed allegations.

6.      In sum, for many years, Dondero and those acting in concert with him have unabashedly disregarded their duties to HCMLP and its creditors to enrich themselves and, most pointedly, Dondero.  They now raise a barrage of hyper-technical but fatally flawed arguments in an attempt to avoid judgment for the harm they have caused.  These defenses should be rejected, and the Trustee permitted to proceed on his claims.

**RELEVANT BACKGROUND**[6]

A.    **DONDERO EXPLOITS AND ABUSES HIS DOMINATION AND CONTROL OF HCMLP TO BENEFIT HIMSELF AND EVADE ITS CREDITORS, WITH THE SUPPORT AND ASSISTANCE OF HCMLP AGENTS AND DONDERO-RELATED ENTITIES**

7.    In 1993, Defendant James D. Dondero co-founded HCMLP, an investment manager and advisor that also engaged in proprietary trading.  Compl. ¶¶ 2, 40.  Prior to the appointment of an independent board of directors (the "Independent Board") on January 9, 2020 in connection with HCMLP's bankruptcy filing, Dondero controlled HCMLP through his ownership and control of HCMLP's general partner, Strand, and was the largest owner of its limited partnership interests, either directly or through entities he owned and controlled or of which he was a beneficiary.  *Id.* ¶¶ 2, 12, 14, 42.  Defendant Mark A. Okada was Dondero's co-founder, HCMLP's Chief Investment Officer until 2019, and the next-largest owner of HCMLP limited partnership interests, either directly or through entities he owned and controlled or of which he was a beneficiary.  *Id.* ¶ 13.

8.    In 2008, HCMLP was experiencing significant losses that threatened its existence, and became ensnared in litigation posing the threat of hundreds of millions of dollars in damages.  *Id.* ¶¶ 42, 44.  In March 2008, HCMLP and two of its managed funds (the "Fund Counterparties") entered into a transaction with UBS to finance the purchase of various collateralized loan obligations ("CLOs") and other assets, under agreements that required the posting of collateral.  *Id.* ¶ 45.  The value of those assets dropped in the fall of 2008, and UBS made a margin demand that HCMLP and its managed funds could not satisfy.  *Id.*  UBS terminated the agreement and commenced an action against HCMLP and the Fund Counterparties alleging that HCMLP had

---

[6]   The following facts are taken from the Complaint or documents of which the Court may take judicial notice.

orchestrated the transfer of assets away from the Fund Counterparties, asserting fraudulent transfer claims, among others, and seeking damages of as much as $745 million. *Id*. ¶¶ 45, 46.

9.      In the same time period, one of the Fund Counterparties, Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") also ceased meeting margin calls issued by Citibank N.A. and certain of its affiliates (collectively, "Citibank"). *Id*. ¶ 47. This led to litigation between HCMLP, CDO Fund, and Citibank, in which Citibank sought $27 million and indemnification of its losses. *Id*. Additionally, in 2009, HCMLP was sued by Barclays Bank Plc and one of its wholly-owned subsidiaries (collectively, "Barclays") in litigation in which Barclays alleged it was owed "hundreds of millions of dollars." *Id.* ¶ 48. And in 2011, HCMLP became aware that it was the subject of an SEC investigation that could result in significant monetary penalties against the company. *Id*. ¶ 49.

10.      In 2012, Dondero testified under oath that HCMLP had been brought to "to a state of insolvency" in 2008, that the company "had been juggling liquidity since," and that "[t]he last three, four years have been negative to the tune of hundreds of millions of dollars." *Id*. ¶ 50. Dondero testified further that the contingent liabilities resulting from the lawsuits filed against HCMLP were a primary driver of HCMLP's insolvency. *Id*.

1.      **In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business**

11.      Against this backdrop, in or around 2011, Dondero determined to create a new set of entities—referred to internally as "Lifeboats"—to take over HCMLP's business, with the aim of placing the resulting profits beyond the reach of HCMLP's creditors. *Id*. ¶ 51. The Lifeboats included (i) Defendant NexPoint, 99.9% of which is owned by Defendant Dugaboy, Dondero's personal trust, and (ii) Defendant HCMFA, which is indirectly owned by Dondero and Okada. *Id*. ¶¶ 15-17, 51, 52, 61.

12.    The Lifeboat scheme was predicated on inserting the Lifeboats in between HCMLP and its clients, as shell middlemen doing none of the work and collecting all of the revenue. *Id*. ¶¶ 53, 54, 63.  In many instances, the Lifeboats accepted services from HCMLP without providing compensation in return and without governing agreements, conducted business through HCMLP's employees and out of HCMLP's office, and took over certain of HCMLP's contracts. *Id*. ¶¶ 53, 54, 62, 63.

13.    ***NexPoint.***  Between 2012 and 2015, NexPoint had no employees of its own and performed no business activities that were distinguishable from those performed by HCMLP. *Id*. ¶ 53.  For over a year, HCMLP performed all services for NexPoint, without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees. *Id*. ¶ 54.  In mid-2013, Dondero attempted to retroactively infuse the scheme with a patina of legitimacy, by causing NexPoint to enter into a shared services agreement with HCMLP that required NexPoint to pay fees to HCMLP based on a formula that resulted in low fee payments. *Id*.  NexPoint continued to reap the vast majority of the fees that were generated, however. *Id.*

14.    Adding insult to injury, HCMLP funded NexPoint's operations whenever needed, seeded large investments made by NexPoint, and funded a large portion of the distributions NexPoint made to its owner, Defendant Dugaboy (the beneficiary of which was Dondero). *Id*. ¶ 55.  Indeed, in June 2012, at the time that Dondero was transferring HCMLP's advisory services business to NexPoint, Okada complained to Dondero that he was "using Highland's cash flow" to set up new entities controlled by Dondero and to "fund all their negative working capital." *Id.*

15.    Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and entered into a revolving line of credit to provide NexPoint with additional liquidity. *Id.* ¶ 56.  Ultimately, HCMLP was forced to file an adversary proceeding to collect on the amounts owed to

it by NexPoint. *Id.* ¶ 59. The Court recently recommended that summary judgment be granted to HCMLP in that action. *Highland Capital Mgmt., L.P. v. NexPoint Advisors, L.P.*, Adv. Pro. 21-03005-sgj (Bankr. N.D. Tex. July 19, 2022).

16. **_HCMFA_**. Dondero utilized the same basic playbook for HCMFA, which is directly or indirectly owned by Dondero and Okada. Compl. ¶ 61. HCMFA was created to replace HCMLP, in name, as the new investment manager for certain open-ended retail investment funds, but in a manner similarly designed to shift profits generated by the business to an entity whose assets would not be available to HCMLP's litigation creditors in the event they achieved favorable judgments. *Id.*

17. On December 15, 2011, Dondero caused HCMLP to transfer HCMLP's rights and obligations under an agreement governing HCMLP's provision of investment advisory services to four of its managed funds to HCMFA for no consideration. *Id.* ¶ 62. Prior to the transfer, HCMLP received management and advisory fees under those agreements in return for the services it performed. *Id.* Following the transfer, it was HCMFA, rather than HCMLP, that received those fees, notwithstanding that HCMFA used HCMLP's employees to perform most services. *Id.* Thus, the effect of the transfer was to insert a new entity to reap the profits earned from the same HCMLP employees performing the same work that had been performed prior to the transfer. *Id.*

18. Following Dondero's "Lifeboat" playbook, HCMLP also provided financial support to HCMFA so that HCMFA was well-positioned to earn profits that bypassed HCMLP's creditors and flowed directly to Dondero and his affiliated entities. *Id.* ¶ 64. Ultimately, HCMLP was forced to file an adversary proceeding to collect on the amounts owed to it by HCMFA. *Id.* ¶ 65. The Court recently recommended that HCMLP be granted summary judgment in this action.

*Highland Capital Mgmt., L.P. v. NexPoint Advisors, L.P.*, Adv. Pro. 21-03005-sgj (Bankr. N.D.

Tex. July 19, 2022).

> **2.      Dondero, Ellington, And Leventon Cause HCMLP To Engage In Misconduct That Results In Significant Additional Liability For The Company**

19.      In addition to establishing the Lifeboats to usurp HCMLP's business and evade its

contingent creditors, Dondero, along with Defendant Scott Ellington, HCMLP's Chief Legal

Officer and General Counsel, and Defendant Isaac Leventon, HCMLP's Assistant General

Counsel, engaged in other actions that meaningfully harmed HCMLP.  Compl. ¶ 66.  This included

exposing HCMLP to significant liability by utilizing it to exact revenge on Dondero's perceived

adversaries, and carrying out schemes that personally benefitted Dondero and, in certain instances,

Ellington, but conferred no benefit on HCMLP.  *Id.*  These actions ultimately resulted in more than

one billion dollars in litigation and arbitration claims against HCMLP and millions of dollars in

legal fees, necessitated HCMLP's bankruptcy filing, and forced HCMLP to enter into settlements

for hundreds of millions of dollars.  *Id.*

20.      ***Acis.***  In 2011, Dondero formed Acis Capital Management, L.P. ("Acis") and Acis

Capital Management GP, LLC ("Acis GP").  *Id.* ¶ 67.  Dondero was President both of Acis and

Acis GP and controlled their overall financial strategies and decisions.  *Id.*  As pled in the

Complaint, prior to its bankruptcy filing in 2018, Acis was indirectly owned by Dondero (through

Dugaboy), Okada, and Joshua Terry, an HCMLP employee that Dondero tapped to manage Acis.

*Id.*  Like HCMLP, Acis was a registered investment advisor that was created to raise money from

third-party investors to launch or invest in CLOs.  HCMLP was the investment manager for Acis,

and Acis performed almost all of its services through HCMLP employees.  *Id.*

21.      Dondero originally created Acis to act as another lifeboat—*i.e.*, to divert income

away from HCMLP when HCMLP was facing the risk that all of its assets would be absorbed by

its creditors. *Id.* In 2013, however, HCMLP began what proved to be a short-lived turnaround, spurred by improving financial performance and settlement of the Barclays litigation. *Id.* At this point, Dondero became more troubled by the dilution of his share of Acis's income that was caused by Terry's ownership in Acis than he was about evading HCMLP's liabilities. *Id.* As a result, Dondero once again redirected the flow of money for his own benefit, this time by siphoning value from Acis back to HCMLP. *Id.* In 2016, Dondero fired Terry based on a pretextual claim of termination for "cause," amended the Acis limited partnership agreement to terminate Terry's interests in Acis, and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded arbitration. *Id.* ¶ 68.

22.    The arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. *Id.* ¶ 69. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked a false pretext of "for cause" in order to deny Terry his contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay HCMLP more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying HCMLP under their shared services and sub-advisory agreements, retroactive to January 1, 2016. *Id.*

23.    Shortly after Terry's arbitration judgment was issued, Dondero, acting through HCMLP, and with the aid of Ellington and Leventon, entered into numerous transactions designed to take control of Acis's assets and business and strip Acis of assets so that it would be unable to pay Terry's arbitration award. *Id.* ¶ 70. Ellington and Leventon aided Dondero by implementing

Dondero's directives and taking the steps necessary to consummate these transactions, notwithstanding their knowledge that the transactions benefitted only Dondero, and would ultimately harm HCMLP by exposing it to significant liability.  *Id.*

24.    Ultimately, Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code against Acis and Acis GP on January 30, 2018. *Id.* ¶ 71.  In response to the bankruptcy filings, Dondero caused HCMLP, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis CLOs, including by failing to purchase a single loan for the CLOs following the appointment of a chapter 11 trustee in the Acis bankruptcy case.  *Id.*  This abrogation of duties caused the chapter 11 trustee to replace HCMLP with Brigade Capital Management, LP and Cortland Capital Markets Services LLC.  *Id.*  Put another way, Dondero's use of HCMLP to cause damage to Acis actually harmed HCMLP, leading HCMLP to incur exorbitant legal fees attacking Acis, the loss of its investment management contracts and the income flowing from those contracts, and reputational harm that precluded HCMLP from launching any future CLOs and generating fee income therefrom.  *Id.*

25.    Dondero also caused HCMLP to commence litigation against the Acis chapter 11 trustee, prompting a countersuit in which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through HCMLP) and to stop HCMLP from engaging in a course of conduct that was harmful to Acis and the Acis CLOs.  *Id.* ¶ 72.  Dondero also caused Highland CLO Funding, Ltd. ("HCLOF") to initiate an additional frivolous lawsuit against Terry in the Royal Court of Guernsey, which was ultimately dismissed, resulting in Terry arguing that HCMLP, as the owner of HCLOF's advisor, was liable for Terry's attorneys' fees and expenses under Guernsey's "loser pays" regime.  *Id.*

26.    Acis filed proofs of claim against HCMLP during HCMLP's bankruptcy, seeking to recover the amounts Dondero had caused HCMLP to overcharge Acis and damages from HCMLP's efforts to transfer assets out of Acis.  *Id.* ¶ 102.  Terry and his wife also filed a proof of claim, alleging that HCMLP, acting through Dondero, had misappropriated assets in their retirement account.  *Id.*  These claims were ultimately settled, with Acis receiving a $23 million allowed claim, and HCMLP agreeing to make additional payments to Terry and Acis.  *Id.*

27.    ***HarbourVest.***  Dondero and Ellington also exposed HCMLP to substantial liability to third-party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). *Id.* ¶ 73.  At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis CLOs away from Acis to evade Terry's arbitration award, he and Ellington were using HCMLP to induce HarbourVest to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from Defendant CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million.  *Id.*  In soliciting this investment, Dondero and Ellington failed to disclose material facts to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing HCMLP to substantial and unnecessary liability.  *Id.*

28.    In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through HCMLP, made numerous misrepresentations and omissions, including: (i) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (ii) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. to HCLOF immediately prior to the HCLOF Investment; and

(iii) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.  *Id.* ¶ 74.

29.    Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero-owned entities, including entities managed by the Lifeboats. *Id.* ¶ 75.  Thus, the HarbourVest investment benefitted Dondero personally, but left HCMLP exposed to hundreds of millions of dollars in potential damages to HarbourVest.  *Id.*

30.    The HarbourVest entities filed proofs of claim in HCMLP's bankruptcy proceeding, asserting a claim for fraudulent inducement and damages of more than $300 million. *Id.* ¶¶ 103-04.  The claims were ultimately settled for an allowed claim of $80 million.  *Id.* ¶ 104.

31.    **_UBS._**    In March 2017, the New York state court presiding over UBS's claims against HCMLP and the Fund Counterparties ruled that UBS's claims against the Fund Counterparties, and its fraudulent transfer claims against HCMLP, could proceed to trial.  *Id.* ¶ 76. Shortly thereafter, Dondero, Ellington, and Leventon took steps to transfer the Fund Counterparties' remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington, in order to place such assets beyond UBS's reach when a judgment was entered in its favor.  *Id.*  In or around August 2017, Dondero, Ellington, and Leventon orchestrated the surreptitious transfer of substantially all of the Fund Counterparties' assets—with a face amount of $300 million and a fair market value of at least $100 million—to Sentinel.  *Id.*

32.    The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that purportedly insured the Fund

Counterparties' first $100 million of liability to UBS. *Id*. ¶ 77. The real goal of the transfer, however, was to drain the Fund Counterparties' assets and render the Fund Counterparties judgment-proof, while keeping the assets within Dondero's and Ellington's control. *Id*. There is no legitimate explanation as to why the Fund Counterparties transferred assets worth at least four times the premium payment to Sentinel. *Id*. And given that Dondero and Ellington indirectly own and control Sentinel, they personally and improperly benefitted from this overpayment. *Id*.

33.     Moreover, Ellington and Leventon actively concealed the transfer of assets and the existence of the purported insurance policy from the Independent Board, apparently in order to prevent the Fund Counterparties from making a claim under the policy. *Id*. ¶ 78. Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it. *Id*. In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the purported Sentinel insurance policy, and lied to HCMLP regarding the Fund Counterparties' assets. *Id*. Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or HCMLP; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with HCMLP's bankruptcy. *Id*.

34.     On February 10, 2020, the New York state court entered a judgment against the Fund Counterparties in connection with the first phase of the litigation, in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of

$1,042,391,031.79. Trial on UBS's claims against HCMLP was still pending when HCMLP filed for bankruptcy. *Id.* ¶ 80.

35.     UBS filed a proof of claim in HCMLP's bankruptcy proceeding for the full $1,039,957,799.44 of its judgment against the Fund Counterparties. *Id.* ¶ 96. In November 2020, the Court considered the value of the UBS Claim for purposes of plan voting and temporarily allowed the UBS Claim in the amount of $94,761,076. *Id.* ¶ 97. The parties subsequently reached an initial settlement in principle granting UBS a $75 million unsecured claim, consisting of a $50 million Class 8 General Unsecured Claim and a $25 million Class 9 Subordinated General Unsecured Claim. *Id.* ¶ 98. When the Independent Board discovered that Dondero, Ellington, and Leventon engaged in a conspiracy to cover up the fraudulent Sentinel transfer, however, the settlement amount was raised to provide UBS with a claim totaling $125 million, consisting of a $65 million Class 8 General Unsecured Claim and a $60 million Class 9 Subordinated Unsecured Claim. *Id.* ¶¶ 99-100.

36.     ***The Redeemer Committee.***   Dondero, Ellington, and Leventon also engaged in misconduct relating to HCMLP managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds") that resulted in an arbitration award against HCMLP of approximately $190 million. *Id.* ¶ 87. HCMLP had placed the Crusader Funds into wind-down in October 2008. *Id.* On July 5, 2016, a committee referred to as the "Redeemer Committee" that was elected to oversee HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors terminated HCMLP as investment manager and commenced an arbitration proceeding alleging that HCMLP had engaged in various forms of misconduct in its role as investment advisor. *Id.* ¶¶ 87-88. The claims that were asserted against HCMLP by the Redeemer Committee stemmed

16

from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused HCMLP to commit.  *Id*. ¶ 89-92.

37.     On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million.  *Id.* ¶ 88.  HCMLP filed for bankruptcy on the day of oral arguments on the Redeemer Committee's motion to enforce the Award in Delaware Chancery Court.  *Id.* ¶ 93.

38.     The Redeemer Committee filed proofs of claims in the HCMLP bankruptcy proceeding in the amount of its arbitration award, and seeking additional management fees and distribution fees.  HCMLP ultimately settled these claims for an allowed general unsecured claim of nearly $137 million.  *Id*. ¶ 101.

### 3.     Dondero And His Loyalists Engage In Other Misconduct That Harms HCMLP

39.     Dondero and his loyalists also engaged in other misconduct that harmed HCMLP and contributed to its demise.

40.     ***Fraudulent Distributions & Transfers***.  Dondero approved hundreds of millions of dollars of distributions from HCMLP to Dondero and Okada at a time when HCMLP was insolvent.  *Id.* ¶¶ 137-157.  Okada was in on this scheme, accepting approximately $18 million in transfers from HCMLP, when he knew—or knowingly disregarded—that HCMLP was insolvent and would not be able to pay its creditors.  *Id.* ¶¶ 140-156.  Although Dondero and Okada placed certain of their limited partnership interests in personal trusts, Dondero disregarded corporate formalities as to limited partnership distributions and, until 2015, distributions were made to Dondero and Okada personally, rather than to the actual entities with ownership stakes in HCMLP.  *Id*. ¶¶ 138-39.  HCMLP also made improper payments of over $500,000 per year to Defendant Massand Capital from November 2014 through 2019, for consulting services that were provided

not to HCMLP, but instead to SAS, a wholly separate entity owned and controlled by Dondero and Ellington. *Id*. ¶¶ 32, 158-162.

41.     ***The Fraudulent CLO Holdco Transaction.***  Dondero caused HCMLP to transfer $24 million in assets to Get Good, in exchange for an assignment from Get Good of an existing Dugaboy obligation (the "Dugaboy Note") that was worth significantly less than the transferred assets. *Id*. ¶¶ 131, 134.  Dondero, with the assistance of Defendant Grant Scott, Dondero's close friend and the Trustee of Get Good, then caused the assets to be immediately transferred from Get Good to Highland Dallas, to DAF Holdco, to the DAF, and ultimately to CLO Holdco, benefitting Dondero personally through tax benefits and harming HCMLP and its creditors by replacing liquid and liquidating assets with an illiquid note of significantly less value (the "CLO Holdco Transfer"). *Id*. ¶¶ 132, 135.

42.     ***The HE Capital Misappropriation.***  Dondero and Ellington also diverted $3 million of funds held in escrow for HCMLP to a Cayman Islands entity owned by Dondero and Ellington. *Id*. ¶¶ 163-67.  Ellington instructed HCMLP's counsel, Wick Phillips Gould & Martin LLP ("Wick Phillips"), to distribute nearly $3 million in proceeds from the sale of real property that belonged to HCMLP to a Cayman Islands shell company owned and controlled by Dondero and Ellington.  *Id*. ¶ 165.  When HCMLP's Tax Director inquired about the missing funds, Ellington claimed that they had been used to fund "additional cost[s]."  *Id*. ¶ 166.

### 4.     Dondero Hopelessly Commingles And Exploits HCMLP And The Other Entities In His Enterprise For His Own Personal Benefit

43.     Dondero treated the elaborate corporate web he created as a single integrated entity that existed solely to further his own self-enriching schemes, rather than as individual entities with their own respective stakeholders and corporate governance.  *Id*. ¶ 110.  Dondero singularly dominated and controlled HCMLP and was its solitary decision-maker.  *Id*. ¶ 111.  Dondero

exercised his complete control of HCMLP through HCMLP's general partner, Defendant Strand, which Dondero similarly dominated and controlled. *Id*. Dondero was Strand's 100% owner, sole director, and president between 1993 and 2020. *Id*. And Strand did not even attempt to maintain the pretenses of observing corporate formalities. *Id*. ¶ 112. Although Strand's bylaws require annual meetings of stockholders, over the 26 years that Dondero controlled Strand, only six such meetings were ever held, and none after 2005. *Id*. ¶ 113. Additionally, although Strand had certain elected officers between 2001 and 2019, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and standing with, Dondero. *Id*. ¶ 114. Indeed, when Dondero was asked under oath in 2020 about Strand's officers, he testified that he did not know if Strand even had officers, and stated that he was "not aware of [Strand] having any employees or active . . . governance." *Id*. Moreover, he did not know whether Strand had a board of directors or if he was solely Strand's president. *Id*.

44.     Further, for at least the last two decades, Dondero's complex web of more than 2000 entities has functioned largely as a single economic unit that was operated and controlled by Dondero, who abused his direct and indirect ownership stakes for his own personal benefit. *Id*. ¶ 115. Dondero directed the integrated enterprise himself, using friends, family members, and directors-for-hire that the Court has previously described as "nominal figureheads" to carry out his will. *Id*. As high-level HCMLP employees have testified under oath, Dondero was the "ultimate decision-maker" for "every [] entity in the firm and for the firm as a whole." *Id*.

45.     Dondero used his domination of his web of entities to facilitate his pillaging of HCMLP, moving HCMLP's assets and revenue out of reach of its creditors while preserving those funds and assets for his own use or for the benefit of other entities he created. *Id*. ¶ 117. Dondero also funneled his own personal expenses through HCMLP, routinely seeking expense

reimbursements from HCMLP in excess of $1 million per year. *Id.* ¶ 119.  At Dondero's direction, HCMLP employed certain employees whose only responsibilities and obligations were to manage Dondero's and Okada's personal affairs and private business interests. *Id.*  Dondero also used HCMLP and its employees for the benefit of other entities he dominated without adequate compensation to HCMLP—including for the benefit of the Lifeboats as described above, as well as for the benefit of his personal trusts. *Id.*  For example, Dondero used his domination of HCMLP to make its employee resources available to Dugaboy and Get Good at his sole discretion. *Id.* HCMLP employees were involved in creating, managing, and providing accounting services to Dugaboy, and certain of those employees performed work on behalf of Get Good in connection with Dondero's estate planning and transactions between Get Good and other Dondero entities. *Id.* Moreover, both Dugaboy and Get Good have acknowledged in the course of HCMLP's bankruptcy that HCMLP hosted their documents on its server. *Id.*  However, neither Dugaboy nor Get Good compensated HCMLP for the use of its employees or its resources. *Id.*

46.    Additionally, HCMLP employees frequently did not know whether they or their colleagues were employees of HCMLP or another entity within the Dondero web. *Id.* ¶ 121.  For example, Leventon has testified that although he was an HCMLP employee, HCMLP could request that he perform legal services for any of the 2,000 entities in the Highland web, and that he performed work for SAS, a Cayman Island litigation funding and management business owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic interests in SAS, respectively, "on and off" for approximately seven years, notwithstanding that he was never an employee of SAS and HCMLP did not have a shared services agreement with SAS. *Id.* Moreover, even when shared services and advisory agreements were in place, HCMLP frequently

charged Dondero's other entities below-market rates for use of HCMLP's employees and resources. *Id*.

47.     Dondero's use of HCMLP's employees for his own personal benefit continued even after the commencement of HCMLP's bankruptcy. *Id*. ¶ 120.  For example, after the bankruptcy was filed, Dondero's and Okada's personal bookkeeper (who was employed by HCMLP) instructed Dondero's sister to send a letter in her capacity as a trustee of Dugaboy instructing the Swiss entity Highland Capital Management AG, which is majority-owned by Dugaboy (which is ultimately owned and controlled by Dondero), to write off a liability that it owed to HCMLP for payments that HCMLP had made on its behalf. *Id*.

48.     Dondero also used his other entities to ensure that HCMLP's employees would remain loyal to him, rather than to HCMLP, following HCMLP's bankruptcy filing.  In early 2020, months after HCMLP filed for bankruptcy, Dondero used the Lifeboats and other Dondero entities to pay Ellington, Leventon, and other HCMLP employees, in an effort to maintain their loyalty to him while they remained HCMLP employees. *Id*. ¶¶ 168-71.  Dondero paid Ellington and Leventon approximately $17 million pursuant to a services agreement among Tall Pine—an entity owned by Ellington—and Dondero entities NexBank, DAF Holdco, NexPoint, and HCMFA (the "Tall Pine Services Agreement").  When Tall Pine received a payment from any of the counterparties to the agreement it contemporaneously transferred funds to a pass-through entity created by Leventon for his own benefit, and to similar entities owned by other HCMLP employees, and retained a portion of the funds for Ellington's benefit.  Despite their status as HCMLP employees and fiduciaries, Ellington and Leventon did not disclose these payments to the Independent Board. *Id*.

5.  **HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy**

49.     The Redeemer Committee's $190 million arbitration award left HCMLP with no choice but to file for bankruptcy. *Id*. ¶ 105. But HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay well before the Redeemer Committee arbitration award was issued. *Id.* As Dondero himself has acknowledged under oath, in 2008, HCMLP "almost went under and . . . moved to a state of insolvency" from which it was still struggling to emerge in 2012. *Id.* Valuations of HCMLP's assets and liabilities show that when litigation liabilities are taken into account, HCMLP was insolvent from no later than April 9, 2010 until no earlier than April 30, 2013, and again between no later than December 31, 2016 until the date it filed for bankruptcy. *Id*. ¶¶ 106-109. Contemporaneous valuations performed by the company itself corroborate this conclusion. *Id.* ¶ 106.

B.  **THE COURT CONFIRMS HCMLP'S PLAN, WHICH PROVIDES FOR THE CREATION OF THE LITIGATION SUB-TRUST TO PURSUE ESTATE CAUSES OF ACTION**

50.     On October 16, 2019 (the "Petition Date"), HCMLP filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). On December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of HCMLP's bankruptcy case to this Court. Bk. Dkt. No. 186. On February 22, 2021, this Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order") (Bk. Dkt. No. 1943), which confirmed the Plan. Bk. Dkt. No. 1808. The Plan went effective on August 11, 2021 (the "Effective Date"). Bk. Dkt. No. 2700.

51.     The Plan provided for the creation of the Claimant Trust for the benefit of holders of Allowed General Unsecured Claims and Allowed Subordinated Claims, which was vested with assets including "all Causes of Action," as defined by the Plan, and "any proceeds realized or received from such Assets."  Plan §§ I.B.24, I.B.26, I.B.27.  The Plan also provided for the creation of the Litigation Sub-Trust, as a "sub-trust established within the Claimant Trust or as a wholly-owned subsidiary of the Claimant Trust," for the purpose of "investigating, prosecuting, settling, or otherwise resolving the Estate Claims" transferred to it by the Claimant Trust pursuant to the Plan, or, as set forth in the Plan, by later assignment.  Plan §§ I.B.81, IV.B.1 ("[T]he Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims."), IV.B.4.  The Litigation Trustee of the Sub-Trust is "responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust . . . ."  Plan § I.B.83.

52.     The Plan's "Schedule of Causes of Action" (the "Schedule of Causes of Action") identified the claims retained under the Plan for post-confirmation pursuit by the Litigation Sub-Trust.  *See* Bk. Dkt. No. 1811-1.  Pursuant to an Assignment Agreement dated October 8, 2021, the Claimant Trust transferred and assigned to the Litigation Sub-Trust any and all causes of action asserted in the Complaint not previously assigned by operation of the Plan (Compl. ¶ 37), all of which—like the claims originally vested in the Litigation Sub-Trust—are encompassed within the Plan's Schedule of Causes of Action.

## C.     THE LITIGATION SUB-TRUST COMMENCES THIS ADVERSARY PROCEEDING FOR THE BENEFIT OF CREDITORS

53.     The Litigation Trustee commenced this Adversary Proceeding on October 15, 2021.  The Complaint asserts 36 causes of action against 23 Defendants.  The causes of action asserted in the Complaint all arise from pre-confirmation conduct perpetrated by Dondero and individuals and entities affiliated with him, which resulted in hundreds of millions of dollars in

damages to HCMLP.  The Complaint asserts claims for the avoidance and recovery of intentional and constructive fraudulent transfers and obligations under sections 544, 548, and 550 of the Bankruptcy Code, illegal distributions under Delaware partnership law, breach of fiduciary duty, declaratory judgment that certain entities are liable for the debts of others by statute or under an alter ego theory, aiding and abetting or knowing participation in breach of fiduciary duty, civil conspiracy, tortious interference with prospective business relations, breach of contract, conversion, unjust enrichment, and disallowance or subordination of claims under sections 502 and 510 of the Bankruptcy Code.

## ARGUMENT

### I.    AS THE COURT HAS ALREADY HELD, THE COURT HAS SUBJECT MATTER JURISDICTION OVER THIS PROCEEDING

54.    As this Court has already held, the Court may exercise subject matter jurisdiction over the Trustee's claims.  Defendants now rehash the same arguments they made in support of their motions to withdraw the reference, trying once again to convince the Court that Fifth Circuit precedent precludes a bankruptcy court from exercising jurisdiction over claims asserted by a litigation trust formed under a confirmed plan for the very purpose of pursuing the claims.  *See* Dondero Defs. Br. at 9-11; Lifeboats Br. ¶ 7; Leventon Br. ¶ 23; Ellington Br. ¶ 12; Okada Defs. Br. ¶¶ 51-52; CLO Holdco Defs. Br. ¶¶ 8-20.  As the Trustee previously articulated in response to these arguments, however, the Fifth Circuit has held that, even after plan confirmation, bankruptcy jurisdiction continues to exist "for matters pertaining to the implementation or execution of the plan."  *Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001).  And, as numerous courts within the Fifth Circuit have subsequently held, where, as here, a trustee of a litigation trust created under a confirmed plan of reorganization for the benefit of creditors pursues post-confirmation causes of action predicated on pre-confirmation

conduct for creditors' benefit, that jurisdictional requirement is satisfied.  *See id.*; *see also* Dkt. No. 95 at 7-8 (the Trustee's response in opposition to the Motions to Withdraw the Reference; collecting cases).

55.     The Court has already considered and rejected Defendants' arguments, holding in its Report and Recommendation on Defendants' motions to withdraw the reference that it does have subject matter jurisdiction over this Action.  Dkt. No. 151 at 17 (this Court's Report and Recommendation on the Motions to Withdraw the Reference).[7]  As the Court explained, post-confirmation jurisdiction exists because "the 36 counts in the Adversary Proceeding '[w]ithout doubt . . . pertain[] to implementation and execution' of the plan," and "Defendants' arguments to the contrary have no merit."  *Id.* (alterations in original); *see also id.* at 3-4 ("This Adversary Proceeding is a typical post-confirmation lawsuit being waged by a liquidating trustee, who was appointed pursuant to a Chapter 11 bankruptcy plan to pursue pre-confirmation causes of action that were owned by the bankruptcy estate, for the benefit of creditors.").

56.     Defendants elected to litigate this Court's jurisdiction in connection with their motions to withdraw the reference.  They did not seek reconsideration of the Court's ruling, and have been fully heard by this Court on this issue already.  They offer no reason or basis for the Court to reconsider its ruling, and offer no new arguments or facts that could warrant deviation from the Court's prior ruling.  Defendants' recycled arguments should be rejected once again.

## II.     ALL OF THE COMPLAINT'S CLAIMS ARE SUFFICIENTLY STATED

57.     Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012(b), must be read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader

---

[7]  The Court's Report and Recommendation is pending before the District Court.

is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). To withstand a Rule 12(b)(6) motion,

a complaint should contain "enough facts to state a claim to relief that is plausible on its face."

*Twombly*, 550 U.S. at 570. A claim satisfies the plausibility test "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged. [*Twombly*'s] plausibility standard is not akin to a 'probability requirement,'

but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556

U.S. at 678 (internal citations omitted).

58.    In reviewing a Rule 12(b)(6) motion, the court may look only to the complaint,

documents incorporated by reference in the complaint, and matters of which a court may take

judicial notice. *See Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th

Cir. 2010); *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *In re BFN Operations LLC*,

607 B.R. 551, 558 n.20 (Bankr. N.D. Tex. 2018). The court must accept all well-pleaded facts in

the complaint as true and view them in the light most favorable to the plaintiff. *See Ins. Distrib.*

*Consulting, LLC v. Freedom Equity Grp., LLC*, 2020 WL 5803249, at *2 (S.D. Tex. Sept. 4,

2020) (citing *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 701 (5th Cir. 2017)). "Because

a complaint must be liberally construed in favor of the plaintiff, a motion to dismiss under Rule

12(b)(6) is generally viewed with disfavor and is rarely granted." *Id.* (citing *Harrington v. State*

*Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### A.    THE TRUSTEE HAS STANDING TO PURSUE ALL OF THE COMPLAINT'S CLAIMS

### 1.    All Of The Complaint's Claims Were Retained Under The Plan

59.    Defendants argue that the Schedule of Causes of Action (the "Schedule of Causes

of Action"), which identifies the claims retained under the Plan for post-confirmation pursuit by

the Litigation Sub-Trust, is "tantamount" to a retention of "any and all claims," which the Fifth

Circuit has held to be insufficient to retain specific claims for post-confirmation litigation.

Leventon Br. ¶¶ 9-11 (citing *In re SI Restructuring Inc.*, 714 F.3d 860, 864 (5th Cir. 2013)); *see*

*also* Ellington Br. ¶ 11 (incorporating Leventon's arguments without additional legal support);

Lifeboats Br. ¶ 6; Dondero Defs. Br. at 6-8.  But Defendants' argument—that a specific list of

reserved claims can be "so lengthy" that it ***effectively*** becomes . . . a reference to 'any and all

claims'"—is both illogical and without support in Fifth Circuit precedent.  Lifeboats Br. ¶ 6

(emphasis added).  In *SI Restructuring Inc.*, the Fifth Circuit explained that the standard for

determining whether a cause of action has been retained under a plan is whether the reservation is

"specific enough to put 'creditors on notice of any claim [the debtor] wishes to pursue after

confirmation.'"  714 F.3d at 865.  Thus, the Fifth Circuit held that the "blanket reservation" at

issue there, where "[n]either the Plan nor the disclosure statement reference[d] specific state law

claims for fraud, breach of fiduciary duty, or any other particular cause of action," and instead

"simply refer[red] to all causes of action, known or unknown," was insufficiently specific to retain

state law causes of action.  *Id.*

60.    In sharp contrast to the "blanket reservation" in *SI Restructuring*, the Schedule of

Causes of Action here lists specific causes of action and specific potential targets of such causes

of action.  *See* Bk. Dkt. No. 1875-3.  The Schedule of Causes of Action is thus plainly sufficient

to "put creditors on notice of any claim [the debtor] wishe[d] to pursue after confirmation," and

there is nothing in the Fifth Circuit's jurisprudence regarding post-confirmation retention

suggesting otherwise.  Defendants' argument is simply a disguised complaint that the Plan retained

***too many*** claims.  *See, e.g.*, Dondero Defs. Br. at 8 (complaining the Schedule "contains a laundry

list of purportedly retained claims" and asserting that it is the "equivalent of an impermissible,

27

blanket reservation of claims").  Given the scope and scale of misconduct by Dondero, his complex web of controlled entities, and the loyalists who have aided in his schemes, broad preservation of potential causes of action was especially necessary here.  And a ruling that the Schedule of Causes of Action was ineffective to retain the causes of action listed therein (notwithstanding its specificity) would be directly contrary to the underlying rationale of *SI Restructuring*, as it would deprive creditors of the benefit of causes of action that they were specifically told would be retained.  *See* Confirmation Order at ¶ 42(b) ("Implementation of the Plan" shall include the "establishment of" and "transfer of Estate Causes of Action" to "the Litigation Sub-Trust," the Trustee of which is charged with "investigating, pursuing, and otherwise resolving any Estate Claims."); *see also* Plan § I.B.4 ("The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims," the proceeds of which "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries . . . .").

61.    Defendants' related assertion that the Trustee lacks standing to bring aiding and abetting and civil conspiracy claims, because those claims are not listed by name on the Schedule of Causes of Action, also fails.  *See* Leventon Br. ¶ 12; Ellington Br. ¶ 11; Dondero Defs. Br. at 9. The Schedule of Causes of Action expressly includes "any cause of action based on . . . breach of fiduciary duties," and "any claims similar in nature to" such causes of action.  *See* Bk. Dkt. No. 1875-3.  The aiding and abetting and civil conspiracy claims are unambiguously "based on" breaches of fiduciary duty, as they seek to (i) impose secondary liability on certain defendants as a result of their participation in other defendants' breaches of fiduciary duty, and (ii) impose liability on certain defendants for conspiring to breach fiduciary duties owed to HCMLP.  Indeed, Defendants acknowledge this reality, in arguing that these claims must be dismissed because the

28

Trustee fails to state a claim for breach of fiduciary duty. *See, e.g.*, Leventon Br. ¶ 18. The claims are also "similar in nature" to claims for breach of fiduciary duty, as the Trustee must—as Defendants note—plead a breach of fiduciary duty in order to state the aiding and abetting and civil conspiracy claims. Thus, the aiding and abetting and civil conspiracy claims are listed on the Schedule of Causes of Action, and were expressly and specifically retained under the Plan.

62. The Dondero Defendants' argument that the Trustee lacks standing to bring Delaware Revised Uniform Limited Partnership Act ("DRULPA") and "declaratory judgment" claims also fails. *See* Dondero Defs. Br. at 9. The Schedule of Causes of Action expressly retained "any cause of action based on . . . alter ego," including "claims brought under state law . . . and any claims similar in nature." *See* Bk. Dkt. No. 1875-3. The Dondero Defendants provide no support—and none exists—for their apparent assertion that the Plan must also have enumerated the procedural mechanism through which the Trustee would pursue these claims in order to preserve them.

### 2.   The Trustee Has Standing To Assert Breach Of Fiduciary Duty Claims

63. Defendants also challenge the Trustee's standing to bring breach of fiduciary duty claims, asserting that those claims were not transferred to the Litigation Sub-Trust and remain with the Reorganized Debtor. *See* Leventon Br. ¶ 18; Ellington Br. ¶ 13. This argument is premised on a blatant misreading of the Plan's unambiguous language.

64. The Plan provides that the Reorganized Debtor will administer "Reorganized Debtor Assets," which are defined to include "those Causes of Action (including, without limitation, claims for breach of fiduciary duty), ***that, for any reason, are not capable of being transferred to the Claimant Trust***." *See* Plan § IV.A, Definition of "Reorganized Debtor Assets" (emphasis added). Relying on this language, Defendants claim that "Reorganized Debtor Assets" include all fiduciary duty claims. But Defendants ignore that "Reorganized Debtor Assets" include

"claims for breach of fiduciary duty" *only to the extent* that such claims "are not capable of being transferred to the Claimant Trust." *Id.* Defendants do not argue, nor could they, that the Trustee's breach of fiduciary duty claims were not capable of being transferred to the Claimant Trust.[8] Accordingly, there is no basis for Defendants' assertion that the Trustee's breach of fiduciary duty claims belong to the Reorganized Debtor.

### 3. The Assignment Agreement Is Not An Impermissible Plan Modification

65.     Finally, Defendants contend that the Assignment Agreement is an impermissible modification of the Plan, and could not have assigned breach of fiduciary duty claims to the Litigation Sub-Trust in any event because the Reorganized Debtor is not a party to it. *See* Leventon Br. ¶¶ 19-22; Ellington Br. ¶ 13; Lifeboats Br. ¶ 8. These arguments are also unavailing.

66.     By Assignment Agreement dated October 8, 2021, the Claimant Trust transferred and assigned to the Litigation Sub-Trust any and all causes of action not previously assigned by operation of the Plan (the "<u>Assignment Agreement</u>") (Appendix at 176-178). The Assignment Agreement was intended to make clear, in the event of any confusion, that all of the claims asserted in the Complaint belong to the Litigation Sub-Trust. For example, the Assignment Agreement alleviates the need for the Court to determine whether Leventon was an insider of HCMLP such that claims against him constitute "Estate Claims" that the Claimant Trust transferred to the Litigation Sub-Trust under the Claimant Trust Agreement (*see* Leventon Br. ¶¶ 13-17), because— to the extent such claims were not originally transferred to the Litigation Sub-Trust—they were

---

[8] Under the Claimant Trust Agreement attached as Exhibit R to the Debtor's Notice of Supplement to the Plan, Causes of Action constituting "Estate Claims" that were transferred to the Claimant Trust were transferred to the Litigation Trust on or as soon as practicable after the Effective Date. Claimant Trust Agreement § 2.4(b). *See* Bk. Dkt. No. 1811-2. The Complaint's breach of fiduciary duty claims constitute Estate Claims, and/or were transferred to the Litigation Sub-Trust under the Assignment Agreement (as defined hereafter). *Id.* (Definition of Estate Claims).

transferred under the Assignment Agreement.  Appendix at 178.  The Assignment Agreement does

not, and need not, effect a transfer of the Complaint's breach of fiduciary duty claims from the

Reorganized Debtor to the Litigation Sub-Trust, because, as discussed above, such claims were

transferred to the Claimant Trust (and not the Reorganized Debtor) under the Plan.

67.    Additionally, Defendants' assertion that the Assignment Agreement constitutes an

impermissible modification of the Plan is wholly without merit.  "A plan modification occurs when

a proposed action alter[s] the parties' rights, obligations, and expectations under the plan."  *In re

Highland Capital Mgmt., L.P.*, 2022 WL 270862, at *4 (Bankr. N.D. Tex. Jan. 28, 2022) (internal

quotations removed).  The Assignment Agreement does no such thing, as (i) the Plan states

expressly that "after the Effective Date . . . the Claimant Trust . . . will have the exclusive right

to . . . ***assign*** . . . ***any or all of the Causes of Action*** without notice to or approval from the

Bankruptcy Court," Plan § IX.E.1 (emphasis added), and (ii) the Claimant Trust Agreement states

expressly that "[a]ll actions, claims, rights or interest constituting Claimant Trust Assets are

preserved and retained and may be enforced, ***or assignable to the Litigation Sub-Trust***, by the

Claimant Trustee as an Estate Representative," Claimant Trust Agreement § 3.11 (emphasis

added).  Thus, far from altering "the parties' rights, obligations, and expectations" under the Plan,

the Assignment Agreement was expressly contemplated by, and thus gives effect to, the Plan.

68.    This makes perfect sense, given that the Litigation Sub-Trust is a wholly owned

subsidiary of the Claimant Trust, is overseen by the same oversight board that controls the

Claimant Trust, and has the same ultimate beneficiaries as the Claimant Trust.  *See* Bk. Dkt. No.

1811-2 at 5 (Claimant Trust Agreement, defining "Oversight Board"); Bk. Dkt. No. 1811-4 at 4

(Litigation Sub-Trust Agreement, defining "Oversight Board"); *id*. at 5 ("The Litigation Sub-Trust

shall serve as a mechanism for investigating, prosecuting, settling, resolving, and otherwise

monetizing all Estate Claims and distributing the proceeds of such Estate Claims to the Claimant

Trust . . . .").  As such, the assignment has no practical impact for any of HCMLP's creditors, and

would not "alter [any] parties' rights, obligations, and expectations under the" Plan even if the

Plan and Claimant Trust Agreement did not expressly permit it (they do).  The Court need not even

reach this question, however, as the express language in the Plan and Claimant Trust Agreement

allowing for such an assignment definitively forecloses Defendants' argument that it is an

impermissible Plan modification.

### B.  THE COMPLAINT'S BREACH OF FIDUCIARY DUTY CLAIMS ARE SUFFICIENTLY PLED

#### 1.  The Complaint States Claims For Breach Of Fiduciary Duty Against Strand, Dondero, Ellington, Leventon, And Okada Under Delaware Law

69.     Under applicable Texas law, the law of the state of an entity's incorporation—here,

Delaware—governs claims for breach of fiduciary duty.  *Hollis v. Hill*, 232 F.3d 460, 464-65 (5th

Cir. 2000); *Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan*, 883 F.2d 345, 353 (5th

Cir. 1989).  Delaware law provides that a plaintiff alleging a breach of fiduciary duty must

ultimately prove by a preponderance of evidence (i) that a fiduciary duty exists and (ii) that a

fiduciary breached that duty.  *CSH Theatres, L.L.C. v. Nederlander of S.F. Assocs.*, 2018 WL

3646817, at *30 (Del. Ch. July 31, 2018).[9]   At the motion to dismiss stage, a plaintiff need only

sufficiently allege these elements.

---

[9]  Ellington's and Leventon's assertions that the Trustee's breach of fiduciary duty claims against
them are barred by the anti-fracturing rule for malpractice under Texas law have no bearing on the
breach of fiduciary duty claims asserted against Ellington and Leventon under Delaware law.
Leventon Br. ¶¶ 24-27; Ellington Br. ¶¶ 19-22.  Their arguments regarding but-for causation,
damages, and client satisfaction are equally irrelevant, as causation and damages are not elements
of a breach of fiduciary duty claim under Delaware law, and a client's satisfaction sounds in
malpractice, not breach of fiduciary duty.  Leventon Br. ¶¶ 30-34; Ellington Br. ¶¶ 24-28; *see also*
*CSH Theatres*, 2018 WL 3646817, at *30 (elements of breach of fiduciary duty are the existence
of a duty and a breach thereof); *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1237-38 (Del.

70.     Delaware law is plain that a limited partnership's general partner (here, Strand), parties in control of a general partner (here, Dondero), and parties who participated in the management or served as agents of the limited partnership (here, Okada, Ellington, and Leventon), owe fiduciary duties to the partnership and its limited partners.  *See Dohmen v. Goodman*, 234 A.3d 1161, 1167-68 (Del. 2020) (general partner's duties to limited partners and partnership parallel those owed by directors of Delaware corporations to their shareholders—the duties of care and loyalty); *In re Bos. Celtics Ltd. P'ship S'holders Litig.*, 1999 WL 641902, at *4 (Del. Ch. Aug. 6, 1999) (general partner of a Delaware limited partnership has a fiduciary duty to manage the partnership in the interests of the partnership and the limited partners); *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48-49 (Del. Ch. 1991) (directors of a corporate general partner that controls the limited partnership owe the limited partnership and its limited partners a duty of loyalty); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P.*, 752 A.2d 1175, 1180-82 (Del. Ch. 1999) (general partner of a limited partnership, and directors of a corporate general partner, have a duty to not use their control over the limited partnership's assets to benefit the general partner); *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *9 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (agent owes his principal a duty of good faith, loyalty, and fair dealing); *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980) (key managerial personnel cannot act antagonistically toward or cause injury to principal).

71.     These fiduciary duties include the duty of care, defined as a duty to act on an informed basis and take an active role in major business decisions, and the "broad and unyielding"

---

Ch. 2000) (disloyal conduct by a fiduciary is punishable even if it ultimately proves profitable to the principal).  And their argument that they are immunized from liability because they were following Dondero's instructions fails for the reasons discussed *infra*.  Leventon Br. ¶ 29; Ellington Br. ¶ 23.

duty of loyalty, defined as a "mandate[] that the best interest of the corporation and its shareholders takes precedence over any interest possessed by" the fiduciary. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361, 367-68 (Del. 1993) ("Duty of care and duty of loyalty are the traditional hallmarks of a fiduciary. . . . Each of these duties is of equal and independent significance."); *360 Sec. Partners, LLC v. Hammond*, 2022 WL 3159274, at *7 (N.D. Tex. Aug. 8, 2022) (applying Delaware law and citing *Cede* for the same proposition). If a fiduciary engages in self-dealing, Delaware law will not allow him to "profit personally from his [disloyal] conduct," even if the disloyal conduct ultimately proves profitable for the limited partnership. *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996); *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1237-38 (Del. Ch. 2000) ("Even if the investments or transactions which [the general partner] negotiated on behalf of the limited partnership prove profitable for the limited partners, [the general partner's] allegedly disloyal acts entitle the limited partners to recover from [the general partner] improper fees portfolio companies may have paid [the general partner] in its role as general partner.").

72.     Defendants do not really dispute that they breached fiduciary duties under traditional principles of Delaware fiduciary duty law, but argue instead that (i) the HCMLP Limited Partnership Agreement (the "LPA") precludes the Trustee's claims for breach of fiduciary duties that might otherwise lie under Delaware law (Leventon Br. ¶¶ 38-39; Ellington Br. ¶¶ 14-18; Okada Defs. Br ¶¶ 23-24), and (ii) Dondero's ultimate authority over HCMLP immunizes them from breach of fiduciary duty liability (Leventon Br. ¶ 29; Ellington Br. ¶ 23; Okada Defs. Br ¶¶ 28-29). Okada also asserts that the Litigation Trustee has failed to plead that HCMLP was insolvent at the times he accepted distributions totaling approximately $18 million, because the Trustee's solvency analysis includes liability for HCMLP litigation that had not yet resulted in the

multi-million dollar judgments or settlements that would ultimately materialize. Okada Defs. Br. ¶¶ 30-35.[10] Each of these arguments fails.

### 2. The Breach Of Fiduciary Duty Claims Are Consistent With The LPA And Delaware Law

73.    As an initial matter, Defendants' assertions that the LPA bars the breach of fiduciary duty claims against them is an affirmative defense that cannot be determined on a motion to dismiss. *See VTX Commc'ns, LLC v. AT&T Inc.*, 2020 WL 4465968, at *15 (S.D. Tex. Aug. 4, 2020) ("In general, exculpatory provisions are affirmative defenses that cannot provide a basis for dismissal."); *In re Simplexity, LLC*, 2017 WL 65069, at *6 (Bankr. D. Del. Jan. 5, 2017) (same); *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 561 and n.161 (D. Del. 2008) (collecting cases). To the extent the Court considers these arguments now, however, they should be rejected for the following reasons.

### (a)   Claims Against Strand And Dondero

74.    The Trustee's claims for breach of fiduciary duty against Strand and Dondero (Counts IV, V, and XIV) are entirely consistent with the LPA and Delaware law, and more than sufficient to state viable claims for breach of fiduciary duty. Although parties to a limited partnership are permitted to modify their fiduciary duties by contract, "[d]efault principles of fiduciary duty will apply unless a partnership agreement plainly provides otherwise," and "drafters of chartering documents must make their intent to eliminate fiduciary duties plain and unambiguous." *Miller v. Am. Real Estate Partners, L.P.,* 2001 WL 1045643, at *8 (Del. Ch. Sept. 6, 2001); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9

---

[10]   Okada also argues that the breach of fiduciary duty and aiding and abetting claims against him are barred by the statute of limitations to the extent that they are predicated on distributions that the Okada Defendants received more than four years before the Petition Date. Okada Defs. Br. ¶¶ 36-37. This argument is addressed *infra* in Section III.G.

(Del. Ch. Apr. 20, 2009).  Here, the LPA provides Strand with broad powers to manage HCMLP, and states that "[n]either the General Partner [*i.e.,* Strand] nor its directors, officers, employees, agents or representatives [*i.e.* Dondero] shall be liable to the Partnership . . . for errors in judgment or for any acts or omissions" ***unless*** such acts or omissions constitute "gross negligence or willful or wanton misconduct."  LPA 3.9(a), 4.1(a), 4.1(i)(i) (Appendix at 19, 23-24, 26).  Courts applying Delaware law hold that "rather than eliminating fiduciary duties," limited partnership agreements of this nature "recognize[] their continuing existence," as "gross negligence is the standard for evaluating a breach of the duty of care," and "willful misconduct is one standard for evaluating whether a fiduciary breached the fiduciary duty by acting in bad faith." *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012); *VTX Commc'ns v. AT&T Inc.*, 2020 WL 4465968, at *16 (S.D. Tex. Aug. 4, 2020) (holding that "far from eliminating fiduciary duties, [language similar to section 4.1(i)(i) of the LPA] is consistent with fiduciary duties").

75.    Additionally, although the LPA permits Strand, as HCMLP's General Partner, and Dondero, as an officer of HCMLP's General Partner, to "have business interests and activities in direct competition with [HCMLP]," it also expressly provides that "a breach of [the LPA] . . . or a breach of any standard of care or duty imposed herein or . . . under the Delaware Act or any other applicable law, rule, or regulation" ***may be found*** if the General Partner acts in bad faith in connection with "a conflict of interest . . . between the General Partner or any of its Affiliates, on the one hand, and [HCMLP] or any Limited Partner, on the other hand . . . ."  LPA 4.1(f), (g) (Appendix at 25).  Accordingly, although the mere act of competition between Strand or one of its affiliates, on the one hand, and HCMLP, on the other, does not, *in and of itself*, result in a breach of fiduciary duty, actions taken by Strand in bad faith in connection with such competition may.

76.    *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219 (Del. Ch. 2000), is instructive.

In *Rutledge*, the court considered contractual language that permitted the general partner to

"engage in other business activities . . . of every kind and description." *Id.* at 1237.  Nevertheless,

the court found that the governing limited partnership agreement did not permit the General Partner

"to engage in transactions involving self-dealing in which [the General Partner] stands on both

sides of a transaction." *Id.*  As the Court explained:

> No contractual language eschews the general partner's duty to the limited
> partner to refrain from entering into self-dealing transactions.  Therefore,
> absent authorizing contractual language, the general partner cannot self-
> deal—it cannot use its position as general partner, and its ability to control
> the terms of transactions, to invest limited partnership funds for its own
> gain, as opposed to investing for the benefit of the limited partnership.

*Id.*

77.    Here, as in *Rutledge*, the Complaint contains well-founded allegations of self-

dealing—along with other acts of impermissible gross negligence and willful and wanton

misconduct—that the LPA does not sanction.  More specifically, the breach of fiduciary duty

claims against Strand and Dondero are predicated on, among other things, the following

allegations:

- *The Lifeboat Scheme (Count IV).*  Dondero and Strand willfully and wantonly
  orchestrated the Lifeboat scheme for the express purpose of transferring value away
  from HCMLP's creditors for Dondero's benefit.  Dondero and Strand transferred
  HCMLP's valuable business to other "Lifeboat" entities owned by Dondero, and
  permitted the Lifeboats to utilize HCMLP employees to perform management and
  advisory services that HCMLP had previously provided directly.  As a result of this
  scheme, HCMLP performed the same services via the same employees, but either
  received only a small fraction of the profits that were generated or, in some
  instances, provided the services at a loss because the service agreements between
  HCMLP and the Lifeboats did not even cover HCMLP's costs. Compl. ¶¶ 50-65,
  196-200.

- ***Breaches That Resulted In HCMLP Liabilities to Third Parties (Count V)***.[11]
  Dondero and Strand willfully and wantonly engaged in misconduct that exposed
  HCMLP to new and increased liabilities, including by:

  (i) causing HCMLP, in its capacity as investment manager and/or controlling equity
  owner of the Fund Counterparties, to surreptitiously transfer substantially all of the
  Fund Counterparties' assets out of those entities to an entity owned by Dondero and
  Ellington, in order to preclude UBS from collecting on judgments against the Fund
  Counterparties, and to conceal these transfers from HCMLP's Independent Board
  (Compl. ¶¶ 76-80, 205-07);

  (ii) causing HCMLP to incur over $23 million to another Acis, Dondero entity, and
  its limited partner and investment manager Josh Terry, by pretextually firing Terry
  and terminating his interests, diverting cash from Acis to HCMLP in order to render
  Acis judgment-proof after Terry prevailed in arbitration, mismanaging Acis's
  assets, and pursuing contentious, yet frivolous, litigation (*id*. ¶¶ 67-72, 208-12);

  (iii) causing HCMLP to violate its duties under a plan of distribution relating to the
  Crusader Funds wind-down, including by transferring Barclays' limited partnership
  interests in the Crusader Funds to an HCMLP-affiliate after the a committee
  appointed to approve such transfers had denied approval, improperly purchasing
  plan claims in violation of certain rights of refusal, covertly purchasing stock of a
  portfolio company and failing to liquidate the Crusader Funds' own position in the
  stock, and taking deferred fees in violation of the distribution plan's requirements
  (*id*. ¶¶ 87-93, 214-16); and

  (iv) causing HCMLP to fraudulently induce HarbourVest to invest in an entity
  related to Acis, HCLOF, at a time when Dondero was transferring assets out of Acis
  and pushing it toward bankruptcy and intended to use the investment proceeds to
  fund yet another scheme for a different set of entities controlled and/or owned by
  Dondero (*id*. ¶¶ 73-75, 213).

- ***Fraudulent Transfers and Schemes (Count XIV).*** Dondero and Strand willfully
  and wantonly engaged in multiple schemes and transfers that diverted assets from
  HCMLP to other entities owned and/or controlled by Dondero, including by (i)
  causing HCMLP to make transfers to Massand Capital on account of services
  Massand Capital provided to SAS, an entity owned by Dondero and Ellington (*id*.
  ¶¶ 158-62); (ii) causing HCMLP to transfer assets valued at $24 million to CLO
  Holdco, in exchange for illusory consideration from Dondero-controlled entity
  Dugaboy (*id*. ¶¶ 131-36); (iii) approving hundreds of millions of dollars of

---

[11]   As the Fifth Circuit recently observed, the Plan in this bankruptcy proceeding was specifically
structured to anticipate "Dondero's continued litigiousness," and the Confirmation Order deduced
he was a "serial litigator," recognizing that HCMLP's deficit may have resulted from "enormous
litigation fees and expenses incurred" due to Highland Capital's "culture of litigation." *Matter of
Highland Capital Mgmt., L.P.*, 2022 WL 4093167, at *3-4 (5th Cir. Sept. 7, 2022) (internal
quotations omitted) (citing Bk. Dkt. Nos. 1809 and 1943 (the Plan and the Confirmation Order)).

distributions from HCMLP to Dondero and Okada at a time when HCMLP was insolvent (*id.* ¶¶ 137-57); (iv) using HCMLP for Dondero's own personal and private business interests (*id.* ¶¶ 115-29); and (v) diverting $3 million of funds in escrow for HCMLP to a Cayman Islands entity owned by Dondero and Ellington (*id.* ¶¶ 163-67). *See also id.* ¶¶ 274-84.

78.     All of these allegations assert that Dondero and Strand knowingly acted to harm HCMLP, by intentionally transferring value away from HCMLP for Dondero's benefit, or by causing HCMLP to engage in conduct that benefitted Dondero or satisfied his whims, but foreseeably resulted in HCMLP's liability to third parties. This conduct constitutes the kind of actionable gross negligence, bad faith, and willful and wanton misconduct precluded by the LPA, and violates both the duty of care and duty of loyalty that Strand and Dondero owed to HCMLP under Delaware law.[12]

(b)     Claims Against Ellington, Leventon, And Okada

79.     The arguments by Ellington, Leventon, and Okada that the LPA precludes the breach of fiduciary duty claims against them (Counts V and XIV) are equally specious, as the LPA says nothing whatsoever about eliminating or modifying the fiduciary duties owed to HCMLP by Ellington, Leventon, and Okada, as agents and managers of HCMLP. Indeed, the LPA makes

---

[12]     *See e.g., In re Parkcentral Glob. Litig.*, 2010 WL 3119403, at *11 (N.D. Tex. Aug 5, 2010) ("Gross negligence is conduct that 'constitutes reckless indifference or actions that are without the bounds of reason.'"); *Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1216-17 (Del. 2012) ("[B]ad faith in the corporate fiduciary duty of loyalty context is defined as a failure to act in the face of a known duty to act, which demonstrates a conscious disregard of one's duties.") (internal quotations omitted); *Schueller v. Cordrey*, 2017 WL 3635570, at *4 (Del. Super. Ct. Aug. 23, 2017), *aff'd*, 195 A.3d 33 (Del. 2018) ("Willfulness indicates an intent, or a conscious decision, to disregard the rights of others . . . to ignore consequences when it is reasonably apparent that someone will probably be harmed. Wanton conduct occurs when a person, though not intending to cause harm, does something so unreasonable and so dangerous that the person either knows or should know that harm will probably result. It reflects a foolhardy 'I don't care' attitude."); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 868 (Del. Ch.), *judgment entered sub nom. In re Metro Storage Int'l LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022) (knowledge of one's obligations, and intentional disregard thereof, is willful misconduct).

clear that the drafters knew how to include agents and managers in the LPA's provisions when they wanted to, as certain provisions extend expressly to any "employee, agent, or representative of the Partnership," or to "officers of the Partnership." *See, e.g.*, LPA 4.1(h), (k) (Appendix at 25-27).  Such parties, however, are not included in any of the provisions modifying or confirming the default fiduciary duties that apply under Delaware law, which therefore remain fully intact with respect to these fiduciaries.  LPA 4.1(g), 4.1(i)(i) (Appendix at 25-26).[13]

80.     Further, Ellington's, Leventon's, and Okada's assertions that section 4.1(k) of the LPA operates to eliminate their fiduciary duty fails.  Section 4.1(k) provides that "[t]he General Partner may, from time to time, designate one or more Persons to be officers of the Partnership," and that "[a]ny officer so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them."  LPA § 4.1(k) (Appendix at 26-27). The notion that this language means that HCMLP's officers and agents would owe fiduciary duties to HCMLP only if Dondero expressly delegated such a duty is belied by the word "perform," which confirms what a natural and common-sense reading of the provision already indicates: that Dondero would determine the ***tasks*** for which an officer or agent would be responsible; not that HCMLP's officers could perform those tasks free of any fiduciary obligations.  In all events, the language certainly does not constitute the "plain and unambiguous" language necessary to eliminate or modify default fiduciary duties.  *Miller*, 2001 WL 1045643, at *8; *see also VTX Commc'ns v. AT&T Inc.*, 2020 WL 4465968, at *15 (S.D. Tex. Aug. 4, 2020) ("[A]ny drafter of a partnership agreement must use great care to supplant the operation of traditional fiduciary duties," and "it is fair to expect that restrictions on fiduciary duties be set forth clearly and unambiguously"

---

[13]   Leventon's assertion that the "Complaint alleges that Leventon acted as an agent of the General Partner" is incorrect.  Leventon Br. ¶ 39.  The Complaint alleges that Leventon "was Assistant General Counsel at HCMLP."  Compl. ¶ 20.

because "[a] topic as important as this should not be addressed coyly."). Given that the LPA does

not modify the default fiduciary duties imposed upon Ellington, Leventon, and Okada under

Delaware or Texas law, the LPA does not bar any remedy for the Complaint's ample allegations

of breaches of those duties.[14]

81.     The breach of fiduciary duty claims against these Defendants are premised on the

following allegations:

- *Ellington.* Ellington breached his fiduciary duties by engaging in conduct that resulted in liabilities to third parties and participating in the fraudulent transfers and schemes discussed above. Specifically, Ellington (i) caused and participated in the transfers of the Fund Counterparties' assets to Sentinel, an entity in which he has an ownership interest, and the cover-up of the Sentinel transfer (Compl. ¶¶ 76-80, 205-07); (ii) caused HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so that it could not pay Terry's arbitration award (*id.* ¶¶ 67-72, 208-12); (iii) caused and participated in the wrongdoing related to the Crusader Funds, resulting in the $190 million arbitration award against HCMLP (*id.* ¶¶ 87-93, 214-16); and (iv) fraudulently induced the HarbourVest investment (*id.* ¶¶ 73-75, 213). Additionally, Ellington further breached his fiduciary duties by (i) causing HCMLP to make transfers to Massand in exchange for services Massand performed for SAS, an entity in which Ellington has an ownership interest (*id.* ¶¶ 158-62); and (ii) diverting $3 million of funds held in escrow for HCMLP to a Dondero- and Ellington-owned entity in the Cayman Islands (*id.* ¶¶ 163-67). *See also id.* ¶¶ 274-84.

- *Leventon.* Leventon breached his fiduciary duties by engaging in conduct that resulted in liabilities to third parties as set forth above. Specifically, Leventon (i) caused and participated in the cover-up of the Sentinel transfer, including by delivering an extensive—but intentionally misleading—presentation to the Independent Board regarding assets that may be available to satisfy UBS's claim that said nothing about the August 2017 asset transfer to Sentinel or the purported Sentinel insurance policy (*id.* ¶¶ 76-80, 205-07); (ii) caused HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so that it could not pay Terry's arbitration award, including by assisting in the drafting and execution of an agreement that transferred Acis's interest in a note receivable from HCMLP to another Dondero-related entity in the Cayman Islands (*id.* ¶¶ 67-72, 208-12); and (iii) caused and participated in the wrongdoing related to the Crusader Funds, resulting in the $190 million arbitration award (*id.* ¶¶ 87-93, 214-16).

---

[14]   The breach of fiduciary duties against Ellington and Leventon under Texas law are addressed *infra* at III.B.3.

- ***Okada.*** Okada breached his fiduciary duties by (i) accepting approximately $18 million in fraudulent transfers from HCMLP at times when he knew or willfully blinded himself to the fact that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors (*id.* ¶¶ 139-57), and (ii) using HCMLP employees for his own personal affairs and private business interests without providing any consideration in return (*id.* ¶ 119). *See also id.* ¶¶ 274-84.

82.    These allegations adequately state claims for breach of the fiduciary duties of care and loyalty that Ellington, Leventon, and Okada owed HCMLP. Their motions to dismiss these claims should be denied.

### 3.    The Complaint Also States Claims For Breach Of The Fiduciary Duties That Ellington and Leventon Owed As Attorneys Under Texas Law

83.    Ellington and Leventon also owed HCMLP fiduciary duties in their capacities as attorneys acting on HCMLP's behalf.[15] *See Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416, 428-29 (Tex. App.—Austin 2009, no pet.) ("In addition to the duty of ordinary care, an attorney owes fiduciary duties to his client as a matter of law."). "An attorney breaches his fiduciary duty when he benefits improperly from the attorney-client relationship by, among other things, subordinating his client's interest to his own, retaining the client's funds, engaging in self-dealing, improperly using client confidences, failing to disclose conflicts of interest, or making misrepresentations to achieve these ends." *Tener v. Short Carter Morris, LLP*, 2014 WL 4259885, at *11 (Tex. App.—Houston [1st Dist.] Aug. 28, 2014, no pet.).

---

[15]    As noted in n. 9, *supra*, Defendants' discussions of the elements of professional negligence or malpractice claims are irrelevant to the Trustee's actual claims against Ellington and Leventon, which are predicated on the improper benefits they obtained in representing HCMLP. *See Murphy v. Gruber*, 241 S.W.3d 689, 692-94 (Tex. App.—Dallas 2007, pet. denied) (noting Texas courts have generally held that a breach of fiduciary duty claim focuses on "whether an attorney obtained an improper benefit from representing the client," while a negligence claim focuses on whether an attorney represented a client with the requisite "degree of care, skill, or diligence."); *Archer v. Med. Protective Co. of Fort Wayne, Indiana*, 2004 WL 1194455, at *5 (N.D. Tex. May 28, 2004) (same).

84.    The Complaint alleges that Ellington engaged in such conduct, as it alleges that Ellington received improper benefits through his breaches discussed above by (i) participating in the illicit transfer—and later cover-up—of the Fund Counterparties' assets to an entity he owned (Sentinel); (ii) causing the Massand transfers to be paid on account of services Massand provided to another entity Ellington owned (SAS); (iii) diverting $3 million held in an escrow account for HCMLP to an entity he owned (Grey Royale); and (iv) surreptitiously accepting money from Dondero as compensation for his willingness to elevate Dondero's interests over those of HCMLP. Compl. ¶¶ 76-80, 205-07, 158-71, 372-74.  Ellington was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest.  *Id*. ¶ 19.  These actions plainly reflect that Ellington subordinated HCMLP's interest to his own, retained HCMLP's funds, engaged in self-dealing, and participated in misrepresentations—all of which sounds in breach of fiduciary duty. *See Tener*, 2014 WL 4259885, at *11.

85.    Leventon also improperly benefitted from his representation of HCMLP.  Leventon was financially rewarded for his actions serving Dondero's interests, to the detriment of HCMLP, both through his HCMLP compensation as well as through the Tall Pine Services Agreement, which enabled Dondero to funnel money to certain HCMLP employees (including both Leventon and Ellington) to ensure their loyalty to him during the bankruptcy.  Compl. ¶¶ 66, 168-71, 372. Dondero paid over $17 million over the course of two years to Ellington and Leventon through this pass-through entity, to compensate them for amounts HCMLP would have paid them in 2020 but for the Official Committee of Unsecured Creditors' objection.  *Id*. ¶ 170.  Ellington and Leventon never disclosed these payments to the Independent Board.  *Id.* ¶ 171.

86.    Leventon also participated in the transfer of the Fund Counterparties' assets to Sentinel to evade the UBS judgment, and then misled the Independent Board about the transfer

and Sentinel insurance policy, in exchange for Sentinel's agreement to pay attorneys' fees and expenses he (and Ellington) incurred in connection with HCMLP's bankruptcy. *Id.* ¶¶ 76-78. Leventon was ultimately terminated for cause for acting in a manner adverse to HCMLP's interests. *Id.* ¶ 20.[16]

### 4.    Dondero's Domination Of HCMLP Did Not Relieve Ellington, Leventon, And Okada Of Their Fiduciary Obligations

87.    Ellington's, Leventon's, and Okada's assertions that Dondero's role as final decision maker insulates them from breach of fiduciary duty liability also fails. Leventon Br. ¶ 34; Ellington Br. ¶ 28; Okada Defs. Br. ¶¶ 28-29. As fiduciaries of HCMLP, each of Ellington, Leventon, and Okada owed an affirmative duty to HCMLP not to place himself "in a position antagonistic to his principal." *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, *12 (Del. Ch. May 18, 2009). By taking affirmative action that necessarily harmed HCMLP (often to their benefit), each of these fiduciaries violated this obligation. They are each therefore liable for any profits they obtained by doing so, and any harm that their actions caused the company. Their assertion that Dondero's approval of their wrongful action precludes liability is without merit. Indeed, taken to its logical conclusion, the argument would mean that a fiduciary could

---

[16]    While damages are normally an element of a breach of fiduciary duty claim under Texas law, the Texas Supreme Court has held that a client is not required to prove damages when he establishes that a defendant breached a fiduciary duty and obtained a "secret gain or benefit." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)). Nevertheless, as discussed in greater detail below, the Complaint adequately alleges that Ellington's and Leventon's breaches resulted in significant damages to HCMLP. Moreover, causation and damages are questions of fact that should be addressed after discovery; not on a motion to dismiss. *See F.D.I.C. v. Nathan*, 804 F. Supp. 888, 896 (S.D. Tex. 1992) ("While [plaintiff] will ultimately, after discovery, have to prove causation and damages, questions of fact, it does not have to do so in the context of a motion to dismiss.").

steal from his principal, so long as the theft was authorized by a more senior decision-maker. Plainly, that is not the law.

88.     Okada's efforts to escape liability by arguing that his fiduciary duties cannot be expanded beyond his responsibility to "oversee[] the investment of HCMLP's capital" also cannot be squared with the basic duties of loyalty that every fiduciary owes his principal.  Okada Defs. Br. ¶ 26.  As Okada acknowledges, a breach of fiduciary duty is stated where it is alleged that a fiduciary (i) "took part in the challenged conduct," and (ii) "failed to demonstrate the due care attendant to his particular office in doing so."  *Id*. ¶ 27 (citing *Bridgeport Holdings, Inc. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 573 (Bankr. D. Del. 2008).  Those elements are sufficiently alleged here:  Okada acted in bad faith by knowingly accepting (or causing the other Okada Defendants to accept) distributions that he knew—or was willful in not knowing—constituted fraudulent transfers, as well as personal services performed by HCMLP employees for which HCMLP was not compensated and received no benefit.  Compl. ¶¶ 119, 139-57, 280-82. Moreover, the damage caused HCMLP by the distributions would not have occurred ***but for*** Okada's acceptance of such distributions.  It is no different than if Okada had accepted money that he knew Dondero had stolen from HCMLP.  As HCMLP's fiduciary, Okada is liable for such harm.

     **5.**     **The Complaint Adequately Pleads That HCMLP Was Insolvent When Okada Accepted Or Caused The Other Okada Defendants To Accept The Distributions**

89.     Okada's assertion that the breach of fiduciary duty claims against him should be dismissed because the Complaint fails to allege that HCMLP was insolvent when he or the other

Okada Defendants took the distributions also fails.[17]   Okada Defs. Br. ¶ 30.  As the court held in

*Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 669-70 (N.D. Tex. 2011), a complaint

adequately pleads insolvency if the allegations "plausibly show that [the company] had liabilities

in excess of the fair value of its assets," or "had an inability to generate sufficient profits to sustain

operations."  A "Trustee need only demonstrate that he is plausibly entitled to relief" at the motion

to dismiss phase, and "is not required to prove his case in the pleadings."  *Id.* at 670.

90.    The Complaint easily satisfies this standard.  The Complaint goes well beyond a

mere recitation of the legal standard for insolvency or conclusory assertions about HCMLP's

financial condition, including by alleging (i) the value of HCMLP's total assets less financial

liabilities for the relevant periods, which are "corroborated by valuations prepared by CBIZ, Inc.

on behalf of HCMLP's general partner" Strand, and (ii) the company's litigation liabilities, which

are "set at the values at which they were settled, or the values at which they were estimated by the

Court in the course of the bankruptcy proceeding."  Compl. ¶¶ 106-09 and n.22-25.  The Complaint

also alleges that Dondero himself acknowledged under oath that "as a result of the economic

recession of 2008 HCMLP 'almost went under . . . and moved to a state of insolvency' from which

it was still struggling to emerge in 2012."  *Id*. ¶ 105.[18]   And the Complaint details additional

---

[17]   The Okada Defendants also assert this argument in support of their motion to dismiss the fraudulent transfer claims against them.  Okada Defs. Br. ¶ 30 n.7.  For the reasons discussed herein, the argument fails with respect to those claims as well.

[18]   Okada's contention that Dondero's testimony has no bearing on HCMLP's financial condition from 2010 and onward is disingenuous, as Okada omits the remainder of the sentence in the Complaint, which explains that Dondero also testified that "HCMLP was still struggling to emerge [from a state of insolvency] in 2012."  *Compare* Okada Defs. Br. ¶ 34 *with* Compl. ¶ 105. Additionally, contrary to Okada's assertion, *In re Crescent Resources, LLC*, 2012 WL 195528, at *8 (Bankr. W.D. Tex. Jan. 23, 2012), does not stand for the proposition that an officer's statement that a company is insolvent is insufficient to plead insolvency.  Rather, the court's stated concern in *Crescent* was that the plaintiff failed to "refer the Court to specific facts" in the CFO's declaration "that would allow the Court to draw a reasonable inference of insolvency."  *Compare* Okada Defs. Br. ¶ 34 *with Crescent*, 2012 WL 195528 at *8.

hardships faced by HCMLP during the relevant time periods, including that "HCMLP's assets under management, operating income from its investment management business, and operating margins [were] steadily declin[ing] . . . almost no new third-party investor money [was coming] into the company," and "HCMLP [was] contin[uing] to shoulder the burden of providing services to [the Lifeboats] without compensation." *Id.* ¶ 107.

91.     The cases cited by Okada are inapposite, as they address complaints that, unlike the Complaint here, included only "conclusory allegations" of insolvency, or failed to allege any facts supporting insolvency. *See* Okada Defs. Br. ¶¶ 30, 32, 35 (citing *In re ATP Oil & Gas Corp.*, 711 F. App'x. 216, 223 (5th Cir. 2017) and *Crescent*, 2012 WL 195528, at *8). Indeed, in finding that the complaint failed to adequately allege insolvency in *Crescent,* the Fifth Circuit noted that although the Trust alleged that various documents "reflect that the Debtors were 'deeply insolvent at all times relevant to the complaint,'" it "did not attach any of these documents to its Complaint nor did it refer the Court to any specific facts provided in these documents that would allow the Court to draw a reasonable inference of insolvency," and failed to "provid[e] the applicable facts to support a finding of insolvency under any of" the tests for insolvency. *Crescent*, 2012 WL 195528 at *8. Similarly, in *ATP*, the court found that the trustee there failed to allege "a specific reference to ATP's financial condition" and offers only "conclusory assertions about ATP's financial condition and subjective determinations regarding the amount of available capital." *ATP*, 711 F. App'x at 223. This contrasts sharply with the Trustee's detailed and objective allegations regarding HCMLP's insolvency. Compl. ¶¶ 106-09.

92.     Additionally, Okada's assertion that the Complaint improperly includes "hindsight-looking settlement liabilities information" in its insolvency allegations is misplaced. Okada Defs. Br. ¶ 33. It is well settled that a solvency analysis should include liability associated with pending

lawsuits.  *See, e.g.*, *In re Sierra Steel, Inc.*, 96 B.R. 275, 279 (B.A.P. 9th Cir. 1989) (finding

bankruptcy court ruling that did not consider pending litigation claim in determining solvency

erroneous); *In re Turner & Cook, Inc.*, 507 B.R. 101, 109 (Bankr. D. Vt. 2014) ("Contingent claims

of an entity, including pending lawsuits, should be included in the insolvency calculation.") (citing

cases).  Indeed, just last year, this Court found a debtor to be insolvent "as a result of the massive

contingent liability" the debtor owed due to a pending litigation claim against him.  *In re Genter*,

2021 WL 1112538, at *6 (Bankr. N.D. Tex. Mar. 23, 2021).  *See also S.E.C. v. Antar*, 120 F. Supp.

2d 431, 443 (D.N.J. 2000) ("It is now clear that the value of the SEC's unliquidated claim against

Sam M. was, and is, approximately $15 million, exclusive of pre-judgment interest in the amount

of approximately $42 million, as ordered by this court.  Because the SEC's claim was based on

Sam M.'s securities fraud in the 1980s, Sam M. possessed this debt at the time of all of the 1991

and 1997 transfers."); *Turner*, 507 B.R. at 109 (where pending litigation claim "was contingent at

the time of the challenged transfers but is reduced to judgement before the court's insolvency

determination . . . a court may permissibly use the judgment amount in valuing the contingent

liability at the time of the transfers").

93.      The allegations of insolvency in the Complaint are detailed and amply supported.

This kind of detailed and analytical insolvency pleading goes well beyond what is required in a

complaint to allege the element of insolvency, and Okada's assertions to the contrary should be

rejected.

## C.      THE COMPLAINT'S CLAIMS FOR AIDING AND ABETTING OR KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY ARE SUFFICIENTLY PLED

94.      To state a claim for aiding and abetting breach of fiduciary duty, a plaintiff must

allege: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3)

knowing participation in that breach by the defendants, and (4) damages proximately caused by

the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (internal quotation marks

omitted). Under the Texas law equivalent—knowing participation in breach of fiduciary duty—

the plaintiff must show: "(1) the existence of a fiduciary duty owed by a third party to the plaintiff;

(2) the defendant knew of the fiduciary relationship; and (3) the defendant was aware of his

participation in the third party's breach of its duty." *Straehla v. AL Glob. Servs.*, *LLC*, 619 S.W.3d

795, 804 (Tex. App.—San Antonio 2020, pet. denied).

95.     As discussed above, the Complaint adequately alleges the existence of fiduciary

duties and that those duties were breached. *Supra,* Section III.B. The Complaint also alleges that

the Lifeboats, and, as an alternative to the direct breach of fiduciary duty claims against them,

Ellington, Leventon, and Okada, aided and abetted and/or knowingly participated in the breaches

of fiduciary duty, and that HCMLP suffered damages as a result.[19]   Compl. ¶¶ 285-89.   The

arguments by Ellington, Leventon, and the Lifeboats that the Complaint fails to sufficiently allege

damages as a result of their conduct (Leventon Br. ¶¶ 35-37; Ellington Br. ¶¶ 29-31; Lifeboats Br.

¶ 39), and by Ellington, Leventon, and Okada that the Complaint fails to allege their knowing

participation in the breaches (Leventon Br. ¶¶ 49-50; Ellington Br. ¶¶ 40-41; Okada Defs. Br.

¶¶ 38-39), are without merit.

### 1.      The Complaint Adequately Alleges Damages

#### (a)      Ellington and Leventon

96.     Ellington and Leventon argue that the Trustee fails to plead damages with respect

to claims based on conduct creating HCMLP's liability to third parties, because alleged harm to

---

[19]   The Complaint also asserts claims for aiding and abetting/knowing participation in breaches of
fiduciary duty against the CLO Holdco Defendants.  The CLO Holdco Defendants move to dismiss
those claims solely on the ground that the Plan did not retain the claims, which is addressed *supra*,
in Section III.A.1.

creditors does not suffice to state damages.  Leventon Br. ¶¶ 35-37; Ellington Br. ¶¶ 29-31.

However, even the cases Ellington and Leventon cite for this assertion explain that a trustee has

standing to recover where he or she "allege[s] harm to the debtor, distinct from any harm to the

creditors," *Brickley for CryptoMetrics, Inc. Creditors' Trust v. ScanTechIdentification Beams

Systems, LLC*, 566 B.R. 815, 838 (W.D. Tex. 2017), and point out that a plaintiff alleging that a

defendant's conduct resulted in liability to the debtor has sufficiently pled damages, *Reneker v.

Offill*, 2009 WL 804134, at *6 and n.5 (N.D. Tex. Mar. 26, 2009).  The Trustee has done so here

by pleading damages of more than $350 million arising from the judgments, arbitration awards,

and allowed claims imposed against HCMLP as a result of Defendants' actions.[20]  Compl. ¶ 419.

Simply put, the breaches underlying these claims have created liability for HCMLP itself, which

is exactly the type of damages these cases hold to be sufficient.

(b)      The Lifeboats

97.      The Lifeboats argue that the Trustee has failed to plead damages as a result of the

Lifeboat Scheme, arguing that the Trustee's "allegations demonstrate that the transfers of accounts

to [NexPoint] and HCMFA resulted in a financial turnaround in 2013," and that because HCMLP

briefly became solvent following the transfers to the Lifeboats, it cannot, as a matter of law, have

suffered damages from those wrongful transfers or the Lifeboats' continued exploitation of

HCMLP.  Lifeboats Br. ¶ 39.  Defendants are wrong on both the facts and the law.

---

[20]    *See also Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 899 (5th Cir. 2019) (allegations
that defendants' fraudulent marketing scheme resulted in greater liability for receivership estate,
and harmed their ability to repay investors, sufficient for jurisdictional purposes); *Janvey v. Willis
of Colorado Inc.*, 2014 WL 12670763, at *3 (N.D. Tex. Dec. 5, 2014), *amended sub nom. Off.
Stanford Invs. Comm. v. Willis of Colorado, Inc.*, 2015 WL 13742125 (N.D. Tex. Feb. 4, 2015)
(conduct that increased liability for Receivership Estate granted the Receiver standing to pursue
claims against the wrongdoers).

98.     First, the Lifeboats' contention that the Complaint alleges that HCMLP's transfers to them "resulted in a financial turnaround" is expressly belied by the Complaint itself.   The Complaint alleges that although HCMLP's financial condition began to improve in 2013 "*due largely to successful proprietary trading and overall improving market conditions*," "*[t]he creation of the lifeboats and subsequent transfer of management agreements all but ensured HCMLP's demise.*"   Compl. ¶ 107 (emphasis added).   Further, the Complaint alleges that the Company returned to insolvency by December 2016, "*in large part because . . . the company was earning only minimal fees for servicing other Dondero entities* [i.e. the Lifeboats] *rather than generating new business of its own, while continuing to bear significant employee expenses.*" *Id*. ¶ 108 (emphasis added).

99.     Second, there is no basis in law or logic—and the Lifeboats do not cite any—for the contention that if a plaintiff obtains a benefit unrelated to the defendant's conduct, then it is no longer entitled to damages on account of the harm defendant caused it.   The flaws of such an argument are obvious, as HCMLP would have been in a better financial position, and better able to withstand the other damages inflicted upon it, but for the wrongful Lifeboat scheme.   HCMLP's brief and unrelated turnaround did not return to HCMLP the assets improperly conveyed to the Lifeboats at the expense of HCMLP and its constituents, and thus that turnaround period cannot absolve the Lifeboats of liability for their wrongful conduct.

## 2.     The Complaint Adequately Alleges Knowing Participation In The Breaches

100.     As Ellington and Leventon concede, a showing of knowing participation requires allegations suggesting that it is "reasonably conceivable that the alleged aider-and-abettor acted with scienter," or that the defendant is "aware of his participation in the third party's breach." Leventon Br. ¶ 49; Ellington Br. ¶ 40 (citing *Morrison v. Berry*, 2020 WL 2843514 (Del. Ch. June

1, 2020), and *Cent. Tex. Express Metalwork v. Chaves*, 2021 WL 3631009, at *8 (S.D. Tex. July 7, 2021)). As the *Morrison* court stated, a court may draw inferences from the alleged facts, and "the exacting standard for aiding-and-abetting liability remains for trial." *Morrison*, 2020 WL 2843514, at *10; *see also Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 391-92 (Del. Ch. 1999) (claim of knowing participation "need not be pleaded with particularity;" rather, "there must be some factual allegations from which 'knowing participation' can be inferred"). Given the nature of the alleged conduct forming the basis for the derivative claims, the Complaint easily makes the required showing.

101. Indeed, Ellington and Leventon cannot seriously contend that they did not understand that Strand's and Dondero's conduct in (i) diverting value away from HCMLP and the Fund Counterparties to benefit Dondero and Ellington and evade HCMLP's and the Fund Counterparties' creditors, (ii) intentionally breaching HCMLP's obligations under its agreement with the Redeemer Committee, (iii) using HCMLP as a means to fraudulently induce HarbourVest's purchase of an interest in HCLOF from CLO Holdco, and (iv) diverting value from other Dondero entities in order exact revenge on his perceived enemies, resulted in breaches of fiduciary duties, or that their assistance in such conduct furthered such breaches. Indeed, as attorneys, Ellington and Leventon were perhaps best-positioned to know that the self-dealing that Dondero orchestrated—which was directly contrary to HCMLP's interests—was not permitted by the LPA. And such knowledge is conclusively shown by, among other things, Ellington's and Leventon's efforts to hide such conduct from the Independent Board. Compl. ¶¶ 99, 207.[21] The

---

[21] This Court recently held a hearing in the *UBS v. HCMLP* Adversary Proceeding regarding HCMLP's motion to consent to judgment, and remarked that the evidence presented, including evidence regarding Ellington's and Leventon's actions in connection with the Sentinel transfer and cover-up, was "troubling," that "referrals will likely be made to the State Bar disciplinary agencies regarding the attorneys' activities," and that the Court was duty-bound to consider whether any

alleged facts are more than sufficient to result in a reasonable inference that Ellington and

Leventon knowingly participated in Dondero's breaches.[22]

102.    The Trustee has also established a *prima facie* case that Okada knew that Dondero

and Strand owed fiduciary duties to HCMLP and had actual awareness of his participation in the

breach of those duties.  Okada is the co-founder of HCMLP, and was the Chief Investment Officer

as well as a limited partner during the relevant period.  *Id*. ¶ 13.  As the Complaint's allegations

show, Okada was aware of HCMLP's liquidity and of Dondero's misconduct in using that liquidity

for his own purposes (as well as Okada's), and HCMLP's deteriorating financial condition was no

secret.  *See e.g.*, *id*. ¶¶ 55, 118 (alleging that Okada complained to Dondero in July 2012 that

Dondero "was 'using Highland's cash flow' to set up new entities controlled by Dondero and to

'fund all their negative working capital'"), 105 (alleging that Dondero testified publicly under oath

that HCMLP moved to a state of insolvency from which it was still struggling to emerge in 2012),

119 (alleging that Okada used an HCMLP employee as his personal bookkeeper for his personal

investments and entities).  The Complaint thus supports the reasonable inference that Okada knew

that HCMLP was insolvent—and that as a result its value should have been preserved for its

creditors—when Dondero declared the distributions paid to the Okada Defendants, and that Okada

---

provisions of Title 18 may have been violated.  *See* (*UBS Secs. LLC v. Highland Capital Mgmt., L.P.*, Adv. Pro. 21-03020-sgj, Tr. at 130:10-132:06 (Bankr. N.D. Tex. Aug. 8, 2022)), at Appendix at 172-74.

[22]    To the extent Ellington and Leventon are asserting that the *Wagoner* rule bars breach of fiduciary duty claims against them, the argument fails, as the *Wagoner* rule applies only to claims against third parties, not company agents.  Leventon Br. ¶¶ 35-37; Ellington Br. ¶¶ 29-31; *In re Arbco Cap. Mgmt., LLP*, 498 B.R. 32, 44-45 (Bankr. S.D.N.Y. 2013) ("The Second Circuit doctrine commonly referred to as the '*Wagoner* Rule' provides that a bankruptcy trustee lacks federal standing to seek recovery on behalf of a debtor company against **third-parties** for injuries incurred by the misconduct of the debtor's agents.") (emphasis added).  Additionally, the *Wagoner* rule, like the closely-related doctrine of *in pari delicto*, does not warrant dismissal for the additional reasons described *infra* at III.F.5.

understood that he was assisting in Dondero's breaches of fiduciary duties by knowingly, and wrongfully, accepting those distributions from the insolvent company.

### D.  THE COMPLAINT'S CIVIL CONSPIRACY CLAIMS ARE SUFFICIENTLY PLED

103.    The Complaint's civil conspiracy claims (Count XVI) are also sufficiently stated. To state a claim for civil conspiracy, a plaintiff must show: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).  Ellington's and Leventon's assertions that as agents of the same entity they cannot conspire with one another (Leventon Br. ¶¶ 40-41; Ellington Br. ¶¶ 32-33), and the arguments by Ellington, Leventon, and Dondero that the Complaint fails to adequately allege a meeting of the minds (Leventon Br. ¶ 42; Ellington Br. ¶ 34; Dondero Defs. Br. at 19), should be rejected.

### 1.  Ellington And Leventon Acted Outside The Scope Of Their Authority To Conspire Against HCMLP

104.    "Employees or agents of a principal acting within the course and scope of their employment or agency relationship cannot enter into a conspiracy with each other ***so long as they are not acting outside their capacity as an employee or agent or are not acting for a personal purpose of their own.***"  *Crouch v. Trinque*, 262 S.W.3d 417, 427 (Tex. App.—Eastland 2008, no pet.) (emphasis added); *see also Adidas Am. Inc. v. Shoebacca Ltd.*, 2021 WL 4399745, at *3 (N.D. Tex. Sept. 27, 2021) ("Under Texas law, a corporation's agents generally cannot conspire with each other or with the corporation because their acts are attributed to the corporation.  There is an exception to this general rule where the individual co-conspirators act for personal purposes against the corporation's best interest.") (internal citation omitted); *Texas Pac. Coal & Oil Co. v. Belcher*, 265 S.W. 1081, 1083 (Tex. Civ. App.—Amarillo 1924, no writ) (knowledge of fraud is

not imputed to principal when agent was acting on his own account); *In re Christopher*, 85 F.3d 626 (5th Cir. 1996) (knowledge acquired by agent acting adversely to principal is not imputed to principal); *GXG, Inc. v. Texacal Oil & Gas*, 977 S.W.2d 403, 410 (Tex. App.—Corpus Christi–Edinburg 1998, pet. denied) (dual agent's fraudulent conduct as to one principal is not automatically imputed to the other because it was not acting for that principal); *Rodriguez v. Sarabyn*, 129 F.3d 760, 768 (5th Cir. 1997) (citing RESTATEMENT (SECOND) OF AGENCY § 235 for the proposition that an employee acts outside the scope of his employment, and thus his actions cannot be attributed to the employer, when the employer did not authorize the acts and the acts were done with no intention to serve the employer).

105.    Ellington's and Leventon's conduct here was plainly "outside their capacity as an employee or agent of HCMLP" ***and*** "for a personal purpose of their own."  Indeed, as described in greater detail herein and in the Complaint, Ellington and Leventon (i) caused and participated in the transfers of the Fund Counterparties' assets to Sentinel, an entity owned by Ellington and Dondero, and then participated in the cover-up to hide the transfers from HCMLP (Compl. ¶¶ 76-80, 99-100, 206-07), (ii) caused HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so that they would be unavailable to pay Terry's arbitration award and subject to Dondero's exclusive control, including through Leventon's assistance in the drafting and execution of an agreement that transferred Acis's interest in a note receivable from HCMLP to another Dondero-related entity in the Cayman Islands (*id*. ¶¶ 67-72, 208-12); and (iii) caused and participated in the wrongdoing related to the Crusader funds, which resulted in the $190 million arbitration award against HCMLP (*id*. ¶¶ 87-93, 214-16).  Ellington also assisted in fraudulently inducing the HarbourVest investment for the benefit of another Dondero entity (CLO Holdco), which also resulted in liability to HCMLP.  *Id*. ¶¶ 73-74.  And Ellington also (i) caused

HCMLP to make transfers to Massand in exchange for services Massand performed for SAS, an entity in which Ellington has an ownership interest (Compl. ¶¶ 158-62); and (ii) diverted $3 million of funds held in escrow for HCMLP to Sentinel, a Dondero- and Ellington-owned entity in the Cayman Islands (Compl. ¶¶ 163-67).  Any contention that these actions were undertaken for the benefit of HCMLP—as opposed to Dondero and Ellington—lacks credibility.[23]

## 2. The Trustee Sufficiently Alleges A Meeting Of The Minds

106.    The argument that the Complaint fails to allege a meeting of the minds to harm HCMLP also cannot withstand scrutiny.  To satisfy the "meeting of the minds" element of a civil conspiracy claim, a complaint must allege that each participant had a specific intent to harm the plaintiff.  *Tompkins v. Cyr*, 995 F. Supp. 664, 685 (N.D. Tex. 1998).  The notion that Dondero, Ellington, and Leventon (or the other Defendants to the civil conspiracy claims, for that matter) did not harbor a "specific intent" to harm HCMLP when they diverted funds away from it for Dondero's and Ellington's personal benefit, caused it to engage in conduct that would foreseeably result in its liability, or concealed information from the Independent Board, is too large a pill to swallow, and certainly cannot be accepted on a motion to dismiss.  *See Tompkins*, 995 F. Supp. at 685; *Conceal City, L.L.C. v. Looper L. Enf't, LLC*, 917 F. Supp. 2d 611, 617 (N.D. Tex. 2013) (intent includes knowledge of the harm at the inception of the agreement, which can be proven by circumstantial evidence and reasonable inference).

---

[23]    Additionally, for the reasons discussed *supra*, Ellington's and Leventon's repeated refrain that Dondero's authorization of this misconduct immunizes them from liability, because management of HCMLP was exclusively vested in Strand and Dondero, fails.  Leventon Br. ¶ 41; Ellington Br. ¶ 33.

**E.    THE AIDING AND ABETTING/KNOWING PARTICIPATION AND CIVIL CONSPIRACY CLAIMS ARE NOT BARRED AS DERIVATIVE OF FRAUDULENT TRANSFER CLAIMS**

107.    The contentions by the Lifeboats and CLO Holdco Defendants that the Complaint fails to state claims for aiding and abetting/knowing participation and civil conspiracy against them because such claims are predicated on fraudulent transfer liability should also be rejected. Lifeboats Br. ¶¶ 7, 40-41; CLO Holdco Defs. Br. ¶¶ 4-7.    The aiding and abetting/knowing participation and conspiracy claims against the Lifeboats and CLO Holdco Defendants are predicated, respectively, on the breaches of fiduciary duty that Dondero committed when he (i) diverted HCMLP's valuable business to the Lifeboats and caused HCMLP to provide services to and on behalf of the Lifeboats for little or no value in exchange, and (ii) transferred assets worth approximately $24 million to CLO Holdco in exchange for a note worth significantly less.  *See e.g.*, Compl.  ¶¶ 286, 288, 291.[24]  The fact that the conduct at issue also gives rise to fraudulent transfer claims has no bearing on whether aiding and abetting/knowing participation and civil conspiracy claims are also stated.

108.    Indeed, this Court has expressly held that aiding and abetting breach of fiduciary duty claims premised on a transfer that is alleged to constitute both a breach of fiduciary duty and a fraudulent transfer state viable causes of action.  *In re TOCFHBI, Inc.*, 413 B.R. 523, 534-35 (Bankr. N.D. Tex. 2009) (Jernigan, J.).  The Court has also clarified that the primary case on which the CLO Holdco Defendants rely here, *Mack v. Newton*, 737 F.2d 1343 (5th Cir. 1984), does not

---

[24]    The CLO Holdco Defendants' contention that "[t]he Civil Conspiracy Action does not relate to any 'alleged breach of fiduciary duty", [sic] rather it is derivative of the Get Good Avoidance Actions" is expressly contradicted by the Complaint, which alleges that the CLO Holdco Defendants "conspired with Dondero to breach his fiduciary duties to HCMLP by intentionally siphoning assets away from HCMLP to evade HCMLP's creditors."  *Compare* CLO Holdco Defs. Br. ¶ 4 *with* Compl. ¶ 291.

hold to the contrary, given that the trustee in *Mack* "was not seeking recovery based upon breach of fiduciary duty or aiding and abetting breach of fiduciary duty." *Id*. at 535; CLO Holdco Defs. Br. ¶¶ 4-6.  The cases cited by the Lifeboats (Lifeboats Br. ¶ 40-41), *In re Silver State Holdings, Assignee-7901 Boulevard 26 LLC*, 2020 WL 7414434, at *32-33 (Bankr. N.D. Tex. Dec. 17, 2020), and *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 203-04 (Del. Ch. 2014), provide further support for the Trustee's position, holding that although defendants could not be jointly and severally liable on conspiracy and aiding and abetting theories for actual fraudulent transfers as a matter of law, claims seeking to impose liability under such theories for the breaches of fiduciary duty in which the fraudulent transfers resulted had been sufficiently proven (*Silver State*) or were sufficient to state a claim (*Quadrant*).[25]

### F.    THE COMPLAINT'S EQUITABLE MONEY HAD AND RECEIVED CLAIMS ARE ADEQUATELY PLED

109.    The Complaint alleges claims for money had and received/unjust enrichment against (i) Dondero (Count XXVI), to recover payments and value obtained by him from HCMLP, including distributions, HCMLP transfers to entities he controlled, the value of personal services provided to him by HCMLP employees, and the HE Capital 232 proceeds (Compl. ¶¶ 363-67); (ii) Ellington and Leventon (Count XXVII), to recover monies paid to them by HCMLP to compensate for work they performed for the benefit of Dondero or entities he owned and/or controlled and HE Capital 232 proceeds paid to an entity owned in part by Ellington (*id*. ¶¶ 372-73); (iii) the Lifeboats (Count XXVIII), to recover the value of services performed by HCMLP employees on their behalf without compensation, and funds obtained by them that rightfully

---

[25]  The remaining case cited by the Lifeboats, *Edgewater Growth Capital Partners. L.P. v. H.I.G. Capital Inc.*, 2010 WL 720150, at *2 (Del. Ch. Mar. 3, 2010) is inapposite, as it does not involve claims for aiding and abetting a breach of fiduciary duty or civil conspiracy.

belong to HCMLP (*id*. ¶¶ 379-82), and (iv) CLO Holdco  (Count XXX), to recover the funds paid to it by HarbourVest, which resulted in HCMLP's obligation to pay the HarbourVest settlement (*id*. ¶¶ 395-96).[26]

110.    A money had and received claim is "less restricted and fettered by technical rules and formalities than any other form of action;" instead, it "aims at the abstract justice of the case, and looks solely to the inquiry whether the defendant holds money, which [in equity and good conscience] belongs to the plaintiff." *In re Am. Hous. Found.*, 2011 WL 4625349, at \*25 (Bankr. N.D. Tex. Sept. 30, 2011) (quoting *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951)).  The Complaint easily satisfies that standard, as it alleges that (i) Dondero caused HCMLP to make distributions and enter into transactions that benefited him and entities he owned and/or controlled, and to use its employees to serve his personal interests without providing any consideration in return (Compl. ¶¶ 73-75, 363-64); (ii) Dondero and Ellington absconded with proceeds of the HE Capital 232 real estate sale that rightfully belonged to HCMLP (Compl. ¶¶ 163-67, 366); (iii) Dondero caused HCMLP to pay Ellington and Leventon "compensation" and bonuses in exchange for services that benefitted Dondero and his entities, rather than HCMLP (Compl. ¶¶ 367, 372); (iv) the Lifeboats received the benefit of HCMLP's services without providing any benefit, or sufficient benefit, in return, and collected revenues that rightfully belonged to HCMLP (Compl. ¶¶ 379-85); and (v) CLO Holdco received the benefit of HarbourVest's purchase of 50% of HCLOF, while HCMLP was forced to pay $80 million to settle HarbourVest's claims arising from that investment (Compl. ¶¶ 395-96).  Defendants nevertheless launch a series of technical challenges to the Trustee's equitable claims for money had and received:  that the claims are

---

[26]   The Trustee also pleads claims for money had and received/unjust enrichment against Massand and SAS (Compl. ¶¶ 386-93), who have not moved to dismiss these claims.  As noted, Massand is subject to an order of default.

improperly pled as unjust enrichment claims; that the allegations of Defendants diverting funds

from HCMLP are insufficient; that the existence of contracts bar the claims; and that the Trustee

failed to plead enrichment as against CLO Holdco.  The arguments fail across the board.

### 1.  The Trustee Properly Pleads Equitable Claims For Money Had And Received On Unjust Enrichment Theories

111.    Defendants assert that unjust enrichment is not a standalone cause of action under

Texas law.  *See* Leventon Br. ¶ 44; Ellington Br. ¶ 35; CLO Holdco Defs. Br. ¶ 23; Lifeboats Br.

¶ 45; Dondero Defs. Br. at 24-25.  But that is not what the Trustee asserts.  Consistent with the

Fifth Circuit's recent directive in two *Midwestern Cattle Marketing* cases, the Trustee asserts

"money-had-and-received claim[s] as . . . recovery 'on an unjust enrichment theory.'"  *Midwestern*

*Cattle Mktg., LLC v. Legend Bank, N.A.*, 999 F.3d 970, 972 (5th Cir. 2021); *see also Midwestern*

*Cattle Mktg., L.L.C. v. Legend Bank, N.A.*, 800 F. App'x 239, 245 n.14 (5th Cir. 2020) (holding

that "while unjust enrichment may not be an independent claim in Texas, a party may still recover

under the unjust enrichment theory . . . as long as it proves that [the defendant] obtained a benefit

from [the plaintiff] by fraud, duress, or the taking of an undue advantage") (internal citations and

quotations omitted).[27]  As amended, the Complaint's claims for "unjust enrichment or money had

and received" properly invoke an equitable claim recognized under Texas law.

---

[27]    As Ellington and Leventon acknowledge, prior to *Midwestern*, other courts similarly held that
unjust enrichment claims may be construed as money had and received claims.  *See* Leventon Br.
¶ 44; Ellington Br. ¶ 35; s*ee, e.g.*, *Assure re Intermediaries, Inc. v. Western Surplus Lines Agency,
Inc.*¸ 2021 WL 2402485, at *6-8 (N.D. Tex. June 11, 2021) (construing the claim for unjust
enrichment as one for money had and received, and noting that most federal courts in Texas take
this approach); *Mayers v. Addison Brown, LLC*, 2020 WL 7646973, at *4 n.5 (N.D. Tex. 2020)
(noting that Texas law is unclear as to whether unjust enrichment is a separate claim, but, because
the plaintiff had styled the count as "money had and received/unjust enrichment," construing the
latter as the former); *Aldous v. Darwin Nat'l Assurance Co.*, 2015 WL 1879677, at *5 and n.7
(N.D. Tex. Apr. 24, 2015) (when plaintiff pled unjust enrichment and money had and received
together, with the same factual allegations, the court construed unjust enrichment as the "theory"
upon which the money had and received "claim" could recover).  CLO Holdco and the Lifeboats
also recognize that unjust enrichment is a valid "theory" upon which a recognized "claim" for

### 2.   The Trustee Sufficiently Alleges That Defendants Received Money That Rightfully Belongs To HCMLP

112.   Some Defendants also complain that the Trustee's equitable claims should be dismissed for failing to detail specific monetary amounts that belonged to HCMLP during specific time periods.  *See* Leventon Br. ¶ 45; Ellington Br. ¶ 36; Dondero Defs. Br. at 25.  But the sole case on which they rely fails to support such a requirement.  *See Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 675 (W.D. Tex. 2019).  Instead, *Bates Energy* makes clear that "[t]he sole inquiry" for a money had and received claim is "whether the defendant received money that rightfully belongs to the plaintiff."  *Id*.  Defendants improperly latch on to a portion of the *Bates Energy* decision dismissing a crossclaim against an individual defendant because the plaintiff failed to plead that the individual defendant, rather than an entity he purportedly controlled, personally received funds.  *See id*. ("The Court agrees that [the crossclaim plaintiff] fails to allege facts showing that [the crossclaim defendant] individually received money. . . . [crossclaim plaintiff] never differentiates between money received by [the entity] and money received by [the crossclaim defendant] individually.").[28]  No such pleading deficiency exists (or is alleged) here, and *Bates Energy* has no bearing on the Trustee's claims.[29]

---

money had and received may be based.  *See* CLO Holdco Defs. Br. ¶¶ 23-24; Lifeboats Br. ¶ 45 n.138.  Given that the Trustee does not plead separate unjust enrichment claims, there is no basis for dismissal here.

[28]  Even then, *Bates Energy* did not dismiss the relevant claim, but granted plaintiff leave to amend for a fourth time.  *Bates Energy*, 361 F. Supp. 3d at 676.

[29]  In all events, the Complaint does plead certain specific monetary values that are the basis of these claims.  The Complaint seeks to recover, among other funds, roughly $3 million siphoned from an HCMLP escrow account to a Cayman entity owned and controlled by Dondero and Ellington in 2018, and $75 million accepted by CLO Holdco after Dondero and Ellington fraudulently induced HarbourVest's investment into HCLOF.  *See e.g.*, Compl. ¶¶ 73-75, 357, 360, 366, 373, 396.

### 3. The Trustee's Money Had And Received/Unjust Enrichment Claims Are Not Precluded By Contracts

113.   Defendants also assert that equitable relief is unavailable because the disputes are governed by valid and express contracts.  *See* Leventon Br. ¶¶ 46-47; Ellington Br. ¶¶ 37-38; Lifeboats Br. ¶ 46; *see also, e.g.*, *Moran v. Williamson*, 498 S.W.3d 85, 97 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).  But while certain contracts between the parties may exist, they do not address many of the challenged payments, and thus do not bar equitable claims predicated on those payments.  *See, e.g.*, *Halliburton Energy Servs., Inc. v. NL Indus.*, 648 F. Supp. 2d 840, 887 (S.D. Tex. 2009) (equitable claim could proceed; while there was a lease agreement between the parties, the claim related to cleanup costs potentially outside the agreement's indemnity provisions and thus unrelated to the lease); *Conoco, Inc. v. Fortune Prod. Co.*, 35 S.W.3d 23, 28 (Tex. App.—Houston [1st Dist.] 1998) ("[T]he existence of an express contract does not preclude recovery . . . for the reasonable value of services rendered and accepted which are not covered by the contract. Moreover, when an express contract is silent as to some point or matter, recovery may then be had on the implied contract.").  Additionally, where the disputed payments are subject to contracts, the contracts are void for lack of consideration or unlawful purposes.

114.   As to the Lifeboats, the Complaint is clear that no contracts existed to govern much of the free services that HCMLP provided to them.  The Complaint alleges that "[f]or over a year, HCMLP performed all services for NexPoint, without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees," and that "HCMFA did not execute a sub-advisory agreement with HCMLP, and it was only in May 2018

that HCMFA executed a payroll reimbursement agreement to partially compensate HCMLP for the services of certain HCMLP employees." Compl. ¶¶ 54, 63.[30]

115.    With respect to Ellington and Leventon, the conduct that the Trustee identifies to support this claim—that they received money from HCMLP for services performed on behalf of other Dondero entities—is expressly alleged to have been outside the scope of any employment agreements that might govern their roles as HCMLP employees, and instead was consideration for Ellington's and Leventon's willingness to subordinate HCMLP's interests to Dondero's.[31]  *See, e.g.*, *id*. ¶¶ 66, 121-22, 372.  These allegations are underscored by additional allegations that, once Dondero was precluded by the Bankruptcy Court from using HCMLP to compensate Ellington and Leventon for the services they performed for him (to HCMLP's detriment), he surreptitiously continued paying them through Tall Pine.  *Id*. ¶¶ 168-71.  Further, the Complaint also alleges that Ellington misappropriated $3 million dollars from an HCMLP escrow account, which was plainly outside the scope of any employment agreement.  *Id*. ¶¶ 163-67.

116.    Moreover, even where contracts purportedly governed some of the payments at issue, the Complaint's allegations show that such contracts are invalid for lack of consideration and/or unlawful purposes.  It is well-settled under Texas law that agreements entered into for the purpose of evading or defrauding creditors are unlawful and unenforceable.  *See, e.g.*, *Pettit v. Tabor*, 2020 WL 216025, at *6 (Tex. App.—Texarkana Jan. 15, 2020, pet. denied), *review denied*

---

[30]   This Court has recently reviewed the same facts in connection with other litigation between HCMLP and the Lifeboats, explaining that, "prior to 2018—for six years—Highland provided 'front-office' sub-advisory services to the Advisors for free.  ***For free*** . . . Sounds like the Advisors had been getting a windfall."  *Highland Capital Mgmt., L.P. v. Highland Capital Mgmt. Fund Advisors, L.P.*, Adv. Pro. No. 21-03010-sgj, Dkt. No. 124 at 58 (Bankr. N.D. Tex. Aug. 30, 2022) (Jernigan, J.) (emphasis in original).

[31]   Although Leventon may have been compensated through employee bonus plans, he was an at-will employee, and did not have a written contract governing his employment with HCMLP.

(July 3, 2020) (collecting cases); *Villanueva v. Gonzalez*, 123 S.W.3d 461, 464 (Tex. App.—San Antonio 2003, no pet.) ("A contract to do a thing which cannot be performed without violation of the law violates public policy and is void."); *Hopkins v. Cornerstone Am.*, 2009 WL 10721229, at *5 (N.D. Tex. June 15, 2009) ("Unjust enrichment may also apply to a claim that involves a valid contract when the contract is unenforceable, not fully performed, or void."). The Complaint expressly alleges that any agreements between HCMLP, on the one hand, and the Lifeboats, on the other, were structured to ensure HCMLP would perform all of the work while the Lifeboats retained the fees, for the impermissible purpose of depriving HCMLP's creditors of those assets, and that the sole reason for these agreements was to infuse the scheme with a "patina of legitimacy." *E.g.*, Compl. ¶¶ 51-65. These allegations are sufficient to support an inference that all agreements between HCMLP and the Lifeboats were entered into for the purpose of rendering HCMLP judgment-proof and evading its creditors, which, if proven, could render the agreements unenforceable. Defendants' factual challenges cannot preclude the Trustee's equitable claim now. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683-85 (Tex. 2000) (after all evidence at trial had been adduced, affirming that plaintiffs could assert unjust enrichment and noting the party disputing the equitable claim bears the burden to obtain factual findings that a valid express contract governed the dispute); *Tijerina-Salazar v. Venegas*, 2022 WL 1927007, at *21 (W.D. Tex. June 3, 2022) (plaintiff could pursue its unjust enrichment claim in the face of express contract, as it may later prove the contract was invalid).

### 4. The Trustee Has Stated A Claim For Money Had And Received/Unjust Enrichment Claim Against CLO Holdco

117. The Trustee brings an equitable claim for money had and received, on an unjust enrichment theory, against CLO Holdco, based on CLO Holdco's receipt of $75 million from HarbourVest in exchange for a 50% stake in HCLOF. The Complaint alleges that Dondero and

Ellington caused HCMLP to make material misrepresentations to fraudulently induce HarbourVest to purchase the HCLOF shares held by CLO Holdco.  Compl. ¶¶ 73-75, 103-04, 213, 395.  CLO Holdco—an entity within Dondero's web, and nominally overseen by Grant Scott, Dondero's close friend—was aware of the fraudulent inducement, and benefitted from it through the $75 million purchase price.  *Id*. ¶¶ 18, 23, 396.  HCMLP, meanwhile, bore the repercussions for Dondero's, Ellington's, and Scott's misconduct, ultimately settling HarbourVest's fraudulent inducement claim against it for $80 million in allowed claims against HCMLP's estate.[32] *Id*. ¶ 395.

118.    Equity should not permit CLO Holdco to retain these funds.  "A plaintiff seeking recovery under a theory of money had and received must prove that the defendant holds money which in equity and good conscience belongs to him," while a plaintiff pursuing unjust enrichment "can recover when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Matter of Okedokun*, 968 F.3d 378, 390 (5th Cir. 2020) ("Under Texas law, [t]he question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong . . . .").  Here, the Trustee has clearly alleged that CLO Holdco obtained an undue advantage through its receipt of the $75 million, and that equity and good conscience demand that such money be returned to HCMLP, as compensation for the damages HCMLP was required to pay as a result of the transaction.

119.    *Synergy Strategic Solutions, LLC v. Totus Solutions, Inc.*, 2019 WL 1406599 (N.D. Tex. 2019), is instructive.  In *Synergy*, the plaintiff prepaid a company for products, which the company failed to deliver, instead using the prepayment to pay its secured lender.  The plaintiff

---

[32]  CLO Holdco's mischaracterizations regarding testimony given in support of the HarbourVest Settlement should be disregarded, as this factual issue cannot be determined at this phase of the litigation.  CLO Holdco Defs. Br. ¶¶ 30-34; *Am. Res. Techs., Inc. v. Oden*, 2014 WL 12580475, at *1 (N.D. Tex. Feb. 11, 2014) (denying motion to dismiss as premature when it relied on evidence outside the complaint and challenged plaintiff's factual assertions).

sued to recover the prepaid funds from the secured lender, arguing that the secured lender knew that plaintiff had been fraudulently induced into making the prepayment. *Id*. at *5. The court permitted the claim to proceed, holding that the plaintiff "contends that [the secured lender] knew or should have known that the money he received . . . was the result of a fraudulent transaction," and that such allegations were sufficient "to establish more than a sheer possibility that [the secured lender] holds money which in equity and good conscience belongs to Plaintiff." *Id*. at *6 (relying on *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 842-43 (5th Cir. 2004) ("While . . . a money had and received claim can result from a defendant's duress, fraud, or undue influence," Texas law does not require "that the equitable claim can *only* arise in the context of reprehensible conduct by the defendant. Other, less insidious acts can serve as the basis for the claim.")). The claim here is analogous to that in *Synergy*, as the Complaint alleges that CLO Holdco was aware that HarbourVest was being fraudulently induced to purchase the HCLOF shares from it. Compl. ¶ 396.

120. For the same reason, CLO Holdco's reliance on *Matter of Okedokun* is misplaced. CLO Holdco Defs. Br. ¶¶ 25-29. In *Okedokun*, 968 F.3d 378, 391 (5th Cir. 2020), the plaintiff paid $2.4 million to an attorney to purchase property from a debtor in violation of the automatic stay. The attorney then stole those funds, using them to repay clients from whom he had previously stolen. *Id*. The Fifth Circuit affirmed the trial court's holding that it was not unconscionable for the repaid clients to retain the funds, specifically because they were innocent third parties. Here, the Complaint adequately alleges that CLO Holdco is not an innocent third party; instead, it had knowledge of the wrongful scheme and improperly benefitted from it. *Okedokun*, accordingly, is inapposite, and the distinction between *Okedokun* and the present case highlights why equitable relief against CLO Holdco is appropriate.

### 5.    The Trustee's Money Had And Received/Unjust Enrichment Claim Against CLO Holdco Is Not Barred By Affirmative Defenses

121.    CLO Holdco's assertions that the Complaint's Money Had And Received/Unjust Enrichment claim should be dismissed based on the affirmative defenses of unclean hands, *in pari delicto*, and adequate legal remedies also fail.  CLO Holdco Defs. Br. ¶¶ 36-49.  As an initial matter, the defenses of unclean hands and *in pari delicto* each requires a showing that the plaintiff engaged in wrongful conduct.  As discussed above, however, an agent's actions cannot be attributed to a principal where the agent acts adversely to the principal's interests.  *See* Section III.D.1, *supra*; *see also, e.g.*, *Rodriguez v. Sarabyn*, 129 F.3d 760, 768 (5th Cir. 1997) (citing RESTATEMENT (SECOND) OF AGENCY § 235); *In re Christopher*, 85 F.3d 626 (5th Cir. 1996) (knowledge acquired by agent acting adversely to principal is not imputed to principal).  Here, Dondero's and Ellington's actions in using HCMLP to fraudulently induce the HarbourVest investment for CLO HoldCo's (and therefore, Dondero's) benefit cannot be attributed to HCMLP.

122.    Further, an unclean hands defense also requires a defendant to "show that [it] was injured by the plaintiff's improper acts."  *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363 (N.D. Tex. 2016) (citing *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796 (5th Cir. 1999)).  CLO Holdco cannot make such a showing, as it ***benefitted*** from the HarbourVest investment, by receiving $75 million through Dondero's and Ellington's fraudulent inducement of HarbourVest's investment (of which CLO Holdco was aware).

123.    Additionally, none of these affirmative defenses may be determined at this phase of the litigation.  An unclean hands defense to a money had and received claim "does not bar recovery altogether but rather triggers an equitable analysis akin to comparative negligence."  *Ye v. Zhang*, 2021 WL 5862093, at *3 (S.D. Tex. June 8, 2021) (citing *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 841 (5th Cir. 2004)).  Under these circumstances, where Dondero dominated

and controlled both HCMLP and CLO Holdco, and orchestrated the HarbourVest investment to benefit CLO Holdco to HCMLP's detriment, an equitable analysis will show that CLO Holdco must compensate HCMLP for the harm it suffered. *See, e.g.*, *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 333 (S.D. Tex. 2008) (rejecting an unclean hands defense—under similar Delaware law—asserted by a parent against fraudulent transfer and other claims from its subsidiary, where the parent had forced the subsidiary to create a holding company and make the fraudulent transfer, holding it "would be inequitable to allow [parent] to blame [subsidiary] for the conduct in which it was forced to participate").

124.    The defense of *in pari delicto* is similarly fact-specific, inappropriate to resolve on a motion to dismiss, and not an automatic bar to recovery. *See, e.g.*, *Life Partners Creditors' Tr. v. Black Diamond Lifeplan Fund*, 2017 WL 9934885, at *7 (N.D. Tex. Nov. 27, 2017) (citing *Lewis v. Davis*, 145 Tex. 468, 151 (Tex. 1947)). In determining whether the defense applies, the Court must consider the "peculiar facts and equities" of the case, as well as the doctrine's underlying policy of precluding recovery for wrongdoers. *Id.* This is especially true when the defense is raised against a trustee who is seeking recovery for the benefit of creditors, rather than the purported wrongdoer. *In re IFS Fin. Corp.*, 2007 WL 1308321, at *4 (Bankr. S.D. Tex. May 3, 2007) (where a trustee sought "to recover funds . . . for the benefit of innocent creditors," the court held that it "cannot determine without a trial how to balance the respective equities that are demanded by Texas law when an *in pari delicto* situation is presented"). Indeed, when "the public interest in ensuring that one party to the illegal contract is not unjustly enriched at the expense of the other outweighs the public interest in refusing to aid a wrongdoer," the plaintiff can recover even when *in pari delicto*. *Orthodontic Ctrs. of Texas, Inc. v. Wetzel*, 410 F. App'x 795, 797 (5th Cir. 2011). Thus, even if there were a basis to invoke *in pari delicto* here—and there is not, given

68

that Dondero's and Ellington's conduct was directly adverse to HCMLP's interests—determining

its application at this stage would be premature.

125.    CLO Holdco's assertion that the claims should be dismissed based on the presence

of an adequate legal remedy should also be rejected.  CLO Holdco Defs. Br. ¶¶ 47-49.  "[T]here

is no requirement that a claimant who seeks [equitable remedies] . . . must first demonstrate the

inadequacy of a remedy at law."  *Gordon v. Sig Sauer, Inc.*, 2019 WL 4572799, at *16 (S.D. Tex.

Sept. 20, 2019) (citing RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 4

(2011)); *see also Off. Stanford Invs. Comm. v. Greenberg Traurig, LLP*, 2014 WL 12572881, at

*10 (N.D. Tex. Dec. 17, 2014) ("Hunton cites no authority suggesting a party may not plead

equitable claims in the alternative to claims for which an adequate remedy at law is possible, but

not guaranteed.  The Court declines to dismiss the claims on this basis.").  Indeed, the sole case

cited by CLO Holdco on this issue does not hold to the contrary, as it concluded that an unjust

enrichment claim was precluded once duplicative damages were ***awarded*** on a legal theory ***at trial***,

not based on the mere assertion of both equitable and legal claims in the pleadings.  *See In re

TXCO Res., Inc.*, 475 B.R. 781, 837-38 (Bankr. W.D. Tex. 2012).

G.    **THE BREACH OF FIDUCIARY DUTY, AIDING AND
ABETTING/KNOWING PARTICIPATION, CIVIL CONSPIRACY, AND
EQUITABLE MONEY HAD AND RECEIVED CLAIMS ARE NOT
BARRED BY STATUTES OF LIMITATIONS**

126.    The Lifeboats and the Okada Defendants contend that the Trustee's claims for

breach of fiduciary duty—including claims for aiding and abetting or conspiring to breach that

duty—as well as the claim against the Lifeboats for money had and received, are time barred by

the statute of limitations.[33]  Lifeboats Br. ¶¶ 28-34; Okada Defs. Br. ¶¶ 36-37.  These claims are

---

[33] Notably, none of the Dondero Defendants, Ellington, Leventon, or the CLO Holdco Defendants
contest the timeliness of these claims.

all timely, however, because the Complaint's allegations adequately plead bases for tolling under Texas's discovery rule and adverse domination doctrine.[34]

127.   "[I]t is well-settled law that the discovery rule applies to claims for breach of fiduciary duty." *Friddle v. Fisher*, 378 S.W.3d 475, 483-84 (Tex. App.—Texarkana 2012, pet. denied).  As the Texas Supreme Court has explained, "a person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so." *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996); *see also USPPS, Ltd. v. Avery Dennison Corp.*, 326 F. App'x 842, 847 (5th Cir. 2009) (a fiduciary's conduct is inherently undiscoverable when the party owed the duty is "unable to inquire into the fiduciary's actions or unaware of the need to do so") (quoting *S.V.*, 933 S.W.2d at 8).  Thus, "a person to whom a fiduciary duty is owed is relieved of the responsibility of diligent inquiry into the fiduciary's conduct, so long as the relationship exists." *S.V.*, 933 S.W.2d at 6.

128.   Similarly, the adverse domination doctrine provides that "while culpable individuals continue to have superior power over a corporation, limitations are tolled until a majority of disinterested directors discover or are put on notice of a cause of action." *F.D.I.C. v. Nathan*, 804 F. Supp. 888, 894 (S.D. Tex. 1992).  Under Texas law, the adverse domination tolling rule is presumed to apply if the allegedly culpable directors constitute a majority of the board of directors.[35]  *See F.D.I.C. v. Howse*, 736 F. Supp. 1437, 1441 (S.D. Tex. 1990).  Given Dondero's singular authority over HCMLP, such a presumption should apply here as well.

---

[34]   "Under Texas law, the statute of limitations is a procedural issue that is governed by the law of the state in which the claim is brought, in this case, Texas." *Ziegler v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 182 F.3d 913 (5th Cir. 1999).  Texas has a four-year statute of limitations for breach of fiduciary duty claims.  *See Gregory v. Allstate Ins. Co.*, 2016 WL 4617404, at *6 (S.D. Tex. Sept. 2, 2016).

[35]   This doctrine is applicable to equitable claims as well.  *See, e.g.*, *Janvey v. Suarez*, 978 F. Supp. 2d 685, 708-09 (N.D. Tex. 2013).  In *Janvey*, the court held that a receiver stated a claim for unjust

129.   The Lifeboats' and the Okada Defendants' contentions that the Court may determine at this phase of the litigation whether the discovery rule and adverse domination doctrine operate to extend the statutes of limitations cannot withstand scrutiny.  *See* Okada Defs. Br. ¶ 37 (asserting that the Complaint's "bald assertions" are "insufficient to toll the statute of limitations"); Lifeboats Br. ¶ 34 (contending that "plaintiff fails to allege that HCM[LP] and its creditors . . . did not know and were not on inquiry notice of the injuries allegedly caused them by Dondero, Strand, and the Lifeboats]").  As the court explained in *VTX*, where it held that "dismissal under Rule 12(b)(6) [was] inappropriate at this stage when the allegations of the complaint do not clearly foreclose application of" tolling doctrines:

> A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like.  However, determining when a plaintiff has sufficient information for the limitations period to begin is often fact specific and inappropriate for a motion to dismiss under Rule 12(b)(6). . . .  Dismissal should be granted only when the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint.  In other words, the complaint itself must have effectively pled Plaintiff out of court for the statute of limitations to be grounds for dismissal.

*VTX Commc'ns v. AT&T Inc.*, 2020 WL 4465968 at *11-12 (S.D. Tex. Aug. 4, 2020) (quotation marks and internal citations omitted).

---

enrichment under Texas law where the defendant's alleged domination and control of his entities triggered the discovery theory of tolling, such that the receiver could not have discovered such domination and control until the receivership came into existence.  *Id*. (concluding that the question of when, exactly, discovery occurred was fact-intensive and ill-suited for a motion to dismiss).  *Janvey* is on all fours with the Trustee's claims for money had and received:  the Complaint states a claim for money had and received under Texas law, and alleges complete domination and control of HCMLP by Dondero sufficient to toll the statute under a discovery theory because the Trustee could not have discovered Defendants' improper enrichment until Dondero's control of HCMLP ended.  Dismissal of those claims on statute of limitations grounds is thus similarly inappropriate.

130.    The Complaint here certainly does not foreclose application of the discovery rule and the adverse domination doctrine.  To the contrary, the Complaint makes clear that Dondero owed a fiduciary duty to HCMLP until his ouster in January 2020, and that prior to that ouster HCMLP had no reason to believe that Dondero was not acting in HCMLP's best interest, nor any ability to challenge Dondero's control.  *See, e.g.*, Compl. ¶¶ 195, 203, 276, 289, 292.  Indeed, it was not until after HCMLP filed for bankruptcy that HCMLP was able to wrest control away from him through the establishment of the Independent Board.  *Id*. ¶ 42.  And even then, Dondero continued to exert meaningful control over HCMLP, which did not terminate until he was asked to resign.  *Id*. ¶ 128.  The Complaint more than adequately pleads that HCMLP was unaware of the harm its fiduciaries were causing to the company, and unaware of the need to inquire into their conduct, prior to January 2020.[36]

131.    The additional arguments asserted by the Lifeboats are also without merit.  First, the Lifeboats argue that the law of Delaware, which does not recognize the adverse domination doctrine, applies to the statute of limitations issue because the LPA includes a Delaware choice of law provision and because Delaware law treats statutes of limitation as substantive law.  Lifeboats Br. ¶ 30-31.  But the Lifeboats are wrong on all accounts.  To begin with, the Lifeboats are not parties to the LPA, and thus claims against them are not governed by that agreement.  Moreover, "[w]hile Texas courts typically apply the substantive law of a contractually chosen state, they nevertheless apply Texas procedural law to procedural matters," and "[u]nder Texas law, statutes

---

[36]    The Lifeboats also appear to assert that because UBS and the Redeemer Committee filed a lawsuit and arbitration against HCMLP "years ago," HCMLP somehow could have discovered Dondero's misconduct.  Lifeboats Br. ¶ 31 n. 95.  But HCMLP, acting under Dondero's control, vigorously defended against those actions and asserted, fraudulently, that it had not engaged in any wrongdoing.  *E.g.*, Compl. ¶¶ 76-80, 89.  Given Dondero's concealment of the true facts, the mere filing of the UBS and Redeemer Committee actions was not sufficient to place HCMLP on notice of Dondero's wrongdoing.

of limitations are considered to be procedural, not substantive." *Cypress/Spanish Ft. I, L.P. v. Prof. Serv. Indus., Inc.*, 814 F. Supp. 2d 698, 708 (N.D. Tex. 2008); *see also Ziegler v. Bank of Am. Nat'l Tr. & Sav. Ass'n.*, 182 F.3d 913, 913 (5th Cir. 1999) ("Under Texas law, the statute of limitations is a procedural issue that is governed by the law of the state in which the claim is brought, in this case, Texas."). Further, Delaware courts also hold that "for conflict of law purposes, a statute of limitations issue is [] procedural, not substantive," and "[t]herefore, the law of the forum generally determines whether an action is barred by the statute of limitations."[37] *In re Winstar Commc'ns, Inc.*, 435 B.R. 33, 44 (Bankr. D. Del. 2010). And even if Delaware law treated statute of limitation issues as substantive (it does not), under Texas law, the statute of limitations still would be governed by Texas law. *See In re BP p.l.c. Secs. Litig.*, 51 F. Supp. 3d 693, 698 (2014) ("Even assuming that English law definitively considers statutes of limitations to be substantive . . . Texas law does not support the argument" that "Texas courts will apply the statute of limitations of the jurisdiction whose law governs the claim if that jurisdiction views the statute of limitations as substantive.").

132. Second, the Lifeboats rely on the district court and Fifth Circuit opinions in *F.D.I.C. v. Shrader & York* to contend that the adverse domination doctrine "does not extend 'beyond corporate officers and directors.'" Lifeboats Br. ¶ 32 (citing *F.D.I.C. v. Shrader & York*, 777 F. Supp. 533, 535 (S.D. Tex. 1991); *F.D.I.C. v. Shrader & York*, 991 F.2d 216, 227 (5th Cir. 1993)). Once again, however, the cited cases do not support the proposition. Rather, in *Shrader & York*, the district court granted summary judgment in favor of a defendant law firm, holding that it saw "no justification for applying the 'adverse domination' theory to toll the applicable statute

---

[37] The Lifeboats cite *In re AMC Inv'rs, LLC*, 637 B.R. 43, 57 and n. 60 (Bankr. Del. 2022), for the proposition that Delaware law treats statute of limitations issues as substantive. The *AMC* case, however, does not support the stated proposition, which misstates Delaware law.

of limitations" in a case "in which . . . shareholders [we]re suing a third party law firm for

malpractice." *Shrader & York*, 777 F. Supp. at 535.  On appeal, the FDIC argued that "the policy

rationale for the [adverse domination] doctrine" applied, because the controlling shareholder of

the companies on whose behalf the FDIC was suing had prevented the companies from suing the

law firm defendant "in order to avoid exposure of his own wrongdoing." *Schrader & York,* 991

F.2d at 227.  In affirming the district court's decision, the Fifth Circuit held:

> The FDIC does not allege that [the law firm defendant] committed intentional torts,
> or conspired with [the controlling shareholder] to defraud the [companies on whose
> behalf the FDIC was suing].  Thus, we agree with the district court that, ***in this
> particular case***, Texas's discovery rule adequately addresses the FDIC's policy
> concern.

*Id*. (emphasis added).

133.    Far from rendering a blanket decision that the adverse domination doctrine can only

ever apply to claims against directors and officers, the Fifth Circuit's decision provides, consistent

with other decisions from within the Fifth Circuit, that the adverse domination doctrine may apply

to third parties where a controlling person conspired with the defendants, or where a complaint

alleges that the defendants committed intentional torts.  *See Askanase v. Fatjo*, 828 F. Supp. 465,

471-472 (S.D. Tex. 1993) (relying on *Shrader & York* to reject argument that adverse domination

"does not apply to claims against third parties" and explaining that "[c]ulpable insiders are no more

likely to sue an outside accounting firm . . .  than they are to sue themselves, because either action

would bring to light the insiders' own misconduct," but dismissing claim against outside auditor

as there were not allegations that outside accounting firm "committed intentional torts or conspired

with corporate insiders to defraud" the entity); *F.D.I.C. v. Nathan*, 804 F. Supp. 888, 894-95 (S.D.

Tex. 1992) (tolling claims against outside attorneys on adverse domination theory because as long

as "culpable individuals continue to have superior power over a corporation," the limitations

period "is tolled until a majority of disinterested directors discover or are put on notice of a cause

of action"). The Complaint here alleges exactly that, asserting that the Lifeboats, which were dominated and controlled by Dondero, knowingly participated in Dondero's willful and wanton misconduct, and conspired with Dondero to deprive HCMLP of value that rightfully belonged to it in order to divert value from HCMLP's creditors to Dondero. *See, e.g.*, Compl. ¶¶ 286, 294, 295(a).

### H.    STRAND'S LIABILITY AS HCMLP'S GENERAL PARTNER IS SUFFICIENTLY PLED

#### 1.    The LPA Does Not Shield Strand From Liability As HCMLP's General Partner

134.    Delaware law provides that "[e]xcept as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to persons other than the partnership and the other partners."  DRULPA § 17-403(b).  The referenced Delaware Uniform Partnership Law provides that partners of a partnership "are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law." Delaware Uniform Partnership Law § 15-306(a). *See also In re Physiotherapy Holdings, Inc.*, 2017 WL 5163515, at *1 (Bankr. D. Del. Nov. 6, 2017) ("As general partners of Defendants, the Proposed Defendants are automatically liable."); *In re The Heritage Org., L.L.C.*, 413 B.R. 438, 515 n.65 (Bankr. N.D. Tex. 2009) (stating that "under Delaware partnership law," a "general partner, is liable for [the entity's] debts as a matter of law").

135.    Citing these unambiguous provisions of Delaware partnership law, the Supreme Court of New York previously held that "Strand, [HCMLP's] general partner and a Delaware corporation, may be held liable" for the liabilities of HCMLP. *UBS Secs. LLC v. Highland Capital Mgmt., L.P.*, 924 N.Y.S.2d 312 (Sup. Ct. 2011), *aff'd in part, modified in part*, 93 A.D.3d 489, 940 N.Y.S.2d 74 (2012).  As the court explained, "[i]n Delaware limited partnerships, a general

75

partner is liable for the debts of the limited partnership." *UBS*, 924 N.Y.S.2d at *9 (quoting *Sandvik AB v. Advent Int'l Corp.*, 83 F Supp 2d 442, 448 (D. Del. 1999), *aff'd* 220 F3d 99 (3d Cir. 2000)).

136.    Nevertheless, the Dondero Defendants move to dismiss the Complaint's claim to hold Strand liable for HCMLP's debts under Delaware partnership law, arguing that the Trustee "makes no reference HCMLP's LPA" or Strand's liabilities thereunder.   Dondero Defs. Br. at 19-20.  This is for good reason, however, as Delaware law is clear that unlike some other provisions of the Delaware Partnership law, the provision imposing liability on a general partner for the partnership's debts may not be modified by the partnership agreement.  *Compare, e.g.*, DRULPA § 17-403(a) ("*[e]xcept as provided in this chapter or in the partnership agreement*, a general partner of a limited partnership has the rights and powers and is subject to the restrictions of a partner in a partnership that is governed by the Delaware Uniform Partnership Law . . .") (emphasis added) *with* DRULPA § 17-403(b) ("*[e]xcept as provided in this chapter*, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law . . .") (emphasis added).  The Dondero Defendants' assertion that the LPA bars the claim is thus unavailing, and the claim should be permitted to proceed.

## I.      THE COMPLAINT'S ALTER EGO CLAIMS ARE SUFFICIENTLY PLED

### 1.      Alter Ego Is An Independent Cause Of Action Under Delaware Law

137.    The Lifeboats contend that the Trustee cannot bring claims to enforce alter ego liability as an independent cause of action.  *See* Lifeboats Br. ¶ 11.  But there is substantial Delaware precedent, including from the state's highest court, identifying an alter ego claim— sometimes called a "veil piercing" claim—as a right that may be independently asserted.  *See In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019) ("[U]njust enrichment and alter ego claims are common law claims"); *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("To

state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors."); *Wallace ex. rel. Cencom Cable Income Partners II v. Wood*, 752 A.2d 1175, 1183-85 (Del. Ch. 1999) ("In order to state a cognizable claim to pierce the corporate veil of the General Partner, plaintiffs must allege facts that, if taken as true, demonstrate the Officers' and/or the Parents' complete domination and control of the General Partner."); *see also Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008) (cited in Dondero Defs. Br. at 20) (Under Delaware law, "to state a claim for piercing the corporate veil under an alter ego theory, [the plaintiff] must show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present.").

138.    Defendants' reliance on *In re Essar Steel Minn. LLC*, 602 B.R. 600, 606 (Bankr. D. Del. 2019)—the sole case to which they cite for their assertion that an alter ego claim may not be independently asserted—is misplaced.  Defendants claim *Essar Steel* "search[ed] Delaware law and determin[ed] that alter ego liability is not a stand-alone cause of action but rather a 'theory of liability.'"  Lifeboats Br. ¶ 12 n.37 (characterizing *In re Essar Steel Minn. LLC*, 602 B.R. 600, 606 (Bankr. D. Del. 2019)).  In fact, the court in *Essar Steel* explained that "the Court's independent review of Minnesota and Delaware precedent has not shed light on how those states would treat this question," and so the court instead relied on research showing that "***a plurality of states*** has held that alter ego liability is not an independent cause of action, rather it is a theory of liability that is properly asserted with the underlying breach of contract claim."  *Essar Steel*, 602 B.R. at 605-06 (emphasis added).   As discussed, however, there is substantial Delaware precedent supporting the viability of an independent alter ego claim, and there is no basis to preclude the Trustee from asserting such a claim here.

### 2.     The Trustee Has Sufficiently Pled Alter Ego Claims Against Dondero And Strand

139.    The Complaint sufficiently alleges that Dondero should be liable for Strand's debts as its alter ego (Count VII), and that both Strand and Dondero should be liable for HCMLP's debts as HCMLP's alter egos (Count VIII).   Under Delaware law, "to state a claim for piercing the corporate veil under an alter ego theory, [the plaintiff] must show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008).[38] Delaware courts examine "a number of factors to determine whether the two entities appear to be legally distinct entities." *Fid. Nat'l Info. Servs., Inc. v. Plano Encryption Techs., LLC*, 2016 WL 1650763, at *4 (D. Del. Apr. 25, 2016), *report and recommendation adopted*, 2016 WL 11695472 (D. Del. June 23, 2016).  These factors include undercapitalization, a failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor entity, siphoning of the

---

[38]   The Dondero Defendants imply that Dondero's responsibilities for the liabilities of Strand or HCMLP should be "governed by HCMLP's LPA," and that Strand cannot be liable as HCMLP's alter ego because the LPA "permitted [Strand] to take various unilateral actions in its management of HCMLP."   Dondero Defs. Br. at 20.   Defendants cannot point to a single case in which a partnership agreement limited or altered any court's equitable power to pierce the corporate veil, however, and do not argue that any specific language in the LPA accomplished such an aim here. "The purpose of allowing the corporate veil to be pierced on an alter ego theory is to hold the party actually responsible for the inequitable conduct accountable and to prevent that party from using another corporation to shield itself from liability." *In re Opus E., LLC*, 528 B.R. 30, 57 (Bankr. D. Del. 2015), *aff'd sub nom. In re: Opus E., LLC*, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd sub nom. In re Opus E. LLC*, 698 F. App'x 711 (3d Cir. 2017); *see also Gadsden v. Home Pres. Co.*, 2004 WL 485468, at *4 (Del. Ch. Feb. 20, 2004), *judgment entered*, (Del. Ch. 2004) ("A court of equity will disregard the separate legal existence of a corporation where it is shown that the corporate form has been used to perpetrate a fraud or similar injustice.").  There is no legal support for the proposition that corporate entities may limit their exposure to alter ego liability through their partnership agreements, or prevent a court from holding them accountable for abusing the corporate form as a shield from liability.   And this is unsurprising, as a limited partnership agreement governs only the relationships among a limited partnership and its general and limited partners, and as such is not binding upon creditors that are not party to the agreement.

corporation's funds by the dominant shareholder, the absence of corporate records, and that the corporation is merely a facade for the dominant shareholder. *See Trevino*, 583 F. Supp. 2d at 528-29. "[N]o single factor justifies a decision to disregard the corporate entity," but instead "some combination . . . is required." *Trevino*, 583 F. Supp. 2d at 529 (quoting *United States v. Golden Acres, Inc*., 702 F. Supp. 1097, 1104 (D. Del. 1988)). The Complaint here includes detailed and well-supported allegations about Dondero's management of both Strand and HCMLP as a single entity and his complete control over each of them, as well as his unfair exploitation of that control to unjustly evade HCMLP's creditors for his own benefit and to shield himself from liability.[39]

140. The Complaint includes myriad allegations that Dondero, as the sole shareholder of Strand, operated Strand as an economic entity wholly indistinguishable from himself. Operating under Dondero's control, Strand failed to observe even the most basic corporate formalities. Although Strand's bylaws require annual stockholder meetings, in Dondero's 26 years of control, he held only six such meetings, and none after 2005. Compl. ¶ 113. Over those 26 years, Strand took only a dozen formal corporate actions, primarily to appoint or remove its own officers, who, in any event, performed no duties for Strand. *Id*. ¶¶ 113-14. Indeed, Dondero made his casual disregard of Strand's independent existence plain, testifying that he did not know if Strand even had officers, was unaware if it had "any employees or active . . . governance," and did not know if Strand had a board of directors or if he was solely Strand's president. *Id*. ¶ 114.

---

[39] The Dondero Defendants also argue that alter ego liability is appropriate only where an entity was "established" for a fraudulent purpose, and argue that Strand's sole purpose of acting as HCMLP's General Partner immunizes it from alter ego liability. *See* Dondero Defs. Br. at 20-21. But there is no support—and Defendants do not cite any—for the assertion that an entity established as a general partner cannot be the alter ego of the partnership for which it serves. To the contrary, as the Second Circuit has held under Delaware law, an entity need not have been "created with fraud or unfairness in mind" so long as there is "a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008).

141.   The Complaint's extensive detailing of Dondero's domination of HCMLP further supports Dondero's use of Strand as a façade designed merely to insulate him from liability.  As other courts have explained, "[t]o plead facade, [p]laintiff must show [the controlling shareholder] had significant control over [the debtor entity's] operations and finances." *Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Grp. Glob. I LLC*, 2019 WL 148454, at *5 (D. Del. Jan. 9, 2019) (citing *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 472 (D. Del. 2010)).   Such "significant control" is plainly alleged here.   Dondero acted as HCMLP's "solitary decision-maker," making "every material business, operational, management, and financial decision for HCMLP." Compl. ¶ 111.  And "high-level HCMLP employees have testified under oath" that "Dondero was the 'ultimate decision-maker' for 'every [] entity in the firm and for the firm as a whole.'"  *Id*. ¶ 115.  Dondero's control of financial and operational decisions included favoring loyal friends and family members to "carry out his will."  *Id*.  And even his co-founder Okada remarked in 2012 that Dondero was "coming up with ideas" for new companies and "using Highland's cash flow to set them up."  *Id*. ¶ 118.  These allegations are more than sufficient to state a claim, and at a minimum create a question of fact regarding the unitary operations of Dondero, Strand, and HCMLP.  *See Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010) ("The nature and extent of the dominion and control exercised by the [parent] defendants over the [s]ubsidiaries is a question of fact, not subject to resolution on a motion to dismiss.") (citing *In re Buckhead Am. Corp.*, 178 B.R. 956, 975 (D. Del. 1994)).

142.   HCMLP also lacked corporate formalities, resulting in ambiguity about which Dondero entity HCMLP employees actually worked for.  *See* Compl. ¶ 121 ("Highland employees frequently did not know whether they or their colleagues were employees of HCMLP or another entity within the Dondero web.").  As other courts have held, a "failure to maintain formal barriers

80

between management is enough to plead" a "fail[ure] to observe corporate formalities." *Starwood*,

2019 WL 148454, at *4 (citing *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown,

Inc.*, 296 F.3d 164, 172 (3d Cir. 2002)).   Dondero's disregard of HCMLP's separate identity

extended beyond his removal as HCMLP's CEO and President, after which he continued using his

HCMLP email account, worked from HCMLP's office, disregarded this Court's order restraining

him from communicating with HCMLP employees, and disposed of a corporate cell phone and its

data, serving his own interests and potentially spoliating evidence valuable to HCMLP.  *See*

Compl. ¶¶ 128-29.

143.    In further support of the conclusion that Dondero, Strand, and HCMLP acted as a

single entity, the Complaint offers substantial allegations of Donderdo's fluid treatment of

HCMLP's funds as available to other entities in his web.  Dondero's control of HCMLP through

Strand permitted him to cause HCMLP to provide tens of millions in cash to Dondero entity HCMS

between 2017 and 2020, funds HCMS was then able to "loan" to Dondero or Okada.  *Id*. ¶ 124.

As extensively detailed  in the Complaint, Dondero used his control of HCMLP and his operation

of it as a single entity to "move HCMLP's assets and revenue out of reach of its creditors while

preserving those funds and assets for his own use or for the benefit of other entities he created or

controlled," including transferring HCMLP's business and agreements, as well as its cash, to the

Lifeboats and selling preferred tranches of CLOs from HCMLP to CLO Holdco.  *Id*. ¶¶ 117, 126.

Dondero's complete and unilateral control of Strand and HCMLP, and his disregard of corporate

distinctions facilitated this enrichment of himself and defrauding of his creditors.

144.    The Complaint also sufficiently alleges the presence of unfairness or injustice to

support both Dondero's liability for Strand's debts and Dondero and Strand's liability for

HCMLP's debts.  The allegations make clear that Dondero's abusive domination of Strand and

HCMLP was a core tool used in perpetrating numerous self-interested schemes, including rendering HCMLP insolvent by diverting money to other entities he owned and/or controlled. *See* Compl. ¶¶ 105-09 (detailing HCMLP insolvency); *see also Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005) (explaining that insolvency is "one factor to be considered in assessing whether the corporation engaged in conduct that unjustly shields its assets from its creditors," including where insolvency relates to "attempt to avoid [] creditors"). Dondero "exploited HCMLP, Strand, and the various entities he controlled . . . for his own personal benefit," and caused HCMLP to act to move assets out of reach of creditors and for the benefit of Dondero's other entities, ultimately forcing HCMLP into bankruptcy. Compl. ¶¶ 110, 117. As courts have explained, "[a]cts intended to leave a debtor judgment proof are sufficient to show fraud and injustice." *Starwood*, 2019 WL 148454, at *5. Dondero looted HCMLP for his own gain, reimbursing expenses in excess of $1 million a year and using ostensible HCMLP employees as his personal staff to manage his personal finances and business interests, including requiring HCMLP employees to create and manage the books for Dugaboy and Get Good. Compl. ¶ 119. Dondero borrowed millions from HCMLP, including over $16 million in four demand notes during 2018, more than half of which remains unrepaid. *Id.* ¶ 123. None of these acts would have been feasible had Dondero not exercised complete control over both Strand and HCMLP. The Trustee's claims to hold Dondero liable for the liabilities of both entities, and Strand liable for HCMLP's debts, should be permitted to proceed.

### 3. The Trustee Has Adequately Pled Reverse Veil Piercing Claims Against Dugaboy and the Lifeboats

145. The Complaint also properly asserts reverse alter ego claims seeking to hold Dugaboy liable for the debts of its beneficiary, Dondero, as well as of his alter ego HCMLP (Count IX), and to hold NexPoint (Count X) and HCMFA (Count IX) liable for the debts of their

dominating shareholder, Dondero, and of his alter ego HCMLP. The Dondero Defendants move

to dismiss the claim seeking to hold Dugaboy liable for Dondero's and HCMLP's debts, arguing

that a company cannot be liable as the alter ego of an individual. *See* Dondero Defs. Br. at 22-23.

And the Lifeboats misconstrue the alter ego allegations against them, arguing that the Trustee no

longer seeks to pierce the corporate veil and hold those entities liable for HCMLP's liabilities. *See*

Lifeboats Br. ¶ 9 n. 33. In fact, however, the Complaint seeks to reverse pierce the veils between

Dondero and NexPoint, and Dondero and HCMFA, to render the Lifeboats liable for Dondero's

debts and for those of his alter ego, HCMLP.[40]

146.    The Delaware Chancery Court recently surveyed reverse piercing precedent and

found the theory to be viable under Delaware law, noting that "reverse veil-piercing can act as a

deterrent to owners of companies, particularly those that are closely held, from shuffling their

assets among their controlled entities with the express purpose of avoiding a judgment." *See*

*Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 714 (Del. Ch. 2021). In *Manichaean*,

the plaintiff sought to reverse pierce the veil between subsidiaries and their parent to hold the

subsidiaries liable for the parent's debts, alleging that the subsidiaries "actively participated in a

scheme [with the parent entity] to defraud or work an injustice against [the parent entity's]

creditors, . . . by diverting funds that would normally flow to" the parent from the subsidiaries

instead to the parent's parent. *Id*. at 716. The court observed that "[t]he natural starting place

---

[40]    The Lifeboats may also be liable for HCMLP's debts through horizontal veil piercing. Piercing
the corporate veil horizontally—between sister entities with shared ownership—can be available
where the veils between each sister entity and the common parent are first pierced. *See Capmark
Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349 (S.D.N.Y. 2013) ("Where
a plaintiff seeks to disregard the corporate formalities separating horizontal affiliates such as the
Goldman Lenders and the PIA Funds, the veils separating each entity from the shared corporate
parent must be pierced."); *Outokumpu Eng'g Enters. v. Kvaerner EnviroPower, Inc.*, 685 A.2d
724, 729 (Del. Super. Ct. 1996) (refusing to pierce the veil between sister entities for personal
jurisdiction without first piercing the veils to the common parent).

when reviewing a claim for reverse veil-piercing are the traditional factors," and that the interests

of a subsidiary's innocent shareholders and its third-party creditors necessitate consideration of

the following additional factors:

> (1) the degree to which allowing a reverse pierce would impair the legitimate
> expectations of any adversely affected shareholders who are not responsible for the
> conduct of the insider that gave rise to the reverse pierce claim, and the degree to
> which allowing a reverse pierce would establish a precedent troubling to
> shareholders generally; (2) the degree to which the corporate entity whose disregard
> is sought has exercised dominion and control over the insider who is subject to the
> claim by the party seeking a reverse pierce; (3) the degree to which the injury
> alleged by the person seeking a reverse pierce is related to the corporate entity's
> dominion and control of the insider, or to that person's reasonable reliance upon a
> lack of separate entity status between the insider and the corporate entity; (4) the
> degree to which the public convenience, as articulated by the Delaware General
> Corporation Law and Delaware's common law, would be served by allowing a
> reverse pierce; (5) the extent and severity of the wrongful conduct, if any, engaged
> in by the corporate entity whose disregard is sought by the insider; (6) the
> possibility that the person seeking the reverse pierce is himself guilty of wrongful
> conduct sufficient to bar him from obtaining equitable relief; (7) the extent to which
> the reverse pierce will harm innocent third-party creditors of the entity the plaintiff
> seeks to reach; and (8) the extent to which other claims or remedies are practically
> available to the creditor at law or in equity to recover the debt.

*Id*. at 715.  The court found that the claim was sufficiently stated, noting that it did not see

"innocent shareholders or creditors" of the subsidiaries "that would be harmed by reverse veil-

piercing, nor any potential alternative claims at law or equity" against the subsidiary or parent that

"would for certain remedy the harm." *Id*.

147.    The *Manichaean* analysis shows that a reverse veil piercing claim is also stated

here.  First, the Complaint contains numerous allegations demonstrating Dondero's domination of

and operation of Dugaboy as a single unit with HCMLP, and how Dondero operated Dugaboy as

an extension of himself, disregarding distinctions and formalities between the two.  For example,

Dondero exploited his ability to appoint and remove Dugaboy trustees without cause to appoint

his personal friend as trustee, "for the purpose of serving as a rubber stamp of approval for all

transactions" and functionally ceding full control to Dondero, and then replaced Scott as trustee with his sister.  Compl. ¶¶ 16, 240.  Dondero used HCMLP employees to conduct Dugaboy's business and Dondero's personal estate planning through Dugaboy, all without any compensation to HCMLP, and comingled Dugaboy's electronically stored information with HCMLP's data.  *Id.* ¶¶ 119-20; *see also Starwood*, 2019 WL 148454, at *4 (permitting alter ego claim where "failure to maintain formal barriers between management" was sufficient to support "fail[ure] to observe corporate formalities").  Additionally, Dondero is Dugaboy's sole beneficiary, and so there are no shareholders that could be adversely affected by the claim, and, upon information and belief, Dugaboy does not have any creditors.  *See Manichaean*, 251 A.3d at 716 (permitting reverse veil piercing claim where no "innocent shareholders or creditors of the [subsidiaries] . . . would be harmed by reverse veil-piercing").  Moreover, the Trustee, who is suing in HCMLP's shoes, represents an innocent actor that was abused by Dondero's disregard for corporate form and structure, and given Dondero's strategic maneuvers and abuses of the corporate form, there may be no other remedies available to recover funds siphoned to Dugaboy, or to hold Dondero accountable for his misdeeds.  *See id*.

148.    The Complaint also shows that Dondero's abuse of Dugaboy's corporate form is directly related to Dondero's campaign to defraud HCMLP's investors, and that Dugaboy participated in Dondero's schemes to evade creditors, render HCMLP judgment proof, and enrich himself, such that holding Dugaboy liable for Dondero's debts would be equitable and appropriate. Dondero caused Dugaboy to help facilitate HCMLP's transfer of assets from CLO Holdco to Get Good, through the Dugaboy Note.  Compl. ¶ 241.  And in litigation over funds lent from HCMLP to the Lifeboats, and other of his entities, Dondero caused Dugaboy to falsely assert (through Dondero's sister Nancy) that Dugaboy had caused HCMLP to forgive the notes as compensation

to Dondero—using Dugaboy to attempt to insulate Dondero from repaying funds improperly "lent" by HCMLP to Dondero through his web of entities. *Id*. As in *Manichaean*. the Complaint sufficiently alleges that Dugaboy "actively participated" in Dondero's "scheme to defraud or work an injustice" against his and HCMLP's creditors and to raid HCMLP for his own benefit, and that it would be an appropriate use of the Court's equitable powers to permit this claim to proceed. *Manichaean*, 251 A.3d at 716.

149.    The same is true of the claims against the Lifeboats.  The Complaint alleges that Dondero ran each of the Lifeboats, respectively, as single entities with HCMLP, failing to respect any formal delineations between them.  These entities have conceded their control by Dondero to this Court.  Compl. ¶ 118.  Dondero often managed these three entities as a single integrated unit, with a single set of business plans and projections and with employees of HCMLP servicing the Lifeboats on HCMLP's dime.  *Id*. ¶¶ 116, 121.  These entities shared a single office and employees "frequently did not know whether they or their colleagues were employees of HCMLP or another entity within the Dondero web."  *Id*. ¶ 121.  Together, these entities were a façade for Dondero, permitting him to act through any of them as he pleased, without personal exposure to their corporate liabilities.

150.    These allegations starkly contrast with those in cases where courts have rejected allegations that entities were run as a façade for their shareholder.  For example, the District of Delaware Bankruptcy Court dismissed one claim at summary judgment where entities were "operated in a decentralized fashion in which each operating company had its own management, financing, and financial-reporting department," the "Debtor's officers understood that the companies were separate and that the Debtor was their employer," and the "Debtor did not share

offices" with its parent or subsidiary entities.  *In re Opus E., LLC*, 528 B.R. 30, 60-62 (Bankr. D.

Del. 2015), *aff'd sub nom. In re Opus E. LLC*, 698 F. App'x 711 (3d Cir. 2017).

151.    The considerations specific to reverse veil piercing also weigh in favor of piercing

here, as there are no innocent shareholders or third-party creditors who could be impacted, and the

Trustee is suing on behalf of an innocent actor.  Further, while the Trustee brings other claims

against the Lifeboats, those claims seek damages for specific harms, and only this claim would

directly hold the Lifeboats—and their resources—accountable for their role in Dondero's scheme

to enrich himself while rendering HCMLP unable to pay its debts.

152.    Finally, the Complaint sufficiently alleges that Dondero used his domination of the

Lifeboats to perpetrate his fraud on HCMLP's creditors.  Under Dondero's control, the Lifeboats

participated in Dondero's scheme to transfer HCMLP's profits away from it and to the Lifeboats,

to enrich Dondero to the detriment of HCMLP's creditors.  The Lifeboats accepted services from

HCMLP without compensation.  Compl. ¶¶ 53-55, 62-63.  Additionally, Dondero caused HCMLP

to loan substantial funds to NexPoint and, after initially entering into forbearance agreements,

restructured the loans—for no consideration—into a consolidated note with 30-year maturity, a

low coupon rate, no covenants, and no security.[41]   *Id.*  ¶¶ 55-58.  And NexPoint then made

distributions of approximately $34 million, essentially all of which were made to Dugaboy, for

---

[41]   In related litigation, Defendants have argued some of these loans were forgiven, via an oral
agreement with Dondero's sister as the trustee of Dugaboy, as part of his compensation, or were
executed by mistake.  This Court recently found that those arguments are not credible.  *See* Report
and Recommendation, *Highland Capital Mgmt., L.P. v. NexPoint Advisors, L.P. (In re Highland
Capital Mgmt.)*, Adv. Pro. No. 21-03005-sgj (Bankr. N.D. Tex. July 19, 2022) (Dkt. No. 207, at 6
and n.7, 7-9, 24-26, 29, 33) (recommending granting summary judgment against Defendants, and
referring to their arguments and assertions as "shocking[]," "bizarre," "preposterous,"
"manufacturing chaos," "not a thing," "false," failures of the "straight face test," "simply
inaccurate," "farfetched," and "self-serving conclusory statements" without "any tangible
evidence").

Dondero's direct and sole benefit. *Id*. ¶ 56. Dondero also caused HCMLP to loan funds to HCMFA, which then defaulted on the loans, thereby enabling it to retain HCMLP's profits. Compl. ¶¶ 64-65. Again mirroring the facts of *Manichaean*, the Lifeboats also "actively participated" in Dondero's "scheme to defraud or work an injustice" against his and HCMLP's creditors and to raid HCMLP for his own benefit. *Manichaean*, 251 A.3d at 715. These claims, too, should survive these motions.

## J.    THE COMPLAINT'S AVOIDANCE CLAIMS ARE ADEQUATELY PLED

153.    The Complaint also states claims to avoid, as fraudulent transfers, the following: (i) over $107 million in distributions that HCMLP made to Dondero and Okada or to trusts they controlled, from 2010-2013 and 2016-2019; (ii) the transfer of HCMLP's rights under various management agreements to the Lifeboats from 2011-2013; (iii) the transfer of certain assets from HCMLP to Get Good, and to the other CLO Holdco Defendants as subsequent transferees, in exchange for a note from Dugaboy worth substantially less than the transferred assets; (iv) millions of dollars paid to the Massand entities on account of services they performed for SAS; and (v) over $5 million paid to Dondero and Ellington on account of alleged expenses for which HCMLP has no documentation (these amounts are also challenged as preferences). Compl. ¶¶ 172-86, 262-73, 303-47, 400-417.

154.    Defendants challenge these claims by arguing that (i) the Trustee has failed to plead a triggering creditor with respect to each transfer (Dondero Defs. Br. at 11-12; Okada Defs. Br. ¶¶ 41-42; Lifeboats Br. ¶¶ 15-18), (ii) the claims that extend beyond four years prior to the Petition Date are untimely because the Trustee may not stand in the Internal Revenue Service's ("IRS") shoes (Dondero Defs. Br. at 12-14; Okada Defs. Br. ¶¶ 43-50; Lifeboats Br. ¶¶ 19-25), (iii) the Complaint fails to adequately allege a lack of reasonably equivalent value with respect to the Alleged Expense Transfers (as defined in the Complaint, Compl. ¶ 402) (Ellington Br. ¶¶ 50-51;

Dondero Defs. Br. at 14-15), (iv) the intentional fraudulent transfer claims to avoid the Massand

Transfers and Expense Transfers are not pled with particularity (Ellington Br. ¶¶ 44-49; Dondero

Defs. Br. at 15), and (v) the Trustee does not satisfy the due diligence requirement for the

preference claims (Ellington Br. ¶¶ 42-43).  Each of these arguments should be rejected.

### 1.    The Trustee Has Sufficiently Pled A Triggering Creditor For Each Challenged Transfer

155.    In order to state a claim for avoidance, the Trustee must "demonstrate the existence

of an unsecured creditor that holds an allowable claim and who could have avoided the transfers

under state law" for each alleged fraudulent transfer.  *In re Giant Gray, Inc.*, 629 B.R. 814, 828

(Bankr. S.D. Tex. 2020).  As Defendants have previously acknowledged, Northern District of

Texas bankruptcy courts require that a trustee plead only the existence of a triggering creditor—

not that the pleading specifically identify such creditor, or include a rote repetition of the same

triggering creditor for each transfer.  *See, e.g.*, *In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 420

(Bankr. N.D. Tex. 2021) ("Although the Trustee must prove the existence of this so-called 'golden

creditor,' the Trustee need not specifically identify the 'golden creditor.'") (citation omitted); *In

re The Heritage Org., L.L.C.*, 413 B.R. 438, 459 (Bankr. N.D. Tex. 2009) ("While the Trustee

must demonstrate the existence of this 'golden creditor,' the Trustee need not specifically identify

the creditor by name; as long as the Trustee establishes that such unsecured creditors exist, he can

assume the mantle of any one of them.") (citation omitted).

156.    Nevertheless, the Complaint goes well beyond this requirement, identifying several

creditors who held claims on the Petition Date and could have avoided each challenged transfer.

Although the Dondero Defendants assert that "there are no allegations that an unsecured creditor

exists that could avoid each of the transfers at issue" (Dondero Defs. Br. at 12), in fact, each

avoidance claim alleges that "[o]n the date of the bankruptcy filing," "at least one or more secured

creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015," and/or "the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count."[42]  Compl. ¶¶ 173, 181, 263, 270, 304, 316, 325, 331, 336, 344.   These allegations are more than sufficient to satisfy the Trustee's obligations to identify a triggering creditor with respect to his avoidance claims.

### 2. The Trustee May Stand In The Shoes Of The IRS, As A Future Creditor, To Avoid Transfers Made Prior To 2015

157.   The Trustee's claims to avoid transfers made beyond four years prior to the Petition Date are timely becuase the Trustee may stand in the shoes of the IRS to avoid these transfers. Defendants assert two arguments in response:  first, that the Trustee should not as a matter of policy be permitted to stand in the IRS's shoes to avoid these transfers, notwithstanding that the plain language of 11 U.S.C. § 544 permits him to do so, and second, that even if the Trustee may stand in the IRS's shoes, the IRS itself may not avoid transfers made prior to the accrual of its claims against HCMLP.  Lifeboats Br. ¶¶ 19-25; Okada Defs. Br. ¶¶ 43-50; Dondero Defs. Br. 12-14.  Neither argument has merit.

#### (a) The Trustee May Stand In The IRS's Shoes To Pursue The Avoidance Of Transfers Made Prior To 2015

158.   Under section 544(b)(1) of the Bankruptcy Code, "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under

---

[42]   UBS's claim, which arose in December 2008, was the first of these claims to materialize. Compl. ¶ 45.

section 502." 11 U.S.C. § 544(b)(1).  This section is derivative, and "enables a trustee to do in a bankruptcy proceeding what a creditor would have been able to do outside of bankruptcy—except the trustee will recover the property for the benefit of the estate." *In re Equip. Acquisition Res., Inc.*, 742 F.3d 743, 746 (7th Cir. 2014).  As such, the Trustee's avoidance rights depend on the rights of an actual unsecured creditor under applicable law, and such an action is timely if the unsecured creditor's claim would have been timely under the applicable non-bankruptcy law at the time the bankruptcy petition was filed.  11 U.S.C. § 546(a).  Here, the Trustee's avoidance claims are timely because the IRS is an unsecured creditor that could have pursued all of the fraudulent transfer claims stated by the Trustee as of the Petition Date.

159.    Pursuant to 26 U.S.C. § 6502(a)(1), state limitations periods do not apply to the IRS.  Instead, the IRS's collection efforts, including avoidance actions pursued as an unsecured creditor, are subject to a ten-year limitations period that begins to accrue only when a tax is assessed.[43]  *See* 26 U.S. Code § 6502(a)(1) ("Where an assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court . . . within 10 years after the assessment of the tax."); *United States v. Evans*, 340 F. App'x 990, 992-93 (5th Cir. 2009) ("[I]t is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights. . . .  The same rule applies whether the United States brings its suit in its own courts or in a state court.  Rather, the United States is subject to the ten-year statute of limitations found in § 6502(a)(1) of the Internal Revenue Code.") (internal citations and quotations omitted).

---

[43]  Here, the IRS's claim accrued in June 30, 2015, and was not assessed until November 12, 2018.  *See* Dkt. No. 127 at 53 (IRS Amended Proof Of Claim).

160.    As numerous courts have held, a trustee may stand in the shoes of the IRS, and avail itself of the IRS's longer limitations periods, when seeking to avoid transfers under section 544. *See, e.g.*, *In re Kaiser*, 525 B.R. 697, 711 (Bankr. N.D. Ill. 2014) ("Within section 544, there are no conditions on which unsecured creditor a trustee may choose as the golden creditor."). Defendants concede this consensus. *See* Okada Defs. Br. ¶ 47 (explaining that other courts "have adhered to the literal language of section 544(b)(1)" in finding that "the trustee should have the same powers as the IRS would if it had brought an individual suit outside of bankruptcy"); Lifeboats Br. ¶ 23 (collecting cases acknowledging the long-settled interpretation of these statutes); Dondero. Defs. Br. at 12-13 (claiming this approach is approved by a "minority of courts," but identifying only one decision holding to the contrary).

161.    Nevertheless, Defendants argue that the Court should depart from this precedent and instead adopt the reasoning of *In re Vaughan Co.*, 498 B.R. 297 (Bankr. D.N.M. 2013), to disregard the plain language of section 544 and avoid what Defendants refer to as "incongruous" results.[44]  Lifeboats Br. ¶¶ 22-25; Okada Defs. Br. ¶¶ 45-48.  The *Vaughan* court concluded that the IRS's statute of limitations should not be available to a trustee because the sovereign power of the United States rests on its acting in the public interest and, purportedly, a trustee is does not act

---

[44]   Defendants also make passing reference to the Fifth Circuit's ruling in *In re Mirant Corp.*, 675 F.3d 530, 535 (5th Cir. 2012), which held that an entirely distinct statute, the Fair Debt Collection Practices Act (the "FDCPA"), is not available as "applicable law" under Section 544(b). *See* Dondero Defs. Br. at 14 (broadly arguing that the *Mirant* ruling "prevented similar efforts to extend Section 544(b)(1)"); Lifeboats Br. ¶ 22 and n.70 (characterizing *Mirant* as considering a "very similar context").  There is good reason, however, that Defendants do not discuss *Mirant* in detail, or strenuously argue that it provides a basis to depart from the majority of courts holding that a Trustee may avail itself of the IRS's longer statute of limitations.  Unlike 28 U.S.C. 6502, the FDCPA provides that it "shall not be construed to ***supersede or modify*** the operation of—(1) title 11," and includes within its legislative history a statement that the Bankruptcy Code should be read as if the FDCPA did not exist." *Mirant*, 675 F.3d at 535-36 (quoting 28 U.S.C. § 3003(c)) (emphasis added).

in the public interest.  *See Vaughan*, 498 B.R. at 304.  The court further held that adhering to the statutory language, by permitting trustees to step into the shoes of the IRS, would lead to what it perceived as an untenable result—overuse of the lengthened limitations period.[45]

162.   ***Every court*** that has considered *Vaughan* in the nine years since it was decided has rejected it, however, explaining that the "fundamental problem with [its] analysis is its failure to start where courts must start in interpreting statutes and that is to look at the statute's plain meaning."  *In re Kipnis*, 555 B.R. 877, 881-82 (Bankr. S.D. Fla. 2016) (identifying *Vaughan* as the "only" court that "has reached the opposite conclusion" on a trustee's ability to stand in the IRS's shoes, and holding that "this Court agrees with . . . the majority of decisions" that a trustee may "step into the shoes of the IRS to take advantage of the ten-year collection period"); *see also In re Omanski*, 2022 WL 4281472, at *9 (Bankr. S.D.N.Y. Sept. 15, 2022) (rejecting *Vaughan*'s reasoning as "unpersuasive" and "based solely on policy considerations"); *In re Smith*, 2022 WL 1814415, at *5-6 (Bankr. D. Kan. June 2, 2022) (explaining that the *Vaughan* analysis "has no basis in the plain language of § 544(b)," and following "the majority position" that a trustee "stepping into the shoes of the IRS" is not subject to state limitations periods because "[u]nder the plain wording of § 544(b)" the "grant of derivative rights to a trustee is unqualified"); *In re Musselwhite*, 2021 WL 4342902, at *10 (Bankr. E.D.N.C. Sept. 23, 2021) (holding that courts that "have criticized the analysis of the *Vaughan* court" are correct that a court "must begin with the

---

[45]   Defendants also argue that the Court should ignore the plain language of Section 544 because the regularity of IRS claims for payroll taxes will enable a trustee to extend the statute of limitations in almost every case.  But Defendants rely solely on dicta in a footnote in a single case, which, as Defendants concede, was decided based on a factor that easily distinguishes it from the circumstances here:  the IRS had not filed a proof of claim.  *In re J&M Sales Inc.*, 2022 WL 532721, at *2, 3 n.7 (Bankr. D. Del. Feb. 22, 2022).  The case does not support Defendants' assertion that the Court should deviate from the plain language of Section 544 or the long line of cases holding that it must be interpreted as written.

language of the statute itself" and that under section 544(b) "there is no prohibition against the trustee stepping into the shoes of the IRS"); *In re Gaither*, 595 B.R. 201, 207-10 (Bankr. D.S.C. 2018) (identifying that the "majority of courts" have "concluded that § 544(b) does permit a trustee to step into the shoes of the IRS" and that "[u]nlike the court in *Vaughan*, these courts focused on the plain language contained in § 544(b) rather than policy or congressional intent"); *In re CVAH, Inc.*, 570 B.R. 816, 834 (Bankr. D. Idaho 2017) ("Notably, it appears only one court has come to a different conclusion.").

163.    As the court in *Kaiser* held, *Vaughan*'s sovereign power analysis—that the trustee cannot employ a limitations period based on the United States' sovereignty—"is simply misplaced" because a trustee's suit under section 544(b) is derivative, by which the trustee "enforces the rights of that creditor for the benefit of the bankruptcy estate" and thus, while "[t]he unsecured creditor's ability to trump the applicable state statute of limitations might derive from its sovereign immunity," "the estate representative's ability to override that same limitation derives from § 544(b)." *In re Kaiser*, 525 B.R. at 713 (quoting *In re Greater Se. Cmty. Hosp. Corp. I*, 365 B.R. 293, 304 (Bankr. D.D.C. 2006)); *see also In re Kipnis*, 555 B.R. at 883 (where "the trustee is stepping into the shoes of a creditor that has sovereign immunity, the focus is not on whether the trustee is performing a public or private function, but rather, the focus is on whether the IRS, the creditor from whom the trustee is deriving her rights, would have been performing that public function if the IRS had pursued the avoidance actions under 'applicable law'").

164.    Moreover, multiple courts have persuasively explained that a trustee ***does*** act in the public interest, because "the equitable operation of the bankruptcy laws is a matter of critical public interest," and "allowing a bankruptcy trustee, standing in the shoes of IRS, to avoid fraudulent transfers promotes the public interest of maintaining fairness in the bankruptcy process," including

94

"payment of a debtor's tax obligations." *In re CVAH*, 570 B.R. at 835. The *CVAH* court explained

that limiting a trustee's ability to exercise the IRS's rights would create "inappropriate" results,

because individual creditors including the IRS cannot seek to avoid transfers, and so the IRS could

be "deprived of its statutory right to recover the transfers." *Id.* at 835-36 ("declin[ing] to

effectively frustrate the purpose of § 544(b)(1)" and "restrict Trustee, now standing in the shoes

of IRS, from asserting the same claims against the defendants as transferees as IRS could"); *see

also In re Maxus Energy Corp.*, 641 B.R. 467, 545 (Bankr. D. Del. June 22, 2022) ("adopt[ing]

this logic" as expressed in *CVAH* and applying it to an avoidance action brought "in the shoes of

the EPA to avoid fraudulent transfers," as "promot[ing] the public interest of fairness in the

bankruptcy process" as well as the "payment of a debtor's environmental liabilities").

165.    *Vaughan*'s policy arguments have further been rejected because "[w]hen the law is

clear, the court need not look to the underlying policy." *In re Kaiser*, 525 B.R. at 713 (citing

*United States v. Ron Pair Enters.*, 489 U.S. 235, 240-41 (1989)). As courts have explained

repeatedly, these policy concerns have no basis in the "clear language" of section 544(b), which

"impose[s] no limitation on the meaning of 'applicable law' or on the type of unsecured creditor a

trustee can choose as a triggering creditor," and thus fall outside the scope of a court's permissible

role in interpreting the provision. *In re Kipnis*, 555 B.R. at 882 ("policy concerns and legislative

intent may not be considered, unless the result from applying the plain meaning would be absurd")

(citing *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004)); *see also In re Webster*, 629 B.R.

654, 674 n.18 (Bankr. N.D. Ga. 2021) ("Numerous cases, however, have rejected *Vaughan* on

grounds that it improperly emphasizes congressional intent and policy concerns over the plain

language of the statute. . . . The Court agrees with those cases rejecting *Vaughan*'s analysis.")

(collecting cases); *In re Kaiser*, 525 B.R. at 714 (explaining that the "plain language . . . does

simply not support the view permitting a trustee to claim a larger statute of limitations by stepping into the shoes of the IRS as an unsecured creditor would somehow override Congressional intent by superseding state law"); *In re Behrends*, 2017 WL 4513071, at *9 (Bankr. D. Colo. Apr. 10, 2017) ("[T]his Court does not agree that policy arguments should limit the scope of § 544(b). The plain language of § 544(b) refers to the trustee having the power to avoid transfers that are voidable under 'applicable law.'").

166.    Notably, even the courts that agree with *Vaughan*'s policy concerns have acknowledged that they are nevertheless bound to enforce section 544(b)(1) as it is written: "standards of statutory construction" mandate that courts are " constrained to interpret the plain language of § 544 without regard to these adverse consequences." *In re Smith*, 2022 WL 1814415 at *6; *see also In re Musselwhite*, 2021 WL 4342902, at *10 ("It is not necessary for the court to address whether this outcome was the intent of Congress or any other underlying policy concerns because the plain language of the statute clearly permits the trustee to choose any unsecured creditor holding an allowed claim as the golden creditor."); *In re Kipnis*, 555 B.R. at 883 (stating that although "the *Vaughan* court's policy concerns may be justified," "the statute does not say" what the *Vaughan* court wants, and "this Court cannot simply read such a limitation into the text"). Defendants' request that the Court deviate from these well-settled principles of statutory interpretation should be rejected.

    (b)    The IRS May Avoid Transfers Made Prior To The Accrual Of Its
          Claim As A "Future Creditor"

167.    Unable to seriously dispute that section 544 enables the Trustee to avail himself of the IRS's longer statute of limitations, Defendants argue that even if the Trustee may do so, he still may not pursue claims prior to the accrual of the IRS's claim on June 30, 2015. But Defendants are wrong again.

168.    Texas's fraudulent transfer law provides for the avoidance of transfers that are fraudulent as to future creditors. *See* Tex. Bus. & Com. Code. Ann. § 24.005(a) ("Transfers Fraudulent as to Present and Future Creditors").    The statute provides that transfers may be "fraudulent as to a creditor, whether the creditor's claim arose before ***or within a reasonable time after*** the transfer was made or the obligation was incurred." *Id*. (emphasis added).    As the Fifth Circuit has acknowledged, the IRS has the same rights as any creditor under state law to challenge transfers made prior to accrual of the IRS's claim as a "future creditor." *United States v. Fernon*, 640 F.2d 609, 611 (5th Cir. 1981) ("On October 12, 1965, when his parents were liable to the Government as a present creditor for tax deficiencies in 1962, 1963, and 1964 ***and as a future creditor for tax year 1965***, Fernon, Jr.'s father and mother transferred an ocean front lot and house to him individually.") (emphasis added).

169.    Additionally, numerous other courts have held that a trustee may stand in the shoes of the IRS to avoid transfers made ***before*** the IRS became a creditor, on the basis of state fraudulent conveyance laws providing that future creditors may avoid a transfer, as incorporated through section 544(b) of the Bankruptcy Code.    As one such court explained, "whether a transfer is fraudulent as to, and therefore recoverable on behalf of, only existing creditors," as opposed to future creditors as well, "depends on the statute invoked by the trustee to support the avoidance claim." *In re CVAH*, 570 B.R. at 841-42 (The IRS "need not have been a creditor at the time of the transfers under some of the statutes invoked by Trustee" because the relevant state fraudulent transfer statute provides that transfers "may be avoided by either creditors that existed at the time of the subject transfer, and those transfers that may be avoided by existing ***and future creditors***.") (emphasis in original); *see also In re Emergency Monitoring Techs., Inc.*, 347 B.R. 17, 18-19 (Bankr. W.D. Pa. 2006) ("[T]he Court cannot dismiss, at the present stage of the instant litigation,

the chance that the I.R.S. could have avoided the aforesaid 1999 transfer pursuant to [Pennsylvania's fraudulent transfer statute], which statutory provision allows a 'future creditor' to avoid a transfer under certain circumstances."); *In re Greater Se. Cmty. Hosp. Corp. I*, 365 B.R. 293, 305-06 (Bankr. D.D.C. 2006) ("The IUFTA allows future creditors to utilize its remedies. There is no great injustice in allowing HHS or the IRS to have a fraudulent transfer claim under the IUFTA without a set statute of limitations.") (internal citation omitted).  In contrast, Defendants have not identified a single case dismissing an avoidance claim brought by a trustee standing in the IRS's shoes on the ground that the transfer pre-dated accrual of the claim.[46]

170.    While Texas's fraudulent transfer statute does not define "reasonable time" for purposes of determining the period within which a creditor may challenge a transfer predating the accrual of its claim, some courts have held that "reasonable" should mean at least the four years provided by the statute as the limitations period, while others have concluded that "[r]easonableness is, by its nature, fact specific," and "the contours of a situation must guide the reasonableness standard."  *See, e.g., In re Houston Drywall, Inc.*, 2008 WL 2754526, at *19 n.23 (Bankr. S.D. Tex. July 10, 2008) ("The Court concludes that the Trustee's claim arose within a reasonable time after the assignments took place.  Although the definition of 'reasonable time' under TUFTA is not specifically defined, the four-year statute of limitations suggests that a 'reasonable time' is within four years."); *In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 725-27 (Bankr. S.D. Tex. 2020) ("This will be a matter for trial, or perhaps summary judgment.  It is

---

[46]    The *Vaughan* case dismissed an avoidance claim on distinct grounds, rather than based on a challenge to the IRS's rights as a state law creditor, as discussed *supra* at Section III.J.  In *Taylor, Bean & Whitaker*, the court simply denied plaintiff's summary judgment motion as to transfers that occurred more than four years before the petition date, but did not dismiss the claims.  *See In re Taylor, Bean & Whitaker Mortg. Corp.*, 2018 WL 6721987, at *6 (Bankr. M.D. Fla. Sept. 28, 2018).

definitively not a matter to be decided at the Rule 12(b)(6) stage of this proceeding."). The Court should decline to determine the contours of reasonableness at this phase of the case. Defendants have provided no legal grounds on which to dismiss the Trustee's fraudulent transfer claims as untimely at this juncture, and their request should be denied.

### 3. The Complaint Adequately Alleges A Lack Of Reasonably Equivalent Value In Exchange For The Alleged Expense Transfers

171. Ellington and the Dondero Defendants argue that the Complaint fails to sufficiently plead that HCMLP did not receive reasonably equivalent value in exchange for the Alleged Expense Transfers. Ellington Br. ¶¶ 48-51; Dondero Defs. Br. at 14-15. The Complaint alleges that HCMLP paid Dondero and Ellington Alleged Expense Transfers totaling more than $5 million and received "no value" in exchange. Compl. ¶ 411. The Trustee is unable to locate any supporting documentation justifying these transfers as valid business expenses. However, evidence presented to the Court regarding other requests for reimbursement of alleged business expenses made by Dondero and Ellington show that there is serious reason to doubt the validity of the Alleged Expense Transfers. *See* Transcript of Aug. 8, 2022 Hearing, *UBS Secs. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.*), Adv. Pro. No. 21-03020-sgj (Dkt. No. 183, at 107-14) (Bankr. N.D. Tex. Aug. 10, 2022) (Appendix at 149-56) (detailing "expense reimbursements" for "business development," where the expenses were actually incurred by Ellington to fund lavish European vacations and visits to Vegas strip clubs, and used to fund millions of dollars in dividends paid to Ellington and Dondero, all using money stolen from the Fund Counterparties and given to Sentinel to avoid UBS's collection efforts). This evidence, combined with the Complaint's other allegations regarding Dondero's and Ellington's efforts to siphon value from HCMLP for their own benefit, shows that the Complaint's allegations that HCMLP did not receive reasonably equivalent value in exchange for the Alleged Expense

Transfers are highly plausible.  The constructive fraudulent transfer claims to avoid and recover the Alleged Expense Transfers should not be dismissed on this basis at this phase of the litigation, especially given that information regarding the purpose of the Alleged Expense Transfers appears to be within Dondero's and Ellington's exclusive knowledge.  *Cf. In re: Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *10 (Bankr. N.D. Tex. Aug. 24, 2020) ("[W]hen a fraudulent transfer claim is asserted by the bankruptcy trustee, courts often apply a less stringent standard when weighing the sufficiency of the complaint, reasoning that a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge.") (internal quotations and citations omitted).

### 4.    The Intentional Fraudulent Transfer Claims Are Sufficiently Pled

172.    The Complaint's claims for intentional fraudulent transfer are also sufficiently pled. Ellington argues that the intentional fraudulent transfer claims to avoid the Massand Transfers are not stated with the particularity required by Federal Rule of Civil Procedure 9(b), and the Dondero Defendants make the same argument with respect to the Expense Transfers.  Ellington Br. ¶¶ 44-46; Dondero Defs. Br. at 15.  Each of these arguments should be rejected.

173.    Federal Rule of Civil Procedure 9(b), made applicable by Federal Rule of Bankruptcy Procedure 7009, requires that "[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud . . . ."  As this Court has noted, "the Fifth Circuit has yet to address whether the heightened pleading standard of Rule 9(b) applies to claims for fraudulent transfers."  *In re Texas Rangers Baseball Partners*, 498 B.R. 679, 712 (Bankr. N.D. Tex 2013); *see also In re Life Partners Holdings, Inc.*, 926 F.3d 103, 118 (5th Cir 2019) ("We have not previously addressed the question of whether an actual fraudulent transfer claim is subject to Rule 9(b)'s heightened pleading requirements" and again declining to rule on the issue).  And courts within this district have repeatedly held that intentional fraudulent transfer claims are subject to the "short and plain" pleading standard under Rule 8(a).  *See, e.g., Janvey v. Alguire*,

846 F. Supp. 2d 662, 676 (N.D. Tex. 2011) ("The Court can find no principled reason for applying Rule 9's pleading requirement to . . . fraudulent transfer claims.") (internal quotations omitted).

174.    In any event, the claim to avoid the Massand Transfers as intentional fraudulent transfers are sufficiently stated regardless of the pleading standard applied.  The Trustee pleads the "who, what, where, when and why"[47] of the intentionally fraudulent Massand Transfers:  Dondero caused HCMLP to make the Massand Transfers,[48] which transfers are specifically identified by date and amount, to Massand as part the "multi-faceted scheme to defraud HCMLP's creditors which involved, among other things, causing HCMLP to become an obligor under certain contracts, including the Massand Consulting Agreements, that did not confer value on HCMLP." *See, e.g.*, Comp. ¶¶ 35-46.  Instead, Massand received hundreds of thousands of dollars from HCMLP despite having provided services solely to SAS—a separate entity that was owned and controlled by Dondero and Ellington.  *See id.* ¶ 161.

175.    Moreover, courts often consider "badges of fraud" when determining whether transfers were made with the actual intent to hinder, delay, or defraud creditors, including:

> (1) [T]he lack or inadequacy of consideration; (2) the family, friendship or close relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

---

[47]    *See Texas Rangers*, 498 B.R. at 711-12 (noting that, to the extent it even applies, Rule 9(b) requires a party alleging fraud to specify "the who, what, where, when, and how" of the alleged fraud) (internal quotation marks omitted).

[48]    Ellington asserts that the Trustee did not adequately plead how Dondero "caused" HCMLP to make the Massand Transfers.  To the contrary, the Complaint is replete with allegations regarding Dondero's domination and control over HCMLP.  *See, e.g.*, Compl. ¶¶ 2, 42, 110.

*Texas Rangers*, 498 B.R. at 712. Courts recognize that, "[b]adges of fraud are but one way, at the pleading stage, to fulfill the heightened pleading requirement of Rule 9(b)." *In re TMST, Inc.*, 610 B.R. 807, 826 (Bankr. D. Md. 2019); *see also Texas Rangers*, 498 B.R. at 712 (finding that pleading three badges of fraud was "enough to establish the requisite 'fraudulent intent' to meet the pleading requirements of both Rule 9(b) and Rule 12(b)(6)"). The Trustee pleads facts corresponding directly to these badges of fraud. *See, e.g.*, Compl. ¶ 346(a)-(f).[49]

176.    Similarly, the Trustee satisfies Rule 9(b)'s pleading standards with respect to the Alleged Expense Transfers. Dondero and Ellington caused HCMLP to make the Alleged Expense Transfers on specific dates identified by the Trustee, in specific, identified amounts, to identified transferees (Dondero or Ellington), with the actual intent to hinder, delay or defraud creditors, which intent was demonstrated by several badges of fraud. *See id*. ¶¶ 402, 416. Such alleged badges of fraud include that (i) Dondero and Ellington were insiders of HCMLP, (ii) the Alleged Expense Transfers did not reimburse valid expenses, (iii) the transfers were made at a time when Dondero and Ellington believed HCMLP's legal exposure rendered it insolvent, and (iv) the transfers were made in order to siphon value so that such value would not be available to satisfy HCMLP's creditors. *Id.* ¶ 416(a)-(h). By pleading these and other badges of fraud, among other allegations, the Trustee has satisfied Rule 9(b)'s pleading standards. *See Texas Rangers*, 498 B.R. at 712; *TMST*, 610 B.R. at 826.

---

[49]    Specifically, the Trustee pleads that (i) Dondero was an insider of HCMLP and Massand Capital, (ii) before the Massand Transfers, HCMLP had been sued and Dondero believed its legal exposure rendered it insolvent, (iii) HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to become an obligor on certain contracts, including the Massand Consulting Agreements, that did not confer value on HCMLP, and (iv) HCMLP, through Dondero, effected transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors.

### 5.    The Complaint Adequately Alleges Due Diligence And Consideration Of Known Defenses In Support Of The Preference Claims

177.    The Complaint asserts claims under sections 547 and 550 of the Bankruptcy Code to avoid and recover transfers made to Dondero and Ellington within one year of the Petition Date. *See* Compl. ¶¶ 403-05.  Ellington argues that these claims against him should be dismissed because the Complaint fails to plead that the Trustee conducted the reasonable due diligence and consideration of known defenses in conformance with language added to section 547(b) under the Small Business Reorganization Act of 2019.  As Ellington concedes, however, "[w]hether the due diligence language created an additional ***pleading*** requirement is unclear," and "[a]ssessing a trustee's due diligence efforts at the motion-to-dismiss stage is difficult."  *See* Ellington Br. ¶ 42; *In re Reagor-Dykes Motors, LP*, 2021 WL 2546664, at *2 (Bankr. N.D. Tex. Jun. 21, 2021) (emphasis in original).

178.    The Complaint's preference claims should survive Ellington's challenge regardless of whether the newly-added language results in a new pleading requirement.  The Complaint's consistently detailed allegations plainly show that the Trustee undertook a great deal of diligence in preparing the Complaint's causes of action, and that no statutory defenses to the preference claims were overlooked or disregarded.  Indeed, Ellington does not even contend that any such defense applies, only that the Complaint fails to include a rote recitation of the statute's language. Mere recitation of a statute's language is not required, however, where the Complaint's detailed allegations demonstrate compliance therewith.  *See, e.g.*, *Agredano v. State Farm Lloyds*, 975 F.3d 504, 506 (5th Cir. 2020); *Kuhl v. City of Garland*, 1999 WL 173969, at *2 (Tex. App.—Dallas Mar. 31, 1999, no pet.).  The Court may easily conclude that any due diligence requirement is satisfied.  *See In re Trailhead Eng'g LLC*, 2020 WL 7501938, at *7 (Bankr. S.D. Tex. Dec. 21, 2020) (declining to dismiss a preference claim for failure to plead "reasonable due diligence," and

explaining that a plain reading of section 547(b) reference to due diligence "in the circumstances

of the case" indicates that a level of discretion is involved).

### K. THE COMPLAINT'S CLAIM FOR TORTIOUS INTERFERENCE IS ADEQUATELY PLED

179.    The Complaint adequately pleads claims for tortious interference with prospective

business relations against the Lifeboats in connection with the Lifeboat Scheme (Count XVII).  To

assert a claim for interference with prospective business relations, a plaintiff must allege:

> (1) [A] reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference.

*United Biologics, L.L.C. v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*, 819 F. App'x

204, 211 (5th Cir. 2020) (quoting *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.—

Houston [14th Dist.] 2001, pet. denied)); *accord Del. State Univ. Student Hous. Found. v. Ambling

Mgmt. Co.*, 556 F. Supp. 2d 367, 376-77 (D. Del. 2008).  The Lifeboats assert that the tortious

interference claims should be dismissed because (i) the Complaint fails to plead independently

tortious or unlawful conduct that prevented the relationship from occurring, and (ii) the claims are

precluded by the LPA.  Lifeboats Br. ¶¶ 42-44.  As discussed above, however, the Complaint

adequately pleads that the creation of the Lifeboats and siphoning of business from HCMLP to

those entities resulted in fraudulent transfers, breaches of fiduciary duty, aiding and abetting

breaches of fiduciary duty, and civil conspiracy.  Thus, the Complaint adequately pleads the

"tortious or unlawful conduct" necessary to state the tortious interference claims.

180.    The Lifeboats' assertions that the LPA shields them from liability for tortious

interference also fails.  Lifeboats Br. ¶¶ 43-44.  The LPA permits Strand, as the General Partner,

and "any affiliate thereof to "have business interests and activities in direct competition with the Partnership," and further provides that HCMLP shall not "have any rights *by virtue of [the LPA] or the partnership relationship created [t]hereby* in any business ventures of the General Partner [or] any Affiliate thereof."  LPA § 4.1(f) (Appendix at 25) (emphasis added).  Here, the Trustee's claims for damages as a result of the Lifeboats' tortious interference with HCMLP's prospective business relations derives not from the LPA or the partnership relationship created thereunder, but instead by virtue of the common law, which imposes damages upon a defendant where the elements of a tortious interference claim are shown.  The LPA does not preclude such claims, which is made clear by the language of the LPA itself: the General Partner may not act in bad faith in connection with "a conflict of interest . . . between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand."  *Id.* § 4.1(g) (Appendix at 25).  Thus, while the General Partner may engage in competing businesses, it cannot steal existing contracts away from HCMLP and transfer them to a competing entity, solely for the purpose of benefitting Dondero and at the expense of HCMLP.

181.   The sole case cited by the Lifeboats in support of their LPA argument, *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 106 (Del. 2013), does not help them.  Lifeboats Br. ¶ 43.  In *Allen*, the Delaware Supreme Court rejected an "invitation to import standards of conduct from corporate or tort law," where the governing partnership agreement "explicitly provide[d] that when the LPA requires Encore GP or its Affiliates to make a determination in 'good faith,' they 'shall not be subject to any other or different standards.'"  *Allen*, 72 A.3d at 106; *see also id.* at 105 (explaining that the partnership agreement "replaced the common law fiduciary duties of loyalty and care with a contractual duty of subjective good faith").  This holding does not apply here.  There is no similar language in the LPA, nor is any such provision at issue.  Rather, because

the LPA does not permit competition by Strand or its affiliates that is undertaken ***in bad faith***, it cannot and does not foreclose a tortious interference claim where such bad faith conduct deprives HCMLP of its business relationships. The Complaint's allegations of bad faith, independently tortious conduct are sufficient to state a claim for tortious interference.

## L.    THE COMPLAINT'S CLAIMS FOR CONVERSION ARE ADEQUATELY PLED

182.    In order to state a claim for conversion, a plaintiff must allege that: (i) the plaintiff owned or had possession of the property or entitlement to possession; (ii) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (iii) the defendant refused a demand for return of the property; and, (iv) damages. *See, e.g.*, *Murphy Oil USA, Inc. v. Love's Travel Stops & Country Stores, Inc.*, 2021 WL 824647, at *3 (N.D. Tex. Mar. 3, 2021), *aff'd*, 2022 WL 796179 (5th Cir. Mar. 15, 2022); *Gibson v. Wells Fargo Bank, N.A.*, 2016 WL 11755377, at *3 (N.D. Tex. June 9, 2016). A demand and refusal is not strictly required when the defendant's conduct manifests a clear repudiation of the plaintiff's rights or otherwise clearly establishes a conversion. *See, e.g., HHH Farms, L.L.C. v. Fannin Bank*, 2022 WL 175967, at *22 (Tex. App.—Texarkana Jan. 20, 2022, pet. filed), *reconsideration denied* (Mar. 1, 2022), *reh'g denied* (Mar. 1, 2022). When the allegedly converted chattel is money, Texas law requires that the money: "(1) was delivered to the defendant for safekeeping, (2) was intended to be kept segregated, (3) was substantially in the form in which it was received or intact, and (4) was not the subject of a title claim by the defendant." *In re Okedokun*, 968 F.3d 378, 392 (5th Cir. 2020). The Complaint satisfies all of these elements.[50]

---

[50] If the Court concludes that any element of the Trustee's conversion claim is insufficiently pled, the Trustee respectfully requests that the Court treat the claim as one for statutory theft under the Texas Theft Liability Act, or grant the Trustee leave to replead such a claim. *Cf. Rotstain v.*

183.    In support of his claims for conversion against Dondero and Ellington (Count XXV), the Trustee alleges that:  (i) HCMLP gained possession of the relevant property, the cash proceeds from a real property sale by HE Capital 232, an entity in which HCMLP had a 97.5% stake (Compl. ¶ 163); (ii) Dondero and Ellington unlawfully and without authorization assumed and exercised control over the property to the exclusion of HCMLP's rights as an owner, by improperly directing HCMLP's agent Wick Phillips to disburse over $2 million to a Cayman Islands entity owned by Ellington and Dondero (*id.* ¶ 165); (iii) Dondero and Ellington refused a demand for return of the property, with Ellington misrepresenting to an HCMLP employee that the funds were "additional cost[s] of sale, reducing the gain," and had been "used to pay various legal expenses and other closing costs" (*id.* ¶ 166); and (iv) HCMLP suffered damages as a result (*id.* ¶ 164).

184.    Dondero asserts that the Trustee's conversion claim against him should be dismissed because the Complaint fails to allege that (i) Dondero "unlawfully and without

---

*Trustmark Nat'l Bank*, 2022 WL 179609, at *3 (N.D. Tex. Jan. 20, 2022) (failure to identify a specific legal theory in an initial pleading is not fatal, so long as factual allegations sufficient to support the later-identified claim are included); *Williams v. Aire Serv, LLC*, 2019 WL 13150027, at *3-4 (W.D. Tex. July 25, 2019) (factual allegations were sufficient to state claim under vicarious liability theory, despite never using the word "agent" that would traditionally invoke such a theory); *see Murphy Oil USA, Inc. v. Love's Travel Stops & Country Stores, Inc.*, 2021 WL 824647, at *3 (N.D. Tex. Mar. 3, 2021), *aff'd*, 2022 WL 796179 (5th Cir. Mar. 15, 2022); Tex. Civ. Prac. & Rem. Code § 134.005 (Under the Act, "a person who has sustained damages resulting from theft may recover . . . from a person who commits theft, the amount of actual damages found by the trier of fact and, in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1,000 . . . ."). Under the Texas civil theft statute, "'theft' means unlawfully appropriating property or unlawfully obtaining services," as set out in the Texas Penal Code. *In re Sherali*, 490 B.R. 104, 120 (Bankr. N.D. Tex. 2013) ("A person commits an offense if he unlawfully appropriates property with the intent to deprive the owner of that property. Appropriation of property is unlawful if it is without the owner's effective consent.") (citing Tex. Penal Code § 31.03(a)). The allegations pled in support of the Trustee's conversion claim plainly also support such a claim, as the Trustee already asserts that Dondero and Ellington appropriated HCMLP's property without HCMLP's consent and with the intent to deprive HCMLP of those funds.

authorization assumed and exercised control over the property" in question, (ii) the funds were delivered to him for safekeeping, or (iii) the funds can be traced. Dondero Defs. Br. at 23-24. The Dondero Defendants' arguments should be rejected.

185.    First, the Complaint alleges that Dondero unlawfully exercised control over HCMLP property by directing HCMLP's agent, the Wick Phillips firm, to send $2 million in proceeds from the sale of real property belonging to HCMLP first to MaplesFS and then to Grey Royale, a Cayman Islands entity owned and controlled by Dondero and Ellington that was not related to the real estate transaction and was not entitled to the proceeds. Compl. ¶ 165. Directing HCMLP's law firm to transfer its funds to an offshore account held by an entity owned by Dondero and Ellington is plainly an exercise of control over the funds that is contrary to HCMLP's rights. The allegations make clear that the transfer placed the funds out of HCMLP's reach, for the benefit of Dondero and Ellington, and are sufficient to show unlawful and unauthorized control over HCMLP's property.

186.    Second, the Complaint alleges that the money was delivered to Dondero and Ellington for safekeeping prior to its diversion. *Id.* ¶¶ 163-64. Dondero's and Elington's control over these funds is obvious, given that they were able to direct the transfer from the Wick Phillips escrow account to offshore accounts held by entities owned and controlled by them. The funds were thus "delivered to [Dondero and Ellington] for safekeeping" even though they did not have physical possession of them. And Dondero and Ellington abused their obligation to ensure the safekeeping of the funds, by diverting them from HCMLP for their own personal benefit.

187.    Third, the Complaint sufficiently pleads the funds at issue in order for them to be traceable. The Complaint states the amount of the converted funds down to the cent: $2,977,245.15; the payment intermediary: MaplesFS; and the entity that received the funds: Grey

Royale Ltd. *Id.* ¶¶ 164-65. Thus, the Trustee has sufficient information to locate the funds and, with the support of discovery into the accounts of Grey Royale Ltd, to trace them to the HCMLP funds that Wick Phillips transferred at the direction of Dondero and Ellington. *Id.*

188.   Dondero seems to suggest that his moving the funds out of reach to the Cayman Islands *per se* makes them untraceable. Dondero Defs. Br. at 24. Leaving aside the brazenness of that argument, it is false—at least one court has already found Cayman Island accounts to be traceable to defendants in Texas. *United States v. Garcia Abrego*, 141 F.3d 142, 180 (5th Cir. 1998) (funds in Swiss and Cayman accounts were traceable to defendants in McAllen, Texas). And recent Cayman Islands judicial decisions make tracing funds stolen by fiduciaries easier. *See AHAB v. SAAD*, CICA Civil Appeal No.: 15 of 2018 (21 December 2021). The Trustee can and will find the funds that Dondero and Ellington stole from HCMLP, and the Court should permit him to proceed to do so, and to recover them for the benefit of HCMLP's creditors.

## M.   THE CLO HOLDCO DEFENDANTS' MOTION FOR A MORE DEFINITIVE STATEMENT SHOULD BE DENIED BECAUSE THE CLAIMS AGAINST THEM ARE SUFFICIENTLY PLED

189.   The CLO Holdco Defendants seek a more definitive statement regarding the CLO Holdco Transfer claims, arguing that: (i) the Complaint fails to allege the value of the Dugaboy Note that HCMLP received in exchange for the assets it transferred to the CLO Holdco Defendants; (ii) the Complaint alleges that one of the motivations for the CLO Holdco Transfer was to move assets held by Get Good beyond the reach of Dondero's wife, which implies that the Dugaboy Note had value; (iii) the Complaint alleges that the Redeemer Committee was always likely to prevail in the Redeemer Committee Arbitration, which means that the Crusader Fund interests that HCMLP transferred to CLO Holdco had no value. CLO Holdco Defs. Br. ¶¶ 50-61. None of these arguments has merit.

190.    A motion for a more definitive statement under Rule 12(e) should be granted only when the pleading is "so vague or ambiguous that a party cannot reasonably prepare a response." *Philips N. Am. LLC v. Image Tech. Consulting LLC*, 2022 WL 2972226, at *3 (N.D. Tex. July 26, 2022) (citing Fed. R. Civ. P. 12(e)).    Motions for a more definitive statement are disfavored, particularly when the matter can be clarified through the discovery process.    *Mendez v. Semi Express, LLC*, 2022 WL 1138148, at *1-2 (S.D. Tex. Apr. 18, 2022).    A more definite statement should be ordered only when a complaint is "unintelligible," rather than simply lacking in detail. *Id.* at *1.    If the defendant is able to form a responsive pleading, the complaint is sufficient and a more definite statement is not necessary.    *Black v. Experian Info. Sols., Inc.*, 2022 WL 2305778, at *2 (S.D. Tex. June 27, 2022); *see also Liberty Ins. Corp. v. Omni Constr. Co., Inc.*, 2022 WL 2373734, at *2 (S.D. Tex. June 9, 2022), *report and recommendation adopted*, 2022 WL 2359643 (S.D. Tex. June 29, 2022).    Further, if a complaint is sufficient to survive a motion to dismiss, Rule 12(e) should not be used to require a plaintiff to amend.    *Philips*, 2022 WL 2972226, at *3 (citing *Mitchell v. E-Z Way Towers, Inc.*, 269 F.2d 126, 132 (5th Cir. 1959)).

191.    The CLO Holdco Defendants' motion comes nowhere near meeting this standard. Rather, the CLO Holdco Defendants' characterizations of the Trustee's allegations show that they understand perfectly well what the allegations are and can reasonably prepare a response.    Their arguments that the CLO Holdco Transfer claims are nonviable raise factual issues that are inappropriate to determine at this stage, and can be rebutted by the Trustee in any event; but they also show that a response is certainly possible, and thus a more definitive statement is unwarranted.

192.    Indeed, the precise value of the Dugaboy Note need not be determined at this stage, given the Complaint's express allegation that "the value of the Dugaboy Note did not come close to the value of the Transferred CLO Holdco Assets" due to its "paltry" interest rate and lack of

lender protection.  Compl. ¶ 134.  Additionally, the fact that Dondero transferred the Dugaboy Note from Get Good to HCMLP in part to place assets beyond his wife's reach does not show that the Dugaboy Note had value, because as long as Dondero controlled the party that held the Dugaboy Note, he could control whether or not the note was repaid.  Conversely, if the note was held by Dondero's ex-wife, Dondero could not control whether the note would be enforced.  And finally, the Redeemer Committee sought damages against HCMLP on account of the transfer of the Crusader Funds' interests to HCMLP.  *Id.* ¶¶ 88-92, 101.  Thus, it was not clear, at the time that Dondero transferred the Crusader Funds Interests from HCMLP to the CLO Holdco Defendants, that those interests would be cancelled.  If the arbitration panel had instead ordered HCMLP to pay damages on account of that transfer, Dondero could have continued depleting assets out of HCMLP to avoid the judgment, while still obtaining the benefit of the Crusader Fund's interests transferred to the CLO Holdco Defendants.

193.    All of these factual disputes are for another day, and their existence does not warrant an order requiring a more definitive statement.

### III.    CONCLUSION

194.    For the foregoing reasons, the Trustee respectfully requests that the Motions to Dismiss and Motion for a More Definitive Statement be denied in their entirety.  The Trustee further respectfully requests such further relief as to which he may be justly entitled.

Dated: September 19, 2022

Respectfully submitted,

SIDLEY AUSTIN LLP
/s/ *Paige Holden Montgomery*
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Kate Scherling (admitted *pro hac vice*)
Anna Deknatel (*pro hac vice* application
pending)
Aaron M. Lawrence (*pro hac vice* application
pending)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone:  (212) 849-7000

*Counsel for Marc S. Kirschner, as Litigation
Trustee of the Highland Litigation Sub-Trust*

112

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies, that on this 19th day of September 2022, the undersigned caused to be served a true and correct copy of the *Litigation Trustee's Response in Opposition to Defendants' Motions to Dismiss*, by electronically filing it with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

/s/ *Paige Holden Montgomery*
Paige Holden Montgomery