**QUINN EMANUEL URQUHART & SULLIVAN LLP**  **SIDLEY AUSTIN LLP**
Deborah J. Newman (admitted *pro hac vice*)       Paige Holden Montgomery
Robert S. Loigman (admitted *pro hac vice*)       Juliana L. Hoffman
Calli Ray (admitted *pro hac vice*)               2021 McKinney Avenue
Anna Deknatel (*pro hac vice* pending)            Suite 2000
Aaron M. Lawrence (*pro hac vice* pending)        Dallas, Texas 75201
51 Madison Avenue, 22nd Floor                     Telephone: (214) 981-3300
New York, NY 10010
Telephone:  (212) 849-7000

*Counsel for Marc S. Kirschner, as Litigation*
*Trustee of the Highland Litigation Sub-Trust*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST, | |
| Plaintiff, | |
| v. | |
| JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA | Adv. Pro. No. 21-03076-sgj |

---

[1]   The last four digits of the Reorganized Debtor's taxpayer identification number are (8357).  The Reorganized Debtor is a Delaware limited partnership.  The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.

i

OKADA FAMILY TRUST – EXEMPT TRUST
#2 AND LAWRENCE TONOMURA IN HIS
CAPACITY AS TRUSTEE OF MARK &
PAMELA OKADA FAMILY TRUST –
EXEMPT TRUST #2; CLO HOLDCO, LTD.;
CHARITABLE DAF HOLDCO, LTD.;
CHARITABLE DAF FUND, LP.; HIGHLAND
DALLAS FOUNDATION; RAND PE FUND I,
LP, SERIES 1; MASSAND CAPITAL, LLC;
MASSAND CAPITAL, INC.; AND SAS ASSET
RECOVERY, LTD.,

        Defendants.

## APPENDIX IN SUPPORT OF
## THE LITIGATION TRUSTEE'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTIONS TO DISMISS AND THE CLO HOLDCO DEFENDANTS'
## MOTION FOR A MORE DEFINITIVE STATEMENT

Marc S. Kirschner, the above-captioned Plaintiff, through his undersigned counsel,

hereby files this Appendix in support of his Opposition to the Motions.

| Exhibit | Description | Appendix Pages |
|---|---|---|
| A | Declaration of Deborah Newman, dated September 19, 2022 | 1-4 |
| A-1 | Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015 | 5-41 |
| A-2 | Transcript from August 8, 2022 hearing in the matter of *UBS Secs. LLC v. Highland Capital Mgmt., L.P.*, Adv. Pro. 21-03020-sgj (N.D. Tex. Aug. 10, 2022) [Dkt. No. 183]. | 42-175 |
| A-3 | Assignment Agreement between Claimant Trust and Litigation Sub-Trust, executed as of October 8, 2021. | 176-178 |

Dated: September 19, 2022

Respectfully submitted,

SIDLEY AUSTIN LLP
/s/ *Paige Holden Montgomery*
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Kate Scherling (admitted *pro hac vice*)
Anna Deknatel (*pro hac vice* pending)
Aaron M. Lawrence (*pro hac vice* pending)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone:  (212) 849-7000

*Counsel for Marc S. Kirschner, as Litigation
Trustee of the Highland Litigation Sub-Trust*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies, that on this 19th day of September 2022, the

undersigned caused to be served a true and correct copy of the foregoing by electronically filing

it with the Court using the CM/ECF system, which sent notification to all parties of interest

participating in the CM/ECF system.

/s/ *Paige Holden Montgomery*
Paige Holden Montgomery

**<u>Exhibit A</u>**

**QUINN EMANUEL URQUHART & SULLIVAN LLP**     **SIDLEY AUSTIN LLP**
Deborah J. Newman (admitted *pro hac vice*)        Paige Holden Montgomery
Robert S. Loigman (admitted *pro hac vice*)        Juliana L. Hoffman
Calli Ray (admitted *pro hac vice*)                2021 McKinney Avenue
Anna Deknatel (admitted *pro hac vice*)            Suite 2000
Aaron Lawrence (admitted *pro hac vice*)           Dallas, Texas 75201
51 Madison Avenue, 22nd Floor                      Telephone: (214) 981-3300
New York, NY 10010
Telephone:  (212) 849-7000

*Counsel for Marc S. Kirschner, as Litigation*
*Trustee of the Highland Litigation Sub-Trust*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[2] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST, | |
| Plaintiff, | |
| v. | |
| JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA | Adv. Pro. No. 21-03076-sgj |

---

[2]    The last four digits of the Reorganized Debtor's taxpayer identification number are (8357).  The Reorganized Debtor is a Delaware limited partnership.  The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.

2

OKADA FAMILY TRUST – EXEMPT TRUST
#2 AND LAWRENCE TONOMURA IN HIS
CAPACITY AS TRUSTEE OF MARK &
PAMELA OKADA FAMILY TRUST –
EXEMPT TRUST #2; CLO HOLDCO, LTD.;
CHARITABLE DAF HOLDCO, LTD.;
CHARITABLE DAF FUND, LP.; HIGHLAND
DALLAS FOUNDATION; RAND PE FUND I,
LP, SERIES 1; MASSAND CAPITAL, LLC;
MASSAND CAPITAL, INC.; AND SAS ASSET
RECOVERY, LTD.,

                    Defendants.

**DECLARATION OF DEBORAH J. NEWMAN IN SUPPORT OF PLAINTIFF MARC
KIRSCHNER'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND
MOTION FOR A MORE DEFINITE STATEMENT**

Deborah J. Newman, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declares

as follows:

1.     I am a member of the law firm of Quinn Emanuel Urquhart & Sullivan LLP,

counsel to Plaintiff Marc Kirschner, as Litigation Trustee of the Litigation Sub-Trust, created

under Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization. I submit

this Declaration in support of *Plaintiff's Opposition to Defendants' Motions to Dismiss and

Motion for a More Definite Statement*, which is being filed concurrently with this Declaration. I

submit this Declaration based on my personal knowledge and the documents listed below.

2.     Attached as **Exhibit A-1** is a true and correct copy of the Fourth Amended and

Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated

December 24, 2015.

3.     Attached as **Exhibit A-2** is a true and correct copy of the transcript from the

August 8, 2022 hearing in the matter of *UBS Secs. LLC v. Highland Capital Mgmt., L.P.*, Adv.

Pro. 21-03020-sgj (N.D. Tex. Aug. 10, 2022) [Dkt. No. 183].

3

4.      Attached as **Exhibit A-3** is a true and correct copy of the Assignment Agreement

between the Claimant Trust and the Litigation Sub-Trust, executed as of October 8, 2021.

/s/ *Deborah J. Newman*
Deborah J. Newman

**<u>Exhibit A-1</u>**

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

<u>TABLE OF CONTENTS</u>

ARTICLE 1   GENERAL ...........................................................................................................1
   1.1.   Continuation ...............................................................................................................1
   1.2.   Name ...........................................................................................................................1
   1.3.   Purpose .......................................................................................................................1
   1.4.   Term ............................................................................................................................1
   1.5.   Partnership Offices; Addresses of Partners ...............................................................1

ARTICLE 2   DEFINITIONS ...................................................................................................2
   2.1.   Definitions ..................................................................................................................2
   2.2.   Other Definitions .......................................................................................................6

ARTICLE 3   FINANCIAL MATTERS ...................................................................................6
   3.1.   Capital Contributions .................................................................................................6
   3.2.   Allocations of Profits and Losses ..............................................................................8
   3.3.   Allocations on Transfers ............................................................................................9
   3.4.   Special Allocations .....................................................................................................9
   3.5.   Curative Allocations .................................................................................................10
   3.6.   Code Section 704(c) Allocations .............................................................................10
   3.7.   Capital Accounts ......................................................................................................11
   3.8.   Distributive Share for Tax Purpose .........................................................................12
   3.9.   Distributions .............................................................................................................12
   3.10.  Compensation and Reimbursement of General Partner ...........................................14
   3.11.  Books, Records, Accounting, and Reports ...............................................................14
   3.12.  Tax Matters ..............................................................................................................14

ARTICLE 4   RIGHTS AND OBLIGATIONS OF PARTNERS ..........................................15
   4.1.   Rights and Obligations of the General Partner ........................................................15
   4.2.   Rights and Obligations of Limited Partners .............................................................19
   4.3.   Transfer of Partnership Interests ..............................................................................19
   4.4.   Issuances of Partnership Interests to New and Existing Partners .............................21
   4.5.   Withdrawal of General Partner .................................................................................21
   4.6.   Admission of Substitute Limited Partners and Successor General Partner ...............21

ARTICLE 5   DISSOLUTION AND WINDING UP ..............................................................22
   5.1.   Dissolution ...............................................................................................................22
   5.2.   Continuation of the Partnership ...............................................................................23
   5.3.   Liquidation ...............................................................................................................23
   5.4.   Distribution in Kind .................................................................................................24
   5.5.   Cancellation of Certificate of Limited Partnership ..................................................24
   5.6.   Return of Capital ......................................................................................................24
   5.7.   Waiver of Partition ...................................................................................................24

ARTICLE 6   GENERAL PROVISIONS ...............................................................................24
   6.1.   Amendments to Agreement ......................................................................................24

i

6.2.    Addresses and Notices ................................................................................................25
6.3.    Titles and Captions......................................................................................................25
6.4.    Pronouns and Plurals...................................................................................................25
6.5.    Further Action .............................................................................................................25
6.6.    Binding Effect .............................................................................................................25
6.7.    Integration ...................................................................................................................25
6.8.    Creditors ......................................................................................................................25
6.9.    Waiver..........................................................................................................................25
6.10.   Counterparts ................................................................................................................25
6.11.   Applicable Law ...........................................................................................................25
6.12.   Invalidity of Provisions ..............................................................................................25
6.13.   Mandatory Arbitration.................................................................................................26

ii

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.    Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act.  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    Partnership Offices**.**  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate**.**  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate**.**  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners**.**  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201**.**  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership.  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

# ARTICLE 2

## DEFINITIONS

**2.1.    Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in <u>Section 3.1(b)</u> of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to <u>Section 3.7</u> and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to <u>Section 3.7(a)</u>.

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

*"Class B Limited Partner"* means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

*"Class B Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

*"Class B NAV Ratio Trigger Period"* means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

*"Class C Limited Partner"* means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

*"Class C Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

*"Class C NAV Ratio Trigger Period"* means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

*"Code"* means the Internal Revenue Code of 1986, as amended and in effect from time to time.

*"Contribution Note"* means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

*"Default Loan"* has the meaning set forth in Section 3.1(c)(i).

*"Defaulting Partner"* has the meaning set forth in Section 3.1(c).

*"Delaware Act"* means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

*"Effective Date"* means the date first recited above.

*"Fiscal Year"* has the meaning set forth in Section 3.11(b).

3

**11**

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse* Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

4

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

5

**13**

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

2.2.    **Other Definitions**.  All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

### ARTICLE 3

### FINANCIAL MATTERS

3.1.    **Capital Contributions**.

(a)    Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

(i)        The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)        Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)        Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one one of the option set forth below.

(i)        Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

        (ii)    <u>Reduction of Percentage Interest</u>.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

    **3.2.**    **Allocations of Profits and Losses**.

        (a)    <u>Allocations of Profits</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

        (i)    <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

        (ii)    <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

        (iii)    <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

        (b)    <u>Allocations of Losses</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

        (i)    <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

        (ii)    <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

        (iii)    <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

8

(c)     <u>Limitation on Loss Allocations</u>.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.     Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.     Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)     <u>Partnership Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this <u>Article 3</u>, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This <u>Section 3.4(a)</u> is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)     <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this <u>Article 3</u> (other than <u>Section 3.4(a)</u>), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This <u>Section 3.4(b)</u> is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)     <u>Qualified Income Offset</u>.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(c)</u> shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering this <u>Section 3.4(c)</u>.

(d)     <u>Gross Income Allocation</u>.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(d)</u> shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

(e)    Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)    Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)    Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

3.5.    Curative Allocations.  The "*Basic Regulatory Allocations*" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

3.6.    Code Section 704(c) Allocations.  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

10

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

**3.7.    Capital Accounts**.

(a)    <u>Maintenance of Capital Accounts</u>.  The Partnership shall establish and maintain a separate capital account (*"Capital Account"*) for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i)    The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii)    The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)    <u>Negative Capital Accounts</u>.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)    <u>Interest</u>.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)    <u>No Withdrawal</u>.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e)    <u>Loans From Partners</u>.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)    <u>Revaluations</u>.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

**3.8.    Distributive Share for Tax Purpose.** All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion. Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.    Distributions**.

(a)    <u>General</u>.   The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f). The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners. Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    <u>Priority Distributions</u>.   Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

(iii)     No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)     No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)     <u>Tax Distributions</u>.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such  Partners (a "**_Tax Distribution_**").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under <u>Section 3.9(b)</u>.

(d)     <u>Payments Not Deemed Distributions</u>.   Any amounts paid pursuant to <u>Sections 4.1(e)</u> or <u>4.1(h)</u> shall not be deemed to be distributions for purposes of this Agreement.

(e)     <u>Withheld Amounts</u>.  Notwithstanding any other provision of this <u>Section 3.9</u> to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.  To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this <u>Section 3.9(d)</u> shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)     <u>Special Tax Distributions</u>.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)     <u>Tolling of Priority Distributions</u>.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under <u>Section 3.9(b)</u>, to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

**3.10.   Compensation and Reimbursement of General Partner**.

(a)   Compensation.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)   Reimbursement for Expenses.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

**3.11.   Books, Records, Accounting, and Reports**.

(a)   Records and Accounting.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)   Fiscal Year.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)   Other Information.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)   Distribution Reporting to Class B Limited Partner and Class C Limited Partner. Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

**3.12.   Tax Matters**.

(a)   Tax Returns.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion.  The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)    Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)    Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)    Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.    Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)    Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hypothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)  <u>Certificate of Limited Partnership</u>.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)  <u>Reliance by Third Parties</u>.  Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially**.**  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing**.**  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence**.**  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)  <u>Partnership Funds</u>**.**  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner**.**  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership**.**  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

(e)     Loans to or from General Partner: Contracts with Affiliates; Joint Ventures.

(i)     The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; provided, however, the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

(ii)     The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

(iii)     The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

(f)     Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

(g)     Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

(h)     Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

17

the "**GP Party**"*)*, against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

      (i)     Liability of General Partner.

          (i)     Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

          (ii)     The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

      (j)     Reliance by General Partner.

          (i)     The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

          (ii)     The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

      (k)     The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

18

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

     **4.2.**    **Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

     (a)    <u>Limitation of Liability</u>. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

     (b)    <u>Management of Business</u>. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

     (c)    <u>Return of Capital</u>. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

     (d)    <u>Second Amended Buy-Sell and Redemption Agreement</u>. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

     (e)    <u>Default on Priority Distributions</u>. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; <u>provided</u>, <u>however</u>, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>. In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

     **4.3.**    **Transfer of Partnership Interests**.

     (a)    <u>Transfer</u>. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

(b)    Transfers by General Partner.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)    Transfers by Limited Partners.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)    Distributions and Allocations in Respect of Transferred Partnership Interests.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; *provided, however,* if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)    Forfeiture of Partnership Interests Pursuant to the Contribution Note.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)    Transfers of Partnership Interests Pursuant to the Purchase Notes.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

**4.4.** **Issuances of Partnership Interests to New and Existing Partners.**

(a) Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b) Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

**4.5.** **Withdrawal of General Partner**

(a) Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "*Departing Partner*") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b) Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

**4.6.** **Admission of Substitute Limited Partners and Successor General Partner.**

(a) Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "*Substitute Limited Partner*"),

21

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.  Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)      Admission of Successor General Partner.  A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)      Action by General Partner.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

### DISSOLUTION AND WINDING UP

**5.1.      Dissolution.**  The Partnership shall be dissolved upon:

(a)      The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)      An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)      Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in <u>Section 5.1(a)</u>, the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in <u>Section 5.1(a)</u>, then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this <u>Article 5</u>;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under <u>Section 5.2</u>, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in <u>Section 5.1</u>), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this <u>Article 5</u>, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

(a)    To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)    To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)    To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)    To the Partners in proportion to their respective Percentage Interests.

5.4.    **Distribution in Kind.**  Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time.  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

5.5.    **Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

5.6.    **Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

5.7.    **Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

## ARTICLE 6

## GENERAL PROVISIONS

6.1.    **Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2.    Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3.    Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement.  All Exhibits hereto are incorporated herein by reference.

**6.4.    Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5.    Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6.    Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7.    Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8.    Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9.    Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10.    Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11.    Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12.    Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

25

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

    **6.13.**   **General Partner Discretion.**   Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

    **6.14.**   **Mandatory Arbitration.**   In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules. All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

26

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

27

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:      Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:      Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:      Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:     President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

## EXHIBIT A

| | Percentage Interest | |
|---|---|---|
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

**EXHIBIT B**

**ADDENDUM
TO THE
FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

       IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____

       Name: _____

       Title:   _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

**Exhibit A-2**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3   In Re:                         )    Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )    Dallas, Texas
     MANAGEMENT, L.P.,              )    Monday, August 8, 2022
 5                                  )    9:30 a.m. Docket
              Debtor.               )
 6   _____)
                                    )
 7   UBS SECURITIES, LLC, et.       )    Adversary Proceeding 21-3020-sgj
     al.,                           )
 8                                  )    HIGHLAND CAPITAL MANAGEMENT,
              Plaintiffs,           )    L.P.'S MOTION TO WITHDRAW ITS
 9                                  )    ANSWER AND CONSENT TO JUDGMENT
     v.                             )    FOR PERMANENT INJUNCTIVE
10                                  )    RELIEF [169]
     HIGHLAND CAPITAL               )
11   MANAGEMENT, LP,                )
                                    )
12            Defendant.            )
     _____)
13
                        TRANSCRIPT OF PROCEEDINGS
14            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
15
     APPEARANCES:
16
     For Plaintiff UBS          Andrew Clubok
17   Securities, LLC:           Shannon Elizabeth McLaughlin
                                LATHAM & WATKINS, LLP
18                              555 Eleventh Street, NW,
                                  Suite 1000
19                              Washington, DC  20004-1304
                                (202) 637-2335
20
     For Plaintiff UBS          Kathryn (Katie) George
21   Securities, LLC:           LATHAM & WATKINS, LLP
                                330 North Wabash Avenue,
22                                Suite 2800
                                Chicago, IL  60611
23                              (312) 876-6567

24

25
```

**43**

2

```
 1   APPEARANCES, cont'd.:

 2   For the Defendant:          John Morris
                                 Gregory V. Demo
 3                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
 4                               New York, NY  10017-2024
                                 (212) 561-7700
 5
     For the Defendant:          Jeffrey Nathan Pomerantz
 6                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Blvd.,
 7                                 13th Floor
                                 Los Angeles, CA  90067-4003
 8                               (310) 277-6910

 9   For Former Employees:       Eric A. Soderlund
                                 ROSS & SMITH, P.C.
10                               Plaza of the Americas
                                 700 N. Pearl Street, Suite 1610
11                               Dallas, TX  75201
                                 (214) 377-7879
12
     Recorded by:                Caitlynne Smith
13                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
14                               Dallas, TX  75242
                                 (214) 753-2088
15
     Transcribed by:             Kathy Rehling
16                               311 Paradise Cove
                                 Shady Shores, TX  76208
17                               (972) 786-3063

18

19

20

21

22

23

24

25        Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.
```

44

3

1         DALLAS, TEXAS - AUGUST 8, 2022 - 9:47 A.M.

2      THE COURT:  21-3020.  Mr. Clubok, I saw you out there

3 earlier.  Are you appearing for UBS?

4      MR. CLUBOK:  Yes.  Good morning, Your Honor.  Andrew

5 Clubok; Latham & Watkins; on behalf of UBS.  And I'm here also

6 with my colleagues Kathryn George and Shannon McLaughlin.

7      THE COURT:  Okay.  Thank you.

8    All right.  For the Debtor, Mr. Morris, are you appearing?

9      MR. MORRIS:  Yes.  Good morning, Your Honor.  John

10 Morris; Pachulski Stang Ziehl & Jones.  I'm joined by my

11 colleagues Jeffrey Pomerantz and Greg Demo for the reorganized

12 Highland Capital Management, LP.  And we have today with us

13 Mr. Seery, who will present some live testimony today.

14      THE COURT:  Okay.  Good morning to all.

15    All right.  The Committee was an intervenor, I believe, in

16 this adversary.  Is there any appearance by the Committee?  Or

17 I should -- well, --

18      MR. MORRIS:  I think that was before the effective

19 date, Your Honor.

20      THE COURT:  That was --

21      MR. MORRIS:  Yeah.

22      THE COURT:  I guess we have no Committee anymore.

23 The Liquidating Trustee.  I don't know if the Liquidating

24 Trustee stepped in the shoes of the Committee.

25    (No response.)

4

1           THE COURT:  Okay.  Anybody I've missed?

2           MR. SODERLUND:  Your Honor, this is -- good morning,

3    Your Honor.  This is Eric Soderlund with Ross & Smith.  We

4    represent nonparties to this adversary:  Scott Ellington,

5    Isaac Leventon, Katie Lucas, J.P. Sevilla, Matt DiOrio, and

6    Stephanie Vitiello.  We're just monitoring the hearing, but I

7    did want to make an appearance and let the Court know we're

8    here.

9           THE COURT:  Okay.  Thank you.

10       All right.  Well, if there are no other appearances, Mr.

11   Clubok, you may proceed.

12          MR. CLUBOK:  Thank you, Your Honor.  Technically, I

13   think --

14          THE COURT:  Oh, actually, let me -- it's Highland's

15   motion to withdraw --

16          MR. CLUBOK:  Yeah.

17          THE COURT:  -- its answer, so I was thinking

18   Plaintiff go first, but actually it makes more sense for

19   Highland to go first.  So, go ahead.

20          MR. CLUBOK:  Yes.

21          MR. MORRIS:  Thank you, Your Honor.  Again, John

22   Morris from Pachulski Stang for Highland.

23       We're here today on Highland's motion to withdraw its

24   answer and to consent to the judgment that has been requested

25   by UBS.

5

1      We thought it was very important, Your Honor, to create an

2   evidentiary record to enable the Court to rule on that motion.

3      As Your Honor will recall, at the time this adversary

4   proceeding was commenced, Highland had just recently

5   discovered and had shared with UBS certain facts that it had

6   identified with respect to the transfer of certain assets that

7   appeared to belong to entities against which UBS had obtained

8   a judgment.

9      And at the time the action was commenced, the Reorganized

10  Debtor -- I guess at that time it was really still the Debtor

11  -- did not feel that it had sufficient personal knowledge in

12  order to address the merits of the allegations that were made.

13  And so we specifically told the Court and all parties in

14  interest that we felt we needed a fulsome evidentiary record.

15  And having concluded that, Mr. Seery on behalf of the

16  Reorganized Debtor seeks to terminate this litigation and

17  confess to judgment.

18      I've got a brief opening statement that I'd like to make,

19  but before I do that, Your Honor, there has been one

20  meaningful development since we last met with the Court that

21  I'm going to defer to Mr. Clubok to report at this time.

22          THE COURT:  All right.  Mr. Clubok?

23          MR. CLUBOK:  Yes, Your Honor.  Sometimes we --

24  development is a euphemism for something bad, but in this case

25  it's something good.  And that is we, on Friday morning,

6

1   reached a memorandum of understanding with Sentinel that we

2   believe will ultimately result in several papers that we will

3   be -- that will be submitted to the Court I believe through

4   the 9019 process, hopefully in a matter of weeks.

5       Now, that's going to resolve a large portion of what we're

6   doing here today, but really it sort of highlights the fact

7   that what UBS has always wanted in this proceeding is for the

8   Court to issue a permanent injunction so that all of these

9   assets are frozen, the ones we know about now and probably the

10  ones we keep finding.  Every time we turn around, we find a

11  new one.  By permanent, we mean until a court orders the

12  disposition through a proceeding or pursuant to a settlement.

13      So this new news from Friday is good, and it really sets

14  the table for this proceeding so that we can do this once and

15  for all, ideally, where the Court hopefully agrees with what

16  apparently Highland agrees, there should be an injunction,

17  that we've met the standard, assuming we can present the

18  evidence to you.  And I would note that public interest is a

19  factor, too, so that's another reason why we just want to make

20  sure we have a full evidentiary record.

21      We will not then need to repeat this record, we can then

22  use the same record and refer to it for the expected 9019

23  process, and we can be very efficient.

24      Also, in light of that and in light of other stipulations

25  we've reached, I just wanted to advise the Court we do think

7

1  we can have a relatively streamlined process here.  For

2  example, I am going to defer my opening statement and just let

3  Mr. Morris make his opening statement and his presentation,

4  and I'll defer until the back half.

5     We've also agreed to stipulate to I believe all of the

6  exhibits on each other's lists.  If Your Honor would like me

7  to specifically read out the numbers, I can do that for

8  housekeeping.  If it's more convenient, just very quickly I

9  can identify the exhibits, at least on UBS's list, and then

10  Mr. Morris can add his as well, so we don't have to keep doing

11  that as Mr. Seery testifies.

12          THE COURT:  All right.  Thank you for that report.

13  Let's go ahead and get the exhibits on the record before we do

14  anything else.

15     Mr. Morris, it looks like you had, at Docket No. 176,

16  Exhibits 1 through 10 designated.  Is that correct?

17          MR. MORRIS:  That's correct.  And with Mr. Seery

18  available to testify, we'd also respectfully move into

19  evidence his declaration, which can be found at Docket No.

20  170.

21          THE COURT:  All right.  So I'm hearing, Mr. Clubok,

22  no objection to that?

23          MR. CLUBOK:  No objection, Your Honor.

24          THE COURT:  So the declaration at 170, as well as the

25  10 exhibits at 176, will be admitted.

8

1      (Defendant's Exhibits 1 through 10 and the declaration of

2  James Seery are received into evidence.)

3           THE COURT:  And then turning to UBS's exhibit list,

4  UBS at Docket 177 had it looks like 41 or 42 exhibits,

5  including the declaration of Mr. Seery.  There's no objection,

6  Mr. Morris, to all of those coming in?

7           MR. CLUBOK:  Your Honor, briefly, we did file an

8  amended --

9           THE COURT:  Oh.

10          MR. CLUBOK:  -- exhibit list this morning that we

11  have -- that we have provided in advance to Mr. Morris.  It's

12  obviously not made its way to you yet.  It's Docket No. 179.

13  And we -- if you haven't gotten hard copies yet, you won't

14  need them for the purpose of this hearing, but you'll have

15  them shortly if you don't have them yet.  We have extra for

16  the relevant exhibits that we'll put up on the screen each

17  time we refer to them.

18          THE COURT:  All right.  So, are they filed on the

19  docket or did you deliver hard copies?

20          MR. CLUBOK:  Yes.  I believe both, Your Honor.  It's

21  179.  I have Docket 179.

22          THE COURT:  Okay.  I'm pulling it up.

23          MR. CLUBOK:  And the hard copies, I guess -- maybe

24  the hard copies haven't yet been delivered, but they're on

25  their way and you should get them by -- by the end of the

9

1  hearing.

2          THE COURT:  Okay.

3          MR. CLUBOK:  Or shortly thereafter.

4          THE COURT:  Bear with me.

5      (Pause.)

6          THE COURT:  Okay.  There they are.  179.  Okay.  It

7  looks like you've added some exhibits, so we're now up through

8  51 exhibits.  Is that correct?

9          MR. CLUBOK:  I believe that's right, Your Honor.  I

10  can -- just because there's a couple of gaps, maybe if it

11  would help I can just read the numbers of the ones that we

12  wish to move into -- for the record, so the record's clean,

13  I'll just read off the numbers?

14          THE COURT:  Okay.

15          MR. CLUBOK:  So, we -- UBS would like to move into

16  evidence Exhibits 1 through 12, Exhibits 14 through 23,

17  Exhibits 25 through 35, Exhibits 37 through 53.  And with the

18  one caveat being, Your Honor, that some of those exhibits are

19  deposition transcripts.  For those, we have designated the

20  portions that we'd like to move into evidence through

21  highlighting.  And you'll, if you haven't already, you'll be

22  receiving those as well.  And so it's the -- for the

23  deposition transcripts of those exhibits I just identified,

24  it's the highlighted or designated portions.

25          THE COURT:  Okay.

**51**

10

1         MR. CLUBOK:  And all this has been shared with
2    Highland.
3         THE COURT:  Very good.  And Mr. Morris, do you
4    confirm you're okay with those coming in?
5         MR. MORRIS:  I do.  I just want to make a very brief
6    note that the reason we have no objections to the exhibits
7    today isn't because we don't have views as to the evidentiary
8    rules.  We actually exchanged exhibit lists on Thursday before
9    they were filed with the Court.  Highland did object to a
10   number of exhibits that were on UBS's proposed exhibit list
11   and they withdrew them.  And so that's really the reason why
12   there is no objection today, is because we actually took the
13   time to meet and confer and to go through any evidentiary
14   concerns prior to today.
15      So, with that background, Highland has no objection.
16        THE COURT:  Okay.  So these UBS exhibits named will
17   be admitted.
18      (UBS Securities, LLC's Exhibits 1 through 12, 14 through
19   23, 25 through 35, and 37 through 53 are received into
20   evidence.)
21        THE COURT:  All right.  Well, are we ready for
22   opening statements?  Mr. Morris?
23        MR. MORRIS:  Yes, Your Honor.
24        THE COURT:  You may proceed.
25        MR. MORRIS:  Thank you very much.

11

1          OPENING STATEMENT ON BEHALF OF THE DEFENDANT

2          MR. MORRIS:  Good morning, Your Honor.  John Morris;

3  Pachulski Stang; for Highland.

4      We're here today on Highland's motion to withdraw its

5  answer and to confess to judgment.  And I want to just cover

6  certain facts that we believe will be reflected in the record

7  and to share with Your Honor certain perspectives that we

8  have.

9      The facts here I think are largely not in dispute.  They

10  concern the August 2017 transfer of assets from certain funds

11  that were under the control of James Dondero to a Cayman

12  Islands putative insurance company that was owned by Mr.

13  Dondero and Mr. Ellington.

14      The evidence will show that the funds that transferred

15  their assets to Mr. Dondero's -- at Mr. Dondero's direction

16  were defendants in a lawsuit that was brought by UBS in New

17  York and that the transfers were effectuated immediately after

18  the New York court denied the Highland entities' motion for

19  summary judgment.

20      The evidence will show that the Debtor's independent board

21  was unaware of these transfers until they were uncovered in

22  late January and early February 2021, and that the reason for

23  the transfers was unknown until that time by the independent

24  board precisely because certain former Highland employees

25  actively and intentionally worked to conceal them.

12

1        I don't have a PowerPoint presentation today, Your Honor.

2    I want to just look at three documents.  The first one is an

3    insurance policy.  And the reason for the transfers ostensibly

4    was to purchase what is called after-the-fact insurance.  And

5    what's on the screen now is Highland's Exhibit 1.  And if we

6    can go to the first page, you'll see that it's an email from

7    Isaac Leventon to someone named Chris Dunn.  It's dated

8    October 2017.  So this is just a few months after the court in

9    New York has denied summary judgment, and it follows on the

10   heels of an analysis that was prepared that I think is at UBS

11   Exhibit No. 7, an analysis of settlement options and

12   optionality following that decision.

13       Mr. Leventon attaches an insurance policy.  He labels it

14   privileged.  He says that all communications related to the

15   project are privileged.

16       You know, Your Honor, he's attaching an insurance policy.

17   I know of no basis to assert any privilege of any kind, but

18   this is the litigation team, if Your Honor will recall, that

19   was found to be subject to the crime fraud exception in

20   Delaware.  It's the team that was found by the arbitration

21   panel in Redeemer, the Redeemer arbitration, to have engaged

22   in misleading conduct.

23       Again, it's troubling to find this document.  And here's

24   the thing, Your Honor.  You may be aware that UBS took

25   numerous depositions in this case.  This particular document

13

1   wasn't uncovered -- actually, no, I'm confusing it with a

2   different document.  So this document is sent by Mr.

3   Ellington, and he attaches the insurance policy.

4       If we could go to Page 19 of 20 of the PDF, and let's just

5   see exactly what this policy is.  It's to insure certain

6   funds.  These are the funds that are the Defendants in the UBS

7   action.  The appointed representative is Paul Lackey, an

8   attorney now with the Stinson firm.  Mr. Lackey is the

9   representative here.  It's a policy that was effective as of

10  August 1, 2017.  And it specifically covers the UBS action.

11      You'll see below, Your Honor, that it's supposed to be for

12  a $100 million policy with a premium of $25,000.  $25 million.

13  So think about it.  The New York court comes out with its

14  decision.  They transfer all the assets from the Defendants

15  other than Highland to Mr. Dondero's captive insurance company

16  in the Cayman Islands.  And they don't tell anybody.

17      And if we can go to the next page, you can just see Mr.

18  Dondero's signature on behalf of the various entities.  And

19  the important point for us here, Your Honor, as the Debtors,

20  the former Debtors, the reorganized Highland, is that Highland

21  CDO Opportunity Master Fund is one of the insureds here, and

22  they're signing the document -- it's being signed by Highland

23  CDO Opportunity Fund GP, its general partner; Highland CDO

24  Opportunity GP, LLC, its general partner; and Highland Capital

25  Management, LP, its sole member.

14

1      So the acts that are being undertaken here, unbeknownst to

2    the independent board, Mr. Seery, and the postpetition

3    professionals, is that there was a transaction back in August

4    of 2017 in which the assets of the Defendants were put beyond

5    the reach of UBS.

6      The $25 million insurance payment premium was funded at

7    the same time, if we can go to Exhibit 2, with what's called a

8    purchase agreement.  This purchase agreement, you can see,

9    Your Honor, is dated as of August 7, 2017.  It's between

10   Sentinel Reinsurance and the two funds that were Defendants.

11   It is through this agreement that the funds transferred their

12   assets to Sentinel.

13     Sentinel is, I think I mentioned, a Cayman -- right, no

14   dispute about these facts -- is a Cayman Islands entity owned

15   by Mr. Dondero and Mr. Leventon.

16     And if we could go to Pages 4 and 5, we'll see again Mr.

17   Dondero signing on behalf of all of the Highland entities.

18         MR. SODERLUND:  Your Honor, this is Eric Soderlund.

19   I just want to interrupt here.  I think Mr. Morris said that

20   Sentinel was owned by Mr. Leventon.

21         THE COURT:  Actually, I heard the same --

22         MR. SODERLUND:  I don't think that's true.

23         THE COURT:  I heard the same thing.  Did you mean

24   Ellington?

25         MR. MORRIS:  Right.  Thank you.  I did mean

15

1  Ellington.

2         THE COURT:  Okay.

3         MR. MORRIS:  Thank you so much.

4         THE COURT:  Thank you.

5         MR. MORRIS:  Appreciate the clarification.  We -- I

6  do need to get this right.

7      So, you can see that Mr. Dondero is signing on behalf of

8  all of the Highland entities on Pages 4 and 5.

9      And if we can go down to Pages 7 and 8, you'll see

10 attached is a schedule.  And what's really interesting, Your

11 Honor, is that if you add up the assets that are being

12 transferred to Sentinel, they don't equal $25 million.  They

13 equal something approaching $300 million.  And there will be

14 other evidence in the record that shows the fair market value

15 at the time was over $100 million.

16     In other words, the Defendants in the UBS action, the

17 evidence, and there really can never be a dispute about this,

18 transferred what appears to be all of their assets, with a

19 value in excess of what the benefit is under the so-called

20 insurance policy.

21     Why are these issues -- we can take this down now.  Why

22 are these issues important, Your Honor?  At Mr. Dondero's

23 direction, the funds were left judgment-proof.  The only

24 assets it apparently had was this insurance policy.

25     This became critical in the spring of 2020, postpetition,

16

1   when the New York court entered judgments against the two

2   funds in amounts in excess of $500 million each.  So those

3   judgments early in 2020 were for over a billion dollars.  But

4   these transfers by these Defendants were never disclosed to

5   the board.

6       The evidence will show and Mr. Seery will testify and the

7   documents will corroborate his testimony that the transfers

8   were not only never disclosed, but that the independent board

9   relied specifically on Scott Ellington and Isaac Leventon to

10  learn about the UBS claim, to determine the defenses that the

11  Debtor asserted.  And as Your Honor will recall, in 2020 the

12  Debtor spent enormous time, money, and effort, as the Court

13  did, defending against the claims against Highland.  We took

14  -- we didn't really have an interest in the claims against

15  these two funds, but as to Highland at that point we had no

16  reason to believe that Highland had been engaged in any

17  wrongdoing, and we litigated accordingly.  That's why this is

18  all so terribly important, Your Honor.

19      The evidence will show that, at the independent board's

20  direction, the Debtor's professionals pressed the Debtor's

21  employees for information relating to the funds' assets, only

22  to be effectively stonewalled.

23      I don't want to take the time to go through all of the

24  emails, but at Exhibits 5, 6, and 7 there is evidence in the

25  record that will show the Court -- to me, it just, you know,

17

1   it jumps out -- the answers that were given, you know, to Mr.

2   Demo and DSI's dogged and persistent inquiries.  And you'll

3   see, Your Honor, that these employees did nothing but

4   obfuscate, engage in misdirection, and feign ignorance as to

5   basic matters.  We just had a judgment entered for over a

6   billion dollars, and nobody told us about the transfer of

7   these assets in 2017, or the existence of the insurance

8   policy.

9        And we think that we know why.  Because -- and this is the

10  document that we uncovered after the depositions, so nobody

11  has ever been asked about this -- but we found a document late

12  last year that's called an indemnification agreement.  It's a

13  secret indemnification agreement between these employees and

14  Sentinel, and it was dated June 18, 2020.  It is hard to think

15  of a document that could convey a consciousness of guilt more

16  than an indemnification agreement entered into weeks after the

17  New York court enters a billion-dollar judgment against

18  Defendants who have transferred all of their assets to the

19  indemnitor.  Hard to imagine.

20       Mr. Dondero does not act alone.  We've spent two years

21  talking about Mr. Dondero.  Mr. Dondero does not act alone.

22  He is assisted by a group of loyalists who do his bidding in

23  exchange for substantial compensation and protection.

24       June 2020.  At the very moment that Mr. Dondero is making

25  those $10 million of payments that he admitted to in open

18

1   court back in April, his insurance company is also

2   indemnifying Highland employees.  And the source of the

3   indemnity are the assets that have been -- that were

4   transferred in 2017 from these Defendants to Sentinel.

5        Let's look at the indemnity agreement.  It's Exhibit 9 on

6   the Debtor's exhibit list.  And you'll see, Your Honor, in

7   Exhibit 9, if we could just scroll down, you can see that it's

8   sent to an entity called SAS Asset Recovery.  You'll see in

9   the emails that I cited to earlier that Mr. Demo and DSI asked

10  numerous questions of the indemnitees, unknown to them at the

11  time, about what SAS was, and they all said they had no idea.

12  And yet this is an agreement dated June 18, 2020, on behalf of

13  Sentinel Reinsurance, where they -- where Sentinel indemnifies

14  six individuals.

15       And the language is startling, Your Honor, because while

16  Mr. Ellington has an ownership interest and Matthew DiOrio is

17  a director of Sentinel, the other signatories to this

18  indemnity agreement, to the best of our knowledge, have

19  absolutely no formal relationship with Sentinel in any way,

20  shape, or form, and yet Sentinel is thanking them for their

21  efforts, including as an agent in connection with the

22  preparation of documents and reports and, quote, other

23  activities as requested by Sentinel.

24       Postpetition, undisclosed, and it's issued at the time

25  huge payments of money are being made after the New York court

19

1   has issued its judgment and as Mr. Demo and DSI began -- begin

2   making very substantial inquiries as to the location of these

3   assets.

4       If we could go to Page 5, please.  I want the Court to be

5   aware of the names of the signatories to this indemnity

6   agreement.  We have Matthew DiOrio.  Next page.  Stephanie

7   Vitiello.  Next page.  Katie Irving.  Next page.  Isaac

8   Leventon.  Next page.  Scott Ellington.  Next page.  J.P.

9   Sevilla.

10      Your Honor, those six individuals are all over Exhibits 5,

11  6, and 7, the emails where Mr. Demo and DSI and Mr. Seery are

12  trying their hardest to find out whatever information they can

13  about SAS, Sentinel, and the assets of these two funds.  These

14  are the six people who signed the indemnity, and they're the

15  six people are responding to the inquiries with no meaningful

16  factual information.

17      The transfers and the cover-ups have substantially harmed

18  the Debtor.  The actions taken in 2017, in our view, were

19  plainly wrongful.  They left Defendants judgment-proof.  They

20  transferred assets to the Cayman Islands.  They supposedly

21  paid over a hundred million dollars for a hundred-million-

22  dollar policy.

23      The Debtors spent significant time, money, and efforts,

24  substantial resources.  They stand accused all the time of, oh

25  my god, they're spending so much money.  Think about what --

20

1   and Mr. Seery is going to testify to this -- about how much

2   time, money, and effort went to defending against UBS's claim

3   against Highland.  The mediation where we didn't have this

4   information.  The motion for partial summary judgment.  The

5   3018 proceeding.  Right?  And we finally got to a settlement

6   with them without this information.

7        The damage caused to the Debtor and the independent board.

8   We sat there and we made representations to the Court.  You

9   know, in hindsight, they were not accurate.  They just

10  weren't.  And they weren't accurate.  They weren't accurate to

11  UBS, they weren't accurate to the mediators, they weren't

12  accurate to the Court, because we just didn't know.  We didn't

13  know anything about the policy.  We didn't know anything about

14  the asset transfers.  Substantial damage.  Chasing nothing.

15       Most critically, Your Honor, it deprived the Debtor of

16  currency to settle its claim with UBS on favorable terms, and

17  that is the greatest damage of all.  Highland was forced to

18  renegotiate its settlement with UBS because, based on Mr.

19  Dondero's signature under the Highland Capital name back in

20  2017, and based on the conduct of those six employees,

21  Highland had liability where it believed there was none.  And

22  consequently, it had to -- had to increase very substantially,

23  by tens of millions of dollars, the allowed claim with UBS.

24  And then -- and then stand as a Defendant in these

25  proceedings.

21

1     We've been damaged hard.  This is not -- this is not the

2  way the process is supposed to work.  The massive transfer of

3  assets that leave Defendants judgment-proof.  Undisclosed and

4  secret indemnity agreements that in and of itself constitutes

5  a massive breach of duty.  The cover-up that immediately

6  followed the execution of the indemnity agreement.

7     We are just bankruptcy lawyers, Your Honor.  Our duty is

8  only to maximize recovery for creditors.  We're not

9  prosecutors.  We're not the SEC.  We're not the U.S. Trustee's

10 Office.  We're not the Texas Committee of Attorney Discipline.

11 There's only so much that we can do.  We'll continue to do our

12 jobs, and we're not presenting everything that we have here

13 today, and our investigation continues.  But if nobody is held

14 accountable for this type of conduct, then the system is

15 broken.  And I hope that's not the case.

16     So, we had expected Sentinel and its owners to intervene

17 and defend their conduct in this matter, but they chose not

18 to, although I'm grateful that their attorney or at least the

19 attorney of the individuals are here.

20     I do want to point out just one clarification.  And Mr.

21 Clubok or Mr. Seery may correct me.  But the directors at

22 Sentinel today who authorized the entry into the MOU are new

23 directors, and Mr. DiOrio and the others resigned as the heat

24 was being turned up last spring.  They were replaced by new

25 directors.  And that's, in our opinion -- this is not fact --

22

1   in our opinion, that's what enabled Sentinel to reach this

2   agreement that Mr. Clubok described.

3       But make no mistake.  We don't pretend that we know where

4   all assets are.  We don't pretend that we know the value of

5   the assets that may have been transferred.  But based on the

6   evidence that Mr. Clubok and his team adduced during this

7   adversary proceeding, the Debtor, Highland, does not believe

8   it can defend against the claim, and therefore is prepared to

9   withdraw its answer and confess to the permanent injunction

10  that was sought by UBS.

11      That's all I have.

12          THE COURT:  All right.  Well, Mr. Clubok, I

13  understood you were waiving your opening statement, correct?

14          MR. CLUBOK:  Yes, Your Honor.

15          THE COURT:  Okay.

16          MR. CLUBOK:  I'll defer it to my presentation.

17          THE COURT:  All right.  Mr. Morris, you may call your

18  first witness.

19          MR. MORRIS:  With that, we'll call James Seery.

20          THE COURT:  All right.  Welcome back, Mr. Seery.

21          MR. SEERY:  Good morning, Your Honor.

22          THE COURT:  Please raise your right hand.

23      (The witness is sworn.)

24          THE COURT:  All right.  Thank you.  Mr. Morris?

25           JAMES SEERY, DEFENDANT'S WITNESS, SWORN

Seery - Direct                                   23

1                            DIRECT EXAMINATION

2    BY MR. MORRIS:

3    Q    Good morning, Mr. Seery.  Can you hear me okay?

4    A    I can, yes.

5    Q    Okay.

6    A    Apologies on my end.  There is some construction in the

7    background.  If it interferes, please let me know.  I'll try

8    to speak loudly.

9    Q    Okay.

10            MR. MORRIS:  Your Honor, we're not going through

11   every fact, and I actually don't even plan to share with Mr.

12   Seery any particular exhibits, so that we can try to get

13   through this fairly quickly.  But if Your Honor has any

14   particular questions, of course, feel free to interrupt.

15   BY MR. MORRIS:

16   Q    Mr. Seery, can you please just describe at a general level

17   your involvement with the Highland bankruptcy, including the

18   timing and titles that you've obtained?

19   A    Yes.  In the beginning of 2020, January 9th, I was

20   appointed as an independent director by the Court.  Prior to

21   that, I didn't have any involvement with Highland.  Prior to

22   2008, the business I ran at Lehman did business with Highland,

23   but between 2008 and 2020 I had no involvement whatsoever with

24   Highland.  Was appointed as an independent director on January

25   9th, working with John Dubel and Russ Nelms, who were also

Seery - Direct                                24

1  appointed as independent directors.  And then in July, I

2  believe, of 2020, I was appointed by the Court as the interim

3  CEO and CRO of Highland Capital.

4  Q    Okay.  Did there come a time that you learned of the UBS

5  claim in this case?

6  A    Yes.  I learned of the UBS claim before I was even

7  appointed as an independent director.  UBS had gotten a

8  decision prior to judgment in I believe November of 2019.

9  Prior to my apartment, I did diligence, and one of the

10 diligence items was to read that decision.

11      Subsequently, in I believe it was February of 2020, UBS

12 obtained an actual judgment against the two subsidiaries, both

13 indirect, but CDO Funds, which was a little bit more direct

14 subsidiary fund of Highland's, managed by Highland, and SOHC,

15 which was a direct subsidiary of HFP, which is Highland

16 Financial Partners, an indirect subsidiary of Highland.

17 Q    And after being appointed, did the independent board do

18 any work to try to understand, you know, the merits and

19 potential defenses of the UBS claim?

20 A    Absolutely.  This was one of the critical issues in the

21 case.  This, as I said, was a billion-dollar judgment against

22 subsidiaries, and the question was, was Highland liable?

23 There was really no question that the subsidiaries were

24 liable.  There was already a decision and a judgment in

25 February.  But was Highland going to be liable for that

Seery - Direct                              25

1  decision?

2       UBS had theories, and we -- me, specifically -- did

3  hundreds of hours' worth of research and work around the

4  claims, and I'm sure my fellow directors read and analyzed

5  documents similar to the way that I did.

6  Q    And did Mr. Leventon and Mr. Ellington make any

7  presentations to the board concerning the UBS claim?

8  A    Yes.  Mr. Leventon was the point person at Highland

9  managing the UBS litigation.  He had been, as he described to

10 me directly on my first day, one of his chief jobs and one of

11 the reasons he was hired was to help manage the UBS

12 litigation.  He reported directly to Mr. Ellington, who was

13 the general counsel and an officer of the general partner of

14 Highland.  Mr. Ellington described himself as the person

15 chiefly responsible for all negotiations with UBS.

16      So, everything to do with the underlying transaction, the

17 ten years of litigation, and the various stops and starts in

18 potential settlements was encompassed by the knowledge held by

19 Mr. Ellington and Mr. Leventon.

20 Q    Can you describe for the Court kind of your understanding

21 of the structure of the Highland legal department, the

22 hierarchy and who reported to whom and who was there?

23 A    Yes.  The legal department at Highland was a large group,

24 headed by Mr. Ellington as general counsel.

25      Mr. Leventon was responsible for all litigation.

Seery - Direct                              26

1      Mr. Sevilla was a senior attorney who handled

2   predominantly transactions.

3      Mr. DiOrio was not an attorney but worked in the legal

4   department.

5      Ms. Irving was not an attorney but worked in the legal

6   department.

7      In addition, tangentially, or dotted-line, I think,

8   basically report, the CCO, Thomas Surgent, was connected to

9   the legal department.

10      And Tim Cournoyer was a transaction lawyer in the legal

11   department.

12      Other lawyers had come in and out, and there was a

13   paralegal, Helen Kim.

14      Stephanie Vitiello was also an attorney in the legal

15   department.

16      But that was the core group when I became an independent

17   director.

18   Q   And I think you mentioned this at a very high level, but

19   how did the board educate -- how did the board interact with

20   the Highland legal group to educate itself on the merits of

21   the UBS claim against Highland, the potential defenses that

22   there was?  Just give us a sense of, you know, what the

23   interaction was and what the interface was.

24   A   Well, day-to-day -- and right at the beginning of the

25   case, as I say, a critical issue -- a ton of time spent with

Seery - Direct                              27

1   Mr. Leventon going through every aspect of the case.

2       In addition, as I mentioned earlier, I read every document

3   related to the transaction and every one of the court

4   decisions that had been previously issued.  Many of those

5   raised questions, and I'd address those generally to Mr.

6   Leventon as the point person.

7       There came a time in January or early February, pre-COVID,

8   so on the premises of Highland, that there was at least one,

9   possibly two, multi-hour meetings about the UBS litigation.

10  Mr. Leventon led those discussions, really educating myself as

11  the lead director, but also Mr. Nelms and Mr. Dubel as

12  independent directors about this critical issue.

13      Very specifically, Mr. Leventon provided a detailed

14  PowerPoint deck which he went through.  And I recall it

15  because it'll come up later on with another deck that we found

16  from 2017 that had an unusual font, one that you typically

17  don't seem in PowerPoints.  So Mr. Leventon presented that and

18  walked through every step of the transaction, what in his

19  view, or at least what he communicated to us, had happened,

20  how the subsidiaries were set up, his statements that they

21  were special purpose entities and that they had no assets, and

22  how the litigation then unfolded after the default in 2000 --

23  late 2008, early 2009.

24  Q   And based on the review that you've described and your own

25  due diligence, based on the facts that you had at the time,

Seery - Direct                          28

1   did the independent board form a view as to its perception of

2   the merits of UBS's claim against Highland Capital Management,

3   LP?

4   A    Yes.  I and the rest of the board, based upon the -- both

5   the documents we reviewed and the description of the

6   circumstances and the litigation provided to us by Mr.

7   Leventon primarily and Mr. Ellington and the other people in

8   the legal department -- and I should just, as an aside, say

9   the ones in that meeting are Sevilla, DiOrio, Irving,

10  Ellington, Leventon, nobody else.  I don't recall Stephanie

11  Vitiello being in that particular meeting or meetings.  But

12  our view that we developed from those -- from that work and

13  from the independent work we did was that Highland didn't have

14  any liability for the UBS judgments.  It was clear that the

15  subsidiaries did, and the underlying documents made clear that

16  they were responsible to UBS.  But our perspective from that

17  work and the information we received from the legal department

18  was that UBS was reaching, its claims were only against subs

19  that never had any assets, and that Highland should not be

20  held responsible for any of the damages from the transaction.

21  Q    And do you recall, at around the time of the mediation in

22  the summer of 2020, did UBS press their informational requests

23  for documents concerning the assets of the funds?  Do you

24  recall that at all?

25  A    Yes, they did.  They actually started earlier, and we took

Seery - Direct                          29

1  the perspective initially that we didn't need to provide any

2  documents to them because we were going to really move for

3  summary judgment.  We took a very aggressive posture in

4  respect of that position.

5      When we came to the mediation, there was a slightly

6  different structure and relationship in that you're trying to

7  work towards an understanding, so you really weren't able,

8  between the parties and the mediators, you know, you weren't

9  really able to say, we're not going to give you anything, so

10  we took the perspective that we should just turn over

11  everything because we've got nothing to hide.

12      And UBS took that very directly and made pretty

13  substantial discovery requests on us with respect to their

14  claim and the mediation, particularly with respect to the

15  underlying assets that they claimed that the CDO Fund and SOHC

16  had and wanted to know what happened to them.  And the

17  Highland legal department, as previously described, led by

18  Leventon, said they didn't exist and there were no assets.

19  Q    Did they in fact, though, identify, I think, two assets?

20  A    Ultimately, --

21  Q    (overspoken) and the Multi-Strat?

22  A    Ultimately, they identified, and this was Mr. Leventon,

23  cash that had been used for -- purportedly used for legal

24  fees.  And it was a significant amount.  And that was a bit

25  startling, because previously we'd been told there was no --

Seery - Direct                              30

1  there were no assets there, so it was startling that all of a

2  sudden, well, there was cash, but it was spent.  And we

3  pressed Mr. Leventon on that.

4      In addition, they identified interests in -- potential

5  interests in an entity called Greenbrier.  And that was a very

6  confusing description from Mr. Leventon, and it didn't make a

7  lot of sense.  But if there was an asset in CDO Fund or SOHC

8  that was owned and had value, then it should have been

9  incumbent on Highland to discover that asset and use that

10  asset in settlement, because, from our perspective, if there

11  was anything in those subsidiaries, we should turn it over to

12  UBS and try to use that to settle the litigation, because it

13  would never come to Highland since these entities had

14  judgments in excess of a billion dollars against them.

15  Q    All right.

16          MR. MORRIS:  Your Honor, just so the record is clear,

17  the emails that relate to these issues can be found at

18  Exhibits 5 and 6.  They're from August 2020.

19          THE COURT:  Okay.

20  BY MR. MORRIS:

21  Q    And do you recall, in the fall, based on the information

22  that the independent board had at the time, that the Debtor

23  proceeded with their motion for summary judgment and their

24  3018 hearing with UBS?

25  A    Yes.  And previous to that, we'd gone through the

Seery - Direct                          31

1   mediation with two experienced mediators.  It was a very

2   intense experience.  Aggressive from both our side and UBS's

3   side.  So we had gone through that mediation.

4      We had endeavored during the mediation to provide

5   discovery around this Greenbrier and any other assets.  Both

6   Mr. Leventon and Mr. Ellington made very specific

7   representations to me and to the board and to our counsel

8   regarding lack of assets and the ability to find any assets

9   and that there was really nothing there.

10     So we went through the mediation and were unable to

11  resolve anything with UBS.  The parties were incredibly far

12  apart.  And we decided to move for summary judgment.  And that

13  became a very tall order because of the complexity of the

14  claims and the complexity of the underlying litigation.

15     We dug in really hard on that, and ultimately had a

16  hearing both with respect to summary judgment -- partial

17  summary judgment as well as with respect to estimating UBS's

18  claim.

19  Q    And as the calendar rolled towards the end of the year, do

20  you recall that the Debtor was preparing for confirmation?

21  A    Yes.  We had developed the monetization plan in the late

22  fall of 2020.  We were at the same time trying to structure

23  potential settlements with the creditors.  We took the

24  perspective with respect to UBS that it was unlikely we were

25  going to get a settlement.  And so as we moved forward with

Seery - Direct                                      32

1  the plan, when looking at it, can see there's a lot of

2  mechanisms that basically assumed that we won't be settled

3  with UBS.  They'll be on an oversight board, but that

4  ultimately we're going to be litigating with them to determine

5  what their claim could be.

6  Q   I'm not testifying, but I do remember there was an awful

7  lot going on in January 2021.  Did you and the independent

8  board ultimately reach an agreement in principle with UBS on

9  the resolution of their claim?

10 A   Yes.  And coming into -- your statement about January 2021

11 is absolutely correct.  But it really went through the fourth

12 quarter and then January 2021.

13     As the Court will recall, we had a number of hearings in

14 December of 2020 that were intense:  contempt, injunction,

15 preliminary to the plan process, disclosure statement.  There

16 were depositions.  There were challenges -- there were

17 significant challenges to Highland's management of both its

18 assets and managed fund assets.

19     We discovered some significant problems with what we

20 thought was going on in the legal department at that juncture,

21 which led to the termination of Mr. Ellington and Mr. Leventon

22 on January 5, 2021.  And then January 2021 was chockful of

23 hearings from contempt to HarbourVest to preliminary

24 injunction, and ultimately confirmation at the beginning of

25 February.

Seery - Direct                           33

1    Q    Did the termination of Mr. Leventon in particular have any

2    impact on the independent board and management's ability to

3    access information?

4    A    Well, both Mr. Leventon and Mr. Ellington then opened up

5    -- which we probably could have done before -- but opened up

6    our access to their email accounts.  And in respect of Mr.

7    Leventon, an interesting thing happened when I went to send

8    him his termination notice.  Microsoft Outlook thankfully

9    filled an entity called SAS Management into the address bar.

10   And I didn't know what SAS Management was.  I had no

11   familiarity with it.  It wasn't something I'd seen.  So I

12   tasked outside counsel, Mr. Demo, as well as DSI, Mr. Romey,

13   to figure out what SAS was and why that was showing up for Mr.

14   Leventon.  That led us to do reviews of their email, and

15   particularly Mr. Leventon, a significant amount of information

16   that we developed over the next several months.

17   Q    And did you instruct my colleague, Mr. Demo, and DSI to

18   continue to pursue, you know, any information relating to SAS?

19   A    Absolutely.  What we did was we -- at the same time we

20   were doing this, we were trying to settle with UBS.  One of my

21   fellow directors was really leading that.  I didn't think

22   there was much chance of settling with them, primarily because

23   I thought there was no way to bridge the gap.  And frankly, I

24   was of the firm, firm view that Highland shouldn't have any

25   liability because the allegations that Highland had prevented

Seery - Direct                                          34

1    UBS from recovering on its judgments really didn't have any

2    basis based on the facts that I had at the time.

3        But as we continued to look at what SAS might be and

4    whether that was an asset of the Debtor and what it meant to

5    the Debtor, whether Debtor employees were involved, we started

6    finding more and more information about other assets and other

7    dealings with respect to UBS.

8        We did find that this SAS entity had been around for quite

9    some time.  It was, in essence, a secret entity.  The legal

10   department -- Ellington, Leventon, Sevilla, Vitiello, I

11   believe, Irving, DiOrio -- all had SAS, my recollection is all

12   had SAS Management emails.  They were stored on a separate

13   server so we couldn't uncover those.  We could only find

14   things that were sent to the SAS server.

15   Q    And did any of those individuals share with you or the

16   Debtor's professionals any substantive information concerning

17   SAS at the time?

18   A    None at all.  What we did do, though, is because we could

19   then use SAS to search through the entire Highland databank,

20   we did find -- let's see how to describe it; we have a

21   colloquial term that I won't use -- but charts that showed the

22   ownership of SAS and the -- and that led to the ownership of

23   Sentinel.  And we didn't know what Sentinel was, but one of

24   our outside professionals recalled Sentinel is a redeemer out

25   of the Multi-Strat fund.  So that got us looking at who is

Seery - Direct                              35

1   Sentinel and who owns Sentinel.

2       The records were ultimate beneficial owner, what they call

3   UBOs, but because of the requirements of the Cayman

4   authorities, ultimately Mr. Ellington and Mr. Leventon -- Mr.

5   Dondero had to produce their passports and information to show

6   the ultimate beneficial owners, but they're never actually

7   listed as Mr. Ellington and Mr. Dondero.  They're only listed

8   on the charts as UBO 1 and UBO 2.

9       And that shows a whole bunch of different entities,

10  including SAS.  And apparently, Ms. Irving worked on a lot of

11  this stuff in the Caymans for either SAS or for these other

12  entities, notwithstanding being a full-time employee of

13  Highland in the legal department.

14  Q   Was -- do you recall if Matt DiOrio was involved in

15  responding to the requests of you and your team in January and

16  early February 2021?

17  A   Yes.  So, after Mr. Leventon's termination, Mr. DiOrio was

18  tasked by Mr. Demo and Mr. Romey to help figure out what SAS

19  was, what Sentinel was, and any information regarding these

20  Cayman entities.

21      He professed ignorance.  We now know that he was a

22  director at the time of his protestations of no knowledge.

23  And in addition, he, with respect to other people on the email

24  chain, texted some and said, I've got this, notwithstanding

25  that he didn't produce any information, even though he had

Seery - Direct                          36

1  been directly asked for it.

2  Q   When you say that --

3       MR. MORRIS:  Ms. Canty, can you put up Exhibit 10?

4  It's just a text message.  I just want to make sure the Court

5  understands the context for Mr. Seery's testimony.

6       But Your Honor, while she's doing that, I would just point

7  the Court to Highland's Exhibits 7 and 8, which are other

8  lengthy email strings from late January 2021 where, at Mr.

9  Seery's direction, the Debtor's professionals were seeking

10 information about these matters.

11      And if we could just scroll down here, what's on the

12 screen now is Exhibit 10, Your Honor.

13 BY MR. MORRIS:

14 Q   Mr. Seery, can you just describe for the Court what your

15 understanding of this text message is?

16 A   See if I can see it.  This is a text message from DiOrio

17 to Thomas Surgent.  Thomas, as I said, is in the legal

18 department tangentially, but is really the CCO.  This is Mr.

19 DiOrio telling Mr. Surgent, I've got the request, you don't

20 have to worry about it.

21      And so that led to a number of obfuscating emails as well

22 as a failure to respond and significant delays.  Ultimately,

23 when -- and I'm not sure if this was before Mr. DiOrio was

24 terminated or after he was terminated, as soon as we went to

25 Mr. Surgent directly, he quickly provided the documents --

Seery - Direct                              37

1  searched for them and found the documents that we needed on

2  the Highland system.

3  Q   Okay.  So let's --

4           MR. MORRIS:  We can take that down now.  Thank you

5  very much.

6  BY MR. MORRIS:

7  Q   Let's just go to the next step.  What does the independent

8  board learn in late January or early February -- withdrawn.

9  Did there come a time when the independent board made a

10 disclosure to UBS?

11 A   Yes.  So, as we were doing this work in January and early

12 February -- and remember, as I said earlier, this is while

13 there's probably five to ten hearings going on that are

14 crucial in the case.  I'm giving multiple depositions.  We're

15 trying to figure out assets.  We're terminating employees.

16 We're negotiating or attempting to negotiate a transition

17 agreement for the businesses.  It was incredibly busy.

18      But we came across this Sentinel entity, and we came

19 across the fact that it was a redeemer in Multi-Street, and

20 then ultimately led us to find the after-the-event insurance

21 policy, this ATE policy, which I'm not an insurance expert but

22 I know enough that it's not really a thing.  There's after-

23 the-event policies that typically cover attorneys' fees in a

24 loser-pays jurisdiction.  There's no such thing as a policy

25 where you go to an insurance company and take $100 million

Seery - Direct                                38

1    worth of assets and buy $100 million worth of coverage.  It

2    doesn't provide you any benefit.  It's not a thing.

3    Q    So, we did --

4    A    But my point -- sorry, John, I digressed.  We have -- we

5    have the contempt, we have all these different things going

6    on, and we're finding different information.  And we find out

7    about this policy as negotiations at the same time is going on

8    with UBS to try to reach a settlement on their claim.  And

9    that was directed by one of the other directors as this was

10   going on.

11        And recall that the policy was purchased by CDO Fund and

12   SOHC.  As I said, SOHC is an indirect subsidiary.  So is CDO

13   Fund.  But CDO Fund was controlled by Highland.  Highland

14   controlled the GP.  Highland controlled SOHC.  That policy was

15   the only asset -- I mean, CDO Fund.  That's the only asset of

16   CDO Fund.  Highland's control of that is a valuable asset of

17   Highland, but it's been hidden from Highland.  Completely

18   hidden.

19        We discover it.  We had reached a settlement with UBS

20   while we were doing this work, but we didn't -- we hadn't

21   discovered this, all of this information.  I think we

22   announced the settlement with UBS at the -- at the

23   confirmation hearing.  I think it was on February 2nd.  And

24   later on in the month, as we were working on documenting that

25   settlement -- and documenting a settlement with UBS and the

Seery - Direct                                39

1   Latham team is not an easy thing.  Not because they're not

2   good to their word; they're just (audio gap), as maybe I am.

3   And so that getting that deal documented was taking a while.

4   And we discovered this information, and I couldn't go forward

5   with a deal with UBS, knowing the information I had without

6   sharing that information with them, because it would have been

7   fraudulent, in my opinion.

8       And so we told them we're not going to enter the

9   settlement agreement.  They were a bit shocked.  And we told

10  them, well, we need to tell you why.  And then we laid out the

11  information to them, which initially set them back to figuring

12  out what they wanted to do, and then ultimately came back to

13  the table to renegotiate the settlement agreement with them.

14  Q   And as a result of the information that the Debtor shared

15  with UBS, did UBS and the Debtor renegotiate the deal that

16  they had presented to the Court at the confirmation hearing?

17  A   We did.  And the dates on that are March 21 into April.

18  So we've got a decent amount of information.  Not everything,

19  but we've got a decent amount of information that maybe some

20  of their allegations about Highland interfering with their

21  judgment activities was true.  And we renegotiated that

22  settlement, upping the claims by about $50 million, the

23  allowed claims that they would get.

24  Q   Why did the independent board decide to share this

25  information with UBS at the time that it did?  Why not just

Seery - Direct                              40

1  take the deal that you had?

2  A   Well, number one, first and foremost, we're fiduciaries.

3  And we're fiduciaries to the estate.  Our job is not to

4  defraud the creditors.  It's to fight hard to make sure that

5  legitimate claims are allowed but that illegitimate claims are

6  kept out.  And we thought, both myself and the other

7  directors, that we couldn't enter into a settlement in good

8  faith when we have knowledge that the underlying facts that

9  the counterparty were relying on were untrue and that we'd

10 provided a lot of that information to them.  We had

11 represented to them that there were no assets based upon the

12 information we had been given by Leventon and Ellington in

13 particular.

14 Q   Do you recall that right around the time the parties

15 presented their proposed settlement to the Court UBS also

16 commenced this action?

17 A   Yeah.  I think it was -- it was probably the next day.

18 Q   Uh-huh.

19 A   And recall that all of this is while the transfer took

20 place two years prior to filing.  All of this cover-up.  All

21 of this misdirection.  All of the expenditure and the

22 additional damages that Highland suffers is postpetition by

23 officers and attorneys at Highland.  In-house senior attorneys

24 on the payroll full-time at Highland.

25 Q   After the action was commenced -- withdrawn.  Did the --

**82**

Seery - Direct                              41

1   did Highland agree to temporary and preliminary injunctive

2   relief?

3   A    I believe we agreed to the temporary preliminary

4   injunction.  But we had not yet settled the action completely.

5   Q    And why is that?  Why did the Debtor agree to the

6   temporary relief but not the permanent relief?

7   A    Well, the information that we had certainly justified at

8   least a preliminary injunction, in our opinions, because there

9   were -- we didn't have all the information, but it was very

10  clear that there had been material asset transfers and that

11  funds were going to continue to run through the assets that

12  either Highland had or Highland managed that would continue to

13  flow to this Cayman entity.

14      And those funds had flowed during the case.  And in fact,

15  during the case, some of these same individuals, during the

16  bankruptcy case, moved assets around in the Caymans.  It

17  wasn't as if they'd forgotten about them.

18      So we felt that at least a preliminary injunction to keep

19  the status quo and prevent further leakage of assets and

20  protect potentially liability for Highland was appropriate.

21  That subsequently led us to do additional work, and we really

22  didn't have enough at that time to just agree to consent to

23  the judgment.

24  Q    And with respect to discovery, are you aware of any

25  additional documents that were uncovered after the action was

Seery - Direct                              42

1    commenced?

2    A    Yes.  UBS commenced discovery, both document discovery and

3    depositions.  And while discovery in the Caymans is not

4    usually that easy, or any foreign jurisdiction, in my

5    experience, the manager, the accounting manager for Sentinel

6    was actually a U.S. entity called Beecher Carlson.  And UBS

7    and Latham did a significant amount of discovery with respect

8    to those entities, both depositions and documents, many of

9    which we've seen, one of which you alluded to today which we

10   didn't know about prior to that, which is this indemnification

11   agreement from June 2020.

12       And by the way, that indemnification agreement has been

13   used.  Sentinel paid Baker & McKenzie fees, Sentinel paid Ross

14   & Smith fees, from what we've seen and what we've seen in the

15   depositions.  I think it was prior to the indemnification,

16   there's hundreds of thousands of dollars of hit to the policy

17   from personal expenses of Scott Ellington postpetition run

18   through Sentinel.

19       So we learned about the indemnification.  We learned about

20   the payments.  We learned about more of the transfers.  We

21   learned about attempts during the case to move assets out of

22   Sentinel, calling them worthless.  And it became very clear

23   that this was a really organized, orchestrated attempt to hide

24   these assets from the estate and prevent Highland as the

25   Debtor from controlling a CDO Fund asset that really would

Seery - Direct                          43

1  have changed the dynamic of the case completely.  We wouldn't

2  have been spending tens of millions of dollars fighting with

3  UBS, thousands of hours fighting with UBS, if we could have

4  used an insurance policy or the assets to help arrange a

5  settlement.

6  Q    There was a suggestion early on after this adversary

7  proceeding was commenced, I think it was in the context of a

8  motion to quash, that maybe this is a friendly litigation and

9  it's not really adversarial.  Do you have a view as to whether

10 or not this has been an arm's length adversary proceeding?

11 A    Everything with UBS and with Latham & Watkins is very

12 arm's length.  This is a pretty aggressive group.  And I say

13 that respectfully.  I don't say that in a negative way at all.

14 It's been that way from the start.  And even in this

15 litigation post our settlement with UBS, we have a number of

16 material disputes regarding costs, regarding the breadth of

17 the depositions and the discovery they want from us.  They're

18 pretty exhaustive.  And we have worked through a number of

19 those disputes, but it has not been easy.  It's certainly

20 arm's length.

21 Q    All right.  Finally, Mr. Seery, why are we making this or

22 why is the Reorganized Debtor making this motion now?

23 A    We have spent a tremendous amount of time and money on

24 disputes with UBS, both prior to settlement and with respect

25 to this lawsuit.  From what we see now -- and I'm sure we

Seery - Direct                          44

1   don't know everything; we continue to do work -- there is no

2   benefit to the estate, the reorganized entity, from continuing

3   to fight this dispute.  I don't think we have a good faith

4   basis to do so.

5        And to the extent that the injunction, a permanent

6   injunction subsequent -- subject to a resolution can help

7   finally resolve the issues with Sentinel -- as you mentioned,

8   Mr. Morris, the directors at Sentinel are new directors.

9   There has -- we've spent a lot of time working with the

10  parties with respect to our claims from CDO Fund under the

11  policy, a mediation in that action as well.  And if that

12  resolution can get done, that'll be of benefit to Highland and

13  all of the respective parties.

14            MR. MORRIS:  I have nothing further, Your Honor.

15            THE COURT:  All right.  Mr. Clubok, any questions?

16            MR. CLUBOK:  A very brief follow-up, Your Honor, just

17  to clarify a couple of points.

18            THE COURT:  Okay.

19            MR. CLUBOK:  May I proceed?

20            THE COURT:  You may

21            MR. CLUBOK:  Okay.

22                       CROSS-EXAMINATION

23  BY MR. CLUBOK:

24  Q   Mr. Seery, I want to take you back to the document

25  requests that UBS made once we had gotten to the point where

Seery - Cross                               45

1  you had made it clear to both UBS and to your team that you

2  were going to provide whatever information you had.

3  A    This was around the summer of 2020, prior to the

4  mediation, or as we were going through the mediation?

5  Q    Exactly.

6  A    Okay.

7  Q    Exactly.  Okay.  And just to orient you, I would like to

8  put up what we've marked as Exhibit 57.  Exhibit 57 was not

9  previously marked explicitly, but it is a deposition exhibit.

10 You'll recognize it, Mr. Seery and Mr. Morris.  It was

11 Deposition Exhibit 69 to your deposition, Mr. Seery.  And we'd

12 like to mark it, for the purpose of this hearing, Exhibit 57.

13 This was UBS's first request for production of documents to

14 Debtor Highland Capital Management, which is I think what

15 you're referring to.  Do you recognize that document?

16 A    I do, yes.

17 Q    Okay.  And I'm going to specifically turn your attention

18 to Request No. 8.  Request No. 8 asked for all documents

19 pertaining to the assets and liabilities of HFP, CDO Fund, and

20 SOHC, including but not limited to -- and then there's a

21 number of subparts.  Do you see that?

22 A    Yes.

23 Q    And if we can turn -- and, actually, in the very first

24 one, A, you can see it talks about consolidating standalone

25 financial statements from December 2007 through December 2019,

Seery - Cross                           46

1  or the most recent period available.  Do you see that?

2  A    Yes.

3  Q    And there's a number of other requests, but --

4         THE COURT:  Mr. Clubok, let me interrupt a minute.

5  Do you have an exhibit up on the screen?  I am not seeing it.

6  But I can pull it up off the docket if you tell me again which

7  one it is.

8         MR. CLUBOK:  I'm sorry.  Exhibit 57.  It's showing up

9  on my screen.  Ms. George has put it up.  Does it not show up

10 on your screen, Your Honor?  Oh.

11        THE COURT:  No.  Do you know what -- just a moment.

12    (Pause.)

13        MR. CLUBOK:  If I may, Mr. Morris, can you see it?

14        THE COURT:  Okay.  Yes.  We're -- the court reporter

15 informs me we have --

16        MR. MORRIS:  I can.

17        THE COURT:  -- something frozen on -- where we're

18 supposed to get the document.  She's called IT.  But I can

19 pull it up on the ECF, I hope.  So, you said 57?  No?

20        MR. CLUBOK:  Well, unfortunately, Your Honor, this is

21 the one exhibit that we didn't explicitly mark in our amended

22 179.  It is referred to because it was an exhibit to the

23 deposition of Mr. Seery.

24        THE COURT:  Okay.

25        MR. CLUBOK:  So we didn't individually mark this one.

Seery - Cross                              47

1   So I'll just narrate it.  I don't think you need to see it.

2            THE COURT:  Okay.  Okay.

3            MR. CLUBOK:  You can confirm later.

4            THE COURT:  Okay.

5            MR. CLUBOK:  It is -- Exhibit 57 is the -- is UBS's

6   first request for production of documents to Debtor Highland

7   Capital Management.  And it is a series of requests -- I'm

8   sorry, is the first official request, or I should say the

9   first document request, but I think even before this we had

10  exchanged information requests as well.

11  BY MR. CLUBOK:

12  Q    Is that correct, Mr. Seery?

13  A    That's correct.  Do you recall the date on this document,

14  Mr. Clubok?

15  Q    This particular document is dated September 28, 2020.  So

16  this would have been the formal document request that

17  encapsulated our discussions that were either communicated

18  more informally or as information requests.

19  A    That's my recollection.  I think this would have been

20  during the mediation.  I think the first session had already

21  happened, and there was discussion informally or during the

22  mediation that this would have been a document request.  My

23  recollection is it's more from UBS to more formally

24  crystallize requests that had been made during the mediation

25  -- during and before the mediation.

Seery - Cross                                48

1  Q    All right.

2          MR. CLUBOK:  And by the way, Your Honor, I do see

3  that this is Bankruptcy Docket 1345, I believe, if that's

4  helpful.

5          THE COURT:  Okay.  Could you repeat the number again?

6          MR. CLUBOK:  1345.

7          THE COURT:  Okay.

8  BY MR. CLUBOK:

9  Q    Mr. Seery, I just want to -- I want to direct your

10  attention to, in particular, Subparts I and J.  And this, in

11  Subpart I, if we can hopefully get it on the screen, but if

12  not I'll read it, it asks for a monthly roll-forward of the

13  itemized asset listing and corresponding values requested

14  above from December 31, 2007 through August 31, 2020 or the

15  most recent period available.  Here we go.  And we now have it

16  on the screen, hopefully, and I just read part of Subpart I.

17  Up on the screen.

18      Also, Subpart J asked for all activity associated with the

19  itemized assets requested in Items H and I.  For each one, a

20  transaction listing of all related parties or affiliated

21  transactions, including date and amount of transaction, et

22  cetera.

23      Do you see that?

24  A    Yes.

25  Q    In a nutshell, these requests and the prior requests that

Seery - Cross                                49

1  we had been discussing for the months leading up to that, in

2  sum and substance is it fair to say that you understood that

3  what UBS was looking for was the complete financial picture of

4  the assets that these funds -- namely, HFP, CDO, and SOHC --

5  had from the time of the original dispute through the present?

6  A    Yeah.  I think that's fair.

7  Q    And that was, in fact, very clear to you, that that's what

8  UBS was asking for in a paraphrased nutshell?

9  A    Yes.

10  Q    Okay.  And it's true that you tasked your in-house legal

11  team with coming up with a substantive -- or, identifying the

12  information that could form the response to these requests?

13  A    Yeah, that's true, with -- with outside counsel as well.

14  Q    Right.  But you in particular tasked Mr. Leventon and Mr.

15  Ellington in the first instance for identifying that

16  information to provide to your outside counsel to be provided

17  to UBS, correct?

18  A    Yeah.  I think that's fair.  They were working together,

19  though.  It was going to be -- Ellington and Leventon had

20  access to the systems and the ability to get the information.

21  How to present it and making sure that it was compliant with

22  discovery requests would have been more of an outside counsel

23  task.

24  Q    Now, prior to getting these requests, even, or maybe when

25  you initially got these requests, Mr. Ellington and Leventon

Seery - Cross                          50

1   had advised you, in words or substance -- I'm not quoting

2   them, but I want to get the gist of what they said -- that, in

3   fact, these entities had lost all of their value during the

4   financial crisis of 2008 and the years thereafter, correct?

5   A    That's correct.

6   Q    And they told you that these entities had basically no

7   remaining value at all, no assets left at all.  Correct?

8   A    That's correct.  Even more than that, initially, these

9   were described to us as shell entities.  The only assets they

10  would have had were assets that were moving in and out of the

11  UBS warehouse.  So it was -- they weren't going to be entities

12  that ever were, as described to us, asset -- entities that

13  held any sort of material assets at all.

14       And then subsequent to the financial crisis, the

15  information they gave us was that there was no -- there was no

16  -- there were no assets there.

17  Q    Yes.  It wasn't just that there was a net negative value;

18  it was that there were no assets at all, supposedly.  Correct?

19  A    Correct.

20  Q    And yet when UBS pressed harder for information about

21  assets, eventually Mr. Leventon started to disclose that in

22  fact there were at least some assets in these entities, and

23  specifically CDO Fund.  Correct?

24  A    That's correct.  As I mentioned earlier, he showed us a

25  spreadsheet with expenditures, millions of dollars of

Seery - Cross                                    51

1   expenditures for legal fees, which was surprising based upon

2   the fact that if these -- the prior statements that these

3   assets had no value, or these entities had no value, how,

4   then, did they have cash to spend millions of dollars on legal

5   fees?

6   Q   But even when he -- and by the way, it came as a surprise

7   to you to learn that, in fact, instead of zero assets, there

8   were at least some assets remaining, correct?

9   A   That's correct.

10  Q   And then even when Mr. Ellington disclosed that additional

11  information, he never disclosed anything about the hundreds of

12  millions of face value in assets that had been transferred out

13  of these funds just a few years prior.  Correct?

14  A   That's right.  Yes.  It was never disclosed to either me

15  or my independent -- fellow independent board members, or, to

16  my knowledge, to counsel or outside consultants.

17  Q   Okay.  Mr. Seery, I just want to end with a clarification

18  of your role and why this injunction is proper.  It's correct

19  to say that Highland is the portfolio manager of an entity

20  we've been calling Multi-Strat, correct?

21  A   That's correct.  I'm not sure if under the docs it's

22  called portfolio manager or collateral manager, but Highland

23  is that entity, yes.

24  Q   And as the CEO, you are responsible for directing the

25  efforts of Highland with respect to its role as the manager of

Seery - Cross                                    52

1  Multi-Strat, correct?

2  A    That's correct, yes.

3  Q    And just -- I think the Court has heard these names below

4  -- the entity that we're calling Multi-Strat has also been

5  called Credit Opportunities in the past?  That's

6  interchangeable for purposes of this proceeding; is that

7  correct?

8  A    Yeah.  But there's a number of different Credit

9  Opportunity-type funds that Highland has had over the years,

10  but you'll see that in a number of the documents before the

11  name was changed to Multi-Strat.

12  Q    Okay.  And with respect to CDO Fund, it is fair to say

13  that Highland Capital Management had control of CDO Fund as a

14  director and as a direct owner of the CDO Funds through its

15  general partner, correct?

16  A    Yeah, through the general partner interest, yes.  So,

17  Highland owns CDO Funds GP, which can direct CDO Fund.  I

18  believe we had LP units as well, but there were also third-

19  party limited partners in that entity pre-financial crisis.

20  Q    And with respect to Multi-Strat, in addition to acting as

21  Multi-Strat's investment manager, Highland Capital also is the

22  indirect hundred-percent owner of Multi-Strat's general

23  partner as well, correct?

24  A    Of the GP, that's correct, and we own about roughly 55 to

25  60 percent of the LP interests.

Seery - Cross                         53

1  Q    And finally, Mr. Seery, you knows there's a TRO or

2  temporary restraining order already issued by the Court in

3  connection with this proceeding?

4  A    Yes.  And we've adhered to that order.

5  Q    But absent having that order, you would have had -- you

6  would have felt obligated previously to transfer funds that

7  are currently being restrained by this order, correct?

8  A    That's correct.  Our perspective of the documents and the

9  role of the collateral manager is that, at least with respect

10 to Multi-Strat, but also with respect to funds that we turn

11 over to trustees on certain CLOs, which then flow to -- could

12 flow to Sentinel without the TRO, those would have flowed,

13 those funds.

14 Q    Okay.  Thank you, Mr. Seery.

15         MR. CLUBOK:  I have nothing further.

16         THE COURT:  All right.

17         MR. MORRIS:  No redirect, Your Honor.

18         THE COURT:  Okay.  Then I have a couple of questions.

19                  EXAMINATION BY THE COURT

20         THE COURT:  I just want to make sure I understand the

21 relevance of this line of questioning about Multi-Strat.  I

22 remember Multi-Strat.  There was an adversary proceeding that

23 I just had in front of me last week, a motion to dismiss.  So

24 I remember what it is.  It was a fund that, among other

25 things, or maybe it mainly owned the viaticals.  But I'm

Seery - Examination by the Court              54

1   trying to understand the significance of Multi-Strat to these

2   two funds we're talking about right now.

3          THE WITNESS:  So, I'll be happy to walk you through,

4   Your Honor.  Multi-Strat, when the case started, owned certain

5   life policies.

6          THE COURT:  Right.

7          THE WITNESS:  It owned some other assets as well, and

8   it owned a lot of MGM.  The life policies -- and it's not fair

9   to call them a portfolio.  They are -- they were eleven

10  policies on eight lives.  When the case started, the premiums

11  on those policies were substantial, and we didn't have the

12  funds to make payments.  Multi-Strat didn't, and Highland

13  didn't, with the Committee's involvement, other than an

14  initial payment and to keep the policies alive, didn't have

15  the funds to invest in Multi-Strat.

16      So Multi-Strat ran an auction and sold those policies

17  above the market value.  So it was a full, open auction, it

18  was a successful auction, and it was sold for more than the

19  values that had been maintained by Highland prior to the

20  filing.

21      As an aside, or there's two asides, one is part of the

22  reason you had to get rid of the -- or sell the Multi-Strat

23  policies was that they were security for a loan to NexBank.

24  And so that loan had to get paid off to free up value to

25  Multi-Strat.  Multi-Strat is a separate fund that Highland

Seery - Examination by the Court                55

1   manages that, in addition, fast forward, no one -- there

2   hasn't been an event on those policies since we sold them in

3   the first quarter of 2020.  That means no one passed away up

4   until at least a month or so ago, and premiums would have been

5   in excess of $22 million by now, which Multi-Strat didn't

6   have.  So that's the life policy part of that.

7       In addition, as I said, Multi-Strat owned other assets,

8   including MGM.  Also, some of that was secured or provide

9   security to NexBank for a loan that Multi-Strat had taken out

10  previously.

11      The reason Multi-Strat took out a loan, my recollection

12  is, a number of investors in Multi-Strat had tried to redeem.

13  Most of those were offshore investors in either Australia or

14  Japan, and basically Highland told them, Thanks for your

15  redemption, but we're not paying you.  We're not closing the

16  fund down.  And the documents allowed those redeemed interests

17  to sit out there, and they basically functioned like non-

18  cumulative preferred, meaning they didn't increase in interest

19  rate but they had a fixed claim.

20      Amongst those redeemers was Sentinel.  And so when we

21  learned about the Sentinel involvement, we didn't really know

22  who Sentinel was, one of our outside advisors said, They're

23  one of the redeemers in Multi-Strat.  That got us looking even

24  further.

25      But Multi-Strat's involvement in this litigation, or the

Seery - Examination by the Court            56

1  UBS litigation, relates to some fraudulent conveyances that

2  UBS alleged that happened back in 2009, 2008-2009, where

3  Multi-Strat and other funds were making contributions in to

4  try to support the UBS transaction from the Highland

5  perspective, and then when it looked like that transaction

6  wasn't going to work out, a bunch of those assets went back

7  out.

8     There was a so-called -- it was very oddly named -- but

9  basically a note transaction.  A bunch of assets went in,

10 Multi-Strat and other entities got a note, and then there was

11 basically -- I forget what they called it, but it wasn't a --

12 they didn't call it satisfaction.  It was basically they

13 ripped up the trade and gave the assets back.  And UBS had

14 issues with that.

15    So when we sold the life policies, it was actually very

16 difficult, because one of the buying entities had done their

17 diligence and they saw that UBS had a claim against Multi-

18 Strat, and unless we could get a stipulation with UBS we

19 weren't going to be able to sell those policies.  If we

20 weren't able to sell those policies, we didn't have the money

21 to pay the premiums, they would have expired worthless.  So we

22 cut an initial deal with UBS.

23    So they -- they've been in and around the Multi-Strat for

24 14 years.  And ultimately Multi-Strat settled with UBS for

25 $18-1/2 million.  That was in the original UBS settlement.

Seery - Examination by the Court                57

1          THE COURT:  Okay.

2          THE WITNESS:  When we learned of all the Sentinel

3     issues and these transfers, UBS took the position that we

4     should start over and we took the position that, no, based on

5     what we see, we've -- Multi-Strat has settled, but these other

6     allegations relate more to Highland liability, CDO and SOHC

7     liability, not to Multi-Strat liability.

8          So that $18-1/2 million piece didn't change.  The extra

9     $50 million in claims was just claims against Highland, not

10    against Multi-Strat.  And Multi-Strat has subsequently settled

11    its issues with UBS by paying the $18-1/2 million.  It had

12    previously sold the life policies, freeing up the liens from

13    NexBank and paid off NexBank.  And it subsequently made

14    distributions and redeemed all of the redeemers save Sentinel.

15    That money is set aside because of the TRO.

16         And some day there will be more about Multi-Strat and the

17    attempts to, according to the Multi-Strat investors, rip them

18    off for their interests, redeemed interests.  And we do have

19    signed documents evidencing that.  But we'll get to that

20    another day.

21         THE COURT:  All right.

22         MR. MORRIS:  Your Honor, if I may, can I just ask a

23    --

24         THE COURT:  Go ahead.

25         MR. MORRIS:  -- question or two, a follow-up

                          Seery - Redirect                    58

1   question?

2                       REDIRECT EXAMINATION

3   BY MR. MORRIS:

4   Q   Mr. Seery, just to make this clean, does Sentinel have a

5   redemption interest in Multi-Strat?

6   A   Yes.

7   Q   And does Highland control Multi-Strat?

8   A   Yes.

9   Q   And is the TRO or now the permanent injunction designed to

10  prevent Highland from paying anything to Sentinel on account

11  of its redemption interest?

12  A   That's my understanding, yes.

13  Q   Okay.

14          MR. MORRIS:  Your Honor, does that clear it up for

15  you?

16          THE COURT:  It does.  And I think probably some of

17  this was explained to me way back when I --

18          MR. MORRIS:  Yeah.

19          THE COURT:  -- was presented with the 9019 settlement

20  with UBS.  But, shockingly, I'm a little -- I was a little

21  fuzzy on the Multi-Strat part of that.

22          MR. MORRIS:  There's a lot.

23          THE COURT:  Mr. Seery, --

24          MR. CLUBOK:  Your Honor, may I ask just one -- may I

25  ask just one follow-up question, just to tie this up in a bow,

                              **100**

Seery - Recross                                    59

1   to make it extra clear?  There's one other element to this --

2            THE COURT:  All --

3            MR. CLUBOK:  -- that I just want to make sure is

4   clean.

5            THE COURT:  All right.  You may.

6                       RECROSS-EXAMINATION

7   BY MR. CLUBOK:

8   Q   And Mr. Seery, that redemption interest that is currently

9   on the books as being in favor of Sentinel, that is one of the

10  assets that was transferred by CDO Fund to purportedly buy

11  this so-called insurance policy, correct?

12  A   Part of that is.  It has multiple parts.  It's all covered

13  in the memorandum of understanding.  But the big piece of it

14  is, yes.

15  Q   Thank you.

16           THE COURT:  All right.  And another loose end I want

17  to tie up.

18                    EXAMINATION BY THE COURT

19           THE COURT:  I just want to be clear on the $100

20  million of market value of transferred assets.  I think I

21  heard that they were not all transferred in August 2017.

22  There had even been some transfer of value postpetition.  Is

23  that correct?

24           THE WITNESS:  So, the transaction was structured so

25  that all of the assets would transfer in 2017.  The value --

Seery - Examination by the Court           60

1   the face amount of those is north of $300 million.  The fair

2   market value, according to a Highland tax memorandum, we

3   didn't value it in 2 -- as of -- we didn't retroactively look

4   back and try to put a value on it.  But according to a

5   Highland tax memorandum written by one Shawn Raver, is north

6   of $100 million.

7       The -- all of the assets didn't -- didn't effectively

8   transfer.  It looks like certificates were lost in transit,

9   which just doesn't happen very often, but in this case it

10  seems to.  So some of the assets didn't transfer.

11      So, pre- and postpetition, while that was going on,

12  Highland employees were advising the trustees for those assets

13  -- these are Highland-managed CLOs where there's a trustee in

14  place, and the assets are preferred shares in the CLOs -- when

15  those preferred shares were due cash, they would go to the

16  trustee.  The trustee would see that CDO Fund still owned the

17  asset because the transfer didn't make it all the way to

18  Sentinel, and the trustee would deposit those into a CDO Fund

19  account.  Highland employees were directing that those pre-

20  and some postpetition, that those assets -- those accounts be

21  swept to Sentinel.

22          MR. MORRIS:  Your Honor, if I may, I think that --

23  Mr. Clubok, it would be helpful here.  I think some of the

24  documents that they have admitted into evidence relates to

25  these postpetition transfers.  So Mr. Seery can correct me if

Seery - Examination by the Court            61

1   I'm wrong -- and I'll call this argument -- that there are

2   certain assets, including Greenbrier, that didn't make their

3   way, even though they were intended to make their way to

4   Sentinel, did not because their certificates were lost.  And

5   as, you know, that assets and any other that didn't actually

6   make its way as intended, as they generated income, it was the

7   income and other dividends or distributions that those

8   interests received that were then transferred to Sentinel.  Do

9   I have that right, Mr. Seery?

10          THE WITNESS:  Yes, you have.  That's correct.

11          MR. MORRIS:  Yeah.

12          THE COURT:  Okay.  That's all the follow-up I had.

13  Anything else of Mr. Seery?

14          MR. MORRIS:  No, Your Honor.  Highland at this point

15  rests.

16          THE COURT:  Okay.  Thank you, Mr. Seery.

17          MR. MORRIS:  I'll turn the podium over to Mr. Clubok.

18  Yeah.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21      (The witness is excused.)

22          THE COURT:  Mr. Clubok, any more evidence from UBS?

23          MR. CLUBOK:  Yes, Your Honor.  We do have evidence.

24  This is where we have probably a good 45 minutes.  I don't

25  know if you want to take a break or if you want me to just

62

1  launch into it.

2          THE COURT:  Oh, okay.  I appreciate getting that time

3  estimate.  We will go ahead and take -- let's make it a 10-

4  minute break, please.

5          THE CLERK:  All rise.

6      (A recess ensued from 11:18 a.m. until 11:31 a.m.)

7          THE CLERK:  All rise.

8          THE COURT:  All right.  Please be seated.  Thank you.

9  We're back on the record in UBS v. Highland, Adversary 21-

10 3020.  Mr. Clubok, are you ready to proceed?

11     (No response.)

12         THE COURT:  All right.  You must be on mute.

13         MR. CLUBOK:  Sorry.  Thank you.

14         THE COURT:  Okay.  Gotcha.

15         MR. CLUBOK:  Your Honor, can you see the title page

16 of the presentation we're about to walk through?

17         THE COURT:  I can.  Thank you.

18         MR. CLUBOK:  Terrific.  Okay.  I will be -- you know,

19 again, for efficiency's sake, we can call the first few

20 minutes the opening, if you'd like.  But really I just want to

21 get right to presenting the evidence for our part of this

22 proceeding.

23         OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

24         MR. CLUBOK:  Your Honor, again, Andrew Clubok, Latham

25 & Watkins, on behalf of UBS.

63

1    Your Honor, we start with how did we get here.  And you've

2   heard this before.  But UBS had a $1 billion judgment.  And

3   very specifically, the judgment that I spent so much time that

4   Mr. Seery has alluded to that really was the impetus of a lot

5   of discovery initially was specifically against two entities,

6   approximately 50 percent to each.  About $531 million, the

7   judgments against Defendant Highland CDO Opportunity Master

8   Fund, which we've often shorthanded as CDO Fund, and about

9   $510 million against Defendant Highland Special Opportunities

10  Holding Company, which we often call SOHC.

11    These judgments were the product of a so-called Phase I of

12  the New York litigation that UBS instituted back in 2009

13  against Highland Capital Management and some of these other

14  funds.

15    Phase II was supposed to take on Highland Capital

16  Management and the other Defendants' liabilities, but

17  restructuring intervened, and as a result those proceedings

18  were stayed and Your Honor knows the rest.

19    We have, as Your Honor knows, settled with most of the

20  Defendants, but there was one important Defendant remaining,

21  and that was the parent company of Highland Special

22  Opportunities Holdco.  That SOHC is a hundred-percent

23  subsidiary of Highland Financial Partners.

24    And just recently, after a damages inquest and other

25  proceedings in New York -- well, this was the total judgment,

64

1 │ the $1.042 [billion] that Your Honor is familiar with, before

2 │ additional interest -- but recently we obtained a judgment in

3 │ the so-called Phase II portion of what remains in New York,

4 │ and amongst other judgments, most importantly for the purpose

5 │ of today, is that we have now obtained a judgment against

6 │ Highland Financial Partners as an alter ego of the Defendant

7 │ SOHC.  So HFP is responsible for that same $510 million, plus

8 │ additional interest.

9 │     And I'm getting a request to annotate, but I guess I have

10 │ to hit approve, too.  Which is fine with me.

11 │     In any event, the HFP alter ego judgment is now also

12 │ completed.

13 │     As was well known, and you'll see that, in particular, Mr.

14 │ Dondero, Mr. Ellington, and their associates all have

15 │ anticipated for years that one day SOC's liabilities, SOHC's

16 │ liabilities, would also be HFP's liabilities, as they now

17 │ officially are.

18 │     Sorry.  I've got this request to annotate that has created

19 │ some curious issues here.

20 │     (Pause.)

21 │         MR. CLUBOK:  A moment, Your Honor.

22 │     (Pause.)

23 │         MR. CLUBOK:  Well, unfortunately, I -- someone asked

24 │ me if I could annotate.  I'm going to try to annotate.  Okay.

25 │ There we go.

**106**

65

1        In any event, we start with the judgments.  Then the next
2   thing to know about, as you've heard a little bit, is there
3   was this so-called ATE, or after-the-event policy.  And
4   Exhibit 1 is a copy of this so-called policy.  As you can see,
5   the insurer is Sentinel Reinsurance.  The legal action that
6   this policy was aimed at, the only one identified in the
7   policy, is the New York action, the *UBS Securities v.*
8   *Highland Capital Management* and others.  The limit of
9   indemnity was intended to be $100 million.  And the premium
10  was identified as $25 million.
11       Well, Your Honor, you heard a lot about how the ultimate
12  consideration for this policy exceeded even the coverage
13  limits of $100 million.  But, of course, that's -- you don't
14  pay for an insurance policy with the coverage limits, you pay
15  for it with a premium, and this premium was supposedly set at
16  $25 million.  So the transfer of assets, which you've heard
17  already testimony exceeded $100 million and had a face value
18  of $300 million, far exceeded the so-called premium limit.
19  And, of course, exceeded the limit of indemnity itself.
20       The policy is fairly straightforward, fairly simple.  It
21  said that the insurer agrees to indemnify the insured in
22  respect to any legal liability occurring during the period of
23  insurance, up to and including but not exceeding the limit of
24  indemnity, provided that either the Court or any Appellate
25  Court makes an order of liability relating to the legal action

66

1  that's insured.  Notably, also if there was a settlement would

2  be another way that the policy would be triggered.

3      As you've seen, this policy was signed by James Dondero in

4  his -- what has become the typical fashion that we've seen in

5  which he signs on behalf of every relevant Highland-related

6  entity.  Here, he signs for all the insureds, which are

7  identified as CDO Opportunity Master Fund, Highland CDO

8  Holding Company, which we'll come back to, and then Highland

9  Special Opportunities Holding Company.

10     At the same time, there was an asset transfer, a so-called

11 purchase agreement whereby all of these funds, and other funds

12 at Highland, pooled their assets and transferred them all to

13 Sentinel, supposedly so that Sentinel could purchase them, so

14 that in turn these Highland funds could then pay the supposed

15 $25 million premium.

16     And then the premium, as set forth in Exhibit 2, was

17 agreed to be all of the assets listed in Schedule A hereto as

18 a hundred percent payment of the premium.  And Schedule A,

19 which you saw briefly during Mr. Morris's presentation,

20 identified every single asset from CDO Fund, from SOHC, from

21 HFP, and also from some other entities that we'll talk more

22 about in a moment.

23     One thing of note of these assets, and I'll just point out

24 because Your Honor asked about it, is that there is the so-

25 called Multi-Strat asset.  Remember, Multi-Strat was then

**108**

67

1   called Credit Opportunities CDO Limited Partnership Interest.

2   You can see that CDO Fund, this is the Highland CDO

3   Opportunity Master Fund asset, so CDO Fund, which is the

4   entity -- one of the entities that we have over a half-

5   billion-dollar judgment directly against now, had this

6   interest in what was then called Credit Opportunities but is

7   now known as Multi-Strat.  That is the interest that is now

8   currently the subject of the restraining order, and had not

9   the restraining order entered, those monies would have

10  already, as Mr. Seery testified, been distributed on to

11  Sentinel.

12      Just like with the insurance policy, with the asset

13  transfer agreement, Mr. Dondero just signs on behalf of

14  everybody.  You will see all the transferors he signs on

15  behalf of.

16      It turns out, or as known from the get-go, that this was a

17  massive overpayment.  Remember, the aggregate purchase price

18  paid by Sentinel for these assets was $25 million.  That was

19  what the premium supposedly was set for -- was set as at the

20  outset.

21      At this time, and this is according to a tax memo that

22  Shawn Raver wrote, you know, about a year later when he's

23  trying to evaluate the tax consequences of the Sentinel

24  acquisition of -- notably of HFP/CDO Opportunity Assets,

25  you'll note even internally they describe this not as SOHC and

68

1   CDO Fund assets but as HFP CDO Fund assets.  This is when they

2   were challenging alter ego at that time, and they continued to

3   challenge alter ego right up until we got the judgment.  But

4   you can see that internally they certainly treated it as an

5   HFP liability, not an SOHC liability.

6       In any event, you'll note that the purchase price for the

7   assets was $25 million, but the aggregate fair market value of

8   the assets on the date of the transaction was $105 million and

9   change.  So, from the get go, they're paying, you know, more

10  than quadruple the premium price, and more even than the

11  limits of coverage.

12      As you noted, as Mr. Seery testified already, this was

13  from his deposition, we're here because Highland Capital

14  Management controls Multi-Strat in two ways, both as indirect

15  hundred-percent owner, also as investment manager, and also

16  controlled CDO Fund.

17      And then we're here because Your Honor, having entered a

18  TRO, otherwise it may have already been too late to stop a lot

19  of this.

20      So, what now?  What now is that UBS asks for what it's

21  always asked for, is an ultimate -- a permanent injunction.

22  And we set forth in our response to this motion -- and,

23  really, this is what we've asked for from the get go -- this

24  requires a slightly different form of order than what Highland

25  submitted, but I hope that after they hear the rest of this

69

1   evidence they will agree that our form of order is

2   appropriate.

3       By permanent, as you can see in our order, it means not

4   permanent for the rest of time, but permanent until either a

5   court adjudication of what actually happened here or a

6   settlement agreement.  And we now hope that the latter will be

7   what triggers it, at least for the assets that we now know

8   about.

9       So, what are the factors?  Obviously, success on the

10  merits.  Irreparable injury.  Weighing of harms.  And the

11  public interest.  And these are the familiar factors recently

12  articulated in the *Environmental Texas Citizen Lobby* case from

13  the Fifth Circuit, 824 F.3d 507.

14      So, let's talk about success on the merits.  Why will UBS

15  win?  Not just likely to, but will win on the merits if we

16  proceed?

17      There's really two ways for UBS to prevail here.  You

18  could look at it either way.  Either the policy was just pure

19  fraud and everything needs to be unwound.  Or the policy was

20  valid, valid, but there was about an $80 million

21  (indecipherable) overpayment.  In other words, it may well be

22  fair that a $25 million ATE policy could have purchased a $100

23  million -- a $100 million after-the-event coverage at that

24  time.  As we've seen, they didn't pay $25 million.  They paid

25  $105 million.

70

1        So these are two different theories that both result in

2   effectively the same place.

3        Now, we're not claiming simply constructive fraud, or we

4   wouldn't be claiming simply constructive fraud at the end of

5   the day.  This is -- this goes into actual fraud.  And as a

6   result, we're going to go through the factors, the so-called

7   badges of fraud.  And these badges are from New York

8   precedent.  And they are from the *Matter of Gard Enter. v.*

9   *Block*, most recently articulated, 2012 N.Y. Misc. LEXIS 4175.

10  But they very much overlap with the badges of actual fraud

11  that Texas and the Fifth Circuit have identified very recently

12  in the *Matter of Alabama & Dunlavy*, 983 F.3d 766.  That's a

13  Fifth Circuit 2020 case.

14       These particular ones that we have on the screen on Slide

15  12 are the actual ones identified from -- by New York, and we

16  think New York law applies because the fraud was conducted

17  through the Bank of New York and was directed at the New York

18  proceedings.  However, you could also argue that Texas law

19  applies because clearly the continuing fraud that continued

20  even after the restructuring has affected this bankruptcy.

21       So, under either way of looking at it -- and normally you

22  don't need to, of course, show each one of these; you show

23  some of these -- you'll see that literally every one of these,

24  and every one to the extent it's slightly articulated

25  differently in Texas, have all been demonstrated by the

71

1   evidence that we've obtained.   So we're going to briefly walk

2   through those.

3       We begin with knowledge of the claim.  This is obvious.

4   That the timing -- and by the way, a lot of these factors

5   overlap, because it's like one factor is whether you had

6   knowledge of a claim in anticipation of a transfer.   Another

7   is suspicious timing of a transfer.  So some of these, as you

8   can see, overlap.

9       But certainly knowledge of the claim.  In March of 2017,

10  UBS had defeated all or virtually all of Highland and the

11  Funds' arguments on summary judgments.  And they had a host of

12  supposed defenses on liability that they claimed they were

13  going to win on summary judgment.  They were, I believe, all

14  or virtually all overruled.  That ultimately was appealed, and

15  in New York you can take interlocutory appeals much more

16  liberally than other jurisdictions, so they were able to delay

17  the trial for another year through interlocutory appeal of the

18  denial of summary judgments.

19      This is the world they were facing in March of 2017.  In a

20  very thorough opinion, Justice Friedman and the Supreme Court

21  of New York had overruled their -- rejected their summary

22  judgment claims.

23      So remember that date, March -- that's March 2017.

24      So we asked Mr. Leventon, let's start with liability and

25  then we'll talk about damages.  Did you ever give a

72

1   recommendation that UBS was likely to win on its breach of

2   contract claim against CDO Fund and SOHC in Phase I?

3       Answer, Yes, I did.

4       Question, What was that recommendation?

5       Answer, That liability was likely to be found.

6       Question, Who did you make that to?

7       Answer, I don't recall.  It certainly would have been --

8   well, I don't recall who it was.

9       Question, You said certainly would have been.

10      And then he answered, No, I believe it probably was Mr.

11  Ellington and Mr. Dondero.

12      Later in his deposition he was asked, How many times did

13  you have discussions with Mr. Dondero in which you expressed

14  your view that liability was likely to be determined against

15  CDO Fund and SOHC?  He claimed he didn't recall.  And then he

16  said, Well, it would have been more than one and probably less

17  than five.

18      Likewise, Mr. Ellington testified.  We asked him, You said

19  a number of times that it didn't surprise you at all about the

20  size or the magnitude of the damages verdict, correct?

21      He answered, Correct.

22      Question, And you had warned Mr. Dondero, in words or

23  substance, that this was likely to occur before the verdict

24  came, correct?

25      Answer, Yes.

1    So, not only did they obviously know about the claim, but

2    they had, you know, the individuals, Mr. Ellington and Mr.

3    Leventon, who were tasked with responding to the claim and

4    running the litigation in-house, had formed opinions about the

5    likely loss and had shared those with each other and certainly

6    with Mr. Dondero.

7    In the course of purchasing this after-event, you know,

8    so-called after-the-event policy, they were asked by Beecher

9    Carlson -- you're going to find out that Beecher Carlson is

10   the managing -- insurance managing agent for Sentinel.  And

11   they were asked at some point, well, you know, what's up with

12   these claims?  Or can you give us an analysis of them?  And

13   there's an email exchange between Mr. Leventon and then Mr.

14   Sevilla, who at the time was another former assistant general

15   counsel in the Highland legal department.  And in that

16   exchange, which they prepared to be able to send on to

17   Sentinel's representative, Mr. Leventon notes, The claims

18   against CDO Fund and HFP and affiliates are very strong.  They

19   are guaranty claims.  The Defendants' primary responsibility

20   will be to contest the amount of damages.

21   And they note that it's $686 million at that time from

22   February of 2009, accumulating interest.  And obviously the

23   billion-dollar judgment, much of it is interest.  And they

24   noted how CDO Fund was a guarantor of 49 percent.  And, again,

25   by the way, HFP/Affiliates are 51 percent guarantors.

74

1    At this time, they were insisting, demanding, putting on

2    evidence in court that supposedly HFP and SOHC were not at all

3    alter egos, that they were not related, they shouldn't be

4    treated as one.  But internally, when they wanted to pool the

5    assets of HFP and SOHC to purchase this so-called policy, and

6    then when they wanted to justify it to Beecher, they're always

7    talking about it as if -- as if it's HFP, as one unified alter

8    ego.

9        So that's just a -- one of the many sort of side let's

10   just say issues that are uncovered by this whole series of

11   events.

12       In any event, that's our main story.  At that point, and

13   the next thing to see or badge of fraud is the transferor's

14   inability to pay.

15       Well, at this time, these funds, the HFP and CDO Funds,

16   who are the main Defendants, HFP through its alter ego, SOHC,

17   at that time, were insolvent.  And they were insolvent -- at

18   least, they had declared to their investors they were

19   insolvent back in 2009.  And check -- and look at this.  This

20   is the HFP letter that went to its investors in 2009:  Due to

21   events and circumstances described in this letter, we've

22   concluded that as of December 31, 2008, it's likely that all

23   future inflows of cash to HFP will be used to pay creditors

24   and there is no prospect of return to holders of HFP.

25       So, first of all, they're telling their holders of HFP,

1  hey, all we've got left are creditors.  And by the way, other

2  documents, and we've submitted them into the record

3  (indecipherable) and they're talked about in the depositions,

4  the only major creditor left is UBS.  If UBS's claim had

5  really been denied or if they had prevailed, HFP would have

6  actually finished in the black, not in the red.

7      So they're telling their investors, hey, we can't pay you,

8  we're insolvent because we have this giant claim to UBS.  Of

9  course, they've never paid a single penny to UBS.  HFP has not

10 directly.

11     Meanwhile, CDO Fund, the same thing.  They're telling

12 their investors, yes, we're also insolvent.  And explained to

13 their investors, of, look, all of the Fund's available assets

14 will be distributed to the Fund's remaining (indecipherable)

15 and counterparties and other senior and trade creditors in an

16 orderly liquidation.

17     Of course, that doesn't happen.  None of CDO Funds -- and

18 you've seen the CDO Funds that were belatedly identified to

19 Mr. Seery in 2020, and you've also seen that lengthy list of

20 funds or assets that CDO Fund had back in 2017.  They

21 obviously had this post-2009.  They have told their investors,

22 hey, everything we've got left is going to be distributed to

23 our creditors, but instead we know now that they've funneled

24 it to Mr. Dondero and Mr. Ellington's Cayman entity.

25     Another badge of fraud.  Suspicious timing in anticipation

76

1   of litigation.  This plan was all hatched -- remember, March

2   '17 is when they lost summary judgment.  This plan is hatched

3   just a few weeks later, in April of '17.  And this is the so-

4   called settlement analysis that sort of lays out the scheme.

5   And this is a document that I believe was prepared by Mr.

6   Leventon and Ms. Vitiello, at Mr. Ellington's direction, I

7   believe.  And it's Exhibit 7 in the record.

8       And it notes -- this is why they were trying to justify

9   why they should do this ATE policy.  And they say, well, if

10  UBS wins, Highland is going to lose all the assets again in

11  HFP and CDO Fund.

12      And by the way, of particular note, the one asset they

13  made particular note of:  HFP assets include a $32 million DAF

14  note payable.  Put a pin in that.  And remember, why are they

15  so intently concerned?  Of all the $300 million of face value

16  assets, the one that gets particular attention in this

17  presentation is a $32 million DAF note payable.

18      That note, by the way, we now have come to learn, is an

19  entity which Your Honor is familiar with, I think it's been

20  called CLO Holdco or CLO entity, and it's also known as the

21  DAF.  That note was owed to CDO Fund because of a prior

22  transfer, probab... you know, of -- or I do know that we're --

23  I'm sure we'll dig into.  And so they're holding this $32

24  million note that the DAF owes them, and they note that, if

25  Highland doesn't settle, Highland is going to lose all the

77

1    assets, including that particular $32 million DAF note.

2        It's also noted that Highland will face years of

3    fraudulent transfer claims through the Highland structure, and

4    HCMLP will face clawback of $9 million and liability to

5    backstop HFP CDO Fund for up to $1.2 billion.

6        This was the view of the legal department.  Obviously,

7    never shared with us during the litigation, but we've come to

8    understand never shared with Mr. Seery or with Mr. Morris,

9    right?  Their team, right?  This is -- this is all -- this

10   document is uncovered after Mr. DiOrio is fired, after

11   everyone is fired, I believe, related to this, and then they

12   happen to find this document either on a desk or through that

13   email search that you heard about.

14       Side note.  If Highland were to win, you can see below,

15   then it would show that HFP is solvent.  That would have

16   reduced -- reversed the tax write-off and would have perhaps

17   exposed them to tax fraud or to at least a massive payment for

18   prior taxes.

19       So, a lot going on here.  But, again, let's get back to

20   the direct impact on UBS and then, later, Highland.

21       So, this is the settlement analysis that was prepared to

22   support this whole ATE scheme.  And here's the structure

23   that's laid out.  Okay.  And this is before the actuaries have

24   gone to work.  This is before they've put together the actual

25   documents.  This is April of 2017, when the scheme is first

78

1   hatched.  And it says, Step 1.  HFP -- once again, HFP, CDO

2   Fund -- will buy a $100 million ATE policy from Sentinel.  The

3   ATE premium will be all assets in HFP CDO Fund.

4       It doesn't say, gee, we'll go find out what the premium

5   is, or we'll go check with an actuary and see what it should

6   be, or we'll price this thing out and find out what the

7   likelihood is of buying such a helpful insurance policy at

8   this time.  Nope.  It's just, The premium is going to be

9   whatever assets are left that we can round up.  That's the

10  plan from the get go.  And it's suspiciously timed right after

11  summary judgment has been lost in anticipation of trial.

12      The close relationship amongst the parties who devised

13  this plan.  Mr. Ellington -- that's putting it mildly.  Mr.

14  Ellington is the one who devised the plan.  Says the idea --

15  we asked him, Who had the idea?  He said, I had that initial

16  conversation with Mr. Leventon because it was my idea.

17      Question, It was your idea to have Sentinel issue an

18  insurance policy with respect to the UBS litigation that was

19  then pending in New York, correct?

20      Answer, Yes.

21      This is from Mr. Leventon's deposition transcript, 86:21

22  through 87:6, which has been marked and included as part of

23  the designations for Mr. Ellington.

24      Mr. Leventon was then asked, Who made the decision to

25  obtain the policy?  So, Mr. Ellington had come up with the

79

1   idea, but of course, we all know who's the ultimate decider at

2   Highland.

3        Mr. Leventon says, My understanding is that it was Mr.

4   Dondero who made that decision.

5        What's that understanding based on?

6        That was communicated to him by Mr. Ellington.

7        When?

8        Back around the time, probably right after the policy was

9   implemented.

10       Of course, there is a very close relationship, because

11  Dondero and Ellington own several.  This is Mr. Ellington.

12  This is a -- this is an org chart for Sentinel.  And you can

13  see it was notarized -- this was produced to Sentinel back in

14  -- or provided, I believe, to the regulators in the Caymans in

15  January of 2018.

16       So this is the way things looked back at the end of '17

17  when these actions were taken.  And you can see that Mr.

18  Ellington has a 30 percent ownership interest in Sentinel,

19  although he was only given a 9 percent vote.  Mr. Dondero had

20  a 70 percent ownership interest ultimately through a bunch of,

21  you know, intermediary entities, but yet a 91 percent vote in

22  how Sentinel would be operated.

23       And that's it.  These are the two so-called UBOs or

24  ultimate beneficial owners.  Sometimes they're listed on org

25  charts as UBO 1 and UBO 2.  But UBO 1 and UBO 2 are simply Mr.

80

1   Ellington and Mr. Dondero, who collectively own a hundred

2   percent of Sentinel.

3       Remember, this is the scheme.  We're going to pool all of

4   HFP and CDO Fund's assets, whatever they amount to, send them

5   off to Sentinel, supposedly for this hundred-million-dollar

6   ATE policy.

7       And this was Beecher Carlson.  Again, it's Sentinel's

8   insurance manager.  He was deposed in these proceedings.  And

9   we asked, Was it common that employees of Highland Capital

10  would do things on behalf of Sentinel?  This goes, again, to

11  whether there's a close relationship between HCM and Sentinel.

12  Mr. Carlson -- or Mr. Adamczak, who is the representative, the

13  corporate representative of Beecher Carlson, says, Well, a

14  captive insurance company does not generally have any

15  employees, so all of the employees are typically from a

16  sponsoring organization.  In this case, it was Highland

17  Capital that was the sponsoring organization.

18      Now, when you look at the deposition transcripts, you can

19  see that, one by one, the former Highland employees denied to

20  various degrees their involvement with Sentinel.  Meanwhile,

21  though, Sentinel has no employees, and it was these Highland

22  former employees who did everything for Sentinel while they

23  were being paid by Highland.

24      But, again, this just -- for purposes of this factor, this

25  just goes to the close relationship between HCM and Sentinel.

81

1   Obviously, Mr. Dondero, who ultimately controls HCM, also

2   ultimately controlled Sentinel.  You've got Mr. Ellington.

3   And then you've got all of the Highland former employees doing

4   the work of Sentinel.

5       Here is an example of each of the key figures who were at

6   Highland who've now been fired.  Mr. DiOrio.  He was the

7   former managing director of Sentinel, but he was also a

8   Sentinel director.  And that included right up until after

9   even he was fired by Highland and finally tendered his

10  resignation.  But he was made a director in the wake of this

11  transaction.

12      Mr. Sevilla.  He was the former assistant general counsel

13  at Highland.  And he was described by Mr. DiOrio as the point

14  person, I guess, for things that had to happen with Sentinel.

15  He helped with the formation.  He, as I understand it, he was

16  part of the team.  And he's also described as the point person

17  by everybody except for Mr. Sevilla, who disavows the same

18  kind of involvement that everyone else said he had and that

19  the documents show he had.

20      Then you've got Mr. Leventon.  He was another former

21  assistant general counsel.

22      By the way, all these folks are in the legal department.

23  They have fiduciary duties.  They're all in the legal

24  department, and they presumably have fiduciary duties

25  throughout, and they're all, as you can see, right in the

82

1   thick of this.

2       Mr. -- the corporate representative of Beecher Carlson

3   talked about how Mr. Leventon, each year-end, would work with

4   Sentinel's actuaries to determine the scenarios for the

5   outcome of the case -- he's talking about the UBS litigation

6   -- with the end goal being to determine what the loss,

7   ultimate loss would end up being that Sentinel would record in

8   their financial statements.

9       So Mr. Leventon is working hand-in-glove with Sentinel

10  from the time the policy is issued -- even before; you know,

11  he was one of the drafters of that memo -- but certainly for

12  years after, including after the restructuring.  Of course,

13  with never a word to Mr. Seery or his outside counsel.

14      And then you have Katie Irving.  She was a former managing

15  director.  She's, again, one of these people who, in her

16  deposition, tried to effectively say she really didn't have

17  much to do with Sentinel.  But at the Beecher deposition, they

18  noted that she was someone who had been knowledgeable of all

19  the activities centered around Sentinel, and she attended

20  multiple meetings between Sentinel and CIMA, which is the

21  regulatory authority in the Caymans.  She had traveled to the

22  Cayman Islands several times for these meetings, yet somehow

23  it's all apparently slipped her mind when she was being

24  examined or asked about this kind of information directly or

25  indirectly by Mr. Seery and his team.

83

1    Back to the Beecher Carlson representative.  In terms of

2    the unusualness of the transaction, Beecher has lots of

3    insurance companies that they help manage.  We asked if they

4    have any other clients that issue ATE policies.  Answer is no.

5    Sentinel is the only one.

6    Just how many ATE policies did Sentinel actually produce?

7    Just the one.

8    Just the one we're looking at here?

9    Correct.

10   So this is very outside the ordinary course of business.

11   And here's why.  At the time of the transaction -- this is the

12   financials at the end of 2016.  Remember, the transaction is

13   summer of 2017.  Things haven't changed much for Sentinel in

14   those few months.

15   (Interruption.)

16       MR. CLUBOK:  That's -- the total assets are $19

17   million.  Okay?

18       A VOICE:  Sorry.  I didn't mean to get --

19       THE COURT:  I'm sorry.  Who's speaking?

20       MR. CLUBOK:  Okay.

21       THE COURT:  Who is that voice?

22       MR. MORRIS:  I think that was one of ours, Chris, I

23   think you went off mute.

24       THE COURT:  Okay.

25       MR. CLUBOK:  That's okay.

**125**

84

1          THE COURT:  Continue.

2          MR. CLUBOK:  That's fine.  Back on Slide 30.  Slide

3  30 is UBS Exhibit 9, and that's from Sentinel's financial

4  statements year end of 2016.  And you can see that as December

5  2016 Sentinel's total assets were only about $19 million.  So

6  how are they issuing a $100 million ATE policy in good faith?

7      Well, the only way to even try to justify it is if you get

8  more than $100 million in transfers, which we know they

9  ultimately did.  But, again, this just shows how unusual and

10  outside the ordinary course of business this whole transaction

11  was, even for Sentinel, even if someone were to try to portray

12  it as just a, you know, normal insurance company, just your

13  everyday normal captive insurance company in Highland run by

14  Mr. Dondero and Mr. Ellington.

15      You can see the total cash was only about $5.8 million.

16  And of course, the policy doesn't -- isn't supposed to pay off

17  the claim in cash and prizes.  It's supposed to pay just cash.

18  But they only had about less than $6 million on the balance

19  sheet at the time.

20      Unusualness of the case, case, is another factor that

21  indicates fraud.  And of course, we asked -- this is the

22  former chief accounting officer, Mr. Stoops.  At Mr. Sevilla's

23  instructions, did you transfer all the assets of the relevant

24  funds?

25      Answer, Yes.  That is my recollection.

85

1      And in that instruction, he wanted all funds or all assets

2  transferred, regardless of the value of those assets?

3      Yes.  That's right.

4      Mr. Ringheimer, who was the former management or manager

5  of operations, I guess, is his title at Highland, he was

6  asked, To the extent there's a transfer of all of the funds of

7  a particular entity, would you say it was common while you

8  were at Highland for Highland to transfer all of the assets

9  out of a Highland entity?

10     Answer, I don't believe I -- so, I have seen funds wind

11  down before, but I don't believe I've seen another transfer

12  like this before.

13     Then we asked, Do you recall what the urgency was for

14  executing a transfer that day?

15     Answer, I do not.

16     Never communicated to you why it was urgent?

17     Answer, If they did, I don't remember.

18     And remember, you've already heard testimony that it was

19  done in such haste that some of the assets weren't even

20  properly transferred.

21     Use of dummies.  This is a -- you know, it's always hard

22  to unpack how Highland -- entities.  But if you look at

23  Exhibit 1, you will note three insureds.  CDO Fund and SOHC,

24  which you would expect, but also, oddly, CDO Holding Company.

25  When you look at the Defendants, though, you don't see CDO

86

1   Holding Company.  That was not one of the Defendants in the

2   litigation, and yet somehow they're becoming an insured

3   pursuant to this policy.  That's curious.

4        Meanwhile, who paid for the insurance?  There are six

5   entities who paid for the insurance, and three of them are the

6   insureds.  That's double-curious, right?

7        And so all of this just adds to the suspiciousness of this

8   whole transaction.

9        So, what about the consideration?  Well, obviously, you've

10  heard a lot.  It was inadequate.  This was, going back to that

11  settlement analysis that was done, you know, hastily a few

12  weeks after summary judgment was lost, out there it was

13  identified that HFP CDO Fund would send all their assets, and

14  they said, parentheses, $94 million, as the ATE premium, and

15  that would let them write a $100 million ATE policy for UBS

16  liability.  They had roughly estimated that there was about

17  $94 million left between HFP and CDO Fund, and that would

18  justify this $100 million policy.

19       Well, it turns out that the aggregate purchase price paid

20  was actually $25 million.  Okay?  So the premium gets set at

21  $25 million, for other curious reasons.  And meanwhile, the

22  aggregate fair market value of all the assets -- because the

23  plan was always to transfer all the assets, regardless of the

24  value -- turns out to be $105 million.  So that original plan,

25  transfer all the assets to get us $100 million, that never

87

1  changed, even though it turned out the assets were worth more

2  than $100 million and the so-called premium had to be set at

3  $25 million.

4      Now, the Cayman Islands Monetary Authority, CIMA, found

5  this suspicious.  And they asked about it.  And here you'll

6  see, they catch Sentinel in a complete lie.  This is a report

7  that was done May 19th, when they're saying -- they're asking

8  for information about what happened here.  And they say, Those

9  changed with Licensee's governance could not explain the basis

10  upon which the investments had been valued on or about August

11  20 -- August 1, 2017 for the purpose of premium settlement.

12  And this is Page 78819, Bates label, that is, of UBS Exhibit

13  11.  Sort of a question/answer.  It's like CIMA will say,

14  Well, here's the question we raised, and then they will say,

15  Well, how did management respond?  And this is how management

16  responded when CIMA raised this question.  They said, you

17  know, basically, how'd you set the policy?  How'd you set the

18  premium?  And management -- this is management's comments, was

19  that, At the time the ATE policy was drafted, premium had been

20  established at $25 million based on a pricing study conducted

21  by Licensee's actuary.

22      So they told CIMA, Hey, no problem, we had an actuary set

23  the price, and $25 million was the price.  Let alone the

24  overage of payment, but at least $25 million was supposedly

25  the premium price pursuant to this actuary.

88

1    Well, CIMA didn't just take their word for it.  They

2    continued their investigation, and this is how CIMA in this

3    report, Exhibit 11, responds to this management comment.  They

4    say, Well, on April 4, 2019, the Authority held a telephone

5    interview with Mr. Jason Stubbs of Risk International, the

6    Licensee's actuary.  During the interview, Mr. Stubbs informed

7    the Authority he was not involved in the determination of

8    premium pricing for the Licensee to any extent at all.

9        It goes on to say, The Authority notes with concern that

10   the management's assertion that the ATE policy premium of $25

11   million was established based on a pricing study conducted by

12   the Licensee's actuary contradicts the actuary's position.

13       So the actuary is basically outing them for having just

14   simply lied to CIMA.

15       But you still -- even all that is suspicious, but the

16   problem is we know the assets were worth way more than $25

17   million.  And by June of 2018, there was already questions

18   being raised.  And Mr. Adamczak at Beecher Carlson had written

19   an email to J.P. Sevilla and Matt DiOrio, copied one of his

20   colleagues, and he said, Look, the problem is the premium was

21   only $25 million, creating a ding on the transaction.  This is

22   from Exhibit 12.  Because there is no return of overpayment of

23   premium, it gives rise to the question, is this an arm's

24   length transaction?

25       This is the managing agent for Sentinel raising these

89

1    concerns.

2        So what do they do?  They change -- they change the

3    policy.  And this is -- this is way after the fact.  This ends

4    up being in 2018.  This is like June of 2018.  Remember, this

5    is about a year after the policy which was -- it was issued in

6    2017.

7        And what they do is they just say, you know what, let's

8    just adjust the premium.  Now let's say the premium is $68

9    million.  Okay?  And now let's say that the limit of indemnity

10   is down to $91 million.  Okay?  Remember, previously, they had

11   a fair market value of $105 million.  They've now got the fair

12   market value supposedly down to $68 million.  P.S., because

13   they're now treating that note from DAF as worthless, amongst

14   other things.

15       But they say, Well, the premium is $68 million.  We had

16   said if it was a $25 million premium, we at Sentinel would

17   have to take a gain on that difference.  Well, what if we just

18   after-the-fact changed the premium up to match exactly the

19   supposed new fair market value, and then lower the limit of

20   indemnity at the same time down to $91 million?

21       So they cook up this scheme, they do it.  Of course, they

22   forget to have the insureds sign it, which is, again, a series

23   of, I would say, fully unusual transactions.  And this is, you

24   know, again, a year after.  So they're just continuing to do

25   things to dig deeper into this hole.

90

1        We asked Mr. Adamczak, Is this something you've done

2   before in other policies, changed the premium to reflect

3   assets transferred?

4        Answer, This is the first situation like this we've seen

5   where there are assets that were taken in as opposed to cash.

6        And have you ever seen anything like it since?

7        I have not.

8        Beecher Carlson is a nationally renowned, you know, large

9   entity that works with insurance companies, I believe, you

10  know, all over the world, I think, but certainly they have

11  many clients.  They've never seen anything like this.  And

12  certainly it has never been done before by Sentinel.

13       So, again, this goes to how it's an unusual transaction,

14  and also it goes to the fact that this is not just one mistake

15  or one event but a whole series of things in a pattern.

16       By the way, he was asked, Did any one of the insureds

17  actually agree with the policy premium increasing by three

18  times without increasing the coverage amount?

19       He said, I'm not aware if that was presented to the

20  insureds.

21       Now, we know that a couple of those individuals at

22  Highland Capital Management were in the mix on this, but it

23  was never formally presented, I guess, to the insureds.

24  Somebody at Highland just said, Yeah, go ahead and do this.

25       Then, in 2019 -- and note, this is Exhibit 15, the date of

91

1   this is December 31, 2019, months after the bankruptcy in this

2   case has opened.  And then what happens?  There's an asset

3   transfer agreement because Sentinel had this collection of

4   assets that they want to get out of even Sentinel and

5   basically to transfer all these assets to another Dondero/

6   Ellington-affiliated entity -- I believe it was to Sebastian

7   Clark, allegedly -- all of these assets for $3.  That's in

8   December of 2019.

9        Now, this is -- you know, they've already moved the assets

10  from CDO Fund, HFP, and Sentinel in 2017.  They disposed of

11  some of them in other ways, but some they still have in the

12  Caymans.  And what they do is they hustle or try to hustle and

13  get them out after the restructuring to an entity connected or

14  owned by Ellington for $3.

15       You'll note that amongst these assets there's that $32

16  million CLO Holdco also known as the DAF note.  Remember the

17  one that they had so much emphasis on when they originally

18  hatched the scheme, that they were really worried that this

19  note could ultimately end up in the hands of UBS if UBS were

20  to prevail?  Well, they now try to double-transfer it away.

21       After, by the way -- here's another asset.  Aberdeen.

22  This is an interest in a CLO.  We now know this is -- millions

23  of dollars, I believe, are currently restrained in connection

24  with this Aberdeen asset by the New York court.  But, again,

25  they're just transferring all these assets, supposedly for $3.

92

1    Why?  Well, Mr. Adamczak said they were told they were

2    worthless.  And we asked, Who told you they were worthless?

3    And he said, That direction would have come from Matt DiOrio.

4    This is December of '19, after the bankruptcy.

5    Then we asked, Well, as part of the valuation service the

6    Valuation and Research Corp. had done, had they determined

7    these assets were worthless?  Had this VRC group, this -- the

8    group that previously they had used to try to give them at

9    least some argument of fair market value.  Mr. Adamczak said,

10   Well, they -- VRC had not been engaged to perform valuations

11   on those investments, and it was discussed that if those

12   investments were worthless there's no point in obtaining a

13   valuation.

14   So just think about that.  And this is his deposition at

15   276, Line 17, through 277, Line 6.

16   Basically, Matt DiOrio says, Hey, these assets are

17   worthless.  Transfer them to this entity for $3.  And they

18   say, Well, shouldn't we have VRC value them?  And DiOrio

19   basically says, No need to value them.  I told you they're

20   worthless.  Why spend money valuing them when I've already

21   told you they're worthless?  Even though they include a $32

22   million note payable by the DAF and they include at least

23   other assets that we know are worth millions of dollars.  We

24   asked if Beecher had done anything independent, and they

25   explained that had no way of confirming anything.

93

1       Now, luckily, those assets had been transferred back to

2   Sentinel.  And, luckily, the current directors, I believe, did

3   listen to our arguments, and also had, I think, some pretty

4   sharp instructions from CIMA.  And as a result, those assets

5   or those purported transfers have been unwound and those

6   assets have been returned to Sentinel.

7       But this just shows the danger and risk that at every --

8   every opportunity, these individuals will try to keep moving

9   these assets and try to keep evading them from judgment.

10      And by the way, this has happened before.  Mr. Seery was

11  testifying a little bit about what started all this.  This --

12  Slide 43 just has a compilation from UBS Exhibit 52, which

13  just showed the asset transfer or the fraudulent transfer that

14  we alleged back in 2009.

15      And for UBS, this is just déjà vu all over again, because

16  what we alleged in the New York case was, at the time, there

17  was a whole bunch of assets that were pooled into HFP and then

18  distributed to the winds right after default was declared in

19  the contract and at the outset of this litigation.

20      Actually, after UBS had sued Highland, a couple months

21  later they did this, you know, then face value of a couple

22  hundred million dollars in assets that we had argued was

23  fraudulently transferred.

24      What we see now happened in 2017 was basically the follow-

25  on to that, like, everything that was left, let's put it all

**135**

94

1  together and send all that to Sentinel.  So, to us, it is a

2  pattern.  And it is, as I said, déjà vu all over again.

3      And back then, just like in 2017, of course, Mr. Dondero

4  signed on behalf of everybody.  That's the typical pattern.

5  That's the series of continued fraudulent transfers that had

6  been -- UBS, but also really speak to what we've seen from

7  Highland in connection with many of the creditors.

8      Sentinel again looked at all of this -- later, and they

9  say, with respect to some of the other practices, they say

10  that, Those charged with the Licensee and licensing at

11  Sentinel governance could not explain the basis upon which the

12  investments have been valued in August 2017.

13      They also couldn't explain the reason why the information

14  that was relied on to value the investments for the purpose of

15  premium couldn't be readily provided to the auditors upon

16  request, considering that the policy inception and the

17  financial statements on it was only a few months apart.

18      CIMA also noted, and this is Exhibit 11 at Bates 78819,

19  that those charged with governance could not explain why the

20  premium was adjusted without a commensurate adjustment to the

21  indemnity limit provided or why the initial pricing was

22  subsequently deemed not sufficient.

23      And they say, In addition, in any case, to amend an

24  insurance policy to artificially inflate the premium amount to

25  equal the value of investments transferred to the licensee

 1  without any justifiable business purpose and economic

 2  substance is, at the very least, questionable.

 3      In sum, the above matters cast significant doubt on the

 4  economic substance and business purpose of the transactions

 5  relating to the ATE coverage.

 6      According to CIMA, it was Sentinel's own lawyers.  They

 7  hired a lawyer in Cayman to look at this, and they tried to

 8  get some help -- this was back in 2017 -- to just effectuate

 9  this plan once it had been cooked up.  And even back then the

10  Cayman lawyer noted, Has any thought been given as to the

11  legal validity of such a transfer, bearing in mind that these

12  assets will then be put beyond the reach of the Plaintiffs in

13  the U.S. litigation against the Fund.  Obviously, the last

14  thing you want to find is that the "premium" has to be

15  returned or set aside as some unlawful preference or similar.

16  Obviously, an issue for U.S. counsel, but just thought I

17  should raise it.  Well, you can imagine U.S. counsel at the

18  time in 2017 did nothing, but this was obviously flagged by

19  their Cayman counsel.

20      So, one factor that I skipped over but you've heard a lot

21  about is the secrecy.  And, really, the secrecy is a -- just

22  sort of it wraps everything up.  You know, we know the

23  bankruptcy was in October 2019.  We know that we got a

24  decision that notified the world or at least notified Highland

25  and Mr. Dondero and even Mr. Seery before he became a director

96

1   that there was this looming $1 billion judgment.

2       It was first issued as a decision.  It was not made public

3   so that the parties could have some time to try to negotiate

4   settlement, which we -- you heard testimony in other

5   proceedings that we started to with Mr. Ellington.

6       So Highland obviously had received it from the Court and

7   knew all about the billion-dollar judgment.

8       February 10th, it -- I'm sorry, the billion-dollar then-

9   decision.

10      By February 10, 2020, it is reduced to a judgment for

11  Phase I.  And yet from 2019 until the beginning of 2021,

12  everyone -- all these ex-employees of Highland now who knew

13  about this actively concealed it.

14      And of course, we start with Mr. Dondero.  This is Mr.

15  Ellington saying, Did you ever tell Mr. Dondero that there was

16  an insurance policy issued by Sentinel that could potentially

17  satisfy the judgment?

18      That was kind of an obvious question.

19      Ellington said, Well, I didn't need to tell Mr. Dondero.

20  He was aware of it since the inception.

21      And, of course, Mr. Dondero signed it.  So it just goes

22  without saying Exhibit 1 shows that Dondero knew about it.

23  And, of course, Mr. Dondero never said anything about it

24  throughout, as you can see by his deposition.

25      Meanwhile, though, Mr. Sevilla also covered it up.  We

97

1   asked Mr. DiOrio about Mr. Sevilla's role, and as we noted, he

2   was the point person for things that happened on Sentinel.  He

3   knew everything about Sentinel.

4        We asked Mr. Sevilla, in his deposition transcript, 278,

5   Line 20, to 279, Line 3:  So, between the time the independent

6   board was appointed and your departure from the company, did

7   you ever disclose to any of the members of the independent

8   board that you were aware the existence of a Sentinel

9   insurance policy ostensibly provided for coverage for the loss

10  of the UBS litigation?

11       Answer, no.

12       Mr. Leventon.  Mr. Leventon doesn't just omit information,

13  he -- well, you'll see for yourself.  This is one of the

14  documents where he had been tasked with tracking the assets

15  through on SOHC.  He says, this is Exhibit 16, and in one of

16  his emails to Mr. Seery and to Mr. Demo and others, he claims

17  he had been tracking the assets through an SOHC and CDO Fund.

18  He was putting together a report with supporting

19  documentation.  And he claims that there's just this small

20  account of cash and a few worthless securities.

21       Now, he's claiming he's tracking the assets through.

22  Okay.  He knows what happened to the assets of SOHC and CDO

23  Funds.  He helped devise the scheme to transfer them in 2017

24  to Sentinel.  He has also been, every year, talking to

25  Sentinel or their actuaries about the prospects of the

98

1   litigation.  And yet when Mr. Seery, Mr. Demo, and others task

2   him with tracking the assets, he just, you know, says what's

3   there, doesn't ever mention this.  You know, this would be, at

4   a minimum, a material omission.

5       I think if you read the documents and you look in Exhibit

6   16, you'll see things that are even more concerning.  This is

7   not an accidental omission.

8       This is the list he provides, without identifying at all

9   that there is, in fact, all of this other -- all these other

10  assets that were transferred and a $10 million supposed

11  insurance policy just available for the asking.

12      And he was asked, Well, you knew there was a schedule that

13  showed Sentinel having an interest in Multi-Strat that

14  specifically said, parentheses, from Highland CDO Fund.  There

15  was a schedule that showed that.

16      And he said, Well, I think that's fair.  December 2017, I

17  think that's fair.

18      And we asked, Well, when you were tasked with helping

19  trace the assets of CDO Fund and HFP, you even talked to Mr.

20  Ellington, in words or substance, about whether or not you

21  should mention Sentinel, correct?

22      And this is an email exchange that Mr. Ellington had had

23  with Mr. Leventon back in December of 2017.  This is Exhibit

24  46.  This showed -- this is of Highland Credit Opportunities.

25  In other words, the Multi-Strat list of -- of interests in

**140**

99

1  Multi-Strat.

2       And you can see, back in the end of 2017, it was

3  identified, the first one on the list is an interest of

4  Sentinel in Credit Opportunities, also called Multi-Strat.

5  Okay.  That's the interest that right now is being restrained

6  by Your Honor's order.  And this interest was being -- was on

7  the books as being settled but it said right in their

8  document, parentheses, from Highland CDO Fund, because it had

9  only been transferred a few months ago, in August.  Right?

10       So Leventon and Ellington know this.  They know that

11  Sentinel has an asset that came from CDO Fund.  Of course, not

12  just because of this document.  This is just one of many.  But

13  back then -- and, again, if you look at those documents, Mr.

14  Leventon was asked, You never told anyone at the Pachulski

15  firm that assets of CDO Fund held with respect to Multi-Strat

16  may have been transferred to Sentinel, correct?  And he says

17  yes, that's correct.  Just never -- never mentioned it.

18       We asked, What was the information you had about the

19  assets of SOHC and CDO Fund from March of 2009 to the present

20  that you chose not to provide to the Pachulski firm?  He says,

21  Answer, I knew that there had been a transaction in 2017

22  sometime with respect to an after-the-event insurance policy

23  with Sentinel.

24       Then we asked, Did you ever disclose the existence of this

25  policy to any of the independent directors?

100

1      Answer, I never discussed with them one way or the other.

2      This is all while he has been tasked with, as Mr. Seery

3  put it, generally speaking, to trace the assets from 2009

4  through the present.

5      Mr. Ellington goes even further.  He really tries to

6  divert things.  And you'll see in an email exchange where he

7  jumps in and tries to cloud the issue by using a phrase he's

8  used over and over again as he explains so-called ghost funds.

9  This is an August 15, 2020 exchange that's got Mr. Ellington,

10  Mr. Demo, Mr. Leventon, Mr. Seery, and others on it.  And this

11  is Exhibit 17.

12      Mr. Ellington jumps in.  If you read the Exhibit 17,

13  you'll see how he jumps in and he says, Look, stop, stop all

14  this.  You know, basically, he says, There's not much more to

15  do.

16      He goes, I have personally discussed at length this

17  situation with the head of KPMG Cayman Islands and he

18  expressed to me there are currently more than 6,000 ghost

19  funds such as these target entities -- the target entities, of

20  course, are not just random funds out of the so-called 6,000

21  ghost funds, but CDO, SOHC, HFP -- stemming from the 2008

22  crisis that do not have directors, custodians, administrators,

23  bank accounts, et cetera, that sit dormant, and, capital, NO

24  ONE, capital letters, knows what they truly retain, et cetera.

25      He then said, I know that UBS is aware of the situation,

101

1   and I know Andy Clubok -- that's me -- knows of this

2   situation, the so-called situation of everything being ghost

3   funds because I've personally discussed it with him several

4   dozen times, including as recently as this year.

5       He goes on to say, Oh, this process is a Herculean task.

6   He and I just spent 100 hours, or excess of 100 hours, trying

7   to piece together everything they can to create a true and

8   accurate document record, based record, of what happened with

9   these target entities.

10      He is affirmatively telling Mr. Seery, Mr. Demo, and

11  others that, you know, not just waiving those funds and trying

12  to trick them with that, but claiming that he is doing

13  everything with Leventon to piece together everything they can

14  to create a true and accurate document, at least record of

15  what happened to these entities.  And the simple thing that

16  happened to those entities, the most important thing, frankly,

17  the only really relevant thing, is that all of their assets

18  were transferred or tried to be transferred in 2017 to

19  Sentinel.

20      Now, by the way, some of those assets weren't transferred.

21  So CDO Fund still had some accounts and still did have some

22  assets, even when Mr. Ellington is claiming this.  So the

23  whole thing is, you know, inaccurate, but, frankly, just a

24  downright -- well, I won't characterize it.  I think it speaks

25  for itself.

102

1       We deposed Mr. Ellington in this proceeding.  This is at

2   Deposition Transcript 83, Line 15, to 84:24.  I asked him, Did

3   you ever tell me that there was an insurance policy issued by

4   Sentinel that potentially could satisfy that judgment?

5       Answer, No.

6       Did you ever tell Mr. Seery anything at all about the

7   insurance policy that was issued by Sentinel with respect to

8   the UBS litigation in New York?

9       Answer, No.

10      Question, Did you tell Mr. Nelms, Judge Nelms, anything at

11  all about the insurance policy that was issued by Sentinel

12  with respect to the UBS litigation in New York?

13      Answer, No.

14      Mr. Leventon was asked, Well, did you, in words or

15  substance, ever ask Mr. Ellington whether you should disclose

16  the policy?

17      And we got kind of a hard-to-understand answer, but it's

18  Leventon Deposition Transcript 154, 217.  The gist of it is

19  Ellington told him not to.

20      The answer specifically says, So, the conversation was, is

21  the policy relevant to the task I'm working on?  And the

22  answer, Mr. Ellington said he didn't believe that it was and

23  therefore didn't need to be included as material because part

24  of that past.

25      And then I asked, You know, you've been in conversations

1   with Mr. Seery.  I don't talk to Mr. Seery hardly ever.  So is

2   there any other thing that any other -- anything else that I

3   should know of or -- or any other reason, you know, outside of

4   my task that I should include in the materials, and Scott said

5   no.  Okay?

6       Basically, this is a very narrowly defined -- it's an

7   effort by Mr. Leventon to somehow define his task down so

8   narrowly that he and Mr. Ellington could somehow have a

9   conversation and believe in good faith, while they are lawyers

10  working for the estate that's in bankruptcy, that somehow this

11  is something they should affirmatively not disclose to Mr.

12  Seery and his team.

13      And then we get to Mr. DiOrio.  And Mr. DiOrio tried and

14  tried to hide it, but ultimately I believe it was his

15  documents that left -- were left behind or that were found

16  that helped unravel the scheme.  But back in January of '21,

17  when he was still here, he repeatedly lied to Highland

18  Capital.

19      This is an email exchange from January 28, '21.  Remember,

20  Mr. DiOrio is a Sentinel director at that time.  Okay?  He's

21  getting paid exclusively by Highland Capital Management, but

22  on Highland Capital Management time he has this side gig of

23  being a Sentinel director.  And he's asked -- he was asked to

24  figure out what are the -- what are the assets that didn't

25  make its way to actually be transferred.  There's an asset

104

1  that's called Greenbrier.  It's an interest in a CLO.  And

2  with respect to that particular asset, he claims he was

3  working to reissue physical certificates, he'll keep everyone

4  in the loop on the timing.  Does not appear to be a swift

5  process, but we're moving forward.  The shares are still

6  registered to Hare & Co., with CDO Opportunity Fund as

7  beneficial owner.

8      So this is one of those assets where they, just because of

9  the haste, had not -- not competently effectuated the transfer

10 as they tried to do.

11     He talks about how BONY has a custody account in CDO

12 Opportunity Fund's name, and been receiving past waterfall

13 payments.

14     By the way, I think this has amounted to over $10 million,

15 and these have been ultimately now paid to UBS and we're

16 continuing to get it as part of the prior settlement

17 agreement, but, you know, obviously only because it was

18 identified at the last minute.

19     Anyway, Mr. DiOrio says, Well, these certificates were

20 transferred in error in 2017 by Carter Chisholm, who no longer

21 works at HCM.  Now, Mr. DiOrio knows exactly what happened

22 with these transfers, okay, but he just kind of gives this

23 weird answer, it was transferred in error.

24     And then Mr. Demo says, Okay, but do we have any

25 visibility into who Sentinel Reinsurance is?  Who owns them?

105

1   What do they do?  Et cetera.

2       Because this is about the time, as Mr. Seery testified,

3   that it's all kind of starting to unravel.  They've seen a

4   ledger that showed that Sentinel actually had some interest in

5   Multi-Strat, and that's kind of weird, and it sparked some

6   memory, and certainly they really start fussing Mr. DiOrio,

7   who is a director of Sentinel.  And Mr. Demo asks him this

8   January 27, 2021.  This is Exhibit 18.  What does Mr. DiOrio

9   say?  He says, It's a nondebtor, non-affiliate reinsurance

10  company, but I do not know who or how it's owned.  That's what

11  he tells Mr. Demo and the others.  Okay?

12      Now, we asked him about that, and we said, Well, you knew

13  it was owned in part by Dondero?

14      Yes.

15      And you knew it was owned at least in part by Mr.

16  Ellington?

17      This is when he gets under oath.  His deposition

18  transcript at Page 336, Lines 3, to 338, Line 1.

19      He said, yeah, he knew it when he told them that he

20  didn't.

21      And we say, Well, he asked -- talking about Mr. Demo --

22  who owns Sentinel Reinsurance, right?

23      Answer, Yes.

24      Okay.  And you didn't tell him Mr. Dondero and Mr.

25  Ellington owned part of it, right?

106

1      Right.

2      Question, Well, why didn't you just explain this to Mr.

3   Demo?

4      Answer, I wanted as little to do with Pachulski as

5   possible, so I answered the questions and waited for the next

6   one.

7      Okay?  Now, to be sure, he wasn't under oath in Exhibit

8   18, I guess.  But he's a member of the legal department, he's

9   a Sentinel director, he's working for the bankruptcy estate at

10  that time, and he just flat lies.  There's no getting around

11  it.  And then when we're talking under oath, he admits the lie

12  and, you know, basically just didn't want to -- didn't want to

13  have anything to do with Pachulski, I guess.

14     Well, that's when luckily Mr. Seery now stepped in.  And

15  seeing all of this, I think he fires the last of these

16  individuals who were still there.  And then just, you know,

17  weeks later makes a claim on behalf of CDO Fund to Sentinel

18  for that $100,000 million, which, of course, he clearly would

19  have done, and his deposition testimony reflects this, from

20  the get go had he known about it, since we had a judgment and

21  the insurance policy was intended to benefit UBS.

22     So that's secrecy.

23     Turning back to the factors, I'll run through the rest of

24  these quickly.  Transfers retain control.  Well, of course.

25  It is the case that Beecher had been servicing Sentinel --

107

1   throughout the time that Beecher worked for Sentinel, Dondero

2   and Ellington were the ultimate beneficial owners, called

3   UBOs.  Mr. Adamczak testified to that on Pages 22, 24, and 25

4   of his deposition.

5        He was asked, What's the role of the ultimate beneficial

6   owner?  And as he understood it, the ultimate person would

7   call the shots for the captive.  And we asked him if that was

8   true with respect to Dondero and Ellington, that they were the

9   ones ultimately calling the shots.  He said, To the best of

10  our knowledge, that's correct.

11       Everything that was done -- remember, Sentinel doesn't

12  have employees, so everything is either done by a Highland

13  employee working for Sentinel or being executed by Beecher,

14  which is sort of the agent that executes stuff.  And they just

15  did everything that Dondero and Ellington told them.

16       So, with all of that, where has this money gone?  Okay?

17  At least the money that has not been restrained.  Where has

18  some of the other money gone?  And you heard a little bit

19  about this, but I am sure you can't -- will not believe some

20  of this.

21       Basically, the transferors, and that's Dondero and

22  Ellington, retained control and have used that money that they

23  transferred out of CDO Fund and HFP and all the others as

24  their own personal piggybank.  Here is just a sampling of some

25  of the expenses that have been approved since that transfer.

**149**

108

And by the way, these are post-bankruptcy, November of 2019
through January of 2020 expenses that, unbeknownst to Mr.
Seery and our understanding is unbeknownst to the Pachulski
firm, were just being authorized by Mr. DiOrio and others
post-bankruptcy with money out of Sentinel that should have
been used to pay UBS's judgment.

First of all, here's an expense report from January 15,
2020 through January 19, 2020.  It's UBS Exhibit 19.  And in
there you will see Ellington expenses for a London and Paris
trip of over $78,000.  At least one of these trips, I think
it's this one, or maybe others, he went with his girlfriend.
There are some emails that we have submitted that are in the
records that show her, like, talk about which restaurants she
wants to dine at, what hotels they want to stay in.  All
that's in the exhibits to the depositions.  One of the -- one
of the visits they did was a place called Sexy Fish.  Sounds
good.  This is all being charged to Sentinel, okay?

Then there's another expense report to Toronto, $97,000.
Interesting.  There, they spent about $12,000 at the Rebel
nightclub.  Okay?  Again, this is all instead of using the
money to satisfy the judgment.

Meanwhile, there's another one.  This is December of 2019.
Scott Ellington.  A $318,000 expense report.  Okay.  Now, this
is before Mr. Seery has been appointed but post-bankruptcy.
And I'm sure that the Pachulski firm had no idea about this.

109

 1   A huge expense on this one was the Sapphire.  This is a trip

 2   to Las Vegas.  Somehow they spent $318,000 in Las Vegas.  And

 3   there's five entries that total, you know, something like

 4   almost $50,000 or something to Sapphire.  So we said, Well,

 5   what's Sapphire?  This is Sapphire.  And you can see inside

 6   72, there's a picture, and we've hidden strategically some of

 7   it.

 8        But we asked Mr. Adamczak, the corporate representative of

 9   Beecher Carlson, at Page 101, Lines 15, to 102, What did you

10   understand Sapphire to be?

11        He answered, A typical Las Vegas strip club.

12        Question, Did you look at that at the time when they

13   submitted $318,000 in expenses?

14        Answer, Yes.

15        And did you ask Mr. DiOrio specifically about that?

16        Answer, I did.

17        Question, And his answer was that it was business

18   development?

19        Answer, They were all business development.  This is how

20   they do business.

21        Question, They being who?

22        Answer, Highland Capital.

23        Okay?  By the way, the business is, on one day, or one

24   evening, December 16, 2019, as you can see, $9,800, $9,800,

25   $9,000, all being supposedly conducted at the Sapphire strip

110

1  club.

2      Back in the day, this was looked at.  And you can see on

3  some of these emails.  Remember, you heard about this SAS

4  Management server that's apparently been hidden from the

5  Highland -- from the Debtor?  Sarah Goldsmith to Matt DiOrio

6  says that she was submitting the attached expense

7  reimbursement on behalf of Scott Ellington.  Ms. Goldsmith, I

8  think, was his assistant.  Subject to an approval by the

9  directors, please instruct reimbursement to Scott Ellington

10  for this total travel expenses of $318,000.

11      Mr. DiOrio forwards that on to Beecher Carlson and just

12  says, Hey, guys, Please submit the attached expenses for

13  approval and reimbursement.

14      By the way, as a heads up, settlement talks are cranking

15  up, but okay.

16      Internally at Beecher Carlson -- and this finally gets

17  their attention.  They mostly just do what they're told, but

18  internally Mr. Adamczak emails with his colleague and says,

19  Nice.  What the hell is going on with these expenses?  I

20  question how much, quote, business development is actually

21  being done.  Did you look at this?

22      Well, we asked, What raises concern?  He said, The fact

23  there was $318,000 worth of expenses at first, but there was a

24  significant amount of that that seemed to be club-related.  We

25  asked if the directors approved it.  He said, Ultimately, but

**152**

111

1   they also questioned it.

2      Oh, by the way, these are not the current directors.  As

3   Mr. Morris noted, the current directors are new, and those are

4   the ones we're dealing with now.  These were Mr. DiOrio and

5   his two other colleagues back then.

6      They were asked -- they requested the nature of these

7   expenses and then specifically inquired whether all or both of

8   the UBOs would be okay with running these expenses through the

9   captive as business development.  That was their only

10  question.  Are the UBOs -- that is, Dondero and Ellington --

11  going to be okay with running these expenses through the

12  captive?

13     Who did they ask?  Matt DiOrio.  What did he answer?  That

14  it was appropriate.

15     And I just clarified, So he was saying it's appropriate

16  because the UBOs said it was appropriate?

17     Answer, To my knowledge, yes.

18     No justification other than, Hey, if Dondero and Ellington

19  said it's okay, at least according to DiOrio, it must be okay.

20     That's not it, though.  It wasn't just a mod... you know,

21  relatively, I guess, when you consider the total amount of

22  expenses.  There's also dividend payments.  And on Slide 77,

23  you see that we've uncovered at least a total of $8.9 million

24  dividend payments that were paid to Mr. Dondero and Mr.

25  Ellington's entities that they owned, that they're the

**153**

112

1   intermediaries to them as the ultimate beneficial owners.

2        Here is an example of a payment that was made in April of

3   2020 -- again, unbeknownst I think at the time, I'm sure at

4   the time, to Mr. Seery.  And this is out of Sentinel's money.

5   It's supposed to be -- you know, they don't even have a

6   hundred million in cash at that time, and yet they're

7   dividending up to Mr. Dondero and Mr. Ellington.  There is an

8   approval of the payment, of course.  It's done by Matt DiOrio

9   and his -- and then two colleagues, as the Sentinel director

10  at the time, in April 24, 2020.  This is Exhibit 47.  A total

11  of $6.4 million.  And you can see it's divided up.  About $4.4

12  million goes to Main Spring, Limited.  This is Exhibit 21.

13  That's a Dondero entity.  And you can see there's -- Exhibit

14  22 shows the wire transfer to another entity called Montage of

15  about $1.9 million.  That's the Ellington-affiliated entity.

16       So, the grand total of about $6.4 million gets distributed

17  70/30, as we've seen in the ownership interest, to entities

18  controlled, respectively, by Mr. Dondero and Mr. Ellington, as

19  set forth in Exhibits 21 and 22.

20       That's not all, of course.  Even in 2021, in January of

21  2020 -- sort of the last gasp before they get found out,

22  there's another dividend payment.  Again, approved by Mr.

23  DiOrio.  January 11, 2021.  This is -- this is all during a

24  time when they're not telling anything to Mr. Seery or Mr.

25  Demo or the others about Sentinel.  And yet Mr. DiOrio is

113

1   hustling dividend payments up to Dondero and Ellington.  And

2   you can see Exhibits 48 and 23 show how the money ultimately

3   gets transferred, you know, even, you know, as late as the

4   spring of 2021.

5       Finally, Sentinel money.  Mr. Morris talked about this.

6   And I guess there's a lawyer on the -- on the -- in the

7   proceedings today that maybe intends to try to benefit from

8   Sentinel's money as well.

9       In June 2021, Beecher Carlson was given a request for

10  expense approval for Ross & Smith of about $75,000.  This,

11  according to Mr. DiOrio, was all in order and should be

12  settled.  Mr. DiOrio represents -- this is June of 2021, after

13  he's been fired by Highland.  He says, The company identified

14  a group of former employees, my -- former employees, okay?

15  Sentinel had no employees.  And by the way, many of these

16  people testified under oath that not only were they not

17  employees, but they hardly did anything at all with Sentinel.

18  Yet Mr. DiOrio is claiming that the company had identified a

19  group of former employees, myself included -- presumably, he's

20  talking about former Sentinel employees; there's no reason why

21  Sentinel would be indemnifying former Highland employees.  But

22  in any event, he says, It relates to our defense with today's

23  hearing that I mentioned.

24      Now, they're not a part of this hearing.  To the extent

25  Sentinel -- Sentinel insurance doesn't go to Mr. DiOrio for

**155**

114

1    trying to avoid deposition testimony or something, and that's,

2    by the way, what that hearing was.

3        Your Honor may not remember that date.  We do.  It was

4    June 24, 2021.  This is an entry that shows that that hearing

5    that day was the motion we had to make to compel the

6    deposition testimony, because at the time all of these former

7    Highland employees were fighting having to come provide all of

8    this testimony you've now seen.  You would never have seen

9    much of what we presented today had this motion to compel not

10   been granted.  And they charged $75,000 to fight it.

11       Now, we asked for fees at the time.  And we understand why

12   Your Honor didn't award fees, but -- we can understand that.

13   But it sort of put us flat.  Not only did they not pay our

14   fees for having to move to compel, they depleted Sentinel

15   further, which owes us, at the time, owes us quite a bit of

16   money, for the privilege of trying to stop us from finding out

17   all of the evidence here.

18       So, and I say that it's UBS's money at Sentinel because

19   the New York courts say so.  The New York courts have held

20   that insurance policies may constitute debts against which a

21   money judgment may be enforced under Article 52 of the New

22   York CPLR, and a judgment debtor can enforce the subject debt

23   arising from the court's final judgment against the judgment

24   debtor's insurer, pursuant to Article 52 of the CPLR.  So,

25   really, this money really ultimately should go to UBS.  It

115

1    should not be allowed to continue to be paid for this

2    indemnification or for any other purpose, et cetera.

3        At the end of the day, even if the policy were valued, or

4    valid, UBS would be owed at least $100 million, even if it was

5    a totally valid thing.  But in fact, UBS is owed the $100

6    million plus the $80 million for the fraudulent transfer, for

7    a total of over $180 million.

8        So that's how we get to success on the merits.  The

9    others, I really don't need to go much through.

10       I think, you know, irreparable injury.  In brief, there's

11   case law that makes it clear that the irreparable injury

12   element is satisfied when the defendants would dissipate the

13   frozen assets, and if the defendants were to dissipate or

14   transfer these assets out of the jurisdiction, the District

15   Court would not be able to grant the effective remedy.  That's

16   from the Fifth Circuit, *Janvey v. Alguire*, 647 F.3d 585.

17   There's similar law in the Ninth Circuit:  *Johnson v.*

18   *Couturier*, 572 F.3d 1067.

19       And, again, Mr. Seery, as you heard him testify live, but

20   this is from his deposition, made it clear that he really had

21   no choice.  Without the TRO, this money probably would have

22   been already transferred to Sentinel and gosh knows what would

23   have happened.

24       The weighing of harms.  Well, this adversary proceeding,

25   of course, as Mr. Morris said, we kind of expected maybe

116

1   Sentinel or maybe Mr. DiOrio or someone to intervene.  No one

2   did.  So the proceeding is between UBS and Highland.  There is

3   huge harm to UBS if the injunction is not granted.

4        The other party is Highland, because Highland -- you know,

5   there's certainly no benefit to Highland, and instead what

6   Highland will face is more litigation, costs, and a fraud,

7   which, of course, Highland doesn't want.  And that's why I

8   think Highland -- not only is there no harm to Highland to

9   granting the relief, but Highland wants to cut these

10  proceedings short.  And that's fine with us, as long as we

11  were able to present this evidence, as long as it doesn't cut

12  short the ability to get the full order that we've requested.

13  So, I think the weighing of harms is easy.

14       And finally I end with the public interest.  Your Honor,

15  there is no harm to the public interest if the Court does

16  enjoin fraudulent behavior.  That is the only way that we can

17  prevent harm to the public interest.  You have seen a pattern,

18  a series, you know, it's tacked on to other things you've seen

19  in connection with these proceedings.  But the prevention of

20  unjust enrichment by means of fraud or misappropriation, even

21  if it was affecting "only private entities," is in the general

22  public interest.

23       Of course, here, all of these things impact not just UBS,

24  it affects the other creditors of the estate.  It affects the

25  Court's time.  And certainly, I think as Mr. Morris put it,

117

1  it's just the signal that it sends to allow this to go

2  unchecked would be terrible.

3      So it's many issues of concern that we haven't even dived

4  into as much as we could, including testimony that is

5  questionable, I'll say, at best, and various transfers and

6  information that was not provided to the Court and its

7  representatives.  And, of course, these proceedings, I suspect

8  there will be issues for someone else for another day to deal

9  with.

10      But for us, we just ask that the Court enter the

11  injunction as we have suggested with the minor edits to the

12  version that Mr. Morris and his colleagues submitted.  The

13  public interest will be served by that.

14      And I'll end with, you know, why are we still here?  We're

15  still here because UBS still has that over billion-dollar

16  judgement.  And, in fact, because of interest, that judgment

17  has grown by about $116 million, okay, while we've been

18  dealing with all of this.  While we could've maybe gotten a

19  significant portion, maybe could've settled, et cetera, but

20  it's now up to over $1.1 billion.

21      And how much total has UBS been paid by the judgment

22  debtors?  About $14 million.  By the way, the $14 million is

23  those assets that we caught at the last second that were

24  ineffectually tried to -- transferred, even though they tried

25  to be.  But that's all that UBS has recovered from the actual

118

1   judgment debtors.  And that's why we're still here, that's why

2   we have to stay here, and that's why we should be entitled to

3   continue to make sure that this Court's injunctive power

4   protects UBS's ability to continue in its efforts.

5        Thank you for your patience.  I appreciate it.

6           THE COURT:  All right.  I'm going to ask you a couple

7   of follow-up questions.  I've heard today that once Highland's

8   independent directors, Strand's, discovered all of this, the

9   Sentinel policy and the transfer of assets, they immediately

10  notified UBS.  And one of the results was the settlement that

11  had originally been struck between UBS and Highland was

12  increased with $50 million more to go to UBS.  Could you just

13  elaborate on that?  Before this was all discovered, the

14  settlement that had been negotiated that was going to be

15  presented to the Bankruptcy Court involved how much of an

16  allowed claim that would be paid out of the estate and any

17  other relevant components?

18           MR. MORRIS:  Mr. Clubok, I have those numbers if you

19  don't have them handy.

20           THE COURT:  Okay.  Or Mr. Morris.

21           MR. CLUBOK:  Thank you.  I was just going to -- so I

22  would appreciate that.

23           MS. MORRIS:  So, at the confirmation hearing, the

24  proposed settlement was a Class 8 general unsecured claim for

25  $50 million, a $25 million Class 9 subordinated general

119

1   unsecured claim, and a cash payment of $18-1/2 million from
2   Multi-Strat.

3       After the disclosure of this information, the Class 8
4   claim was increased by $15 million, from $50 to $65 million,
5   and the Class 9 subordinated general unsecured claim was
6   increased by $35 million, from $25 to $60 million.  And the
7   Multi-Strat cash payment remained the same.

8       So, just to summarize, the Class 8 claim went up by $15
9   million and the Class 9 claim went up by $35 million.

10              THE COURT:  Okay.  And just another refresher of my
11  memory.  The global mediation that happened in this case, it
12  was summer 2020, the global mediation before former Judge
13  Gropper and Sylvia Mayer.  So I know UBS technically did not
14  settle during that mediation, but it came about, you know, a
15  few weeks or months after.  But there had been participation
16  by UBS and the Debtor in that mediation.  And, again, this was
17  summer 2020, before anyone knew about this Sentinel insurance
18  policy, correct?

19              MR. CLUBOK:  That's correct, Your Honor, but also, as
20  you note, the mediation started in the summer of 2020.  We
21  were, prior to doing that mediation, in anticipation of that
22  mediation, asking for all this financial information.  To Mr.
23  Seery's credit, as he testified, he said, Hey, we'll get it to
24  you.  We -- that's fair.  And he said, I'll tell my folks to
25  get whatever you need, or words to that effect.

120

1        We didn't settle in the first round when some others did,

2   but we had continuing mediation sessions into the fall.  And I

3   believe, I don't have the exact dates, but I believe UBS then

4   had follow-on continuing discussions with Judge Gropper or Ms.

5   Mayer in, you know, I want to say October, September/October

6   time frame.  And that's when we're still in the mediation, we

7   believe or we've been told at that time, oh, you've got all

8   the information about the assets now, because in the first

9   mediation we didn't have it, so that's why I said, hey, we

10  can't settle.  By the time we had that second set of sessions

11  with Judge Gropper and Ms. Mayer, then we had been given all

12  the information, as we now know, because Mr. Leventon, Mr.

13  Ellington, and others told Mr. Seery and Mr. Morris and his

14  team, hey, this is everything.

15       So, with that in hand, that's when we reached this initial

16  settlement that Mr. Morris described to you.  And then, you

17  know, as we're working through it and we'd gotten that -- I

18  think we finally got to that settlement by the end of the

19  year, by the end of 2020.  But then, luckily, as we continued

20  to press for information, and then in January a lot of this

21  gets uncovered.  In fact, before we had finalized that

22  settlement per those discussions, this was all uncovered.  And

23  so that's what caused us to, then, say, well, --

24            THE COURT:  I'm just mainly trying to be clear.  And

25  I'm just thinking through all the time and attorneys' fees

121

1  that were incurred related to this UBS claim and what was a

2  fair and equitable settlement, without anyone having the

3  benefit of the knowledge about this Sentinel transaction.

4         MR. CLUBOK:  For sure.  And my point is it started

5  August, but we worked all the way -- I think maybe it was even

6  close to Christmas.  I feel like it was very much at the end

7  of the year when we finally got a settlement, and all that was

8  on the fiction of the belated production of some of the

9  assets, which then we get to January and it's like ah, gee, we

10  have to start over again.  And you know, it's all those months

11  of attorneys' fees and time and et cetera, all because or

12  largely because this information was hidden from Mr. Seery,

13  Mr. Morris, and his colleagues.

14         THE COURT:  Okay.  My last question for you.  We

15  heard a little bit of testimony from Mr. Seery about the

16  after-the-fact insurance policy and whether that's a thing or

17  not.  That's our new phrase in this case, "Is this really a

18  thing or not?" it seems like.

19     What is your view of this?  I mean, I'm certainly

20  generally aware.  I think Mr. Seery said, you know, in

21  jurisdictions where there's a loser-pay concept as opposed to

22  the American rule there is a concept such as this, I guess, to

23  at least pay defense costs.  But what is your take on this,

24  you know, fake or real insurance policy?

25         MR. CLUBOK:  So, so a slightly different take.  It's

122

1    a little more nuanced.  There is certainly something called an

2    after-the-event insurance policy that is not -- it would be

3    common for some insurers to issue those policies.  Sometimes

4    it's call judgment insurance.  And basically what happens is

5    that, you know, let's say your company gets hit with some

6    lawsuit, maybe it's an environmental potential liability, so

7    it's now known that, you know, you are alleged to have leaked

8    chemicals onto somebody's property.  So, a claim is filed.

9    Normally, obviously, you can't buy insurance to insure against

10   something right after you find out about it, but there are

11   companies, I understand, insurers, that will say, okay, you've

12   already been sued; I'm going to now insure you against the

13   judgment.  Now, the premium might be very high, and we have

14   to, you know, price it the right way.  But, you know, you have

15   a, you know, if you have a billion dollar claim, if you want a

16   billion dollar judgment, the premium might be, you know, $250

17   million, or you have a $100 million claim, you know, it could

18   be a $100 million claim, and so maybe the premium could be $25

19   [million].  Let's look at the strengths and weaknesses, we'll

20   price it out, et cetera.

21      There is a market that I'm very loosely describing.  I'm

22   not an insurance expert.  I'm not testifying here.  But my

23   understanding is that is a market and you could theoretically

24   get it.

25      What is in the record here is that these guys came up with

123

1  this idea that -- probably because they had heard there's

2  something like this -- and they start with the proposition,

3  okay, all the assets, hundred million coverage, let's backdoor

4  figure out how to work it out.

5     They then ask Beecher Carlson to "shop it" to see if they

6  could get a policy.  And Beecher Carlson, there's extensive

7  testimony in this, I'm not sure we submitted every bit, but we

8  could if we needed to, basically said, yeah, we shopped around

9  and no -- no insurance would have done it for anything like

10  that.  There would have been a very different premium.  They

11  would have had to do lots of due diligence.  It would have

12  been a whole different process.

13     They said some of them agreed to just look into it as a

14  favor to Beecher Carlson, but they were never going to write a

15  policy.  And so there was some -- something suspect.  Some of

16  the individuals said, oh, this looks very legitimate.  We

17  priced it around.  Now, one of -- some of them said, oh, we

18  priced it around.  There's other testimony that some of it's

19  been designated by us that I didn't cover today for purpose of

20  time that say, yeah, but no other insurer would -- no other

21  insurer would do it at this price.  Right?

22     Which just shows it's not -- even if it's a thing,

23  theoretically, this particular transaction is not arm's

24  length.  Obviously, they grossly overpaid.  They did it in a

25  way that was very highly irregular for any insurance company.

124

1   And they -- and for Sentinel, it was the one and only ATE

2   policy they ever tried to issue.

3        So, yes, it's a thing.  That's why they -- there's enough

4   there that they, in some of their deposition testimony, can

5   sort of say, this is a legitimate thing.  And that's why, you

6   know, if we take them at their word, it's perfectly legitimate

7   to have a hundred -- you know, had they told us, hey, we spent

8   $25 million and we got in a $100 million insurance policy, we

9   probably would have said, that sounds okay.  You know.

10       Had they told us we shipped away $300 million face-value

11  assets that were worth at least $105 million and then we're

12  going to buy $100 million policies and we're going to hide it

13  from you and never pay out on it, that wouldn't be so good.

14  And that's the difference between a thing that's legit and a

15  thing that is let's just say highly irregular.

16            THE COURT:  Okay.  All right.  I just wanted to be

17  educated on that point.  I realize what the real beef is here,

18  the nondisclosure.

19            MR. CLUBOK:  Did I give you the information you

20  needed?

21            THE COURT:  What?

22            MR. CLUBOK:  I'm sorry.  Did I give you what you

23  needed --

24            THE COURT:  Yes, you did.

25            MR. CLUBOK:  -- on that?

1          THE COURT:  All right.  Thank you.

2          MR. CLUBOK:  Okay.

3          THE COURT:  Was there anything else?  I think you

4    rested, correct?

5          MR. CLUBOK:  I assume Mr. Morris -- I don't know if

6    there's going to be "closing arguments."  I don't need any if

7    Mr. Morris is comfortable with standing on the record, unless

8    there's final --

9          MR. MORRIS:  I've got about three minutes, Your

10   Honor, if I may.

11         THE COURT:  All right.  Go ahead, Mr. Morris.

12         CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

13         MR. MORRIS:  Number one, I don't think anybody could

14   fairly call this insurance policy a legitimate thing, and you

15   know that from two undisputed facts.  Number one, it was never

16   disclosed, and number two, nobody ever made a claim until Jim

17   Seery did.  So nobody ever tried to recover the assets and

18   nobody ever disclosed the existence of the policy.  It is not

19   a thing.

20       Number two, at Slide 79 of Mr. Clubok's presentation,

21   you'll see a transfer of $6.4 million to an entity called Main

22   Spring.  You'll see that that transfer was made in the spring

23   of 2020, and we believe, Your Honor, that that $6.4 million

24   was part of the $10 million that Mr. Dondero referred to in

25   April in open court when he testified that he had caused $10

126

1   million to be paid to Highland's insiders.

2       So, think about that.  They transfer the money to

3   Sentinel.  That money was from the Defendants that UBS was

4   suing.  And then they use that money to pay the insiders at

5   the same time they're signing the indemnity agreement.  At the

6   exact same moment.

7       Your Honor, I told you that Mr. Seery and the Debtor and

8   the independent board agreed to the preliminary injunction but

9   could not agree to a permanent injunction because they didn't

10  have personal knowledge of all the facts.  We knew of the

11  existence of the policy, but Mr. Clubok's presentation and the

12  work done by his team show exactly the justification, the

13  rationale, and the common sense that Mr. Seery and the

14  independent board showed in not rushing to a conclusion here.

15      The evidence that Mr. Clubok presented today was unknown

16  to the Debtor, was unknown to the independent board, and we

17  thank them for their diligence and for their work.

18      At the end of the day, Your Honor, to borrow a phrase the

19  Court has used before, this is not a garden-variety commercial

20  dispute.  This is not a garden-variety fraudulent transfer

21  action.  This is not a garden-variety breach of fiduciary

22  duty.  This is fraud, plain and simple, compounded by the

23  failure, the intentional -- knowing, intentional failure to

24  disclose post-bankruptcy.

25      We'd respectfully request that the Court grant the motion.

127

1          THE COURT:  All right.

2          MR. CLUBOK:  Your Honor, if I may.

3          THE COURT:  You may.

4          MR. CLUBOK:  Very briefly.  I just --

5          THE COURT:  Go ahead.

6          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

7          MR. CLUBOK:  Sorry.  Yeah, as a housekeeping matter,

8    I would like to offer our presentation as a demonstrative

9    exhibit reflective of the evidence.  We will provide you with

10   a hard copy.  It refers to, obviously, many of the exhibits

11   that we submitted, and it'll be up to the Court's convenience,

12   I think.  I think we've -- we've given a copy to Mr. Morris

13   ahead of time.  I think there's no objection to that being

14   submitted to Your Honor.

15      I would just like to, you know, end by saying, you know,

16   we started the proceedings, we appreciate, we understand

17   certainly why Highland wanted to stop the bleeding and stop

18   spending money on this proceeding, and so that -- we have no

19   issue with that.

20      We would ask that -- we provided a redline that makes mild

21   edits that I think -- dare I hope, Mr. Morris, that, per

22   agreement, can and should be made to the proposed order.  They

23   submitted one and we submitted a slightly proposed -- one

24   which also referred to a consideration of the evidence that we

25   anticipated being able to present today, and most importantly,

128

 1  now that we've presented that evidence today, I think that

 2  justifies a modest change in the order along the lines to that

 3  effect.

 4      I see Mr. Morris nodding, so hopefully that means he

 5  agrees.

 6          MR. MORRIS:  It does.  We hadn't heard the evidence

 7  before, Your Honor.  I'd never seen Mr. Clubok's presentation.

 8  I didn't know quite what he was going to do today.  And that's

 9  the reason why we had a slight dispute over some of the

10  language.

11      But based on the evidence that I heard, you know, if we

12  could take one last review of it and confirm, but I have no

13  reason to believe that we'll have any objection.

14          THE COURT:  All right.  And you have no objection to

15  the PowerPoint being part of the record, Mr. Morris?

16          MR. MORRIS:  Not as -- not as a demonstrative

17  exhibit, Your Honor, --

18          THE COURT:  Okay.

19          MR. MORRIS:  -- which is, I think, what Mr. Clubok

20  said.

21          THE COURT:  All right.  Well, Mr. Clubok, if you

22  could send it to Traci Ellison, with copy to counsel, I will

23  make that part of the record.  It's always, I think, easier to

24  understand a transcript, if anyone's looking at it after the

25  fact, if they have the PowerPoint in the Court file to cross-

129

1 reference.

2     Well, it's been, for lack of a better term, an amazing day

3 of evidence.  The Court believes the evidence is overwhelming

4 to justify the granting of an injunction here.  And as was

5 stated early on, it's been phrased in terms of it being a

6 permanent injunction, but as I understand it, the injunction

7 sought would be to enjoin disbursement, disposition of the so-

8 called transferred assets until a further order of a court of

9 competent jurisdiction with regard to fraudulent transfer

10 litigation or other litigation over the Sentinel matters or a

11 settlement with Sentinel.

12     Certainly, the four prongs for an injunction have been met

13 here.

14     I believe the relief is necessary to avoid immediate and

15 irreparable harm to the UBS entities.

16     I believe UBS has made a very strong showing of likely

17 success on the merits here with regard to these transfers of

18 assets being fraudulent and with regard to a potential showing

19 of insolvency or inability of the transferors to pay debts as

20 they become due, and as a result of the transfers,

21 consideration for the transfers appears to have been

22 inadequate.

23     Secrecy of the transaction.

24     Certainly, there are all of these indicia of fraud

25 suggesting UBS would succeed on the merits.

130

1    The balance of equities certainly tip in favor of UBS

2  here.  Injury to it would appear to outweigh any damages that

3  the injunction would cause Highland.  And such relief would

4  serve the public interest.

5    So, the Court reserves the right to supplement in a more

6  fulsome form of order, but, again, the motion of the Debtor to

7  withdraw its answer disputing this relief is granted, and I

8  think judgment for this injunctive relief is also appropriate

9  at this juncture.

10    I said that it's been an amazing day of evidence.  It's

11  been amazing.  It's been exhausting.  It's been troubling.

12  You know, I think it was, Mr. Morris, you who said at the

13  beginning today that, you know, Debtor-in-Possession counsel

14  is not a prosecutor, it's not the SEC, it's not the State Bar

15  disciplinary agency.  And, you know, your goal for your client

16  is always to maximize value for creditors and get a good

17  overall result for all parties in interest affected by the

18  bankruptcy.

19    I could say something similar right now that I, you know,

20  I oversee these things.  I apply the Bankruptcy Code to

21  motions filed and different relief sought and grant relief

22  where appropriate that is designed to help companies or people

23  get a fresh start and help creditors get paid what they're

24  justly owed.

25    But this evidence today, I am, unfortunately, duty-bound

131

1   to do more than just sign the judgment and order that's

2   submitted to me and forget about it.  I'm just letting you

3   know that referrals will likely be made to the State Bar

4   disciplinary agencies regarding the attorneys' activities that

5   I've heard about.  And, you know, it's not a good day in court

6   when I'm looking at 18 U.S.C. during the middle of evidence,

7   but I'm just going to let observers who -- I don't who all is

8   on the WebEx today.  I don't have all the little boxes on my

9   screen to know.  But 18 U.S.C. Section 3057:  Any judge having

10  reasonable grounds for believing that violation of laws of the

11  United Stated relating to insolvent debtors has been committed

12  or that an investigation should be had in connection therewith

13  shall report to the appropriate United States Attorney all the

14  facts and circumstances of the case, the names of the

15  witnesses, and the offense or offenses believed to have been

16  committed.  And there are different provisions of Title 18

17  that I'm very, very concerned may be implicated.

18       So, I'm duty-bound to go back and carefully look at some

19  of the exhibits that have been submitted today.  And, again,

20  I'm not the U.S. Attorney and I'm not a criminal judge.  I

21  don't plan on combing over everything as, you know, a grand

22  jury would do.  But if I think there is enough there, I will

23  be making a referral to the U.S. Attorney.

24       Again, the nondisclosure, the potential cover-up here is

25  beyond troubling.  And, you know, I'm duty-bound to do what

**173**

132

1  I've got to do if the exhibits look as damning as, you know,

2  on further reflection in chambers, as they did sitting here on

3  the bench today.

4      So, you know, I regret, I regret this greatly, but, you

5  know, I'm just letting people know that it's a potential

6  consequence of what I've heard today.

7      All right.  Anything else?  All right.

8          MR. MORRIS:  No, Your Honor.  Thank you.

9          THE COURT:  Thank you.  We stand adjourned.

10     (Proceedings concluded at 1:16 p.m.)

11                         --oOo--

12

13

14

15

16

17

18

19

20                       CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **08/10/2022**

24  _____     _____

   Kathy Rehling, CETD-444                    Date
25  Certified Electronic Court Transcriber

**174**

133

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Morris                                               11
- By Mr. Clubok                                              62

WITNESSES

Defendant's Witnesses

James Seery
- Direct Examination by Mr. Morris                           23
- Cross-Examination by Mr. Clubok                            44
- Examination by the Court                                   53
- Redirect Examination by Mr. Morris                         58
- Recross-Examination by Mr. Clubok                          59
- Examination by the Court                                   59

EXHIBITS

Defendant's Exhibits 1 through 10              Received   7
Declaration of James Seery (#170)             Received   7

UBS Securities, LLC's Exhibits 1 through 12,   Received 10
14 through 23, 25 through 35, and 37 through 53

CLOSING ARGUMENTS

- By Mr. Morris                                             125
- By Mr. Clubok                                             127

RULINGS                                                     128

END OF PROCEEDINGS                                          132

INDEX                                                       133

**<u>Exhibit A-3</u>**

## ASSIGNMENT AGREEMENT

This Assignment Agreement, effective as of August 11, 2021 (this "Agreement"), is being entered by and among the Highland Claimant Trust (the "Claimant Trust") and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust") for the transfer and assignment of certain claims and causes of action.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. (the "Debtor") filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on February 22, 2021, pursuant to the *Findings of Fact and Order Confirming Plan of Reorganization for the Debtor* [Docket No. 1943] (the "Confirmation Order");

WHEREAS, on August 11, 2021, the Effective Date of the Plan occurred [Docket No. 2700] and, pursuant to the Plan, the Claimant Trust and the Litigation Sub-Trust subsequently came into existence;

WHEREAS, pursuant to the Plan, the Causes of Action were vested in the Claimant Trust and the Estate Claims that were Causes of Action were transferred from the Claimant Trust to the Litigation Sub-Trust;

WHEREAS, the purpose of the Litigation Sub-Trust is to investigate, prosecute, settle, or otherwise resolve claims and causes of action for the benefit of the Claimant Trust Beneficiaries;

WHEREAS, pursuant to Section 2.6 of the Litigation Sub-Trust Agreement, the Claimant Trustee shall, upon reasonable request of the Litigation Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Litigation Trustee any portion of the Claimant Trust Assets intended to be conveyed by the Litigation Sub-Trust Agreement and in the Plan;

WHEREAS, the Litigation Trustee, at the direction of the Claimant Trust Oversight Committee, has requested that the Claimant Trustee assign to the Litigation Sub-Trust all Causes of Action not otherwise held by the Litigation Sub-Trust to the Litigation Sub-Trust, other than those Causes of Action that (1) the Claimant Trustee is currently pursuing, and (2) the Claimant Trustee intends to pursue on behalf of entities managed by the Reorganized Debtor (together, the "

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

DOCS_NY:44237.1 36027/003

<u>Claimant Trust Causes of Action</u>").

## AGREEMENT

In furtherance of the Plan and for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Claimant Trust hereby irrevocably transfers and assigns to the Litigation Sub-Trust any and all Causes of Action not previously transferred or assigned by operation of the Plan, the Litigation Sub-Trust Agreement, or otherwise, except for the Claimant Trust Causes of Action, effective as of the date below. For the avoidance of doubt, to the extent not already held by the Litigation Sub-Trust, all Causes of Action that will be included in the Litigation Trustee's complaint filed on or before October 15, 2021 are assigned to the Litigation Sub-Trust.

Executed as of _October 8, 2021_

**Claimant Trust**

By: _____
James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

**Litigation Sub-Trust**

By: _____
Marc Kirschner, not individually but solely in his capacity as the Litigation Trustee

DOCS_NY:44237.1 36027/003

**178**