**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST, | Adv. Pro. No. 21-03076-sgj |
| *Plaintiff* | |
| v. | |
| JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET | |

RECOVERY, LTD.,

*Defendants.*

## MEMORANDUM OF LAW IN SUPPORT OF
## HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.'S MOTION TO
## RECUSE

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................. 1

II.   LEGAL STANDARD FOR RECUSAL................................................................ 2

III.  STATEMENT OF FACTS .................................................................................. 3

      A.   The Court's Animus Toward Movant Began During The Acis Bankruptcy ......... 4

      B.   The Court's Continuing Animus Has Been Evident Throughout HCMLP's
           Bankruptcy Proceedings ....................................................................... 6

           1.   The Court Has Repeatedly Threatened Mr. Dondero And Movant
                And Accused Them Of Bad Acts Or Acting In "Bad Faith" .................... 6

           2.   The Court Labeled Mr. Dondero as a "Vexatious" Litigant,
                Without Requiring Any Evidence To Support That Label ..................... 10

           3.   The Court Has Repeatedly Sanctioned Or Threatened To Sanction
                Mr. Dondero And His Lawyers ............................................................. 12

           4.   The Court's Actions Have Discouraged Movant From Invoking
                Legal Process, Even Where Legitimate And Necessary......................... 15

      C.   Judge Jernigan Authors A Book Mirroring Her Perception of Highland
           And Mr. Dondero.................................................................................. 16

      D.   The Kirschner Litigation Opens The Door To Additional Abuse ...................... 18

IV.   RECUSAL IS WARRANTED .......................................................................... 19

      A.   Movant Has Met The Requirements Of Section 144, Mandating Recusal.......... 19

      B.   Recusal Is Required Because Judge Jernigan Harbors An Actual Personal
           Bias Against Mr. Dondero And, By Association, Movant ................................ 21

      C.   Recusal Is Required Because, At The Very Least, Judge Jernigan Appears
           Biased.................................................................................................. 23

V.    CONCLUSION.................................................................................................. 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Acis Capital Mgmt., L.P.*, *Bench Ruling and Memorandum of Law in
Support of:*
(A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter
11 Trustee's Third Amended Joint Plan, Case No. 18-30264-SGJ-11 (Bankr.
N.D. Tex.) ...................................................................................................................................4

*Auf v. Howard Univ.*,
Cause No. 19-22065-CIV-Smith, 2020 WL 10458573 (S.D. Fla. Mar. 25,
2020) ..........................................................................................................................................21

*Baldwin v. Zurich Am. Ins. Co.*,
Cause No. 1:17-CV-149-RP, 2017 WL 2963515 (W.D. Tex. July 11, 2017) ........................10

*Bell v. Johnson*,
404 F.3d 997 (6th Cir. 2005) ...................................................................................................22

*Charitable DAF Fund, L.P. v. Highland Capital Mgmt., L.P.*,
Case No. 21-cv-00842 (N.D. Tex.) ..........................................................................................12

*In re Chevron U.S.A., Inc.*,
121 F.3d 163 (5th Cir.1997) .....................................................................................................19

*In re Cont'l Airlines Corp.*,
901 F.2d 1259 (5th Cir. 1990) ...................................................................................................3

*In re Drexel Burnham Lambert Inc.*,
861 F.2d 1307 (2d Cir. 1988)...................................................................................................24

*Highland Capital Mgmt., L.P. v. Highland Capital Mgmt. Fund Advisors, L.P., et
al.*,
Adv. Proc. No. 21-03000-sgj ......................................................................................................8

*Johnson v. Sawyer*,
120 F.3d 1307 (5th Cir. 1997) ..................................................................................................23

*In re Kansas Pub. Employees Retirement Sys.*,
85 F.3d 1353 (8th Cir. 1996) .....................................................................................................3

*Kirschner v. Dondero, et al.*,
Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.)....................................................................18

*Liljeberg v. Health Servs. Acquisition Corp.*,
    486 U.S. 847 (1988)..........................................................................................24

*Liteky v. U.S.*,
    510 U.S. 540 (1994)..........................................................................................22

*Miller v. Sam Houston State Univ.*,
    986 F.3d 880 (5th Cir. 2021) .....................................................................23, 24

*Offutt v. United States*,
    348 U.S. 11 (1954)............................................................................................24

*Parrish v. Board of Comm'rs*,
    524 F.2d 98 (5th Cir. 1975) .............................................................................22

*Patterson v. Mobil Oil Corp.*,
    335 F.3d 476 (5th Cir. 2003) ........................................................................3, 19

*Phillips v. Joint Legislative Committee*,
    637 F.2d (5th Cir. 1981) ..................................................................................21

*Sentis Group, Inc. v. Shell Oil Co.*,
    559 F.3d 888 (8th Cir. 2009) ...........................................................................22

*Smith v. Danyo*,
    585 F.2d 83 (3d Cir. 1978).........................................................................20, 21

*Tillotson v. Esparza*,
    Cause No. EP-15-CV-178-KC, 2015 WL 13333823 (W.D. Tex. June 19,
    2015) ................................................................................................................21

*U.S. v. Brocato*,
    4 F.4th 296 (5th Cir. 2021) ............................................................................2, 3

*U.S. v. Kennedy*,
    682 F.3d 244 (3d Cir. 2012).............................................................................23

*U.S. v. Microsoft Corp.*,
    56 F.3d 1448 (D.C. Cir. 1995) ....................................................................23, 24

*U.S. v. Olis*,
    571 F. Supp. 2d 777 (S.D. Tex. 2008) .............................................................20

*U.S. v. Torkington*,
    874 F.2d 1441 (11th Cir.1989) ........................................................................24

*U.S. v. York*,
    888 F.2d 1050 (5th Cir. 1989) ...........................................................................2

*In re U.S.*,
    572 F.3d 301 (7th Cir. 1999) ....................................................................23

*United States v. Jordan*,
    49 F.3d 152 (5th Cir. 1995) .....................................................................23

**Statutes**

28 U.S.C. § 144 ..................................................................................... *passim*

28 U.S.C. § 455 ..................................................................................... *passim*

28 U.S.C. § 455(a)-(b)(1) .................................................................................3

Tex. Civ. Prac. & Rem. Code § 11.054 .......................................................10

**Other Authorities**

Texas Rule of Civil Procedure 202 ...............................................................14

## I.    INTRODUCTION

Defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA" or the "Movant") moves to recuse Judge Stacey G. Jernigan from serving as the magistrate judge in this adversary proceeding filed by Marc S. Kirschner, as Trustee for the Litigation Sub-Trust ("Adversary Proceeding").  Recusal of Judge Jernigan is mandatory under 28 U.S.C. § 144 and 28 U.S.C. § 455 because the Judge clearly possesses an abiding animus and prejudice against James D. Dondero ("Mr. Dondero"), and by association, Movant, and any objective observer would question the Judge's impartiality under the circumstances presented.

By adopting an acerbic narrative about Mr. Dondero, his entities, his perceived affiliates, and their motivations—a narrative that the Debtor and its professionals have repeatedly used to their advantage—the Bankruptcy Judge has effectively hamstrung any litigant associated with Mr. Dondero from asserting or defending any of its positions in this Court.  For example, Movant and others have alleged that the Debtor has managed and sold property and money in violation of bankruptcy provisions, or in violation of contractual obligations, fiduciary obligations, and federally-imposed duties.  The Court's persistent response has been to deny these parties substantial justice, often departing from its usual practice and procedure in doing so.  At the same time, the Court has summarily rejected any challenge to the Debtor's actions, evincing a dogmatic belief that the Debtor and its current management can do no wrong.

Moreover, Movant and other challengers to the Debtor have repeatedly been thrown out of court on unusual procedural technicalities.  The Court also has stymied every attempt to hold someone on the Debtor's side accountable under federal law, with opinions that are frequently accompanied by extensive exposition of the Judge's unevidenced speculation regarding what dastardly plan she foiled.  The Court's repeated *ad hominem* smears against the challengers and their lawyers, and its suppositions about their supposed connections to Mr. Dondero (a feature that

1

does not otherwise feature in the Court's other decisions, much less in other courts' decisions) are telling. Movant has been punished for fighting back to protect its interests, as is its constitutional right. That relentlessly unfair treatment, coupled with a recently discovered publication that operates as a window into Judge Jernigan's thinking about Mr. Dondero, is the basis of this motion.

Judge Jernigan has written and published a book exposing how she sees her relationship to Mr. Dondero. The book's antagonist, Cade Graham, is "a Dallas hedge fund manager…founder and CEO of Dallas based Ranger Capital, a multibillion dollar conglomerate, which managed not just hedge funds but private equity funds, CDOs, CLOs, REITs, life settlements, and all manner of complicated financial products." The book's protagonist is a bankruptcy judge, Avery Lassiter, who is in a battle with Graham. Everything Graham does is a pretext for sinister and illegal activity that only the Judge sees and therefore must bring to light. The parallels do not end there. That Judge Jernigan clearly perceives a battle between *herself* and Mr. Dondero—and that she is the one tasked with bringing the truth to light—wholly undermines the legitimacy of the Court and its rulings.

While normally, losing (even losing more than once) is not enough to ask for disqualification, it is the unbalanced nature of these proceedings that raises the palpable appearance of bias. The Judge's persistent negative treatment of Mr. Dondero and his perceived affiliates (including Movant) has chilled their invocation of legal process, making fair treatment in this Adversary Proceeding impossible. This Motion should be granted to salvage the Court's reputation as an impartial and neutral factfinder and to ensure that justice is done.

## II.    LEGAL STANDARD FOR RECUSAL

Two federal statutes govern recusal of judges for bias: 28 U.S.C. §§ 144 and 455. *See U.S. v. Brocato*, 4 F.4th 296, 301 (5th Cir. 2021). A judge's duty to rescue herself is "quite similar, if not identical" under both statutes. *U.S. v. York*, 888 F.2d 1050, 1053 (5th Cir. 1989). Notably,

both statutes are written in mandatory terms: if the terms of the statutes are met, recusal is required.

Section 144 mandates recusal when a judge "has a personal bias or prejudice" against or in favor of a party. 28 U.S.C. § 144. A motion under this statute must be supported by "a timely and sufficient affidavit" setting forth "the facts and the reasons for the belief that bias or prejudice exists[.]" *Brocato*, 4 F.4th 296 at 301 (citing 28 U.S.C. § 144). "A legally sufficient affidavit must: (1) state material facts with particularity; (2) state facts that, if true, would convince a reasonable person that a bias exists; and (3) state facts that show the bias is personal, as opposed to judicial, in nature." *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 483 (5th Cir. 2003).

Under Section 455's broader standard, a judge must be recused if the judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," or if the court's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a)-(b)(1). Thus, under Section 455, "recusal may be required even though the judge is not actually partial." *Patterson*, 335 F.3d at 484 (citing *In re Cont'l Airlines Corp*., 901 F.2d 1259, 1262 (5th Cir. 1990)). Therefore, the relevant inquiry under Section 455 is not whether the judge believes she is impartial. Rather, the critical question is whether "the 'average person on the street who knows all the relevant facts of a case'" might reasonably question the judge's impartiality. *In re Kansas Pub. Employees Retirement Sys*., 85 F.3d 1353, 1358 (8th Cir. 1996). Where the question of whether Section 455 requires disqualification is a "close one, the balance tips in favor of recusal." *Id*. at 484-85.

## III.    STATEMENT OF FACTS

Movant does not come to this Adversary Proceeding with a clean slate. To the contrary, as has been evident for several years, Judge Jernigan has an abiding animus against Mr. Dondero, Movant, and their perceived affiliates, formed well before Mr. Dondero's firm, Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), sought chapter 11 bankruptcy protection. That

animus became apparent during the 2018 bankruptcy of Acis Capital Management, L.P. and its

general partner, Acis Capital Management GP, LLC—companies for which Mr. Dondero

previously served as Chief Executive Officer, and for which HCMLP provided certain

management services.  When HCMLP's own chapter 11 case was transferred to Judge Jernigan's

court more than a year later, the Judge immediately made clear that she would not put aside her

negative opinions formed during the Acis bankruptcy.  As described in greater detail below, during

the pendency of the subsequently-filed HCMLP bankruptcy, Judge Jernigan has repeatedly (1)

singled out Mr. Dondero, Movant, and their attorneys for unfair treatment, (2) admonished Mr.

Dondero, Movant, and their attorneys for invoking proper legal process to protect their interests,

(3) refused to credit evidence of record when presented by Mr. Dondero, Movant, and their

attorneys (even where that evidence was undisputed), and (4) departed from normal procedure

where doing so would harm the legal position or rights of Mr. Dondero, Movant, and their

attorneys.  In short, any objective observer would have substantial reason to doubt Judge Jernigan's

impartiality in any proceeding in which Mr. Dondero and Movant are defendants.  Under these

circumstances, recusal is mandatory.

### A.      The Court's Animus Toward Movant Began During The Acis Bankruptcy

Mr. Dondero's first encounter with Judge Jernigan came in the context of the involuntary

bankruptcy of Acis Capital Management, L.P. and its general partner, Acis Capital Management

GP, LLC (collectively, "Acis").  Prior to bankruptcy, Acis managed "hundreds of millions of

dollars' worth of CLOs [collateralized loan obligations]."  *In re Acis Capital Mgmt., L.P.*, *Bench

Ruling and Memorandum of Law in Support of:* (A) Final Approval of Disclosure Statement; and

(B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan ("Acis Bench Ruling"), Case

No. 18-30264-SGJ-11 (Bankr. N.D. Tex.), Acis Dkt. 287 at 10-11.[1]  Joshua Terry ("Mr. Terry"),

then an employee of HCMLP, served as portfolio manager for Acis.  *Id.* at 10.  But in June 2016,

HCMLP terminated Mr. Terry "under contentious circumstances," allegedly stemming from

"disagreements with Mr. Dondero." *Id*.  JAMS arbitration between Mr. Terry and HCMLP ensued,

and in October 2017, Mr. Terry obtained an arbitration award against Acis.  *Id.* at 10-11.

Thereafter, contending that he had concerns that Acis had insufficient funds to pay his

arbitration award, on January 18, 2018, Mr. Terry filed two involuntary chapter 7 bankruptcy

petitions against Acis Capital Management, L.P. and Acis Capital Management GP, LLC.  (the

"Acis Bankruptcy").  *Id.* at 3, 11.[2]

After what Judge Jernigan described as an "astonishingly contentious" bankruptcy, *see id.*

at 3, she issued an order confirming the Acis joint plan on January 31, 2019.  *See* Acis Dkt. 829.

Judge Jernigan's simultaneous Bench Ruling is replete with negative remarks about Mr. Dondero,

his management decisions, and his businesses.

Indeed, in remarks that are eerily prescient of what was to come, Judge Jernigan

concluded—without citing any evidence—that various entities were merely marching to the orders

of Mr. Dondero and HCMLP, that testimony given by individuals affiliated with Mr. Dondero and

his entities was not credible, that "the Highlands" (i.e., Dondero-affiliated entities objecting to the

Acis plan) were merely acting in "lockstep," , and that the Highlands' party-in-interest status was

"questionable."  *See, e.g.*, Acis Bench Ruling, Acis Dkt. 827, at 3, 14-15, 17, 38, 42-45.

---

[1] For ease of reference, where the Movant refers to court dockets other than the HCMLP
bankruptcy docket, the Movant includes a shorthand description of the docket referenced.  For
example, references to the Acis bankruptcy docket are to "Acis Dkt."
[2] The cases were later consolidated.  *See* Order dated April 19, 2018, Acis Dkt. 137.

**B.    The Court's Continuing Animus Has Been Evident Throughout HCMLP's Bankruptcy Proceedings**

Seeking a "fresh start," HCMLP filed its own chapter 11 petition in Delaware on October 16, 2019.  Dkt. 3; *see also* Ex. C, Dec. 3, 2019 Hr'g Tr. at 78:21-23.  The Unsecured Creditors Committee ("UCC") moved to transfer the case from the Delaware Bankruptcy Court to the United States Bankruptcy Court for the Northern District of Texas.  At that time, HCMLP's counsel— Pachulski Stang Ziehl & Jones, the same counsel that continues to represent HCMLP to this day— argued that the case should not be transferred to Judge Jernigan's court because of the and negative opinions and "baggage" that the Court formed of HCMLP's management during the Acis bankruptcy.  *See* Ex. C, December 3, 2019 Hr'g Tr. at 78:21-23.  Over HCMLP's objection, the Delaware Bankruptcy Court transferred the case on December 4, 2019.  *See* Order Transferring this Case to the United States Bankruptcy Court for the Northern District of Texas, Dkt. 1.  As anticipated (and urged) by the UCC, the case landed in Judge Jernigan's court.  Following transfer, Judge Jernigan immediately targeted Mr. Dondero—treatment that, over time, extended to Mr. Dondero's perceived affiliates (including the Movant) and even their lawyers.

What follows is a narrative description of only the most egregious examples.[3]

**1.    The Court Has Repeatedly Threatened Mr. Dondero And Movant And Accused Them Of Bad Acts Or Acting In "Bad Faith"**

During the HCMLP bankruptcy proceedings, the Court has repeatedly threatened Mr. Dondero, Movant, and their lawyers or otherwise accused them of committing bad acts or acting in "bad faith," even when those parties and counsel are raising legitimate legal arguments or defending their rights.

---

[3] This brief seeks to highlight a sampling of Judge Jernigan's biased treatment of Mr. Dondero and the Movant.  But there are countless other examples that support recusal in this case.  For brevity's sake, the Movant attach as Exhibit B a chart containing other examples that are similar in kind, coupled with relevant citations to the record.

Indeed, at one of the earliest hearings following transfer of HCMLP's bankruptcy to Judge Jernigan's court, the Judge (1) expressed negative opinions about Mr. Dondero (although he had not yet filed any motion or objection in her court), (2) opined that Mr. Dondero had a *propensity* to engage in bad acts (based on Judge Jernigan's perceptions formed during the Acis Bankruptcy), and (3) *sua sponte* insisted that language be included in her order approving a settlement between the Debtor and the UCC allowing the Court to hold Mr. Dondero in contempt for violating the terms of that settlement. *See* Ex. D, Jan. 9, 2020 Hr'g Tr. at 52:10-25, 78:23-79:16, 80:3-6.

At a separate hearing held just a few months later in June 2020, Judge Jernigan openly questioned whether lawyers for CLO Holdco—an entirely separate entity that is a wholly owned subsidiary of a charitable Donor Advised Fund (the "DAF"), established by Mr. Dondero—were acting in good faith in seeking a release of funds belonging to CLO Holdco from the Court registry. *See* Ex. E, June 30, 2020 Hr'g Tr. at 82:3-11, 85:4-16.

This reaction was surprising because there was no dispute that the funds belonged to CLO Holdco.  In fact, the Judge herself acknowledged that CLO Holdco's counsel made "perfect arguments" in support of the requested relief. *Id.* at 85:17-22.  The Judge nonetheless made clear that she was suspicious of CLO Holdco's motion—a suspicion stemming entirely from her belief (unsupported by any evidence) that Mr. Dondero was behind the CLO Holdco filing and despite that CLO Holdco had independent outside counsel representing it. *Id.* at 82:3-11, 85:4-16.

Just over a week later, at a hearing on July 8, 2020, the Court *sua sponte* directed Debtor's counsel to investigate Mr. Dondero and certain "Highland affiliates" to ascertain whether they had received PPP loans. *See* Ex. F, July 8, 2020 Hr'g Tr. at 42:10-24.  In asking for an investigation, Judge Jernigan made clear that her request was based on "extrajudicial knowledge" she had learned from reading "the newspapers, the financial papers," rather than any evidence or argument

presented in her courtroom.  *Id.*[4]

At yet another hearing on December 16, 2020, Judge Jernigan openly chastised HCMFA and NexPoint Advisors, L.P. for filing a motion seeking to stop the Debtor and its management from liquidating certain collateralized loan obligations ("CLOs") pending confirmation of HCMLP's Fifth Amended Plan of Reorganization ("Plan").  Dkt. 1528.  As HCMFA and NexPoint explained in their motion, they were concerned that the Debtor's premature liquidation of the CLOs would harm the investors to whom HCMFA and NexPoint owed a fiduciary duty.  *Id.* at 9.  Notwithstanding that concern and the very legitimate legal arguments made in the brief accompanying the motion, Judge Jernigan expressed her belief (untethered to evidence) that Mr. Dondero was behind the motion, concluded that HCMFA and NexPoint filed the motion for an improper purpose, and declared that the motion was "almost Rule 11 frivolous."  *See* Ex. G, Dec. 16, 2020 Hr'g Tr. at 63:14-64:14.  The Judge then used the opportunity to publicly condemn Mr. Dondero, despite the dearth of evidence to support the Judge's assumptions about his role in filing the motion.

That did not dissuade Judge Jernigan from reaching the same evidence-defying conclusion—and going further—just over one month later.  At two hearings in January 2021, HCMFA and NexPoint were back before the Court, this time being accused by the Debtor of interfering with its management of the CLO portfolios.  *See Highland Capital Mgmt., L.P. v. Highland Capital Mgmt. Fund Advisors, L.P., et al.*, Adv. Proc. No. 21-03000-sgj, Dkt. 6.  Notwithstanding that Mr. Dondero had no continuing role with HCMLP and no ability to interfere with management of the CLO portfolios, Judge Jernigan yet again turned her attention to Mr.

---

[4] As Debtor's counsel confirmed, the PPP loans at issue in the article referenced by Judge Jernigan had nothing to do with HCMLP.  Ex. F, July 8, 2020 Hr'g Tr. at 42:10-44:12.  As a result, Judge Jernigan dropped the request.

Dondero, threatening to hold him in contempt of court based on actions taken by others, not Mr. Dondero. *See* Ex. H, Jan. 8, 2021 Hr'g Tr. at 119:6-122:25. She also suggested that Mr. Dondero had caused independent outside counsel to undertake the actions that were the subject of the adversary proceeding, without any evidence to support that finding. *See* Ex. I, Jan. 26, 2021 Hr'g Tr. at 251:24-252:5.

The Court's view of Mr. Dondero and his affiliates as "bad faith" actors persisted though confirmation of HCMLP's chapter 11 plan of reorganization ("Plan"). In her February 22, 2021, Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified), and (II) Granting Related Relief ("Confirmation Order"), Judge Jernigan again questioned the good faith of Mr. Dondero, and two trusts affiliated with Mr. Dondero—The Dugaboy Investment Trust and Get Good Trust—in objecting to Plan confirmation, labeling them "disruptors." Confirmation Order, Dkt. 1943, ¶ 17; *see also id.*, ¶ 19. Their objections specifically related to their desire to protect the assets and not allow those assets to be wasted—a position that is highly meritorious and far from frivolous.

Further still, during a June 2021 hearing in connection with adversary proceedings filed by the Debtor against Mr. Dondero and various of the companies for which HCMLP provided services, Judge Jernigan went so far as to suggest to HCMLP's counsel that HCMLP amend its complaint to include a fraudulent transfer claim against Mr. Dondero based solely on "allegedly problematic things" described by HCMLP's counsel during the hearing. *See* Ex. J, June 10, 2021 Hr'g Tr. at 81:5-82:12. HCMLP thereafter amended its complaint per Judge Jernigan's suggestion. *See* Adv. Case No. 21-3006-sgj, Dkt. 68.

In short, Judge Jernigan has—from start to finish and despite the evidence—consistently viewed Mr. Dondero and perceived affiliates (including Movant) as evildoers and made that bias

clear through repeated commentary and chastisements from the bench.

### 2.  The Court Labeled Mr. Dondero as a "Vexatious" Litigant, Without Requiring Any Evidence To Support That Label

Yet another indication of the Court's bias is its repeated refrain that Mr. Dondero is a "vexatious" litigant, notwithstanding that no such finding has ever been made (and notwithstanding that Mr. Dondero has never been given the opportunity to brief or argue the issue).[5]  Indeed, the record in the bankruptcy proceedings is littered with Judge Jernigan's refrain that Mr. Dondero is "vexatious:"

- Speaking about a lawsuit that Judge Jernigan knew nothing about and had not even read: "If Mr. Dondero doesn't think that is so transparently vexations litigation, yeah, I'm going out there and saying that. I haven't seen it [the compliant she was condemning as vexatious], but, come on." Ex. K, Hr'g Tr. dated Sep. 28, 2020 at 51:13-16.

- Offering up her *sua sponte* view on whether Mr. Dondero should be declared a "vexatious" litigant: "[A]lthough I have not been asked to declare Mr. Dondero and his affiliated entities as vexatious litigants per se, it is certainly not beyond the pale to find that his long history with regard to major creditors in this case has strayed into that possible realm, and thus this court is justified in approving this provision." Ex. L, Hr'g Tr. dated Feb. 8, 2021 at 46:20-25.

- Chastising CLO Holdco Ltd. and The Charitable DAF Fund, LP's counsel for filing a motion based on her view of Mr. Dondero: "I have commented before that we

---

[5] Under Texas law, a court "'may find a plaintiff a vexatious litigant if the defendant shows that there is not a reasonable probability that the plaintiff will prevail in the litigation against the defendant' and one of three additional prerequisites has occurred within the last seven years." *Baldwin v. Zurich Am. Ins. Co.*, Cause No. 1:17-CV-149-RP, 2017 WL 2963515, *4 (W.D. Tex. July 11, 2017) (citing Tex. Civ. Prac. & Rem. Code § 11.054).  These additional elements include "(1) the filing of at least five suits as a pro se litigant that have been dismissed against the plaintiff; (2) relitigating a case pro se after having previously received an adverse and final determination; and a prior finding in state or federal court that the plaintiff is a vexatious litigant in an action concerning the same or substantially similar facts." *Id.*  Putting aside that Mr. Dondero rarely has been a plaintiff in any action in which he has been involved, nothing in the bankruptcy record remotely supports the existence of the three elements required for a finding that Mr. Dondero is a "vexatious litigant."

seem to have vexatious litigation behavior with regard to Mr. Dondero and his many controlled entities." Ex. M, Hr'g Tr. dated Jun. 25, 2021 at 109:20-22.[6]

The Judge's "vexatious" refrain has been so ubiquitous that it has found its way into various movants' papers and oral arguments and has been invoked as a reason to deny Mr. Dondero and Movant the relief they seek, or to reject their arguments out of hand as not credible—*even when the court was not in a position to adjudge credibility*. *See, e.g.*, HCMLP's Response to Movants' Renewed Motion to Recuse, Dkt. 3595, ¶¶ 2, 67 (describing Mr. Dondero as "quintessentially vexatious" and invoking "the never-ending, meritless, vindictive, and vexatious litigation strategy that Mr. Dondero stubbornly clings to regardless of the burdens imposed on the judicial system…" as a reason to deny recusal); Debtor's Omnibus Reply to Objections to Confirmation of Plan, Dkt. 1828, ¶ 22 (arguing that "[e]xculpation is particularly appropriate in this case to stem the tide of frivolous and vexatious litigation against the Exculpated Parties which Dondero and his Related Entities are seeking so desperately to continue to pursue"). Dkt. 1828, ¶ 22.

And while the Court has cited Mr. Dondero's pre-bankruptcy litigation reputation (itself unfounded), no court has previously found that Mr. Dondero (or his entities) ever filed a meritless suit or a frivolous defense or labeled him or them vexatious. Yet Judge Jernigan saw fit to include the term in her Confirmation Order, as part of her justification for discrediting the testimony of Mr. Dondero, overruling the objections raised by him and the Movant to Plan confirmation, and requiring them to channel any future motions or litigation through her. *See* Confirmation Order, Dkt. 1943, ¶ 80 (positing that "[t]he Gatekeeper Provision is also consistent with the notion of a prefiling injunction to deter vexatious litigants…").

Notably, although numerous parties-in-interest to the bankruptcy proceeding have filed

---

[6] CLO Holdco Ltd., The Charitable DAF Fund, LP, Get Good Trust, and Dugaboy Investment Trust moved to modify a portion of the Court's order retaining Mr. Seery relating to the scope of the Court's assertion of jurisdiction. *See id.*; *see also* Dkt. 2248.

repeated adversary proceedings against Mr. Dondero, HCMLP, and other affiliated entities, thereby driving up bankruptcy costs, complicating settlement of claims, and reducing the amount of funds available to creditors, the Court has never even suggested that any of *that* litigation is vexatious.  Apparently, it is only when Mr. Dondero and his affiliates fight back against such suits or against the depletion of the estate by the Debtor's minders in violation of their obligations that the Court labels such action vexatious.

>### 3.    The Court Has Repeatedly Sanctioned Or Threatened To Sanction Mr. Dondero And His Lawyers

Notwithstanding that most courts use sanctions sparingly and only when absolutely necessary, Judge Jernigan also has repeatedly sanctioned Mr. Dondero and his counsel or threatened them with sanctions.  The Court has not imposed similar punishment (or even threatened similar punishment) on any other party to the case.

In what is perhaps the most egregious example, the Court in August 2021 sanctioned Mr. Dondero in connection with a motion filed by two entities—the DAF and CLO Holdco—in consultation with their own, independent legal counsel.  Specifically, the DAF and CLO Holdco filed a motion in the District Court challenging the bankruptcy court's gatekeeping order and *seeking permission* from the Court—in light of the gatekeeping order—to add James P. Seery (the Debtor's CEO and Chief Restructuring Officer) as a defendant.  *Charitable DAF Fund, L.P. v. Highland Capital Mgmt., L.P.*, Case No. 21-cv-00842 (N.D. Tex.), Dkt. 6.  That Order was denied without prejudice to refile after all named defendants had been served. Nonetheless, the Debtor filed a separate motion asking the Court to impose sanctions not only on the DAF and CLO Holdco and their counsel for seeking the Court's permission, but also to impose sanctions on Mr. Dondero, a non-party to the underlying Texas state-court lawsuit.  Dkt. 2247. Mr. Dondero's only action was to alert the DAF and its Counsel of recently uncovered evidence of the value of the HarbourVest

interest in Highland CLO Fund, Ltd., as that evidence suggested that perhaps Mr. Seery had lied

on the stand, and Highland was engaged in inappropriate self-dealing.

At the hearing on the Debtor's sanction motion, the testimony was undisputed that the

DAF's general manager, Mark Patrick, authorized both the lawsuit and the motion for leave to add

Mr. Seery as a defendant. Dkt. 2660 at 19. The testimony was also undisputed that, although Mr.

Dondero was asked to provide, and in fact did provide, information in connection with those

proceedings, he was not in a position to authorize any of the filings at issue and did not do so. *Id.*

at 21. Despite this testimony, Judge Jernigan concluded that "Mr. Dondero sparked this fire," that

the evidence was "clear and convincing that Mr. Dondero encouraged Mr. Patrick to do something

wrong," and that the lawsuit filed by the DAF and Holdco was, in "th[e] Court's estimation, wholly

frivolous." *Id.* at 26. In the end, the Court ordered Mr. Dondero to pay a startling $239,655, as a

result of his supposed contempt, despite that the movant had only submitted bills of about $170,000

in attorneys' fees. *Id.* at 28-30. Worse still, the Court tacked on a monetary sanction of $100,000

to be paid by Mr. Dondero (or any other individual or entity) for any attempted appeal of the

sanctions award. *Id.* at 30.[7] These results are not surprising given that Judge Jernigan – before

any evidence was heard – instituted the proceeding with an order to show cause why the "violators"

of her order should not be held in contempt – not "alleged violators," just "violators." *See* Dkt.

2255. Nothing could more clearly telegraph the prejudgment that had occurred.

In short, Judge Jernigan ignored undisputed testimony, concocted a way to saddle Mr.

Dondero and others with a multi-hundred-thousand-dollar liability for seeking her permission to

do something (and for obeying the Court's order denying that relief), and attempted to

prophylactically deny Mr. Dondero's access to the appellate courts through an additional threat of

---

[7] Not even the Debtor attempted to defend this portion of the Court's sanction award.

sanctions.  This ruling along smacks of bias and animus and should be sufficient to require recusal

of Judge Jernigan in future proceedings where Mr. Dondero is a defendant.

Additionally, Mr. Dondero sought to file a petition under Texas Rule of Civil Procedure

202 in state court to investigate how and why two funds that are known to associate with Mr. Seery

were able to purchase bankruptcy claims at a steep discount and what those funds knew or were

told by Mr. Seery about the estate.[8]  Undoubtedly seeking to take advance of Judge Jernigan's

known predilection against Mr. Dondero, the funds improperly removed the Rule 202 petition to

Bankruptcy Court, despite dozens of cases stating that such actions are not removable because the

federal courts lack subject matter jurisdiction.  With obvious reluctance, Judge Jernigan was forced

to remand the case.  *See* Order Granting Motion to Remand, Adv. Pro. No. 21-03051, Dkt. 22 at

20-21 ("[W]hile remand appears to be the correct result under the law, it is done here with grave

misgivings ... Dondero's standing in filing the Rule 202 Proceeding would appear to be highly

questionable and his motives highly suspect.").  But she did not sanction the removing parties for

the clearly frivolous removal.  Instead, in a lengthy opinion, she chastised Mr. Dondero for

deigning to ask questions and seek information.  *Id.* at 5-6.  The Judge's allegations against him

clearly carried weight in the state court and poisoned the well for that judge, who denied the Rule

202 depositions.

In addition to these orders, Judge Jernigan has sanctioned Mr. Dondero on another occasion

and repeatedly threatened his lawyers with sanctions.  *See, e.g.*, Dkt. 2660; Ex. N, February 23,

2021 Hr'g Tr. at 232:7-234:19 ("But it just feels like sickening games. And again, if this keeps on,

if this keeps on, one day, one day, there may be an enormous attorney fee-shifting order.").  Again,

notwithstanding questionable legal arguments made by other parties to the case and other dubious

---

[8] *See* 95th Judicial District Court of Dallas County, Texas Cause No. DC-21-09534.

motion practice by the Debtor, the UCC, and its constituents, no other party to these proceedings

has been threatened with sanctions for any reason.  There is a reason for that: Judge Jernigan seeks

out opportunities to punish Mr. Dondero and his affiliates.

> **4.    The Court's Actions Have Discouraged Movant From Invoking Legal
> Process, Even Where Legitimate And Necessary**

Ultimately, and as set forth in detail in the accompanying affidavit of Mr. Dondero, the

statements made and actions taken by Judge Jernigan against him, his entities, and his perceived

affiliates has had a substantial prejudicial effect on Movant, in two critical respects.  *See* Ex. A,

Affidavit of James D. Dondero.  First, the Court's bias has caused it to make decisions that are

detrimental not just to Movant but to creditors and stakeholders more generally.

For example, the Court did not require the Debtor to file Rule 2015.3 reports in bankruptcy,

notwithstanding that the Debtor had at its fingertips the information with which to populate those

reports (and in fact provided similar reporting to the UCC).  As a result, the Debtor has been

permitted by Judge Jernigan to obfuscate the true value of the bankruptcy estate, disabling

meaningful settlement discussions that could have resolved the estate long ago.  Indeed, the Court

itself remains ignorant of the true value of the estate to this day.  And as has been posited in a

recently filed adversary proceeding seeking an accounting and other information from the

Claimant Trustee, the bankruptcy estate is and always has been solvent, meaning that the estate

could pay all creditors in full now and dispense with all further proceedings before the Court.  *See*

Motion for Leave, Dkt. 3662.  Put another way, the Court has allowed its desire to punish Mr.

Dondero and his perceived affiliates to outweigh the Court's obligation to expedite the orderly and

transparent reorganization of HCMLP.

Second and more significantly, the Court's bias has had a chilling effect on Movant and its

counsel.  Specifically, the Court's repeated threats, negative treatment, and sanctions orders have

left Movant and its counsel with the perception that they cannot succeed on any motion or objection filed with this Court. Worse still, Movants and its counsel must proceed with extreme caution out of legitimate concern that the Court will sanction them for attempting to protect their legal rights and positions.[9] That is precisely the type of problem that recusal is designed to prevent. No litigant should perceive that justice is impossible because of the predilections of the presiding judge.

### C.    Judge Jernigan Authors A Book Mirroring Her Perception of Highland And Mr. Dondero

Compounding matters, Movant recently became aware that Judge Jernigan wrote and published two novels while she was presiding over the Acis and HCMLP Bankruptcies.

Judge Jernigan's first novel, *He Watches All My Paths*, was released on January 3, 2019, just weeks before Judge Jernigan confirmed the joint bankruptcy plan of Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Acis")—companies for which Mr. Dondero served as CEO and for which HCMLP performed certain management services prior to Acis's bankruptcy. Against that backdrop, Judge Jernigan describes the financial industry as being dominated by "[h]igh flying hedge fund managers" that "suck up money like an i-robot vacuum" and seem to "make money no matter what" and who routinely show "outrageous amounts of hubris" as part of their "bro culture." Given that description, it is no wonder that the novel's central protagonist, a Dallas federal bankruptcy judge, wonders whether the death threats she is receiving come from a hedge fund manager that has previously appeared in her court.

Judge Jernigan's second novel, *Hedging Death*, was released in March 2022, less than a

---

[9] Debtor sought to have Movant and Nexpoint sanctioned and held in contempt for making a proffer of evidence to preserve the record for appeal in the Notes cases. *See* Adv. Pro. No. 21-3004, Dkt. 130 at 10-14. Although it was the Debtor's motions that were out of line (given that a making a proffer was the only means of preserving the record), and while Judge Jernigan denied the Debtor's motions, she still chastised Movant and Nexpoint for protecting their rights, calling the Debtor's motion "a close call." Ex. O, April 20, 2022 Hr'g Tr. at 51:14-21.

year after HCMLP's Plan was approved and while these bankruptcy proceedings were still
ongoing.[10]   In *Hedging Death*, Judge Jernigan repeatedly invokes detail from the ACIS and
Highland Bankruptcies.  Again, the central protagonist of the novel is a Dallas bankruptcy judge,
along with her husband, a retired police officer (like Judge Jernigan's husband) and private
investigator.   The story involves a "high-flying, Dallas hedge fund manager" who, like Mr.
Dondero, Judge Jernigan characterizes as a reckless investment manager and vexatious litigant.
*Id.* at 10, 16.   The investment firm in the novel is called Ranger Capital and is experiencing
economic distress largely because of extensive litigation stemming from bad investments.  *Id.* at
11, 74.  This alone is astonishing:  HCMLP's original name was Ranger Asset Management, as is
prominently disclosed on the website of Mr. Dondero's investment firm NexPoint, and which has
been mentioned in other filings in Judge Jernigan's court.   And HCMLP, like the supposedly
fictitious Ranger, initially sought chapter 11 protection because of investor litigation.   The
similarities do not stop there.

In the novel, Ranger, like HCMLP, is a "multi-billion dollar conglomerate, which
manage[s] not just hedge funds but private equity funds, CLOs, REITs, life settlements, and all
manner of complicated financial products." *Id.* at 11.  In the novel, Judge Jernigan describes the
life settlement industry—which she knows was an industry in which HCMLP and Mr. Dondero
invested—as "creepy," "immoral," "unethical," and "should be illegal." *Id.* at 71-74.  As Judge
Jernigan is well aware, HCMLP and its affiliates managed hedge funds, private equity funds,
CDOs, CLOs,  REITs, life settlement portfolios, and private investment accounts for institutions
around the world—exactly the same unusual mix of investments at issue in Judge Jernigan's
second "fictional" novel.

---

[10] Stacey Jernigan, Hedging Death (2022).

There can be no question that Judge Jernigan learned about this mix of investments from her work on the Acis and Highland Bankruptcies.  Indeed, even financial hubs such as New York and Los Angeles have only a limited number of firms with the mixture of products found at HCMLP.  Given that and the books use of the name "Ranger," anyone in the industry would readily conclude that the author was writing about Mr. Dondero and his businesses.

Moreover, Judge Jernigan has repeatedly expressed her suspicion of international tax structures and off-shore transactions (something highly regular in finance), calling them "byzantine."  *See, e.g.*, Ex. E, June 30, 2020 Hr'g Tr. at 86:16-87:15.  And she expressed her suspicion in the book by setting forth how such structures are actually pretexts for hiding illegal activity and money laundering.  *See, e.g., Hedging Death* at 75, 127-128 ("Graham had kept all this information secret with his byzantine web of offshore companies."), 179.  In short, Judge Jernigan's writings (both inside and outside the courtroom) suggest that she harbors exceedingly negative views about Mr. Dondero, and that she in fact patterned the antagonist in her books after Mr. Dondero, leading any reasonable observer to question Judge Jernigan's impartiality in these bankruptcy proceedings.

### D.    The Kirschner Litigation Opens The Door To Additional Abuse

Against this tortured backdrop, in September 2021, Marc S. Kirschner, as Trustee for the Litigation Sub-Trust, filed this Adversary Proceeding against Movant and numerous other defendants, claiming that various individuals and entities affiliated with HCMLP committed fraud, breached their fiduciary duties, and engaged in fraudulent transfers.  *See Kirschner v. Dondero, et al.*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.) (the "Kirschner Litigation"), Dkt. 158 (Amended Complaint).  The Kirschner Litigation seeks to impose on Movant and other defendants hundreds of millions of dollars of potential damages.  *Id.*

To date, the Kirschner Litigation has progressed slowly.  Movant and others filed motions

to withdraw the reference.  On April 6, 2022, Judge Jernigan issued a Report and Recommendation in which she recommended that the reference be withdrawn but that she retain the case and preside over it as a magistrate judge until trial.  Dkt. 151.  Movant has objected to Judge Jernigan's Report and Recommendation (and urged that the reference be withdrawn immediately to allow this case to proceed in federal District Court), but the District Court has not yet ruled on that objection.  In the interim, Movant and others have moved to dismiss the various causes of action asserted in the Kirschner Litigation.  *See, e.g.*, Dkts. 182-183, 189-190.  Briefing on those motions to dismiss is complete, but no oral argument has been set, and no decision on the motions has been made.  Judge Jernigan has not been called upon to make any other decisions in the Adversary Proceeding to date.

Although a favorable ruling from the District Court on Movant's objection to Judge Jernigan's Report and Recommendation on the motions to withdraw the reference would moot this Motion to Recuse, in an abundance of caution and to avoid any argument about unnecessary delay, Movant decided to file the Motion now, so that it may be decided before any substantive decisions are made by Judge Jernigan in the Adversary Proceeding.

## IV.    RECUSAL IS WARRANTED

Based on the facts set forth above, and in the Dondero Affidavit, recusal of Judge Jernigan is mandatory in this Adversary Proceeding.  The facts and accompanying evidence establish that the Court has both an actual "personal bias or prejudice," and that any reasonable and objective observer would "harbor doubts concerning the judge's impartiality."  *Patterson*, 335 F.3d at 483-84 (quoting *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 165 (5th Cir.1997)).

### A.    Movant Has Met The Requirements Of Section 144, Mandating Recusal

The District Court should recuse Judge Jernigan in this Adversary Proceeding because Movant has met all the requirements of 28 U.S.C. § 144.  Notably, there is no dispute that Judge

Jernigan already has recommended that the District Court withdraw the reference in this Adversary

Proceeding.  As a result, this proceeding is now a "proceeding in a district court," as contemplated

under Section 144, with Judge Jernigan serving in her capacity as a magistrate judge for the District

Court.  As Judge Jernigan has previously insisted, once the reference is withdrawn, "the District

rules apply."  Ex. P, Hr'g Tr. dated Nov. 9, 2021, at 12:2-3, 13:9-20.  Indeed, the Judge emphasized

that "District Courts are very much sticklers for rules and procedures," such that she must "do

what I think the District Judge would expect me to do on all future occasions and strictly apply the

rules" while sitting as a magistrate for the District Court prior to trial.  *Id.* at 14:4-8.  Given this

procedural posture, this adversary proceeding is no different from a case pending before a

magistrate in the District Court, and section 144 applies with equal force.

In addition, Movant meets both of the procedural requirements of Section 144.

*First*, Movant's motion is timely.  In assessing the timeliness of a Section 144 motion,

"courts simply require exercise of reasonable diligence in filing an affidavit after discovering facts

that show bias, or an explanation of good cause for failing to do so."  *U.S. v. Olis*, 571 F. Supp. 2d

777, 781 (S.D. Tex. 2008).  "For example, courts will often consider whether the affiant has

participated in substantial pre-trial motions between the time he first learned of the asserted bias

and the time he filed the § 144 request."  *Smith v. Danyo*, 585 F.2d 83, 86 (3d Cir. 1978).

As explained above, if granted, Movant's pending motion to withdraw the reference would

moot this motion, as would dismissal, obviously.  However, since filing the motions, Movant

became aware of Judge Jernigan's two novels.  *See* Section III.C, supra.  In light of this discovery,

Movant is filing this motion now out of an abundance of caution, while this proceeding is still in

its early stages and before Judge Jernigan has issued any substantive decisions in the case.  Where,

as here, the case is still in the preliminary stages and more than a year away from trial, there is no

risk of gamesmanship or the parties "waiting until the eve of trial and then resorting to a §

144 affidavit in order to obtain an adjournment." *Smith*, 585 F.2d at 86.   Under these

circumstances, Movant's motion is timely.

*Second*, Mr. Dondero has submitted a "sufficient affidavit" stating "the facts and the

reasons for the belief that bias or prejudice exists[.]" 18 U.S.C. § 144.   "If an affidavit filed

under section 144 is timely and technically correct, its factual allegations must be taken as true for

purposes of recusal. The judge must pass on the legal sufficiency of the affidavit, but he may not

pass on the truth of the matters alleged." *Phillips v. Joint Legislative Committee*, 637 F.2d, 1019-

20 (5th Cir. 1981); *see also Tillotson v. Esparza*, Cause No. EP-15-CV-178-KC, 2015 WL

13333823, *2 (W.D. Tex. June 19, 2015) (denying motion under Section 144 where plaintiff

"failed to attach a supporting affidavit."); *Auf v. Howard Univ.*, Cause No. 19-22065-CIV-Smith,

2020 WL 10458573, *3 (S.D. Fla. Mar. 25, 2020) (denying motion denied where the plaintiff

submitted only an unsworn statement that did not address the substance of the motion).

Here, Mr. Dondero has submitted an affidavit signed under penalty of perjury attesting to

the specific facts and reasons supporting recusal, which are set forth above.   *See* Ex. A, Dondero

Affidavit.  That affidavit is plainly legally sufficient and meets the requirements of the statute.

### B.   Recusal Is Required Because Judge Jernigan Harbors An Actual Personal Bias Against Mr. Dondero And, By Association, Movant

The facts described above and in the accompanying evidence establish beyond question

that Judge Jernigan harbors an actual bias and animus against Mr. Dondero and his perceived

affiliates (including Movant), making recusal mandatory.   The Judge's consistent threats,

admonitions, assumptions and findings contrary to or in the absence of evidence, and adverse

treatment of Mr. Dondero and those entities that appear aligned with him (including Movant) are

more than sufficient to demonstrate that the Judge's bias is "personal rather than judicial in nature."

21

*Parrish v. Board of Comm'rs*, 524 F.2d 98, 100 (5th Cir. 1975).

Notably, although "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," the Supreme Court has also recognized that predispositions developed during the course of a trial can suffice to demonstrate the requisite bias or prejudice. *Liteky v. U.S.*, 510 U.S. 540, 555 (1994). In this regard, the words "bias" and "prejudice" mean a disposition or opinion that is somehow wrongful or inappropriate, either because: (a) it is undeserved; (b) it rests upon knowledge that the holder of the opinion ought not to possess; or (c) it is excessive in degree. *Id.* at 554. For example, the court's consideration of an extrajudicial source of information is a factor in favor of finding either an appearance of partiality under section 455(a) or bias or prejudice under section 455(b)(1). *Bell v. Johnson*, 404 F.3d 997, 1004 (6th Cir. 2005) (citations omitted).[11]

Moreover, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings," may evidence bias if the opinions reveal that they "derive from an extrajudicial source; and ***they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible***." *Liteky*, 510 U.S. at 555 (emphasis added).

Applying these standards, the federal courts have held that recusal (or reassignment to a new judge) is appropriate under several circumstances that mirror those at issue in this case. For example, the federal courts have found recusal or reassignment appropriate where (1) the judge made antagonistic statements to plaintiffs and manifested an "apparent distrust" of plaintiffs "early in the litigation,"[12] (2) the judge questioned one party's decision to pursue a course of action and

---

[11] Importantly, consideration of an extrajudicial source is not necessary to a finding of bias or prejudice. *Liteky*, 510 U.S. at 554-55.
[12] *Sentis Group, Inc. v. Shell Oil Co.*, 559 F.3d 888, 904-05 (8th Cir. 2009) (reassigning case to a new judge on remand).

made comments that were critical of the party's position,[13] (3) the judge openly questioned the integrity of one party's counsel, suggested he was proceeding in "bad faith," and called certain decisions made by him "suspicious,"[14] (4) there was "immediate, continuing, and ever-increasing tension" between the judge and one party's counsel, the judge questioned in open court "the conduct of the lawyers" for one party, and the judge questioned one party's "good faith,"[15] (5) the judge's comments "evidenced his distrust of [one party's] lawyers and his generally poor view of [one party's] practices."[16]  As set forth above, the Court has engaged in *all* of these practices in this case, each of which individually would mandate recusal.  *Johnson v. Sawyer*, 120 F.3d at 1334.

In short, Movant, like all other litigants, are entitled to a full and fair opportunity to make their case in an impartial forum—regardless of their history with that forum.  *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 893 (5th Cir. 2021) (citing *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995)).  Judge Jernigan's personal bias and animus toward Mr. Dondero and his perceived affiliates (including Movant) far exceeds what is permissible in any court proceeding.

**C.    Recusal Is Required Because, At The Very Least, Judge Jernigan Appears Biased**

In the alternative, and at the very least, the numerous examples discussed above clearly establish that an objective observer would harbor doubts about Judge Jernigan's impartiality.  This alone is grounds for mandatory recusal.  As the Fifth Circuit has held, "fundamental to the judiciary

---

[13] *In re U.S.*, 572 F.3d 301, 311-12 (7th Cir. 1999) (on mandamus, reversing district judge's order denying motion to recuse and ordering that "all orders entered by the Judge after the motion for recusal was filed . . . be vacated").

[14] *U.S. v. Kennedy*, 682 F.3d 244, 258-260 (3d Cir. 2012) (ordering reassignment of the case to a different judge on remand).

[15] *Johnson v. Sawyer*, 120 F.3d 1307, 1334-1337 (5th Cir. 1997) (ordering reassignment of the case to a different judge on remand and explaining that "the loss of efficiency and economy pales in comparison" to "the necessity to preserve the appearance of impartiality, fairness, and justice").

[16] *U.S. v. Microsoft Corp.*, 56 F.3d 1448, 1465 (D.C. Cir. 1995) (where a reasonable observer could question whether the presiding judge "would have difficulty putting his previous views and findings aside" on remand, case should be assigned to a different judge).

is the public's confidence in the impartiality of [its] judges and the proceedings over which they preside." *Id.* Thus, "justice must satisfy the appearance of justice." *Id.* (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).  Indeed, Section 455 was "designed to promote public confidence in the impartiality of the judicial process." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988) (quoting H.R. Rep. No. 1453); *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859-60 (1988).  Accordingly, recusal is warranted where a judge's comments would "cause a reasonable observer to question whether [the judge] 'would have difficulty putting his previous views and findings aside.'"  *Microsoft Corp.*, 56 F.3d at 1465 (quoting *U.S. v. Torkington,* 874 F.2d 1441, 1447 (11th Cir.1989)).

Even if Judge Jernigan does not harbor actual bias—and all signs point to that being true—the facts as described and the accompanying evidence establish that a reasonable observer would question her impartiality.  Allowing Judge Jernigan to continue to preside over this Adversary Proceeding despite the overwhelming evidence of bias would only serve to undermine the public confidence in the judiciary.  Under these circumstances, federal statute requires recusal.

## V.    CONCLUSION

It is time for Judge Jernigan to step aside and allow a neutral judge to preside over this Adversary Proceeding.  For more than four years, she has expressed overtly hostile opinions and sentiments about Mr. Dondero and Movant, and no reasonable observer could possibly believe that Movant can receive fair treatment at Judge Jernigan's hand.  The federal recusal statutes exist to protect not just parties injured by biased judicial treatment, but to protect the public interest in a fair and rational judiciary.   For all these reasons, and based on the argument and evidence presented, Movant respectfully requests that the Court grant this Motion to Recuse and assign this Adversary Proceeding to another magistrate judge pending trial.

Dated: February 27, 2023

Respectfully submitted,

**STINSON LLP**

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email:  deborah.deitschperez@stinson.com

*Counsel for Highland Capital Management Fund Advisors, L.P.*

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that counsel for Highland Capital Management Fund Advisors, L.P. conferred with counsel for Plaintiff regarding the relief sought in this motion, and counsel for Plaintiff indicated that Plaintiff is unlikely to consent. Counsel for HCMFA will promptly inform the Court if counsel for Plaintiff indicates that it determines that it is not opposed to the relief sought in this motion.

*/s/  Deborah Deitsch-Perez*
Deborah Deitsch-Perez

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 27, 2023, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/  Deborah Deitsch-Perez*
Deborah Deitsch-Perez