## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| **MARK S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST** | |
| **Plaintiff,** | |
| **v.** | **Adv. Pro. No. 21-03076-sgj** |
| **JAMES D. DONDERO; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,** | |
| **Defendants.** | |

### PLAINTIFF HUNTER MOUNTAIN INVESTMENT TRUST'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY VERIFIED MOTION FOR TEMPORARY RESTRAINING ORDER, <u>PRELIMINARY INJUNCTION, AND APPOINTMENT OF RECEIVER</u>

Plaintiff Hunter Mountain Investment Trust ("<u>HMIT</u>") submits this Memorandum of Law

in Support ("<u>Memorandum</u>") of its Emergency Verified Motion for Temporary Restraining Order,

Preliminary Injunction, and Appointment of Receiver ("Verified Motion"), pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure and Section 24.008(a)(3)(B) of the Texas Business and Commerce Code, also known as the Texas Uniform Fraudulent Transfer Act ("TUFTA"), seeking to enjoin Defendants James Dondero ("Dondero"), Scott Ellington ("Ellington"), Isaac Leventon ("Leventon"), Strand Advisors, Inc. ("Strand Advisors"), The Get Good Trust ("Get Good"), NexPoint Advisors, L.P. ("NexPoint"), Highland Capital Management Fund Advisors, L.P. ("HCMFA"), The Dugaboy Investment Trust ("Dugaboy"), Highland Dallas Foundation ("HDF"), Massand Capital LLC, Massand Capital, Inc., and SAS Asset Recovery, Ltd. ("SAS") (collectively, "Defendants") from (i) secreting or concealing assets in any manner or otherwise transferring assets out of the country beyond the jurisdiction of this Court that would hinder, frustrate or prevent the satisfaction of a potential recovery or judgment awarded against them in these proceedings; and, (ii) imposing a receivership on Defendants NexPoint, Get Good, HCMFA and Dugaboy pursuant to TUFTA Section 24.008(a)(3)(B). In support, HMIT states:

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ...........................................................................................v

**I. INTRODUCTION** ....................................................................................................1

**II. FACTUAL BACKGROUND** ..................................................................................4

**A.    Procedural and Substantive Background** .......................................................4

**B.    Defendants' Historical Pattern of Diverting and Concealing Assets** ............6

*The Highland Bankruptcy* .....................................................................................6

*Dondero Engaged In Misconduct Relating to Acis and Joshua Terry* .............7

*Dondero and Ellington Fraudulently Induced an Investment from HarbourVest* .........8

*Willful Misconduct in the Transfer of Highland Capital Credit Strategies
Fund's Assets* ...........................................................................................................9

*Willful Misconduct in the Transfer of Highland Crusader Fund's Assets* ......9

*Dondero and His Accomplices Caused Highland to Engage In Misconduct That
Increased Liability To UBS* ...................................................................................10

**C.    Defendants' Recent Efforts to Transfer and Conceal Assets** .......................11

**III. LEGAL STANDARD** ..........................................................................................13

**A.    Injunctive Relief** .............................................................................................13

**B.    Receivership** ....................................................................................................14

**IV. ARGUMENT** ........................................................................................................15

**A.    HMIT Will Suffer Irreparable Harm in the Absence of Injunctive Relief** ...15

**B.    HMIT Demonstrates Likelihood of Success on the Merits** ..........................18

**C.    The Equities Strongly Favor HMIT** .............................................................19

**D.    Injunctive Relief Serves the Public Interest** ................................................20

**E.    Appointment of a Receiver** ............................................................................20

**IV. SECURITY** ..........................................................................................................22

**V. CONCLUSION** ................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*35 Bar & Grille, LLC v. City of San Antonio*, 943 F. Supp. 2d 706 (W.D. Tex. 2013) ............... 18

*Akin, Gump, Strauss, Hauer and Feld, L.L.P. v. E-Court, Inc.*, 2003 Tex. App. LEXIS 3966 (Tex. App.—Austin May 8, 2003, no pet.) ...................................................................................... 21

*Amegy Bank N.A. v. Monarch Flight II, LLC*, No. 4:11-CV-3218, 2011 U.S. Dist. LEXIS 140874 (S.D. Tex. Dec. 7, 2011) ........................................................................................................ 16

*Bank of Am., N.A. v. Mega World Builder Corp.*, No. 4:24-CV-3021, 2024 U.S. Dist. LEXIS 203763 (S.D. Tex. Nov. 8, 2024) .............................................................................................. 16

*Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733 (N.D. Tex. 2008) ...................................... 21

*Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300 (5th Cir. 1978) ...................................... 22

*Craig v. McCarty Ranch Trust (In re Cassidy Land and Cattle Co.)*, 836 F.2d 1130 (8th Cir. 1988) ........................................................................................................................................ 15

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579 (5th Cir. 2013) ....... 15

*Green v. Wells Fargo Bank, N.A.*, 575 Fed. Appx. 322 (5th Cir. 2014) ....................................... 14

*In re Compton Corp.*, 90 B.R. 798 (Bankr. N.D. Tex. 1988) ....................................................... 14

*In re FiberTower Network Servs. Corp.*, 482 B.R. 169 (Bankr. N.D. Tex. 2012) ................... 13, 20

*In re Hunt*, 93 B.R. 484 (Bankr. N.D. Tex. 1988) ................................................................. 15, 20

*In re Memorial Estates, Inc.*, 797 F.2d 516 (7th Cir. 1986) ........................................................ 15

*In re OGA Charters, LLC*, 554 B.R. 415 (Bankr. S.D. Tex. 2016) ......................................... 13, 20

*In re Seatco, Inc.*, 259 B.R. 279 (Bankr. N.D. Tex. 2001) ........................................................... 14

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2010) .......................................................... 15, 16, 17, 18

*Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624 (5th Cir. 1996) ......................................................... 22

*Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021) ................................................................... 14

*Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618 (5th Cir. 1985) ....................... 13

*Moore v. Brown*, 868 F.3d 398 (5th Cir. 2017) .......................................................................... 14

*Nobelman v. American Savings Bank*, 508 U.S. 324 (1993) ........................................................ 15

*Prep Sols., Ltd v. Lecht*, 2022 U.S. Dist. LEXIS 98756 (E.D. Tex. June 2, 2022) ....................... 16

*S. Texas Lighthouse for the Blind, Inc. v. Fed. Supply Servs. Int'l, Inc.*, 2020 U.S. Dist. LEXIS 157347 (S.D. Tex. Aug. 28, 2020) ......................................................................................... 17

*Sargeant v. Al Saleh*, 512 S.W.3d 399 (Tex. App.—Corpus Christi 2016, no pet.) ..................... 17

*SEC v. Barton*, 135 F.4th 206 (5th Cir. 2025) ........................................................................... 16

*Sharp v. SSC Farms I, LLC (In re SK Foods, L.P.)*, 2010 Bankr. LEXIS 6445 (E.D. Cal. April 5, 2010) .................................................................................................................................. 17, 18

*Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074 (5th Cir. 1986) ............................................ 14

*Titlemax of Tex., Inc. v. City of Dall.*, 142 F.4th 322 (5th Cir. 2025) .......................................... 18

*Triadou SPV S.A. v. Chetrit*, 2021 WL 3290834, at *9 (Sup. Ct. N.Y. Cnty. Aug. 2, 2021) ....... 10

*Tujague v. Adkins*, No. 4:18-CV-631, 2018 U.S. Dist. LEXIS 171394 (E.D. Tex. 2018) ...... 16, 17

*Turnkey Offshore Project Servs., LLC v. JAB Energy Solutions, LLC*, 2021 U.S. Dist. LEXIS 149733 (E.D. La. Aug. 10, 2021) ........................................................................................... 17

*Unisys Corp. v. Dataware Prods., Inc.*, 848 F.2d 311 (1st Cir. 1988) .......................................... 14

*Walker v. Doe*, No. 6:24-cv-00633-ADA, 2025 U.S. Dist. LEXIS 100396 (W.D. Tex. 2025) 16, 17

**Statutes**

11 U.S.C. § 105 .................................................................................................... 13, 14, 15

11 U.S.C. § 544 .......................................................................................................................... 20

11 U.S.C. § 548 .......................................................................................................................... 20

11 U.S.C. § 550 .......................................................................................................... 20
26 U.S.C. § 6502 ........................................................................................................ 20
N.Y. C.P.L.R. § 5225 ................................................................................................. 10
Tex. Bus. & Comm. Code § 24.008 ............................................................. ii, 4, 22, 23
Tex. Bus. Orgs. Code § 11.403 .................................................................................. 23
Tex. Bus. Orgs. Code § 11.410 .................................................................................. 24
Tex. Civ. Prac. & Rem. Code § 64.001 ..................................................................... 23

**Rules**
Fed. R. Bankr. P. 7065.......................................................................................ii, 13, 14
Fed. R. Civ. P. 65(c) ...................................................................................... 13, 14, 22

## I.
## INTRODUCTION

1.      Dondero and Ellington, and the other Defendants which they control or with which they are closely allied, are preparing for imminent reckonings, and they are using their affiliated entities to secrete and conceal assets that would otherwise be available to satisfy a judgment against them in this adversary proceeding. After decades of avoiding accountability through a "byzantine" web of entities and fraudulent transfers, the walls are finally closing in on Defendants.

2.      There are two such reckonings on the immediate horizon. First, this adversary proceeding, alone, seeks to impose hundreds of millions of dollars of liability on Dondero and Ellington, individually, as well as entities they control. HMIT recently reactivated this adversary proceeding after a two-year stay.[1] Dondero and other Defendants aggressively opposed HMIT's acquisition of the rights to prosecute this adversary proceeding and, now, fully realizing the stay would be lifted, opposed HMIT's substitution as Plaintiff.[2]

3.      The other immediate reckoning is the oral argument now scheduled for September 22, 2025, in a turnover case brought by UBS—one of Highland's largest original creditors[3]—seeking to hold Dondero and Ellington personally liable for over $1.4 billion in damages and accrued interest related to an underlying transaction involving Highland Capital Management, L.P. ("Highland").[4] UBS seeks to hold Dondero and Ellington accountable for

---

[1] HMIT's notice to lift stay was served on Wednesday, September 3, 2025 [Doc. 375].

[2] *See* Objection of NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. to Motion to Substitute [Doc. 364]; Joinder to Objection of NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. to Motion to Substitute [Doc. 363]; Joinder of Scott Ellington and Isaac Leventon to the Objection of NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. to Motion to Substitute [Doc. 362].

[3] UBS's Claims against Highland's estate (Claim Nos. 190 and 191) exceeded $1 billion, of which $125 million was ultimately allowed against the estate. *See* Order Approving Debtor's Settlement With UBS Securities LLC And UBS AG London Branch And Authorizing Actions Consistent Therewith [BK Doc. 2389].

[4] The UBS litigation is pending in New York Supreme Court, Index 6500744/2023, *UBS Securities LLC and UBS AG London Branch v. James Dondero, Scott Ellington, et al.* ("UBS Lawsuit").

fraudulent transfers predating Highland's bankruptcy,[5] and also seeks to impose alter ego liability upon them for the very large judgment against Highland in favor of UBS.[6] Thus, when combined, the UBS litigation and this adversary proceeding seek to impose over $1.7 billion in damages, making Defendants' motivations undeniably clear—Defendants are aggressively seeking to insulate their assets at all costs.

4.      HMIT's immediate need for injunctive relief stems from Defendants' recent use of an old playbook of moving and secreting assets. They are using shell entities and moving assets outside the jurisdiction of this and other interested U.S. courts to achieve this end. If not immediately restrained, the Defendants' efforts will frustrate the essential purpose of this adversary proceeding—recovering assets fraudulently and improperly transferred out of Highland's estate. In sum, Defendants are controlling assets which they wrongfully diverted from Highland, and they are now trying to prevent restitution of those assets.

5.      Recent evidence confirms that Dondero and Ellington are involved in transferring or seeking to transfer substantial assets using affiliated entities they control. One of these entities is Skyview Group Inc. ("Skyview"), an entity nominally owned by Ellington, but ultimately controlled and largely funded by Dondero.[7] These recent transfers or attempts to transfer include:

- Transfers of millions of dollars in 2025 to Crossvine Litigation Funding LLC ("CLF"), a Cayman entity created in April 2025 and controlled by Ellington and funded by Dondero;[8]

- Efforts to liquidate or transfer a stock ownership position (held directly or indirectly by Dondero) involving multi-family housing

---

[5] Certain of these fraudulent transfers involved other Defendants, including Massand Capital and SAS.

[6] Special Turnover Petition (a true and correct copy is attached as **Exhibit 1**) ("UBS Petition"), ¶¶ 1-3 [Index No. 650744/2023, Supreme Court of New York County, New York, *UBS Securities LLC, et al. v. James Dondero, et al.*

[7] Skyview provides back-office support for Dondero's NexPoint and HCMFA, which manage assets wrongfully diverted from Highland.

[8] CLF is owned by Crossvine Holdings LLC and Crossvine Foundation (collectively "Crossvine")—two Texas entities created by Ellington in April 2025.

and thereby moving over $30 million to a "charity" under Dondero's control and which, upon information and belief, is located in the Cayman Islands;[9]

- Dondero's highly improper, if not illegal demand to the Charitable DAF Fund, LP ("DAF") which indirectly owns HMIT, to send $1.5 million dollars to an offshore entity to bolster and "maintain the Sentinel structure," which involved a bogus insurance company created by Dondero and Ellington to hide assets from UBS. DAF's control person, Mark Patrick ("Patrick"), has independent contemporaneous evidence of this request. This attempt to funnel money from DAF to Sentinel was and is part of an ongoing effort that would continue (and, as described below, has continued) into the future;

- Even though DAF rejected Dondero's demand, Skyview made multiple wires in connection with this proposed scheme, including a $3 million wire to Atreyu Pipeline Logistics, LLC, an entity controlled by Ellington,[10] and there is contemporaneous evidence that as much as $7 million was transferred by Dugaboy, NexPoint and/or Ellington (acting through Skyview); and

- Isaac Leventon, a Defendant, was aware of Dondero's requests but made it clear to Patrick that he would deny any involvement in any related conversations.

6.    The conduct at issue flows from the same vein as the types of conduct previously considered by this Court when the Court expressed concern that Defendants' efforts to conceal their ongoing fraudulent schemes and transfers involving Sentinel potentially violated federal criminal statutes.[11]

7.    Absent a TRO and preliminary injunction, HMIT's ability to recover the relief requested in this proceeding, which includes the avoidance, recovery and return of assets diverted

---

[9] Preparations for the transfer of this stock position occurred within the immediate past, and is evidenced by a contemporaneous tape recording.

[10] Ellington refused to provide 1099s to Skyview tax professionals relating to Atreyu and certain other entities in an ostensible effort to evade scrutiny.

[11] See August 8, 2022 Hearing Transcript [Adv. Pro. No. 21-3020-sgj, Doc. 183] , p. 131; see also Highland Capital Management, L.P.'s Memorandum Of Law In Support Of Its Motion To Deem The Dondero Entities Vexatious Litigants And For Related Relief [Case No. 3:21-cv-881, Doc. 137] ("Vexatious Litigant Motion").

or fraudulently transferred out of Highland's estate,[12] will be jeopardized, and the integrity of these proceedings undermined. If Defendants' schemes remain unchecked, they will succeed in frustrating HMIT's efforts to collect on a judgment in this lawsuit, resulting in a colossal waste of party and judicial resources. At a minimum, HMIT will be forced to incur additional legal expense to unwind Defendants' fraudulent transactions.

8.     The imposition of a receivership is separately justified because the Liquidation Trustee's claims, now assigned to HMIT, include a probable interest and right to various assets under Defendants' wrongful control. In light of Defendants' history of diverting assets and fraudulent transfers, a receivership is appropriate pursuant to TEX. BUS. & COMM. CODE § 24.008(a)(3)(B).

9.     It is clear that emergency relief is needed. However, if for any reason this Court disagrees with HMIT's application for an immediate TRO, then HMIT alternatively requests an expedited hearing date at the Court's earliest convenience for consideration of a preliminary injunction and the appointment of a receiver. Expedited relief is needed to avoid the harms which HMIT will otherwise suffer if Defendants are allowed to continue transferring and secreting assets undeterred and to preserve the Court's jurisdiction over these assets and ability to grant relief. HMIT is separately seeking expedited discovery in anticipation of this hearing.

## II.
## FACTUAL BACKGROUND

### A.     Procedural and Substantive Background

10.     This adversary proceeding was filed in October 2021, shortly after the Effective Date of the Fifth Amended Plan of Reorganization of Highland Capital Management, LP (as

---

[12] *See* Amended Complaint, ¶¶ 137-186.

modified) (the "Plan"), and was initiated by a Litigation Sub-Trust created pursuant to the Plan.

The purpose of the Litigation Sub-Trust was to bring and prosecute claims belonging to the

Debtor's estate. Those claims have now been assigned and transferred to HMIT;[13] and HMIT

stands in the shoes of the Litigation Sub-Trust as Plaintiff.

11.     The relief sought in this adversary proceeding is wide-ranging, seeking to impose

liability for myriad wrongful acts and fraudulent transfers induced by Dondero, Ellington and other

Defendants. As this Court previously noted:[14]

> The 36 causes of action [in this lawsuit] seek: the avoidance and recovery of
> intentional and constructive fraudulent transfers and obligations under Sections
> 544, 548, and 550 of the Bankruptcy Code; illegal distributions under Delaware
> partnership law; breach of fiduciary duty; declaratory judgment that certain entities
> are liable for the debts of others under alter ego theories, successor liability, aiding
> and abetting, or knowing participation in breach of fiduciary duty; civil conspiracy;
> tortious interference with prospective business relations; breach of contract;
> conversion; unjust enrichment; and the disallowance or subordination of claims
> under Sections 502 and 510 of the Bankruptcy Code.

12.     As set forth in the Amended Complaint, at ¶¶ 110-171, stretching back to 2013,

Dondero and Ellington have used their control over affiliated entities, such as Dugaboy, Get Good,

NexPoint, and SAS, for improper purposes, including improper insider distributions and transfers

out of the reach of creditors. Over $50 million remains to be clawed back from Dondero for

voidable transfers alone, not including the hundreds of millions of dollars HMIT seeks for its other

claims against Dondero and the other Defendants.[15]

---

[13] Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement [BK Doc. 4297]; Order
Granting Motion to Substitute [Doc. 377].

[14] Report And Recommendation To The District Court Proposing That It: (A) Grant Defendants' Motions To
Withdraw The Reference At Such Time As The Bankruptcy Court Certifies That Action Is Trial Ready; But (B) Defer
Pre-Trial Matters To The Bankruptcy Court [Doc. 151], p. 6.

[15] *See* Amended Complaint, ¶¶ 171-186.

B.    **Defendants' Historical Pattern of Diverting and Concealing Assets**

13.    Dondero, and those acting in concert with him, including Ellington, NexPoint and the other Defendants, have repeatedly undermined the authority and ability of the Court to deal with Highland's estate. Although a meaningful elucidation of the Defendants' conduct would require hundreds of pages, the following historical exemplars, as alleged in the Amended Complaint, exemplify Defendants' wrongful conduct. A common scheme and pattern of behavior is also evident—fraudulent transfers and the diversion of assets.

### *The Highland Bankruptcy*

14.    Dondero was formerly the President and Chief Executive Officer of Highland, and the sole member of its general partner, Strand Advisors. Together with Ellington—Highland's former general counsel—Dondero directed Highland to file for Chapter 11 bankruptcy in Delaware in late 2019 in response to several massive litigation awards against Highland.[16] Soon after Highland's bankruptcy was transferred to this Court, the Unsecured Creditors Committee demanded, and the Court approved, a change of control resulting in Dondero's removal as the sole control person and the appointment of an independent board of directors and a new CEO.[17]

15.    On October 9, 2020, Dondero was instructed to fully resign from all positions related to Highland or face removal as a Highland employee and as portfolio manager for all Highland managed funds due to conduct detrimental to Highland, as the Debtor, and its creditors.[18] Ellington was similarly terminated for cause on January 5, 2021, for actions adverse to Highland.[19]

---

[16] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (II) Granting Related Relief [BK Doc. 1943] ("Confirmation Order"), ¶¶ 6-8.

[17] *See* Confirmation Order, ¶¶ 11-13.

[18] *See* Confirmation Order, ¶ 4.

[19] *See* Plaintiff's First Amended Original Complaint [Civil Action No. 3:24-cv-498 in the Northern District of Texas, Doc. 82] ("HERA Complaint"), ¶ 125.

16.     Highland's bankruptcy was unique because the largest creditor claims arose from litigation awards and judgments.[20] Indeed, upon information and belief, Dondero and Ellington expected to use the bankruptcy process to thwart recoveries while maintaining control of Highland, but the bankruptcy instead served to reveal a pattern of recurring misconduct that led to over $1 billion dollars in litigation judgments and arbitration claims against Highland and over $40,000,000 in legal fees.[21]

17.     On February 8, 2021, the Court confirmed the Plan, and the Court entered its Confirmation Order on February 22, 2021.[22] The Plan became effective on August 11, 2021, and, as a result, Highland's ownership was restructured.[23] Both before and after bankruptcy, Defendants Dondero and Ellington have been working to strip the assets of entities they controlled to ensure that any aggrieved party could not collect on its hard-fought judgments or its rights of ownership. This Court previously considered evidence of wrongdoing and expressed concern that criminal laws may have been violated.[24]

### *Dondero Engaged In Misconduct Relating to Acis and Joshua Terry*[25]

18.     In 2010, Dondero formed Acis Capital Management, L.P. ("Acis") as a "lifeboat" to divert collateralized loan business fees from Highland after its lenders placed security liens on Highland's assets. Initially, Acis was owned indirectly by Dondero and others. Joshua Terry, a Highland employee, later joined the platform in 2011 to manage Acis.

---

[20] Confirmation Order, ¶ 8.

[21] *See* Amended Complaint, ¶¶ 66, 95.

[22] Confirmation Order, p. 4, ¶ k.

[23] *See* Notice Of Occurrence Of Effective Date Of Confirmed Fifth Amended Plan Of Reorganization Of Highland Capital Management, L.P. [BK Doc. 2700].

[24] August 8, 2022 Hearing Transcript [Adv. Pro. No. 21-3020-sgj, Doc. 183], p. 131.

[25] The following summary refers to and incorporates ¶¶ 67-72 of the Amended Complaint.

19.     In 2016, Dondero sought to finance an investment in South America by causing a separate portfolio company, Trussway Industries Inc. ("Trussway"), to incur unnecessary debt and divert loan proceeds to finance the purchase. Terry criticized this conduct as a breach of fiduciary duties to Acis' investors, and Dondero responded by firing Terry. Dondero and Terry ultimately went to arbitration in which the panel found against Dondero and Highland.

20.     Four days after Terry's arbitration judgment was issued, Dondero, acting through Highland, and with the aid of Ellington and others, entered into numerous transactions designed to take control of Acis's business and strip Acis of assets so it would be unable to pay Terry's arbitration award. This scheme to render Acis judgment-proof led Terry to file involuntary Chapter 11 petitions against Acis. In response, Dondero, through Highland, which Dondero still controlled, amped up Dondero's mismanagement of the Acis funds, leading Acis' appointed bankruptcy trustee to replace Highland as sub-advisor.

21.     Dondero also caused Highland to commence litigation against Acis' trustee, prompting a countersuit pursuant to which the Chapter 11 trustee sought to recover fraudulent transfers Dondero had directed. This led to the entry of a temporary restraining order against Highland.

### *Dondero and Ellington Fraudulently Induced an Investment from HarbourVest*[26]

22.     Dondero and Ellington fraudulently induced an investment from a group of third-party investors collectively known as "HarbourVest." Dondero and Ellington used Highland to induce HarbourVest to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—for approximately $75 million in cash, with a commitment to invest an additional $75 million. Unbeknownst to HarbourVest, however, Dondero intended to use the $75 million from

---

[26] The following summary refers to and incorporates ¶¶ 73-75 of the Amended Complaint.

HarbourVest to make investments in other Dondero controlled and owned entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefited Dondero personally, but left Highland exposed to hundreds of millions of dollars in potential damages to HarbourVest.

### Willful Misconduct in the Transfer of Highland Capital Credit Strategies Fund's Assets[27]

23.    Another example of fraudulent transfers involved the judgment relating to Highland Capital Credit Strategies Fund. In that case, Dondero was found to have engaged in willful misconduct by secretly causing Highland (still under Dondero's control) to move certain assets to other entities for far less than actual value. Highland paid only $24 million for those assets—far less than valuations performed by third parties, even those hired by Highland (up to $37 million). The arbitration panel found Dondero's explanations to excuse his conduct "to put it mildly, far-fetched"—and awarded Highland Capital Credit Strategies Fund over $30 million in damages.

### Willful Misconduct in the Transfer of Highland Crusader Fund's Assets[28]

24.    Dondero and Ellington engaged in misconduct relating to a group of Highland managed funds known as the "Crusader Funds." On July 5, 2016, the "Redeemer Committee," which was formed to oversee the wind-down and distribution of proceeds from the Crusader Funds, commenced an arbitration (the "Redeemer Arbitration") against Highland alleging misconduct as its investment advisor. The Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that resulted in an award of damages of $136.8 million and total damages (including interest) of $190.8 million.

---

[27] *See* HERA Complaint, ¶ 153.

[28] The following summary refers to and incorporates ¶¶ 87-93 of the Amended Complaint.

25.     One of the many willful breaches the arbitrators found is that Dondero and Ellington caused Highland to commit surreptitious self-benefitting transfers of approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016.

### *Dondero and His Accomplices Caused Highland to Engage In Misconduct That Increased Liability To UBS*[29]

26.     In August 2017, Dondero and Ellington, along with others including Leventon, transferred assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity created, and indirectly owned and controlled, by Dondero and Ellington, to ensure that assets would be out of UBS's reach in the event a judgment was entered in its favor in a pending New York State Court proceeding.[30] In or around August 2017, Dondero, Ellington and others orchestrated the surreptitious transfer of all assets of the judgment defendants—with a face amount of $300 million and a market value of at least $100 million—to Sentinel. The goal of this transfer was to drain assets while keeping the assets within Dondero's and Ellington's ownership and control.

27.     In February 2023, UBS filed a turnover petition in New York State Court seeking to collect its judgment from Dondero, Ellington, and others, by clawing-back the assets from Sentinel and unwinding several other alleged fraudulent transfers. Exhibit 71 to UBS's petition outlines the hundreds of entities Dondero and Ellington have under their control to move assets and avoid scrutiny.[31] Oral arguments on the turnover petition are now scheduled for September 22, 2025, following which the turnover petition will be ripe for summary adjudication.[32]

---

[29] The following summary refers to and incorporates ¶¶ 76-80 of the Amended Complaint.

[30] *See* UBS Petition (**Exhibit 1**), pp. 22-35; UBS Pet. Ex. 40 (a true and correct copy of which is attached as **Exhibit 2**) (outlining Sentinel structure and aftershocks of "years of fraudulent transfer claims throughout [the] Highland structure" should Dondero refuse to settle).

[31] A true and correct copy is attached as **Exhibit 3**.

[32] *See* Index No. 650744/2023 Docket Sheet (a true and correct copy is attached as **Exhibit 4**); N.Y. C.P.L.R. § 5225; *Triadou SPV S.A. v. Chetrit*, 2021 WL 3290834, at *9 (Sup. Ct. N.Y. Cnty. Aug. 2, 2021) (noting that turnover petitions are governed by the same standards as summary judgments).

C.    **Defendants' Recent Efforts to Transfer and Conceal Assets**

28.    Following their exodus from Highland, Dondero and Ellington picked up the mantle under the banner of the newly formed Skyview. With Highland no longer under Dondero's control, Skyview and NexPoint are now the primary means by which Defendants continue their fraudulent activities.

29.    Ellington nominally owns Skyview,[33] but Dondero, through NexPoint, is Skyview's primary client. Using Skyview, Dondero is currently seeking to move and transfer approximately $30 million in assets to a new "charity" which Dondero controls. This ownership stake includes a stock position involving multi-family projects and other assets. Upon information and belief, this "charity" is an offshore Cayman entity that has been described as "DAF-2." This scheme was underway as recently as August 2025.

30.    Dondero, acting individually and through Skyview, made a highly improper demand upon Patrick, the control person of DAF, to transfer $1.5 million to an entity unrelated to the charitable purposes of DAF and without any consideration. This transaction was properly rejected by Patrick. It is also apparent Dondero would have used Patrick's compliance with his demand (which never occurred) to exert leverage over Patrick in his capacity as DAF's control person. It was one of many reasons Patrick reorganized the DAF structure in the Cayman Islands. Ultimately, Dondero and Ellington transferred $7 million overseas to "maintain the Sentinel structure." Over $3 million (of the $7 million) initially went to Atreyu. The remaining $4 million was also funded.

---

[33] A true and correct copy of the 2024 Texas Franchise Tax Public Information Report for Skyview Group, Inc. is attached as **Exhibit 5**.

31.     Due in large part to Dondero's improper demands, Mr. Patrick left Skyview. Since then, Dondero, Ellington, and their conspirators have embarked on a multi-front litigation campaign designed to harass Mr. Patrick and the entities he controls. The cornerstone of this new wave of litigation involves liquidation proceedings in the Cayman Islands regarding a former limited-partner within the DAF structure. Consistent with Dondero's theme of using entities without standing to challenge transactions Dondero does not like, the entity over which Dondero seeks to gain control in the Caymans has no authority to exercise control over any other DAF entity, nor any right to object to transactions made by other DAF entities. Nonetheless, Dondero, either individually or through his representatives, is funding this litigation assault in the Cayman Islands to undo the reorganization of DAF—a series of transactions that were designed to reinforce Dondero's lack of influence over the DAF entities.

32.     Dondero and Ellington recently created several new entities that are being used to fund this Cayman litigation by funneling funds to a Cayman entity known as Crossvine, and are doing so through layers of Crossvine-related entities.[34] Ellington is identified as the control person in this Cayman entity,[35] but again, it is clear that Dondero is funding this entity.[36] There is no credible dispute that these Crossvine entities are controlled by Dondero and Ellington. Ellington is the member or manager of these various Crossvine vehicles.[37]

---

[34] *See* Funding Agreement of Joint Official Liquidators dated 11 July 2025 ("Funding Agreement") (a true and correct copy of which is attached as **Exhibit 6**); Certificate of Formation for Crossvine Holdings, LLC (a true and correct copy of which is attached as **Exhibit 7**); Certificate of Formation for Crossvine Foundation (a true and correct copy of which is attached as **Exhibit 8**).

[35] *See id.*

[36] The Joint Official Liquidators ("JOLs") have admitted in the Cayman proceedings that Crossvine is a special purpose entity ultimately created for Dondero's benefit.

[37] *Id.*

33.     This litigation funding serves a dual purpose: (i) it shuffles money to offshore allies in exchange for contingent future recoveries that are legally distinct from the assets that funded those returns, and subject to further dissipation, and (ii) it serves to frustrate this adversary proceeding against Dondero, Ellington, and the other Defendants which, to the extent of any recovery, will benefit the restructured DAF and its charitable mission. This new attempt to move funds offshore under the guise of "litigation funding" is conspicuously similar to the movement of assets through Sentinel.

34.     The continued attempts by Dondero, Ellington, and their affiliates to frustrate HMIT's prosecution of the claims in this adversary proceeding confirm that their litigation strategy is the same today as it has been throughout the past decade: delay, defraud, and dissipate.

## III.
## LEGAL STANDARD

### A. Injunctive Relief

35.     Bankruptcy Rule 7065 provides that Fed. R. Civ. P. 65 applies in an adversary proceeding. Under Rule 65, the Court is authorized to issue injunctive relief, and a decision to do so is committed to the Court's sound discretion. *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). Likewise, § 105(a) of the Bankruptcy Code authorizes bankruptcy courts to "issue any order, process, of judgment that is necessary or appropriate to carry out the provisions of the Code," including injunctions. *In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 182 (Bankr. N.D. Tex. 2012) (*quoting* 11 U.S.C. § 105); *see also In re OGA Charters, LLC*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016) (*quoting Miss. Power*, 760 F.2d at 621).

36.     The purpose of injunctive relief is to "prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Miss. Power*, 760 F.2d at 627. A court also may appropriately exercise its powers to grant injunctive relief by compelling disclosure

of regular audited financial reports and freezing transfers of assets outside the ordinary course of business. *See Unisys Corp. v. Dataware Prods., Inc.*, 848 F.2d 311 (1st Cir. 1988).

37.     To obtain injunctive relief under either Rule 65 or § 105, a movant must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest. *Moore v. Brown*, 868 F.3d 398, 402-03 (5th Cir. 2017); *Green v. Wells Fargo Bank, N.A.*, 575 Fed. Appx. 322, 323 n. 3 (5th Cir. 2014). "Likelihood of success and irreparable injury to the movant are the most significant factors." *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021).

38.     A temporary restraining order should be granted pending a hearing for a preliminary injunction where it appears that "immediate and irreparable injury, loss or damage will result to the movant." *See* Fed. R. Bankr. P. 7065 (incorporating by reference Fed. R. Civ. P. 65); *see also In re Seatco, Inc.*, 259 B.R. 279, 285 (Bankr. N.D. Tex. 2001). Again, the issuance of an injunction is within the broad discretion of the court. *See In re Compton Corp.*, 90 B.R. 798, 806 (Bankr. N.D. Tex. 1988); *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986).

## B.  Receivership

39.     Given the Defendants' long history of transferring and hiding assets, setting up new entities, abusing the bankruptcy system, and engaging in every conceivable effort to delay and avoid responsibility, a preliminary injunction may not be enough to protect Plaintiff and/or the jurisdiction of the Court over the assets at issue. Accordingly, HMIT also asks the Court to appoint a receiver.

40.     It is well understood that § 105(b) of the Bankruptcy Code does not prohibit the appointment of a receiver in a related adversary proceeding where authorized and appropriate. *See, e.g., Craig v. McCarty Ranch Trust (In re Cassidy Land and Cattle Co.)*, 836 F.2d 1130, 1133 (8th

Cir. 1988); *In re Memorial Estates, Inc.*, 797 F.2d 516, 520 (7th Cir. 1986) ("The power cut off by section 105(b) of the Bankruptcy Code is the power to appoint a receiver for the bankrupt estate, that is, a receiver in lieu of a trustee."). The Court's appointment of a receiver is otherwise governed by applicable state law. *See Nobelman v. American Savings Bank*, 508 U.S. 324, 329 (1993). In this instance, the appointment of a receiver is also authorized under TUFTA.

### IV.
### ARGUMENT

**A.    HMIT Will Suffer Irreparable Harm in the Absence of Injunctive Relief**

41.    HMIT will be severely harmed if Defendants are not enjoined from transferring assets outside the jurisdiction of this Court or otherwise secreting or concealing assets in a blatant attempt to avoid the impact of an adverse judgment and interfere with the Court's authority to grant relief.

42.    Irreparable harm occurs "where there is no adequate remedy at law.'" *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2010); *see OGA Charters*, 554 B.R. at 424 (*quoting Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)). In the bankruptcy context, "irreparable harm" refers to either "irreparable harm to the interest of a creditor or irreparable harm to the bankruptcy estate," including th[e] Court's exclusive authority to effectively manage the[] case[]." *In re Hunt*, 93 B.R. 484, 495 (Bankr. N.D. Tex. 1988) (internal quotations omitted).

43.    Although money damages may, in some circumstances, be *available* to remediate threatened harm, the Fifth Circuit has recognized, the "mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Janvey*, 647 F.3d at 600. "For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions." *Id.*; *see Walker v. Doe*, No. 6:24-cv-00633-

ADA, 2025 U.S. Dist. LEXIS 100396, at *10 (W.D. Tex. 2025) (finding money damages to be inadequate remedy in light of alleged scheme to launder funds beyond the reach of the court); *Tujague v. Adkins*, No. 4:18-CV-631, 2018 U.S. Dist. LEXIS 171394 (E.D. Tex. 2018) ("[A] plaintiff seeking economic damages will suffer irreparable harm when the defendant's dissipation of assets would require the plaintiff to initiate '"a multiplicity of suits … to gain relief."'").

44.       Courts have determined repeatedly that a dissipation or transfer of assets impairing the court's ability to grant an effective remedy constitutes irreparable harm, and injunctive relief is appropriate where the underlying complaint includes claims that are equitable in nature. *See, e.g., Janvey*, 647 F.3d 585; *Walker*, 2025 U.S. Dist. LEXIS 100396; *Tujague*, 2018 U.S. Dist. LEXIS 171394; *Prep Sols., Ltd v. Lecht*, 2022 U.S. Dist. LEXIS 98756 (E.D. Tex. June 2, 2022) ("[t]he Court can permissibly freeze assets to protect a plaintiff's equitable remedies—such as the equitable remedy of disgorgement"); *Amegy Bank N.A. v. Monarch Flight II, LLC*, No. 4:11-CV-3218, 2011 U.S. Dist. LEXIS 140874, at *17 (S.D. Tex. Dec. 7, 2011) (irreparable harm is established and injunctive relief is appropriate where there is "evidence showing that … the defendant intends to dissipate his assets to make a judgment awarding damages uncollectible"); *Bank of Am., N.A. v. Mega World Builder Corp*., No. 4:24-CV-3021, 2024 U.S. Dist. LEXIS 203763, *17 (S.D. Tex. Nov. 8, 2024) ("When the dissipation of assets that are the subject of a lawsuit would impair the district court's ability to grant an effective remedy at the conclusion of the case, the district court may enter a preliminary injunction to protect against those assets' dissipation"); *SEC v. Barton*, 135 F.4th 206, 228 (5th Cir. 2025) ("[T]he SEC has also shown irreparable harm to the defrauded investors through further dissipation of assets. If those assets were distributed, there would be no recovery for the defrauded investors—thus making the harm irreparable."); *Turnkey Offshore Project Servs., LLC v. JAB Energy Solutions, LLC,* 2021 U.S. Dist.

LEXIS 149733, at *15-16 (E.D. La. Aug. 10, 2021) ("[W]hen the underlying claim is one that is equitable in nature, a Rule 65 injunction may be available to preserve the defendant's assets during the pendency of the proceeding."). In cases like this one, the Court has full authority to issue an injunction if necessary to prevent Defendants from dissipating, disposing or transferring assets prior to judgment. *See id.*; *Sargeant v. Al Saleh*, 512 S.W.3d 399 (Tex. App.—Corpus Christi 2016, no pet.) (affirming sweeping asset-freezing injunction in TUFTA case).

45.    Fraudulent transfer, disgorgement, and declaratory judgment claims form a large part of the Amended Complaint.[38] Unquestionably, these are equitable claims that support injunctive relief where appropriate. *See, e.g.*, *Janvey*, 647 F.3d 585; *Walker*, 2025 U.S. Dist. LEXIS 100396; *Tujague*, 2018 U.S. Dist. LEXIS 171394; *Sharp v. SSC Farms I, LLC (In re SK Foods, L.P.)*, 2010 Bankr. LEXIS 6445, *54 (E.D. Cal. April 5, 2010) ("Courts have held that a preliminary injunction freezing the transfer of assets is proper where fraudulent conveyance is alleged in a bankruptcy case."); *S. Texas Lighthouse for the Blind, Inc. v. Fed. Supply Servs. Int'l, Inc.*, 2020 U.S. Dist. LEXIS 157347, *3-4 (S.D. Tex. Aug. 28, 2020) (noting that a fraudulent transfer claim in a complaint is a claim for equitable relief that will support injunctive relief if assets are being concealed or dissipated).

46.    An injunction is particularly appropriate where, as here, the assets at issue are not just being dissipated or concealed, but are, upon information and belief, intentionally transferred outside the jurisdiction of the Court and therefore beyond the authority of the Court to enforce a judgment in favor of HMIT. *See, e.g., Janvey*, 647 F.3d 585; *Walker*, 2025 U.S. Dist. LEXIS 100396; *Tujague*, 2018 U.S. Dist. LEXIS 171394; *Sharp*, 2010 Bankr. LEXIS 6445, at *53 ("In the event an injunction is not issued and Defendants are permitted to transfer or sell their assets

---

[38] ¶¶ 137-186.

beyond the reach of this Court, the Trustee, and the creditors of the estates, will suffer irreparable harm.").

47.      Such activity should be prohibited and, in reaching the determination to do so, this Court is free to and should consider Dondero's and Ellington's long history of engaging in the very type of conduct sought to be enjoined. Manifestly, "[p]rior misconduct in hiding or depleting assets is 'extremely relevant to the concern that [defendants] might conceal or dissipate assets' again and is properly considered in granting an injunction." *Sharp*, 2010 Bankr. LEXIS, at *55.

48.      In the absence of injunctive relief, HMIT will face imminent and irreparable harm that cannot be adequately remedied. If Defendants continue to engage in the conduct sought to be prohibited, HMIT's ability to effectively recover the fraudulent transfers and assets at issue will be impaired and the Court will not be able to effectively grant the relief requested. If Defendants are not immediately enjoined from engaging in their attempts to hide assets and place those assets beyond the jurisdiction of the Court, this entire proceeding may be rendered futile.

**B.      HMIT Demonstrates Likelihood of Success on the Merits**

49.      HMIT is likely to succeed on the merits. To satisfy the likelihood of success element, the movant need only present a "prima facie case." *Janvey*, 647 F.3d at 595. In that regard, the Fifth Circuit recognizes that "[n]one of the [preliminary injunction] prerequisites has a fixed quantitative value," and instead employs a sliding scale which balances the likelihood of success on the merits against the other factors. *Titlemax of Tex., Inc. v. City of Dall.*, 142 F.4th 322, 328 (5th Cir. 2025). "As the level of persuasion in relation to the other three factors increases, the degree of persuasion necessary on the substantial likelihood of success factor may decrease." *35 Bar & Grille, LLC v. City of San Antonio*, 943 F. Supp. 2d 706, 722 (W.D. Tex. 2013).

50.      Here, the Amended Complaint alleges, among other things, numerous claims for the avoidance and recovery of intentional and constructively fraudulent transfers under 11 U.S.C.

§§ 544, 548, and 550, 26 U.S.C. § 6502, as well as Delaware and Texas law, as applicable. The Amended Complaint details the avoidable transactions at issue, in explicit detail and with numerous references to competent evidence amassed throughout these bankruptcy proceedings, and explains why the transfers were illegal under applicable law and should be recovered.

51.     The Amended Complaint and the documents cited therein alone establish the required likelihood of success on the merits, as to these and all of the claims asserted therein. As they are doing now, and as they have done in the past, Dondero and Ellington have devised elaborate schemes to place assets beyond the ability of the Court and HMIT to recover.[39] There is no legitimate defense to Defendants' various fraudulent schemes, whether through "lifeboats," their use of pass-through entities to transfer assets, and their other actions in avoidance of this Court's management of the Highland bankruptcy.

## C.    **The Equities Strongly Favor HMIT**

52.     The balance of the equities also tip decisively in HMIT's favor. In the absence of injunctive relief, HMIT faces imminent and irreparable harm. If Defendants are not prevented from secreting or transferring assets outside the jurisdiction of the Court, HMIT's ability to recover on its claims will be at risk, as will the Court's jurisdiction to effectively render judgment. By contrast, there are no equities that favor denying injunctive relief as Defendants have no legal or equitable right to engage in conduct intentionally designed to avoid paying a judgment awarded against them. Should Defendants have a legitimate need to transfer assets, they can seek the Court's permission to do so.

---

[39] *See* Vexatious Litigant Motion, ¶ 5 n.5 ("Dondero's proclivity for frivolous litigation is so well known that HCMLP was unable to obtain cost-effective insurance because the insurance market refuses to insure the risk of Dondero's vexatiousness, calling it the 'Dondero Exclusion.'").

53.    In sum, the potential harm to HMIT in the absence of injunctive relief far outweighs any harm to Defendants if injunctive relief issues.

**D.    Injunctive Relief Serves the Public Interest**

54.    Finally, injunctive relief will further the public interest because it is necessary to protect HMIT's ability to successfully prosecute its claims and recover assets wrongfully taken from the Highland estate. "Courts have often held that injunctions that facilitate reorganizations serve the public interest." *FiberTower*, 482 B.R. at 189; *see also Hunt,* 93 B.R. at 497 ("Chapter 11 expresses the public interest of preserving the going-concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders."); *OGA Charters*, 554 B.R. at 426 (finding that the "public interest may be served where the purpose of the preliminary injunction is such that it serves to" uphold a core "pillar of bankruptcy by preserving a debtor's … assets that can be potentially used to satisfy valid claims against the bankruptcy estate."). By contrast, the public interest will not be served by allowing Defendants to continue to avoid the claims asserted against them and place assets at issue beyond the reach of HMIT and the Court's jurisdiction.

**E.    Appointment of a Receiver**

55.    Among other things, the Amended Complaint includes claims under TUFTA, which expressly authorizes the appointment of a receiver under "applicable principles of equity" when necessary to "take charge of the asset transferred or of other property of the transferee." TEX. BUS. & COM. CODE § 24.008(a)(3)(B). TUFTA provides creditors, secured or unsecured, with "a substantive right to the prejudgment appointment of a receiver" when a defendant is "seeking to hinder, delay, or defraud creditors." *Biliouris v. Sundance Res., Inc*., 559 F. Supp. 2d 733, 737-39 (N.D. Tex. 2008) ("TUFTA provides creditors—secured and unsecured alike—with the substantive right to seek quickly the appointment of a receiver to secure their interests and prevent

further fraudulent conduct without first enduring the long delay necessary to reduce their claims to judgment").

56.    The Texas Civil Practices & Remedies Code § 64.001 also authorizes any "court of competent jurisdiction" to appoint a receiver for numerous reasons, including "in an action by a creditor to subject any property or fund to the creditor's claim" and "in any other case in which a receiver may be appointed under the rules of equity." Tex. Civ. Prac. & Rem. Code §§ 64.001(a)(2) and (a)(7). Under subsection (a)(2), a receiver may be appointed where the applicant has "a probable interest in or right to the property or fund" and the property or fund is "in danger of being lost, removed, or materially injured." *Id*. at § 64.001(b). The decision to appoint a receiver, whether under TUFTA, § 64.001(a)(2) or § 64.001(a)(7), "rests in the sound discretion of the trial court." *Akin, Gump, Strauss, Hauer and Feld, L.L.P. v. E-Court, Inc*., 2003 Tex. App. LEXIS 3966, *10 (Tex. App.—Austin May 8, 2003, no pet.).

57.    Like § 64.001, a court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property, or the proceeds from that property, in several scenarios, including actions "by a creditor to subject the property or fund to the creditor's claim," and between "partners or others jointly owning or interested in the property or fund." Tex. Bus. Orgs. Code §§ 11.403(a)(2), (a)(3). Additionally, under § 11.410 of the Texas Business Organizations Code, a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court.

58.    Defendants Dondero and Ellington, along with their controlled entities, affiliates, and allies, are actively seeking to deprive the Court of jurisdiction over the assets and funds at

issue in this adversary proceeding, which were in large part diverted or fraudulently transferred

from the Debtor. Absent relief, HMIT will be frustrated in its efforts to recover those assets and

collect on any future judgment issued herein. The documented history of Defendants' manipulation

of corporate entities and assets to retain control and to avoid expected judgments strongly suggests

that a receiver should be appointed to preserve Defendants' assets, or, at a minimum, assets

sufficient to satisfy any judgment rendered in this case.

59.    HMIT will be irreparably harmed if the Defendants' manipulation, dissipation and

fraudulent transfers of assets are allowed to continue through the remaining course of these

proceedings, and Defendants have given the Court no reason to believe they will fully respect and

comply with a preliminary injunction alone. Thus, the Court should invoke its authority to appoint

a receiver.

## IV.
## SECURITY

60.    Generally, the Court may issue a TRO if Plaintiff "gives security in an amount that

the [C]ourt considers proper to pay the costs and damages sustained by any party found to have

been wrongfully enjoined or restrained." *See* Fed. R. Civ. P. 65(c). Despite the language of Rule

65(c), the Fifth Circuit has held that a court, in the proper exercise of its discretion, "may elect to

require no security at all" in an appropriate case. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628

(5th Cir. 1996) (*quoting Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir.

1978)). Here, because there is no risk of monetary loss to the Defendants, and the relief requested

is in fact directed to *preserving* the alleged assets, the Court should waive the bond or set a nominal

amount for its issuance.

## V.
## CONCLUSION

WHEREFORE, Plaintiff Hunter Mountain Investment Trust respectfully requests that the

Court grant its Motion and enter an Order in the form annexed thereto as Exhibit A, and grant any

further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
Texas Bar No. 24110325
isalzer@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

**ATTORNEYS FOR HUNTER MOUNTAIN
INVESTMENT TRUST**

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2025, a true and correct copy of the foregoing
document was served on all parties of record via the Court's ECF system.

*/s/ Ian B. Salzer*
Ian B. Salzer

3203957

**ITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL<br>MANAGEMENT, L.P.,<br><br>     Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| **HUNTER MOUNTAIN INVESTMENT TRUST,**<br><br>     **Plaintiff,**<br><br>v.<br><br>**JAMES D. DONDERO; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HIGHLAND DALLAS FOUNDATION; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,**<br><br>     **Defendants.** | **Adv. Pro. No. 21-03076-sgj** |

<u>**VERIFICATION**</u>

My name is Mark Patrick, my date of birth is April 23, 1972, and my address is 6716 Glenhurst Drive, Dallas, Texas 75254. I am the Administrator of Hunter Mountain Investment Trust ("<u>HMIT</u>"), I am of sound mind, and I am competent to make this Verification. I declare under penalty of perjury that the factual statements contained in HMIT's Emergency Verified Motion for Temporary Restraining Order and Preliminary Injunction, as well as the accompanying Memorandum of Law in Support, are true and correct to the best of my knowledge and belief.

- 1 -

Docusign Envelope ID: AC957DE7-342B-4A5B-AE7C-F9930E58966F

Executed in Dallas County, State of Texas, on September 15, 2025.

_____
MARK PATRICK