**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

COUNSEL FOR CLO HOLDCO, LTD., CHARITABLE DAF FUND, LP AND
HIGHLAND DALLAS FOUNDATION, INC.

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor | § | **Relates to Dkt. No. 2460** |

---

RESPONSE AND DISCLOSURES RELATED TO THE COURT'S ORDER REQUIRING DISCLOSURES

EXHIBIT
**G**
G-1

CLO HoldCo, Ltd. ("CLO HoldCo"), Charitable DAF Fund, LP ("DAF Fund"), Highland

Dallas Foundation, Inc., ("Highland Dallas Foundation," collectively, the "Charitable

Respondents"),[1] file this *Response* ("Response") and submit these *Disclosures* ("Disclosures") to

comply with the Court's *sua sponte Order Requiring Disclosures* (Dkt. No. 2460) (the

"Disclosures Order").

---

[1]      CLO Holdco and Highland Dallas Foundation have filed a *Motion to Withdraw the Reference* in Adversary Case No. 20-03195 (the "Adversary Proceeding"), at Dkt. No. 24 (in the Adversary Proceeding), and neither the fact nor content of this Response is intended to be nor shall be deemed a waiver of their right to a trial by jury on all claims asserted in the Adversary Proceeding nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court.  DAF Fund is also a defendant in the Adversary Proceeding but has not been served.  Neither the fact nor content of this Response by DAF Fund is intended to be nor shall be deemed: a waiver of service requirements in the Adversary Proceeding; acceptance of service of citation or summons in the Adversary Proceeding; waiver of its right to a trial by jury on all claims in the Adversary Proceeding (if ever served), nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court (again, if ever served).  The Charitable Respondents submit this Response in the Bankruptcy Case solely because the Court has ordered them to do so, and because they have appeared before this Court previously.

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................I

TABLE OF AUTHORITIES ........................................................................................II

PRELIMINARY STATEMENT ...................................................................................1

PROCEDURAL HISTORY...........................................................................................4

RESPONSE....................................................................................................................7

    I.        The Charitable Respondents are independently owned and controlled charitable organizations. ...................................................................................7

        a)    CLO HoldCo.................................................................................. 9

        b)    DAF Fund ..................................................................................... 9

        c)    DAF Holdco ................................................................................ 10

        d)    DAF GP ....................................................................................... 11

        e)    The Supporting Organizations .................................................... 11

        f)    Mr. Patrick's role........................................................................ 15

    II.        The Charitable Respondents have donated tens of millions of dollars to charitable causes ......................................................................................16

    III.        CLO HoldCo and DAF Fund may be creditors of the Debtor ..............................18

    IV.        The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing...............................20

        a)    The Court does not have the power to require non-parties to provide it with disclosures............................................................................... 20

        b)    The Court's *sua sponte* investigation into hypothetical standing is improper. ......... 22

        c)    The Disclosures Order is not just improper, it is prejudicial. ..................................... 26

CONCLUSION...........................................................................................................28

APP 00114

TABLE OF AUTHORITIES

Page(s)

**Cases**

Baum v. Blue Moon Ventures, LLC,
    513 F.3d 181 (5th Cir. 2008) ............................................................................26

Berry v. CIGNA/RSI-CIGNA,
    975 F.2d 1188 (5th Cir. 1992) ..........................................................................21

Brackeen v. Haaland,
    994 F.3d 249 (5th Cir. 2021) ............................................................................24

Castro v. United States,
    540 U.S. 375, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003).....................................23

In re Delta Underground Storage Co., Inc.,
    165 B.R. 596 (Bankr. S.D. Miss. 1994).............................................................25

Franklin v. Laughlin,
    No. SA-10-CV-1027 XR, 2011 WL 598489 (W.D. Tex. Jan. 13, 2011) ..............26

In re Friede Goldman Halter Inc.,
    600 B.R. 526 (Bankr. S.D. Miss. 2019)..............................................................25

Greenlaw v. United States,
    554 U.S. 237 (2008)..........................................................................................23

NASCO, Inc. v. Calcasieu Television & Radio, Inc.,
    894 F.2d 696 (5th Cir.1990) ............................................................................22

Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.,
    2 F.3d 1397 (5th Cir. 1993) ........................................................................21, 22

Navtech US Surveyors USSA Inc. v. Boat/Us Inc.,
    No. 219CV184FTM99MRM, 2019 WL 3219667 (M.D. Fla. July 17, 2019) ........24

In re Saldana,
    531 B.R. 141 (Bankr. N.D. Tex.), aff'd in part, remanded in part, 534 B.R.
    678 (N.D. Tex. 2015)........................................................................................22

Sanchez-Llamas v. Oregon,
    548 U.S. 331 (2006)..........................................................................................23

Simon v. Taylor,
    794 F. App'x 703 (10th Cir. 2019) ....................................................................23

ii

APP 00115

*Thompson v. Gonzales*,
No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436 (E.D. Cal. Sept. 27, 2016) ........................22

*Uberoi v. Labarga*,
769 F. App'x 692 (11th Cir. 2019) ..........................................................................24

*United States v. Sineneng-Smith*,
140 S. Ct. 1575 (2020)..........................................................................................23

*Matter of Ward*,
978 F.3d 298 (5th Cir. 2020) ................................................................................21

*Wood v. Milyard*,
566 U.S. 463 (2012)..............................................................................................23

**Statutes**

11 U.S.C. § 101(10) ...............................................................................................20

11 U.S.C. § 105.........................................................................................5, 20, 21, 24

**Other Authorities**

Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245 (2002) ................................23

Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832 (2000).......................................................................................................24

Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR. L.J. 461, 563 (2002).......................................................................................24

**APP 00116**

## PRELIMINARY STATEMENT

1.      CLO HoldCo, DAF Fund, and Highland Dallas Foundation have each previously filed pleadings in this Court and are, at least arguably, parties to the Bankruptcy Case.  As set forth herein, several targets of the Court's Disclosures Order have never made an appearance before this Court including Charitable DAF Holdco, Ltd.[2] ("DAF Holdco"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara Foundation"), and Highland Kansas City Foundation, Inc. ("Highland Kansas City Foundation," collectively with DAF Holdco and Highland Santa Barbara Foundation, the "Non-Party Targets").[3]  The Court does not have the power to order a non-party to produce documents nor undertake *sua sponte* investigations, particularly into non-parties.  The fact that these entities are non-parties and at the same time targets, is telling.  Further the Non-Party Targets have not been served with the Disclosures Order.

2.      Neither the Charitable Respondents nor undersigned counsel are authorized to make appearances for the Non-Party Targets, and the Non-Party Targets are not by this Response submitting themselves to this Court's jurisdiction.  The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Non-Party Targets.  Nonetheless, much of the Disclosures provided by the Charitable Respondents on their own behalf will be informative regarding the Non-Party Targets.  Further, the Non-Party Targets have provided limited authorization for the

---

[2]      Undersigned counsel has been retained to represent DAF Holdco; however, DAF Holdco has never made an appearance in this bankruptcy case and has not been served in the Adversary Proceeding.  Nor has DAF Holdco been served with this Disclosures Order.  DAF Holdco has not authorized undersigned counsel to accept service nor to make an appearance for it in this Bankruptcy Case.

[3]      The Highland Dallas Foundation, the Highland Santa Barbara Foundation, and the Highland Kansas City Foundation are sometimes also referred to as "Supporting Organizations."

1

**APP 00117**

Charitable Respondents, through Mr. Mark Patrick ("Patrick"), to provide the information to the Court that is submitted by the Charitable Respondents in this Response.

3.      Further, the Disclosures Order does not mention the third-party foundation level entities included in the Structure Chart (*infra*) ("Foundations"); however, these Foundations have provided the Charitable Respondents with documents and important information regarding their charitable giving structures and the supporting organizations include the Highland Dallas Foundation and the supporting organizations that are Non-Party Targets.  The fact and content of this Response is not intended to be nor shall be deemed to be an appearance by these Foundations in this Bankruptcy Case, nor submission by them to this Court's jurisdiction.  The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Foundations.

4.      Patrick has provided a declaration regarding the information provided by and/or about the Foundations and the Supporting Organizations, and as provided herein within the Disclosures.  As well, he has reviewed the Response and Disclosures.  *See* **Exhibit 1** [Mark Patrick Declaration]

5.      As set forth herein, contrary to the Court's unsupported and highly prejudicial *sua sponte* assertions that the Charitable Respondents and Non-Party Targets "appear to be under the *de facto* control of Mr. Dondero," the Charitable Respondents and Non-Party Targets (along with the Foundations) make up a legal and viable charitable giving structure, established through a non-byzantine set of entities that has committed over $42 million in grants, and funded $32.5 million, to nonprofits across a wide-range of issues including education, support of military, veterans, and first-responders, and victims of family violence and child abuse.  With respect to Mr. Dondero, of course he is involved, personally in the capacity as the Donor personality.  In addition, as disclosed

within the Disclosures, he holds positions within the Supporting Organizations, which are subject to the authority of the Foundations they support.  As well, and as established by Mr. Patrick's uncontroverted testimony before this Court, Mr. Dondero currently acts as an unpaid investment advisor to CLO HoldCo and DAF Fund.  However, as will be shown Mr. Dondero is not in "de facto" or legal control of the Charitable Respondents nor the Non-Party Targets (nor the Foundations).

6.      The Charitable Respondents take the time to refute the Court's assertions in the Disclosures Order because not only are they factually inaccurate—which will be shown herein and through the submitted Disclosures—but worse, these *sua sponte* findings bear directly upon the causes of action asserted by Official Committee of Unsecured Creditors (the "Committee") against CLO HoldCo, DAF Holdco, DAF Fund, and Highland Dallas Foundation (the "Charitable Defendants") in Adversary Proceeding No. 20-03195 (the "Adversary Proceeding").  While there are several motions to withdraw the reference pending in the Adversary Proceeding, this Court should, at an absolute minimum, refrain from espousing, *sua sponte*, any "findings" or "conclusions" that in fact are indistinguishable from allegations made in conclusory fashion (much like the Court's expositions) by a plaintiff party in litigation currently pending in this Court.  Such an "approach" to exercise of the judicial function (under the notion of maintaining the Court's docket) is, frankly, not recognizable as a constitutional approach to exercise of judicial power. This Court, it appears has become litigant, investigator and decider, far outside the scope of case or controversy.  Through its assertions the Court appears to have decided integral issues in the Adversary Proceeding *sua sponte* without considering any evidence nor offering the Charitable Defendants any opportunity to present their case, and all this notwithstanding pending motions to

withdraw reference (that the Court has previously stayed over the objection of the Charitable

Defendant movers).

**PROCEDURAL HISTORY**

7.      As the Court is aware, there was a show cause hearing on June 8, 2021 (the "Show

Cause Hearing") related to the lawsuit filed by CLO HoldCo and DAF Fund against the Debtor

captioned *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P. et al*., case no.

21-cv-00842, pending in the United States District Court for the Northern District of Texas (the

"District Court Suit").  In the District Court Suit, the plaintiffs filed a motion to amend their

complaint (the "Seery Motion"), and thereafter, the Court issued what it titled: *Order Requiring*

*the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two*

*Court Orders* [Dkt. No. 2255] (the "Show Cause Order") to determine if the "Violators" should

be held in contempt of court for filing the Seery Motion.  The Court ordered the "Violators," as

defined by the Court, including CLO HoldCo and DAF Fund, those persons who authorized the

filing of the Seery Motion and the District Court Suit (and the law firm representing the plaintiffs),

along with Mr. Dondero, to appear at the Show Cause Hearing.

8.      Patrick identified himself as the person who authorized the filing of the Seery

Motion and the District Court Suit and identified that he was vested with such authority by virtue

of his position as the director CLO HoldCo and control person of DAF Fund.  *See* Response, Dkt.

No. 2309.  The Debtor undertook extensive discovery related to the Show Cause Hearing with the

express purpose of attempting to prove that despite Mr. Patrick authorizing the filings and being

the control person of the plaintiffs, Mr. Dondero should nonetheless be held in contempt.

4

9.      Therefore, at the Show Cause Hearing, the respondents, including Patrick, introduced evidence reflecting the structure of the Charitable Respondents,[4] the ownership of the Charitable Respondents,[5] and the controlling entities/persons of the Charitable Respondents.[6] At the Show Cause Hearing, Patrick further provided extensive testimony regarding the creation, structure, organization, purpose, and control of the Charitable Respondents. *See* **Exhibit 2** [Transcript, June 8, 2021 Hearing, Excerpts].

10.     On June 17, 2021, the Court issued its Disclosures Order *sua sponte* pursuant to Section 105 of the Bankruptcy Code and its "inherent ability to efficiently monitor its docket and evaluate standing of parties who ask for relief in the [Bankruptcy Case]." Disclosures Order, p. 1.

11.     Importantly, the Disclosures Order does not relate to and was not issued in connection with any contested matter or adversary proceeding before the Bankruptcy Court. Instead, the Court states that the Disclosures Order is "in furtherance of [its] desire to be more clear about the standing of various of these entities, and to assess whether their interests may be sufficiently aligned, in some circumstances, so as to require joint pleadings." Disclosures Order, p. 12. As such, the Court appears to be attempting to ascertain some sort of generalized standing where there is no proceeding before it and contemplating the issuance of pre-filing injunctions against the Charitable Respondents and Non-Party Targets.

12.     Based on the forgoing, the Disclosures Order requires numerous parties (whether before the Court or not), including the Charitable Respondents and Non-Party Targets, to file a notice in the Bankruptcy Case disclosing: (a) who owns the entity (showing percentages); (b)

---

[4] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 1)

[5] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 9, 10, 11, 12, 15, 16, 17, 18, 19, 20)

[6] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 3, 4, ,5, 6, 7, 8, 29)

whether Mr. Dondero or his family trusts have either a direct or indirect ownership interest in the entity and, if so, what percentage of ultimate ownership; (c) who are the officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity (this itself looks to be a determination by this Court of "relationship" with damaging consequences); and (d) whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and substance of its claims).

13.     The Disclosures Order does not even pretend to be concerned with such mundane matters as proper service, or the right of parties not before the Court, even if creditors, to remain outside the Court.  Certainly the Court does not exhibit a glimpse of concern about possible limitations upon the judicial power to compel parties to appear before it.  Because of its assertions concerning Mr. Dondero's "de facto control" of third party entities (again, outside of any pending case or controversy and in fact contrary to evidence put before the Court), the Court has (i) dispensed with case or controversy boundaries, and (ii) sent its Disclosures Order into the universe as an all-powerful compulsion imposed upon entities that have never made appearance before the Court - all without service.  All because this Court has concluded that these third parties are controlled by Mr. Dondero, and because this Court has power over Mr. Dondero, it need not think twice about its power over any entity it has determined (without ground) to be controlled by Mr. Dondero because such party may have some relation to Mr. Dondero.

14.     As mentioned above, the Charitable Respondents are responding.  But the entities outside the scope of the Court's authority are not appearing in Response.  As set forth below, the Charitable Respondents believe this Response and the Disclosures provided herein are sufficient and compliant.  The Charitable Respondents reserve all rights.

APP 00122

## RESPONSE

15.    The Charitable Respondents file their Response to the Disclosures Order to comply with it, but with full reservations concerning the propriety of such a *sua sponte* investigation into standing where there is no proceeding before the Court and the prospective issuance of pre-filing injunctions against parties who have never participated in the Bankruptcy Case (i.e. the Non-Party Targets), or have only do so on a limited basis or were compelled to by order of the Court (i.e. the Charitable Respondents).

16.    The Charitable Respondents have already provided the Debtor and the Court with much of the information ordered by the Court, and do so again and more robustly herein, to show to the Court that the Charitable Respondents are not "under the *de facto* control of Mr. Dondero" and its directors do not act "at Mr. Dondero's direction."  *See* Disclosures Order, pp. 5, 11.

17.    The Charitable Respondents, however, take this opportunity to correct any misunderstanding regarding their structure and control, while noting and reserving all rights regarding the impropriety of such prejudicial *sua sponte* assertions.

### I.    The Charitable Respondents are independently owned and controlled charitable organizations.

18.    The best starting point to understand the structure of the Charitable Respondents is the Structure Chart attached hereto as __Exhibit 3__ ["Structure Chart"].  For ease of reference, the Structure Chart is reproduced as follows:

APP 00123



19.    Second, the Charitable Respondents provide the Court with a legal memorandum of Kenneth K. Bezozo, a partner with Haynes and Boone, LLP, determined by the Charitable Respondents to be a legal expert in the field of taxation and organizational structures.  *See* **Exhibit 4** [Kenneth K. Bezozo Memorandum].  As the Bezozo Memorandum explains, the Structure Chart and the entity structure of which the Charitable Respondents are a part (along with the Supporting Organizations and the Foundations) is a structure including offshore entities that is a typical industry standard investment structure to facilitate tax-exempt ownership and charitable giving.  Given that the structure employed is in fact, within the tax-exempt, charitable entity structures neither unusual nor exotic, the Charitable Respondents submit that contrary to the jargon appropriated by the Court from the Committee and the Debtor and its counsel, this structure is not at all "Byzantine."

8

**The Entities**

### a) CLO HoldCo

20.     As the Structure Chart reflects, CLO HoldCo is a company limited by shares incorporated in the Cayman Islands.  *See* **Exhibit 5** [Certificate of Incorporation - CLO HoldCo, Ltd.].  CLO HoldCo was incorporated in 2010. *See* **Exhibit 6** [Memorandum of Association of CLO HoldCo, Ltd.].  CLO HoldCo is managed and controlled by directors who are appointed by resolution of shareholders of CLO HoldCo.  *See* Memorandum of Association of CLO HoldCo, Ltd., p. 11-12 ("Directors").  The Directors are currently Mr. Patrick and Mr. Paul Murphy.  *See* **Exhibit 36** [CLO HoldCo - Register of Directors].

21.     CLO HoldCo is owned by the holder of its sole share.  The sole shareholder of CLO HoldCo was previously DAF Holdco who contributed the share on November 7, 2011 to DAF Fund.  *See* **Exhibit 7** [Ordinary Share Registry - CLO HoldCo].  Therefore, CLO HoldCo is wholly owned by DAF Fund.[7]

### b) DAF Fund

22.     DAF Fund is a limited partnership organized under the laws of the Cayman Islands. *See* **Exhibit 8** [Certificate of Registration of Exempted Limited Partnership - DAF Fund]. Pursuant to the *Amended and Restated Exempted Limited Partnership Agreement dated November 7, 2011* (the "DAF Fund LP Agreement"), DAF Holdco is the limited partner of the DAF Fund and the Charitable DAF GP, LLC ("DAF GP") is the general partner.  *See* **Exhibit 9** [DAF Fund

---

[7]     While not appearing on the Structure Chart, nor made subject of the Disclosures Order, there are subsidiaries of CLO HoldCo as well, and these are named, with corresponding ownership and director exhibits identified as follows: (i) Liberty CLO Holdco, Ltd. (*see* **Exhibits 38 and 39** [Register of Directors and Share Register]); (ii) MGM Studios HoldCo, Ltd. (*see* **Exhibits 40 and 41** [Register of Directors and Share Register]); (iii) HCT HoldCo 2, Ltd. (*see* **Exhibits 42 and 43** [Register of Directors and Share Register]).  Note, Dondero holds no directorship or ownership.

9

LP Agreement]. Pursuant to the terms of the DAF Fund LP Agreement, DAF Holdco contributed its equity interest in CLO HoldCo to DAF Fund pursuant to a Contribution and Transfer Agreement dated November 7, 2011. Ordinary Share Class Transfers - CLO HoldCo; DAF Fund LP Agreement, ¶3.1.

23.    The express purpose of DAF Fund is and always was to invest and trade in securities of all type and other investment vehicles for the purpose of befitting, direct and indirectly, the indirect equity owners of DAF Holdco, which were required to be Section 501(c)(3) of the IRS Code entities or organizations or have sole beneficiaries which are entities or organizations exempt from taxation under Section 501(c)(3) of the IRS Code. *See* DAF Fund LP Agreement, ¶1.3.

24.    Because DAF Fund is a limited partnership, the DAF GP has the exclusive and complete discretion in the management and control of the DAF Fund. DAF Fund LP Agreement, ¶1.6, **Exhibit 10** [DAF Fund General Partner Register].

c)  **DAF Holdco**

25.    DAF Holdco is a company limited by shares incorporated under the laws of the Cayman Islands. See **Exhibit 11** [Amended and Restated Memorandum of Association of DAF Holdco]. DAF Holdco's equity ownership consists of holders of Management and Participating Shares. *Id*. The Management Shares confer no right to participate in profits but rather to manage DAF Holdco, whereas Participating Shares confer the right to participate in profits or assets but not management rights. *Id*.

26.    The Management Shares of DAF Holdco were allotted to Grant Scott ("Scott") in 2011 but as will be discussed herein, were transferred to Patrick in 2021. *See* **Exhibit 12** [Register of Management Shares DAF Holdco]. The Directors are currently Mr. Patrick and Mr. Paul Murphy. *See* **Exhibit 37** [DAF Holdco - Register of Directors]. The Participating Shares of DAF

10

Holdco are held by the "Supporting Organizations," which are Highland Kanas City Foundation [32.78%], Highland Dallas Foundation [32.78%], Highland Santa Barbara Foundation [32.78%], and Highland Community Foundation of North Texas [1.63%].[8]  *See* **Exhibit 13** [Register of Participating Shares DAF Holdco].

27.    As set forth in the DAF Fund LP Agreement, DAF Fund's investments are for the benefit of the equity owners of  DAF Holdco which were required to be non-profit organizations. The Supporting Organizations are those non-profit organizations.

### d)  DAF GP

28.    DAF GP is a limited liability company organized under the laws of Delaware.  *See* **Exhibit 14** [Certificate of Formation of DAF GP].  Again, DAF GP is the general partner of DAF Fund who manages and controls DAF Fund.  Prior to March 2021, 100% of the limited liability company interests in the DAF GP (the "DAF GP Membership Interests") were held by Mr. Scott. Mr. Scott transferred all of the DAF GP Membership Interests to Mr. Patrick.  **Exhibit 15** [Assignment and Assumption of Membership Interests Agreement Dated March 24, 2021].

29.    As shown by the Exhibits hereto, Dondero holds no ownership, officer, or director status in any of:  CLO HoldCo; DAF Fund; DAF HoldCo; or DAF GP.

### e)  The Supporting Organizations

30.    As mentioned, the Supporting Organizations are Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation, and Highland Community Foundation of North Texas.  These Supporting Organizations were established by the Foundations.

---

[8]       The Court has not included Highland Community Foundation of North Texas in its Disclosures Order.

11

- **Highland Dallas Foundation**

31.    Highland Dallas Foundation is a corporation incorporated in 2011 under the laws of Delaware.  **Exhibit 16** [HDF Certificate of Incorporation].  The Highland Dallas Foundation was and is organized and operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the IRS Code.  **Exhibit 17** [IRS Determination - HDF].

32.    The Highland Dallas Foundation supports and benefits the Dallas Foundation.  *See* HDF Certificate of Incorporation, **Exhibit 18** [Narrative Description of Activities].  The Dallas Foundation is a third-party and is the oldest community foundation in Texas.

33.    As set forth in the attached letter from the President and Chief Executive Officer of the Dallas Foundation, the Dallas Foundation is a Texas nonprofit corporation, and is the successor in interest to Dallas Community Trust, a charitable trust which was formed in 1929.  **Exhibit 19** [reserved for supplementation].  The Dallas Foundation has hundreds of donors with whom it works regularly to make charitable grants supporting numerous worthy causes and regularly utilizes donor-advised funds and supporting organizations to carry out its charitable mission.  *Id.*

34.    The Highland Dallas Foundation is a membership corporation, and its members have the ultimate authority to elect its Board of Directors.  *Id.*  **Exhibit 20** [HDF Bylaws].  The Highland Dallas Foundation has two (2) classes of members, an "Institutional Member" (the TDF), and an "Individual Member" (Mr. Dondero).  *Id.*

35.    The Institutional Member has two (2) votes and the Individual Member has only one (1) vote on any matter submitted to the members.  *Id.*  Further, the Institutional Member elects two (2) of Highland Dallas Foundation's three (3) directors, and the Individual Member elects one (1) director.  *Id.*  The Board of Directors of Highland Dallas Foundation consists of Mr. Dondero, Julie Diaz (Chief Philanthropic Partnerships Officer of TDF) and Matthew Randazzo (President

12

APP 00128

& Chief Executive Officer of Dallas Foundation).  Mr. Dondero serves as President, Mr. Randazzo serves as Vice President and Ms. Diaz serves as Secretary and Treasurer.

36.    So while Mr. Dondero is a member with some level of influence within the Highland Dallas Foundation, he has 1/3 of the voting power, where TDF employees have 2/3 of voting power.

37.    The Highland Dallas Foundation is an independent supporting organization of the Dallas Foundation.  While Mr. Dondero is on the Board of Directors and is President of the Highland Dallas Foundation, it cannot be said to be "under the control" (de facto or otherwise) of Mr. Dondero, because of the control of the Board of Directors held by the Dallas Foundation.

- **Highland Santa Barbara Foundation**

38.    The Highland Santa Barbara Foundation was formed in November 2011 as a Delaware nonprofit nonstock corporate to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Santa Barbara Foundation.  See **Exhibit 21** [HSBF Certificate of Incorporation]; **Exhibit 22** [IRS Determination - HSBF].

39.    The Santa Barbara Foundation is a third-party community foundation incorporated in 1928 as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy.  **Exhibit 23** [SBF Letter Overview].  The Santa Barbara Foundation funds a wide range of initiatives, projects, and organizations and has supported nearly every Santa Barbara County nonprofit organization and essential community sproject during its 93-year history.  *Id.*

40.    Similarly to the Dallas Foundation, the Santa Barbara Foundation works with entities organized under Section 509(a)(3) of IRS Code as supporting organizations to Santa Barbara Foundation for the specific and primary purpose of benefiting, performing functions of,

APP 00129

and engaging in activities consistent with Santa Barbara Foundation's charitable purposes.  *Id.*

Highland Santa Barbara Foundation is one such supporting organization.  *Id.*

41.    Again as is common amongst supporting organizations, Highland Santa Barbara

Foundation has two classes of members, institutional and individual, and one member in each

class.  *Id.*, *see also* Bylaws HSBF.  Santa Barbara Foundation is the institutional member and Mr.

Dondero is the individual member.  Highland Santa Barbara Foundation has three directors, two

elected by SBF and one elected by Mr. Dondero. The president, secretary, and any other officers

of HSBF are elected by the three directors.  *Id.*  The directors are Mr. Dondero, Jacqueline M.

Carrera (President & CEO of SBF), and Arnold Brier (Santa Barbara County community

volunteer).  Currently, Mr. Dondero serves as President, Jacqueline M. Carrera as Vice President,

and the Secretary position is vacant pending board of directors election.

42.    Again, while Mr. Dondero positions in the Highland Santa Barbara Foundation, it

is certainly not under his "de facto" control, nor do the other directors and officers act under Mr.

Dondero's direction.  The Highland Santa Barbara Foundation is an independent supporting

organization of the Santa Barbara Foundation, and is controlled by the Santa Barbara Foundation.

Imputing a lack of independence based on what is a typical structure for supporting organization

management sets a unwarrantable precedent for charitable organizations.

- **Highland Kansas City Foundation**

43.    Highland Kansas City Foundation was and is organized and operated exclusively

for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the

IRS Code, and to support and benefit the Greater Kansas City Community Foundation

("GKCCF").  *See* **Exhibit 24** [GKCCF Certificate of Formation].

14

44.     The Greater Kansas City Community Foundation was created in 1978 and manages over $4 billion in assets, and again uses donor-advised funds and supporting organizations.  *See* **Exhibit 25** [GKCCF Letter].  As explained by the President & CEO of Greater Kansas City Community Foundation, Highland Kansas City Foundation is one of 18 supporting organizations that Greater Kansas City Community Foundation works with.  *Id.*

45.     Highland Kansas City Foundation has two classes of members, institutional and individual, and one member in each class.  *See* **Exhibit 26** [Bylaws HKCF].  Greater Kansas City Community Foundation is the institutional member and Mr. Dondero is the individual member.

46.     The Directors of Highland Kansas City Foundation are: Brenda Chumley (Senior Vice President of Greater Kansas City Community Foundation), Mr. Dondero, and Deborah Wilkerson (the President & CEO of Greater Kansas City Community Foundation).  The Highland Kansas City Foundation has not named officers. All three directors approve grants by unanimous consent.

**f)  Mr. Patrick's role**

47.     Prior to March 24, 2021, Mr. Scott was the holder of Management Shares in the DAF Holdco.  On March 24, 2021, Mr. Scott executed the *Share Transfer Form*, in which he transferred the management shares in DAF Holdco to Mr. Patrick.  **Exhibit 27** [Share Transfer Form].  Further on March 24, 2021, Mr. Scott and Mr. Patrick entered into that certain *Assignment and Assumption of Membership Interest* whereby Mr. Scott assigned and Mr. Patrick assumed one hundred percent of the limited liability company interest in the DAF GP.  *See* Assignment and Assumption Agreement.

48.     As the holder of the management shares in DAF Holdco, Mr. Patrick executed a resolution removing Mr.  Scott as Director and appointing Mr. Patrick as Director.  **Exhibit 28** [March 25 Resolution - DAF Holdco].

15

49.     On April 2, 2021, Mr. Patrick, as holder of one hundred percent of the interest in DAF GP, executed the shareholder resolution removing Mr. Scott as Director of CLO HoldCo and appointing Mr. Patrick as director.  **Exhibit 29** [April 2 Resolution - CLO HoldCo].

50.     While on paper the switch from Mr. Scott to Mr. Patrick was completed, it became obvious that this switch would be practically more complicated.  Therefore, there was a transitional period wherein Mr. Scott had to continue to authorize certain actions with Mr. Patrick assisting him.  As of the date of filing, Mr. Scott no longer has authority/ control over the Charitable Respondents.

51.     After Mr. Patrick's appointment, he determined that given the breadth of issues facing the Charitable Respondents, including but not limited to the Adversary Proceeding, it would be in the best interest of DAF Holdco, CLO HoldCo and others for another director to be appointed.  As such, on April 22, 2021, Paul Murphy was appointed a director of DAF Holdco and CLO HoldCo.  **Exhibit 30** [Written Resolution - Murphy].

## II.     The Charitable Respondents have donated tens of millions of dollars to charitable causes

52.     The Court included the Charitable Respondents and Non-Party Targets as part of what it terms — borrowing from the Committee's verbiage in the Adversary Proceeding — Mr. Dondero's "byzantine" empire and made *sua sponte* assertions regarding their lack of independence and Mr. Dondero's "de facto" control.  Again, as will be set forth herein, these findings are procedurally improper and highly prejudicial to the Charitable Defendants.  But most importantly, they are wrong.

53.     The Charitable Respondents are part of a charitable structure that donates tens of millions of dollars to charitable causes focusing on education; support for military, veterans, and

16

first responders; health and medical research; economic and community development initiatives; and youth and family. *See* **Exhibit 31** [Charitable Giving Overview, Grant Summary: 2012-2020].

54.    Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations, and have funded $32 million of the total commitments (with the remaining commitments being comprised of future scheduled installments). *Id.*

55.    The Supporting Organizations' charitable giving has made a tangible impact on some of the most vulnerable including grants to the Dallas Children's Advocacy Center which serves over 8,000 abused children a year and The Family Place which serves more than 11,000 victims of family violence. *Id.* The CEO of The Family Place has submitted a letter in support which is attached hereto as **Exhibit 32** [The Family Place Letter]. The Family Place empowers victims of family violence by providing safe housing and counseling, and identifies its partnership with the Highland Dallas Foundation as "instrumental" in providing community exposure and awareness of domestic violence as well as providing essential services to family violence victims. *Id.* As stated by the CEO, The Family Violence Place would not be able to successfully serve its domestic violence clients without this support.

56.    Cristo Rey Dallas also submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 33** [Cristo Rey Letter]. Cristo Rey Dallas provides college preparatory high school curriculum accessible to those of limited financial resources. Highland Dallas Foundation provided impactful donations which allow Crito Rey Dallas to provide services to its 465 students, including funding work study programs and remote work places during COVID-19 pandemic. *Id.*

57.    Dallas Children's Advocacy Center submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 34** [DCAC Letter]. Dallas Children's

APP 00133

Advocacy Center's mission is to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues. *Id.* Highland Dallas Foundation has robustly supported this mission since 2016, including providing funding that has been critical to the sustainability of its programs. *Id.*

58.     The Supporting Organizations' grants to the Center for BrainHealth helped provide and training other programming to members of the military, veterans, and local law enforcements to improve their congestive health. *See* Charitable Giving Overview.

59.     The Friends of the Dallas Police grants show appreciation to men and women who risk their lives every day to make Dallas a safer city and the Supporting Organizations have funded awards programs and educational sponsorships for children of police officers. *Id.*

60.     The Charitable Respondents invite the Court, and others who have characterized the Supporting Organizations as mere "puppets" of Mr. Dondero, to review the Charitable Giving Overview provided herewith as well as the letters in support from The Family Place, Cristo Rey Dallas, Dallas Children's Advocacy Center,  the Santa Barbara Foundation, and the Highland Kansas City Foundation.  The Charitable Respondents have and will continue to make meaningful impacts on the communities they serve through the tens of millions of dollars of philanthropic giving they facilitate.

### III.     CLO HoldCo and DAF Fund may be creditors of the Debtor

61.     In the Disclosures Order, the Court requires all entities to state whether the entity is a creditor of the Debtor and explain in reasonable detail the amount and substance of its claims. Disclosures Order, p. 13.

62.     All claims bar dates have long since passed [*see* General Claims Bar Date Order [Dkt. No. 498].

63.     The Court states that CLO HoldCo filed two proofs of claim.  Disclosures Order, p. 11.  This is not correct.  CLO HoldCo filed a proof of claim on April 8, 2020 [Proof of Claim No. 133] and on October 21, 2021, CLO HoldCo amended that same proof of claim [Proof of Claim No. 198] (the "Amended Proof of Claim").  In the Amended Proof of Claim, CLO HoldCo explained that as a result of certain proceedings that effectuated a termination of the Debtor's participation interests in the funds referred to in the CLO HoldCo proof of claim, such termination served to cancel the CLO HoldCo interests, as well, as the CLO HoldCo interests were in effect derivative of the Debtor's interests.  Accordingly, the Amended Proof of Claim reflected that the CLO HoldCo claim was reduced to $0.00, and therefore resolved.

64.     The Court stated in the Disclosures Order that it was unaware of whether DAF Holdco, DAF Fund, Highland Dallas Foundation, Highland Santa Barbara Foundation, or Highland Kansas City Foundation filed proofs of claims (notwithstanding this "uncertainty" the Court deemed it appropriate nevertheless to try to compel appearance).  Disclosures Order, p. 11.  A review of the Court's Claims Register and that of the Debtor's claims and noticing agent reflects that none of these entities filed proofs of claim against the Debtor.

65.     Therefore, none of the Charitable Respondents are pre-petition creditors of the Debtor, as the claims bar date has long since passed and no claims were filed which have not been fully resolved.

66.     It is unclear from the Disclosures Order whether the Court is referring to the term "creditor" as defined in section 101(10) of the Bankruptcy Code or using creditor as a lay term.  If it is the former, the Charitable Respondents are not creditors of the Debtor.  *See* 11 U.S.C. § 101(10) (defining a "creditor" an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor).

19

67.     As the Court is aware from the Show Cause Hearing, CLO HoldCo and DAF Fund

filed the District Court Suit against the Debtor.  The causes of action asserted by CLO HoldCo and

DAF Fund arose after the  order for relief.  **Exhibit 35** [Complaint].  The substance of these claims

is set forth in the Complaint.

### IV.    The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing.

68.     The Charitable Defendants have fully complied with the Court's Disclosures Order

and provided the Court with complete information regarding: (a) who owns each entity, (b)

whether Mr. Donerdo or his family trusts have direct or indirect ownership, (c) who the officers,

directors, and managers are, and (d) whether the entity is a creditor of the Debtor.  The Charitable

Defendants have done so because they were expressly ordered by the Court do; however, the

Disclosures Order is procedurally improper and highly prejudicial.

### a)   The Court does not have the power to require non-parties to provide it with disclosures.

69.     The Charitable Defendants are those named entities who have made appearances

before this Court.  The Court does not have the power to order production or disclosures from non-

parties including the Non-Party Targets.

70.     In the Disclosures Order, the Court states that the order is issued "*sua sponte*

pursuant to Section 105 of the Bankruptcy Code and the court's inherent ability to efficiently

monitor its docket and evaluate the standing of parties who ask for relief in the above-referenced

case." Disclosures Order, p. 1.  But yet, the Disclosures Order goes on to target entities who have

never asked for the relief in the Bankruptcy Case.

71.     Of course, it is undisputed that the Court has the inherent power to manage its own

docket "to ensure the orderly and expeditious disposition of cases." *Berry v. CIGNA/RSI-CIGNA*,

975 F.2d 1188, 1191 (5th Cir. 1992) (quoting *Link v. Wabash R.R. Co*., 370 U.S. 626, 630-31

APP 00136

(1962)).  But this inherent authority is limited, as is the Court's authority pursuant to section 105 of the Bankruptcy Code.  *Matter of Ward*, 978 F.3d 298, 303 (5th Cir. 2020) (noting that "the powers afforded to bankruptcy courts pursuant to § 105, however, are not unlimited").

72.    In *Energy Gathering*, the Fifth Circuit considered whether the district court could *sua sponte* order a party's attorney, a non-party to the case, to produce documents.  *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1412 (5th Cir. 1993).  In that case, the district court found that the attorney had purposefully withheld documents from the court, and "ordered [him] to produce every document in his possession relating to [his client] or business he had done with [his client]." *Id*. at 1404. The district court did not explain the source of its perceived authority to do so.  *See id.* at 1405.

73.    On appeal by the attorney, the plaintiffs asserted that the district court had the inherent authority to order him to produce documents. *Id*. at 1406.  The Fifth Circuit disagreed with the plaintiffs.  *See id.* at 1408-09. Specifically addressing whether the district court had the inherent authority to issue its order, the Fifth Circuit acknowledged that the district court had certain limited power "to conduct discovery not recognized by rule or statute," observing that federal courts "possess[ ] all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitation) to process litigation to a just and equitable conclusion."  *Id*. at 1409.  The Fifth Circuit suggested that the district court had the inherent authority to order the attorney to produce documents—if at all—under its power to issue a "bill of discovery," a common law "chancery tool" that the Supreme Court has described as "the forerunner of all modern discovery procedures."  *Id*. at 1409.  But recognizing that bills of discovery "could not be used to obtain documents (or other discovery) from someone who was not a party," the Fifth Circuit

APP 00137

therefore concluded that district courts do not have the inherent authority to order non-parties to produce discovery. *Id.*

74.     Important here, the Fifth Circuit noted the impropriety of the *sua sponte* investigation by the district court. *Id.* at 1411 (noting "factors [that] contribute to the order's unreasonableness" as being the *sua sponte* nature of the order and that the "court engaged in a fishing expedition"). Expressly relying upon the *Energy Gathering* opinion, the court in *Thompson v. Gonzales* determined that the court lacked inherent authority to order disclosures from non-parties. *Thompson v. Gonzales*, No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436, at *8 (E.D. Cal. Sept. 27, 2016).

**b)  The Court's *sua sponte* investigation into hypothetical standing is improper.**

75.     As the Fifth Circuit noted in *Energy Gatherings* and this Court and others numerous have many times since, inherent authority "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir.1990); *In re Saldana,* 531 B.R. 141, 166 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R. 678 (N.D. Tex. 2015).

76.     Here, the Court has launched a *sua sponte* investigation into parties under the stated purpose of evaluating their hypothetical standing.

77.     The American adversarial system differs from its European (and other) inquisitorial counterparts in that its central features are "party presentation of evidence and arguments" for resolution before a "neutral and passive decision maker[]." Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245, 272 & n.143 (2002); *see also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020); *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *Wood v. Milyard*, 566 U.S. 463, 472 (2012).

78.     The judge "does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties."    *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356 (2006) (quotation omitted). Thus,"[i]t is normally incumbent on each party to prove its claims," and a *sua sponte* investigation upsets the normal burden of persuasion between the parties."  Domitille Baizeau and Tessa Hayes, *The Arbitral Tribunal's Duty and Power to Address Corruption Sua Sponte*, in Andrea Menaker (ed), International Arbitration and the Rule of Law: Contribution and Conformity, ICCA Congress Series, Volume 19, pp. 225 -265.

79.     Thus, federal courts have been instructed to restrain from conducting such an inquest which is antithetical to the American adversarial system.  *Simon v. Taylor*, 794 F. App'x 703, 718 (10th Cir. 2019) (noting that scientific evidence involving environmental contamination from the district court's own *sua sponte* investigation cannot be considered); *Wood*, 566 U.S. at 472 ("federal court does not have carte blanche to depart from the principle of party presentation basic to our adversary system"); *Castro v. United States*, 540 U.S. 375, 381–383, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003).

80.     The Court asserts that it launched its investigation because standing is an issue of subject matter jurisdiction and that it must gain "clarity" with regard to standing. Disclosures Order, p. 2.  But what the Court proposes to do is render an impermissible advisory opinion on the hypothetical standing of the various entities, including some of have never filed a pleading in the Bankruptcy Case.  How can this Court have blanket power to compel investigation of entities that have never made appearances before the Court, or that have only been made parties because they have been sued, on the purported ground it needs to investigate standing?  As shown here, it cannot.

23

81.     A bankruptcy case itself is not a justiciable controversy; rather, it is the individual proceedings (contested matters or adversary proceedings) which create a justiciable case or controversy.[9]  Here, there is no proceeding, and instead, the Court expressly stated that it will determine standing *sua sponte* pursuant to section 105 of the Bankruptcy Code.  While this general rule of justiciablity standing alone would prohibit such a determination, evaluating a party's hypothetical standing absent a justiciable controversy is acutely problematic.  *See Uberoi v. Labarga*, 769 F. App'x 692, 697 (11th Cir. 2019) ("The Court should not speculate concerning the existence of standing."); *Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*, No. 219CV184FTM99MRM, 2019 WL 3219667, at *2 (M.D. Fla. July 17, 2019) (noting that advisory opinions on standing are improper).

82.     This is because "standing is not dispensed in gross," rather, standing must be established for each claim a party seeks to press and for each form of relief that is sought.  *Brackeen v. Haaland*, 994 F.3d 249, 291 (5th Cir. 2021) (quoting *Town of Chester v. Laroe Estates, Inc.*, –—— U.S. ——, 137 S. Ct. 1645, 1650, 198 L.Ed.2d 64 (2017) and *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008)).

83.     This is rule is no less applicable in a bankruptcy case.  The Bankruptcy Code does not define "party in interest," offering instead a non-exclusive list of who "may raise and may appear and be heard on any issue" in cases under chapter 11.  *In re Friede Goldman Halter Inc.*,

---

[9]     Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 Wm. & Mary L. Rev. 743, 832 (2000); Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 Am. Bankr. L.J. 461, 563 (2002) (explaining that: "the appropriate constitutional explanation for the entirety of federal bankruptcy jurisdiction materializes only when one recognizes that the fundamental jurisdictional unit in bankruptcy is an individual bankruptcy 'proceeding' raising a justiciable controversy between adverse parties.").

APP 00140

600 B.R. 526, 530–31 (Bankr. S.D. Miss. 2019). "The lack of definition was intentional." *In re*

*Delta Underground Storage Co., Inc*., 165 B.R. 596, 598 (Bankr. S.D. Miss. 1994).

84.    Congress' failure to define a party in interest specifically was discussed by both

Senator DeConcini and Representative Edwards during the proceedings preceding the enactment

of the Code.  Senator DeConcini stated:

> Rules of bankruptcy procedure or court decisions will determine who is a party in
> interest **for the particular purposes of the provision in question.**' 124 Cong.Rec.
> § 12407 (daily ed. Oct. 6, 1978).... Party in interest is an expandable concept
> **depending on the particular factual context in which it is applied**.

*Id. (*citing *In re North American Oil & Gas, Inc.*, 130 B.R. 473, 479 (Bankr.W.D.Tex.1990))

(emphasis added).  Congress has thus expressly directed that standing in a bankruptcy case must

be determined in the particular proceeding before the bankruptcy court.

85.    But here, there is no "particular purpose" or "particular factual context" in which

this Court can properly evaluate party in interest standing.  Instead, it appears that the Court

proposes to render an advisory opinion on the named entities' standing to file pleadings without

any requisite justiciable controversy before it.  But none of this makes sense, with respect to entities

not before the Court or only before the Court in capacity as defendants.  In fact the Disclosures

Order appears to be more of an investigation to find evidence that the Court could point to as

supporting its assertions about Dondero's *de facto* control.

86.    Additionally, the Court further states that beyond determining the hypothetical

standing of such parties, it also must "ascertain whether their interests are sufficiently aligned such

that the parties might be required to file joint pleadings hence forth, rather than each file pleadings

that are similar in content."  Disclosures Order, p. 1.  What the Court is describing are pre-filing

injunctions, which "are an extreme remedy" that courts should not issue "with undue haste because

such sanctions can tread on a litigant's due process right of access to the courts." *Franklin v.*

25

Case 24-05037-sgj Doc 25-6 Filed 07/09/21 Entered 07/09/21 16:29:48 Desc
Exhibit G    Page 31 of 34

*Laughlin,* No. SA-10-CV-1027 XR, 2011 WL 598489, at *7 (W.D. Tex. Jan. 13, 2011), *report*

*and recommendation adopted,* No. SA-10-CV-1027-XR, 2011 WL 672328 (W.D. Tex. Feb. 15,

2011).

87.     Specifically, the Fifth Circuit has explained that:

"In determining whether it should impose a pre-filing injunction or should modify
an existing injunction to deter vexatious filings, a court must weigh all the relevant
circumstances.  Four factors must be specifically considered: (1) the party's history
of litigation, in particular whether he has filed vexatious, harassing, or duplicative
lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or
simply intended to harass; (3) the extent of the burden on the courts and other
parties resulting from the party's filings; and (4) the adequacy of alternative
sanctions.

*Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008).

88.     What is more, this purported reason makes no sense, as multiple entities the Court

seeks to compel have never made an appearance and the Court has no basis to even suspect that

they might make an appearance.  With respect to parties who have filed pleadings, for example the

Charitable Defendants, the Court already knows that Highland Dallas Foundation and CLO

HoldCo have filed joint pleadings within the Adversary Proceeding (a single motion to dismiss for

failure to state claims and a single motion to withdraw reference). The Non-Party Targets are

nowhere to be found within the Bankruptcy Case or any proceedings before the Court; yet the

Court must conduct an investigation into these entities to see whether to compel the filing of joint

pleadings?  Cannot be.

### c)   The Disclosures Order is not just improper, it is prejudicial.

89.     As this Court is aware, the Charitable Defendants are defendants in the Adversary

Proceeding instituted by the Committee (DAF Fund and DAF Holdco are also defendants, though

yet unserved—despite the Adversary Proceeding being pending for over 6 months).  Central to the

Committee's claims against the Charitable Defendants are the conclusions posing as allegation(s)

that the Charitable Defendants are part of civil conspiracy to fraudulently transaction assets out of the estate orchestrated by Mr. Dondero whom the Committee characterized as: standing on top of byzantine empire, moving assets and funds from one entity to another to meet various needs.  *See* Adversary Proceeding, Dkt. No. 6, ¶2.  (Sounds familiar).

90.    In the Disclosures Order, the Court, seemingly already deciding this highly disputed issue in the Adversary Proceeding (which is not even a dispute—CLO HoldCo and Highland Dallas Foundation have filed a (joint) motion to dismiss under Rule 7012 for failure to state a claim), as it borrows the Committee's "byzantine" characterization and states that the targets of its Disclosures Order "appear to be under the *de facto* control of Mr. Dondero" and that the DAF Fund's decisions are "presumably at Mr. Dondero's direction."  (the word "byzantine" is a much overworked word within this Bankruptcy Case, and its proceedings, pleadings, and orders of this Court).  Disclosures Order, pp. 5, 11.  This constitutes direct, specific, and express pre-judgment by this Court, and, of course, has tainted the Adversary Proceeding.

91.    First and foremost, as shown herein, these assertions/findings are wrong.  The Charitable Respondents and Non-Party Targets comprise an independent charitable giving structure that has facilitated the donation of tens of millions of dollars to important philanthropic causes.  They are not under the *de facto* control of Mr. Dondero nor does Mr. Dondero direct their decisions—though like any donor would expect, Mr. Dondero has some say in the causes which the Supporting Organizations donate to.

92.    But the fact that the Court has made these assertions/findings *sua sponte* outside of the Adversary Proceeding (or any case or controversy), when it has no authority to adjudicate the Adversary Proceeding (that is the subject of a motion to withdraw reference), is highly prejudicial to the Charitable Defendants. This Court, in its assumed posture as investigative body as well as

27

prosecutor and decider, has given cover to the utterly conclusory assertions of the Committee, and has, practically, joined the Committee as a plaintiff.

93.    At an absolute minimum, the Court should refrain from deciding or even commenting upon contested issues of law and fact *sua sponte* outside of the Adversary Proceeding, and should retract its supposed findings (issued under the transparently incorrect suggestion of its power to manage its own docket [by pre-screening parties for standing????? - again, the case law cited above shows this is not proper]).  The Charitable Respondents urge the Court, particularly after reviewing the information and documents provided in this Response and Disclosures, to reconsider such findings, and respectfully request that this Court retract its Disclosure Order or at least the problematic content therein.

### CONCLUSION

By this Response and the Disclosures, the Charitable Respondents have fully complied with this Court's Disclosures Order, but have done so with the express reservations concerning the impropriety of the Disclosures Order and the non-appearance or submission by the Non-Party Targets.  But most important to the Charitable Respondents is that the Court closely review this Response and Disclosures and reconsider its assumptions/assertions/findings/conclusion that the Charitable Respondents are under the *de facto* control of or act at the direction of Mr. Dondero. The Charitable Respondents are real, independent charitable giving vehicles that have affected, very positively, the lives of countless people through the tens of millions of dollars donated to important philanthropic causes.

*[**signature block on following page**]*

28

APP 00144

Respectfully submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this July 9, 2021.

*/s/ Louis M. Phillips*
Louis M. Phillips

APP 00145