**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

-----------------------------------------------------------------x

|  |  |
|---|---|
| UBS SECURITIES LLC and UBS AG LONDON BRANCH, | Index No. 650744/2023 |
|  | Hon. Melissa A. Crane |
| Petitioners, | Motion Sequence No. 13 |
| - against - | **NOTICE OF APPEAL** |
| JAMES DONDERO, SCOTT ELLINGTON, HIGHLAND CDO HOLDING COMPANY, HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P., HIGHLAND FINANCIAL PARTNERS, L.P., HIGHLAND SPECIAL OPPORTUNITIES HOLDING COMPANY, CLO HOLDCO, LTD., MAINSPRING, LTD., and MONTAGE HOLDINGS, LTD., |  |
| Respondents. |  |

-----------------------------------------------------------------x

**PLEASE TAKE NOTICE,** that Respondent James Dondero ("Dondero"), by and through the undersigned counsel, hereby appeals to the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, from the Decision and Order, dated March 25, 2025, issued in this action by the Honorable Melissa A. Crane, Justice of the Supreme Court, County of New York, denying Dondero's Motion to Dismiss the Special Turnover Petition, which Decision and Order was entered in the Office of the County Clerk on March 26, 2025, and notice of entry of which was served on March 27, 2025.

CORE/3522697.0003/198524607.3

EXHIBIT
**P**

P - 1

**APP 00214**

FILED: NEW YORK COUNTY CLERK 04/25/2025 03:56 PM
NYSCEF DOC. NO: 449

INDEX NO. 650744/2023
RECEIVED NYSCEF: 04/25/2025

Case 21-03076-sgj   Doc 397-7   Filed 10/14/25   Entered 10/14/25 21:24:58   Desc
Exhibit P   Page 2 of 105

Dated: New York, New York

      April 25, 2025

Respectfully submitted,

*/s/  Deborah Deitsch-Perez*
Deborah Deitsch-Perez
2200 Ross Avenue
Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
deborah.deitschperez@stinson.com

Michael P. Aigen
*Admitted Pro Hac Vice*
2200 Ross Avenue
Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
michael.aigen@stinson.com

Jeffrey T. Prudhomme
*Admitted Pro Hac Vice*
2200 Ross Avenue
Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
jeff.prudhomme@stinson.com

Kieran Corcoran
STINSON LLP
100 Wall Street
Suite 201
New York, New York 10005
Telephone: (646) 883-7480
kieran.corcoran@stinson.com

*Attorneys for Defendant James Dondero*

CORE/3522697.0003/198524607.3

FILED: NEW YORK COUNTY CLERK 04/25/2025 05:55 PM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 448
RECEIVED NYSCEF: 04/25/2025
Case 21-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
Exhibit P    Page 3 of 105

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| UBS SECURITIES LLC AND UBS AG LONDON BRANCH, | Index No. 650744/2023 |
| Petitioners, | Hon. Melissa Anne Crane |
| | Motion Seq. Nos. 011 and 013 |
| v. | **NOTICE OF ENTRY** |
| JAMES DONDERO, et al., | |
| Respondents. | |

**PLEASE TAKE NOTICE** that a Decision + Order on Motion of the Honorable Melissa Anne Crane dated March 25, 2025, a true and correct copy of which is attached as Exhibit A, was duly entered in the office of the Clerk of the Supreme Court of New York, County of New York on March 26, 2025 (NYSCEF Nos. 430-431).

Dated: March 27, 2025
New York, New York

**LATHAM & WATKINS LLP**

*/s/ Andrew Clubok*
Andrew Clubok
1271 Avenue of the Americas
New York, New York 10020
Phone: (212) 906-1200
Email: andrew.clubok@lw.com

Jason R. Burt (*pro hac vice*)
Richard Frohlichstein (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Phone: (202) 637-2200
Email: jason.burt@lw.com
richard.frohlichstein@lw.com

P-3

Kathryn K. George (*pro hace vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611-3695
Phone: (312) 876-7700
Email: kathryn.george@lw.com

*Counsel for Petitioners UBS Securities LLC
and UBS AG London Branch*

APP 00217

# EXHIBIT A

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | | | |
|---|---|---|---|
| PRESENT: | **HON. MELISSA A. CRANE** | **PART** | **60M** |
| | *Justice* | | |

--------------------------------------------------------------------------------X

UBS SECURITIES LLC, UBS AG LONDON BRANCH,

Plaintiff,

- v -

JAMES DONDERO, SCOTT ELLINGTON, HIGHLAND CDO
HOLDING COMPANY, HIGHLAND CDO OPPORTUNITY
MASTER FUND, L.P., HIGHLAND FINANCIAL PARTNERS,
L.P., HIGHLAND SPECIAL OPPORTUNITIES HOLDING
COMPANY, CLO HOLDCO, LTD., MAINSPRING, LTD.,
MONTAGE HOLDINGS, LTD.,

Defendant.

--------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 650744/2023 |
| **MOTION DATE** | 02/26/2024, 02/26/2024 |
| **MOTION SEQ. NO.** | 011 013 |

**DECISION + ORDER ON
MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 011) 256, 257, 258, 259, 260, 261, 262, 263, 264, 265, 266, 267, 268, 269, 270, 271, 272, 273, 274, 275, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 344, 345, 346, 347, 348, 349, 350, 351, 352, 353, 354, 355, 356, 357, 366, 367

were read on this motion to/for                                    DISMISS                                    .

The following e-filed documents, listed by NYSCEF document number (Motion 013) 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 325, 326, 327, 328, 329, 330, 331, 332, 368, 369, 370, 371, 372, 373, 374, 375, 376, 377, 378, 379, 380, 381, 382, 383, 394, 395, 416

were read on this motion to/for                                    DISMISS                                    .

Motion sequence numbers 011 and 013 are consolidated for disposition.

Petitioners UBS Securities LLC and UBS AG London Branch (together, "UBS") bring

this turnover proceeding under CPLR Article 52 to enforce the judgments that UBS obtained in

*UBS Secs. LLC v Highland Cap. Mgmt., L.P.,* index No. 650097/2009 (Sup Ct, NY County) (the

"Underlying Action") against respondents Highland CDO Opportunity Master Fund, L.P. ("CDO

Fund"), Highland Special Opportunities Holding Company ("SOHC," together with CDO Fund,

the "Funds"), and Highland Financial Partners, L.P. ("HFP," together with the Funds, the

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No. 011 013**                                                              Page 1 of 48

**APP 00219**
                                              61 of 105
P - 6

Case 21-03076-sgj   Doc 397-7   Filed 10/14/25   Entered 10/14/25 21:24:58   Desc
Exhibit P   Page 7 of 105

"Judgement Debtors"). The petition asserts four causes of action. The first claim is for turnover

of certain allegedly fraudulent transfers, asserted against respondents CLO HoldCo, Ltd. ("CLO

HoldCo"), Scott Ellington ("Ellington"), Mainspring, Ltd. ("Mainspring"), and Montage

Holdings, Ltd. ("Montage"). In its second claim, UBS seeks to: (i) pierce the corporate veils of

the Judgment Debtors to hold respondents James Dondero ("Dondero") and Ellington personally

liable for the judgments in the Underlying Actions; (ii) pierce the corporate veils of Mainspring

and Montage to hold Dondero (as alter ego of Mainspring) and Ellington (as alter ego of

Montage) personally liable for the allegedly fraudulent transfers made to these entities; and (iii)

reverse-pierce the corporate veil of respondent Highland CDO Holding Company ("CDO

Holding"), a wholly owned subsidiary of HFP, to hold CDO Holding liable, as the alter ego of

HFP, for the allegedly fraudulent transfers made in 2010 to CLO HoldCo and for HFP's portion

of the judgments in the Underlying Action. The petition additionally asserts two now stayed

claims for violations the Racketeer Influence and Corrupt Organizations Act ("RICO").

Ellington and Dondero (in motion sequence numbers 011 and 013, respectively) move to

dismiss the petition pursuant to CPLR 404 (a) and 3211 (a) (1), (5), (7), and (8).

I.     Background

The following facts are taken from the petition and are presumed to be true for purposes

of the these motions (*see Allianz Underwriters Ins. Co. v Landmark Ins. Co.*, 13 AD3d 172, 174

[1st Dept 2004]).

A.   Dondero and Ellington's Alleged Control Over a Web of Entities

Dondero, a resident of Texas, co-founded Highland Capital Management, L.P. ("HCM")

in 1993 and was its majority owner, President, and Chief Executive Officer until his removal in

Case 21-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
Exhibit P    Page 8 of 105

2020 (NYSCEF Doc No. 186, petition ¶¶ 6, 27). Dondero exercised control over HCM and its

web of funds and other entities, in part, through his status as the sole stockholder and director of

Strand Advisors, Inc. ("Strand"), HCM's general partner (*id.* ¶ 29). According to the expert

report in the Underlying Action, from his position as President and majority owner of HCM,

Dondero controlled HCM and many related entities— including SOHC, CDO Fund, Highland

Financial Corp. ("HFC"), HFP, and CDO Holding (*id.* ¶¶ 28, 33, exhibit 2 [NYSCEF Doc No.

8], Dudney Report at 40-41). Dondero also served as chairman of HFP's board of directors, as

the sole director of SOHC, and as President of the ultimate general partner of CDO Fund.

Through these various positions, Dondero was responsible for the day-to-day operations of HFP,

SOHC and CDO Fund. (*See id.* ¶¶ 28, 33, exhibit 2 [NYSCEF Doc No. 8], Dudney Report at 4-

5, 41-42). Further, Dondero was able to alter the Judgment Debtors' structures to ensure his

control. For example, "[i]n 2009, Dondero eliminated the requirement that HFP have

independent directors and made himself [its] sole director" and, thus, "the direct decision maker

for HFP and its subsidiaries, including SOHC and CDO Holding" (*id.* ¶ 33, exhibit 88 [NYSCEF

Doc No. 94], email with Apr. 9, 2009 HFP board minutes at UBSPROD1854773,

UBSPROD1854782 [stating that the Independent Directors were eliminated and Dondero was

left solely responsible for the "management and operation" of HFP]; exhibit 113 [NYSCEF Doc

No. 118], Dondero deposition tr at 48:8-13 [admitting that he was "generally" the "decision

maker" for HFP and its subsidiaries]).

  Ellington, who also resides in Texas, was an officer of Strand. He was also HCM's Chief

Legal Officer and General Counsel from 2010 until his removal in January 2021. (*Id.* ¶¶ 7, 27,

31.) According to UBS, "Ellington operated as one of Dondero's top lieutenants and confidants"

(*id.* ¶ 27). "Dondero delegated and entrusted many decisions related to SOHC, CDO Fund, and

APP 00221

related entities to Ellington, including signatory authority and litigation strategy" (*id.* ¶ 31 [internal quotation marks omitted]; *see id.*, exhibit 50 [NYSCEF Doc No. 56], documents transferring interest in a limited partnership at UBSPROD2630461-463 [showing Ellington's signature on behalf of CDO Fund to transfer assets]).

HCM and its related entities, including the Judgement Debtors, "utilized the same offices, employees, and internal counsel" (*id.* ¶ 35, exhibit 92 [NYSCEF Doc No. 98], Cash Warehouse Agreement ¶ 9 [listing HCM's Dallas office for CDO Fund and SOHC], exhibit 121 [NYSCEF Doc No. 194], Leventon deposition tr at 31:6- 19 [explaining that various entities, including SOHC, would have their business offices "co-located" with HCM's office]). HCM's employees performed all work for all HCM-related entities based on instructions from Dondero and Ellington (*id.* ¶¶ 34-36). Employees also regularly worked on personal matters for Dondero and Ellington. For example, HCM employees handled Dondero's divorce, litigated a lemon law claim on his behalf and managed tenant issues at a building he owned (*id.* ¶ 37). Personal work for Ellington included conducting diligence and analysis for personal investments, paying rent on a warehouse he leased, and managing his personal trust (*id.* ¶ 39). Regardless of whether they performed work for a specific entity or worked on personal matters for Dondero or Ellington, employees received all their compensation from HCM (*id.* ¶¶ 36-38). As Ellington explained during deposition, HCM compensation was "the only compensation . . . that anyone ever received" and it was based on the "amalgamation of total efforts as directed by Mr. Dondrero as the [General Partner]." This included "personal assignments for Mr. Dondero, [because] it was still seen as value to Mr. Dondero as the GP, and he set the overall compensation numbers." (*Id.* ¶ 34, exhibit 117 [NYSCEF Doc No. 192], Ellington deposition tr at 113:5-16.)

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No. 011 013**                                  **Page 4 of 48**

P - 9

**APP 00222**

94 of 105

"HFP and its subsidiaries did not employ any specific limitations or procedures that governed when one HFP subsidiary could cover the debt of HFP or another subsidiary" (*id.* ¶ 52). HFP freely used the assets of its wholly owned subsidiary, CDO Holding (*see id.* ¶¶ 11, 52, 53). In 2008, to cover SOHC losses, HFP withdrew about $15 million from CDO Holding (*id.* ¶ 53). Both transfers, from CDO Holding to HFP and from HFP to SOHC, were approved with a one-word email from HFP's Chief Operating Officer (*id.* ¶¶ 52, 53). "HFP also used money from CDO Holding to pay legal invoices related to the Underlying Action, even though CDO Holding was not a party" (*id.* ¶ 53). On another occasion, also in 2008, SOHC recorded a dividend of $10.5 million to HFP, that HFP then purportedly paid to CDO Holding. In reality, the money moved directly from SOHC to CDO Holding. (*Id.* ¶ 54.) That same month, "HFP also raised $40 million from other HCM entities and transferred the money to CDO Holding to distribute it" (*id.* ¶ 54, exhibit 2 [NYSCEF Doc No. 8], Dudney Report at 43, 48).

The expert in the Underlying Action concluded that "'Dondero exercised his ability to dominate and control HCM, SOHC, CDO Fund and HFP, amongst other [HCM] [e]ntities,' to his own benefit, including to 'authorize loans to himself' and facilitate transfers among these entities— 'which were not at arm's length or executed in accordance with corporate formalities'" (*id.* ¶ 33, quoting NYSCEFF Doc No. 8, Dudley Report at 54-56). As an example, the expert pointed to a $3.7 million payment made to Dondero in December 2008. This was purportedly a repayment of a short-term loan to CDO Holding. However, the expert could find no evidence of a loan agreement and the funds originated from SOHC. (NYSCEFF Doc No. 8, Dudley Report at 48, 54.) More specifically, "'as part of a single set of instructions to Bank of New York Mellon, SOHC transferred $3.7 million to HFP, which was then transferred to CDO Hold[ing]

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL          Page 5 of 48
Motion No. 011 013

P - 10

APP 00223
10 of 105

and ultimately to James Dondero'" (NYSCEF Doc No. 186, petition ¶ 54, quoting NYSCEF Doc No. 8, Dudley Report at 48).

B. The Underlying Action and the Allegedly Fraudulent Transfers

In 2007 and 2008, UBS agreed to pursue a complex securitization transaction involving collateralized debt obligations and collateralized loan obligations with HCM, CDO Fund and SOHC (the "Knox Transaction") (*id.* ¶ 41). The warehouse agreements governing the transaction (the "Knox Agreements") contain forum selection clauses, by which UBS, CDO Fund and SOHC agreed to submit to the exclusive jurisdiction of New York courts (*id.* ¶ 18, exhibit 92 [NYSCEF Doc No. 98], Cash Warehouse Agreement ¶ 15, exhibit 93 [NYSCEF Doc No. 99], Synthetic Warehouse Agreement ¶ 15). As part of the transaction, CDO Fund and SOHC agreed to be responsible for 100% of any losses (*id.* ¶ 42). They breached this obligation as losses continued to mount amid the 2008 financial crisis. In December 2008, losses had grown to $519,374,149 and UBS terminated the Knox Agreements (*id.* ¶ 43).

In February 2009, UBS commenced the Underlying Action against HCM, CDO Fund, SOHC and several other affiliated entities, including HFP, for breach of the Knox Agreements (*id.* ¶ 44).

In late October 2010, the court in the Underlying Action heard arguments on the defendants' motion to dismiss UBS's claim to hold HFP liable as SOHC's alter ego (*id.* ¶ 49). UBS claims that Dondero and Ellington, anticipating a negative outcome, acted to transfer HFP's assets out of the reach of any future UBS judgments (*id.* ¶¶ 49, 51). On December 23, 2010, CDO Holding, one of the primary repositories of HFP's assets, transferred substantially all its assets, valued at $39,638,160, to CLO HoldCo in exchange for $6,597,862.00 in cash and a promissory note for $32,801,593.00 plus interest payable in fifteen years (the "2010 Transfer")

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL                Page 6 of 48
Motion No. 011 013

**APP 00224**

(*id.* ¶¶ 51, 52, 59). CLO HoldCo is a Cayman Islands company and a wholly owned subsidiary

of Charitable DAF Fund, L.P., that Dondero indirectly controls and has funded from his personal

assets, his family trusts, and HCM (*id.* ¶ 12). It was incorporated on December 13, 2010,

specifically for the 2010 Transfer (*id.* ¶ 55).

In March 2017, the Judgement Debtors suffered summary judgment losses and Dondero

and Ellington anticipated a $1.2 billion judgment (*id.* ¶¶ 61, 62, 64). They then devised a way

for the Judgement Debtors to transfer all their remaining assets (the "2017 Transfers") to

Sentinel Reinsurance, Ltd. ("Sentinel"). The Judgement Debtors would transfer their assets,

pursuant to an attendant Asset Purchase Agreement (the "APA"), as payment of the premium for

an after-the-event insurance policy (the "ATE Policy") to insure CDO Fund, SOHC and CDO

Holding (together, the "Insureds") against liability in the Underlying Action (*id.* ¶¶ 63, 64).

During the development of the ATE Policy, Sentinel's outside counsel raised concerns about the

"legal validity of such a transfer," warning that using the "hedge funds' investment portfolios"

to satisfy the premium would put "these assets . . . beyond the reach of the plaintiffs in the

[Underlying Action]" and risked the "'premium' [being] returned or . . . set aside as some

unlawful preference" (*id.* ¶ 72, exhibit 42 [NYSCEF Doc No. 48], email from Solomon Harris at

BC SEN0000745905).

In August 2017, Dondero executed the ATE Policy and the APA, transferring assets

valued at $105,647,679.00 (the "2017 Transferred Assets") to satisfy a $25,000,000 premium (*id.*

¶ 72). The face value of the transferred cash and promissory notes alone was nearly twice the

ATE Policy's premium (*see id.* ¶ 73, exhibit 98 [NYSCEF Doc No. 104], APA at BC

SEN0000089127-28 [listing assets]). Dondero signed the ATE Policy on behalf of all the

APP 00225

Insureds and the APA on behalf of all transferors (*id.* ¶ 77). According to UBS, he also
attempted "to sign a corollary to the APA on behalf of the [t]ransferors and Sentinel" (*id.*).

Under the ATE Policy, Sentinel agreed to indemnify CDO Fund, SOHC and CDO
Holding for up to a $100 million, in the aggregate, against any adverse judgment or settlement
with UBS (*id.* ¶ 75, exhibit 51 [NYSCEF Doc No. 57], ATE Policy at UBSPROD1973070).
Although not a party to the Underlying Action, CDO Holding was included among the Insureds
because, as a primary asset repository for HFP, it had liability (*see id.* ¶ 75, exhibit 121
[NYSCEF Doc No. 194], Leventon deposition tr at 32:10-15 [stating that any collection against
HFP "would then expose CDO Hold[ing]'s assets to seizure"]). CDO Opportunity Fund, HFC,
and HFP also transferred their assets to Sentinel. However, they were not insured under the ATE
Policy. Notably, CDO Opportunity Fund and HFC were not party to the Underlying Action. (*Id.*
¶ 76, exhibit 98 [NYSCEF Doc No. 104], APA at BC SEN000089127-28.)

Ellington devised the ATE Policy without any input from Sentinel or Beecher Carlson
("Beecher"), Sentinel's insurance manager (*id.* ¶ 65). The terms of the policy were carefully
tailored to enable the Insureds to claim reimbursements unrelated the Underlying Action. First,
the terms were revised to permit reimbursement even if the Insureds could not afford to litigate
the Underlying Action (*id.* ¶ 69). Then, coverage was extended to include Insureds' "own costs
and expenses," and this was later broadened to include the "costs and expenses of the
Representative and other service providers in the normal course, including related tax, which are
incurred during the conduct of the legal action on behalf of the insured" (*id.* ¶ 69, exhibit 42
[NYSCEF Doc No. 48] email exchange between HCM's Assistant General Counsel and
Solomon Harris at BC SEN0000745902-03 [finalizing the terms of the ATE Policy]).

APP 00226

Sentinel is a Cayman Island based reinsurance company (*id.* ¶ 63). Respondent Montage, a Cayman Islands company of which Ellington is the ultimate beneficial owner, owns 30% of Sentinel and respondent Mainspring, a Cayman Islands company of which Dondero is the ultimate beneficial owner, owns the remaining 70% (*id.* ¶¶ 13, 14, 63, exhibit 68 [NYSCEF Doc No. 74], email to the Cayman Islands Monetary Authority at DISCEN0008410 [containing chart of Sentinel's ownership structure]). "Dondero tasked Ellington with setting up and managing Sentinel through HCM's in-house legal team" (*id.* ¶ 80). Until 2021, Sentinel was run exclusively by HCM employees, who took direction from Ellington and Dondero (*id.*).

Dondero and Ellington also arranged to be appointed as sole members of the Sentinel Advisory Board of ITA Trust, the entity with ultimate voting control over Sentinel. Although Sentinel had been operating for several years, Dondero and Ellington's tenure on the Sentinel Advisory Board commenced around the same time as the ATE Policy and APA were executed. (*See id.* ¶ 71, exhibit 66 [NYSCEF Doc No. 72], Sentinel's board minutes with annexed Aug. 10, 2017 resolution of ITA Trust at BC SEN0000076075 [establishing the advisory board and appointing Dondero and Ellington as its sole members].) As the sole members of the Sentinel Advisory Board, Dondero and Ellington "guide[d] the decision making of the Trustee of the ITA Trust in its role as an indirect shareholder in Sentinel" (*id.*).

The ATE Policy was the first and only time that Sentinel issued an after-the-event policy. Previously, it had only issued director and officer liability policies to Dondero and Ellington-related entities and these policies contained significantly more modest coverage limits than that of the ATE Policy. (*Id.* ¶ 66.) Additionally, without the 2017 Transferred Assets, Sentinel did not have the means to pay the $100 million under the ATE Policy. Based on an actuary's limited analysis of the ATE Policy, "[e]ven under reasonably optimistic assumptions," the premium was

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL     Page 9 of 48
Motion No. 011 013

P - 14

APP 00227

14 of 105

going to be exceeded (*id.* ¶ 70, exhibit 41 [NYSCEF Doc No. 47], Bartlett Actuarial Group, Ltd.'s analysis of the ATE Policy at BC SEN0000745987). As of December 2016, Sentinel had $19,193,823.23 in total assets, $5,886,746.39 of which were cash (*id.* ¶ 66).

In 2018, "Sentinel (on behalf of Dondero and Ellington) tried to hide the fraudulent nature of the transfers by ascribing only $68 million in value to the 2017 Transferred Assets" (*id.* ¶ 84). However, this did not resolve the issue of the obvious overpayment for the premium. Beecher noted that the failure to "return [] overpayment of premium, [would] give[] rise to the question 'is this an arms-length transaction?'" (*id.*, exhibit 55 [NYSCEF Doc No. 61], email exchange between HCM and Beecher at BC SEN0000707457). In June 2018, Sentinel executed endorsements to the ATE Policy, one of which adjusted the premium to $68,362,333.62, purportedly "to include the total fair value of received assets" (*id.* ¶¶ 85, 86, exhibit 52 [NYSCEF Doc No 58], endorsements at DISCEN0007912).

The Cayman Island Monetary Authority ("CIMA") conducted an onsite inspection of Sentinel in March 2019 (*id.* ¶ 88). CIMA raised numerous concerns regarding the ATE Policy and the APA. For example, CIMA found that Sentinel's actuary "was not involved in the determination of premium pricing . . . to any extent at all" (*id.,* exhibit 67 [NYSCEF Doc No. 73], CIMA's Final Inspection Reports at BC SEN0000078822). It also found that those charged with governance could not explain: "the basis upon which the [2017 Transferred Assets] had been valued on or about August 1, 2017 for the purpose of premium settlement"; "the reason why the information that was relied on to value the [2017 Transferred Assets] could not be readily provided to the auditors upon request"; and "why the premium was adjusted from US$25 million to US$68.3 million without a commensurate adjustment to the indemnity limit provided or why the initial pricing for the policy was subsequently deemed not sufficient." CIMA

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL        Page 10 of 48
Motion No. 011 013

P - 15

**APP 00228**

1150 of 1405

FILED: NEW YORK COUNTY CLERK 03/25/2025 03:55 PM        INDEX NO. 650744/2023

NYSCEF DOC. NO. 416        Case 21-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc        RECEIVED NYSCEF: 03/25/2025

Exhibit P    Page 16 of 105

concluded that these facts, as well as the seven-fold increase in Sentinel's portfolio due to the 2017 Transferred Assets, "cast significant doubt on the economic substance and business purpose of the transactions relating to the ATE coverage" (*id.*, at BC SEN0000078819).

In the meantime, the Underlying Action advanced. The court bifurcated the trial into two phases (NYSCEF Doc No. 186, petition ¶ 1). At the end of phase one, by decision and order dated November 14, 2019, the court awarded UBS $1,042,391,031.79, ordering CDO Fund to pay $531,619,426.24 and SOHC to pay $510,771,605.55 ("Phase I Judgment") (*id.* ¶ 2, exhibit 11 [NYSCEF Doc No. 17], Phase I Judgment at 2-3). Prior to trial of the second phase, HCM filed for bankruptcy, staying the Underlying Action.

UBS alleges that "[i]n the months after the November 2019 Phase I [Judgment], Dondero and Ellington spent, transferred, and otherwise dissipated the 2017 Transferred Assets" and that "[t]hey did this in two main ways" (*id.* ¶ 99). First, Ellington sough reimbursement from the ATE Policy for personal expenses (*id.* ¶ 100). Second, Dondero and Ellington directed Sentinel to pay "dividends" to Mainspring and Montage (*id.* ¶ 101). In this way, UBS alleges, Dondero and Ellington exercised their control over Sentinel to enrich themselves and to diminished the assets available to UBS to satisfy its judgments (*id.* ¶ 98).

Ellington is alleged to have made the following improper reimbursement claims: (1) on December 16, 2019, for $21,557.04 in expenses for travel to Los Angeles, New York City, and Chicago (*id.* ¶ 104); (2) on December 19, 2019, for $318,934.88 in expenses for a single day in Austin and seven days in Las Vegas, which included $42,324 in charges from a single night at a Las Vegas strip club and $97,706.19 in charges at a Las Vegas nightclub (*id.* ¶ 105); (3) on January 30, 2020, for reimbursement of $78,841.93 in expenses for personal trips to London and Paris with his girlfriend (*id.* ¶ 108) and $140,000 in expenses for a trip to Toronto that included

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL        Page 11 of 48
Motion No. 011 013

P - 16

APP 00229

1161 of 1405

FILED: NEW YORK COUNTY CLERK 03/25/2025 03:55 PM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 415
Case 21-03076-sgj   Doc 397-7   Filed 10/14/25   Entered 10/14/25 21:24:58   Desc
RECEIVED NYSCEF: 03/25/2025
Exhibit P   Page 17 of 105

$43,353.54 spent on a private jet (*id.* ¶ 109); and (4) on March 12, 2020, for $273,662.82 in expenses for a six-day trip to London, that included approximately $18,000 in airfare for three individuals unaffiliated with Sentinel and $75,914.86 spent in a single day at two restaurants and a night club (*id.* ¶ 110). Sentinel reimbursed all of these expenses without questioning their validity, relying on Dondero and Ellington's determinations, as the ultimate beneficial owners of Sentinel, that such reimbursements were appropriate (*see id.* ¶¶ 104, 105-107, 111-112).

In January 2020, an independent board of directors of Strand (the "Independent Board") took over HCM's operations, management of its assets, and its bankruptcy proceeding (*id.* ¶ 45).

On April 24, 2020, Sentinel paid $6.4 million in dividends to Mainspring and Montage. $4,480,000.00 was paid to Mainspring, as Dondero's 70% share of the dividend. $1,920,000.00 was paid to Montage, as Ellington's 30% share of the dividend (*id.* ¶ 114).

In late 2020, UBS participated in bankruptcy court-ordered mediation. At this time, Ellington repeatedly told UBS that CDO Fund and SOHC were "ghost funds" (*id.* ¶ 46, exhibit 87 [NYSCEF Doc No. 93] Aug. 15, 2020 Ellington email at UBSPROD1738891 [stating that the Funds were "ghost funds . . . that (did) not have directors, custodians, administrators, bank accounts etc. that s(a)t dormant and NO ONE kn(ew) what they truly retain(ed)" and that "UBS (was) aware of this situation . . . because (Ellington) ha(d) personally discussed it with (Andy Clubok, UBS's counsel,) several dozen times"]). Neither Ellington nor Dondero ever disclosed the existence of the ATE Policy to UBS, the bankruptcy court or the Independent Board (*id.* ¶ 91).

On January 12, 2021, a year after the Phase I Judgment, Sentinel paid another $1,750,000.00 to Mainspring and $750,000.00 to Montage (*id.* ¶ 117). UBS alleges that the issuance of these dividends, as well as the April 2020 dividends, were against a representation

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL
Motion No. 011 013

Page 12 of 48

P - 17

APP 00230

172 of 405

that Matthew DiOrio ("DiOrio"), Managing Director of HCM and trusted lieutenant to Ellington

and Dondero (*id.* ¶¶ 36, 40), had made to Beecher in 2018— that Sentinel would "not be

entertaining any dividend issuance while the ATE policy [was] active" (*id.* ¶ 115, exhibit 62

[NYSCEF Doc No. 68] at DISCSEN0006464-65). In addition, UBS alleges that the second

dividend violated CIMA's regulations, requiring that CIMA be notified before a dividend is

issued. UBS points to the notice Sentinel provided CIMA three months after the fact, in which it

represented that it was "notifying the Authority of a $2,500,00 dividend *to be* declared and paid"

(*id.* ¶ 117, exhibit 91 [NYSCEF Doc No. 97] at BC SEN0000083961 [emphasis added]).

Sentinel had no schedule for issuing dividends to Mainspring and Montage and did so at

the request of its ultimate beneficial owners, Dondero and Ellington (*id.* ¶ 113, 116, exhibit 111

[NYSCEF Doc No. 190], DiOrio deposition tr at 195:12-197:3). As DiOrio explained during

deposition, Ellington and Dondero "could ask [for dividends] every day of the year," and

Sentinel's board would have to approve it (*id.* ¶ 116, exhibit 111 [NYSCEF Doc No. 190],

DiOrio deposition tr at 196:13-14).

According to UBS, Dodero and Ellington used some of these dividend payments to make

bonus payments to statutory insiders, including Ellington, after the bankruptcy court denied

HCM's request to make such bonus payments (*see id.* ¶¶ 119, 120). Ellington created an entity

called Tall Pine Group, LLC "to enter into consulting agreements with various Dondero-

controlled entities . . . and then [to] subcontract with entities owned by or affiliated with [the

statutory insiders]" (*id.* ¶ 122). Under these consulting agreements, "the contributing entities,"

which included Mainspring, "were jointly and severally liable for the total amount on the various

milestone payment dates" (*id.* ¶ 123; *see id.* at 45 n 30). "[T]he 'consultants' performed no other

work on top of the services already being performed by those individuals as employees of HCM,

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL        Page 13 of 48
Motion No. 011 013

P - 18

APP 00231

and in certain instances some of the employees did no work for certain contributing entities" (*id.* ¶ 124). Under these consulting agreements, the statutory insiders received approximately $8,638,536.07 in 2020, including about $5,874,203.21 from Mainspring (*id.* ¶ 126).

According to UBS, "it was only after Dondero and Ellington were removed that HCM and UBS were able to reach an agreement in principle to settle UBS's claims in the bankruptcy" (*id.* ¶ 47). Before a settlement agreement was signed, "on or about February 10, 2021, . . . HCM disclosed several fraudulent conveyances that HCM entities (at the direction of Dondero and Ellington) had conducted in concert with Sentinel" (*id.*). It was only through this disclosure that UBS learned of the 2010 Transfer and the 2017 Transfers (*id.* ¶¶ 47, 60). On March 30, 2021, UBS and HCM entered into a renegotiated settlement agreement, which settled UBS's claims against HCM and certain related entities in the Underlying Action (*id.* ¶ 47).

On July 27, 2022, the court in the Underlying Action issued a decision and order on the remaining, unsettled claims. The court awarded UBS $67,222.00 against CDO Fund, found HFP to be the alter ego of SOHC and liable for SOHC's portion of the Phase I Judgment, and awarded UBS attorney's fees ("Phase II Judgment," and together with the "Phase I Judgment," the "Judgment"). (*Id.* ¶¶ 2, 48, exhibit 24 [NYSCEF Doc No. 30], Phase II Judgment at 9-10.)

On September 1, 2022, UBS entered into a final settlement agreement with Sentinel. Sentinel agreed to transfer to UBS what remained of the 2017 Transferred Assets and UBS agreed to count those assets toward satisfaction of the Judgment (*id.* at 37 n 21, exhibit 25 [NYSCEF Doc No. 31], Partial Satisfaction-Piece for Post-Judgment Interest).

II.    Procedural History

UBS commenced this proceeding on February 8, 2023 (NYSCEF Doc No. 1). On March 7, 2023, Dondero removed the case to the U.S. District Court for the Southern District of New

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL                    Page 14 of 48
Motion No. 011 013

P - 19

APP 00232

FILED: NEW YORK COUNTY CLERK 03/25/2025 03:55 PM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 449
RECEIVED NYSCEF: 03/25/2025

Case 21-03076-sgj   Doc 397-7   Filed 10/14/25   Entered 10/14/25 21:24:58   Desc
Exhibit P   Page 20 of 105

York pursuant to 28 USC § 1441(a). The district court remanded the first two claims to this Court on December 7, 2023 (NYSCEF Doc Nos. 176-179, 197-99).

Ellington, CLO HoldCo and Dondero (in motions sequence numbers 011, 012, 013, respectively) moved to dismiss the petition. Argument on the motions was held on July 8, 2024.

By decision and order dated July 8, 2024, this court granted CLO HoldCo's motion to dismiss for lack of personal jurisdiction. In pertinent part, the court held that CLO HoldCo was not a signatory to the agreements containing forum selection clauses and that there was no basis for long-arm jurisdiction, because: (1) the alleged 2010 fraudulent transfers occurred years before there was a judgment or a bankruptcy settlement, and so there could be no reasonable expectation of consequence in New York under CPLR 302 (a) (3) (ii); and  (2) the "'original critical events' giving rise to the injury here indisputably did not occur in New York" (NYSCEF Doc No. 417, Decision and order dated July 8 2024, quoting *Deutsche Bank v Vik*, 163 AD3d 414, 415 [1st Dept 2018]).

III.   Analysis

A. Personal Jurisdiction and Piercing the Corporate Veils of the Judgement Debtors

The parties dispute whether the court has personal jurisdiction over Dondero and Ellington, either as alter egos of the Judgement Debtors, bound by the forum selection clauses of Knox Agreements, or under the long-arm statute. They also dispute whether the petition contains sufficient allegations of Ellington and Dondero's close relationship with the Judgement Debtors to bind them under the Knox Agreements' forum-selection clauses.

1.   Choice of Law Analysis for Veil-Piercing

As a preliminary matter, the parties dispute which jurisdiction's law should apply in determining whether to pierce the corporate veils of the Judgment Debtors. SOHC is a Cayman

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL
Motion No. 011 013

Page 15 of 48

P - 20

APP 00233

20 of 40

FILED: NEW YORK COUNTY CLERK 03/25/2025 03:55 PM INDEX NO. 650744/2023
NYSCEF DOC. NO. 418

Case 24-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
RECEIVED NYSCEF: 03/25/2025
Exhibit P    Page 21 of 105

Islands corporation, HFP is a Delaware limited partnership and CDO Fund is a Bermuda limited partnership (NYSCEF Doc No. 186, petition ¶¶ 8, 9, 10). Respondents contend that the court should apply the law of the place of incorporation of the company whose veil is sought to be pierced. UBS counters that, as this proceeding concerns the enforcement of a New York judgment, New York's interest is paramount and its law applies.

The first step in a choice of law analysis, is to determine "whether there is an actual conflict between the laws of the jurisdictions involved" (*Matter of Allstate Ins. Co. [Stolarz-New Jersey Mfrs. Ins. Co.]*, 81 NY2d 219, 223 [1993]). "For an actual conflict to exist, the laws in question must provide different substantive rules . . . that are relevant to the issue at hand and have a significant *possible* effect on the outcome of the trial" (*TBA Global, LLC v Proscenium Events, LLC*, 114 AD3d 571, 572 [1st Dept 2014] [internal quotation marks and citation omitted]). If no conflict exists "between the laws of the competing jurisdictions . . . , then the court should apply the law of the forum state in which the action is being heard" (*Excess Ins. Co. Ltd. v Factory Mut. Ins. Co.*, 2 AD3d 150, 151 [1st Dept 2003], *affd 3* NY3d 577 [2004]). Where a conflict exists, "under New York choice-of-law principles, courts apply the law of the forum to procedural questions and, to substantive issues, the law of the jurisdiction with the most significant relationship to the dispute" (*Eccles v Shamrock Capital Advisors, LLC*, 42 NY3d 321, 335 [2024] [internal citations omitted]).

Generally, "the substantive law of a company's place of incorporation presumptively applies to causes of action arising from its internal affairs" (*Eccles*, 42 NY3d at 339). However, this presumption may be overcome, if a party demonstrates "both that (1) the interest of the place of incorporation is minimal—i.e., that the company has virtually no contact with the place of

APP 00234

incorporation other than the fact of its incorporation, and (2) New York has a dominant interest in applying its own substantive law" (*id.*).

If the dispute concerns the application of tort law and the law is conduct-regulating, "New York courts usually apply the law of the place where the tort occurred because that jurisdiction has the greatest interest in regulating behavior that takes place within its borders" (*Elson v Defren*, 283 AD2d 109, 115 [1st Dept 2001]; *see Eccles*, 42 NY3d at 336). "Where a defendant's wrongful conduct occurs in one jurisdiction and the plaintiff suffers injuries in another, 'the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred;' that is where the plaintiffs' injuries occurred" (*Deutsche Bank AG v Vik*, 2015 NY Slip Op 30163[U], *20 [Sup Ct, NY County 2015], *affd* 142 AD3d 829 [1st Dept 2016], quoting *Schultz v Boy Scouts of Am., Inc.*, 65 NY2d 189, 197 [1985]).

Here, New York law applies to the veil-piercing analysis.

Because "HFP is a Delaware limited partnership" (NYSCEF Doc No. 186, petition ¶ 9) and "the standard [for piercing the corporate veil] is not materially different under Delaware law" from that under New York law (*Tap Holdings, LLC v Orix Fin. Corp.*, 109 AD3d 167, 174 [1st Dept 2013]; *see also Spinnell v JP Morgan Chase Bank, N.A.*, 59 AD3d 361, 361 [1st Dept 2009] ["(t)he court properly applied New York law because there is no conflict with Delaware law with respect to 'reverse veil-piercing' . . ."]), New York law applies with regard to HFP (*see Excess Ins. Co. Ltd., 2* AD3d at 151]).

However, the standard for piercing the corporate veil under the laws of the Cayman Islands and Bermuda differ from that of New York. According to the parties' experts on Cayman Island and Bermuda law, because these jurisdictions are British Overseas Territories, they follow English law where there is no local authority on a particular issue (*see* NYSCEF Doc

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL     Page 17 of 48
Motion No. 011 013

APP 00235     P - 22

2127 of 1405

No. 260, Lowe affirmation ¶¶ 8-9; NYSCEF Doc No. 309, Hayden affirmation ¶¶ 7-10; NYSCEF Doc No. 324, Wasty affirmation ¶¶ 12-19). In this case, the leading, applicable case on piercing the corporate veil in English law is *Prest v Petrodel Resources Limited* ([2013] 2 AC 415) (*see* NYSCEF Doc No. 260, Lowe affirmation ¶ 16; NYSCEF Doc No. 309, Hayden affirmation ¶ 11; NYSCEF Doc No. 324, Wasty affirmation ¶ 27).

*Prest* explains that English cases addressing the issue can be divided into two categories that have often been confused (NYSCEF Doc No. 316, *Prest* at 70). The first category of cases applies the concealment principle, which "is legally banal and does not involve piercing the corporate veil at all" (*id.*). This principle is not implicated in this proceeding. [1] The second category of cases applies the evasion principle, "which applies when a person is under an *existing* legal obligation or liability or subject to an *existing* legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control" (*id.* at 74 [emphasis added]). Because English law requires the existence of liability prior to the abuse of the corporate form, a temporal requirement not found under New York law (*see Tianbo Huang v iTV Media, Inc.*, 13 F Supp 3d 246, 258 n 4 [ED NY 2014] [explaining how "(t)he temporal requirement most clearly distinguishes New York from English

---

[1] In applying the concealment principle, courts look to general legal principles "to discover the facts which the corporate structure is concealing," without "disregarding the 'facade'" (NYSCEF Doc No. 316, *Prest* at 70). For example, in one of the cases discussed in *Prest*, it was not necessary to pierce the corporate veil, because the defendant company had acted as the individual defendant's "nominee for the purpose of receiving and holding the secret profit" and, as such, both had to account for it to the plaintiff (*id.* at 72).

Notably, UBS contends that, even under Bermudan and Cayman laws, the court should hold Dondero and Ellington personally liable for the Judgement under the concealment principle. However, the petition clearly seeks to hold Dondero and Ellington liable as the alter egos of the Judgement Debtors and asks the court to disregard the corporate form to find personal jurisdiction over the individuals. This cannot be accomplished by applying the concealment principle.

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL                Page 18 of 48
Motion No.  011 013

P - 23

APP 00236

law"]), a choice of law analysis is necessary to determine which standard should apply to piercing the corporate veils of SOHC and CDO Fund.

Piercing the corporate veil involves holding an individual accountable to third parties for the abuse of the corporate form (*see Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 141 [1993]) rather than "the relationships between directors and shareholders" or a corporation's internal administration (*Eccles*, 42 NY3d at 336, 336 n 11). Therefore, "alter ego liability and the related doctrine of piercing the corporate veil . . . do not implicate the corporation's internal affairs" and there is no presumption in favor of Bermuda or the Cayman Islands as the jurisdictions of incorporation (*see UBS Sec. LLC v Highland Capital Mgt., L.P.*, 30 Misc 3d 1230[A], 2011 NY Slip Op 50297[U], *3 [Sup Ct, NY County 2011], *affd in part, mod in part* 93 AD3d 489 [1st Dept 2012] [applying New York law to determine whether HCM was SOHC's alter ego]; *see also Highland CDO Opportunity Master Fund, L.P. v Citibank, N.A.*, 270 F Supp 3d 716, 725 [SD NY 2017] ["find[ing] that veil piercing is best treated as a species of fraud or similar tort and therefore is a conduct-regulating rule"]).

Here, New York has the greater interest in applying its law to the veil piercing claims.

Apart from SOHC and CDO Fund's status as a Cayman Islands corporation and a Bermuda limited partnership, respectively, it is not clear how those jurisdictions' interests are implicated here. Indeed, as concerns SOHC, it has already been found not to have any "obvious ties" to the Cayman Islands (*UBS Sec. LLC*, 2011 NY Slip Op 50297[U] at *3 [applying New York law to the veil piercing claim on "the ground that SOHC has almost no ties to the Cayman Islands," based upon findings that, among other things, it "conducts business in New York and Texas with entities based in New York, including UBS"]). Moreover, none of the injured parties are located in the Cayman Islands or Bermuda.

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 19 of 48
Motion No. 011 013

P - 24

APP 00237

249 of 1405

On the other hand, petitioner UBS Securities LLC has its principal place of business in New York (NYSCEF Doc No. 186, petition ¶ 4). Accordingly, at least part of the injury was felt in New York (*see Schultz*, 65 NY2d at 195; *see also Highland CDO Opportunity Master Fund, L.P., N.A.*, 270 F Supp 3d at 725 [applying New York's interest analysis and concluding that "New York ha(d) the greatest interest in applying its law to the veil piercing claims," where three of the four counterclaim plaintiffs had their principal place of business in New York and, "(a)ccordingly, the relevant injury . . . occurred in New York"]). In addition, New York has an interest in enforcing a judgment entered in the state, which resulted from the breach of the Knox Agreements, which were "largely conducted in New York" (NYSCEF Doc No. 281, Dondero brief at 13) and contain New York forum selection clauses (*see Forum Ins. Co. v Texarkoma Transp. Co.*, 229 AD2d 341, 342 [1st Dept 1996] [finding New York's law applied in an action seeking to pierce the corporate veil to hold a foreign entity liable under an indemnification agreement, where, among other things, the subject agreement had been executed in New York]; *Citibank, N.A. v Aralpa Holdings L.P.*, 2025 WL 289499, *2, 2025 US App LEXIS 1559, *5 [2d Cir, Jan. 24, 2025, No. 24-423-CV] [applying New York choice of law principles and concluding that New York law applied to Citibanks' reverse veil piercing claim, because "New York clearly ha(d) the more significant relationship to th(e) dispute," where Citibank's principal place of business was in New York, the underlying contracts "contained New York choice-of-law and venue clauses," and "the judgment which Citibank (sought) to execute upon was entered in New York"]). Accordingly, New York law determines whether to pierce the Judgement Debtors' corporate veils.

    2.   Piercing the Corporate Veil Analysis

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**        **Page 20 of 48**
**Motion No. 011 013**

**APP 00238**

P - 25

250 of 1405

Dondero contends that the alter ego claim must be dismissed as against him and that it cannot serve as the basis of personal jurisdiction over him, because the petition fails to allege: (1) that he disregarded the corporate formalities of the Judgment Debtors to advance his personal interests; (2) that the Judgment Debtors were purposefully undercapitalized in 2008, when UBS entered into the Knox Agreements; (3) that he commingling his personal assets with those of the Judgment Debtors or used Judgment Debtor funds for personal use; and (4) causation, or that, in the absence of the alleged wrongful conduct, UBS would have been able to satisfy the $1.2 billion Judgement.  In addition, as concerns HFP and CDO Fund, Dondero contends that alter ego claims fail as a matter of law, because veil-piercing does not apply to limited partnerships.

Ellington contends that the alter ego claim must be dismissed as against him and that it cannot serve as the basis for personal jurisdiction over him, because: (1) there are no allegations that he was using the Judgement Debtors to conduct business in his personal capacity or that he personally benefited from the Knox Transaction or from the 2017 Transfers to Sentinel when they occurred, as opposed to subsequently; (2) he had no ownership interest in the Judgment Debtors; and (3) the petition's extensive allegations of Dondero's control of the Judgement Debtors negate any claim of control by Ellington.

Dondero and Ellington both argue that to hold them liable for the Judgement would be inequitable, as it would give UBS the benefit of personal guarantees that it did not bargain for. They also urge that a fraudulent transfer claim is the proper vehicle to recover the allegedly funneled funds.

UBS responds that limited partnership status does not bar alter ego liability.  In addition, it argues that the petition sufficiently alleges Dondero's control over the Judgment Debtors and explains how the commingling of assets ultimately benefitted only Dondero and his associates.

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No. 011 013**

**Page 21 of 48**

P - 26

**APP 00239**

26 of 105

UBS also contends that the intentional undercapitalization of the Judgment Debtors near the time

of the Judgment being entered is relevant to the veil-piercing analysis. Lastly, UBS contends

that the Judgment Debtors' inability to pay the entirety of the Judgment does not mean that

Dondero's conduct did not cause UBS injury. It argues that allegations that Dondero worked to

funnel the Judgment Debtors' assets to himself and his associates are sufficient to plead

causation in this case.

As concerns Ellington, UBS argues that the petition sufficiently details how he

orchestrated the 2017 Transfers to Sentinel, a company for which Ellington was an ultimate

beneficial owner, and then used those assets for lavish personal expenses and dividend payments

to himself. UBS contends that his lack of ownership interest in the Judgement Debtors does not

bar alter ego liability, as he can be held liable as an equitable owner based on his control over the

Judgement Debtors. In addition, it argues, as multiple individuals may be held liable as alter

egos of an entity, Dondero's alter ego status does not shield Ellington against alter ego liability.

Finally, UBS contends that the absence of a personal guarantee does not render piercing the

corporate veil inequitable and that to find otherwise would render alter ego liability ephemeral.

"A non-signatory may be bound by a [forum selection clause] under certain limited

circumstances, including as . . . an alter ego of a signatory" (*Highland Crusader Offshore

Partners, L.P. v Targeted Delivery Tech. Holdings, Ltd.*, 184 AD3d 116, 122 [1st Dept 2020]

[internal citations omitted]). "Subjecting the foreign defendants to New York jurisdiction under

an alter ego theory does not offend due process" (*Clingerman v Ali*, 212 AD3d 572, 572 [1st

Dept 2023] [internal citation omitted]).

To state a claim against an individual on an alter ego theory of liability, the petitioner

must allege facts that, if proved, indicate that: : "(1) the owner exercised complete domination

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL       Page 22 of 48
Motion No. 011 013

P - 27

APP 00240

272 of 1405

over the corporation with respect to the transaction attacked, and (2) that such domination was used to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury" (*First Capital Asset Mgt. v N.A. Partners*, 300 AD2d 112, 116 [1st Dept 2002], citing *Matter of Morris*, 82 NY2d at 141).  Courts consider the following factors when determining whether domination has been alleged:

> "the disregard of corporate formalities; inadequate capitalization; intermingling of funds; overlap in ownership, officers, directors and personnel; common office space or telephone numbers; the degree of discretion demonstrated by the alleged dominated corporation; whether the corporations are treated as independent profit centers; and the payment or guarantee of the corporation's debts by the dominating entity" (*Cortlandt St. Recovery Corp. v Bonderman*, 226 AD3d 103, 105 [1st Dept 2024], quoting *Tap Holdings, LLC*, 109 AD3d at 174)

"The determinative factor is whether the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends" (*Port Chester Elec. Constr. Corp. v Atlas*, 40 NY2d 652, 657 [1976] [internal quotation marks and citation omitted]).  However, domination, standing alone, is not enough to pierce the corporate veil, which requires a showing "that the owners, through their domination, abused the privilege of doing business in the corporate form" (*East Hampton Union Free School Dist. v Sandpebble Bldrs., Inc.*, 66 AD3d 122, 126 [2d Dept 2009], *affd* 16 NY3d 775 [2011] [internal quotation marks and citations omitted]).  "Because a decision to pierce the corporate veil in any given instance will necessarily depend on the attendant facts and equities, there are no definitive rules governing the varying circumstances when this power may be exercised" (*Baby Phat Holding Co., LLC v Kellwood Co.*, 123 AD3d 405, 407 [1st Dept 2014] [internal citation omitted]).

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL          Page 23 of 48
Motion No. 011 013

P - 28

**APP 00241**          283 of 1405

Pursuant to CPLR 103 (b), "procedure in special proceedings shall be the same as in actions, and the provisions of the civil practice law and rules applicable to actions shall be applicable to special proceedings." On a motion to dismiss for failure to state a claim, pursuant to CPLR 3211 (a) (7), "the [petition] must be construed in the light most favorable to the [petitioner] and all factual allegations must be accepted as true" (*Allianz Underwriters Ins. Co.*, 13 AD3d at 174). The court is not permitted "to assess the merits of the [pleading] or any of its factual allegations, but only to determine if, assuming the truth of the facts alleged, the [pleading] states the elements of a legally cognizable cause of action" (*Skillgames, LLC v Brody*, 1 AD3d 247, 250 [1st Dept 2003]).

As a preliminary matter, to the extent that respondents claim that veil-piercing is, as a matter of law, inapplicable to limited partnership such as HFP and CDO Fund, the contention is without merit (*see e.g. Cortlandt St. Recovery Corp.*, 226 AD3d at 34 n 2, 48-50 [denying motion to dismiss where the complaint contained sufficient allegation to pierce the corporate veil of two entities, including a limited partnership]; *Pensmore Invs., LLC v Gruppo, Levey & Co.*, 184 AD3d 468, 469 [1st Dept 2020] [finding that "Supreme Court properly determined that veil piercing was appropriate against . . . Frog Pond Partners, L.P."]).

### a. Dondero as Alter Ego of the Judgement Debtors

Here, the petition sufficiently alleges that Dondero is the Judgement Debtors' alter ego.

First, it alleges that Dondero, from his position as President and majority owner of HCM—as well as his positions as chairman of HFP's Board of Directors, the sole Director of SOHC and as President of the ultimate general partner of CDO Fund—controlled the day-to-day operations of the Judgment Debtors (*see* NYSCEF Doc No. 186, petition ¶¶ 28, 33, exhibit 2 [NYSCEF Doc No. 8], Dudney Report at 4-5, 41-42). Further, the petition alleges that in 2009,

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No. 011 013**                                    **Page 24 of 48**

P - 29

**APP 00242**

294 of 1405

Dondero eliminated the requirement that HFP have independent directors and made himself

solely responsible for the "management and operation" of HFP and, by extension, its

subsidiaries, including SOHC (*id.* ¶ 33, exhibit 88 [NYSCEF Doc No. 94] at

UBSPROD1854782). Indeed, Dondero has stated that he was "generally" the "decision maker"

for HFP and its subsidiaries (*id.* ¶ 28, exhibit 113 [NYSCEF Doc No. 118], Dondero deposition

tr at 48:8-13).

Further, UBS's expert in the Underlying Action concluded that "'Dondero exercised his

ability to dominate and control HCM, SOHC, CDO Fund and HFP, amongst other [HCM]

[e]ntities,' to his own benefit, including to 'authorize loans to himself' and facilitate transfers

among these entities— 'which were not at arm's length or executed in accordance with corporate

formalities'" (*id.* ¶ 33, quoting Dudley Report [NYSCEFF Doc No. 8] at 54-56). As an example,

the expert pointed to a $3.7 million payment made to Dondero in December 2008. This was

purportedly a repayment of a short-term loan that Dondero made to CDO Holding, but there was

no evidence of a loan agreement, and the funds originated from SOHC. The money traveled

from SOHC to HFP, then from HFP to CDO Holding and only then to Dondero (*see id.* ¶¶ 43,

54, exhibit 2 [NYSCEFF Doc No.8], Dudley Report at 48, 54). Other allegations demonstrating

Dondero's domination of the Judgment Debtors include an overlap of offices and employees. It

was common for various entities, including the Judgment Debtors, to share HCM's office in

Texas, HCM employees performed whatever work Dondero assigned them, regardless of which

entity was involved or whether the work was personal in nature (e.g. handling his divorce), and

Dondero determined employees' compensation based on an "amalgamation of total efforts" (*id.*

¶¶ 34-37.) These allegations sufficiently plead Dondero's domination of the Judgement Debtors

(*cf Horizon Inc. v Wolkowicki*, 55 AD3d 337, 337-338 [1st Dept 2008] [affirming denial of

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL          Page 25 of 48
Motion No. 011 013

P - 30

APP 00243

305 of 405

motion for summary judgement to dismiss "plaintiffs' claim that NYREG's corporate veil should be pierced and its principal . . . held personally liable for the corporation's obligations," where the principal "ignored the corporate form by transferring monies in and out of NYREG without any documentation or formalities"]; *Webmediabrands, Inc. v Latinvision, Inc.*, 46 Misc 3d 929, 932-933 [Sup Ct, NY County 2014] [piercing the corporate veil where, among other things, the individual defendant used corporate assets for personal purposes, terming such payments as "loans"]).

Second, the petition sufficiently alleges that Dondero used his domination of the Judgement Debtors to commit a wrong against UBS that resulted in its injury. The petition alleges that Dondero, anticipating an adverse judgment in the Underlying Action, "deliberately undercapitalized the Judgment Debtors to prevent UBS from collecting on the Judgment" by effecting the 2017 Transfers and "ensur[ing] that the Judgment Debtors would be judgment proof" (NYSCEF Doc No. 186, petition ¶ 176; *see id.* ¶¶ 61-78). "Allegations that corporate funds were purposefully diverted to make it judgment proof . . . are sufficient to satisfy the pleading requirement of wrongdoing which is necessary to pierce the corporate veil on an alter-ego theory" (*Baby Phat Holding Co., LLC*, 123 AD3d at 407-408 [internal citation omitted]). The petition further alleges that by transferring the assets to Sentinel, Dondero, as one of Sentinel's ultimate beneficial owner, was able to extract millions in dividends, thereby reducing assets available to satisfy the Judgment (*see id.* ¶¶ 113-119).

Accordingly, the petition states a claim for piercing the corporate veil of the Judgement Debtors to hold Dondero liable as their alter ego (*see First Capital Asset Mgt.*, 300 AD2d at 116).

None of Dondero's contentions change the analysis.

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**          **Page 26 of 48**
**Motion No.  011 013**

APP 00244

First, he argues that the petition, at most, alleges that HCM and other entities disregarded the corporate formalities of the Judgement Debtors to advance Dondero's interest. Relying on a single case, he claims that "[i]f the fact that a corporation served its owner's interests were enough to establish a wrongful 'domination' of the corporation, then the corporate form would never be respected" (*In re Stage Presence, Inc.*, 592 BR 292, 304 [Bankr SD NY 2018], *affd* 2019 WL 2004030, 2019 US Dist LEXIS 77111 [SD NY, May 7, 2019, No. 12-10525 (MEW)]). However, in *Stage Presence, Inc.*, the court also concluded that "the evidence showed that in all important operational and financial respects the separate existence of [corporation] was honored and fully respected" (*id.*). Here, UBS alleges that the Judgement Debtors did not have operational or financial separateness from each other or Dondero.

Dondero then argues that the relevant time for undercapitalization is 2008, when UBS entered the Knox Transaction. As this is the transaction that caused the alleged injury, he argues, UBS's failure to allege Dondero's domination over it, as the "transaction attacked" (*First Capital Asset Mgt.*, 300 AD2d at 116), requires dismissal. In so arguing, Dondero ignores the fact that the Judgement exists because the Judgement Debtors' obligations under the Knox Agreements were not satisfied. According to the petition, they remain so, at least in part, due to Dondero's purposeful evasion of those obligations. Therefore, the alleged undercapitalization in 2017 is pertinent to the domination analysis (*see 265 W. 34th St., LLC v Joon Sik Chung*, 47 Misc 3d 1219[A], 2015 NY Slip Op 50704[U], *8 [Sup Ct, NY County 2015] [denying motion to dismiss an alter ego claim to hold the owners liable for the judgment previously entered against the corporate defendant in a summary non-payment proceeding in housing court, explaining that the "transaction plaintiff seeks to attack is not the execution of the lease itself, but rather, the avoidance of obligations created by the lease"]; *see also Azte Inc. v Auto Collection, Inc.*, 36

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL                    Page 27 of 48
Motion No. 011 013

P - 32

APP 00245

327 of 1405

Misc 3d 1238(A), 2012 NY Slip Op 51731(U), *11-12 [Sup Ct, Kings County 2012], *affd* 124

AD3d 811 [2d Dept 2015] [declining to accept defendant's contention "that 'the transactions

attacked' by the plaintiffs terminated upon the plaintiffs' transferring the money to the

(defendant)," as the transaction was ongoing until the defendant performed its obligations]; *see*

*also Grigsby v Francabandiero*, 152 AD3d 1195, 1197 [4th Dept 2017] [finding sufficient

allegations to pierce the corporate veil, where plaintiff alleged that, near the time her judgment

was entered against the entity, the individual defendant "took actions calculated to make (the

entity) judgment-proof by undercapitalizing (it)"]).

Dondero also contends that alter ego claim must be dismissed, because UBS cannot prove

proximate causation. Dondero argues that UBS cannot show it would have been able to recover

$1.2 billion but for Dondero's alleged domination of the Judgement Debtors, because the petition

alleges that the 2017 Transfers involved approximately $105 million in assets. For this

proposition, Dondero primarily relies on a single case, *Pensmore Invs., LLC v Gruppo, Levey &*

*Co.* (2019 NY Slip Op 31360[U] [Sup Ct, NY County 2019], *affd as mod* 184 AD3d 468 [1st

Dept 2020]).

In *Pensmore*, the court initially denied summary judgment to both parties on a claim to

pierce the corporate veil to hold the individual defendants personally liable. It reasoned:

> "for the fraud prong to be satisfied with respect to [the individual
> defendants], Pensmore [had to] prove that they unjustifiably
> funneled corporate funds to themselves and that, had they not done
> so, Pensmore would have been able to recover the amounts sought
> from the companies in excess of the assets they . . . ha[d] on hand."
> (*Pensmore Invs., LLC v Gruppo*, 2017 NY Slip Op 30661[U], *19
> [NY Sup Ct, New York County 2017].)[2]

---

[2] Notably, UBS seeks to distinguish *Pensmore Invs., LLC*, because the court in that case applied
Delaware law to the veil-piercing claim (2017 NY Slip Op 30661[U] at *11). However, as
already stated, Delaware's veil-piercing law is not substantially different from that of New York
(*see Tap Holdings, LLC*, 109 AD3d at 17). Moreover, after a bench trial that found that the

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**    Page 28 of 48
**Motion No. 011 013**

APP 00246

338 of 405

P - 33

As Pensmore did not make such a showing and the defendants did not show that it could not do so at trial, neither side was granted summary judgment (*id.*). Additionally, the court observed that if Pensmore could not carry its burden at trial, then the individual defendants "[did] not deserve to be held personally liable because, despite their behavior, they would not have been the proximate cause of Pensmore's inability to satisfy its judgment against [the entity defendants]" (*id.* at *19 n 16). The court explained that, because "veil piercing . . . impose[s] alter ego liability [based on] to the causal relationship between malfeasance and fraud on a creditor[,] [w]ithout proving that [the individual defendants] did anything that made the companies, collectively, unable to pay Pensmore, the requisite fraud [could not] be said to be present" (*id.*).

After a bench trial, the court concluded that Pensmore made the requisite showing and pierced the corporate veil to hold the individual defendants liable (*Pensmore Invs., LLC*, 2019 NY Slip Op 31360[U] at *13-*14). However, the court also stated that it was "not decid[ing] whether, as a necessary predicate to all veil piercing claims, there must be proof that a business composed of alter ego affiliates is collectively capable of paying off the plaintiff but for the corporate malfeasance" (*id.* at *13), rather that it "[was] a predicate of the fraud prong under the circumstances" of that case (*id.*).

The Appellate Division, First Department, held that veil piercing against the individual defendants was proper (*Pensmore Invs. LLC*, 184 AD3d at 469). It observed that the evidence showed that the defendants used their domination over the entities to render them judgment proof and that "the [entites] would have had sufficient funds to satisfy the underlying debt owed to

---

plaintiff made the requisite showing, the Appellate Division, First Department affirmed, holding that veil piercing against the individual defendants was proper, regardless of whether New York or Delaware law was applied (*Pensmore Invs., LLC*, 184 AD3d at 469).

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL          Page 29 of 48
Motion No. 011 013

P - 34

APP 00247

Pensmore, but for appellants' fraud" (*id.*). However, it did not state whether a showing of the entities' ability to satisfy the debt was a necessary element of the claim.

While the reasoning of *Pensmore* is compelling (*see* 2017 NY Slip Op 30661[U], \*19 n16), as neither the motion court, the trial court, nor the appellate court held that proof of the entity defendants' ability to satisfy the underlying debt was a prerequisite to proving veil-piercing generally, much less that it was a necessary element to state such a claim, the court declines to dismiss the petition on that ground.[3]

Dondero contends that it would be inequitable to hold him personally liable, because UBS did not negotiate a personal guarantee in the Knox Transaction, or that UBS should be limited to its fraudulent conveyance claims. This is unavailing. If the absence of a personal guarantee was sufficient to evade liability, alter ego liability would never be imposed. Additionally, UBS's ability to pursue fraudulent transfer claims, in no way bars it from pursuing alter ego liability (*see e.g. Cortlandt St. Recovery Corp. v Bonderman*, 31 NY3d 30, 50 [2018] [holding that "(s)ince the complaint allege(d) the existence of a corporate debt, created by defendants by their use of the corporate form to profit from fraudulent conveyances that left (the shell companies) insolvent, (the plaintiff) could request that the court pierce the corporate veil to impose liability upon defendants as the alter egos of (the shell companies)"]).

Finally, to the extent that Dondero seeks to demonstrate that UBS "has already recovered the allegedly funneled amounts from Sentinel" (NYSCEF Doc No. 368, Dondero's reply at 11 n

_____

[3] Notably, UBS relies on *AMP Servs. Ltd. v Walanpatrias Found.* for the proposition that plaintiff need not allege "that the transfer at issue had rendered the subject assets totally and permanently unavailable or diminished" (34 AD3d 231, 232 [1st Dept 2006]). That case is inapposite as it addresses the sufficiency of a fraudulent conveyance claim under Debtor and Creditor Law § 276.

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL      Page 30 of 48
Motion No. 011 013

P - 35

APP 00248

350 of 1405

5; *see* NYSCEF Doc No. 369, Leventon reply affirmation ¶¶13-23, exhibits 9-13 [purporting to demonstrate that UBS has recovered in excess of the value of the 2017 Transferred Assets]), this evidence is submitted for the first time in reply and, therefore, will not be considered (*see Dannasch v Bifulco*, 184 AD2d 415, 416-417 [1st Dept 1992]).

For the foregoing reasons, Dondero's motion to dismiss is denied with respect to the second claim, to the extent the claim seeks to hold Dondero liable as the Judgement Debtors' alter ego. The motion is also denied to the extent it seeks to dismiss the petition for lack of personal jurisdiction (*see Highland Crusader Offshore Partners, L.P.*, 184 AD3d at 122).

b. Ellington as Alter Ego of the Judgement Debtors

The Petition also sufficiently alleges that Ellington is the Judgement Debtors' alter ego. Ellington's lack of any ownership interest in the Judgement Debtors is not dispositive. "Even if an individual is not a record owner of a corporation, he may nonetheless be found to be an 'equitable owner' and alter ego thereof if he dominated and controlled [it] to such an extent that [he] may be considered its equitable owner[ ]" (*Matter of Berisha v 4042 E. Tremont Café Corp.*, 220 AD3d 608, 609 [1st Dept 2023] [internal quotation marks and citations omitted]). Here, the petition contains sufficient allegations of Ellington's domination and control over the Judgement Debtors. The petition alleges that: as an officer of Strand, he had signatory authority for the Judgment Debtors (*see* NYSCEF Doc No. 186, petition ¶ 31); as Chief Legal Officer of HCM, he oversaw the litigation strategy against UBS (*see id.*); he directed the work of HCM employees and used them to perform work on personal matters (*see id.* ¶¶ 36-39); and, with respect to the 2017 Transfers and the ATE Policy, Dondero "delegated and entrusted" many decisions to Ellington (*id.* ¶ 31, exhibit 113 [NYSCEF Doc No. 118], Dondero deposition tr at 215:19-

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**                    **Page 31 of 48**
**Motion No.  011 013**

**APP 00249**

361 of 1405

P - 36

216:11), who "devised" the ATE Policy and "got the transaction approved and completed" (*id.*
¶¶ 64, 77).

The petition also alleges that the ATE Policy was not for the benefit of the Judgement
Debtors, because: (1) the 2017 Transfers to Sentinel were for more than four times what was
required under the ATE Policy for the premium and even exceeded the coverage amount (*see*
NYSCEF Doc No. 186, petition ¶¶ 72, 75); and (2) HFP received no benefit from the transfer, as
it was not one of the Insureds (*id.* ¶ 76). Additionally, it alleges that Ellington was one of the
ultimate beneficial owners of Sentinel (*id.* ¶ 80) and was, therefore, able to deplete the 2017
Transferred Assets for personal expenses after the transfer (*id.* ¶¶ 79, 98-119). Accepting these
allegations as true and construing the petition in the light most favorable to UBS (*see Allianz
Underwriters Ins. Co.*, 13 AD3d at 174), the petition sufficiently alleges that Ellington so
dominated the Judgement Debtors that they "serve[d] [his] purposes rather than [their] own"
*Deutsche Bank AG*, 2015 NY Slip Op 30163[U] at *18; *see Port Chester Elec. Constr. Corp.*, 40
NY2d at 657).

Finally, as already explained above, the allegations of intentional undercapitalization of
the Judgement Debtors to prevent UBS from collecting the Judgment "are sufficient to satisfy the
pleading requirement of wrongdoing which is necessary to pierce the corporate veil on an alter-
ego theory" (*Baby Phat Holding Co., LLC*, 123 AD3d at 407-408 [internal citation omitted]).
Therefore, the petition states a claim for piercing the corporate veils of the Judgement Debtors to
hold Ellington liable as their alter ego (*see Chase Manhattan Bank (Natl. Assn.) v 264 Water St.
Assoc.*, 174 AD2d 504, 505 [1st Dept 1991] [finding allegation sufficient to pierce the corporate
veil where "plaintiff specifically alleged that (the defendants) masterminded a scheme to denude
the subsidiary of its assets in order to render it unable to honor its obligations resulting in a loss

APP 00250

to plaintiff" and that "individual defendant dominated and controlled the corporation and caused the corporation to make fraudulent conveyances"]).

That the petition also alleges that Ellington was Dondero's second-in-command does not require a contrary result (*cf Patel v Pandya*, 2015 WL 4523283, *7, 2015 US Dist LEXIS 97665, *16 [DNJ July 27, 2015, No. 2:14-cv-08127 (WJM) [finding that the complaint sufficiently alleged that the companies were the alter egos of their owner as well as of the owner's "office manager" and "second in command"]; *Matter of Berisha*, 220 AD3d at 608-610 [finding that evidence of the defendant's equitable ownership, when opposed by evidence that he "merely provided assistance to his brother and brother-in-law . . . for which he was paid a salary," created issues of fact as to his domination and control, "precluding summary determination of the applicability of veil-piercing"]).

For the foregoing reasons, Ellington's motion to dismiss is denied with respect to the second claim. to the extent the claim seeks to hold Ellington liable as the Judgement Debtors' alter ego. The motion is also denied to the extent it seeks to dismiss the petition for lack of personal jurisdiction (*see Highland Crusader Offshore Partners, L.P.*, 184 AD3d at 122).

Having determined that alter ego liability is sufficiently pleaded against Dondero and Ellington, the court need not consider the alternate grounds for personal jurisdiction asserted against them.

B. Fraudulent Conveyances

The parties dispute the viability of the fraudulent conveyance claims and whether Dondero and Ellington may be held personally liable, as alter egos of Mainspring and Montage, respectively, for the allegedly fraudulent conveyances made to those entities. As "[a]n argument to pierce the corporate veil is not a cause of action in itself, but rather dependent on the action

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL       Page 33 of 48
Motion No. 011 013

APP 00251

38 of 105

P - 38

against the corporation," the court must first consider the viability of the underlying fraudulent conveyance claims (*Cortlandt St. Recovery Corp.*, 31 NY3d at 50 [internal citation omitted]). Regarding these claims, respondents argue that without an actionable fraudulent conveyance claim for the initial transfers to Sentinel in 2017, UBS may not avoid any of Sentinel's subsequent transfers, including the reimbursements paid to Ellington and the dividends issued to Mainspring and Montage. The parties dispute whether the 2017 Transfers are time-barred and whether the claim for actual fraudulent conveyance is sufficiently pleaded.

### 1. Choice of Law Analysis

The parties dispute which jurisdiction has the greater interest in applying its laws to the fraudulent conveyance claims. Respondents contend that, because fraudulent conveyance laws are conduct-regulating, the focus of the analysis should be on where the tort occurred. They reason that, because the Judgement Debtors were operated by personnel located in Texas who worked for HCM, a Texas-based investment manager, and funds were transferred from Sentinel, utilizing at least one Texas bank account (*see* NYSCEF Doc No. 84), Texas has the greater interest in regulating the conduct and protecting the reasonable expectations of those engaging in allegedly fraudulent conveyances within its borders. In addition, they argue that, should the court conclude that Texas law does not apply, then Bermuda and the Cayman Islands have the greater interest in applying their laws to transfers made by Bermuda and Cayman entities (i.e. CDO Fund and SOHC) to Cayman entities (i.e. Sentinel, Montage and Mainspring). UBS counters that New York has the greater interest in enforcing its fraudulent conveyance laws, as the claims in this proceeding are concerned with the enforcement of New York judgements.

Here, a conflict exists between New York and Texas with respect to the timeliness of UBS's claims for actual fraudulent conveyances based on the 2017 Transfers. The Texas

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL          Page 34 of 48
Motion No. 011 013

P - 39

APP 00252

Uniform Fraudulent Transfer Act contains a statute of repose. It provides, in pertinent part, that a claim for intentional fraudulent transfer "is extinguished" if it is not brought "within four years after the transfer was made . . . or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant" (*see* Tex Bus & Com Code Ann § 24.010 [a] [1]). This is substantially different to the applicable New York law, which provides that "[a] claim for actual fraud (Debtor and Creditor Law § 276) is timely if brought either within six years of the date that the fraud or conveyance occurs or within two years of the date that the fraud or conveyance is discovered or should have been discovered, whichever is longer" (*Patterson Belknap Webb & Tyler LLP v Marcus & Cinelli LLP*, 227 AD3d 505, 507 [1st Dept 2024] [internal citation omitted]).[4] While statutes of limitation are generally "matters of procedure" that are "governed by the law of the forum," statutes of repose are matters of substantive law and "fall within the course charted by choice of law analysis" (*Tanges v Heidelberg N. Am., Inc.*, 93 NY2d 48, 53, 55-56 [1999] [explaining that a statute of repose is substantive, because, unlike a statute of limitation, which "does not extinguish the underlying right, but merely bars the remedy," a statute a repose "s*erves as an absolute barrier that prevents . . . what might otherwise have been a cause of action from ever arising*" [internal quotation marks and citation omitted]).

A conflict also exists, with respect to these claims, between New York law and the laws of Bermuda and the Cayman Islands. Under New York's Debtor and Creditor Law ("DCL") § 276, which "addresses actual fraud, . . . proof of unfair consideration or insolvency" is not

---

[4] Notably, there is a dispute as to whether this is the applicable version of New York's law. In 2020, the Uniform Fraudulent Conveyance Act ("UFCA") was repealed and replaced by the Uniform Voidable Transaction Act. As explained below, the UFCA governs many of the issues raised on these motions. Therefore, unless indicated otherwise, all references to "Debtor and Creditor Law" or "DCL" refer to the UFCA.

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**          **Page 35 of 48**
**Motion No. 011 013**

P - 40

**APP 00253**

required (*Wall St. Assoc. v Brodsky*, 257 AD2d 526, 529 [1st Dept 1999]). Under the laws of Bermuda and the Cayman Islands, for such a transfer to be voidable, it must be made with the intent to defraud and the transaction must be for no consideration or significantly less than the value of the property transferred (*see* NYSCEF Doc No. 260, Lowe affirmation ¶¶ 27, 29, exhibits L [NYSCEF Doc No. 272], Cayman Is. Fraudulent Dispositions Law §§ 2, 4 [1]; M [NYSCEF Doc No. 273] Bermuda Conveyancing Act §§ 36A [1], 36C [1]).

As already explained, where conflicting conduct-regulating laws are at issue, "New York courts usually apply the law of the place where the tort occurred" (*Elson*, 283 AD2d at 115; *see Eccles*, 42 NY3d at 336). "[T]he place of the wrong is . . . where the last event necessary to make the actor liable occurred; that is where the plaintiffs' injuries occurred" (*Deutsche Bank AG*, 2015 NY Slip Op 30163[U] at *20 [internal quotation marks and citation omitted]; *see Taberna Preferred Funding II, Ltd. v Advance Realty Group LLC*, 45 Misc 3d 1204[A], 2014 NY Slip Op 51461[U], *10 [Sup Ct, NY County 2014] [stating that "(i)n fraud claims, the paramount concern of a court is the locus of the fraud (,) which ( ) is where the injury is inflicted, not where the fraudulent act originated" (internal quotation marks and citations omitted)]). "Further, as the purpose of fraudulent conveyance laws is to aid creditors who have been defrauded by the transfer of property, consideration of the residency of the parties, particularly the creditors, is also required to determine their reasonable expectations" (*Wimbledon Fund, SPC (Class TT) v Weston Capital Partners Master Fund II, Ltd.*, 184 AD3d 448, 450 [1st Dept 2020] [internal quotation marks and citations omitted]; *see Taberna Preferred Funding II, Ltd.*, 2014 NY Slip Op 51461[U] at *10-*11 [explaining that "(a)pplying foreign law to foreign (debtors) does not necessarily incentivize lawful conduct by the (debtor) in the jurisdiction where the injury occurred if that (debtor) is managed and operated from a different jurisdiction"]).

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL                Page 36 of 48
Motion No. 011 013

P - 41

APP 00254

Here, New York has a significant interest in applying its laws to the fraudulent conveyance claims (*see* discussion of New York's interest, *supra* at 20-21). "Since fraudulent conveyance law is an essential tool in ensuring that creditors' rights manifest into a real recovery, rather than a worthless, unrecoverable judgment, applying New York law is a sensible way to fulfill the parties' expectations" (*Taberna Preferred Funding II, Ltd.*, 2014 NY Slip Op 51461[U] at * 11). Texas' interest, on the other hand, is limited. While HCM managed the Judgment Debtors from its Texas offices, neither it nor the Judgment debtors are incorporated in Texas and no injury is alleged to have occurred there.[5] "Thus, the only interest that Texas has in this litigation is regulating the conduct of . . . foreign [entities] doing business within Texas when the conduct injures parties outside of Texas. That does not outweigh New York's significant interests in the litigation." (*Highland CDO Opportunity Master Fund, L.P.*, 270 F Supp 3d at 726.)

For previously stated reasons (*see* discussion of New York's interest, *supra* at 19-20), New York also has a greater interest in enforcing its fraudulent conveyance laws in connection with the 2017 Transfers by CDO Fund and SOHC than Bermuda and the Cayman Islands. As already explained, this is particularly so with regard to SOHC, which has no demonstrable ties to the Cayman Islands beyond the fact of its incorporation there (*see id.* at 20).

Accordingly, New York's law applies to the fraudulent conveyance claims.

2.  Statute of Limitations

As a preliminary matter, respondents contend that this claim is time barred under the relatively recent changes to Article 10 of New York's Debtor and Creditor Law, formerly known

---

[5] The petition does not state where HMC is incorporated and the submissions on these motions do not supply that information. However, according to the court in *Highland CDO Opportunity Master Fund, L.P.*, "HCM is incorporated in Delaware, not Texas" (270 F Supp 3d at 726).

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 37 of 48
Motion No.  011 013

P - 42

APP 00255

as the Uniform Fraudulent Conveyance Act ("UFCA"). The UFCA was repealed and replaced by the Uniform Voidable Transaction Act ("UVTA").

Respondents argue that the fraudulent conveyance claims must be dismissed as untimely under the UVTA, as this proceeding was commenced on February 8, 2023, more than four years after the 2017 Transfers and more than a year after their alleged discovery on February 10, 2021. Respondents insist that, despite the fact that the 2017 Transfers occurred prior to the UVTA's effective date, the UVTA is applicable, because the fraudulent transfer claim accrued upon discovery, on February 10, 2021, after the effective date

The UVTA does not apply to the 2017 Transfers. The historical note found after § 278 of the Debtor-Creditor law states that the new statute "**shall not apply to a transfer made or obligation incurred before [the effective date of the statute], nor shall it apply to a right of action that has accrued before such effective date.**"

Respondents' interpretation is contrary to this plain language. The word "nor" indicates that the UVTA "shall not apply" in either situation presented, whether it be a transfer before the effective date <u>or</u> the accrual of a claim before the effective date. Therefore, because the 2017 Transfers occurred before the effective date, under the plain language of the historical and statutory note, the UVTA does not apply.

Respondents rightly point out that a claim will always accrue after a transfer, as in the case of a fraud not being discovered until a later time (*see Guedj v Dana,* 11 AD3d 368, 368 [1st Dept 2004]) or where a judgment must be entered in order for the claim to accrue (*see Matter of Setters v AI Props. & Devs. (USA) Corp.*, 139 AD3d 492, 493 [1st Dept 2016]). However, this does not render "nor shall it apply to a right of action that has accrued before such effective date" superfluous. Its presence serves to emphasize the absence of its mirror opposite. Had the statute

APP 00256

intended otherwise, it would have provided that, in addition to "appl[ying] to a transfer made or obligation incurred on or after such effective date," it applied to causes of action that accrued on or after such date. As the statute does not so provide, the court shall not read such a provision into the statute (*see Corr*, 42 NY3d at 673). "[A] new statute is to be applied prospectively, and will not be given retroactive construction unless an intention to make it so can be deduced from its wording" (*Aguaiza v Vantage Props., LLC*, 69 AD3d 422, 423 [1st Dept 2010]).

Thus, the UFCA is the operative law in this proceeding and, unless indicated otherwise, all references to the DCL refer to the version effective prior to April 4, 2020 (see *Owens v. Turkiye Halk Bankasi A.S.,* 2021 WL 638975, at \*2 n. 2 (SDNY Feb. 16, 2021), *aff'd,* 2023 WL 3184617 [2d Cir. May 2, 2023]; see also *In re Diamond Fin. Co., Inc.*, 658 B.R. 748, 772 n. 18 [Bankr. EDNY 2024]["the amendments do not apply in this adversary proceeding because the transfers occurred before the effective date of the UVTA"]). The court in *Foley v Union de Banques Arabes et Francaises* (683 F Supp 3d 375 [SD NY 2023]), a case upon which respondents rely, adopted a contrary interpretation. However, this case appears to be against the weight of authority. In that case, the court treated a claim's accrual after the effective date as the determinative factor, despite the <u>transfer</u> having occurred before the effective date. This interpretation is clearly wrong as it ignores the language of the historical and statutory note that the new statute "**shall not apply to a <u>transfer</u> made". . . before such effective date**.

### 3. Sufficiency of the Pleadings

Respondents contend that the petition fails to state a claim for fraudulent conveyance, because the underlying contention, that the Judgement Debtors intended to defraud UBS by buying insurance to cover the Judgment, is implausible. Next, respondents argue that, because the petition does not specify the value of the assets each entity contributed to the 2017 Transfer,

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 39 of 48
Motion No. 011 013

P - 44

APP 00257

it fails to allege that the value of the insurance the Funds received was significantly less than the value of the assets they transferred. Respondents also contend that the remaining badges of fraud are insufficiently pleaded to support an intentional fraud claim, because: (1) there was no secret and hasty transfer, as the ATE policy was planned and executed over the course of several months; (2) there were no "dummy" entities involved, as all entities were pre-existing rather than created for the purpose of the transaction; and (3) Sentinel, a regulated insurance company, rather than the transferors, owned the assets after the 2017 Transfers. Finally, respondents argue that because UBS cannot demonstrate that the 2017 Transfers to Sentinel are voidable, neither are any of the subsequent transfers from Sentinel to Ellington, Montage and Mainspring.

UBS responds that the petition sufficiently alleges all of the badges of fraud and that respondents' contention that such allegations are "implausible" and attempts at raising issues of fact are inappropriate on a motion to dismiss on the pleadings.

DCL § 276 provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." To establish actual intent, a petitioner may "rely on 'badges of fraud' to support [its] case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent" (*Wall St. Assoc.*, 257 AD2d at 529 [internal quotation marks and citations omitted]). These include:

> "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance" (*id.*; *see also Matter of Wimbledon Fin. Master Fund, Ltd. v Bergstein*, 166 AD3d 496, 497 [1st Dept 2018]).

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**    **Page 40 of 48**
**Motion No. 011 013**

P - 45

**APP 00258**

Case 24-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
Exhibit P    Page 46 of 105

The allegations of fraudulent intent must be pleaded with particularity pursuant to CPLR 3016

(b) (*see Carlyle, LLC v Quik Park 1633 Garage LLC*, 160 AD3d 476, 477 [1st Dept 2018]).  On

a motion to dismiss pursuant to CPLR 3211, the court must accept the petition's factual

allegation as true and, "in the absence of proof that an alleged material fact is untrue or beyond

significant dispute, must not dismiss the [petition]" (*Wall St. Assoc.*, 257 AD2d at 526-527

[internal citations omitted]).

Here, the petition alleges numerous badges of fraud with sufficient particularity to state

a claim for actual fraudulent conveyance under DCL § 276 with respect to the 2017 Transfers.

The Petition alleges that the 2017 Transfers to Sentinel were carried out after negative summary

judgment outcomes in the Underlying Action, at a time when respondents anticipated a $1.2

billion judgment (*see* NYSCEF Doc No. 186, petition ¶¶ 61-64, exhibit 38 [NYSCEF Doc No.

44], HCM's Settlement Analysis [identifying risks to Dondero and the HCM-related entities

associated with the Underlying Action, including a $1.2 billion judgment, and analyzing how

transferring assets away from the transferors could obviate these risks]).

The petition also alleges that the ATE Policy was outside the usual course of business for

Sentinel.  Sentinel had never previously issued an after-the-even policy or a policy as large as the

ATE Policy and would not have had the means to pay on the policy without the 2017 Transferred

Assets (*id.* ¶¶ 66, 70).  Additionally, the petition alleges that outside counsel raised possible

issues with "the idea that the premium [would] be satisfied by the transfer of the hedge funds'

investment portfolios," as it risked the "'premium' [being] returned or . . . set aside as some

unlawful preference" (*id.* ¶ 72, exhibit 42 [NYSCEF Doc No. 48], email from Solomon Harris at

BC SEN0000745905).  CIMA is also alleged to have raised numerous concerns about the ATE

Policy, including that: no one could explain the "basis upon which the [2017 Transferred Assets]

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No.  011 013**

**Page 41 of 48**

P - 46

**APP 00259**

461 of 1405

had been valued on or about August 1, 2017 for the purpose of premium settlement"; and

Sentinel's actuary "was not involved in the determination of premium pricing . . . to any extent at

all" (*id.* ¶ 88, exhibit 67 [NYSCEF Doc No. 73], CIMA's Final Inspection Reports at BC

SEN0000078822, BC SEN0000078819).

Further, the petition alleges that Ellington and Dondero were involved with both sides of

the transaction (*see id.* ¶¶ 63-65, 77, 80) and that they retained control of the 2017 Transferred

Assets through their control of Sentinel as its ultimate beneficial owners and as the sole members

of the Sentinel Advisory Board (*see id.* ¶¶ 13, 14, 63, 71).

Finally, the petition alleges the inadequacy of consideration, as the 2017 Transfers to

Sentinel were for more than four times what was required under the contract for the premium and

exceeded the coverage of the policy (*see id.* ¶¶ 72, 75).

While respondents scoff at the implausibility of the fraudulent scheme set out in the

petition, they do not refute any of its allegations.

Respondents point to internal communications and documents demonstrating that "the

ATE policy was designed as a way for the Funds to settle with UBS" and that using all of their

assets as a premium payment was intended "to convert illiquid securities into cash" and to

"protect against crushing tax liability" (NYSCEF Doc No. 257, Ellington brief at 16, 17; *see*

NYSCEF Doc No. 46, HCM's Settlement Analysis at HCMUBS005254, HCMUBS005257-59).

However, this does not refute fraudulent intent, but merely creates an issue of fact. Neither does

the fact that UBS was ultimately able to recover a substantial portion of the 2017 Transferred

Assets through its settlement with Sentinel (*see* NYSCEF Doc No. 257, Ellington brief 17-18;

NYSCEF Doc No. 186, petition ¶ 98 n 21, exhibit 25 [NYSCEF Doc No. 31], Partial

Satisfaction-Piece for Post-Judgment Interest at 3) demonstrate that the ATE Policy was created

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**                    **Page 42 of 48**
**Motion No. 011 013**

P - 47

**APP 00260**

472 of 1405

for that purpose. This is especially so in light of the allegations that: Ellington and Dondero

never disclosed the existence of the ATE Policy; Ellington told UBS that CDO Fund and SOHC

were ghost funds; and it was only after Ellington and Dondero were removed from HCM, that

the Independent Board disclosed the existence of the ATE Policy (*see* NYSCEF Doc No. 186,

petition ¶¶ 90-92).

Respondents also rely on the fact that Sentinel had approximately $19.2 million in assets

and $17.6 million in equity in December 2016 (*see* NYSCEF Doc No. 257, Ellington brief at 17;

*see* NYSCEF Doc No. 55, Sentinel's December 2016 Financial Statements at HCMUBS001071).

However, this does not establish that Sentinel's subsequent transfers to Ellington, Montage and

Mainspring, occurring three to five years later (between 2019 and 2021) did not intrude into

2017 Transferred Assets. Additionally, the fact that the subsequent transfers were made at least

two years after the 2017 Transfers, does not "undermine[] the claim of fraudulent intent"

(*Carlyle, LLC*, 160 AD3d at 477), particularly as the petition alleges that dissipation of the 2017

Transferred Assets started shortly after issuance of the Phase I Judgment (*see* NYSCEF Doc No.

186, petition ¶¶ 99-101; *contra Carlyle, LLC*, 160 AD3d at 477 [ finding the "the timing of the

allegedly fraudulent transfers—beginning two years before the judgment debtors incurred the

subject debts—undermines the claim of fraudulent intent"]).

Respondents also contend that the allegation that "the Funds transferred assets 'valued at

over $105,647,679.00 to satisfy a $25,000,000 premium" is impermissibly vague and disregards

the economic substance of the transaction" (NYSCEF Doc No. 257, Ellington brief at 18,

quoting petition ¶ 72). They argue that the allegations of the petition refute UBS's claim that the

value of the insurance the Funds received was significantly less than the value of the transfers

they made, because: (1) each fund received a policy with a $100 million limit of liability; and

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No. 011 013**                                                    **Page 43 of 48**

P - 48

**APP 00261**                                48 of 105

FILED: NEW YORK COUNTY CLERK 03/25/2025 03:55 PM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 418
Case 21-03076-sgj   Doc 397-7   Filed 10/14/25   Entered 10/14/25 21:24:58   Desc
RECEIVED NYSCEF: 03/25/2025
Exhibit P   Page 49 of 105

(2) a review of the APA's Schedule A, listing the transferred assets, shows that CDO Fund contributed only about half, and SOHC contributed only a handful (*see* NYSCEF Doc No. 104, APA at BC SEN0000089127-28). Therefore, they argue, there is no basis for the allegation that each of the Funds transferred more value than the $100 million in insurance they received. However, as the stated purpose of the 2017 Transfer was to satisfy the premium of $25 million, the transfer of assets valued at more than four times that amount alleges an overpayment. Additionally, the statement that "each Fund received . . . an ATE policy with a $100 million limit of liability" is misleading (NYSCEF Doc No. 257, Ellington brief at 18). The $100 million limit was in the aggregate for all three Insureds, CDO Fund, SOHC and CDO Holding (*see* NYSCEF Doc No. 186, petition ¶ 75, exhibit 51 [NYSCEF Doc No. 57], ATE Policy at UBSPROD1973070). Moreover, respondents gloss over the allegation that HFP, one of the Judgement Debtors, received no consideration whatsoever, as it was not a named insured (*id.* ¶ 76).

Lastly, respondents point to the alternate valuations for the 2017 Transferred Assets, contained in the exhibits annexed to the petition: a valuation of $94 million in April 2017 (*see* NYSCEF Doc No. 46, HCM's Settlement Analysis at HCMUBS005261) and a valuation of $68 million in June 2018 (NYSCEF Doc No. 75, Sentinel Presentation to CIMA at UBSPROD2572277). Thus, they argue, the petition itself refutes any suggestion that the Funds overpaid for the $100 million ATE Policy. Considering the petition's allegation concerning the manner in which HCM employees generate these valuations, i.e. that there was no explanation for "the basis upon which the [2017 Transferred Assets] had been valued" (*id.* ¶ 88, exhibit 67 [NYSCEF Doc No. 73], CIMA's Final Inspection Reports at BC SEN0000078819), and the fact

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No. 011 013**

**Page 44 of 48**

P - 49

**APP 00262**

49 of 105

that neither valuation speaks to the value of the 2017 Transferred Assets at time of transfer, they do not refute the petition's allegation of overpayment.

For the foregoing reasons, the petition sufficiently alleges that the 2017 Transfers were actual fraudulent conveyances under DCL § 276 (*see Matter of CIT Group/Commercial Servs., Inc. v 160-09 Jamaica Ave. LP*, 25 AD3d 301, 303 [1st Dept 2006] [holding that "(g)iven the 'badges of fraud,' which include the close relationship among the parties to the transaction, the inadequacy of consideration, (the judgment debtor's) knowledge of (the petitioner's) claims and its inability to pay them, and the timing of the transfer . . . (a) sworn explanation that the transfer was in partial satisfaction of an antecedent rent debt (did) not negate the inference as to intent"]).

Respondents do not challenge the sufficiency of the allegations with respect to the subsequent transfer to Ellington, Mainspring and Montage, other than to challenge the underlying 2017 Transfers. Therefore, to the extent these motions seek to dismiss these turnover claims, the motions are denied.

### 4. Piercing the Corporate Veils of Mainspring and Montage

Dondero contends that there is no basis to hold him liable as Mainspring's alter ego, because the petition fails to allege the elements of veil-piercing in a nonconclusory way. UBS responds that this ignores the plethora of facts alleged that reveal his personal domination over Mainspring.

Ellington does not challenge the sufficiency of the allegations seeking to hold him liable as Montage's alter ego. Instead, he argues that the claim fails because he had only a 9% voting share in Montage, with the remaining 91% controlled by a trust for the benefit of the Cayman Islands Red Cross (*see* NYSCEF Doc No. 74, Sentinel email to CIMA at DISCSEN0008408,

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 45 of 48
Motion No. 011 013

P - 50

**APP 00263**

50 of 105

Case 21-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
Exhibit P    Page 51 of 105

DISCSEN0008410). UBS responds that, because Ellington guided the decision making of the

trustee of the ITA Trust, he was, in fact, controlling Montage's voting shares.[6]

Here, the petition sufficiently alleges that Dondero is Mainspring's alter ego. In addition

to alleging that "Dondero is the ultimate beneficial owner of Mainspring" (NYSCEF Doc No.

186, petition ¶ 13), who "owned 99.5% of Mainspring" (*id.* ¶ 113), it alleges that he used

Mainspring to enter into fake service agreements in order to pay HCM insiders bonuses that they

were otherwise ineligible to receive in HCM's bankruptcy. The petition alleges that Mainspring

received no benefit from these agreements and would even pay the obligations of other entities.

In this way, the petition alleges, Dondero used Mainspring to reward HCM employees who were

loyal to him. (*See id.* ¶¶ 119-128.) Viewed in the light most favorable to petitioner, these

allegations permit the inference that Mainspring "is a 'dummy' for its individual stockholder[]

who [is] in reality carrying on the business in [his] personal capacit[y] for purely personal rather

than corporate ends" (*Port Chester Elec. Constr. Corp.*, 40 NY2d at 657 [internal quotation

marks and citation omitted]).

The petition also sufficiently alleges that Dondero used his domination over Mainspring

"to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury" (*First

Capital Asset Mgt.*, 300 AD2d at 116, citing *Matter of Morris*, 82 NY2d at 141), as it alleges that

he used his position as the ultimate beneficial owner of Mainspring, which owned 70% of

Sentinel, to compel Sentinel to issue dividends, thereby draining assets that would have

---

[6] UBS made this argument during oral arguments on these motions (*see* July 8, 2024 tr at 83:22-
84:8). In its brief in opposition to Ellington's motion, UBS mistakenly assumes that "Ellington
does not dispute, and therefore concedes, that UBS sufficiently alleged he is an alter ego of
Montag" (NYSCEF Doc No. 333, opposition brief to Ellington's motion at 7).

APP 00264

otherwise been available for collection by UBS (*see* NYSCEF Doc No. 186, petition ¶¶ 113-119).

Accordingly, the petition sufficiently alleges that Dondero was Mainspring's alter ego.

As for Ellington's claim that he did not control the voting shares of Montage, it is contradicted by the very document he cites. In explaining Sentinel's organization chart to CIMA (*see* NYSCEF Doc No. 74, Sentinel email to CIMA at DISCSEN0008410), a Beecher employee states that "ITA acts as trustee of the shares . . . and holds the shares in trust, with the Cayman Islands Red Cross as the beneficiary" (*id.* at DISCSEN0008408). As the petition alleges that Dondero and Ellington were the sole members of the Sentinel Advisory Board of ITA Trust, and that they "guide[d] the decision making of the Trustee of the ITA Trust in its role as an indirect shareholder in Sentinel" (*id.* ¶ 71, exhibit 66 [NYSCEF Doc No. 72] at BC SEN0000076075), this contradicts Ellington's claim that he did not control Montage.

For the foregoing reasons, the motions to dismiss are denied with respect to the second claim to the extent that the claim seeks to hold Dondero liable as the alter ego of Mainspring and to hold Ellington liable as the alter ego of Montage.

C. Converting the Special Proceeding into a Plenary Action

Respondents contend that this proceeding should be converted into a plenary action, because the fact-laden claims at issue are inappropriate for summary disposition. UBS responds that the request should be denied, because there is no basis for it.

Article 52 of the CPLR provides for the enforcement of money judgments and, where the asset sought is not in the possession of the judgment debtor, the article authorizes a turnover proceeding to be brought against the transferee (*see* CPLR 5225 [b]). In fact, "when the 'property' of a judgment debtor is physically held by a third party, the applicable provision is

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No.   011 013**

                                                                          **Page 47 of 48**

                                                                                    P - 52

**APP 00265**

CPLR 5225 (b), and a special proceeding is required" (*AC Penguin Prestige Corp. v Two Thousand Fifteen Artisanal LLC*, 233 AD3d 576, 577 [1st Dept 2024].) Further, a special proceeding brought pursuant to CPLR 5225 (b) "obviates the necessity for a plenary action" under the DCL (*Siemens & Halske GmbH. v Gres*, 32 AD2d 624, 624 [1st Dept 1969]; *see Matter of WBP Cent. Assoc., LLC v DeCola*, 50 AD3d 693, 694 [2d Dept 2008]) and "may be maintained under an alter ego theory" (*Matter of Rockefeller v Statement Servs., Corp.*, 204 AD3d 922, 924 [2d Dept 2022] [internal citation omitted]).

Based on the foregoing, the request to convert this turnover proceeding into a plenary action is denied. However, petitioner has now charted its course and should not complain later should it need more recourse to discovery than this proceeding will permit.

Accordingly, it is hereby

ORDERED that the motion of respondent Scott Ellington (motion sequence number 011) to dismiss the petition is denied; and it is further

ORDERED that the motion of respondent James Dondero (motion sequence number 013) to dismiss the petition is denied; and it is further

ORDERED that respondents are directed to serve their answers to the petition within 20 days after the electronic filing of this decision and order; and it is further

ORDERED that counsel are directed to appear for a status conference over Microsoft Teams on April 2, 2025 at 11:00 a.m.

| | | |
|---|---|---|
| 25 | | |
| 3/28/2025 | | *mle* |
| **DATE** | | **HON. MELISSA A. CRANE** |
| | | **J.S.C.** |

| CHECK ONE: | CASE DISPOSED | X | NON-FINAL DISPOSITION |
|---|---|---|---|
| | GRANTED | X DENIED | GRANTED IN PART | OTHER |
| APPLICATION: | SETTLE ORDER | | SUBMIT ORDER |
| CHECK IF APPROPRIATE: | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL      Page 48 of 48
Motion No.  011 013

P - 53

**APP 00266**

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| | | | |
|---|---|---|---|
| PRESENT: | HON. MELISSA A. CRANE | PART | 60M |
| | *Justice* | | |

-------------------------------------------------------------------X

| | |
|---|---|
| UBS SECURITIES LLC, UBS AG LONDON BRANCH, | **INDEX NO.** 650744/2023 |
| Plaintiff, | **MOTION DATE** 02/26/2024, 02/26/2024 |
| - v - | **MOTION SEQ. NO.** 011 013 |

JAMES DONDERO, SCOTT ELLINGTON, HIGHLAND CDO
HOLDING COMPANY, HIGHLAND CDO OPPORTUNITY
MASTER FUND, L.P., HIGHLAND FINANCIAL PARTNERS,
L.P., HIGHLAND SPECIAL OPPORTUNITIES HOLDING
COMPANY, CLO HOLDCO, LTD., MAINSPRING, LTD.,
MONTAGE HOLDINGS, LTD.,

**DECISION + ORDER ON
MOTION**

Defendant.

-------------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 011) 256, 257, 258, 259,
260, 261, 262, 263, 264, 265, 266, 267, 268, 269, 270, 271, 272, 273, 274, 275, 333, 334, 335, 336, 337,
338, 339, 340, 341, 342, 343, 344, 345, 346, 347, 348, 349, 350, 351, 352, 353, 354, 355, 356, 357, 366,
367

were read on this motion to/for                     DISMISS                     .

The following e-filed documents, listed by NYSCEF document number (Motion 013) 280, 281, 282, 283,
284, 285, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 300, 301, 302, 303, 304,
305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 325,
326, 327, 328, 329, 330, 331, 332, 368, 369, 370, 371, 372, 373, 374, 375, 376, 377, 378, 379, 380, 381,
382, 383, 394, 395, 416

were read on this motion to/for                     DISMISS                     .

Motion sequence numbers 011 and 013 are consolidated for disposition.

Petitioners UBS Securities LLC and UBS AG London Branch (together, "UBS") bring

this turnover proceeding under CPLR Article 52 to enforce the judgments that UBS obtained in

*UBS Secs. LLC v Highland Cap. Mgmt., L.P.,* index No. 650097/2009 (Sup Ct, NY County) (the

"Underlying Action") against respondents Highland CDO Opportunity Master Fund, L.P. ("CDO

Fund"), Highland Special Opportunities Holding Company ("SOHC," together with CDO Fund,

the "Funds"), and Highland Financial Partners, L.P. ("HFP," together with the Funds, the

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No. 011 013**

Page 1 of 48

P - 54

**APP 00267**

54 of 105

"Judgement Debtors"). The petition asserts four causes of action. The first claim is for turnover

of certain allegedly fraudulent transfers, asserted against respondents CLO HoldCo, Ltd. ("CLO

HoldCo"), Scott Ellington ("Ellington"), Mainspring, Ltd. ("Mainspring"), and Montage

Holdings, Ltd. ("Montage"). In its second claim, UBS seeks to: (i) pierce the corporate veils of

the Judgment Debtors to hold respondents James Dondero ("Dondero") and Ellington personally

liable for the judgments in the Underlying Actions; (ii) pierce the corporate veils of Mainspring

and Montage to hold Dondero (as alter ego of Mainspring) and Ellington (as alter ego of

Montage) personally liable for the allegedly fraudulent transfers made to these entities; and (iii)

reverse-pierce the corporate veil of respondent Highland CDO Holding Company ("CDO

Holding"), a wholly owned subsidiary of HFP, to hold CDO Holding liable, as the alter ego of

HFP, for the allegedly fraudulent transfers made in 2010 to CLO HoldCo and for HFP's portion

of the judgments in the Underlying Action. The petition additionally asserts two now stayed

claims for violations the Racketeer Influence and Corrupt Organizations Act ("RICO").

Ellington and Dondero (in motion sequence numbers 011 and 013, respectively) move to

dismiss the petition pursuant to CPLR 404 (a) and 3211 (a) (1), (5), (7), and (8).

I.    Background

The following facts are taken from the petition and are presumed to be true for purposes

of the these motions (*see Allianz Underwriters Ins. Co. v Landmark Ins. Co.*, 13 AD3d 172, 174

[1st Dept 2004]).

A.    Dondero and Ellington's Alleged Control Over a Web of Entities

Dondero, a resident of Texas, co-founded Highland Capital Management, L.P. ("HCM")

in 1993 and was its majority owner, President, and Chief Executive Officer until his removal in

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL        Page 2 of 48
Motion No. 011 013

P - 55

APP 00268

2020 (NYSCEF Doc No. 186, petition ¶¶ 6, 27). Dondero exercised control over HCM and its

web of funds and other entities, in part, through his status as the sole stockholder and director of

Strand Advisors, Inc. ("Strand"), HCM's general partner (*id.* ¶ 29). According to the expert

report in the Underlying Action, from his position as President and majority owner of HCM,

Dondero controlled HCM and many related entities— including SOHC, CDO Fund, Highland

Financial Corp. ("HFC"), HFP, and CDO Holding (*id.* ¶¶ 28, 33, exhibit 2 [NYSCEF Doc No.

8], Dudney Report at 40-41). Dondero also served as chairman of HFP's board of directors, as

the sole director of SOHC, and as President of the ultimate general partner of CDO Fund.

Through these various positions, Dondero was responsible for the day-to-day operations of HFP,

SOHC and CDO Fund. (*See id.* ¶¶ 28, 33, exhibit 2 [NYSCEF Doc No. 8], Dudney Report at 4-

5, 41-42). Further, Dondero was able to alter the Judgment Debtors' structures to ensure his

control. For example, "[i]n 2009, Dondero eliminated the requirement that HFP have

independent directors and made himself [its] sole director" and, thus, "the direct decision maker

for HFP and its subsidiaries, including SOHC and CDO Holding" (*id.* ¶ 33, exhibit 88 [NYSCEF

Doc No. 94], email with Apr. 9, 2009 HFP board minutes at UBSPROD1854773,

UBSPROD1854782 [stating that the Independent Directors were eliminated and Dondero was

left solely responsible for the "management and operation" of HFP]; exhibit 113 [NYSCEF Doc

No. 118], Dondero deposition tr at 48:8-13 [admitting that he was "generally" the "decision

maker" for HFP and its subsidiaries]).

Ellington, who also resides in Texas, was an officer of Strand. He was also HCM's Chief

Legal Officer and General Counsel from 2010 until his removal in January 2021. (*Id.* ¶¶ 7, 27,

31.) According to UBS, "Ellington operated as one of Dondero's top lieutenants and confidants"

(*id.* ¶ 27). "Dondero delegated and entrusted many decisions related to SOHC, CDO Fund, and

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 3 of 48
Motion No. 011 013

P - 56

APP 00269

56 of 105

related entities to Ellington, including signatory authority and litigation strategy" (*id.* ¶ 31 [internal quotation marks omitted]; *see id.*, exhibit 50 [NYSCEF Doc No. 56], documents transferring interest in a limited partnership at UBSPROD2630461-463 [showing Ellington's signature on behalf of CDO Fund to transfer assets]).

HCM and its related entities, including the Judgement Debtors, "utilized the same offices, employees, and internal counsel" (*id.* ¶ 35, exhibit 92 [NYSCEF Doc No. 98], Cash Warehouse Agreement ¶ 9 [listing HCM's Dallas office for CDO Fund and SOHC], exhibit 121 [NYSCEF Doc No. 194], Leventon deposition tr at 31:6- 19 [explaining that various entities, including SOHC, would have their business offices "co-located" with HCM's office]). HCM's employees performed all work for all HCM-related entities based on instructions from Dondero and Ellington (*id.* ¶¶ 34-36). Employees also regularly worked on personal matters for Dondero and Ellington. For example, HCM employees handled Dondero's divorce, litigated a lemon law claim on his behalf and managed tenant issues at a building he owned (*id.* ¶ 37). Personal work for Ellington included conducting diligence and analysis for personal investments, paying rent on a warehouse he leased, and managing his personal trust (*id.* ¶ 39). Regardless of whether they performed work for a specific entity or worked on personal matters for Dondero or Ellington, employees received all their compensation from HCM (*id.* ¶¶ 36-38). As Ellington explained during deposition, HCM compensation was "the only compensation . . . that anyone ever received" and it was based on the "amalgamation of total efforts as directed by Mr. Dondrero as the [General Partner]." This included "personal assignments for Mr. Dondero, [because] it was still seen as value to Mr. Dondero as the GP, and he set the overall compensation numbers." (*Id.* ¶ 34, exhibit 117 [NYSCEF Doc No. 192], Ellington deposition tr at 113:5-16.)

650744/2023 UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL
Motion No. 011 013

Page 4 of 48

P - 57

**APP 00270**

57 of 105

"HFP and its subsidiaries did not employ any specific limitations or procedures that governed when one HFP subsidiary could cover the debt of HFP or another subsidiary" (*id.* ¶ 52). HFP freely used the assets of its wholly owned subsidiary, CDO Holding (*see id.* ¶¶ 11, 52, 53). In 2008, to cover SOHC losses, HFP withdrew about $15 million from CDO Holding (*id.* ¶ 53). Both transfers, from CDO Holding to HFP and from HFP to SOHC, were approved with a one-word email from HFP's Chief Operating Officer (*id.* ¶¶ 52, 53). "HFP also used money from CDO Holding to pay legal invoices related to the Underlying Action, even though CDO Holding was not a party" (*id.* ¶ 53). On another occasion, also in 2008, SOHC recorded a dividend of $10.5 million to HFP, that HFP then purportedly paid to CDO Holding. In reality, the money moved directly from SOHC to CDO Holding. (*Id.* ¶ 54.) That same month, "HFP also raised $40 million from other HCM entities and transferred the money to CDO Holding to distribute it" (*id.* ¶ 54, exhibit 2 [NYSCEF Doc No. 8], Dudney Report at 43, 48).

The expert in the Underlying Action concluded that "'Dondero exercised his ability to dominate and control HCM, SOHC, CDO Fund and HFP, amongst other [HCM] [e]ntities,' to his own benefit, including to 'authorize loans to himself' and facilitate transfers among these entities— 'which were not at arm's length or executed in accordance with corporate formalities'" (*id.* ¶ 33, quoting NYSCEFF Doc No. 8, Dudley Report at 54-56). As an example, the expert pointed to a $3.7 million payment made to Dondero in December 2008. This was purportedly a repayment of a short-term loan to CDO Holding. However, the expert could find no evidence of a loan agreement and the funds originated from SOHC. (NYSCEFF Doc No. 8, Dudley Report at 48, 54.) More specifically, "'as part of a single set of instructions to Bank of New York Mellon, SOHC transferred $3.7 million to HFP, which was then transferred to CDO Hold[ing]

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL          Page 5 of 48
Motion No. 011 013

P - 58

**APP 00271**

58 of 105

FILED: NEW YORK COUNTY CLERK 03/25/2025 03:55 PM
INDEX NO. 650744/2023

NYSCEF DOC. NO. 415
Case 21-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
RECEIVED NYSCEF: 03/25/2025

Exhibit P    Page 59 of 105

and ultimately to James Dondero'" (NYSCEF Doc No. 186, petition ¶ 54, quoting NYSCEF Doc No. 8, Dudley Report at 48).

### B. The Underlying Action and the Allegedly Fraudulent Transfers

In 2007 and 2008, UBS agreed to pursue a complex securitization transaction involving collateralized debt obligations and collateralized loan obligations with HCM, CDO Fund and SOHC (the "Knox Transaction") (*id.* ¶ 41). The warehouse agreements governing the transaction (the "Knox Agreements") contain forum selection clauses, by which UBS, CDO Fund and SOHC agreed to submit to the exclusive jurisdiction of New York courts (*id.* ¶ 18, exhibit 92 [NYSCEF Doc No. 98], Cash Warehouse Agreement ¶ 15, exhibit 93 [NYSCEF Doc No. 99], Synthetic Warehouse Agreement ¶ 15). As part of the transaction, CDO Fund and SOHC agreed to be responsible for 100% of any losses (*id.* ¶ 42). They breached this obligation as losses continued to mount amid the 2008 financial crisis. In December 2008, losses had grown to $519,374,149 and UBS terminated the Knox Agreements (*id.* ¶ 43).

In February 2009, UBS commenced the Underlying Action against HCM, CDO Fund, SOHC and several other affiliated entities, including HFP, for breach of the Knox Agreements (*id.* ¶ 44).

In late October 2010, the court in the Underlying Action heard arguments on the defendants' motion to dismiss UBS's claim to hold HFP liable as SOHC's alter ego (*id.* ¶ 49). UBS claims that Dondero and Ellington, anticipating a negative outcome, acted to transfer HFP's assets out of the reach of any future UBS judgments (*id.* ¶¶ 49, 51). On December 23, 2010, CDO Holding, one of the primary repositories of HFP's assets, transferred substantially all its assets, valued at $39,638,160, to CLO HoldCo in exchange for $6,597,862.00 in cash and a promissory note for $32,801,593.00 plus interest payable in fifteen years (the "2010 Transfer")

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL
Motion No. 011 013

Page 6 of 48

P - 59

APP 00272

59 of 105

(*id.* ¶¶ 51, 52, 59). CLO HoldCo is a Cayman Islands company and a wholly owned subsidiary of Charitable DAF Fund, L.P., that Dondero indirectly controls and has funded from his personal assets, his family trusts, and HCM (*id.* ¶ 12). It was incorporated on December 13, 2010, specifically for the 2010 Transfer (*id.* ¶ 55).

In March 2017, the Judgement Debtors suffered summary judgment losses and Dondero and Ellington anticipated a $1.2 billion judgment (*id.* ¶¶ 61, 62, 64). They then devised a way for the Judgement Debtors to transfer all their remaining assets (the "2017 Transfers") to Sentinel Reinsurance, Ltd. ("Sentinel"). The Judgement Debtors would transfer their assets, pursuant to an attendant Asset Purchase Agreement (the "APA"), as payment of the premium for an after-the-event insurance policy (the "ATE Policy") to insure CDO Fund, SOHC and CDO Holding (together, the "Insureds") against liability in the Underlying Action (*id.* ¶¶ 63, 64). During the development of the ATE Policy, Sentinel's outside counsel raised concerns about the "legal validity of such a transfer," warning that using the "hedge funds' investment portfolios" to satisfy the premium would put "these assets . . . beyond the reach of the plaintiffs in the [Underlying Action]" and risked the "'premium' [being] returned or . . . set aside as some unlawful preference" (*id.* ¶ 72, exhibit 42 [NYSCEF Doc No. 48], email from Solomon Harris at BC SEN0000745905).

In August 2017, Dondero executed the ATE Policy and the APA, transferring assets valued at $105,647,679.00 (the "2017 Transferred Assets") to satisfy a $25,000,000 premium (*id.* ¶ 72). The face value of the transferred cash and promissory notes alone was nearly twice the ATE Policy's premium (*see id.* ¶ 73, exhibit 98 [NYSCEF Doc No. 104], APA at BC SEN0000089127-28 [listing assets]). Dondero signed the ATE Policy on behalf of all the

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL          Page 7 of 48
Motion No. 011 013

APP 00273

60 of 105

P - 60

Insureds and the APA on behalf of all transferors (*id.* ¶ 77). According to UBS, he also attempted "to sign a corollary to the APA on behalf of the [t]ransferors and Sentinel" (*id.*).

Under the ATE Policy, Sentinel agreed to indemnify CDO Fund, SOHC and CDO Holding for up to a $100 million, in the aggregate, against any adverse judgment or settlement with UBS (*id.* ¶ 75, exhibit 51 [NYSCEF Doc No. 57], ATE Policy at UBSPROD1973070). Although not a party to the Underlying Action, CDO Holding was included among the Insureds because, as a primary asset repository for HFP, it had liability (*see id.* ¶ 75, exhibit 121 [NYSCEF Doc No. 194], Leventon deposition tr at 32:10-15 [stating that any collection against HFP "would then expose CDO Hold[ing]'s assets to seizure"]). CDO Opportunity Fund, HFC, and HFP also transferred their assets to Sentinel. However, they were not insured under the ATE Policy. Notably, CDO Opportunity Fund and HFC were not party to the Underlying Action. (*Id.* ¶ 76, exhibit 98 [NYSCEF Doc No. 104], APA at BC SEN000089127-28.)

Ellington devised the ATE Policy without any input from Sentinel or Beecher Carlson ("Beecher"), Sentinel's insurance manager (*id.* ¶ 65). The terms of the policy were carefully tailored to enable the Insureds to claim reimbursements unrelated the Underlying Action. First, the terms were revised to permit reimbursement even if the Insureds could not afford to litigate the Underlying Action (*id.* ¶ 69). Then, coverage was extended to include Insureds' "own costs and expenses," and this was later broadened to include the "costs and expenses of the Representative and other service providers in the normal course, including related tax, which are incurred during the conduct of the legal action on behalf of the insured" (*id.* ¶ 69, exhibit 42 [NYSCEF Doc No. 48] email exchange between HCM's Assistant General Counsel and Solomon Harris at BC SEN0000745902-03 [finalizing the terms of the ATE Policy]).

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL        Page 8 of 48
Motion No. 011 013

APP 00274

P-61

61 of 105

Case 21-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
Exhibit P    Page 62 of 105

Sentinel is a Cayman Island based reinsurance company (*id.* ¶ 63). Respondent Montage, a Cayman Islands company of which Ellington is the ultimate beneficial owner, owns 30% of Sentinel and respondent Mainspring, a Cayman Islands company of which Dondero is the ultimate beneficial owner, owns the remaining 70% (*id.* ¶¶ 13, 14, 63, exhibit 68 [NYSCEF Doc No. 74], email to the Cayman Islands Monetary Authority at DISCEN0008410 [containing chart of Sentinel's ownership structure]). "Dondero tasked Ellington with setting up and managing Sentinel through HCM's in-house legal team" (*id.* ¶ 80). Until 2021, Sentinel was run exclusively by HCM employees, who took direction from Ellington and Dondero (*id.*).

Dondero and Ellington also arranged to be appointed as sole members of the Sentinel Advisory Board of ITA Trust, the entity with ultimate voting control over Sentinel. Although Sentinel had been operating for several years, Dondero and Ellington's tenure on the Sentinel Advisory Board commenced around the same time as the ATE Policy and APA were executed. (*See id.* ¶ 71, exhibit 66 [NYSCEF Doc No. 72], Sentinel's board minutes with annexed Aug. 10, 2017 resolution of ITA Trust at BC SEN0000076075 [establishing the advisory board and appointing Dondero and Ellington as its sole members].) As the sole members of the Sentinel Advisory Board, Dondero and Ellington "guide[d] the decision making of the Trustee of the ITA Trust in its role as an indirect shareholder in Sentinel" (*id.*).

The ATE Policy was the first and only time that Sentinel issued an after-the-event policy. Previously, it had only issued director and officer liability policies to Dondero and Ellington-related entities and these policies contained significantly more modest coverage limits than that of the ATE Policy. (*Id.* ¶ 66.) Additionally, without the 2017 Transferred Assets, Sentinel did not have the means to pay the $100 million under the ATE Policy. Based on an actuary's limited analysis of the ATE Policy, "[e]ven under reasonably optimistic assumptions," the premium was

P - 62

**APP 00275**

62 of 105

going to be exceeded (*id.* ¶ 70, exhibit 41 [NYSCEF Doc No. 47], Bartlett Actuarial Group,

Ltd.'s analysis of the ATE Policy at BC SEN0000745987). As of December 2016, Sentinel had

$19,193,823.23 in total assets, $5,886,746.39 of which were cash (*id.* ¶ 66).

In 2018, "Sentinel (on behalf of Dondero and Ellington) tried to hide the fraudulent

nature of the transfers by ascribing only $68 million in value to the 2017 Transferred Assets" (*id.*

¶ 84). However, this did not resolve the issue of the obvious overpayment for the premium.

Beecher noted that the failure to "return [] overpayment of premium, [would] give[] rise to the

question 'is this an arms-length transaction?'" (*id.*, exhibit 55 [NYSCEF Doc No. 61], email

exchange between HCM and Beecher at BC SEN0000707457). In June 2018, Sentinel executed

endorsements to the ATE Policy, one of which adjusted the premium to $68,362,333.62,

purportedly "to include the total fair value of received assets" (*id.* ¶¶ 85, 86, exhibit 52

[NYSCEF Doc No 58], endorsements at DISCEN0007912).

The Cayman Island Monetary Authority ("CIMA") conducted an onsite inspection of

Sentinel in March 2019 (*id.* ¶ 88). CIMA raised numerous concerns regarding the ATE Policy

and the APA. For example, CIMA found that Sentinel's actuary "was not involved in the

determination of premium pricing . . . to any extent at all" (*id.,* exhibit 67 [NYSCEF Doc No.

73], CIMA's Final Inspection Reports at BC SEN0000078822). It also found that those charged

with governance could not explain: "the basis upon which the [2017 Transferred Assets] had

been valued on or about August 1, 2017 for the purpose of premium settlement"; "the reason

why the information that was relied on to value the [2017 Transferred Assets] could not be

readily provided to the auditors upon request"; and "why the premium was adjusted from US$25

million to US$68.3 million without a commensurate adjustment to the indemnity limit provided

or why the initial pricing for the policy was subsequently deemed not sufficient." CIMA

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL                    Page 10 of 48
Motion No. 011 013

P - 63

APP 00276

concluded that these facts, as well as the seven-fold increase in Sentinel's portfolio due to the 2017 Transferred Assets, "cast significant doubt on the economic substance and business purpose of the transactions relating to the ATE coverage" *(id.*, at BC SEN0000078819).

In the meantime, the Underlying Action advanced. The court bifurcated the trial into two phases (NYSCEF Doc No. 186, petition ¶ 1). At the end of phase one, by decision and order dated November 14, 2019, the court awarded UBS $1,042,391,031.79, ordering CDO Fund to pay $531,619,426.24 and SOHC to pay $510,771,605.55 ("Phase I Judgment") *(id.* ¶ 2, exhibit 11 [NYSCEF Doc No. 17], Phase I Judgment at 2-3). Prior to trial of the second phase, HCM filed for bankruptcy, staying the Underlying Action.

UBS alleges that "[i]n the months after the November 2019 Phase I [Judgment], Dondero and Ellington spent, transferred, and otherwise dissipated the 2017 Transferred Assets" and that "[t]hey did this in two main ways" *(id.* ¶ 99). First, Ellington sough reimbursement from the ATE Policy for personal expenses *(id.* ¶ 100). Second, Dondero and Ellington directed Sentinel to pay "dividends" to Mainspring and Montage *(id.* ¶ 101). In this way, UBS alleges, Dondero and Ellington exercised their control over Sentinel to enrich themselves and to diminished the assets available to UBS to satisfy its judgments *(id.* ¶ 98).

Ellington is alleged to have made the following improper reimbursement claims: (1) on December 16, 2019, for $21,557.04 in expenses for travel to Los Angeles, New York City, and Chicago *(id.* ¶ 104); (2) on December 19, 2019, for $318,934.88 in expenses for a single day in Austin and seven days in Las Vegas, which included $42,324 in charges from a single night at a Las Vegas strip club and $97,706.19 in charges at a Las Vegas nightclub *(id.* ¶ 105); (3) on January 30, 2020, for reimbursement of $78,841.93 in expenses for personal trips to London and Paris with his girlfriend *(id.* ¶ 108) and $140,000 in expenses for a trip to Toronto that included

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 11 of 48
Motion No. 011 013

P - 64

**APP 00277**

641 of 1405

$43,353.54 spent on a private jet (*id.* ¶ 109); and (4) on March 12, 2020, for $273,662.82 in expenses for a six-day trip to London, that included approximately $18,000 in airfare for three individuals unaffiliated with Sentinel and $75,914.86 spent in a single day at two restaurants and a night club (*id.* ¶ 110). Sentinel reimbursed all of these expenses without questioning their validity, relying on Dondero and Ellington's determinations, as the ultimate beneficial owners of Sentinel, that such reimbursements were appropriate (*see id.* ¶¶ 104, 105-107, 111-112).

 In January 2020, an independent board of directors of Strand (the "Independent Board") took over HCM's operations, management of its assets, and its bankruptcy proceeding (*id.* ¶ 45).

On April 24, 2020, Sentinel paid $6.4 million in dividends to Mainspring and Montage. $4,480,000.00 was paid to Mainspring, as Dondero's 70% share of the dividend. $1,920,000.00 was paid to Montage, as Ellington's 30% share of the dividend (*id.* ¶ 114).

In late 2020, UBS participated in bankruptcy court-ordered mediation. At this time, Ellington repeatedly told UBS that CDO Fund and SOHC were "ghost funds" (*id.* ¶ 46, exhibit 87 [NYSCEF Doc No. 93] Aug. 15, 2020 Ellington email at UBSPROD1738891 [stating that the Funds were "ghost funds . . . that (did) not have directors, custodians, administrators, bank accounts etc. that s(a)t dormant and NO ONE kn(ew) what they truly retain(ed)" and that "UBS (was) aware of this situation . . . because (Ellington) ha(d) personally discussed it with (Andy Clubok, UBS's counsel,) several dozen times"]). Neither Ellington nor Dondero ever disclosed the existence of the ATE Policy to UBS, the bankruptcy court or the Independent Board (*id.* ¶ 91).

On January 12, 2021, a year after the Phase I Judgment, Sentinel paid another $1,750,000.00 to Mainspring and $750,000.00 to Montage (*id.* ¶ 117). UBS alleges that the issuance of these dividends, as well as the April 2020 dividends, were against a representation

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL
Motion No. 011 013

Page 12 of 48

P - 65

APP 00278

Case 21-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
Exhibit P    Page 66 of 105

that Matthew DiOrio ("DiOrio"), Managing Director of HCM and trusted lieutenant to Ellington

and Dondero (*id.* ¶¶ 36, 40), had made to Beecher in 2018— that Sentinel would "not be

entertaining any dividend issuance while the ATE policy [was] active" (*id.* ¶ 115, exhibit 62

[NYSCEF Doc No. 68] at DISCSEN0006464-65).  In addition, UBS alleges that the second

dividend violated CIMA's regulations, requiring that CIMA be notified before a dividend is

issued.  UBS points to the notice Sentinel provided CIMA three months after the fact, in which it

represented that it was "notifying the Authority of a $2,500,00 dividend *to b*e declared and paid"

(*id.* ¶ 117, exhibit 91 [NYSCEF Doc No. 97] at BC SEN0000083961 [emphasis added]).

Sentinel had no schedule for issuing dividends to Mainspring and Montage and did so at

the request of its ultimate beneficial owners, Dondero and Ellington (*id.* ¶ 113, 116, exhibit 111

[NYSCEF Doc No. 190], DiOrio deposition tr at 195:12-197:3).  As DiOrio explained during

deposition, Ellington and Dondero "could ask [for dividends] every day of the year," and

Sentinel's board would have to approve it (*id.* ¶ 116, exhibit 111 [NYSCEF Doc No. 190],

DiOrio deposition tr at 196:13-14).

According to UBS, Dodero and Ellington used some of these dividend payments to make

bonus payments to statutory insiders, including Ellington, after the bankruptcy court denied

HCM's request to make such bonus payments (*see id.* ¶¶ 119, 120).  Ellington created an entity

called Tall Pine Group, LLC "to enter into consulting agreements with various Dondero-

controlled entities . . . and then [to] subcontract with entities owned by or affiliated with [the

statutory insiders]" (*id.* ¶ 122).  Under these consulting agreements, "the contributing entities,"

which included Mainspring, "were jointly and severally liable for the total amount on the various

milestone payment dates" (*id.* ¶ 123; *see id.* at 45 n 30).  "[T]he 'consultants' performed no other

work on top of the services already being performed by those individuals as employees of HCM,

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL                Page 13 of 48
Motion No. 011 013

P - 66

**APP 00279**

66 of 105

and in certain instances some of the employees did no work for certain contributing entities" (*id.* ¶ 124). Under these consulting agreements, the statutory insiders received approximately $8,638,536.07 in 2020, including about $5,874,203.21 from Mainspring (*id.* ¶ 126).

According to UBS, "it was only after Dondero and Ellington were removed that HCM and UBS were able to reach an agreement in principle to settle UBS's claims in the bankruptcy" (*id.* ¶ 47). Before a settlement agreement was signed, "on or about February 10, 2021, . . . HCM disclosed several fraudulent conveyances that HCM entities (at the direction of Dondero and Ellington) had conducted in concert with Sentinel" (*id.*). It was only through this disclosure that UBS learned of the 2010 Transfer and the 2017 Transfers (*id.* ¶¶ 47, 60). On March 30, 2021, UBS and HCM entered into a renegotiated settlement agreement, which settled UBS's claims against HCM and certain related entities in the Underlying Action (*id.* ¶ 47).

On July 27, 2022, the court in the Underlying Action issued a decision and order on the remaining, unsettled claims. The court awarded UBS $67,222.00 against CDO Fund, found HFP to be the alter ego of SOHC and liable for SOHC's portion of the Phase I Judgment, and awarded UBS attorney's fees ("Phase II Judgment," and together with the "Phase I Judgment," the "Judgment"). (*Id.* ¶¶ 2, 48, exhibit 24 [NYSCEF Doc No. 30], Phase II Judgment at 9-10.)

On September 1, 2022, UBS entered into a final settlement agreement with Sentinel. Sentinel agreed to transfer to UBS what remained of the 2017 Transferred Assets and UBS agreed to count those assets toward satisfaction of the Judgment (*id.* at 37 n 21, exhibit 25 [NYSCEF Doc No. 31], Partial Satisfaction-Piece for Post-Judgment Interest).

II.    Procedural History

UBS commenced this proceeding on February 8, 2023 (NYSCEF Doc No. 1). On March 7, 2023, Dondero removed the case to the U.S. District Court for the Southern District of New

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 14 of 48
Motion No. 011 013

P - 67

**APP 00280**

674 of 1405

York pursuant to 28 USC § 1441(a). The district court remanded the first two claims to this

Court on December 7, 2023 (NYSCEF Doc Nos. 176-179, 197-99).

Ellington, CLO HoldCo and Dondero (in motions sequence numbers 011, 012, 013,

respectively) moved to dismiss the petition. Argument on the motions was held on July 8, 2024.

By decision and order dated July 8, 2024, this court granted CLO HoldCo's motion to

dismiss for lack of personal jurisdiction. In pertinent part, the court held that CLO HoldCo was

not a signatory to the agreements containing forum selection clauses and that there was no basis

for long-arm jurisdiction, because: (1) the alleged 2010 fraudulent transfers occurred years

before there was a judgment or a bankruptcy settlement, and so there could be no reasonable

expectation of consequence in New York under CPLR 302 (a) (3) (ii); and (2) the "'original

critical events' giving rise to the injury here indisputably did not occur in New York" (NYSCEF

Doc No. 417, Decision and order dated July 8 2024, quoting *Deutsche Bank v Vik*, 163 AD3d

414, 415 [1st Dept 2018]).

III.    Analysis

A. Personal Jurisdiction and Piercing the Corporate Veils of the Judgement Debtors

The parties dispute whether the court has personal jurisdiction over Dondero and

Ellington, either as alter egos of the Judgement Debtors, bound by the forum selection clauses of

Knox Agreements, or under the long-arm statute. They also dispute whether the petition

contains sufficient allegations of Ellington and Dondero's close relationship with the Judgement

Debtors to bind them under the Knox Agreements' forum-selection clauses.

1. Choice of Law Analysis for Veil-Piercing

As a preliminary matter, the parties dispute which jurisdiction's law should apply in

determining whether to pierce the corporate veils of the Judgment Debtors. SOHC is a Cayman

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 15 of 48
Motion No. 011 013

P - 68

**APP 00281**

68 of 105

Islands corporation, HFP is a Delaware limited partnership and CDO Fund is a Bermuda limited

partnership (NYSCEF Doc No. 186, petition ¶¶ 8, 9, 10). Respondents contend that the court

should apply the law of the place of incorporation of the company whose veil is sought to be

pierced. UBS counters that, as this proceeding concerns the enforcement of a New York

judgment, New York's interest is paramount and its law applies.

The first step in a choice of law analysis, is to determine "whether there is an actual

conflict between the laws of the jurisdictions involved" (*Matter of Allstate Ins. Co. [Stolarz-New

Jersey Mfrs. Ins. Co.]*, 81 NY2d 219, 223 [1993]). "For an actual conflict to exist, the laws in

question must provide different substantive rules . . . that are relevant to the issue at hand and

have a significant *possible* effect on the outcome of the trial" (*TBA Global, LLC v Proscenium

Events, LLC*, 114 AD3d 571, 572 [1st Dept 2014] [internal quotation marks and citation

omitted]). If no conflict exists "between the laws of the competing jurisdictions . . . , then the

court should apply the law of the forum state in which the action is being heard" (*Excess Ins. Co.

Ltd. v Factory Mut. Ins. Co.*, 2 AD3d 150, 151 [1st Dept 2003], *affd 3* NY3d 577 [2004]).

Where a conflict exists, "under New York choice-of-law principles, courts apply the law of the

forum to procedural questions and, to substantive issues, the law of the jurisdiction with the most

significant relationship to the dispute" (*Eccles v Shamrock Capital Advisors, LLC*, 42 NY3d 321,

335 [2024] [internal citations omitted]).

Generally, "the substantive law of a company's place of incorporation presumptively

applies to causes of action arising from its internal affairs" (*Eccles*, 42 NY3d at 339)*. However,

this presumption may be overcome, if a party demonstrates "both that (1) the interest of the place

of incorporation is minimal—i.e., that the company has virtually no contact with the place of

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL                    Page 16 of 48
Motion No. 011 013

P - 69

APP 00282

incorporation other than the fact of its incorporation, and (2) New York has a dominant interest in applying its own substantive law" (*id.*).

If the dispute concerns the application of tort law and the law is conduct-regulating, "New York courts usually apply the law of the place where the tort occurred because that jurisdiction has the greatest interest in regulating behavior that takes place within its borders" (*Elson v Defren*, 283 AD2d 109, 115 [1st Dept 2001]; *see Eccles*, 42 NY3d at 336). "Where a defendant's wrongful conduct occurs in one jurisdiction and the plaintiff suffers injuries in another, 'the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred;' that is where the plaintiffs' injuries occurred" (*Deutsche Bank AG v Vik*, 2015 NY Slip Op 30163[U], *20 [Sup Ct, NY County 2015], *affd* 142 AD3d 829 [1st Dept 2016], quoting *Schultz v Boy Scouts of Am., Inc.*, 65 NY2d 189, 197 [1985]).

Here, New York law applies to the veil-piercing analysis.

Because "HFP is a Delaware limited partnership" (NYSCEF Doc No. 186, petition ¶ 9) and "the standard [for piercing the corporate veil] is not materially different under Delaware law" from that under New York law (*Tap Holdings, LLC v Orix Fin. Corp.*, 109 AD3d 167, 174 [1st Dept 2013]; *see also Spinnell v JP Morgan Chase Bank, N.A.*, 59 AD3d 361, 361 [1st Dept 2009] ["(t)he court properly applied New York law because there is no conflict with Delaware law with respect to 'reverse veil-piercing' . . ."]), New York law applies with regard to HFP (*see Excess Ins. Co. Ltd., 2* AD3d at 151]).

However, the standard for piercing the corporate veil under the laws of the Cayman Islands and Bermuda differ from that of New York. According to the parties' experts on Cayman Island and Bermuda law, because these jurisdictions are British Overseas Territories, they follow English law where there is no local authority on a particular issue (*see* NYSCEF Doc

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL
Motion No. 011 013

Page 17 of 48

P - 70

APP 00283

707 of 1405

Case 21-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
Exhibit P    Page 71 of 105

No. 260, Lowe affirmation ¶¶ 8-9; NYSCEF Doc No. 309, Hayden affirmation ¶¶ 7-10;

NYSCEF Doc No. 324, Wasty affirmation ¶¶ 12-19). In this case, the leading, applicable case

on piercing the corporate veil in English law is *Prest v Petrodel Resources Limited* ([2013] 2 AC

415) (*see* NYSCEF Doc No. 260, Lowe affirmation ¶ 16; NYSCEF Doc No. 309, Hayden

affirmation ¶ 11; NYSCEF Doc No. 324, Wasty affirmation ¶ 27).

    *Prest* explains that English cases addressing the issue can be divided into two categories

that have often been confused (NYSCEF Doc No. 316, *Prest* at 70). The first category of cases

applies the concealment principle, which "is legally banal and does not involve piercing the

corporate veil at all" (*id.*). This principle is not implicated in this proceeding. [1] The second

category of cases applies the evasion principle, "which applies when a person is under an

*existing* legal obligation or liability or subject to an *existing* legal restriction which he

deliberately evades or whose enforcement he deliberately frustrates by interposing a company

under his control" (*id.* at 74 [emphasis added]). Because English law requires the existence of

liability prior to the abuse of the corporate form, a temporal requirement not found under New

York law (*see Tianbo Huang v iTV Media, Inc.*, 13 F Supp 3d 246, 258 n 4 [ED NY 2014]

[explaining how "(t)he temporal requirement most clearly distinguishes New York from English

---

[1] In applying the concealment principle, courts look to general legal principles "to discover the facts which the corporate structure is concealing," without "disregarding the 'facade'" (NYSCEF Doc No. 316, *Prest* at 70). For example, in one of the cases discussed in *Prest*, it was not necessary to pierce the corporate veil, because the defendant company had acted as the individual defendant's "nominee for the purpose of receiving and holding the secret profit" and, as such, both had to account for it to the plaintiff (*id.* at 72).

    Notably, UBS contends that, even under Bermudan and Cayman laws, the court should hold Dondero and Ellington personally liable for the Judgement under the concealment principle. However, the petition clearly seeks to hold Dondero and Ellington liable as the alter egos of the Judgement Debtors and asks the court to disregard the corporate form to find personal jurisdiction over the individuals. This cannot be accomplished by applying the concealment principle.

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**    Page 18 of 48
**Motion No.  011 013**

P-71

**APP 00284**

law"]), a choice of law analysis is necessary to determine which standard should apply to piercing the corporate veils of SOHC and CDO Fund.

Piercing the corporate veil involves holding an individual accountable to third parties for the abuse of the corporate form (*see Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 141 [1993]) rather than "the relationships between directors and shareholders" or a corporation's internal administration (*Eccles*, 42 NY3d at 336, 336 n 11). Therefore, "alter ego liability and the related doctrine of piercing the corporate veil . . . do not implicate the corporation's internal affairs" and there is no presumption in favor of Bermuda or the Cayman Islands as the jurisdictions of incorporation (*see UBS Sec. LLC v Highland Capital Mgt., L.P.*, 30 Misc 3d 1230[A], 2011 NY Slip Op 50297[U], *3 [Sup Ct, NY County 2011], *affd in part, mod in part* 93 AD3d 489 [1st Dept 2012] [applying New York law to determine whether HCM was SOHC's alter ego]; *see also Highland CDO Opportunity Master Fund, L.P. v Citibank, N.A.*, 270 F Supp 3d 716, 725 [SD NY 2017] ["find[ing] that veil piercing is best treated as a species of fraud or similar tort and therefore is a conduct-regulating rule"]).

Here, New York has the greater interest in applying its law to the veil piercing claims.

Apart from SOHC and CDO Fund's status as a Cayman Islands corporation and a Bermuda limited partnership, respectively, it is not clear how those jurisdictions' interests are implicated here. Indeed, as concerns SOHC, it has already been found not to have any "obvious ties" to the Cayman Islands (*UBS Sec. LLC*, 2011 NY Slip Op 50297[U] at *3 [applying New York law to the veil piercing claim on "the ground that SOHC has almost no ties to the Cayman Islands," based upon findings that, among other things, it "conducts business in New York and Texas with entities based in New York, including UBS"]). Moreover, none of the injured parties are located in the Cayman Islands or Bermuda.

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 19 of 48
Motion No. 011 013

P - 72

**APP 00285**

On the other hand, petitioner UBS Securities LLC has its principal place of business in
New York (NYSCEF Doc No. 186, petition ¶ 4).  Accordingly, at least part of the injury was felt
in New York (*see Schultz*, 65 NY2d at 195; *see also Highland CDO Opportunity Master Fund,
L.P., N.A.*, 270 F Supp 3d at 725 [applying New York's interest analysis and concluding that
"New York ha(d) the greatest interest in applying its law to the veil piercing claims," where three
of the four counterclaim plaintiffs had their principal place of business in New York and,
"(a)ccordingly, the relevant injury . . . occurred in New York"]).  In addition, New York has an
interest in enforcing a judgment entered in the state, which resulted from the breach of the Knox
Agreements, which were "largely conducted in New York" (NYSCEF Doc No. 281, Dondero
brief at 13) and contain New York forum selection clauses (*see Forum Ins. Co. v Texarkoma
Transp. Co.*, 229 AD2d 341, 342 [1st Dept 1996] [finding New York's law applied in an action
seeking to pierce the corporate veil to hold a foreign entity liable under an indemnification
agreement, where, among other things, the subject agreement had been executed in New York];
*Citibank, N.A. v Aralpa Holdings L.P.*, 2025 WL 289499, *2, 2025 US App LEXIS 1559, *5 [2d
Cir, Jan. 24, 2025, No. 24-423-CV] [applying New York choice of law principles and concluding
that New York law applied to Citibanks' reverse veil piercing claim, because "New York clearly
ha(d) the more significant relationship to th(e) dispute," where Citibank's  principal place of
business was in New York, the underlying contracts "contained New York choice-of-law and
venue clauses," and  "the judgment which Citibank (sought) to execute upon was entered in New
York"]).  Accordingly, New York law determines whether to pierce the Judgement Debtors'
corporate veils.

    2.  <u>Piercing the Corporate Veil Analysis</u>

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No. 011 013**

**Page 20 of 48**

**APP 00286**

Dondero contends that the alter ego claim must be dismissed as against him and that it cannot serve as the basis of personal jurisdiction over him, because the petition fails to allege: (1) that he disregarded the corporate formalities of the Judgment Debtors to advance his personal interests; (2) that the Judgment Debtors were purposefully undercapitalized in 2008, when UBS entered into the Knox Agreements; (3) that he commingling his personal assets with those of the Judgment Debtors or used Judgment Debtor funds for personal use; and (4) causation, or that, in the absence of the alleged wrongful conduct, UBS would have been able to satisfy the $1.2 billion Judgement.  In addition, as concerns HFP and CDO Fund, Dondero contends that alter ego claims fail as a matter of law, because veil-piercing does not apply to limited partnerships.

Ellington contends that the alter ego claim must be dismissed as against him and that it cannot serve as the basis for personal jurisdiction over him, because: (1) there are no allegations that he was using the Judgement Debtors to conduct business in his personal capacity or that he personally benefited from the Knox Transaction or from the 2017 Transfers to Sentinel when they occurred, as opposed to subsequently; (2) he had no ownership interest in the Judgment Debtors; and (3) the petition's extensive allegations of Dondero's control of the Judgement Debtors negate any claim of control by Ellington.

Dondero and Ellington both argue that to hold them liable for the Judgement would be inequitable, as it would give UBS the benefit of personal guarantees that it did not bargain for. They also urge that a fraudulent transfer claim is the proper vehicle to recover the allegedly funneled funds.

UBS responds that limited partnership status does not bar alter ego liability.  In addition, it argues that the petition sufficiently alleges Dondero's control over the Judgment Debtors and explains how the commingling of assets ultimately benefitted only Dondero and his associates.

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL          Page 21 of 48
Motion No. 011 013

P - 74

APP 00287

UBS also contends that the intentional undercapitalization of the Judgment Debtors near the time

of the Judgment being entered is relevant to the veil-piercing analysis. Lastly, UBS contends

that the Judgment Debtors' inability to pay the entirety of the Judgment does not mean that

Dondero's conduct did not cause UBS injury. It argues that allegations that Dondero worked to

funnel the Judgment Debtors' assets to himself and his associates are sufficient to plead

causation in this case.

As concerns Ellington, UBS argues that the petition sufficiently details how he

orchestrated the 2017 Transfers to Sentinel, a company for which Ellington was an ultimate

beneficial owner, and then used those assets for lavish personal expenses and dividend payments

to himself. UBS contends that his lack of ownership interest in the Judgement Debtors does not

bar alter ego liability, as he can be held liable as an equitable owner based on his control over the

Judgement Debtors. In addition, it argues, as multiple individuals may be held liable as alter

egos of an entity, Dondero's alter ego status does not shield Ellington against alter ego liability.

Finally, UBS contends that the absence of a personal guarantee does not render piercing the

corporate veil inequitable and that to find otherwise would render alter ego liability ephemeral.

"A non-signatory may be bound by a [forum selection clause] under certain limited

circumstances, including as . . . an alter ego of a signatory" (*Highland Crusader Offshore

Partners, L.P. v Targeted Delivery Tech. Holdings, Ltd.*, 184 AD3d 116, 122 [1st Dept 2020]

[internal citations omitted]). "Subjecting the foreign defendants to New York jurisdiction under

an alter ego theory does not offend due process" (*Clingerman v Ali*, 212 AD3d 572, 572 [1st

Dept 2023] [internal citation omitted]).

To state a claim  against an individual on an alter ego theory of liability, the petitioner

must allege facts that, if proved, indicate that: : "(1) the owner exercised complete domination

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 22 of 48
Motion No. 011 013

P - 75

APP 00288

752 of 1405

over the corporation with respect to the transaction attacked, and (2) that such domination was used to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury" (*First Capital Asset Mgt. v N.A. Partners*, 300 AD2d 112, 116 [1st Dept 2002], citing *Matter of Morris*, 82 NY2d at 141). Courts consider the following factors when determining whether domination has been alleged:

> "the disregard of corporate formalities; inadequate capitalization; intermingling of funds; overlap in ownership, officers, directors and personnel; common office space or telephone numbers; the degree of discretion demonstrated by the alleged dominated corporation; whether the corporations are treated as independent profit centers; and the payment or guarantee of the corporation's debts by the dominating entity" (*Cortlandt St. Recovery Corp. v Bonderman*, 226 AD3d 103, 105 [1st Dept 2024], quoting *Tap Holdings, LLC*, 109 AD3d at 174)

"The determinative factor is whether the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends" (*Port Chester Elec. Constr. Corp. v Atlas*, 40 NY2d 652, 657 [1976] [internal quotation marks and citation omitted]). However, domination, standing alone, is not enough to pierce the corporate veil, which requires a showing "that the owners, through their domination, abused the privilege of doing business in the corporate form" (*East Hampton Union Free School Dist. v Sandpebble Bldrs., Inc.*, 66 AD3d 122, 126 [2d Dept 2009], *affd* 16 NY3d 775 [2011] [internal quotation marks and citations omitted]). "Because a decision to pierce the corporate veil in any given instance will necessarily depend on the attendant facts and equities, there are no definitive rules governing the varying circumstances when this power may be exercised" (*Baby Phat Holding Co., LLC v Kellwood Co.*, 123 AD3d 405, 407 [1st Dept 2014] [internal citation omitted]).

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 23 of 48
Motion No. 011 013

P - 76

APP 00289

Pursuant to CPLR 103 (b), "procedure in special proceedings shall be the same as in actions, and the provisions of the civil practice law and rules applicable to actions shall be applicable to special proceedings." On a motion to dismiss for failure to state a claim, pursuant to CPLR 3211 (a) (7), "the [petition] must be construed in the light most favorable to the [petitioner] and all factual allegations must be accepted as true" (*Allianz Underwriters Ins. Co.*, 13 AD3d at 174). The court is not permitted "to assess the merits of the [pleading] or any of its factual allegations, but only to determine if, assuming the truth of the facts alleged, the [pleading] states the elements of a legally cognizable cause of action" (*Skillgames, LLC v Brody*, 1 AD3d 247, 250 [1st Dept 2003]).

As a preliminary matter, to the extent that respondents claim that veil-piercing is, as a matter of law, inapplicable to limited partnership such as HFP and CDO Fund, the contention is without merit (*see e.g. Cortlandt St. Recovery Corp.*, 226 AD3d at 34 n 2, 48-50 [denying motion to dismiss where the complaint contained sufficient allegation to pierce the corporate veil of two entities, including a limited partnership]; *Pensmore Invs., LLC v Gruppo, Levey & Co.*, 184 AD3d 468, 469 [1st Dept 2020] [finding that "Supreme Court properly determined that veil piercing was appropriate against . . . Frog Pond Partners, L.P."]).

### a. Dondero as Alter Ego of the Judgement Debtors

Here, the petition sufficiently alleges that Dondero is the Judgement Debtors' alter ego.

First, it alleges that Dondero, from his position as President and majority owner of HCM—as well as his positions as chairman of HFP's Board of Directors, the sole Director of SOHC and as President of the ultimate general partner of CDO Fund—controlled the day-to-day operations of the Judgment Debtors (*see* NYSCEF Doc No. 186, petition ¶¶ 28, 33, exhibit 2 [NYSCEF Doc No. 8], Dudney Report at 4-5, 41-42). Further, the petition alleges that in 2009,

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL            Page 24 of 48
Motion No. 011 013

P - 77

**APP 00290**

774 of 1405

Dondero eliminated the requirement that HFP have independent directors and made himself

solely responsible for the "management and operation" of HFP and, by extension, its

subsidiaries, including SOHC (*id.* ¶ 33, exhibit 88 [NYSCEF Doc No. 94] at

UBSPROD1854782). Indeed, Dondero has stated that he was "generally" the "decision maker"

for HFP and its subsidiaries (*id.* ¶ 28, exhibit 113 [NYSCEF Doc No. 118], Dondero deposition

tr at 48:8-13).

Further, UBS's expert in the Underlying Action concluded that "'Dondero exercised his

ability to dominate and control HCM, SOHC, CDO Fund and HFP, amongst other [HCM]

[e]ntities,' to his own benefit, including to 'authorize loans to himself' and facilitate transfers

among these entities— 'which were not at arm's length or executed in accordance with corporate

formalities'" (*id.* ¶ 33, quoting Dudley Report [NYSCEFF Doc No. 8] at 54-56). As an example,

the expert pointed to a \$3.7 million payment made to Dondero in December 2008. This was

purportedly a repayment of a short-term loan that Dondero made to CDO Holding, but there was

no evidence of a loan agreement, and the funds originated from SOHC. The money traveled

from SOHC to HFP, then from HFP to CDO Holding and only then to Dondero (*see id.* ¶¶ 43,

54, exhibit 2 [NYSCEFF Doc No.8], Dudley Report at 48, 54). Other allegations demonstrating

Dondero's domination of the Judgment Debtors include an overlap of offices and employees. It

was common for various entities, including the Judgment Debtors, to share HCM's office in

Texas, HCM employees performed whatever work Dondero assigned them, regardless of which

entity was involved or whether the work was personal in nature (e.g. handling his divorce), and

Dondero determined employees' compensation based on an "amalgamation of total efforts" (*id.*

¶¶ 34-37.) These allegations sufficiently plead Dondero's domination of the Judgement Debtors

(*cf Horizon Inc. v Wolkowicki*, 55 AD3d 337, 337-338 [1st Dept 2008] [affirming denial of

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL          Page 25 of 48
Motion No. 011 013

P - 78

APP 00291

motion for summary judgement to dismiss "plaintiffs' claim that NYREG's corporate veil should be pierced and its principal . . . held personally liable for the corporation's obligations," where the principal "ignored the corporate form by transferring monies in and out of NYREG without any documentation or formalities"]; *Webmediabrands, Inc. v Latinvision, Inc.*, 46 Misc 3d 929, 932-933 [Sup Ct, NY County 2014] [piercing the corporate veil where, among other things, the individual defendant used corporate assets for personal purposes, terming such payments as "loans"]).

Second, the petition sufficiently alleges that Dondero used his domination of the Judgement Debtors to commit a wrong against UBS that resulted in its injury. The petition alleges that Dondero, anticipating an adverse judgment in the Underlying Action, "deliberately undercapitalized the Judgment Debtors to prevent UBS from collecting on the Judgment" by effecting the 2017 Transfers and "ensur[ing] that the Judgment Debtors would be judgment proof" (NYSCEF Doc No. 186, petition ¶ 176; *see id.* ¶¶ 61-78). "Allegations that corporate funds were purposefully diverted to make it judgment proof . . . are sufficient to satisfy the pleading requirement of wrongdoing which is necessary to pierce the corporate veil on an alter-ego theory" (*Baby Phat Holding Co., LLC*, 123 AD3d at 407-408 [internal citation omitted]). The petition further alleges that by transferring the assets to Sentinel, Dondero, as one of Sentinel's ultimate beneficial owner, was able to extract millions in dividends, thereby reducing assets available to satisfy the Judgment (*see id.* ¶¶ 113-119).

Accordingly, the petition states a claim for piercing the corporate veil of the Judgement Debtors to hold Dondero liable as their alter ego (*see First Capital Asset Mgt.*, 300 AD2d at 116).

None of Dondero's contentions change the analysis.

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 26 of 48
Motion No. 011 013

P - 79

**APP 00292**

First, he argues that the petition, at most, alleges that HCM and other entities disregarded the corporate formalities of the Judgement Debtors to advance Dondero's interest. Relying on a single case, he claims that "[i]f the fact that a corporation served its owner's interests were enough to establish a wrongful 'domination' of the corporation, then the corporate form would never be respected" (*In re Stage Presence, Inc.*, 592 BR 292, 304 [Bankr SD NY 2018], *affd* 2019 WL 2004030, 2019 US Dist LEXIS 77111 [SD NY, May 7, 2019, No. 12-10525 (MEW)]). However, in *Stage Presence, Inc.*, the court also concluded that "the evidence showed that in all important operational and financial respects the separate existence of [corporation] was honored and fully respected" (*id.*). Here, UBS alleges that the Judgement Debtors did not have operational or financial separateness from each other or Dondero.

Dondero then argues that the relevant time for undercapitalization is 2008, when UBS entered the Knox Transaction. As this is the transaction that caused the alleged injury, he argues, UBS's failure to allege Dondero's domination over it, as the "transaction attacked" (*First Capital Asset Mgt.*, 300 AD2d at 116), requires dismissal. In so arguing, Dondero ignores the fact that the Judgement exists because the Judgement Debtors' obligations under the Knox Agreements were not satisfied. According to the petition, they remain so, at least in part, due to Dondero's purposeful evasion of those obligations. Therefore, the alleged undercapitalization in 2017 is pertinent to the domination analysis (*see 265 W. 34th St., LLC v Joon Sik Chung*, 47 Misc 3d 1219[A], 2015 NY Slip Op 50704[U], *8 [Sup Ct, NY County 2015] [denying motion to dismiss an alter ego claim to hold the owners liable for the judgment previously entered against the corporate defendant in a summary non-payment proceeding in housing court, explaining that the "transaction plaintiff seeks to attack is not the execution of the lease itself, but rather, the avoidance of obligations created by the lease"]; *see also Azte Inc. v Auto Collection, Inc.*, 36

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 27 of 48
Motion No. 011 013

P - 80

APP 00293    807 of 1405

Misc 3d 1238(A), 2012 NY Slip Op 51731(U), *11-12 [Sup Ct, Kings County 2012], *affd* 124

AD3d 811 [2d Dept 2015] [declining to accept defendant's contention "that 'the transactions

attacked' by the plaintiffs terminated upon the plaintiffs' transferring the money to the

(defendant)," as the transaction was ongoing until the defendant performed its obligations]; *see*

*also Grigsby v Francabandiero*, 152 AD3d 1195, 1197 [4th Dept 2017] [finding sufficient

allegations to pierce the corporate veil, where plaintiff alleged that, near the time her judgment

was entered against the entity, the individual defendant "took actions calculated to make (the

entity) judgment-proof by undercapitalizing (it)"]).

Dondero also contends that alter ego claim must be dismissed, because UBS cannot prove

proximate causation. Dondero argues that UBS cannot show it would have been able to recover

$1.2 billion but for Dondero's alleged domination of the Judgement Debtors, because the petition

alleges that the 2017 Transfers involved approximately $105 million in assets. For this

proposition, Dondero primarily relies on a single case, *Pensmore Invs., LLC v Gruppo, Levey &*

*Co.* (2019 NY Slip Op 31360[U] [Sup Ct, NY County 2019], *affd as mod* 184 AD3d 468 [1st

Dept 2020]).

In *Pensmore*, the court initially denied summary judgment to both parties on a claim to

pierce the corporate veil to hold the individual defendants personally liable. It reasoned:

> "for the fraud prong to be satisfied with respect to [the individual
> defendants], Pensmore [had to] prove that they unjustifiably
> funneled corporate funds to themselves and that, had they not done
> so, Pensmore would have been able to recover the amounts sought
> from the companies in excess of the assets they . . . ha[d] on hand."
> (*Pensmore Invs., LLC v Gruppo*, 2017 NY Slip Op 30661[U], *19
> [NY Sup Ct, New York County 2017].)[2]

---

[2] Notably, UBS seeks to distinguish *Pensmore Invs., LLC*, because the court in that case applied
Delaware law to the veil-piercing claim (2017 NY Slip Op 30661[U] at *11). However, as
already stated, Delaware's veil-piercing law is not substantially different from that of New York
(*see Tap Holdings, LLC*, 109 AD3d at 17). Moreover, after a bench trial that found that the

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**          **Page 28 of 48**
**Motion No.  011 013**

**APP 00294**
P - 81

818 of 1405

As Pensmore did not make such a showing and the defendants did not show that it could not do so at trial, neither side was granted summary judgment (*id.*). Additionally, the court observed that if Pensmore could not carry its burden at trial, then the individual defendants "[did] not deserve to be held personally liable because, despite their behavior, they would not have been the proximate cause of Pensmore's inability to satisfy its judgment against [the entity defendants]" (*id.* at *19 n 16). The court explained that, because "veil piercing . . . impose[s] alter ego liability [based on] to the causal relationship between malfeasance and fraud on a creditor[,] [w]ithout proving that [the individual defendants] did anything that made the companies, collectively, unable to pay Pensmore, the requisite fraud [could not] be said to be present" (*id.*).

After a bench trial, the court concluded that Pensmore made the requisite showing and pierced the corporate veil to hold the individual defendants liable (*Pensmore Invs., LLC*, 2019 NY Slip Op 31360[U] at *13-*14). However, the court also stated that it was "not decid[ing] whether, as a necessary predicate to all veil piercing claims, there must be proof that a business composed of alter ego affiliates is collectively capable of paying off the plaintiff but for the corporate malfeasance" (*id.* at *13), rather that it "[was] a predicate of the fraud prong under the circumstances" of that case (*id.*).

The Appellate Division, First Department, held that veil piercing against the individual defendants was proper (*Pensmore Invs. LLC*, 184 AD3d at 469). It observed that the evidence showed that the defendants used their domination over the entities to render them judgment proof and that "the [entites] would have had sufficient funds to satisfy the underlying debt owed to

---

plaintiff made the requisite showing, the Appellate Division, First Department affirmed, holding that veil piercing against the individual defendants was proper, regardless of whether New York or Delaware law was applied (*Pensmore Invs., LLC*, 184 AD3d at 469).

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL                Page 29 of 48
Motion No. 011 013

APP 00295

829 of 1405

P - 82

Pensmore, but for appellants' fraud" (*id.*). However, it did not state whether a showing of the entities' ability to satisfy the debt was a necessary element of the claim.

While the reasoning of *Pensmore* is compelling (*see* 2017 NY Slip Op 30661[U], \*19 n16), as neither the motion court, the trial court, nor the appellate court held that proof of the entity defendants' ability to satisfy the underlying debt was a prerequisite to proving veil-piercing generally, much less that it was a necessary element to state such a claim, the court declines to dismiss the petition on that ground.[3]

Dondero contends that it would be inequitable to hold him personally liable, because UBS did not negotiate a personal guarantee in the Knox Transaction, or that UBS should be limited to its fraudulent conveyance claims. This is unavailing. If the absence of a personal guarantee was sufficient to evade liability, alter ego liability would never be imposed. Additionally, UBS's ability to pursue fraudulent transfer claims, in no way bars it from pursuing alter ego liability (*see e.g. Cortlandt St. Recovery Corp. v Bonderman*, 31 NY3d 30, 50 [2018] [holding that "(s)ince the complaint allege(d) the existence of a corporate debt, created by defendants by their use of the corporate form to profit from fraudulent conveyances that left (the shell companies) insolvent, (the plaintiff) could request that the court pierce the corporate veil to impose liability upon defendants as the alter egos of (the shell companies)"]).

Finally, to the extent that Dondero seeks to demonstrate that UBS "has already recovered the allegedly funneled amounts from Sentinel" (NYSCEF Doc No. 368, Dondero's reply at 11 n

---

[3] Notably, UBS relies on *AMP Servs. Ltd. v Walanpatrias Found.* for the proposition that plaintiff need not allege "that the transfer at issue had rendered the subject assets totally and permanently unavailable or diminished" (34 AD3d 231, 232 [1st Dept 2006]). That case is inapposite as it addresses the sufficiency of a fraudulent conveyance claim under Debtor and Creditor Law § 276.

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL          Page 30 of 48
Motion No. 011 013

                                                                          P - 83

        APP 00296
                              8830 off 1405

5; *see* NYSCEF Doc No. 369, Leventon reply affirmation ¶¶13-23, exhibits 9-13 [purporting to demonstrate that UBS has recovered in excess of the value of the 2017 Transferred Assets]), this evidence is submitted for the first time in reply and, therefore, will not be considered (*see Dannasch v Bifulco*, 184 AD2d 415, 416-417 [1st Dept 1992]).

For the foregoing reasons, Dondero's motion to dismiss is denied with respect to the second claim, to the extent the claim seeks to hold Dondero liable as the Judgement Debtors' alter ego. The motion is also denied to the extent it seeks to dismiss the petition for lack of personal jurisdiction (*see Highland Crusader Offshore Partners, L.P.*, 184 AD3d at 122).

b. Ellington as Alter Ego of the Judgement Debtors

The Petition also sufficiently alleges that Ellington is the Judgement Debtors' alter ego. Ellington's lack of any ownership interest in the Judgement Debtors is not dispositive. "Even if an individual is not a record owner of a corporation, he may nonetheless be found to be an 'equitable owner' and alter ego thereof if he dominated and controlled [it] to such an extent that [he] may be considered its equitable owner[ ]" (*Matter of Berisha v 4042 E. Tremont Café Corp.*, 220 AD3d 608, 609 [1st Dept 2023] [internal quotation marks and citations omitted]). Here, the petition contains sufficient allegations of Ellington's domination and control over the Judgement Debtors. The petition alleges that: as an officer of Strand, he had signatory authority for the Judgment Debtors (*see* NYSCEF Doc No. 186, petition ¶ 31); as Chief Legal Officer of HCM, he oversaw the litigation strategy against UBS (*see id.*); he directed the work of HCM employees and used them to perform work on personal matters (*see id.* ¶¶ 36-39); and, with respect to the 2017 Transfers and the ATE Policy, Dondero "delegated and entrusted" many decisions to Ellington (*id.* ¶ 31, exhibit 113 [NYSCEF Doc No. 118], Dondero deposition tr at 215:19-

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL
Motion No.  011 013

Page 31 of 48

APP 00297

216:11), who "devised" the ATE Policy and "got the transaction approved and completed" (*id.* ¶¶ 64, 77).

The petition also alleges that the ATE Policy was not for the benefit of the Judgement Debtors, because: (1) the 2017 Transfers to Sentinel were for more than four times what was required under the ATE Policy for the premium and even exceeded the coverage amount (*see* NYSCEF Doc No. 186, petition ¶¶ 72, 75); and (2) HFP received no benefit from the transfer, as it was not one of the Insureds (*id.* ¶ 76). Additionally, it alleges that Ellington was one of the ultimate beneficial owners of Sentinel (*id.* ¶ 80) and was, therefore, able to deplete the 2017 Transferred Assets for personal expenses after the transfer (*id.* ¶¶ 79, 98-119). Accepting these allegations as true and construing the petition in the light most favorable to UBS (*see Allianz Underwriters Ins. Co.*, 13 AD3d at 174), the petition sufficiently alleges that Ellington so dominated the Judgement Debtors that they "serve[d] [his] purposes rather than [their] own" *Deutsche Bank AG*, 2015 NY Slip Op 30163[U] at *18; *see Port Chester Elec. Constr. Corp.*, 40 NY2d at 657).

Finally, as already explained above, the allegations of intentional undercapitalization of the Judgement Debtors to prevent UBS from collecting the Judgment "are sufficient to satisfy the pleading requirement of wrongdoing which is necessary to pierce the corporate veil on an alter-ego theory" (*Baby Phat Holding Co., LLC*, 123 AD3d at 407-408 [internal citation omitted]). Therefore, the petition states a claim for piercing the corporate veils of the Judgement Debtors to hold Ellington liable as their alter ego (*see Chase Manhattan Bank (Natl. Assn.) v 264 Water St. Assoc.*, 174 AD2d 504, 505 [1st Dept 1991] [finding allegation sufficient to pierce the corporate veil where "plaintiff specifically alleged that (the defendants) masterminded a scheme to denude the subsidiary of its assets in order to render it unable to honor its obligations resulting in a loss

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 32 of 48
Motion No. 011 013

P - 85

APP 00298

852 of 1405

to plaintiff" and that "individual defendant dominated and controlled the corporation and caused
the corporation to make fraudulent conveyances"]).

That the petition also alleges that Ellington was Dondero's second-in-command does not
require a contrary result (*cf Patel v Pandya*, 2015 WL 4523283, *7, 2015 US Dist LEXIS 97665,
*16 [DNJ July 27, 2015, No. 2:14-cv-08127 (WJM) [finding that the complaint sufficiently
alleged that the companies were the alter egos of their owner as well as of the owner's "office
manager" and "second in command"]; *Matter of Berisha*, 220 AD3d at 608-610 [finding that
evidence of the defendant's equitable ownership, when opposed by evidence that he "merely
provided assistance to his brother and brother-in-law . . . for which he was paid a salary," created
issues of fact as to his domination and control, "precluding summary determination of
the applicability of veil-piercing"]).

For the foregoing reasons, Ellington's motion to dismiss is denied with respect to the
second claim. to the extent the claim seeks to hold Ellington liable as the Judgement Debtors'
alter ego. The motion is also denied to the extent it seeks to dismiss the petition for lack of
personal jurisdiction (*see Highland Crusader Offshore Partners, L.P.*, 184 AD3d at 122).

Having determined that alter ego liability is sufficiently pleaded against Dondero and
Ellington, the court need not consider the alternate grounds for personal jurisdiction asserted
against them.

B.  Fraudulent Conveyances

The parties dispute the viability of the fraudulent conveyance claims and whether
Dondero and Ellington may be held personally liable, as alter egos of Mainspring and Montage,
respectively, for the allegedly fraudulent conveyances made to those entities. As "[a]n argument
to pierce the corporate veil is not a cause of action in itself, but rather dependent on the action

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL        Page 33 of 48
Motion No. 011 013

P - 86

APP 00299

86 of 105

against the corporation," the court must first consider the viability of the underlying fraudulent conveyance claims (*Cortlandt St. Recovery Corp.*, 31 NY3d at 50 [internal citation omitted]). Regarding these claims, respondents argue that without an actionable fraudulent conveyance claim for the initial transfers to Sentinel in 2017, UBS may not avoid any of Sentinel's subsequent transfers, including the reimbursements paid to Ellington and the dividends issued to Mainspring and Montage. The parties dispute whether the 2017 Transfers are time-barred and whether the claim for actual fraudulent conveyance is sufficiently pleaded.

      1.  Choice of Law Analysis

The parties dispute which jurisdiction has the greater interest in applying its laws to the fraudulent conveyance claims. Respondents contend that, because fraudulent conveyance laws are conduct-regulating, the focus of the analysis should be on where the tort occurred. They reason that, because the Judgement Debtors were operated by personnel located in Texas who worked for HCM, a Texas-based investment manager, and funds were transferred from Sentinel, utilizing at least one Texas bank account (*see* NYSCEF Doc No. 84), Texas has the greater interest in regulating the conduct and protecting the reasonable expectations of those engaging in allegedly fraudulent conveyances within its borders. In addition, they argue that, should the court conclude that Texas law does not apply, then Bermuda and the Cayman Islands have the greater interest in applying their laws to transfers made by Bermuda and Cayman entities (i.e. CDO Fund and SOHC) to Cayman entities (i.e. Sentinel, Montage and Mainspring). UBS counters that New York has the greater interest in enforcing its fraudulent conveyance laws, as the claims in this proceeding are concerned with the enforcement of New York judgements.

Here, a conflict exists between New York and Texas with respect to the timeliness of UBS's claims for actual fraudulent conveyances based on the 2017 Transfers. The Texas

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 34 of 48
Motion No. 011 013

P - 87

APP 00300

Uniform Fraudulent Transfer Act contains a statute of repose. It provides, in pertinent part, that a claim for intentional fraudulent transfer "is extinguished" if it is not brought "within four years after the transfer was made . . . or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant" (*see* Tex Bus & Com Code Ann § 24.010 [a] [1]). This is substantially different to the applicable New York law, which provides that "[a] claim for actual fraud (Debtor and Creditor Law § 276) is timely if brought either within six years of the date that the fraud or conveyance occurs or within two years of the date that the fraud or conveyance is discovered or should have been discovered, whichever is longer" (*Patterson Belknap Webb & Tyler LLP v Marcus & Cinelli LLP*, 227 AD3d 505, 507 [1st Dept 2024] [internal citation omitted]).[4] While statutes of limitation are generally "matters of procedure" that are "governed by the law of the forum," statutes of repose are matters of substantive law and "fall within the course charted by choice of law analysis" (*Tanges v Heidelberg N. Am., Inc.*, 93 NY2d 48, 53, 55-56 [1999] [explaining that a statute of repose is substantive, because, unlike a statute of limitation, which "does not extinguish the underlying right, but merely bars the remedy," a statute a repose "s*erves as an absolute barrier that prevents . . . what might otherwise have been a cause of action from ever arising*" [internal quotation marks and citation omitted]).

A conflict also exists, with respect to these claims, between New York law and the laws of Bermuda and the Cayman Islands. Under New York's Debtor and Creditor Law ("DCL") § 276, which "addresses actual fraud, . . . proof of unfair consideration or insolvency" is not

---

[4] Notably, there is a dispute as to whether this is the applicable version of New York's law. In 2020, the Uniform Fraudulent Conveyance Act ("UFCA") was repealed and replaced by the Uniform Voidable Transaction Act. As explained below, the UFCA governs many of the issues raised on these motions. Therefore, unless indicated otherwise, all references to "Debtor and Creditor Law" or "DCL" refer to the UFCA.

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**                              **Page 35 of 48**
**Motion No. 011 013**

P - 88

**APP 00301**

required (*Wall St. Assoc. v Brodsky*, 257 AD2d 526, 529 [1st Dept 1999]). Under the laws of

Bermuda and the Cayman Islands, for such a transfer to be voidable, it must be made with the

intent to defraud and the transaction must be for no consideration or significantly less than the

value of the property transferred (*see* NYSCEF Doc No. 260, Lowe affirmation ¶¶ 27, 29,

exhibits L [NYSCEF Doc No. 272], Cayman Is. Fraudulent Dispositions Law §§ 2, 4 [1]; M

[NYSCEF Doc No. 273] Bermuda Conveyancing Act §§ 36A [1], 36C [1]).

As already explained, where conflicting conduct-regulating laws are at issue, "New York

courts usually apply the law of the place where the tort occurred" (*Elson*, 283 AD2d at 115; *see*

*Eccles*, 42 NY3d at 336). "[T]he place of the wrong is . . . where the last event necessary to

make the actor liable occurred; that is where the plaintiffs' injuries occurred" (*Deutsche Bank*

*AG*, 2015 NY Slip Op 30163[U] at *20 [internal quotation marks and citation omitted]; *see*

*Taberna Preferred Funding II, Ltd. v Advance Realty Group LLC*, 45 Misc 3d 1204[A], 2014

NY Slip Op 51461[U], *10 [Sup Ct, NY County 2014] [stating that "(i)n fraud claims, the

paramount concern of a court is the locus of the fraud (,) which ( ) is where the injury is inflicted,

not where the fraudulent act originated" (internal quotation marks and citations omitted)]).

"Further, as the purpose of fraudulent conveyance laws is to aid creditors who have been

defrauded by the transfer of property, consideration of the residency of the parties, particularly

the creditors, is also required to determine their reasonable expectations" (*Wimbledon Fund, SPC*

*(Class TT) v Weston Capital Partners Master Fund II, Ltd.*, 184 AD3d 448, 450 [1st Dept 2020]

[internal quotation marks and citations omitted]; *see Taberna Preferred Funding II, Ltd.*, 2014

NY Slip Op 51461[U] at *10-*11 [explaining that "(a)pplying foreign law to foreign (debtors)

does not necessarily incentivize lawful conduct by the (debtor) in the jurisdiction where the

injury occurred if that (debtor) is managed and operated from a different jurisdiction"]).

Here, New York has a significant interest in applying its laws to the fraudulent

conveyance claims (*see* discussion of New York's interest, *supra* at 20-21). "Since fraudulent

conveyance law is an essential tool in ensuring that creditors' rights manifest into a real

recovery, rather than a worthless, unrecoverable judgment, applying New York law is a sensible

way to fulfill the parties' expectations" (*Taberna Preferred Funding II, Ltd.*, 2014 NY Slip Op

51461[U] at * 11). Texas' interest, on the other hand, is limited. While HCM managed the

Judgment Debtors from its Texas offices, neither it nor the Judgment debtors are incorporated in

Texas and no injury is alleged to have occurred there.[5] "Thus, the only interest that Texas has in

this litigation is regulating the conduct of . . . foreign [entities] doing business within Texas when

the conduct injures parties outside of Texas. That does not outweigh New York's significant

interests in the litigation." (*Highland CDO Opportunity Master Fund, L.P.*, 270 F Supp 3d at

726.)

For previously stated reasons (*see* discussion of New York's interest, *supra* at 19-20),

New York also has a greater interest in enforcing its fraudulent conveyance laws in connection

with the 2017 Transfers by CDO Fund and SOHC than Bermuda and the Cayman Islands. As

already explained, this is particularly so with regard to SOHC, which has no demonstrable ties to

the Cayman Islands beyond the fact of its incorporation there (*see id.* at 20).

Accordingly, New York's law applies to the fraudulent conveyance claims.

2. Statute of Limitations

As a preliminary matter, respondents contend that this claim is time barred under the

relatively recent changes to Article 10 of New York's Debtor and Creditor Law, formerly known

---

[5] The petition does not state where HMC is incorporated and the submissions on these motions
do not supply that information. However, according to the court in *Highland CDO Opportunity
Master Fund, L.P.*, "HCM is incorporated in Delaware, not Texas" (270 F Supp 3d at 726).

**APP 00303**

as the Uniform Fraudulent Conveyance Act ("UFCA"). The UFCA was repealed and replaced by the Uniform Voidable Transaction Act ("UVTA").

Respondents argue that the fraudulent conveyance claims must be dismissed as untimely under the UVTA, as this proceeding was commenced on February 8, 2023, more than four years after the 2017 Transfers and more than a year after their alleged discovery on February 10, 2021. Respondents insist that, despite the fact that the 2017 Transfers occurred prior to the UVTA's effective date, the UVTA is applicable, because the fraudulent transfer claim accrued upon discovery, on February 10, 2021, after the effective date

The UVTA does not apply to the 2017 Transfers. The historical note found after § 278 of the Debtor-Creditor law states that the new statute "**shall not apply to a transfer made or obligation incurred before [the effective date of the statute], nor shall it apply to a right of action that has accrued before such effective date.**"

Respondents' interpretation is contrary to this plain language. The word "nor" indicates that the UVTA "shall not apply" in either situation presented, whether it be a transfer before the effective date or the accrual of a claim before the effective date. Therefore, because the 2017 Transfers occurred before the effective date, under the plain language of the historical and statutory note, the UVTA does not apply.

Respondents rightly point out that a claim will always accrue after a transfer, as in the case of a fraud not being discovered until a later time (*see Guedj v Dana,* 11 AD3d 368, 368 [1st Dept 2004]) or where a judgment must be entered in order for the claim to accrue (*see Matter of Setters v AI Props. & Devs. (USA) Corp.*, 139 AD3d 492, 493 [1st Dept 2016]). However, this does not render "nor shall it apply to a right of action that has accrued before such effective date" superfluous. Its presence serves to emphasize the absence of its mirror opposite. Had the statute

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL        Page 38 of 48
Motion No. 011 013

P - 91

APP 00304

intended otherwise, it would have provided that, in addition to "appl[ying] to a transfer made or obligation incurred on or after such effective date," it applied to causes of action that accrued on or after such date. As the statute does not so provide, the court shall not read such a provision into the statute (*see Corr*, 42 NY3d at 673). "[A] new statute is to be applied prospectively, and will not be given retroactive construction unless an intention to make it so can be deduced from its wording" (*Aguaiza v Vantage Props., LLC*, 69 AD3d 422, 423 [1st Dept 2010]).

Thus, the UFCA is the operative law in this proceeding and, unless indicated otherwise, all references to the DCL refer to the version effective prior to April 4, 2020 (see *Owens v. Turkiye Halk Bankasi A.S.,* 2021 WL 638975, at *2 n. 2 (SDNY Feb. 16, 2021), *aff'd,* 2023 WL 3184617 [2d Cir. May 2, 2023]; see also *In re Diamond Fin. Co., Inc.*, 658 B.R. 748, 772 n. 18 [Bankr. EDNY 2024]["the amendments do not apply in this adversary proceeding because the transfers occurred before the effective date of the UVTA"]). The court in *Foley v Union de Banques Arabes et Francaises* (683 F Supp 3d 375 [SD NY 2023]), a case upon which respondents rely, adopted a contrary interpretation. However, this case appears to be against the weight of authority. In that case, the court treated a claim's accrual after the effective date as the determinative factor, despite the <u>transfer</u> having occurred before the effective date. This interpretation is clearly wrong as it ignores the language of the historical and statutory note that the new statute "**shall not apply to a <u>transfer</u> made". . . before such effective date**.

### 3. Sufficiency of the Pleadings

Respondents contend that the petition fails to state a claim for fraudulent conveyance, because the underlying contention, that the Judgement Debtors intended to defraud UBS by buying insurance to cover the Judgment, is implausible. Next, respondents argue that, because the petition does not specify the value of the assets each entity contributed to the 2017 Transfer,

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL    Page 39 of 48
Motion No. 011 013

P - 92

APP 00305

it fails to allege that the value of the insurance the Funds received was significantly less than the value of the assets they transferred. Respondents also contend that the remaining badges of fraud are insufficiently pleaded to support an intentional fraud claim, because: (1) there was no secret and hasty transfer, as the ATE policy was planned and executed over the course of several months; (2) there were no "dummy" entities involved, as all entities were pre-existing rather than created for the purpose of the transaction; and (3) Sentinel, a regulated insurance company, rather than the transferors, owned the assets after the 2017 Transfers. Finally, respondents argue that because UBS cannot demonstrate that the 2017 Transfers to Sentinel are voidable, neither are any of the subsequent transfers from Sentinel to Ellington, Montage and Mainspring.

UBS responds that the petition sufficiently alleges all of the badges of fraud and that respondents' contention that such allegations are "implausible" and attempts at raising issues of fact are inappropriate on a motion to dismiss on the pleadings.

DCL § 276 provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." To establish actual intent, a petitioner may "rely on 'badges of fraud' to support [its] case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent" (*Wall St. Assoc.*, 257 AD2d at 529 [internal quotation marks and citations omitted]). These include:

> "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance" (*id.*; *see also Matter of Wimbledon Fin. Master Fund, Ltd. v Bergstein*, 166 AD3d 496, 497 [1st Dept 2018]).

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No. 011 013**

**Page 40 of 48**

**APP 00306**

P - 93

93 of 105

Case 21-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
Exhibit P    Page 94 of 105

The allegations of fraudulent intent must be pleaded with particularity pursuant to CPLR 3016

(b) (*see Carlyle, LLC v Quik Park 1633 Garage LLC*, 160 AD3d 476, 477 [1st Dept 2018]). On

a motion to dismiss pursuant to CPLR 3211, the court must accept the petition's factual

allegation as true and, "in the absence of proof that an alleged material fact is untrue or beyond

significant dispute, must not dismiss the [petition]" (*Wall St. Assoc.*, 257 AD2d at 526-527

[internal citations omitted]).

Here, the petition alleges numerous badges of fraud with sufficient particularity to state

a claim for actual fraudulent conveyance under DCL § 276 with respect to the 2017 Transfers.

The Petition alleges that the 2017 Transfers to Sentinel were carried out after negative summary

judgment outcomes in the Underlying Action, at a time when respondents anticipated a $1.2

billion judgment (*see* NYSCEF Doc No. 186, petition ¶¶ 61-64, exhibit 38 [NYSCEF Doc No.

44], HCM's Settlement Analysis [identifying risks to Dondero and the HCM-related entities

associated with the Underlying Action, including a $1.2 billion judgment, and analyzing how

transferring assets away from the transferors could obviate these risks]).

The petition also alleges that the ATE Policy was outside the usual course of business for

Sentinel. Sentinel had never previously issued an after-the-even policy or a policy as large as the

ATE Policy and would not have had the means to pay on the policy without the 2017 Transferred

Assets (*id.* ¶¶ 66, 70). Additionally, the petition alleges that outside counsel raised possible

issues with "the idea that the premium [would] be satisfied by the transfer of the hedge funds'

investment portfolios," as it risked the "'premium' [being] returned or . . . set aside as some

unlawful preference" (*id.* ¶ 72, exhibit 42 [NYSCEF Doc No. 48], email from Solomon Harris at

BC SEN0000745905). CIMA is also alleged to have raised numerous concerns about the ATE

Policy, including that: no one could explain the "basis upon which the [2017 Transferred Assets]

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No.  011 013**

Page 41 of 48

P - 94

**APP 00307**

94 of 105

Case 21-03076-sgj   Doc 397-7   Filed 10/14/25   Entered 10/14/25 21:24:58   Desc
Exhibit P   Page 95 of 105
RECEIVED NYSCEF: 03/25/2025

had been valued on or about August 1, 2017 for the purpose of premium settlement"; and

Sentinel's actuary "was not involved in the determination of premium pricing . . . to any extent at

all" (*id.* ¶ 88, exhibit 67 [NYSCEF Doc No. 73], CIMA's Final Inspection Reports at BC

SEN0000078822, BC SEN0000078819).

Further, the petition alleges that Ellington and Dondero were involved with both sides of

the transaction (*see id.* ¶¶ 63-65, 77, 80) and that they retained control of the 2017 Transferred

Assets through their control of Sentinel as its ultimate beneficial owners and as the sole members

of the Sentinel Advisory Board (*see id.* ¶¶ 13, 14, 63, 71).

Finally, the petition alleges the inadequacy of consideration, as the 2017 Transfers to

Sentinel were for more than four times what was required under the contract for the premium and

exceeded the coverage of the policy (*see id.* ¶¶ 72, 75).

While respondents scoff at the implausibility of the fraudulent scheme set out in the

petition, they do not refute any of its allegations.

Respondents point to internal communications and documents demonstrating that "the

ATE policy was designed as a way for the Funds to settle with UBS" and that using all of their

assets as a premium payment was intended "to convert illiquid securities into cash" and to

"protect against crushing tax liability" (NYSCEF Doc No. 257, Ellington brief at 16, 17; *see*

NYSCEF Doc No. 46, HCM's Settlement Analysis at HCMUBS005254, HCMUBS005257-59).

However, this does not refute fraudulent intent, but merely creates an issue of fact.  Neither does

the fact that UBS was ultimately able to recover a substantial portion of the 2017 Transferred

Assets through its settlement with Sentinel (*see* NYSCEF Doc No. 257, Ellington brief 17-18;

NYSCEF Doc No. 186, petition ¶ 98 n 21, exhibit 25 [NYSCEF Doc No. 31], Partial

Satisfaction-Piece for Post-Judgment Interest at 3) demonstrate that the ATE Policy was created

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No.  011 013**

**Page 42 of 48**

P - 95

**APP 00308**

for that purpose. This is especially so in light of the allegations that: Ellington and Dondero

never disclosed the existence of the ATE Policy; Ellington told UBS that CDO Fund and SOHC

were ghost funds; and it was only after Ellington and Dondero were removed from HCM, that

the Independent Board disclosed the existence of the ATE Policy (*see* NYSCEF Doc No. 186,

petition ¶¶ 90-92).

Respondents also rely on the fact that Sentinel had approximately $19.2 million in assets

and $17.6 million in equity in December 2016 (*see* NYSCEF Doc No. 257, Ellington brief at 17;

*see* NYSCEF Doc No. 55, Sentinel's December 2016 Financial Statements at HCMUBS001071).

However, this does not establish that Sentinel's subsequent transfers to Ellington, Montage and

Mainspring, occurring three to five years later (between 2019 and 2021) did not intrude into

2017 Transferred Assets. Additionally, the fact that the subsequent transfers were made at least

two years after the 2017 Transfers, does not "undermine[] the claim of fraudulent intent"

(*Carlyle, LLC*, 160 AD3d at 477), particularly as the petition alleges that dissipation of the 2017

Transferred Assets started shortly after issuance of the Phase I Judgment (*see* NYSCEF Doc No.

186, petition ¶¶ 99-101; *contra Carlyle, LLC*, 160 AD3d at 477 [ finding the "the timing of the

allegedly fraudulent transfers—beginning two years before the judgment debtors incurred the

subject debts—undermines the claim of fraudulent intent"]).

Respondents also contend that the allegation that "the Funds transferred assets 'valued at

over $105,647,679.00 to satisfy a $25,000,000 premium" is impermissibly vague and disregards

the economic substance of the transaction" (NYSCEF Doc No. 257, Ellington brief at 18,

quoting petition ¶ 72). They argue that the allegations of the petition refute UBS's claim that the

value of the insurance the Funds received was significantly less than the value of the transfers

they made, because: (1) each fund received a policy with a $100 million limit of liability; and

650744/2023 UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL
Motion No. 011 013

Page 43 of 48

P - 96

**APP 00309**

963 of 1405

(2) a review of the APA's Schedule A, listing the transferred assets, shows that CDO Fund contributed only about half, and SOHC contributed only a handful (*see* NYSCEF Doc No. 104, APA at BC SEN0000089127-28). Therefore, they argue, there is no basis for the allegation that each of the Funds transferred more value than the $100 million in insurance they received. However, as the stated purpose of the 2017 Transfer was to satisfy the premium of $25 million, the transfer of assets valued at more than four times that amount alleges an overpayment. Additionally, the statement that "each Fund received . . . an ATE policy with a $100 million limit of liability" is misleading (NYSCEF Doc No. 257, Ellington brief at 18). The $100 million limit was in the aggregate for all three Insureds, CDO Fund, SOHC and CDO Holding (*see* NYSCEF Doc No. 186, petition ¶ 75, exhibit 51 [NYSCEF Doc No. 57], ATE Policy at UBSPROD1973070). Moreover, respondents gloss over the allegation that HFP, one of the Judgement Debtors, received no consideration whatsoever, as it was not a named insured (*id.* ¶ 76).

Lastly, respondents point to the alternate valuations for the 2017 Transferred Assets, contained in the exhibits annexed to the petition: a valuation of $94 million in April 2017 (*see* NYSCEF Doc No. 46, HCM's Settlement Analysis at HCMUBS005261) and a valuation of $68 million in June 2018 (NYSCEF Doc No. 75, Sentinel Presentation to CIMA at UBSPROD2572277). Thus, they argue, the petition itself refutes any suggestion that the Funds overpaid for the $100 million ATE Policy. Considering the petition's allegation concerning the manner in which HCM employees generate these valuations, i.e. that there was no explanation for "the basis upon which the [2017 Transferred Assets] had been valued" (*id.* ¶ 88, exhibit 67 [NYSCEF Doc No. 73], CIMA's Final Inspection Reports at BC SEN0000078819), and the fact

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**
**Motion No.  011 013**                                                    **Page 44 of 48**

P - 97

**APP 00310**

97 of 105

that neither valuation speaks to the value of the 2017 Transferred Assets at time of transfer, they do not refute the petition's allegation of overpayment.

For the foregoing reasons, the petition sufficiently alleges that the 2017 Transfers were actual fraudulent conveyances under DCL § 276 (*see Matter of CIT Group/Commercial Servs., Inc. v 160-09 Jamaica Ave. LP*, 25 AD3d 301, 303 [1st Dept 2006] [holding that "(g)iven the 'badges of fraud,' which include the close relationship among the parties to the transaction, the inadequacy of consideration, (the judgment debtor's) knowledge of (the petitioner's) claims and its inability to pay them, and the timing of the transfer . . . (a) sworn explanation that the transfer was in partial satisfaction of an antecedent rent debt (did) not negate the inference as to intent"]).

Respondents do not challenge the sufficiency of the allegations with respect to the subsequent transfer to Ellington, Mainspring and Montage, other than to challenge the underlying 2017 Transfers. Therefore, to the extent these motions seek to dismiss these turnover claims, the motions are denied.

### 4. Piercing the Corporate Veils of Mainspring and Montage

Dondero contends that there is no basis to hold him liable as Mainspring's alter ego, because the petition fails to allege the elements of veil-piercing in a nonconclusory way. UBS responds that this ignores the plethora of facts alleged that reveal his personal domination over Mainspring.

Ellington does not challenge the sufficiency of the allegations seeking to hold him liable as Montage's alter ego. Instead, he argues that the claim fails because he had only a 9% voting share in Montage, with the remaining 91% controlled by a trust for the benefit of the Cayman Islands Red Cross (*see* NYSCEF Doc No. 74, Sentinel email to CIMA at DISCSEN0008408,

**650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**                    **Page 45 of 48**
**Motion No. 011 013**

P - 98

**APP 00311**

Case 21-03076-sgj    Doc 397-7    Filed 10/14/25    Entered 10/14/25 21:24:58    Desc
Exhibit P    Page 99 of 105

DISCSEN0008410). UBS responds that, because Ellington guided the decision making of the

trustee of the ITA Trust, he was, in fact, controlling Montage's voting shares.[6]

Here, the petition sufficiently alleges that Dondero is Mainspring's alter ego. In addition

to alleging that "Dondero is the ultimate beneficial owner of Mainspring" (NYSCEF Doc No.

186, petition ¶ 13), who "owned 99.5% of Mainspring" (*id.* ¶ 113), it alleges that he used

Mainspring to enter into fake service agreements in order to pay HCM insiders bonuses that they

were otherwise ineligible to receive in HCM's bankruptcy. The petition alleges that Mainspring

received no benefit from these agreements and would even pay the obligations of other entities.

In this way, the petition alleges, Dondero used Mainspring to reward HCM employees who were

loyal to him. (*See id.* ¶¶ 119-128.) Viewed in the light most favorable to petitioner, these

allegations permit the inference that Mainspring "is a 'dummy' for its individual stockholder[]

who [is] in reality carrying on the business in [his] personal capacit[y] for purely personal rather

than corporate ends" (*Port Chester Elec. Constr. Corp.*, 40 NY2d at 657 [internal quotation

marks and citation omitted]).

The petition also sufficiently alleges that Dondero used his domination over Mainspring

"to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury" (*First

Capital Asset Mgt.*, 300 AD2d at 116, citing *Matter of Morris*, 82 NY2d at 141), as it alleges that

he used his position as the ultimate beneficial owner of Mainspring, which owned 70% of

Sentinel, to compel Sentinel to issue dividends, thereby draining assets that would have

---

[6] UBS made this argument during oral arguments on these motions (*see* July 8, 2024 tr at 83:22-
84:8). In its brief in opposition to Ellington's motion, UBS mistakenly assumes that "Ellington
does not dispute, and therefore concedes, that UBS sufficiently alleged he is an alter ego of
Montag" (NYSCEF Doc No. 333, opposition brief to Ellington's motion at 7).

**650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL**    **Page 46 of 48**
**Motion No. 011 013**

P - 99

**APP 00312**

996 of 1405

otherwise been available for collection by UBS (*see* NYSCEF Doc No. 186, petition ¶¶ 113-119).

Accordingly, the petition sufficiently alleges that Dondero was Mainspring's alter ego.

As for Ellington's claim that he did not control the voting shares of Montage, it is contradicted by the very document he cites. In explaining Sentinel's organization chart to CIMA (*see* NYSCEF Doc No. 74, Sentinel email to CIMA at DISCSEN0008410), a Beecher employee states that "ITA acts as trustee of the shares . . . and holds the shares in trust, with the Cayman Islands Red Cross as the beneficiary" (*id.* at DISCSEN0008408). As the petition alleges that Dondero and Ellington were the sole members of the Sentinel Advisory Board of ITA Trust, and that they "guide[d] the decision making of the Trustee of the ITA Trust in its role as an indirect shareholder in Sentinel" (*id.* ¶ 71, exhibit 66 [NYSCEF Doc No. 72] at BC SEN0000076075), this contradicts Ellington's claim that he did not control Montage.

For the foregoing reasons, the motions to dismiss are denied with respect to the second claim to the extent that the claim seeks to hold Dondero liable as the alter ego of Mainspring and to hold Ellington liable as the alter ego of Montage.

## C. Converting the Special Proceeding into a Plenary Action

Respondents contend that this proceeding should be converted into a plenary action, because the fact-laden claims at issue are inappropriate for summary disposition. UBS responds that the request should be denied, because there is no basis for it.

Article 52 of the CPLR provides for the enforcement of money judgments and, where the asset sought is not in the possession of the judgment debtor, the article authorizes a turnover proceeding to be brought against the transferee (*see* CPLR 5225 [b]). In fact, "when the 'property' of a judgment debtor is physically held by a third party, the applicable provision is

650744/2023  UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL
Motion No. 011 013

Page 47 of 48

CPLR 5225 (b), and a special proceeding is required" (*AC Penguin Prestige Corp. v Two Thousand Fifteen Artisanal LLC*, 233 AD3d 576, 577 [1st Dept 2024].) Further, a special proceeding brought pursuant to CPLR 5225 (b) "obviates the necessity for a plenary action" under the DCL (*Siemens & Halske GmbH. v Gres*, 32 AD2d 624, 624 [1st Dept 1969]; *see Matter of WBP Cent. Assoc., LLC v DeCola*, 50 AD3d 693, 694 [2d Dept 2008]) and "may be maintained under an alter ego theory" (*Matter of Rockefeller v Statement Servs., Corp.*, 204 AD3d 922, 924 [2d Dept 2022] [internal citation omitted]).

Based on the foregoing, the request to convert this turnover proceeding into a plenary action is denied. However, petitioner has now charted its course and should not complain later should it need more recourse to discovery than this proceeding will permit.

Accordingly, it is hereby

ORDERED that the motion of respondent Scott Ellington (motion sequence number 011) to dismiss the petition is denied; and it is further

ORDERED that the motion of respondent James Dondero (motion sequence number 013) to dismiss the petition is denied; and it is further

ORDERED that respondents are directed to serve their answers to the petition within 20 days after the electronic filing of this decision and order; and it is further

ORDERED that counsel are directed to appear for a status conference over Microsoft Teams on April 2, 2025 at 11:00 a.m.

| | | |
|---|---|---|
| 3/25/2025 | | *(signature)* |
| DATE | | HON. MELISSA A. CRANE |
| | | J.S.C. |

| CHECK ONE: | CASE DISPOSED | | X | NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | GRANTED | X   DENIED | | GRANTED IN PART | OTHER |
| APPLICATION: | SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | REFERENCE |

650744/2023   UBS SECURITIES LLC ET AL vs. DONDERO, JAMES ET AL                    Page 48 of 48
Motion No.   011 013

**APP 00314**

# Supreme Court of the State of New York

# Appellate Division: First    Judicial Department

Informational Statement (Pursuant to 22 NYCRR 1250.3 [a]) - Civil

| | |
|---|---|
| **Case Title:** Set forth the title of the case as it appears on the summons, notice of petition or order to show cause by which the matter was or is to be commenced, or as amended. | **For Court of Original Instance** |

UBS SECURITIES LLC AND UBS AG LONDON BRANCH,

- against -

JAMES DONDERO, SCOTT ELLINGTON, HIGHLAND CDO HOLDING COMPANY, HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P., HIGHLAND FINANCIAL PARTNERS, L.P., HIGHLAND SPECIAL OPPORTUNITIES HOLDING COMPANY, CLO HOLDCO, LTD., MAINSPRING, LTD., and MONTAGE HOLDINGS, LTD.

Date Notice of Appeal Filed

**For Appellate Division**

| Case Type | | Filing Type | |
|---|---|---|---|
| ☐ Civil Action | ☐ CPLR article 78 Proceeding | ■ Appeal | ☐ Transferred Proceeding |
| ☐ CPLR article 75 Arbitration | ■ Special Proceeding Other | ☐ Original Proceedings | ☐ CPLR Article 78 |
| ☐ Action Commenced under CPLR 214-g | ☐ Habeas Corpus Proceeding | ☐ CPLR Article 78 | ☐ Executive Law § 298 |
| | | ☐ Eminent Domain | ☐ CPLR 5704 Review |
| | | ☐ Labor Law 220 or 220-b | |
| | | ☐ Public Officers Law § 36 | |
| | | ☐ Real Property Tax Law § 1278 | |

**Nature of Suit:** Check up to three of the following categories which best reflect the nature of the case.

| | | | |
|---|---|---|---|
| ☐ Administrative Review | ☐ Business Relationships | ■ Commercial | ☐ Contracts |
| ☐ Declaratory Judgment | ☐ Domestic Relations | ☐ Election Law | ☐ Estate Matters |
| ☐ Family Court | ☐ Mortgage Foreclosure | ☐ Miscellaneous | ☐ Prisoner Discipline & Parole |
| ☐ Real Property (other than foreclosure) | ☐ Statutory | ☐ Taxation | ☐ Torts |

Informational Statement - Civil

P - 102

FILED: NEW YORK COUNTY CLERK 04/25/2025 03:56 PM     INDEX NO. 650744/2023

NYSCEF DOC. NO.: 449     Case 21-03076-sgj   Doc 397-7   Filed 10/14/25   Entered 10/14/25 21:24:58   Desc   RECEIVED NYSCEF: 04/25/2025

Exhibit P    Page 103 of 105

| Appeal | |
|---|---|
| Paper Appealed From (Check one only): | If an appeal has been taken from more than one order or judgment by the filing of this notice of appeal, please indicate the below information for each such order or judgment appealed from on a separate sheet of paper. |

| | | | |
|---|---|---|---|
| ☐ Amended Decree | ☐ Determination | ■ Order | ☐ Resettled Order |
| ☐ Amended Judgement | ☐ Finding | ☐ Order & Judgment | ☐ Ruling |
| ☐ Amended Order | ☐ Interlocutory Decree | ☐ Partial Decree | ☐ Other (specify): |
| ☐ Decision | ☐ Interlocutory Judgment | ☐ Resettled Decree | |
| ☐ Decree | ☐ Judgment | ☐ Resettled Judgment | |

| Court: | Supreme Court | County: | New York |
|---|---|---|---|
| Dated: | 03/25/2025 | Entered: | 03/26/2025 |
| Judge (name in full): | Melissa A. Crane | Index No.: | 650744/2023 |
| Stage: | ■ Interlocutory ☐ Final ☐ Post-Final | Trial: | ☐ Yes ■ No   If Yes: ☐ Jury ☐ Non-Jury |

| Prior Unperfected Appeal and Related Case Information |
|---|

Are any appeals arising in the same action or proceeding currently pending in the court?     ■ Yes ☐ No
If Yes, please set forth the Appellate Division Case Number assigned to each such appeal.
2024-05185 Appellate Division - First Department
Where appropriate, indicate whether there is any related action or proceeding now in any court of this or any other jurisdiction, and if so, the status of the case:

| Original Proceeding |
|---|

| Commenced by:   ☐ Order to Show Cause ☐ Notice of Petition ☐ Writ of Habeas Corpus | Date Filed: |
|---|---|
| Statute authorizing commencement of proceeding in the Appellate Division: | |

| Proceeding Transferred Pursuant to CPLR 7804(g) | |
|---|---|
| Court: Choose Court | County: Choose County |
| Judge (name in full): | Order of Transfer Date: |

| CPLR 5704 Review of Ex Parte Order: | |
|---|---|
| Court: Choose Court | County: Choose County |
| Judge (name in full): | Dated: |

| Description of Appeal, Proceeding or Application and Statement of Issues |
|---|

Description:  If an appeal, briefly describe the paper appealed from.  If the appeal is from an order, specify the relief requested and whether the motion was granted or denied.  If an original proceeding commenced in this court or transferred pursuant to CPLR 7804(g), briefly describe the object of proceeding.  If an application under CPLR 5704, briefly describe the nature of the ex parte order to be reviewed.
James Dondero appeals the Supreme Court's March 25, 2025 Decision and Order denying Dondero's Motion to Dismiss the claims brought against Dondero by UBS Securities LLC and UBS AG London Branch (collectively, "UBS") in the Special Turnover Petition (the "Petition").

Informational Statement - Civil

P - 103

Issues:  Specify the issues proposed to be raised on the appeal, proceeding, or application for CPLR 5704 review, the grounds for reversal, or modification to be advanced and the specific relief sought on appeal.

1.  Holding that New York law applies to Petitioners' veil-piercing claims;
2.  Holding that the Petition sufficiently alleged that Dondero is the Judgment Debtors' alter ego and that the court has personal jurisdiction over Dondero;
3.  Holding that veil-piercing can apply to a limited partnership;
4.  Holding that New York law applies to Petitioners' fraudulent conveyance claims;
5.  Holding that the Uniform Fraudulent Conveyance Act, not the Uniform Voidable Transaction Act, applies to the 2017  Transfers;
6.  Holding that the Petition sufficiently alleged a claim against Dondero for fraudulent conveyance;
7.  Holding that the Petition sufficiently alleged that Dondero is the alter ego of Mainspring; and
8.  Denying Dondero's request to convert the proceeding into a plenary action.

On appeal, Dondero seeks reversal of the Decision and Order.

## Party Information

Instructions:  Fill in the name of each party to the action or proceeding, one name per line.  If this form is to be filed for an appeal, indicate the status of the party in the court of original instance and his, her, or its status in this court, if any.  If this form is to be filed for a proceeding commenced in this court, fill in only the party's name and his, her, or its status in this court.

| No. | Party Name | Original Status | Appellate Division Status |
|---|---|---|---|
| 1 | UBS Securities LLC | Petitioner | Respondent |
| 2 | UBS AG London Branch | Petitioner | Respondent |
| 3 | James Dondero | Respondent | Appellant |
| 4 | Scott Ellington | Respondent | None |
| 5 | Highland CDO Holding Company | Respondent | None |
| 6 | Highland CDO Opportunity Master Fund, L.P. | Respondent | None |
| 7 | Highland Financial Partners, L.P. | Respondent | None |
| 8 | Highland Special Opportunities Holding Company | Respondent | None |
| 9 | CLO Holdco, Ltd. | Respondent | None |
| 10 | Mainspring, Ltd. | Respondent | None |
| 11 | Montage Holdings, Ltd. | Respondent | None |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |

Informational Statement - Civil

P - 104

## Attorney Information

Instructions: Fill in the names of the attorneys or firms for the respective parties. If this form is to be filed with the notice of petition or order to show cause by which a special proceeding is to be commenced in the Appellate Division, only the name of the attorney for the petitioner need be provided. In the event that a litigant represents herself or himself, the box marked "Pro Se" must be checked and the appropriate information for that litigant must be supplied in the spaces provided.

| Attorney/Firm Name: Deborah Deitsch-Perez / Stinson LLP | | | |
|---|---|---|---|
| Address: 2200 Ross Avenue, Suite 2900 | | | |
| City: Dallas | State: Texas | Zip: 75201 | Telephone No: 214-560-2218 |
| E-mail Address: deborah.deitschperez@stinson.com | | | |
| Attorney Type: ■ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

| Attorney/Firm Name: Robert J. Lack / Friedman Kaplan Seiler Adelman & Robbins LLP | | | |
|---|---|---|---|
| Address: 7 Times Square, 28th Floor | | | |
| City: New York | State: New York | Zip: 10036 | Telephone No: 212-833-1100 |
| E-mail Address: rlack@fklaw.com | | | |
| Attorney Type: ■ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

| Attorney/Firm Name: Andrew B. Clubok / Latham & Watkins LLP | | | |
|---|---|---|---|
| Address: 1271 Avenue of the Americas | | | |
| City: New York | State: New York | Zip: 10020 | Telephone No: 212-906-1200 |
| E-mail Address: andrew.clubok@lw.com | | | |
| Attorney Type: ■ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

| Attorney/Firm Name: Robert S. Landy / Ford O'Brien Landy LLP | | | |
|---|---|---|---|
| Address: 275 Madison Avenue, 24th Floor | | | |
| City: New York | State: New York | Zip: 10016 | Telephone No: 212-858-0040 |
| E-mail Address: rlandy@fordobrien.com | | | |
| Attorney Type: ■ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

| Attorney/Firm Name: Sawnie A. McEntire / Parsons McEntire McCleary PLLC | | | |
|---|---|---|---|
| Address: 1700 Pacific Avenue, Suite 4400 | | | |
| City: Dallas | State: Texas | Zip: 75201 | Telephone No: 214-237-4303 |
| E-mail Address: smcentire@pmmlaw.com | | | |
| Attorney Type: ■ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

| Attorney/Firm Name: | | | |
|---|---|---|---|
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained  ☐ Assigned  ☐ Government  ☐ Pro Se  ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

Informational Statement - Civil