# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

UBS SECURITIES LLC and UBS AG LONDON BRANCH,

                    Petitioners,

    - against -

JAMES DONDERO, SCOTT ELLINGTON, HIGHLAND CDO HOLDING COMPANY, HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P., HIGHLAND FINANCIAL PARTNERS, L.P., HIGHLAND SPECIAL OPPORTUNITIES HOLDING COMPANY, CLO HOLDCO, LTD., MAINSPRING, LTD., and MONTAGE HOLDINGS, LTD.,

                    Respondents.

Index No. _____

**SPECIAL TURNOVER PETITION**

**ORAL ARGUMENT REQUESTED**

Andrew Clubok
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020-1300
Phone:    (212) 906-1200
Email:    andrew.clubok@lw.com

Jason R. Burt[*]
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Phone:    (202) 637-2200
Email:    jason.burt@lw.com

Kathryn K. George[*]
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611-3695
Phone:    (312) 876-7700
Email:    kathryn.george@lw.com

*Counsel for Petitioners UBS Securities LLC
and UBS AG London Branch*

---

[*]    Motion for admission *pro hac vice* forthcoming.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................1

THE PARTIES...........................................................................................................2

JURISDICTION AND VENUE ................................................................................4

LEGAL AUTHORITY FOR RELIEF......................................................................6

FACTS .......................................................................................................................7

I.      Dondero, Ellington, And The Byzantine Structure Of The Highland Capital
        Management "Complex" ................................................................................7

II.     The Underlying Action ...............................................................................14

III.    Anticipating Liability, Dondero And Ellington Shuffle Assets To Put Them
        Beyond UBS's Reach ..................................................................................17

        A.      The 2010 Fraudulent Conveyance From CDO Holding To CLO HoldCo ............17
        B.      The 2017 Fraudulent Conveyances To Sentinel ......................................22
                1.      Dondero And Ellington Manufacture The ATE Policy As A Way
                        To Transfer Assets .......................................................................23
                2.      Dondero And Ellington Set And Carry Out The Terms Of The
                        ATE Policy...................................................................................25
                3.      At All Times, Dondero And Ellington Controlled Sentinel .....................29
                4.      Dondero And Ellington Try To Conceal The 2017 Sentinel
                        Transfers ......................................................................................30
        C.      The 2019 Fraudulent Conveyance To Sebastian Clarke........................................35

IV.     Dondero And Ellington Use The 2017 Transferred Assets As A Piggy Bank .................37

        A.      The 2019-2021 Voidable Transfers To Dondero And Ellington ..........................37
                1.      The 2019-2020 Fraudulent Ellington Reimbursements...........................38
                2.      The 2020-2021 Fraudulent "Dividends" To Mainspring And
                        Montage ......................................................................................42
        B.      The 2020 Voidable Transfer To Pay Bonuses In Violation Of The
                Bankruptcy Court Order ..........................................................................44
                1.      Dondero And Ellington Make Bonus Payments Blocked By The
                        Bankruptcy Court..........................................................................44
                2.      Ellington And Others Defraud The Bankruptcy Court By Filing
                        Claims Seeking Bonuses Already Procured By Fraud ..............................47

CLAIMS FOR RELIEF ..........................................................................................49

I.    CLAIM I: TURNOVER PREDICATED ON FRAUDULENT AND VOIDABLE CONVEYANCES AGAINST CLO HOLDCO, ELLINGTON, MAINSPRING, AND MONTAGE (CPLR 5225(b)) .......................................................................49

        A.    New York's Former Fraudulent Conveyance Law (Effective Through April 3, 2020) .........................................................................................49
        B.    The 2010 Fraudulent Conveyance To CLO HoldCo ............................50
        C.    The Ellington Reimbursements Were Fraudulent Conveyances ...........52
        D.    New York's Current Voidable Transactions Law (Effective April 4, 2020).........53
        E.    The April 2020 And January 2021 "Dividends" To Mainspring And Montage Were Voidable Conveyances.................................................54

II.    CLAIM II: TURNOVER PREDICATED ON ALTER EGO LIABILITY AGAINST DONDERO, ELLINGTON, AND CDO HOLDING (CPLR 5225(b)) ..........55

        A.    Dondero And Ellington Were Each Alter Egos Of The Judgment Debtors ..........56
                1.    Dondero And Ellington Dominated The Judgment Debtors.....................57
                2.    Dondero And Ellington Used Their Domination Over The Judgment Debtors To Defraud And Harm UBS ...............................61
        B.    Dondero And Ellington Were The Alter Egos Of Mainspring And Montage, Respectively.................................................................62
                1.    Dondero And Ellington Dominated Mainspring And Montage, Respectively...............................................................62
                2.    Dondero And Ellington Used Their Control Of Mainspring And Montage To Defraud UBS .................................................63
        C.    CDO Holding Is An Alter Ego Of HFP ...............................................64
                1.    HFP Dominated Its "Asset Repository" CDO Holding............................64
                2.    HFP Used Its Domination Over CDO Holding To Defraud UBS ............66

II.    CLAIM III: VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") BY DONDERO AND ELLINGTON (18 U.S.C. § 1962(c)) ..............................................................66

        A.    The RICO Enterprise ........................................................................68
        B.    The Pattern Of Racketeering Activity.................................................71
        C.    The Predicate Acts ............................................................................75
                1.    Wire Fraud In Violation Of 18 U.S.C. § 1343............................75
                2.    Money Laundering In Violation Of 18 U.S.C. § 1956 ..............80
        D.    Summary Of Allegations To Each RICO Defendant.............................81
        E.    The Harm To UBS ............................................................................83

III.    CLAIM IV: CONSPIRACY TO VIOLATE RICO BY ELLINGTON (18 U.S.C. § 1962(d))...................................................................................84

REQUESTS FOR RELIEF ......................................................................................85

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 5 of 535

## INTRODUCTION

1.        Petitioners UBS Securities LLC and UBS AG London Branch (together, "UBS")

bring this proceeding under CPLR Article 52 to enforce more than a billion dollars in related

judgments that UBS obtained after a decade of hard-fought litigation against Highland Capital

Management, L.P. ("HCM") and its affiliates.  *See UBS Secs. LLC v. Highland Cap. Mgmt., L.P.*,

Index No. 650097/2009 (Sup. Ct. N.Y. Cnty.) (the "Underlying Action").   The court bifurcated

the Underlying Action into two phases ("Phase I" and "Phase II") and entered judgment for UBS

in each phase ("Phase I Judgment," "Phase II Judgment," and collectively, the "Judgment").

2.        In the Phase I Judgment, the court awarded UBS $1,042,391,031.79 against

Highland Special Opportunities Holding Company ("SOHC") and CDO Opportunity Master Fund,

L.P. ("CDO Fund") collectively,[1] including prejudgment interest and another $257,027.92

accruing daily in post-judgment interest.  *See* Ex. 11, Phase I Judgment, at 2-3 (Feb. 10, 2020).   In

the Phase II Judgment, the court awarded UBS $67,222.00 against CDO Fund; adjudged defendant

Highland Financial Partners, L.P. ("HFP" and with CDO Fund and SOHC, the "Judgment

Debtors") the alter ego of SOHC and liable for SOHC's portion of the Judgment; and awarded

UBS $16,283,331.00 in attorney's fees.  *See* Ex. 24, Phase II Judgment, at 9-10 (Nov. 21, 2022).

3.        After UBS obtained the Phase I Judgment, it discovered that HCM's two former

principals—James Dondero (former President and Chief Executive Officer) and Scott Ellington

(former Chief Legal Officer and General Counsel)—conspired for over a decade to frustrate UBS's

ultimate recovery by systematically draining the Judgment Debtors' assets.  Dondero and Ellington

exercised unfettered control over HCM and numerous other entities—including the Judgment

---

[1]     The Phase I Judgment ordered CDO Fund to pay $531,619,426.24 and SOHC to pay
$510,771,605.55.  Ex. 11, Phase I Judgment, at 2-3.

Debtors—to fraudulently transfer assets away from the Judgment Debtors and other potentially liable entities to enrich themselves at UBS's expense. UBS brings this petition (the "Turnover Petition" or "Petition") to collect on its Judgment and hold accountable Dondero, Ellington, and certain entities they controlled and used as part of their scheme to defraud UBS.

## THE PARTIES

4.      Petitioner UBS Securities LLC is a Delaware limited liability company with its headquarters and principal place of business at 1285 Avenue of the Americas in New York, New York 10019.

5.      Petitioner UBS AG London Branch is a Swiss banking corporation with its principal place of business at 5 Broadgate, London EC2M 2QS, United Kingdom.

6.      Respondent Dondero is an individual who resides at 3807 Miramar Ave, Dallas, TX 75205. Dondero co-founded HCM in 1993 and served as its President and Chief Executive Officer until his removal in 2020.

7.      Respondent Ellington is an individual who resides at 3825 Potomac Ave, Dallas, TX 75205. Ellington was HCM's Chief Legal Officer and General Counsel until his removal in 2021.

8.      Respondent SOHC is a Cayman Islands corporation with its principal office at Walker House, 87 Mary Street, George Town, Grand Cayman, Cayman Islands. UBS has a Judgment against SOHC in the amount of $527,054,936.55, on which $137,839,662.28 of gross post-judgment interest has accrued and $33,366,517.87 of post-judgment interest only has been satisfied. *See* Ex. 11, Phase I Judgment, at 3; Ex. 24, Phase II Judgment, at 9.

9.      Respondent HFP is a Delaware limited partnership with its principal office at 100 Crescent Street, Suite 1850, Dallas, Texas 75201. The Supreme Court of New York has declared HFP to be an alter ego of SOHC and adjudged HFP liable for UBS's judgment against SOHC,

presently totaling $631,528,081.35, including post-judgment interest. Ex. 24, Phase II Judgment, at 9.

      10.      Respondent CDO Fund is a Bermuda limited partnership with its principal office at 52 Reid Street, Hamilton, Bermuda. UBS has a Judgment against CDO Fund in the amount of $547,969,979.24, on which $143,454,428.88 of gross post-judgment interest has accrued and $52,420,980.58 of post-judgment interest only has been satisfied. Ex. 11, Phase I Judgment, at 2; Ex. 24, Phase II Judgment, at 9. Although an independently managed HCM now controls CDO Fund, Dondero and Ellington controlled CDO Fund at all times relevant to allegations involving CDO Fund in this Turnover Petition.[2]

      11.      Respondent Highland CDO Holding Company ("CDO Holding") is a Cayman Islands company with its registered office at Intertrust Corporate Services (Cayman) Limited, One Nexus Way, Camana Bay, Grand Cayman, KY1-9005, Cayman Islands. CDO Holding is a wholly owned subsidiary of HFP.

      12.      Respondent CLO HoldCo, Ltd. ("CLO HoldCo"), is a Cayman Islands company with its registered office at Intertrust Corporate Services (Cayman) Limited, One Nexus Way, Camana Bay, Grand Cayman, KY1-9005, Cayman Islands. CLO HoldCo is a wholly owned subsidiary of Charitable DAF Fund, L.P. (the "DAF"), which Dondero indirectly controls and has funded from his personal assets, his family trusts, and HCM.

---

[2]    This Turnover Petition names the Judgment Debtors from the Underlying Action as Respondents because it seeks to pierce the corporate veil against the Judgment Debtors' alter egos. In an action to impose alter ego liability, each alter ego is a necessary party. *Intelligent Prod. Sols., Inc. v. Morstan Gen. Agency, Inc.*, 45 Misc.3d 1225(A), 2014 WL 6883125, at *2 (Sup. Ct. Suffolk Cnty. Dec. 4, 2014) (citing *Mannucci v. Missionary Sisters of Sacred Heart of Jesus*, 94 A.D.3d 471 (1st Dep't 2012)).

13.    Respondent Mainspring, Ltd. ("Mainspring"), is a Cayman Islands company with a registered office at P.O. Box 10008 (c/o Services Cayman Limited), Willow House, Cricket Square, Grand Cayman KY1-1001, Cayman Islands.  Dondero is the ultimate beneficial owner of Mainspring.

14.    Respondent Montage Holdings, Ltd. ("Montage"), is a Cayman Islands company which shares Mainspring's registered office address: P.O. Box 10008 (c/o Services Cayman Limited), Willow House, Cricket Square, Grand Cayman KY1-1001, Cayman Islands.  Ellington is the ultimate beneficial owner of Montage.

### JURISDICTION AND VENUE

15.    As a court of general jurisdiction, this Court has subject-matter jurisdiction over this case.  *See* N.Y. Const. art. VI, § 7; Judiciary Law § 140-b.

16.    Venue is proper under CPLR 5221(a)(4) because this is a special proceeding to enforce a judgment entered by the Commercial Division of the Supreme Court of the State of New York, New York County, and there is no county in this state in which any respondent "resides or is regularly employed or has a place for the regular transaction of business in person."  *See* Ex. 24, Phase II Judgment.  CPLR 5221(a)(4) instructs that "if there is no such county," a judgment creditor may bring a judgment-enforcement proceeding in the supreme court in "the county in which the judgment was entered."  That makes this Court the proper forum.

17.    This Court also has personal jurisdiction over all Respondents.

18.    The Court has personal jurisdiction over CDO Fund and SOHC under General Obligations Law § 5-1402 based on the forum-selection clauses in the agreements underpinning the claims in the Underlying Action.  *See* Ex. 92, Cash Warehouse Agreement ¶ 15 (Mar. 14, 2008) (UBS, CDO Fund, and SOHC agreeing to "submit to the exclusive jurisdiction of the federal and New York state courts located in the county of New York, New York in connection with any

4

dispute related to this Agreement or any of the matters contemplated hereby"); Ex. 93, Synthetic

Warehouse Agreement ¶ 15 (Mar. 14, 2008) (same); Ex. 11, Phase I Decision and Order, at 39

(Nov. 14, 2019) (finding CDO Fund and SOHC liable for breaching these two agreements as part

of UBS's Judgment).  These clauses "obviat[e] the need for a separate analysis of the propriety of

exercising personal jurisdiction," *Oak Rock Fin., LLC v. Rodriguez*, 148 A.D.3d 1036, 1038 (2d

Dep't 2017) and remain enforceable and provide personal jurisdiction for "judgment enforcement

claims" even after Judgment on the claims, *Cortlandt St. Recovery Corp. v. Bonderman*, 73 Misc.

3d 1217(A), 2021 WL 5272497, at *7 (Sup. Ct. N.Y. Cnty. 2021), *reargument denied*, 75 Misc.

3d 469, 476-78 (Sup. Ct. N.Y. Cnty. 2022).

19.     For similar reasons, the Court has personal jurisdiction over HFP.  Although not a

signatory to the agreements involved in the Underlying Action, HFP is "bound" by the agreements'

forum-selection clause as "an alter ego of a signatory," SOHC, as the court found in Phase II.

*Highland Crusader Offshore Partners, L.P. v. Targeted Delivery Techs. Holdings, Ltd.*, 184

A.D.3d 116, 122 (1st Dep't 2020); Ex. 24, Phase II Judgment, at 5-6.

20.     The Court has personal jurisdiction over Dondero and Ellington because, as

explained below, they are alter egos of the Judgment Debtors.  The Court has personal jurisdiction

over CDO Holding because, as also explained below, it is the alter ego of Judgment Debtor HFP.

21.     The Court also has personal jurisdiction over all Respondents under CPLR

302(a)(2) and (a)(3) as participants in a conspiracy involving tortious acts in New York to frustrate

the judgment of a New York court, which resulted in injury in New York.  As demonstrated below,

all Respondents participated in a scheme to funnel away assets to frustrate UBS's efforts to collect

on a judgment from a New York action.  *See, e.g.*, *Wimbledon Fin. Master Fund, Ltd. v. Bergstein*,

2016 WL 4410881, at *4 (Sup. Ct. N.Y. Cnty. Aug. 19, 2016) (citing cases) (holding that

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186

INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 10 of 535

conspiracy to frustrate New York judgment established personal jurisdiction over participants), *aff'd*, 147 A.D.3d 644, 645 (1st Dep't 2017).

## LEGAL AUTHORITY FOR RELIEF

22.     UBS brings this special turnover proceeding under CPLR 5225(b) to enforce the Judgment in its favor.  *See* Ex. 11, Phase I Judgment, at 2-3; Ex. 24, Phase II Judgment at 10-11. To date, the total amount owed on the Judgment, including statutory post-judgment interest, is $1,253,939,017.66.

23.     A judgment creditor can bring a special proceeding under CPLR 5225(b) against any person or entity that (1) possesses or has custody over assets in which the judgment debtor has an interest; (2) unlawfully received assets from the judgment debtor, or received judgment debtor assets in which the judgment creditor has a superior interest, or (3) owes or will owe a debt to the judgment debtor.

24.     The same standards "governing a motion for summary judgment, 'requiring the court to decide the matter upon the pleadings, papers[,] and admissions to the extent that no triable issues of fact are raised'" govern a special proceeding.  *Triadou SPV S.A. v. Chetrit*, 2021 WL 3290834, at *9 (Sup. Ct. N.Y. Cnty. Aug. 2, 2021) (quoting *Matter of Gonzalez v City of New York*, 127 A.D.3d 632, 633 (1st Dep't 2015)).

25.     Although a special proceeding, this action remains a plenary action and allows this Court to adjudicate all disputes between the parties.  *See, e.g.*, *Cardinal Health 414 LLC v. U.S. Heartcare Mgmt., Inc.*, 2013 WL 563288, at *3 (Sup. Ct. Suffolk Cnty. Feb. 13, 2013) ("Although originally a creditor was required to commence a plenary action to achieve this goal, now it can be accomplished through a special proceeding under CPLR 5225 or 5227." (citing *Siemens & Halske GmbH v. Gres*, 32 A.D.2d 624, 624 (1st Dep't 1969) (per curiam))); *Matter of WBP Cent. Assocs., LLC v. DeCola*, 50 A.D.3d 693, 694 (2d Dep't 2008) ("[A] claim to set aside an allegedly

INDEX NO. 650744/2023

fraudulent conveyance of money, assets, or property may be asserted in a special proceeding pursuant to CPLR 5225(b), without first commencing a plenary action . . . .").

**FACTS**

I.    **DONDERO, ELLINGTON, AND THE BYZANTINE STRUCTURE OF THE HIGHLAND CAPITAL MANAGEMENT "COMPLEX"**

26.    Before its bankruptcy, HCM was an investment management firm that managed billions of dollars of assets "through its organizational structure of approximately 2,000 separate business entities." *In re Acis Cap. Mgmt., L.P.*, 2019 WL 417149, at *5 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019), *aff'd sub nom. In re Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021).

27.    Dondero co-founded HCM in 1993 and was its majority owner, President, and Chief Executive Officer until his removal in 2020.[3]    *See* Ex. 36, Email from L. Thedford, at HCMUBS000050 (Mar. 1, 2017) (attaching Highland Affiliate Ownership Chart); *see also In re Highland Cap. Mgmt., L.P.*, 2021 WL 2326350, at *1, *21 (Bankr. N.D. Tex. June 7, 2021). Ellington served as HCM's Chief Legal Officer and General Counsel from 2010 until his removal in January 2021. *See In re Highland*, 2021 WL 2326350, at *17; Ex. 116, Ellington Dep. at 55:4-13 (July 29, 2021). At all times relevant to this Turnover Petition, Ellington operated as one of Dondero's top lieutenants and confidants, often handing many aspects of the business himself.

---

[3]    Dondero resigned from director positions at the Judgment Debtors in 2021. *See* Ex. 129, Letter from Clay Taylor, at HCMUBS005324 (Apr. 28, 2021) ("[T]his letter shall serve as Mr. Dondero's immediate resignation of the alleged director position(s) at HFP and SOHC and/or any officer positions at those entities."); *see also* Ex. 130, Letter from J. Pomerantz, at HCMUBS005322 (May 7, 2021) (requesting that Dondero also confirm his resignation from Highland CDO Opportunity Fund, Ltd. ("CDO Opportunity Fund"), and its subsidiaries, including CDO Fund).

App. 011

28.     Dondero, with Ellington at his side, for years controlled HCM and its vast web of funds and other entities under its management and control with unilateral and unfettered discretion. *See, e.g.*, Ex. 97, HFP 2010 Organizational Chart, at UBSPROD2415709; Ex. 113, Dondero Dep. at 48:8-13 (May 10, 2021) (Dondero was the "decision maker" for HFP and its subsidiaries); Ex. 114, Dondero Dep. at 319:20-325:14 (May 12, 2021) (Dondero had the authority to authorize the sale and assignment of the assets of SOHC, CDO Fund, and related entities); *see also* Ex. 2, Dudney Report, at 40-41 (Apr. 18, 2013) (expert report from the Underlying Action that concludes "HCM and its President and majority owner, Mr. Dondero, sit at the top of [the HCM] organization chart," and "[f]rom this position, Mr. Dondero controlled" HCM and many related entities— including SOHC, CDO Fund, Highland Financial Corp. ("HFC"), HFP, and CDO Holding); Ex. 2, Dudney Report, at 5 ("Mr. Dondero also served as the sole Director of SOHC and as President of the ultimate general partner of CDO Fund."); *In re Acis Cap. Mgmt.*, 2019 WL 417149, at *5 (holding that Dondero controlled his many related entities through friends, family members, and directors-for-hire that the Court described as "nominal figureheads who are paid to act like they are in charge, while they are not.").

29.     Dondero exercised his control in part through his status as the sole stockholder and director of Strand Advisors, Inc. ("Strand"), HCM's general partner.  *See* Ex. 117, Ellington Dep. at 12:4-13:17 (Oct. 19, 2022); Ex. 105, HCM Organizational Chart; *see also generally* Ex. 5, Bk. Dkt. No. 281-1 (Dec. 12, 2019).  Dondero unilaterally made decisions for HCM, and "through his controlling stake in HCM, and/or his positions within SOHC, CDO Fund and HFP, Mr. Dondero was able to control these entities," Ex. 2, Dudney Report, at 41-42, as demonstrated in part by the below (attached in larger format as Ex. 100, HCM Affiliates Organizational Chart (July 2019)):

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 13 of 535



30.     Dondero's dominion over HCM and the related web of entities was so extensive that the bankruptcy court overseeing HCM's reorganization proceeding (the "Bankruptcy Court") labeled this web the "Non-Debtor Dondero-Related Entities" as "[m]any of these non-Debtor entities appear to be under the *de facto* control of Mr. Dondero—as he is the president and portfolio manager for many or most of them." *In re Highland*, 2021 WL 2326350, at *3.

31.     Ellington, as an officer of Strand and the Chief Legal Officer of HCM, also exercised control over the HCM complex. *See* Ex. 117, Ellington Dep. at 21:2-23:16 (as an officer of Strand, Ellington performed any task that Dondero instructed him to perform). Dondero "delegated and entrusted" many decisions related to SOHC, CDO Fund, and related entities to Ellington, *see* Ex. 113, Dondero Dep. at 215:19-216:11, including signatory authority and litigation strategy, *see* Ex. 117, Ellington Dep. at 194:22-196:12; *see also* Ex. 50, Email from S. Goldsmith, at UBSPROD2630461, -463 (Aug. 31, 2017) (Ellington signs on behalf of CDO Fund

App. 013

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 14 of 535

to transfer assets); Ex. 53, Email from J. Sevilla, at BC SEN0000767181 (Nov. 20, 2017)

(Ellington signs on behalf of CDO Fund appointing Beecher as representative).[4]

32.　　Among their vast web of HCM-linked entities, Dondero and Ellington directed six

to initiate the fraudulent activities at issue in this proceeding (the "Transferors"):

- **CDO Fund**, a Judgment Debtor to UBS and an indirect subsidiary of HCM (and, with SOHC, the "Funds").

- **SOHC**, a Judgment Debtor to UBS and wholly owned subsidiary and alter ego of HFP.

- **HFP**, a Judgment Debtor to UBS as alter ego of SOHC and an indirect subsidiary of HCM.

- **HFC**, a subsidiary of HFP.  *See* Ex. 97, HFP 2010 Organizational Chart, at UBSPROD2415709 (reflecting entity organization); *see also* Ex. 26, Email from J. Blumer, at UBSHCDO-160165 (row 665) (attaching Highland Entity Excel Chart and reflecting Dondero as the sole Director/Manager/Trustee of HFC).

- **CDO Holding**, a wholly owned subsidiary of HFP.  *See* Ex. 97, HFP 2010 Organizational Chart, at UBSPROD2415709 (reflecting entity organization).[5]

- **CDO Opportunity Fund**, which is also an indirect subsidiary of HCM and serves as the "offshore feeder" fund to CDO Fund.  *See* Ex. 104, CDO Opportunity Fund Organizational Chart, at UBSPROD5113036.

33.　　A testifying expert in the Underlying Action applied New York principles of alter

ego relationships and concluded that "HCM and its President and majority owner, Mr. Dondero,

---

[4]　　Indeed, Ellington's repeated use of the term "we" under oath to describe himself, Dondero, and their web of companies evidences Ellington's understanding of his control over the HCM complex and his partnership with Dondero at all times during the relevant events. *See* Ex. 117, Ellington Dep. at 119:10-120:15, 140:25-141:12, 192:6-11, 369:8-11.

[5]　　Although HFC was listed in the organizational chart as an intermediate parent of CDO Holding just below HFP, *see* Ex. 97, HFP 2010 Organizational Chart, at UBSPROD2415709, Dondero and Ellington similarly ignored this corporate form as evidenced by their own documented plan to directly strip CDO Holding of its assets in 2010 and again in the 2017 Fraudulent Conveyances defined and described *infra* Section III. *See, e.g.*, Ex. 40, Email from I. Leventon, at HCMUBS005260 (Apr. 19, 2017) (internal document ignoring HFC's intermediate ownership of CDO Holding).

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 15 of 535

sit at the top of [the HCM] organization chart," and "[f]rom this position, Mr. Dondero controlled"

several HCM-related entities—including the Funds, HFC, HFP, and CDO Holding. Ex. 2, Dudney

Report, at 40. In support, the expert relied upon the following facts and findings:

- Dondero "unilaterally ma[d]e decisions on behalf of HCM," and "through his controlling stake in HCM, and/or his positions within SOHC, CDO Fund and HFP, Mr. Dondero was able to control these entities." Ex. 2, Dudney Report, at 41-42.

- In 2009, Dondero eliminated the requirement that HFP have independent directors and made himself the sole director of HFP and direct decision maker for HFP and its subsidiaries. Ex. 88, Email from H. Kim, at UBSPROD1854773 (Sept. 11, 2020) (attaching HFP board minutes). HFP and its subsidiaries were financially dependent on HCM for their capital needs; indeed, at one point Dondero committed that HCM "would cover up to $12 million of margin calls" for HFP. Ex. 2, Dudney Report, at 49. In general, there was a "lack of separateness between HFP and its subsidiaries and HCM." Ex. 2, Dudney Report, at 49. This alter ego relationship encompassed CDO Holding, which HFP dominated for the benefit of itself and other HCM subsidiaries. Ex. 2, Dudney Report, at 44, 49.

- "Dondero exercised his ability to dominate and control HCM, SOHC, CDO Fund and HFP, amongst other [HCM] [e]ntities," to his own benefit, including to "authorize loans to himself" and facilitate transfers among these entities—"which were not at arm's length or executed in accordance with corporate formalities." Ex. 2, Dudney Report, at 54-56.

34.    The expert's findings track the conduct animating this special proceeding. Dondero

and Ellington ensured the entities they controlled routinely failed to observe corporate formalities

with respect to their personnel, internal systems, and considerable assets. *See, e.g.*, Ex. 117,

Ellington Dep. at 113:5-9 (HCM employees' salaries reflected "an amalgamation of total efforts"

on behalf of all affiliated entities "as directed by Mr. Dondero as the [General Partner]" of HCM);

*see also* Ex. 26, Email from J. Blumer, at UBSHCDO-160165 (rows 536, 666) (attaching Highland

Entity Excel Chart and reflecting Dondero as CEO and "sole member of 'Monitoring Committee'"

App. 015

of HFP).[6]  At all times material to UBS's claims in this Petition, these entities functioned as extensions of one another and ultimately extensions of Dondero and Ellington.

35.    HCM, the Judgment Debtors, and the other Transferors often utilized the same offices, employees, and internal counsel.  *See, e.g.*, Ex. 121, Leventon Dep. at 27:25-28:15, 31:6-19 (Oct. 10, 2022) (CDO Fund and SOHC shared the same registered office in the Cayman Islands and also operated out of the same business office as HCM, "co-located" in Delaware); *id.* at 28:21-29:3, 31:20-25 (CDO Fund and SOHC did not have any employees or internal counsel separate from HCM); *see also* Ex. 92, Cash Warehouse Agreement ¶ 9 (Mar. 14, 2008) (listing the same address for all Judgment Debtors: Two Galleria Tower 13455 Noel Road, Suite 800 Dallas, Texas 75240).  Many of these entities did not have separate boards of directors or a formal corporate structure.  *See* Ex. 111, DiOrio Dep. at 22:10-23:5.

36.    Dondero and Ellington exerted their control through high-ranking HCM employees, including Matthew DiOrio (Managing Director), Katie Lucas Irving (Managing Director), Isaac Leventon (Assistant General Counsel), and Jean Paul Sevilla (Assistant General Counsel), who functioned as Dondero and Ellington's lieutenants in executing their instructions. *See, e.g.*, Ex. 111, DiOrio Dep. at 18:3-21:1 ("[w]hen asked to do something" by Dondero or Ellington, DiOrio "would do it"); Ex. 119, Irving Dep. at 18:11-15 (Sept. 20, 2022) ("I would work on anything that Mr. Ellington needed me to work on."); Ex. 121, Leventon Dep. at 26:22-29:9 (Leventon provided services to both HFP and its wholly owned subsidiary SOHC, while he was an employee at HCM without separate compensation from either entity); Ex. 121, Leventon Dep.

---

[6]    *See also, e.g.*, Ex. 116, Ellington Dep. at 61:16-23 (HCM compensated Ellington for his work on behalf of HCM's affiliates and managed funds); *id.* at 63:20-64:4 (Ellington used an HCM email address in connection with his work on behalf of HCM's affiliates); Ex. 111, DiOrio Dep. at 20:22-22:9 (Oct. 3, 2022) (Ellington hired DiOrio to work on matters for an HCM affiliate, but he never received separate paychecks).

App. 016

at 183:8-18 (Leventon did work for SAS without separate compensation); Ex. 125, Sevilla Dep. at

37:15-23 (Oct. 11, 2022) (Sevilla performed work on Dondero's personal matters because he

"ha[d] been assigned it, by Mr. Ellington and/or Mr. Dondero" and because he "considered it part

of his job" as an HCM employee).

37.   HCM employees even performed work for Dondero and Ellington personally as

part of their HCM employment, all without separate compensation.  As DiOrio testified, "everyone

wore multiple hats at Highland, I guess. . . . Highland employees would work on NexPoint issues,

*personal business for Dondero*, anything like that."   Ex. 111, DiOrio Dep. at 17:23-18:15

(emphasis added); Ex. 111, DiOrio Dep. at 21:25-22:9 (DiOrio only received a paycheck from

HCM despite doing work for other entities).   Below are a few examples:

- Sevilla and Leventon each worked for years, along with another HCM-employed bookkeeper, on tasks related to Dondero's divorce.  Ex. 125, Sevilla Dep. at 30:19-31:10, 31:18-25; Ex. 121, Leventon Dep. at 43:25-44:12.

- Leventon also litigated a lemon law claim for Dondero without separate compensation.  Ex. 121, Leventon Dep. at 44:13-25.

- Stephanie Vitiello helped Dondero manage a building leased to a salon.  *See* Ex. 128, Vitiello Dep. at 39:7-21 (Sept. 19, 2022).

38.   Even Ellington did personal tasks for Dondero, just as he expected of other HCM

employees.  *See* Ex. 117, Ellington Dep. at 51:2-8 (HCM "employees also performed work for

entities connected with Mr. Dondero for which there was no shared services agreement" and "for

Mr. Dondero personally"); *see also* Ex. 117, Ellington Dep. at 115:23-116:2 (Ellington's "team

sometimes did personal work for" him).  Completing personal tasks for Dondero influenced HCM

employees' annual compensation.  *See* Ex. 117, Ellington Dep. at 113:13-16 ("[I]f it was a personal

assignment for Mr. Dondero, it was still seen as value to Mr. Dondero as the GP, and he set these

overall compensation numbers.").

39.     Sevilla and Irving also worked on personal matters for Ellington, including conducting diligence and analysis for personal investments that Ellington was considering.  Ex. 125, Sevilla Dep. at 35:22-36:25; Ex. 119, Irving Dep. at 18:11-22 (Irving would work on "anything that Mr. Ellington needed me to work on," including personal matters).  Likewise, DiOrio conducted diligence for Ellington's personal investments, paid rent on a warehouse Ellington leased, and helped manage Ellington's personal trust.  Ex. 111, DiOrio Dep. at 15:9-16:8, 18:3-21:1.  For these tasks, DiOrio was not paid separately from his HCM salary.  Ex. 111, DiOrio Dep. at 15:5-8, 17:4-18:2.  And regularly DiOrio did not have an understanding of the entity for which he was performing his work.  Ex. 111, DiOrio Dep. at 18:3-19:16, 52:24-53:7.

40.     DiOrio was particularly loyal to Ellington.  He has known him since 2009.  Ex. 111, DiOrio Dep. at 90:22-91:1.  Before joining HCM, at an event with Ellington in a bar, DiOrio agreed to become a shareholder of one of the entities Ellington owned without any knowledge of the entity after Ellington assured DiOrio he would not "have any liability."  Ex. 111, DiOrio Dep. at 89:25-92:1.  DiOrio never paid for the shares, received any equity or distributions, or attended any meetings; indeed, he could not even remember the entity.  Ex. 111, DiOrio Dep. at 89:25-90:6, 95:18-96:24.  Indeed, after getting fired from HCM, Ellington hired DiOrio to work at Skyview.  Ex. 110, DiOrio Dep. at 12:11-12.

## II.     THE UNDERLYING ACTION

41.     UBS became entangled in Dondero and Ellington's web back in 2007.  In 2007 and 2008, UBS agreed to pursue a complex securitization transaction involving collateralized debt

obligations and collateralized loan obligations with HCM, CDO Fund, and SOHC (the "Knox Transaction").[7]

42.     The Funds stood to earn significant fees in connection with this transaction and in exchange agreed to bear 100% of the risk of loss associated with the transaction.  *See* Ex. 11, Phase I Decision and Order, at 12, 17.

43.     In late 2008, amid the global economic recession, the assets suffered steep losses and the Funds breached their contractual obligations to bear 100% of those losses.  *See* Ex. 11, Phase I Judgment, at 2.  UBS thus terminated the agreements in December 2008, at which point the losses on the diminished assets had grown to $519,374,149.  Ex. 11, Phase I Decision and Order, at 26-27.

44.     UBS sued HCM, the Funds, and several other affiliated entities (including HFP) in the New York Supreme Court for breach of contract from the Funds and indemnification from HCM.  *See* Ex. 11, Decision and Order, at 1.

45.     Prior to the court's entry of the Phase I Judgment and the Phase II trial on UBS's remaining claims, HCM filed for bankruptcy, staying the Phase II trial.[8]  In January 2020, an independent board of directors (the "Independent Board") of Strand took over sole authority to oversee HCM's operations, management of its assets, and its bankruptcy proceeding.  *See* Ex. 6, Bk. Dkt. No. 339 (Jan. 9, 2020).

---

[7]  A collateralized loan obligation ("CLO") is a financial structure that acquires and manages a pool of loans or other debt.  The CLO raises money by issuing its own debt tranches, as well as equity, and uses the proceeds of those issuances to obtain loans.  As the borrowers of the underlying loans make payments, the CLO distributes the money to its investors.

[8]  HCM's bankruptcy case was transferred to the United States Bankruptcy Court for the Northern District of Texas under case number 19-bk-34054.

App. 019

46.     In late 2020, HCM and several of its largest creditors, including UBS, participated in a Bankruptcy Court-ordered mediation.  *See* Ex. 10, Bk. Dkt. No. 912, at 2 (Aug. 3, 2020). During this time, Ellington repeated several misrepresentations to UBS that he had made over the years, including that the Funds were "ghost funds."  *See* Ex. 87, Email from I. Leventon, at UBSPROD1738891 (Aug. 21, 2020) (Ellington misrepresenting that (1) "[m]ost of the employees and custodians" of documents related to the Funds' assets "have not worked for the debtor or related entities in 10+ years," (2) the Funds are "ghost funds" and noting that "UBS is aware of this situation . . . because I have personally discussed it with [Andy Clubok, UBS's counsel] several dozen times," and (3) Ellington and Leventon spent 100+ hours "trying to piece together everything we can" and "all that is available" about the Funds).

47.     Despite long discussions with mediators and months of settlement discussions between the parties, it was only after Dondero and Ellington were removed that HCM and UBS were able to reach an agreement in principle to settle UBS's claims in the bankruptcy.  Then, on or about February 10, 2021, on the eve of the parties signing a settlement agreement, HCM disclosed several fraudulent conveyances that HCM entities (at the direction of Dondero and Ellington) had conducted in concert with Sentinel, a Dondero- and Ellington-affiliated insurance entity based in the Cayman Islands.  *See* Ex. 90, HCM and UBS Settlement Agreement, at 2 (Mar. 30, 2021) (acknowledging disclosure of ATE Policy); Ex. 16, Bk. Dkt. No. 2389, at Exhibit 1, at 2 (May 27, 2021) (order approving settlement).  UBS and HCM renegotiated their settlement, including settlement of UBS's Phase II claims against HCM and certain related entities.

48.     On July 27, 2022, the court issued a Decision and Order on the remaining, unsettled Phase II claims, finding HFP to be an alter ego of SOHC and liable for satisfying the $510,771,605.55 Phase I Judgment against SOHC, plus all statutory interest.  Ex. 23, Phase II

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 186
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 21 of 535

Decision and Order (July 29, 2022). On November 21, 2022, the court issued the Phase II Judgment. Ex. 24, Phase II Judgment.

## III. ANTICIPATING LIABILITY, DONDERO AND ELLINGTON SHUFFLE ASSETS TO PUT THEM BEYOND UBS'S REACH

### A. The 2010 Fraudulent Conveyance From CDO Holding To CLO HoldCo

49.     In late October 2010, the parties to the Underlying Action had fully briefed, and the presiding court held a hearing on, HFP's and the Funds' motion to dismiss UBS's claim against HFP as alter ego of SOHC. *See* Ex. 12, Motion to Dismiss Hearing Transcript, 650097/2009 (Oct. 19, 2011). UBS highlighted the many facts animating UBS's allegations that HFP exercised unfettered control over SOHC and used that control to defraud UBS, all facts the court later determined to be true. Ex. 12, Motion to Dismiss Hearing Transcript at 29:24-30:14 (citing the allegations in UBS's complaint that explained the alter ego relationship between HFP and SOHC). Dondero and Ellington saw the writing on the wall and correctly predicted that the court would hold that HFP is the alter ego of SOHC and thus liable for claims under which UBS would seek hundreds of millions of dollars in damages. *See* Ex. 1, Decision and Order Denying Motion to Dismiss, 650097/2009, at 10 (Nov. 3, 2011) (holding that UBS sufficiently pled an alter ego relationship between SOHC and HFP and denying motion to dismiss); *see also* Ex. 23, Phase II Decision and Order, at 9 (holding that HFP is the alter ego of SOHC and liable for the Judgment).

50.     The following figure (attached in larger format as Ex. 97, HFP 2010 Organizational Chart, at UBSPROD2415709), shows the way HCM controlled HFP as the 100% owner of its general partner. It also shows the way HCM was thus able to control HFP's subsidiaries:

App. 021



51.     Shortly after the hearing, Dondero acted to move HFP's assets out of its structure and therefore ostensibly out of the reach of any future UBS judgment. On December 23, 2010, CDO Holding transferred substantially *all* of its assets in exchange for cash and a promissory note to CLO HoldCo, an entity created just weeks before (the "2010 Fraudulent Conveyance"). *See* Ex. 96, CDO Holding Balance Sheet, at UBSPROD4957189, tab "200.3 CDO BS."

52.     CDO Holding was "one of the primary repositories of assets of HFP." Ex. 121, Leventon Dep. at 32:5-15. HFP used CDO Holding's assets for whatever HFP and HFP's subsidiaries needed. Indeed, HFP's former President and Chief Executive Officer (an HCM employee), Todd Travers, admitted that HFP and its subsidiaries did not employ any specific limitations or procedures that governed when one HFP subsidiary could cover the debt of HFP or another subsidiary. *See* Ex. 127, Travers Dep. at 192:14-193:8 (Apr. 3, 2012) (decisions to cover debts for HFP or its subsidiaries were "all just sort of done on an ad hoc basis as Mr. Dondero

directed"). Dondero—who controlled HFP and therefore CDO Holding—could not even recall if HFP had any policies or procedures in place to determine whether HFP or its subsidiaries would pay its debts. *See* Ex. 112, Dondero Dep. at 431:2-12 (June 11, 2012). HFP's former Chief Operating Officer, Philip Braner, similarly testified that transfers between HFP and its subsidiaries were rarely formally documented as HFP did not have any policies requiring documentation of such transfers. *See* Ex. 108, Braner Dep. at 804:3-20 (Dec. 7, 2011).

53.     For instance, to cover certain SOHC losses in 2008, HFP withdrew about $15 million from CDO Holding. *See* Ex. 2, Dudney Report, at 19; *see also* Ex. 107, Braner Dep. at 323:19-326:11 (Dec. 6, 2011) (Braner approved both the $15 million transfer from CDO Holding to HFP and the later transfer from HFP to SOHC with a one-word email reading "approved"). HFP also used money from CDO Holding to pay legal invoices related to the Underlying Action, even though CDO Holding was not a party. *See* Ex. 121, Leventon Dep. at 32:5-33:7. And as Leventon testified, "if there was any collection against HFP, that collection would then be against its equity holding in CDO [Holding], which would then expose CDO [Holding]'s assets to seizure." Ex. 121, Leventon Dep. at 32:5-33:7.

54.     Assets moved in the other direction as well. CDO Holding routinely "required cash contributions from HFP in order to make various disbursements." Ex. 2, Dudney Report, at 47. In June 2008, SOHC recorded a dividend of $10.5 million to HFP, which HFP in turn moved to CDO Holding. *Id.* In reality, the cash transfer went directly from SOHC to CDO Holding (and not through HFP). *See id.* at 43. That month, HFP also raised $40 million from other HCM entities and transferred the money to CDO Holding to distribute it. *See id.* at 48. In December 2008, "as part of a single set of instructions to Bank of New York Mellon, SOHC transferred $3.7 million to

HFP, which was then transferred to CDO Hold[ing] and ultimately to James Dondero." *See id.* at 48.

55.     CLO HoldCo, on the other hand, was set up specifically to carry out the 2010 Fraudulent Conveyance.  CLO HoldCo was incorporated on December 13, 2010, ***ten days*** before the 2010 Fraudulent Conveyance, "to hold certain CLO assets" and to "enter[] into an investment transaction [the] next week." *See* Ex. 28, Email from H. Kim, at UBSHCDO-015354 (Dec. 14, 2010) (attaching CLO HoldCo's Certificate of Incorporation at UBSHCDO-015356); Ex. 29, Email from A. Alvarez, at UBSHCDO-135396, -98 (Dec. 16, 2010). CDO Holding recorded no sales to any other entity in 2010.  *See* Ex. 96, CDO Holding Balance Sheet, at UBSPROD4957189, tab "200.3 CDO BS."

56.     Dondero controlled CLO HoldCo through its parent, Highland Capital Management Partners Charitable Trust #2, and later, the DAF, which Dondero funded with his own assets and assets from HCM and other sources.  *See* Ex. 71, Email from H. Kim, at UBSPROD2389234, tab "Dissolved Entities," row 429; tab "DAF," row 11 (Sept. 23, 2019) (attaching Legal Entities List); Ex. 18, Bk. Dkt. No. 2660, at 2-3 (Aug. 4, 2021) (CLO HoldCo Contempt Order)]; Ex. 32, Email from M. Okolita, at UBSHCDO-125280 (Dec. 21, 2010) ("Jim [Dondero] will be contributing ~16% of the value [of] the assets . . . .").

57.     To solidify his control, Dondero put an empty suit in charge of CLO HoldCo.  On paper, Grant Scott was CLO HoldCo's director and sole manager.  Ex. 28, Email from H. Kim, at UBSHCDO-015354, -55.  However, as the Bankruptcy Court recently explained when holding CLO HoldCo in contempt for violating court orders, Grant is "a patent lawyer with no experience in finance or running charitable organizations, who was Mr. Dondero's long-time friend, college housemate, and best man at his wedding." *See* Ex. 18, Bk. Dkt. No. 2660, at 2.  The documentation

App. 024

underlying the 2010 Fraudulent Conveyance further underscores Dondero's control, as Dondero

signed as the "[g]atekeeper" for both CDO Holding and CLO HoldCo on an internal compliance

report for the transfer. *See* Ex. 35, Email from C. Chism, at UBSHCDO-212473 (Jan. 5, 2011)

(attaching Dec. 21, 2010 Compliance Report).

58.    The 2010 Fraudulent Conveyance was far from an arm's-length transaction, with

contemporaneous internal HCM documentation evidencing concern over the lack of independent

review and evaluation of the terms of the underlying note.[9]

59.    The justification for the transfer was similarly suspect.  One rushed valuation

determined the assets to be worth at least $39,638,160.00.  *See* Ex. 30, Email from M. Khankin, at

UBSHCDO-117919 (Dec. 16, 2010) (attaching Dec. 8, 2010 Highland Valuation Results Letter).[10]

Dondero justified transferring the asset portfolio to provide "[l]iquidity" to CDO Holding.  Ex. 35,

Email from C. Chism, at UBSHCDO-212473 (attaching Dec. 21, 2010 Compliance Report).  But

CDO Holding received just $6,597,862.00 in cash from the transfer, along with a promissory note

for $32,801,593.00 plus interest that would not be payable for *fifteen* years.  *See* Ex. 96, CDO

Holding Balance Sheet, at UBSPROD4957189, tab "200.3 CDO BS," row 19 (reflecting that

---

[9]    "It appears that the note from the trust to the CDO Holdi[ng] is **not being** independently valued.  I expressed sever [sic] concerns about this being at arms length and told him I had spoken to Clint and Frank AND JIM [Dondero] about this and that it was a requirement and I don't know how you deem a transaction at arms length when you control the terms of the note and no one has reviewed them!???!  He expressed concerns that no one had told him this before to which I reiterated I had told everyone about this, including him and Jim [Dondero] and playing ignorant is not helpful and that I had serious doubts as to how this transaction was fair."  Ex. 32, Email from M. Okolita, at UBSHCDO-125280 (emphasis in original).

[10]    A subsequent version of this document indicates that the two largest CLOs in the portfolio made returns in Euros.  *See* Ex. 34, Email from M. Khankin, at UBSHCDO-056482 (Jan. 3, 2011) (attaching Dec. 8, 2010 Revised Highland Valuation Results Letter).  The dollar figure in this petition calculates the value based on the Euro-to-Dollar spot exchange rate from the valuation date, Dec. 8, 2010.  *See* European Central Bank, Euro Foreign Exchange Rates (Dec. 8, 2010), https://www.ecb.europa.eu/stats/exchange/eurofxref/shared/pdf/2010/12/20101208.pdf    (last accessed Feb. 5, 2023).

between December 31, 2009, and December 31, 2010, CDO Holding added a new intercompany

receivable from CLO HoldCo in the amount of $32,801,593.00); *id.* at tab "200.5 CDO CF," row

1478 (showing that on December 23, 2010, CDO Holding recorded a "sale" of "CDO Holding

Assets" to CLO HoldCo in exchange for $6,597,862.00).

60.     UBS did not discover the 2010 Fraudulent Conveyance until well after Dondero's

and Ellington's removal from HCM.  On February 10, 2021, HCM's bankruptcy counsel sent UBS

a copy of the ATE Policy, which included a schedule listing a promissory note from CLO HoldCo

to CDO Holding.  And only after that initial disclosure did UBS receive a copy of the actual

promissory note and details surrounding the fraudulent nature of the conveyance.

**B.     The 2017 Fraudulent Conveyances To Sentinel**

61.     As the Underlying Action progressed, the defendants' (and, by extension,

Dondero's and Ellington's) litigation setbacks continued to mount.  And after summary judgment

losses in March 2017, Dondero and Ellington knew an adverse judgment was inevitable.  *See* Ex.

116, Ellington Dep. at 115:13-116:13 (Ellington believed Judgment Debtors would lose, was not

surprised by the size of the damages verdict, and had warned Dondero that UBS would likely

prevail); Ex. 120, Leventon Dep. at 87:22-88:4 (July 22, 2021) (Leventon advised Dondero and

Ellington that Judgment Debtors were likely to be found liable).

62.     Dondero and Ellington also knew that the Transferors held substantial assets—all

of which were ultimately under HCM's (and therefore Dondero's and Ellington's) control, and all

of which could be used to satisfy an award to UBS.  And as early as April 2017, HCM's Legal

Department, at Ellington's direction, prepared an internal document that specifically contemplated

the financial and legal risks to HCM, its related entities, and Dondero himself, pending the outcome

of the Underlying Action.  *See* Ex. 38, Email from I. Leventon, at HCMUBS005289 (Apr. 12,

2017) (attaching an HCM "Settlement Analysis" which identified risks to Dondero and the HCM-

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM

NYSCEF DOC. NO. 186

INDEX NO. 650744/2023

RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 27 of 535

related entities associated with the Underlying Action, including a $1.2 billion judgment, and analyzed how transferring assets away from the Transferors could obviate these risks).

63. And so Dondero and Ellington devised and implemented a scheme to move *all* the Judgment Debtors' remaining assets (as well as assets of the other Transferors) that could be subject to the impending judgment to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands-based reinsurance company that Dondero and Ellington ultimately owned (the "2017 Fraudulent Conveyances"). *See* Ex. 68, Email from C. Price, at DISCEN0008408, -8410 (June 20, 2019) (attaching Sentinel Structure Ownership Chart).

       1.     <u>Dondero And Ellington Manufacture The ATE Policy As A Way To Transfer Assets</u>

64. As guise for the 2017 Fraudulent Conveyances, Ellington devised that the Funds and the other Transferors would transfer substantially all their assets (the "2017 Transferred Assets") to Sentinel as "premium" on a so-called "After-The-Event" insurance policy (the "ATE Policy") to the Funds and CDO Holding (together, the "Insureds") for liability in the Underlying Action, under an attendant Asset Purchase Agreement (the "APA"). *See* Ex. 117, Ellington Dep. at 119:10-11; *see also* Ex. 37, Email from S. Vitiello, at UBSPROD4837429 (Apr. 11, 2017) (email between Stephanie Vitiello and Leventon attaching draft ATE Policy presentation "[b]ased on our discussion with Scott [Ellington]"); Ex. 38, Email from I. Leventon, at HCMUBS005295 (attached revised ATE Policy presentation including purchase of "$100m ATE policy from Sentinel" with "ATE premium = all assets in HFP/CDO Fund"). By moving all the 2017 Transferred Assets, Dondero and Ellington could avoid loss of the assets, HCM facing "years of fraudulent transfer claims throughout Highland structure," and "liability to backstop HFP/CDO Fund for up to $1.2b" if UBS won. Ex. 40, Email from I. Leventon, at HCMUBS005253-54 (Apr.

App. 027

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186
INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 28 of 535

19, 2017). The moves also avoided $257 million tax liabilities for HCM, including $50 million for Dondero personally, if HCM happened to win the case. *Id.*

65. Ellington concocted the idea without input from Sentinel or Beecher Carlson, Sentinel's insurance manager ("Beecher").[11] *See* Ex. 117, Ellington Dep. at 327:2-14, 328:9-329:1; *id.* at 119:10-11 (the ATE policy was Ellington's idea); *see also* Ex. 121, Leventon Dep. at 132:3-18 (the presentation "was a document that was being prepared as a presentation to Mr. Dondero to encourage him to settle the UBS litigation"); *see also, e.g.*, Ex. 106, Beecher Dep. at 145:11-19 (Apr. 12, 2022) (that the policy premium would "be satisfied by the transfer of the entire investment portfolios of the [F]unds" was Sevilla's idea).

66. Sentinel's prior business and financial status at the time of the ATE Policy further evidences the ATE Policy's fraudulent nature. Sentinel had never issued an after-the-event legal liability policy before it issued one to the Insureds, nor has it issued one since. *See* Ex. 124, Sevilla Dep. at 138:23-25 (July 21, 2021); Ex. 106, Beecher Dep. at 124:20-125:4. Before the ATE Policy, Sentinel exclusively wrote director and officer liability policies for Dondero- and Ellington-related entities worth fractions of that of the ATE Policy. Ex. 124, Sevilla Dep. at 95:9-23; Ex. 49, Email from K. Irving, at HCMUBS001079 (Aug. 16, 2017). Without the 2017 Transferred Assets, Sentinel would have been unable to pay the full $100 million coverage of the ATE Policy: as of December 2016, Sentinel had only $19,193,823.23 in total assets, $5,886,746.39 of which were cash. *See* Ex. 49, Email from K. Irving, at HCMUBS001079.

---

[11] Beecher "specialized in setting up and helping to manage captive[]" insurers. Ex. 106, Beecher Dep. at 19:6-11. Beecher "helped set up [Sentinel]" and then provided services "consisting of financial statements, preparation, coordination of board meetings, corresponding with the regulators . . . [and] [i]nteracting with the various service providers that Sentinel would engage for audit [and] actuarial" work. *Id.* at 16:1-18.

App. 028

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186
INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 29 of 535

2.      Dondero And Ellington Set And Carry Out The Terms Of The ATE Policy

67.      Dondero, Ellington, and their lieutenants unilaterally dictated the substantive terms of the ATE Policy and associated APA, reinforcing the transfers' fraudulent nature and Dondero and Ellington's control over the Judgment Debtors.

68.      *First*, Dondero and Ellington's lieutenants revised the ATE Policy to allow reimbursement of expenses even if the Insureds could not afford to litigate the Underlying Action—a near certainty given that the Insureds transferred substantially all of their assets to purchase the ATE Policy.  *See* Ex. 42, Email from P. Kranz, at BC SEN0000745902 (Aug. 8, 2017) (responding to an email chain in which Sevilla directs Solomon Harris to remove an exclusion that would permit Sentinel to deny coverage to an insured that lacked the funds to litigate its case).

69.      *Second*, Dondero and Ellington's lieutenants carefully tailored the terms of the ATE Policy to enable the Insureds and other related entities to drain the policy limit through reimbursements unrelated to the Underlying Action.  *See* Ex. 42, Email from P. Kranz, at BC SEN0000745902-03 (Sevilla directing Solomon Harris to extend coverage under the Policy to the Insureds' "own costs and expenses," and later broadening that language to the "costs and expenses of the Representative *and other service providers in the normal course*, including related tax, which are incurred during the conduct of the legal action on behalf of the insured" (emphasis added)).

70.      *Third*, when Sentinel's actuary analyzed the ATE under the terms Dondero and Ellington's lieutenants provided, including the coverage limit and premium, the actuary noted that "[e]ven under reasonably optimistic assumptions," Sentinel would lose money on the ATE Policy. Ex. 41, Email from T. Adamczak, at BC SEN0000745987 (June 28, 2017). But this did not deter Dondero, Ellington, or their lieutenants.

App. 029

71. *Finally*, to ensure that they would have the authority to push the transaction through on Sentinel's behalf, Dondero and Ellington arranged for their own appointment as sole members of the Sentinel Advisory Board of ITA Trust, the entity with ultimate voting control over Sentinel. Although Sentinel had been operating for five years, Dondero and Ellington's tenure on the Sentinel Advisory Board commenced at the same time Sentinel and the Transferors executed the ATE Policy and APA. *See* Ex. 116, Ellington Dep. at 93:9-10 (Ellington testifying that Sentinel was formed in 2012); Ex. 66, Email from C. Price, at BC SEN0000076075 (Mar. 5, 2019) (attaching Sentinel Board Minutes). As the sole members of the Advisory Board, Dondero and Ellington would "guide the decision making of the Trustee of the ITA Trust in its role as an indirect shareholder in [Sentinel]." *Id.*

72. While developing the ATE Policy and APA, Sentinel's outside counsel at Solomon Harris questioned the "legal validity" of the contemplated transfer, ***articulating the exact theory of fraud animating UBS's claims here***: that the 2017 Fraudulent Conveyances put the assets "beyond the reach of the plaintiffs in the [Underlying Action] against the [F]unds" and a court could determine "that the 'premium' has to be returned or . . . set aside as some unlawful preference or similar." Ex. 42, Email from P. Kranz, at BC SEN0000745905. This did not dissuade Dondero or Ellington. In August 2017, Dondero executed the ATE Policy and corresponding APA, transferring the 2017 Transferred Assets valued at over $105,647,679.00 to satisfy a $25,000,000 "premium." *See* Ex. 51, Email from I. Leventon (Oct. 26, 2017); Ex. 98, Asset Purchase Agreement (Aug. 7, 2017).[12]

---

[12] The final APA largely mirrors Appendix 1 that was attached to the settlement analysis presentation prepared by Ellington and his team in April 2017 and presented to Dondero. *See* Ex. 39, Email from I. Leventon, at UBSPROD4837680 (Apr. 13, 2022) (attaching Settlement Analysis presentation).

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186
INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 31 of 535

73.     The face value of the transferred cash and promissory notes sent as part of the 2017 Transferred Assets alone were worth nearly twice the ATE Policy premium.  *See* Ex. 98, Email from I. Leventon, at BC SEN0000089127-28 (Schedule A to APA).[13]

74.     In its time managing "[t]housands" of insurance policies, Beecher had never before seen a premium paid in this fashion.  *See* Ex. 106, Beecher Dep. at 180:18-181:5.  But as DiOrio observed, "I don't think there was a consideration of picking and choosing assets to send.  It was all or none, and they chose all to pay for the policy."  Ex. 111, DiOrio Dep. at 304:16-305:1.

75.     Under the final ATE Policy, Sentinel agreed to indemnify CDO Holding—a non-party to the Underlying Action but alter ego to parties HFP and SOHC—and the Funds for up to a $100 million limit for any adverse judgment or settlement with UBS.  *See* Ex. 51, Email from I. Leventon, at UBSPROD1973056, -70.  Though CDO Holding is not a defendant in the Underlying Action, Dondero and Ellington determined it "had liability" in the suit, *see* Ex. 125, Sevilla Dep. at 118:18-120:4, no doubt because it was an "asset repository" for HFP.  Ex. 121, Leventon Dep. at 32:5-15.

76.     The other three Transferors that contributed their assets—CDO Opportunity Fund, HFC, and HFP—were not insured under the ATE Policy and, as for CDO Opportunity Fund and HFC, were not even party to the Underlying Action.  *Compare* Ex. 98, Asset Purchase Agreement,

---

[13]   The 2017 Fraudulent Conveyances included the assignment of three promissory notes.  *See* Ex. 98, Asset Purchase Agreement, at BC SEN000089127-28.  This included the $32,801,593 CLO HoldCo promissory note, originally issued for the 2010 Fraudulent Conveyance.  Ex. 54, Email from L. Thompson (April 6, 2018) (attaching Assignment Agreement Ex. A (CLO HoldCo Promissory Note)).  It also included the assignment of a promissory note from the Dugaboy Investment Trust for $2,399,996, signed by Dondero's sister, Nancy, and a promissory note from Governance Re Ltd. for $2,155,144, signed by Dondero, both originally issued to CDO Fund on August 7, 2017, just days before the 2017 Fraudulent Conveyances.  *See* Ex. 63, Email from I. Leventon, at UBSPROD2309345-47, 43-44 (Nov. 14, 2018) (attaching Dugaboy and Governance Re promissory notes).

at BC SEN000089127-28, *with* Ex. 51, Email from I. Leventon, at UBSPROD1983071. These three had nothing to gain from the 2017 Fraudulent Conveyances except to safeguard their assets (ultimately under the control of Dondero and Ellington) from an adverse judgment and alter ego liability in the Underlying Action. *See generally* Ex. 122, Raver Dep. at 111:20-112:7 (May 6, 2021) (the Transferors *lost* money in these transfers).

77.    Dondero, Ellington, and their lieutenants were intimately involved in effecting the 2017 Fraudulent Conveyances from both sides. Ellington got the transaction approved and completed, *see* Ex. 113, Dondero Dep. at 74:9-17, and Dondero signed the ATE Policy on behalf of all the Insureds and the APA on behalf of all Transferors, *see* Ex. 51, Email from I. Leventon, at UBSPROD1983071; Ex. 98, Asset Purchase Agreement, at BC SEN0000089124-25. Dondero even tried to sign a corollary to the APA on behalf of the Transferors *and* Sentinel. *See* Ex. 48, Email from T. Loiben, at HCMUBS000863 (Aug. 14, 2017); Ex. 47, Email from T. Loiben, at HCMUBS000947, (Aug. 14, 2017) (attaching Assignment Agreement signed by Dondero as assignor and assignee). Even when they were not acting directly, Dondero and Ellington directed others at HCM to carry out their plans. *See, e.g.*, Ex. 43, Email from J. Sevilla, at UBSPROD2566503 (Aug. 10, 2017) (replying to an email from H. Kim noting that she had to track down Dondero's signature on behalf of the Judgment Debtors); Ex. 46, Email from D. Willmore, at HCMUBS000563 (Aug. 11, 2017) (confirming to Dondero and Ellington's lieutenants that wires had been initiated "to move all of CDO Fund's cash to Sentinel."). For instance, Vitiello worked with Leventon and Ellington to help design the ATE Policy, Ex. 121, Leventon Dep. at 157:14-158:6, and Irving was instrumental in ensuring that Sentinel received all the assets in satisfaction of the premium payment under the APA, *see* Ex. 118, Irving Dep. at 87:13-18 (Nov. 15, 2021).

78.    When asked, Dondero could not be sure who he or Ellington represented in the 2017 Fraudulent Conveyances: Sentinel, the Transferors, or both.  *See* Ex. 113, Dondero Dep. at 143:21-144:14 ("And although Scott Ellington coordinated the overall transaction, I don't know if there was somebody separate representing one side or the other or if he represented both [Sentinel and the Insureds].").

### 3.    At All Times, Dondero And Ellington Controlled Sentinel

79.    Dondero and Ellington happily moved assets out of the various HCM-entities because they fully controlled Sentinel and would still have control over and access to the 2017 Transferred Assets.

80.    As noted above, Dondero and Ellington are and have always been the ultimate beneficial owners of Sentinel.  Dondero tasked Ellington with setting up and managing Sentinel through HCM's in-house legal team.  *See* Ex. 115, Dondero Dep. at 18:25-22:19 (Oct. 18, 2022); *see also* Ex. 117, Ellington Dep. at 50:1-16 (noting that Dondero had "very wide latitude" to direct HCM employees to work on Sentinel).  As a reward, even though Ellington did not contribute any capital, he would receive 30% of the contingent residual interest; Dondero would receive the remaining 70%.  Ex. 115, Dondero Dep. at 22:2-12; Ex. 116, Ellington Dep. at 155:17-156:6.  Dondero and Ellington "call[ed] the shots" as the ultimate beneficial owners of Sentinel.  Ex. 106, Beecher Dep. at 34:16-19.

81.    Ellington was "responsible for managing . . . and monitoring [Sentinel]," Ex. 113, Dondero Dep. at 134:1-4, and in turn directed a close circle of trusted HCM employees to perform, in their roles as HCM employees, work in connection with Sentinel.  *See* Ex. 125, Sevilla Dep. at 41:22-25 (Ellington "directed [Sevilla's] work on the Sentinel platform"); Ex. 111, DiOrio Dep. at 33:4-24 (Ellington instructed DiOrio to work on different platforms, including Sentinel); Ex. 119, Irving Dep. at 238:14-23 (Irving did work for Ellington, including work for Sentinel); Ex.

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186

INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 34 of 535

121, Leventon Dep. at 91:13-92:7 (Ellington directed Leventon's work on Sentinel).  Sentinel had

no separate employees and instead was, until 2021, run exclusively by HCM employees at

Dondero and Ellington's direction.  *See* Ex. 106, Beecher Dep. at 18:10-25; *id.* at 16:22-17:23

(Sevilla, Irving, DiOrio, and Leventon worked on behalf of Sentinel); *see also* Ex. 110, DiOrio

Dep. at 88:25-89:23 (July 23, 2021) (same); Ex. 106, Beecher Dep. at 32:9-22 ("[a]nything

pertaining to the entities within the Sentinel structure . . . would either be communicated by"

Sevilla or select other HCM employees, including DiOrio); Ex. 111, DiOrio Dep. at 115:10-12

(Sevilla "watched" over day-to-day management of Sentinel).  In fact, Ellington appointed DiOrio

as a Sentinel director, using DiOrio to continue to control Sentinel and to push through various

fraudulent dividends and disbursements described below, even going so far as to remove a Sentinel

director at whim.  *See* Ex. 111, DiOrio Dep. at 212:13-19 (DiOrio worked to remove a fellow

Sentinel director because Ellington instructed him to do so).[14]

4.    Dondero And Ellington Try To Conceal The 2017 Sentinel Transfers

82.    Dondero and Ellington went to great lengths to cover up the 2017 Fraudulent

Conveyances to Sentinel.

83.    To start, Dondero and Ellington concealed their ownership of Sentinel and the true

purpose of the ATE Policy from everyone except their trusted lieutenants.  *See* Ex. 113, Dondero

Dep. at 167:20-25 (Dondero did not "remember" or "recall" telling anyone at HCM that he was

the majority beneficial holder of Sentinel); Ex. 123, Ringheimer Dep. at 29:14-18 (Apr. 30, 2021)

(HCM employee who helped push through the transfers was aware they were urgent but could not

---

[14]    DiOrio removed the director and pushed forward the dividend in the same breath: "[p]lease
see the attached shareholder resolution removing Dilip Massand from the Sentinel board. I think
we should be good to get the dividend paid out now."  *See* Ex. 83, Email from J. Neveril, at BC
SEN0000770886 (Apr. 24, 2020).

App. 034

recall an explanation for the urgency); Ex. 126, Stoops Dep. at 16:3-20:16 (Apr. 27, 2021) (HCM employee who helped push through the transfers had "very, very limited knowledge" of the ATE Policy but knew that there was urgency to execute the associated transfers); *see also* Ex. 126, Stoops Dep. at 14:5-17:9 (Sevilla told HCM employee who helped push through the transfers that the transfers were necessary because UBS and HCM were in settlement negotiations and UBS required HCM to remit settlement in cash).

84.     Later on in 2018, Sentinel (on behalf of Dondero and Ellington) tried to hide the fraudulent nature of the transfers by ascribing only $68 million in value to the 2017 Transferred Assets, *assets which HCM confirmed were worth $105,647,679.00 less than one year after the transfers.  See* Ex. 69, Email from K. Irving, at UBSPROD2572277 (Aug. 6, 2019) (attaching Sentinel Presentation to CIMA); Ex. 61, Email from R. Swadley, at HCMUBS003792 (Sept. 12, 2018) (attaching Tax Memorandum).  But an auditor for Sentinel noted that even under this value, "Sentinel [w]as . . . overpaid by approximately $15m" for the premium with "no return of overpayment."  Ex. 55, Email from J. Sevilla, at BC SEN0000707457 (June 6, 2018).  This raised "the question 'is this an arms-length transaction'" and would require "a ton of additional disclosures in the audit report."  *Id.*  Dondero, Ellington, and their lieutenants tried to conceal this disparity through retroactive "adjustments" to the ATE Policy terms, all of which underscore the illicit nature of the 2017 Fraudulent Conveyances.

85.     Around June 2018, Sentinel executed the first of two undated endorsements (or amendments) to the ATE Policy, which "adjusted" the premium from $25,000,000 to Sentinel's $68,362,333.62 valuation of the assets.  *See* Ex. 69, Email from K. Irving, at UBSPROD2572277 (attaching Sentinel Presentation to CIMA); Ex. 52, Limited Liability Insurance Policy and Endorsements, at DISCEN0007913 (June 2018).  The post-hoc increase in the ATE Policy

premium did not increase the policy limit or period of coverage—every other aspect of the ATE

Policy remained the same. *See* Ex. 52, Limited Liability Insurance Policy and Endorsements.

86.     Later that same month, Sentinel executed a second endorsement to the ATE Policy,

reducing the premium and coverage by $9 million for monies that the Insureds supposedly

"prepaid" to "cover risk mitigation costs, which include but are not limited to, legal defense costs."

*See* Ex. 69, Email from K. Irving, at UBSPROD2572277 (attaching Sentinel Presentation to

CIMA); Ex. 52, Limited Liability Insurance Policy and Endorsements, at DISCEN0007913.

87.     Despite the substantive changes to the ATE Policy resulting from the endorsements,

no representative of the Insureds signed either endorsement, and Beecher could not recall whether

the Insureds had representation in connection with these amendments. *See* Ex. 106, Beecher Dep.

at 236:7-13.

88.     The fraudulent nature of the ATE Policy and related transfers came to light in

March 2019 when the Cayman Island Monetary Authority ("CIMA") conducted onsite inspections

of Sentinel.[15] Because Sentinel's only active policy at the time was the ATE Policy, CIMA focused

its assessment on the ATE Policy, the APA, and associated transfers.  CIMA was concerned that

"[t]hose charged with . . . governance could not explain the basis upon which the [2017 Transferred

Assets] had been valued on or about August 1, 2017 for the purpose of premium settlement," and

"they could not explain the reason why the information that was relied on to value the [2017

Transferred Assets] could not be readily provided to the auditors upon request."  Ex. 67, Email

from S. Dube, at BC SEN0000078819, -22 (May 6, 2019) (attaching CIMA Sentinel Final

---

[15]  "[CIMA's] Insurance Supervision Division is responsible for the supervision, regulation, and licensing of all insurance companies and insurance brokers, managers and agents through an integrated risk-based supervisory approach while ensuring compliance with regulatory legislation."  Cayman Islands Monetary Auth., "Divisions," https://www.cima.ky/about-division (last accessed Feb. 6, 2023).

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 37 of 535

Inspection Reports). CIMA similarly found the post hac endorsements troubling, as "[t]hose charged with governance could not explain why the premium was adjusted from US$25 million to US$68.3 million without a commensurate adjustment to the indemnity limit provided or why the initial pricing for the policy was subsequently deemed not sufficient." *Id.* These facts, coupled with the realization that the 2017 Transferred Assets led to a near seven-fold increase in Sentinel's investment portfolio between December 2016 and December 2017, "cast significant doubt on the economic substance and business purpose of the transactions relating to the ATE coverage" that were "at the very least questionable." *Id.*

89.    Dondero and Ellington's lieutenants sought to legitimize the ATE Policy by lying to CIMA in claiming that Sentinel's actuary independently determined the ATE Policy's terms — which the actuary denied and the documentary evidence shows is false. *See* Ex. 67, Email from S. Dube, at BC SEN0000078822 (attaching CIMA Sentinel Final Inspection Reports). In reality, the actuary flagged a "huge down-side risk" with "not much to gain" and warned Sentinel that "[e]ven under reasonably optimistic assumptions, Highlands' loss would exceed the projected premium." Ex. 41, Email from T. Adamczak, at BC SEN0000745985-987, -993 (June 28, 2017).[16] CIMA determined as much through its inspection, finding that Sentinel's actuary "was not involved in the determination of premium pricing . . . to any extent at all" and that the actuary's "involvement arose after premium decisions had been finalized by [Sentinel]." Ex. 67, Email from S. Dube, at BC SEN0000078822. CIMA expressed "concern that the management's assertion that the ATE [P]olicy premium of US$25 million was established based on a pricing study conducted by [Sentinel's] actuary contradicts the actuary's position." *Id.* However, nothing came of these

---

[16] This analysis assumed a premium of $20 million and coverage of $80 million—the final ATE Policy maintained the same losing ratio, with a $25 million premium for $100 million in coverage. Ex. 41, Email from T. Adamczak, at BC SEN0000745985-987.

App. 037

inspections and the fraudulent nature of the 2017 Fraudulent Conveyances and ATE Policy remained hidden.

90.      After the court entered the Phase I Judgment, Dondero and Ellington continued to make every effort to obscure from UBS the existence of the ATE Policy and the 2017 Fraudulent Conveyances.[17]

91.      During years of settlement negotiations with UBS, UBS made requests for documentation relating to the Funds' assets as of February 2009 and any subsequent transfer or dissipation. *See* Ex. 13, Bk. Dkt. No. 1345, at 10 (Nov. 6, 2020).  In response, Dondero, Ellington, and their lieutenants repeatedly lied to UBS, stating such documentation was limited or did not exist, that CDO Fund and SOHC were "ghost funds," that "had no assets left, but if there was a settlement, that Mr. Dondero could come up with funds from some other source to satisfy a relatively small settlement on behalf of those funds." *See, e.g.*, Ex. 87, Email from I. Leventon, at UBSPROD1738891 ("I know that UBS is aware of this situation and I know Andy Clubok knows of this situation because *I have personally discussed it with him several dozen times*.  Including as recently as this year.") (emphasis added); Ex. 103, Ellington Subpoena (Mar. 1, 2022); Ex. 116, Ellington Dep. at 83:15-84:24 (Ellington did not disclose the ATE Policy to UBS's counsel or the Bankruptcy Court); Ex. 120, Leventon Dep. at 150:25-152:4, 268:4-20 (Leventon did not disclose the ATE Policy to UBS, the Independent Board, or HCM's bankruptcy counsel).[18]

---

[17]   Indeed, Dondero and Ellington's lieutenants even went as far as to disclaim any knowledge of Sentinel's relationship with HCM.  *See, e.g.*, Ex. 89, Email from G. Demo, at UBSPROD3603372 (Feb. 9, 2021) (DiOrio, a director of Sentinel at the time, lies in response to a question from Demo requesting visibility into Sentinel's ownership and purpose, "It is a non-debtor, non-affiliate reinsurance company and I do not know who or how it is owned.").

[18]   Neither did Dondero, Ellington, and their lieutenants disclose to the Independent Board that HFP, SOHC, and CDO Fund were insured for up to $100 million under the ATE Policy when representing that they were insolvent.  *See* Ex. 117, Ellington Dep. at 133:3-10, 137:15-138:11 (Ellington did not disclose the ATE Policy to the Independent Board); Ex. 124, Sevilla Dep. at

34

92. It was only on or about February 10, 2021, after Dondero's and Ellington's removal, that the Independent Board first shared with UBS the existence of the ATE Policy and APA, revealing for the first time the clandestine scheme to frustrate the Judgment and defraud UBS. *See* Ex. 90, HCM and UBS Settlement Agreement, at 2 (acknowledging disclosure of ATE Policy).

### C.   The 2019 Fraudulent Conveyance To Sebastian Clarke

93. Just a month after the court found the Funds liable in the Underlying Action, Dondero and Ellington, through their lieutenants, sought to drain Sentinel of the remaining 2017 Transferred Assets.

94. In a single day on December 31, 2019, DiOrio and Sevilla forced through the transfer of $35,201,589 of the 2017 Transferred Assets to Sebastian Clarke—yet another Cayman Island entity Dondero and Ellington owned and controlled.[19]  *See* Ex. 82, Email from M. DiOrio, at BC SEN0000638651 (Mar. 19, 2020) (Sevilla requests that the directors of Sebastian Clarke, John Cullinane and David Egglishaw, "review a matter for approval today" involving a transfer of assets "Sentinel currently marks at zero and which Sentinel would propose to transfer to Sebastian Clarke for minimal consideration"); *id*. at BC SEN0000638650 (DiOrio notes that "[a]ll we need is an email consent to the transfer and we will have it documented later this week"); Ex. 60, Email from J. Venza, at HCMUBS003785 (Sept, 5, 2018) (attaching Offshore Fund Structure Chart) (reflecting Dondero and Ellington's ownership interests in various entities, including Sebastian

---

278:20-279:3 (Sevilla did not disclose the ATE Policy to the Independent Board); Ex. 86, Email from I. Leventon, at UBSPROD1706963 (Aug. 5, 2020) (Leventon did not disclose the ATE Policy when representing that "HFP (the parent of SOHC) and CDO Fund both informed their investors in 2009 that they had zero net asset value," and that, after personally tracking down SOHC's and CDO Fund's assets, "both portfolio assets are illiquid unless the underlying PE positions are sold").

[19]   Sentinel later told UBS that Sebastian Clarke returned the assets.

Clarke); Ex. 111, DiOrio Dep. at 109:22-110:21 (Sebastian Clarke was "an entity under still the same general common ownership" as Sentinel).

95.     In exchange for the assets it sent Sebastian Clarke, Sentinel received just *$3*, even though the assets included two promissory notes from the 2017 Transferred Assets with a face value of over $35 million—notes from entities Dondero confirmed had the ability to pay.[20]  *See* Ex. 99, Asset Transfer Agreement, at UBSPROD020571 (Dec. 31, 2019); Ex. 114, Dondero Dep. at 333:5-16 (confirming that Dugaboy has the solvency to pay off the Dugaboy promissory note); Ex. 115, Dondero Dep. at 190:1-6 (confirming that the estimated value of CLO HoldCo exceeds $100 million).

96.     When pushed to explain why he deemed the notes worthless, DiOrio could only recall vaguely that "there were some notes that were not paying interest, and I didn't have the info to provide to VRC [the independent valuation company] to have them valued."  Ex. 111, DiOrio Dep. at 293:1-16.  But, on the face of the $32,800,000 promissory note from CLO HoldCo, no interest is due until maturity in 2025.  Ex. 54, Email from L. Thompson, at Ex. A (attaching Assignment Agreement).  And DiOrio was unaware whether Sentinel had even demanded payment on the promissory note backed by Dondero's personal trust.  Ex. 111, DiOrio Dep. at 295:14-296:21.

---

[20]   Though within his power, Dondero has done nothing to cause these two promissory notes to be paid to Sentinel.  Dondero is the sole beneficiary of the Dugaboy Investment Trust, and he has admitted that his sister, the trustee, "take[s] guidance from me on the asset management side."  Ex. 115, Dondero Dep. at 62:19-63:16; *see also* Ex. 114, Dondero Dep. at 280:7-21.  Dondero "tr[ies] [to] have as much of [his] assets as possible [stored] in Dugaboy," including "a lot of [his houses]," and has admitted that he had not ever asked his sister whether she would pay off the Dugaboy note.  Ex. 115, Dondero Dep. at 245:21-246:8, 248:15-21.  Similarly, Dondero testified that he has done nothing to ensure that CLO HoldCo would pay off the promissory note.  *Id.* at 240:22-25.

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 186
RECEIVED NYSCEF: 03/29/2023
Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 41 of 535

97.    DiOrio claimed the reason for the rush was that "Sentinel had to get these assets off its balance sheet per the instruction of CIMA" because they "could not be valued or were not valued" and would lead to "a qualified audit opinion." Ex. 111, DiOrio Dep. at 109:22-110:13. But only DiOrio deemed these assets "worthless;" Sentinel did not have the assets independently valued. Ex. 82, Email from M. DiOrio, at BC SEN0000638649, -51 (DiOrio characterizing the assets transferred to Sebastian Clarke as "worthless" but admitting that Sentinel did not have the assets formally valued). And Beecher had "no way of confirming" the value of the assets because "Sentinel had no documents" on the assets' value. Ex. 106, Beecher Dep. at 281:17-282:2. In fact, DiOrio only advised Beecher of the transfer months after the agreement's execution. *See* Ex. 82, Email from M. DiOrio, at BC SEN0000638649 (DiOrio forwarding the agreement to Beecher on March 19, 2020, "Not sure if I ever sent this to you guys. Sale of worthless assets agreement").

## IV.    DONDERO AND ELLINGTON USE THE 2017 TRANSFERRED ASSETS AS A PIGGY BANK

98.    Dondero and Ellington exercised their control over Sentinel to enrich themselves using cash at Sentinel that was originally transferred with, or generated by, the 2017 Transferred Assets. This diminished the fraudulently transferred assets at Sentinel, all of which should have been available to UBS to satisfy the judgment.[21]

### A.    The 2019-2021 Voidable Transfers To Dondero And Ellington

99.    In the months after the November 2019 Phase I Decision and Order, Dondero and Ellington spent, transferred, and otherwise dissipated the 2017 Transferred Assets. They did this in two main ways.

---

[21]    On September 1, 2022, UBS entered into a final settlement agreement with Sentinel, whereby, among other terms, Sentinel agreed to transfer to UBS what remained at Sentinel of the 2017 Transferred Assets, and UBS agreed to count those assets toward satisfaction of the Judgment. *See* Ex. 25, Partial Satisfaction-Piece for Post-Judgment Interest (Feb. 1, 2023).

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186

INDEX NO. 650744/2023

RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 42 of 535

100.    *First*, Ellington charged the ATE Policy for ludicrous personal expenses, unrelated "business development" expenses meant to develop business for other Dondero- and Ellington-entities, and unrelated litigation funding expenses (collectively, and as set forth *infra* ¶¶ 103-112, the "Fraudulent Ellington Reimbursements").

101.    *Second*, Dondero, Ellington, and their lieutenants arranged for "dividend" transfers from Sentinel to Dondero and Ellington's holding companies, Mainspring and Montage. *See infra* ¶¶ 113-119.

102.    Each of these transfers was made for no consideration and was purely to transfer the 2017 Transferred Assets parked at Sentinel to Dondero and Ellington and away from UBS.

1.    The 2019-2020 Fraudulent Ellington Reimbursements

103.    Ellington received several direct cash transfers that funded his high-flying party lifestyle and supposed attempts to drum up non-Sentinel business—expenses unrelated to the ATE Policy or to Sentinel at all.

104.    On December 16, 2019, Ellington submitted for reimbursement $21,557.04 in expenses for travel to Los Angeles, New York City, and Chicago. *See* Ex. 74, Email from M. DiOrio, at BC SEN0000712799 (Dec. 17, 2019). DiOrio forwarded the expense to Beecher Carlson with instructions to reimburse pursuant to the ATE Policy with no further explanation to justify why they qualified as "risk mitigation" expenses under the ATE Policy. *Id.* Beecher made the reimbursement without question. Ex. 76, Email from CIBC Bank, at BC SEN0000004342-43 (Dec. 20, 2019).

105.    On December 19, 2019, Ellington submitted for reimbursement $318,934.88 in expenses for a single day in Austin and seven days in Las Vegas during December 11-17, 2019, all of which Sentinel reimbursed as "business development." *See* Ex. 75, Email from T. Adamczak, at BC SEN0000663342 (Dec. 20, 2019) (attaching Ellington Dec. 19 Expense Report).

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 43 of 535

INDEX NO. 650744/2023

RECEIVED NYSCEF: 03/29/2023

Among the expenses were $42,324 in charges from a *single night* at Sapphire, a Las Vegas strip club,[22] $97,706.19 at nightclub OMNIA, and $157,855.47 at the Wynn casino and hotel in Las Vegas. Ex. 117, Ellington Dep. at 368:16-373:2; Ex. 75, Email from T. Adamczak, at BC SEN00000663344 (attaching Ellington Dec. 19 Expense Report).

106.    Ellington justified the expenses at OMNIA and the strip club Sapphire as related to a party for a real estate brokerage firm that had "worked out and disposed of" hundreds of millions of dollars of real estate for **HCM**. Ex. 117, Ellington Dep. at 369:6-18. Ellington wanted to "thank[] them for their service [to HCM]." *See id.* at 370:15-371:10.

107.    The $150,000+ Ellington spent at the Wynn Hotel was purportedly related to a trial in Lake Las Vegas. Ellington explained Sentinel had "a contingency relationship where Sentinel was investing in fronting part of the money for a return of any recoveries." *See* Ex. 117, Ellington Dep. at 373:10-374:15. But according to public court records, Ellington and Sevilla's trial in Lake Las Vegas was in ***August and September*** 2019 for **HCM**-affiliated entity "LLV Holdco." *See* Ex. 70, Email from J. Sevilla, at UBSPROD2708622 (Sept. 13, 2019) (reflecting Sevilla and Ellington stayed at the Wynn Hotel during a seven-week trial on behalf of LLV Holdco); *see generally* Ex. 3, Docket Excerpts, *LLV Holdco LLC v. James Coyne*, No. A-17-749387 (Jan. 8, 2023) (case docket does not reflect any trial dates during December 2019).

108.    On January 30, 2020, Ellington instructed DiOrio to submit reimbursement requests totaling $78,841.93 for Ellington's personal trips to London and Paris with his girlfriend Stephanie Archer as "Risk Mitigation" expenses under the ATE Policy. Ex. 80, Email from A. Devins (Feb. 6, 2020) (attaching Ellington January Expense Report). For instance, in a December 12, 2019

---

[22]    When Beecher asked questions about the Sapphire expenses, DiOrio simply stated that "this is how [HCM] do[es] business." *See* Ex. 106, Beecher Dep. at 101:7-102:2.

App. 043

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 44 of 535

INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

email exchange planning for the trip, Archer wrote to Ellington, "I would love to do Christmas Eve Dinner at Claridge's." Ex. 72, Email from S. Ellington, at UBSPROD460936 (Dec. 12, 2019). Sure enough, on December 24, 2019, Ellington recorded a $2,629.26 charge to the ATE Policy for "Risk Mitigation" at Claridge's. Ex. 80, Email from A. Devins, at BC SEN0000727324 (attaching Ellington January 30 Expense Report). Ellington and Archer similarly enjoyed visits to the Park Chinois ($4,155.66) and Sexy Fish restaurants ($716.75), as well as a jaunt to the Four Seasons in Paris ($8,089.44). *Id.* Each of these were billed as "Risk Mitigation" expenses. *Id.* When faced with this damning documentary evidence, Ellington admitted that none of the $78,841.93 were in any way related to "Risk Mitigation" or even to Sentinel at all. Ex. 117, Ellington Dep. at 365:6-10.

109.     Also in January 2020, Ellington instructed DiOrio to submit reimbursement requests totaling more than $140,000 for a trip to Toronto that lasted less than a week. Ex. 80, Email from A. Devins, at BC SEN0000727325; Ex. 77, Email from M. DiOrio, at BC SEN0000713384-87 (Jan. 2, 2020). But Ellington could not keep his story straight as to why Sentinel should pay the bill. Although Ellington directed DiOrio to expense the $43,353.54 for his private jet travel to Toronto as purely for "work . . . on settlement for the ATE matter," Ex. 77, Email from M. DiOrio, at BC SEN0000713384-87, he also submitted the $97,492.82 he spent while in Toronto for a mix of "risk mitigation" and "business development" expenses. Ex. 80, Email from A. Devins, at BC SEN0000727324, -26 (attaching Ellington January Expense Report).[23]     Despite the conflicting justifications, Sentinel approved all of Ellington's reimbursement requests for the trip. *See* Ex. 117, Ellington Dep. at 366:19-368:11.

---

[23]   Like his other trips, while in Toronto, Ellington spent more than $20,000 at the Shangri-La Hotel and $18,292.60 at Goldie, a nightclub. *See* Ex. 80, Email from A. Devins, at BC SEN0000727325, (attaching Ellington January Expense Report).

App. 044

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186

INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 45 of 535

110.    Next, on March 12, 2020, Ellington's secretary Sarah Goldsmith submitted a reimbursement request for another London trip costing $273,662.82 for around six days of purported "travel & business meetings related to Sentinel." *See* Ex. 81, Email from A. Damien, at BC SEN0000777547 (Mar. 16, 2020) (attaching Ellington March Expense Report).    Those expenses included three $6,000+ airfares for Kristen Leonardelli, Sara Leonardelli, and Julia Masiello—three people who appear to be unaffiliated with Sentinel. *Id.* at BC SEN0000777513-15.    And again, on one day in London, Ellington spent $75,914.86 at two restaurants and a night club. *Id.* at BC SEN0000777506.

111.    Sentinel reimbursed every single Fraudulent Ellington Reimbursement that Ellington submitted. *See* Ex. 106, Beecher Dep. at 65:19-24.    DiOrio confirmed that he would submit these reimbursements without question. *See* Ex. 111, DiOrio Dep. at 264:5-265:1 ("[W]hen he submitted something . . . and said it was for UBS, I trusted that was the case.").    After all, while DiOrio was a director at Sentinel, "Ellington was [his] direct boss" at HCM. *Id.* at 19:9-16.    And as long as Dondero and Ellington said the expenses were appropriate, Sentinel reimbursed them. *See* Ex. 106, Beecher Dep. at 104:22-105:2 (Q  . . . [The expense] is . . . appropriate because the UBOs said it was appropriate? . . . A  To my knowledge, yes.").

112.    Beecher also "had no choice other than to follow the direction of the directors" no matter the expense. *See id.* at 85:11-86:8; *see also* Ex. 80, Email from A. Devins, at BC SEN0000727319 (processing fraudulent Ellington expenses).    Beecher understood that even if it had pushed back, it "would have had no choice other" than to follow the instructions of DiOrio and other individuals controlled by Dondero and Ellington.    *See* Ex. 106, Beecher Dep. at 85:22-86:5.    In the end, Beecher understood Dondero and Ellington "called the shots," and it never pushed back on any Fraudulent Ellington Reimbursement requests even when Beecher internally

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 186
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 46 of 535

questioned their legitimacy. *Id.* at 24:13-25:13; Ex. 75, Email from T. Adamczak, at BC SEN0000663342 (confirming that Beecher pushed through an expense despite "question[ing] how much 'business development' is actually being done"); Ex. 79, Email from A. Devins, at BC SEN0000713829 (June 1, 2020) (expensing private jet as a risk mitigation expense but noting internally, "I think it's a little excessive, but who am I to say. . .").

2.  The 2020-2021 Fraudulent "Dividends" To Mainspring And Montage

113.  From 2020-2021, Dondero and Ellington extracted millions from Sentinel that should have been payable to UBS to satisfy the Phase I Judgment through "dividends" to Mainspring and Montage.  At the time, Dondero owned 99.5% of Mainspring and Ellington owned 99% of Montage, *see* Ex. 68, Email from C. Price, at DISCEN0008408, -8410 (attaching Sentinel Structure Ownership Chart).  They only revealed their near-complete ownership of Mainspring and Montage—and thus Sentinel—after CIMA regulators warned that the complexity of Sentinel's prior ownership structure "could impede effective regulatory judgment," Ex. 45, Email from A. Devins, at BC SEN0000133653 (Mar. 22, 2018).

114.  On April 24, 2020, Sentinel transferred a total of $6.4 million to Mainspring and Montage, $4,480,000.00 to Mainspring as payment of Dondero's 70% share of the dividend and $1,920,000.00 to Montage as Ellington's 30% share of the dividend.  *See* Ex. 101, CIBC Bank Statement, at BC SEN0000598154 (Apr. 30, 2020); Ex. 84, Email from CIBC, at BC SEN0000004334 (Apr. 24, 2020) (attaching wire transfer to Mainspring); Ex. 85, Email from CIBC, at BC SEN0000004242-43 (Apr. 24, 2020) (attaching wire transfer to Montage).

115.  Despite DiOrio's commitment that Sentinel would "not be entertaining any dividend issuance while the ATE policy is active," Ex. 62, Email from J. Arbeit, at DISCSEN0006464-65 (Oct. 3, 2018) (Beecher advising that issuance of dividends to Dondero and Ellington "would decrease the cash position below the amount of the loss reserves"), this dividend

payment occurred *after* the court entered the Phase I Judgment. Sentinel's own manager could not explain the basis for this dividend distribution. *See* Ex. 106, Beecher Dep. at 210:3-211:10.

116.     As the ultimate beneficial owners of Sentinel, Dondero and Ellington determined when Sentinel issued the dividends. *See* Ex. 111, DiOrio Dep. at 196:8-197:3. Ellington simply "would say, can we issue a dividend, and [DiOrio] would send the analysis like if we—if you want to, we can, shareholders, so it is ultimately—he's the UBO." *Id.* at 195:12-25. Indeed, Dondero and Ellington "could ask [for dividends] every day of the year." *Id.* at 196:8-21, 238:25-239:12; *see also id.* at 224:20-225:12 (Sentinel issued dividends at Ellington's request rather than according to a set payment schedule).

117.     On January 12, 2021, a year after the Phase I Judgment, Dondero and Ellington repeated the same play: they moved another $2.5 million to themselves by sending $1,750,000.00 to Mainspring and $750,000.00 to Montage. *See* Ex. 102, CIBC Bank Statement, at BC SEN0000610180 (Jan. 29, 2021). This violated not only Sentinel's commitment against dividend issuance while the ATE Policy was in effect, but also CIMA's policy requiring that it receive notice before a dividend was issued. Ex. 95, CIMA Statement of Guidance, at 4.2.1 (Jan. 2014). When Sentinel finally provided notice of the dividend issuance to CIMA three months later, it obscured the retroactive nature of the request by noticing a future "dividend *to be declared and paid*." Ex. 91, Email from G. Pereira, at BC SEN0000083961 (Apr. 27, 2021).

118.     In the end, Sentinel's board never rejected a single dividend request submitted on behalf of Dondero and Ellington. *See* Ex. 111, DiOrio Dep. at 196:22-197:1. Ultimately, Dondero and Ellington had "the ultimate responsibility of [Sentinel] meeting capital and solvency requirements." Ex. 106, Beecher Dep. at 21:2-22:9, 23:25-24:25.

119.    Ellington acknowledged receiving millions of dollars from these dividends.[24]  Ex. 117, Ellington Dep. at 126:12-21.  Meanwhile, when the Bankruptcy Court blocked certain bonus payments, Dondero used at least some of his dividend money to reward his loyalists with payments that matched the amounts HCM allegedly owed.  *See id.*

**B.      The 2020 Voidable Transfer To Pay Bonuses In Violation Of The Bankruptcy Court Order**

    1.    Dondero And Ellington Make Bonus Payments Blocked By The Bankruptcy Court

120.    During its bankruptcy, HCM requested that the Bankruptcy Court allow it to pay all employee bonuses. Ex. 4, Bk. Dkt. No. 177, at 1 (Dec. 4, 2019).  The Bankruptcy Court rejected bonus payments to four "statutory insiders": Ellington; Leventon; Frank Waterhouse, former HCM CFO; and Thomas Surgent, former HCM Chief of Compliance, *see* Ex. 7, Bk. Dkt. No. 380, at 2-3 (Jan. 22, 2020) (order approving payment only for "Covered employees"); *see also* Ex. 17, Bk. Dkt. No. 2423, at 118-19 (June 8, 2021) (transcript of Jan. 21, 2020 hearing excluding four "statutory insiders" from the "Covered employees").

121.    In defiance of this order, and with knowledge of the Judgment, Dondero and Ellington schemed to funnel payments to Ellington, Waterhouse, Leventon, and Surgent through Dondero- and Ellington-controlled entities using Judgment Debtor resources.  *See* Ex. 117, Ellington Dep. at 60:22-61:8 (describing nature of the plan); *id.* at 216:7-217:11 (conceding he developed the plan); *id.* at 126:12-21 (conceding he, Leventon, Surgent, and Waterhouse received millions from Mainspring); *id.* at 129:5-24 (conceding he was aware of the Judgment when he

---

[24]   Ellington disputed that he had ever received any "dividends" from Sentinel, but agreed that he had received "distributions," based on his understanding of the terms.  Ex. 117, Ellington Dep. at 125:3-17.  At the time of the payments to Dondero and Ellington, Sentinel called them "dividends" and this Petition adopts that term.

orchestrated the payments); Ex. 115, Dondero Dep. at 126:7-25, 127:9-18, 128:19-129:15 (confirming Ellington developed the plan).

122.    Ellington created an entity called Tall Pine Group, LLC ("Tall Pine") and its general partner, Sunshine Coast Development, LLC ("Sunshine Coast") to enter into consulting agreements with various Dondero-controlled entities, including NexBank,[25] NexPoint,[26] Highland Funds Asset Management,[27] Sentinel,[28] and the DAF,[29] and then subcontract with entities owned by or affiliated with Surgent, Waterhouse, and Leventon.  *See* Ex. 117, Ellington Dep. at 56:21-24, 59:7-60:7, 60:22-61:8, 217:12-24; *see also* Ex. 120, Leventon Dep. at 29:3-31:11 (conceding Leventon received some of the blocked bonus payments from NexPoint).[30]

---

[25]    ***NexBank Capital, Inc.*** ("NexBank") is majority owned by Dondero.  *See* Ex. 100, HCM Affiliate Organizational Chart.  Ellington discussed the consulting scheme with John Holt (President and Chief Executive Officer) and Matt Siekielski (Chief Operating Officer).  *See* Ex. 117, Ellington Dep. at 56:21-24, 217:12-217:23.

[26]    ***NexPoint Advisors, L.P.*** ("NexPoint"), with general partner NexPoint Advisors GP, LLC, is 100% owned by Dondero.  *See* Ex. 100, HCM Affiliate Organizational Chart.  Ellington discussed the consulting scheme with Brian Mitts (Chief Financial Officer of NexPoint Real Estate Advisors).  *See* Ex. 117, Ellington Dep. at 217:12-24; *id.* at 56:19-24.

[27]    ***Highland Funds Asset Management, L.P.***, with general partner Strand Advisors XVI, Inc., is 100% owned by James Dondero.  *See* Ex. 100, HCM Affiliate Organizational Chart (July 2019); *see also* Ex. 94 Highland Funds Asset Management Relationship, at UBSPROD1824596 (Feb. 18, 2011) (clarifying that Highland Capital Management Fund Advisors, L.P. was formerly known as Highland Funds Asset Management, L.P.).

[28]    Ellington used his influence at Sentinel to convince the directors to make a distribution to Mainspring to help fund the bonus payments.  *See* Ex. 117, Ellington Dep. at 215:2-9.

[29]    The ***Charitable DAF Fund, L.P.***, is indirectly controlled by Dondero, as described *supra* ¶¶ 12, 56, and was funded with his own assets, his family trusts, and HCM.  *See* Ex. 18, Bk. Dkt. No. 2660, at 2 (Aug. 4, 2021) (CLO HoldCo Contempt Order).

[30]    At times, the contributing entities, such as Mainspring and NexPoint, made these payments to or created these consulting agreements directly with entities owned by or affiliated with Surgent, Waterhouse, and Leventon.  *See* Ex. 19, Bk. Dkt. No. 2856 ¶ 32 (Sept. 21, 2021) (stipulation that Surgent received $750,906.13 from Tall Pine, $1,887,929.00 from Mainspring, and $135,437.00 from NexPoint).

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 50 of 535

123.    Under the consulting agreements, the contributing entities "were jointly and severally liable for the total amount on the various milestone payment dates." Ex. 117, Ellington Dep. at 214:7-18.  Contributions were based not on services rendered but on ability to pay and regulatory limitations.  *See id*.  When Tall Pine received a "consulting" payment, it would distribute the payment to a pass-through entity controlled by one of the employees.  *See id.* at 59:12-60:2.  As the ultimate economic owner of Tall Pine, *id.* at 60:10-16, Ellington kept the amounts that remained after it paid out the other claims.

124.    The objective was to create the appearance of legitimate business dealings to conceal Dondero and Ellington's true purpose of funneling cash to senior leaders to thwart the Bankruptcy Court's freeze on bonus payments.  But such "consulting agreements" were fraudulent because the "consultants" performed no other work on top of the services already being performed by those individuals as employees of HCM, and in certain instances some of the employees did no work for certain contributing entities.  For example, Ellington used distributions from Sentinel to Mainspring to pay Waterhouse's HCM bonus—but Waterhouse did not do any work for Sentinel. Ex. 117, Ellington Dep. at 226:1-13.

125.    Ellington ultimately directed the amount of the payments and directed members of his legal team, including Sevilla and Leventon, to help structure these consulting agreements and coordinate with the various parties.  *Id.* at 54:11-24, 215:21-23, 216:7-15; Ex. 115, Dondero Dep. at 133:13-15. He also worked with Waterhouse, the Chief Financial Officer at HCM for more than decade, who instructed the accounting department to generate the amounts HCM owed in bonuses to himself, Ellington, Leventon, and Surgent so that Dondero and Ellington could pay those amounts through the consulting agreements. Ex. 117, Ellington Dep. at 213:8-215:1; Ex. 20, Bk. Dkt. No 2940 ¶ 1 (Oct. 19, 2021).

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186
INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 51 of 535

126.     Under these fraudulent consulting agreements, Ellington, Surgent, Waterhouse, and Leventon received[31] roughly $8,638,536.07 in 2020, including about $5,874,203.21 from Mainspring.[32]

- Ellington received $3,074,408.  *See* Ex. 15, Bk. Claim No. 244 (Mar. 23, 2021) (Ellington's amended claim for $3,074,408.16 in bonus payments).

- Surgent received $2,774,272.  Ex. 19, Bk. Dkt. No. 2856 ¶ 32 (Motion for Entry of Order, reflecting Surgent's claim for $2,774,272.13 in bonus payments).

- Waterhouse received $2,102,260.  Ex. 8, Bk. Claim No. 182, at 2 (May 26, 2020) (Waterhouse's claim for $2,102,260.99 in bonus payments).

- Leventon received $687,594.  Ex. 14, Bk. Claim No. 216 Rider 3, at 3 (Mar. 3, 2021) (Leventon's amended claim for $687,594.79 in bonus payments).

2.     Ellington And Others Defraud The Bankruptcy Court By Filing Claims Seeking Bonuses Already Procured By Fraud

127.     Despite having received cash intended to replace the bonuses the Bankruptcy Court denied, Waterhouse, Leventon, Surgent, and Ellington filed proofs of claim that included the amounts already secured through these illicit payments.  Ex. 8, Bk. Claim No. 182 (Waterhouse's claim for $2,102,260.99); Ex. 9, Bk. Claim No. 183 (May 26, 2020) (Surgent's claim for $3,958,628.14); Ex. 14, Bk. Claim No. 216 (Leventon's amended claim for $687,594.79); Ex. 15, Bk. Claim No. 244 (Ellington's amended claim for $3,074,408.16).  After Waterhouse, Leventon,

---

[31]     Ellington testified that he, Surgent, Waterhouse, and Leventon were paid "the amounts that each of them believed were owed to them by HCM, but not paid."  Ex. 117, Ellington Dep. at 211:5-213:14.

[32]     Upon HCM's discovery of some of the illicit payments, Surgent disclosed the full scheme and revealed that Mainspring had contributed 68% of his total bonus payments.  Ex. 19, Bk. Dkt. No. 2856 ¶ 32. Each entity contributed the same percentage to each employee.  Ex. 117, Ellington Dep. at 225:11-18.  Thus, about $5,874,203.21 of these illicit bonus payments came through Mainspring from Sentinel.

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 186
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 52 of 535

and Ellington left HCM, each of them joined Skyview Group ("Skyview"),[33] an entity Ellington owns. They assigned their claims to CPCM LLC ("CPCM"), a wholly owned subsidiary of Skyview. *See* Ex. 116, Ellington Dep. at 38:23-45:21; Ex. 120, Leventon Dep. at 56:24-57:2. CPCM ultimately withdrew both Leventon's and Ellington's claims because of objections.

128.    In January 2021, HCM entered into stipulations with Surgent and Waterhouse that ostensibly resolved their claims. The Bankruptcy Court approved the settlement in February 2021. But before any payment could occur, the Independent Board uncovered evidence of the above-described sizable payments from entities owned by Dondero and Ellington and filed a motion to reconsider the stipulation on account of the uncovered fraud. Ex. 19, Bk. Dkt. No. 2856 ¶¶ 26-35; Ex. 20, Bk. Dkt. No. 2940 ¶¶ 24-27. After HCM presented this evidence to the Bankruptcy Court, Surgent agreed to apply payments already received against his claim. Ex. 19, Bk. Dkt. No. 2856 ¶¶ 36-39. CPCM, however, fought the motion, and Waterhouse moved to quash a subpoena sent by HCM as imposing an undue burden on a third party. Ex. 21, Bk. Dkt. No. 3191 ¶ 5. Ultimately, CPCM and Waterhouse agreed to a settlement and withdrew the claim against HCM for bonus amounts. Ex. 22, Bk. Dkt. No. 3317 ¶ 18 (Mar. 24, 2022).

---

[33]    Skyview also hired DiOrio, Irving, and Vitiello. *See* Ex. 110, DiOrio Dep. at 12:11-12; Ex. 119, Irving Dep. at 10:2-24; Ex. 128, Vitiello Dep. 64:6-65:4. Skyview has around 30 to 40 employees, "almost all ex-Highland Capital Management employees." Ex. 120, Leventon Dep. at 55:23-56:18. Leventon testified that, at the time, it operated out of the same offices as NexBank and NexPoint, *id.*, entities that Dondero fully controls, *see supra* ¶ 122, nn.25-26.

### CLAIMS FOR RELIEF

I.    **CLAIM I: TURNOVER PREDICATED ON FRAUDULENT AND VOIDABLE CONVEYANCES AGAINST CLO HOLDCO, ELLINGTON, MAINSPRING, AND MONTAGE (CPLR 5225(B))**

A.    **New York's Former Fraudulent Conveyance Law (Effective Through April 3, 2020)**

129.    The former version of New York Debtor & Creditor Law ("DCL") § 276[34] sets forth a clear standard for finding and voiding intentional fraudulent conveyances. It provides, "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, defraud either present or future creditors, is fraudulent as to both present and future creditors." DCL 276 (2019).

130.    Because "fraudulent intent, by its very nature, is rarely susceptible to direct proof," it "must be established by inference from the circumstances surrounding the allegedly fraudulent act." *Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 530 (S.D.N.Y. 2011).

131.    To establish fraudulent intent under the earlier DCL 276, courts look to "badges of fraud," which are "circumstances so commonly associated with fraudulent transfers 'that their presence gives rise to an inference of intent.'" *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529 (1st Dep't 1999).

132.    These "badges of fraud" include:

(1) a close relationship between the parties to the transaction,

(2) a secret and hasty transfer not in the usual course of business,

---

[34]    The former version of DCL 276, which was in effect through April 3, 2020, applies to all fraudulent conveyances that occurred through that date. James Gadsden & Alan Kolod, Supplemental Practice Commentaries, McKinney's Cons Laws of NY, Book 12, Debtor and Creditor Law Ch. 12, Art. 10 (explaining that the amended DCL "became effective on April 4, 2020, and applies to transfers and incurrences effected on or after that date").

(3) inadequacy of consideration,

(4) the transferor's knowledge of the creditor's claim and his or her inability to pay it,

(5) the use of dummies or fictitious parties, and

(6) retention of control of the property by the transferor after the conveyance.

*Matter of Shelly v. Doe*, 249 A.D.2d 756, 758 (3d Dep't 1998).

133.   In addition, "when a transfer has been made for no consideration, the courts recognize a rebuttable presumption of insolvency and fraudulent transfer." *Wimbledon Fin. Master Fund, Ltd. v. Wimbledon Fund, SPC*, 2016 WL 7440844, at *4-6 (Sup. Ct. N.Y. Cnty. Dec. 22, 2016) (applying CPLR 5225 turnover principles to DCL 276).

### B.   The 2010 Fraudulent Conveyance To CLO HoldCo

134.   Paragraphs 1-133 are incorporated by reference as if fully stated here.

135.   On December 23, 2010, CDO Holding transferred its entire portfolio of assets to CLO HoldCo for only a little cash and a note with no principal or interest payments due for fifteen years. *See supra* ¶¶ 51, 59. Because CDO Holding was an alter ego of HFP, this transfer of assets was made by an entity of which UBS was a current or future creditor.

136.   The circumstances surrounding the transaction, including the strong likelihood that the court in the Underlying Action would assess liability against HFP and Leventon's specific awareness that such liability "would then expose CDO Holding's assets to seizure," explain the real reason for a trade that otherwise did not make sense. *See supra* ¶ 53. Indeed, the trade bore many of the quintessential "badges of fraud" that reveal it was a fraudulent conveyance.

137.   ***A Close Relationship Between The Parties To The Transaction:*** CDO Holding and CLO HoldCo were each controlled by Dondero, also the ultimate controlling shareholder of

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186
INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 55 of 535

each of the Judgment Debtors.  On an internal compliance report, Dondero signed as the "gatekeeper" for both entities.  *See supra* ¶ 57.

138.  ***A Secret And Hasty Transfer Not In The Usual Course Of Business:***  Despite Dondero justifying the transfer for "liquidity," CDO Holding transferred substantially *all* of its assets in exchange for consideration that was in large part a note that was not payable for *fifteen years*.  There was also no negotiation of any kind; the rushed terms were set based on just a single valuation, prompting concern from an HCM employee.  And CDO Holding recorded no sales to any other entity in 2010.  *See* Ex. 96, CDO Holding Balance Sheet, at UBSPROD4957189, tab "200.3 CDO BS."  This was not a transfer "in the usual course of business."  *See supra* ¶¶ 58-59.

139.  In addition, the 2010 Fraudulent Conveyance was "hasty": it was executed just days after CLO HoldCo, the receiving entity, was created in the Cayman Islands for the purpose of receiving these assets.  *See supra* ¶¶ 55, 57.

140.  ***Inadequacy Of Consideration:***  The inadequacy of the consideration underscores how brazen this transfer was.  Rather than receiving nearly $40 million in cash for the CLOs on the open market, CLO HoldCo sold the assets to another Dondero-controlled entity for consideration that was, in large part, a note not payable for fifteen years.  *See supra* ¶ 59.

141.  ***The Use Of Dummies Or Fictitious Parties:***  Although not a "fictitious" party, CLO HoldCo was set up specifically to carry out *this* fraudulent conveyance.  *See supra* ¶ 55.

142.  ***Retention Of The Property After The Conveyance:***  Dondero, ultimately controlled CDO Holding (through HFP) and CLO HoldCo.  After Dondero personally funded a portion of the consideration for the transfer, Dondero's close ally Grant Scott oversaw the parent structure that housed CDO Holding's former assets at CLO HoldCo.  *See supra* ¶¶ 56-57.

App. 055

143.    The Court should void the 2010 Fraudulent Conveyance, enter judgment against CLO HoldCo for the value of the transferred assets, and award UBS's costs and attorney's fees incurred in connection with this special proceeding.  *See* DCL 276-A (2019).

### C.    The Ellington Reimbursements Were Fraudulent Conveyances

144.    Paragraphs 1-143 are incorporated by reference as if fully stated here.

145.    The hundreds of thousands of dollars that Ellington spent on lavish personal vacations and questionable "business development" expenses were in fact assets to which UBS was entitled based on its status as a creditor—indeed, the largest creditor—of the Judgment Debtors.

146.    The transactions that led to the "reimbursements" occurred in two steps: (i) move the assets from the Judgment Debtors to Sentinel, and then (ii) move the assets from Sentinel to Ellington.

147.    New York's fraudulent conveyance law protects judgment creditors against exactly these kinds of fraudulent conveyances, which used Judgment Debtor assets to pay for the lifestyle expenses of those who controlled those Judgment Debtors.  For these reasons, the badges of fraud are readily apparent from the Fraudulent Ellington Reimbursements.

148.    ***A Close Relationship Between The Parties To The Transaction:***  Ellington did not just have a close relationship to the other parties in the transaction, he created the transaction and controlled it from all sides.  As Dondero's trusted lieutenant, Ellington is the one who proposed moving the assets away from the Transferors and sending them to Sentinel's Cayman Islands accounts—accounts over which Ellington had a 30% stake as one of the ultimate beneficial owners.  *See supra* ¶¶ 78, 80.  Once Dondero and Ellington had the assets tucked away offshore, Ellington was one of the two people who "called the shots" about Sentinel and the use of the assets. *See supra* ¶ 80.  Ellington even took his control a step further: he installed his subordinate DiOrio

52

onto Sentinel's board and then submitted the Fraudulent Ellington Reimbursements to him directly to get approved.  *See supra* ¶ 81.

149.  ***A Secret And Hasty Transfer Not In The Usual Course Of Business:***  DiOrio unquestioningly submitted hundreds of thousands of dollars in Ellington's highly questionable charges without receiving from Ellington, or providing to Beecher, *any* legitimate business justification for the massive costs.  *See supra* ¶¶ 103-112.

150.  ***Inadequacy Of Consideration:***  There was no consideration provided for these expenses—Sentinel never got any benefit, a single new client, or a single new dollar, in exchange for the $833,843.05 it provided Ellington in travel, fine dining, and partying reimbursements.  *See supra* ¶¶ 103-112.

151.  ***The Transferor's Knowledge Of The Creditor's Claim And His Or Her Inability To Pay It:***  Ellington and DiOrio knew of UBS's Judgment and understood the 2017 Transferred Assets should go to UBS to pay that Judgment—their own legal advisors at Solomon Harris told them as much.  *See supra* ¶ 72.  They distributed the assets through the Fraudulent Ellington Reimbursements anyway.

152.  The Court should void the Fraudulent Ellington Reimbursements and award UBS's costs and attorney's fees incurred in connection with this special proceeding.  *See* DCL 276-A (2019).

D.  **New York's Current Voidable Transactions Law (Effective April 4, 2020)**

153.  On April 4, 2020, New York replaced its former fraudulent conveyance statute.  *See* James Gadsden & Alan Kolod, Supplemental Practice Commentaries, McKinney's Cons Laws of NY, Book 12, Debtor and Creditor Law Ch. 12, Art. 10 (explaining that the amended DCL "became effective on April 4, 2020, and applies to transfers and incurrences effected on or after that date").

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186

INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 58 of 535

154.     The newly enacted statute addresses "voidable transactions" instead of "fraudulent conveyances."  Substantively, however, much of the voidable transactions law remains the same.  For instance, DCL 273(a)(1) provides that a transfer made by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the debtor made the transfer, if made "with actual intent to hinder, delay or defraud any creditor of the debtor."  DCL 273(a)(1) (2020).

155.     The statute defines "Debtor" to include any "person that is liable on a claim."  DCL 270(f).  The statute provides eleven factors to weigh when determining whether a transaction is voidable (like the badges of fraud that courts consider when reviewing claims under the prior version of DCL 276).  *See* DCL 273.  As relevant here, these factors include, among others, whether: "the transfer or obligation was to an insider;" "the transfer or obligation was disclosed or concealed;" "the debtor removed or concealed assets;" "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;" and "the transfer occurred shortly before or shortly after a substantial debt was incurred."  DCL 273(b).

**E.     The April 2020 And January 2021 "Dividends" To Mainspring And Montage Were Voidable Conveyances**

156.     Paragraphs 1-155 are incorporated by reference as if fully stated here.

157.     Like the Fraudulent Ellington Reimbursements, the multi-million-dollar "dividends" that Dondero and Ellington sent themselves through Sentinel were the final step in the process to move Judgment Debtor assets away from UBS and to themselves.  They are voidable under New York's 2020 Debtor and Creditor Law.

158.     *The Transfers Were To Insiders:*  Dondero and Ellington "called the shots" at the Judgment Debtors as well as Sentinel, and the payments to Mainspring and Montage were payments to Dondero and Ellington as Sentinel's ultimate beneficial owners.  *See supra* ¶¶ 112,

App. 058

114; DCL 273(b)(1); *see also* DCL 270(h)(2)(iii) (defining "Insider" to include "a person in control of the debtor"). Sentinel made the payments even after Sentinel's directors determined the insurer would not pay any dividends while the ATE Policy was active. *See supra* ¶¶ 115-116.

159. ***The Transfers Were For Insufficient Consideration:*** The 2017 Fraudulent Conveyances from the Judgment Debtors were for insufficient consideration. The 2020 and 2021 transfers from Sentinel to Dondero and Ellington in their capacity as "shareholders" were for no consideration. Sentinel made the transfers only because of a specific request from Ellington (rather than a set payment schedule). *See supra* ¶ 116.

160. ***The April 2020 Transfer Occurred Shortly After A Substantial Debt Was Incurred:*** The court entered the Phase I Judgment shortly before the April 2020 transfers. At the time, Dondero and Ellington understood—because Solomon Harris warned them—that the court may order Sentinel to return all of the 2017 Transferred Assets to UBS in a fraudulent conveyance action like this one. *See supra* ¶ 72; *see also* DCL 273(b)(10).

161. The Court should void the dividends to Mainspring and Montage and award UBS's costs and attorney's fees incurred in connection with this special proceeding. *See* DCL 276-A (2020).

## II.   CLAIM II: TURNOVER PREDICATED ON ALTER EGO LIABILITY AGAINST DONDERO, ELLINGTON, AND CDO HOLDING (CPLR 5225(B))

162. Paragraphs 1-161 are incorporated by reference as if fully stated here.

163. To establish an alter ego claim, a plaintiff must show (i) that the defendant exercised "complete domination of the corporation . . . in respect to the transaction attacked," and (ii) "that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Baby Phat Holding Co. v Kellwood Co.*, 123 A.D.3d 405, 407 (1st Dep't 2014).

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186

INDEX NO. 650744/2023

RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 60 of 535

164. The first element—domination or control—can involve many factors, including the disregard of corporate formalities; inadequate capitalization; intermingling of funds; overlap in ownership, officers, directors, and personnel; common office space or telephone numbers; the degree of discretion demonstrated by the allegedly dominated corporation; whether dealings between the parties involved were at arm's length; whether the dominated corporation was treated as independent profit center; and the payment or guaranty of the corporation's debts by the dominating entity. *See Fantazia Int'l Corp. v CPL Furs N.Y., Inc.*, 67 A.D.3d 511, 512 (1st Dep't 2009). No one factor is dispositive. *Id.*

165. As to the second element—using control to commit a fraud or wrong against the plaintiff—a scheme to render an entity judgment-proof is one of the classic examples justifying alter ego liability. *See, e.g., Chase Manhattan Bank (N.A.) v. 264 Water St. Assocs.*, 174 A.D.2d 504, 505 (1st Dep't 1991) (allegations that defendants "masterminded a scheme to denude the subsidiary of its assets in order to render it unable to honor its obligations resulting in a loss to plaintiff" held sufficient).

166. If a defendant or respondent qualifies as an alter ego, it becomes liable for the full amount of the outstanding judgment against its alter ego. *See* Ex. 24, Phase II Judgment, at 5 ("alter ego liability makes HFP liable for satisfying the judgment against SOHC").

### A.    Dondero And Ellington Were Each Alter Egos Of The Judgment Debtors

167. Dondero and Ellington exercised complete control over the Judgment Debtors and used that control to defraud UBS. As a matter of equity, this Court should pierce the corporate veils of HFP, CDO Fund, and SOHC and hold that Dondero and Ellington—as the individuals ultimately responsible for the Judgment Debtors' harm to UBS—are their alter egos and thus personally liable for the Judgment.

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 61 of 535

1.    <u>Dondero And Ellington Dominated The Judgment Debtors</u>

168.    Applying the factors that New York courts consider when determining whether individuals exercised "complete dominion" over their alter ego to the facts in this Petition confirms that Dondero and Ellington exercised complete dominion over the Judgment Debtors.

169.    ***Disregard Of Corporate Formalities:***    Dondero and Ellington disregarded the corporate formalities of HCM, SOHC, CDO Fund, and HFP to advance their own personal interests.    They facilitated transfers among these entities without even trying to provide the appearance of arm's-length bargaining.    *See supra* ¶¶ 52-57.    During the Underlying Action, a testifying expert detailed the substantial evidence of an alter ego relationship between Dondero and HCM, SOHC, CDO Fund, and HFP since the time of the transaction underpinning the Underlying Action, specifically noting the "lack of separateness" between the entities.    *See supra* ¶ 33.

170.    Through 2017, Dondero and Ellington continued to operate just as they always had done, without any regard for the corporate forms of the Judgment Debtors.    For instance, in the case of the 2017 Fraudulent Conveyances, one of the main benefits of the asset transfers was to help Dondero avoid a potential $50 million personal tax bill.    *See supra* ¶ 64.    At other times, Dondero brazenly authorized loans from the entities to himself.    *See supra* ¶ 33.    Dondero even altered formal control structures to increase his domination: In 2009, Dondero eliminated the requirement that HFP have independent directors and made himself the sole director of HFP—and thus the direct decision maker for HFP and its subsidiaries, including SOHC and CDO Holding.    *See supra* ¶ 33.

171.    Dondero and Ellington also enriched themselves through improper use of HCM employees for any entity they pleased, repeatedly ignoring corporate formalities.    Despite their formal terms of employment, HCM employees served as Dondero and Ellington's workers,

App. 061

completing any task that Dondero and Ellington asked them to complete, whether personal or business related, including work for the Judgment Debtors. *See supra* ¶¶ 35-40.

172.    The Judgment Debtors were not separate bona fide entities with distinct corporate ownership and controls—they were part of an overall structure that Dondero and Ellington unilaterally directed.  Dondero was the ultimate decision maker for the Judgment Debtors.  *See supra* ¶¶ 27-30, 32-33.  He did not consult any board before authorizing the sale and assignment of the assets of SOHC, CDO Fund, HFP, and related entities.  *See supra* ¶¶ 28-29.  In fact, many of these entities did not have separate boards of directors or any sort of formal corporate structure. *See supra* ¶¶ 28, 33, 35.  And Ellington, as Dondero's right-hand man, also exercised unfettered authority over the Judgment Debtors, including signatory authority and directing litigation and settlement efforts.  *See supra* ¶ 31, 36.

173.    Dondero and Ellington repeatedly disregarded corporate formalities by shuffling assets among entities they controlled, including the Judgment Debtors, without formal documentation.  Wholly owned subsidiaries of HFP would often dividend money up to HFP and HFP would then put the cash into different subsidiaries to satisfy one of that subsidiary's debts. *See supra* ¶¶ 52-54.  At times, these transfers also were made without formal documentation.  *See supra* ¶¶ 52-53.  In 2008, with a single word, Dondero and Ellington directed HFP to withdraw about $15 million from CDO Holding before directing the funds to SOHC to cover SOHC's losses. *See supra* ¶ 53.

174.    Whether orders came from Dondero himself, or his proxy Ellington, the result was the same: protect the collective interests of Dondero, Ellington, and their web of entities, rather than the distinct interests (and responsibilities) of any one entity.  *See supra* ¶¶ 29, 31, 34, 36-40, 49-55, 61-81.

175.    ***Common Office Space:***  Dondero- and Ellington-controlled entities, including the Judgment Debtors, shared common office space and operated out of the same registered addresses, with no separation of the entities.  *See supra* ¶ 35.  The entities employed the same roster of employees, did not separately pay those employees, and did not retain separate internal counsel. *See supra* ¶¶ 34-37.

176.    ***Deliberate   Undercapitalization:***         Dondero   and   Ellington   deliberately undercapitalized the Judgment Debtors to prevent UBS from collecting on the Judgment.  *See supra* ¶¶ 49, 55-78, 93-97.  In the wake of the adverse summary judgment rulings, and with trial looming in the Underlying Action for claims on which their own lieutenant Leventon told them they would be found liable, Dondero and Ellington ensured that the Judgment Debtors would be judgment proof by effecting the 2017 Fraudulent Conveyances.  *See supra* ¶¶ 61-92.

177.    ***Intermingling Of Funds:***  Dondero and Ellington intermingled their funds and those of the entities they controlled.  In one instance, Dondero committed HCM's cash to cover HFP's shortfalls in the face of margin calls.  *See supra* ¶ 33.  Dondero also used his own money to partially fund the consideration CLO HoldCo sent to CDO Holding in the 2010 Fraudulent Conveyance.  The testifying expert in the Underlying Action noted many additional examples of "HFP's and its subsidiaries' financial dependence on HCM," which Dondero dominated, controlled, and even funded.  *See supra* ¶ 33.

178.    After Dondero and Ellington combined all the assets of the Judgment Debtors (and the other Transferors) in Sentinel in 2017, they later withdrew assets for themselves or entities they controlled whenever they saw fit, both as "dividends" and improper "reimbursements."  *See supra* ¶¶ 98-119.

179. ***Overlap In Ownership, Officers, And Directors:*** Dondero and Ellington owned and controlled the Judgment Debtors. Dondero co-founded HCM and held the most influential roles up and down the HCM organizational chart. Dondero held many titles under the HCM umbrella and particularly among the Judgment Debtors: He was HCM's President and Chief Executive Officer from 1993 until his removal in 2020; chairman of the Board of Directors for HFP; sole Director for SOHC; and President and ultimate General Partner for CDO Fund until his resignation in 2021. *See supra* ¶¶ 6, 27 n.3, 28-29. Ellington, always at Dondero's side, implemented Dondero's directives while maintaining discretion to make his own decisions about the entities. *See supra* ¶¶ 28, 31, 36, 39-40, 77-78. The two maintained these roles and their control over the Judgment Debtors as officers of Strand, HCM's general partner. *See supra* ¶¶ 29-31. Dondero was Strand's sole stockholder. *See supra* ¶ 29.

180. ***The Degree Of Discretion Demonstrated By The Allegedly Dominated Corporation:*** Dondero and Ellington were the decision makers for all the entities. *See supra* ¶¶ 28-34, 36, 52-54, 65, 67, 71, 77. Dondero, and Ellington as his designee, unilaterally made decisions for HCM and, through his control of HCM, controlled the Judgment Debtors as well. *See supra* ¶¶ 28-34, 36, 52-54, 65, 67, 71, 77. These decisions were not for the benefit of the individual entities but were all in service of protecting Dondero and Ellington themselves.

181. ***Whether Dealings Between The Parties Involved Were At Arm's Length:*** The key dealings at issue in this Turnover Petition, the 2017 Fraudulent Conveyances, were not at arm's length. Rather, the Judgment Debtors collectively transferred all of their assets, all with different valuations, for a shared (and sham) ATE Policy that did not treat them differently based on their differing contributions to the Policy. *See supra* ¶¶ 74-76. The shared contribution— including by three non-insureds, and the shared coverage (including CDO Holding, a non-party to

the Underlying Action)—evidences that these entities were merely instruments of the broader plan

to move assets out of UBS's reach.  Once they shuffled the 2017 Transferred Assets out of the

Judgment Debtors, Dondero and Ellington appropriated the assets for their own ends, including

through personal withdrawals as dividends and reimbursements for romantic getaways.  *See supra*

¶¶ 98-119.

> 2. Dondero And Ellington Used Their Domination Over The Judgment
> Debtors To Defraud And Harm UBS

182. Dondero's and Ellington's control over the Judgment Debtors enabled them to

orchestrate the fraudulent acts that have directly led to UBS's harm: its difficulty collecting on the

Judgment.

183. ***Use Of Corporate Funds For Personal Purposes:***   Dondero and Ellington

routinely directed Judgment Debtor funds and assets to Sentinel, and ultimately to Dondero and

Ellington themselves.  *See supra* ¶¶ 61-81, 93-128.  Dondero and Ellington diverted these funds

out of Judgment Debtor hands and into Sentinel's coffers to render the Judgment Debtors judgment

proof and keep the assets in Dondero and Ellington's possession, using the assets for their own

ends and to fund other entities they controlled.  *See supra* ¶¶ 61-81, 93-128.

184. Ellington, in particular, used Judgment Debtor assets to fund his lavish lifestyle,

including tens of thousands of dollars in luxurious trips to London and Paris for him and his

companions, personal meals with his girlfriend, and to reimburse his outings to bars, night clubs,

and a strip club.  *See supra* ¶¶ 103-110.  None of these reimbursements were for any plausible

business purpose—much less related to the Policy insuring against the Underlying Action—and

instead were strictly for Ellington's personal expenses.  *See supra* ¶¶ 103-112.

185. Dondero and Ellington also used Judgment Debtors funds in issuing Mainspring

and Montage millions of dollars in "dividends," which they in turn used for their own personal

App. 065

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO.: 186
RECEIVED NYSCEF: 03/29/2023
Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 66 of 535

purposes. *See supra* ¶¶ 113-128 (Ellington confirming he received millions in dividends; Dondero approving the use of his dividends to make fraudulent bonus payments). Like the Ellington reimbursements and original 2017 Fraudulent Conveyances, Dondero and Ellington masterminded the dividends, showing the complete control Dondero and Ellington had over the Judgment Debtors and the later transferees of the Judgment Debtors' assets.

186. Like fraud and breaches of contract the Court identified in the Underlying Action, the 2017 Fraudulent Conveyances that Dondero and Ellington orchestrated from the Judgment Debtors to Sentinel were quintessential abuses of the corporate form at UBS's expense, satisfying the second required element for alter ego liability. The Court should thus pierce the corporate veil and hold Dondero and Ellington liable for the judgment against CDO Fund, SOHC, and HFP.

### B. Dondero And Ellington Were The Alter Egos Of Mainspring And Montage, Respectively

187. As a matter of equity, Dondero should be liable for the debts of Mainspring and Ellington should be liable for the debts of Montage. At the time of the fraudulent conveyances from Sentinel to Mainspring and Montage, Dondero had complete control of Mainspring as its ultimate beneficial owner, and Ellington had complete control of Montage as its ultimate beneficial owner. *See supra* ¶¶ 13-14. In fact, Dondero controls 99.5% of Mainspring's assets and Ellington controls 99% of Montage's assets. *See supra* ¶ 113.

#### 1. Dondero And Ellington Dominated Mainspring And Montage, Respectively

188. Once again applying the same alter ego factors, the evidence confirms that Dondero and Ellington exercised complete dominion over Mainspring and Montage, respectively.

189. **Intermingling Of Funds:** Sentinel's "dividend" payments were at the sole discretion of Dondero and Ellington in their personal capacities. *See supra* ¶¶ 113-119. But to pay Dondero's and Ellington's respective dividends, Sentinel transferred money not to them

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 67 of 535

directly but to Mainspring and Montage. *See supra* ¶¶ 113-119. Even as Beecher facilitated these payments to Mainspring and Montage, it understood that it was in fact paying dividends to Dondero and Ellington. *See supra* ¶¶ 115-118.

190. ***Overlap In Ownership:*** At the time of the fraudulent conveyances from Sentinel to Mainspring and Montage, Dondero had complete control and domination of Mainspring as its ultimate beneficial owner, and Ellington had complete control and domination of Montage as its ultimate beneficial owner. *See supra* ¶¶ 13-14, 116-119. Dondero and Ellington were also the ultimate controllers of the Transferors, who sent the assets to Sentinel, and of Sentinel itself.

191. ***The Degree Of Discretion Demonstrated By The Allegedly Dominated Corporation:*** Neither Mainspring nor Montage demonstrated any discretion. Rather, Dondero and Ellington took the dividend payments that Sentinel deposited and used them for personal purposes unrelated to Mainspring and Montage. They moved the money to other entities they controlled to pay court-blocked bonuses to former *HCM* employees who were never affiliated with Mainspring and even to personally enrich Ellington. *See supra* ¶¶ 120-128. There is no indication that Mainspring or Montage had any operations or purpose other than to receive money for Dondero and Ellington.

    2.   <u>Dondero And Ellington Used Their Control Of Mainspring And Montage To Defraud UBS</u>

192. Dondero and Ellington used their complete dominion over Mainspring and Montage to take for themselves funds that should have been available to satisfy the Judgment.

193. By ordering the siphoning of millions of dollars in dividends from Sentinel to Mainspring and Montage, Dondero and Ellington ensured that Sentinel would have even fewer Judgment Debtor assets to return to satisfy the Judgment. *See supra* ¶¶ 113-119. Dondero and Ellington forced through these dividend payments over Sentinel's express commitment that it

App. 067

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186

INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 68 of 535

would "not be entertaining any dividend issuance while the ATE policy is active." *See supra* ¶¶ 113-119. Dondero and Ellington's clear disregard of this commitment illustrates their abuse of their complete control over the entities.

194.    Dondero and Ellington abused their control over these dummy entities by secreting assets from the Judgment Debtors and to other entities that Dondero and Ellington owned and controlled all to frustrate any claim UBS had to those funds. *See supra* ¶¶ 51-81, 93-128. The Court should pierce the corporate veil and hold Dondero and Ellington liable for the judgment against CDO Fund, SOHC, and HFP.

### C.    CDO Holding Is An Alter Ego Of HFP

195.    When it transferred substantially all of its assets to CLO HoldCo in 2010, CDO Holding was an alter ego of Judgment Debtor HFP.

196.    CDO Holding's relationship to HFP is in all material respects the same as SOHC's adjudged alter ego relationship to HFP. In its alter ego default judgment in the Underlying Action, the court held that UBS's allegations sufficiently linked SOHC and HFP as alter egos because SOHC "was HFP's instrumentality, had no independence, could not exercise any business discretion, did not have its own offices, officers or employees, and that HFP completely dominated the day-to-day operations of SOHC as well as SOHC's *sister affiliates*." Ex. 24, Phase II Judgment, at 6 (emphasis added). The evidence shows that HFP both dominated CDO Holding and abused its control over CDO Holding to defraud UBS. The Court should reverse-pierce the corporate veil and hold CDO Holding to account for its role as a controlled asset repository for HFP.

### 1.    HFP Dominated Its "Asset Repository" CDO Holding

197.    The factors that characterized the HFP and SOHC alter ego relationship also apply to HFP and CDO Holding, one of SOHC's "sister affiliates."

198.   ***Disregard Of Corporate Formalities:***   CDO Holding, under the complete control and domination of HFP, was a key repository for HFP assets.  It had no independence and regularly saw its assets taken by HFP for the benefit of HFP or HFP's other subsidiaries.  *See supra* ¶¶ 52-55.

199.   ***Intermingling Of Funds:***   In 2017, CDO Holding intermingled its funds and assets with several other Dondero-controlled entities, including HFP, to pay the premium on the ATE Policy.  *See supra* ¶¶ 61-78.  The entities that combined their funds to pay the ATE Policy did not allocate coverage amounts according to contributions; the real goal of the ATE Policy was to move money from the Judgment Debtors and their potential alter egos to Sentinel, another entity that Dondero and Ellington owned and controlled.  *See supra* ¶¶ 61-76.  Moreover, CDO Holding was not a named defendant in the Underlying Action but still was an Insured because it was an alter ego of defendant HFP, and Dondero and Ellington realized that a court would determine as much.  *See supra* ¶¶ 64, 75.

200.   ***Overlap In Ownership, Officers, And Directors:***   Dondero was ultimately in charge of HFP and CDO Holding and was the sole director of each.  *See supra* ¶¶ 28-30, 32-33, 62.

201.   ***The Degree Of Discretion Demonstrated By The Allegedly Dominated Corporation:***   There is no evidence that CDO Holding ever demonstrated any discretion.  Just the opposite, it saw its assets stripped for the benefit of HFP and its other subsidiaries, such as SOHC.  *See supra* ¶¶ 51-53.  These transfers were not arm's-length transactions; CDO Holding was simply an asset repository that existed for the benefit of HFP.  CDO Holding also lost all of its equity assets in a single 2010 transfer conducted at the direction of HFP's controller Dondero.  *See supra* ¶¶ 49-51, 55-59.

202.    ***The Payment Or Guaranty Of The Corporation's Debts By The Dominating Entity:***  At other times, HFP moved money into CDO Holding to enable CDO Holding to make distributions to other creditor entities or make payments for other of HFP's subsidiaries.  *See supra* ¶ 54.

>    2.    <u>HFP Used Its Domination Over CDO Holding To Defraud UBS</u>

203.    HFP, alongside its controller Dondero, used its control of CDO Holding to defraud UBS.  In 2010, Dondero ordered a transaction to fraudulently move substantially all of CDO Holding's assets to CLO HoldCo.  The portfolio was worth nearly $40 million.  *See supra* ¶¶ 51, 55-60.  In return, CDO Holding received scant cash and a note that was not payable until 2025.  *See supra* ¶ 59.

204.    The 2010 asset transfer to Dondero-controlled CLO HoldCo, which left CDO Holding and HFP without assets they could have used to satisfy the Judgment, satisfies the second element of an alter ego claim.  It was a fraud against UBS that sought to prevent UBS from collecting on any eventual judgment in the underlying action.

205.    The Court should thus reverse-pierce the corporate veil to find that CDO Holding was the alter ego of HFP at the time of the 2010 Fraudulent Conveyance and that CDO Holding was and is liable for the HFP's portion of the Judgment.

## II.    CLAIM III: VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") BY DONDERO AND ELLINGTON (18 U.S.C. § 1962(C))

206.    For the reasons set forth above, Dondero and Ellington each are alter egos of the Judgment Debtors and should be personally liable for the full outstanding amount on the Judgment.  If the Court finds for UBS on Claim II, it need not reach Claims III and IV.

207.    In the alternative, Dondero and Ellington are liable for treble damages under 18 U.S.C. § 1962(c) for the reasons below.

208.    A civil RICO claim is established when there is: "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *NRO Bos. LLC v. Yellowstone Cap. LLC*, 72 Misc. 3d 267, 271 (Sup. Ct. Rockland Cnty. 2021) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)). A violation of § 1962(c) requires a corresponding criminal violation of the substantive RICO statute through "seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly . . . participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc*., 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962(c)). A plaintiff can establish civil damages by showing "that he was 'injured in his business or property by reason of a violation of section 1962.'" *Id.* (emphasis omitted) (quoting 18 U.S.C. § 1964(c)).

209.    Dondero and Ellington are each individuals able to hold a legal or beneficial interest in property and are thus "person[s]" under 18 U.S.C. §§ 1961(3) and 1962(c).

210.    Dondero and Ellington each violated 18 U.S.C. § 1962(c) by leveraging a separate and distinct enterprise that engaged in a pattern of racketeering activity that harmed UBS in violation of 18 U.S.C. § 1964(c).

211.    Dondero and Ellington, acting individually and together in concert, have orchestrated and participated in a continually running scheme dating to at least 2010 and lasting to the present. They have, among other acts, fraudulently transferred assets to individuals and companies in different states and countries in anticipation and frustration of an adverse judgment in the Underlying Action. Dondero and Ellington, through the Enterprise, conducted the predicate

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 72 of 535

acts of racketeering through interstate wires or other instrumentalities of interstate commerce, including by sending funds to the Cayman Islands and other international destinations.

A.    **The RICO Enterprise**

212.    Dondero and Ellington conducted these misrepresentations and frauds through an association-in-fact enterprise that comprised these nine persons and nineteen entities: Dondero and Ellington, together with Leventon, Sevilla, DiOrio, Waterhouse, Irving, Vitiello, and Surgent (the "Associates"); and CDO Fund, SOHC, HFP, HFC, CDO Opportunity Fund, CDO Holding, CLO HoldCo, Sentinel, Sebastian Clarke, Mainspring, Montage, Tall Pine, Sunshine Coast, NexBank, NexPoint, Highland Funds Asset Management, the DAF, Skyview, and CPCM (collectively, "the Enterprise"). The common purpose of the Enterprise was to generate money for its members. *See supra* ¶¶ 49-97.

213.    The entities that constituted the Enterprise were owned, directed, or otherwise controlled by Dondero and Ellington, as described in ¶¶ 13, 14, 32, 33, 94, 122, and 147, *supra*, and served these functions in the Enterprise:

- *The Transferors.*  The role of CDO Fund, SOHC, HFP, HFC, CDO Opportunity Fund, and CDO Holding, as Judgment Debtors or subsidiaries of HCM and/or Judgment Debtors against whom UBS could foreseeably collect on the Judgment, was to be rendered insolvent and therefore judgment-proof.

- *The Transferees.*  The role of CLO HoldCo, Sentinel, Sebastian Clarke, Mainspring, Montage, Tall Pine, and Sunshine Coast (together, "the Transferees") was to receive fraudulently transferred assets from the Transferors or other Transferees and shuffle assets farther away from UBS and to Dondero and Ellington.

- *The Facilitators Of Bonus Payments.*  The role of NexBank, NexPoint, Highland Funds Asset Management, the DAF, Mainspring, Sunshine Coast, Tall Pine, Skyview, and CPCM was to make—and cover-up—fraudulent payments to associates Ellington, Leventon, Waterhouse, and Surgent. This scheme diverted about $5.9 million in Judgment Debtor assets.

App. 072

214. The Associates were employees at HCM who reported to Dondero or Ellington and who engaged in predicate acts or received the spoils of the predicate acts at Dondero and Ellington's direction.

215. **Leventon** worked at HCM for more than a decade, ultimately as Assistant General Counsel, and reported directed to Ellington. *See supra* ¶ 36. He also did personal work for Dondero while employed at HCM, including working on his divorce and litigating a lemon law claim. *See supra* ¶ 37. Leventon worked with Ellington closely in bringing to life Ellington's idea for the ATE Policy to drain substantially all assets from the Transferors. *See supra* ¶¶ 64-65. He also helped draft the fraudulent consulting agreements and coordinated with Sentinel and other funding entities in the Enterprise—for which he was paid his "bonus" of roughly $687,594.00. *See supra* ¶¶ 126-127. Despite receiving these payments, and to cover his tracks, Leventon lied to the Bankruptcy Court and filed an amended claim. *See supra* ¶¶ 127. After getting fired from HCM, Leventon went to work at Ellington-owned Skyview. *See id.*

216. **Sevilla** worked at HCM for nine years, ultimately as Assistant General Counsel. *See supra* ¶ 36. He worked directly with Ellington and Dondero and even did personal work for them, including conducting diligence on personal investments Ellington was considering and helping Dondero with his divorce, paying bills, and administrative matters. *See supra* ¶ 37. Sevilla oversaw the daily management of Sentinel and helped develop the idea that the ATE Policy premium would be satisfied by transferring the entire investment portfolios of the Transferors. *See supra* ¶ 65. Sevilla also facilitated the fraudulent conveyance between Sentinel and Sebastian Clarke. *See supra* ¶ 94. He also helped structure the fraudulent consulting agreements to pay associate bonuses and coordinated with Sentinel and other funding entities in the Enterprise. *See*

*supra* ¶¶ 125-127. After getting fired from HCM, Ellington hired Sevilla to work at Skyview. *See supra* ¶ 127.

217. ***DiOrio*** has known Ellington since 2009. *See supra* ¶ 40. When Ellington approached him in a bar in 2014, DiOrio blindly agreed to serve as a director of an Ellington-controlled company in Sentinel's ownership structure. *See supra* ¶ 40. As an HCM employee, DiOrio did personal work for Ellington, including paying rent on a warehouse he leased and helping to manage his personal trust. *See supra* ¶ 39. After Ellington asked DiOrio to serve as a director of Sentinel, DiOrio pushed through Ellington's requests for reimbursement of hundreds of thousands of dollars in personal expenses without question. *See supra* ¶¶ 111-112. From his position as a director of Sentinel, DiOrio also ultimately helped funnel $8,900,000.00 in "dividends" to Dondero and Ellington. *See supra* ¶¶ 113-119. DiOrio also facilitated the fraudulent conveyance between Sentinel and Sebastian Clarke and falsely characterized the assets transferred as "worthless." *See supra* ¶¶ 93-97. After getting fired from HCM, Ellington hired DiOrio to work at Skyview. *See supra* ¶ 40.

218. ***Waterhouse*** served as the Chief Financial Officer of HCM for more than a decade. *See supra* ¶ 125. At Ellington's instruction, Waterhouse had employees in his department determine the amounts HCM owed in bonuses to Waterhouse, Ellington, Leventon, and Surgent so that they could be paid through the fraudulent consulting agreements. *See supra* ¶¶ 120-125. For his participation in this scheme, Waterhouse received the roughly $2,000,000.00 bonus blocked by the Bankruptcy Court. *See supra* ¶ 126. Despite receiving these payments, and to cover his tracks, Waterhouse lied to the Bankruptcy Court and filed an amended claim for his bonus payment. *See supra* ¶ 127. After getting fired from HCM, Ellington hired Waterhouse to work at Skyview. *See supra* ¶ 127.

App. 074

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 75 of 535

219.    **Surgent** has been a long-time employee at HCM, serving as Chief Compliance Officer for much of the relevant period.  *See supra* ¶ 120.  According to a stipulation he signed with the Independent Board, Surgent entered into consulting agreements with Mainspring and Tall Pine and, in March and September 2020, received payments through a pass-through entity (Prive Solutions LLC) totaling $2,774,272.13.  *See supra* ¶ 126.  This included $750,906.13 from Tall Pine, $1,887,929.00 from Mainspring, and $135,437.00 from NexPoint.  *See supra* ¶ 122 n.30. Surgent failed to disclose these payments and instead submitted a claim to the Bankruptcy Court seeking, in part, money he had already received.  *See supra* ¶¶ 126-127.

220.    **Irving** reported to Ellington for the more than eight years she worked at HCM.  She testified that she "would work on anything that Mr. Ellington needed [her] to work on," including diligence for Ellington's personal investments.  *See supra* ¶ 36.  Irving was instrumental in ensuring that Sentinel received all the assets in satisfaction of the premium payment under the APA.  *See supra* ¶ 77.  After getting fired from HCM, Irving joined Skyview, where she reports to Sevilla and ultimately Ellington.  *See supra* ¶ 127 n.33.

221.    **Vitiello** worked in the legal department in HCM for seven years, at times reporting to Leventon.  She conducted personal work for Dondero, including helping to manage a building Dondero leased to a salon.  *See supra* ¶ 37.  Vitiello worked with Leventon and Ellington to design the ATE Policy to drain substantially all assets from the Judgment Debtors.  *See supra* ¶ 64.  She is now at Skyview.  *See supra* ¶ 127 n.33.

**B.    The Pattern Of Racketeering Activity**

222.    From at least 2010 to the present, Dondero and Ellington were associated with the Enterprise and conducted or participated, directly or indirectly, in the management and operation of the Enterprise's affairs through a pattern of racketeering activity, including acts of

App. 075

wire fraud in violation of 18 U.S.C. § 1343 and acts of money laundering in violation of 18 U.S.C. § 1956.

223. These acts were a pattern of fraudulent transactions intended to facilitate the theft of Judgment Debtor assets using the Associates, misrepresentations, and shell companies to hide their involvement in the schemes.

224. The predicate acts funneled money ever farther away from UBS. They centered on these events: (1) the 2010 Fraudulent Conveyance; (2) the 2017 Fraudulent Conveyances; (3) the 2018 fraudulent amendments to the ATE Policy; (4) the 2019 fraudulent conveyance to Sebastian Clarke; (5) the 2019-2020 Fraudulent Ellington Reimbursements; (6) the 2020-2021 fraudulent dividends to Mainspring and Montage; (7) the 2020 fraudulent bonus payments; and (8) misrepresentations to UBS about the solvency of the Judgment Debtors.

225. ***Horizontal Relatedness.*** Dondero and Ellington conducted the related acts constituting the pattern of racketeering activity for the same purpose: making themselves rich and hiding the assets to which UBS had superior right. *See supra* ¶¶ 49-72, 82-87, 90-92, 93-97, 103-112, 113-117, 122-126. The methods of commission are also similar: Dondero and Ellington repeatedly flouted corporate formalities to use the Associates and entities under their control to hide the assets owed to UBS. For example, Dondero and Ellington failed to observe corporate formalities in moving assets from the Transferors and among the Transferees, *see supra* ¶¶ 55-63, 94, in using individuals involved in the Enterprise to do their personal work and the work of other entities in the Enterprise, *see supra* ¶¶ 36-40, in misrepresenting to regulators the fraudulent nature of the ATE Policy, *see supra* ¶¶ 88-89, in using Sentinel as a piggy bank to reimburse personal expenses and pay out dividends, *see supra* ¶¶ 103-119, and in fraudulently issuing bonus payments blocked by the Bankruptcy Court, *see supra* ¶¶ 120-127.

226. *Vertical Relatedness.* The acts constituting the pattern of racketeering activity related to the Enterprise as a whole: Dondero and Ellington were able to commit the offenses only because of their powerful positions in the Enterprise.

227. As chair and sole member of the Board of Directors for HFP, sole Director for SOHC, and President and ultimate General Partner for CDO Fund, Dondero had specific control over the Judgment Debtors. *See supra* ¶¶ 28-33. As the sole stockholder and sole director of Strand, Dondero had ultimate control over every HCM entity, affiliate, and employee. *See supra* ¶ 29. Dondero often leveraged this control to direct individuals associated with the Enterprise to perform work for other entities in the Enterprise. *See supra* ¶¶ 36-38. Dondero also used his position to authorize fraudulent conveyances, sometimes from all sides: he approved, for example, both the sale and purchase of assets from CDO Holding to CLO HoldCo in 2010. *See supra* ¶¶ 51-57. And he signed the ATE Policy on behalf of all Transferors at the same time he was the 70% ultimate beneficial owner of Sentinel and a member of the ITA Advisory Board overseeing Sentinel. *See supra* ¶¶ 71, 77-78, 80. He also exercised his authority over Sentinel and the other funding entities to authorize their issuance of fraudulent "consulting" payments to associates who had rendered services to HCM. *See supra* ¶¶ 122-126.

228. Ellington also leveraged his position as Dondero's right-hand man in the Enterprise to commit this pattern of racketeering. Ellington's position as General Counsel at HCM, an officer of Strand, and a 30% ultimate beneficial owner of Sentinel uniquely positioned him to implement his idea to drain all Judgment Debtor assets pursuant to the ATE Policy and APA. *See supra* ¶¶ 31, 64, 80. He also used these positions to acquire fraudulent reimbursements and unwarranted dividends. *See supra* ¶¶ 103-119. Finally, Ellington leveraged his position in the Enterprise to

smuggle bonus payments to himself and to Waterhouse, Leventon, and Surgent in 2020 under sham consulting agreements using Judgment Debtor funds. *See supra* ¶¶ 122-127.

229. *Continuity.* The pattern of racketeering activity Dondero and Ellington engaged in and conducted has been continuous from at least 2010 to the present. Dondero and Ellington have completed at least *seven* separate schemes involving predicate acts of wire fraud and money laundering over the course of more than a decade. *See* Ex. A (table detailing selected acts of wire fraud); Ex. B (table detailing selected acts of money laundering). Such misconduct satisfies the requirements of closed-ended continuity.

230. In the alternative, the pattern of racketeering activity committed by Dondero and Ellington is open-ended in that it has no predetermined end date and is continuous, as Dondero and Ellington have shown that their scheme is the regular way of operating and conducting themselves and their ongoing business. *See supra* ¶¶ 49-72, 82-87, 90-92, 93-97, 103-112, 113-117, 122-126. Dondero and Ellington used their connections while controlling HCM to move Judgment Debtor assets not only within HCM, but to other entities outside HCM that were also in their control. *See supra* ¶¶ 113-119. As their control over HCM faded during the bankruptcy, Dondero and Ellington simply created or recruited non-HCM entities to join the Enterprise, including NexBank, NexPoint, Highland Funds Asset Management, the DAF, Tall Pine, Sunshine Coast, Skyview, and CPCM. *See supra* ¶ 122.

231. Dondero and Ellington retain positions of power in the Enterprise. *See supra* ¶¶ 122, 127 n.33. Ellington employs most of the Associates at Skyview, which at first shared an address with, and still preforms work for, Dondero-affiliated entities NexPoint and NexBank. *See supra* ¶ 127 n.33. Thus, there also exists the threat of continuing long-term racketeering activity.

## C.      **The Predicate Acts**

### 1.      Wire Fraud In Violation Of 18 U.S.C. § 1343

232.     Dondero and Ellington used the Enterprise to transmit communications in interstate commerce by means of wire in violation of 18 U.S.C. § 1343 in furtherance of their scheme to defraud UBS.

233.     UBS incorporates by reference Exhibit A, which sets forth particular uses of wire communications in the U.S. in furtherance of the scheme to defraud, describing which RICO Defendant or individual associated with the Enterprise caused the communication to be wired, when the communication was made, and how it furthered the scheme.  The wire communications described in Exhibit A were made in furtherance of the scheme to defraud UBS.

234.     UBS also incorporates by reference Exhibit B, which sets forth money laundering transactions in furtherance of the scheme to defraud.  Each of these wire transfers was made in furtherance of the scheme to defraud UBS and constitutes another instance of wire fraud.

### a.      The 2010 Fraudulent Conveyance

235.     On or about December 23, 2010, Dondero, through the Enterprise, violated 18 U.S.C. § 1343 by using interstate wires to fraudulently transfer to CLO HoldCo nearly all the assets from CDO Holding, a subsidiary and alter ego of HFP.  *See supra* ¶¶ 49-60.

236.     This fraudulent conveyance aimed to render CDO Holding judgment-proof and to keep UBS from receiving the money the Judgment Debtors owed in the Underlying Action. Exhibit A lists specific instances of wire fraud undertaken in furtherance of this scheme.

### b.      The 2017 Fraudulent Conveyances

237.     On or about April 2017, through the Enterprise (including through associates Leventon, Sevilla, DiOrio, Irving, and Vitiello), Dondero and Ellington violated 18 U.S.C. § 1343

App. 079

by using interstate wires to orchestrate the 2017 Fraudulent Conveyances to render the Transferors judgment proof.

238. After summary judgment rulings in favor of UBS in the Underlying Action, Dondero and Ellington anticipated an enormous damages verdict. *See supra* ¶ 61. Despite the explicit warning by outside counsel as to the "legal validity" of sending assets "beyond the reach of the plaintiffs in the [Underlying Action] against the [F]unds," *see supra* ¶ 72, Dondero and Ellington drained the 2017 Transferred Assets, valued at over $105,647,679.00, in satisfaction of the ATE Policy's $25,000,000.00 "premium." *See supra* ¶ 72.

239. The 2017 Fraudulent Conveyances included the use of interstate wires to deceive UBS, Cayman regulators, and HCM employees and other persons facilitating the transfer to believe that the ATE Policy was in good faith instead of a fraudulent sham. *See supra* ¶¶ 68-71. The objective of the transfer was to render the Transferors judgment-proof and to defraud UBS of the more than one billion dollars it was owed. *See supra* ¶ 64. Exhibit A lists specific instances of wire fraud sent in furtherance of this scheme.

c.     <u>The 2018 Fraudulent Adjustments To The ATE Policy</u>

240. In or around June 2018, through the Enterprise (including associates DiOrio, Sevilla, and Irving), Dondero and Ellington violated 18 U.S.C. § 1343 by using interstate wires to make fraudulent retroactive "adjustments" to ATE Policy terms and valuations of the 2017 Transferred Assets. *See supra* ¶¶ 82-87.

241. The objective of the adjustments was to keep the Transferors judgment-proof and to defraud UBS of the millions of dollars the Judgment Debtors owed. *See supra* ¶¶ 90-92. Exhibit A lists specific instances of wire fraud undertaken in furtherance of this scheme.

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 81 of 535

d.      The 2019 Fraudulent Conveyance To Sebastian Clarke

242.    In or around December 31, 2019, through the Enterprise (including through associates DiOrio and Sevilla), Dondero and Ellington violated 18 U.S.C. § 1343 by using the interstate wires to transfer certain of the 2017 Transferred Assets to Sebastian Clarke for $3 to hide assets from UBS.  *See supra* ¶¶ 93-97.  Exhibit A lists specific instances of wire fraud sent in furtherance of this scheme.

e.      The 2019-2020 Fraudulent Ellington Reimbursements

243.    In or around November 2019 until March 2020, through the Enterprise (including through associate DiOrio), Ellington violated 18 U.S.C. § 1343 by using the interstate wires to defraud UBS by reimbursing his personal entertainment expenses and business expenses unrelated to the UBS litigation or the ATE Policy.

244.    The objective of these reimbursements was to enrich Ellington and to hide assets from UBS that could be used as payment for the Judgment.  *See supra* ¶¶ 102-112.  Exhibit A lists specific instances of wire fraud sent in furtherance of this scheme.

f.      The 2020-2021 Fraudulent "Dividends"

245.    In or around April 2020 and January 2021, through the Enterprise (including through associate DiOrio), Dondero and Ellington violated 18 U.S.C. § 1343 by using interstate wires to defraud UBS by causing Sentinel to issue $8,900,000.00 in dividends to entities owned and controlled by Dondero and Ellington.  *See supra* ¶¶ 114, 117.

246.    Sentinel fraudulently issued these distributions upon the request of Ellington, even with the knowledge that Sentinel would need to return all of the 2017 Transferred Assets to the Transferors, because the 2017 Fraudulent Conveyances were fraudulent.  *See supra* ¶¶ 113-117. And Sentinel issued the distributions after its directors had set a moratorium on dividend issuance while the ATE Policy was active.  *See supra* ¶¶ 115, 117.

App. 081

247.    The objective of these dividends was to enrich Dondero and Ellington, to hide

assets that could be used to pay the Judgment, and to defraud UBS of the millions of dollars owed.

*See supra* ¶¶ 113-119.  Exhibit A lists specific instances of wire fraud sent in furtherance of this

scheme.

g.    The 2020 Fraudulent Bonus Payments

248.    In or around 2021, through the Enterprise (including through associates Leventon,

Sevilla, Surgent, and Waterhouse), Dondero and Ellington also violated 18 U.S.C. § 1343 by using

interstate wires to defraud UBS by diverting Judgment Debtor assets to Ellington, Waterhouse,

Leventon, and Surgent.

249.    In 2020, the Bankruptcy Court blocked HCM from making bonus payments to

Waterhouse, Ellington, Leventon, and Surgent.  *See supra* ¶ 120.  Ellington came up with a plan

(approved by Dondero) to make these bonus payments to himself and the others by transferring

assets from entities in Ellington and Dondero's control.  *See supra* ¶ 120.

250.    In furtherance of this scheme, Ellington used interstate wires to convince various

Dondero-affiliated entities and their affiliates, including NexBank, NexPoint, Highland Funds

Asset Management, Mainspring, and the DAF to contribute to the illicit payments.  *See supra*

¶ 122.

251.    In furtherance of this scheme, Ellington used interstate wires to create Tall Pine and

its general partner, Sunshine Coast, as "special purpose entities" to enter into consulting

agreements with NexBank, NexPoint, Highland Funds Asset Management, Mainspring, and the

DAF, and then to subcontract with entities owned by or affiliated with Surgent, Waterhouse, and

Leventon.  *See supra* ¶ 122.

252.    In furtherance of this scheme, Dondero and Ellington caused "consulting"

payments to be issued via interstate wires (either directly or through Tall Pine) to pass-through

entities controlled by Ellington, Surgent, Waterhouse, and Leventon.  *See supra* ¶¶ 122-123. Contributions were based not on services rendered but on ability to pay and regulatory limitations. *See supra* ¶¶ 124-125.

253.    As a result of this scheme, Dondero and Ellington diverted approximately $5,874,203.21 of Judgment Debtor assets from Sentinel, through Mainspring, to Ellington, Surgent, Waterhouse, and Leventon.  *See supra* ¶ 126.

254.    Despite having received these payments, Ellington, Surgent, Waterhouse, and Leventon filed proofs of claim seeking those same amounts in bonuses.  *See supra* ¶ 127.  In furtherance of the scheme, Ellington, Waterhouse, and Leventon assigned these claims to CPCM, a wholly owned subsidiary of Skyview, which pursued them on their behalf.

255.    The objective of this scheme was to enrich Ellington and the Associates, to hide assets from UBS for the Judgment, and to defraud UBS of the millions of dollars owed.  *See supra* ¶ 121.  Exhibit A lists specific instances of wire fraud in furtherance of this scheme.

> **h.**    <u>The Misrepresentations About The Solvency Of CDO Fund And HFP</u>

256.    As part of the scheme to defraud UBS, Ellington, through his control of the Enterprise, made false representations to UBS as to the solvency of the Judgment Debtors and their ability to pay the Judgment.  This scheme included the use of interstate wires to deceive UBS and to deprive it of money owed.

257.    In furtherance of this scheme, Ellington repeatedly misrepresented to UBS that some of the Judgment Debtors had been "ghost funds" since 2009 without disclosing that Dondero and Ellington had made them insolvent through the 2010 Fraudulent Conveyance and 2017 Fraudulent Conveyances.  *See supra* ¶ 46, 91.  Exhibit A lists specific instances of wire fraud sent in furtherance of this scheme.

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 84 of 535

2.    Money Laundering In Violation Of 18 U.S.C. § 1956

258.    Dondero and Ellington have also committed acts of money laundering to carry on and promote illegal activity in violation of 18 U.S.C. § 1956.  They knowingly caused the transportation, transmission, and transfer of funds to or from the United States to themselves and other Enterprise associates to promote unlawful activity, including but not limited to the violations of 18 U.S.C. § 1343 alleged above.

259.    Dondero and Ellington engaged in several financial transactions over the course of operating and managing their scheme to defraud UBS, including (i) financial transactions constituting predicate acts of wire fraud and (ii) financial transactions to funnel the proceeds of their scheme between and among themselves and other individuals associated with the Enterprise.

260.    The assets sent from CLO HoldCo to CDO Holding became proceeds of wire fraud at the time of the 2010 Fraudulent Conveyance, because they stemmed from a fraudulent transfer. *See supra* ¶¶ 49-60.  Later, Dondero and Ellington engaged in financial transactions involving additional proceeds of wire fraud, including: (1) the 2017 Fraudulent Conveyances; (2) the 2019 fraudulent conveyance to Sebastian Clarke; (3) the 2019-2020 Fraudulent Ellington Reimbursements; (4) the 2020-2021 fraudulent dividends to Mainspring and Montage; and (5) the 2020 fraudulent bonus payments.[35]

---

[35]    Even if every individual transfer did not comprise Judgment Debtor assets, all financial transactions made under the fraudulent bonus scheme in 2020 also involved the proceeds of wire fraud as defined in 18 U.S.C. § 1956(a)(1)(B) because each transaction was part of a set of parallel or dependent transactions in this scheme, at least one of which (the payments made from Mainspring) involved the proceeds of wire fraud.  In addition, all were part of a single plan or arrangement concocted by Ellington to pay himself, Leventon, Waterhouse, and Surgent bonuses blocked by the Bankruptcy Court.  *See supra* ¶¶ 120-128.

App. 084

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186
INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023
Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 85 of 535

261.    Dondero and Ellington directed these transactions with knowledge that the funds at issue were actually owed to UBS (either pursuant to the contractual breach, court order, or the Judgment).  The funds were therefore the proceeds of wire fraud in violation of 18 U.S.C. § 1343:

- The 2017 Fraudulent Conveyances occurred after it became clear to Dondero and Ellington that the Judgment Debtors would lose in the Underlying Action. *See supra* ¶ 72.

- The 2019 fraudulent conveyance from Sentinel to Sebastian Clarke; the 2019 and 2020 Fraudulent Ellington Reimbursements; the 2020 and 2021 fraudulent dividends from Sentinel to Mainspring and Montage; and the voidable transfers from Mainspring (at times, through Tall Pine) to entities owned by Ellington, Leventon, Waterhouse, and Surgent all took place after the court in the Underlying Action found CDO Fund and SOHC liable to UBS.  *See supra* ¶¶ 93-95, 103-112, 120-122, 113-117.

262.    Dondero and Ellington conducted these financial transactions with the intent to promote and continue their unlawful activities as alleged in this Petition, and designing the financial transactions in whole or part to conceal or disguise the nature, location, source, ownership, and control of the proceeds of their unlawful activities, and to prevent recovery of the proceeds by UBS.  *See supra* ¶¶ 49, 61-63, 93, 98, 103, 113, 120-121.  Had Dondero and Ellington intended to pay the Judgment, then they would have revealed the existence of the ATE Policy when the court issued the Phase I Decision and Order, rather than point to their empty pockets. *See supra* ¶¶ 46-47.

263.    Exhibit B details known money laundering transactions in furtherance of the scheme to defraud.  The twelve money laundering violations listed in the table total more than $130 million.

### D.    Summary Of Allegations To Each RICO Defendant

264.    Dondero and Ellington have both participated in and conducted the affairs of the Enterprise by engaging in multiple predicate acts, as alleged above and summarized immediately

App. 085

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM

NYSCEF DOC. NO. 186

INDEX NO. 650744/2023

RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 86 of 535

below.  The conduct of each constitutes a pattern of racketeering activity under 18 U.S.C. § 1961(5).

265.    ***Dondero*** has committed many predicate acts, including wire fraud and money laundering.  Dondero, directly or indirectly, used the interstate wires in violation of 18 U.S.C. § 1343 to:

- fraudulently transfer assets rightfully owed to UBS to CLO HoldCo in 2010;

- fraudulently transfer assets rightfully owed to UBS to Sentinel in 2017;

- fraudulently issue amendments to cover up the sham ATE Policy in 2018;

- fraudulently transfer assets rightfully owed to UBS to Sebastian Clarke in 2019;

- fraudulently transfer assets rightfully owed to UBS from Mainspring to Tall Pine and ultimately to Ellington and entities owned by Leventon, Waterhouse, and Surgent as bonus payments from HCM in 2020; and to

- fraudulently transfer assets rightfully owed to UBS to himself and Ellington through the issuance of dividends from Sentinel to Mainspring and Montage (their alter egos) in 2020-2021.

266.    Dondero also engaged in financial transactions involving the known proceeds of wire fraud in violation of 18 U.S.C. § 1956, including:

- the 2017 Fraudulent Conveyances;

- the 2019 fraudulent conveyances to Sebastian Clarke;

- the voidable transfers of about $5.9 million from Mainspring (at times, through Tall Pine) to entities owned by Ellington, Leventon, Waterhouse, and Surgent in 2020; and

- the fraudulent issuance of roughly $9 million in "dividends" to himself and Ellington from Sentinel in 2020-2021.

267.    ***Ellington*** has committed many predicate acts, including wire fraud and money laundering.  Ellington, directly or indirectly, used the interstate wires in violation of 18 U.S.C. § 1343 to:

- fraudulently transfer assets rightfully owed to UBS to Sentinel in 2017;

- fraudulently issue amendments to cover up the sham ATE Policy in 2018;

- fraudulently transfer assets rightfully owed to UBS to Sebastian Clarke in 2019;

- fraudulently transfer assets rightfully owed to UBS to himself through personal expense reimbursements in 2019-2020;

- fraudulently transfer assets rightfully owed to UBS from Mainspring to Tall Pine and ultimately to himself and entities owned Leventon, Waterhouse, and Surgent as bonus payments from HCM in 2020;

- fraudulently transfer assets rightfully owed to UBS to himself and Dondero through the issuance of dividends from Sentinel to Mainspring and Montage (their alter egos) in 2020-2021; and to

- fraudulently make repeated misrepresentations to UBS as to the solvency of the Judgment Debtors and their ability to pay on the Judgment.

268.    Ellington also engaged in financial transactions involving the known proceeds of wire fraud in violation of 18 U.S.C. § 1956, including:

- the 2017 Fraudulent Conveyances;

- the 2019 fraudulent conveyances to Sebastian Clarke;

- the fraudulent reimbursements of $833,843.05 for his personal expenses in 2019-2020;

- the voidable transfers of about $5.9 million from Mainspring (at times, through Tall Pine) to entities owned by Ellington, Leventon, Waterhouse, and Surgent in 2020; and

- the fraudulent issuance of roughly $9 million in "dividends" to himself and Dondero from Sentinel in 2020-2021.

**E.**    **The Harm To UBS**

269.    UBS has suffered substantial injury to its business and property because of, and through, Dondero and Ellington's commission of the enumerated racketeering acts in violation of 18 U.S.C. §§ 1962(c) and 1964(c).

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 88 of 535

270.     Dondero and Ellington have frustrated UBS's ability to collect virtually any of the more than a $1 billion judgment entered against CDO Fund, SOHC, and HFP.  *See supra* ¶ 98. The looting of the Judgment Debtors and subsequent shuffling of assets continued for more than a decade.  *See supra* ¶¶ 49, 62, 104, 108, 113, 122-123.  As a direct, proximate, and consequential damage of the result of the predicate acts described UBS has suffered: (1) lost-debt damages for the amount that UBS would have been able to collect from the Judgment Debtors but for Dondero and Ellington's wrongful conduct as set forth above; and (2) separate and independent damages in the nature of collection expense damages for the attorney's fees and other expenses incurred by UBS in connection with its enforcement of its Judgment.  *See supra* ¶¶ 48, 98 n.21.

271.     Under 18 U.S.C. § 1964(c), UBS has a right to recover threefold the damages it sustained, and the cost of this suit, including reasonable attorney's fees.

## III.   CLAIM IV: CONSPIRACY TO VIOLATE RICO BY ELLINGTON (18 U.S.C. § 1962(D))

272.     UBS repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth here.

273.     UBS pleads Claim IV in addition to Ellington's direct liability for violating 18 U.S.C. § 1962(c).

274.     Ellington, along with Dondero, willfully conspired, and agreed to conduct and participate, directly or indirectly, in the conduct of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), thereby violating 18 U.S.C. § 1962(d).

275.     Dondero knew of, agreed to, and acted to further the overall objective of the conspiracy by agreeing to and conspiring to use wire communications at the times, places, and circumstances discussed above to transfer assets and valuable rights, titles, and interests from the Judgment Debtors.  *See supra* ¶¶ 49-72, 82-87, 90-92, 93-97, 103-112, 113-117, 122-126.

App. 088

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186
INDEX NO. 650744/2023
RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 89 of 535

276.    Ellington knew of, agreed to, and acted to further the overall objective of the conspiracy by agreeing to and conspiring to use wire communications at the times, places, and circumstances discussed above to transfer assets and valuable rights, titles, and interests from the Judgment Debtors. *See supra* ¶¶ 31 n.4, 49-72, 82-87, 90-92, 93-97, 102-112, 113-117, 122-126.

277.    Ellington committed the predicate acts of wire fraud and money laundering and thereby injured UBS in its business and property.

278.    As a result of Ellington's assistance in the conspiracy, Dondero could misappropriate assets that would have otherwise been available to satisfy the Judgment.

279.    As a result of Ellington's involvement in the conspiracy, UBS expended legal costs in attempts to collect its Judgment, which remains unsatisfied.  In addition to its legal costs, UBS has sustained lost-debt damages for the amount that UBS would have been able to collect from the Judgment Debtors but for Ellington's involvement in the conspiracy, including the harm from the fraudulent conveyances and dissipation of assets.  Dondero and Ellington's violations have thus damaged UBS.

280.    Under 18 U.S.C. § 1964(c), UBS has a right to recover threefold the damages it sustained, and the cost of this suit, including reasonable attorney's fees.

## REQUESTS FOR RELIEF

281.    Based on the facts and claims set forth above, UBS seeks the following relief:

i.    Under CPLR 5225(b) and the former DCL 270 *et seq.*, to void the fraudulent conveyances of assets from CDO Holding to CLO HoldCo and from the Judgment Debtors to Ellington through Sentinel, and to enter money judgments against CLO Holdco and Ellington for the full value of the transfers;

ii.    Under CPLR 5225(b) and the current DCL 270 *et seq.*, to void all voidable conveyances from the Judgment Debtors to Mainspring and Montage through Sentinel in 2020 and 2021 and to enter money judgments against Mainspring and Montage for all amounts received in said transfers;

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM    INDEX NO. 650744/2023

NYSCEF DOC. NO. 186    Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc    RECEIVED NYSCEF: 03/29/2023

Exhibit Exhibits 1-16    Page 90 of 535

iii.    Under CPLR 5225(b), an order that: (a) CDO Holding at all relevant times was the alter ego of HFP, and is thus jointly and severally liable for the Judgment as against HFP and SOHC; (b) Dondero and Ellington at all relevant times were the alter egos of CDO Fund, SOHC, and HFP and are therefore jointly and severally liable for the Judgment; (c) Dondero at all relevant times was the alter ego of Mainspring and is liable for any turnover order and judgment against Mainspring; and (d) Ellington at all relevant times was the alter ego of Montage and is liable for any turnover order and judgment against Mainspring;

iv.    Under CPLR 6201 *et seq.*, (a) an order of attachment against the Judgment Debtors' assets and/or assets to which UBS has a superior right up to the sum of $631,658,040.11, including statutory interest for the Judgment against SOHC and HFP, and $639,138,543.43, including statutory interest for the Judgment against CDO Fund; and (b) a temporary restraining order against the Respondents as to the transfer of the Judgment Debtors' assets and assets to which UBS has a superior right, including, but not limited to, (i) the assets transferred as part of the 2010 fraudulent conveyance to CLO HoldCo, and (ii) the assets transferred to Ellington, Mainspring, and Montage through Sentinel;

v.    Under CPLR 6220 and 408, an order requiring Respondents to make disclosure as to any other assets that may be subject to attachment, and permitting UBS to obtain additional, related disclosure as needed;

vi.    In the alternative to a finding of alter-ego liability under (iii) above and under 18 U.S.C. § 1964(c), an award of threefold lost-debt damages against Dondero and Ellington for the amount that UBS would have been able to collect from the Judgment Debtors but for Dondero and Ellington's wrongful conduct;

vii.    Under the formerly enacted DCL 276-A, which was in effect at the time of the 2010 Fraudulent Conveyance and Ellington Fraudulent Reimbursement, an award of UBS's costs and attorney's fees incurred in connection with the enforcement of the Judgment as to those transfers, to include costs and fees incurred in UBS's investigation of the facts animating the claims set forth above;

viii.    Under the newly enacted DCL 276-A, which was in effect at the time of the April 2020 and January 2021 Dividends, an award of UBS's costs and attorney's fees incurred in connection with the enforcement of the Judgment as to those transfers, to include costs and fees incurred in UBS's investigation of the facts animating the claims set forth above;

ix.    Under 18 U.S.C. § 1964(c), an award of UBS's costs and attorney's fees incurred in connection with UBS's civil RICO claims; and

x.    Such other relief as the Court deems just and proper.

App. 090

FILED: NEW YORK COUNTY CLERK 03/29/2023 11:58 AM
NYSCEF DOC. NO. 186

INDEX NO. 650744/2023

RECEIVED NYSCEF: 03/29/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 91 of 535

Dated:  February 6, 2023
New York, NY

Respectfully submitted,

/s/ Andrew Clubok
Andrew Clubok
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020-1300
Phone:    (212) 906-1200
Email:     andrew.clubok@lw.com

Jason R. Burt[*]
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
Phone:    (202) 637-2200
Email:     jason.burt@lw.com

Kathryn K. George[*]
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611-3695
Phone:    (312) 876-7700
Email:     kathryn.george@lw.com

*Counsel for Petitioners UBS Securities LLC
and UBS AG London Branch*

---

[*]    Motion for admission *pro hac vice* forthcoming.

# EXHIBIT 2

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 93 of 535

# EXHIBIT 40

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM

INDEX NO. 650744/2023

NYSCEF DOC. NO. 46

RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 94 of 535

**From:** Isaac Leventon <ILeventon@HighlandCapital.com>
**To:** JP Sevilla <JSevilla@HighlandCapital.com>
**Subject:** UBS Settlement Structure (9).pptx
**Date:** Wed, 19 Apr 2017 14:06:01 -0500
**Importance:** Normal
**Attachments:** UBS_Settlement_Structure_(9).pptx

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.





EXHIBIT 86
WIT: Leventon
DATE: 10-10-22
S. Klinger, RMR-CRR

HCMUBS005251

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 02/08/2023
Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 95 of 535

# Settlement Analysis

 vs. 

1

HCMUBS005252

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 96 of 535

# *If Highland does not settle...*

**AND UBS WINS:**

1. Highland loses all assets in HFP/CDO Fund (HFP assets include $32m DAF Note Payable) (*see Slide 9 and Appendix 1*); AND

2. Highland faces years of fraudulent transfer claims throughout Highland structure (*see Slide 9*); AND

3. HCMLP faces clawback of $9m and liability to backstop HFP/CDO Fund for up to $1.2b ($686m principal + $511m interest back to 2009) (*see Slide 9*); AND

4. Giant PR hit (*see Slide 7*).

**OR HIGHLAND WINS:**

1. HFP is solvent = reverses 2008's $257m tax write-off by HCMLP (resulting in $50m+ in taxes due from HCMLP's partners) (*see Slides 3*); AND

2. UBS appeals, so issue is left unresolved for years (*see Slide 4*); AND

3. Citi has $34m claim against CDO Fund assets (*see Slides 5, 9*); AND

4. If CDO Fund can't pay Citi $34m, then HCMLP has to pay the balance (*see Slides 5, 9*).

*BOTTOM LINE: There is no upside to going to trial in either matter.*

2

HCMUBS005253

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 46

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 97 of 535

# *Taxes: If Highland Wins... it Loses*

- If Lackey wins at trial = HFP has positive value
- Result: Reverses 2008 HFP tax-write off from 2008
- Resulting Tax Liability:

| | |
|---|---|
| Dondero: $50m+ | *Pat Daugherty: $167k |
| *Crusader: $20m+ | Davis Deadman: $110k |
| *Goldman: $15m+ | Also: Plumer, Paul Kauffman, |
| Scott Kavanaugh: $1.4m | Borud, Okada, Joe Dougherty, |
| *Todd Travers: $1m | John Morgan |
| John Honis: $212k | |

- Everyone who suffers tax consequences has a litigation claim for mismanagement against HCMLP and Dondero (as decision maker for HFP)

*Red, most likely to assert claims

3

HCMUBS005254

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 46

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 98 of 535

# *If Highland does not settle: UBS Appeals*

- UBS appeals in NY State Court
- Average time to outcome is 2 years
- $5m additional legal expenses
- Can be remanded back to trial court to start all over; OR
- Can be reversed and HCM loses

4

HCMUBS005255

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 46
INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 99 of 535

# *If Highland does not settle: Citi*

- Trial in late 2017 or 2018
- Additional PR issues
- Delay repairing trading relationship
- Incur $3-4m in Lackey fees through trial
- Have to pay for Citi's legal fees under the terms of the contract
- $24m principal liability + $10m in Citi's legal fees
- CDO Fund pays, but if it can't, then HCMLP has to pay balance

5

HCMUBS005256

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 100 of 535

# *If Highland Settles...*

1. Sentinel controls HFP/CDO Fund assets (currently $94m) (*see Slide 10*); *AND*

2. Sentinel and HCMLP can use HFP/CDO Fund assets to generate cash to pay UBS settlement, Citi, and outstanding legal fees (*see Slides 12-16*); *AND*

3. HCMLP's $50m+ tax liability is avoided (*see Slides 3, 9*); *AND*

4. Residual assets (up to $50m) stay at Sentinel (*see Slide 16*); *AND*

5. Potential to repair UBS distribution/relationship (*see Slide 7*); *AND*

6. PR issues resolved (*see Slide 7*); *AND*

7. Crusader Redeemer Committee remains the stand-alone target (*see Slide 7*).

> *BOTTOM LINE: Even if UBS and Citi are awarded ZERO damages, settlement still nets $100m (Avoids $50m tax liability + keeps $50m in net HFP/CDO Fund assets)*

6

HCMUBS005257

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM

NYSCEF DOC. NO. 46

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 101 of 535

# *If Highland Settles: PR*

- Amicably and **privately** resolve:
  - Credit Strat
  - UBS
  - Citi
- No more defensive bank-counterparty lawsuits
  - Credit Suisse "offense" is the only remaining story
- Final "Crisis" issue is Crusader (Committee is alone on an island)

7

HCMUBS005258

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 02/08/2023
Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 102 of 535

# UBS Settlement: Structure Summary

Step 1: HFP/CDO Fund buy $100m ATE policy from Sentinel
   *ATE premium = all assets in HFP/CDO Fund*

Step 2: Negotiate settlement amount with UBS

Step 3: Sentinel generates cash from HFP/CDO Fund Assets

Step 4: Sentinel pays settlement amount to UBS

Step 5: Sentinel pays Lackey legal bills

Step 6: HCMLP (or designee) or Sentinel pay Citi

Conclusion: Sentinel keeps net assets (could be up to $50 million)

*Here is why we should settle...*

8

HCMUBS005259

## UBS Settlement: Assets and Liabilities



**Total Potential Liability**
To UBS: $1.2b (split among HCMLP, HFP, CDO Fund)
To Citi: $34m (split btw. HCMLP and CDO Fund)

9

HCMUBS005260

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM

INDEX NO. 650744/2023

NYSCEF DOC. NO. 46

RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 104 of 535

# UBS Settlement: Step 1 – ATE Policy



Actor: Scott's Team

CDO Fund
($51)

HCMLP

HFP/CDO Fund send all their assets
($94m) as ATE premium payment

Sentinel

Write $100m ATE policy for UBS liability

HFP

CDO Holdco
($43)

SOHC
($0)

UBS

10

HCMUBS005261

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 46
Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
RECEIVED NYSCEF: 02/08/2023
Exhibit Exhibits 1-16   Page 105 of 535

## UBS Settlement: Step 2 –  Negotiate Settlement Amount



HCMUBS005262

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 46
INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 106 of 535

## UBS Settlement: Step 3 – Generate Cash



Actor: Sentinel

Sentinel($94m)

Sentinel generates cash by selling portion of HFP/CDO Fund assets

3rd P. Purchaser

3rd P. Purchaser

3rd P. Purchaser

UBS

*TBD: How / how much of HFP/CDO Fund assets to sell for cash*

12

HCMUBS005263

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 02/08/2023
Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 107 of 535

## UBS Settlement: Step 4 – Pay UBS



HCMUBS005264

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 108 of 535

## UBS Settlement: Step 5 – Pay Lackey



HCMUBS005265

## UBS Settlement: Step 6 – Pay Citi



HCMUBS005266

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM | INDEX NO. 650744/2023
NYSCEF DOC. NO. 46    Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc   RECEIVED NYSCEF: 02/08/2023

Exhibit Exhibits 1-16    Page 110 of 535

## <u>UBS Settlement: Step 7 – Remainder</u>





HCMUBS005267

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 111 of 535

# Appendix 1

17

HCMUBS005268

# EXHIBIT 3

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
INDEX NO. 650744/2023

NYSCEF DOC. NO. 77

RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 113 of 535

# EXHIBIT 71

**From:** Helen Kim <HKim@HighlandCapital.com>
**To:** Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** RE: Highland Entity List
**Date:** Mon, 23 Sep 2019 09:17:33 -0500
**Importance:** Normal
**Attachments:** 0-Legal_Entities_List_(Q2_2019)_9.13.19.xls
**Inline-Images:** image001.jpg

---

Attached

---

**From:** Isaac Leventon
**Sent:** Monday, September 23, 2019 9:13 AM
**To:** Helen Kim
**Subject:** Highland Entity List

Will you please send me the most recent version?

**ISAAC LEVENTON |** ASSISTANT GENERAL COUNSEL



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4100 | D: 972.419.4482 | F: 972.628.4147

ileventon@highlandcapital.com | www.highlandcapital.com

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

UBSPROD2389233

No Images Produced

UBSPROD2389234

| Name | EIN | Formation Date | Jurisdiction | Foreign Qualification | Category | Owners | Ownership Type | Ownership % | Voting Shares | Director/Manager/ Trustee | Officers | Bank Signatory | Fund Contact | Accounting Contact Books & Records | Dissolve (Y/N) | Termination Date | Entity Description (one sentence) | Other Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 and 17 HoldCo LLC | | 9/16/2013 | Texas | N/A | NB | NexBank Capital, Inc. | Member | 100 | | | | | Dierk Hohman | Courtney Burton | Y | | Underlying assets sold on 1/30/2015 | FORECLOSED |
| 2006 Prosper Partners GP, LLC | | 9/15/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero Ted Dameris Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Chris Wise, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 10/30/2014 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | Dissolve upon distribution of funds |
| 2006 Prosper Partners, L.P. | | 9/15/2006 | Texas | N/A | RE | 2006 Prosper Partners GP, LLC | Class A Limited Partner | 0.09 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Clifford Stoops. | Ted Dameris | Drew Wilson | Terminated | 10/5/2012 | This entity owns a real estate asset for investment purposes. | FORECLOSED Dissolve upon distribution of funds |
| 2006 Prosper Partners, L.P. | | 9/15/2006 | Texas | N/A | RE | 2006 Prosper Partners GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Clifford Stoops. | Ted Dameris | Drew Wilson | Terminated | 10/5/2012 | This entity owns a real estate asset for investment purposes. | FORECLOSED Dissolve upon distribution of funds |
| 2006 Prosper Partners, L.P. | | 9/15/2006 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 99.9 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Clifford Stoops. | Ted Dameris | Drew Wilson | Terminated | 10/5/2012 | This entity owns a real estate asset for investment purposes. | FORECLOSED Dissolve upon distribution of funds |
| 2014 Galveston Jones Drive, LLC | | 5/27/2014 | Texas | N/A | REIT | HMCF IB Investors, LLC | Member | 42.75 | n/a | Rene O. Campos-Manager | | | Matt McGraner | Brandon Knott | N | 2/11/2016 | Holds multifamily real property known as "Island Bay" located at 7400 Jones Dr, Galveston, TX 77551 | Redeemed 2/11/16 |
| 2014 Galveston Jones Drive, LLC | | 5/27/2014 | Texas | N/A | REIT | Galveston Jones Drive Member, LLC | Member | 57.25 | n/a | Rene O. Campos-Manager | | | Matt McGraner | Brandon Knott | N | 2/11/2016 | Holds multifamily real property known as "Island Bay" located at 7400 Jones Dr, Galveston, TX 77551 | Redeemed 2/11/16 |
| 2606 Shelby Avenue, Ltd. | | 7/12/2005 | Texas | N/A | RE | HCREH Shelby Townhomes, L.P. | Investor Limited Partner | 50 | n/a | General Partner Controlled | | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This is not one of our entities. It is an operating entity in which one of the investment entities is invested. S. Caudle Properties, Inc. c/o Sam Caudle 5615 Preston Fairways Drive Dallas, TX 75252 | SOLD AT FORECLOSURE AUCTION IN 2008 |
| 2606 Shelby Avenue, Ltd. | | 7/12/2005 | Texas | N/A | RE | Third Party Investors | Developer Partner | 49 | n/a | General Partner | | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | | SOLD AT FORECLOSURE AUCTION IN 2008 |
| 2606 Shelby Avenue, Ltd. | | 7/12/2005 | Texas | N/A | RE | Third Party Investors | General Partner | 1 | n/a | General Partner | | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | | SOLD AT FORECLOSURE AUCTION IN 2008 |
| 2747 Camelback, LLC | | 3/16/2007 | Delaware | AZ | RE | Biltmore Camelback Investors, LLC | Member | 100% | n/a | HCMLP-Manager | HCMLP-Manager | HCMLP-Manager | Ted Dameris | Drew Wilson | Y | 3/31/2017 | Underlying project is a 4.46 acre site located in Phoenix, AZ, improved with three vacant office buildings that are expected to be demolished for construction of a condo tower upon receipt of amended height restriction. | Dissolution docs sent to DE SOS & AZ SOS on 3.30.17 |
| 3500 Beverly, L.P. | | 2/15/2005 | Delaware | | JD | The Get Good Non-Exempt Trust No. 2 | Limited Partner | 59 | n/a | Strand Advisors VIII, LLC | N/A | James Dondero | Matt Griffith | Matt Griffith | Y | 12/17/2010 | Jim's investment property | SOLD 6/21/10 |
| 3500 Beverly, L.P. | | 2/15/2005 | Delaware | | JD | Strand Advisors VIII, LLC | General Partner | 1 | n/a | Strand Advisors VIII, LLC | N/A | James Dondero | Matt Griffith | Matt Griffith | Y | 12/17/2010 | Jim's investment property | SOLD 6/21/10 |
| 3500 Beverly, L.P. | | 2/15/2005 | Delaware | | JD | Third Party Investor | Limited Partner | 40 | n/a | Strand Advisors VIII, LLC | N/A | James Dondero | Matt Griffith | Matt Griffith | Y | 12/17/2010 | Jim's investment property | SOLD 6/21/10 |
| 3700 Euclid, L.P. | | 1/17/2006 | Delaware | | JD | The Get Good Trust | Limited Partner | 99 | n/a | Strand Advisors XIV, LLC | | James Dondero | Matt Griffith | Matt Griffith | Y | 8/20/2010 | Jim's investment property | SOLD 6/8/09 |
| 3700 Euclid, L.P. | | 1/17/2006 | Delaware | | JD | The Get Good Trust | Limited Partner | 99 | n/a | Strand Advisors XIV, LLC | | James Dondero | Matt Griffith | Matt Griffith | Y | 8/20/2010 | Jim's investment property | SOLD 6/8/09 |
| 3704 Euclid, L.P. | | 5/10/2006 | Delaware | | JD | Strand Advisors XIV, LLC | General Partner | 1 | n/a | Strand Advisors XIV, LLC | | James Dondero | Matt Griffith | Matt Griffith | Y | 8/20/2010 | Jim's investment property | SOLD 6/8/09 |
| 3704 Euclid, L.P. | | 5/10/2006 | Delaware | | JD | The Get Good Trust | Limited Partner | 99 | n/a | Strand Advisors XIV, LLC | | James Dondero | Matt Griffith | Matt Griffith | Y | 8/20/2010 | Jim's investment property | SOLD 6/8/09 |
| 3708 Harvard, L.P. | | 8/1/2005 | Delaware | | JD | Strand Advisors X, LLC | General Partner | 1 | n/a | Strand Advisors X, LLC | | James Dondero | Matt Griffith | Matt Griffith | Y | 8/20/2010 | Jim's investment property | SOLD 10/2008 |
| 4041 Grasmere, L.P. | | 12/22/2004 | Delaware | | JD | Strand Advisors VI, LLC | General Partner | 1 | n/a | Strand Advisors VI, LLC | | James Dondero | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | Jim's investment property | Wayne Lewis interest transferred to GGNE#2 in 2011 |
| 4041 Grasmere, L.P. | | 12/22/2004 | Delaware | | JD | The Get Good Non-Exempt Trust No. 2 | Limited Partner | 99 | n/a | Strand Advisors VI, LLC | | James Dondero | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | Jim's investment property | Wayne Lewis interest transferred to GGNE#2 in 2011 |
| 4201 Versailles, L.P. | | 12/22/2004 | Delaware | | JD | Strand Advisors VII, LLC | General Partner | 1 | n/a | Strand Advisors VII, LLC | | James Dondero | Melissa Schroth | Melissa Schroth | Y | 4/20/2012 | Jim's investment property | |
| 4201 Versailles, L.P. | | 12/22/2004 | Delaware | | JD | The Get Good Trust | Limited Partner | 59 | n/a | Strand Advisors VII, LLC | | James Dondero | Melissa Schroth | Melissa Schroth | Y | 4/20/2012 | Jim's investment property | |
| 4201 Versailles, L.P. | | 12/22/2004 | Delaware | | JD | Wayne Lewis | Limited Partner | 40 | n/a | Strand Advisors VII, LLC | | James Dondero | Melissa Schroth | Melissa Schroth | Y | 4/20/2012 | Jim's investment property | |
| 4223 Bordeaux, L.P. | | 9/28/2005 | Delaware | | JD | Strand Advisors XI, LLC | General Partner | 1 | n/a | Strand Advisors XI, LLC | | James Dondero | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | Jim's investment property | Wayne Lewis interest transferred to GGT in 2011  2 EINs were obtained for the entity - 20-2197558 is active and 20-3646318 should be terminated |
| 4223 Bordeaux, L.P. | | 9/28/2005 | Delaware | | JD | The Get Good Trust | Limited Partner | 99 | n/a | Strand Advisors XI, LLC | | James Dondero | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | Jim's investment property | Wayne Lewis interest transferred to GGT in 2011 |
| 4346 Overhill, L.P. | | 11/24/2004 | Delaware | | JD | The Get Good Non-Exempt Trust No. 2 | Limited Partner | 99 | n/a | Strand Advisors V, LLC | | James Dondero | Matt Griffith | Matt Griffith | Y | 8/20/2010 | Jim's investment property | SOLD 7/23/09 |
| 4346 Overhill, L.P. | | 11/24/2004 | Delaware | | JD | Strand Advisors V, LLC | General Partner | 1 | n/a | Strand Advisors V, LLC | | James Dondero | Matt Griffith | Matt Griffith | Y | 8/20/2010 | Jim's investment property | SOLD 7/23/09 |
| 78/Kreymer, Ltd. | | 2/6/2004 | Texas | | JD | The Get Good Non-Exempt Trust No. 1 | Shareholder | 30.07 | n/a | James Dondero-Trustee | James Dondero | James Dondero | Melissa Schroth | Melissa Schroth | N | | Jim's investment property | |
| 78/Kreymer, Ltd. | | 2/6/2004 | Texas | | JD | Third Party Investors | Shareholder | 69.93 | n/a | James Dondero-Trustee | James Dondero | James Dondero | Melissa Schroth | Melissa Schroth | N | | Jim's investment property | |
| Acis CLO Opportunity Fund I, L.P. | | 5/16/2014 | Delaware | N/A | Hedge | Acis CLO Opportunity Funds GP, LLC | GP | TBD | | GP | | Hunter Covitz | Kristin Hendrix | | Y | 12/28/2016 | | |
| Acis CLO Opportunity Fund I, L.P. | | 5/16/2014 | Delaware | N/A | Hedge | Acis CLO Opportunity Funds SGP, LLC | Special GP | TBD | n/a | GP | | GP | Hunter Covitz | Kristin Hendrix | | 12/28/2016 | | |
| Acis CLO Opportunity Fund II, L.P. | | 5/16/2014 | Delaware | N/A | Hedge | Acis CLO Opportunity Funds GP, LLC | GP | TBD | n/a | GP | | GP | Hunter Covitz | Kristin Hendrix | | 12/28/2016 | | |
| Acis CLO Opportunity Fund II, L.P. | | 5/16/2014 | Delaware | N/A | Hedge | James Dondero | Initial LP | TBD | n/a | GP | | GP | Hunter Covitz | Kristin Hendrix | | 12/28/2016 | | |
| Acis CLO Opportunity Fund III, L.P. | | 5/16/2014 | Delaware | N/A | Hedge | Acis CLO Opportunity Funds GP, LLC | GP | TBD | n/a | GP | | GP | Hunter Covitz | Kristin Hendrix | | 12/28/2016 | | |
| Acis CLO Opportunity Fund III, L.P. | | 5/16/2014 | Delaware | N/A | Hedge | Acis CLO Opportunity Funds SGP, LLC | Special GP | TBD | n/a | GP | | GP | Hunter Covitz | Kristin Hendrix | | 12/28/2016 | | |
| Acis CLO Value Fund I Investment Team Assets L | | 12/21/2012 | Delaware | N/A | Hedge | Third Party Investors | Member | TBD | n/a | Manager | | Manager | | | Y | 10/17/2013 | NOT USED | |
| Acis CLO Value Intermediate Fund, L.P. | | 7/21/2010 | Cayman Islands | N/A | Hedge | Acis CLO Value GP, LLC | General Partner | TBD | | TBD | | Dondero, Terry, Waterhouse, Stoops, Wise, Chism | Josh Terry | David Willmore | Dissolved | 12/31/2012 | Dissolve | |
| Acis Funding Manager, LLC | | 2/14/2014 | Delaware | N/A | BrasilInvest | Acis Capital Management, L.P. | Member | 100 | N/A | TBD | | TBD | Philip Braner | | Y | 4/8/2014 | Set up in connection with TMRS transaction but will not be used | |
| Acis Funding, LLC | | 2/7/2014 | Delaware | N/A | BrasilInvest | Acis Funding Manager, LLC | Non-economic Member | TBD | | Acis Funding Manager, LLC (Manager) | | TBD | Philip Braner | | Y | 4/8/2014 | Set up in connection with TMRS transaction but will not be used | |

**FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM**
NYSCEF DOC. NO. 77

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 117 of 535

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

| # | A | B | C | D | E | F | G | H | I | J | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43 | Acis Funding, LLC | | 2/7/2014 | Delaware | N/A | | BrasilInvest CLO HoldCo, Ltd | Member | TBD | | Acis Funding Manager, LLC (Manager) | TBD | Philip Braner | | | Y | 4/8/2014 | Set up in connection with TMRS transaction but will not be used | |
| 44 | Acis Funding, LLC | | 2/7/2014 | Delaware | N/A | | BrasilInvest Third Party (Northern Providence) | Member | TBD | | Acis Funding Manager, LLC (Manager) | TBD | Philip Braner | | | Y | 4/8/2014 | Set up in connection with TMRS transaction but will not be used | |
| 45 | AFM Highland Village Partners I, L.P. | | 5/11/2006 | Texas | N/A | RE | HCREA Highland Village, L.P. | Class A Limited Partner | 90 | n/a | Non HCMLP GP | n/a | Dennis McDaniel | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed |
| 46 | AFM Highland Village Partners I, L.P. | | 5/11/2006 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 9.9 | n/a | Non HCMLP GP | n/a | Dennis McDaniel | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed |
| 47 | AFM Highland Village Partners I, L.P. | | 5/11/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 0.1 | n/a | Non HCMLP GP | n/a | Dennis McDaniel | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed |
| 48 | Amcast Industrial Corporation | | 7/26/2005 | Delaware | | PE | CalPERS | Shareholder | 6.33 | n/a | Richard Smith-VP-Finance/CFO Jeffrey McWilliams-VP-Admin/Secy | Richard Smith-VP-Finance/CFO Jeffrey McWilliams-VP-Admin/Secy | | Carl Moore | Carl Moore | Y | | DELETE PER C. MOORE | |
| 49 | Amcast Industrial Corporation | | 7/26/2005 | Delaware | | PE | Highland Crusader Offshore Partners, L.P. | Shareholder | 14.17 | n/a | same | same | same | Carl Moore | Carl Moore | Y | | DELETE PER C. MOORE | |
| 50 | Amcast Industrial Corporation | | 7/26/2005 | Delaware | | PE | Highland Legacy Limited | Shareholder | 4.64 | n/a | same | same | same | Carl Moore | Carl Moore | Y | | DELETE PER C. MOORE | |
| 51 | Amcast Industrial Corporation | | 7/26/2005 | Delaware | | PE | Pam Capital Funding, L.P. | Shareholder | 28.56 | n/a | same | same | same | Carl Moore | Carl Moore | Y | | DELETE PER C. MOORE | |
| 52 | Amcast Industrial Corporation | | 7/26/2005 | Delaware | | PE | PamCo Cayman Ltd. | Shareholder | 21.59 | n/a | same | same | same | Carl Moore | Carl Moore | Y | | DELETE PER C. MOORE | |
| 53 | Amcast Industrial Corporation | | 7/26/2005 | Delaware | | PE | Third Party Investors | Shareholder | 24.71 | n/a | same | same | same | Carl Moore | Carl Moore | Y | | DELETE PER C. MOORE | |
| 54 | Andrew Merrick Homes-4301 Bordeaux, L.P. | | 9/14/2007 | Delaware | | JD | Strand Advisors XV, LLC | General Partner | 1 | n/a | Strand Advisors XV, LLC | N/A | | James Dondero | Matt Griffith | Matt Griffith | Y | 1/17/2012 | Jim's home building company |
| 55 | Andrew Merrick Homes-4301 Bordeaux, L.P. | | 9/14/2007 | Delaware | | JD | The Good Trust | Limited Partner | 99 | n/a | | | | James Dondero | Matt Griffith | Matt Griffith | Y | 1/17/2012 | Jim's home building company |
| 56 | Appennini, LLC | | 9/24/2015 | Delaware | N/A | JD | The Dugsboy Investment Trust | Member | 100 | n/a | Grant Scott-Director | Grant Scott-Director | Grant Scott-Director | Mark Patrick | Melissa Schroth | Y | 5/27/2016 | Investment in Rand PE Fund I, LP - Series 1 | |
| 57 | Armstrong Loan Funding, Ltd. | | 2/22/2008 | Cayman Islands | N/A | CLO | Highland Credit Opportunities CDO, Ltd. | Class 1 Voting Preferred Shares | 19.46 | 7,500 | Maples Finance | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Josh Terry | Hunter Covitz / Edward Leo | N | | Issuer for CLO investment structure. | Liquidating |
| 58 | Armstrong Loan Funding, Ltd. | | 2/22/2008 | Cayman Islands | N/A | CLO | Highland Offshore Partners, L.P. | Class 1 Voting Preferred Shares | 2.59 | 1,000 | Maples Finance | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Josh Terry | Hunter Covitz / Edward Leo | N | | Issuer for CLO investment structure. | Liquidating |
| 59 | Armstrong Loan Funding, Ltd. | | 2/22/2008 | Cayman Islands | N/A | CLO | Tunstall Opportunities Master Fund, L.P. | Class 1 Voting Preferred Shares | 2.59 | 1,000 | Maples Finance | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Josh Terry | Hunter Covitz / Edward Leo | N | | Issuer for CLO investment structure. | Liquidating |
| 60 | Armstrong Loan Funding, Ltd. | | 2/22/2008 | Cayman Islands | N/A | CLO | CLO HoldCo, Ltd | Class 1 Voting Preferred Shares | 8.69 | 3,350 | Maples Finance | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Josh Terry | Hunter Covitz / Edward Leo | N | | Issuer for CLO investment structure. | Liquidating |
| 61 | Armstrong Loan Funding, Ltd. | | 2/22/2008 | Cayman Islands | N/A | CLO | Highland Crusader Offshore Partners, LP | Class 2 Voting Preferred Shares | 38.52 | 14,845 | Maples Finance | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Josh Terry | Hunter Covitz / Edward Leo | N | | Issuer for CLO investment structure. | Liquidating |
| 62 | Armstrong Loan Funding, Ltd. | | 2/22/2008 | Cayman Islands | N/A | CLO | Highland Credit Strategies Master Fund, LP | Class 2 Voting Preferred Shares | 28.14 | 10,845 | Maples Finance | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Josh Terry | Hunter Covitz / Edward Leo | N | | Issuer for CLO investment structure. | Liquidating |
| 63 | Atascosa Investments LLC | | 10/22/2004 | Delaware | N/A | Hedge Blocker | Highland Crusader Offshore Partners, L.P. | Member | 100 | n/a | Member | James Dondero-Pres | Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership |
| 64 | Bandera Strategic Credit Partners I GP, LLC (fka Highland Strategic Partners GP, LLC) | | 1/23/2014 | Delaware | TX | I-Fund | Bandera Strategic Credit Partners I SLP, L.P. | Member | 100 | n/a | Sole member | Dondero, Okada, Britain, Ellington, Parker Waterhouse, Palmer, Stoops, Chism | | Trey Parker | Charlie Hoedebeck | Y | 8/23/2018 | TMRS fund | |
| 65 | Bandera Strategic Credit Partners I SLP GP, LLC | | 4/3/2014 | Delaware | TX | I-Fund | Bandera Capital Management, L.P. | Member | 100 | n/a | Sole member | Dondero, Okada, Britain, Ellington, Parker Waterhouse, Palmer, Stoops, Chism | | Trey Parker | Charlie Hoedebeck | Y | 8/23/2018 | TMRS fund | |
| 66 | Bandera Strategic Credit Partners I SLP GP, LLC | | 4/3/2014 | Delaware | N/A | I-Fund | Bandera Strategic Credit Partners I SLP GP, LLC | General Partner | 50 | n/a | GP | GP | | Trey Parker | Charlie Hoedebeck | Y | 8/23/2018 | TMRS fund | |
| 67 | Bandera Strategic Credit Partners I SLP, L.P. | | 4/3/2014 | Delaware | N/A | I-Fund | Bandera Capital Management, L.P. | Initial LP | 50 | n/a | GP | GP | | Trey Parker | Charlie Hoedebeck | Y | 8/23/2018 | TMRS fund | |
| 68 | Bandera Strategic Credit Partners I L.P.P. (fka Highland Strategic Partners Fund, L.P.) | | 1/23/2014 | Delaware | TX | I-Fund | Bandera Strategic Credit Partners I GP, LLC | General Partner | 0 | n/a | GP | GP | | Trey Parker | Charlie Hoedebeck | GP/management terminated 5.31.18 | | TMRS fund | |
| 69 | Bandera Strategic Credit Partners I L.P.P. (fka Highland Strategic Partners Fund, L.P.) | | 1/23/2014 | Delaware | TX | I-Fund | Highland Capital Management, L.P. | LP | 0.35 | n/a | GP | GP | | Trey Parker | Charlie Hoedebeck | GP/management terminated 5.31.18 | | TMRS fund | |
| 70 | Bandera Strategic Credit Partners I L.P.P. (fka Highland Strategic Partners Fund, L.P.) | | 1/23/2014 | Delaware | TX | I-Fund | Texas Municipal Retirement System | LP | 99.65 | n/a | GP | GP | | Trey Parker | Charlie Hoedebeck | GP/management terminated 5.31.18 | | TMRS fund | |
| 71 | Bankruptcy Funding, LLC | | 11/12/2013 | Delaware | N/A | Legal | BFC 1, LLC | Member | 50 | n/a | N/A | James Dondero-Pres Scott Ellington-VP | Scott Ellington-VP | Jason Goldsmith | Katie Irving | Y | 3/31/2016 | | |
| 72 | Bankruptcy Funding, LLC | | 11/12/2013 | Delaware | N/A | Legal | BFC 1, LLC | Member | 50 | n/a | N/A | James Dondero-Pres Scott Ellington-VP | Scott Ellington-VP | Jason Boctor | Katie Irving | Y | 3/31/2016 | | |
| 73 | Barrier Advisors, Inc. | | 4/27/2006 | Delaware | | NB | NexBank Capital, Inc. | Shareholder | 100 | n/a | John Holt, Mike Rossi, Harrison Price | Harrison Price-Pres Harold Kessler-VP/Treas | Mike Rossi, Lisa Stuart, Harrison Price | Josh Bock | Mike Rossi | Merged into NSI as of 1/1/12 | 4/30/2016 | Barrier Advisors is a turnaround, workout, and distressed M&A consulting firm. | Barrier merged with NSI on 1/1/2012, with NSI as the surviving entity |
| 74 | BB Highland Floating Rate Fund I | | | Dublin | | Irish Fund | Highland CDO Opportunity Master Fund, Member | Member | 0 | n/a | Dondero, Okada, Ellington, Parker Waterhouse, Palmer, Stoops, Chism | | Hunter Covitz | Tom Beauchamp | | | 4/30/2016 | Irish sub-fund of BB Unit Trust Ireland, an open-ended umbrella unit trust |
| 75 | BB Highland Floating Rate Fund I | | | Dublin | | Irish Fund | Mark Okada | Member | 0 | n/a | Dondero, Okada, Ellington, Parker Waterhouse, Palmer, Stoops, Chism | | Hunter Covitz | Tom Beauchamp | | | 4/30/2016 | Irish sub-fund of BB Unit Trust Ireland, an open-ended umbrella unit trust |
| 76 | BB Highland Floating Rate Fund I | | | Dublin | | Irish Fund | Mark and Pamela Family Trust | Member | 100 | n/a | Dondero, Okada, Ellington, Parker Waterhouse, Palmer, Stoops, Chism | | Hunter Covitz | Tom Beauchamp | | | 4/30/2016 | Irish sub-fund of BB Unit Trust Ireland, an open-ended umbrella unit trust |
| 77 | BFC 1, LLC | | 11/12/2013 | Delaware | N/A | Legal | James Dondero | Member | 100 | n/a | James Dondero | | | Jason Goldsmith | Katie Irving | Y | 3/31/2016 | | |
| 78 | Biltmore Camelback Investors, LLC | | 3/20/2007 | Delaware | AZ | RE | HE Capital 2747, LLC | Member | 100 | n/a | HCMLP-Manager | HCMLP-Manager | | Matt McGraner | Newbank | Y | 3/31/2017 | Underlying project is a 4.46 acre site located in Phoenix, AZ, improved with three vacant office buildings that are expected to be demolished for construction of a condo tower upon receipt of amended height restriction. | Dissolution docs sent to DE SOS & AZ SOS on 3.30.17 |

| | A | B | C | D | E | F | G | H | I | J | K | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 79 | Blackwell BMC, LLC (fka HCM-BMC, LLC) | | 3/9/2007 | Delaware | TX | Hedge Blocker | HCM Blackwell Holding Corporation | Member | 88.92 | | 100 | Managers: Jon Poglitsch/Carl Moore | Poglitsch-President Moore-Treasurer Stoops-Asst. Treas Chism-Asst. Treas Palmer-Asst. Treas | Poglitsch-President Moore-Treasurer Stoops-Asst. Treas Chism-Asst. Treas Palmer-Asst. Treas | Carl Moore/ Jon Poglitsch | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Entity holding a portion of Crusader's interest in BlackWell | Name changed from HCM-BMC, LLC to Blackwell BMC, LLC on 4/13/07 | |
| 80 | Blackwell BMC, LLC (fka HCM-BMC, LLC) | | 3/9/2007 | Delaware | TX | Hedge Blocker | Highland Crusader Holding Corporation | Member | 11.08 | | 100 | Managers: Jon Poglitsch/Carl Moore | Poglitsch-President Moore-Treasurer Stoops-Asst. Treas Chism-Asst. Treas Palmer-Asst. Treas | Poglitsch-President Moore-Treasurer Stoops-Asst. Treas Chism-Asst. Treas Palmer-Asst. Treas | Carl Moore/ Jon Poglitsch | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Entity holding a portion of Crusader's interest in BlackWell | Name changed from HCM-BMC, LLC to Blackwell BMC, LLC on 4/13/07 | |
| 81 | Bradenton RE Holdings, LLC | | 12/10/2015 | Delaware | FL | Non-REIT | NexPoint Real Estate Capital, LLC | Member | 100 | | | Member Managed | Member Managed | Member Managed | Scott Wilson | Cornerstone | | 2/2/2018 | Cornerstone sub | | |
| 82 | Breckenridge Apartments Investors, L.P. | | 3/7/2006 | Delaware | N/A | RE | HCREA Breckenridge L.P. | Limited Partner | 90 | | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | SOLD AT FORECLOSURE AUCTION IN 2009 | |
| 83 | Breckenridge Apartments Investors, L.P. | | 3/7/2006 | Delaware | N/A | RE | Third Party Investors | General Partner | 0.1 | | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | SOLD AT FORECLOSURE AUCTION IN 2009 | |
| 84 | Breckenridge Apartments Investors, L.P. | | 3/7/2006 | Delaware | N/A | RE | Third Party Investors | Limited Partner | 9.9 | | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | SOLD-AT-FORECLOSURE AUCTION IN 2009 | |
| 85 | Brentwood Cayman Holdings, Ltd. | | 4/17/2009 | Cayman Islands | N/A | CLO Blocker | Brentwood CLO, Ltd. | Shares | 100 | | 100 | Maples Finance | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Palmer, Stoops, Chism | Hunter Covitz | Brandon Wurz | | 3/20/2018 | Blocker 100% owned by the CLO to hold ownership interest in real estate/real property foreclosures | To be dissolved | |
| 86 | Brentwood Panda Holdings, Ltd. | | 4/22/2009 | Cayman Islands | N/A | CLO Blocker | Brentwood CLO, Ltd. | Shares | 100.00 | | 100 | Maples Finance | N/A | Dondero, Okada, Ellington, Palmer, Waterhouse, Palmer, Stoops, Chism | Hunter Covitz | Jon Reiter | | 12/6/2013 | Blocker set up for our lender, MetLife, to hold Panda Hereford assets | | |
| 87 | Buckhead Capital, LLC | | 7/2/2013 | Delaware | N/A | TBD | TBD | | | | | TBD | TBD | | Isaac Leventon | James Palmer | N | 12/30/2014 | Blocker to hold CS litigation assignment | No assignment yet | |
| 88 | Burnet Partners, LLC | | 10/22/2004 | Delaware | N/A | Hedge Blocker | Highland Crusader Offshore Partners, L.P. | Member | 100 | | n/a | Member | James Dondero-Pres | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership | |
| 89 | C-1 Meridian, LLC | | 1/24/2014 | Delaware | N/A | REIT | BH Equities, LLC | Stockholder | 100 | 100 | | Brian Mitts | Brian Mitts - Secy/auth sig | Brian Mitts | Matt McGraner | Brandon Knott | Y | 1/31/2018 | UNDERLYING PROPERTY SOLD - but perhaps we change the name to NXRT SM, Inc. and use it for | | |
| 90 | C-1 Timberglen, Inc. | | 1/24/2014 | Delaware | N/A | REIT | BH Equities, LLC | Stockholder | 100 | 100 | | Brian Mitts | Brian Mitts - Secy/auth sig | Brian Mitts | Matt McGraner | Brandon Knott | | 12/27/2018 | To be dissolved | | |
| 91 | C-1 Toscana, Inc. | | 1/24/2014 | Delaware | N/A | REIT | BH Equities, LLC | Stockholder | 100 | 100 | | Brian Mitts | Brian Mitts - Secy/auth sig | Brian Mitts | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 92 | Canopy Timberlands GP, LLC | | 4/29/2008 | Delaware | N/A | Canopy | HCM Canopy Holdings, LLC | Member | 75 | | 75 | HCM Member | N/A | Dondero, Jameson, Waterhouse, Palmer, Matt Jameson Stoops, Chism | Taylor Colbert | | | | General partnership - owns 0.1% of the Canopy Timberlands, LP, management fees and the | | |
| 93 | Canopy Timberlands GP, LLC | | 4/29/2008 | Delaware | N/A | Canopy | Third Party Investors | Member | 25 | | 25 | HCM Member | N/A | Dondero, Jameson, Waterhouse, Palmer, Matt Jameson Stoops, Chism | Taylor Colbert | | | | General partnership - owns 0.1% of the Canopy Timberlands, LP, management fees and the | | |
| 94 | Canopy Timberlands Maine GP, LLC | | 6/13/2008 | Delaware | ME | Canopy | Canopy Timberlands GP, LLC | Member | 100 | | | HCM Member | James Dondero-Pres Matt Jameson-VP Frank Waterhouse-Asst Treas | Dondero, Jameson, Waterhouse, Palmer, Matt Jameson Stoops, Chism | Taylor Colbert | | | | Blocker set up for our lender, MetLife; Owned 100% by Canopy Timberlands GP, LLC | | |
| 95 | Canopy Timberlands Spout Springs GP, LLC | | 8/19/2008 | Delaware | N/A | Canopy | HCM Spout Springs Holdings, LLC | Member | 75 | | | n/a HCM Member | | Dondero, Jameson, Waterhouse, Palmer, Matt Jameson Stoops, Chism | Taylor Colbert | | CRUSADER IMA TERMINATED | 8/4/2016 | General partnership - owns 0.1% of the Canopy Timberlands Spout Springs, LP, management fees and the managers' carried interest is paid to this entity | | |
| 96 | Canopy Timberlands Spout Springs GP, LLC | | 8/19/2008 | Delaware | N/A | Canopy | Third Party Investors | Member | 25 | | | n/a HCM Member | | Dondero, Jameson, Waterhouse, Palmer, Matt Jameson Stoops, Chism | Taylor Colbert | | CRUSADER IMA TERMINATED | 8/4/2016 | General partnership - owns 0.1% of the Canopy Timberlands Spout Springs, LP, management fees and the managers' carried interest is paid to this entity | | |
| 97 | Canopy Timberlands Spout Springs Holdings GP, LLC | | 7/1/2008 | Delaware | N/A | Canopy | Canopy Timberlands Spout Springs GP, LLC | Member | 100 | | | n/a HCM Member | James Dondero-Pres Matt Jameson-VP Frank Waterhouse-Asst Treas | Dondero, Jameson, Waterhouse, Palmer, Stoops, Chism | Taylor Colbert | | CRUSADER IMA TERMINATED | 8/4/2016 | Blocker set up for our lender, MetLife; Owned 100% by Canopy Timberlands Spout Springs GP, LLC | | |
| 98 | Canopy Timberlands Spout Springs Holdings, L.P. | | 7/1/2008 | Delaware | AR | Canopy | Canopy Timberlands Spout Springs Holdings GP, LLC | GP | 0.1 | | | n/a GP | | Dondero, Jameson, Waterhouse, Palmer, Stoops, Chism | Taylor Colbert | | CRUSADER IMA TERMINATED | 8/4/2016 | Owns 100% Canopy Timberlands Spout Springs, LLC | | |
| 99 | Canopy Timberlands Spout Springs Holdings, L.P. | | 7/1/2008 | Delaware | AR | Canopy | Canopy Timberlands Spout Springs L.P. | LP | 99.9 | | | n/a GP | GP | Dondero, Jameson, Waterhouse, Palmer, Stoops, Chism | Taylor Colbert | | CRUSADER IMA TERMINATED | 8/4/2016 | Owns 100% Canopy Timberlands Spout Springs, LLC | | |
| 100 | Canopy Timberlands Spout Springs L.P. | | 8/19/2008 | Delaware | N/A | Canopy | Canopy Timberlands Spout Springs GP, LLC | GP | 0 | | | n/a GP | GP | Dondero, Jameson, Waterhouse, Palmer, Stoops, Chism | Taylor Colbert | | CRUSADER IMA TERMINATED | 8/4/2016 | Owns 99.9% Canopy Timberlands Spout Springs Holdings, LP | | |
| 101 | Canopy Timberlands Spout Springs L.P. | | 8/19/2008 | Delaware | N/A | Canopy | Highland Crusader Holding Corporation | LP | 100 | | | n/a Member | GP | Dondero, Jameson, Waterhouse, Palmer, Stoops, Chism | Taylor Colbert | | CRUSADER IMA TERMINATED | 8/4/2016 | Owns 99.9% Canopy Timberlands Spout Springs Holdings, LP | | |
| 102 | Canopy Timberlands Spout Springs, LP | | 7/1/2008 | Delaware | AR | Canopy | Canopy Timberlands Spout Springs Holdings, L.P. | GP | 100 | | | n/a Member | James Dondero-Pres Matt Jameson-VP | GP | Taylor Colbert | | CRUSADER IMA | 8/4/2016 | Owns ~19,000 acres of timber in Arkansas | | |
| 103 | Canyon Falls GP, LLC | | 5/24/2010 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | | n/a | James Dondero Ted Dameris Clifford Stoops | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | | | | Replacement GP to Canyon Falls Land Partners, LP | FORECLOSED | Dissolve upon distribution of funds |
| 104 | Canyon Falls Land GP, LLC | | 5/25/2010 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | | n/a | James Dondero Ted Dameris | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | | 12/31/2012 | Replacement GP to McGinnis Land Partners I, LP | Investment property foreclosed | |
| 105 | Canyon Falls Land and Partners, L.P. | | 3/16/2006 | Texas | N/A | RE | HCREA Canyon Falls L.P. | Class A Limited Partner | 50 | | n/a | GP | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | | 4/30/2014 | This entity owns a real estate asset for investment | FORECLOSED | Dissolve upon distribution of funds |
| 106 | Canyon Falls Land and Partners, L.P. | | 3/16/2006 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 49.9 | | n/a | GP | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | GP | Drew Wilson | | 4/30/2014 | This entity owns a real estate asset for investment purposes. | FORECLOSED | Dissolve upon distribution of funds |
| 107 | Canyon Falls Land and Partners, L.P. | | 3/16/2006 | Texas | N/A | RE | Canyon Falls GP, LLC | Class C Limited Partner | 0.1 | | n/a | GP | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | GP | Drew Wilson | | 4/30/2014 | This entity owns a real estate asset for investment purposes. | FORECLOSED | Dissolve upon distribution of funds |
| 108 | Canyon Falls TC GP, LLC | | 5/26/2010 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | | n/a | James Dondero Ted Dameris Scott Ellington | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | | 12/17/2012 | Replacement GP to Canyon Falls Town Center Partners, LP | Investment property foreclosed | |
| 109 | Canyon Falls Town Center Partners, LP | | 3/2/2007 | Texas | N/A | RE | HCREA Canyon Falls Town Center, LP | Class A Limited Partner | 50 | | n/a | James Dondero Ted Dameris Scott Ellington | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | | 12/17/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 110 | Canyon Falls Town Center Partners, LP | | 3/2/2007 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 49.9 | | n/a | James Dondero Ted Dameris Scott Ellington | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | | 12/17/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 111 | Canyon Falls Town Center Partners, LP | | 3/2/2007 | Texas | N/A | RE | Third Party Investors | Class C Limited Partner | 0.1 | | n/a | James Dondero Ted Dameris Scott Ellington | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | | 12/17/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 112 | Canyon Falls Town Center Partners, LP | | 3/2/2007 | Texas | N/A | RE | Canyon Falls TC GP, LLC | General Partner | 0 | | n/a | James Dondero Ted Dameris Scott Ellington | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | | 12/17/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 113 | Celina Springs, Ltd. | | 5/16/2007 | Texas | N/A | RE | Celina Springs Partners, Ltd. | Class B Limited Partner | 13.77 | | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment | LP interest abandoned | |
| 114 | Celina Springs, Ltd. | | 5/16/2007 | Texas | N/A | RE | Third Party Investor | General Partner | 0.01 | | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 119 of 535

| # | Entity | Date | State | | Type | Related Entity | Role | % | # | | Mgr/Officers | Officers 2 | Controlled / Persons | Contact 1 | Contact 2 | Y/N | Date/Status | Description | Status / Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 116 | Celina Springs, Ltd. | 5/16/2007 | Texas | N/A | RE | HCREA Celina Springs, LP | Class A Limited Member | 86.22 | | n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned |
| 117 | CHG Acquisition, LLC | 9/24/2007 | Delaware | N/A | Hedge Blocker | Highland Capital Management, L.P. | Member | 3.65 | 1,022,000 | Carl Moore-Manager | Carl Moore-Manager | Carl Moore | | Matt Jameson | David Willmore | Y | 2/24/2017 | Held Cornerstone assets - Cornerstone shares transferred directly to members | |
| 118 | CHG Acquisition, LLC | 9/24/2007 | Delaware | N/A | Hedge Blocker | Highland Credit Strategies Master Fund, L.P. | Member | 29.00 | 8,119,000 | Carl Moore-Manager | Carl Moore-Manager | Carl Moore | | Matt Jameson | David Willmore | Y | 2/24/2017 | Held Cornerstone assets - Cornerstone shares transferred directly to members | |
| 119 | CHG Acquisition, LLC | 9/24/2007 | Delaware | N/A | Hedge Blocker | Highland Restoration Capital Master Fund, L.P. | Member | 52.96 | 14,830,000 | Carl Moore-Manager | Carl Moore-Manager | Carl Moore | | Matt Jameson | David Willmore | Y | 2/24/2017 | Held Cornerstone assets - Cornerstone shares transferred directly to members | |
| 120 | CHG Acquisition, LLC | 9/24/2007 | Delaware | N/A | Hedge Blocker | Highland Restoration Capital Partners, L.P. | Member | 6.48 | 1,813,000 | Carl Moore-Manager | Carl Moore-Manager | Carl Moore | | Matt Jameson | David Willmore | Y | 2/24/2017 | Held Cornerstone assets - Cornerstone shares transferred directly to members | |
| 121 | CHG Acquisition, LLC | 9/24/2007 | Delaware | N/A | Hedge Blocker | Highland Restoration Capital Partners | Member | 7.91 | 2,216,000 | Carl Moore-Manager | Carl Moore-Manager | Carl Moore | | Matt Jameson | David Willmore | Y | 2/24/2017 | Held Cornerstone assets - Cornerstone shares transferred directly to members | |
| 122 | Children's Healthcare of Atlanta, Inc. | 10/24/1997 | Georgia | N/A | Sep Acct | Third Party Investors | Shareholder | 100 | n/a | Ruth Fowler - SVP/CFO | Ruth Fowler - SVP/CFO | | | Josh Terry | David Willmore | Y | 8/26/2014 | IMA terminated as of 8/26/14 | |
| 123 | Cleat LLC | 12/12/2012 | Delaware | TX | HCM | Highland Capital Management, L.P. | Sole Member | 100 | | | | | | JP Sevilla | Kristin Hendrix | Y | 12/31/2015 | Formed to hold Barclays' interest but not used | |
| 124 | College Savings Bank | | Texas | NB | | NexBank SSB | Member | 100 | | | | | | Dierk Holman | Courtney Burton | Y | | Merged into NexBank SSB and became a division of SSB | |
| 125 | Complete Wellness Solutions, LLC | 4/3/2012 | Texas | N/A | JD | James Dondero | Managing Member | 100 | | Manager - James Dondero | Manager - James Dondero | James Dondero | | Melissa Schroth | Melissa Schroth | Y | 11/7/2013 | Jim's pharmaceutical investment | |
| 126 | Context Alternative Strategies Fund | | | | Retail | Context Capital Funds | Trust | | | Context Capital Funds - Trust / | | | | Ethan Powell | Chris Wise | N | | Highland subadvised - Subadvisory Agent as of 1/23/14 | |
| 127 | Copernicus Euro CDO I B.V. [REMOVE -- no longer manage] | 9/11/2000 | Netherlands | N/A | Euro CLO | Third Party Investors | Common Shareholder | 100 | 33,250,000 | Mr J.R. de Vos van Steenwijk, Ms. M.C. van | None | | | John McAuliffe | Frank Waterhouse | N | Terminated 10/1/2014 Sold 8/17/12 | invest in various products, such as loans, bonds, cfo, synthetics | |
| 128 | Crusader Master Fund Equity Holdings, Ltd. | 12/20/2007 | Cayman Islands | N/A | Hedge | Highland Crusader Offshore Partners, L.P. | Shareholder | 100 | n/a | James Dondero | James Dondero | James Dondero | | Dondero/Okada | Cliff Stoops | Y | 12/9/2010 | Sub of Crusader | All Crusader-related entities in wind-down with the Master Partnership |
| 129 | Crusader Offshore Holdings, Ltd. | 6/18/2008 | Bermuda | N/A | Hedge | Highland Crusader Offshore Partners, L.P. | Sole Shareholder | 100 | n/a | James Dondero, Roderick Forrest, Nicholas Hoskins | James Dondero-Pres Roderick Forrest-VP Lorna Phillips-Secy | Chris Halpin, Jason Post, Cliff Stoops | | Dondero/Okada | Cliff Stoops | Y | 7/7/2009 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership |
| 130 | Denton 288 GP, LLC | 1/9/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero | James Dondero-Pres Ted Dameris Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington-Secy/Treas | | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | FORECLOSED — Dissolve upon distribution of funds |
| 131 | Denton 288, L.P. | 1/9/2006 | Texas | N/A | RE | Denton 288 GP, LLC | General Partner | 0.01 | n/a | n/a | | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. | FORECLOSED — Dissolve upon distribution of funds |
| 132 | Denton 288, L.P. | 1/9/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 98.99 | n/a | General Partner | | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. | FORECLOSED — Dissolve upon distribution of funds |
| 133 | Denton 288, L.P. | 1/9/2006 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 1 | n/a | General Partner | | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. | FORECLOSED — Dissolve upon distribution of funds |
| 134 | EFPRF Investments, LLC [IMA transferred from Charles G. Koch Charitable Foundation] | 12/24/1980 | Kansas | N/A | Sep Acct | Koch Industries, Inc. | Member | 100 | | David May | Brian Menkes-Secy | Acis - IM | | Josh Terry | Will Mabry | N | 6/30/2014 | Koch separate account managed by Acis | IMA will terminate as of 6/30/14 |
| 135 | Elk CLO Holdings, LLC | 9/16/2010 | Delaware | N/A | CLO Blocker | CLO HoldCo, Ltd. | Member | 20.4187 | n/a | HCMLP | | Dondero, Okada, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | | Ted Dameris | Ed Leo | Y | 12/31/2014 | CLO blocker to hold Kyle assets (KAG Property) | Hewett's interest transferred to CLO Holdco as of 8/1/13 |
| 136 | Elk CLO Holdings, LLC | 9/16/2010 | Delaware | N/A | CLO Blocker | Highland Park CDO 1, Ltd. | Member | 38.7438 | n/a | HCMLP | | Dondero, Okada, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | | Ted Dameris | Ed Leo | Y | 12/31/2014 | CLO blocker to hold Kyle assets (KAG Property) | |
| 137 | Elk CLO Holdings, LLC | 9/16/2010 | Delaware | N/A | CLO Blocker | Jasper CLO, Ltd. | Member | 4.5375 | n/a | HCMLP | | Dondero, Okada, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | | Ted Dameris | Ed Leo | Y | 12/31/2014 | CLO blocker to hold Kyle assets (KAG Property) | |
| 138 | Elk CLO Holdings, LLC | 9/16/2010 | Delaware | N/A | CLO Blocker | Liberty CLO, Ltd. | Member | 4.5375 | n/a | HCMLP | | Dondero, Okada, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | | Ted Dameris | Ed Leo | Y | 12/31/2014 | CLO blocker to hold Kyle assets (KAG Property) | |
| 139 | Elk CLO Holdings, LLC | 9/16/2010 | Delaware | N/A | CLO Blocker | Loan Funding IV LLC | Member | 4.5375 | n/a | HCMLP | | Dondero, Okada, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | | Ted Dameris | Ed Leo | Y | 12/31/2014 | CLO blocker to hold Kyle assets (KAG Property) | |
| 140 | Elk CLO Holdings, LLC | 9/16/2010 | Delaware | N/A | CLO Blocker | Loan Funding VII LLC | Member | 4.5375 | n/a | HCMLP | | Dondero, Okada, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | | Ted Dameris | Ed Leo | Y | 12/31/2014 | CLO blocker to hold Kyle assets (KAG Property) | |
| 141 | Elk CLO Holdings, LLC | 9/16/2010 | Delaware | N/A | CLO Blocker | Stratford CLO, Ltd. | Member | 22.6875 | n/a | HCMLP | | Dondero, Okada, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | | Ted Dameris | Ed Leo | Y | 12/31/2014 | CLO blocker to hold Kyle assets (KAG Property) | |
| 142 | Embarcadero Partners, L.P. | 6/21/2005 | Texas | N/A | RE | HCREA Embarcadero L.P. | Class A Limited Partner | 54 | n/a | General Partner | | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity owns a real estate asset for investment purposes. | IN CH 11 PROCESS |
| 143 | Embarcadero Partners, L.P. | 6/21/2005 | Texas | N/A | RE | Third Party Investors | Class A Limited Partner | 6 | n/a | General Partner | | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity owns a real estate asset for investment purposes. | IN CH 11 PROCESS |
| 144 | Embarcadero Partners, L.P. | 6/21/2005 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 39 | n/a | General Partner | | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity owns a real estate asset for investment purposes. | IN CH 11 PROCESS |
| 145 | Embarcadero Partners, L.P. | 6/21/2005 | Texas | N/A | RE | Pierview Partners LLC | General Partner | 1 | n/a | General Partner | | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity owns a real estate asset for investment purposes. | IN CH 11 PROCESS |
| 146 | Embarcadero Water Supply Corp. | 5/18/2006 | Texas | N/A | RE | [Stocks never issued] | | n/a | n/a | Wallace H. Scott, III H.M. Pike, Jr. Glen Nickerson | Wallace H. Scott, III H.M. Pike, Jr. Glen Nickerson | Wallace H. Scott, III | | Ted Dameris | Tanya Massie | Y | | This entity is used to control the water rights of one of the projects that HCREF is a limited partner (HCREA Embarcadero Partners, LP) | |
| 147 | Emerald Orchard Limited | | 36804 Cayman Islands | | Sep Acct | Ontario Teachers' Pension Plan | Shareholders | 100 | N/A | Okada, Dougherty, Boyce, Colvin, Kauffman, Halpin, Post, Stoops. | | | | Paul Kauffman | Jack Bateman | Terminated | | Highland-managed separate account for Ontario Teacher's Pension Plan. Management terminated | |
| 148 | Endurance Investement Holdings Ltd. (fka Montgelier Investment Holdings, Ltd.) | IMA-10/30/12 | Bermuda | N/A | Sep Acct | Endurance Specialty Holdings, Ltd. | Shareholder | 100 | N/A | Michael J. McGuire-CFO John V. Del Col-GC | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | | Hunter Covitz | Taylor Colbert/ Charlie Hoedebeck | 8/31/2016 | Acis managed - IMA signed 10/30/2012 Acquired by Endurance effective 7/31/15 | Contact: Mark Silverstein msilverstein@enduranceservi |
| 149 | Entrega Crusader Superholdco, LLC | 8/16/2013 | Delaware | N/A | Hedge Blocker | Highland Crusader Offshore Partners, L.P. | Member | 100 | n/a | Dondero, Okada, Ellington, Waterhouse, Palmer, Stoops, Chism | | | | Matthew Gray | James Palmer | CRUSADER IMA | | Crusader blocker to hold Entrega Power interest | |
| 150 | Entrega-DCF Superholdco, LLC | 8/16/2013 | Delaware | N/A | I-Blocker | Highland Offshore Partners, L.P. | Member | 100 | n/a | Dondero, Okada, Ellington, Waterhouse, Palmer, Stoops, Chism | | | | Matthew Gray | Taylor Colbert | Y | 12/26/2018 | DCF blocker to hold Entrega Power interest | |
| 151 | Entrega-Granite Bay Holdco, LLC | 9/25/2014 | Delaware | N/A | I-Blocker | Granite Bay Long/Short Credit Master Fund, L.P. | Member | 100 | n/a | Okada, Parker, Waterhouse | Okada, Parker, Waterhouse, Palmer, Stoops, Chism | | | Matthew Gray | Charlie Hoedebeck | Y | 12/27/2018 | | |
| 152 | Falcon E&P Five, LLC | 11/17/2011 | Texas | N/A | Falcon | Falcon E&P Opportunities Fund, L.P. | Member | 100 | 100 | Member | Lane Britain-Managing Director | | | Lane Britain/ Marc Manzo | Mike Throckmorton | Y | 12/27/2018 | Falcon investment subsidiary | |
| 153 | Falcon E&P Opportunities Fund B, L.P. | 3/31/2010 | Delaware | N/A | Falcon | Oil&Gas/Ca Falcon E&P Opportunities Fund GP, LLC | General Partner | TBD | 0 | GP | N/A | | | Lane Britain | Marc Manzo | Y | 12/13/2011 | New energy fund (non-taxable) - not launched yet | |
| 154 | Falcon E&P Seven, LLC | 6/6/2013 | Texas | N/A | Falcon | Oil&Gas/Ca Falcon E&P Opportunities Fund, L.P. | Member | 100 | 100 | Member | Lane Britain-Managing Director | | | Lane Britain/ Marc Manzo | Mike Throckmorton | Y | 12/30/2014 | Falcon investment subsidiary | |
| 155 | Falcon E&P Three, LLC | 5/16/2011 | Texas | N/A | Falcon | Oil&Gas/Ca Falcon E&P Opportunities Fund, L.P. | Member | 100 | 100 | Member | Lane Britain-Managing Director | | | Lane Britain/ Marc Manzo | Mike Throckmorton | Y | 12/27/2018 | Falcon investment subsidiary | |
| 156 | Falcon Seven Opus JOA | n/a | n/a | N/A | Oil&Gas/Canopy | Lane Britain | | | | | Lane Britain | | | Lane Britain/ Marc Manzo | Jennifer Blumer | | | | |
| 157 | Fanshaw Bay, LLC | 12/26/2017 | Delaware | N/A | I-Blocker | Mark Okada | Member | 12.36 | N/A | James Dondero-President Mark Okada-EVP Trey Parker-Secy Frank Waterhouse-Treas | James Dondero-President Mark Okada-EVP Trey Parker-Secy Frank Waterhouse-Treas | | | Jon Poglitsch | Mike Throckmorton | Y | 6/12/2019 | iHeart blocker | Granite Bay interest assigned to Okada of 12.4.18 |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM  INDEX NO. 650744/2023

NYSCEF DOC. NO. 77    Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc  RECEIVED NYSCEF: 02/08/2023

Exhibit Exhibits 1-16   Page 120 of 535

| | A | B | C | D | E | F | G | H | I | J | K | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 158 | Fanshaw Bay, LLC | | 12/26/2017 | Delaware | N/A | I-Blocker | Highland Dynamic Income Master Fund, L.P. | Member | 8.48 | | N/A | | James Dondero-President<br>Mark Okada-EVP<br>Trey Parker-Secy<br>Frank Waterhouse-Treas | James Dondero-President<br>Mark Okada-EVP<br>Trey Parker-Secy<br>Frank Waterhouse-Treas | Jon Poglitsch | Mike Throckmorton | Y | 6/12/2019 | iHeart blocker | | |
| 159 | Fanshaw Bay, LLC | | 12/26/2017 | Delaware | N/A | I-Blocker | Longhorn Credit Funding, LLC | Member | 30.4 | | N/A | | James Dondero-President<br>Mark Okada-EVP<br>Trey Parker-Secy<br>Frank Waterhouse-Treas | James Dondero-President<br>Mark Okada-EVP<br>Trey Parker-Secy<br>Frank Waterhouse-Treas | Jon Poglitsch | Mike Throckmorton | Y | 6/12/2019 | iHeart blocker | | |
| 160 | Fanshaw Bay, LLC | | 12/26/2017 | Delaware | N/A | I-Blocker | PensionDanmark | Member | 48.76 | | N/A | | James Dondero-President<br>Mark Okada-EVP<br>Trey Parker-Secy<br>Frank Waterhouse-Treas | James Dondero-President<br>Mark Okada-EVP<br>Trey Parker-Secy<br>Frank Waterhouse-Treas | Jon Poglitsch | Mike Throckmorton | Y | 6/12/2019 | iHeart blocker | | |
| 161 | Firearms Venture I, LLC | | 1/11/2008 | Delaware | N/A | JD | James Dondero | Member | 100 | N/A | | James Dondero-Member | N/A | | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | Jim's firearms investment | | |
| 162 | First Trust/Highland Capital Floating Rate Income Fund II | | 5/16/2005 | Ontario | N/A | Retail | Third Party Investors | Shareholder | 100 | n/a | | Mark Bradley<br>Robert Bredemeier<br>Fraser Howell<br>Ronald McAlister<br>John Szucs<br>Robert Turner | Ronald McAlister-CEO<br>Mark Bradley-CFO<br>Scott Blair-SVP<br>Craig Brown-Secy<br>Lawrence Guy-VP<br>Liberty Rivera-VP | Auth Sigs:<br>Joe Dougherty<br>Matt Okolita<br>Greg Stuecheli<br>Brian Mitts<br>Ethan Powell<br>Mandy Garrett | Joe Dougherty | Ethan Powell | Y | 3/31/2011 | FT1 merged with FT2 in 8/18/09 | Liquidated 3/31/11 | |
| 163 | First Trust/Highland Capital Senior Loan Trust | | 5/16/2005 | Ontario | N/A | Retail | Third Party Investors | Shareholder | 100 | n/a | | Mark Bradley<br>Robert Bredemeier | Ronald McAlister-CEO<br>Mark Bradley-CFO | Auth Sigs:<br>Joe Dougherty<br>Matt Okolita | Joe Dougherty | Ethan Powell | Y | 3/31/2011 | | Liquidated 3/31/11 | |
| 164 | Focsle LLC | | 12/12/2012 | Delaware | TX | HCM | Cleat LLC | Sole Member | 100 | N/A | | | | | JP Sevilla | Kristin Hendrix | Y | 12/31/2015 | Formed to hold Barclays' interest but not used | | |
| 165 | Foremast LLC | | 12/12/2012 | Delaware | TX | HCM | Highland Capital Management, L.P. | Sole Member | 100 | N/A | | | | | JP Sevilla | Kristin Hendrix | Y | 12/31/2015 | Formed to hold Barclays' interest but not used | | |
| 166 | Fountain Hills, LLC | | 8/11/2004 | Arizona | N/A | RE | Ellman Holdings, Inc | Member | 10.00% | | | Bob Kaufman-EVP/Ellman<br>Manager | Bob Kaufman-EVP/Ellman<br>Management Group, Inc.-<br>Manager | Bob Kaufman-EVP/Ellman Management<br>Group, Inc.-Manager | Ted Dameris/Jim Pfertner | | Y | 12/30/2009 | RE investment portfolio | | |
| 167 | Fountain Hills, LLC | | 8/11/2004 | Arizona | N/A | RE | Stanfield Capital Partners, LLC | Member | 22.50% | | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | | Y | 12/30/2009 | | | |
| 168 | Fountain Hills, LLC | | 8/11/2004 | Arizona | N/A | RE | Highland Capital Real Estate Fund, L.P. | Member | 22.50% | | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | | Y | 12/30/2009 | | | |
| 169 | Fountain Hills, LLC | | 8/11/2004 | Arizona | N/A | RE | Camulous Capital, LP | Member | 22.50% | | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | | Y | 12/30/2009 | | | |
| 170 | Fountain Hills, LLC | | 8/11/2004 | Arizona | N/A | RE | Credit Suisse Management, LLC | Member | 22.50% | | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | | Y | 12/30/2009 | | | |
| 171 | FRBH Arbors, LLC | | 12/10/2013 | Texas | N/A | REIT | FRBH C1 Residential, LLC | Member | 100 | | | Brian Mitts-Manager | Brian Mitts-Manager | Brian Mitts-Manager | Brian Mitts | Brian Mitts | Y | 1/14/2014 | Dissolve in TX and reform in DE | | |
| 172 | FRBH Colonial Forest SM, Inc. | | 8/19/2014 | Delaware | N/A | REIT | BH Equities, LLC | Shareholder | 100 | | | Brian Mitts | Brian Mitts - Secy/auth sig | Brian Mitts | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 173 | FRBH Colonial Forest, LLC | | 6/18/2014 | Delaware | FL | REIT | FRBH JAX-TPA, LLC | Member | 90 | N/A | | | Matt McGraner<br>Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 174 | FRBH Colonial Forest, LLC | | 6/18/2014 | Delaware | FL | REIT | Third Party | Member | 10 | N/A | | | Matt McGraner<br>Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 175 | FRBH CP, LLC | | 12/10/2013 | Texas | N/A | REIT | FRBH C1 Residential, LLC | Member | 100 | | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts | Brian Mitts | Y | 1/14/2014 | Dissolve in TX and reform in DE | | |
| 176 | FRBH Eaglecrest, LLC | | 12/10/2013 | Texas | N/A | REIT | FRBH C1 Residential, LLC | Member | 100 | | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts | Brian Mitts | Y | 1/14/2014 | Dissolve in TX and reform in DE | | |
| 177 | FRBH Frederick, LLC | | 2/18/2014 | Delaware | MD | REIT | FRBH C1 Residential, LLC | Member | 76.3 | N/A | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Matt McGraner | Matt McGraner | Brandon Knott | Y | 12/28/2017 | | | |
| 178 | FRBH Frederick, LLC | | 2/18/2014 | Delaware | MD | REIT | Third Party | Member | 23.7 | N/A | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Matt McGraner | Matt McGraner | Brandon Knott | Y | 12/28/2017 | | | |
| 179 | FRBH Meridian, LLC | | 12/10/2013 | Texas | N/A | REIT | FRBH C1 Residential, LLC | Member | 100 | | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts | Brian Mitts | Y | 5/17/2017 | Dissolve in TX and reform in DE | | |
| 180 | FRBH Meridian, LLC | | 1/3/2014 | Delaware | TX | REIT | FRBH C1 Residential, LLC | Member | 90 | N/A | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Matt McGraner | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 181 | FRBH Meridian, LLC | | 1/3/2014 | Delaware | TX | REIT | Third Party | Member | 10 | N/A | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Matt McGraner | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 182 | FRBH Park at Blanding SM, Inc. | | 8/19/2014 | Delaware | N/A | REIT | BH Equities, LLC | Shareholder | 100 | | | Brian Mitts | Brian Mitts - Secy/auth sig | Brian Mitts | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 183 | FRBH Park at Blanding, LLC | | 6/24/2014 | Delaware | FL | REIT | FRBH JAX-TPA, LLC | Member | 90 | N/A | | | | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 184 | FRBH Park at Blanding, LLC | | 6/24/2014 | Delaware | FL | REIT | Third Party | Member | 10 | N/A | | | Matt McGraner<br>Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 185 | FRBH Park at Regency SM, Inc. | | 8/19/2014 | Delaware | N/A | REIT | BH Equities, LLC | Shareholder | 100 | | | Brian Mitts | Brian Mitts - Secy/auth sig | Brian Mitts | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 186 | FRBH Park at Regency, LLC | | 6/24/2014 | Delaware | FL | REIT | FRBH JAX-TPA, LLC | Member | 90 | N/A | | | | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 187 | FRBH Park at Regency, LLC | | 6/24/2014 | Delaware | FL | REIT | Third Party | Member | 10 | N/A | | | Matt McGraner<br>Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD | |
| 188 | FRBH Silverbrook, LLC | | 12/10/2013 | Texas | N/A | REIT | FRBH C1 Residential, LLC | Member | 100 | | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts | Brian Mitts | Y | 1/14/2014 | Dissolve in TX and reform in DE | | |
| 189 | FRBH Timberglen, LLC | | 12/10/2013 | Texas | N/A | REIT | FRBH C1 Residential, LLC | Member | 100 | | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts | Brian Mitts | Y | 1/14/2014 | Dissolve in TX and reform in DE | | |
| 190 | FRBH Toscana, LLC | | 12/10/2013 | Texas | N/A | REIT | FRBH C1 Residential, LLC | Member | 100 | | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts | Brian Mitts | Y | 1/14/2014 | Dissolve in TX and reform in DE | | |
| 191 | FRBH Toscana, LLC | | 1/3/2014 | Delaware | TX | REIT | FRBH C1 Residential, LLC | Member | 100 | N/A | | Brian Mitts-Manager<br>Harry Bookey-Manager | Brian Mitts-Manager<br>Harry Bookey-Manager | Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |

| | A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 192 | FRBH Toscana, LLC | | 1/3/2014 | Delaware | TX | REIT | C-1 Toscana, Inc. | Special Member | 0 | N/A | Brian Mitts-Manager / Harry Bookey-Manager | Brian Mitts-Manager / Harry Bookey-Manager | Brian Mitts / Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | |
| 193 | FRBH Victoria Park SM, Inc. | | 9/10/2014 | Delaware | N/A | REIT | BH Equities, LLC | Shareholder | 100 | N/A | Brian Mitts | Brian Mitts - Secy/auth sig | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD |
| 194 | FRBH Victoria Park, LLC | | 6/24/2014 | Delaware | FL | REIT | FRBH JAX-TPA, LLC | Member | 90 | N/A | Brian Mitts | Brian Mitts / Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD |
| 195 | FRBH Victoria Park, LLC | | 6/24/2014 | Delaware | FL | REIT | Third Party | Member | 10 | N/A | | Brian Mitts / Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD |
| 196 | FRBH Willowdale, LLC | | 4/22/2014 | Delaware | MD | REIT | BH Willowdale Manager, LLC | Member | 80 | N/A | | Brian Mitts / Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD |
| 197 | FRBH Willowdale, LLC | | 4/22/2014 | Delaware | MD | REIT | Freedom Willowdale, LLC | Member | 10 | N/A | | Brian Mitts / Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD |
| 198 | FRBH Willowdale, LLC | | 4/22/2014 | Delaware | MD | REIT | SMG Willowdale LLC | Member | 14 | N/A | | Brian Mitts / Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD |
| 199 | FRBH Wood Forest SM, Inc. | | 8/19/2014 | Delaware | N/A | REIT | BH Equities, LLC | Shareholder | 100 | N/A | Brian Mitts | Brian Mitts - Secy/auth sig | | | | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD |
| 200 | FRBH Wood Forest, LLC | | 6/24/2014 | Delaware | FL | REIT | FRBH JAX-TPA, LLC | Member | 90 | N/A | | Brian Mitts / Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD |
| 201 | FRBH Wood Forest, LLC | | 6/24/2014 | Delaware | FL | REIT | Third Party | Member | 10 | N/A | | Brian Mitts / Matt McGraner | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD |
| 202 | Freedom BBY 22401, LLC | | 9/27/2013 | Delaware | FL | REIT | NexPoint Real Estate Opportunities, LLC (fka Freedom REIT LLC) | Member | 100 | N/A | Member Managed | Member Managed | James Dondero-Pres/PEO / Brian Mitts-EVP/PFO/PAO / Frank Waterhouse-Treas / Cliff Stoops-Asst Treas / Dustin Norris-Secy | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | UNDERLYING PROPERTY SOLD |
| 203 | Freedom BBY 32114, LLC | | 9/25/2013 | FL | | REIT | NexPoint Real Estate Opportunities, LLC (fka Freedom REIT LLC) | Member | 100 | N/A | Member Managed | Member Managed | James Dondero-Pres/PEO / Brian Mitts-EVP/PFO/PAO / Frank Waterhouse-Treas / Cliff Stoops-Asst Treas / Dustin Norris-Secy | Matt McGraner | Brandon Knott | Y | 5/17/2017 | Best Buy - Daytona, Floria | UNDERLYING PROPERTY SOLD |
| 204 | Freedom Miramar SM, Inc. | | 1/7/2015 | Delaware | N/A | REIT | NexPoint Real Estate Opportunities, LLC (fka Freedom REIT LLC) | Shareholder | 100 | N/A | Brian Mitts | Brian Mitts-Secy/ Authorized Agent | Brian Mitts / Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | |
| 205 | Freedom Overlook Manor, LLC | | 2/19/2014 | Delaware | MD | REIT | NexPoint Residential Trust Operating Partnership, L.P. | Member | 100 | N/A | Member Managed | Member Managed | Brian Mitts / Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | |
| 206 | Freedom RAD Canton, LLC | | 11/8/2013 | Delaware | Michigan | REIT | Freedom REIT LLC | Member | 100 | N/A | Member Managed | Member Managed | Brian Mitts/Dustin Norris | Brian Mitts | Dustin Norris | N | 8/8/2014 | RiteAid - Canton, Michigan | |
| 207 | Freedom Regatta Bay, LLC | | 2/19/2014 | Texas | TX | REIT | NexPoint Residential Trust Operating Partnership, L.P. | Member | 100 | N/A | Member Managed | Member Managed | Brian Mitts / Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/31/2018 | Investment partner in Regatta Bay Apartments in Seabrook, TX | |
| 208 | Freedom Sarasota LLC | | 6/6/2013 | FL | | REIT | NexPoint Real Estate Opportunities, LLC (fka Freedom REIT LLC) | Member | 100 | N/A | Member Managed | Member Managed | James Dondero-Pres/PEO / Brian Mitts-EVP/PFO/PAO / Frank Waterhouse-Treas / Cliff Stoops-Asst Treas / Dustin Norris-Secy | Matt McGraner | Brandon Knott | Y | 5/17/2017 | Staples Sarasota purchase | UNDERLYING PROPERTY SOLD |
| 209 | Freedom SPLS Phoenix, LLC | | 10/24/2013 | Delaware | AZ | REIT | Freedom REIT LLC | Member | 100 | 100 | Member Managed | Member Managed | Brian Mitts/Dustin Norris | Brian Mitts | Dustin Norris | N | 8/8/2014 | Staples Phoenix purchase | |
| 210 | Frisco TC LP | | 8/26/2004 | Texas | N/A | JD | Texas Land Management LLC | General Partner | 0 | | Texas Land Management LLC | N/A | Texas Land Management LLC | Matt Griffith | Matt Griffith | Y | sold 8/8/07 | | 5400 Dallas Pkwy Frisco, TX 75034 |
| 211 | Frisco TC LP | | 8/26/2004 | Texas | N/A | JD | Mark Okada | Limited Partner | 2.5 | | Texas Land Management LLC | | Texas Land Management LLC | Matt Griffith | Matt Griffith | Y | sold 8/8/07 | Jim's investment property | as of 12/31/08 |
| 212 | Frisco TC LP | | 8/26/2004 | Texas | N/A | JD | Todd & Kim Travers | Limited Partner | 2.5 | | Texas Land Management LLC | | Texas Land Management LLC | Matt Griffith | Matt Griffith | Y | sold 8/8/07 | Jim's investment property | as of 12/31/08 |
| 213 | Frisco TC LP | | 8/26/2004 | Texas | N/A | JD | Highland Real estate Fund 2002-A | Limited Partner | 20 | | Texas Land Management LLC | | Texas Land Management LLC | Matt Griffith | Matt Griffith | Y | sold 8/8/07 | Jim's investment property | as of 12/31/08 |
| 214 | Frisco TC LP | | 8/26/2004 | Texas | N/A | JD | The Get Good Non-Exempt Trust No. 1 | Limited Partner | 5 | | Texas Land Management LLC | | Texas Land Management LLC | Matt Griffith | Matt Griffith | Y | sold 8/8/07 | Jim's investment property | as of 12/31/08 |
| 215 | Frisco TC LP | | 8/26/2004 | Texas | N/A | JD | Pat Dougherty | Limited Partner | 2.5 | | Texas Land Management LLC | | Texas Land Management LLC | Matt Griffith | Matt Griffith | Y | sold 8/8/07 | Jim's investment property | as of 12/31/08 |
| 216 | Frisco TC LP | | 8/26/2004 | Texas | N/A | JD | Raymond Joseph Dougherty | Limited Partner | 1.25 | | Texas Land Management LLC | | Texas Land Management LLC | Matt Griffith | Matt Griffith | Y | sold 8/8/07 | Jim's investment property | as of 12/31/08 |
| 217 | Frisco TC LP | | 8/26/2004 | Texas | N/A | JD | Kurt Plumer | Limited Partner | 1.25 | | Texas Land Management LLC | | Texas Land Management LLC | Matt Griffith | Matt Griffith | Y | sold 8/8/07 | Jim's investment property | as of 12/31/08 |
| 218 | Frisco TC LP | | 8/26/2004 | Texas | N/A | JD | Brad Borud | Limited Partner | 1.25 | | Texas Land Management LLC | | Texas Land Management LLC | Matt Griffith | Matt Griffith | Y | sold 8/8/07 | Jim's investment property | as of 12/31/08 |
| 219 | Frisco TC LP | | 8/26/2004 | Texas | N/A | JD | Third Party Investors | Limited Partner | 63.75 | | Texas Land Management LLC | | Texas Land Management LLC | Matt Griffith | Matt Griffith | Y | sold 8/8/07 | Jim's investment property | as of 12/31/08 |
| 220 | FTI Panda Holdings Corp. | | 4/20/2009 | Delaware | N/A | REIT | First Trust/Highland Capital Floating Rate Income Fund II | Common Shareholder | 100 | N/A | Ronald McAlister, Mark Bradley | Ronald McAlister-Pres, Mark Bradley-Sec/Treasurer | Joe Dougherty | Ethan Powell | | Y | 3/31/2011 | | Liquidated 3/31/11 |
| 221 | Gambier Bay, LLC | | 12/26/2017 | Delaware | N/A | Retail Blocker | NexPoint Capital, Inc. | Member | 20 | N/A | Dustin Norris-EVP / F. Waterhouse-Treas/PAO/PFO/PEO / Cliff Stoops-A. Treas / Lauren Thedford-Secy | Dustin Norris-EVP / F. Waterhouse-Treas/PAO/PFO/PEO / Cliff Stoops-A. Treas / Lauren Thedford-Secy | Jon Poglitsch | Will Mabry/ Will Duffy | | N | 6/12/2019 | iHeart blocker | |
| 222 | Gambier Bay, LLC | | 12/26/2017 | Delaware | N/A | Retail Blocker | NexPoint Credit Strategies Fund | Member | 20 | N/A | Dustin Norris-EVP / F. Waterhouse-Treas/PAO/PFO/PEO / Cliff Stoops-A. Treas | Jason Post-CCO/AMLO / Dustin Norris-EVP / F. Waterhouse-Treas/PAO/PFO/PEO / Cliff Stoops-A. Treas | Jon Poglitsch | Will Mabry/ Will Duffy | | N | 6/12/2019 | iHeart blocker | |
| 223 | Gambier Bay, LLC | | 12/26/2017 | Delaware | N/A | Retail Blocker | Highland Floating Rate Opportunities Fund | Member | 20 | N/A | Dustin Norris-EVP / F. Waterhouse-Treas/PAO/PFO/PEO | Dustin Norris-EVP / F. Waterhouse-Treas/PAO/PFO/PEO / Cliff Stoops-A. Treas | Jon Poglitsch | Will Mabry/ Will Duffy | | N | 6/12/2019 | iHeart blocker | |
| 224 | Gambier Bay, LLC | | 12/26/2017 | Delaware | N/A | Retail Blocker | Highland Global Allocation Fund | Member | 20 | N/A | Dustin Norris-EVP / F. Waterhouse-Treas/PFO/PEO | Dustin Norris-EVP / F. Waterhouse-Treas/PAO/PFO/PEO / Cliff Stoops-A. Treas | Jon Poglitsch | Will Mabry/ Will Duffy | | N | 6/12/2019 | iHeart blocker | |
| 225 | Gambier Bay, LLC | | 12/26/2017 | Delaware | N/A | Retail Blocker | Highland Opportunistic Credit Fund | Member | 20 | N/A | Dustin Norris-EVP / F. Waterhouse-Treas/PAO/PFO/PEO | Dustin Norris-EVP / F. Waterhouse-Treas/PAO/PFO/PEO / Cliff Stoops-A. Treas | Jon Poglitsch | Will Mabry/ Will Duffy | | N | 6/12/2019 | iHeart blocker | |
| 226 | Gardens of Denton, L.P. | | 12/23/2009 | Delaware | N/A | JD | Andrew Merrick Construction LLC | General Partner | 1 | N/A | GP/Wayne Lewis | GP/Wayne Lewis | James Dondero, Wayne Lewis | Matt Griffith | Matt Griffith | Y | 3/7/2011 | Jim's investment property | |
| 227 | Gardens of Denton, L.P. | | 12/23/2009 | Delaware | N/A | JD | Wayne Lewis | Limited Partner | 99 | N/A | GP/Wayne Lewis | GP/Wayne Lewis | James Dondero, Wayne Lewis | Matt Griffith | Matt Griffith | Y | 3/7/2011 | Jim's investment property | |

| | A | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 228 | Gardens of Denton, L.P. | 3/2/2011 | Texas | N/A | JD | Dugaboy Project Management GP, LLC | General Partner | 1 | | General Partner | Nancy Dondero-Trustee of sole member of GP | Nancy Dondero-Trustee of sole member of GP | Melissa Schroth | Melissa Schroth | Y | 12/29/2016 | Jim's investment property | | |
| 229 | Gardens of Denton, L.P. | 3/2/2011 | Texas | N/A | JD | The Dugaboy Investment Trust | Class I LP | 75 | | General Partner | Nancy Dondero-Trustee of sole member of GP | Nancy Dondero-Trustee of sole member of GP | Melissa Schroth | Melissa Schroth | Y | 12/29/2016 | Jim's investment property | | |
| 230 | Gardens of Denton, L.P. | 3/2/2011 | Texas | N/A | JD | The Dugaboy Investment Trust | Class II LP | 24 | | General Partner | Nancy Dondero-Trustee of sole member of GP | Nancy Dondero-Trustee of sole member of GP | Melissa Schroth | Melissa Schroth | Y | 12/29/2016 | Jim's investment property | | |
| 231 | Geneve Corporation | 11/23/1971 | Delaware | N/A | Sep Acct | [Netter International Ltd.] | First Series Class B Common Shares | 100 | | External Geneve Directors | External Geneve Directors | External Geneve Directors | Michael Gregory | Dustin Norris | Terminated | 12/31/2012 | Separate Account managed by Cummings Bay Capital through Michael Gregory | | Management Agreement terminated as of 12/31/12 |
| 232 | Gillespie Income Fund, LLC | 10/22/2004 | Delaware | N/A | Hedge Blocker | Highland Crusader Offshore Partners, L.P. | Member | 100 | n/a | James Dondero-Pres | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | Matt Jameson | Tom Beauchamp | CRUSADER IMA TERMINATED | 8/4/2016 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership | |
| 233 | Goldfield Preserve Development, LLC | 5/10/2006 | Delaware | N/A | RE | Ellman Management Group, Inc. | Class A Member | 50.00% | | Bob Kaufman-EVP/Ellman Management Group, Inc.-Manager | Bob Kaufman-EVP/Ellman Management Group, Inc.-Manager | Bob Kaufman-EVP/Ellman Management Group, Inc.-Manager | Ted Dameris | | Y | | RE investment portfolio | Foreclosed | |
| 234 | Goldfield Preserve Development, LLC | 5/10/2006 | Delaware | N/A | RE | SOLA Preserve, LLC | Class B-1 Member | 12.90% | | Ellman | Ellman | Ellman | Ted Dameris | | Y | | RE investment portfolio | | |
| 235 | Goldfield Preserve Development, LLC | 5/10/2006 | Delaware | N/A | RE | SOLUS, LLC | Class B-1 Member | 0.90% | | Ellman | Ellman | Ellman | Ted Dameris | | Y | | RE investment portfolio | | |
| 236 | Goldfield Preserve Development, LLC | 5/10/2006 | Delaware | N/A | RE | CMF Goldfield LTD | Class B-1 Member | 8.28% | | Ellman | Ellman | Ellman | Ted Dameris | | Y | | RE investment portfolio | | |
| 237 | Goldfield Preserve Development, LLC | 5/10/2006 | Delaware | N/A | RE | Credit Suisse Management, LLC | Class B-1 Member | 9.66% | | Ellman | Ellman | Ellman | Ted Dameris | | Y | | RE investment portfolio | | |
| 238 | Goldfield Preserve Development, LLC | 5/10/2006 | Delaware | N/A | RE | Highland Goldfield Preserve Holding, LLC | Class B-1 Member | 3.45% | | Ellman | Ellman | Ellman | Ted Dameris | | Y | | RE investment portfolio | | |
| 239 | Goldfield Preserve Development, LLC | 5/10/2006 | Delaware | N/A | RE | Highland Goldfield Preserve Holdings II, LLC | Class B-1 Member | 2.76% | | Ellman | Ellman | Ellman | Ted Dameris | | Y | | RE investment portfolio | | |
| 240 | Goldfield Preserve Development, LLC | 5/10/2006 | Delaware | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class B-1 Member | 0.69% | | Ellman | Ellman | Ellman | Ted Dameris | | Y | | RE investment portfolio | | |
| 241 | Goldfield Preserve Development, LLC | 5/10/2006 | Delaware | N/A | RE | Highland Crusader Offshore Partners, L.P. | Class B-1 Member | 1.38% | | Ellman | Ellman | Ellman | Ted Dameris | | Y | | RE investment portfolio | | |
| 242 | Goldfield Preserve Development, LLC | 5/10/2006 | Delaware | N/A | RE | Credit Suisse Securities (USA) LLC | Class B-2 Member | 10.00% | | Ellman | Ellman | Ellman | Ted Dameris | | Y | | RE investment portfolio | | |
| 243 | Granite Bay Long/Short Credit Fund, L.P. | 9/17/2010 | Delaware | N/A | I-Fund | Granite Bay Long/Short Credit GP, LLC | General Partner | 0 | N/A | GP | GP | Okada, Parker, Waterhouse, Stoops, Palmer, Chism | Mark Okada | Charlie Hoedebeck | | 12/27/2018 | | | |
| 244 | Granite Bay Long/Short Credit Fund, L.P. | 9/17/2010 | Delaware | N/A | I-Fund | Mark Okada | Limited Partner | 89.54 | N/A | GP | GP | Okada, Parker, Waterhouse, Stoops, Palmer, Chism | Mark Okada | Charlie Hoedebeck | | 12/27/2018 | | | |
| 245 | Granite Bay Long/Short Credit Fund, L.P. | 9/17/2010 | Delaware | N/A | I-Fund | Granite Bay Advisors, L.P. | Limited Partner | 10.46 | N/A | GP | GP | Okada, Parker, Waterhouse, Stoops, Palmer, Chism | Mark Okada | Charlie Hoedebeck | | 12/27/2018 | | | |
| 246 | Granite Bay Long/Short Credit Fund, Ltd. | 3/1/2012 | Cayman Islands | N/A | I-Fund | Granite Bay Advisors, L.P. | Shareholder | 0 | 1 | Mark Okada James Dondero (Intertrust) | N/A | Okada, Parker, Waterhouse, Stoops, Chism | Mark Okada | Charlie Hoedebeck | | 3/29/2019 | | | |
| 247 | Granite Bay Long/Short Credit GP, LLC | 9/17/2010 | Delaware | Cayman Islands | I-Fund | Granite Bay Advisors, L.P. | Member | 100 | N/A | Sole Member | Sole Member | Okada, Parker, Waterhouse, Stoops, Palmer, Chism | Mark Okada | Charlie Hoedebeck | | 12/27/2018 | | | |
| 248 | Granite Bay Long/Short Credit Master Fund, L.P. | 9/24/2010 | Cayman Islands | N/A | I-Fund | Granite Bay Long/Short Credit Fund, L.P. | Limited Partner | 100 | N/A | GP (Intertrust) | GP | Okada, Parker, Waterhouse, Stoops, Palmer, Chism | Mark Okada | Charlie Hoedebeck | | 12/28/2018 | | | |
| 249 | Granite Bay Long/Short Credit Master Fund, L.P. | 9/24/2010 | Cayman Islands | N/A | I-Fund | Granite Bay Long/Short Credit Fund, Ltd. | Limited Partner | 0 | N/A | GP (Intertrust) | GP | Okada, Parker, Waterhouse, Stoops, Chism | Mark Okada | Charlie Hoedebeck | | 12/28/2018 | | | |
| 250 | Grey Walls Bexar County, L.P. | 10/12/2005 | Texas | N/A | RE | HCREA Grey Walls, L.P. | Limited Partner | 60 | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity owns a real estate asset for investment purposes. | SOLD TO SHADFAN IN 2009 | |
| 251 | Grey Walls Bexar County, L.P. | 10/12/2005 | Texas | N/A | RE | Grey Walls San Antonio GP, LLC | General Partner | 40 | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity owns a real estate asset for investment purposes. | SOLD TO SHADFAN IN 2009 | |
| 252 | Grey Walls San Antonio GP, LLC | 4/21/2008 | Delaware | TX | James Dondero | | Sole Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-Pres, Ted Dameris-VP, Scott Ellington-Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops | Ted Dameris | Tanya Massie | Y | 12/22/2010 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes (Grey Walls Bexar County, LP). | GP to Grey Walls Bexar County, LP | |
| 253 | Harvest Fund XX, L.P. | 3/1/2006 | Texas | N/A | RE | HCREA Princeton 380 L.P. | Class A Limited Partner | 90 | N/A | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Drew Wilson | FORECLOSED | | This entity owns a real estate asset for investment purposes. | FORECLOSED | We do not control - delete |
| 254 | Harvest Fund XX, L.P. | 3/1/2006 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 9.9 | N/A | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | FORECLOSED | | This entity owns a real estate asset for investment purposes. | FORECLOSED | We do not control - delete |
| 255 | Harvest Fund XX, L.P. | 3/1/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 0.1 | N/A | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Drew Wilson | FORECLOSED | | This entity owns a real estate asset for investment purposes. | FORECLOSED | We do not control - delete |
| 256 | Hayman Capital Master Fund, LP | 12/12/2005 | N/A | N/A | JD | Hayman Capital Partners, L.P. | General Partner | 62.3 | N/A | | | | Melissa Schroth | Melissa Schroth | N | | | as of 12/31/08 | |
| 257 | Hayman Capital Master Fund, LP | 12/12/2005 | N/A | N/A | JD | Third Party Investors | Limited Partner | 37.7 | N/A | | | | Melissa Schroth | Melissa Schroth | N | | | as of 12/31/08 | |
| 258 | Hayman Capital Partners, L.P. | 12/12/2005 | Delaware | N/A | JD | The Get Good Non-Exempt Trust No. 2 | Limited Partner | 1.23 | N/A | | | | Melissa Schroth | Melissa Schroth | N | | | as of 6/1/09 | |
| 259 | Hayman Capital Partners, L.P. | 12/12/2005 | Delaware | N/A | JD | Third Party Investors | Limited Partner | 98.77 | N/A | | | | Melissa Schroth | Melissa Schroth | N | | | as of 6/1/09 | |
| 260 | HBI Asset Management Gestora de Recursos, LTDA | 8/31/2010 | Brazil | N/A | BrasilInvest | Highland Capital Management AG | Shareholder | 0.2 | 2 | | | | Philip Braner | Frank Waterhouse | N | | Old Brazilian parent entity, not currently being utilized, perhaps to dissolve later in the year | NOT HIGHLAND AFFILIATE | |
| 261 | HBI Asset Management Gestora de Recursos, LTDA | 8/31/2010 | Brazil | N/A | BrasilInvest | HBI Capital, SA (Brazil) (Third Party) | Shareholder | 99.8 | 998 | | | | Philip Braner | Frank Waterhouse | N | | Old Brazilian parent entity, not currently being utilized, perhaps to dissolve later in the year | NOT HIGHLAND AFFILIATE | |
| 262 | HCM Blackwell Holding Corporation | 3/9/2007 | Delaware | N/A | Hedge Blocker | Highland Crusader Offshore Partners, L.P. | Shareholder | 100 | 100 | James Dondero, Mark Okada | Dondero-Pres Okada-EVP Ellington-Secy Waterhouse-Treas | Dondero, Okada, Ellington, Waterhouse, Palmer, Stoops, Chism | Carl Moore/ Jon Poglitsch | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | | | |
| 263 | HCM Canopy Holdings, LLC | 10/10/2008 | Delaware | N/A | HCM | Highland Capital Management, L.P. | Member | 100 | 100 | James Dondero | James Dondero-President, Matt Jameson-VP Frank Waterhouse-Secretary | Dondero, Jameson, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | Taylor Colbert | N | | Receives 75% of the carry and 25% of the fees from Canopy Timberlands GP, LLC - represents Highland's portion of the partnership | | |
| 264 | HCM Europe, Ltd. | 12/7/2012 | UK | N/A | HCM | Highland Capital Management, L.P. | Shareholder | 100 | | James Dondero, Mark Okada | Dondero, Okada | Dondero, Okada, Waterhouse | Frank Waterhouse | Kristin Hendrix | Y | 5/19/2013 | New HCM Europe office | | |

**FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM**
NYSCEF DOC. NO. 77

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 123 of 535

| A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HCM Holdco, LLC | | 10/27/2015 | Delaware | N/A | Corporate | Highland Capital Management, L.P. | Member | 100 | N/A | | | | Dave Klos | Kristin Hendrix | Y | 8/23/2018 | Investment holdco | | |
| HCM ParK West Guarantor, LLC | | 10/14/2016 | Delaware | TX | RE | Highland TCI Holding Company, LLC | Member | 100 | | Member Managed | Member Managed | | Ted Dameris | Newbank | Y | 1/30/2019 | Park West RE holding | | |
| HCM ParK West Office, LLC | | 10/14/2016 | Delaware | TX | RE | Highland TCI Holding Company, LLC | Member | 100 | | Member Managed | Member Managed | | Ted Dameris | Newbank | Y | 1/30/2019 | Park West RE holding | | |
| HCM Spout Springs Holdings, LLC | | 10/10/2008 | Delaware | N/A | HCM | Highland Capital Management, L.P. | Member | 100 | 100 Member | Member Managed | James Dondero – President; Matt Jamison – VP; Frank Waterhouse – Secretary | Dondero, Jameson, Waterhouse, Palmer, Stoops, Colburn | Matt Jameson | Taylor Colbert | N | | Receives 75% of the carry and 25% of the fees from Canopy Timberlands Spout Spring Holdings GP, LLC - represents Highland's portion of the partnership | | |
| HCM Trident (Delaware) Corp. | | 7/3/2007 | Delaware | N/A | HCM | HCM Trident Holdco | shareholder | 100 | n/a | Gene Miao | n/a | n/a | Chris Halpin | Frank Waterhouse | Y | 12/20/2010 | Not expected to have any activity going forward, may want to dissolve. This entity was supposed to be the warehouse for the Collateralized Fund Obligation (CFO). Never launched. | | |
| HCMLP, LLC | | 6/23/2009 | Delaware | N/A | HCM | Highland Capital Management Services, Inc. | Member | 100 | n/a | N/A | N/A | N/A | Carl Moore | Clay Callan | Y | 8/18/2010 | LLC formed in order to participate in HySky auction. Did not get the bid. **CAN WE DISSOLVE??** | fka Highland ERA Management LLC. Name amended on 10/2/09 | |
| HCRE Park Central Residential Shell, LLC (fka Park Central Residential, LLC) | | 2/27/2014 | Texas | N/A | REIT-JD | HCRE Partners, LLC | Member | 100 | n/a | | | | Matt McGraner | Brandon Knott | Y | | Forfeited status in TX | Name change filed 4/25/14 | |
| HCREA Breckenridge GP, LLC | | 2/7/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Breckenridge L.P. | | 2/7/2006 | Texas | N/A | RE | HCREA Breckenridge GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Breckenridge L.P. | | 2/7/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Breckenridge L.P. | | 2/7/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 10.14 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Breckenridge L.P. | | 2/7/2006 | Texas | N/A | RE | Highland Financial Real Estate Corporation | Class A Limited Partner | 14.79 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Breckenridge L.P. | | 2/7/2006 | Texas | N/A | RE | Third Party Investors | Class A Limited Partner | 55.07 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Canyon Falls GP, LLC | | 3/15/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | Ted Dameris-VP Scott Ellington -Secy/Treas | James Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 10/30/2014 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | **Investment property foreclosed** | Dissolve upon distribution of funds |
| HCREA Canyon Falls L.P. | | 3/15/2006 | Texas | N/A | RE | HCREA Canyon Falls GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 4/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | **Investment property foreclosed** | Dissolve upon distribution of funds |
| HCREA Canyon Falls L.P. | | 3/15/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 4/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | **Investment property foreclosed** | Dissolve upon distribution of funds |
| HCREA Canyon Falls L.P. | | 3/15/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 40 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 4/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | **Investment property foreclosed** | Dissolve upon distribution of funds |
| HCREA Canyon Falls L.P. | | 3/15/2006 | Texas | N/A | RE | Highland Crusader Holding Corporation fka Highland Crusader Real Estate Holding Corp. | Class A Limited Partner | 40 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 4/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | **Investment property foreclosed** | Dissolve upon distribution of funds |
| HCREA Canyon Falls Town Center GP, LLC | | 3/6/2007 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/17/2012 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | **Investment property foreclosed** | |
| HCREA Canyon Falls Town Center, LP | | 3/2/2007 | Texas | N/A | RE | HCREA Canyon Falls Town Center GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/17/2012 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | **Investment property foreclosed** | |
| HCREA Canyon Falls Town Center, LP | | 3/2/2007 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/17/2012 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | **Investment property foreclosed** | |
| HCREA Canyon Falls Town Center, LP | | 3/2/2007 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/17/2012 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | **Investment property foreclosed** | |
| HCREA Celina Springs GP, LLC | | 5/30/2007 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Celina Springs, LP | | 5/30/2007 | Texas | N/A | RE | HCREA Celina Springs GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Celina Springs, LP | | 5/30/2007 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Celina Springs, LP | | 5/30/2007 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Cornerstone GP, LLC | | 1/25/2006 | Texas | N/A | RE | Internal Investors | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | | | |
| HCREA Cornerstone, L.P. | | 1/25/2006 | Texas | N/A | RE | HCREA Cornerstone GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | | The real estate assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Cornerstone, L.P. | | 1/25/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Cornerstone, L.P. | | 1/25/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Court Glen GP, LLC | | 2/11/2007 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a partnership that is a limited partner of a partnership that owns a real estate asset for investment purposes. | | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77
Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 124 of 535
INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

| A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HCREA Court Glen, LP | | 2/21/2007 | Texas | N/A | RE | HCREA Court Glen GP, LLC | | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns real estate asset for investment purposes | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Court Glen, LP | | 2/21/2007 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns real estate asset for investment purposes | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Court Glen, LP | | 2/21/2007 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns real estate asset for investment purposes | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Embarcadero GP, LLC | | 2/9/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero Ted Dameris Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a limited partnership that owns real estate asset for investment purposes. | | |
| HCREA Embarcadero L.P. | | 2/9/2006 | Texas | N/A | RE | HCREA Embarcadero GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns real estate asset for investment purposes. | | |
| HCREA Embarcadero L.P. | | 2/9/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns real estate asset for investment purposes. | | |
| HCREA Embarcadero L.P. | | 2/9/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 40.3 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns real estate asset for investment purposes. | | |
| HCREA Embarcadero L.P. | | 2/9/2006 | Texas | N/A | RE | Third Party Investors | Class A Limited Partner | 39.7 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns real estate asset for investment purposes. | | |
| HCREA Georgetown Apts G.P., LLC | | 10/11/2005 | Texas | N/A | RE | Internal Investors | Member | 100 | n/a | James Dondero Ted Dameris Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | | | |
| HCREA Georgetown Apts, L.P. | | 10/11/2005 | Texas | N/A | RE | HCREA Georgetown Apts G.P., LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot | |
| HCREA Georgetown Apts, L.P. | | 10/11/2005 | Texas | N/A | RE | Highland Capital Management, L.P. | Service Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot | |
| HCREA Georgetown Apts, L.P. | | 10/11/2005 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Investment Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot | |
| HCREA Grand Prairie Truck Service GP, LLC | | 1/20/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero Ted Dameris Scott Ellington | James Dondero-VP | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real | | |
| HCREA Grand Prairie Truck Service, L.P. | | 1/23/2006 | Texas | N/A | RE | HCREA Grand Prairie Truck Service GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Grand Prairie Truck Service, L.P. | | 1/23/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Service Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Grand Prairie Truck Service, L.P. | | 1/23/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Investment Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Grey Walls GP, LLC | | 9/26/2005 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero Ted Dameris Scott Ellington | James Dondero-VP Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Grey Walls, L.P. | | 9/29/2005 | Texas | N/A | RE | HCREA Grey Walls GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Grey Walls, L.P. | | 9/29/2005 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Grey Walls, L.P. | | 9/29/2005 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 55.93 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Grey Walls, L.P. | | 9/29/2005 | Texas | N/A | RE | Third Party Investors | Class A Limited Partner | 24.07 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Highland Village GP, LLC | | 6/26/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | James Dondero Ted Dameris Scott Ellington | James Dondero-Pres Ted Dameris-VP Carter Chism, Clifford Stoops. | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity is the general partner of a limited partnership that is a limited partner of a partnership | Investment property foreclosed | |
| HCREA Highland Village, L.P. | | 6/26/2006 | Texas | N/A | RE | HCREA Highland Village GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Investment property foreclosed | |
| HCREA Highland Village, L.P. | | 6/26/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Investment property foreclosed | |
| HCREA Highland Village, L.P. | | 6/26/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class A Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Investment property foreclosed | |
| HCREA Hutchins Truck Service, LP | | 3/28/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero Ted Dameris Scott Ellington | James Dondero-VP Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Hutchins Truck Service, LP | | 3/30/2006 | Texas | N/A | RE | HCREA Hutchins Truck Service, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Hutchins Truck Service, LP | | 3/30/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Service Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Hutchins Truck Service, LP | | 3/30/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Investment Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot be dissolved | |
| HCREA Indian Creek GP, LLC | | 7/19/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | James Dondero Ted Dameris Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real estate asset for investment purposes. | | Upon notification from Issac, can be dissolved |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM

NYSCEF DOC. NO. 77

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 125 of 535

| A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HCREA Indian Creek, L.P. | | 7/19/2006 | Texas | N/A | RE | HCREA Indian Creek GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | Interest being sold - upon notification from Isaac, can be dissolved |
| HCREA Indian Creek, L.P. | | 7/19/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | Interest being sold - upon notification from Isaac, can be dissolved |
| HCREA Indian Creek, L.P. | | 7/19/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 52.93 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | Interest being sold - upon notification from Isaac, can be dissolved |
| HCREA Indian Creek, L.P. | | 7/19/2006 | Texas | N/A | RE | Third Party Investors | Class A Limited Partner | 27.07 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | Interest being sold - upon notification from Isaac, can be dissolved |
| HCREA Kings Wood GP, LLC | | 1/4/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington-Secy/Treas | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity is the general partner of a limited partnership that owns a real estate asset for investment purposes. | Investment property foreclosed | |
| HCREA Kings Wood, L.P. | | 1/6/2006 | Texas | N/A | RE | HCREA Kings Wood GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity is the limited partner of a partnership that owns real estate asset for investment purposes. | Investment property foreclosed | |
| HCREA Kings Wood, L.P. | | 1/6/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity is the limited partner of a partnership that owns real estate asset for investment purposes. | Investment property foreclosed | |
| HCREA Kings Wood, L.P. | | 1/6/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity is the limited partner of a partnership that owns real estate asset for investment purposes. | Investment property foreclosed | |
| HCREA Lockhill Retail GP, LLC | | 3/20/2006 | Texas | N/A | RE | HCREF-X Holding Corp. | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington-Secy/Treas | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | | Y | 12/30/2016 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Lockhill Retail LP | | 3/20/2006 | Texas | N/A | RE | HCREA Lockhill Retail GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | | Y | 12/29/2016 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Lockhill Retail LP | | 3/20/2006 | Texas | N/A | RE | HCREF-X Holding Corp. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | | Y | 12/29/2016 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Lockhill Retail LP | | 3/20/2006 | Texas | N/A | RE | Gunwale, LLC | Class A Limited Partner | 46.74 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | | Y | 12/29/2016 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Lockhill Retail LP | | 3/20/2006 | Texas | N/A | RE | HCREF-X Holding Corp. | Class A Limited Partnership | 33.26 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | | Y | 12/29/2016 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Nolen Drive GP, LLC | | 7/17/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-VP Scott Ellington-Secy/Treas | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Nolen Drive, L.P. | | 7/17/2006 | Texas | N/A | RE | HCREA Nolen Drive GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Nolen Drive, L.P. | | 7/17/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 24.99 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Nolen Drive, L.P. | | 7/17/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class B Limited Partner | 10 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Nolen Drive, L.P. | | 7/17/2006 | Texas | N/A | RE | Third Party | Class A Limited Partner | 31.2 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Nolen Drive, L.P. | | 7/17/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class A Limited Partner | 33.8 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Pilot Point Land GP, LLC | | 7/26/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-VP Scott Ellington-Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops | Tanya Massie | | Y | 12/20/2010 | This entity is the general partner of a limited partnership that owns a real estate asset for investment purposes. | | |
| HCREA Pilot Point Land, L.P. | | 7/26/2006 | Texas | N/A | RE | HCREA Pilot Point Land GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Tanya Massie | | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Pilot Point Land, L.P. | | 7/26/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Tanya Massie | | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Pilot Point Land, L.P. | | 7/26/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Tanya Massie | | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Princeton 380 GP, LLC | | 3/6/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington-Secy/Treas | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 10/30/2014 | This entity is the general partner of a limited partnership that owns a real estate asset for investment purposes. | Investment property foreclosed | Dissolve upon distribution of funds |
| HCREA Princeton 380 L.P. | | 3/6/2006 | Texas | N/A | RE | HCREA Princeton 380 GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 4/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Investment property foreclosed | Dissolve upon distribution of funds |
| HCREA Princeton 380 L.P. | | 3/6/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 4/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Investment property foreclosed | Dissolve upon distribution of funds |
| HCREA Princeton 380 L.P. | | 3/6/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 4/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Investment property foreclosed | Dissolve upon distribution of funds |
| HCREA Prosper Crossing East GP, LLC | | 4/9/2007 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington-Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a limited partnership that owns a real estate asset for investment purposes. | | |
| HCREA Prosper Crossing East, LP | | 4/9/2007 | Texas | N/A | RE | HCREA Prosper Crossing East GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Prosper Crossing East, LP | | 4/9/2007 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| HCREA Prosper Crossing East, LP | | 4/9/2007 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 126 of 535

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

| | A | B | C | D | E | F | G | H | I | J | | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 357 | HCREA Prosper Crossing West GP, LLC | | 4/9/2007 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | | | James Dondero; Ted Dameris; Scott Ellington | James Dondero-Pres; Ted Dameris-VP; Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 358 | HCREA Prosper Crossing West, LP | | 4/9/2007 | Texas | N/A | RE | HCREA Prosper Crossing West GP, LLC | General Partner | 0.01 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 359 | HCREA Prosper Crossing West, LP | | 4/9/2007 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 360 | HCREA Prosper Crossing West, LP | | 4/9/2007 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 361 | HCREA Terrell Land GP, LLC | | 10/26/2005 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | | James Dondero; Ted Dameris | James Dondero-Pres; Ted Dameris-VP | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 10/30/2014 | This entity is the limited partnership that is a limited partner of a | Interest sold | Dissolve upon distribution of funds |
| 362 | HCREA Terrell Land, L.P. | | 10/26/2005 | Texas | N/A | RE | HCREA Terrell Land GP, LLC (GP transferred to Third Party) | General Partner | 0.01 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | SOLD | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Interest sold | Removed upon distribution of funds |
| 363 | HCREA Terrell Land, L.P. | | 10/26/2005 | Texas | N/A | RE | Highland Capital Management, L.P. (SOLD) | Class B Limited Partner | 19.99 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | SOLD | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Interest sold | Removed upon distribution of funds |
| 364 | HCREA Terrell Land, L.P. | | 10/26/2005 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. (SOLD) | Class A Limited Investor | 45.94 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | SOLD | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Interest sold | Removed upon distribution of funds |
| 365 | HCREA Terrell Land, L.P. | | 10/26/2005 | Texas | N/A | RE | Third Party Investors | Class A Limited Investor | 34.06 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | SOLD | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Interest sold | Removed upon distribution of funds |
| 366 | HCREA The Tribute GP, LLC | | 12/21/2005 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | | James Dondero; Ted Dameris | James Dondero-Pres; Ted Dameris-VP | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a limited partnership that is a limited partner of a | Interest sold | Dissolve upon distribution of funds |
| 367 | HCREA The Tribute, L.P. | | 12/22/2005 | Texas | N/A | RE | HCREA The Tribute GP, LLC | General Partner | 0.01 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Interest sold | Removed upon distribution of funds |
| 368 | HCREA The Tribute, L.P. | | 12/22/2005 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Interest sold | Removed upon distribution of funds |
| 369 | HCREA The Tribute, L.P. | | 12/22/2005 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 26.84 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Interest sold | Removed upon distribution of funds |
| 370 | HCREA The Tribute, L.P. | | 12/22/2005 | Texas | N/A | RE | Third Party Investors | Class A Limited Partner | 53.16 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | Interest sold | Removed upon distribution of funds |
| 371 | HCREA Trimarchi of North Dallas, GP, LLC | | 3/23/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | | James Dondero; Ted Dameris | James Dondero-Pres; Ted Dameris-VP | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a limited partnership that is a limited partner of a | Investment property foreclosed | Dissolve upon distribution of funds |
| 372 | HCREA Trimarchi of North Dallas, LP | | 3/23/2006 | Texas | N/A | RE | HCREA Trimarchi of North Dallas, GP, LLC | General Partner | 0.01 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership | Investment property foreclosed | Dissolve upon distribution of funds |
| 373 | HCREA Trimarchi of North Dallas, LP | | 3/23/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Service Limited Partner | 19.99 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership | Investment property foreclosed | Dissolve upon distribution of funds |
| 374 | HCREA Trimarchi of North Dallas, LP | | 3/23/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Investment Limited Partner | 16 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership | Investment property foreclosed | Dissolve upon distribution of funds |
| 375 | HCREA Trimarchi of North Dallas, LP | | 3/23/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class A Limited Investment Limited Partner | 30 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership | Investment property foreclosed | Dissolve upon distribution of funds |
| 376 | HCREA Trimarchi of North Dallas, LP | | 3/23/2006 | Texas | N/A | RE | Third Party Investors | Class A Limited Investment Limited Partner | 34 | n/a | | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the limited partner of a partnership | Investment property foreclosed | Dissolve upon distribution of funds |
| 377 | HCREA Wilcox 190, LLC | | 7/25/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | | James Dondero; Ted Dameris | James Dondero-Pres; Ted Dameris-VP | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 378 | HCREA Wilcox 190, L.P. | | 7/25/2006 | Texas | N/A | RE | HCREA Wilcox 190 GP, LLC | General Partner | 0.01 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 379 | HCREA Wilcox 190, L.P. | | 7/25/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 380 | HCREA Wilcox 190, L.P. | | 7/25/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 381 | HCREA Wylie Partners I GP, LLC | | 3/30/2006 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | | James Dondero; Ted Dameris; Scott Ellington | James Dondero-Pres; Ted Dameris-VP; Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 382 | HCREA Wylie Partners I, LP | | 3/30/2006 | Texas | N/A | RE | HCREA Wylie Partners I GP, LLC | General Partner | 0.01 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 383 | HCREA Wylie Partners I LP | | 3/30/2006 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 384 | HCREA Wylie Partners I LP | | 3/30/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 80 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 385 | HCREF-X Holding Corp. | | 12/13/2012 | Delaware | N/A | HCM | Highland Capital Management, L.P. | Shareholder | 100 | 1,000 | James Dondero | N/A | James Dondero | Mark Patrick | Kristin Hendrix | | Y | 12/15/2016 | Holds HCMLP's interest in HCREA Lockhill Retail LP | | |
| 386 | HCREH Shelby Townhomes GP, LLC | | 9/9/2005 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | | James Dondero; Ted Dameris; Scott Ellington | James Dondero-Pres; Ted Dameris-VP; Scott Ellington -Secy/Treas | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity is the general partner of a limited partnership that is a limited partner of a partnership that owns a real estate asset for investment purposes. | | |
| 387 | HCREH Shelby Townhomes, L.P. | | 9/9/2005 | Texas | N/A | RE | HCREH Shelby Townhomes GP LLC | General Partner | 0.01 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 3/26/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot |
| 388 | HCREH Shelby Townhomes, L.P. | | 9/9/2005 | Texas | N/A | RE | Highland Capital Management, L.P. | Class B Limited Partner | 19.99 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 3/26/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot |
| 389 | HCREH Shelby Townhomes, L.P. | | 9/9/2005 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 40 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 3/26/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot |
| 390 | HCREH Shelby Townhomes, L.P. | | 9/9/2005 | Texas | N/A | RE | Third Party Investors | Class A Limited Partner | 40 | n/a | | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 3/26/2010 | This entity is the limited partner of a partnership that owns a real estate asset for investment purposes. | The real estate assets were sold but this entity assets are pledge in the Wachovia loan, so cannot |
| 391 | HCREP WP, LLC | | 1/30/2015 | Delaware | N/A | REIT-JD | HCRE Partners, LLC | Member | 96.69 | N/A | | HCRE Partners, LLC | Matt McGraner-VP/Secy | Jame Dondero | Matt McGraner | Melissa Schroth | Y | 12/26/2018 | | | |
| 392 | HCREP WP, LLC | | 1/30/2015 | Delaware | N/A | REIT-JD | KHM Interests, LLC (third party) | Member | 2.5 | N/A | | HCRE Partners, LLC | Matt McGraner-VP/Secy | Jame Dondero; Matt McGraner | Matt McGraner | Melissa Schroth | Y | 12/26/2018 | | | |
| 393 | HCREP WP, LLC | | 1/30/2015 | Delaware | N/A | REIT-JD | Ventoux Capital, LLC (third party) | Member | 0.81 | N/A | | HCRE Partners, LLC | Matt McGraner-VP/Secy | Jame Dondero; Matt McGraner | Matt McGraner | Melissa Schroth | Y | 12/26/2018 | | | |

| | A | B | C | D | E | F | G | H | I | J | K | L | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 394 | HCSLR Camelback Investors, LLC | | 7/14/2016 | Delaware | N/A | RE Blocker | HCSLR Camelback Investors (Cayman), Ltd. | Member | 0 | 9,104 | Scott Ellington-Manager / Isaac Leventon-Manager | n/a | Scott Ellington-Manager / Isaac Leventon-Manager | Matt McGraner | Nexbank | Y | 12/26/2018 | All assets distributed to HCSLR Camelback, LLC | | |
| 395 | HCSLR Camelback Investors, LLC | | 7/14/2016 | Delaware | N/A | RE Blocker | Longhorn Credit Funding, LLC | Member | 0 | 896 | Scott Ellington-Manager / Isaac Leventon-Manager | n/a | Scott Ellington-Manager / Isaac Leventon-Manager | Matt McGraner | Nexbank | Y | 12/26/2018 | | | |
| 396 | HE 1001 West Loop Holdings GP, LLC | | 12/13/2007 | Texas | N/A | RE | HE 1001 West Loop Project, LLC | Member | 100.00% | n/a | Member | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | | Underlying property is a 228,820 sf of B+ multi-tenant office building in Houston, TX. | Dissolve upon distribution of funds | |
| 397 | HE 1001 West Loop Holdings LP, LLC | | 12/4/2007 | Delaware | N/A | RE | HE 1001 West Loop Project, LLC | Member | 100.00% | n/a | Member | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | 1/30/2017 | Underlying property is a 228,820 sf of B+ multi-tenant office building in Houston, TX. | Dissolve upon distribution of funds | |
| 398 | HE 1001 West Loop Project, LLC | | 12/6/2007 | Delaware | TX | RE | Highland Credit Strategies Holding Corporation | Member | 97.50% | n/a | HCMLP-Manager | HCMLP-Manager | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | 1/30/2017 | Underlying property is a 228,820 sf of B+ multi-tenant office building in Houston, TX. | | |
| 399 | HE 1001 West Loop Project, LLC | | 12/6/2007 | Delaware | TX | RE | HE CLO Holdco, LLC | Member | 2.50% | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris | Drew Wilson | Y | 1/30/2017 | Underlying property is a 228,820 sf of B+ multi-tenant office building in Houston, TX. | | |
| 400 | HE 1001 West Loop, LP | | 12/13/2007 | Texas | N/A | RE | HE 1001 West Loop Holdings LP, LLC | LP | 99.00% | n/a | GP | GP | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | | Underlying property is a 228,820 sf of B+ multi-tenant office building in Houston, TX. | Dissolve upon distribution of funds | |
| 401 | HE 1001 West Loop, LP | | 12/13/2007 | Texas | N/A | RE | HE 1001 West Loop Holdings GP, LLC | GP | 1.00% | n/a | GP | GP | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | | Underlying property is a 228,820 sf of B+ multi-tenant office building in Houston, TX. | Dissolve upon distribution of funds | |
| 402 | HE 2425 West Loop Holdings GP, LLC | | 12/6/2007 | Delaware | N/A | RE | HE 2425 West Loop Project, LLC | Member | 100.00% | n/a | Member | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | | Underlying property is a 281,590 sf of B+ multi-tenant office building in Houston, TX. | | |
| 403 | HE 2425 West Loop Holdings LP, LLC | | 12/4/2007 | Delaware | N/A | RE | HE 2425 West Loop Project, LLC | Member | 100.00% | n/a | Member | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | 1/30/2017 | Underlying property is a 281,590 sf of B+ multi-tenant office building in Houston, TX. | | |
| 404 | HE 2425 West Loop Project, LLC | | 12/4/2007 | Delaware | TX | RE | Highland Credit Strategies Holding Corporation | Member | 97.50% | n/a | HCMLP-Manager | HCMLP-Manager | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | 1/30/2017 | Underlying property is a 281,590 sf of B+ multi-tenant office building in Houston, TX. | | |
| 405 | HE 2425 West Loop Project, LLC | | 12/4/2007 | Delaware | TX | RE | HE CLO Holdco, LLC | Member | 2.50% | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris | Drew Wilson | Y | 1/30/2017 | Underlying property is a 281,590 sf of B+ multi-tenant office building in Houston, TX. | | |
| 406 | HE 2425 West Loop, LP | | 12/6/2007 | Texas | N/A | RE | HE 2425 West Loop Holdings LP, LLC | LP | 99.00% | n/a | GP | GP | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | | Underlying property is a 281,590 sf of B+ multi-tenant office building in Houston, TX. | | |
| 407 | HE 2425 West Loop, LP | | 12/6/2007 | Texas | N/A | RE | HE 2425 West Loop Holdings GP, LLC | GP | 1.00% | n/a | GP | GP | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | | Underlying property is a 281,590 sf of B+ multi-tenant office building in Houston, TX. | | |
| 408 | HE Capital 2747, LLC | | 8/15/2007 | Delaware | AZ | RE | Gunwale, LLC | Member | 13.89% | n/a | HCMLP-Manager | HCMLP-Manager | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | 3/31/2017 | Underlying project is a 4.46 acre site located in Phoenix, AZ, improved with three vacant office buildings that are expected to be demolished for construction of a condo tower upon receipt of amended height restriction. | Dissolution docs sent to DE SOS & AZ SOS on 3.30.17 | |
| 409 | HE Capital 2747, LLC | | 8/15/2007 | Delaware | AZ | RE | Highland Crusader Holding Corporation | Member | 55.83% | n/a | HCMLP-Manager | HCMLP-Manager | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | 3/31/2017 | Underlying project is a 4.46 acre site located in Phoenix, AZ, improved with three vacant office buildings that are expected to be demolished for construction of a condo tower upon receipt of amended height restriction. | Dissolution docs sent to DE SOS & AZ SOS on 3.30.17 | |
| 410 | HE Capital 2747, LLC | | 8/15/2007 | Delaware | AZ | RE | Highland Credit Opportunities Holding Corporation | Member | 13.89% | n/a | HCMLP-Manager | HCMLP-Manager | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | 3/31/2017 | Underlying project is a 4.46 acre site located in Phoenix, AZ, improved with three vacant office buildings that are expected to be demolished upon receipt of amended height restriction. | Dissolution docs sent to DE SOS & AZ SOS on 3.30.17 | |
| 411 | HE Capital 2747, LLC | | 8/15/2007 | Delaware | AZ | RE | Highland Credit Strategies Holding Corporation | Member | 13.89% | n/a | HCMLP-Manager | HCMLP-Manager | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | 3/31/2017 | Underlying project is a 4.46 acre site located in Phoenix, AZ, improved with three vacant office buildings that are expected to be demolished for construction of a condo tower upon receipt of amended height restriction. | Dissolution docs sent to DE SOS & AZ SOS on 3.30.17 | |
| 412 | HE Capital 2747, LLC | | 8/15/2007 | Delaware | AZ | RE | HE CLO Holdco, LLC | Member | 2.50% | n/a | HCMLP-Manager | HCMLP-Manager | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Drew Wilson | Y | 3/31/2017 | Underlying project is a 4.46 acre site located in Phoenix, AZ, improved with three vacant office buildings that are expected to be demolished for construction of a condo tower upon receipt of amended height restriction. | Dissolution docs sent to DE SOS & AZ SOS on 3.30.17 | |
| 413 | HE Sugar Land Buildings, LP | | 7/2/2007 | Texas | N/A | RE | HE Sugar Land Holdings LP, LLC | LP | 99 | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris/Jim Pfertner | Jim Pfertner | Y | 12/31/2012 | Underlying project is a 528,857 sf single tenant A- office building in Sugar Land, TX. | Investment property foreclosed | |
| 414 | HE Sugar Land Buildings, LP | | 7/2/2007 | Texas | N/A | RE | HE Sugar Land Holdings GP, LLC | GP | 1 | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris/Jim Pfertner | Jim Pfertner | Y | 12/31/2012 | Underlying project is a 528,857 sf single tenant A- office building in Sugar Land, TX. | Investment property foreclosed | |
| 415 | HE Sugar Land Development, LP | | 7/16/2007 | Texas | N/A | RE | HE Sugar Land Holdings LP, LLC | LP | 99 | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris/Jim Pfertner | Jim Pfertner | Y | 12/31/2012 | Underlying project is a 528,857 sf single tenant A- office building in Sugar Land, TX. | | |
| 416 | HE Sugar Land Development, LP | | 7/16/2007 | Texas | N/A | RE | HE Sugar Land Holdings GP II, LLC | GP | 1 | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris/Jim Pfertner | Jim Pfertner | Y | 12/31/2012 | Underlying project is a 528,857 sf single tenant A- office building in Sugar Land, TX. | | |
| 417 | HE Sugar Land Holdings GP II, LLC | | 7/16/2007 | Texas | N/A | RE | HE Sugar Land Project, LLC | Member | 100 | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris/Jim Pfertner | Jim Pfertner | Y | 12/31/2012 | Underlying project is a 528,857 sf single tenant A- office building in Sugar Land, TX. | | |
| 418 | HE Sugar Land Holdings GP, LLC | | 6/29/2007 | Texas | N/A | RE | HE Sugar Land Project, LLC | Member | 100 | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris/Jim Pfertner | Jim Pfertner | Y | 12/31/2012 | Underlying project is a 528,857 sf single tenant A- office building in Sugar Land, TX. | Investment property foreclosed | |
| 419 | HE Sugar Land Holdings LP, LLC | | 6/26/2007 | Texas | N/A | RE | HE Sugar Land Project, LLC | Member | 100 | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris/Jim Pfertner | Jim Pfertner | Y | 12/31/2012 | Underlying project is a 528,857 sf single tenant A- office building in Sugar Land, TX. | | |
| 420 | HE Sugar Land Project, LLC | | 6/19/2007 | Delaware | N/A | RE | Highland Capital Real Estate Fund, L.P. | Member | 39.22% | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris/Jim Pfertner | Jim Pfertner | Y | 12/31/2012 | Underlying project is a 528,857 sf single tenant A- office building in Sugar Land, TX. | | |
| 421 | HE Sugar Land Project, LLC | | 6/19/2007 | Delaware | N/A | RE | Highland Employee Retention Assets LLC | Member | 58.28% | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris/Jim Pfertner | Jim Pfertner | Y | 12/31/2012 | Underlying project is a 528,857 sf single tenant A- office building in Sugar Land, TX. | | |
| 422 | HE Sugar Land Project, LLC | | 6/19/2007 | Delaware | N/A | RE | HE CLO Holdco, LLC | Member | 2.50% | n/a | HCMLP-Manager | HCMLP-Manager | | Ted Dameris/Jim Pfertner | Jim Pfertner | Y | 12/31/2012 | Underlying project is a 528,857 sf single tenant A- office building in Sugar Land, TX. | | |
| 423 | Headquarters, LP | | 10/10/2003 | Texas | N/A | JD | Texas Land Management, LLC | General Partner | 0 | n/a | Texas Land Management, LLC | N/A | Texas Land Management, LLC | Melissa Schroth | Melissa Schroth | Y | SOLD 7/29/2010 | | | |
| 424 | Headquarters, LP | | 10/10/2003 | Texas | N/A | JD | The Get Good Trust | Limited Partner | 8.75 | n/a | Texas Land Management, LLC | N/A | Texas Land Management, LLC | Melissa Schroth | Melissa Schroth | Y | SOLD 7/29/2010 | | | |

| # | A | B | C | D | E | F | G | H | I | J | K | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 425 | Headquarters, LP | | 10/10/2003 | Texas | N/A | JD | Mark Okada | Limited Partner | 2.5 | | n/a | Texas Land Management, LLC | N/A | Texas Land Management, LLC | Melissa Schroth | Melissa Schroth | Y | | SOLD 7/29/2010 | | |
| 426 | Headquarters, LP | | 10/10/2003 | Texas | N/A | JD | Todd Travers | Limited Partner | 1.667 | | n/a | Texas Land Management, LLC | N/A | Texas Land Management, LLC | Melissa Schroth | Melissa Schroth | Y | | SOLD 7/29/2010 | | |
| 427 | Headquarters, LP | | 10/10/2003 | Texas | N/A | JD | Todd Travers IRA Sterling Trust | Limited Partner | 0.417 | | n/a | Texas Land Management, LLC | N/A | Texas Land Management, LLC | Melissa Schroth | Melissa Schroth | Y | | SOLD 7/29/2010 | | |
| 428 | Headquarters, LP | | 10/10/2003 | Texas | N/A | JD | Davis Deadman | Limited Partner | 1.667 | | n/a | Texas Land Management, LLC | N/A | Texas Land Management, LLC | Melissa Schroth | Melissa Schroth | Y | | SOLD 7/29/2010 | | |
| 429 | Headquarters, LP | | 10/10/2003 | Texas | N/A | JD | Highland Real estate Fund 2002-A | Limited Partner | 10 | | n/a | Texas Land Management, LLC | N/A | Texas Land Management, LLC | Melissa Schroth | Melissa Schroth | Y | | SOLD 7/29/2010 | | |
| 430 | Headquarters, LP | | 10/10/2003 | Texas | N/A | JD | Third Party Investors | Limited Partner | 75 | | n/a | Texas Land Management, LLC | N/A | Texas Land Management, LLC | Melissa Schroth | Melissa Schroth | Y | | SOLD 7/29/2010 | | |
| 431 | Heimskringla, LLC | | 11/9/2015 | Nevada | N/A | HCM | Highland Capital Management, L.P. | Member | 100 | | n/a | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | David Klos | Kristin Hendrix | Y | | 11/15/2016 Investment holdco | | |
| 432 | Heron Pointe Residential Partners SM, Inc. | | 1/26/2016 | Delaware | N/A | REIT-JD | Gardens of Denton II, L.P. | Shareholder | 100 | 100 | N/A | Matt McGraner - Secu/Auth Agent | Matt McGraner - Secu/Auth Agent | Matt McGraner | Melissa Schroth | Y | | 12/26/2018 | To be dissolved | |
| 433 | Heron Pointe Residential Partners, LLC | | 1/22/2016 | Delaware | FL | REIT-JD | Heron Pointe Investors, LLC | Member | 100 | | n/a | | | Matt McGraner | Melissa Schroth | Y | | 2/17/2017 | Entity sold to Somerstone, LLC on 2/17/2017 | |
| 434 | Heron Pointe, LLC | | 1/20/2016 | Delaware | N/A | REIT-JD | Gardens of Denton II, L.P. | Member | 100 | | n/a | | | Matt McGraner | Melissa Schroth | Y | | 1/22/2016 Formation null and void | | |
| 435 | HGPH A Inc. | | 11/30/2006 | Delaware | N/A | Hedge | Highland Goldfield Preserve Holding, Ltd. | Shareholder | 100 | | n/a | James Dondero | James Dondero | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | | 10/23/2013 Sub of Credit Strat | | |
| 436 | HGPH B Inc. | | 11/30/2006 | Delaware | N/A | Hedge | Highland Goldfield Preserve Holding, Ltd. | Shareholder | 100 | | n/a | James Dondero | James Dondero | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | | 10/23/2013 Sub of Credit Strat | | |
| 437 | HGPH C Inc. | | 11/30/2006 | Delaware | N/A | Hedge | Highland Goldfield Preserve Holding, Ltd. | Shareholder | 100 | | n/a | James Dondero | James Dondero | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | | 10/23/2013 Sub of Credit Strat | | |
| 438 | HGPH D Inc. | | 11/30/2006 | Delaware | N/A | Hedge | Highland Goldfield Preserve Holding, Ltd. | Shareholder | 100 | | n/a | James Dondero | James Dondero | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | | 10/23/2013 Sub of Credit Strat | | |
| 439 | HGPH II-A Inc. | | 11/30/2006 | Delaware | N/A | Hedge | Highland Goldfield Preserve Holding II, Ltd. | Shareholder | 100 | | n/a | James Dondero | James Dondero | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | | 10/23/2013 Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership | |
| 440 | HGPH II-B Inc. | | 11/30/2006 | Delaware | N/A | Hedge | Highland Goldfield Preserve Holding II, Ltd. | Shareholder | 100 | | n/a | James Dondero | James Dondero | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | | 10/23/2013 Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership | |
| 441 | HGPH II-C Inc. | | 11/30/2006 | Delaware | N/A | Hedge | Highland Goldfield Preserve Holding II, Ltd. | Shareholder | 100 | | n/a | James Dondero | James Dondero | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | | 10/23/2013 Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership | |
| 442 | HGPH II-D Inc. | | 11/30/2006 | Delaware | N/A | Hedge | Highland Goldfield Preserve Holding II, Ltd. | Shareholder | 100 | | n/a | James Dondero | James Dondero | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | | 10/23/2013 Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership | |
| 443 | Highland Acquisition Corporation | | 4/25/2016 | Delaware | TX | Retail | Highland Capital Management, L.P. | Initial Shareholder | 98.96 | 7,112,500 | James Dondero-Chairman/ Class C Director | James Dondero-CEO/President | James Dondero-CEO/President Mark Okada-EVP | Brian Mitts | David Klos | Y | | 11/29/2017 SPAC offering | | |
| 444 | Highland Acquisition Corporation | | 4/25/2016 | Delaware | TX | Retail | William Swenson | Initial Shareholder | 0.35 | 25,000 | James Dondero-Chairman/ Class C Director | James Dondero-CEO/President | James Dondero-CEO/President Mark Okada-EVP | Brian Mitts | David Klos | Y | | 11/29/2017 SPAC offering | | |
| 445 | Highland Acquisition Corporation | | 4/25/2016 | Delaware | TX | Retail | Kevin MacDonald | Initial Shareholder | 0.35 | 25,000 | James Dondero-Chairman/ Class C Director | James Dondero-CEO/President | James Dondero-CEO/President Mark Okada-EVP | Brian Mitts | David Klos | Y | | 11/29/2017 SPAC offering | | |
| 446 | Highland Acquisition Corporation | | 4/25/2016 | Delaware | TX | Retail | Robert W. Scannell | Initial Shareholder | 0.35 | 25,000 | James Dondero-Chairman/ Class C Director | James Dondero-CEO/President | James Dondero-CEO/President Mark Okada-EVP | Brian Mitts | David Klos | Y | | 11/29/2017 SPAC offering | | |
| 447 | Highland All Cap Equity Value Fund | | 4/8/2010 | Delaware | N/A | Retail | Highland Capital Management, L.P. | TBD | TBD | | Trustees: Dougherty-Pres/CEO Blackburn-Sec/Treas | Dougherty-Pres/CEO Blackburn-Sec/Treas | | Joe Dougherty | Brian Mitts | Terminated | | 10/28/2010 Highland Funds Series of Trust | | |
| 448 | Highland Alpha Trend Strategies Fund | | 10/31/2011 | Massachusetts | N/A | Retail | Third Party Investors | Common | 0 | | 0 Trustees: | Powell-EVP/Sec | Powell-EVP/Sec | Brian Mitts | Brian Mitts | Liquidated | | 1/16/2014 Series of trust of Highland-Funds II | HCMFA - advisor, | |
| 449 | Highland Alternative Income Fund | | 1/13/2012 | Massachusetts | N/A | Retail | Third Party Investors | Common | 0 | | 0 Trustees: Tim Hui, Bryan Ward, Scott Kavanaugh, Ethan Powell, John Honis, Terrence Jones | Powell-EVP/Sec Mitts-Treas Head-CCO/AMLO | Powell-EVP/Sec Mitts-Treas Head-CCO/AMLO | Brian Mitts | Brian Mitts | | | 1/16/2014 Series of trust of Highland-Funds II | HCMFA - advisor, Anchor capital-Subadvisor | Acquired by Northern Lights Fund Trust |
| 450 | Highland Brasilinvest, Ltda | | 1/31/2012 | Cayman Islands | N/A | Brasilinvest | Highland International Holdings, Ltda | Shareholder | 75 | | | James Dondero Jack Takacs | | | Philip Braner | Frank Waterhouse | Dissolved | | 3/28/2013 Cayman vehicle for any fee related activties that could arise from offshore activities related to Brazil | Will unwound in 2013 | |
| 451 | Highland Brasilinvest, Ltda | | 1/31/2012 | Cayman Islands | N/A | Brasilinvest | Highland Investimentos Participacoes e Consultoria LTDA (Third Party) | Shareholder | 25 | | | Jack Takacs | | | Philip Braner | Frank Waterhouse | Dissolved | | 3/28/2013 Cayman vehicle for any fee related activties that could arise from offshore activities related to Brazil | Will unwound in 2013 | |
| 452 | Highland Brasilinvest, S.A. | | 4/19/2010 | Brazil | N/A | Brasilinvest | Brasilinvest Investimentos Participacoes e Consultoria LTDA (Third Party) | Shareholder | 100 | | | Mario Bernardo Garneiro; Mario Bernardo Monteiro | Sueli de Fatima Ferretti-Pres; | | Philip Braner | Frank Waterhouse | N | | Old Brazilian company that was to be used as part of the initial Brazilian strategy, not currently being utilized, | | |
| 453 | Highland Capital Equity Partners GP, LLC | | 3/21/2013 | Delaware | TX | Private | Highland Capital Management, L.P. | Member | 100 | | n/a | Sole Member | | Dondero, Okada, Ellington, Palmer, Waterhouse, Palmer, Stoops, Chism | Jonathan Lamensdorf | Charlie Hoedebeck | Y | | 11/17/2015 | | |
| 454 | Highland Capital Equity Partners, L.P. | | 3/21/2013 | Delaware | TX | Private Fund | Highland Capital Equity Partners GP, LLC | General Partner | 0 | | n/a | GP | | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Palmer, Stoops, Chism | Jonathan Lamensdorf | Charlie Hoedebeck | Y | | 11/17/2015 | | |
| 455 | Highland Capital Equity Partners, L.P. | | 3/21/2013 | Delaware | TX | Private Fund | Eames, Ltd. | Limited Partner | 100 | | n/a | LP | | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Palmer, Stoops, Chism | Jonathan Lamensdorf | Charlie Hoedebeck | Y | | 11/17/2015 | | |
| 456 | Highland Capital Healthcare Advisors GP, LLC (fka Cummings Bay Capital Management GP, LLC) | | 2/26/2010 | Delaware | TX | I-Advisor | Highland Capital Management Services, Inc. | Member | 100 | | n/a | Sole Member - HCMSI | Dondero-Pres Okada-VP | Palmer, Chism | Michael Gregory | Kristin Hendrix | Y | | 5/11/2018 GP of the new retail advisor - fka Veris Capital Management GP, LLC - name changed 3/4/10 and 3/19/10 | | |
| 457 | Highland Capital Healthcare Advisors, L.P. (fka Cummings Bay Capital Management, L.P.) | | 2/26/2010 | Delaware | TX | I-Advisor | Highland Capital Healthcare Advisors GP, LLC | GP | 0.1 | | n/a | 75 | GP | Dondero, Okada, Waterhouse, Stoops, Palmer, Chism | Michael Gregory | Kristin Hendrix | Y | | 5/11/2018 New retail advisor - fka Veris Capital Management, LP - name change 3/4/10 and 3/19/10 | | |
| 458 | Highland Capital Healthcare Advisors, L.P. (fka Cummings Bay Capital Management, L.P.) | | 2/26/2010 | Delaware | TX | I-Advisor | Highland Capital Management Services, Inc. | LP | 99.9 | | n/a | GP | GP | Dondero, Okada, Waterhouse, Stoops, Palmer, Chism | Michael Gregory | Kristin Hendrix | Y | | 5/11/2018 New retail advisor | | |
| 459 | Highland Capital Healthcare Advisors, L.P. (fka Cummings Bay Capital Management, L.P.) | | 2/26/2010 | Delaware | TX | I-Advisor | James Dondero | Non-economic LP | 0 | | n/a | GP | GP | Dondero, Okada, Waterhouse, Stoops, Palmer, Chism | Michael Gregory | Kristin Hendrix | Y | | 5/11/2018 New retail advisor | | |
| 460 | Highland Capital Healthcare Partners (Master), L.P. (fka Cummings Bay Healthcare Master Fund, L.P.) | | 2/1/2011 | Cayman Islands | N/A | Hedge | Highland Capital Healthcare Partners, L.P. | LP | 100.00 | | n/a | General Partner | | Dondero, Okada, Waterhouse, Stoops, Palmer, Chism | Michael Gregory | Tom Beauchamp | N | | 6/6/2016 Name change filed 2/28/14 | | |
| 461 | Highland Capital Healthcare Partners (Master), L.P. (fka Cummings Bay Healthcare Master Fund, L.P.) | | 2/1/2011 | Cayman Islands | N/A | Hedge | Highland Capital Healthcare Partners, L.P. | LP | 0 | | n/a | General Partner | | Dondero, Okada, Waterhouse, Stoops, Palmer, Chism | Michael Gregory | Tom Beauchamp | N | | 6/6/2016 Name change filed 2/28/14 | | |
| 462 | Highland Capital Healthcare Partners GP, LLC (fka Cummings Bay Healthcare GP, LLC) | | 1/31/2011 | Delaware | N/A | Hedge | Highland Capital Healthcare Advisors, L.P. | Member | Member | | n/a | Member | | Dondero, Okada, Waterhouse, Stoops, Palmer, Chism | Michael Gregory | Tom Beauchamp | N | | 4/27/2016 Name change filed 2/26/14 | | |
| 463 | Highland Capital Healthcare Partners, L.P. (fka Cummings Bay Healthcare Fund, L.P.) | | 6/27/2006 | Delaware | N/A | Hedge | Third Party Investors | LP | 46.25 | 4,088,108.68 | General Partner | | | Dondero, Okada, Waterhouse, Stoops, Palmer, Chism | Michael Gregory | Tom Beauchamp | N | | 4/27/2016 Name change filed 2/26/14 | | |
| 464 | Highland Capital Healthcare Partners, L.P. (fka Cummings Bay Healthcare Fund, L.P.) | | 6/27/2006 | Delaware | N/A | Hedge | Highland Capital Management, L.P. | LP | 53.75 | 1,372,811.25 | General Partner | | | Dondero, Okada, Waterhouse, Stoops, Palmer, Chism | Michael Gregory | Tom Beauchamp | N | | 4/27/2016 Name change filed 2/26/14 | | |

| # | A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 465 | Highland Capital Healthcare Partners, Ltd. (fka Cummings Bay Healthcare Fund, Ltd.) | | 2/1/2011 | Cayman Islands | N/A | Hedge | Highland Capital Healthcare Advisors, L.P. | Shareholder | 0 | 1 | James Dondero Mark Okada | N/A | Dondero, Okada, Waterhouse, Stoops, Palmer, Chism | Michael Gregory | David Willmore | Y | 10/12/2016 | Name change filed 2/28/14 | |
| 466 | Highland Capital Management Europe, Limited | | 6/21/2001 | United Kingdom | N/A | HCM | Highland Capital Management, L.P. | Shareholder | 100 | n/a | Dondero, Okada, McAuliffe | Authorized Sigs: Dondero, Okada, McAuliffe | | Frank Waterhouse | Frank Waterhouse | Y | 12/31/2013 | HCMLP's Europe office. | In dissolution |
| 467 | Highland Capital Management Partners Charitable Trust #1 | | 12/29/2005 | Texas | N/A | JD | Highland Capital Management, L.P. | Settlor | 100 | n/a | Grant Scott-Trustee | Grant Scott-Trustee | Grant Scott-Trustee | Mark Patrick | Melissa Schroth | Y | 12/29/2015 | 10-year trust | Trust expired as of 12/29/2015 |
| 468 | Highland Capital Management Partners Charitable Trust #1 | | 12/29/2005 | Texas | N/A | JD | Highland Dallas Foundation, Inc. | Remainder Beneficiary | 100 | n/a | Grant Scott-Trustee | Grant Scott-Trustee | Grant Scott-Trustee | Mark Patrick | Melissa Schroth | Y | 12/29/2015 | 10-year trust | Trust expired as of 12/29/2015 |
| 469 | Highland Capital Management Partners Charitable Trust #2 | | 11/30/2006 | Texas | N/A | JD | James Dondero | Settlor | 100 | n/a | Grant Scott - Trustee | Grant Scott - Trustee | Grant Scott - Trustee | Frank Waterhouse | Frank Waterhouse | Y | 12/1/2011 | Terminated and all assets transferred to Charitable DAF HoldCo, Ltd. then to Charitable DAF Fund, LP | |
| 470 | Highland Capital Management, LTD. | | 6/21/2000 | Bermuda | N/A | HCM | Mark Okada | Shareholder | 25 | n/a | James Dondero Mark Okada | James Dondero-Pres Mark Okada-VP | Dondero, Okada | Frank Waterhouse | Kristin Hendrix | Y | 2/6/2017 | | |
| 471 | Highland Capital Management, LTD. | | 6/21/2000 | Bermuda | N/A | HCM | Mark Okada | Shareholder | 75 | n/a | James Dondero Mark Okada | James Dondero-Pres Mark Okada-VP Loran Phillips-Secy | Dondero, Okada | Frank Waterhouse | Kristin Hendrix | Y | 2/6/2017 | | |
| 472 | Highland Capital Multi-Strategy Fund | | 1/23/2007 | Delaware | N/A | Retail | | | | | | | | Joe Dougherty | | Y | 5/14/2010 | Deregistered on 12/18/08 | |
| 473 | Highland Capital Real Estate Holdings, LLC | | 8/25/2005 | Delaware | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | Member | Member | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Cliff Stoops | Y | 5/25/2012 | | |
| 474 | Highland Capital SLS, LLC | | 4/1/2007 | Delaware | TX | HCM | Highland Capital Management, L.P. | Member | 100 | n/a | Member | Member | Chris Halpin, Jason Post, Cliff Stoops | Chris Halpin | Frank Waterhouse | Y | 8/20/2010 | Insurance related entity. Established in case Highland wanted to buy policies directly from sellers. | |
| 475 | Highland Capital Terrell Investment Partners, L.P. | | 5/18/2005 | Texas | CO | RE | Highland Capital Real Estate Fund GP, LLC | General Partner | 1 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 4/30/2014 | This entity owns a real estate asset for investment purposes. | |
| 476 | Highland Capital Terrell Investment Partners, L.P. | | 5/18/2005 | Texas | CO | RE | Highland Capital Real Estate Fund, L.P. | Limited Partner | 99 | n/a | General Partner | n/a | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 4/30/2014 | This entity owns a real estate asset for investment purposes. | |
| 477 | Highland CLO Intermediate Holdings LLC | | 10/19/2017 | Delaware | N/A | I-Fund | Highland HCF Advisor Ltd. | Managing Member | 0 | 0 economic/ 100 voting | Managing Member | N/A | Dondero, Okada, Ellington, Waterhouse, Stoops, Ringheimer, Willmore | Hunter Covitz | Mike Throckmorton | Y | 5/22/2019 | Highland CLO risk retention C-MOA fund | |
| 478 | Highland CLO Intermediate Holdings I, LLC | | 10/19/2017 | Delaware | N/A | I-Fund | Highland CLO Intermediate Holdings II, LLC | Non-voting Member | 100 | 100 economic/ 0 voting | Managing Member | N/A | Dondero, Okada, Ellington, Waterhouse, Stoops, Ringheimer, Willmore | Hunter Covitz | Mike Throckmorton | Y | 5/22/2019 | Highland CLO risk retention C-MOA fund | |
| 479 | Highland CLO Intermediate Holdings II, LLC | | 10/19/2017 | Delaware | N/A | I-Fund | Highland CLO Management Holdings, L.P. | Sole Member | 100 | | Sole Member | | Dondero, Okada, Ellington, Waterhouse, Stoops, Ringheimer, Willmore | Hunter Covitz | Mike Throckmorton | Y | 5/22/2019 | Highland CLO risk retention C-MOA fund | |
| 480 | Highland CLO Management GP, LLC | | 10/19/2017 | Delaware | Cayman Islands | I-Fund | Highland HCF Advisor Ltd. | Member | | | Sole Member | | Dondero, Okada, Ellington, Waterhouse, Stoops, Ringheimer, Willmore | Hunter Covitz | Mike Throckmorton | Y | 7/9/2019 | Highland CLO risk retention C-MOA fund | |
| 481 | Highland CLO Management Holdings, L.P. | | 10/20/2017 | Cayman Islands | N/A | I-Fund | Highland CLO Management GP, LLC | General Partner | 0 | | General Partner | | Dondero, Okada, Ellington, Waterhouse, Stoops, Ringheimer, Willmore | Hunter Covitz | Mike Throckmorton | Y | 6/21/2019 | Highland CLO risk retention C-MOA fund | |
| 482 | Highland CLO Management Holdings, L.P. | | 10/20/2017 | Cayman Islands | N/A | I-Fund | Highland HCF Advisor Ltd. | Class A LP | 50.1 | | General Partner | | Dondero, Okada, Ellington, Waterhouse, Stoops, Ringheimer, Willmore | Hunter Covitz | Mike Throckmorton | Y | 6/21/2019 | Highland CLO risk retention C-MOA fund | |
| 483 | Highland CLO Management Holdings, L.P. | | 10/20/2017 | Cayman Islands | N/A | I-Fund | Highland HCF Advisor, Ltd. as Trustee for and on behalf of Highland CLO Trust, as nominee for and on behalf of Highland CLO | Class B LP | 49.9 | | General Partner | | Dondero, Okada, Ellington, Waterhouse, Stoops, Ringheimer, Willmore | Hunter Covitz | Mike Throckmorton | Y | 6/21/2019 | Highland CLO risk retention C-MOA fund | |
| 484 | Highland CLO Management, LLC | | 10/19/2017 | Delaware | N/A | Relying Advisor | Highland CLO Management Holdings I, LLC | Management Series/ EU Originator | 100 | | Don Puglisi-Independent Manager | James Dondero-Pres Mark Okada-EVP Scott Ellington-Secy | Dondero, Okada, Ellington, Waterhouse, Stoops, Ringheimer, Willmore | JP Sevilla | Kristin Hendrix | Y | 5/22/2019 | Relying adviser to Highland CLO risk retention C-MOA fund | |
| 485 | Highland CLO Management, LLC | | 10/19/2017 | Delaware | N/A | Relying Advisor | Highland CLO Management Holdings, L.P. | US Retention Series | 100 | | Don Puglisi-Independent Manager | James Dondero-Pres Mark Okada-EVP Scott Ellington-Secy | Dondero, Okada, Ellington, Waterhouse, Stoops, Ringheimer, Willmore | JP Sevilla | Kristin Hendrix | Y | 5/22/2019 | Relying adviser to Highland CLO risk retention C-MOA fund | |
| 486 | Highland CLO Value Fund (Bermuda), L.P. | | 9/30/2008 | Bermuda | N/A | Hedge | Third Party Investors (Arizona PSPRS Trust) | Limited Partner | 100 | n/a | GP | N/A | Chris Halpin, Jason Post, Cliff Stoops | Gibran Mahmud | Cliff Stoops | Y | 12/16/2010 | CLO Value offshore fund | Liquidated on 11/23/09 - in process of dissolving |
| 487 | Highland CLO Value Fund GP, LLC | | 8/12/2008 | Delaware | TX | Hedge | Highland Capital Management, L.P. | Member | 100 | n/a | Member | | Chris Halpin, Jason Post, Cliff Stoops | Gibran Mahmud | Cliff Stoops | Y | 11/17/2010 | GP to CLO Value | Liquidated on 11/23/09 - in process of dissolving |
| 488 | Highland CLO Value Fund, L.P. | | 8/12/2008 | Delaware | TX | Hedge | Highland Capital Management, L.P. | Limited Partner | 100 | n/a | GP | | Chris Halpin, Jason Post, Cliff Stoops | Gibran Mahmud | Cliff Stoops | Y | 11/17/2010 | Onshore CLO Value fund | Liquidated on 11/23/09 - in process of dissolving |
| 489 | Highland CLO Value Intermediate Fund, L.P. | | 9/30/2008 | Bermuda | N/A | Hedge | Highland CLO Value Fund (Bermuda), L.P. | Limited Partner | 100 | n/a | GP | | Chris Halpin, Jason Post, Cliff Stoops | Gibran Mahmud | Cliff Stoops | Y | 12/16/2010 | Offshore intermediate fund | Liquidated on 11/23/09 - in process of dissolving |
| 490 | Highland CLO Value Master Fund, L.P. | | 9/30/2008 | Bermuda | N/A | Hedge | Highland CLO Value Intermediate Fund, L.P. | Limited Partner | 82 | n/a | GP | | Chris Halpin, Jason Post, Cliff Stoops | Gibran Mahmud | Cliff Stoops | Y | 12/16/2010 | Master fund | Liquidated on 11/23/09 - in process of dissolving |
| 491 | Highland CLO Value Master Fund, L.P. | | 9/30/2008 | Bermuda | N/A | Hedge | Highland CLO Value Fund, L.P. | Limited Partner | 18 | n/a | GP | | Chris Halpin, Jason Post, Cliff Stoops | Gibran Mahmud | Cliff Stoops | Y | 12/16/2010 | Master fund | Liquidated on 11/23/09 - in process of dissolving |
| 492 | Highland Commingled Holding Company | | 9/22/2008 | Delaware | N/A | I-Blocker | Highland Offshore Partners, L.P. | Shareholder | 100 | n/a | Dondero, Okada | Dondero-Pres Okada-EVP Ellington-Secy Parker-Asst Secy | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Hunter Covitz | Taylor Colbert | Y | 5/30/2018 | Onshore blocker for Diversified Credit (fka Comingled Loan) | |
| 493 | Highland Core Equity Fund, Ltd. | | 12/19/2006 | Bermuda | N/A | Hedge | Highland Capital Management, L.P. | Shareholder | 100 | n/a | James Dondero, Roderick Forrest, Nicholas Hoskins | James Dondero-Pres Roderick Forrest-VP Penny Cornell-Secy MQ Services-Asst Secy | James Dondero, Okada, Brittain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | James Dondero | Chris Dunn | Y | 2/6/2014 | Select offshore fund (fka Highland Select Equity Fund, Ltd.) BMA deregistered as of 10/18/13 | |
| 494 | Highland Core Equity Intermediate Fund, L.P. | | 6/26/2008 | Bermuda | N/A | Hedge | Highland Select Equity Fund GP, LLC | General Partner | 50 | n/a | GP | N/A | Chris Halpin, Jason Post, Cliff Stoops | Dondero/Chris Colvin | Cliff Stoops | Y | 3/1/2010 | Dissolved 3/1/10 | |
| 495 | Highland Core Equity Intermediate Fund, L.P. | | 6/26/2008 | Bermuda | N/A | Hedge | Highland Core Equity Fund, Ltd. | Limited Partner | 50 | n/a | GP | | Chris Halpin, Jason Post, Cliff Stoops | Dondero/Chris Colvin | Cliff Stoops | Y | 3/1/2010 | Dissolved 3/1/10 | |

| | A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 496 | Highland Credit Opportunities CDO Asset Holdings Ltd. | | 3/31/2009 | Cayman Islands | N/A | Hedge | Highland Credit Opportunities CDO Holdings, Ltd. | | 100 | n/a | Walkers SPV: Rachel Rankin Otelia Scott | | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops | Josh Terry | David Willmore | Y | 7/15/2014 | Credit Ops Sub-holding fund | | |
| 497 | Highland Credit Opportunities CDO Holdings, Ltd. | | 3/31/2009 | Cayman Islands | N/A | Hedge | Highland Credit Opportunities CDO, Ltd. | Shareholder | 100 | n/a | Walkers SPV: David Lloyd Ferona Bartley-Davis | | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops | Josh Terry | David Willmore | Y | 7/15/2014 | Credit Ops Sub-holding fund | | |
| 498 | Highland Credit Opportunities Master Assets Holdings Ltd. | | 4/16/2009 | Cayman Islands | N/A | Hedge | Highland Credit Opportunities CDO, L.P. | Shareholder | 100 | n/a | Dondero Mark Okada | | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops | Josh Terry | David Willmore | Y | 7/15/2014 | Credit Ops Sub-holding fund | | |
| 499 | Highland Crusader Fund GP, L.P. | | 10/20/2005 | Delaware | N/A | Hedge | Highland Capital Management, L.P. | Limited Partner | 99 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Winding down as of 11/15/08 | | |
| 500 | Highland Crusader Fund GP, L.P. | | 10/20/2005 | Delaware | N/A | Hedge | Highland Crusader GP, LLC | General Partner | 1 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Winding down as of 11/15/08 | | |
| 501 | Highland Crusader Fund II, Ltd. | | 1/21/2002 | Bermuda | N/A | Hedge | Third Party Investors | Shareholder | 90.45 | n/a | James Dondero, Roderick Forrest, Nicholas Hoskins | James Dondero-Pres Roderick Forrest-VP Penny Cornell-Secy MQ Services-Asst Secy | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Winding down as of 11/15/08 | | |
| 502 | Highland Crusader Fund II, Ltd. | | 1/21/2002 | Bermuda | N/A | Hedge | Highland Capital Management (401k Plan) | Shareholder | 0.04 | n/a | James Dondero, Roderick Forrest, Nicholas Hoskins | James Dondero-Pres Roderick Forrest-VP Penny Cornell-Secy MQ Services-Asst Secy | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Winding down as of 11/15/08 | | |
| 503 | Highland Crusader Fund II, Ltd. | | 1/21/2002 | Bermuda | N/A | Hedge | Highland Capital Management, L.P. | Shareholder | 4.14 | n/a | James Dondero, Roderick Forrest, Nicholas Hoskins | James Dondero-Pres Roderick Forrest-VP Penny Cornell-Secy | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Winding down as of 11/15/08 | | |
| 504 | Highland Crusader Fund II, Ltd. | | 1/21/2002 | Bermuda | N/A | Hedge | Highland Capital Management, Ltd. (Deferred Fees) | Shareholder | 4.08 | n/a | James Dondero, Roderick Forrest, Nicholas Hoskins | James Dondero-Pres Roderick Forrest-VP Penny Cornell-Secy | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Winding down as of 11/15/08 | | |
| 505 | Highland Crusader Fund II, Ltd. | | 1/21/2002 | Bermuda | N/A | Hedge | Highland Capital Management Services, Inc. | Shareholder | 1.29 | n/a | James Dondero, Roderick Forrest, Nicholas Hoskins | James Dondero-Pres Roderick Forrest-VP Penny Cornell-Secy | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Winding down as of 11/15/08 | | |
| 506 | Highland Crusader Fund, L.P. | | 7/10/2000 | Delaware | TX | Hedge | Dallas Police and Fire | Limited Partner | 11.17 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 507 | Highland Crusader Fund, L.P. | | 7/10/2000 | Delaware | TX | Hedge | Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P. | Limited Partner | 4.78 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 508 | Highland Crusader Fund, L.P. | | 7/10/2000 | Delaware | TX | Hedge | Highland Crusader Fund GP, L.P. | General Partner | 0 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 509 | Highland Crusader Fund, L.P. | | 7/10/2000 | Delaware | TX | Hedge | Highland Capital Management Services, Inc. | Limited Partner | 3.24 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 510 | Highland Crusader Fund, L.P. | | 7/10/2000 | Delaware | TX | Hedge | Highland Capital Management, L.P. | Limited Partner | 5.71 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 511 | Highland Crusader Fund, L.P. | | 7/10/2000 | Delaware | TX | Hedge | Barclays (Eames, Ltd.) | Limited Partner | 27.19 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 512 | Highland Crusader Fund, L.P. | | 7/10/2000 | Delaware | TX | Hedge | James Dondero | Limited Partner | 0.04 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 513 | Highland Crusader Fund, L.P. | | 7/10/2000 | Delaware | TX | Hedge | Mark Okada | Limited Partner | 0.61 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 514 | Highland Crusader Fund, L.P. | | 7/10/2000 | Delaware | TX | Hedge | Third Party Investors | Limited Partner | 47.27 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 515 | Highland Crusader Fund, Ltd. | | 8/1/2000 | Bermuda | N/A | Hedge | Highland Capital Management, Ltd. (Deferred Fees) | Shareholder | 7.60 | n/a | James Dondero, Roderick Forrest, Nicholas Hoskins | James Dondero-Pres Roderick Forrest-VP Penny Cornell-Secy | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Winding down as of 11/15/08 | | |
| 516 | Highland Crusader Fund, Ltd. | | 8/1/2000 | Bermuda | N/A | Hedge | Third Party Investors | Shareholder | 92.40 | n/a | James Dondero, Roderick Forrest, Nicholas Hoskins | James Dondero-Pres Roderick Forrest-VP Penny Cornell-Secy | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Winding down as of 11/15/08 | | |
| 517 | Highland Crusader GP, LLC | | 10/20/2005 | Delaware | N/A | Hedge | Highland Capital Management, L.P. | Member | 100 | n/a | Member | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 518 | Highland Crusader Holding Corporation | | 3/20/2006 | Delaware | N/A | Hedge Blocker | Highland Crusader Offshore Partners, L.P. | Shareholder | 100 | n/a | James Dondero | Dondero-Pres Okada-EVP | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | fka Highland Crusader Real Estate Holding Corp. | |
| 519 | Highland Crusader Offshore Partners, L.P. | | 7/10/2000 | Bermuda | N/A | Hedge | Highland Crusader Fund GP, L.P. | General Partner | 0 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 520 | Highland Crusader Offshore Partners, L.P. | | 7/10/2000 | Bermuda | N/A | Hedge | Highland Crusader Fund II, Ltd. | Limited Partner | 77.96 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA TERMINATED | 8/4/2016 | Winding down as of 11/15/08 | | |
| 521 | Highland Crusader Offshore Partners, L.P. | | 7/10/2000 | Bermuda | N/A | Hedge | Highland Crusader Fund, L.P. | Limited Partner | 18.10 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 522 | Highland Crusader Offshore Partners, L.P. | | 7/10/2000 | Bermuda | N/A | Hedge | Highland Crusader Fund, Ltd. | Limited Partner | 3.94 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Winding down as of 11/15/08 | | |
| 523 | Highland Debt Dislocation Fund (Cayman), L.P. | | 2/22/2016 | Cayman Islands | N/A | Hedge | Highland Debt Dislocation Fund GP, LLC | General Partner | | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | David Willmore | Y | 6/30/2017 | | | |
| 524 | Highland Debt Dislocation Fund (Cayman), L.P. | | 2/22/2016 | Cayman Islands | N/A | Hedge | James Dondero | Limited Partner | | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | David Willmore | Y | 6/30/2017 | | | |
| 525 | Highland Debt Dislocation Fund GP, LLC | | 2/12/2016 | Delaware | N/A | Hedge | Highland Capital Management, L.P. | Member | 100 | n/a | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | David Willmore | Y | 4/20/2017 | | | |
| 526 | Highland Debt Dislocation Fund SLP, LLC | | 2/12/2016 | Delaware | N/A | Hedge | Highland Capital Management, L.P. | Member | 100 | n/a | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | David Willmore | Y | 4/20/2017 | | | |
| 527 | Highland Debt Dislocation Fund, L.P. | | 3/1/2016 | Delaware | N/A | Hedge | Highland Debt Dislocation Fund GP, LLC | General Partner | | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | David Willmore | Y | 4/20/2017 | | | |
| 528 | Highland Debt Dislocation Master Fund, L.P. | | 2/22/2016 | Cayman Islands | N/A | Hedge | Highland Debt Dislocation Fund GP, LLC | General Partner | | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | David Willmore | Y | 6/30/2017 | | | |

| | A | B | C | D | E | F | G | H | I | J | O | P | R | T | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 529 | Highland Debt Dislocation Master Fund, L.P. | | 2/22/2016 | Cayman Islands | N/A | Hedge | James Dondero | Limited Partner | | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | David Willmore | Y | 6/30/2017 | | |
| 530 | Highland Diversified Credit Fund GP, L.P. | | 10/20/2005 | Delaware | N/A | I-Fund | Highland Capital Management, L.P. | Limited Partner | 99 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | Taylor Colbert | Y | 2/12/2018 | GP of Diversified Credit (fka Commingled Loan) | fka Highland Commingled Loan Fund GP, L.P. |
| 531 | Highland Diversified Credit Fund GP, L.P. | | 10/20/2005 | Delaware | N/A | I-Fund | Highland Diversified Credit Fund, LLC | General Partner | 1 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | Taylor Colbert | Y | 2/12/2018 | | |
| 532 | Highland Diversified Credit Fund, L.P. | | 11/19/1999 | TX | I-Fund | Highland Diversified Credit Fund GP, L.P. | General Partner | 0 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | Taylor Colbert | Y | 2/12/2018 | Onshore feeder | fka Highland Commingled Loan Fund, L.P. |
| 533 | Highland Diversified Credit Fund, L.P. | | 11/19/1999 | TX | I-Fund | Highland Capital Management, L.P. | Limited Partner | 100.00% | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | Taylor Colbert | Y | 2/12/2018 | | |
| 534 | Highland Diversified Credit Fund, Ltd. | | 11/11/2000 | Bermuda | N/A | Hedge | Third Party Investors | Shareholder | 100 | n/a | James Dondero, Roderick Forrest, Nicholas Hoskins | James Dondero-Pres Roderick Forrest-VP Penny Cornell-Secy | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Josh Terry | Chris Dunn | Y | 12/3/2013 | fka Highland Commingled Loan Fund, Ltd. | BMA deregistered as of 10/23/13 |
| 535 | Highland Diversified Credit Fund GP, LLC | | 10/20/2005 | Delaware | N/A | I-Fund | Highland Capital Management, L.P. | Member | 100 | n/a | GP | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Trey Parker | Taylor Colbert | Y | 2/12/2018 | GP of Diversified Credit (fka Commingled Loan) | fka Highland Commingled Loan GP, L.P. |
| 536 | Highland Dividend Equity Fund | | 10/31/2011 | Massachusetts | N/A | Retail | Third Party Investors | Common | 99.42 | 1,623,120.50 | Independent Trustees: Dr. Bob Froehlich, Bryan Ward, Tim Hui, | Ethan Powell-EVP/PEO F. Waterhouse-Treas | Ethan Powell-EVP/PEO F. Waterhouse-Treas | Dustin Norris | James Palmer | Terminated 2/23/16 | Series of trust of Highland-Funds II | HCMFA - advisor, Brookmont capital - Subadvisor |
| 537 | Highland Employee Retention Assets II LLC | | 3/16/2016 | Delaware | N/A | HCM | N/A | | N/A | N/A | N/A | Dustin Norris-A. Treas | Dustin Norris-A. Treas | Thomas Surgent | Kristin Hendrix | 2/24/2017 | Liquidated as of 1/25/16 DID NOT LAUNCH | |
| 538 | Highland Equity Focus Fund GP, L.P. | | 10/20/2005 | Delaware | N/A | Private Fund | Highland Capital Management, L.P. | Limited Partner | 99 | n/a | GP | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Palmer, Stoops, Chism | James Dondero | Taylor Colbert | Y | 4/26/2016 | GP of Equity Focus | |
| 539 | Highland Equity Focus Fund GP, L.P. | | 10/20/2005 | Delaware | N/A | Private Fund | Highland Equity Focus Fund, LLC | General Partner | 1 | n/a | GP | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Palmer, Stoops, Chism | James Dondero | Taylor Colbert | Y | 4/26/2016 | GP of Equity Focus | |
| 540 | Highland Equity Focus Fund, L.P. | | 8/1/2002 | Delaware | TX | Private Fund | Highland Equity Focus Fund GP, L.P. | General Partner | 0 | n/a | GP | N/A | Dondero, Okada, Ellington, Terry, Waterhouse,Palmer, Stoops, Chism | James Dondero | Taylor Colbert | Y | 4/26/2016 | | |
| 541 | Highland Equity Focus Fund, L.P. | | 8/1/2002 | Delaware | TX | Private Fund | Neutra Ltd. | Limited Partner | 99.57 | n/a | GP | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Palmer, Stoops, Chism | James Dondero | Taylor Colbert | Y | 4/26/2016 | | |
| 542 | Highland Equity Focus Fund, L.P. | | 8/1/2002 | Delaware | TX | Private Fund | Mark Okada | Limited Partner | 0.43 | n/a | GP | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Palmer, Stoops, Chism | James Dondero | Taylor Colbert | Y | 4/26/2016 | | |
| 543 | Highland Equity Focus Fund GP, LLC | | 10/20/2005 | Delaware | N/A | Private Fund | Highland Capital Management, L.P. | Member | 100 | n/a | GP | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Palmer, Stoops, Chism | James Dondero | Taylor Colbert | Y | 4/26/2016 | GP of Equity Focus | |
| 544 | Highland Event Driven Fund | | 7/20/2007 | Delaware | N/A | Retail | | | | | | | | Joe Dougherty | Brian Mitts | Y | 3/29/2010 | Never launched; | |
| 545 | Highland Financial Real Estate Corporation | | 3/15/2006 | Maryland | N/A | HFP | Highland Capital Management, L.P. | Shareholder | 49 | | 51 Jim Dondero | Jim Dondero-Pres Cliff Stoops-Secy & Interim | Jim Dondero / Cliff Stoops | Philip Braner | Cliff Stoops | Y | 12/31/2009 | | |
| 546 | Highland Financial Real Estate Corporation | | 3/15/2006 | Maryland | N/A | HFP | Highland Financial Partners, L.P. | Shareholder | 51 | | 49 Jim Dondero | Jim Dondero-Pres Cliff Stoops-Secy & Interim | Jim Dondero / Cliff Stoops | Philip Braner | Cliff Stoops | Y | 12/31/2009 | | |
| 547 | Highland Financial Real Estate TRS, Inc. | | 7/19/2007 | Delaware | N/A | HFP | Highland Financial Real Estate Corporation | Shareholder | 100 | | Jim Dondero | Jim Dondero-Pres Cliff Stoops-Secy & Interim | Jim Dondero / Cliff Stoops | Philip Braner | Cliff Stoops | Y | 12/31/2009 | | |
| 548 | Highland Financial Solutions, LLC | | 5/24/2007 | Delaware | N/A | HFP | Highland Distressed Opportunities, Inc. | Member | 100 | | | | | Joe Dougherty | | Y | 1/14/2010 | | |
| 549 | Highland Floating Rate Advantage Fund | | 11/26/2007 | Delaware | N/A | Retail | | Common-Class Z | 0 | 41,459 | Trustees: Bryan Ward, Scott Kavanaugh, James Leary, | Dougherty-Pres/CEO Powell-Sec Mitts-Treas | Dougherty-Pres/CEO Powell-Sec Mitts-Treas | Joe Dougherty | Brian Mitts | Terminated | 6/13/2011 | Assets acquired by Highland Floating Rate Opportunities Fund | |
| 550 | Highland Floating Rate Fund | | 11/26/2007 | Delaware | N/A | Retail | HCMLP 401(k) & DBP Plans | Common-Class Z | 0.01 | 74,810 | Trustees: Bryan Ward, Scott Kavanaugh, James Leary, | Dougherty-Pres/CEO Powell-Sec Powell-Sec | Dougherty-Pres/CEO Powell-Sec Mitts-Treas | Joe Dougherty | Ethan Powell | Terminated | 6/13/2011 | Assets acquired by Highland Floating Rate Opportunities Fund | |
| 551 | Highland Floating Rate Opportunities Fund | | 1/13/2000 | Delaware | N/A | Retail | Highland Capital Management, L.P. | Common | 0.10% | 99,428.54 | Independent Trustees Dr. Bob Froehlich | Brad Ross-Pres/PEO Trey Parker-EVP | Brad Ross-Pres/PEO Trey Parker-EVP | Dustin Norris | James Palmer/ Austin Spence | Y | | Acquired assets from Highland Floating Rate Advantage Fund & Highland Floating Rate Fund on | |
| 552 | Highland Floating Rate Opportunities Fund | | 1/13/2000 | Delaware | N/A | Retail | Highland 401(k) Plan | Common | 0.20% | 189,390.96 | Independent Trustees Dr. Bob Froehlich | Brad Ross-Pres/PEO Trey Parker-EVP | Brad Ross-Pres/PEO Trey Parker-EVP | Dustin Norris | James Palmer/ Austin Spence | Y | | Acquired assets from Highland Floating Rate Advantage Fund & Highland Floating Rate Fund on | |
| 553 | Highland Floating Rate Opportunities Fund | | 1/13/2000 | Delaware | N/A | Retail | James Dondero and Mark Okada | Common | 0.04% | 41,480.19 | Independent Trustees Dr. Bob Froehlich John Honis | Brad Ross-Pres/PEO F. Waterhouse-Treas/PAO/PFO Trey Parker-EVP | Brad Ross-Pres/PEO F. Waterhouse-Treas/PAO/PFO Trey Parker-EVP | Dustin Norris | James Palmer/ Austin Spence | Y | | 6/13/2011 and now series of trust of Highland Acquired assets from Highland Floating Rate Advantage Fund & Highland Floating Rate Fund on 6/13/2011 and now series of trust of Highland | |
| 554 | Highland Floating Rate Opportunities Fund | | 1/13/2000 | Delaware | N/A | Retail | Third Party Investors | Common | 99.66% | ########### | Independent Trustees Dr. Bob Froehlich John Honis Timothy Hui Bryan A. Ward Ethan Powell Interested Trustees Ethan Powell | Brad Ross-Pres/PEO F. Waterhouse-Treas/PAO/PFO Trey Parker-EVP F. Waterhouse-Treas/PAO/PFO Cliff Stoops-A. Treas Dustin Norris-Secy Jason Post-CCO/AMLO | Brad Ross-Pres/PEO F. Waterhouse-Treas/PAO/PFO Trey Parker-EVP F. Waterhouse-Treas/PAO/PFO Cliff Stoops-A. Treas Dustin Norris-Secy Carter Chism-Auth Sig James Palmer-Auth Sig | Dustin Norris | James Palmer/ Austin Spence | Y | | Acquired assets from Highland Floating Rate Advantage Fund & Highland Floating Rate Fund on 6/13/2011 and now series of trust of Highland Funds I | |
| 555 | Highland Gemini Program (Castor), L.P. | | 11/14/2016 | Delaware | | Hedge | Highland Gemini Program GP, LLC | General Partner | | | | | | Trey Parker | Chris Dunn | Y | 11/29/2017 | | |
| 556 | Highland Gemini Program (Castor), L.P. | | 11/14/2016 | Delaware | | Hedge | James Dondero | Initial LP | | | | | | Trey Parker | Chris Dunn | Y | 11/29/2017 | | |
| 557 | Highland Gemini Program (Pollux), L.P. | | 11/15/2016 | Cayman Islands | | Hedge | Highland Gemini Program GP, LLC | General Partner | | | | | | Trey Parker | Chris Dunn | Y | 11/16/2017 | | |
| 558 | Highland Gemini Program (Pollux), L.P. | | 11/15/2016 | Cayman Islands | | Hedge | James Dondero | Initial LP | | | | | | Trey Parker | Chris Dunn | Y | 11/16/2017 | | |
| 559 | Highland Gemini Program , L.P. | | 11/15/2016 | Cayman Islands | | Hedge | Highland Gemini Program GP, LLC | General Partner | | | | | | Trey Parker | Chris Dunn | Y | 11/16/2017 | | |
| 560 | Highland Gemini Program , L.P. | | 11/15/2016 | Cayman Islands | | Hedge | James Dondero | Initial LP | | | | | | Trey Parker | Chris Dunn | Y | 11/16/2017 | | |
| 561 | Highland Gemini Program GP, LLC | | 11/14/2016 | Delaware | | Hedge | Highland Capital Management, L.P. | Member | 100 | | | | | Trey Parker | Chris Dunn | Y | 11/29/2017 | | |
| 562 | Highland Global Equity Fund | | Acquired by HCM on 2/18/11. | Massachusetts | | Retail | Third Party Investors | Common | 0 | 0 | Trustees: Tim Hui, Bryan Ward, Scott Kavanaugh, Ethan | Powell-EVP/Sec Mitts-Treas Head-CCO/AMLO | Mitts-Treas Head-CCO/AMLO | Brian Mitts | Brian Mitts | N | 9/2014 | Series of trust of Highland-Funds II | HCMFA - advisor, GEAM - Subadvisor / Merged into Highland Global Allocation Fund in 9/2014 |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 132 of 535

| | A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 563 | Highland Goldfield Preserve Holding II, LLC | | 11/30/2006 | Delaware | N/A | Hedge | HGPH II-A Inc. | | Member | 33 | n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Dissolved | 10/15/2013 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership |
| 564 | Highland Goldfield Preserve Holding II, LLC | | 11/30/2006 | Delaware | N/A | Hedge | HGPH II-B Inc. | | Member | 33 | n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Dissolved | 10/15/2013 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership |
| 565 | Highland Goldfield Preserve Holding II, LLC | | 11/30/2006 | Delaware | N/A | Hedge | HGPH II-C Inc. | | Member | 33 | n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Dissolved | 10/15/2013 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership |
| 566 | Highland Goldfield Preserve Holding II, LLC | | 11/30/2006 | Delaware | N/A | Hedge | HGPH II-D Inc. | | Member | 1 | n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Dissolved | 10/15/2013 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership |
| 567 | Highland Goldfield Preserve Holding II, Ltd. | | 9/7/2006 | Cayman Islands | N/A | Hedge | Highland Crusader Offshore Partners, L.P. | | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 6/17/2014 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership |
| 568 | Highland Goldfield Preserve Holding, LLC | | 11/30/2006 | Delaware | N/A | Hedge | HGPH A Inc. | | Member | 33 | n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Dissolved | 10/15/2013 | Sub to Credit Strat | |
| 569 | Highland Goldfield Preserve Holding, LLC | | 11/30/2006 | Delaware | N/A | Hedge | HGPH B Inc. | | Member | 33 | n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Dissolved | 10/15/2013 | Sub to Credit Strat | |
| 570 | Highland Goldfield Preserve Holding, LLC | | 11/30/2006 | Delaware | N/A | Hedge | HGPH C Inc. | | Member | 33 | n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Dissolved | 10/15/2013 | Sub to Credit Strat | |
| 571 | Highland Goldfield Preserve Holding, LLC | | 11/30/2006 | Delaware | N/A | Hedge | HGPH D Inc. | | Member | 1 | n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Dissolved | 10/15/2013 | Sub to Credit Strat | |
| 572 | Highland Goldfield Preserve Holding, Ltd. | | 8/9/2006 | Cayman Islands | N/A | Hedge | Highland Credit Strategies Master Fund, L.P. | | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 6/17/2014 | Sub to Credit Strat | |
| 573 | Highland HFR Equity Hedge ETF | | 6/1/2015 | Delaware | N/A | Retail | | | | | | Independent Trustees Dr. Bob Froehlich John Honis Tim Hui | Brad Ross-Pres/PEO Brian Mitts-Secy/PFO/PAO F. Waterhouse-Treas Dustin Norris-A. Treas | Brad Ross-Pres/PEO Brian Mitts-Secy/PFO/PAO F. Waterhouse-Treas Dustin Norris-A. Treas | | | Y | Liquidation Plan effective date 4/11/16 | Series of trust of Highland Funds I | |
| 574 | Highland HFR Event-Driven ETF | | 6/1/2015 | Delaware | N/A | Retail | | | | | | Independent Trustees Dr. Bob Froehlich John Honis Tim Hui | Brad Ross-Pres/PEO Brian Mitts-Secy/PFO/PAO F. Waterhouse-Treas Dustin Norris-A. Treas | Brad Ross-Pres/PEO Brian Mitts-Secy/PFO/PAO F. Waterhouse-Treas Dustin Norris-A. Treas | | | Y | Liquidation Plan effective date 4/11/16 | Series of trust of Highland Funds I | |
| 575 | Highland HFR Global ETF | | 6/1/2015 | Delaware | N/A | Retail | | | | | | Independent Trustees Dr. Bob Froehlich | Brad Ross-Pres/PEO Brian Mitts-Secy/PFO/PAO | Brad Ross-Pres/PEO Brian Mitts-Secy/PFO/PAO | | | Y | Liquidation Plan effective date 4/11/16 | Series of trust of Highland Funds I | |
| 576 | Highland High Income Fund | | 2/1/2007 | Delaware | N/A | Retail | | | | | | | | | | | Y | 11/9/2009 | Series of trust of Highland Funds I | |
| 577 | Highland Income Fund | | 2/1/2007 | Delaware | N/A | Retail | | | | | | | | | | | | 11/9/2009 | Series of trust of Highland Funds I | |
| 578 | Highland International Equity Fund | | Acquired by HCM on 2/18/11. | Massachusetts | N/A | Retail | Third Party Investors | | Common | 0 | 0 | Trustees: Tim Hui, Bryan Ward, Scott Kavanaugh, Ethan James Dondero | Powell-EVP/Sec Head-CCO/AMLO | Powell-EVP/Sec Head-CCO/AMLO | Brian Mitts | Brian Mitts | N | 9/2014 | Series of trust of Highland Funds II | HCMFA - advisor, GEAM - Subadvisor |
| 579 | Highland International Holdings, Ltda (fka Highland Brasilinvest, Ltd.) | | 5/3/2011 | Cayman Islands | N/A | Brasilinvest | Highland Capital Management AG | | Shareholder | 100 | | Jack Takacs | | | Philip Braner | Frank Waterhouse | Dissolved | 12/31/2012 | Cayman vehicle for any fee related proceeds that could arise from offshore activities related to Brazil | Merged into Highland Global Allocation Fund in 9/2014 |
| 580 | Highland Life Settlement Program, LP | | 6/7/2006 | Delaware | N/A | I-Fund | 2018 Life Settlement GP, LLC | | General Partner | 0 | n/a | GP | GP | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | Charlie Hoedebeck | N | 2/27/2018 | Sale Ocean Gate Life Settlement Program, LP - Highland replaced GP and IM on 07/13/11 | GP resigned and IMA terminated as of 2/27/18 |
| 581 | Highland Life Settlement Program, LP | | 6/7/2006 | Delaware | N/A | I-Fund | California Public Employees' Retirement System | | Limited Partner | 100 | n/a | GP | GP | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | Charlie Hoedebeck | N | 2/27/2018 | Sale Ocean Gate Life Settlement Program, LP - Highland replaced GP and IM on 07/13/11 | GP resigned and IMA terminated as of 2/27/18 |
| 582 | Highland LS GP, LLC | | 4/13/2011 | Delaware | N/A | I-Fund | Highland Capital Management, L.P. | | Sole Member | 100 | | Member | Dondero-Pres Okada-VP Ellington-Secy Waterhouse-Treas | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | Charlie Hoedebeck | N | 5/17/2018 | GP to new Life Settlements fund | Withdraw as GP of HLSP as of 2/27/18 |
| 583 | Highland Merger Arbitrage GP, LLC | | 10/16/2014 | Delaware | N/A | Private Fund | Highland Capital Management, L.P. | | Member | 100 | n/a | Sole Member | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Jonathan Lamensdorf | Kristin Hendrix | Y | 12/28/2016 | Merged into Retail fund | Dissolve? |
| 584 | Highland Merger Arbitrage Fund, L.P. | | 10/16/2014 | Delaware | N/A | Private Fund | Highland Merger Arbitrage Fund GP, LLC | | General Partner | 0 | n/a | GP | GP | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Jonathan Lamensdorf | Kristin Hendrix | Y | 12/28/2016 | Merged into Retail fund | Dissolve? |
| 585 | Highland Merger Arbitrage Fund, L.P. | | 10/16/2014 | Delaware | N/A | Private Fund | Highland Capital Management, L.P. | | Limited Partner | 100 | n/a | GP | GP | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Jonathan Lamensdorf | Kristin Hendrix | Y | 12/28/2016 | Merged into Retail fund | Dissolve? |
| 586 | Highland Money Market Fund | | 2/29/1988 | Maryland | N/A | Retail | Third Party Investors | | Common | - | - | | | | Brian Mitts | Brian Mitts | N | 12-Dec | Not launched yet | |
| 587 | Highland Offshore Partners, L.P. | | 2/29/2000 | Bermuda | N/A | I-Fund | Highland Diversified Credit GP, L.P. | | General Partner | 0 | n/a | N/A | | Dondero, Okada, Ellington, Parker, Waterhouse, Stoops, Chism | Trey Parker | Taylor Colbert | Y | 1/26/2016 | Master to Diversified Credit (fka Commingled Loan) | |
| 588 | Highland Offshore Partners, L.P. | | 2/29/2000 | Bermuda | N/A | I-Fund | Highland Diversified Credit Fund, L.P. | | Limited Partner | 100 | n/a | GP | | Dondero, Okada, Ellington, Parker, Waterhouse, Stoops, Chism | Trey Parker | Taylor Colbert | Y | 1/26/2016 | Master to Diversified Credit (fka Commingled Loan) | |
| 589 | Highland Park Cayman Holdings, Ltd. | | 4/17/2009 | Cayman Islands | N/A | CLO Blocker | Highland PCKD 1, Ltd. | | Common Shares | 100 | | Maples Corporate Services Limited | | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Hunter Covitz | Brandon Wurz | Y | 3/13/2018 | Blocker entity 100% owner by the CLO to hold ownership interest in real estate/real property foreclosures | |
| 590 | Highland Pharmaceutical Royalty Fund | | 1/12/2009 | Delaware | N/A | Retail | Highland Capital Management, L.P. | | Common | 100 | - | | | | Joe Dougherty | Charlie Hoedebeck | Y | 8/24/2010 | | |
| 591 | Highland Premium Dividend Fund | | 10/31/2011 | Delaware | N/A | Retail | N/A | | N/A | N/A | N/A | N/A | | | Dustin Norris | Charlie Hoedebeck | Y | 2/24/2017 | DID NOT LAUNCH | HCMFA - advisor, Brookmont capital - Subadvisor |
| 592 | Highland Premium Long/Short Equity Fund | | 11/30/2011 | Delaware | N/A | Retail | N/A | | N/A | N/A | N/A | N/A | | | Mark Patrick | Charlie Hoedebeck | Y | 2/24/2017 | DID NOT LAUNCH | |
| 593 | Highland Purchased Holdings , L.P. | | 8/2/2012 | Delaware | N/A | Hedge | Highland Purchased Holdings GP, LLC | | General Partner | 0.1 | n/a | GP | GP | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Mark Patrick | Frank Waterhouse | Y | 2/11/2013 | NOT USED | |
| 594 | Highland Purchased Holdings , L.P. | | 8/2/2012 | Delaware | N/A | Hedge | Highland Capital Management, L.P. | | Limited Partner | 99.9 | n/a | GP | GP | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Mark Patrick | Frank Waterhouse | Y | 2/11/2013 | NOT USED | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 133 of 535

| | A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 595 | Highland Purchased Holdings GP, LLC | | 8/2/2012 | Delaware | N/A | Hedge | Highland Capital Management, L.P. | Member | 100 | N/A | Sole Member - HCMLP | N/A | Dondero, Okada, Britain, Ellington, Boyce, Terry, Waterhouse, Wise, Stoops, Chism | Mark Patrick | Frank Waterhouse | Y | 2/11/2013 | NOT USED | | |
| 596 | Highland Residential Trust I, Inc. | | 6/26/2014 | Maryland | N/A | REIT | NexPoint Real Estate Opportunities, LLC (fka Highland Freedom REIT LLC) | Shareholder | 100 | | NexPoint Advisors, LP-Manager | Brian Mitts-Pres/Treas Matt McGraner-Secy | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/30/2019 | | | |
| 597 | Highland RT Corporation | | 10/8/2008 | Delaware | N/A | Hedge | Highland Capital Management, L.P. | Shareholder | 100 | n/a | Dondero, Okada | Dondero, Okada, Colvin, Boyce | Dondero, Okada, Dougherty, Boyce, Colvin, Kauffman, Halpin, Post, Stoops, Chism | Dondero/Okada | | | 12/20/2010 | Served as Noteholders Agent on HFP Note transaction | | |
| 598 | Highland S&P AAA CLO ETF | | | | | Retail | | | | | | | | | | Y | 4/11/2016 | Series of trust of Highland Funds I | NEVER LAUNCHED | |
| 599 | Highland Special Situations Fund | | 4/12/2005 | Delaware | N/A | Retail | Highland Capital Management, L.P. | Common | n/a | | n/a Trustees: Tim Hui, Dr. Bob Froehlich, Bryan Ward | Ethan Powell-EVP/Sec Brian Norris-Treas | Ethan Powell-EVP/Sec Brian Mitts-Treas | Dustin Norris | James Palmer | Y | 6/20/2016 | Privately offered closed-end fund with Highland as only shareholder. Fka Restoration Opportunities Fund | Deregistered with SEC on 3.25.2015 | |
| 600 | Highland Special Situations Fund | | 4/12/2005 | Delaware | N/A | Retail | Third Party Investors | Common | n/a | | n/a Trustees: Tim Hui, Dr. Bob Froehlich, Bryan Ward | Ethan Powell-EVP/Sec Brian Norris-Treas | Ethan Powell-EVP/Sec Brian Mitts-Treas | Dustin Norris | James Palmer | Y | 6/20/2016 | | Deregistered with SEC on 3.25.2015 | |
| 601 | Highland Special Situations Fund | | 4/12/2005 | Delaware | N/A | Retail | Internal Investors | Preferred | n/a | | n/a Trustees: Tim Hui, Dr. Bob Froehlich, Bryan Ward | Ethan Powell-EVP/Sec Brian Norris-Treas | Ethan Powell-EVP/Sec Brian Norris-A. Treas | Dustin Norris | James Palmer | Y | 6/20/2016 | Redeemed in 2010 | Deregistered with SEC on 3.25.2015 | |
| 602 | Highland Special Situations Fund | | 4/12/2005 | Delaware | N/A | Retail | Third Party Investors | Preferred | n/a | | n/a Trustees: Tim Hui, Dr. Bob Froehlich, Bryan Ward | Ethan Powell-EVP/Sec Brian Norris-A. Treas | Ethan Powell-EVP/Sec Brian Mitts-Treas | Dustin Norris | James Palmer | Y | 6/20/2016 | Redeemed in 2010 | Deregistered with SEC on 3.25.2015 | |
| 603 | Highland Special Situations Fund II | | 6/5/2008 | Delaware | N/A | Retail | - | - | - | - | - | Brian Norris-A. Treas Dougherty-Pres/CEO Borud-EVP Blackburn-Sec/Treas | Dougherty-Pres/CEO Borud-EVP Blackburn-Sec/Treas Powell-EVP/Sec | Joe Dougherty | Jason Blackburn | Y | 3/29/2010 | | | |
| 604 | Highland Trend Following Fund | | 3/31/2009 | Massachusetts | N/A | Retail | Third Party Investors | Common | 0 | | 0 Trustees: Tim Hui, Bryan Ward, James Leary, Bryan Ward, Scott Kavanaugh, Ethan | Powell-EVP/Sec Mitts-Treas Head-CCO/AMLO | Mitts-Treas Head-CCO/AMLO | Brian Mitts | Brian Mitts | Y | Liquidated | Series of trust of Highland Funds II | HCMFA - advisor. Incline capital -Subadvisor | |
| 605 | Highland Westgate Investments Holding II, LLC | | 3/23/2007 | Delaware | N/A | Hedge | HWH II A Inc. | Member | 19.8 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 606 | Highland Westgate Investments Holding II, LLC | | 3/23/2007 | Delaware | N/A | Hedge | HWH II B Inc. | Member | 19.8 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 607 | Highland Westgate Investments Holding II, LLC | | 3/23/2007 | Delaware | N/A | Hedge | HWH II C Inc. | Member | 19.8 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 608 | Highland Westgate Investments Holding II, LLC | | 3/23/2007 | Delaware | N/A | Hedge | HWH II D Inc. | Member | 19.8 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 609 | Highland Westgate Investments Holding II, LLC | | 3/23/2007 | Delaware | N/A | Hedge | HWH II E Inc. | Member | 19.8 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 610 | Highland Westgate Investments Holding II, LLC | | 3/23/2007 | Delaware | N/A | Hedge | HWH II F Inc. | Member | 1 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 611 | Highland Westgate Investments Holding II, Ltd. | | 9/7/2006 | Cayman Islands | N/A | Hedge | Highland Crusader Offshore Partners, L.P. | Shareholder | 100 | N/A | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 12/1/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 612 | Highland Westgate Investments Holding, LLC | | 3/28/2007 | Delaware | N/A | Hedge | HWH A Inc. | Member | 19.8 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 613 | Highland Westgate Investments Holding, LLC | | 3/28/2007 | Delaware | N/A | Hedge | HWH B Inc. | Member | 19.8 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 614 | Highland Westgate Investments Holding, LLC | | 3/28/2007 | Delaware | N/A | Hedge | HWH C Inc. | Member | 19.8 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 615 | Highland Westgate Investments Holding, LLC | | 3/28/2007 | Delaware | N/A | Hedge | HWH D Inc. | Member | 19.8 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 616 | Highland Westgate Investments Holding, LLC | | 3/28/2007 | Delaware | N/A | Hedge | HWH E Inc. | Member | 19.8 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 617 | Highland Westgate Investments Holding, LLC | | 3/28/2007 | Delaware | N/A | Hedge | HWH F Inc. | Member | 1 | N/A | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 618 | Highland Westgate Investments Holding, Ltd. | | 8/9/2006 | Cayman Islands | N/A | Hedge | Highland Credit Strategies Master Fund, L.P. | Shareholder | 100 | N/A | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 12/1/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 619 | Highland/U.S. Global Infrastructure Fund | | 8/4/2008 | Delaware | N/A | Retail | - | Common | - | | | | | Joe Dougherty | Jason Blackburn | Y | 3/29/2010 | | | |
| 620 | Highlander Equity Holdings III, Ltd. | | 1/15/2013 | Cayman Islands | N/A | Euro CLO | Maples | Initial Subscriber | 100 | 1 | Maples-Wendy Ebanks, Laura Chisholm | Maples Secretaries (Cayman) Limited - | | Josh Terry | Hunter Covitz / Edward Leo | N | | Highlander III Repack | | |
| 621 | Highlander Equity Holdings, Ltd. | | 12/12/2012 | Cayman Islands | N/A | Euro CLO | Maples | Initial Subscriber | 100 | 1 | Maples-Christopher Watler, Wendy Ebanks | Maples Secretaries (Cayman) Limited - Maples | | Josh Terry | Hunter Covitz / Edward Leo | N | | Highlander II Repack | | |
| 622 | Highlander Euro CDO (Cayman) Ltd. | | 4/29/2004 | Cayman Islands | N/A | CLO | Third Party Investors | Common Shareholder | 100 | | Maples | Maples | Maples | Josh Terry | Hunter Covitz / Edward Leo | Sold to Carlyle | 2/28/2012 | Issuer for CLO investment structure. | Sold to Carlyle on 2/28/2012 | Sold to Carlyle |
| 623 | Highlander Euro CDO II (Cayman) Ltd. | | 6/7/2006 | Cayman Islands | N/A | CLO | Third Party Investors | Common | 100 | | Maples | Maples | Maples | Josh Terry | Hunter Covitz / Edward Leo | Sold to Carlyle | 2/28/2012 | Issuer for CLO investment structure. | Sold to Carlyle on 2/28/2012 | |
| 624 | Highlander Euro CDO II, B.V. | | 6/7/2006 | Netherlands | N/A | Euro CLO | Highlander Equity Holdings, Ltd. | Class F-2 Primary Subordinated | 51 | 35,700,000 | M.C. van der Sluijs-Plantz, Mr. H.P.C. Mourits, Ms. | Carlyle | Carlyle | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlyle | 2/28/2012 | invest in various products, such as loans, bonds, cfo, synthetics | Servicing contract sold to Carlyle on 2/28/2012 | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM

NYSCEF DOC. NO. 77

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 134 of 535

| | A | B | C | D | E | F | G | H | I | J | K | L | O | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 625 | Highlander Euro CDO II, B.V. | | 6/7/2006 | Netherlands | N/A | Euro CLO | Third Party Investors | Class F-1 Secondary Subordinated Notes | 49 | 34,300,000 | M.C. van der Sluijs-Plantz, Mr. H.P.C. Mourits, Ms. Th.F.C. Wijnen | Carlye | Carlyle | | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlye | 2/28/2012 | invest in various products, such as loans, bonds, clo, synthetics | Servicing contract sold to Carlye on 2/28/2012 | |
| 626 | Highlander Euro CDO III, B.V. | | 9/13/2006 | Netherlands | N/A | Euro CLO | Highlander Equity Holdings III, Ltd. | Class F-1 Secondary Subordinated Notes | 11.25 | 9,000,000 | M.C. van der Sluijs-Plantz, Mr. H.P.C. Mourits, Ms. Th.F.C. Wijnen | Carlye | Carlyle | | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlye | 2/28/2012 | invest in various products, such as loans, bonds, clo, synthetics | Servicing contract sold to Carlye on 2/28/2012 | |
| 627 | Highlander Euro CDO III, B.V. | | 9/13/2006 | Netherlands | N/A | Euro CLO | Highlander Equity Holdings III, Ltd. | Class F-2 Primary Subordinated Notes | 27.25 | 21,800,000 | M.C. van der Sluijs-Plantz, Mr. H.P.C. Mourits, Ms. Th.F.C. Wijnen | Carlye | Carlyle | | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlye | 2/28/2012 | invest in various products, such as loans, bonds, clo, synthetics | Servicing contract sold to Carlye on 2/28/2012 | |
| 628 | Highlander Euro CDO III, B.V. | | 9/13/2006 | Netherlands | N/A | Euro CLO | Third Party Investors | Class F-1 Subordinated Notes | 61.5 | 49,200,000 | M.C. van der Sluijs-Plantz, Mr. H.P.C. Mourits, Ms. Th.F.C. Wijnen | Carlye | Carlyle | | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlye | 2/28/2012 | invest in various products, such as loans, bonds, clo, synthetics | Servicing contract sold to Carlye on 2/28/2012 | |
| 629 | Highlander Euro CDO IV, B.V. | | 12/11/2006 | Netherlands | N/A | Euro CLO | Highland Crusader Offshore Partners, LP | Class F-2 Subordinated Notes | 19.92 | 14,140,000 | M.C. van der Sluijs-Plantz, Mr. H.P.C. Mourits, Ms. Th.F.C. Wijnen | Carlye | Carlyle | | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlye | 2/28/2012 | invest in various products, such as loans, bonds, clo, synthetics | Servicing contract sold to Carlye on 2/28/2012 | |
| 630 | Highlander Euro CDO IV, B.V. | | 12/11/2006 | Netherlands | N/A | Euro CLO | CLO HoldCo, Ltd | Class F-2 Subordinated Notes | 14.08 | 10,000,000 | M.C. van der Sluijs-Plantz, Mr. H.P.C. Mourits, Ms. Th.F.C. Wijnen | Carlye | Carlyle | | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlye | 2/28/2012 | invest in various products, such as loans, bonds, clo, synthetics | Servicing contract sold to Carlye on 2/28/2012 | |
| 631 | Highlander Euro CDO IV, B.V. | | 12/11/2006 | Netherlands | N/A | Euro CLO | Third Party Investors | Class F-2 Subordinated Notes | 51 | 36,210,000 | M.C. van der Sluijs-Plantz, Mr. H.P.C. Mourits, Ms. Th.F.C. Wijnen | Carlye | Carlyle | | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlye | 2/28/2012 | invest in various products, such as loans, bonds, clo, synthetics | Servicing contract sold to Carlye on 2/28/2012 | |
| 632 | Highlander Euro CDO, B.V. | | 4/29/2004 | Netherlands | N/A | Euro CLO | CLO HoldCo, Ltd | Common Shareholder | 15 | 10,650,000 | M.C. van der Sluijs-Plantz, Mr. H.P.C. Mourits, Ms. Th.F.C. Wijnen | Carlye | Carlyle | | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlye | 2/28/2012 | invest in various products, such as loans, bonds, clo, synthetics | Servicing contract sold to Carlye on 2/28/2012 | |
| 633 | Highlander Euro CDO, B.V. | | 4/29/2004 | Netherlands | N/A | Euro CLO | CLO HoldCo, Ltd | Class F-2 Primary Subordinated Notes | 68 | 34,000,000 | Ms. M.C. van der Sluijs-Plantz, Ms. Th.F.C. Wijnen, | Carlye | Carlyle | | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlye | 2/28/2012 | invest in various products, such as loans, bonds, clo, synthetics | Servicing contract sold to Carlye on 2/28/2012 | |
| 634 | Highlander Euro CDO, B.V. | | 4/29/2004 | Netherlands | N/A | Euro CLO | Third Party Investors | Class F-1 Secondary Subordinated Notes | 32 | 16,000,000 | Ms. M.C. van der Sluijs-Plantz, Ms. Th.F.C. Wijnen, | Carlye | Carlyle | | Josh Terry | Hunter Covitz / Edward Leo | Servicing contract sold to Carlye | 2/28/2012 | invest in various products, such as loans, bonds, clo, synthetics | Servicing contract sold to Carlye on 2/28/2012 | |
| 635 | Hillcrest IV, LLC | | 10/17/2011 | Delaware | N/A | Retail | Highland Credit Strategies Fund | Member | 50 | N/A | Member Managed | Member Managed | Powell-EVP/Sec Mitts-Treas Head-CCO/AMLO | | Brian Mitts | Brian Mitts | Dissolved | 7/12/2013 | Assignee of Highland Funds' claims against CBRE and CS re LLV loans | | |
| 636 | Hillcrest IV, LLC | | 10/17/2011 | Delaware | N/A | Retail | Highland Floating Rate Opportunies Fund | Member | 50 | N/A | Member Managed | Member Managed | Powell-EVP/Sec Mitts-Treas Head-CCO/AMLO | | Brian Mitts | Brian Mitts | Dissolved | 7/12/2013 | Assignee of Highland Funds' claims against CBRE and CS re LLV loans | | |
| 637 | Hills of Kings Wood, L.P. | | 1/3/2006 | Texas | N/A | RE | HCREA Kings Wood, L.P. | Limited Partner | 50.52 | n/a | Non HCMLP GP | n/a | General Partner Controlled | | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 638 | Hills of Kings Wood, L.P. | | 1/3/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 0 | n/a | Non HCMLP GP | n/a | General Partner Controlled | | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 639 | Hills of Kings Wood, L.P. | | 1/3/2006 | Texas | N/A | RE | Third Party Investors | Limited Partner | 49.48 | n/a | Non HCMLP GP | n/a | General Partner Controlled | | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 640 | HKW Land Holdings, L.P. | | 1/3/2006 | Texas | N/A | RE | HCREA Kings Wood, L.P. | Limited Partner | 50.58 | n/a | Non HCMLP GP | n/a | General Partner Controlled | | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 641 | HKW Land Holdings, L.P. | | 1/3/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 0 | n/a | Non HCMLP GP | n/a | General Partner Controlled | | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 642 | HKW Land Holdings, L.P. | | 1/3/2006 | Texas | N/A | RE | Third Party Investors | Limited Partner | 49.42 | n/a | Non HCMLP GP | n/a | General Partner Controlled | | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/31/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 643 | HMCF IB Investors, LLC | | 6/4/2014 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Managed | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO Frank Waterhouse-Treas | | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 644 | HMCF RV Investors, LLC | | 8/7/2014 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Managed | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO Frank Waterhouse-Treas | | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 645 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Atascosa Investments LLC | Shareholder | 0.33 | n/a | Joe Colonnetta | Michael Lohner-Pres/CEO Kenneth Cichocki-SVP/CFO/Secy | Michael Lohner-Pres/CEO Kenneth Cichocki-SVP/CFO/Secy | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 646 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Burnet Partners, LLC | Shareholder | 0.38 | n/a | Barbara Hammond Christina Carter Urschel | same | Eugenia Price-SVP | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 647 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Gillespie Income Fund, LLC | Shareholder | 0.33 | n/a | same | same | same | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 648 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Highland Crusader Offshore Partners, L.P. | Shareholder | 46.31 | n/a | same | same | same | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 649 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Highland Legacy Limited | Shareholder | 3.76 | n/a | same | same | same | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 650 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Highland Special Situations Fund | Shareholder | 3.27 | n/a | same | same | same | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 651 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Hopkins Capital Partners, LLC | Shareholder | 0.33 | n/a | same | same | same | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 652 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Milam High Yield Fund, LLC | Shareholder | 0.41 | n/a | same | same | same | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 653 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Navarro Investment Partners, LLC | Shareholder | 0.41 | n/a | same | same | same | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 654 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Pam Capital Funding, L.P. | Shareholder | 0.33 | n/a | same | same | same | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 655 | Home Interiors & Gifts | | 3/10/1999 | Delaware | | PE | Third Party Investors | Shareholder | 32.38 | n/a | same | same | same | | Carl Moore | Clay Callan | Y | | NO EQUITY HOLDING | | |
| 656 | Hopkins Capital Partners, LLC | | 10/22/2004 | Delaware | N/A | Hedge | Highland Crusader Offshore Partners, L.P. | Member | 100 | n/a | James Dondero-Pres | James Dondero-Pres | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Sub of Crusader | | |
| 657 | Hoss I, LLC | | 5/14/2008 | Delaware | N/A | CLO Blocker | Highland Loan Funding V, Ltd. | Shareholder | 100 | | James Dondero-Manager | N/A | James Dondero-Manager | | Josh Terry | Hunter Covitz / Edward Leo | Y | 6/18/2012 | Conduit entity related to Marcal restructure - provided funds to Outland 77, LLC | | |
| 658 | Hoss II, LLC | | 5/14/2008 | Delaware | N/A | CLO Blocker | Rockwall CDO, Ltd. | Shareholder | 100 | | James Dondero-Manager | N/A | James Dondero-Manager | | Josh Terry | Hunter Covitz / Edward Leo | Y | 6/18/2012 | Conduit entity related to Marcal restructure - provided funds to Outland 77, LLC | | |
| 659 | Hoss III, LLC | | 5/14/2008 | Delaware | N/A | CLO Blocker | Grayson CLO, Ltd. | Shareholder | 100 | | James Dondero-Manager | N/A | James Dondero-Manager | | Josh Terry | Hunter Covitz / Edward Leo | Y | 6/18/2012 | Conduit entity related to Marcal restructure - provided funds to Outland 77, LLC | | |
| 660 | Hoss IV, LLC | | 5/14/2008 | Delaware | N/A | CLO Blocker | Brentwood CLO, Ltd. | Shareholder | 100 | | James Dondero-Manager | N/A | James Dondero-Manager | | Josh Terry | Hunter Covitz / Edward Leo | Y | 6/18/2012 | Conduit entity related to Marcal restructure - provided funds to Outland 77, LLC | | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77
INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj    Doc 401-1    Filed 10/15/25    Entered 10/15/25 22:24:37    Desc
Exhibit Exhibits 1-16    Page 135 of 535

| | A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 661 | Hoss IX, LLC | | 5/14/2008 | Delaware | N/A | CLO Blocker | Greenbriar CLO, Ltd. | Shareholder | 100 | | James Dondero-Manager | N/A | James Dondero-Manager | Josh Terry | Hunter Covitz / Edward Leo | Y | 6/18/2012 | Conduit entity related to Marcal restructure - provided funds to Outland 77, LLC | | |
| 662 | Hoss V, LLC | | 5/14/2008 | Delaware | N/A | CLO Blocker | Eastland CLO, Ltd. | Shareholder | 100 | | James Dondero-Manager | N/A | James Dondero-Manager | Josh Terry | Hunter Covitz / Edward Leo | Y | 6/18/2012 | Conduit entity related to Marcal restructure - provided funds to Outland 77, LLC | | |
| 663 | Hoss VI, LLC | | 5/14/2008 | Delaware | N/A | CLO Blocker | Rockwall CDO II, Ltd. | Shareholder | 100 | | James Dondero-Manager | N/A | James Dondero-Manager | Josh Terry | Hunter Covitz / Edward Leo | Y | 6/18/2012 | Conduit entity related to Marcal restructure - provided funds to Outland 77, LLC | | |
| 664 | Hoss VII, LLC | | 5/14/2008 | Delaware | N/A | CLO Blocker | Westchester CLO, Ltd. | Shareholder | 100 | | James Dondero-Manager | N/A | James Dondero-Manager | Josh Terry | Hunter Covitz / Edward Leo | Y | 6/18/2012 | Conduit entity related to Marcal restructure - provided funds to Outland 77, LLC | | |
| 665 | Hoss VIII, LLC | | 5/14/2008 | Delaware | N/A | CLO Blocker | Stratford CLO, Ltd. | Shareholder | 100 | | James Dondero-Manager | N/A | James Dondero-Manager | Josh Terry | Hunter Covitz / Edward Leo | Y | 6/18/2012 | Conduit entity related to Marcal restructure - provided funds to Outland 77, LLC | | |
| 666 | HRT Aspen Grove, LLC | | 7/21/2014 | Delaware | N/A | REIT | Freedom REIT LLC | Member | 100 | n/a | | | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/31/2016 | | | |
| 667 | HRTBH Arbors, LLC | | 8/18/2014 | Delaware | GA | REIT | HRTBH North Atlanta, LLC | Member | 100 | n/a | Member Managed | Member Managed | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 668 | HRTBH Aspen Grove Owner, LLC | | 10/9/2014 | Delaware | CO | REIT | HRTBH Aspen Grove, LLC | Member | 100 | n/a | Sole Member | Sole Member | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/11/2016 | | | |
| 669 | HRTBH Aspen Grove, LLC | | 7/21/2014 | Delaware | N/A | REIT | BH Equities, LLC | Managing Member | 0.1 | n/a | Authorized Signatories Brian Mitts Harry Bookey Nicholas H. Roby | Authorized Signatories Brian Mitts Harry Bookey Nicholas H. Roby | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/11/2016 | | | |
| 670 | HRTBH Aspen Grove, LLC | | 7/21/2014 | Delaware | N/A | REIT | BH Aspen Grove, LLC | Member | 9.9 | n/a | Auth Sigs | Auth Sigs | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/11/2016 | | | |
| 671 | HRTBH Aspen Grove, LLC | | 7/21/2014 | Delaware | N/A | REIT | HRT Aspen Grove, LLC | Member | 90 | n/a | Auth Sigs | Auth Sigs | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/11/2016 | | | |
| 672 | HRTBH Knolls, LLC | | 8/18/2014 | Delaware | GA | REIT | HRTBH North Atlanta, LLC | Member | 100 | n/a | Member Managed | Member Managed | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 673 | HRTBH Wood Bridge, LLC | | 8/18/2014 | Delaware | GA | REIT | HRTBH North Atlanta, LLC | Member | 100 | n/a | Member Managed | Member Managed | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 674 | HRTBH Wood Station, LLC | | 8/18/2014 | Delaware | GA | REIT | HRTBH North Atlanta, LLC | Member | 100 | n/a | Member Managed | Member Managed | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 675 | HSMEP Tulsa Plaza, LP | | | | JD | | James Dondero | Limited Partner | 6.76 as of 12/31/08 | | | N/A | | Melissa Schroth | Melissa Schroth | Written off | 7/1/2011 | Jim's investment property | | |
| 676 | HSMEP Tulsa Plaza, LP | | | | JD | | Third Party Investors | Limited Partner | 93.24 as of 12/31/08 | | | N/A | | Melissa Schroth | Melissa Schroth | Written off | 7/1/2011 | Jim's investment property | | |
| 677 | HT Cornerstone Limited Partnership | | 1/31/2006 | Texas | N/A | RE | HCREA Cornerstone, L.P. | Limited Partner | 50 | n/a | General Partner | n/a | Davis Deadman, Mike Rossi, Lisa Stuart | Ted Dameris | Tanya Massie | Y | 1/9/2009 | | SOLD TO RREEF IN 2007 | |
| 678 | HT Cornerstone Limited Partnership | | 1/31/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 1 | n/a | General Partner | n/a | Davis Deadman, Mike Rossi, Lisa Stuart | Ted Dameris | Tanya Massie | Y | 1/9/2009 | | SOLD TO RREEF IN 2007 | |
| 679 | HT Cornerstone Limited Partnership | | 1/31/2006 | Texas | N/A | RE | Third Party Investors | Limited Partner | 0.3 | n/a | General Partner | n/a | Davis Deadman, Mike Rossi, Lisa Stuart | Ted Dameris | Tanya Massie | Y | 1/9/2009 | | SOLD TO RREEF IN 2007 | |
| 680 | HT Cornerstone Limited Partnership | | 1/31/2006 | Texas | N/A | RE | Third Party Investors | Limited Partner | 48.7 | n/a | General Partner | n/a | Davis Deadman, Mike Rossi, Lisa Stuart | Ted Dameris | Tanya Massie | Y | 1/9/2009 | | SOLD TO RREEF IN 2007 | |
| 681 | HTT Advisors, AG | | 7/7/2010 | Switzerland | N/A | HCM | Highland Capital Management, AG | Shareholder | 100 | 100,000 | James Dondero Philip Braner | N/A | | Philip Braner | Gabi Gonzales | Y | | New Swiss advisory entity to assist in the management of the Swiss healthcare platform | In liquidation - initial share capital being returned to Dugaboy | |
| 682 | Hukill REO LLC | | | Texas | | NB | NCI Assets Holding | Member | 100 | | | | | Dierk Hohman | Courtney Burton | Y | 8/12/2016 | | | |
| 683 | Hutchins Truck Service Partners, L.P. | | 3/31/2006 | Texas | N/A | RE | HCREA Hutchins Truck Service, LP | Limited Partner | 90 | n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | SOLD AT FORECLOSURE AUCTION IN 2009 | |
| 684 | Hutchins Truck Service Partners, L.P. | | 3/31/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 0 | n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | SOLD AT FORECLOSURE AUCTION IN 2009 | |
| 685 | Hutchins Truck Service Partners, L.P. | | 3/31/2006 | Texas | N/A | RE | Third Party Investors | Limited Partner | 10 | n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | SOLD AT FORECLOSURE AUCTION IN 2009 | |
| 686 | HWIH A Inc. | | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding, Ltd. | Shareholder | 100 | | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 687 | HWIH B Inc. | | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding, Ltd. | Shareholder | 100 | | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 688 | HWIH C Inc. | | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding, Ltd. | Shareholder | 100 | | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 136 of 535

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

| | A | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 689 | HWH D Inc. | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding, Ltd. | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 690 | HWH E Inc. | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding, Ltd. | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 691 | HWH F Inc. | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding, Ltd. | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | Will Mabry | Y | 4/8/2014 | Sub of Credit Strat | CAN BE DISSOLVED | |
| 692 | HWH II A Inc. | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding II, Ltd. | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 693 | HWH II B Inc. | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding II, Ltd. | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 694 | HWH II C Inc. | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding II, Ltd. | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 695 | HWH II D Inc. | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding II, Ltd. | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 696 | HWH II E Inc. | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding II, Ltd. | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 697 | HWH II F Inc. | 3/23/2007 | Delaware | N/A | Hedge | Highland Westgate Investment Holding II, Ltd. | Shareholder | 100 | n/a | James Dondero | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | Dondero/Okada | James Palmer | Y | 4/8/2014 | Sub of Crusader | CAN BE DISSOLVED | |
| 698 | Hwy 80 Terrell Partners, Ltd. | 8/11/2005 | Texas | N/A | RE | HCREA Terrell Land, L.P. (SOLD) | Class A Limited Partner | 98.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | SOLD | This entity owns a real estate asset for investment purposes. | SOLD | Remove once funds distributed |
| 699 | Hwy 80 Terrell Partners, Ltd. | 8/11/2005 | Texas | N/A | RE | TODD Terrell Partners, LLC (GP transferred to Third Party) | Class B Limited Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | SOLD | This entity owns a real estate asset for investment purposes. | SOLD | Remove once funds distributed |
| 700 | Hwy 80 Terrell Partners, Ltd. | 8/11/2005 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 1 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | SOLD | This entity owns a real estate asset for investment purposes. | SOLD | Remove once funds distributed |
| 701 | HySky Communications LLC | 11/17/2006 | Delaware | N/A | PE | Highland Capital Management, L.P. | Member | 84.35 | n/a | Gustavo Prilick, Charles McQueary, Joseph Andrulis | HySky CFO, Kevin Van de Grift | HySky CFO, Kevin Van de Grift | Carl Moore | Clay Callan | Y | 12/31/2010 Dissolve | | Discharged in bankruptcy | |
| 702 | HySky Communications LLC | 11/17/2006 | Delaware | N/A | PE | Highland Crusader Fund, L.P. | Member | 9.31 | n/a | same | same | same | Carl Moore | Clay Callan | Y | 12/31/2010 Dissolve | | Discharged in bankruptcy | |
| 703 | HySky Communications LLC | 11/17/2006 | Delaware | N/A | PE | Highland Management Services | Member | 6.34 | n/a | same | same | same | Carl Moore | Clay Callan | Y | 12/31/2010 Dissolve | | Discharged in bankruptcy | |
| 704 | Indian Creek Development GP, LLC | 2/9/2011 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | James Dondero, Scott Ellington | James Dondero-Pres Ted Dameris-VP Scott Ellington -Secy/Treas Manager - Complete Wellness Solutions, LLC | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | GP to LW Indian Creek Dev. LP | Dissolve once LP sale finalizes (Isaac) |
| 705 | Integrated Wellness Pharmacy, LLC | 4/5/2012 | Texas | N/A | JD | Complete Wellness Solutions, LLC | Sole Member | 100 | n/a | James Dondero | Scott Ellington -Secy/Treas Manager - Complete Wellness Solutions, LLC | James Dondero | Melissa Schroth | Melissa Schroth | Y | 11/7/2013 | Jim's pharmaceutical investment | | |
| 706 | KD Rocky Creek, L.P. | 8/18/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Class A Limited Partner | 89.9 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Donna Engstrom | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 707 | KD Rocky Creek, L.P. | 8/18/2006 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 10 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Donna Engstrom | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 708 | KD Rocky Creek, L.P. | 8/18/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 0.1 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Donna Engstrom | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 709 | Keegans Glen Apartments, Ltd. | 2/16/2007 | Texas | N/A | RE | HCREA Court Glen, LP | Class A Limited Partner | 90 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 710 | Keegans Glen Apartments, Ltd. | 2/16/2007 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 9.9 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 711 | Keegans Glen Apartments, Ltd. | 2/16/2007 | Texas | N/A | RE | Third Party Investors | General Partner | 0.1 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 712 | Keel LLC | 12/11/2012 | Delaware | TX | HCM | Foremast LLC | Sole Member | 100 | N/A | N/A | | | JP Sevilla | Kristin Hendrix | Y | 12/31/2013 | Formed to hold Barclays' interest but not used | | |
| 713 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | Third Party Investors | Shareholder | 50 as of 12/31/08 | | Texas Land Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | | |
| 714 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | The Get Good Non-Exempt Trust No. 1 | Shareholder | 5.53 as of 12/31/08 | | Texas Land Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | | |
| 715 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | Todd Travers | Shareholder | 1.37 as of 12/31/08 | | Texas Land Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | | |
| 716 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | Mark Okada | Shareholder | 2.77 as of 12/31/08 | | Texas Land Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | | |
| 717 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | Highland Capital Real Estate Fund, L.P. | Shareholder | 9.67 as of 12/31/08 | | Texas Land Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | | |
| 718 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | Pat Daugherty | Shareholder | 1.37 as of 12/31/08 | | Texas Land Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | | |
| 719 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | Kurt Plumer | Shareholder | 0.7 as of 12/31/08 | | Texas Land Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | | |
| 720 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | Joe Dougherty | Shareholder | 0.7 as of 12/31/08 | | Texas Land Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | | |
| 721 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | Davis Deadman | Shareholder | 1.37 as of 12/31/08 | | Texas Land Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM

NYSCEF DOC. NO. 77

INDEX NO. 650744/2023

RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 137 of 535

| # | A | C | D | E | F | G | H | I / J | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 722 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | Paul Kauffman | Shareholder | 0.7 as of 12/31/08 | Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | |
| 723 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | John Morgan | Shareholder | 0.7 as of 12/31/08 | Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | |
| 724 | Keller 1709 Land, Ltd. | 1/30/2004 | Texas | N/A | JD | Maso Properties, Ltd. | Shareholder | 25.13 as of 12/31/08 | Management, LLC, Mark R. Smith Company, Inc. | | | Melissa Schroth | Melissa Schroth | N | | Jim's property investment | |
| 725 | Knobkerrie, LLC | 10/28/2009 | Texas | N/A | Oil&Gas/Canopy | PetroCap Management Company LLC | Manager & Member | 100 | PetroCap Management Company LLC | Richard Rinehart-Manager | | Lane Britain | Marc Manzo | Y | 8/24/2010 | Shell entity - holds no interest | |
| 726 | Larkspur, LLC | 7/2/2013 | Delaware | N/A | HCM | TBD | | | | | | Isaac Leventon | | N | | Blocker to hold CS litigation assignment | No assignment yet |
| 727 | LF GrayWest CLO Holdings, LLC | 1/15/2010 | Delaware | N/A | CLO Blocker | Loan Funding VII LLC | Member | 34 / n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | Matthew Gray | Ed Leo | Y | 4/8/2014 | DE blocker to hold Panda Hereford assets | |
| 728 | LF GrayWest CLO Holdings, LLC | 1/15/2010 | Delaware | N/A | CLO Blocker | Grayson CLO, Ltd. | Member | 33 / n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | Matthew Gray | Ed Leo | Y | 4/8/2014 | DE blocker to hold Panda Hereford assets | |
| 729 | LF GrayWest CLO Holdings, LLC | 1/15/2010 | Delaware | N/A | CLO Blocker | Westchester CLO, Ltd. | Member | 33 / n/a | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse,Wise, Stoops, Chism | Matthew Gray | Ed Leo | Y | 4/8/2014 | DE blocker to hold Panda Hereford assets | |
| 730 | Life Settlements Prospects GP, LLC | 9/22/2008 | Delaware | N/A | Hedge | Highland Capital Management, L.P. | Member | 100 / n/a | Member | Dondero-Pres Okada-EVP Ellington-Secy | | Matt Jameson | Tom Beauchamp | Y | 8/4/2016 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership |
| 731 | Life Settlements Prospects, L.P. | 9/22/2008 | Delaware | N/A | Hedge | Highland Crusader Holding Corporation | LP | 100 / n/a | GP | Dondero, Okada, Ellington, Waterhouse, Palmer, Stoops, Chism | | Matt Jameson | Tom Beauchamp | Y | 8/4/2016 | Sub of Crusader | All Crusader-related entities are in wind-down with the Master Partnership |
| 732 | LM Houston Apartments, LLC | 11/20/2014 | Texas | N/A | REIT | Freedom La Mirage, LLC | Member | 76.09 | Knightvest 2014, LLC (Manager) | Knightvest 2014, LLC (Manager) | Brian Mitts | Matt McGraner | Brandon Knott | N | Dec-17 | sold 12/2017 | |
| 733 | LM Houston Apartments, LLC | 11/20/2014 | Texas | N/A | REIT | Knightvest La Mirage, LLC | Member | 23.91 | Knightvest 2014, LLC (Manager) | Knightvest 2014, LLC (Manager) | Brian Mitts | Matt McGraner | Brandon Knott | N | Dec-17 | sold 12/2017 | |
| 734 | Loan Funding IV LLC (Bristol Bay) | 9/17/2003 | Delaware | N/A | CLO | Rick Caplan, Doug Warren, Sumit Roy, | Member | 100 / n/a | Rick Caplan, Doug Warren, Sumit Roy, | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | Hunter Covitz | Robert Hill/ Brandon Wurz | Terminated | 12/29/2015 | Issuer for CLO investment structure. | Assets transferred to Bristol Bay |
| 735 | Loan Funding VII LLC (Valhalla) | 4/6/2004 | Delaware | N/A | CLO | Citibank, N.A. | Member | 100 / n/a | Citibank, N.A. | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | Hunter Covitz | Robert Hill/ Brandon | Terminated | 7/25/2016 | Issuer for CLO investment structure. | Assets transferred to Valhalla |
| | Loan Star State Trust | 6/30/2004 | Cayman Islands | N/A | Sep Acct | The Norinchukin Bank | Shareholder | 100 / N/A | Bank of New York Mellon | N/A | Dondero, Okada, Dougherty, Boyce, Colvin, Kauffman, Gilchrist, Post, Stoops, Chism | Paul Kaufman | Jack Bateman | Terminated | 1/13/2015 | Highland managed separate account for Norinchukin Bank. Management terminated | |
| 736 | Lockhill Partners, Ltd. | 10/31/2005 | Texas | N/A | RE | HCREA Lockhill Retail LP (SOLD) | Limited Partner | 50 / n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | Y | | This entity owns a real estate asset for investment purposes. SOLD | |
| 737 | Lockhill Partners, Ltd. | 10/31/2005 | Texas | N/A | RE | Third Party Investors | General Partner | 1 / n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | Y | | This entity owns a real estate asset for investment purposes. SOLD | |
| 738 | Lockhill Partners, Ltd. | 10/31/2005 | Texas | N/A | RE | Third Party Investors | Limited Partner | 49 / n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | Y | | This entity owns a real estate asset for investment purposes. SOLD | |
| 739 | LW Indian Creek Development, L.P. | 7/14/2006 | MS | N/A | RE | HCREA Indian Creek, L.P. (SOLD) | Class A Limited Partner | 89.9 / n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. Being sold | Can be removed once Isaac finalizes sale |
| 740 | LW Indian Creek Development, L.P. | 7/14/2006 | MS | N/A | RE | Third Party Investors | Class B Limited Partner | 10 / n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. Being sold | Can be removed once Isaac finalizes sale |
| 741 | LW Indian Creek Development, L.P. | 7/14/2006 | MS | N/A | RE | Third Party Investors | Class C Limited Partner | 0.1 / n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. Being sold | Can be removed once Isaac finalizes sale |
| 742 | LW Indian Creek Development, L.P. | 7/14/2006 | MS | N/A | RE | Indian Creek Development GP, LLC | General Partner | 0 / n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. Being sold | Can be removed once Isaac finalizes sale |
| 743 | LW Indian Creek Land, L.P. | 7/14/2006 | MS | N/A | RE | HCREA Indian Creek, L.P. (SOLD) | Class A Limited Partner | 89.9 / n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | Y | SOLD | This entity owns a real estate asset for investment purposes. Sold | |
| 744 | LW Indian Creek Land, L.P. | 7/14/2006 | MS | N/A | RE | Third Party Investors | Class B Limited Partner | 10 / n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | Y | SOLD | This entity owns a real estate asset for investment purposes. Sold | |
| 745 | LW Indian Creek Land, L.P. | 7/14/2006 | MS | N/A | RE | Third Party Investors | General Partner | 0.1 / n/a | Non HCMLP GP | | General Partner Controlled | Ted Dameris | Drew Wilson | Y | SOLD | This entity owns a real estate asset for investment purposes. Sold | |
| 746 | MA Boerne Partners, LP | 6/15/2006 | Texas | N/A | RE | NexBank Capital, Inc. | Class A Limited Partner | 15 / n/a | Non HCMLP GP | | N/A | Ted Dameris/ Jim Pfertner | Drew Wilson | SOLD | | MA Boerne Partners is a passive investment. Nexbank Capital, Inc. ("NCI") received a profits interest, but we don't serve as GP or hold any officer positions in the entity | Transferred/sold in settlement w/ Terry Gwin Group |
| 747 | MA Boerne Partners, LP | 6/15/2006 | Texas | N/A | RE | Third Party Investors | Class A Limited Partner | 50 / n/a | Non HCMLP GP | | N/A | Ted Dameris/ Jim Pfertner | Drew Wilson | SOLD | | same | Transferred/sold in settlement w/ Terry Gwin Group |
| 748 | MA Boerne Partners, LP | 6/15/2006 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 34.9 / n/a | Non HCMLP GP | | N/A | Ted Dameris/ Jim Pfertner | Drew Wilson | SOLD | | same | Transferred/sold in settlement w/ Terry Gwin Group |
| 749 | MA Boerne Partners, LP | 6/15/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 0.1 / n/a | Non HCMLP GP | | N/A | Ted Dameris/ Jim Pfertner | Drew Wilson | SOLD | | same | Transferred/sold in settlement w/ Terry Gwin Group |
| 750 | Mansard Holdings LLC | 4/27/2016 | Texas | N/A | JD | Highland Capital Management Services, Inc. | Member | 100 / n/a | | | | JP Sevilla | Melissa Schroth | Y | 5/8/2017 | | |
| 751/752 | McGinnis Land Partners I, L.P. | 3/20/2005 | Texas | N/A | RE | HCREA Canyon Falls L.P. | Class A Limited Partner | 50 / n/a | James Dondero Ted Dameris Scott Ellington | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed |
| 753 | McGinnis Land Partners I, L.P. | 3/20/2005 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 49.9 / n/a | James Dondero Ted Dameris Scott Ellington | | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed |

| # | A | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 754 | McGinnis Land Partners I, L.P. | 3/20/2005 | Texas | N/A | RE | Third Party Investors | Class C Limited Partner | 0.01 | n/a | James Dondero, Ted Dameris, Scott Ellington | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed |
| 755 | McGinnis Land Partners I, L.P. | 3/20/2005 | Texas | N/A | RE | Canyon Falls Land GP, LLC | General Partner | 0 | n/a | Ted Dameris, Ted Dameris, Scott Ellington | | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity owns a real estate asset for investment purposes. | |
| 756 | Merchant Ventures, LLC | 10/2/2015 | Delaware | TX | JD | Yellow Metal Merchants, Inc. | Member | 100 | n/a | Sole Member | James Dondero | James Dondero | Melissa Schroth | Melissa Schroth | Y | 2/16/2016 | | |
| 757 | MF 380 Tollway East, LP | 4/9/2007 | Texas | N/A | RE | HCREA Prosper Crossing East, LP | Class A Limited Partner | 91.3 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity owns a real estate asset for investment purposes. | |
| 758 | MF 380 Tollway East, LP | 4/9/2007 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 8.69 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity owns a real estate asset for investment purposes. | |
| 759 | MF 380 Tollway East, LP | 4/9/2007 | Texas | N/A | RE | Tollway East GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity owns a real estate asset for investment purposes. | |
| 760 | MF 380 Tollway West, LP | 4/16/2007 | Texas | N/A | RE | HCREA Prosper Crossing West, LP | Class A Limited Partner | 98.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity owns a real estate asset for investment purposes. | |
| 761 | MF 380 Tollway West, LP | 4/16/2007 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 1 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity owns a real estate asset for investment purposes. | |
| 762 | MF 380 Tollway West, LP | 4/16/2007 | Texas | N/A | RE | Tollway West GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/27/2010 | This entity owns a real estate asset for investment purposes. | |
| 763 | MF Fund 3 GP, LLC | 11/30/2010 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/17/2012 | New GP to Mooreland Fund III 380 Comm Office, LP | New GP not accepted |
| 764 | MF Fund 8 GP, LLC | 11/30/2010 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero, Ted Dameris, Scott Ellington | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/17/2012 | New GP to MF VIII WF Comm Corner, LP | New GP not accepted |
| 765 | MF VII Prosper 41, LP | 8/9/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, LP | Limited Partner | 99.99 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Involuntarily terminated 9/28/2012 | This entity owns a real estate asset for investment purposes. | Investment property foreclosed | |
| 766 | MF VII Prosper 41, LP | 8/9/2006 | Texas | N/A | RE | Prosper 41 GP, LLC | General Partner | 0.01 | n/a | General Partner | n/a | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Involuntarily terminated 9/28/2012 | This entity owns a real estate asset for investment purposes. | |
| 767 | MF VIII WF Comm Corner, L.P. | 1/25/2006 | Texas | N/A | RE | Mooreland Fund General Parnter, Inc. | General Partner | 0 | 0 | | | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | FORECLOSED | | FORECLOSED |
| 768 | MF VIII WF Comm Corner, L.P. | 1/25/2006 | Texas | N/A | RE | Highland Capital Real Estate Fund, LP | Limited Partner | 100 | 15 | | | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | FORECLOSED | | FORECLOSED |
| 769 | Milam High Yield Fund, LLC | 10/22/2004 | Delaware | N/A | Hedge Blocker | Highland Crusader Offshore Partners, L.P. | Member | 100 | n/a | Member | James Dondero-Pres | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Sub of Crusader | All Crusader-related entities are in wind-down with the |
| 770 | Moll Holdings, Inc. | 12/29/2004 | Delaware | N/A | JD | Highland Capital Management Partners Charitable Trust #1 | Shareholder | 60.61 | n/a | | | | Matt Griffith | Matt Griffith | Y | Written off 12/30/09 | NO EQUITY HOLDING | |
| 771 | Moll Holdings, Inc. | 12/29/2004 | Delaware | N/A | JD | Highland Crusader Offshore Partners, L.P. | Shareholder | 6.06 | n/a | | | | Matt Griffith | Matt Griffith | Y | Written off 12/30/09 | NO EQUITY HOLDING | |
| 772 | Moll Holdings, Inc. | 12/29/2004 | Delaware | N/A | JD | Third Party Investors | Shareholder | 33.33 | n/a | | | | Matt Griffith | Matt Griffith | Y | Written off 12/30/09 | NO EQUITY HOLDING | |
| 773 | Moll Industries, Inc. | 4/16/1990 | Delaware | N/A | JD | Moll Holdings, Inc. | Shareholder | 100 | n/a | | | | Matt Griffith | Matt Griffith | Y | Written off 12/30/09 | NO EQUITY HOLDING | |
| 774 | Nashville RE Holdings, LLC | 12/15/2015 | Delaware | N/A | PE | NexPoint Multifamily Operating Partnership, L.P. | Member | 100 | n/a | | | | Scott Wilson | | Y | 10/2/2017 | Cornerstone sub - transferred to NMCT OP | |
| 775 | Navarro Investment Partners, LLC | 10/22/2004 | Delaware | N/A | Hedge Blocker | Highland Crusader Offshore Partners, L.P. | Member | 100 | n/a | Member | James Dondero-Pres | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Sub of Crusader | All Crusader-related entities are in wind-down with the |
| 776 | Navigators Stevens Ranch, LP | 3/16/2006 | Texas | N/A | PE | Navigators Stevens Ranch GP, LLC | Limited Partner | 99.9 | n/a | GP | N/A | GP | Carl Moore | Jim Pfertner | Y | Written off 9/24/10 | Named in litigation and cannot be dissolved until resolved. | |
| 777 | Navigators Stevens Ranch, LP | 3/16/2006 | Texas | N/A | PE | NSR GP, LLC | General Partner | 0.1 | n/a | same | same | same | Carl Moore | Jim Pfertner | Y | Written off 9/24/10 | Named in litigation and cannot be dissolved until resolved. | |
| 778 | Nevada Land Group, LLC | 11/4/2009 | Delaware | NV | RE | Highland Floating Rate Opportunities Fund | Member | 20.69 | 30.00 | Member Committee/ Kurt Daum | n/a | | JP Sevilla | Nexbank | N | | | |
| 779 | Nevada Land Group, LLC | 11/4/2009 | Delaware | NV | RE | Third Party Investor | Member | 79.31 | 115.00 | Member Committee/ Kurt Daum | n/a | | JP Sevilla | Nexbank | N | | | |
| 780 | Nexpoint Corporation | 11/20/1998 | Delaware | N/A | PE | Highland Crusader Offshore Partners, L.P. | Shareholder | 6.8 | 98 | Pat Daugherty, John Honis, Reece Fulgham, Alvo Oddis, Charles | Randy Johnson-Pres/CFO/Secy Robert Rhoades-COO/VP- | Alan Kirschner Michael Davis | Carl Moore | Carl Moore | | Written off 7/31/09 | NO EQUITY HOLDING | |
| 781 | Nexpoint Corporation | 11/20/1998 | Delaware | N/A | PE | HCM Services, Inc. | Shareholder | 13.9 | 199 | same | same | same | Carl Moore | Carl Moore | | Written off 7/31/09 | NO EQUITY HOLDING | |
| 782 | Nexpoint Corporation | 11/20/1998 | Delaware | N/A | PE | HCMLP - Smith Barney Acct 13HS7106 | Shareholder | 21.3 | 306 | same | same | same | Carl Moore | Carl Moore | | Written off 7/31/09 | NO EQUITY HOLDING | |
| 783 | Nexpoint Corporation | 11/20/1998 | Delaware | N/A | PE | HCMLP Internal | Shareholder | 19.1 | 274 | same | same | same | Carl Moore | Carl Moore | | Written off 7/31/09 | NO EQUITY HOLDING | |
| 784 | Nexpoint Corporation | 11/20/1998 | Delaware | N/A | PE | Highland Legacy Limited | Shareholder | 5.3 | 76 | same | same | same | Carl Moore | Carl Moore | | Written off 7/31/09 | NO EQUITY HOLDING | |
| 785 | Nexpoint Corporation | 11/20/1998 | Delaware | N/A | PE | Pam Capital Funding, L.P. | Shareholder | 33.6 | 482 | same | same | same | Carl Moore | Carl Moore | | Written off 7/31/09 | NO EQUITY HOLDING | |
| 786 | NexPoint BDC, LLC | 9/26/2013 | Delaware | N/A | Retail | | | N/A | N/A | N/A | | | Brian Mitts | Brian Mitts | Y | 9/18/2015 | Never launched; | |
| 787 | NexPoint Capital REIT, LLC | 2/2/2016 | Delaware | N/A | BD | NexPoint Capital, Inc. | | 100 | | | | | Brian Mitts | | Y | 3/8/2016 | Not used | |
| 788 | NexPoint Capital REIT, LLC | 6/15/2016 | Delaware | N/A | BD | NexPoint Capital, Inc. | | 100 | | | | | Brian Mitts | Charlie Hoedebeck | Y | 8/11/2016 | BDC Sub | |
| 789 | NexPoint Hospitality Trust, Inc. | 10/3/2014 | Maryland | N/A | REIT | NexPoint Real Estate Advisors III, L.P. | Shareholder | 100 | 22,223 | Brian Mitts | Dondero-Pres Ellington-GC/Secy | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | | 5/23/2019 | NexPoint Real Estate Advisors III is its advisor | |
| 790 | NexPoint Hospitality, L.P. | 10/21/2014 | Delaware | N/A | REIT | NexPoint Hospitality Trust, Inc. | General Partner | 99 | n/a | GP | | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | | 5/23/2019 | NexPoint Real Estate Advisors III is its advisor | |
| 791 | NexPoint Hospitality, L.P. | 10/21/2014 | Delaware | N/A | REIT | NexPoint Real Estate Advisors III, L.P. | Special LP | 1 | n/a | GP | | Brian Mitts Matt McGraner | Matt McGraner | Brandon Knott | | 5/23/2019 | NexPoint Real Estate Advisors III is its advisor | |
| 792 | NexPoint Real Estate Finance, Inc. | 10/23/2015 | Maryland | N/A | REIT | NexPoint Real Estate Finance Advisor , L.P. | Advisor | | | | | | Brian Mitts | Brandon Knott | | 5/10/2017 | NEVER LAUNCHED | |
| 793 | NexPoint Residential Merger Company, LLC | 2/2/2015 | Delaware | N/A | REIT | Freedom REIT LLC | Member-managed | 100 | n/a | Member-managed | | | Brian Mitts | Brandon Knott | Y | 3/31/15 | Merged into NexPoint Residential Trust Operating Partnership, LP | |
| 794 | North Texas Certified Development Corp | | | | JD | James Dondero | Shareholder | 9.29 | N/A | | | | Matt Griffith | Matt Griffith | | | | |
| 795 | North Texas Certified Development Corp | | | | JD | Mark Okada | Shareholder | 9.29 | N/A | | | | Matt Griffith | Matt Griffith | | | | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 139 of 535

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 796 | North Texas Certified Development Corp | | | | | JD | Third Party Investors | Shareholder | 81.42 | N/A | | | | | | | | Matt Griffith | Matt Griffith | Y | | | | |
| 797 | Northview Concourse SC, Ltd. | | 11/1/2005 | Texas | N/A | RE | HCREA Lockhill Retail LP | Investment Limited Partner | 50 | n/a | Non HCMLP GP | n/a | | | | General Partner Controlled | | Ted Dameris/ Austin Trantham | Donna Engstrom | Y | | This entity owns a real estate asset for investment purposes. | | |
| 798 | Northview Concourse SC, Ltd. | | 11/1/2005 | Texas | N/A | RE | Third Party Investors | General Partner | 1 | n/a | Non HCMLP GP | n/a | | | | General Partner Controlled | | Ted Dameris/ Austin Trantham | Donna Engstrom | Y | | This entity owns a real estate asset for investment purposes. | | |
| 799 | Northview Concourse SC, Ltd. | | 11/1/2005 | Texas | N/A | RE | Third Party Investors | Limited Partner | 49 | n/a | Non HCMLP GP | n/a | | | | General Partner Controlled | | Ted Dameris/ Austin Trantham | Donna Engstrom | Y | | This entity owns a real estate asset for investment purposes. | | |
| 800 | NREA Casa Investors, LLC | | 6/20/2016 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 50 | | Member Managed | Brian Mitts | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 12/27/2018 | | | |
| 801 | NREA Casa Investors, LLC | | 6/20/2016 | Delaware | N/A | REIT | NexPoint Real Estate Strategies Fund | Member | 50 | | Member Managed | Brian Mitts | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 12/27/2018 | | To be dissolved | |
| 802 | NREA AA Investors, LLC | | 10/26/2015 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | | Sole Member | N/A | | | | Brian Mitts | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | INTEREST REDEEMED ON 4/6/16 | |
| 803 | NREC AA TRS, Inc. | | 12/10/2015 | Delaware | N/A | REIT | WW Ross Avenue LP | Shareholder | 100 | 100 | Brian Mitts | | | | | Brian Mitts – Pres/Secy | | Matt McGraner | Brandon Knott | Y | 5/17/2017 | | INTEREST REDEEMED ON 4/6/16 | |
| 804 | NREC BM Investors, LLC | | 3/17/2015 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 12/27/2018 | | To be dissolved | |
| 805 | NREC BP Investors, LLC | | 12/1/2014 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 12/27/2018 | | | |
| 806 | NREC EAH Investors, LLC | | 3/11/2015 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 807 | NREC HG Investors, LLC | | 3/17/2015 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 808 | NREC MOM, LLC | | 12/1/2014 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 809 | NREC Nashville Investors, LLC (fka HREC Nashville Investors, LLC) | | 8/7/2014 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 12/27/2018 | | To be dissolved | |
| 810 | NREC NF Investors, LLC | | 5/26/2015 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 811 | NREC Richmond Investors, LLC | | 12/16/2014 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Brian Mitts | | | | Matt McGraner | | Matt McGraner | Brandon Knott | Y | 12/26/2018 | | To be dissolved | |
| 812 | NREC VAH Investors, LLC | | 4/10/2015 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 813 | NREC WO Investors, LLC | | 10/14/2015 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 814 | NREC YC Investors, LLC | | 11/20/2015 | Delaware | N/A | REIT | NexPoint Real Estate Capital, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | James Dondero-Pres/PEO Brian Mitts-EVP/PFO/PAO | | Matt McGraner | Brandon Knott | Y | 1/31/2018 | | | |
| 815 | NREC NW DT, LLC | | 2/13/2018 | Delaware | N/A | REIT | NexPoint Real Estate Opportunities, LLC | Member | 100 | n/a | Member Managed | Member Managed | | | | | | Matt McGraner | Brandon Knott | Y | 12/26/2018 | | To be dissolved | |
| 816 | NSR GP, LLC | | 6/9/2006 | Texas | N/A | PE | Investment | Member | 100 | n/a | Member Managed | Dondero-Pres Daugherty-VP | Managers: Carl Moore | | | Managers: Pat Daugherty | | Carl Moore | Jim Pfertner | Y | Written off 9/24/10 | Named in litigation and cannot be dissolved until resolved. | | |
| 817 | NXRT McMillan, LLC | | 12/10/2014 | Delaware | N/A | REIT | NexPoint Residential Trust Operating Partnership, L.P. | Member | 100 | n/a | Member Managed | Mark Okada-VP/Secy/Treas Member Managed | | | | Pat Daugherty Brian Mitts | | Matt McGraner | Brandon Wurz | Y | 12/26/2018 | | To be dissolved | |
| 818 | Off-the-Strip Land Holding Company, LLC | | 3/18/2009 | Delaware | N/A | CLO Blocker | Eastland CLO, Ltd. | Members | 6.25 | 1,000,000 | HCMLP-Manager | Manager | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | Ted Dameris | Brandon Wurz | Y | 12/27/2018 | Real estate blocker to hold Weststate equity | fka Buffalo Jump Holding Company, LLC | |
| 819 | Off-the-Strip Land Holding Company, LLC | | 3/18/2009 | Delaware | N/A | CLO Blocker | Gleneagles CLO, Ltd. | Members | 18.75 | 3,000,000 | HCMLP-Manager | Manager | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | Ted Dameris | Brandon Wurz | Y | 12/27/2018 | Real estate blocker to hold Weststate equity | fka Buffalo Jump Holding Company, LLC. Name amended on 10/21/09 | |
| 820 | Off-the-Strip Land Holding Company, LLC | | 3/18/2009 | Delaware | N/A | CLO Blocker | Grayson CLO, Ltd. | Members | 25 | 4,000,000 | HCMLP-Manager | Manager | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | Ted Dameris | Brandon Wurz | Y | 12/27/2018 | Real estate blocker to hold Weststate equity | fka Buffalo Jump Holding Company, LLC. Name amended on 10/21/09 | |
| 821 | Off-the-Strip Land Holding Company, LLC | | 3/18/2009 | Delaware | N/A | CLO Blocker | Jasper CLO, Ltd. | Members | 18.75 | 3,000,000 | HCMLP-Manager | Manager | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | Ted Dameris | Brandon Wurz | Y | 12/27/2018 | Real estate blocker to hold Weststate equity | fka Buffalo Jump Holding Company, LLC. Name amended on 10/21/09 | |
| 822 | Off-the-Strip Land Holding Company, LLC | | 3/18/2009 | Delaware | N/A | CLO Blocker | Highland Legacy Limited | Members | 6.25 | 1,000,000 | HCMLP-Manager | Manager | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | Ted Dameris | Brandon Wurz | Y | 12/27/2018 | Real estate blocker to hold Weststate equity | fka Buffalo Jump Holding Company, LLC. Name amended on 10/21/09 | |
| 823 | Off-the-Strip Land Holding Company, LLC | | 3/18/2009 | Delaware | N/A | CLO Blocker | Valhalla CLO, Ltd. | Members | 25 | 4,000,000 | HCMLP-Manager | Manager | | | | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | | Ted Dameris | Brandon Wurz | Y | 12/27/2018 | Real estate blocker to hold Weststate equity | fka Buffalo Jump Holding Company, LLC. Name amended on 10/21/09 | |
| 824 | Okada Trading LLC | | 10/25/2012 | Delaware | N/A | MO | The Mark and Pamela Okada Family Trust - Exempt Descendants' Trust | Member | 100 | n/a | Trustee-Lawrence Tonomura | N/A | | | | Trustee-Lawrence Tonomura | | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | | | |
| 825 | Outland 77, LLC | | 5/8/2008 | Delaware | N/A | CLO Blocker | Hoss I, LLC | Member | 7.84 | | James Dondero-Manager | Dondero-Pres Okada-EVP Ellington-Secy | | | | Dondero, Okada, Boyce, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | | Josh Terry | Hunter Covitz / Edward Leo | Y | 10/9/2012 | Conduit entity related to Marcal restructure - provided revolver funds to Marcal | Liquidated | |
| 826 | Outland 77, LLC | | 5/8/2008 | Delaware | N/A | CLO Blocker | Hoss II, LLC | Member | 11.77 | | James Dondero-Manager | Dondero-Pres Okada-EVP Ellington-Secy | | | | Dondero, Okada, Boyce, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | | Josh Terry | Hunter Covitz / Edward Leo | Y | 10/9/2012 | Conduit entity related to Marcal restructure - provided revolver funds to Marcal | Liquidated | |
| 827 | Outland 77, LLC | | 5/8/2008 | Delaware | N/A | CLO Blocker | Hoss III, LLC | Member | 9.8 | | James Dondero-Manager | Dondero-Pres Okada-EVP Ellington-Secy | | | | Dondero, Okada, Boyce, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | | Josh Terry | Hunter Covitz / Edward Leo | Y | 10/9/2012 | Conduit entity related to Marcal restructure - provided revolver funds to Marcal | Liquidated | |
| 828 | Outland 77, LLC | | 5/8/2008 | Delaware | N/A | CLO Blocker | Hoss V, LLC | Member | 11.77 | | James Dondero-Manager | Dondero-Pres Okada-EVP Ellington-Secy Terry-A- Secy | | | | Dondero, Okada, Boyce, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | | Josh Terry | Hunter Covitz / Edward Leo | Y | 10/9/2012 | Conduit entity related to Marcal restructure - provided revolver funds to Marcal | Liquidated | |
| 829 | Outland 77, LLC | | 5/8/2008 | Delaware | N/A | CLO Blocker | Hoss VI, LLC | Member | 5.88 | | James Dondero-Manager | Dondero-Pres Okada-EVP Ellington-Secy Terry-A- Secy | | | | Dondero, Okada, Boyce, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | | Josh Terry | Hunter Covitz / Edward Leo | Y | 10/9/2012 | Conduit entity related to Marcal restructure - provided revolver funds to Marcal | Liquidated | |
| 830 | Outland 77, LLC | | 5/8/2008 | Delaware | N/A | CLO Blocker | Hoss VII, LLC | Member | 7.84 | | James Dondero-Manager | Dondero-Pres Okada-EVP Ellington-Secy Terry-A- Secy | | | | Dondero, Okada, Boyce, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | | Josh Terry | Hunter Covitz / Edward Leo | Y | 10/9/2012 | Conduit entity related to Marcal restructure - provided revolver funds to Marcal | Liquidated | |
| 831 | Outland 77, LLC | | 5/8/2008 | Delaware | N/A | CLO Blocker | Hoss VIII, LLC | Member | 17.65 | | James Dondero-Manager | Dondero-Pres Okada-EVP Ellington-Secy Terry-A- Secy | | | | Dondero, Okada, Boyce, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | | Josh Terry | Hunter Covitz / Edward Leo | Y | 10/9/2012 | Conduit entity related to Marcal restructure - provided revolver funds to Marcal | Liquidated | |
| 832 | Outland 77, LLC | | 5/8/2008 | Delaware | N/A | CLO Blocker | Hoss IX, LLC | Member | 19.61 | | James Dondero-Manager | Dondero-Pres Okada-EVP Ellington-Secy Terry-A- Secy | | | | Dondero, Okada, Boyce, Ellington, Terry, Waterhouse, Wise, Stoops, Chism | | Josh Terry | Hunter Covitz / Edward Leo | Y | 10/9/2012 | Conduit entity related to Marcal restructure - provided revolver funds to Marcal | Liquidated | |
| 833 | Pacific East Flamingos, LLC | | 3/4/2009 | Nevada | N/A | Retail | Highland Credit Strategies Fund | Managing Member | 54.35 | n/a | Managing Member | n/a | | | | Managing Member | | Joe Dougherty | Sam Madden | Y | 8/24/2010 | Las Vegas Pacific Clarion property fka Pacific Clarion Hotel, LLC | Check w/ Sam Madden, asset has been sold to probably can be | |
| 834 | Pacific East Flamingos, LLC | | 3/4/2009 | Nevada | N/A | Retail | Highland Floating Rate Advantage Fund | Managing Member | 23.91 | n/a | Managing Member | n/a | | | | | | Joe Dougherty | Sam Madden | Y | 8/24/2010 | | | |

| | A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 836 | Pacific East Flamingo, LLC | | 3/4/2009 | Nevada | N/A | Retail | Highland Floating Rate Fund | Member | 21.74 | n/a | Managing Member | n/a | Managing Member | Joe Dougherty | Sam Madden | Y | 8/24/2010 | | | |
| 837 | Pacific Select Fund - Floating Rate Loan Portfolio | | 5/4/1987 | Massachusetts | N/A | Retail | Third Party Investors | Common | 100 | n/a | Trustees: Frederick Blackmon, Gale | James Morris-CEO Mary Ann Brown-Pres | Authorized Sigs: Dougherty, Blackburn, Colvin, Means, | Joe Dougherty | Ethan Powell | Y | 4/30/2010 | Advisory Agreement terminated 4/30/10 | | |
| 838 | Park Central Residential, LLC | | 4/22/2014 | Delaware | TX | REIT-ID | HCRE Partners, LLC | Member | 100 | n/a | HCRE Partners, LLC - Managing Member | HCRE Partners, LLC - Managing Member | | Matt McGraner | Melissa Schroth | Y | 12/26/2018 | | | |
| 839 | Pierview Partners, LLC | | 3/14/2008 | Texas | N/A | RE | James Dondero | Sole Member | 100 | n/a | James Dondero Ted Dameris | James Dondero-Pres Ted Dameris-VP | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops. | Ted Dameris | Tanya Massie | Y | 12/20/2010 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes | | |
| 840 | PL Floating Rate Loan Fund | | 5/21/2001 | Delaware | N/A | Retail | Third Party Investors | Common | 100 | N/A | Trustees: Frederick Blackmon, Gale | James Morris-CEO Mary Ann Brown-Pres | Authorized Sigs: Doughtery, Blackburn, Colvin, Means, | Joe Dougherty | Frank Waterhouse | Y | 6/30/2010 | Advisory Agreement terminated 6/30/10 | | |
| 841 | PMA GP, LLC | | 8/18/2005 | Delaware | N/A | HCM | Highland Capital Management, L.P. | Member | 100 | | | | | Chris Halpin | Frank Waterhouse | Y | 1/14/2010 | Entity was in existence, no activity since 2006 | | |
| 842 | Poguerosa, LLC | | 10/3/2017 | Texas | N/A | JD | HCRE Partners, LLC | Member | 100 | | | | | Chris Halpin | Frank Waterhouse | Y | 11/30/2017 | | | |
| 843 | Presidio Capital Management, LLC | | 10/22/2004 | Delaware | N/A | Hedge Blocker | Highland Crusader Offshore Partners, L.P. | Member | 100 | n/a | Member | James Dondero-Pres | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Matt Jameson | James Palmer | CRUSADER IMA | 8/4/2016 | Sub of Crusader | All Crusader-related entities are in wind-down with the | |
| 844 | Prospect Management Advisers, L.P. | | 11/22/2004 | Delaware | N/A | HCM | Highland Capital Management, L.P. | Limited Partner | 99 | n/a | | | | Chris Halpin | Frank Waterhouse | Y | 1/14/2010 | Entity was in existence, no activity since 2006 | | |
| 845 | Prospect Management Advisers, L.P. | | 11/22/2004 | Delaware | N/A | HCM | PMA GP, LLC | General Partner | 1 | n/a | | | | Chris Halpin | Frank Waterhouse | Y | 1/14/2010 | Entity was in existence, no activity since 2006 | | |
| 846 | Prosper 41 GP, LLC | | 2/11/2010 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | n/a | James Dondero Ted Dameris | | Ted Dameris, Patrick Boyce, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris/ Jim Pfertner | Drew Wilson | Y | 12/17/2012 | New GP to MF VII Prosper 41, LP | Investment deployed | |
| 847 | Pyxis Global High Yield Fund | | | | | | Retail | Third Party Investors | | | | Powell-EVP/Sec Mitts-Treas | Powell-EVP/Sec Mitts-Treas | Brad Ross | Brian Mitts | Y | 9/30/2012 | Series of trust of Highland Pyxis Funds II | Highland Pyxis - advisor, GEAM - Subadvisor | |
| 848 | Pyxis Government Securities Fund | | Acquired by HCM on | Massachusetts | N/A | Retail | Third Party Investors | Common | 0 | 0 | Trustees: Tim Hui, Scott Kavanaugh, | Powell-EVP/Sec Mitts-Treas | Powell-EVP/Sec Mitts-Treas | Brad Ross | Brian Mitts | Y | 9/30/2012 | Series of trust of Highland Pyxis Funds II | Acquired by the fixed income fund. | |
| 849 | Pyxis Money Market Fund II | | Acquired by HCM on | Massachusetts | N/A | Retail | Third Party Investors | Common | 0 | 0 | Trustees: Tim Hui, Scott Kavanaugh, | Powell-EVP/Sec Mitts-Treas | Powell-EVP/Sec Mitts-Treas | Brad Ross | Brian Mitts | Y | 12/31/2012 | Series of trust of Highland Pyxis Funds II | This will be liquidated by 12/31/12 | |
| 850 | Pyxis Natural Resources Fund | | 9/23/2011 | Massachusetts | N/A | Retail | Third Party Investors | Common | 0 | 0 | Trustees: | Powell-EVP/Sec | Powell-EVP/Sec | Brad Ross | Brian Mitts | Y | 12/31/2012 | This will be liquidated by 12/31/12 | Pyxis - advisor | |
| 851 | Pyxis Premium Long/Short Equity Fund | | 2/4/2010 | Delaware | N/A | Retail | N/A | N/A | N/A | N/A | | | | Brad Ross | Brian Mitts | | 2/24/2012 | DID NOT LAUNCH | | |
| 852 | Pyxis Short-Term Government Fund (this series of | | Acquired by | Massachusetts | N/A | Retail | Third Party Investors | Common | 0 | 0 | Trustees: | Powell-EVP/Sec | Powell-EVP/Sec | Brad Ross | Brian Mitts | Y | 9/30/2012 | Series of trust of Highland Pyxis Funds II | Highland Pyxis - advisor, | |
| 853 | Pyxis U.S. Equity Fund | | 9/22/2008 | Delaware | N/A | Retail | Third Party Investors | Common | 0 | 0 | | Powell-EVP/Sec | Powell-EVP/Sec | Brad Ross | Brian Mitts | Y | 5/4/2010 | Merged | Series of trust of Highland Pyxis Funds II | HCMFA - advisor, |
| 854 | Real Estate Opportunities GP, LLC | | 9/22/2008 | Delaware | N/A | Hedge | Highland Capital Management, L.P. | Member | 100 | n/a | Member | Dondero-Pres | Chris Halpin, Jason Post, Cliff Stoops | Ted Dameris | Cliff Stoops | Y | 5/4/2010 | Dissolved 5/4/10 | | |
| 855 | Real Estate Opportunities, L.P. | | 9/22/2008 | Delaware | N/A | Hedge | Real Estate Opportunities GP, LLC | Member | 100 | n/a | | Chris Halpin, Jason Post, Cliff Stoops | | Ted Dameris | Cliff Stoops | Y | 5/4/2010 | Dissolved 5/4/10 | | |
| 856 | Republic Loan Funding, Ltd | | 10/7/2008 | Cayman | N/A | Sep Acct | Teacher Retirement Systems of Texas | Preferred | 100 | N/A | State Street | N/A | Dondero, Okada, Dougherty, Boyce, | Paul Kauffman | Andrew Padilla | Y | 1/16/2011 | Highland managed separate account for Texas Teachers | | |
| 857 | Restoration Funding CDO, Ltd. | | 12/3/2001 | Cayman Islands | N/A | CLO | Third Party Investors | Voting Preferred Shares | 100 | 31,000,000 | Maples Finance | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Hunter Covitz | Brandon Wurz | Y | 4/26/2018 | Issuer for CLO investment structure. | | |
| 858 | Rockwall Cayman Holdings II, Ltd. | | 4/17/2009 | Cayman Islands | N/A | CLO Blocker | Rockwall CDO II Ltd. | Common Shares | 100 | 0 | Maples Finance | N/A | Dondero, Okada, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Hunter Covitz | Brandon Wurz | Y | 3/13/2018 | Blocker 100% owned by the CLO to hold ownership interest in real estate/real property foreclosures | To be dissolved | |
| 859 | Rockwall CDO II Panda Holdings, Ltd. | | 4/22/2009 | Cayman Islands | N/A | CLO Blocker | Rockwall CDO II Ltd. | Common | 100 | 0 | Maples Finance | N/A | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Hunter Covitz | Jon Reiter | Y | 12/6/2013 | Blocker 100% owned by the CLO to hold Panda Hereford assets | | |
| 860 | Rundberg Residential Partners SM, Inc. | | 1/26/2016 | Delaware | N/A | REIT-ID | 201 Tarrant Partners, LLC | Shareholder | 100 | | | | Matt McGraner-Secy/Auth Agent | Matt McGraner | Melissa Schroth | Y | 12/26/2018 | | | |
| 861 | Rundberg Residential Partners, LLC | | 1/19/2016 | Delaware | TX | REIT-ID | 201 Tarrant Partners, LLC | Member | 100 | n/a | | | | Matt McGraner | Melissa Schroth | Y | 12/26/2018 | | | |
| 862 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Highland Crusader Offshore Partners, L.P. | Common Stock | 30.65 | 15,692,376 | | Mark A. Phariss | Dennis McGill-EVP/CFP Jeff Robertson-SVP/Controller Paul Lee-VP/Treas | Dennis McGill-EVP/CFP Jeff Robertson- | Carl Moore | N | SOLD | | | |
| 863 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Governance Re, Ltd. | Common Stock | 0.48 | 244,489 | | same | same | same | Carl Moore | N | SOLD | | | |
| 864 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Highland Credit Opportunities COO, Ltd. | Common Stock | 2.35 | 1,204,126 | | same | same | same | Carl Moore | N | SOLD | | | |
| 865 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Highland Credit Strategies Holding Corporation | Common Stock | 1.57 | 803,468 | | same | same | same | Carl Moore | N | SOLD | | | |
| 866 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Highland Equity Focus Fund, L.P. | Common Stock | 0.40 | 206,000 | | same | same | same | Carl Moore | N | SOLD | | | |
| 867 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Highland Restoration Capital Partners Master, L.P. | Common Stock | 1.40 | 715,981 | | same | same | same | Carl Moore | N | SOLD | | | |
| 868 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Highland Restoration Capital Partners, L.P. | Common Stock | 1.14 | 585,803 | | same | same | same | Carl Moore | N | SOLD | | | |
| 869 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Highland Special Opportunities Holding Company | Common Stock | 0.16 | 81,237 | | same | same | same | Carl Moore | N | SOLD | | | |
| 870 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Pyxis Credit Strategies Fund | Common Stock | 0.39 | 200,964 | | same | same | same | Carl Moore | N | SOLD | | | |
| 871 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Pyxis Special Situations Fund | Common Stock | 0.18 | 93,061 | | same | same | same | Carl Moore | N | SOLD | | | |
| 872 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Tunstall Opportunities Master Fund, L.P. | Common Stock | 0.34 | 173,328 | | same | same | same | Carl Moore | N | SOLD | | | |
| 873 | Safety-Kleen, Inc. | | 4/6/2005 | Delaware | N/A | PE | Third Party Investors | Common Stock | 60.93 | 31,195,650 | | same | same | same | Carl Moore | N | SOLD | | | |
| 874 | SAMAS, LLC | | 12/2/2014 | South Dakota | N/A | MO | Mark Okada | Member | 100 | n/a | | | | Melissa Schroth | Melissa Schroth | Y | 12/6/2016 | Okada's estate planning | | |
| 875 | Semence, LLC | | 12/16/2013 | Delaware | N/A | HCM | Highland Capital Management, L.P. | Member | 100 | n/a | | | | Ethan Powell | Ethan Powell | Y | 7/28/2015 | | | |
| 876 | Serena Residential Partners, LLC | | 11/12/2015 | Texas | N/A | REIT-ID | HCRE Partners, LLC | Member | | | HCRE Partners, LLC | | | Matt McGraner | Melissa Schroth | Y | | | | |
| 877 | Simba GP, LLC | | 2/4/2009 | Delaware | N/A | JD | James Dondero | Member | 100 | N/A | James Dondero | | N/A | Melissa Schroth | Melissa Schroth | Y | 12/2/2010 | Not Used | | |
| 878 | Simba, L.P. | | 2/4/2009 | Delaware | N/A | JD | Simba GP, LLC | General Partner | 100 | N/A | Simba GP, LLC | | N/A | Melissa Schroth | Melissa Schroth | Y | 12/2/2010 | Not Used | | |
| 879 | SK Shareholder Services, LLC | | 10/24/2012 | Delaware | N/A | HCM | Highland Capital Management, L.P. | Member | 100 | n/a | Manager | HCMLP - Manager | Dondero/ Britain | Melissa Schroth | Kristin Hendrix | Y | 3/6/2015 | Shareholder rep for SK deal | | |
| 880 | Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | | Delaware | | PE | Brentwood CLO, Ltd. | Member | 7.04 | 7.04 | | HCMLP - Manager | Authorized Sigs: Lane Britain | Carl Moore | Shawn Lederman | Y | 12/14/2012 | | | |
| 881 | Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Eastland CLO, Ltd. | Member | 10.56 | 10.56 | | HCMLP - Manager | Authorized Sigs: Lane Britain | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| 882 | Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Gleneagles CLO, Ltd. | Member | 4.51 | 4.51 | | HCMLP - Manager | Authorized Sigs: Shawn Lederman Lane Britain | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| 883 | Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Grayson CLO, Ltd. | Member | 10.82 | 10.82 | | HCMLP - Manager | Authorized Sigs: Lane Britain | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| 884 | Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Greenbriar CLO, Ltd. | Member | 11.73 | 11.73 | | HCMLP - Manager | Authorized Sigs: Lane Britain | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 141 of 535

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

| A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Highland Loan Funding V, Ltd. | Member | 7.4 | 7.40 | | HCMLP - Manager | Authorized Sigs: Lane Britain Shawn Lederman | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Jasper CLO, Ltd. | Member | 1.81 | 1.81 | | HCMLP - Manager | Authorized Sigs: Lane Britain Shawn Lederman | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Liberty CLO, Ltd. | Member | 5.42 | 5.42 | | HCMLP - Manager | Authorized Sigs: Lane Britain Shawn Lederman | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Loan Funding IV LLC | Member | 1.81 | 1.81 | | HCMLP - Manager | Authorized Sigs: Lane Britain Shawn Lederman | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Loan Funding VII LLC | Member | 3.16 | 3.16 | | HCMLP - Manager | Authorized Sigs: Lane Britain Shawn Lederman | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Red River CLO, Ltd. | Member | 5.42 | 5.42 | | HCMLP - Manager | Authorized Sigs: Lane Britain Shawn Lederman | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | | | Rockwall CDO, Ltd. | Member | 7.04 | 7.04 | | | | Carl Moore | Shawn Lederman | Y | 12/14/2012 | | | |
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Rockwall CDO II, Ltd. | Member | 6.23 | 6.23 | | HCMLP - Manager | Authorized Sigs: Lane Britain | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Southfork CLO, Ltd. | Member | 1.81 | 1.81 | | HCMLP - Manager | Authorized Sigs: Lane Britain | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | Stratford CLO, Ltd. | Member | 10.56 | 10.56 | | HCMLP - Manager | Authorized Sigs: Lane Britain Shawn Lederman | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| Slater Drive Property, LLC (f/k/a Marcal Paper Warehouse, LLC) | | 3/24/2008 | Delaware | NJ | PE | westchester CLO, Ltd. | Member | 4.69 | 4.69 | | HCMLP - Manager | Authorized Sigs: Lane Britain Shawn Lederman | Carl Moore | Shawn Lederman | Y | 12/17/12-DE/ 1/24/13-NJ | | | |
| Solstice Neurosciences Inc. | | 8/29/2003 | Delaware | N/A | PE | Highland CDO Opportunity Master Fund, L.P. | Shareholder | 4.3 | n/a | Shawn Patrick O'Brien Douglas Fambrough Fazle Husain Liza Page Nelson James Thomas Brett Pope Nathan Hukill Brian Gallahar | Shawn O'Brien-President/ CEO Michael Pagnotta Michael Abraham Randall Mastrangelo Dee Grosso | Shawn O'Brien-President/ CEO Michael Pagnotta Michael Abraham Randall Mastrangelo Dee Grosso | Carl Moore | Carl Moore | Y | 8/6/2010 | SOLD - DELETE PER C. MOORE | | |
| Solstice Neurosciences Inc. | | 8/29/2003 | Delaware | N/A | PE | Highland Credit Opportunities CDO, L.P. | Shareholder | 2.4 | n/a | same | same | same | Carl Moore | Carl Moore | Y | 8/6/2010 | SOLD - DELETE PER C. MOORE | | |
| Solstice Neurosciences Inc. | | 8/29/2003 | Delaware | N/A | PE | Highland Credit Strategies Master Fund, L.P. | Shareholder | 5.4 | n/a | same | same | same | Carl Moore | Carl Moore | Y | 8/6/2010 | SOLD - DELETE PER C. MOORE | | |
| Solstice Neurosciences Inc. | | 8/29/2003 | Delaware | N/A | PE | Highland Crusader Offshore Partners, L.P. | Shareholder | 12.9 | n/a | same | same | same | Carl Moore | Carl Moore | Y | 8/6/2010 | SOLD - DELETE PER C. MOORE | | |
| Solstice Neurosciences Inc. | | 8/29/2003 | Delaware | N/A | PE | Third Party Investors | Shareholder | 75 | n/a | same | same | same | Carl Moore | Carl Moore | Y | 8/6/2010 | SOLD - DELETE PER C. MOORE | | |
| Sterling Capital Long/Short Equity Fund | | | | | Sep Acct | Sterling Capital Funds (Third Party) | Trust | 100 | 2,391,465 | Sterling Capital Funds - Trust / Sterling Capital | | | Jonthan Lamensdorf | James Palmer/ Austin Spence | Y | 1/26/2018 | HCHA sub-advised / Subadvisory Agent as of 12/10/13 | | |
| Strand Advisors II, Inc. | | 3/11/1996 | Delaware | TX | JD | James Dondero | Shareholder | 100 | n/a | James Dondero | James Dondero-Pres/Secy Mark Okada-EVP | James Dondero-Pres/Secy Mark Okada-EVP | Melissa Schroth | Melissa Schroth | Y | 12/15/2016 | Formerly served as GP to Financial Computer Software, LP (FCS) | | |
| Strand Advisors VI, LLC | | 12/22/2004 | Delaware | N/A | JD | James Dondero | Member | 100 | n/a | James Dondero | James Dondero-Pres/Secy | James Dondero-Pres/Secy | Melissa Schroth | Melissa Schroth | Y | 12/7/2016 | GP to Jim's investment property - 4041 Grassmere | | |
| Strand Advisors VII, LLC | | 12/22/2004 | Delaware | N/A | JD | James Dondero | Member | 100 | n/a | James Dondero | James Dondero-Pres/Secy | James Dondero-Pres/Secy | Melissa Schroth | Melissa Schroth | Y | 4/20/2012 | GP to Jim's investment property - 4201 Versailles | | |
| Strand Advisors VIII, LLC | | 2/15/2005 | Delaware | N/A | JD | James Dondero | Member | 100 | n/a | James Dondero | James Dondero-Pres/Secy | James Dondero-Pres/Secy | Matt Griffith | Matt Griffith | Y | 12/20/2010 | GP to Jim's investment property - 3500 Beverly | | |
| Strand Advisors X, LLC | | 8/1/2005 | Delaware | N/A | JD | James Dondero | Member | 100 | n/a | James Dondero | James Dondero-Pres/Secy | James Dondero-Pres/Secy | Matt Griffith | Matt Griffith | Y | 12/20/2010 | GP to Jim's investment property - 3708 Harvard | | |
| Strand Advisors XI, LLC | | 9/27/2005 | Delaware | TX | JD | James Dondero | Member | 100 | n/a | James Dondero | James Dondero-Pres/Secy | James Dondero-Pres/Secy | Melissa Schroth | Melissa Schroth | Y | 12/7/2016 | GP to Jim's investment property - 4223 Bordeaux | | |
| Strand Advisors XII, LLC | | 1/17/2006 | Delaware | N/A | JD | James Dondero | Member | 100 | n/a | James Dondero | James Dondero-Pres/Secy | James Dondero-Pres/Secy | Matt Griffith | Matt Griffith | Y | 12/20/2010 | GP to Jim's investment property - 3700 Euclid | | |
| Strand Advisors XIV, LLC | | 5/26/2006 | Delaware | N/A | JD | James Dondero | Member | 100 | n/a | James Dondero | James Dondero-Pres/Secy | James Dondero-Pres/Secy | Matt Griffith | Matt Griffith | Y | 12/20/2010 | GP to Jim's investment property - 3704 Euclid | | |
| Strand Advisors XV, LLC | | 5/26/2006 | Delaware | N/A | JD | James Dondero | Member | 100 | n/a | James Dondero | James Dondero-Pres/Secy | James Dondero-Pres/Secy | Matt Griffith | Matt Griffith | Y | 1/15/2012 | GP to Jim's investment property - Andrew Merrick Homes- 4301 Bordeaux | | |
| Stratford Cayman Holdings, Ltd. | | 1/7/2009 | Cayman Islands | N/A | CLO Blocker | Stratford CLO, Ltd. | Shares | 100 | 100 | Maples Finance | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Hunter Covitz | Brandon Wurz | Y | | Blocker 100% owned by the CLO to hold ownership interest in real estate/real property foreclosures To be dissolved | | |
| Stream Asset Secured Income Fund, LP (Forest Hills) | | 1/8/2007 | | | JD | The Get Good Non-Exempt Trust No. 1 | Limited Partner | 8.6 as of 5/31/09 | N/A | | Investment Manager: Stream Capital Management | Investment Manager: Stream Capital Management | Melissa Schroth | Melissa Schroth | Redeemed | 2012 | | Scott E. Johnson @ Stream Capital Management 2200 Ross Ave, 54th Fl. | |

| A | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stream Asset Secured Income Fund, LP (Forest Hills) | 1/8/2007 | | | JD | Third Party Investors | Limited Partners | 91.4 | as of 5/31/09 | | Investment Manager: Stream Capital Management | Investment Manager: Stream Capital Management | Melissa Schroth | Melissa Schroth | Redeemed | 2012 | | | |
| Sur Mer Phase II Holdings LLC | 12/18/2008 | Delaware | N/A | RE | | | | | | | | Ted Dameris | Ted Dameris | N | | Per Ted Dameris, this entity was created not by nor for Highland in connection with a CS loan transaction but was not used. | This is not a Highland affiliate and Highland is not responsible in anyway | |
| Sur Mer Phase II Member LLC | 12/18/2008 | Delaware | N/A | RE | | | | | | | | Ted Dameris | Ted Dameris | N | | Per Ted Dameris, this entity was created not by nor for Highland in connection with a CS loan transaction but was not used. | This is not a Highland affiliate and Highland is not responsible in anyway | |
| SV TIC Residential Partners, LLC | 1/11/2016 | Delaware | TX | REIT-JD | 201 Tarrant Partners, LLC | Member | 100 | n/a | Sole Member | James Dondero Matt McGraner | | Matt McGraner | Melissa Schroth | Y | 12/26/2018 | | | |
| Tesoro Golf Holdings LLC | 12/18/2008 | Delaware | FL | PE | G-LA Resorts Holdings LLC | Member | 100 | | Ted Dameris | Member | Member | Ted Dameris | Ted Dameris | Y | 5/27/2016 | | Dallas, TX 75201 | |
| TGDO Terrell Partners, LLC | 10/26/2005 | Texas | N/A | RE | James Dondero | Member | 100 | n/a | James Dondero | James Dondero-Pres Ted Dameris-VP Scott Ellington | Ted Dameris, Chris Wise, Carter Chism, Scott Ellington -Secs/Treas | Ted Dameris | Drew Wilson | Y | 10/30/2014 | This entity is the general partner of a partnership that owns a real estate asset for investment purposes (HWY 80 Terrell Partners, Ltd) | INTEREST SOLD | sjohnson@streamsc.com DISSOLVE |
| The Canis Major Trust | 8/31/2005 | Texas | N/A | JD | James Dondero | Grantor/ Beneficiary | 100 | n/a | James Dondero-Trustee | James Dondero-Trustee | James Dondero-Trustee | Matt Griffith | Matt Griffith | Terminated | 8/31/2010 | All assets transferred to JD personally due to the outstanding payables due to JD | | |
| The Canis Minor Trust | 11/25/2002 | Texas | N/A | JD | James D. Dondero Descendants | Grantor/ Beneficiary | 100 | n/a | James Dondero-Trustee | James Dondero-Trustee | James Dondero-Trustee | Melissa Schroth | Melissa Schroth | Terminated | 11/30/2007 | All assets transferred to The Get Good Non-Exempt Trust No. 2 | | |
| The Dugaboy Trust | 9/26/2008 | Texas | N/A | JD | James Dondero | Family Trust | 100 | n/a | James Dondero-Trustee | James Dondero-Trustee | James Dondero-Trustee | Matt Griffith | Matt Griffith | Terminated | 11/16/2010 | All assets transferred to The Dugaboy Investment Trust | | |
| The Get Better Trust | 6/10/2002 | Texas | N/A | JD | James Dondero Descendants | Grantor/ Beneficiary | 100 | n/a | James Dondero-Trustee | James Dondero-Trustee | James Dondero-Trustee | Melissa Schroth | Melissa Schroth | Terminated | 6/11/2007 | All assets transferred to The Get Good Non-Exempt Trust No. 1 | | |
| The Mooreland Fund III 380 Comm Office, L.P. | 12/13/2005 | Texas | N/A | RE | Mooreland Fund General Pamter, Inc. | General Partner | 0 | - | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Drew Wilson | Y | FORECLOSED | write off | | |
| The Mooreland Fund III 380 Comm Office, L.P. | 12/13/2005 | Texas | N/A | RE | Highland Capital Real Estate Fund, L.P. | Partnership Interest | 100 | 1,063,694 | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Drew Wilson | Y | FORECLOSED | write off | | |
| The Tutwiler Hotel LLC | | Delaware | | NB | NexBank Capital, Inc. | Member | | | | | | Dierk Hohman | Courtney Burton | | 9/25/2015 | | | |
| Tollway East GP, LLC | 2/11/2010 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | | Managers: Dondero, Dameris, Ellington | N/A | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops | Ted Dameris | Tanya Massie | Y | 12/27/2010 | New GP of MF 380 Tollway East, LP | | |
| Tollway West GP, LLC | 2/11/2010 | Texas | N/A | RE | Highland Capital Management, L.P. | Member | 100 | | Managers: Dondero, Dameris, Ellington | N/A | Ted Dameris, Patrick Boyce, Clint Gilchrist, Jason Post, Clifford Stoops | Ted Dameris | Tanya Massie | Y | 12/27/2010 | New GP of MF 380 Tollway West, LP | | |
| Tribute Management GP, LLC | 1/7/2009 | Texas | N/A | RE | James Dondero | Sole Member | 100 | n/a | James Dondero | James Dondero-Pres | Ted Dameris, Chris Wise, Carter Chism, Gilchrist, Jason Post, Clifford Stoops | Ted Dameris | Drew Wilson | Y | 12/30/2014 | This entity is the general partner of a partnership | Investment property | Dissolve once Tribute |
| Triden Village Holding, LP | 4/4/2006 | Texas | N/A | RE | HCREA Trimarchi of North Dallas, LLC | Limited Partner | 90 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Drew Wilson | Y | FORECLOSED | This entity owns a real estate asset for investment | FORECLOSED | Remove once Trimarchi entities closed |
| Triden Village Holding, LP | 4/4/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 1 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Drew Wilson | Y | FORECLOSED | This entity owns a real estate asset for investment purposes. | FORECLOSED | Remove once Trimarchi entities dissolved |
| Triden Village Holding, LP | 4/4/2006 | Texas | | | Third Party Investors | Limited Partner | 9 | n/a | | General Partner Controlled | | Ted Dameris | Drew Wilson | Y | FORECLOSED | This entity owns a real estate asset for investment purposes. | FORECLOSED | Remove once Trimarchi entities dissolved |
| Triden Village, L.P. | 4/5/2006 | Texas | N/A | RE | HCREA Trimarchi of North Dallas, LLC | Limited Partner | 90 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Drew Wilson | Y | FORECLOSED | This entity owns a real estate asset for investment purposes. | FORECLOSED | Remove once Trimarchi entities dissolved |
| Triden Village, L.P. | 4/5/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 1 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Drew Wilson | Y | FORECLOSED | This entity owns a real estate asset for investment | FORECLOSED | Remove once Trimarchi entities dissolved |
| Triden Village, L.P. | 4/5/2006 | Texas | N/A | RE | Third Party Investors | Limited Partner | 9 | n/a | Non HCMLP GP | General Partner Controlled | | Ted Dameris | Drew Wilson | Y | FORECLOSED | This entity owns a real estate asset for investment purposes. | FORECLOSED | Remove once Trimarchi entities dissolved |
| Triple R Eastwood Holdings, LLC | 9/2/2010 | Delaware | N/A | CLO Blocker | Brentwood CLO, Ltd. | Member | 37.5 | n/a | HCMLP-Manager | n/a | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Carl Moore | Brandon Wurz | Y | 12/27/2018 | CLO blocker to hold Medical Staffing equity interest | | |
| Triple R Eastwood Holdings, LLC | 9/2/2010 | Delaware | N/A | CLO Blocker | Eastland CLO, Ltd. | Member | 18.75 | n/a | HCMLP-Manager | n/a | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Carl Moore | Brandon Wurz | Y | 12/27/2018 | CLO blocker to hold Medical Staffing equity interest | | |
| Triple R Eastwood Holdings, LLC | 9/2/2010 | Delaware | N/A | CLO Blocker | Red River CLO, Ltd. | Member | 6.25 | n/a | HCMLP-Manager | n/a | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Carl Moore | Brandon Wurz | Y | 12/27/2018 | CLO blocker to hold Medical Staffing equity interest | | |
| Triple R Eastwood Holdings, LLC | 9/2/2010 | Delaware | N/A | CLO Blocker | Rockwall CDO, Ltd. | Member | 25 | n/a | HCMLP-Manager | n/a | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Carl Moore | Brandon Wurz | Y | 12/27/2018 | CLO blocker to hold Medical Staffing equity interest | | |
| Triple R Eastwood Holdings, LLC | 9/2/2010 | Delaware | N/A | CLO Blocker | Rockwall CDO II, Ltd. | Member | 12.5 | n/a | HCMLP-Manager | n/a | Dondero, Okada, Ellington, Parker, Waterhouse, Palmer, Stoops, Chism | Carl Moore | Brandon Wurz | Y | 12/27/2018 | CLO blocker to hold Medical Staffing equity interest | | |
| Tunstall Capital Management GP, LLC | 12/16/2009 | Delaware | TX | Institutional Advisor | Tunstall Capital Management Services, Inc. | Sole Member | 100 | n/a | Sole Member - HCMSI | Dondero-Pres/Sec Okada-VP Waterhouse-Treas | | Frank Waterhouse | Frank Waterhouse | | 11/21/2014 | GP of a new RIA - fka Highland Capital Management Services COO GP, LLC - name changed 2/10/10 | In wind down | |
| Tunstall Capital Management, L.P. | 12/16/2009 | Delaware | TX | Institutional Advisor | Tunstall Capital Management GP, LLC | GP | 1 | n/a | GP | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | | Frank Waterhouse | Frank Waterhouse | | 11/21/2014 | New RIA for new Tunstall funds - fka Highland Capital Management Services COO, LP - name changed 2/10/10 | In wind down | |
| Tunstall Capital Management, L.P. | 12/16/2009 | Delaware | TX | Institutional Advisor | James Dondero | LP | 99 | n/a | GP | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | | Frank Waterhouse | Frank Waterhouse | | 11/21/2014 | | In wind down | |
| Tunstall Diversified Opportunities Fund, L.P. | 8/10/2010 | Delaware | N/A | Hedge | Tunstall GP, LLC | General Partner | 100 | n/a | GP | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | | Dondero | Kristin Hendrix | | 11/21/2014 | | In wind down | |
| Tunstall GP, LLC | 2/4/2009 | Delaware | TX | Hedge | Tunstall Capital Management, L.P. | Member | 100 | n/a | N/A | Dondero-Pres/Sec Okada-VP | | Dondero | Will Mabry | | 11/21/2014 | | In wind down | |
| Tunstall Opportunities Fund, L.P. | 2/4/2009 | Delaware | TX | Hedge | Highland Capital Management Services, Inc. | Limited Partner | 2.53% | n/a | GP | N/A | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | Dondero | Will Mabry | | 11/21/2014 | | In wind down | |
| Tunstall Opportunities Fund, L.P. | 2/4/2009 | Delaware | TX | Hedge | Tunstall Capital Management, L.P. | Limited Partner | 0 | n/a | GP | N/A | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | Dondero | Will Mabry | | 11/21/2014 | | In wind down | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 143 of 535

| | A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 947 | Tunstall Opportunities Fund, L.P. | | 2/4/2009 | Delaware | TX | Hedge | Cornerstone Healthcare Group Holding, Inc. | Limited Partner | 97.47% | n/a | GP | N/A | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | Dondero | Will Mabry | Y | 11/21/2014 | | In wind down | |
| 948 | Tunstall Opportunities Fund, L.P. | | 2/4/2009 | Delaware | TX | Hedge | Trussway Holdings, Inc. | Limited Partner | 0 | n/a | GP | N/A | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | Dondero | Will Mabry | Y | 11/21/2014 | | In wind down | |
| 949 | Tunstall Opportunities Fund, L.P. | | 2/4/2009 | Delaware | TX | Hedge | Tunstall GP, LLC | General Partner | 0 | n/a | GP | N/A | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | Dondero | Will Mabry | Y | 11/21/2014 | | In wind down | |
| 950 | Tunstall Opportunities Fund, Ltd. | | 12/16/2009 | Cayman Islands | N/A | Hedge | Tunstall GP, LLC | Shareholder | 100 | 1 | James Dondero | James Dondero-Director | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | Dondero | James Palmer | Dissolved | 8/17/2012 | | | |
| 951 | Tunstall Opportunities Master Fund, L.P. | | 2/23/2010 | Cayman Islands | N/A | Hedge | Tunstall GP, LLC | General Partner | 0 | n/a | GP | N/A | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | Dondero | Will Mabry | Y | 11/20/2014 | | In wind down | |
| 952 | Tunstall Opportunities Master Fund, L.P. | | 2/23/2010 | Cayman Islands | N/A | Hedge | Tunstall Opportunities Fund, L.P. | Limited Partner | 100 | n/a | GP | N/A | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | Dondero | Will Mabry | Y | 11/20/2014 | | In wind down | |
| 953 | Tunstall Opportunities Master Fund, L.P. | | 2/23/2010 | Cayman Islands | N/A | Hedge | Tunstall Opportunities Fund, Ltd. | Limited Partner | 0 | n/a | GP | N/A | Dondero, Okada, Waterhouse, Wise, Stoops, Chism | Dondero | Will Mabry | Y | 11/20/2014 | | In wind down | |
| 954 | USA Grand Prairie Truck Service Partners, L.P. | | 3/13/2006 | Texas | N/A | RE | HCREA Grand Prairie Truck Service, L.P. | Limited Partner | 90 | n/a | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | SOLD TO PRIME WEST IN 2007 | |
| 955 | USA Grand Prairie Truck Service Partners, L.P. | | 3/13/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 0 | n/a | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | SOLD TO PRIME WEST IN 2007 | |
| 956 | USA Grand Prairie Truck Service Partners, L.P. | | 3/13/2006 | Texas | N/A | RE | Third Party Investors | Limited Partner | 10 | n/a | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | SOLD TO PRIME WEST IN 2007 | |
| 957 | Van Alstyne 386, L.P. | | | Texas | N/A | RE | Mark Okada | Limited Partner | 3.3 as of 12/31/08 | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Donna Engstrom | Y | 7/29/2010 | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 958 | Van Alstyne 386, L.P. | | | Texas | N/A | RE | The Get Good Trust | Limited Partner | 5.5 as of 12/31/08 | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Donna Engstrom | Y | 7/29/2010 | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 959 | Van Alstyne 386, L.P. | | | Texas | N/A | RE | Todd and Kim Travers | Limited Partner | 2.2 as of 12/31/08 | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Donna Engstrom | Y | 7/29/2010 | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 960 | Van Alstyne 386, L.P. | | | Texas | N/A | RE | David Smith | Limited Partner | 16.5 as of 12/31/08 | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Donna Engstrom | Y | 7/29/2010 | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 961 | Van Alstyne 386, L.P. | | | Texas | N/A | RE | Highland Real estate Fund 2002-A | Limited Partner | 22 as of 12/31/08 | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Donna Engstrom | Y | 7/29/2010 | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 962 | Van Alstyne 386, L.P. | | | Texas | N/A | RE | Third Party Investors | General Partner | 50.5 as of 12/31/08 | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Donna Engstrom | Y | 7/29/2010 | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 963 | W/J Tribute, Ltd. | | 12/14/2005 | Texas | N/A | RE | Tribute Management GP, LLC | General Partner | 0 | n/a | General Partner | N/A | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | SOLD | This entity owns a real estate asset for investment purposes. | SOLD | Remove once Tribute funds distributed and dissolved |
| 964 | W/J Tribute, Ltd. | | 12/14/2005 | Texas | N/A | RE | HCREA The Tribute, L.P. | Limited Partner | 97 | n/a | General Partner | N/A | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | SOLD | This entity owns a real estate asset for investment purposes. | SOLD | Remove once Tribute funds distributed and dissolved |
| 965 | W/J Tribute, Ltd. | | 12/14/2005 | Texas | N/A | RE | Third Party Investors | Limited Partner | 3 | n/a | General Partner | N/A | Ted Dameris, Chris Wise, Carter Chism, Clifford Stoops. | Ted Dameris | Drew Wilson | Y | SOLD | This entity owns a real estate asset for investment purposes. | SOLD | Remove once Tribute funds distributed and dissolved |
| 966 | WAICCS Recovery Partners, LLC | | 3/17/2015 | Delaware | N/A | CLO Blocker | TBD | Members | | | | | | Isaac Leventon | Jon Reiter | Y | 5/18/2016 | Blocker to hold CLOs assets in WAICCS but was not used | Can be dissolved per Isaac | |
| 967 | WDS 190, L.P. | | 8/10/2006 | Texas | N/A | RE | HCREA Wilcox 190, L.P. | Class A Limited Partner | 80 | n/a | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 968 | WDS 190, L.P. | | 8/10/2006 | Texas | N/A | RE | Third Party Investors | Class B Limited Partner | 19.9 | n/a | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 969 | WDS 190, L.P. | | 8/10/2006 | Texas | N/A | RE | Third Party Investors | General Partner | 0.1 | n/a | Non HCMLP GP | n/a | General Partner Controlled | Ted Dameris | Tanya Massie | Y | | This entity owns a real estate asset for investment purposes. | LP interest abandoned | |
| 970 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Brentwood CLO, Ltd. | Members | 5.77 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | 3/5/2016 | CLO blocker to hold J Hotel equity interest | Tax to get clearance to dissolve from Comptroller | |
| 971 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Eastland CLO, Ltd. | Members | 15.38 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 972 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Gleneagles CLO, Ltd. | Members | 5.77 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 973 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Grayson CLO, Ltd. | Members | 13.46 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 974 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Greenbriar CLO, Ltd. | Members | 9.62 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 975 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Highland Loan Funding V, Ltd. | Members | 3.85 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 976 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Jasper CLO, Ltd. | Members | 7.69 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 977 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Liberty CLO, Ltd. | Members | 3.85 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 978 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Loan Funding IV LLC | Members | 1.92 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 979 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Loan Funding VII LLC | Members | 3.85 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 980 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Red River CLO, Ltd. | Members | 3.85 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 981 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLO Blocker | Rockwall CDO, Ltd. | Members | 3.85 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Palmer, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 144 of 535

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

| | A | B | C | D | E | F | G | H | I | J | O | P | Q | R | S | T | U | V | W | X |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 982 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLD Blocker | Rockwell CDO II, Ltd. | Members | 1.92 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, Terry, Waterhouse, Stoops, Chism | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 983 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLD | Southfork CLO, Ltd. | Members | 5.77 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 984 | West 22nd Street Luxury Resort, LLC | | 10/22/2010 | Texas | N/A | CLD | Westchester CLO, Ltd. | Members | 7.69 | | HCMLP-Manager | N/A | Dondero, Okada, Britain, Ellington, | Ted Dameris | Jon Reiter | Y | Mar-16 | CLO blocker to hold J Hotel equity interest | | |
| 985 | Westgate Investments, LLC | | 4/7/2005 | Delaware | N/A | RE | Ellman | Class A Member | 54.58% | | Bob Kaufman-EVP/Ellman Management Group, Inc.- Manager | Bob Kaufman-EVP/Ellman Management Group, Inc.- Manager | Bob Kaufman-EVP/Ellman Management Group, Inc.- Manager | Ted Dameris/Jim Pfertner | Jim Pfertner | Written off | Jan-12 | RE investment portfolio | Investment foreclosed 2012 | |
| 986 | Westgate Investments, LLC | | 4/7/2005 | Delaware | N/A | RE | Highland Credit Strategies Fund | Class B-1 Member | 0.76% | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | Jim Pfertner | Written off | Jan-12 | RE investment portfolio | Investment foreclosed 2012 | |
| 987 | Westgate Investments, LLC | | 4/7/2005 | Delaware | N/A | RE | Highland Westgate Investment Holding II, LLC | Class B-1 Member | 3.74% | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | Jim Pfertner | Written off | Jan-12 | RE investment portfolio | Investment foreclosed 2012 | |
| 988 | Westgate Investments, LLC | | 4/7/2005 | Delaware | N/A | RE | Highland Westgate Investment Holding, LLC | Class B-1 Member | 3.03% | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | Jim Pfertner | Written off | Jan-12 | RE investment portfolio | Investment foreclosed 2012 | |
| 989 | Westgate Investments, LLC | | 4/7/2005 | Delaware | N/A | RE | Camulous Capital, LP | Class B-1 Member | 5.05% | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | Jim Pfertner | Written off | Jan-12 | RE investment portfolio | Investment foreclosed 2012 | |
| 990 | Westgate Investments, LLC | | 4/7/2005 | Delaware | N/A | RE | Stanfeld Capital Partners, LLC | Class B-1 Member | 12.63% | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | Jim Pfertner | Written off | Jan-12 | RE investment portfolio | Investment foreclosed 2012 | |
| 991 | Westgate Investments, LLC | | 4/7/2005 | Delaware | N/A | RE | Credit Suisse Management, LLC | Class B-1 Member | 5.05% | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | Jim Pfertner | Written off | Jan-12 | RE investment portfolio | Investment foreclosed 2012 | |
| 992 | Westgate Investments, LLC | | 4/7/2005 | Delaware | N/A | RE | Credit Suisse Securities (USA) LLC | Class B-2 Member | 15.16% | | Ellman | Ellman | Ellman | Ted Dameris/Jim Pfertner | Jim Pfertner | Written off | Jan-12 | RE investment portfolio | Investment foreclosed 2012 | |
| 993 | Willoughby McCabe and Co., L.P. | | 1/11/2008 | Delaware | N/A | JD | Firearms Venture I, LLC | General Partner | 1 | n/a | General Partner | N/A | General Partner | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | | | |
| 994 | Willoughby McCabe and Co., L.P. | | 1/11/2008 | Delaware | N/A | JD | Patrick Willoughby-McCabe | Limited Partner | 10 | n/a | General Partner | N/A | General Partner | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | | | |
| 995 | Willoughby McCabe and Co., L.P. | | 1/11/2008 | Delaware | N/A | JD | The Get Good Trust | Limited Partner | 89 | n/a | General Partner | N/A | General Partner | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | | | |
| 996 | Wilmington Multi-Manager Alternative Fund | | | | | Sep Acct | | | | | | Wilmington | | Michael Gregory/ Jonathan Lamensdorf | James Palmer | N | 1/12/2017 | HCHA/HCMFA sub-advised | Sub-advisory terminated on 1.12.2017 | |
| 997 | Windana GP, LLC | | 2/5/2009 | Delaware | N/A | JD | James Dondero | Member | 100 | | James Dondero | N/A | N/A | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | Not Used | | |
| 998 | Windana, L.P. | | 2/5/2009 | Delaware | N/A | JD | Windana GP, LLC | General Partner | 100 | | Windana GP, LLC | N/A | | Melissa Schroth | Melissa Schroth | Y | 12/2/2016 | Not Used | | |
| 999 | Withers REO LLC | | | Texas | | NB | NCI Assets Holding | Member | 100 | | | | | Dierk Hohman | Courtney Burton | Y | 8/12/2016 | | | |
| 1000 | Woori Highland Healthcare Private Equity Fund I | | | | | | | | | | | | | | | | | | | |
| 1001 | Wynnwood Peninsula Venture | | 1/3/2007 | Texas | N/A | RE | Third Party Investors | Managing JV Partner | 50 | n/a | Non HCMLP Managing JV | n/a | Non HCMLP Managing JV | Ted Dameris | Drew Wilson | Y | SOLD | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | INTEREST SOLD IN JV | Remove once Tribute funds distributed and dissolved |
| 1002 | Wynnwood Peninsula Venture | | 1/3/2007 | Texas | N/A | RE | W/J Tribute, Ltd. (SOLD) | Joint Venture Partner | 50 | n/a | Non HCMLP Managing JV | | Non HCMLP Managing JV | Ted Dameris | Drew Wilson | Y | SOLD | This entity is the general partner of a partnership that owns a real estate asset for investment purposes. | INTEREST SOLD IN JV | Remove once Tribute funds distributed and dissolved |
| 1003 | Granite Bay Advisors GP, LLC | | 7/22/2010 | Delaware | TX | I-Advisor | Mark Okada | Member | 100 | n/a | N/A | Mark Okada-Pres Trey Parker-Secy F. Waterhouse-Treas | Okada, Parker, Waterhouse, Stoops, Palmer, Chism | Jon Poglitsch | Melissa Schroth | Y | 8/29/2019 | GP of a new RIA - fka Kiyoshi Capital Management GP, LLC - name changed 8/13/10 | | |
| 1004 | Granite Bay Advisors, L.P. | | 7/22/2010 | Delaware | TX | I-Advisor | Granite Bay Advisors GP, LLC | GP | 0.1 | n/a | GP | GP | Okada, Parker, Waterhouse, Stoops, Palmer, Chism | Jon Poglitsch | Kristin Hendrix | Y | 8/29/2019 | New RIA for proposed new long/short healthcare funds - fka Kiyoshi Capital Management, LP - name changed 8/13/10 | | |
| 1005 | Granite Bay Advisors, L.P. | | 7/22/2010 | Delaware | TX | I-Advisor | Mark Okada | LP | 69.9 | n/a | GP | GP | Okada, Parker, Waterhouse, Stoops, Palmer, Chism | Jon Poglitsch | Kristin Hendrix | Y | 8/29/2019 | | | |
| 1006 | Granite Bay Advisors, L.P. | | 7/22/2010 | Delaware | TX | I-Advisor | James Dondero | LP | 30.0 | n/a | GP | GP | Okada, Parker, Waterhouse, Stoops, Palmer, Chism | Jon Poglitsch | Kristin Hendrix | Y | 8/29/2019 | | | |
| 1007 | MAR Quail Landing, LLC | | 10/3/2016 | Delaware | OK | REIT-DST | SE Quail Landing, LLC | Member | 100 | | | | | Matt McGraner | Bonner McDermott | | 2019 | Project Unicorn - Quail Landing | SOLD BEGINNING OF 2019 | |

FILED: NEW YORK COUNTY CLERK 02/08/2023 12:41 AM
NYSCEF DOC. NO. 77

Case 21-03076-sgj   Doc 401-1   Filed 10/15/25   Entered 10/15/25 22:24:37   Desc
Exhibit Exhibits 1-16   Page 145 of 535

INDEX NO. 650744/2023
RECEIVED NYSCEF: 02/08/2023

| | Name | EIN | Formation Date | Jurisdiction | Foreign Qualification | Category | Owners | Ownership Type | Ownership % | Voting Shares | Director/Manager/ Trustee | Officers | Bank Signatory | Fund Contact | Accounting Contact Books & Records | Dissolve (Y/N) | Termination Date | Entity Description (one sentence) | Other Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Acis CLO Value Fund II Charitable DAF Ltd. | | 2/5/2013 | Cayman Islands | N/A | DAF | Charitable DAF Fund, L.P. | Shareholder | 100 | n/a | Grant Scott (Maples) | Grant Scott | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 3 | Charitable DAF Fund, L.P. | | 10/28/2011 | Cayman Islands | N/A | DAF | Charitable DAF GP, LLC | GP | 1 | n/a | GP (Intertrust) | GP | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 4 | Charitable DAF Fund, L.P. | | 10/28/2011 | Cayman Islands | N/A | DAF | Charitable DAF HoldCo, Ltd | LP | 99 | n/a | GP (Intertrust) | GP | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 5 | Charitable DAF GP, LLC | | 10/25/2011 | Delaware | N/A | DAF | Grant Scott | Managing Member | 100 | n/a | Grant Scott-Managing Member | | Grant Scott | Mark Patrick | Taylor Colbert | N | | Grant Scott became managing member as of 1/1/2012 | |
| 6 | Charitable DAF HoldCo, Ltd | | 10/27/2011 | Cayman Islands | N/A | DAF | Grant Scott | Management Shares | 0 | 100 | Grant Scott (Intertrust) | n/a | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 7 | Charitable DAF HoldCo, Ltd | | 10/27/2011 | Cayman Islands | N/A | DAF | Highland Dallas Foundation, Inc. | Participation Shares | 32.786885 | 100 | Grant Scott (Intertrust) | n/a | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 8 | Charitable DAF HoldCo, Ltd | | 10/27/2011 | Cayman Islands | N/A | DAF | Highland Kansas City Foundation, Inc. | Participation Shares | 32.786885 | 100 | Grant Scott (Intertrust) | n/a | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 9 | Charitable DAF HoldCo, Ltd | | 10/27/2011 | Cayman Islands | N/A | DAF | Highland Santa Barbara Foundation, Inc. | Participation Shares | 32.786885 | 100 | Grant Scott (Intertrust) | n/a | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 10 | Charitable DAF HoldCo, Ltd | | 10/27/2011 | Cayman Islands | N/A | DAF | Highland Capital Management, LP Charitable Fund | Participation Shares | 1.6393443 | 5 | Grant Scott (Intertrust) | n/a | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 11 | CLO HoldCo, Ltd. | | 12/13/2010 | Cayman Islands | N/A | DAF | Charitable DAF Fund, L.P. | Shareholder | 100 | | Grant Scott (Intertrust) | | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 12 | Empower Dallas Foundation, Inc. | | 2/10/2015 | Delaware | N/A | JD | The Dallas Foundation | Institutional Member | 66.67 | | 2 Institutional Directors: Gary Garcia/Mary Jalonick Individual Director: Grant Scott | Grant Scott-Chair/Pres Mary Jalonick-VP/CFO Gary Garcia-Secy | | Mark Patrick | Melissa Schroth | N | | Charitable giving set up with The Dallas Foundation | |
| 13 | Empower Dallas Foundation, Inc. | | 2/10/2015 | Delaware | N/A | JD | Grant Scott | Individual Member | 33.33 | | 1 Institutional Directors: Gary Garcia/Mary Jalonick Individual Director: Grant Scott | Grant Scott-Chair/Pres Mary Jalonick-VP/CFO Gary Garcia-Secy | | Mark Patrick | Melissa Schroth | N | | Charitable giving set up with The Dallas Foundation | |
| 14 | HCT Holdco 2, Ltd. | | 12/29/2010 | Cayman Islands | N/A | DAF | CLO HoldCo, Ltd. | Shareholder | 100 | N/A | Grant Scott (Intertrust) | | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 15 | Highland Dallas Foundation, Inc. | | 11/22/2011 | Delaware | N/A | DAF | The Dallas Foundation (third party) | Shareholder | 100 | 100 | James Dondero | James Dondero - Pres Mary M. Jalonick - VP | | Mark Patrick | Taylor Colbert | N | | Charitable giving set up with The Dallas Foundation | |
| 16 | Highland Kansas City Foundation, Inc. | | 11/23/2011 | Delaware | N/A | DAF | Greater Kansas City Community Foundation (third party) | Shareholder | 100 | 100 | James Dondero | Mary M. Jalonick James Dondero - Pres Grant Scott - Secy/Treas | | Mark Patrick | Taylor Colbert | N | | Charitable giving set up with The Dallas Foundation | |
| 17 | Highland Santa Barbara Foundation, Inc. | | 11/22/2011 | Delaware | N/A | DAF | Santa Barbara Foundation (third party) | Shareholder | 100 | 100 | Debbie Wilkerson James Dondero Grant Scott Arnold Brier Ronald Gallo | James Dondero - Pres Grant Scott - Secy/Treas Ronald Gallo - VP | | Mark Patrick | Taylor Colbert | N | | Charitable giving set up with The Dallas Foundation | |
| 18 | Liberty CLO Holdco, Ltd. | | 6/6/2012 | Cayman Islands | N/A | DAF | CLO HoldCo, Ltd | Shareholder | 100.00 | 1 | Grant Scott (Intertrust) | N/A | | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 19 | Liberty Sub, Ltd. | | 4/12/2018 | Cayman Islands | N/A | DAF | Liberty CLO Holdco, Ltd. | Shareholder | 100.00 | 1 | Grant Scott (Intertrust) | N/A | | Grant Scott | Carl Moore | David Willmore | N | | Hold Tandem interest | |
| 20 | MGM Studios HoldCo, Ltd. | | 11/12/2014 | Cayman Islands | N/A | DAF | CLO HoldCo, Ltd | Shareholder | 100 | 1 | Grant Scott - Director (Intertrust) | | | Grant Scott | Mark Patrick | Taylor Colbert | N | | | |
| 21 | BVP Property, LLC | | 1/4/2012 | Delaware | N/A | NB | Liberty CLO Holdco, Ltd. | Member | 100 | | Member Managed | Member Managed | | | John Holt | Taylor Colbert | | | | |
| 22 | NCI Apache Trail LLC | | 5/23/2014 | Texas | N/A | DAF | Liberty CLO Holdco, Ltd. | Member | 100 | | Member Managed | Member Managed | | | John Holt | Taylor Colbert | | | | |
| 23 | NCI Fort Worth Land LLC | | 5/23/2014 | Texas | N/A | DAF | Liberty CLO Holdco, Ltd. | Member | 100 | | Member Managed | Member Managed | | | John Holt | Taylor Colbert | | | | |
| 24 | NCI Royse City Land LLC | | 5/23/2014 | Texas | N/A | DAF | Liberty CLO Holdco, Ltd. | Member | 100 | | Member Managed | Member Managed | | | John Holt | Taylor Colbert | | | | |
| 25 | NCI Stewart Creek LLC | | 5/23/2014 | Texas | N/A | DAF | Liberty CLO Holdco, Ltd. | Member | 100 | | | | | | John Holt | Taylor Colbert | | | | |
| 26 | NLA Assets LLC | | 12/9/2014 | Texas | N/A | NB | Liberty CLO Holdco, Ltd. | Member | 100 | | Member Managed | Member Managed | | | John Holt | Taylor Colbert | | | | |

# EXHIBIT 4



# *WebCivil Supreme - Appearance Detail*

| | |
|---|---|
| Court: | **New York Supreme Court** |
| Index Number: | **650744/2023** |
| Case Name: | **UBS Securities LLC et al vs. Dondero, James et al** |
| Case Type: | **Comm-Other** |
| Track: | **Standard** |

## Appearance Information:

| Appearance Date | Time | Court Date Purpose | Fully Virtual | Court Date Type | Outcome Type | Justice Part | Remarks | Motion Seq |
|---|---|---|---|---|---|---|---|---|
| 09/22/2025 | 09:30 AM | Motion-Notice of Petition | Yes | Remote | | Crane, Hon. Melissa A. 60M | ORAL ARGUMENT - REMOTE | 2 |
| 05/14/2025 | 09:30 AM | Motion-Notice of Petition | No | Administrative - No Appearance Required | Adjourned | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | SO ORDERED. NYSCEF DOC. #446. | 2 |
| 04/16/2025 | 12:00 PM | Conference-Status | Yes | Remote | Held | Crane, Hon. Melissa A. 60 | | |
| 04/02/2025 | 11:00 AM | Conference-Status | Yes | Remote | Held | Crane, Hon. Melissa A. 60 | MS TEAMS | |
| 07/08/2024 | 02:15 PM | Motion-Notice of Motion | Yes | Remote | Fully Submitted | Crane, Hon. Melissa A. 60M | ORAL ARGUMENT - REMOTE PRIOR DATE AND TIME CHANGED PER PART'S REQUEST | 11 |
| 07/08/2024 | 02:15 PM | Motion-Notice of Motion | Yes | Remote | Fully Submitted | Crane, Hon. Melissa A. 60M | ORAL ARGUMENT - REMOTE PRIOR DATE AND TIME CHANGED PER PART'S REQUEST. | 12 |
| 07/08/2024 | 02:15 PM | Motion-Notice of Motion | Yes | Remote | Fully Submitted | Crane, Hon. Melissa A. 60M | ORAL ARGUMENT - REMOTE PRIOR DATE AND TIME CHANGED PER PART'S REQUEST. | 13 |
| 06/28/2024 | 09:30 AM | Motion-Notice of Petition | No | Administrative - No Appearance Required | Adjourned | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | SO ORDERED. NYSCEF DOC. #208. MOTION DECIDED | 2 |
| 05/17/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS | 15 |
| 05/17/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS | 16 |
| 05/17/2024 | 10:30 AM | Conference-Preliminary | Yes | Remote | Held | Crane, Hon. Melissa A. 60 | VIA MS TEAMS | |
| 05/15/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS | 14 |
| 05/09/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Adjourned | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS NO APPEARANCE NECESSARY | 11 |
| 05/09/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Adjourned | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS NO APPEARANCE NECESSARY | 12 |
| 05/09/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Adjourned | Crane, Hon. Melissa A. | ROOM 130 SUBMISSIONS NO APPEARANCE NECESSARY | 13 |

App. 147

| 02/16/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS | 10 |
| 02/14/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS NO APPEARANCE NECESSARY | 6 |
| 02/14/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS NO APPEARANCE NECESSARY | 7 |
| 02/14/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS NO APPEARANCE NECESSARY | 8 |
| 02/14/2024 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS NO APPEARANCE NECESSARY | 9 |
| 04/28/2023 | 09:30 AM | Motion-Notice of Petition | No | Administrative - No Appearance Required | Adjourned | Lebovits, Hon. Gerald SUBMISSION - NO APPEARANCE | PER SO-ORDERED STIP DOC#175/ROOM 130 SUBMISSIONS | 2 |
| 03/24/2023 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS | 4 |
| 03/24/2023 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Crane, Hon. Melissa A. SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS | 5 |
| 03/24/2023 | 09:30 AM | Motion-Notice of Petition | No | Administrative - No Appearance Required | Adjourned | Lebovits, Hon. Gerald SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS | 2 |
| 03/24/2023 | 09:30 AM | Motion-Notice of Motion | No | Administrative - No Appearance Required | Fully Submitted - No Opposition | Lebovits, Hon. Gerald SUBMISSION - NO APPEARANCE | ROOM 130 SUBMISSIONS | 3 |
| 03/20/2023 | 02:15 PM | Motion-Order to Show Cause (Returnable) | No | Administrative - No Appearance Required | Fully Submitted | Crane, Hon. Melissa A. 60M | ORAL ARGUMENT VIA MICROSOFT TEAMS - NO PERSONAL APPEARANCE | 1 |

Close

# EXHIBIT 5

05-102
(Rev.9-15/33) FORM

**Texas Franchise Tax Public Information Report**

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP),
Professional Associations (PA) and Financial Institutions*

■ **Tcode** 13196 Franchise

| ■ Taxpayer number | | | | | | | | | | ■ Report year | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 2 | 0 | 7 | 8 | 0 | 8 | 0 | 1 | 5 | 0 | 2 | 0 | 2 | 4 |

*You have certain rights under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

| Taxpayer name | **SKYVIEW GROUP, INC.** | ○ Blacken circle if the mailing address has changed. |
|---|---|---|
| Mailing address | **2101 CEDAR SPRINGS RD STE 1200** | Secretary of State (SOS) file number or Comptroller file number |
| City **DALLAS** | State **TX** | ZIP code plus 4 **75201** | **0803967249** |

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office | **2101 CEDAR SPRINGS ROAD STE 1200, DALLAS, TX, 75201** |
|---|---|
| Principal place of business | **2101 CEDAR SPRINGS ROAD STE 1200, DALLAS, TX, 75201** |

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

1000000000015

**SECTION A**  Name, title and mailing address of each officer, director, member, general partner or manager.

| Name **SCOTT ELLINGTON** | Title **DIRECTOR** | Director ● YES | Term expiration | m m d d y y |
|---|---|---|---|---|
| Mailing address **2101 CEDAR SPRINGS RD STE 1200** | City **DALLAS** | State **TX** | ZIP Code **75201** | |

| Name | Title | Director ○ YES | Term expiration | m m d d y y |
|---|---|---|---|---|
| Mailing address | City | State | ZIP Code | |

| Name | Title | Director ○ YES | Term expiration | m m d d y y |
|---|---|---|---|---|
| Mailing address | City | State | ZIP Code | |

**SECTION B**  Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C**  Enter information for each corporation, LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

| Registered agent and registered office currently on file *(see instructions if you need to make changes)* | *You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.* |
|---|---|
| Agent: **CT CORPORATION SYSTEM** | |
| Office: **1999 BRYAN ST STE 900** | City **DALLAS** | State **TX** | ZIP Code **75201** |

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

| sign here ▶ | **FRANK WATERHOUSE** | Title **TREASURER** | Date **11/04/2024** | Area code and phone number **( 214 ) 550 - 4500** |
|---|---|---|---|---|

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |
|---|---|

# EXHIBIT 6

**DATED 11 JULY 2025**

**(1)  CROSSVINE LITIGATION FUNDING, LLC**

**(2)  MARGOT MACINNIS AND SANDIPAN BHOWMIK OF GRANT THORNTON SPECIALIST
SERVICES (CAYMAN) LIMITED IN THEIR CAPACITY AS JOINT OFFICIAL
LIQUIDATORS OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**FUNDING AGREEMENT OF JOINT OFFICIAL LIQUIDATORS**

---



1

## FUNDING AGREEMENT

### DATED 11 JULY 2025

**BETWEEN**

(1) **Crossvine Litigation Funding, LLC** of c/o CO Services Cayman Limited Willow House, Cricket Square Cayman Islands (the **Funder**)

(2) **Margot MacInnis** and **Sandipan Bhowmik** in their capacity as the joint official liquidators of Charitable DAF HoldCo, Ltd (In Official Liquidation), of Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square PO Box 1044, Grand Cayman, Cayman Islands, KY1-1102 (together and each of them severally the **JOLs**).

(together the **Parties** and each individually a **Party**)

**RECITALS:**

A    **WHEREAS**, the JOLs were appointed as official liquidators of Charitable DAF HoldCo, Ltd (In Official Liquidation) (the **Company**) pursuant to an order of Justice Jalil Asif KC of the Grand Court of the Cayman Islands dated 6 May 2025

B    **WHEREAS**, the Company was previously the sole limited partner of Charitable DAF Fund, LP (the **Fund**), a Cayman Islands exempted limited partnership. The Company's valuable interest in the Fund was transferred to a third party in December 2024 (the **Disposal**)

C    **WHEREAS**, following the Disposal, the Company is believed to have no, or very limited, liquid assets

D    **WHEREAS**, the JOLs require funding to, among other things meet the Remuneration and Expenses incurred by the JOLs up to and including Effective Date (defined below) in connection with: (i) the conduct of the liquidation of the Company; (ii) pursuing proceedings in the Cayman Islands for and on behalf of the Company against the Company's former directors and entities under their control in connection with the Disposal (the **Claim**); and (iii) obtain ancillary relief in the United States in support of the Claim, and the Funder desires to extend limited funding to the JOLs for these purposes on the terms below

E    **NOW, THEREFORE**, in consideration for the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**AGREED TERMS**

1    **CONSTRUCTION**

1.1    For purposes of this Agreement, capitalised terms shall have the meanings set forth herein and in Section 2 below.

2

1.2     Headings are for information only and do not form part of the operative provisions of this Agreement.

1.3     References to this Agreement include references to the Recitals.

1.4     In this Agreement, unless a clear contrary intention appears:

(a)     words denoting the singular include the plural and vice versa;

(b)     words denoting any gender include all genders;

(c)     all references to "$" or dollars shall mean U.S. Dollars;

(d)     the word "or" shall include both the adjunctive and the disjunctive meaning thereof; and

(e)     the words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation."

1.5     The terms of this Agreement have been negotiated between the Parties in an arms' length transaction with the advice of counsel and shall not be construed for or against either Party by reason of the drafting or preparation hereof.

## 2     DEFINITIONS

The following terms shall have the meanings given below:

2.1     **"Agreement"** means, collectively, this Agreement, together with all exhibits, schedules and amendments hereto, including all documents expressly incorporated herein by reference.

2.2     **"Affiliate"** means as to any Person (i) any other Person that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person or its respective successors or (ii) if such Person is an individual, a spouse, parent, sibling, or descendant of such Person, or a trust over which such Person has sole investment and dispositive power for the benefit of such Person, spouse, parent, sibling, or descendant. The term "control" including the terms "controlling," "controlled by," and "under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting shares, by contract, or otherwise. Affiliates include such entities whether now existing or later established by investment, merger, or otherwise, including the successors and assigns of such Person.

2.4     **"Business Day"** means any day except any Saturday, any Sunday, and any day that is a federal legal holiday in the United States and any public holiday in the Cayman Islands.

3

2.5 **"Counsel"** means any barrister(s) who have been or are to be instructed to represent the JOLs in respect of the Claim, or such other barrister or barristers as may be instructed in respect of the Claim from time to time.

2.6 **"Court"** means the Grand Court of the Cayman Islands.

2.7 **"Defendant(s)"** means any Person against which Litigation is brought or threatened.

2.8 **"Documents"** means documents in the possession of the JOLs arising in and relating to the Claim and includes without limitation copies of:-

    (i)    pleadings, orders, judgments, disclosure lists, disclosed documents, witness statements, affidavits, written submissions, notes of oral submissions, and costs schedules;

    (ii)    correspondence passing between the JOLs and/or the Legal Practitioner (on the one hand) and the Defendants and/or the Defendants' lawyers (on the other hand);

    (iii)    any advice or notes of advice given by the Legal Practitioner and/or Counsel and/or any other lawyers instructed by the JOLs in relation to the Claim; and

    (iv)    instructions to and correspondence with and from, and reports and drafts of reports prepared by, expert witness or potential witnesses.

2.9 **"Investigation"** means the work done by the JOLs to consider relief that may be sought by the Company in respect of (amongst other things) the Disposal.

2.10 **"Legal Practitioner"** means any firm of attorneys who has been retained to represent the JOLs in respect of the Claim and/or such other firm of attorneys as may be retained by the JOLs from time to time.

2.11 **"Litigation"** includes the Claim and any other court or arbitration proceedings, suits or actions (including any interim or ancillary proceedings or interlocutory applications) brought by the JOLs (whether acting in the name of the Company or the JOLs), and whether within or outside the United States, including in any U.S. district court and the courts of the Cayman Islands.

2.12 **"Person"** means any individual, firm, company, corporation, partnership, limited liability company, sole proprietorship, government, state, or agency, or subdivision of a state (or governmental entity), or any association, trust, joint venture, or consortium (whether or not having separate legal personality).

2.13 **"Recovered Assets"** means assets over which the JOLs obtain control for the benefit of the Company on and from the Effective Date.

2.14 **"Representative"** means the employees, officers, directors, partners, members, shareholders, co-investors, potential co-investors, agents, advisors, consultants, accountants, attorneys, trustees, or authorised representatives of a Party.

2.15   **"Settlement"**   means any agreement between the JOLs and any one or more Defendants and/or any third party in settlement of the Claim or any part of the Claim including with respect to costs (including interim costs), including any agreement by the JOLs with any Defendant or any other third party to abandon or withdraw the Claim or to discontinue or stay the Claim.

2.16   **"Taxes"** means any non-U.S., U.S. federal, state, provincial, territorial, local, municipal, or other governmental taxes, duties, levies, fees, excises, or tariffs, arising as a result of or in connection with any amounts of property received or paid under this Agreement, including: (i) any state or local sales or use taxes; (ii) any import, value-added, consumption, or similar tax; (iii) any business transfer tax; (iv) any taxes imposed or based on or with respect to or measured by any net or gross income or receipts of any of the Parties; (v) any withholding or franchise taxes, taxes on doing business, gross receipts taxes or capital stock or property taxes; or (vi) any other tax now or hereafter imposed by any governmental or taxing authority on any aspect of this Agreement, the Recoveries

3      **EFFECTIVE DATE**

This Agreement shall be conditional upon and take effect from the date of an order from the Court sanctioning the JOLs to enter into (and to cause the Company to enter into) this Agreement (the **Effective Date**).

4      **FUNDING ARRANGEMENT**

4.1    Subject to Section 4.2 and the terms and conditions of this Agreement, the Funder hereby agrees to pay a lump sum of ▮▮▮▮▮▮ to the JOLs within 7 Business Days of the Effective Date ▮▮▮▮▮▮▮▮ for the purpose of meeting:

    (a)    the remuneration of the JOLs (the **Remuneration**); and

    (b)    the expenses and disbursements properly and reasonably incurred by the JOLs (the **Expenses**),

within the meaning of those terms under Rule 1(1)(h) and Rule 1(1)(k) respectively of Order 20 of the Companies Winding Up Rules (2023 Consolidation) (the **CWR**).

4.2    The Parties agree and acknowledge that the ▮▮▮▮▮▮ is provided by the Funder for the specific purpose of only paying the:

    (a)    Remuneration; and

    (b)    Expenses relating to any Legal Practitioner or Counsel (including any disbursements incurred or paid by any Legal Practitioner or Counsel in connection with the Claim).



App. 157



7

6.8    The Funder's written consent shall be required for the negotiation, settlement, or compromise of payment obligations under Section 6.6, such written consent to be provided by Funder in its sole discretion.

**7**    **Third Party Costs / Cross Undertaking.**

The Parties acknowledge that the courts of the Cayman Islands and other jurisdictions may require the JOLs, when seeking any interim order in any Litigation, to pay the reasonable costs of any innocent third party in complying with such an order ("**Innocent Party Costs**"), or to offer a cross undertaking in damages as a condition of obtaining an order ("**Cross Undertaking**"). The Funder agrees that it will pay any Innocent Party Costs incurred and provide (if so required) any Cross Undertaking, and will, if so ordered, provide security for any such Cross Undertaking in the sum and on the terms ordered by the Court.

**8**    **RECOVERIES**

8.1    In the event that the JOLs recover any unencumbered assets to which the Company is beneficially entitled in a cumulative amount equal to or exceeding ███████ (**Threshold Amount**) such that the Company has assets lawfully and properly available (as reasonably determined by the JOLs), any amount in excess of the Threshold Amount shall be paid to the Funder in the following priority:

(a)    first, the Remuneration and Expenses paid by the Funder will be repaid to it by the JOLs: (i) in priority to the claims of creditors and contributories of the Company, in accordance with section 109 of the Companies Act (As Revised); and (ii) as an expense of the liquidation under Rule 1(1)(h) or 1(1)(k) of Order 20 of the CWR, until the Funder has received one-hundred percent (100%) of the aggregate amount paid by it under this Agreement; and

(b)    second:

(i)    if the Recovered Assets exceed US\$50million, the Funder shall receive an additional 10% of the amount paid by the Funder pursuant to this Agreement;

(ii)    if the Recovered Assets exceed US\$100million, the Funder shall receive an additional 20% of the amount of the amount paid by the Funder pursuant to this Agreement; and

(iii)    if the Recovered Assets exceed US\$270million, the Funder shall receive an additional 30% of the amount paid by the Funder pursuant to this Agreement.

8.2    The JOLs shall be permitted to retain any amount less than or equal to the Threshold Amount for the purpose of meeting outstanding and future Remuneration and Expenses of the JOLs.

8

8.3     To the extent that the JOLs do not use part or all of the Threshold Amount to meet their Remuneration and Expenses, any remaining amount shall be paid to the Funder in accordance with Section 8.1.

## 9       INFORMATION AND ACCESS

9.1     This Section 9 shall remain in force from the date of this Agreement for so long as any amount remains payable to the Funder and under Section 7.

9.2     The JOLs shall:

(a)     keep the Funder regularly informed of all developments in the Claim as soon as reasonably practicable and in any event within seven (7) Business Days, including but not limited to:

    (i)     any development that may have an impact on the cost budgeting or outcome of the Claim, █████████████████████████████████████;

    (ii)    the progress of any Settlement discussions or any Settlement offer with the other parties to the Claim, howsoever made or raised, including developments before, during and after any alternative dispute resolution;

    (iii)   any pre-action or interlocutory (or equivalent) application it intends to make or which is threatened or made by a Defendant in respect of the Claim;

    (iv)    any hearing that is listed in the Claim; and/or

    (v)     any change in the Legal Practitioner's or Counsel's appraisal of the JOLs' prospects of success in the Claim, as a whole or in respect of any part or stage of the Claim.

9.3     <u>Matter Monitoring:</u>  The JOLs shall keep Funder reasonably informed of the progress of the assertion of the Claims and shall provide Funder access to all non-privileged information and Documents, including, without limitation (but subject to any confidentiality or sealing orders) (i) reports on settlement negotiations, settlement agreements, electronic copies of all pleadings, court filings, notices of hearings, rulings or orders, and all other non-privileged information as soon as practicable after receipt or creation of such information; (ii) oral status reports as may be reasonably requested by Funder from time to time; and (iii) and timely disclosure of important documents and material events or changes regarding the Claim. Funder understands that the timing and scope of its requests must be reasonable given the activity in the Claim, and Funder shall not make requests or demands that will interfere with the JOLs' obligations to the Court or with respect to the Claim. The JOLs shall not be obligated to provide access to documents or information the disclosure of which would violate any order by a court or tribunal, confidentiality or sealing order, or agreement governing confidentiality or non-disclosure.

9.4    <u>Privileged Consultation.</u> It is the intent of the Parties that the communications and exchanges of information between Funder and the JOLs shall be regarded as subject to litigation privilege and not subject to disclosure to any third-party not a Party to this Agreement. Pursuant to such litigation privilege, the JOLs agree (subject to any orders of the Court) to notify (but not invite comment from) the Funder with respect to: (i) any filings with respect to the Claim prior to such material being filed with the court, including providing Funder with an opportunity to review such filings prior to its being filed; and (ii) material strategy decisions with respect to the Claim.

9.5    <u>No Control</u>. The Funder agrees that subject to the approval rights expressly granted to the Funder under this Agreement, the JOLs are free to act as they see fit, provided that such conduct is not inconsistent with their legal and statutory duties, and the JOLs are under no obligation to take or refrain from taking any action requested by Funder relating to the Claim or any further Investigations or Litigation.

## 10    CONFIDENTIALITY

10.1    Each Party agrees that it will treat as confidential and, save as expressly authorised by this Agreement, will not disclose to any third party without the express prior written approval of each of the other Party, or unless required by applicable law or regulations of any governmental or regulatory authority or ordered to do so by a court of competent jurisdiction, any information or documentation in connection with this Agreement and that it will treat as confidential (and subject to common interest privilege (which it will take all reasonable steps to maintain)) all communications between itself and the JOLs and/or the Legal Practitioner (including communications pre-dating the date of this Agreement).

10.2    Notwithstanding Section 10.1, any Party may disclose such information or documentation in connection with this Agreement to its Affiliate or its Affiliate's directors, officers, employees, advisers, agents, representatives and providers of finance, provided that each Party shall procure that each such person to whom such information is so disclosed shall comply with the undertakings in this Section, and will be responsible for any failure by such persons to do so. The Parties may also make such disclosure:

(b)    to any entity to whom a Party considers disclosure is necessary in order to give effect to this Agreement and that Party's obligations pursuant to Sections 3 and 4;

(c)    ███████████████████████████████████████████ or

(d)    to parties whom, and to the extent that, information is required to be disclosed by any applicable law, regulation or court order.

10.3    The Parties agree and acknowledge that the provision of privileged information and documents to Funder, and any reference in this Agreement to materials that are or may be privileged and/or confidential, is not intended to diminish and shall not waive or diminish in any way the confidentiality and privilege that subsists in them.

10.4    Each Party shall use all reasonable endeavours to procure that each Party to whom disclosure of information is made will put in place reasonable measures to maintain the confidentiality and privilege of the same.

10.5    Each Party shall inform the other Parties as soon as reasonably practicable of any application or request by a third party for the disclosure (not otherwise permitted in this Section 10) of any information or documentation in connection with this Agreement and, unless each other Party consents to such disclosure, agrees to resist such disclosure and assert to the maximum extent possible claims to confidentiality, common interest privilege and/or legal professional privilege

## 11    TERMINATION

This Agreement shall terminate upon the later of the conclusion of the liquidation of the Company as ordered by the Court or the re-payment of all amounts to the Funder as required under this Agreement.

## 12    GOVERNING LAW AND JURISDICTION

This Agreement is governed by the laws of the Cayman Islands.  Each Party irrevocably agrees that the Courts of the Cayman Islands shall have exclusive jurisdiction to hear and decide any suit, action or proceedings, and/or to settle any disputes, which may arise out of or in any way relate to this Deed or its formation.

## 13    TAXES

13.1    All Taxes shall be the financial responsibility of the Party obligated to pay such Taxes as determined by applicable law and no Party is or shall be liable at any time for any of the other Parties' Taxes incurred in connection with or related to amounts paid under this Agreement. The JOLs acknowledge that all amounts advanced to them under this Agreement by Funder are eligible to be claimed as charitable contributions under the U.S. Internal Revenue Code.

13.2     The JOLs agree to cooperate with Funder with respect to provision and/or execution of any documents or information reasonably requested by Funder to (i) evidence the amounts paid under this Agreement and (ii) evidence the charitable intent and nature of any amounts paid under this Agreement.

## 14    MISCELLANEOUS

14.1    <u>No Personal Liability of the JOLs.</u> The JOLs execute this Agreement solely in their capacity as official liquidators of the Company and assume no personal liability under the terms of this Agreement.

14.2    <u>Entire Agreement and Amendments.</u> This Agreement constitutes the entire agreement between the Parties with respect to the matters covered herein and supersede all prior agreements, promises, representations, warranties, statements, and understandings with respect to the subject matter hereof as between the Parties. This Agreement may not be

11

amended, altered, or modified except by an amendment or supplement to this Agreement executed by all Parties hereto.

14.3   <u>Partial Invalidity; Severability.</u> If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provisions under the law of any other jurisdiction shall in any way be affected or impaired.

14.4   <u>Remedies and Waivers.</u> No failure to exercise, nor any delay in exercising, on the part of any Party hereto, of any right or remedy under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law. No provision of this Agreement may be waived except in writing signed by the Party granting such waiver.

14.5   <u>Assignment.</u> No Party may assign or delegate their rights or obligations under this Agreement without the prior written consent of all other parties to this Agreement.

14.6   <u>Notices.</u>

(a)   all notices, reports and other communications required or permitted under this Agreement shall be in writing. They shall be delivered by hand or sent by regular mail, courier, email or other reliable means of electronic communication to the Parties at their addresses indicated below or at such other address as may be specified hereafter in writing by any of the Parties to the other Party in accordance with this Section(a).

| JOLs | Funder |
|---|---|
| Margot MacInnis and Sandipan Bhowmik in their capacity as the joint official liquidators of Charitable DAF HoldCo, Ltd (In Official Liquidation) 2nd floor, Century Yard, Cricket Square PO Box 1044<br><br>Grand Cayman, KY1-1102 margot.macinnis@uk.gt.com sandipan.bhowmik@uk.gt.com<br><br>With copy to: Maples and Calder (Cayman) LLP PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands caroline.moran@maples.com justin.naidu@maples.com | Crossvine Litigation Funding C/O Services Cayman Limited, P.O. Box 10008, Willow House, Cricket Square, Grand Cayman, KY1-1001, Cayman Islands<br><br>With copy to: Ogier (Cayman) LLP 89 Nexus Way Camana Bay christopher.levers@ogier.com or nour.khaleq@ogier.com |

|  |  |
|  |  |

(b)    any notice, report or other communication hereunder shall be deemed to have been delivered and received (i) on the date delivered, if delivered personally by hand or sent by courier, (ii) on the date sent, if sent by email or other form of electronic communication provided that confirmation of delivery is received by the sending party, and (iii) five (5) Business Days after mailing, if placed in the U.S. mail, by registered or certified mail, first class postage prepaid, with a request for a confirmation of delivery.

(c)    any notice, report or other communication sent under this Agreement that is sent by fax, email or other electronic communication must be confirmed by sending a hard paper copy thereof to the recipient in accordance with subsection (a) above, provided, the effective date of such notice, report or other communication shall be as specified in subsection (b) above. If the recipient actually received a fax, email or other electronic form of a notice, report or other communication, then the notice, report or other communication shall be deemed to have been given and delivered even if the sender fails to send a hard copy as called for in this subsection or the sender does not receive a confirmation of delivery under subsection (b)(ii) above.

14.7    No Presumption Against Drafter. This Agreement has been negotiated by the Parties and their respective counsel and will be fairly interpreted in accordance with its terms and without any strict construction in favour of or against a Party.

14.8    Counterparts. This Agreement may be executed in counterparts which, when read together, shall constitute a single instrument, and this has the same effect as if the signatures on the counterparts were on a single copy hereof.

14.9    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

***************REMAINDER OF PAGE INTENTIONALLY LEFT BLANK***************

13

**IN WITNESS WHEREOF –**

The Parties execute this Agreement effective as of the Effective Date.

**Funder: Crossvine Litigation Funding, LLC**

By: _____

Name: Scott Ellington

Title: Manager

**JOLs: Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited in their capacity as joint official liquidators of Charitable DAF HoldCo, Ltd.**

By: _____

Name: Margot MacInnis

Title: Joint Official Liquidator

14

# EXHIBIT 7

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 805984614 04/08/2025
Document #: 1468771430003
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Crossvine Holdings, LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

## Capitol Corporate Services, Inc.

### OR

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**1501 S. Mopac Expy., Ste. 220    Austin  TX  78746**

### Consent of Registered Agent

☑A. A copy of the consent of registered agent is attached. **Crossvine Holdings, LLC.pdf**

### OR

☐B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑A. The limited liability company is to be managed by managers.

### OR

☐B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **Scott    Ellington**                     Title: **Manager**

Address: **2101 Cedar Springs Rd., Ste. 1200    Dallas  TX, USA  75201**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

### Initial Mailing Address

Address to be used by the Comptroller of Public Accounts for purposes of sending tax information.

The initial mailing address of the filing entity is:

**2101 Cedar Springs Rd., Suite 1200**
**Dallas, TX 75201**
**USA**

### Organizer

The name and address of the organizer are set forth below.

**Scott Ellington**          **2101 Cedar Springs Rd., Ste. 1200, Dallas, TX 75201**

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Scott Ellington**

Signature of Organizer

**FILING OFFICE COPY**

**Form 401-A**
**(Revised 12/09)**



**Acceptance of Appointment**
**and**
**Consent to Serve as Registered Agent**
**§5.201(b) Business Organizations Code**

The following form may be used when the person designated as registered agent in a registered agent filing is an individual.

---

**Acceptance of Appointment and Consent to Serve as Registered Agent**

I acknowledge, accept and consent to my designation or appointment as registered agent in Texas for

*Name of represented entity*

I am a resident of the state and understand that it will be my responsibility to receive any process, notice, or demand that is served on me as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if I resign.

**x:** _____

| *Signature of registered agent* | *Printed name of registered agent* | *Date (mm/dd/yyyy)* |

---

The following form may be used when the person designated as registered agent in a registered agent filing is an organization.

---

**Acceptance of Appointment and Consent to Serve as Registered Agent**

I am authorized to act on behalf of  Capitol Corporate Services, Inc.

*Name of organization designated as registered agent*

The organization is registered or otherwise authorized to do business in Texas. The organization acknowledges, accepts and consents to its appointment or designation as registered agent in Texas for:

Crossvine Holdings, LLC

*Name of represented entity*

The organization takes responsibility to receive any process, notice, or demand that is served on the organization as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if the organization resigns.

**x:** *Genava Harris*   Geneva Harrison, Asst. Sec. on behalf
of Capitol Corporate Services, Inc.   04/08/2025

| *Signature of person authorized to act on behalf of organization* | *Printed name of authorized person* | *Date (mm/dd/yyyy)* |

---

# EXHIBIT 8

| Form 202 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $25 | <br>**Certificate of Formation<br>Nonprofit Corporation** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 805986556 04/10/2025<br>Document #: 1469596750002<br>Image Generated Electronically<br>for Web Filing** |

### Article 1 - Corporate Name

The filing entity formed is a nonprofit corporation. The name of the entity is :

## Crossvine Foundation

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be corporation named above) by the name of:

## Capitol Corporate Services, Inc.

### OR

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**1501 S. Mopac Expy., Ste. 220    Austin  TX  78746**

### Consent of Registered Agent

☑A. A copy of the consent of registered agent is attached. **CS Registered Agent Consent.PDF**

### OR

☐B. The consent of the registered agent is maintained by the entity.

### Article 3 - Management

☐ A. Management of the affairs of the corporation is to be vested solely in the members of the corporation.

### OR

☑ B. Management of the affairs of the corporation is to be vested in its board of directors. The number of directors, which must be a minimum of three, that constitutes the initial board of directors and the names and addresses of the persons who are to serve as directors until the first annual meeting or until their successors are elected and qualified are set forth below.

Director 1: **Scott    Ellington**                                    Title: **Director**

Address: **2101 Cedar Springs Road, Ste. 1200    Dallas  TX, USA  75201**

Director 2: **Gabriel    Pardo**                                    Title: **Director**

Address: **2101 Cedar Springs Road, Ste. 1200    Dallas  TX, USA  75201**

Director 3: **Giancarlo    Stanton**                                    Title: **Director**

Address: **2101 Cedar Springs Road, Ste. 1200    Dallas  TX, USA  75201**

### Article 4 - Organization Structure

☐ A. The corporation will have members.

or

☑ B. The corporation will not have members.

### Article 5 - Purpose

The corporation is organized for the following purpose or purposes:

**The Corporation is organized and shall be operated exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the Code), or corresponding provisions of any subsequent federal tax laws. The general purposes for which the Corporation is organized**

are to receive and maintain a fund or funds of property and, subject to the restrictions and limitations hereinafter set forth, to use and apply the whole or any part of the income therefrom and the principal thereof exclusively for charitable, religious, scientific, literary, or educational purposes either directly or by contributions to organizations described in Section 501(c)(3) and exempted from taxation under Section 501(a) of the Code and the Regulations thereunder.

### Supplemental Provisions / Information

See attached Addendum for:
Article 6 Foundation Limitations;
Article 7 No Corporate Shares; and
Article 8 Liability and Indemnity of Directors.

[The attached addendum, if any, is incorporated herein by reference.]

Addendum.pdf

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Initial Mailing Address

Address to be used by the Comptroller of Public Accounts for purposes of sending tax information.

The initial mailing address of the filing entity is:
2101 Cedar Springs Road, Ste. 1200
Dallas, TX 75201
USA

### Organizer

The name and address of the organizer are set forth below.

Scott Ellington          2101 Cedar Springs Road, Ste. 1200, Dallas, Texas 75201

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Scott Ellington
Signature of organizer.

FILING OFFICE COPY

**Addendum to Form 202 Certificate of Formation**
**Nonprofit Corporation**
**Crossvine Foundation**

### Article 6 – Foundation Limitations

**A.**      No part of the net earnings of the Corporation shall inure to the benefit of any director, trustee, or officer of the Corporation or of any private individual (except that reasonable compensation may be paid for services rendered to or for the Corporation affecting one or more of its purposes), and no director, trustee, or officer of the Corporation or private individual shall be entitled to share in the distribution of any of the corporate assets upon dissolution of the Corporation.  No substantial part of the activities of the Corporation shall consist of activities which do not further the Corporation's exempt purposes or of the carrying on of propaganda or otherwise attempting to influence legislation.  The Corporation shall not participate or intervene (including the publication or distribution of statements) in any political campaign on behalf of any candidate for public office.

**B.**      Upon dissolution of the Corporation, the assets of the Corporation shall be distributed exclusively to charitable, religious, scientific, or educational organizations that would then qualify under the provisions of § 501(c)(3) and §§ 509(a)(1), (a)(2), or (a)(3) of the Code and the Regulations thereunder as they now exist or as they may be amended.

**C.**      The Corporation shall distribute its income for each taxable year at such time and in such manner as not to become subject to the tax on undistributed income imposed by § 4942 of the Code or corresponding provisions of any subsequent federal tax laws.

**D.**      The Corporation shall not engage in any act of self-dealing as defined in § 4941(d) of the Code or corresponding provisions of any subsequent federal tax laws.

**E.**      The Corporation shall not retain any excess business holdings as defined in § 4943(c) of the Code or corresponding provisions of any subsequent federal tax laws.

**F.**      The Corporation shall not make any investments in such manner as to subject it to tax under § 4944 of the Code or corresponding provisions of any subsequent federal tax laws.

**G.**      The Corporation shall not make any taxable expenditures as defined in § 4945(d) of the Code or corresponding provisions of any subsequent federal tax laws.

**H.**      The Corporation is intended to be an organization defined in § 509(a) of the Code.

### Article 7 – No Corporate Shares

The Corporation shall have no stock or shares.

### Article 8 – Liability and Indemnity of Directors

A Director of the Corporation shall not be liable to the Corporation for monetary damages for an act or omission in the individual's capacity as a Director, except for liability (i) for any breach of the Director's duty of loyalty to the Corporation; (ii) for acts or omissions which are not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) for any transaction from which the Director received an improper benefit, whether or not the benefit resulted from an action taken within the scope of the Director's office; or (iv) for acts or omissions for which the liability of a Director is expressly provided by the Act or any other statute of the State of Texas.  This provision shall in no way limit or relieve a Director of any liability for federal excise taxes under Chapter 42 of the Code.

The Corporation shall have the power to indemnify the directors, officers, employees, and agents of the Corporation and to purchase liability insurance for those persons as, and to the extent, permitted by the Act or any other statute of the State of Texas.

**Form 401-A**
**(Revised 12/09)**



### Acceptance of Appointment
### and
### Consent to Serve as Registered Agent
### §5.201(b) Business Organizations Code

The following form may be used when the person designated as registered agent in a registered agent filing is an individual.

---

### Acceptance of Appointment and Consent to Serve as Registered Agent

I acknowledge, accept and consent to my designation or appointment as registered agent in Texas for

*Name of represented entity*

I am a resident of the state and understand that it will be my responsibility to receive any process, notice, or demand that is served on me as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if I resign.

**x:**

| *Signature of registered agent* | *Printed name of registered agent* | *Date (mm/dd/yyyy)* |

---

The following form may be used when the person designated as registered agent in a registered agent filing is an organization.

---

### Acceptance of Appointment and Consent to Serve as Registered Agent

I am authorized to act on behalf of   Capitol Corporate Services, Inc.
*Name of organization designated as registered agent*

The organization is registered or otherwise authorized to do business in Texas. The organization acknowledges, accepts and consents to its appointment or designation as registered agent in Texas for:

Crossvine Foundation

*Name of represented entity*

The organization takes responsibility to receive any process, notice, or demand that is served on the organization as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if the organization resigns.

**x:** *Mary Fink*     Mary Fink, Asst. Sec., on behalf of     04/09/2025
                        Capitol Corporate Services, Inc.

| *Signature of person authorized to act on behalf of organization* | *Printed name of authorized person* | *Date (mm/dd/yyyy)* |

---

Form 401-A                                    3

# EXHIBIT 9

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL<br>MANAGEMENT, L.P.,<br><br>      Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| **MARK S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**JAMES D. DONDERO; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,**<br><br>      **Defendants.** | **Adv. Pro. No. 21-03076-sgj** |

### PLAINTIFF HUNTER MOUNTAIN INVESTMENT TRUST'S
### EMERGENCY VERIFIED MOTION FOR TEMPORARY RESTRAINING
### ORDER, PRELIMINARY INJUNCTION, AND APPOINTMENT OF RECEIVER

Plaintiff Hunter Mountain Investment Trust ("HMIT") files this Emergency Verified

Motion ("Motion") seeking entry of a temporary restraining order and a preliminary injunction

enjoining Defendants James Dondero, Scott Ellington, Isaac Leventon, Strand Advisors, Inc., The

Get Good Trust, NexPoint Advisors, L.P., Highland Capital Management Fund Advisors, L.P.,

The Dugaboy Investment Trust, Highland Dallas Foundation, Massand Capital LLC, Massand

Capital, Inc., and SAS Asset Recovery, Ltd., (collectively, "Defendants") and those persons acting

in concert or participation with them from secreting, concealing or otherwise transferring any

funds or assets beyond the jurisdiction of this Court that would hinder or prevent the satisfaction

of a potential recovery or judgment awarded to Plaintiff in this adversary proceeding. HMIT also

seeks a mandatory injunction to require Defendants to periodically report to HMIT and the Court

any and all asset transfers regardless of purpose to maintain full and complete transparency.

Defendants have engaged in underhanded conduct for years, as orchestrated by Defendants

Dondero, Ellington and their affiliated entities, and Plaintiff has recently learned that they are

doing so again, this time to deprive the Court of the ability to enforce a judgment in favor of

Plaintiff. Defendants are asset managers, hedge funds, and their affiliates, whose business

operations frequently involve financial transactions in the millions of dollars or more. Defendants

have historically attempted to prop up sham transactions as otherwise legitimate, then used their

intimate familiarity with the civil litigation system to evade judgments in the face of clear liability.

Without question, HMIT is entitled to injunctive relief. A temporary restraining order and/or

preliminary injunction are vitally necessary to preserve the Court's jurisdiction over the

Defendants' assets by preventing their concealment or transfer beyond the Court's reach, thereby

ensuring they remain available to satisfy any judgment herein.

This Motion further requests that the Court appoint a receiver over the assets and property

of the Defendants and authorize the receiver to take control of such assets and property to the

extent necessary to ensure the Defendants' compliance with the injunctive relief requested herein

and to prevent the transfer of assets and property beyond the jurisdiction of the Court.

Unfortunately, given the Defendants' long history of avoiding liability through a complicated web of entities and fraudulent transfers, as well as recent evidence indicating that this pattern and practice of dissipating assets to avoid judgments remains ongoing, neither the Court nor HMIT can have any confidence that this conduct will not continue absent direct supervision.

In support of the Motion, HMIT respectfully incorporates herein, as if fully set forth verbatim, Plaintiff Hunter Mountain Investment Trust's Memorandum of Law in Support of its Emergency Verified Motion for Temporary Restraining Order, Preliminary Injunction and Appointment of Receiver ("<u>Memorandum</u>"), which is being filed contemporaneously with this Motion.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b).

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

3.      The predicates for the relief requested in the Motion are 11 U.S.C. § 105(a), Federal Rule of Bankruptcy Procedure 7065, and Federal Rule of Civil Procedure 65.

4.      The requested receivership is authorized, additionally, by Tex. Bus. & Orgs. Code §§ 11.403(a)(3) and 11.410(a), Tex. Bus. & Com. Code § 24.008(a)(3)(B), and/or Tex. Civ. Prac. & Rem. Code §§ 64.001(a)(2) and (a)(7).

## RELIEF REQUESTED

5.      HMIT requests that this Court issue the proposed form of restraining order attached hereto as **Exhibit A** ("<u>Proposed Order</u>") pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065.

6.     For the reasons set forth more fully in HMIT's Memorandum, HMIT seeks injunctive relief enjoining Defendants from directly or indirectly, through their affiliated corporate entities or anyone else acting on their behalf or in concert with them, from concealing, secreting or dissipating any assets or otherwise transferring any assets out of the country or beyond the jurisdiction of this Court that would hinder or prevent the satisfaction of a potential recovery or judgment awarded to HMIT in this proceeding. The Court also should enjoin Defendants requiring periodic disclosure of all transfers or dispositions of assets.

7.     HMIT further seeks the appointment of a receiver over the assets and property of the Defendants to ensure that the Defendants' conduct does not continue, as fully authorized by applicable law.

8.     Absent injunctive relief, and the appointment of a receiver to ensure Defendants' compliance, HMIT's ability to obtain the relief requested in this proceeding, which includes equitable relief in the form of the avoidance, recovery and return of fraudulently transferred assets out of the Debtor's estate,[1] will be jeopardized, and the integrity of this lawsuit and the estate assets at issue will be severely threatened. Emergency relief is needed to avoid this immediate and irreparable harm that will be caused to HMIT.

9.     In accordance with Rule 7.1 of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas*, contemporaneously herewith and in support of this Motion, HMIT is submitting its: (a) *Memorandum of Law*, (b) *Proposed Order*, and (c) *Motion for Expedited Hearing on Emergency Motion for a Temporary Restraining Order and Preliminary Injunction* ("Motion to Expedite"). HMIT also provides the Court with the

---

[1] Amended Complaint and Objection to Claims [Doc. 158] ("Amended Complaint").

Verification of Mark Patrick ("<u>Verification</u>") as to the statements made in this Motion and the Memorandum concerning the facts at issue and the necessity of immediate relief.

10. As is demonstrated by this Motion, the Memorandum, the Verification, and the evidentiary materials referenced therein, HMIT is entitled to the relief requested herein as set forth in the Proposed Order.

11. Notice of this Motion has been provided to Defendants in compliance with Fed. R. Civ. P. 65, and HMIT submits that no other or further notice need be provided.

WHEREFORE, HMIT respectfully requests that the Court (i) enter the Proposed Order substantially in the form annexed hereto as **<u>Exhibit A</u>** granting the relief requested herein, and (ii) grant HMIT such other and further relief as the Court may deem proper.

Respectfully submitted,

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
Texas Bar No. 24110325
isalzer@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

**ATTORNEYS FOR HUNTER MOUNTAIN INVESTMENT TRUST**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on September 15, 2025, counsel for HMIT emailed counsel for Defendants regarding the relief requested in this Emergency Motion for Temporary Restraining Order, Preliminary Injunction and Appointment of Receiver, and stating that if a response was not received by 2:00 p.m. HMIT would consider Defendants to be opposed. Counsel for HMIT then and conducted a telephone call with counsel for Defendants Dondero, Dugaboy, Nexpoint, and HCMFA, who advised that such Defendants are opposed to the relief requested this Motion, and further stated that they would attempt to coordinate with the other Defendants, but that HMIT should assume the remaining Defendants are also opposed. Accordingly, this Motion is being filed as opposed due to the need for immediate relief.

/s/ Ian B. Salzer
Ian B. Salzer

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2025, a true and correct copy of the foregoing document was served on all parties of record via the Court's ECF system.

/s/ Ian B. Salzer
Ian B. Salzer

3204169

# EXHIBIT 10

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL<br>MANAGEMENT, L.P.,<br><br>    Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| **MARK S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**JAMES D. DONDERO; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,**<br><br>    **Defendants.** | **Adv. Pro. No. 21-03076-sgj** |

PLAINTIFF HUNTER MOUNTAIN INVESTMENT TRUST'S
MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY
VERIFIED MOTION FOR TEMPORARY RESTRAINING ORDER,
<u>PRELIMINARY INJUNCTION, AND APPOINTMENT OF RECEIVER</u>

Plaintiff Hunter Mountain Investment Trust ("<u>HMIT</u>") submits this Memorandum of Law

in Support ("<u>Memorandum</u>") of its Emergency Verified Motion for Temporary Restraining Order,

Preliminary Injunction, and Appointment of Receiver ("<u>Verified Motion</u>"), pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure and Section 24.008(a)(3)(B) of the Texas Business and Commerce Code, also known as the Texas Uniform Fraudulent Transfer Act ("<u>TUFTA</u>"), seeking to enjoin Defendants James Dondero ("<u>Dondero</u>"), Scott Ellington ("<u>Ellington</u>"), Isaac Leventon ("<u>Leventon</u>"), Strand Advisors, Inc. ("<u>Strand Advisors</u>"), The Get Good Trust ("<u>Get Good</u>"), NexPoint Advisors, L.P. ("<u>NexPoint</u>"), Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>"), The Dugaboy Investment Trust ("<u>Dugaboy</u>"), Highland Dallas Foundation ("<u>HDF</u>"), Massand Capital LLC, Massand Capital, Inc., and SAS Asset Recovery, Ltd. ("<u>SAS</u>") (collectively, "<u>Defendants</u>") from (i) secreting or concealing assets in any manner or otherwise transferring assets out of the country beyond the jurisdiction of this Court that would hinder, frustrate or prevent the satisfaction of a potential recovery or judgment awarded against them in these proceedings; and, (ii) imposing a receivership on Defendants NexPoint, Get Good, HCMFA and Dugaboy pursuant to TUFTA Section 24.008(a)(3)(B). In support, HMIT states:

Case 21-03076-sgj   Doc 309-1   Filed 09/15/25   Entered 09/15/25 22:00:39   Desc
Memo of Law ISO Preliminary Injunction TRO 535 Page 3 of 31
Exhibit Exhibit 1 to Page 186 of 535

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................v

I. INTRODUCTION ............................................................................................................1

II. FACTUAL BACKGROUND ..........................................................................................4

A.    Procedural and Substantive Background ...............................................................4

B.    Defendants' Historical Pattern of Diverting and Concealing Assets ...........................6

      *The Highland Bankruptcy* ...................................................................................6

      *Dondero Engaged In Misconduct Relating to Acis and Joshua Terry* ....................7

      *Dondero and Ellington Fraudulently Induced an Investment from HarbourVest* ..........8

      *Willful Misconduct in the Transfer of Highland Capital Credit Strategies
      Fund's Assets* ....................................................................................................9

      *Willful Misconduct in the Transfer of Highland Crusader Fund's Assets* ....................9

      *Dondero and His Accomplices Caused Highland to Engage In Misconduct That
      Increased Liability To UBS* ...............................................................................10

C.    Defendants' Recent Efforts to Transfer and Conceal Assets ....................................11

III. LEGAL STANDARD .................................................................................................13

A.    Injunctive Relief ...............................................................................................13

B.    Receivership .....................................................................................................14

IV. ARGUMENT ..............................................................................................................15

A.    HMIT Will Suffer Irreparable Harm in the Absence of Injunctive Relief ................15

B.    HMIT Demonstrates Likelihood of Success on the Merits .......................................18

C.    The Equities Strongly Favor HMIT .....................................................................19

D.    Injunctive Relief Serves the Public Interest ..........................................................20

E.    Appointment of a Receiver .................................................................................20

IV. SECURITY ..................................................................................................................22

**V. CONCLUSION** ....................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*35 Bar & Grille, LLC v. City of San Antonio*, 943 F. Supp. 2d 706 (W.D. Tex. 2013)................ 18

*Akin, Gump, Strauss, Hauer and Feld, L.L.P. v. E-Court, Inc.*, 2003 Tex. App. LEXIS 3966 (Tex. App.—Austin May 8, 2003, no pet.).................................................................................. 21

*Amegy Bank N.A. v. Monarch Flight II, LLC*, No. 4:11-CV-3218, 2011 U.S. Dist. LEXIS 140874 (S.D. Tex. Dec. 7, 2011).......................................................................................................... 16

*Bank of Am., N.A. v. Mega World Builder Corp.*, No. 4:24-CV-3021, 2024 U.S. Dist. LEXIS 203763 (S.D. Tex. Nov. 8, 2024)............................................................................................ 16

*Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733 (N.D. Tex. 2008) ...................................... 21

*Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300 (5th Cir. 1978)........................................ 22

*Craig v. McCarty Ranch Trust (In re Cassidy Land and Cattle Co.)*, 836 F.2d 1130 (8th Cir. 1988)........................................................................................................................................... 15

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579 (5th Cir. 2013) ....... 15

*Green v. Wells Fargo Bank, N.A.*, 575 Fed. Appx. 322 (5th Cir. 2014) ........................................ 14

*In re Compton Corp.*, 90 B.R. 798 (Bankr. N.D. Tex. 1988) ........................................................ 14

*In re FiberTower Network Servs. Corp.*, 482 B.R. 169 (Bankr. N.D. Tex. 2012)................... 13, 20

*In re Hunt*, 93 B.R. 484 (Bankr. N.D. Tex. 1988) ................................................................. 15, 20

*In re Memorial Estates, Inc.*, 797 F.2d 516 (7th Cir. 1986) ........................................................ 15

*In re OGA Charters, LLC*, 554 B.R. 415 (Bankr. S.D. Tex. 2016) ......................................... 13, 20

*In re Seatco, Inc.*, 259 B.R. 279 (Bankr. N.D. Tex. 2001) .......................................................... 14

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2010)............................................... 15, 16, 17, 18

*Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624 (5th Cir. 1996)......................................................... 22

*Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021) ..................................................................... 14

*Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618 (5th Cir. 1985) ...................... 13

*Moore v. Brown*, 868 F.3d 398 (5th Cir. 2017) .......................................................................... 14

*Nobelman v. American Savings Bank*, 508 U.S. 324 (1993)........................................................ 15

*Prep Sols., Ltd v. Lecht*, 2022 U.S. Dist. LEXIS 98756 (E.D. Tex. June 2, 2022) ...................... 16

*S. Texas Lighthouse for the Blind, Inc. v. Fed. Supply Servs. Int'l, Inc.*, 2020 U.S. Dist. LEXIS 157347 (S.D. Tex. Aug. 28, 2020)......................................................................................... 17

*Sargeant v. Al Saleh*, 512 S.W.3d 399 (Tex. App.—Corpus Christi 2016, no pet.) ..................... 17

*SEC v. Barton*, 135 F.4th 206 (5th Cir. 2025) ............................................................................ 16

*Sharp v. SSC Farms I, LLC (In re SK Foods, L.P.)*, 2010 Bankr. LEXIS 6445 (E.D. Cal. April 5, 2010)...................................................................................................................................... 17, 18

*Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074 (5th Cir. 1986) ............................................ 14

*Titlemax of Tex., Inc. v. City of Dall.*, 142 F.4th 322 (5th Cir. 2025) .......................................... 18

*Triadou SPV S.A. v. Chetrit*, 2021 WL 3290834, at *9 (Sup. Ct. N.Y. Cnty. Aug. 2, 2021)....... 10

*Tujague v. Adkins*, No. 4:18-CV-631, 2018 U.S. Dist. LEXIS 171394 (E.D. Tex. 2018) ...... 16, 17

*Turnkey Offshore Project Servs., LLC v. JAB Energy Solutions, LLC*, 2021 U.S. Dist. LEXIS 149733 (E.D. La. Aug. 10, 2021)............................................................................................ 17

*Unisys Corp. v. Dataware Prods., Inc.*, 848 F.2d 311 (1st Cir. 1988)......................................... 14

*Walker v. Doe*, No. 6:24-cv-00633-ADA, 2025 U.S. Dist. LEXIS 100396 (W.D. Tex. 2025)16, 17

**Statutes**

11 U.S.C. § 105................................................................................................ 13, 14, 15

11 U.S.C. § 544....................................................................................................... 20

11 U.S.C. § 548....................................................................................................... 20

11 U.S.C. § 550 ........................................................................................................................... 20

26 U.S.C. § 6502 ......................................................................................................................... 20

N.Y. C.P.L.R. § 5225 .................................................................................................................. 10

Tex. Bus. & Comm. Code § 24.008 ............................................................................. ii, 4, 22, 23

Tex. Bus. Orgs. Code § 11.403 ................................................................................................... 23

Tex. Bus. Orgs. Code § 11.410 ................................................................................................... 24

Tex. Civ. Prac. & Rem. Code § 64.001 ....................................................................................... 23

**Rules**

Fed. R. Bankr. P. 7065 ....................................................................................................... ii, 13, 14

Fed. R. Civ. P. 65(c) ....................................................................................................... 13, 14, 22

## I.
## INTRODUCTION

1.        Dondero and Ellington, and the other Defendants which they control or with which they are closely allied, are preparing for imminent reckonings, and they are using their affiliated entities to secrete and conceal assets that would otherwise be available to satisfy a judgment against them in this adversary proceeding. After decades of avoiding accountability through a "byzantine" web of entities and fraudulent transfers, the walls are finally closing in on Defendants.

2.        There are two such reckonings on the immediate horizon. First, this adversary proceeding, alone, seeks to impose hundreds of millions of dollars of liability on Dondero and Ellington, individually, as well as entities they control. HMIT recently reactivated this adversary proceeding after a two-year stay.[1] Dondero and other Defendants aggressively opposed HMIT's acquisition of the rights to prosecute this adversary proceeding and, now, fully realizing the stay would be lifted, opposed HMIT's substitution as Plaintiff.[2]

3.        The other immediate reckoning is the oral argument now scheduled for September 22, 2025, in a turnover case brought by UBS—one of Highland's largest original creditors[3]—seeking to hold Dondero and Ellington personally liable for over $1.4 billion in damages and accrued interest related to an underlying transaction involving Highland Capital Management, L.P. ("Highland").[4] UBS seeks to hold Dondero and Ellington accountable for

---

[1] HMIT's notice to lift stay was served on Wednesday, September 3, 2025 [Doc. 375].

[2] *See* Objection of NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. to Motion to Substitute [Doc. 364]; Joinder to Objection of NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. to Motion to Substitute [Doc. 363]; Joinder of Scott Ellington and Isaac Leventon to the Objection of NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. to Motion to Substitute [Doc. 362].

[3] UBS's Claims against Highland's estate (Claim Nos. 190 and 191) exceeded $1 billion, of which $125 million was ultimately allowed against the estate. *See* Order Approving Debtor's Settlement With UBS Securities LLC And UBS AG London Branch And Authorizing Actions Consistent Therewith [BK Doc. 2389].

[4] The UBS litigation is pending in New York Supreme Court, Index 6500744/2023, *UBS Securities LLC and UBS AG London Branch v. James Dondero, Scott Ellington, et al.* ("UBS Lawsuit").

- 1 -

fraudulent transfers predating Highland's bankruptcy,[5] and also seeks to impose alter ego liability upon them for the very large judgment against Highland in favor of UBS.[6] Thus, when combined, the UBS litigation and this adversary proceeding seek to impose over $1.7 billion in damages, making Defendants' motivations undeniably clear—Defendants are aggressively seeking to insulate their assets at all costs.

4.    HMIT's immediate need for injunctive relief stems from Defendants' recent use of an old playbook of moving and secreting assets. They are using shell entities and moving assets outside the jurisdiction of this and other interested U.S. courts to achieve this end. If not immediately restrained, the Defendants' efforts will frustrate the essential purpose of this adversary proceeding—recovering assets fraudulently and improperly transferred out of Highland's estate. In sum, Defendants are controlling assets which they wrongfully diverted from Highland, and they are now trying to prevent restitution of those assets.

5.    Recent evidence confirms that Dondero and Ellington are involved in transferring or seeking to transfer substantial assets using affiliated entities they control. One of these entities is Skyview Group Inc. ("Skyview"), an entity nominally owned by Ellington, but ultimately controlled and largely funded by Dondero.[7] These recent transfers or attempts to transfer include:

- Transfers of millions of dollars in 2025 to Crossvine Litigation Funding LLC ("CLF"), a Cayman entity created in April 2025 and controlled by Ellington and funded by Dondero;[8]

- Efforts to liquidate or transfer a stock ownership position (held directly or indirectly by Dondero) involving multi-family housing

---

[5] Certain of these fraudulent transfers involved other Defendants, including Massand Capital and SAS.

[6] Special Turnover Petition (a true and correct copy is attached as **Exhibit 1**) ("UBS Petition"), ¶¶ 1-3 [Index No. 650744/2023, Supreme Court of New York County, New York, *UBS Securities LLC, et al. v. James Dondero, et al.*

[7] Skyview provides back-office support for Dondero's NexPoint and HCMFA, which manage assets wrongfully diverted from Highland.

[8] CLF is owned by Crossvine Holdings LLC and Crossvine Foundation (collectively "Crossvine")—two Texas entities created by Ellington in April 2025.

and thereby moving over $30 million to a "charity" under Dondero's control and which, upon information and belief, is located in the Cayman Islands;[9]

▪ Dondero's highly improper, if not illegal demand to the Charitable DAF Fund, LP ("DAF") which indirectly owns HMIT, to send $1.5 million dollars to an offshore entity to bolster and "maintain the Sentinel structure," which involved a bogus insurance company created by Dondero and Ellington to hide assets from UBS. DAF's control person, Mark Patrick ("Patrick"), has independent contemporaneous evidence of this request. This attempt to funnel money from DAF to Sentinel was and is part of an ongoing effort that would continue (and, as described below, has continued) into the future;

▪ Even though DAF rejected Dondero's demand, Skyview made multiple wires in connection with this proposed scheme, including a $3 million wire to Atreyu Pipeline Logistics, LLC, an entity controlled by Ellington,[10] and there is contemporaneous evidence that as much as $7 million was transferred by Dugaboy, NexPoint and/or Ellington (acting through Skyview); and

▪ Isaac Leventon, a Defendant, was aware of Dondero's requests but made it clear to Patrick that he would deny any involvement in any related conversations.

6.     The conduct at issue flows from the same vein as the types of conduct previously considered by this Court when the Court expressed concern that Defendants' efforts to conceal their ongoing fraudulent schemes and transfers involving Sentinel potentially violated federal criminal statutes.[11]

7.     Absent a TRO and preliminary injunction, HMIT's ability to recover the relief requested in this proceeding, which includes the avoidance, recovery and return of assets diverted

---

[9] Preparations for the transfer of this stock position occurred within the immediate past, and is evidenced by a contemporaneous tape recording.

[10] Ellington refused to provide 1099s to Skyview tax professionals relating to Atreyu and certain other entities in an ostensible effort to evade scrutiny.

[11] See August 8, 2022 Hearing Transcript [Adv. Pro. No. 21-3020-sgj, Doc. 183] , p. 131; see also Highland Capital Management, L.P.'s Memorandum Of Law In Support Of Its Motion To Deem The Dondero Entities Vexatious Litigants And For Related Relief [Case No. 3:21-cv-881, Doc. 137] ("Vexatious Litigant Motion").

or fraudulently transferred out of Highland's estate,[12] will be jeopardized, and the integrity of these proceedings undermined. If Defendants' schemes remain unchecked, they will succeed in frustrating HMIT's efforts to collect on a judgment in this lawsuit, resulting in a colossal waste of party and judicial resources. At a minimum, HMIT will be forced to incur additional legal expense to unwind Defendants' fraudulent transactions.

8.      The imposition of a receivership is separately justified because the Liquidation Trustee's claims, now assigned to HMIT, include a probable interest and right to various assets under Defendants' wrongful control. In light of Defendants' history of diverting assets and fraudulent transfers, a receivership is appropriate pursuant to TEX. BUS. & COMM. CODE § 24.008(a)(3)(B).

9.      It is clear that emergency relief is needed. However, if for any reason this Court disagrees with HMIT's application for an immediate TRO, then HMIT alternatively requests an expedited hearing date at the Court's earliest convenience for consideration of a preliminary injunction and the appointment of a receiver. Expedited relief is needed to avoid the harms which HMIT will otherwise suffer if Defendants are allowed to continue transferring and secreting assets undeterred and to preserve the Court's jurisdiction over these assets and ability to grant relief. HMIT is separately seeking expedited discovery in anticipation of this hearing.

## II.
## FACTUAL BACKGROUND

### A.      Procedural and Substantive Background

10.      This adversary proceeding was filed in October 2021, shortly after the Effective Date of the Fifth Amended Plan of Reorganization of Highland Capital Management, LP (as

---

[12] *See* Amended Complaint, ¶¶ 137-186.

modified) (the "Plan"), and was initiated by a Litigation Sub-Trust created pursuant to the Plan.

The purpose of the Litigation Sub-Trust was to bring and prosecute claims belonging to the

Debtor's estate. Those claims have now been assigned and transferred to HMIT;[13] and HMIT

stands in the shoes of the Litigation Sub-Trust as Plaintiff.

11.     The relief sought in this adversary proceeding is wide-ranging, seeking to impose

liability for myriad wrongful acts and fraudulent transfers induced by Dondero, Ellington and other

Defendants. As this Court previously noted:[14]

> The 36 causes of action [in this lawsuit] seek: the avoidance and recovery of
> intentional and constructive fraudulent transfers and obligations under Sections
> 544, 548, and 550 of the Bankruptcy Code; illegal distributions under Delaware
> partnership law; breach of fiduciary duty; declaratory judgment that certain entities
> are liable for the debts of others under alter ego theories, successor liability, aiding
> and abetting, or knowing participation in breach of fiduciary duty; civil conspiracy;
> tortious interference with prospective business relations; breach of contract;
> conversion; unjust enrichment; and the disallowance or subordination of claims
> under Sections 502 and 510 of the Bankruptcy Code.

12.     As set forth in the Amended Complaint, at ¶¶ 110-171, stretching back to 2013,

Dondero and Ellington have used their control over affiliated entities, such as Dugaboy, Get Good,

NexPoint, and SAS, for improper purposes, including improper insider distributions and transfers

out of the reach of creditors. Over $50 million remains to be clawed back from Dondero for

voidable transfers alone, not including the hundreds of millions of dollars HMIT seeks for its other

claims against Dondero and the other Defendants.[15]

---

[13] Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement [BK Doc. 4297]; Order
Granting Motion to Substitute [Doc. 377].

[14] Report And Recommendation To The District Court Proposing That It: (A) Grant Defendants' Motions To
Withdraw The Reference At Such Time As The Bankruptcy Court Certifies That Action Is Trial Ready; But (B) Defer
Pre-Trial Matters To The Bankruptcy Court [Doc. 151], p. 6.

[15] *See* Amended Complaint, ¶¶ 171-186.

**B.**     **Defendants' Historical Pattern of Diverting and Concealing Assets**

13.     Dondero, and those acting in concert with him, including Ellington, NexPoint and the other Defendants, have repeatedly undermined the authority and ability of the Court to deal with Highland's estate. Although a meaningful elucidation of the Defendants' conduct would require hundreds of pages, the following historical exemplars, as alleged in the Amended Complaint, exemplify Defendants' wrongful conduct. A common scheme and pattern of behavior is also evident—fraudulent transfers and the diversion of assets.

### *The Highland Bankruptcy*

14.     Dondero was formerly the President and Chief Executive Officer of Highland, and the sole member of its general partner, Strand Advisors. Together with Ellington—Highland's former general counsel—Dondero directed Highland to file for Chapter 11 bankruptcy in Delaware in late 2019 in response to several massive litigation awards against Highland.[16] Soon after Highland's bankruptcy was transferred to this Court, the Unsecured Creditors Committee demanded, and the Court approved, a change of control resulting in Dondero's removal as the sole control person and the appointment of an independent board of directors and a new CEO.[17]

15.     On October 9, 2020, Dondero was instructed to fully resign from all positions related to Highland or face removal as a Highland employee and as portfolio manager for all Highland managed funds due to conduct detrimental to Highland, as the Debtor, and its creditors.[18] Ellington was similarly terminated for cause on January 5, 2021, for actions adverse to Highland.[19]

---

[16] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (II) Granting Related Relief [BK Doc. 1943] ("Confirmation Order"), ¶¶ 6-8.

[17] *See* Confirmation Order, ¶¶ 11-13.

[18] *See* Confirmation Order, ¶ 4.

[19] *See* Plaintiff's First Amended Original Complaint [Civil Action No. 3:24-cv-498 in the Northern District of Texas, Doc. 82] ("HERA Complaint"), ¶ 125.

16.     Highland's bankruptcy was unique because the largest creditor claims arose from litigation awards and judgments.[20] Indeed, upon information and belief, Dondero and Ellington expected to use the bankruptcy process to thwart recoveries while maintaining control of Highland, but the bankruptcy instead served to reveal a pattern of recurring misconduct that led to over $1 billion dollars in litigation judgments and arbitration claims against Highland and over $40,000,000 in legal fees.[21]

17.     On February 8, 2021, the Court confirmed the Plan, and the Court entered its Confirmation Order on February 22, 2021.[22] The Plan became effective on August 11, 2021, and, as a result, Highland's ownership was restructured.[23] Both before and after bankruptcy, Defendants Dondero and Ellington have been working to strip the assets of entities they controlled to ensure that any aggrieved party could not collect on its hard-fought judgments or its rights of ownership. This Court previously considered evidence of wrongdoing and expressed concern that criminal laws may have been violated.[24]

### *Dondero Engaged In Misconduct Relating to Acis and Joshua Terry*[25]

18.     In 2010, Dondero formed Acis Capital Management, L.P. ("Acis") as a "lifeboat" to divert collateralized loan business fees from Highland after its lenders placed security liens on Highland's assets. Initially, Acis was owned indirectly by Dondero and others. Joshua Terry, a Highland employee, later joined the platform in 2011 to manage Acis.

---

[20] Confirmation Order, ¶ 8.

[21] *See* Amended Complaint, ¶¶ 66, 95.

[22] Confirmation Order, p. 4, ¶ k.

[23] *See* Notice Of Occurrence Of Effective Date Of Confirmed Fifth Amended Plan Of Reorganization Of Highland Capital Management, L.P. [BK Doc. 2700].

[24] August 8, 2022 Hearing Transcript [Adv. Pro. No. 21-3020-sgj, Doc. 183], p. 131.

[25] The following summary refers to and incorporates ¶¶ 67-72 of the Amended Complaint.

19.     In 2016, Dondero sought to finance an investment in South America by causing a separate portfolio company, Trussway Industries Inc. ("Trussway"), to incur unnecessary debt and divert loan proceeds to finance the purchase. Terry criticized this conduct as a breach of fiduciary duties to Acis' investors, and Dondero responded by firing Terry. Dondero and Terry ultimately went to arbitration in which the panel found against Dondero and Highland.

20.     Four days after Terry's arbitration judgment was issued, Dondero, acting through Highland, and with the aid of Ellington and others, entered into numerous transactions designed to take control of Acis's business and strip Acis of assets so it would be unable to pay Terry's arbitration award. This scheme to render Acis judgment-proof led Terry to file involuntary Chapter 11 petitions against Acis. In response, Dondero, through Highland, which Dondero still controlled, amped up Dondero's mismanagement of the Acis funds, leading Acis' appointed bankruptcy trustee to replace Highland as sub-advisor.

21.     Dondero also caused Highland to commence litigation against Acis' trustee, prompting a countersuit pursuant to which the Chapter 11 trustee sought to recover fraudulent transfers Dondero had directed. This led to the entry of a temporary restraining order against Highland.

### *Dondero and Ellington Fraudulently Induced an Investment from HarbourVest*[26]

22.     Dondero and Ellington fraudulently induced an investment from a group of third-party investors collectively known as "HarbourVest." Dondero and Ellington used Highland to induce HarbourVest to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—for approximately $75 million in cash, with a commitment to invest an additional $75 million. Unbeknownst to HarbourVest, however, Dondero intended to use the $75 million from

---

[26] The following summary refers to and incorporates ¶¶ 73-75 of the Amended Complaint.

HarbourVest to make investments in other Dondero controlled and owned entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefited Dondero personally, but left Highland exposed to hundreds of millions of dollars in potential damages to HarbourVest.

### *Willful Misconduct in the Transfer of Highland Capital Credit Strategies Fund's Assets*[27]

23.     Another example of fraudulent transfers involved the judgment relating to Highland Capital Credit Strategies Fund. In that case, Dondero was found to have engaged in willful misconduct by secretly causing Highland (still under Dondero's control) to move certain assets to other entities for far less than actual value. Highland paid only $24 million for those assets—far less than valuations performed by third parties, even those hired by Highland (up to $37 million). The arbitration panel found Dondero's explanations to excuse his conduct "to put it mildly, far-fetched"—and awarded Highland Capital Credit Strategies Fund over $30 million in damages.

### *Willful Misconduct in the Transfer of Highland Crusader Fund's Assets*[28]

24.     Dondero and Ellington engaged in misconduct relating to a group of Highland managed funds known as the "Crusader Funds." On July 5, 2016, the "Redeemer Committee," which was formed to oversee the wind-down and distribution of proceeds from the Crusader Funds, commenced an arbitration (the "Redeemer Arbitration") against Highland alleging misconduct as its investment advisor. The Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that resulted in an award of damages of $136.8 million and total damages (including interest) of $190.8 million.

---

[27] *See* HERA Complaint, ¶ 153.

[28] The following summary refers to and incorporates ¶¶ 87-93 of the Amended Complaint.

25.     One of the many willful breaches the arbitrators found is that Dondero and Ellington caused Highland to commit surreptitious self-benefitting transfers of approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016.

### *Dondero and His Accomplices Caused Highland to Engage In Misconduct That Increased Liability To UBS*[29]

26.     In August 2017, Dondero and Ellington, along with others including Leventon, transferred assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity created, and indirectly owned and controlled, by Dondero and Ellington, to ensure that assets would be out of UBS's reach in the event a judgment was entered in its favor in a pending New York State Court proceeding.[30] In or around August 2017, Dondero, Ellington and others orchestrated the surreptitious transfer of all assets of the judgment defendants—with a face amount of $300 million and a market value of at least $100 million—to Sentinel. The goal of this transfer was to drain assets while keeping the assets within Dondero's and Ellington's ownership and control.

27.     In February 2023, UBS filed a turnover petition in New York State Court seeking to collect its judgment from Dondero, Ellington, and others, by clawing-back the assets from Sentinel and unwinding several other alleged fraudulent transfers. Exhibit 71 to UBS's petition outlines the hundreds of entities Dondero and Ellington have under their control to move assets and avoid scrutiny.[31] Oral arguments on the turnover petition are now scheduled for September 22, 2025, following which the turnover petition will be ripe for summary adjudication.[32]

---

[29] The following summary refers to and incorporates ¶¶ 76-80 of the Amended Complaint.

[30] *See* UBS Petition (**Exhibit 1**), pp. 22-35; UBS Pet. Ex. 40 (a true and correct copy of which is attached as **Exhibit 2**) (outlining Sentinel structure and aftershocks of "years of fraudulent transfer claims throughout [the] Highland structure" should Dondero refuse to settle).

[31] A true and correct copy is attached as **Exhibit 3**.

[32] *See* Index No. 650744/2023 Docket Sheet (a true and correct copy is attached as **Exhibit 4**); N.Y. C.P.L.R. § 5225; *Triadou SPV S.A. v. Chetrit*, 2021 WL 3290834, at *9 (Sup. Ct. N.Y. Cnty. Aug. 2, 2021) (noting that turnover petitions are governed by the same standards as summary judgments).

## C.   Defendants' Recent Efforts to Transfer and Conceal Assets

28.   Following their exodus from Highland, Dondero and Ellington picked up the mantle under the banner of the newly formed Skyview. With Highland no longer under Dondero's control, Skyview and NexPoint are now the primary means by which Defendants continue their fraudulent activities.

29.   Ellington nominally owns Skyview,[33] but Dondero, through NexPoint, is Skyview's primary client. Using Skyview, Dondero is currently seeking to move and transfer approximately $30 million in assets to a new "charity" which Dondero controls. This ownership stake includes a stock position involving multi-family projects and other assets. Upon information and belief, this "charity" is an offshore Cayman entity that has been described as "DAF-2." This scheme was underway as recently as August 2025.

30.   Dondero, acting individually and through Skyview, made a highly improper demand upon Patrick, the control person of DAF, to transfer $1.5 million to an entity unrelated to the charitable purposes of DAF and without any consideration. This transaction was properly rejected by Patrick. It is also apparent Dondero would have used Patrick's compliance with his demand (which never occurred) to exert leverage over Patrick in his capacity as DAF's control person. It was one of many reasons Patrick reorganized the DAF structure in the Cayman Islands. Ultimately, Dondero and Ellington transferred $7 million overseas to "maintain the Sentinel structure." Over $3 million (of the $7 million) initially went to Atreyu. The remaining $4 million was also funded.

---

[33] A true and correct copy of the 2024 Texas Franchise Tax Public Information Report for Skyview Group, Inc. is attached as **Exhibit 5**.

31.     Due in large part to Dondero's improper demands, Mr. Patrick left Skyview. Since then, Dondero, Ellington, and their conspirators have embarked on a multi-front litigation campaign designed to harass Mr. Patrick and the entities he controls. The cornerstone of this new wave of litigation involves liquidation proceedings in the Cayman Islands regarding a former limited-partner within the DAF structure. Consistent with Dondero's theme of using entities without standing to challenge transactions Dondero does not like, the entity over which Dondero seeks to gain control in the Caymans has no authority to exercise control over any other DAF entity, nor any right to object to transactions made by other DAF entities. Nonetheless, Dondero, either individually or through his representatives, is funding this litigation assault in the Cayman Islands to undo the reorganization of DAF—a series of transactions that were designed to reinforce Dondero's lack of influence over the DAF entities.

32.     Dondero and Ellington recently created several new entities that are being used to fund this Cayman litigation by funneling funds to a Cayman entity known as Crossvine, and are doing so through layers of Crossvine-related entities.[34] Ellington is identified as the control person in this Cayman entity,[35] but again, it is clear that Dondero is funding this entity.[36] There is no credible dispute that these Crossvine entities are controlled by Dondero and Ellington. Ellington is the member or manager of these various Crossvine vehicles.[37]

---

[34] *See* Funding Agreement of Joint Official Liquidators dated 11 July 2025 ("<u>Funding Agreement</u>") (a true and correct copy of which is attached as **Exhibit 6**); Certificate of Formation for Crossvine Holdings, LLC (a true and correct copy of which is attached as **Exhibit 7**); Certificate of Formation for Crossvine Foundation (a true and correct copy of which is attached as **Exhibit 8**).

[35] *See id.*

[36] The Joint Official Liquidators ("<u>JOLs</u>") have admitted in the Cayman proceedings that Crossvine is a special purpose entity ultimately created for Dondero's benefit.

[37] *Id.*

33.     This litigation funding serves a dual purpose: (i) it shuffles money to offshore allies

in exchange for contingent future recoveries that are legally distinct from the assets that funded

those returns, and subject to further dissipation, and (ii) it serves to frustrate this adversary

proceeding against Dondero, Ellington, and the other Defendants which, to the extent of any

recovery, will benefit the restructured DAF and its charitable mission. This new attempt to move

funds offshore under the guise of "litigation funding" is conspicuously similar to the movement of

assets through Sentinel.

34.     The continued attempts by Dondero, Ellington, and their affiliates to frustrate

HMIT's prosecution of the claims in this adversary proceeding confirm that their litigation strategy

is the same today as it has been throughout the past decade: delay, defraud, and dissipate.

## III.
## LEGAL STANDARD

### A.  Injunctive Relief

35.     Bankruptcy Rule 7065 provides that Fed. R. Civ. P. 65 applies in an adversary

proceeding. Under Rule 65, the Court is authorized to issue injunctive relief, and a decision to do

so is committed to the Court's sound discretion. *Miss. Power & Light Co. v. United Gas Pipe Line*,

760 F.2d 618, 621 (5th Cir. 1985). Likewise, § 105(a) of the Bankruptcy Code authorizes

bankruptcy courts to "issue any order, process, of judgment that is necessary or appropriate to

carry out the provisions of the Code," including injunctions. *In re FiberTower Network Servs.

Corp.*, 482 B.R. 169, 182 (Bankr. N.D. Tex. 2012) (*quoting* 11 U.S.C. § 105); *see also In re OGA

Charters, LLC*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016) (*quoting Miss. Power*, 760 F.2d at 621).

36.     The purpose of injunctive relief is to "prevent irreparable injury so as to preserve

the court's ability to render a meaningful decision on the merits." *Miss. Power*, 760 F.2d at 627. A

court also may appropriately exercise its powers to grant injunctive relief by compelling disclosure

of regular audited financial reports and freezing transfers of assets outside the ordinary course of business. *See Unisys Corp. v. Dataware Prods., Inc.*, 848 F.2d 311 (1st Cir. 1988).

37.    To obtain injunctive relief under either Rule 65 or § 105, a movant must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest. *Moore v. Brown*, 868 F.3d 398, 402-03 (5th Cir. 2017); *Green v. Wells Fargo Bank, N.A.*, 575 Fed. Appx. 322, 323 n. 3 (5th Cir. 2014). "Likelihood of success and irreparable injury to the movant are the most significant factors." *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021).

38.    A temporary restraining order should be granted pending a hearing for a preliminary injunction where it appears that "immediate and irreparable injury, loss or damage will result to the movant." *See* Fed. R. Bankr. P. 7065 (incorporating by reference Fed. R. Civ. P. 65); *see also In re Seatco, Inc.*, 259 B.R. 279, 285 (Bankr. N.D. Tex. 2001). Again, the issuance of an injunction is within the broad discretion of the court. *See In re Compton Corp.*, 90 B.R. 798, 806 (Bankr. N.D. Tex. 1988); *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986).

**B.  Receivership**

39.    Given the Defendants' long history of transferring and hiding assets, setting up new entities, abusing the bankruptcy system, and engaging in every conceivable effort to delay and avoid responsibility, a preliminary injunction may not be enough to protect Plaintiff and/or the jurisdiction of the Court over the assets at issue. Accordingly, HMIT also asks the Court to appoint a receiver.

40.    It is well understood that § 105(b) of the Bankruptcy Code does not prohibit the appointment of a receiver in a related adversary proceeding where authorized and appropriate. *See, e.g., Craig v. McCarty Ranch Trust (In re Cassidy Land and Cattle Co.)*, 836 F.2d 1130, 1133 (8th

Cir. 1988); *In re Memorial Estates, Inc.*, 797 F.2d 516, 520 (7th Cir. 1986) ("The power cut off by

section 105(b) of the Bankruptcy Code is the power to appoint a receiver for the bankrupt estate,

that is, a receiver in lieu of a trustee."). The Court's appointment of a receiver is otherwise

governed by applicable state law. *See Nobelman v. American Savings Bank*, 508 U.S. 324, 329

(1993). In this instance, the appointment of a receiver is also authorized under TUFTA.

## IV.
## ARGUMENT

**A.**   **HMIT Will Suffer Irreparable Harm in the Absence of Injunctive Relief**

41.   HMIT will be severely harmed if Defendants are not enjoined from transferring

assets outside the jurisdiction of this Court or otherwise secreting or concealing assets in a blatant

attempt to avoid the impact of an adverse judgment and interfere with the Court's authority to grant

relief.

42.   Irreparable harm occurs "where there is no adequate remedy at law.'" *Janvey v.*

*Alguire*, 647 F.3d 585, 600 (5th Cir. 2010); *see OGA Charters*, 554 B.R. at 424 (*quoting Daniels*

*Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)). In the

bankruptcy context, "irreparable harm" refers to either "irreparable harm to the interest of a

creditor or irreparable harm to the bankruptcy estate," including th[e] Court's exclusive authority

to effectively manage the[] case[]." *In re Hunt*, 93 B.R. 484, 495 (Bankr. N.D. Tex. 1988) (internal

quotations omitted).

43.   Although money damages may, in some circumstances, be *available* to remediate

threatened harm, the Fifth Circuit has recognized, the "mere fact that economic damages may be

available does not always mean that a remedy at law is 'adequate.'" *Janvey*, 647 F.3d at 600. "For

example, some courts have found that a remedy at law is inadequate if legal redress may be

obtained only by pursuing a multiplicity of actions." *Id.*; *see Walker v. Doe*, No. 6:24-cv-00633-

ADA, 2025 U.S. Dist. LEXIS 100396, at *10 (W.D. Tex. 2025) (finding money damages to be inadequate remedy in light of alleged scheme to launder funds beyond the reach of the court); *Tujague v. Adkins*, No. 4:18-CV-631, 2018 U.S. Dist. LEXIS 171394 (E.D. Tex. 2018) ("[A] plaintiff seeking economic damages will suffer irreparable harm when the defendant's dissipation of assets would require the plaintiff to initiate '"a multiplicity of suits … to gain relief."'").

44.     Courts have determined repeatedly that a dissipation or transfer of assets impairing the court's ability to grant an effective remedy constitutes irreparable harm, and injunctive relief is appropriate where the underlying complaint includes claims that are equitable in nature. *See, e.g., Janvey*, 647 F.3d 585; *Walker*, 2025 U.S. Dist. LEXIS 100396; *Tujague*, 2018 U.S. Dist. LEXIS 171394; *Prep Sols., Ltd v. Lecht*, 2022 U.S. Dist. LEXIS 98756 (E.D. Tex. June 2, 2022) ("[t]he Court can permissibly freeze assets to protect a plaintiff's equitable remedies—such as the equitable remedy of disgorgement"); *Amegy Bank N.A. v. Monarch Flight II, LLC*, No. 4:11-CV-3218, 2011 U.S. Dist. LEXIS 140874, at *17 (S.D. Tex. Dec. 7, 2011) (irreparable harm is established and injunctive relief is appropriate where there is "evidence showing that … the defendant intends to dissipate his assets to make a judgment awarding damages uncollectible"); *Bank of Am., N.A. v. Mega World Builder Corp*., No. 4:24-CV-3021, 2024 U.S. Dist. LEXIS 203763, *17 (S.D. Tex. Nov. 8, 2024) ("When the dissipation of assets that are the subject of a lawsuit would impair the district court's ability to grant an effective remedy at the conclusion of the case, the district court may enter a preliminary injunction to protect against those assets' dissipation"); *SEC v. Barton*, 135 F.4th 206, 228 (5th Cir. 2025) ("[T]he SEC has also shown irreparable harm to the defrauded investors through further dissipation of assets. If those assets were distributed, there would be no recovery for the defrauded investors—thus making the harm irreparable."); *Turnkey Offshore Project Servs., LLC v. JAB Energy Solutions, LLC,* 2021 U.S. Dist.

LEXIS 149733, at *15-16 (E.D. La. Aug. 10, 2021) ("[W]hen the underlying claim is one that is equitable in nature, a Rule 65 injunction may be available to preserve the defendant's assets during the pendency of the proceeding."). In cases like this one, the Court has full authority to issue an injunction if necessary to prevent Defendants from dissipating, disposing or transferring assets prior to judgment. *See id.*; *Sargeant v. Al Saleh*, 512 S.W.3d 399 (Tex. App.—Corpus Christi 2016, no pet.) (affirming sweeping asset-freezing injunction in TUFTA case).

45.     Fraudulent transfer, disgorgement, and declaratory judgment claims form a large part of the Amended Complaint.[38] Unquestionably, these are equitable claims that support injunctive relief where appropriate. *See, e.g.*, *Janvey*, 647 F.3d 585; *Walker*, 2025 U.S. Dist. LEXIS 100396; *Tujague*, 2018 U.S. Dist. LEXIS 171394; *Sharp v. SSC Farms I, LLC (In re SK Foods, L.P.)*, 2010 Bankr. LEXIS 6445, *54 (E.D. Cal. April 5, 2010) ("Courts have held that a preliminary injunction freezing the transfer of assets is proper where fraudulent conveyance is alleged in a bankruptcy case."); *S. Texas Lighthouse for the Blind, Inc. v. Fed. Supply Servs. Int'l, Inc.*, 2020 U.S. Dist. LEXIS 157347, *3-4 (S.D. Tex. Aug. 28, 2020) (noting that a fraudulent transfer claim in a complaint is a claim for equitable relief that will support injunctive relief if assets are being concealed or dissipated).

46.     An injunction is particularly appropriate where, as here, the assets at issue are not just being dissipated or concealed, but are, upon information and belief, intentionally transferred outside the jurisdiction of the Court and therefore beyond the authority of the Court to enforce a judgment in favor of HMIT. *See, e.g., Janvey*, 647 F.3d 585; *Walker*, 2025 U.S. Dist. LEXIS 100396; *Tujague*, 2018 U.S. Dist. LEXIS 171394; *Sharp*, 2010 Bankr. LEXIS 6445, at *53 ("In the event an injunction is not issued and Defendants are permitted to transfer or sell their assets

---

[38] ¶¶ 137-186.

beyond the reach of this Court, the Trustee, and the creditors of the estates, will suffer irreparable harm.").

47.     Such activity should be prohibited and, in reaching the determination to do so, this Court is free to and should consider Dondero's and Ellington's long history of engaging in the very type of conduct sought to be enjoined. Manifestly, "[p]rior misconduct in hiding or depleting assets is 'extremely relevant to the concern that [defendants] might conceal or dissipate assets' again and is properly considered in granting an injunction." *Sharp*, 2010 Bankr. LEXIS, at *55.

48.     In the absence of injunctive relief, HMIT will face imminent and irreparable harm that cannot be adequately remedied. If Defendants continue to engage in the conduct sought to be prohibited, HMIT's ability to effectively recover the fraudulent transfers and assets at issue will be impaired and the Court will not be able to effectively grant the relief requested. If Defendants are not immediately enjoined from engaging in their attempts to hide assets and place those assets beyond the jurisdiction of the Court, this entire proceeding may be rendered futile.

## B.     **HMIT Demonstrates Likelihood of Success on the Merits**

49.     HMIT is likely to succeed on the merits. To satisfy the likelihood of success element, the movant need only present a "prima facie case." *Janvey*, 647 F.3d at 595. In that regard, the Fifth Circuit recognizes that "[n]one of the [preliminary injunction] prerequisites has a fixed quantitative value," and instead employs a sliding scale which balances the likelihood of success on the merits against the other factors. *Titlemax of Tex., Inc. v. City of Dall.*, 142 F.4th 322, 328 (5th Cir. 2025). "As the level of persuasion in relation to the other three factors increases, the degree of persuasion necessary on the substantial likelihood of success factor may decrease." *35 Bar & Grille, LLC v. City of San Antonio*, 943 F. Supp. 2d 706, 722 (W.D. Tex. 2013).

50.     Here, the Amended Complaint alleges, among other things, numerous claims for the avoidance and recovery of intentional and constructively fraudulent transfers under 11 U.S.C.

§§ 544, 548, and 550, 26 U.S.C. § 6502, as well as Delaware and Texas law, as applicable. The Amended Complaint details the avoidable transactions at issue, in explicit detail and with numerous references to competent evidence amassed throughout these bankruptcy proceedings, and explains why the transfers were illegal under applicable law and should be recovered.

51.      The Amended Complaint and the documents cited therein alone establish the required likelihood of success on the merits, as to these and all of the claims asserted therein. As they are doing now, and as they have done in the past, Dondero and Ellington have devised elaborate schemes to place assets beyond the ability of the Court and HMIT to recover.[39] There is no legitimate defense to Defendants' various fraudulent schemes, whether through "lifeboats," their use of pass-through entities to transfer assets, and their other actions in avoidance of this Court's management of the Highland bankruptcy.

## C.      **The Equities Strongly Favor HMIT**

52.      The balance of the equities also tip decisively in HMIT's favor. In the absence of injunctive relief, HMIT faces imminent and irreparable harm. If Defendants are not prevented from secreting or transferring assets outside the jurisdiction of the Court, HMIT's ability to recover on its claims will be at risk, as will the Court's jurisdiction to effectively render judgment. By contrast, there are no equities that favor denying injunctive relief as Defendants have no legal or equitable right to engage in conduct intentionally designed to avoid paying a judgment awarded against them. Should Defendants have a legitimate need to transfer assets, they can seek the Court's permission to do so.

---

[39] *See* Vexatious Litigant Motion, ¶ 5 n.5 ("Dondero's proclivity for frivolous litigation is so well known that HCMLP was unable to obtain cost-effective insurance because the insurance market refuses to insure the risk of Dondero's vexatiousness, calling it the 'Dondero Exclusion.'").

53.    In sum, the potential harm to HMIT in the absence of injunctive relief far outweighs any harm to Defendants if injunctive relief issues.

**D.    Injunctive Relief Serves the Public Interest**

54.    Finally, injunctive relief will further the public interest because it is necessary to protect HMIT's ability to successfully prosecute its claims and recover assets wrongfully taken from the Highland estate. "Courts have often held that injunctions that facilitate reorganizations serve the public interest." *FiberTower*, 482 B.R. at 189; *see also Hunt,* 93 B.R. at 497 ("Chapter 11 expresses the public interest of preserving the going-concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders."); *OGA Charters*, 554 B.R. at 426 (finding that the "public interest may be served where the purpose of the preliminary injunction is such that it serves to" uphold a core "pillar of bankruptcy by preserving a debtor's … assets that can be potentially used to satisfy valid claims against the bankruptcy estate."). By contrast, the public interest will not be served by allowing Defendants to continue to avoid the claims asserted against them and place assets at issue beyond the reach of HMIT and the Court's jurisdiction.

**E.    Appointment of a Receiver**

55.    Among other things, the Amended Complaint includes claims under TUFTA, which expressly authorizes the appointment of a receiver under "applicable principles of equity" when necessary to "take charge of the asset transferred or of other property of the transferee." TEX. BUS. & COM. CODE § 24.008(a)(3)(B). TUFTA provides creditors, secured or unsecured, with "a substantive right to the prejudgment appointment of a receiver" when a defendant is "seeking to hinder, delay, or defraud creditors." *Biliouris v. Sundance Res., Inc*., 559 F. Supp. 2d 733, 737-39 (N.D. Tex. 2008) ("TUFTA provides creditors—secured and unsecured alike—with the substantive right to seek quickly the appointment of a receiver to secure their interests and prevent

further fraudulent conduct without first enduring the long delay necessary to reduce their claims

to judgment").

56.    The Texas Civil Practices & Remedies Code § 64.001 also authorizes any "court of

competent jurisdiction" to appoint a receiver for numerous reasons, including "in an action by a

creditor to subject any property or fund to the creditor's claim" and "in any other case in which a

receiver may be appointed under the rules of equity." Tex. Civ. Prac. & Rem. Code §§ 64.001(a)(2)

and (a)(7). Under subsection (a)(2), a receiver may be appointed where the applicant has "a

probable interest in or right to the property or fund" and the property or fund is "in danger of being

lost, removed, or materially injured." *Id.* at § 64.001(b). The decision to appoint a receiver, whether

under TUFTA, § 64.001(a)(2) or § 64.001(a)(7), "rests in the sound discretion of the trial court."

*Akin, Gump, Strauss, Hauer and Feld, L.L.P. v. E-Court, Inc.*, 2003 Tex. App. LEXIS 3966, *10

(Tex. App.—Austin May 8, 2003, no pet.).

57.    Like § 64.001, a court that has subject matter jurisdiction over specific property of

a domestic or foreign entity in Texas may appoint a receiver for that property, or the proceeds from

that property, in several scenarios, including actions "by a creditor to subject the property or fund

to the creditor's claim," and between "partners or others jointly owning or interested in the property

or fund." Tex. Bus. Orgs. Code §§ 11.403(a)(2), (a)(3). Additionally, under § 11.410 of the Texas

Business Organizations Code, a court may appoint a receiver for all of the property, in and outside

Texas, of a foreign entity doing business in Texas if the court determines, in accordance with the

ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver

even if a receiver has not been appointed by another court.

58.    Defendants Dondero and Ellington, along with their controlled entities, affiliates,

and allies, are actively seeking to deprive the Court of jurisdiction over the assets and funds at

issue in this adversary proceeding, which were in large part diverted or fraudulently transferred from the Debtor. Absent relief, HMIT will be frustrated in its efforts to recover those assets and collect on any future judgment issued herein. The documented history of Defendants' manipulation of corporate entities and assets to retain control and to avoid expected judgments strongly suggests that a receiver should be appointed to preserve Defendants' assets, or, at a minimum, assets sufficient to satisfy any judgment rendered in this case.

59.    HMIT will be irreparably harmed if the Defendants' manipulation, dissipation and fraudulent transfers of assets are allowed to continue through the remaining course of these proceedings, and Defendants have given the Court no reason to believe they will fully respect and comply with a preliminary injunction alone. Thus, the Court should invoke its authority to appoint a receiver.

**IV.**
**SECURITY**

60.    Generally, the Court may issue a TRO if Plaintiff "gives security in an amount that the [C]ourt considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *See* Fed. R. Civ. P. 65(c). Despite the language of Rule 65(c), the Fifth Circuit has held that a court, in the proper exercise of its discretion, "may elect to require no security at all" in an appropriate case. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (*quoting Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)). Here, because there is no risk of monetary loss to the Defendants, and the relief requested is in fact directed to *preserving* the alleged assets, the Court should waive the bond or set a nominal amount for its issuance.

**V.**

**CONCLUSION**

WHEREFORE, Plaintiff Hunter Mountain Investment Trust respectfully requests that the

Court grant its Motion and enter an Order in the form annexed thereto as Exhibit A, and grant any

further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire
Texas Bar No. 13590100
smcentire@pmmlaw.com
Ian B. Salzer
Texas Bar No. 24110325
isalzer@pmmlaw.com
**PARSONS MCENTIRE MCCLEARY PLLC**
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Tel. (214) 237-4300
Fax (214) 237-4340

**ATTORNEYS FOR HUNTER MOUNTAIN
INVESTMENT TRUST**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2025, a true and correct copy of the foregoing
document was served on all parties of record via the Court's ECF system.

*/s/ Ian B. Salzer*
Ian B. Salzer

3203957

Docusign Envelope ID: AC957DE7-342B-4A5B-AE7C-F9000058966E

# ITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |

| | |
|---|---|
| **HUNTER MOUNTAIN INVESTMENT TRUST,** | |
| **Plaintiff,** | |
| **v.** | **Adv. Pro. No. 21-03076-sgj** |
| **JAMES D. DONDERO; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HIGHLAND DALLAS FOUNDATION; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,** | |
| **Defendants.** | |

## <u>VERIFICATION</u>

My name is Mark Patrick, my date of birth is April 23, 1972, and my address is 6716 Glenhurst Drive, Dallas, Texas 75254. I am the Administrator of Hunter Mountain Investment Trust ("<u>HMIT</u>"), I am of sound mind, and I am competent to make this Verification. I declare under penalty of perjury that the factual statements contained in HMIT's Emergency Verified Motion for Temporary Restraining Order and Preliminary Injunction, as well as the accompanying Memorandum of Law in Support, are true and correct to the best of my knowledge and belief.

- 1 -

Docusign Envelope ID: AC957DF7-342B-4A5B-AE7C-F9090E8966F1

Case 21-03076-sgj    Doc 309-1    Filed 09/15/25    Entered 09/15/25 22:00:39    Desc
Memo of Law ISO Preliminary Injunction Page 214 of 535 Page 31 of 31

Executed in Dallas County, State of Texas, on September 15, 2025.

DocuSigned by:

_____
95905020484D45F...
MARK PATRICK

# EXHIBIT 11

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |

| | |
|---|---|
| **MARK S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST** | |
| **Plaintiff,** | |
| **v.** | **Adv. Pro. No. 21-03076-sgj** |
| **JAMES D. DONDERO; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD** | |

**TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,**

**Defendants.**

## ORDER GRANTING TEMPORARY RESTRAINING ORDER AND SETTING HEARING ON PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION AND APPOINTMENT OF RECEIVER

Having considered Plaintiff Hunter Mountain Investment Trust's ("HMIT") *Emergency Motion for Temporary Restraining Order, Preliminary Injunction, and Appointment of a Receiver and Memorandum in Support* ("Verified Motion") against Defendants James Dondero, Scott Ellington, Isaac Leventon, Strand Advisors, Inc., The Get Good Trust, NexPoint Advisors, L.P., Highland Capital Management Fund Advisors, L.P., The Dugaboy Investment Trust, Highland Dallas Foundation, Massand Capital LLC, Massand Capital, Inc., and SAS Asset Recovery, Ltd. (collectively, "Defendants"), and all persons acting in concert or participation with them, the Court finds the following:

HMIT's Verified Motion and accompanying Memorandum of Law in Support, the evidentiary materials referenced therein, the record in this adversary proceeding and in the underlying bankruptcy case of Highland Capital Management, L.P., establish sufficient grounds for issuance of a temporary restraining order as set forth in the Verified Motion. The Court specifically finds that:

- HMIT has established a likelihood that it will prevail on the merits of the claims asserted against Defendants in the Amended Complaint, which details the avoidable transactions and conduct at issue in explicit detail and with numerous references to competent evidence amassed throughout these bankruptcy proceedings;

- HMIT will be irreparably harmed absent immediate injunctive relief if Defendants' efforts to conceal assets, or transfer such assets outside the jurisdiction of this Court, are allowed to continue;

- The equities favor HMIT;

- Injunctive relief serves the public interest; and

- Defendants have no legal or equitable right to engage in conduct designed to avoid paying a judgment awarded against them.

Accordingly, pending the hearing and determination of HMIT's Motion for Preliminary Injunction and Appointment of a Receiver, and HMIT having established grounds for the issuance of a temporary restraining order, the Court hereby **ORDERS** that:

1.      Defendants[1] shall be temporarily restrained and enjoined from transferring, selling, liquidating, dissipating, assigning, alienating, tampering with, withdrawing, concealing, mortgaging, encumbering, granting a lien or security interest or other interest in, or otherwise harming or reducing the value of, or disposing of, any funds or other assets under the Defendants' individual or joint control including, among other things, their subsidiaries, businesses, physical assets, real property, cash, and equity interests ("Assets").

2.      Defendants shall be temporarily restrained and enjoined from transferring any Assets to other entities owned or controlled, directly or indirectly, by the Defendants, whether such entity is currently existing or newly created.

3.      Defendants shall be temporarily restrained and enjoined from transferring any Assets owned or controlled by the Defendants, directly or indirectly, to any account, entity or individual located outside the United States of America or beyond the jurisdiction of this Court.

---

[1] Including Defendants' successors, assigns, officers, agents, employees, and attorneys, and all persons or entities in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or through any corporation, subsidiary, division, or other device,

4.      Notwithstanding this Order, the Defendants are allowed to continue to engage in transactions in the ordinary course of business, but all transactions are subject to the disclosure requirements set forth in Paragraph 5. For purposes of this paragraph, "ordinary course of business" shall include transfers, assignments or sales to a bona fide third-party purchaser or assignee for equivalent value, as viewed by an objective observer with knowledge of the party's business, so long as such transactions are at arm's length, on commercially reasonable terms, and with unaffiliated third parties, without involving extraordinary commitments, unprecedented expenditures, or actions that would breach duties or dissipate assets outside the jurisdiction of this Court or in any manner that may frustrate collection of any judgment in this lawsuit.

5.      The Defendants are ordered to identify and disclose on or before September ___, 2025, all past, current or planned transactions in which they have been involved or are currently involved relating to or involving the transfer, assignment, monetization or other disposition of any Assets since the commencement of this adversary proceeding through the date of the hearing on the Preliminary Injunction set forth below.

6.      The Court shall hold a hearing on HMIT's request for preliminary injunctive relief and appointment of receiver(s) on _____, 2025 at _____.

7.      Defendants may submit any opposition to the requested preliminary injunction and/or the appointment of a receiver on or before _____, 2025, to which HMIT may reply on or before _____, 2025.

8.      This Order is effective immediately and the Court, in the exercise of its discretion, finds that no security is required.

9.      The Court retains jurisdiction for such other pre-trial orders as shall be deemed just and necessary.

### END OF ORDER ###

# EXHIBIT 12

Case 21-03076-sgj Doc 151-1 Filed 04/06/22 Entered 04/06/22 15:05:22 Page 278 of 521
Case 3:22-cv-00203-S Document 5-10 Filed 04/26/22 Page 223 of 535
Exhibit Exhibits 1-16 Page 223 of 535

Docket #0151 Date Filed: 4/6/2022



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 6, 2022**

_____
**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-34054-SGJ-11** |
| HIGHLAND CAPITAL MANAGEMENT, | § | **(CHAPTER 11)** |
| L.P., | § | |
| | § | |
| REORGANIZED DEBTOR. | § | |
| _____ | § | |
| | § | |
| MARC S. KIRSCHNER, AS LITIGATION | § | |
| TRUSTEE OF THE LITIGATION | § | |
| SUB-TRUST, | § | |
| | § | **CIVIL ACTION NO. 3:22-CV-203-S** |
| PLAINTIFF, | § | |
| | § | |
| v. | § | **ADVERSARY NO. 21-03076** |
| | § | |
| JAMES D. DONDERO; MARK A. OKADA; | § | |
| SCOTT ELLINGTON; ISAAC | § | |
| LEVENTON; GRANT JAMES SCOTT III; | § | |
| FRANK WATERHOUSE; STRAND | § | |
| ADVISORS, INC.; NEXPOINT ADVISORS, | § | |

1

1934054220406000000000001

Case 21-03076-sgj Doc 154 Filed 04/06/22 Entered 04/06/22 15:42:24 Page 2 of 21
Case 3:21-cv-01710-E Document 15-16 Filed 06/22/15 Page 224 of 535
Exhibit Exhibits 1-16    Page 224 of 535

L.P.; HIGHLAND CAPITAL §
MANAGEMENT FUND ADVISORS, L.P. §
DUGABOY INVESTMENT TRUST §
AND NANCY DONDERO, AS TRUSTEE §
OF DUGABOY INVESTMENT TRUST; §
GET GOOD TRUST AND GRANT JAMES §
SCOTT III, AS TRUSTEE OF GET GOOD §
TRUST; HUNTER MOUNTAIN §
INVESTMENT TRUST; MARK & §
PAMELA OKADA FAMILY TRUST – §
EXEMPT TRUST #1 AND LAWRENCE §
TONOMURA AS TRUSTEE OF MARK & §
PAMELA OKADA FAMILY TRUST – §
EXEMPT TRUST #1; MARK & PAMELA §
OKADA FAMILY TRUST – EXEMPT §
TRUST #2 AND LAWRENCE §
TONOMURA IN HIS CAPACITY AS §
TRUSTEE OF MARK & PAMELA §
OKADA FAMILY TRUST – EXEMPT §
TRUST #2; CLO HOLDCO, LTD.; §
CHARITABLE DAF HOLDCO, LTD.; §
CHARITABLE DAF FUND, LP.; §
HIGHLAND DALLAS FOUNDATION; §
RAND PE FUND I, LP, SERIES 1; §
MASSAND CAPITAL, LLC; MASSAND §
CAPITAL, INC.; SAS ASSET RECOVERY, §
LTD.; AND CPCM, LLC, §
§
    DEFENDANTS. §
§

---

## REPORT AND RECOMMENDATION TO THE DISTRICT COURT PROPOSING THAT IT: (A) GRANT DEFENDANTS' MOTIONS TO WITHDRAW THE REFERENCE AT SUCH TIME AS THE BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY; BUT (B) DEFER PRE-TRIAL MATTERS TO THE BANKRUPTCY COURT

2

## I. INTRODUCTION

As further explained herein, there are 23 Defendants in the above-referenced adversary proceeding (the "Adversary Proceeding")—almost all of whom have jury trial rights and desire to have the reference withdrawn from the bankruptcy court, so that a jury trial may ultimately occur in the District Court. All parties agree (even the Plaintiff) that the reference *must* ultimately be withdrawn for final adjudication to occur in the District Court, since: (a) jury trial rights exist, and (b) the Defendants do not consent to a jury trial occurring in the bankruptcy court. However, there is a question of *timing* here.

Specifically, the Plaintiff believes that the bankruptcy court should, for the time being—that is, *until the action is trial-ready*—essentially serve as a magistrate and preside over all pre-trial motions and other matters, with the District Court considering reports and recommendations with regard to any dispositive motions.

The Defendants, on the other hand, believe that the District Court should *immediately* withdraw the reference, taking the position that there is not even "related to" bankruptcy subject matter jurisdiction with regard to the 36 causes of action asserted in the Adversary Proceeding (*see* 28 U.S.C. § 1334(b))—since the Adversary Proceeding was brought *after* confirmation of a Chapter 11 debtor's plan, and the claims in the Adversary Proceeding do not require interpretation or implementation of the plan. Additionally, the Defendants argue that, even if there is "related to" bankruptcy subject matter jurisdiction, mandatory abstention applies with regard to certain of the causes of action in the Adversary Proceeding, since certain *other* federal laws—namely tax law and securities law—are implicated (*see* 28 U.S.C. § 157(d)).

The bankruptcy court disagrees with the Defendants. This Adversary Proceeding is a typical post-confirmation lawsuit being waged be a liquidating trustee, who was appointed

pursuant to a Chapter 11 bankruptcy plan to pursue pre-confirmation causes of action that were owned by the bankruptcy estate, for the benefit of creditors. Despite the "post-confirmation" timing of the *filing* of the lawsuit, there *is* still "related to" bankruptcy subject matter jurisdiction. Additionally, there will be no substantial or material consideration of "other laws of the United States regulating organizations or activities affecting interstate commerce." *Id.*

Accordingly, the bankruptcy court recommends that the District Court only withdraw the reference of this Adversary Proceeding *at such time as the bankruptcy court certifies that the action is trial-ready and defer to the bankruptcy court the handling of all pre-trial matters (as is most often the custom in this District)*. A more detailed explanation follows.

## II. PROCEDURAL CONTEXT

This Adversary Proceeding is related to the bankruptcy case (the "Bankruptcy Case")[1] of Highland Capital Management, L.P. (the "Debtor," "Highland," or sometimes the "Reorganized Debtor").

Highland filed a voluntary Chapter 11 petition on October 16, 2019, in the United States Bankruptcy Court of Delaware. That court subsequently entered an order transferring venue to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), on December 4, 2019.

On February 22, 2021, the Bankruptcy Court entered an *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order") [Bankr. Docket No. 1943], which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (as amended, the "Plan" or "Highland Plan") [Bankr. Docket No. 1808].

---

[1] Bankruptcy Case No. 19-34054.

4

Case 21-03076-sgj Doc 154 Filed 04/06/22 Entered 04/06/22 15:42:24 Page 5 of 21
Case 21-03076-sgj Doc 1 Filed 10/15/21 Entered 10/15/21 22:47:37 Page 5 of 21
Exhibit Exhibits 1-16    Page 227 of 535

The Highland Plan went effective on August 11, 2021 (the "Effective Date"). Thus, the Bankruptcy Case is now in what is referred to as a "post-confirmation" phase.

Like many Chapter 11 plans, the Highland Plan provided for the creation of a "Claimant Trust" for the benefit of holders of Highland's creditors. The Claimant Trust was vested with certain assets of Highland, including "all Causes of Action" and "any proceeds realized or received from such Assets." Plan §§ I.B.24, I.B.26, I.B.27. The Plan also provided for the creation of a "Litigation Sub-Trust," as a "sub-trust established within the Claimant Trust or as a wholly-owned subsidiary of the Claimant Trust," for the purpose of "investigating, prosecuting, settling, or otherwise resolving the Estate Claims" transferred to it by the Claimant Trust pursuant to the Plan. Plan §§ I.B.81, IV.B.1 ("[T]he Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims."), Plan § IV.B.4. The Litigation Trustee of the Litigation Sub-Trust is "responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust[.]" Plan § I.B.83. Under the Plan, proceeds from the Litigation Trust's pursuit of claims "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries[.]" Plan § IV.B.4.

On October 15, 2021, the Litigation Trustee ("Plaintiff") commenced the Adversary Proceeding for the benefit of Highland's creditors. [Adv. Proc. Docket. No. 1 (the "Complaint")].

The Complaint asserts *36 causes of action* against *23 Defendants*. The causes of action all arise from *pre-confirmation conduct* allegedly perpetrated by Highland's founder James Dondero and individuals and entities affiliated with him, which purportedly resulted in hundreds of millions of dollars in damages to Highland. It appears that all of the Defendants are owned, controlled, or related to Mr. Dondero, although some of the Defendants dispute this characterization.

The 36 causes of action seek: the avoidance and recovery of intentional and constructive fraudulent transfers and obligations under Sections 544, 548, and 550 of the Bankruptcy Code; illegal distributions under Delaware partnership law; breach of fiduciary duty; declaratory judgment that certain entities are liable for the debts of others under alter ego theories, successor liability, aiding and abetting, or knowing participation in breach of fiduciary duty; civil conspiracy; tortious interference with prospective business relations; breach of contract; conversion; unjust enrichment; and the disallowance or subordination of claims under Sections 502 and 510 of the Bankruptcy Code.

As further addressed below, the Bankruptcy Court has concluded that the 36 causes of action include some statutory *core* (*i.e.,* "arising under" or "arising in") claims, some *non-core* (*i.e.,* "related to") claims, and some causes of action that are a *mixture* of both core and non-core claims. The following three tables summarize the Bankruptcy Court's determination as to which counts are core, which are non-core, and which are a mixture:

| Count No. | Core ("Arising Under") Claims | Defendants Named |
|---|---|---|
| 31 | Avoidance and Recovery of One-Year Transfers as Preferential Under 11 U.S.C. §§ 547 and 550 | James Dondero and Scott Ellington |
| 34 | Disallowance of Claims Under Sections 502(b), 502(d), and 502(e) of the Bankruptcy Code | James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, and CPCM, LLC |
| 35-36 | Disallowance or Subordination of Claims Under Sections 502 and 510 of the Bankruptcy Code | James Dondero, Dugaboy Trust, Get Good Trust, Mark Okada, MAP #1, MAP #2, Hunter Mountain, and CLO Holdco |

| Count No. | Non-Core ("Related to") Claims | Defendants Named |
|---|---|---|
| 3 | Illegal Distributions Under Delaware Revised Uniform Limited Partnership Act | James Dondero, Strand Advisors, Dugaboy Trust, Hunter Mountain |

6

| 4 | Breach of Fiduciary Duty Arising Out of Dondero's Lifeboat Scheme | James Dondero, Strand Advisors |
| 5 | Breach of Fiduciary Duty Arising Out of Conduct that Resulted in HCMLP Liabilities | James Dondero, Scott Ellington, Isaac Leventon, Strand Advisors |
| 6 | Declaratory Judgment that Strand is Liable for HCMLP's Debts in its Capacity as HCMLP's General Partner | Strand Advisors |
| 7 | Declaratory Judgment that Dondero is Liable for Strand's Debts as Strand's Alter Ego | James Dondero |
| 8 | Declaratory Judgment that Dondero and Strand are Liable for HCMLP's Debts in Their Capacities as HCMLP's Alter Ego | James Dondero, Strand Advisors |
| 9 | Declaratory Judgment that NexPoint and HCMFA are Liable for the Debts of HCMLP, Strand, and Dondero as Their Alter Egos | NexPoint Advisors, HCMFA |
| 10 | Declaratory Judgment that Dugaboy is Liable for the Debts of Dondero in Their Capacities as Dondero's Alter Ego | Dugaboy Trust |
| 13 | Successor Liability | NexPoint Advisors, HCMFA |
| 14 | Breach of Fiduciary Duty in Connection with Fraudulent Transfers and Schemes | James Dondero, Mark Okada, Scott Ellington, Strand Advisors |
| 15 | Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty Under Texas Law | Grant Scott, Strand Advisors, NexPoint Advisors, HCMFA, Get Good Trust, CLO Holdco, DAF Holdco, DAF Highland Dallas Foundation, and SAS |
| 16 | Civil Conspiracy to Breach Fiduciary Duties Under Texas Law | James Dondero, Scott Ellington, Isaac Leventon, Grant Scott, NexPoint Advisors, HCMFA, Get Good Trust, CLO Holdco, DAF Holdco, DAF, Highland Dallas Foundation, and SAS |
| 17 | Tortious Interference with Prospective Business Relations | James Dondero, NexPoint Advisors, HCMFA |
| 24 | Breach of Contract Arising Out of Hunter Mountain Note | Hunter Mountain and Rand |
| 25 | Conversion | James Dondero, Scott Ellington |
| 26-30 | Unjust Enrichment | James Dondero, Scott Ellington, Isaac Leventon, NexPoint Advisors, HCMFA, CLO Holdco, Massand Capital, and SAS |

| Count No. | Mixture of Core and Non-Core Claims | Defendants Named |
|---|---|---|
| 1 | Avoidance and Recovery of HCMLP Distributions as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law | James Dondero, Mark Okada, Strand Advisors, Dugaboy Trust, Hunter Mountain, MAP #1, and MAP #2 |
| 2 | Avoidance and Recovery of HCMLP Distributions as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law | James Dondero, Mark Okada, Strand Advisors, Dugaboy Trust, Hunter Mountain, MAP #1, and MAP #2 |
| 11 | Avoidance of Transfer of Management Agreements as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law | NexPoint Advisors and HCMFA |
| 12 | Avoidance of Transfer of Management Agreements as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law | NexPoint Advisors and HCMFA |
| 18 | Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, and Applicable State Law | James Dondero, Grant Scott, Get Good Trust, CLO Holdco, DAF Holdco, DAF, and Highland Dallas Foundation |
| 19 | Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, and Applicable State Law | James Dondero, Grant Scott, Get Good Trust, CLO Holdco, DAF Holdco, DAF, and Highland Dallas Foundation |
| 20 | Avoidance of Obligations Under Massand Consulting Agreement as Constructively Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law | Massand LLC |
| 21 | Avoidance of Obligations Under Massand Consulting Agreement as Intentionally Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law | Massand Capital |
| 22 | Avoidance and Recovery of Certain Massand Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law | James Dondero, Scott Ellington, Massand Capital, and SAS |
| 23 | Avoidance and Recovery of Certain Massand Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law | James Dondero, Scott Ellington, Massand Capital, and SAS |
| 32 | Avoidance and Recovery of the Alleged Expense Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law | James Dondero and Scott Ellington |
| 33 | Avoidance and Recovery of the Alleged Expense Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law | James Dondero and Scott Ellington |

Of the 23 Defendants, ***only one*** has a pending, unresolved proof of claim on file in the Bankruptcy Case: CLO Holdco.[2] The rest of the Defendants have either never filed proofs of claim, have withdrawn their proofs of claim, or have had them disallowed during the pendency of the Bankruptcy Case.[3] Thus, 22 of the 23 Defendants have jury trial rights.[4] Further, none of the Defendants have consented to the Bankruptcy Court presiding over a jury trial or issuing final orders for that matter.[5]

Six motions to withdraw the reference (collectively, the "Motions to Withdraw") were subsequently filed by the following Defendants on the following dates:

• On January 18, 2022, Defendants Scott Ellington, Isaac Leventon, Frank Waterhouse, and CPCM, LLC (collectively, the "Former Employee Defendants") filed the Motion to Withdraw the Reference for Causes of Action in the Complaint Asserted Against the Former Employee Defendants [Adv. Docket No. 27] and their Brief in Support [Adv. Docket No. 28].

• On January 21, 2022, Defendants Mark A. Okada, The Mark & Pamela Okada Family Trust – Exempt Trust #1, Lawrence Tonomura in his Capacity as Trustee, The Mark & Pamela Okada Family Trust – Exempt Trust #2, and Lawrence Tonomura in his Capacity as Trustee (the "Okada Defendants") filed the Motion of the Okada Parties to Withdraw the Reference [Adv. Docket No. 36] and their Memorandum of Law in Support [Adv. Docket No. 37].

• On January 21, 2022, Defendants NexPoint Advisors L.P ("NexPoint") and Highland Capital Management Fund Advisors L.P. ("HCMFA") filed the Motion to Withdraw the Reference for the Causes of Action in the Complaint Asserted Against Defendants [Adv. Docket No. 39] and their Memorandum of Law in Support [Adv. Docket No. 40].

---

[2] CLO Holdco's claim (Claim No. 198) was objected to by the Litigation Trustee in an omnibus claims objection. CLO Holdco's has moved to ratify a second amended proof of claim. These matters are currently set for hearing on May 2, 2022.

[3] Actually, there are two withdrawals of proofs of claim that are not quite final. Specifically, those of Frank Waterhouse and CPCM. On March 24, 2022, the Reorganized Debtor filed a Bankruptcy Rule 9019 motion for the court to approve a settlement among the Litigation Trustee, Frank Waterhouse, and CPCM. Through the settlement motion, among other terms, Frank Waterhouse and CPCM have agreed to withdraw proofs of claim with prejudice. In return, the Litigation Trustee has agreed to withdraw Count 34 (the only claim asserted against Mr. Waterhouse), as to Mr. Waterhouse, with prejudice from the Complaint. The motion is currently set for hearing on May 2, 2022.

[4] *See, e.g., Grandfinanciera, S.A. v. Nordberg,* 109 S. Ct. 2782 (1989); *Lagenkamp v. Culp*, 111 S. Ct. 330 (1990).

[5] *See, e.g., Stern v. Marshall,* 564 U.S. 462 (2011).

• On January 25, 2022, Defendants James Dondero, Dugaboy Investment Trust, Get Good Trust, and Strand Advisors, Inc. (the "Dondero Defendants") filed Defendants James D. Dondero, Dugaboy Investment Trust, Get Good Trust, and Strand Advisors, Inc.'s Motion to Withdraw the Reference [Adv. Docket No. 45] and their Memorandum of Law in Support [Adv. Docket No. 46].

• On January 26, 2022, Defendant Grant James Scott III filed his Motion to Withdraw the Reference [Adv. Docket No. 50] and his Memorandum of Law in Support [Adv. Docket No. 41].

• On January 26, 2022, CLO Holdco, Ltd., Highland Dallas Foundation, Inc., Charitable DAF Fund, LP, and Charitable DAF Holdco, Ltd. (the "CLO Holdco-Related Defendants") filed their Motion to Withdraw the Reference [Adv. Docket No. 59] and their Brief in Support [Adv. Docket No. 59].

• On February 1, 2022, Defendants Hunter Mountain Investment Trust ("Hunter Mountain") and Rand PE Fund I, LP, Series 1 ("Rand" and together with Hunter Mountain, the "Hunter Mountain Defendants") filed a nominal joinder.

The six different Motions to Withdraw initially created six different civil actions before six different District Judges. These six actions were administratively consolidated, by an order signed and entered on March 22, 2022, in Civil Action No. 3:22-CV-203-S [Docket No. 13], and are now pending before District Judge Karen Scholer.

After holding a status conference on the Motions to Withdraw on March 17, 2022, as required by Local Bankruptcy Rule 5011, the Bankruptcy Court now submits the following report and recommendation to the District Court. Based on the reasoning set forth below, the Bankruptcy Court recommends that the Motions to Withdraw be granted, ***but only at such time as the Bankruptcy Court certifies to the District Court that the lawsuit is trial-ready***. The Bankruptcy Court further recommends that the District Court ***defer to the Bankruptcy Court the handling of all pre-trial matters***.

## III.   LEGAL STANDARDS

### A.   *Some General Principles Regarding Discretionary Withdrawal of the Reference*

First, some basic discussion is in order regarding discretionary or permissive withdrawal of the reference. The concept is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."

The statute does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting the United States Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would expedite the bankruptcy process. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985). Courts in this District have placed an emphasis on the first two factors. *See Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006).

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy proceedings (*i.e.,* adversary proceedings or contested matters within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related to" a case under Title 11. 28 U.S.C. § 1334(b). *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011). Further, those that arise under Title 11 or arise in a Title 11 case are defined as "core" matters and those that are merely "related to" a Title 11 case are defined as "non-core" matters. The significance of the "core"/"non-core" distinction is that bankruptcy courts may statutorily enter

11

final judgments in "core" proceedings in a bankruptcy case, while in "non-core" proceedings, the bankruptcy courts instead may only (absent consent from all of the parties) submit proposed findings of fact and conclusions of law to the district court, for that court's review and issuance of final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28 U.S.C. § 157. But while a proceeding may be "core" in nature, under 28 U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the **statutory** power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that authority on an Article I bankruptcy court is **constitutional** (and this turns on whether "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process"). *Stern*, 564 U.S. at 499.

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may only conduct the jury trial if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[6]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and the cause of action is to enforce statutory rights that are at least analogous to rights that were

---

[6] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

tried at law in the late 18th century English courts. *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999). Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989). This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first." *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process. *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990). Withdrawing a claim from the claims allowance process of the bankruptcy courts prior to the commencement of an adversary proceeding can serve to preserve a right to a jury trial. *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.*, No. 05 C 03840, 2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.*, No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).

### B. Post-Confirmation Bankruptcy Subject Matter Jurisdiction

Defendants argue here that this is all more than simply a matter of "permissive withdrawal of the reference" being applicable. Specifically, the Defendants argue that bankruptcy subject matter jurisdiction is lacking with regard to the Plaintiff's various causes of action (*i.e.,* all 36 causes of action) pursuant to the Fifth Circuit's rulings in *Craig's Stores of Texas, Inc. v. Bank of Louisiana (In re Craig's Stores of Texas, Inc.)*, 266 F.3d 388 (5th Cir. 2001) and *Newby v. Enron Corp. (In re Enron Corp. Securities)*, 535 F.3d 325 (5th Cir. 2008).

In *Craig's Stores*, the Fifth Circuit held that a bankruptcy court could not exercise subject matter jurisdiction over a post-confirmation breach of contract claim asserted by a reorganized debtor against its bank in connection with an alleged post-confirmation breach. The Fifth Circuit stated that, following confirmation of a plan, "expansive bankruptcy court jurisdiction" is no longer "required to facilitate 'administration' of the debtor's estate," and further noted: "After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Craig's Store's*, 266 F.3d at 390. *Craig's Stores* has often been cited for the notion that bankruptcy subject matter jurisdiction significantly narrows post-confirmation of a Chapter 11 plan.

The Fifth Circuit elaborated on its *Craig's Store's* holding in *Enron*, in holding that confirmation of a plan does not divest a court of bankruptcy subject matter jurisdiction with regard to an action commenced prior to confirmation. *Enron*, 535 F.3d at 335. Noting that "Section 1334 does not expressly limit bankruptcy jurisdiction upon plan confirmation," the Fifth Circuit explained that "three factors were critical to its decision" in *Craig's Stores*:

> [F]irst, the claims at issue "principally dealt with post-confirmation relations between the parties;" second, "[t]here was no antagonism or claim pending between the parties as of the date of the reorganization;" and third, "no facts or law deriving from the reorganization or the plan [were] necessary to the

14

claim." *Craig's Stores*, 266 F.3d at 391. Notwithstanding its statement that bankruptcy jurisdiction exists after plan confirmation only "for matters pertaining to the implementation or execution of the plan," the facts in *Craig's Stores* were narrow; they involved post-confirmation claims based on post-confirmation activities.

*Id.* (citing *Craig's Stores*, 266 F.3d at 389–91).

Thereafter, numerous courts within the Fifth Circuit have held that the exception to jurisdiction at issue in *Craig's Store's* does not arise where, as here, a trustee of a litigation trust created under a confirmed plan of reorganization for the benefit of creditors pursues post-confirmation causes of action, predicated on pre-confirmation conduct, for the creditors' benefit. *See Faulkner v. Lane Gorman Trubitt, LLC (In re Reagor-Dykes Motors, LP)*, 2021 WL 4823525, at *2–4 (Bankr. N.D. Tex. Oct. 14, 2021) (bankruptcy court had post-confirmation subject matter jurisdiction over a litigation trustee's state law claims "based on pre-petition conduct," the recoveries of which would "affect distributions to creditors under the confirmed plan"); *Dune Operating Co. v. Watt (In re Dune Energy, Inc.)*, 575 B.R. 716, 725–26 (Bankr. W.D. Tex. 2017) (bankruptcy court had post-confirmation subject matter jurisdiction over lawsuit asserting state law claims brought by liquidating trustee established under Chapter 11 plan); *Brickley for Cryptometrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 830–32 (W.D. Tex. 2017) (holding that post-confirmation "related to" subject matter jurisdiction existed over creditors' trust's post-confirmation suit asserting pre-confirmation Chapter 5 claims and non-core state law claims where the plan vested the claims in the trust); *Schmidt v. Nordlicht*, 2017 WL 526017, at *2–3 (S.D. Tex. Feb. 9, 2017) (holding that post-confirmation "related to" subject matter jurisdiction existed over state law claims aimed at pre-confirmation conduct brought by a litigation trustee established by a confirmed plan); *Ogle v. Comcast Corp. (In re Houston Reg'l*, 547 B.R. 717, 736 (Bankr. S.D. Tex. 2016) (bankruptcy court had post-confirmation subject

matter jurisdiction over lawsuit brought by litigation trustee established under confirmed Chapter 11 plan that asserted state law claims); *Kaye v. Dupree (In re Avado Brands, Inc.)*, 358 B.R. 868, 878–79 (Bankr. N.D. Tex. 2006) (bankruptcy court had post-confirmation jurisdiction over litigation trustee's pre-confirmation core and non-core claims that were transferred to the trustee for prosecution under the plan, where proceeds were to be distributed to creditors); *Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.)*, 309 B.R. 217, 221 (Bankr. N.D. Tex. 2004) (bankruptcy court had post-confirmation jurisdiction over claims preserved under Chapter 11 plan and assigned to the creditor's trust for prosecution with recovery to be distributed to creditors).

The Bankruptcy Court agrees with these numerous holdings and believes that they are consistent with *Craig's Stores*. First, unlike the post-confirmation contract dispute at issue in *Craig's Stores*, the claims here all arise from ***pre-confirmation*** conduct. Second, "antagonism" plainly existed between the parties at the date of the reorganization. Contrary to Defendants' assertion that an action must be filed prior to confirmation, courts in the Fifth Circuit consistently hold that "where the claims are based on pre-petition conduct and the cause of action appears to have accrued before the bankruptcy, the antagonism factor is satisfied." *Faulkner*, 2021 WL 4823525, at *3; *see also Schmidt v. Nordlicht*, 2017 WL 526017, at *3 (while "no claim was pending before the bankruptcy," "antagonism existed in the relevant sense; the defendant's alleged wrongdoing harmed the company prior to the bankruptcy, and the company's cause of action appears to have accrued before the bankruptcy"); *Brickley*, 566 B.R. at 831 (confirming that "actual litigation is not necessary to find the existence of antagonism"); *Coho Oil*, 309 B.R. at 221 (finding this factor satisfied where "claims were preserved under the Plan and assigned to the creditor's trust for prosecution"). Moreover, the order confirming the Highland Plan expressly stated that "Implementation of the Plan" shall include the "establishment of" and "transfer of Estate

Causes of Action" to "the Litigation Sub-Trust," the Trustee of which is charged with "investigating, pursuing, and otherwise resolving any Estate Claims." *See* Confirmation Order at ¶ 42(b); *see also* Plan § IV. A ("the Plan will be implemented through . . . the Litigation Sub-Trust"); *id.* at § I.B.4 ("The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims," the proceeds of which "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries . . . ."). Courts within the Fifth Circuit have held that, where a plan "contemplates the prosecution of the claims and the distribution of . . . recovery to creditors under the Plan, and the prosecution of the claims will thus impact compliance with, or completion of, the Plan, the *Craig's Stores* test for post-confirmation jurisdiction is satisfied." *Ernst & Young LLP v. Pritchard (In re Daisytek, Inc.)*, 323 B.R. 180, 185–86 (N.D. Tex. 2005) (bankruptcy court had post-confirmation subject matter jurisdiction over a Rule 2004 motion brought by the trustee of a creditors' trust, established under a confirmed plan, relating to potential accounting malpractice investigation); *see also First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In Re Biloxi Casino Belle Inc.)*, 368 F.3d 491, 496 (5th Cir. 2004) (a suit pertained to the implementation and execution of the plan where recovery had been assigned to a "liquidating trust . . . for the benefit of unsecured creditors").

Accordingly, the Bankruptcy Court concludes that the 36 counts in the Adversary Proceeding "[w]ithout doubt . . . 'pertain[] to implementation and execution'" of the plan and the Defendants arguments to the contrary have no merit. *See Dune Energy*, 575 B.R. at 725–26 (quoting Craig's Stores).[7]

---

[7] The court in *Schmidt* also noted that "*Craig's* turned on the idea that a reorganized debtor's confirmed plan marked the end of the bankruptcy and the emergence of a new reorganized business entity not dependent on the bankruptcy court's protection," commenting that while "that rule makes a good deal of sense in the reorganization context . . . in a liquidation case like this one there is no entity that emerges from the bankruptcy to continue

### C.  *Mandatory Withdrawal of the Reference*

Withdrawal of the reference pursuant to 28 U.S.C. § 157(d) provides for the possibility of mandatory withdrawal of the reference from the bankruptcy court: "The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Under the precedent of this District, in *Nat'l Gypsum Co.* and *Pilgrim's Pride*, mandatory withdrawal of the reference must be granted when: (1) the motion was timely filed; (2) a non-Bankruptcy Code federal law at issue has more than a *de minimis* effect on interstate commerce; and (3) the proceeding involves a substantial and material question of non-Bankruptcy Code federal law. *See U.S. Gypsum Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.),* 145 B.R. 539, 541 (N.D. Tex. 1992) (stating "withdrawal must be granted if it can be established (1) that the proceeding involves a substantial and material question of both Title 11 and non-Bankruptcy Code federal law; (2) that the non-Code federal law has more than a de minimis effect on interstate commerce; and (3) that the motion for withdrawal was timely."); *see also City of Clinton, Ark. v. Pilgrim's Pride Corp.*, No. 4:09-CV-386-Y, 2009 WL 10684933, at *1 (N.D. Tex. Aug. 18, 2009).

It has been well established that "mandatory withdrawal is to be applied narrowly" and to "prevent 157(d) from becoming an 'escape hatch.'" *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009), *adopted in its entirety*, 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009). Unsubstantiated assertions that

---

operations." *Schmidt,* 2017 WL 526017, at *3. Here, although the Plan is one of reorganization, it is "an 'asset monetization plan' providing for the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds." Confirmation Order at ¶ 2. Thus, as in *Schmidt*, the role of the Litigation Trust "is nothing more or less than maximizing the pot of money for distribution to creditors." *Schmidt*, 2017 WL 526017, at *3.

Case 21-03076-sgj Doc 1614-1 Filed 04/06/22 Entered 04/06/22 18:54:22 Page 19 of 21
Case 21-03076-sgj Doc 1614-1 Filed 04/06/22 Entered 04/06/22 18:54:22 Page 19 of 21
Exhibit Exhibits 1-16    Page 241 of 535

non-bankruptcy federal law issues are substantial and material to an adversary proceeding are insufficient to warrant mandatory withdrawal. *Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.)*, 2015 U.S. Dist. LEXIS 74006, at \*21-\*23 (D. Me. June 8, 2015) (insufficient basis for mandatory withdrawal where party failed to demonstrate specifically why a court would have to "engage in anything beyond routine application of current law" and the party "tries to kick up some dust to make the relevant analysis seem complicated").

*Why is the issue of mandatory withdrawal of the reference even being raised here*—when the Bankruptcy Court and all the parties agree that permissive withdrawal of the reference should be exercised here, since mere non-core "related to" claims are pervasive and jury trial rights exist? In other words, everyone agrees the reference should be withdrawn—it's just a matter of *when*. Should withdrawal happen immediately or when the action is trial-ready?

The Defendants advocate for immediate withdrawal on the grounds that the Bankruptcy Court does not have authority to preside over the "other federal law" issues present with regard to certain causes of action—so this should preclude the Bankruptcy Court from even presiding over pre-trial matters.

The court does not agree with the Defendants. The "other federal law" issues that may be involved in this Adversary Proceeding are not pervasive or particularly complicated. There are, admittedly, one or more Tax Code provisions at issue. But bankruptcy courts routinely consider tax matters. Defendants' attempts to characterize what appear to be commonplace tax law issues here as sufficient to mandate withdrawal of the reference seem disingenuous.

Certain of the Defendants (HCMFA and NexPoint Advisors) contend that federal securities laws are implicated by the Adversary Proceeding. But the Plaintiff has not asserted any claims that are based on federal securities law statutes. Rather, HCMFA and NexPoint Advisors have

merely made barebone references to potential defenses that might implicate federal securities laws. While certain of the parties in the litigation are "registered investment advisors," this does not mean that the parties' alleged conduct will implicate broad questions of federal securities law. "If a party to a case is federally regulated, such as a bank or securities brokerage, but no federal regulation applies to the dispute at hand, the court need not withdraw the proceeding because no federal regulation will have to be considered." *Contemp. Lithographers, Inc. v. Hibbert*, 127 B.R. 122, 125 (M.D.N.C. 1991). The rule advanced by HCMFA and NexPoint Advisors would mean that bankruptcy courts would be unable to hear virtually any claims against any investment advisor or other financial entity regulated under the federal securities laws.

In summary, mandatory withdrawal of the reference is inapplicable here.

## D. CONCLUSION

In light of: (a) the non-core, related-to claims in the Complaint; (b) the jury trial rights of most Defendants; (c) the fact that only one Defendant out of 23 still has a proof of claim pending—that might arguably negate jury trial rights; and (d) the lack of consent by the Defendants to the Bankruptcy Court presiding over a jury trial or issuing final judgments, the Bankruptcy Court recommends that the District Court: refer all pre-trial matters to the Bankruptcy Court, and grant the Motions to Withdraw upon certification by the Bankruptcy Court that the parties are trial-ready.

With regard to such pre-trial matters, the Bankruptcy Court further recommends that, to the extent a dispositive motion is brought that the Bankruptcy Court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the Bankruptcy Court should submit a report and recommendation to the District Court for the District Court to either adopt or reject.

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

# EXHIBIT 13



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 4, 2023**

United States Bankruptcy Judge

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,<br><br>Plaintiff,<br><br>v.<br><br>JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN | Adv. Pro. No. 21-03076-sgj<br><br>STIPULATION AND PROPOSED FOURTH AMENDED SCHEDULING ORDER |

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are (8357). The Reorganized Debtor is a Delaware limited partnership. The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.



1934054230404000000000005

INVESTMENT TRUST; MARK & PAMELA OKADA
FAMILY TRUST – EXEMPT TRUST #1 AND
LAWRENCE TONOMURA AS TRUSTEE OF MARK
& PAMELA OKADA FAMILY TRUST – EXEMPT
TRUST #1; MARK & PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2 AND LAWRENCE
TONOMURA IN HIS CAPACITY AS TRUSTEE OF
MARK & PAMELA OKADA FAMILY TRUST –
EXEMPT TRUST #2; CLO HOLDCO, LTD.;
CHARITABLE DAF HOLDCO, LTD.; CHARITABLE
DAF FUND, LP.; HIGHLAND DALLAS
FOUNDATION; RAND PE FUND I, LP, SERIES 1;
MASSAND CAPITAL, LLC; MASSAND CAPITAL,
INC.; AND SAS ASSET RECOVERY, LTD.,

        Defendants.

## STIPULATION AND PROPOSED FOURTH AMENDED SCHEDULING ORDER

This stipulation and proposed fourth amended scheduling order (the "Stipulation") is made

and entered into, subject to Court approval, in the above-captioned adversary proceeding (the

"Adversary Proceeding") by and among Marc S. Kirschner, as Litigation Trustee of the Litigation

Sub-Trust (the "Trustee"), and James D. Dondero; Mark A. Okada; Scott Ellington; Isaac

Leventon; Grant James Scott III; Strand Advisors, Inc.; NexPoint Advisors, L.P.; Highland Capital

Management Fund Advisors, L.P.; Dugaboy Investment Trust and Nancy Dondero, as Trustee of

Dugaboy Investment Trust; Get Good Trust and Grant James Scott III, As Trustee of Get Good

Trust; Hunter Mountain Investment Trust; Mark & Pamela Okada Family Trust – Exempt Trust

#1 and Lawrence Tonomura, as Trustee of Mark & Pamela Okada Family Trust – Exempt Trust

#1; Mark & Pamela Okada Family Trust – Exempt Trust #2 and Lawrence Tonomura, as Trustee

of Mark & Pamela Okada Family Trust – Exempt Trust #2; CLO Holdco, Ltd.; Charitable DAF

Holdco, Ltd.; Charitable DAF Fund, L.P.; Highland Dallas Foundation; and Rand PE Fund I, LP,

Series 1 (each, a "Defendant" and collectively, the "Defendants," and with the Trustee, the

"Parties"), by and through their respective undersigned counsel.  In support of the Stipulation, the

Parties respectfully state as follows:

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP"), filed a voluntary petition for relief under title 11 of the United States Code with the United States Bankruptcy Court for the District of Delaware. The case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division and captioned *In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11;

WHEREAS, on February 22, 2021, the Court confirmed HCMLP's *Fifth Amended Plan of Reorganization* [Case No. 19-34054-sgj11, Docket No. 1943] (the "Plan") which, among other things, established the Litigation Sub-Trust (as defined in the Plan) for the benefit of the Claimant Trust Beneficiaries (as defined in the Plan);

WHEREAS, on October 15, 2021, the Trustee commenced the Adversary Proceeding by filing a complaint against Defendants [Docket No. 1];

WHEREAS, on October 18, 2021, the Clerk of Court for the United States Bankruptcy Court for the Northern District of Texas issued the *Summons In An Adversary Proceeding* [Docket No. 3];

WHEREAS, on October 18, 2021, the Court entered the *Order Regarding Adversary Proceedings Trial Setting and Alternative Scheduling Order* [Docket No. 4] which, among other things, sets forth an Alternative Scheduling Order that applies to the Adversary Proceeding "[i]f the [P]arties do not submit a proposed scheduling order or do not schedule a status conference with the Court to discuss the provisions and deadlines of a scheduling order within forty-five days of the filing of this [A]dversary [P]roceeding";

WHEREAS, on December 2, 2021, the Trustee filed the *Stipulation and Proposed Scheduling Order* [Docket No. 21], setting forth a proposed schedule mutually agreed to by the Parties;

WHEREAS, on December 17, 2021, the Court entered the *Order Approving Adversary Proceedings Trial Setting and Alternative Scheduling Order* (the "Scheduling Order") [Docket No. 22];

WHEREAS, on February 11, 2022, the Court entered the Amended Scheduling Order (the "First Amended Scheduling Order") [Docket No. 81];

WHEREAS, on May 19, 2022, the Trustee filed the *Amended Complaint and Objection to Claims* [Docket No. 158];

WHEREAS, on June 20, 2022, the Parties filed the *Stipulation and Proposed Second Amended Scheduling Order* [Docket No. 162], setting forth a proposed schedule mutually agreed to by the Parties;

WHEREAS, on June 29, 2022, the Court entered the *Stipulation and Proposed Second Amended Scheduling Order* (the "Second Amended Scheduling Order") [Docket No. 167];

WHEREAS, on November 18, 2022, the Parties filed the *Stipulation and Proposed Third Amended Scheduling Order* [Docket No. 228];

WHEREAS, on November 28, 2022, the Court entered the Stipulation and Proposed Third Amended Scheduling Order (the "Third Amended Scheduling Order") [Docket No. 229];

WHEREAS, the Parties have met and conferred as to proposed amendments to the Third Amended Scheduling Order, and have mutually agreed to the schedule as set forth below;

**NOW, THEREFORE,** it is hereby stipulated and agreed, and upon approval by the Court it shall be **SO ORDERED:**

1.      Proposed Fourth Amended Scheduling Order.  The Parties agree to the following proposed scheduling order (the "Proposed Fourth Amended Scheduling Order"):

| Event | Deadline |
|---|---|
| Substantial Completion of Fact Document Discovery | Wednesday, August 9, 2023 |
| Start of Fact Depositions | Earlier of Wednesday, September 6, 2023 or decision on the last outstanding motion to dismiss |
| Completion of Fact Depositions | Monday, December 4, 2023 |
| Deadline to Exchange Names and Addresses of Experts and Expert Witness Reports | Friday, February 9, 2024 |
| Deadline to Exchange Names and Addresses of Rebuttal Experts and Rebuttal Expert Witness Reports | Friday, April 5, 2024 |
| Expert Discovery Closes | Friday, May 17, 2024 |
| Dispositive Motion Deadline | Friday, June 14, 2024 |
| Deadline to File a Response to Dispositive Motions | Friday, August 9, 2024 |
| Deadline to File a Reply in Support of Dispositive Motions | Monday, September 9, 2024 |
| Last Date For Hearings on Dispositive Motions (subject to the Court's schedule) | Monday, October 7, 2024 |
| Deadline to Exchange Expert and Witness Lists | Tuesday, October 15, 2024 |
| Joint Pretrial Order Deadline | Friday, November 1, 2024 |
| Written Proposed Findings of Fact and Conclusions of Law Deadline | Friday, November 1, 2024 |
| Docket call (subject to the Court's schedule) | The first docket call scheduled on or after November 4, 2024 at 1:30pm |

2.      Pending approval of this Stipulation by the Court, each of the Parties agrees that it is and will be bound by this Stipulation and waives any right to object to approval by the Court. In the event that this Stipulation is not approved by the Court, it will be null and void and have no force or effect whatsoever except as may be otherwise agreed in writing by the Parties.

3.      If approved by the Court, the Proposed Fourth Amended Scheduling Order shall be modified only by a writing signed by all Parties or further order of the Court.

4.      The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the Proposed Scheduling Order.

[*Remainder of Page Intentionally Left Blank*]

Dated: March 24, 2023

Respectfully submitted,

**SIDLEY AUSTIN LLP**

/s/ *Paige Holden Montgomery*

Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue, Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**

Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Anna Deknatel (admitted *pro hac vice*)
Aaron M. Lawrence (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

*Counsel for the Marc. S. Kirschner, as
Litigation Trustee of the Highland Litigation
Sub-Trust*

**KANE RUSSELL COLEMAN LOGAN PC**

/s/ *John J. Kane*

John J. Kane
Brian W. Clark
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4200
Facsimile: (214) 777-4299

*Counsel for Defendant Grant James Scott*

**KELLY HART PITRE**

/s/ Louis M. Phillips
Louis M. Phillips
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801
Telephone: (225) 381-9643
Facsimile: (225) 336-9763

and

Amelia L. Hurt
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
Michael D. Anderson
Katherine T. Hopkins
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Facsimile: (817) 878-9280

*Counsel for Defendants CLO Holdco, Ltd.,*
*Highland Dallas Foundation, Charitable DAF*
*Fund, LP, and Charitable DAF Holdco, Ltd.*


**STINSON L.L.P.**

/s/ Deborah Deitsch-Perez
Deborah Deitsch-Perez
3102 Oak Lawn Avenue. Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendants NexPoint Advisors,*
*L.P. and Highland Capital Management Fund*
*Advisors, L.P.*

**DLA PIPER LLP**

/s/ Amy L. Ruhland
Amy L. Ruhland
303 Colorado Street, Suite 3000
Austin, Texas 78701
Telephone: (512) 457-7000
Facsimile: (512) 457-7001

*Counsel for Defendants James D. Dondero,
Strand Advisors, Inc., The Dugaboy
Investment Trust, The Get Good Trust, Hunter
Mountain Investment Trust, and Rand PE
Fund I, LP, Series I*


**BAKER & MCKENZIE LLP**

/s/ Michelle Hartmann
Michelle Hartmann
1900 North Pearl, Suite 1500
Dallas, Texas 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099

and

Debra A. Dandeneau
452 Fifth Ave
New York, NY 10018
Telephone: 212-626-4875

*Counsel for Defendants Scott Ellington and
Isaac Leventon*


**SULLIVAN & CROMWELL LLP**

/s/ Brian D. Glueckstein
Brian D. Glueckstein
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

and

**BROWN FOX PLLC**
Cortney C. Thomas
8111 Preston Road, Suite 300
Dallas, Texas 75225
Telephone: (214) 327-5000
Facsimile: (214) 327-5001

*Counsel for Defendants Mark Okada, The*
*Mark and Pamela Okada Family Trust –*
*Exempt Trust #1, and The Mark and Pamela*
*Okada Family Trust – Exempt Trust #2*

# EXHIBIT 14

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
 2
                                    )   Case No. 19-34054-sgj-11
 3   In Re:                         )   Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )   Dallas, Texas
     MANAGEMENT, L.P.,              )   June 25, 2025
 5                                  )   9:30 a.m. Docket
          Reorganized Debtor.       )
 6                                  )   - MOTION TO EXTEND DURATION OF
                                    )     TRUSTS (4213)
 7                                  )   - MOTION TO APPROVE SETTLEMENT
                                    )     (4216)
 8   _____)
```

                          TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                     UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Highland Capital<br>Management Claimant Trust: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY  10017-2024<br>(212) 561-7760 |
| For the Highland Capital<br>Management Claimant Trust: | Hayley R. Winograd<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY  10019<br>(212) 561-7732 |
| For the Highland Capital<br>Management Claimant Trust: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd.,<br> 13th Floor<br>Los Angeles, CA  90067<br>(310) 277-6910 |
| For Marc S. Kirschner,<br>Litigation Trustee: | Robert Scott Loigman<br>QUINN EMANUEL URQUHART & SULLIVAN,<br> LLP<br>295 5th Avenue<br>New York, NY  10016<br>(212) 849-7000 |

```
 1   APPEARANCES, cont'd.:

 2   For the Hunter Mountain        Louis M. Phillips
     Entities:                      Amelia L. Hurt
 3                                  KELLY HART & PITRE
                                    301 Main Street, Suite 1600
 4                                  Baton Rouge, LA  70801
                                    (225) 381-9643
 5
     For the Dugaboy               Deborah Rose Deitsch-Perez
 6   Investment Trust:             STINSON, LLP
                                   2200 Ross Avenue, Suite 2900
 7                                 Dallas, TX  75201
                                   (214) 560-2201
 8
     For the Dugaboy               Michael Justin Lang
 9   Investment Trust:             CRAWFORD WISHNEW & LANG, PLLC
                                   1700 Pacific Avenue, Suite 2390
10                                 Dallas, TX  75201
                                   (214) 817-4500
11
     For Crown Global Life         David L. Curry, Jr.
12   Insurance, Ltd. and           OKIN ADAMS, LLP
     The Dallas Foundation:        1113 Vine Street, Suite 240
13                                 Houston, TX  77002
                                   (713) 228-4100
14
     For Patrick Daugherty:        Andrew K. York
15                                 Drake Rayshell
                                   Joshua Smeltzer
16                                 GRAY REED & MCGRAW, LLP
                                   1601 Elm Street, Suite 4600
17                                 Dallas, TX  75201
                                   (214) 954-4135
18
     For the U.S. Trustee:         Erin Marie Schmidt
19                                 OFFICE OF THE UNITED STATES
                                      TRUSTEE
20                                 1100 Commerce Street, Room 976
                                   Dallas, TX  75242-1496
21                                 (214) 767-1075

22   Recorded by:                  Michael F. Edmond, Sr.
                                   UNITED STATES BANKRUPTCY COURT
23                                 1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
24                                 (214) 753-2062

25
```

3

1  Transcribed by:            Kathy Rehling
                              311 Paradise Cove
2                             Shady Shores, TX   76208
                              (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.

1             DALLAS, TEXAS - JUNE 25, 2025 - 9:38 A.M.

2             THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, the Honorable Stacey Jernigan presiding.

5             THE COURT:  Good morning.  Please be seated.

6             MR. LANG:  Good morning, Judge.

7             THE COURT:  All right.  We have Highland settings

8    this morning, Case No. 19-34054.  We have two motions:  a

9    motion to extend the duration of the Plan Trust, and then a

10   motion under Rule 9019 to approve a settlement between the

11   estate entities and Hunter Mountain entities.

12      All right.  So, lots to get to.  Let's quickly get

13   appearances from the participating parties in interest this

14   morning.

15            MR. MORRIS:  Good morning, Your Honor.  John Morris;

16   Pachulski Stang Ziehl & Jones.  I'm joined by my colleagues

17   Jeffery Pomerantz, Gregory Demo, and Hayley Winograd.  And we

18   represent the Highland Capital Management Claimant Trust and

19   Highland Capital Management, LP.

20            THE COURT:  Okay.  Good morning.  Other appearances?

21            MR. LOIGMAN:  Good morning, Your Honor.  Robert

22   Loigman from Quinn Emanuel.  We represent the Highland

23   Litigation Trustee, Marc Kirschner.

24            THE COURT:  Good morning.

25            MS. DEITSCH-PEREZ:  Good morning, Your Honor.  This

1   is Deborah Deitsch-Perez from Stinson representing the Dugaboy

2   Trust on the motion to extend the duration of the Trust.

3            THE COURT:  Good morning.

4            MS. DEITSCH-PEREZ:  Good morning.

5            MR. LANG:  Michael Lang for Dugaboy Investment Trust

6   on the 9019 motion.

7            THE COURT:  Good morning.

8            MR. LANG:  Good morning.

9            MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

10  Phillips and Amelia L. Hurt; Kelly Hart Hallman -- Kelly Hart

11  Pitre, Louisiana trade name, I don't know why -- appearing on

12  behalf of Hunter Mountain Investment Trust and the Hunter

13  Mountain entities in connection with the 9019 motion.

14           THE COURT:  Good morning.

15           MR. YORK:  Good morning, Your Honor.  Drew York along

16  with Joshua Smeltzer and Drake Rayshell from Gray Reed on

17  behalf of Patrick Daugherty with regard to the 9019 motion.

18           THE COURT:  Good morning.  Ms. Schmidt?

19           MS. SCHMIDT:  Erin Schmidt on behalf of the U.S.

20  Trustee.

21           THE COURT:  Good morning.

22           MR. CURRY:  Good morning, Your Honor.  David Curry

23  from Okin Adams on behalf of The Dallas Foundation and Crown

24  Global Life Insurance, Ltd.

25           THE COURT:  Good morning.

1    All right.  Well, let me ask.  I'll start with Mr. Morris,

2    given these are your motions.  Do you have any agreements

3    about how you're going to proceed?  I'm wondering, first off,

4    are we going to have joint presentations, joint evidence on

5    both motions, or are we going to take one at the time?

6         MR. MORRIS:  Good morning, Your Honor.  Thank you

7    very much for hearing us yesterday.  It's kind of a big day in

8    the case.  We have a milestone that we hope will greatly

9    advance the prosecution of this case, and, frankly, what

10   remains to be done to complete the wind-up of Highland.

11   There are two motions before the Court.  The first is the

12   motion to extend the Trusts.  That was filed at Docket No.

13   4213.  We're going to address that one first, Your Honor,

14   because we have a resolution and a stipulation.  There's only

15   one objecting party.  That was the Dugaboy Investment Trust.

16   And early this morning we reached an agreement whereby Dugaboy

17   is going to withdraw its objection, with prejudice, subject to

18   a stipulation that we will file with the Court but that

19   contains the following terms.

20        THE COURT:  Okay.

21        MR. MORRIS:  Number one, Dugaboy agrees to withdraw

22   its objection to the motion, with prejudice.

23   Number two, the Trusts expect to dissolve by August 11th,

24   2026, so that no further extension of the duration of the

25   Trusts will be necessary.

1          THE COURT:  Okay.

2          MR. MORRIS:  And number three, Dugaboy hereby

3    preserves and does not waive its right, if any, to object to

4    any further attempts to extend the date by which the Trusts

5    must be dissolved or to extend the duration of the Trusts.

6          THE COURT:  Wait.  I don't understand that third one.

7    Could you repeat it?

8          MR. MORRIS:  It's a reservation of rights.

9          THE COURT:  Okay.

10          MR. MORRIS:  And so Dugaboy preserves and does not

11    waive its right, if any, to object --

12          THE COURT:  Well, okay.  I'm sorry.  Maybe I zoned

13    out or heard something different.

14          MR. MORRIS:  Uh-huh.

15          THE COURT:  I thought number two of the agreement was

16    August 11th, 2026 would be it; there would be no further

17    extensions.

18          MR. MORRIS:  It's a statement of expectation.  It's

19    not a representation.  It's not a warranty.  We do not believe

20    today, based on the facts and circumstances that we know of,

21    that a further extension will be necessary, but we're not

22    waiving the right to seek it if circumstances change or

23    something unforeseen happens.  And all Dugaboy is saying is

24    that, okay, we reserve the right, if any, to object.

25          THE COURT:  Okay.

1          MR. MORRIS:  It's that simple.

2          THE COURT:  Okay.  It's sort of confusing, right?

3          MR. MORRIS:  Yeah.

4          THE COURT:  Okay.

5          MR. MORRIS:  Perhaps.  If you have any questions, let

6   me try and clarify.

7          THE COURT:  Well, I guess I'll just start with Ms.

8   Deitsch-Perez.  Would you come to the podium?  We've got I

9   don't know who on the camera, but we want to make sure

10  everyone hears.

11         MS. DEITSCH-PEREZ:  Okay.  I'll take a stab at --

12         THE COURT:  Do you confirm what you heard and do you

13  have any clarification of Points 2 and 3?

14         MS. DEITSCH-PEREZ:  Maybe I can make it clear.  I

15  confirm that is the stipulation that we agreed upon, and I

16  think all that was intended is the Trusts and the Debtor are

17  saying they expect to be done by August 11, 2026, so that they

18  will not need to make this motion again, but they could not

19  and would not promise that they will be done by then.  So

20  Dugaboy is withdrawing the objection to this particular

21  extension but is not waiving the right to object to a further

22  request for an extension.  And that's the sum of it.  Does

23  that make sense to Your Honor?

24         THE COURT:  It does.

25         MS. DEITSCH-PEREZ:  Okay.

1            THE COURT:  I'm hoping it'll be over by August 11th,

2    2026, and we'll see where we are at that time.

3        Well, one of my reasons for a slight bit of confusion is,

4    in reading the 9019 settlement that is before the Court, I saw

5    that there were some future installments payments, if you

6    will, to HMIT, I think up through 2029, maybe.

7            MR. MORRIS:  Sure.

8            THE COURT:  So I was --

9            MR. MORRIS:  So let me clarify.

10            THE COURT:  Okay.

11            MR. MORRIS:  The only thing that we said that we

12    expect to happen as of, you know, by August 11th, 2026 is that

13    the Trusts will be dissolved.  But that is not the end of

14    their life.  It is a process.  Once you file for dissolution,

15    then you have to complete the wind-down.  And completing the

16    wind-down will require the completion of all litigation.  It

17    will -- right?

18        All we're talking about is dissolving the Highland

19    Claimant Trust and the Highland Litigation Subtrust so that

20    what remains after that is the Indemnity Trust.  And the

21    Indemnity Trust will be fully funded and will be prepared to

22    go forward.  And if we ever get to a point when there's no

23    further litigation, the corpus of that will be distributed to

24    whatever stakeholders are entitled to it at that time.

25        But when we talk about being done by next year, it doesn't

1   mean the case will be over.  It simply means that the Claimant

2   Trust and the Highland Litigation Subtrust will be dissolved.

3   But they still have to complete the wind-up.

4             THE COURT:  Okay.  Gotcha.

5             MS. DEITSCH-PEREZ:  And Dugaboy is reserving its

6   rights to object to -- if something is happening that seems

7   improper or untoward or they're seeking additional relief,

8   obviously, we're not waiving the unknown now.

9             THE COURT:  Okay.  Gotcha.  All right.  Well, I

10  appreciate the resolution of these issues.  I assume no other

11  party in interest is going to weigh in since we only had a

12  Dugaboy objection.

13            MR. MORRIS:  That was the only objection we had.  I'm

14  prepared to, if Your Honor thinks it's necessary or

15  appropriate, or both, to make a very short proffer.  A

16  proffer.

17            THE COURT:  Okay.  I'll accept that proffer at this

18  time.

19            MR. MORRIS:  Okay.  So, Your Honor, we filed on the

20  docket at No. 4253 Exhibits 1 through 65, and we supplemented

21  our exhibit list at Docket No. 4271 with two additional

22  documents, which are Exhibits 66 and 67.  We don't believe

23  there's any objection to any of those documents, and we would

24  respectfully move for their admission into evidence.

25            THE COURT:  All right.  Could you repeat the numbers

Seery - Proffer                          11

1   once again?

2          MR. MORRIS:  Yes, Your Honor.  So, for the motion for

3   an order further extending the duration of the Trusts, we have

4   two docket entries that contain Highland's exhibits.  The

5   first is Docket No. 4253, and that has Exhibits 1 through 65.

6          THE COURT:  Okay.

7          MR. MORRIS:  And then we supplemented at 4271 with

8   Docket -- with Exhibit Numbers 66 and 67.

9          THE COURT:  All right.  I presume there's no

10  objection to these exhibits.

11      All right.  They are admitted.

12      (Claimant Trust's Exhibits 1 through 67 are admitted into

13  evidence.)

14          JAMES P. SEERY, JR., PROFFER OF TESTIMONY

15          MR. MORRIS:  Okay.  So, Your Honor, if called to

16  testify, James P. Seery, Jr., the Claimant Trustee of the

17  Highland Claimant Trust, would testify as follows.

18      At Exhibits 63 and 64, Highland filed excerpts of the

19  Litigation Trust and the Litigation Subtrust -- the Claimant

20  Trust and the Litigation Subtrust, and each of those excerpts

21  contain Section 9.1, respectively.  That's the section of the

22  Trusts that deal with the extensions that may be necessary

23  from to the original three-year term.  And Mr. Seery would

24  testify that he's familiar with those provisions and that he

25  understands the requirements of those provisions include,

Seery - Proffer                                    12

1    among other things, the requirement that all objections to

2    claims and equity interests have been resolved and that all

3    assets that the Trustee believes might yield sufficient value

4    to the estate have been sold.

5        Mr. Seery would also testify that the Highland estate has

6    a number of assets in its possession today, certain of which

7    will be conveyed to Hunter Mountain if the 9019 motion is

8    approved.

9        Among those assets, Mr. Seery would testify that, in

10   accordance with the proposed settlement agreement, which is at

11   Exhibit 17, in Paragraph 5(b), the Court will see reference to

12   what's known as the Dugaboy Note.  The Dugaboy Note is an

13   asset of the estate that will go to Hunter Mountain if the

14   9019 motion is approved.  If it's not approved, then Mr. Seery

15   would testify that he's got to find another way to dispose of

16   it.  But it is an asset with a face amount today of about $17

17   million, so it has substantial value.

18       There is a note from Hunter Mountain.  That also will be

19   disposed of as set forth in Paragraph 4(a) of the proposed

20   settlement agreement.  That note is going to be used to reduce

21   the allowed amount of Hunter Mountain's Class 10 claim if the

22   settlement is approved.  But that note is also an asset of the

23   estate.  It's worth over $60 million.  I believe it actually

24   might be in the fifties.  But somewhere in the $50 to $60

25   million range.  And that's an asset that needs to be disposed

Seery - Proffer                              13

1   of.

2        The estate has a contingent right to receive certain funds

3   under its settlement with Mr. Okada, and it has the Kirschner

4   Litigation.  All of these assets will be disposed of.  They're

5   very illiquid assets, I'd call them, and it would be very

6   helpful to the estate in moving this case forward if the 9019

7   motion is approved.

8        There are other assets that the estate has that will not

9   be monetized by August 11th and which therefore require the

10  extension of the Trusts.  Mr. Seery would testify, if called

11  to the stand, that the pursuit of the sale of these assets

12  will yield proceeds that justified the continued pursuit of

13  their monetization.  They include interests in Highland CLO

14  Funding, Ltd.  Documents pertaining to that can be found at

15  Exhibits 21 and 25.

16       The Claimant Trust also owns shares in Highland Capital

17  Management Korea, Ltd.  Documents relating to that asset can

18  be found at Exhibits 18 through 20.  That's an asset that, if

19  Mr. Seery were to testify, he would say that he has been

20  actively engaged in trying to liquidate that asset, but it's

21  not going to be completed by August 11th.

22       There's also a note that is due from Highland Capital

23  Management Korea, Ltd.  That can be found at Exhibit 67.

24  That's another asset that Mr. Seery has concluded and would

25  testify to that he thinks is valuable for the estate but will

Seery - Proffer                        14

1   not be monetized by the end of this extension period.

2       And then there's the bad faith award that the estate

3   obtained against HCRE, which remains on appeal.  The appeal of

4   that order can be found at Exhibit 15.  And there's no further

5   cost, really, to waiting for the Court's decision, but that is

6   an asset of the estate that remains to be monetized.

7       So there's two buckets of assets, one of which, hopefully,

8   if the 9019 motion is approved, will go to HMIT and that will

9   be helpful.  But there's another bucket of assets that are not

10  implicated by the HMIT settlement that will not be monetized

11  before August 11th that Mr. Seery would testify we need a

12  little bit more time and that's why we're going to extend the

13  Trusts.

14      Mr. Seery would also testify, finally, that there are

15  claims and equity interests that remain unresolved.  They

16  include Mr. Daugherty's Class 8 claim.  As Your Honor is

17  probably aware at this point, Highland has objected to that

18  claim.  It seeks to disallow, subordinate, that particular

19  claim.  Otherwise, have it monetized for purposes of winding

20  up the estate.

21      Mr. Daugherty has moved to dismiss that complaint.  That's

22  his right.  But our scheduling order already takes us past

23  August 11th.

24      And then, finally, we've got Dugaboy's Class 11 interest,

25  which has not yet been allowed.  If the 9019 motion is

Seery - Proffer                          15

1   approved today, we do expect to move quickly to get to that

2   point so that we can finish that up.  But we don't foresee

3   that being completed before August 11th, either.

4       So, in sum, Mr. Seery would testify that, from his

5   perspective, the estate still has assets that are valuable to

6   the estate that will not be monetized by August 11th, and

7   there are still one claim and one equity interest that need to

8   be resolved in order to satisfy the test, you know, to get to

9   the dissolution.

10      So that would be the sum total of his testimony.  That's

11  the completion of the proffer.  And unless Your Honor has any

12  objections, we're prepared to move to the next motion.

13              THE COURT:  I have a couple of questions.

14              MR. MORRIS:  Sure.

15              THE COURT:  But first I'm going to go ahead and swear

16  in Mr. Seery --

17              MR. MORRIS:  Great.

18              THE COURT:  -- to affirm this, as well as swear him

19  in for what I'm sure will be future testimony today.

20              MR. MORRIS:  Sure.

21              MR. SEERY:  Would you like me to come --

22              THE COURT:  Well, you can just stand in place.  Just

23  make sure we hear you.

24      (The witness is sworn as to both his proffer and future

25  testimony.)

1            THE COURT:  Okay.  Thank you.

2        All right.  My question is probably for you.

3            THE WITNESS:  Uh-huh.

4            THE COURT:  Just confirm my understanding.  We have

5    one claim and one --

6            MR. MORRIS:  Equity interest.

7            THE COURT:  -- equity interest to resolve?  Mr.

8    Daugherty's Class 8 claim and the Dugaboy what would be Class

9    11 interest?

10           MR. MORRIS:  That is correct.

11           THE COURT:  Did I hear that correctly, Mr. Seery?

12           THE WITNESS:  That's correct, Your Honor.

13           THE COURT:  Okay.  Thank you.

14       And then my other question is, once again, a

15   clarification.  I pulled out of your attachments to your

16   motion to extend the Exhibit B, Unresolved Pending Litigation.

17           MR. MORRIS:  Uh-huh.

18           THE COURT:  And at the time this was filed, May 8th,

19   2025, it showed nine pending matters at all court levels.  And

20   I think two of them now are finished.  I'm sorry.  This is a

21   long question.  But maybe I'm wrong.  The first two matters,

22   the recusal matter that was at the Fifth Circuit, as well as

23   the gatekeeper appeal, which I know a motion to stay the

24   mandate was at the Supreme Court, both of those are finished

25   now?  Done?

1          MR. MORRIS:  Yes, Your Honor.

2          THE COURT:  Okay.  So the nine pending matters is now

3  down to seven.  And if the Court were to approve the 9019

4  today, I understand that, well, it looks like, at a minimum,

5  two more would go away?

6          MR. MORRIS:  Precisely.

7          THE COURT:  We have an appeal at the District Court,

8  what we call the Claims Trading Appeal, where Highland had

9  sued -- I'm sorry, Hunter Mountain had sued Highland and

10  others regarding the claims trading issue, I'll call it.  So

11  that would go away?

12          MR. MORRIS:  Yes, Your Honor.

13          THE COURT:  And then let me see what else.  I've

14  marked all over my chart.

15          MR. MORRIS:  And then I believe Hunter Mountain's

16  motion for leave to file a complaint in the Delaware Chancery

17  Court --

18          THE COURT:  Ah.

19          MR. MORRIS:  -- to remove Mr. Seery will also be

20  dismissed with prejudice --

21          THE COURT:  Okay.

22          MR. MORRIS:  -- if the 9019 motion is approved.

23          THE COURT:  Okay.  So, that, yes, Hunter Mountain v.

24  Seery, the Court issued a stay on that being able to go

25  forward in Delaware.

1              MR. MORRIS:  Precisely.

2              THE COURT:  So that would go away.

3         So, of the nine matters listed, we're down to five.  But

4    I'll hear, I guess, about this later with Mr. Seery, the big

5    what I would call Kirschner adversary against lots of

6    defendants which has been abated for a long, long time now.

7    Hunter Mountain would basically receive that lawsuit with

8    those claims?  The claims against it go away?  And I don't

9    know what we'll hear, I don't know what Hunter Mountain will

10   do with that big adversary, but maybe it doesn't know yet.  I

11   don't know.

12             MR. MORRIS:  Yeah.

13             THE COURT:  So, --

14             MR. MORRIS:  Not a question we've concerned ourselves

15   with, Your Honor.

16             THE COURT:  Okay.  So that, again, I'm kind of

17   recapping everything.

18        (Counsel confer.)

19             MR. MORRIS:  Go ahead, Your Honor.

20             THE COURT:  So, again, I'm looking at the chart.  If

21   anyone wants to know what I'm looking at, it's at Docket No.

22   4213-2, filed May 8th.  We're down to the HCRE --

23             MR. MORRIS:  Appeal.

24             THE COURT:  -- appeal.

25             MR. MORRIS:  Uh-huh.  Which is fully briefed and

1    we're just waiting for a decision.

2            THE COURT:  Okay.  So that bad faith decision may or

3    may not stick, but it's hanging there on appeal.

4            MR. MORRIS:  Uh-huh.

5            THE COURT:  We're down to a Dugaboy -- what we called

6    the Imaging Motion.  Or no?

7            MR. MORRIS:  Correct.  I guess that's been stayed,

8    but that's out there.

9            THE COURT:  We have the valuation motion of Dugaboy,

10   but I don't know, is it going to be moot after today?  I don't

11   know what I'm going to hear today as far as the evidence.

12           MR. MORRIS:  So, that has -- great question -- two

13   plaintiffs in that lawsuit, HMIT and Dugaboy.

14           THE COURT:  Oh, that's right.  So --

15           MR. MORRIS:  HMIT is going to dismiss it with

16   prejudice.  Dugaboy will still have an active complaint.

17           THE COURT:  Appeal.

18           MR. MORRIS:  My hope is that --

19           THE COURT:  It's an appeal of --

20           MR. MORRIS:  Yes.

21           THE COURT:  Okay.

22           MR. MORRIS:  My hope is that, because we produced so

23   much valuation information to HMIT, which we then had to make

24   available to Dugaboy because that's the way discovery works,

25   that they'll withdraw that complaint.

1              THE COURT:  Okay.

2              MR. MORRIS:  I'm going to make that plea right on the

3    record here, because they've now gotten everything they've

4    asked for.  But that's their decision to make, and it's out

5    there.  But HMIT is withdrawing itself as a party to that

6    lawsuit, but it does remain in Dugaboy's lap.

7              THE COURT:  Okay.  So those potentially three things?

8              MR. MORRIS:  Yeah.

9              THE COURT:  Plus the Daugherty matter?

10             MR. MORRIS:  Yeah.

11             THE COURT:  Okay.  Mr. Seery, did I miss something?

12             THE WITNESS:  One clarification, Your Honor.  My

13   apologies.  One clarification.  In the Class 11 subordinated

14   interests, there's a Dugaboy capital account of $740,000.

15   There's also the Strand capital account -- both of these are

16   controlled by Mr. Dondero -- of $994,000.  And then Mr. Okada

17   and his affiliates have a combined capital account of

18   $248,000.  So we'll -- I said just Dugaboy, but it's actually

19   Dugaboy, Strand, and then Okada and two family trusts of his.

20             THE COURT:  Okay.

21             MR. MORRIS:  And if the 9019 motion is granted, --

22             THE WITNESS:  It's in the footnote.  It's in the

23   footnote in the motion.

24             THE COURT:  Yes.  I actually had that in my notes.

25             MR. MORRIS:  Yeah.

1          THE COURT:  So I glossed over Class 11 just being

2     Dugaboy.  There are Strand and Okada.

3       All right.  So I appreciate that clarification.  We're

4     down hopefully to very little litigation.  But we have no

5     control over higher courts, when they have time to look at it.

6          MR. MORRIS:  Or future litigation, now that the

7     gatekeeper has been curtailed.

8          THE COURT:  Okay.  All right.

9       Anyone wish to say anything about this motion to extend?

10      All right.  Well, based on the pleadings, the argument,

11    the evidence, I do think it is necessary and appropriate and

12    reasonable to extend the duration of the Highland Trusts

13    through August 11th, 2026.  The relief is something that is

14    contemplated as a possibility under the trust documents.

15    Moreover, I think the Court has some authority under

16    Bankruptcy Rule 9006(b) and Bankruptcy Code Section 105 to

17    grant this relief.

18      The evidence shows there are unliquidated assets and some

19    unfinished litigation that must be resolved before the Trust

20    is in a position to wind down.  So, again, I think it's

21    necessary, prudent, and in the best interest.  The motion is

22    granted, and the Court duly acknowledges the comments with

23    regard to the stipulation of Dugaboy and the estate.  All

24    right.

25          MR. MORRIS:  Thank you very much.  So, may I move to

1   the 9019 motion?

2          THE COURT:  You may.

3          MR. MORRIS:  Okay.  With respect to the 9019 motion,

4   there were originally three Objecting Parties:  the Dugaboy

5   Investment Trust, Patrick Daugherty, and The Dallas Foundation

6   and an entity called Crown Global.

7       I'm pleased to report, and I think Your Honor may already

8   be aware, that a settlement has been reached to dispose of The

9   Dallas Foundation and the Crown Global objection.  There is a

10  written agreement to that effect that effectuates that.  And

11  I'd like to just turn the podium over to Mr. Phillips.  Louis

12  Phillips represents the HMIT Entities.  I know Mr. Curry is

13  here on behalf of the objecting parties, The Dallas

14  Foundation, but I think -- I think I'll let Mr. Phillips

15  address, you know, the specific terms of the resolution of

16  that objection.

17         THE COURT:  All right.  Thank you.  And I will say

18  that my staff reached out yesterday to -- I don't know if it

19  was Mr. Curry or someone in your office -- wanting to know

20  have you delivered exhibit notebooks.  And it was at that

21  point my staff heard, well, we've resolved.

22         MR. CURRY:  We had just finished.

23         THE COURT:  Okay.  All right.  So I'm happy to hear

24  what the resolution is.

25         MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

1   Phillips on behalf of the Hunter Mountain Investment Trust and

2   the named parties therein.

3        We had a written stipulation that has been signed by my

4   firm, by Mr. Curry's firm, by the Pachulski firm, and by the

5   Quinn Emanuel firm that is to be submitted to the -- is to be

6   filed on the record.  It also contains a reference to a

7   settlement agreement that will be attached.  But we will read

8   the stipulation into the record, if Your Honor would allow me

9   to.

10             THE COURT:  All right.  You may.

11             MR. PHILLIPS:  And Mr. Curry is here, and he can tell

12   me whether or not I have read correctly, but I think I have

13   it.

14             THE COURT:  Okay.  All right.

15             MR. PHILLIPS:  (reading)  Now, wherefore, it is

16   jointly -- hereby jointly stipulated and agreed as follows.

17   The Foundation Parties -- Mr. Curry's clients -- withdraw The

18   Foundation Objection, which is a defined term in the

19   stipulation, with prejudice, in accordance with the terms of

20   the term sheet annexed hereto as Attachment 1.  And Attachment

21   1 will be attached to the stipulation.

22        Paragraph 2.  The Foundation Parties, the HMIT Entities --

23   that's Hunter Mountain Entities and the Movants; that is, Mr.

24   Morris' client and Quinn Emanuel on behalf of the Litigation

25   Subtrust -- agree that the following language shall be

1   contained in the proposed order on the 9019 motion.  And

2   that's clearly the proposed order.  This is not dependent upon

3   the motion being granted.  Notwithstanding anything in the

4   settlement agreement or the 9019 order to the contrary, none

5   of The Dallas Foundation, EDF, Okada Family, or Crown (The

6   Foundation Parties) are or will be included in the definition

7   of HMIT Releasors or Highland Releasors.  For the avoidance of

8   doubt, however, any attempt by The Foundation Parties to

9   assert a claim against an HMIT released party by, through, or

10  under, including derivatively a Highland entity, or against a

11  Highland released party by, through, or under, including

12  derivatively an HMIT entity, is barred by this order and the

13  settlement agreement.

14      That is the sum and substance of the stipulation.  The

15  settlement agreement we don't think needs to be read to the

16  Court because it's a signed settlement agreement that will be

17  attached as Attachment 1 to the stipulation.  And I believe I

18  read it correctly.

19          THE COURT:  Mr. Curry, did he read it correctly?

20          MR. CURRY:  Mr. Phillips did read it correctly, Your

21  Honor.  And thank you.

22      And we want to thank Trustee's counsel and Mr. Phillips

23  for working with us to address some very real concerns.  And

24  through the stipulation, we still have some work to do, but we

25  have the time to do it, and maybe move it to where we can

1  actually get it resolved.

2         THE COURT:  Okay.  Well, there are some things I am

3  concerned -- well, I should say, all I really feel the need to

4  go into is you're releasing your objection, your clients are,

5  and all of the parties here, parties to the proposed

6  settlement and the estates, the Debtors, Hunter Mountain, are

7  agreeing that your clients are not releasors under the 9019

8  settlement if the Court approves it.

9         MR. CURRY:  Correct, Your Honor.  Unless and except

10 our clients were to attempt to assert a released claim against

11 a released party, and that's what the "provided, however" was

12 to clarify.

13        MR. PHILLIPS:  And this doesn't affect the estate at

14 all.  It basically affects the HMI -- the Hunter Mountain

15 entities.  But the language that we have read in the

16 stipulation has been agreed to and is contained within the

17 order that will be proposed.

18        THE COURT:  Okay.  You said it better than I said it.

19 The estate is releasing claims --

20        MR. PHILLIPS:  I can't believe that, Your Honor, but

21 thank you.

22        THE COURT:  Well, the estate is releasing claims that

23 it has --

24        MR. PHILLIPS:  Correct.

25        THE COURT:  -- or in Trusts have -- I shouldn't have

1   said the estate.  It's the Trust entities and what's left of

2   the Reorganized Debtors are releasing any claims they have

3   against Hunter Mountain in the proposed settlement --

4          MR. PHILIPS:  Yes.

5          THE COURT:  -- if it's approved.  But any direct

6   claims of your clients are not --

7          MR. CURRY:  Well, direct claims that our client has

8   or derivative claims, for example, against Hunter Mountain

9   that are derivative through Hunter Mountain.

10          THE COURT:  Okay.  All right.

11          MR. PHILLIPS:  Yeah.

12          MR. CURRY:  Yeah.  That was the -- what we were

13   trying to make sure.

14          THE COURT:  Yes.  All right.  Well, and when I said

15   this is all I care about, what I mean is I don't even know who

16   the heck Crown Insurance is.

17          MR. PHILLIPS:  Correct.

18          THE COURT:  There was a very interesting party in

19   interest objection asserted by the Debtor.  And I've learned a

20   lot about a lot of entities during all these years, but that

21   was a new one on me.  I understood that it's somewhere in the

22   framework of the --

23          MR. PHILLIPS:  Yes, Your Honor.

24          THE COURT:  -- Charitable DAF.

25          MR. PHILLIPS:  Let's say it's somewhere in the

1   universe, Your Honor.

2             THE COURT:  The universe?  Okay.

3             MR. PHILLIPS:  The universe.  Not necessarily the

4   Charitable DAF or Hunter Mountain.

5             THE COURT:  Okay.

6             MR. PHILLIPS:  But in the universe.

7             THE COURT:  Well, but the point is, we've announced

8   anything relevant to --

9             MR. PHILLIPS:  Correct.

10            THE COURT:  -- the Reorganized Debtor, --

11            MR. PHILLIPS:  Correct.

12            THE COURT:  -- Claimant Trust, Subtrust.

13            MR. PHILLIPS:  And the motion -- and the objections

14   of all these entities are withdrawn with prejudice.

15            THE COURT:  All right.

16            MR. CURRY:  And Your Honor, the one thing that I will

17   note, part of our agreement, and it's in the signed term sheet

18   that you'll see, is that we've agreed that if there's a

19   dispute over the settlement to withdraw our objection, this

20   Court will have at least concurrent jurisdiction to resolve

21   that dispute, because it is a settlement to resolve an

22   objection to a core proceeding.

23            THE COURT:  Okay.  Thank you.

24            MR. PHILLIPS:  And we have agreed and we do agree

25   that the Court has jurisdiction.  It has jurisdiction.

1          THE COURT:  Okay.  For what that is worth.

2          MR. PHILLIPS:  Well, that's what we can agree to.

3          THE COURT:  All right.  I appreciate that.

4      Anyone wish to say anything about what's been announced?

5      All right.  Well, I accept this resolution and withdrawal

6  of --

7          MR. PHILLIPS:  Okay.  We will be filing --

8          THE COURT:  -- the objection.

9          MR. PHILLIPS:  We will be filing, at the close of

10  this hearing, this stipulation, and we will be clicking

11  whatever ECF box request that the Court so ordered on the

12  stipulation.

13          THE COURT:  Okay.  We will be on the lookout for

14  that.

15      All right.  Well, Mr. Lang, you stood up on behalf of

16  Dugaboy.

17          MR. LANG:  I just want to make the Court aware of a

18  letter that was sent last night that involves this from the

19  Caymans, from Grant Thornton.

20          MR. PHILLIPS:  We object.

21          MR. LANG:  I just want to make the Court -- they were

22  asking for a 45-day that the Joint Liquidators --

23          MR. PHILLIPS:  We object to this, Your Honor.  That's

24  not a part of the record.  This is a person from outer space.

25  Not outer space, but the Cayman Islands.  And it's a letter

1    that we --

2              THE COURT:  Coming from someone --

3              MR. PHILLIPS:  It looks like a letter --

4              THE COURT:  -- who is called Yosemite Sam, I

5    understand, outside of court.

6              MR. PHILLIPS: Yeah.  Yeah.  I didn't want to bring

7    that up, but Mr. Morris --

8              THE COURT:  Okay.  Well, it's stuck in my brain

9    forever now.

10             MR. PHILLIPS: -- says it's his favorite cartoon

11   character, so it must be okay.

12             THE COURT:  Okay.  Well, okay, I don't want to make

13   light.  I think this goes back to what I was saying about

14   there are certain things I care about and certain things I

15   don't care about.  And I read from the pleadings, I haven't

16   heard evidence but I've read from the pleadings that there is

17   a lot going on in the Cayman Islands with regard to what I

18   call the Charitable DAF structure or Hunter Mountain.

19             MR. LANG:  Yes.

20             THE COURT:  Parties in that universe.  And I don't

21   plan to exercise any control or jurisdiction over that, so I'm

22   hesitant to hear what it is you want to present.  I don't

23   know, maybe on cross-examination of Mark Patrick today it may

24   or may not be relevant.  But what is it --

25             MR. LANG:  All they ask for is a 45-day basically

1   abeyance or continuance of the decision on the 9019, to allow

2   them to investigate and weigh in on it.

3          MR. PHILLIPS:  Your Honor?

4          MR. LANG:  They're Joint Liquidators.  That's -- I'm

5   just making the Court aware of the request.

6          THE COURT:  Okay.  Well, they're not here to

7   articulate that.  So I respect your wanting to be transparent

8   and whatnot, but I'm not going to let it stop me from going

9   forward today.  Okay.

10         MR. LANG:  Thank you.

11         THE COURT:  Thank you.

12         MR. PHILLIPS:  Your Honor, if I may be excused,

13  that's our position with respect to the withdrawal.  We

14  appreciate Your Honor's attention.  Thank you.

15         THE COURT:  Okay.  Thank you.

16         MR. CURRY:  Thank you, Your Honor.

17         THE COURT:  Anyone else wish to weigh in?

18      All right.  Well, I do, as I was saying, accept the

19  withdrawal of The Dallas Foundation and related entities'

20  objection to the 9019 settlement.

21      So does that leave only the Daugherty objection to the

22  settlement?  Well, and the Dugaboy.

23         MR. MORRIS:  And the Dugaboy, yes.

24         THE COURT:  And Dugaboy, of course.

25         MR. MORRIS:  That's right.

1          THE COURT:  Okay.

2          MR. MORRIS:  So, --

3          THE COURT:  So how did you want to proceed?

4          MR. MORRIS:  So, the way I propose to proceed, Your

5    Honor, I have an opening statement to make --

6          THE COURT:  Okay.

7          MR. MORRIS:  -- with a PowerPoint presentation to

8    present.  I would propose that, as the Movant, I go first.

9    Then we can hear from Dugaboy, we can hear from Mr. Daugherty,

10   and then we can put Mr. Seery on the stand.

11       Assuming that there is no challenge to Mark Patrick's

12   authority to enter into the settlement agreement on behalf of

13   all of the HMIT entities, I would not plan on calling either

14   Mr. Dondero or Ms. Deitsch-Perez, who are under subpoena here,

15   because the challenge to authority was really coming from The

16   Dallas Foundation.  Their objection has now been withdrawn.

17   So as long as Mr. Daugherty -- well, really, as long as

18   Dugaboy doesn't challenge Mr. Patrick's authority to enter

19   into the settlement agreement on behalf of the HMIT entities,

20   I think we'll just put on the one witness and be done.

21         THE COURT:  All right.  Just so we know what lies

22   ahead, --

23         MR. MORRIS:  Uh-huh.

24         THE COURT:  -- I don't think that Dugaboy objected to

25   Mr. Patrick's authority.  I do recall it was just The

32

1   Foundation.

2          MR. LANG:  There was no objection on the -- there was

3   no objection.

4          THE COURT:  Okay.  And same with Mr. Daugherty?  No

5   objection about the authority of Mark Patrick to enter into

6   the settlement?

7          MR. YORK:  There was no objection.

8          THE COURT:  All right.

9          MR. MORRIS:  All right.  May I proceed?

10         THE COURT:  You may proceed.

11         MR. MORRIS:  Okay.  So, may I approach, Your Honor?

12  I've got a --

13         THE COURT:  You may.  Is this a PowerPoint?  And

14  everyone else has it, correct?

15      (Pause.)

16         THE COURT:  You may proceed.

17         MR. MORRIS:  Thank you, Your Honor.  John Morris;

18  Pachulski Stang Ziehl & Jones; for Highland Capital

19  Management, LP and the Highland Claimant Trust.

20      Before I begin, Your Honor, I'd like to move my exhibits

21  into evidence because I will be referring to them in my

22  opening.

23         THE COURT:  All right.  So I think I said on Monday

24  the first thing I was going to ask, and I've already blown

25  that, was did you all have good faith discussions regarding

1  admission of each other's exhibits?  And I did see Mr. Lang

2  filed a day or two ago his list of objections.  It looked like

3  you were like you were down to about nine or eleven exhibits

4  you were objecting to.

5      (Counsel confer.)

6          THE COURT:  Out of 123 designations, which I think

7  probably grew overnight to --

8          MR. MORRIS:  Oh, okay.  Well, --

9          MR. LANG:  I just have to make clear for the record.

10         MR. MORRIS:  You go ahead and do that.

11         MR. LANG:  Your Honor, I've been told that Dugaboy

12  does challenge the authority.  It is not in our objection.

13         MR. PHILLIPS:  It's not in his --

14         THE COURT:  Well, can I ask why it was not in your

15  objection?

16         MR. LANG:  I do not know.  I was not counsel of

17  record when the objection was filed.  I do not know what was

18  known or not known at that time.

19         THE COURT:  So, --

20         MR. LANG:  So I guess we just seek leave to --

21         THE COURT:  -- if you did not have him on -- was Mark

22  Patrick on your exhibit list?  I don't think he was, right?

23         MR. LANG:  He was not.

24         THE COURT:  Okay.  So how would you address that?

25  Again, we've had, I know, some back and forth over who was

1  going to represent Dugaboy on this matter.

2       MR. LANG:  Yes.

3       THE COURT:  I remember the substitutions and whatnot.

4  But --

5       MR. LANG:  We found out late last night that The

6  Foundation was resolving their issue, and that kind of left us

7  in a position.

8       THE COURT:  So what are you saying?  You all were

9  relying on --

10      MR. LANG:  Well, the issue had --

11      THE COURT:  -- The Foundation to carry the flag on

12  this one?

13      MR. LANG:  They had raised the issue.  They were

14  pursuing the issue.  We went through discovery and they were

15  pursuing it.  It was already in front of the Court.

16      THE COURT:  All right.  What would you like to say,

17  Mr. Morris?

18      MR. MORRIS:  Your Honor, this is more than

19  disappointing.  The fact of the matter is Mr. Dondero is

20  funding both the Cayman Islands litigation as well as The

21  Dallas Foundation's prosecution of the objection.  The fact

22  that The Dallas Foundation settled doesn't open the door to

23  Mr. Dondero to assert objections that he's never asserted

24  before.

25     I will tell you what will happen.  If Your Honor allows

1  this, I will have to call Mr. Dondero and Ms. Deitsch-Perez to

2  the stand to offer evidence under subpoena that they

3  personally acknowledge and understand, because Mr. Dondero's

4  signature is on documents that were signed in the year 2025,

5  that Mr. Patrick is authorized to represent HMIT.  I really

6  didn't want to do that.  But if they want to pursue it, I'll

7  have to do my job.

8           THE COURT:  All right.

9           MR. LANG:  And I want to clarify one thing.

10          THE COURT:  Uh-huh.

11          MR. LANG:  And it goes back to something we already

12  discussed, which is the authority issue is derived from the

13  Cayman Island Joint Liquidators' appointment on May 6th, 2020.

14  And so how that changes the authority, it's -- I think the

15  issue is does he have authority, like Mr. Morris --

16          THE COURT:  All right.  Well, before I comment, Mr.

17  Phillips, it's your client representative that we're talking

18  about here.  What do you say?

19          MR. PHILLIPS:  Very disappointing, but -- and further

20  revealing the limits of my imagination.  There is no objection

21  to authority.  There's no evidence of record of objection to

22  authority.  There's no evidence even in The Dallas

23  Foundation's papers about authority.  Dugaboy did not raise

24  objections to authority.  Daugherty did not raise objections

25  to authority.  And Mr. Morris was willing to release Ms.

1    Deitsch-Perez and Mr. Dondero from subpoena in connection with

2    an order that this Court entered that Hunter Mountain objected

3    to.  And outside the Court, the evidence will establish, the

4    evidence submitted by Mr. Morris will establish that Hunter

5    Mountain, through authority of Mr. Patrick, objected to Ms.

6    Deitsch-Perez signing on behalf of Hunter Mountain because she

7    did not seek approval and did not have authorization to sign a

8    stipulation before this Court.

9        Subsequently, after signing the stipulation and entry of

10   the order, we suggested that we would not deal with Ms.

11   Deitsch-Perez, we would only deal with unconflicted counsel,

12   and we dealt with unconflicted counsel to make an agreement

13   with HCLOM and another of Mr. Dondero's entities to avoid

14   filing a motion for reconsideration before this Court based on

15   the fact that, as we have suggested in the motion that we

16   didn't file, Hunter Mountain's approval was not real.

17       So Mr. Morris has these people under subpoena because we

18   signed an agreement that Mr. Dondero signed to avoid the

19   filing of a motion for reconsideration before this Court,

20   recognizing that Mr. Patrick had authority for Hunter Mountain

21   to sign the agreement.  And so that's the purpose of his

22   subpoena.

23       But our position is there's no suggestion in pleadings by

24   Dugaboy or Daugherty that challenge the authority of Mr.

25   Patrick to execute on behalf of any of the Hunter Mountain

1   entities.  And the one party who, without suggesting an

2   evidentiary basis, but that's fine, they say maybe they did

3   have an evidentiary -- we -- and they withdrew their

4   objection.

5            THE COURT:  Okay.  Let me --

6            MR. MORRIS:  Okay.  I'm sorry.  Just really --

7            THE COURT:  Thirty second.

8            MR. MORRIS:  Really quickly.

9            THE COURT:  Uh-huh.

10           MR. MORRIS:  The letter that Mr. Lang just referred

11   to from the Joint Official Liquidators, addressed to us,

12   asking for an extension of time, doesn't even challenge Mr.

13   Patrick's authority to act today on behalf of the HMIT

14   entities to enter into the settlement agreement.  The Joint

15   Official Liquidators wrote to us last night, and they don't

16   say what Mr. Lang is now saying.

17           MR. PHILLIPS:  And the only thing I would say is we

18   got a letter by email from somebody who says, I am who I am.

19   It came through email PDF.  We don't challenge the authority.

20   But we would respectfully request -- we're not there.  We've

21   made no appearance.  We don't challenge the authority.  But

22   please wait -- ask the Court to wait the 45 minutes -- 45 days

23   for us.  We got a letter.  PDF.  We don't know who sent it.

24           THE COURT:  Okay.

25           MR. PHILLIPS:  It wouldn't be admissible even if

1   someone tried to introduce it as evidence.

2            THE COURT:  Okay.  Let me just say a few things here.

3   This has felt like a very strange sideshow, I'm going to say.

4   When I read The Foundation's objection, I was, again,

5   scratching my head, who in the heck is Crown Insurance?  I

6   know who Dallas Foundation is because there have been charts

7   submitted to me in the past, and I know it's part of the I'm

8   going to say Mr. Phillips' client set over the months, the

9   Charitable Foundation structure.  But I'm like, how in the

10  heck do these people have standing?  Okay?  I have to always

11  consider standing.  That's every trial judge's first

12  obligation, does this party have standing?  Not a creditor.

13  Not an equity holder.  But somehow I guess they're going to

14  explain through evidence how they're a person aggrieved by the

15  proposed settlement.

16       So that's why I kind of -- hopefully, it doesn't sound

17  flippant -- thought this sounded like a sideshow, because this

18  is a stranger, really, to weigh in.

19       Okay.  So now I'm hearing that a party in interest, which

20  Dugaboy is -- I guess some might argue that, but I think

21  they're affected by the settlement, so that makes them a party

22  in interest -- you're making the same argument.  And it's

23  because of a rotation of counsel you didn't make it sooner.

24       Okay.  So I'm just trying to be transparent here, tell you

25  what the Court is thinking.  I guess what the Court is

39

1  thinking is Mark Patrick is the client representative, so I'm

2  told by the Movants on the 9019, and you, Mr. Phillips, he's

3  the party representative for Hunter Mountain.

4         MR. PHILLIPS:  Yes, Your Honor.

5         THE COURT:  I don't, I guess, know what harm there

6  is, except a longer hearing, in, okay, put him on the stand to

7  testify about the bona fides of the settlement.  It's more

8  evidence.  But if you all want to call Mr. Dondero, I'm going

9  to require that.

10        MR. MORRIS:  Your Honor?

11        THE COURT:  I mean, as a counterbalance, since it's

12  appearing from the pleadings to be --

13        MR. MORRIS:  Your Honor, respectfully, Mr. Patrick is

14  not on their witness list.  He's not on our witness list.

15        THE COURT:  Wasn't he on somebody's witness list?

16        MR. MORRIS:  He was on The Dallas Foundation's

17  witness list.

18        THE COURT:  Oh.

19        MR. MORRIS:  He's not on their witness list.  He's

20  not on our witness list.  He should not testify today because

21  they're raising an issue that they didn't raise ever before.

22  This is improper.  They should just be shut down here.

23        THE COURT:  I think probably you should be shut down.

24  But I kind of go back and forth, what's the harm in having the

25  representative, the person I'm told is the representative of

1  Highland?

2          MR. PHILLIPS:  Your Honor?

3          THE COURT:  I could limit it to one hour.  And the

4  flip side is that Dondero himself, as I guess the

5  representative of Dugaboy, would have to also take the stand,

6  limited to one hour.

7          MR. PHILLIPS:  I'd like to make one note, Your Honor,

8  about the documents that Mr. Morris has introduced.  That

9  document list -- and I don't have the numbers in front of me

10 -- but part of the presentation and the reason Mr. Patrick is

11 not on the Movants' motion -- witness and exhibit list, the

12 documents that have been introduced are all of -- include all

13 of the documents evidencing Mr. Patrick's authority as the

14 control person of the entire Hunter Mountain group.

15         THE COURT:  Which they've stipulated.

16         MR. PHILLIPS:  Which they've stipulated to.

17         THE COURT:  Uh-huh.

18         MR. MORRIS:  And to be clear, Your Honor, they can be

19 found at Exhibits 70 through 104.  We've got 34 documents in

20 evidence that establish that Mr. Patrick is authorized to act

21 on behalf of each of the HMIT entities.  All that's going to

22 happen is we're now going to spend time dealing with an issue

23 that you already described as a sideshow, and we're going to

24 do it for a party who didn't put Mr. Patrick on a witness

25 list, who hasn't objected on this basis, and we've got a

1  mountain of evidence that shows that he's completely

2  authorized to do this.  I just --

3          MR. PHILLIPS:  To which there's no objection.

4          MR. MORRIS:  And you can also look, Your Honor, at

5  Exhibit 69.  That's the agreement that Mr. Dondero signed with

6  Mr. Patrick after he got outed for authorizing Ms. Deitsch-

7  Perez to sign a document on behalf of HMIT without Mark

8  Patrick's knowledge or approval.  He signed that.  Six months

9  ago.  And we're going to have a trial here over whether Mark

10 Patrick is authorized to act on behalf of HMIT?

11         A VOICE:  That was long ago.

12         MR. MORRIS:  This is not -- this is not --

13         THE COURT:  We're not going to have a trial.  And I

14 fully acknowledge that I am possibly abusing discretion by

15 allowing this.  We have our rules, and our rules were not

16 complied with, and it does feel a little bit like ambush.

17 Okay?

18    But on the flip side of it, it doesn't seem entirely

19 unreasonable to have the representative, the purported

20 representative of Hunter Mountain, who is the counterparty, if

21 you will, to this very major settlement, take the stand.  And

22 I'll limit it.  And, again, I condition it on Mr. Dondero, the

23 ultimate beneficiary of the Dugaboy Trust, as it's been

24 represented to me in prior filings, --

25         MR. MORRIS:  Correct.

 1          THE COURT:  -- he'll have to stay an equal amount of

 2   time on the stand.  Okay?

 3          MR. MORRIS:  Okay.

 4          THE COURT:  Okay.  Hang on.  I've got my smarter

 5   staff member handing me a note.  Okay.

 6     (Pause.)

 7          THE COURT:  Okay.  Well, so that's how we're going to

 8   stand.

 9      Now, I am going to address Mr. Daugherty here.  We're not

10   going to let Mr. Daugherty cross-examine Patrick.  Clearly,

11   his objection has been around, and he never said anything

12   about --

13          MR. YORK:  Certainly not as to authority.  However,

14   we should be able to examine him as it relates to the portion

15   of the objection that goes to whether the settlement is in the

16   best interest, given the claims that are being -- the

17   Kirschner claims that are being transferred by Highland to the

18   HMIT entities.

19          THE COURT:  All right.  Well, you all are going to

20   have to share your 30 minutes.

21          MR. YORK:  That's fine.

22          THE COURT:  Okay?  We're giving 30 minutes to Debtor

23   entities, Highland entities, and Hunter Mountain entities

24   collectively, and 30 minutes to Dugaboy and Daugherty

25   collectively.  Okay?  So, I'm going to have my law clerk

1   timing you like you're on the clock.

2           MR. MORRIS:  Okay.

3           THE COURT:  Okay?

4           MR. MORRIS:  May I proceed?

5           THE COURT:  You may proceed.

6           MR. MORRIS:  Thank you, Your Honor.  So, appearing at

7   Docket 4255 is the Movants' exhibit list, with Exhibits 1

8   through 123.  At Docket 4277 are Exhibits 124 and 125.  And at

9   Docket 4280, we've got Exhibit 126.

10      The Movants respectfully move into evidence all of those

11   documents, with the exception of Exhibits 124 and 125 on

12   Docket No. 4277.  Those are the transcripts of The Dallas

13   Foundation representatives, and since we have reached an

14   agreement and The Dallas Foundation has withdrawn their

15   objection, we are not going to offer those two transcripts

16   into evidence as part of the record in this matter.

17      But Exhibits 1 through 123, and Exhibit 126, we move into

18   evidence.

19           THE COURT:  All right.  And as I thought we were

20   going to start talking about a moment ago, Mr. Lang objected

21   to 11 of these 123 designations.  Do those still remain?  If

22   they do, we're just going to see if they want to be I think

23   offered --

24           MR. LANG:  No, I think we've --

25           THE COURT:  -- the old-fashioned way, but I think

1  that might be more efficient.  I have, in your objection,

2  which is at Docket 4273, you objected to Numbers 10, 12, 13,

3  57 and 59, and then 64 through 69.  Eleven items.

4        MR. LANG:  Mr. Morris clarified that 12 and 13 are

5  one document.  But I still, I think that, again, for purposes

6  of the authority issue, Exhibit 13 we don't think is relevant.

7        MR. MORRIS:  Exhibit 13, Your Honor.  We'll just take

8  them one at a time.

9        THE COURT:  Yes, go ahead and address it.

10        MR. MORRIS:  Is relevant because it's simply a

11  document that was provided to Highland by Hunter Mountain as

12  part of the negotiations.  And we've been asked to produce all

13  of the documents related to the negotiations.  This is one of

14  the documents that we received.

15        THE COURT:  Okay.  And do I understand 12 and 13 are

16  actually the same thing, or --

17        MR. MORRIS:  Yeah.  Well, 12 is the email, 13 is the

18  attachment.

19        THE COURT:  Okay.  I overrule the relevance

20  objection.  Those will be admitted.

21     (Claimant Trust's Exhibits 12 and 13 are admitted into

22  evidence.)

23        MR. LANG:  57.

24        MR. MORRIS:  57 is also a part of the settlement

25  documents.  It's, I think, an email exchange between Mr. Seery

1    and UBS, which was one of the Class 9 claimants, and we had to

2    obtain their consent and that's part of the process of getting

3    to the settlement agreement.

4              MR. LANG:  I think the objection is it doesn't

5    include the attachment.

6              MR. MORRIS:  It's got all -- it's got numerous

7    attachments on it.

8              MR. LANG:  To 57?

9              MR. MORRIS:  Yeah.

10             MR. LANG:  Mine did not.

11             MR. MORRIS:  Your Honor, we'll withdraw the exhibit.

12             THE COURT:  Okay.

13             MR. MORRIS:  Okay.

14             THE COURT:  59.  Well, you didn't address #10.

15             MR. LANG:  Oh, sorry.

16             THE COURT:  That was the first one.

17             MR. LANG:  Yeah.

18             MR. MORRIS:  We'll withdraw #10.

19             THE COURT:  All right.

20             MR. MORRIS:  Okay.

21             THE COURT:  So, 59?

22             MR. MORRIS:  59?  Your Honor, I'm not surprised they

23   object, because it's at the core of the Court's ability to

24   authorize this settlement.

25             MR. LANG:  We withdrew that.

1          MR. MORRIS:  Oh, you withdrew that?

2          MR. LANG:  Withdrew.

3          MR. MORRIS:  Oh, okay.  They withdrew that.

4          THE COURT:  Okay.  So, 59 will be admitted.

5     (Claimant Trust's Exhibit 59 is admitted into evidence.)

6          MR. MORRIS:  And then I think the last is 64 to 69.

7          THE COURT:  Uh-huh.

8          MR. MORRIS:  We were actually prepared to withdraw

9     those exhibits because we didn't think there was a challenge

10    to authority.  Now that there's a challenge to authority,

11    we're going to offer all of those in because they're highly

12    relevant to the acknowledge of Mr. Patrick's authority.

13         THE COURT:  All right.  And your objection was solely

14    to relevance?

15         MR. LANG:  The objection was relevance because they

16    predate the May 6th issue in the Caymans, which is what caused

17    the entire structure to -- the authority from the top down to

18    be questioned.

19         THE COURT:  All right.  Well, you can cross-examine

20    if you want on those items.

21         MR. LANG:  Okay.

22         THE COURT:  But I find they're relevant so they will

23    be admitted, 64 through 69.

24    (Claimant Trust's Exhibits 64 through 69 are admitted into

25    evidence.)

1      *[Court Edit:  Claimant Trust's Exhibits 1 through 9, 11*

2      *through 56, 58 through 123, and 126 are admitted into*

3      *evidence.]*

4              THE COURT:  All right.  And as far as the exhibits of

5      Dugaboy, I think it was just the plan and settlement agreement

6      were all that had been designated.  Correct?

7              MR. LANG:  Yes.

8              MR. MORRIS:  No objection.

9              THE COURT:  So, no objection.  Those will be

10     admitted.

11          (Dugaboy Investment Trust's exhibits are admitted into

12     evidence.)

13             THE COURT:  And Daugherty's exhibits?

14             MR. YORK:  Yes, Your Honor.  So, Mr. Morris and I

15     conferred yesterday about both sides' exhibits.  And my

16     understanding is we've reached an agreement that both sides'

17     exhibits are not objected to.  And so therefore we'd move to

18     admit Daugherty's as well.

19             THE COURT:  All right.

20             MR. YORK:  1 through 42, I believe, it is.

21             THE COURT:  All right.  So you confirm?

22             MR. MORRIS:  Yes, Your Honor.

23             THE COURT:  All right.  The Court will admit all of

24     Daugherty's 1 through 42, and they appear at Docket Entry

25     4266.

1      (Patrick Daugherty's Exhibits 1 through 42 are admitted

2   into evidence.)

3            THE COURT:  All right.  Opening statements.

4        OPENING STATEMENT ON BEHALF OF THE CLAIMANT TRUST

5            MR. MORRIS:  All right.  Good morning, Your Honor.

6   John Morris; Pachulski Stang Ziehl & Jones; for Highland

7   Capital Management, LP and the Highland Claimant Trust.

8      If we can go to the first slide, Your Honor.  This is a

9   9019 motion.  It's not a terribly high bar.  What the Movant

10  has to show here is that the settlement agreement was the

11  product of arm's-length, good-faith negotiations, and

12  effectively that it's in the best interests of its

13  stakeholders.

14           THE COURT:  Did you want this put on the screen, or

15  does everyone have a hard copy?

16           MR. MORRIS:  Counsel have a hard copy.

17           THE COURT:  Oh, okay.

18           MR. MORRIS:  Yeah.  The evidence is going to show,

19  and there really is no dispute, that the settlement agreement

20  is the product of arm's-length, good-faith negotiations.  Mr.

21  Seery is going to testify that the negotiations began in late

22  March and they concluded on May 19th.  Exhibits 2 through 57,

23  with the exception of the one or two I just withdrew, reflect

24  the parties' negotiations.  Mr. Seery is going to testify that

25  the negotiations were conducted by Zoom, by phone call, there

1  was one in-person meeting, there was many, many email

2  exchanges that are reflected in the exhibits.

3      Mr. Seery is going to testify about the substance of the

4  negotiations at a high level.  Originally, we had sought to

5  have one agreement with Hunter Mountain and the DAF entities.

6  Mr. Patrick was not comfortable with that.  He wanted to run

7  them separately.  And there was a DAF agreement that was

8  ultimately entered into but that nobody believed required

9  court approval.

10      So, once that got completed and one of the Fifth Circuit

11  appeals got dismissed as a result, we moved to the Hunter

12  Mountain discussions.  Those discussions were robust.  There

13  were issues about the timing of the effectiveness of certain

14  of the benefits under the proposed agreement.  Highland wanted

15  the releases, for example, to be effective upon signing.  Mr.

16  Patrick was unwilling to agree to anything without this

17  Court's approval.

18      So there were changes that were made over time in terms of

19  the timing of the transfer of the consideration.  There were

20  discussions and negotiations and bids and asks about the

21  amounts that would be paid, when they would be paid, the

22  circumstances under -- that they would be paid.  There was an

23  enormous amount of information that was exchanged pursuant to

24  a confidentiality agreement that now became public because

25  it's relevant to the Debtors' burden or the Claimant Trust's

1   burden to carry the day here.

2      That information included claims information, the trust

3   agreement itself, budgets, asset/liability valuation

4   information, forecasted expenses, because HMIT rightly

5   wondered, you know, what's going to happen to the money?  Is

6   it going to be gone before it got its agreed-upon share?  So,

7   you know, there will be, I think, indisputable evidence at the

8   end of the day that the settlement is the product of arm's-

9   length, good-faith negotiations.

10      If we move to the next slide, the evidence will also show

11   that the proposed settlement is indisputably in the best

12   interest of the Highland entities and their stakeholders.

13   Upon court approval, all of the pending litigation that Your

14   Honor identified earlier will be dismissed with prejudice,

15   thereby greatly reducing litigation risk and attendant costs.

16      The stakeholders will also benefit from the allowance of

17   the HMIT claim at a fixed amount of $337 million.  And we will

18   explain -- Mr. Seery will explain to the Court how that number

19   was arrived at.

20      The estates and their stakeholders will also benefit

21   because, under the proposed settlement, as I indicated

22   earlier, Highland will be able to monetize or otherwise

23   dispose of a number of illiquid assets, including the Dugaboy

24   Note and the estate claims in the Kirschner Litigation.  And

25   perhaps most importantly to the estate, we are getting very,

1   very broad what we refer to as litigation protections from all

2   of the Hunter Mountain entities.  It includes not only a

3   release but a covenant not to sue as well as, you know, we

4   could go through it, but -- but we believe that even if Mr.

5   Dondero or somebody else obtains control of Hunter Mountain,

6   unless somebody sets aside this agreement, those protections

7   are going to inure to the benefit of the Trusts, the Indemnity

8   Trust and all of its stakeholders until the end of time, and

9   nobody is ever going to be able to set this agreement aside

10  because it was negotiated in good faith, it was the product of

11  arm's-length negotiations, and it's fair and reasonable to

12  both sides.

13      So those litigation protections are paramount and they

14  provide another indicator of the benefits that the Claimant

15  Trust is going to receive.

16      The next slide, Your Honor, is a demonstrative exhibit,

17  although, as always, we have citations to the very specific

18  documents that are now in the record.  Mr. Seery will describe

19  for you at a high level how the allowed claim of HMIT was

20  calculated, and it's really just based on the limited

21  partners' capital accounts as of the petition date.  And I'll

22  just leave it at that for the moment.  There's no magic to it.

23  It's objectively reasonable.  It's mathematics.  There's

24  really no subjectivity that I'm aware of that goes into this.

25  It's just, hey, let's look at the tax returns, let's look at

1  the financial statements, and let's look at the partnership

2  agreement, and let's see how the capital account was

3  structured as of the petition date.  And that's how you get

4  to, really, $396 million less the amount of the Dugaboy Note.

5  I mean, the HMIT note.

6      The next slide.  With the settlement, the transfer of the

7  Kirschner Litigation is in the best interests of the Movants.

8  I think Mr. Daugherty somehow suggests that really the best

9  thing to do would be to prosecute that litigation.  We

10  respectfully disagree.  In the Debtors' business -- in the

11  Claimant Trust's business judgment, that would be exactly the

12  wrong thing to do when you are settling with HMIT.

13      And why is that?  When we commenced the Kirschner

14  Litigation a number of years ago, the Kirschner Litigation

15  represented a potential source of funding for indemnification

16  expenses, and at that time, for the payment in full to

17  creditors.

18      By 2023, 2024, with the success of the Highland team's

19  monetization of assets, the need to pursue and monetize the

20  Kirschner claims became less clear, so we put it on ice.  And

21  we voluntarily stayed the litigation to conserve resources.

22      The settlement with HMIT changes everything.  The claims

23  are as valid today as they were yesterday, as they were before

24  we signed the agreement, as they were when we commenced the

25  action.  But they have very different value to Highland when

1  you're settling with HMIT.  And that's why we're prepared to

2  transfer the claims today.

3     Why?  Because at this point, unlike when we commenced the

4  action, Class 8 has been paid in full except for Mr.

5  Daugherty's fully-reserved claim, right, in an amount that he

6  agreed to for years and that he ratified and reaffirmed three

7  different times in three different stipulations.  That's the

8  only thing that remains in Class 8.

9          THE COURT:  And remind me of the dollar amounts on

10  reserve.

11          MR. MORRIS:  It's approximately $2.5 million.  I can

12  --

13          THE COURT:  Okay.

14          MR. MORRIS:  It's -- the dollar amount is

15  specifically set forth --

16     (Pause.)

17          MR. MORRIS:  It would be, I believe, in Exhibit 60,

18  --

19          THE COURT:  Okay.

20          MR. MORRIS:  -- is the original tolling agreement.

21  And in Paragraph 1 it has the very specific dollar amount.

22  And then in Exhibits 62, 63 -- 61, 62, and 63, those are

23  amendments to the tolling agreement that fully incorporated

24  the original tolling agreement, including the reserve amount.

25  So that amount has been there for years.  Nobody has ever said

1   anything about it.  Nobody has ever tried to adjust it.

2   Nobody has ever identified a change in circumstances that

3   would suggest a change was appropriate.  But here we are.

4        So, why is it different and why does the Kirschner

5   Litigation not have so much value to us when we're settling

6   with Class 11?  Because Class 8 has been paid in full.  Class

7   9 has been paid 80 percent.  If the HMIT settlement is

8   approved, it will receive another 10 percent.  So that all

9   that remains is 10 percent of the Class 9s.

10       And most importantly, Your Honor, with the settlement with

11  HMIT and the Claimant Trust's receipt of the litigation

12  protections, the need for indemnification expenses is going to

13  be greatly reduced.  We can give the money where it belongs

14  because all we'll have left is Mr. Dondero and Dugaboy.  It

15  really will literally be the only thing.  And we need a lot to

16  deal with that, but not as much as we needed when we had to

17  deal with them and HMIT.

18       And at the end of the day, once you're settling with HMIT,

19  prosecution of the claims would only benefit HMIT, so why

20  should we undertake the expense of doing that?

21       Is that clear to Your Honor?

22            THE COURT:  It is.

23            MR. MORRIS:  It is?  So, it's -- this has nothing to

24  do -- and you're going to hear questions of Mr. Seery, did you

25  value the Kirschner claims?  Are you giving them away for

1  free?  No, we didn't value them, because once you're settling

2  with HMIT it doesn't really matter.  Once you have the

3  litigation protections, once you know that HMIT is never going

4  to be an adversary of yours, the monetization of the Kirschner

5  claims would insure to their benefit because they will have an

6  allowed claim of $330 million.  So even if we sued and even if

7  we got a hundred million dollars, that's going to go to them.

8  Why would we pick up the tab today?  A very different scenario

9  than when we prosecuted the case, when the case was commenced.

10  So, really, really, in the estate's best interest to get

11  value for those claims.  The value is reflected in the

12  totality of the agreement.  The Court really should look at

13  the body of the consideration that's being received, including

14  the litigation protections.

15  If we can go to the next slide, Your Honor.  As long as

16  we're on the topic of Mr. Patrick's authority, Mr. Seery is

17  going to testify to the work that he did to satisfy himself

18  that Mr. Patrick was duly authorized to act on behalf of each

19  of the HMIT entities in this case.

20  The next slide here shows an excerpt from the Hunter

21  Mountain Trust Agreement.  It's Paragraph 7.  And it says,

22  among other things, the Administrator -- who is Mark Patrick

23  -- shall be duly authorized, from time to time, in his sole

24  discretion, to manage the business and affairs of the Trust.

25  It continues by saying that the Administrator, Mr.

1   Patrick, shall also have the power to settle, compromise,

2   submit to arbitration, or to submit to any court having

3   jurisdiction in any matter, any matters that are in dispute.

4       So, you know, this is just one document.  It's the Hunter

5   Mountain document.  We focus on the Hunter Mountain document

6   because that's the only one of the HMIT entities that has a

7   stake in the Claimant Trust.  But, again, Your Honor, if you

8   just -- Mr. Seery will, at a high level, confirm that Exhibits

9   70 through 104 are documents that definitively establish that

10  Mr. Patrick has the authority to enter into each of these

11  agreements on behalf of the HMIT entities.

12      Not only that, but he will describe, if asked by you or

13  anybody cross-examining him, why nobody has the ability to

14  interfere with the effectuation of his authority.  He doesn't

15  have to get anybody's consent.  He doesn't have to -- right?

16  This is all just crystal clear.  And whatever entity far up

17  the chain may exist, Your Honor should just think of as a

18  shareholder.  And if Coca-Cola came in here and they wanted to

19  do a 9019 motion, a shareholder can't come in and stop Coca-

20  Cola from doing that.  If they don't like what Coca-Cola is

21  doing, go file a derivative suit.  Go sue Coca-Cola in another

22  court at another time.  Not that I'm inviting litigation

23  against Mr. Patrick, but by analogy, this is what we're

24  talking about.

25      There is no restriction on Mr. Patrick's authority.  The

1   settlement is fair and reasonable.  He has authority under the

2   governing documents to do what he has done here, and that is

3   act in the best interests of the HMIT entities.  And so this

4   is just one page.  Mr. Seery will explain, you know, just the

5   work that he's done to satisfy himself.

6       The next slide, Your Honor, there's objections about how

7   somehow the settlement agreement violates the plan or the

8   absolute priority rule, all of that.  It's not accurate.  I'll

9   just leave it at that in terms of how I characterize it.

10      The next slide is excerpts of -- I think it's the plan of

11  reorganization, Your Honor.  And I think we admitted the plan

12  last night.  That's Exhibit 126.  And they're -- these

13  excerpts are really important because what they show is that

14  Classes 9 and 10 have the indisputable right to accept less

15  favorable treatment.  And that's what they've done.  Okay?

16  And I think it's Article III, Section H, Subparts 9 and 10.

17  Holders of Class 9 and 10 interests have the right to accept

18  less favorable treatment.

19      And if we can go to the next slide, I'll just briefly

20  describe the less favorable treatment that these stakeholders

21  have in fact accepted.  As permitted by the plan, holders of

22  Class 9 claims consented to the payment in full of Mr.

23  Daugherty's Class 9 claim and the Class 10 distributions, in

24  accordance with the settlement agreement, before their Class 9

25  claim is paid in full.

1    And that's Exhibit 59.  It may be among the most important

2    documents that have been admitted this morning.  Exhibit 59 is

3    the consent of the Class 9 holders other than Mr. Daugherty to

4    accept lesser treatment.

5    So there's no violation of the plan at all.  HMIT is also

6    accepting less favorable treatment than it might otherwise be

7    entitled to if it ever successfully prosecuted its claim.  It

8    has less favorable treatment because it's agreeing that it's

9    not a Claimant Trust beneficiary, that its rights are limited

10   to the rights that are given to it under the settlement

11   agreement and nowhere else.  It's accepting less favorable

12   treatment because it's agreeing that the Highland entities owe

13   no duty of any kind to any HMIT entity except as provided for

14   in the settlement agreement.  It's accepting restrictions on

15   its ability to transfer its Class 10 interests -- more less-

16   favorable treatment -- as a condition to the first and second

17   distributions.  They have agreed that they are subject to Mr.

18   Seery's determination that the Highland entities are not at

19   that time under any Threat.  "Threat" is a defined term, and

20   it has to do with litigation.

21   And so if Mr. Seery, in his sole discretion, believes that

22   he needs to conserve resources because he remains years in the

23   future under threat of litigation, he's not going to make the

24   payments to HMIT, and HMIT is okay with that because they

25   understand.

1       And, of course, in the end, they're accepting less

2  favorable treatment because they're granting to the Claimant

3  Trust the litigation protections.

4       All stakeholders have been paid in full except for the 10

5  percent of Class 9 and Mr. Daugherty's Class 8 claim.  That

6  claim is the subject of an objection, and as I just walked

7  Your Honor through, it has been fully reserved in an agreed-

8  upon amount for years.

9       There was some questioning during Mr. Seery's -- one of

10  Mr. Seery's I think three depositions in the last week --

11  about why he didn't offer Mr. Daugherty the same treatment

12  that he offered to the other Class 9 holders because Mr.

13  Daugherty had about an $800,000 Class 9 claim.  Your Honor

14  will see in Exhibit 58 that that claim was paid in full, and

15  Mr. Seery will explain that he found negotiating with Mr.

16  Patrick to be difficult, number one.  And number two, it was

17  an amount of money that the estate could afford.  And so the

18  other Class 9 claims are substantially bigger, so rather than

19  going through the process of attempting to negotiate with Mr.

20  Daugherty, he just paid it in full.  The Claimant Trust had

21  every right to do that.  And Mr. Daugherty should not be heard

22  to complain that he actually got everything that he could have

23  ever been entitled to.

24            THE COURT:  And --

25            MR. MORRIS:  Uh-huh?

 1              THE COURT:  I don't mean to get you off-track.

 2              MR. MORRIS:  That's all right.

 3              THE COURT:  But Class 9 claimants, I'm trying to

 4   remember who else was in that class.  Was it a UBS --

 5              MR. MORRIS:  UBS.

 6              THE COURT:  -- claim?

 7              MR. MORRIS:  Exactly right.

 8              THE COURT:  Okay.

 9              MR. MORRIS:  And then affiliates of Stonehill and

10   Farallon.

11              THE COURT:  Okay.

12              MR. MORRIS:  Because they had purchased --

13              THE COURT:  They had Class 9 --

14              MR. MORRIS:  They had purchased originally I think it

15   was Josh Terry, and the Redeemer Committee may have had a

16   piece.  No, no.  No, no, no.  HarbourVest.  HarbourVest had a

17   piece.  Right?  So, HarbourVest sold their claim, including

18   the Class 9 claim.  Josh Terry sold his claim, including his

19   Class 9 claim.  Then there's UBS, who still holds a piece of

20   their claim, and Mr. Daugherty.  So, UBS, if you look at

21   Exhibit 59, you'll see the signatures of UBS and the

22   affiliates of Stonehill and Farallon, who all agreed to accept

23   lesser treatment.

24              THE COURT:  Okay.

25              MR. MORRIS:  So, at the end of the day, Your Honor,

1    the last slide is a slide that I didn't intend to present,

2    frankly, because I didn't ever believe that there was going to

3    be a challenge to authority by anybody other than The Dallas

4    Foundation.  But as long as we have it attached, we might as

5    well see it.

6         As you can see, Your Honor, in the lower right-hand

7    corner, you can see Hunter Mountain is owned by Beacon

8    Mountain, which is owned by CLO Holdco.  Like, there is no --

9    and Mr. Patrick controls it.  And it's really on the other

10   side of the ledger, in the DAF house, so to speak, that any of

11   The Dallas Foundation got interested.

12        Dugaboy is not even on here, by the way.  Like, Dugaboy is

13   nobody.  The people in here who are now going to challenge the

14   authority of Mr. Patrick, no, not on here.  And they're going

15   to do it, they're going to do it without ever having given us

16   notice.

17        I know Your Honor made your ruling and we'll deal with it,

18   but I don't know if Your Honor was aware of this:  They're not

19   on here.

20        Your Honor, at the end of the day, this is a really,

21   really easy call to make from our perspective.  We have been

22   waiting for this moment for years.  Finally, a responsible

23   person understands that the way to preserve value is to put

24   the sword down.

25        Mr. Patrick, I don't know what happened between him and

1   Mr. Dondero.  I don't care.  I have no knowledge of that.  But

2   clearly he is exercising independence.  And that's why we're

3   here, because we finally have somebody who says, you know

4   what, give me everything I can possibly get and I will stop

5   fighting.  I wish other people would say that, because then

6   this case would be over.  Then the case would really be over.

7        But getting to a settlement with the Class 10 interest

8   holder who is going to have an allowed claim of $337 million,

9   such that any value in the future is going to go to HMIT, I

10  hope that that -- you know, this is an easy call to make, Your

11  Honor.

12       I have nothing further at this time, but I look forward to

13  putting Mr. Seery on the stand and making sure that Your Honor

14  has, you know, an adequate, sufficient, overwhelming basis,

15  frankly, to approve this motion.

16            THE COURT:  Okay.  I don't mean to stifle you, but --

17            MR. MORRIS:  Yeah.

18            THE COURT:  -- anything more for an opening

19  statement?  Mr. Phillips, I'm doing friendlies and then

20  friendlies.

21    OPENING STATEMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

22            MR. PHILLIPS:  Your Honor, just briefly.  Louis M.

23  Phillips on behalf of the Hunter Mountain entities.

24       We fully embrace and concur with everything that Mr.

25  Morris has told the Court.  From our perspective, and the

1   reason that -- and you'll see, the documents include all of

2   the back and forth -- we required the Court approval before

3   the effectiveness of any releases, litigation protections, et

4   cetera, for exactly the reason that we needed the Class 9 to

5   agree.  And we obtained -- the Highland entities obtained the

6   approval of the Class 9 creditors to our treatment, and I

7   think that the bona fides of this settlement and the value of

8   the settlement and our -- what we are giving in the settlement

9   is, I think, established beyond even the slightest bit of

10  question by the fact that the Class 9 creditors and the

11  Oversight Board of the Claimant Trust all agreed that it was

12  important enough to the estate to get this settlement with

13  Hunter Mountain Investment Trust that they agreed to allow

14  Hunter Mountain Investment Trust to receive the money set

15  forth in the settlement upon the approval.  And we have agreed

16  that, notwithstanding appeal rights of some people who really

17  don't have the right to be here, but that's going to be

18  determined by Your Honor, we're not worried about that.  We

19  are giving our releases.  And the releases are effective upon

20  approval by this Court.  We are not requiring any type of

21  final unappealable order that doesn't -- that waits for years

22  before the releases are effective.

23      Very importantly, it seems to me, from Your Honor's

24  perspective, and I'm reluctant to suggest that I know about

25  that, but our releases are given upon the approval by this

1   Court of the settlement.  They're not -- if the settlement is

2   reversed on appeal, our releases stay.

3       So the Class 9s that are above the Class 10 have voted,

4   and they have approved, and Mr. Seery is going to testify

5   about that.  And we think that in and of itself is a

6   monumental accomplishment.  And we appreciate everything Mr.

7   Morris has said.  We agree with everything Mr. Morris has

8   said.  We agree with everything Mr. Morris has said about the

9   absence of true objection.  We agree with everything Mr.

10  Morris has said about the fallacy of suggesting that Mr. Seery

11  had to value the Hunter Mountain -- the Kirschner Litigation

12  proceeds, of which would come to us.

13      The idea that we need to worry about how much Mr. Dondero

14  entities can pay in connection with the Kirschner Litigation

15  so that we could value the Kirschner Litigation based on what

16  Mr. Dondero can pay, so that to suffice with an objection by

17  Dugaboy maybe that there was no value given.  I mean, that's

18  all backwards.  Value was given as described by Mr. Morris and

19  will be established by the evidence submitted by Mr. Seery's

20  testimony and the documents that are already in evidence.

21      And that is it from our standpoint, Your Honor.  Thank

22  you.

23          THE COURT:  Thank you.  All right.  I'll hear from

24  the Objectors.  Daugherty's counsel, are you going to go

25  first?

1      OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

2           MR. YORK:  Thank you, Your Honor.  If I may approach.

3           THE COURT:  You may.

4           MR. YORK:  Good morning, Your Honor.  Drew York on

5    behalf of Mr. Daugherty.

6        We're here today regarding the 9019 and Mr. Daugherty's

7    objection.  The 9019 motion should be denied.  If you turn to

8    the third slide in there, we say that Highland -- Highland,

9    I'm referring to Highland collectively for the Movants --

10   attempts to put the cart before the horse.  So really what's

11   going on here, Your Honor, is we're just asking the Court to

12   follow the rules of the road that it set forth in the plan,

13   the confirmation order, and, frankly, even Highland to follow

14   the terms of the settlement agreement it entered into with Mr.

15   Daugherty.

16       None of that is happening here as a result of this

17   proposed settlement that's being presented to you today for

18   consideration.

19       The first problem with the motion and the proposed

20   settlement is that it violates the absolute priority rule, it

21   violates the express terms of the Court's plan, the

22   confirmation order, as well as the Claimant Trust Agreement,

23   because it attempts to fund the contingent Class 10 claims

24   without first resolving, let alone satisfying, Mr. Daugherty's

25   remaining Class 8 claim.

1    And then, secondly, the settlement agreement does not

2    satisfy the *Jackson Brewing* factors because it prioritizes the

3    HMIT insiders over the estate creditors, including Mr.

4    Daugherty, and it forfeits potential recovery that would go to

5    the benefit of those to creditors to appease litigation

6    pressure.

7    So, first, I'm going to talk about why the settlement

8    violates the plan, the confirmation order, and the Trust

9    Agreement.

10    As everyone is aware, the HMIT entities are asserting a

11    Class 10 claim.

12    If you turn to the next page, as Mr. Morris has

13    acknowledged and admitted here today, Mr. Daugherty has a

14    remaining Class 8 claim.  And, importantly, Your Honor,

15    because Mr. Morris and Highland continue to argue that that

16    claim is fully reserved, I would point out that in the

17    settlement agreement between Mr. Daugherty and Highland the

18    parties characterized that claim as a contingent unliquidated

19    claim.  A contingent unliquidated claim.  And in fact, they

20    went so far, Highland did, in its adversary complaint on the

21    next slide, Your Honor, to again refer to it as an

22    unliquidated and contingent claim that is dependent on the

23    final outcome of the 2008 audit, including the magnitude of

24    any adjustments.

25    And so Highland cannot come into this courtroom and on the

1  one hand argue that that claim is fully reserved, and at the

2  same time admit that it is a contingent unliquidated claim

3  that is subject to a myriad of adjustments depending upon the

4  outcome of that audit.

5      And in reality, when you look at the tolling agreement,

6  there is nothing that the parties said that that was a fully

7  reserved claim at all.  That's simply not what they agreed to.

8  They just simply put a number in there, which was put into the

9  reserve account at the time.  But it did not constitute a

10  fully reserved claim at all.

11      Nor has Highland pointed to anything -- in the plan, the

12  confirmation order, or the Claimant Trust Agreement -- that

13  allows Highland to come in and violate those documents by

14  simply saying that we fully reserved for Mr. Daugherty's

15  claim.

16          THE COURT:  Okay.  Well, we're going to hear the

17  evidence, but as I understood it, it was an agreed reserved

18  amount.  And I asked earlier, was it $2.5 million or -- I feel

19  like it was an agreed amount plus even some interest,

20  acknowledging there might be time.  I don't remember every

21  detail from this case, but I'm just telling you that's what my

22  memory is.  Am I correct?

23          MR. YORK:  The --

24          THE COURT:  Mr. Daugherty agreed, here's what we'll

25  agree is enough to set aside for our ultimately potentially

1    allowed claim, *x* amount plus interest?  Can you confirm?

2              MR. YORK:  What the tolling agreement provides is

3    that Mr. Daugherty agreed to provide the tolling of the

4    objection deadline.  Okay.  And Highland then agreed to put

5    $2.56 million into the reserve.

6         And what the footnote says in the tolling agreement,

7    Exhibit 60, is that the estimated amount of that claim as of

8    -- and let's be clear about this -- as of October 23rd of

9    2020, was $2.56 million and change.  And that's it.  And I'm

10   happy to have my colleague, Mr. Smeltzer, who is a tax

11   attorney and deals with these issues all the time, can come up

12   and explain why, at the end of the day, this is still a

13   contingent unliquidated claim and it's subject to a myriad of

14   factors that make it that that amount that Highland has set

15   aside is not necessarily going to be a fully-reserved amount.

16        That is why the parties have -- had called it both in the

17   settlement agreement and the tolling agreement, and Highland

18   has continued to call it -- characterize it in its adversary

19   complaint as a contingent unliquidated claim.  So --

20             THE COURT:  Okay.  It's hard to wrap my brain around

21   it.  It's a claim that I understood really couldn't be

22   liquidated with certainty until this potential audit of 2008

23   is final, and there was some discussion of how close to it

24   being final was it.  But I guess -- well, I don't know where

25   I'm going here except to say this could be a contingent

1  unliquidated claim for a -- you know, it's already, what, 17

2  years?

3          MR. YORK:  Based -- from when the tax return was

4  filed?  I think that's correct, Your Honor.

5          THE COURT:  Okay.  Well, this is what the adversary

6  is about, right?  I guess they're finally saying it should be

7  estimated, liquidated, pursuant to the Bankruptcy Code and

8  we'll be done.

9          MR. YORK:  Correct.  In violation of the terms of the

10  settlement agreement between Mr. Daugherty and Highland.  Yes,

11  that's --

12          THE COURT:  Wait.  Wait.  What?

13          MR. YORK:  So, the settlement agreement between

14  Daugherty and Mr. Highland provides --

15          THE COURT:  Mr. Highland?

16          MR. YORK:  I'm sorry.  I apologize.  Between Mr.

17  Daugherty and Highland --

18          THE COURT:  Uh-huh.

19          MR. YORK:  -- provides that the -- as long as the IRS

20  audit has not had a final -- there's not a final

21  determination, --

22          THE COURT:  Uh-huh.

23          MR. YORK:  -- then any litigation concerning the

24  validity or the amount of Mr. Daugherty's claim is stayed and

25  cannot be brought before the Court.  And that's exactly what

1  their adversary complaint did, which is -- because they admit

2  in their adversary complaint --

3           THE COURT:  Well, okay.  I won't pursue this anymore.

4  But what's an estate to do?  They're getting criticized for

5  the Trust going on too long.  Not by your client, but -- and

6  meanwhile you want, I mean, 2032, are we still going to be

7  waiting on the IRS?

8           MR. YORK:  I don't know because we don't have any

9  insight into what the IRS audit is.

10          THE COURT:  Well, it's been 17 years.

11          MR. YORK:  I understand, Your Honor.

12          THE COURT:  So, --

13          MR. YORK:  But the bottom line is this.  The plan --

14  that Highland entered into the terms of that settlement

15  agreement.

16          THE COURT:  I'm going to say it right now.  I'm not

17  keeping this estate open until 2032.  I just, I was --

18          MR. YORK:  I presume that --

19          THE COURT:  -- kind of flippantly throwing that out

20  there.

21          MR. YORK:  And --

22          THE COURT:  But this happens in bankruptcy cases a

23  lot, where you've got a contingent unliquidated claim, and

24  there are provisions in the Bankruptcy Code to say what can be

25  done in that scenario.  The Court can estimate or liquidate.

1          MR. YORK:  Understood.  Your point to me was --

2    before was that's why Highland brought the adversary

3    complaint, and I was simply pointing out that, pursuant to the

4    express terms of the agreement that Highland reached with Mr.

5    Daugherty, Highland was -- is not allowed to bring the

6    adversary complaint to challenge the validity or amount of Mr.

7    Daugherty's claim so long as the IRS audit has not been -- had

8    a final determination.  That's exactly what's going on here

9    with the adversary complaint that they have filed.

10          THE COURT:  Okay.

11          MR. YORK:  Okay.  So I think Your Honor is familiar

12   with the terms of the plan, the Fifth Amended Plan and the

13   subordination.  But specifically we have two issues.  One

14   begins with the Claimant Trust Agreement in Section 5.1(c),

15   which provides that the equity holders shall not have any

16   rights under the agreement unless and until the Claimant

17   Trustee files with the Bankruptcy Court a certification that

18   all of general unsecured creditor beneficiaries have been paid

19   indefeasibly, in full, including, to the extent applicable,

20   all accrued and unpaid postpetition interest, consistent with

21   the plan, and all disputed claims have been resolved.

22       That has not happened here and it cannot happen because,

23   for one, Mr. Daugherty's unresolved Class 8 claim, and also

24   the remaining Class 9 claims, as I think you'll hear from Mr.

25   Seery.  And so there are no rights that can be given to the

1   HMIT entities pursuant to -- as a Class 10 holder, an allowed

2   Class 10 holder, pursuant to the Claimant Trust Agreement.  So

3   the proposed settlement violates the Claimant Trust

4   Agreement's express terms.

5        It also violates the Court's confirmation order that was

6   entered at -- specifically on Page 45 of the order, in

7   Subparagraph (a):  The holders of the equity interests --

8   which would be the Class 10 and Class 11 equity interests --

9   that are junior to the claims in Class 8 and Class 9 will not

10   receive or retain under the plan, on account of such junior

11   claim interest, any property, unless and until the claims --

12   the claims, not the allowed claims, but the claims -- in Class

13   8 and Class 9 are paid in full, plus applicable interest.

14        That's exactly what the settlement that is proposed here

15   is designed to do.

16        And if you turn two pages in, you'll see that in addition

17   to the assignment of the Kirschner claims, what we're also

18   having under this proposed settlement are interim cash

19   distributions that would be made to the HMIT entities, interim

20   cash distributions that theoretically could be made before the

21   resolution of Mr. Daugherty's Class 8 claim, which would be in

22   violation of the plan, the Claimant Trust Agreement, and the

23   confirmation order.

24        And that is, as best as they put in their agreement,

25   that's approximately $23 million in cash that would be paid

1  out theoretically in those interim distributions.

2       One of the things that Mr. Morris said in his opening was

3  that they did not -- Mr. Seery did not negotiate with Mr.

4  Daugherty because he was difficult to deal with.  Well, that's

5  surprising, Your Honor, considering, on the other hand, Mr.

6  Morris says to the Court that there were repeated tolling

7  agreements or amendments to the tolling agreement that were

8  entered into by Mr. Daugherty willingly and voluntarily to

9  benefit Highland.

10       And what really happened when Mr. Morris says that there

11  were good-faith arm's-length negotiations, well, there may

12  have been good-faith, arm's-length negotiations between the

13  HMIT entities and Highland, but what happened here was that

14  Highland actually sought to ice out Mr. Daugherty from all of

15  this completely.

16       And how did that happen?  Well, the evidence is going to

17  show that Highland reached out to the other Class 9 creditors

18  over a month in advance of the motion being filed, sought

19  their consent to the proposed settlement, told them that Mr.

20  Daugherty was not going to be a part of it, told them that Mr.

21  Daugherty's Class 8 claim was going to have an adversary

22  complaint filed against it, told them that once that adversary

23  complaint was granted and the claim was disallowed, then those

24  funds would waterfall down to Class 9, so the Class 9

25  creditors would get that -- those funds that theoretically are

1    part of Mr. Daugherty's Class 8 claim.

2        So at no point in time prior to the filing of the

3    adversary proceeding, or even prior to the filing of the

4    motion for approval of this proposed settlement, did Highland

5    ever contact Mr. Daugherty to attempt to discuss any of this,

6    because they simply wanted to ice him out.

7            THE COURT:  Okay.  I'm going to hear evidence.  I

8    don't mean to cut you off, but --

9            MR. YORK:  Sure.

10           THE COURT:  -- I was told that Mr. Daugherty was paid

11   $800,000 --

12           MR. YORK:  With respect to his --

13           THE COURT:  -- on his Class 9 claim.

14           MR. YORK:  Correct.

15           THE COURT:  Is that not true?

16           MR. YORK:  So, the day --

17           THE COURT:  Is that true?

18           MR. YORK:  It is true.  The day after the motion for

19   entry of the proposed settlement was filed, Mr. Demo sent a

20   letter to my office that was a payoff --

21           THE COURT:  I just wanted to -- I don't need to know

22   every detail.

23           MR. YORK:  Yes.  Sure.

24           THE COURT:  Has he been paid?

25           MR. YORK:  His Class 9 claim was paid in full the day

1  after the proposed settlement was filed.

2           THE COURT:  Okay.  So what is the asserted amount of

3  his Class 8 claim?

4           MR. YORK:  We -- again, both sides do not know

5  because they do not have --

6           THE COURT:  What was the asserted amount in the proof

7  of claim that's been reserved for, the Class 8 proof of claim?

8  What was the asserted amount?

9           MR. YORK:  It was listed as contingent unliquidated.

10  And as I understood it, and Your Honor --

11          MR. MORRIS:  No.  I think it's approximately $1.7

12  million, Your Honor.

13          MR. DAUGHERTY:  That's not true.

14          THE COURT:  $1.7 million?

15          MR. DAUGHERTY:  No.

16          THE COURT:  I would look it up, but I don't know if

17  we --

18          MR. DAUGHERTY:  Your Honor, I'll tell you.  It was

19  like $1.45 million, and then the interest to October, which

20  was like another $1.3 million.  I'm estimating it.  But the

21  total is around $2.6 million, $2.7 million at October/November

22  2020.  Up to that point.

23          THE COURT:  Okay.  Well, that's kind of a weird

24  process here for an opening statement.  But I'm asking

25  because, you know, I always try to stray people into let's be

1    pragmatic whenever I can.  And a pragmatic approach here might

2    have been, if your client didn't think the reserve was big

3    enough, you all could have a discussion about, oh, instead of

4    $2.56 million, it now should, I don't know, $3 million,

5    whatever you say the number is.  And there could have been a

6    give and take, instead of all these people showing up in the

7    court and having an all-day hearing.

8        So I'm just trying to understand that.  And you're saying,

9    okay, violation of the absolute priority, when your client

10   took a full payment on his Class 9 claim without Class 8 being

11   quite paid in full.  I'm just trying to be pragmatic here.

12   What would it take to make Mr. Daugherty happy?  Again, that's

13   just the bankruptcy judge speaking on Chapter 11 world that's

14   trying to get to a pragmatic result.

15           MR. YORK:  We're happy to have that discussion with

16   the other side.  We were -- we --

17           THE COURT:  Well, what --

18           MR. YORK:  Yes.

19           THE COURT:  You can't tell me right now?  You're here

20   ready to go to battle over this settlement, and I'm trying to

21   figure out what might happen here that would make you all

22   withdraw your objection.  And that's what we do in Chapter 11.

23   If there's a way we can pragmatically resolve things, we do.

24           MR. YORK:  Sure.

25           THE COURT:  And it just, I'm picking on you because

1   we're talking about a $2.5 or so million claim in a situation

2   where people are wanting the estate wrapped up and it's

3   holding hundreds of millions of dollars, I guess.

4          MR. MORRIS:  Not that much, Your Honor.

5          THE COURT:  Not that much anymore.  Not that much

6   anymore.  A lot has been paid out.  But a lot more than $2.56

7   million, shall we say.

8          MR. YORK:  Understood, Your Honor.  And I'm happy to

9   have a conversation with Mr. Morris and see if we can reach a

10  number that's agreeable to accept as, you know, the reserve.

11         THE COURT:  How hard could that be?  I don't mean to

12  be --

13         MR. YORK:  Happy to do so.  Sure.

14         THE COURT:  How hard could that be, when we're

15  talking about he's been paid $800,000 on his Class 9 ahead of

16  his Class 8, which, to understand your argument, would be an

17  absolute priority rule problem.  But, you know, --

18         MR. YORK:  Correct.  We indicated that --

19         THE COURT:  -- no picking and choosing what is

20  problematic here.  And we're talking about $2.56 million is

21  set aside, and we're talking about the prospect of liquidating

22  it and paying whatever is appropriate way before the IRS is

23  finished.  Maybe.  I don't know.  So how hard could it be to

24  figure out --

25         MR. YORK:  I'm sure we can -- we can have a

1   conversation real quick and try to see if we can --

2           THE COURT:  Okay.  Well, it'll have to be during a

3   break, --

4           MR. YORK:  Sure.  Happy to.

5           THE COURT:  -- because we're plowing ahead.  Okay.

6   Anything else on your opening statement?

7           MR. YORK:  The only other thing I would point out

8   with respect to the best interests of the estate is that the

9   -- as part of the settlement, the Class 9 holders and the

10  Class 10 holders are actually getting more favorable treatment

11  than Mr. Daugherty's Class 8 claim because of the mutual

12  releases that they're getting pursuant to the terms of the

13  proposed settlement, including the fact that the Class 9

14  written consent holders who are all -- all have served on the

15  board here are getting those releases as well under the

16  proposed settlement.

17          THE COURT:  It's not a release by your client.

18          MR. YORK:  No, I understand that.  I understand that.

19  But they're getting mutual releases from each other on

20  litigation that Highland has -- the Claimant Trust, excuse me,

21  has -- Trustee has, you know, consistently said that they had

22  all of those parties, all of those defendants, dead to rights

23  on.

24      So, that's all I have.

25          THE COURT:  Okay.  I really, I'm trying to focus on

1  people's standing.  Your client has standing.  He has a proof

2  of claim that's unresolved.  But I'm just trying to understand

3  the economic impact, I guess, on your client.  And all I'm

4  hearing is, I don't know, that maybe he thinks more than $2.56

5  million ought to be reserved.  I mean, I'm --

6        MR. YORK:  Given the passage of time, and also given

7  the fact that it's still undetermined as to what's going to

8  happen with that audit and what the penalties might be,

9  considering that the amount that was --

10        THE COURT:  But, again, this is bankruptcy-land.  We

11  can't wait around 20 years, 30 years.  The Bankruptcy Code

12  contemplates we can at some point estimate --

13        MR. YORK:  Sure.

14        THE COURT:  -- a contingent unliquidated claim.

15        MR. YORK:  I understand.

16        THE COURT:  So I -- all right.  Thank you.

17        MR. YORK:  Thank you.

18        THE COURT:  And Mr. Lang?

19   OPENING STATEMENT ON BEHALF OF THE DUGABOY INVESTMENT TRUST

20        MR. LANG:  We're down to three issues, one of which

21  is the scope the release, which I think we can work out

22  with Mr. Morris, just to make sure people are carved out,

23  being Dugaboy.

24     The second issue is the use of the dollar value from the

25  capital account as the basis for the Class 10 claim versus

1  using the -- well, they're using it on the petition date

2  versus using it -- the current capital account balance or the

3  percentage interest of 99.5 percent, because that prevents the

4  class, as structured, class level (inaudible).  And so we have

5  an issue with why they're using the capital account as the

6  basis for the allowed claim, when the plan is silent on how

7  that equity interest is to be valued.

8      Does that make sense?

9          THE COURT:  Okay.  You have a problem with the

10 valuation methodology used here, which was taking the capital

11 account balances from --

12          MR. LANG:  On the petition date.

13          THE COURT:  -- on the petition date?

14          MR. LANG:  Versus using the ownership percentage of

15 the equity on, as repeatedly stated, 99.5 percent of Highland

16 is owned by HMIT, .5 is owned by the Class 11.

17          THE COURT:  Okay.  Well, I'm not sure what -- I guess

18 you'll cross-examine Mr. Seery on different possible

19 methodologies.

20          MR. LANG:  Yes.

21          THE COURT:  Okay.

22          MR. LANG:  And so then the third one is the authority

23 issue on Mr. Patrick's authority to enter into the settlement

24 agreement and the transfer of the Dugaboy Note to Mr.

25 Patrick's entity, HMIT.

1            THE COURT:  All right.  And, again, I'll just clarify

2     my understanding.  Dugaboy -- this came up earlier -- itself

3     has a .1866 percent Class A limited partnership interest?

4            MR. LANG:  I think that's approximately right.  Not

5     exact.  Is that Mr. Morris' sheet?

6            THE COURT:  It was in several pleadings.

7            MR. LANG:  Okay.  Yeah.

8            THE COURT:  Okay.  So the question will be, should

9     that be valued at $740,000 or something different?

10           MR. LANG:  More -- there's $65 to $70 million in

11    assets in the estate.  There's $20 million in Class 9 debt, is

12    what Mr. Seery -- unpaid Class 9, is what Mr. Seery testified

13    to.

14           THE COURT:  Uh-huh.

15           MR. LANG:  So it's $45 to $50 million would be left

16    after payment of the Class 9.  And if they use the ownership

17    percentages, Class 11 gets some money.  If they use a $333

18    million capital account, Class 11 gets nothing.

19           THE COURT:  Okay.  I presume that's a material

20    difference, and I'm going to hear about that.

21           MR. LANG:  Yes.

22           THE COURT:  Okay.  And then I guess my other thoughts

23    on his interest -- I say his; it's Dugaboy.  We tend to equate

24    Dugaboy with Mr. Dondero since we've heard he and his family

25    are the hundred percent beneficiaries.  There I guess is a

1   note that is addressed in the settlement.

2            MR. LANG:  Yes.

3            THE COURT:  I called it the $24.2 million note in my

4   --

5            MR. LANG:  That was --

6            THE COURT:  -- preparation, but it's down to --

7            MR. LANG:  Seventeen-ish.

8            THE COURT:  -- $17 million or whatever.  So, right

9   now, Highland is a payee on that note, as well as Get Good

10  Trust, and Hunter Mountain under the proposed settlement gets

11  to substitute in as a co-payee.

12      So I guess I'm just trying to, in my brain, figure out all

13  the, just like I was doing with Mr. Daugherty, the economic

14  impact of this settlement on your client.  And have I just

15  addressed the two things in your view?

16           MR. LANG:  Yes.

17           THE COURT:  Okay.

18           MR. LANG:  I believe so.

19           THE COURT:  Okay.  Thank you.

20      All right.  Can we start with evidence?  At some point,

21  we'll break for lunch, but we'll figure out as we go.  I don't

22  want to be inconvenient to people if people have ordered lunch

23  or something.

24           MR. MORRIS:  We are going to be finished with Mr.

25  Seery on direct well before lunch.

Seery - Direct                          83

1           THE COURT:  Okay.

2           MR. MORRIS:  Or by lunch, for sure.

3           THE COURT:  It's 11:30.

4           MR. MORRIS:  Yeah.

5           THE COURT:  So, all right.

6           MR. MORRIS:  I do -- I would be remiss if I didn't

7    point out that Mr. Lang just raised yet another issue, the

8    calculation of the allowed amount of HMIT's Class 10 claim.

9    Nowhere in his pleading.  Again, hearing about this for the

10   first time as I'm standing here.  He raised three issues, only

11   one of which is in their pleading, only one of which I ever

12   heard about from Dugaboy, and that is the scope of the

13   release.

14          THE COURT:  Okay.  I don't know if it makes a

15   material difference or not.  I am not a mathematician.  But --

16          MR. MORRIS:  So Highland -- the Movants call Mr.

17   Seery.

18          THE COURT:  All right.  Mr. Seery, if you could

19   approach the witness box.  I swore you in earlier for purposes

20   of all testimony today, so you are under oath.

21          MR. SEERY:  Thank you, Your Honor.

22      JAMES SEERY, CLAIMANT TRUST'S WITNESS, PREVIOUSLY SWORN

23                      DIRECT EXAMINATION

24   BY MR. MORRIS:

25   Q    Good morning, Mr. Seery.

1    A    Good morning.

2    Q    Do you have three binders in front of you?

3    A    I have four binders in front of me.

4    Q    Okay.  I just want to make sure you have ours.

5    A    I think -- yes, sir.

6    Q    The fourth has the last few exhibits that we filed on the

7    docket.

8         Should we wait for Mr. Edmond?

9             THE WITNESS:  That would be good.

10            THE COURT:  Yes.  I just noticed.  Okay.  The

11   recording is always going, so never fear.

12        (Pause.)

13            THE COURT:  All right.

14            THE WITNESS:  Apologies, Your Honor.

15            THE COURT:  Oh, I didn't see what happened.  Was

16   there a spill episode?

17        And please, if people need breaks, let me know.  I

18   sometimes go long without appropriate breaks, so let me know,

19   anybody, if we need to break for bathroom.

20            MR. MORRIS:  May I proceed, Your Honor.

21            THE COURT:  You may.

22            MR. MORRIS:  All right.

23   BY MR. MORRIS:

24   Q    Are you comfortable, Mr. Seery?

25   A    Yes.

Seery - Direct                              85

1  Q    I want to actually start a little unscripted with the

2  argument that was just made on behalf of Mr. Daugherty.  Did

3  you listen to that?

4  A    I did, Your Honor.  Yes, I did.  I'll speak to Your Honor.

5  Yes, I did, Your Honor.

6  Q    Did Mr. Daugherty have a Class 9 claim?

7  A    He did have a Class 9 claim.

8  Q    And what was the value of the Class 9 interest that he

9  held?

10 A    It was approximately $3.7 million.

11 Q    And who are the other Class 9 claim holders?

12 A    There are three -- I'm sorry, there are four other Class 9

13 holders.  There is Muck Holdings, LLC.  There is Jessup

14 Holdings, LLC.  There is UBS AG.  And there's UBS Securities,

15 LLC.

16 Q    Okay.  And if you can turn to Exhibit 58, which is in

17 Volume 1.

18          A VOICE:  Mr. Morris, what was the exhibit number?

19          MR. MORRIS:  It's 58.

20          A VOICE:  Thank you.

21          MR. MORRIS:  You're welcome.

22 BY MR. MORRIS:

23 Q    Do you have that in front of you, sir?

24 A    Yes.

25 Q    What is that?

Seery - Direct                          86

1   A    That is a distribution notice to Mr. Daugherty from the

2   Highland Claimant Trust with the eighth distribution.  And I

3   believe this would be related to his Class 9 claim.  It may be

4   some 8 -- some Class 8 as well.  But March 25 is -- I'm sorry,

5   May 25, my eyes are not that great for close up, this is just

6   related to the payoff of his Class 9 claim.  So he'd had a

7   $3.7 million.  This was the last -- final payment, so he's

8   been paid in full on his Class 9 claim.

9   Q    So do I have this right, that before you sent this

10  $800,000-plus to him, he had already received $2.9 million on

11  account of his Class 9 claim?

12  A    That's approximately correct, yes.

13  Q    And how many different distributions were made to Mr.

14  Daugherty on account of his Class 9 claim before this last

15  one?

16  A    Two -- two or three.  I believe the way we had phrased and

17  put 8 is our total distributions including 8 and 9.  So he had

18  a larger Class 8 claim as well.  I think it was approximately

19  $8.25 million.  That's been paid in full.  His Class 9 claim

20  was getting paid in full by this one.

21  Q    Okay.  And did Mr. Daugherty receive these prior

22  distributions -- withdrawn.  Did the other holders of Class 9

23  claims also receive pro rata their Class 9 distributions at

24  the same time as Mr. Daugherty?

25  A    Yes.  The distributions were pro rata.

Seery - Direct                    87

1    Q    Okay.  Did Mr. Daugherty ever return any of the Class 9

2    checks that he received and say, oh my goodness, it violates

3    the plan and the absolute priority rule and everything else

4    because his Class 8 claim hasn't been paid in full?

5    A    No, he did not.

6    Q    Did he -- did he suggest that UBS or Muck or Jessup should

7    return their checks that they received on account of their

8    Class 9 claims because his Class 8 claim had remained

9    unresolved?

10   A    No, he did not.

11   Q    Okay.  Let's go to the reason that we're really here

12   today, the agreement itself.  Did you negotiate the settlement

13   on behalf of the Highland entities?

14   A    Yes, I did.

15   Q    Can you describe for the Court how that came about?

16   A    In December, we had a hearing on -- this is a little bit

17   convoluted, I apologize -- but in December we had a hearing on

18   the HCLOM claim in court, and we settled that claim as a $10

19   million Class 10 interest.

20       We moved into the new year and we heard some -- at some

21   point that HMIT disagreed with that settlement, even though

22   HMIT had signed that settlement as acceptable to it in form

23   and substance.  And the reason was because HMIT had been the

24   only Class 10 -- not allowed, but the only Class 10 interest

25   in -- under the plan, and defined that way, and we had agreed

Seery - Direct                                    88

1   pursuant to the plan to put HCLOM in there.

2       And although HMIT had signed in form and substance

3   acceptable by its attorney, we learned that Mark Patrick had

4   not been consulted and that attorney had simply -- because we

5   were in the room -- had gone in and gotten permission from Mr.

6   Dondero to approve that settlement in form and substance.  We

7   didn't know it at the time.

8       That went away pretty quickly, and we understood that

9   somehow it got resolved.

10      Shortly after that, sometime I believe in January or early

11  February, there was contact between HMIT counsel and our

12  counsel about a potential settlement.  And we had two issues,

13  really, with Mr. Patrick, who controlled two separate

14  entities.  There's the DAF entities he controlled and there's

15  the HMIT entities.  And we wanted to make sure -- and we had

16  disputes with both of them.  We had a Fifth Circuit appeal

17  coming up in DAF and HMIT.  And so we were contacted and said,

18  okay, we're willing to settle this if we can get to a place

19  that makes sense to us.  And so that was the commencement of

20  those negotiations.

21  Q   And can you describe -- how long did the negotiations

22  last?

23  A   Well, there was negotiation around the NDA, which took

24  some time, and I think we probably got that finalized at

25  around the middle to end of March.  And then we began

1    negotiations in earnest during April.  And we took pretty much

2    the full month to get these negotiations done, maybe a month

3    and a half.

4    Q    Can you describe for the Court just how the negotiations

5    were conducted?

6    A    Well, initially, we ensured that the ground rules would be

7    set.  We didn't want to waste our time and expense if we

8    weren't going to reach agreement around particularly

9    litigation protections, because that's essential to us, and

10   having any settlement required that.

11        Secondly, we then -- from their side, they wanted

12   information.  So, pursuant to that NDA, which was rather

13   robust, we provided substantial information.

14        We then had a -- I believe one or two Zoom calls, and then

15   a face-to-face meeting, and then subsequently a number of Zoom

16   calls with our counsel -- usually, these were always with

17   counsel -- so, our counsel, their counsel, principals, my

18   team, Mr. Patrick and his team, to go through each of the

19   items that we exchanged.  And then we worked through a

20   framework to -- back and forth on that to a term sheet, to a

21   negotiated structured settlement along the lines of the one

22   you see.

23   Q    And did the parties exchange information as part of the

24   process?

25   A    Yeah.  As I explained, we, under our NDA, we gave a lot of

1    information.  We got information back from Mr. Patrick, Mr.

2    Phillips, their teams, about the structure of their entities,

3    how we could interact with them, who was responsible for each

4    entity.  And that caused us to, frankly, move from just HMIT

5    to a couple other entities to make sure we had full

6    protection.

7    Q    Did you provide information concerning assets, budgets,

8    expenses, and the like?

9    A    Yeah.  The detailed information we provided, it was pretty

10   extensive.  So we gave a high-level view of our budget,

11   assuming that we had a settlement with them.  We have an asset

12   list that we keep and where each asset was located.  So,

13   dollars amounts, what kind of form it was in, whether it was

14   cash, whether it was U.S. Treasuries, whether it was, you

15   know, equity interests.  Some couple other assets, as Mr.

16   Morris explained in the opening, had not yet been disposed of.

17   And the valuations we put on those assets.

18   Q    Can you turn, I guess, to any volume, and let's just look

19   at the exhibit list.  Are you generally familiar with the

20   documentation concerning the negotiations?

21   A    Yes.

22   Q    Can you confirm that Exhibits 2 through 57 are the emails

23   and information that were disclosed between the Highland side

24   and the HMIT side during the negotiations?

25   A    Yes.  And I -- I could look through 2 through 57 now, but

1   --

2   Q    Yeah.

3   A    -- I have looked through them before, and this is the

4   information back and forth.  We generally exchanged, other

5   than at the face-to-face meeting, we exchanged information on

6   Zoom calls as well, but when we get documents we gave them

7   counsel-to-counsel.

8   Q    Okay.  And did you instruct me to produce all of the

9   communications with the HMIT side in connection with the

10  discovery requests that were served in this case?

11  A    Yes.  We had discovery requests that we went through in

12  detail and reviewed them, and we produced in accordance with

13  those requests.

14  Q    Are you aware of any document that we didn't produce that

15  reflects the parties' negotiations of this agreement?

16  A    No, not at all.

17  Q    Can you describe for the Court the general deal points

18  that were negotiated?  Withdrawn.  Who was your counterparty

19  to these negotiations?

20  A    The principal on the HMIT side is Mr. Mark Patrick.  He

21  had his team.  And I was responsible on our side with my team.

22  Q    And can you just describe for the Court what the primary

23  negotiating points were between the two teams?

24  A    Yeah.  Number one for us was dismissal of outstanding

25  litigations.  So we needed, with prejudice, dismissal of those

Seery - Direct                                        92

1    litigations.  Otherwise, why are we bothering?

2         Number two, we wanted to make sure that we had litigation

3    protections.  These have been around since -- we came up with

4    them during our mediation.  They're really important to us.

5    They set up a structure where we can actually count on the

6    estate and the principals of the estate and the indemnified

7    parties of the estate not being attacked.  So that was

8    essential to us.

9         In exchange, we had to fix their claim and allow it in an

10   amount pursuant to the plan, which requires us to fix an

11   amount.  And that's the Class 10 interest that they have,

12   which is senior to the Class 11 interests under the plan and

13   the Claimant Trust Agreement.

14        And then the way the Trust is set up in the plan, it's a

15   waterfall.  They -- we advocated for getting everything for us

16   upfront and putting everything for them at the back.  They,

17   understandably, didn't like that as much and wanted

18   distributions upfront.  So we negotiated around those terms.

19   And I think those are the biggest terms.

20        We had some assets that we were -- we were -- difficult to

21   monetize that we also were happy to dispose of in this way,

22   with a credit, you know, towards their claim amount.

23   Q    Did you -- and I may have missed this; I apologize if I

24   did -- but did you also negotiate the amounts and the timing

25   of the distributions that would be made to the HMIT entities?

1   A    Yeah.  That's what I alluded to, where we -- we had hoped

2   to get everything for us upfront, give them everything later.

3   I think it's the *Wimpy* 'For a hamburger you give me today,

4   I'll gladly pay you Tuesday' structure.  That didn't like that

5   as much, so we did work on timing.  And that did bring into

6   consideration the other Class 9 holders and timing with

7   respect to payments to the Class 9.

8   Q    Was the topic of the allowed amount of HMIT's Class 10

9   interest the subject of negotiation?

10  A    The topic of the allowed --

11  Q    Did you discuss how the amount of its allowed interest

12  would be calculated?

13  A    Oh, yeah, that was a, you know, a critical part of the --

14  or, you know, essential part of the structure.  What's the

15  allowed amount they're going to get?  The plan requires an

16  amount fixed for that class.  We had already had a $10 million

17  HCLOM amount allowed into that class.  So we needed to fix

18  that amount.

19  Q    So let's transition to that particular topic, the

20  calculation of HMIT's Class 10 interest.  Are you familiar

21  with the methodology that was used to arrive at the Class 10

22  amount?

23  A    Yes.

24  Q    Can you tell me the process, before we get to the

25  methodology itself?  Like, what work was done to figure that

Seery - Direct                                    94

1   out?

2   A    Well, the structure of limited partnership is that the

3   equity account is treated as what's called a capital account.

4   Each limited partner in a limited partnership has a capital

5   account that tracks their equity interest.  As a default rule,

6   it's the amount that a limited partner can expect to get on a

7   sale of the partnership or a liquidation of the partnership.

8   So we used the capital account that had been maintained

9   continuously by Highland to set their capital account amount.

10      I think the partnership agreement talks about 99-1/2

11  percent for HMIT.  It doesn't talk about dollars because

12  that's kept in the accounting for the partnership.  And that

13  amount was consistently kept by Highland up to the petition

14  date.  And even after the petition date in the monthly

15  operating reports.

16  Q    If you take a look back at the exhibit list, I would

17  direct your attention to Page 12 of 15.  Actually, it starts

18  at the Page 11.  At the bottom, it's got the heading, Capital

19  Account Amounts.  Are you familiar with Exhibits 113 through

20  118?  And if you need to look at the exhibits, take your time.

21  A    Oh, I'm sorry.  I thought you told me 15.

22  Q    No.  One -- I did.  I mentioned Page 15.  But we're just

23  looking at Exhibits 113 to 118.

24            THE COURT:  113 to what?

25            MR. MORRIS:  18.

1          THE COURT:  Okay.

2          THE WITNESS:  Um, --

3          MR. MORRIS:  If you look at the index, Your Honor, at

4   the bottom of Page 15 -- 11, you'll see a heading, Capital

5   Accounts --

6          THE COURT:  Right.

7          MR. MORRIS:  -- Amounts.  And then that captures

8   Exhibits 113 to 118.

9          THE WITNESS:  Yes.

10  BY MR. MORRIS:

11  Q   Are those the documents that you and your team relied upon

12  in order to calculate the amount of the allowed Class 10

13  interest for HMIT?

14  A   These are some of them.  I don't know if you have the tax

15  returns in here and the K-1s.  Oh, here they are.  115.

16  Q   Yeah.  That's 115?

17  A   Yeah.  You've got the K-1s for 2018, which fix an amount.

18  Those are signed by Mr. Dondero, and they give the amounts to

19  each partner.  And then you've got the adjustments, because

20  those are done in -- they're 2018 year-end.  They were done in

21  September of 2019, about a month before the filing.

22  Q   And is that Exhibit 116?

23  A   It's 115 and 116.  I believe that's -- 116 is 2019, I

24  believe, and that would have been signed postpetition by -- I

25  believe that was signed by Waterhouse.

Seery - Direct                                96

1   Q    Okay.

2   A    So it sets out the K-1.  The numbers that we have are

3   slightly different because they're in the -- they're not

4   middle of the year, but they're for the petition date of

5   10/16/19.  And there are -- there's economic activity that

6   happens during the year, that you take the year-end from '18

7   and you have economic activity that would affect, pursuant to

8   the partnership, the capital account of each partner during

9   that year,  fixed it on the petition date, and then it's been

10  forward since.

11  Q    Did you apply any of your own subjective views or beliefs

12  in the calculation of the amount of the Class 10 interest held

13  by HMIT?

14  A    No.  This was math.

15  Q    And did you hear Dugaboy's counsel suggest in the opening

16  that there was a different methodology that perhaps you could

17  have used, a pro rata methodology, instead of the methodology

18  you used?

19  A    I heard what he said, but it doesn't make any sense.  You

20  can't fix an amount that way.

21  Q    And do you understand that Dugaboy, under the partnership

22  agreement, is subordinated to HMIT?

23  A    Dugaboy is subordinated under the partnership agreement

24  for certain distributions.  But importantly for our purposes,

25  they're subordinated under the plan.  So the Class 11

Seery - Direct                                    97

1  interests are explicitly subordinated to the Class 10

2  interests, in both the plan and the Claimant Trust Agreement.

3  Q    Did the Debtor consider putting Dugaboy and HMIT in the

4  same class?  Back when the plan was being formulated?

5  A    I -- I don't recall.

6  Q    Do you recall why they're in separate classes?

7  A    They -- they're in separate classes because HMIT had a

8  senior -- a right to senior distributions under the

9  partnership agreement.  We set it up that way.  Nobody

10 objected to it.  That was part of the confirmed plan and the

11 confirmed order.

12 Q    Thank you very much.  Let's talk for just a moment about

13 Mr. Patrick's authority.  Before entering into the settlement

14 agreement, did you do anything to satisfy yourself that Mr.

15 Patrick had the authority to enter into the settlement

16 agreement on behalf of each of the HMIT entities?

17 A    Yes.

18 Q    What did you do to satisfy yourself?

19 A    Well, as a default rule, I always look at the agreements

20 that I'm going to enter into and the organizational docs.  And

21 we did do that.  We looked at each of the organizational docs

22 to --

23 Q    Let me stop you there for a second.  Are those the

24 documents that are in the exhibit list from 70 through 104?

25 A    I'd have to check the actual numbers, but --

1  Q    If you just look at the exhibit list.

2  A    Oh.

3  Q    It's at the front.  You'll see on Page 8 of 15 of the

4  exhibit list there's a heading, --

5  A    Yes.

6  Q    -- E, Patrick Authority, and then I'm asking you if you

7  are aware of what Exhibits 70 through 104 are?

8  A    Yes.  So, these, these are -- there's a number of

9  organizational documents that we looked and made sure that Mr.

10  Patrick had authority.

11      We also knew from our own files that Mr. Patrick, you

12  know, previously had different interests assigned to him, and

13  we know from Mr. Patrick and documents he's given us that John

14  Honis, who was a former controller of some of -- controlled

15  some of these entities and a friend of Dondero's who

16  previously worked at Highland, is on some retail boards, in

17  2022 transferred those interests to an entity controlled by

18  Mr. Patrick.

19      Moreover, Mr. Patrick was here in court as the HMIT

20  Administrator, trying to sue the Highland estate.  He

21  testified on behalf of HMIT as the Administrator.  And the

22  documents are very clear that the Administrator has full

23  control of these entities.

24  Q    We've heard some argument about a Cayman Islands

25  proceeding.  Are you generally aware of what's happening in

1  the Cayman Islands?

2  A    I hesitate to say generally aware.  I'm aware that there's

3  a proceeding in the Cayman Islands about involving a blocker

4  corp.  And there's disclosure in this Court about what that

5  entity is.  It's a blocker corp. in the Caymans that prevents

6  the ultimate charitable entities -- and I put that in quotes

7  -- to -- from receiving UBTI, which is Unrelated Business

8  Income.  And in that case, they would have to pay tax on it,

9  and the idea is that they don't want to pay taxes and they

10  don't pay taxes.  So that corp. apparently is in some sort of

11  proceeding.  That's on the DAF side.  That is not on the HMIT

12  side.

13  Q    Okay.  So, based on the work that you did and the

14  documents that you reviewed, did you form a view as to whether

15  or not Mr. Patrick is authorized to enter into the settlement

16  agreement on behalf of each of the HMIT entities?

17  A    Yes.

18  Q    And what view did you reach?

19  A    He has complete authority over each of these entities.

20  They run up to entities that he controls or he owns.  And he's

21  had that, and it's the structure that was set up a long time

22  ago, and any changes to that structure are just consistent

23  with the documents that let him do these things.  And the

24  proceeding in Cayman, whatever that is, has no impact on Mr.

25  Patrick's authority over these entities or any of the entities

Seery - Direct                                          100

1   in this chain.

2   Q    Did you see anything in the diligence that you conducted

3   that required Mr. Patrick to seek anybody's authority,

4   consent, or approval before entering into the settlement

5   agreement on behalf of the HMIT entities?

6   A    No.  And we could go through each document.  He has

7   complete authority on each of these entities.  And even the

8   objections that were filed that were withdrawn from The Dallas

9   Foundation, they have no -- it's absolutely clear that they

10  have no rights to deal with at all the management of each of

11  these entities.  They don't have an ownership interest in it.

12  Crown issued an annuity policy that's a variable policy.  They

13  have no rights.

14  Q    All right.  Let's turn to the agreement itself.  Can you

15  tell the Court why you believe that the settlement agreement

16  is in the Claimant Trust's best interests?

17  A    Number one, this case has been going on for a full five

18  years.  We have spent tens of millions of dollars dealing with

19  vexatious and frivolous litigation and attacks.  The

20  opportunity to settle with a Class 10 holder and allow their

21  claim under the terms of the settlement is extremely valuable

22  because it moves us much, much closer to a potential

23  resolution of this case, which we would all love to resolve.

24       Number two, it's fair value for the estate.  We are making

25  sure, while we're paying some money out in front, we have

Seery - Direct                    101

1   triggers on the backend payments to ensure that the Indemnity

2   Trust has enough assets to protect parties if there are

3   unforeseen litigations.  And I can almost bet there'll be at

4   least one or two of those.  So it's really, really valuable in

5   that respect.

6       Three, it cuts down tremendously on what future expenses

7   could be.  Because we have gotten these litigation

8   protections, we've basically walled off a potential avenue to

9   be attacked.  And I think the structure of this deal is

10  valuable, not only to the fiduciaries and folks who have been

11  responsible for managing this process and who are indemnified

12  by the Claimant Trust or HCMLP, it also enables us to, down

13  the road, pay off the Class 9s and ultimately make

14  distributions to the Class 10s.

15  Q   Is one of the other benefits to this agreement is that it

16  enables the Claimant Trust to dispose of certain illiquid

17  assets?

18  A   Well, that's a -- that is a benefit, because we do have to

19  resolve these claims and dispose of these assets, and we're

20  not in a position to hang around until 2030 or more to do

21  that.

22      So we've got the Kirschner claims, which would go to HMIT.

23  Again, the way that the waterfall is set up, to the extent

24  that they have value, they are very expensive to pursue.

25  We've spent a ton of money setting them up.  We've produced

Seery - Direct                           102

1   seven million documents, pages, and received zero in return.

2   We stayed them because we didn't think we needed them for the

3   Class 8 and 9 and it was prudent to do so, and the question

4   was would we need them for indemnification.  So disposing of

5   those claims now at this time as part of this settlement,

6   where that value would go to Class 10 anyway, is very

7   valuable.

8   Q    Had you made any efforts prior to entering into this

9   agreement to monetize or otherwise sell the Dugaboy Note?

10  A    Yes.

11  Q    Can you describe for the Court what your efforts were in

12  that regard?

13  A    So, we set out to try to monetize the Dugaboy Note.  I

14  contacted -- we put together what we call a teaser, laying out

15  what we knew about Dugaboy, at least up until the time that

16  Dugaboy was no longer part of our computer system.  Laid out

17  what we thought the assets were.  There's not a lot of public

18  information.  Laid out the amortizing of the note.  It's a 3.2

19  percent-ish, 3.26 percent note, I believe, goes to 2047, '46

20  on the amortization, 2047.   And then presented that to I

21  think it's five different investors in distressed funds.  Had

22  no interest whatsoever.  One investor laughed at me, which I

23  understood that he was aware of the parties and the principals

24  and the collection efforts that would be difficult on that

25  note.

Seery - Direct                                103

1    The note is performing, because if it hadn't performed I

2    would have accelerated on the first second and we would have

3    collected the whole thing.  But we've seen that show in the

4    other Notes Litigation.  And so we didn't -- we didn't get any

5    reception.

6    We also reached out to Mr. Dondero, in writing, through

7    D.C. Sauder, and made them an offer and tried to get them to

8    respond, and they indicated they had no interest in the note.

9    Q    Turning back to the exhibit list, if you can turn your

10   attention to Page 11 of 15 of the exhibit list, is Section F,

11   Exhibits 105 through 112, the documents that reflect the note

12   and your efforts to dispose of the note?

13   A    Yes.

14   Q    And let's take a look at Exhibit 112 quickly, since that

15   involves Mr. Dondero.  Can you just tell the Court what this

16   exhibit is?

17   A    Yes.  This is an exchange between D.C. Sauder, Matt

18   McGraner, both of whom work for Dondero, and Dave Klos, our

19   CFO.  I'd authorized Dave to make an offer to them to see if

20   we could get cash for the Dugaboy Note.  And as you see right

21   below the reply from Mr. Klos, which is -- this is friendly,

22   but Mr. Sauder's indication that they have no interest.

23   Q    Okay.  So Highland offered to sell the Dugaboy Note to Mr.

24   Dondero or entities controlled by him, and that offer was

25   rejected without a counteroffer.  Do I have that right?

1   A    That's correct.

2   Q    Okay.  Let's finish up here.  Are you familiar with the

3   objections of Dugaboy and Mr. Daugherty that the settlement

4   somehow violates the plan because it's making distributions to

5   Class 10 before junior classes are paid in full?

6   A    Yes.  I'm familiar with those.

7   Q    Do you believe the settlement violates the plan?

8   A    Not at all.

9   Q    And why is that?

10  A    The plan specifically contemplates that -- I don't think

11  it's -- we showed the 9 and 10s, but I think it's any claimant

12  could take less than is being offered by the plan.  What we

13  did very specifically is go to the Class 9 claimants and

14  discuss with them this opportunity to settle with HMIT and

15  what it would take, which included some, as I described

16  earlier, payments upfront.

17      After being fully informed -- they asked a lot of

18  questions, they pushed back quite a bit, as you can expect

19  that they would -- and we reached agreement with those Class 9

20  claimants in writing to approve the structure of the deal and

21  the settlement and the concurrent payments, as well as the

22  final small payment to Mr. Daugherty on behalf of his Class 9

23  claim.

24  Q    Could I trouble you to turn to Exhibit 59, please, Mr.

25  Seery?

Seery - Direct                                          105

1   A    I've got it.

2   Q    Are you familiar with that document?

3   A    I am, yes.

4   Q    Can you explain to the Court what that document is?

5   A    This document is the written consent that we entered into

6   with the Class 9 claimants, approving the settlement agreement

7   as well as the payment to Mr. Daugherty.

8   Q    Okay.

9   A    And -- and -- so these -- the payment to Mr. Daugherty

10  would have been non-pro rata, so they agreed to that.  And the

11  concurrent payments under the settlement agreement to Class 10

12  were agreed to by the Class 9 claim holders.

13  Q    So looking at Page 2 at the top, do I have this right,

14  that Mr. Daugherty's original Class 9 subordinated claim was

15  in the amount of $3.75 million, and that with the payment

16  described in this document his claim was paid in full?

17  A    That's correct, yes.

18  Q    And did he complain that he was getting paid in full but

19  the other Class 9 holders were not?

20  A    No.  That had never been his complaint.

21  Q    Did he complain that he was getting paid in full on his

22  Class 9 claim but his Class 8 claim remained unresolved?

23  A    No.  I think that, as indicated before in my testimony and

24  indicated here, this was the last payment, the 781.  Before

25  that, he'd received almost $3 million on account of his Class

1  9 claim.  And pro rata with the other Class 9 claimants.

2  Q   I think you mentioned that your understanding is that,

3  under the plan, creditors can elect to receive less favorable

4  treatment than the plan otherwise provides.  Is that right?

5  A   That's correct.  And I think that's a pretty standard

6  provision in virtually every plan that I see.

7  Q   Can we just grab that for a second?  It's the last

8  exhibit, 126, which is probably in the skinny binder, if you

9  have one.

10 A   Yes.  Do you want me to go to the section?

11 Q   Yeah.  Just one minute.  I want to make sure the judge is

12 with us.  Give her a second.

13         MR. MORRIS:  Are you with us, Your Honor?

14         THE COURT:  Yes.

15         MR. MORRIS:  Okay.

16 BY MR. MORRIS:

17 Q   So if you can turn to Page 23 of Exhibit 126.  Does

18 Section 9, under Treatment, Romanette (ii), is that the

19 provision that you were just describing that gives Class 9

20 holders the ability to receive such other less-favorable

21 treatment as to which such holder and the Claimant Trust may

22 agree upon in writing?

23 A   That's correct.

24 Q   And the same is true with respect to the Class 10 claims,

25 at the top of Page 24?

Seery - Direct                                    107

1    A    That's also correct, yes.

2    Q    All right.  And so was the consent that was executed by

3    the Class 9 holders that's Exhibit 59 done in satisfaction of

4    these plan provisions?

5    A    I'd say it's consistent with these.  They could elect to

6    receive it or not, but this was, you know, did it under this

7    provision and they were entitled to elect to take lesser

8    treatment, if that's what they agree to.

9    Q    Okay.  Can you describe for the Court why you believe that

10   the Class 9 claim holders are receiving less-favorable

11   treatment under -- as a result of this settlement agreement

12   than they would otherwise be entitled to under the plan?

13   A    Well, they would be entitled to receive payments in front

14   of any payments that would be made to Class 10.  In addition,

15   they would have been entitled to receive a pro rata

16   distribution of the $800,000 that was paid to Mr. Daugherty,

17   and they agreed to waive those provisions.

18   Q    Okay.  Is it your understanding that HMIT is also

19   accepting less favorable treatment than it might otherwise

20   receive if it pursued and succeeded in the prosecution of its

21   claim?

22   A    I suppose, ultimately, if everything was resolved, that

23   they could have gotten a Class 10 interest that wasn't

24   structured along the lines of the settlement agreement.  So

25   the settlement agreement takes some of that structure and what

1    arguably would be value away from them, and this is the amount

2    that they've agreed to have as their allowed claim, as

3    structured by the settlement agreement.

4    Q   And is it your understanding that under the settlement

5    agreement HMIT has disavowed any rights under the Claimant

6    Trust Agreement?

7    A   Under the Claimant Trust Agreement, yes.  They have rights

8    under the settlement agreement to receive distributions, and

9    those will ultimately come from the Indemnity Trust as we wind

10   down the Claimant Trust.

11   Q   And did HMIT also agree that it would not be a Claimant

12   Trust beneficiary under the Claimant Trust?

13   A   Yes.  And that's very important to us because we have seen

14   lots of litigation, lots of emails, trying to use these types

15   of structures just to create claims, even when there's

16   literally no basis for it.  I should -- well, I'll control

17   myself.

18   Q   Yeah.  We can stop there.

19           MR. MORRIS:  Your Honor, I have no further questions

20   at this time.

21           THE COURT:  All right.  We're going to figure out,

22   are we taking a bathroom break or a short lunch break.  I'll

23   poll the audience and then I'll decide.  Do people want to

24   take maybe a 30 to 45-minute lunch break, or just a bathroom

25   break and keep going?

 1              THE WITNESS:  Thirty minutes.

 2              THE COURT:  I'll say -- are you going to have any

 3    further examination?

 4              MR. PHILLIPS:  I'm going to maybe ask one question,

 5    just to bring it up.  It's already been -- but one question.

 6              THE COURT:  Okay.  And then what about Dugaboy and

 7    Daugherty?  Guesstimate how much examination you'll have.

 8              MR. YORK:  Fifteen minutes, maybe.

 9              MR. LANG:  Twenty minutes or so.

10              THE COURT:  Why don't we take a five-minute bathroom

11    break, --

12              MR. PHILLIPS:  Sure.

13              THE COURT:  -- and then we'll at least finish this

14    witness.

15              MR. PHILLIPS:  Perfect.

16              THE COURT:  All right?

17              MR. PHILLIPS:  Thank you, Your Honor.

18              THE WITNESS:  Thank you.

19              THE CLERK:  All rise.

20         (A recess ensued from 12:07 p.m. until 12:15 p.m.)

21              THE CLERK:  All rise.

22              THE COURT:  Please be seated.

23         (Pause.)

24              THE COURT:  All right.  Can I get some help rounding

25    people up?

1        (Pause.)

2             THE COURT:  All right.  We're missing -- okay.  We're

3    going back on the record in Highland Capital.  We still have

4    Mr. Seery on the witness stand.  Mr. Phillips, you had

5    examination.  You said one question.

6             MR. PHILLIPS:  I did, Your Honor.  And I meant it.

7             THE COURT:  Okay.

8                          CROSS-EXAMINATION

9    BY MR. PHILLIPS:

10   Q    Could you look at Exhibit 118, please?

11   A    You said 118?

12   Q    Yes, sir.

13   A    Certainly.

14   Q    Did the calculation of the Class 10 claim amount of

15   $336,940,230.58, is that the result of applying the full value

16   to the Highland or Highland Claimant Trust of the HMIT note

17   receivable?

18   A    Apologies, because I can't read this because it's too

19   small, but I can answer the question.

20             THE COURT:  Would you like this?

21             THE WITNESS:  I think I can answer the question

22   without it.

23             THE COURT:  Okay.

24             THE WITNESS:  The -- what we used was the petition

25   date capital account.

Seery - Cross                                         111

1    BY MR. PHILLIPS:

2    Q    Correct.

3    A    And just like every other claim in bankruptcy, fixed at

4    the petition date.  And what we subtracted from that petition

5    date was the petition date amount principal and interest of

6    that HMIT note which was owed to Highland Capital.

7    Q    Thank you.

8             THE COURT:  All right.  That was one question.

9         All right.  Counsel?

10            MR. YORK:  Thank you, Your Honor.  Get it organized

11   here.

12                        CROSS-EXAMINATION

13   BY MR. YORK:

14   Q    Good afternoon, Mr. Seery.

15   A    Good afternoon.

16   Q    Would you take a look at Exhibit 1 in Daugherty's witness

17   and exhibit binder?  It's the settlement agreement between

18   Highland and Mr. Daugherty, I believe.

19   A    Yes, I have it.

20   Q    All right.  And can you confirm that is the settlement

21   agreement that Highland and Mr. Daugherty entered into in

22   connection with the claims Mr. Daugherty asserted in the

23   bankruptcy?

24   A    It appears to be, yes.

25   Q    Would you turn to Section 9, then, which is on Page #11,

Seery - Cross                                        112

1    starts on Page #11?

2    A    Yes.

3    Q    And that relates to a reserved claim that Mr. Daugherty

4    had as part of his proof of claim against Highland in the

5    bankruptcy, correct?

6    A    That's correct.

7    Q    And would you agree with me that the second line of

8    Section 9 there of the settlement agreement describes that

9    claim as a contingent unliquidated claim against the Debtor?

10   A    I would not agree with you on that, no.

11   Q    Why not?

12   A    Because it says, Daugherty contends --

13   Q    Ah.  Daugherty contends.

14   A    -- he has a contingent unliquidated claim against the

15   Debtor.

16   Q    Okay.  Well, why don't you then turn with me to Daugherty

17   Exhibit #2, which is the -- which is the -- Highland's

18   adversary complaint that was filed against Mr. Daugherty on I

19   believe May 2nd of 2025.  Correct?

20   A    I don't recall the specific date and it's blurred at the

21   top.  So if you say so, I'll accept that.

22   Q    All right.  And if you look at Paragraph 1, the third

23   line, there's a sentence there that says, All of Mr.

24   Daugherty's claims were settled except his unliquidated

25   contingent claim that the Debtor has a continuing and

1    indefinite obligation to make him whole if a tax refund he

2    apparently received for tax year 2008 on account of his

3    partnership interest is ever successfully challenged by the

4    IRS.

5         Did I read that correctly?

6    A    You did read that correctly, yes.

7    Q    All right.  This reserved claim under the settlement

8    agreement is a Class 8 unsecured claim, correct?

9    A    It is the claim that he asserted and that we initially

10   classed under Class 8 in a fixed amount for a tax refund which

11   is on his statement that he got that he claims he's entitled

12   to more, which would be unsecured as of the petition date.  I

13   believe the amount on his payment statement from 2009 is

14   $1.475 million.

15   Q    All right.

16            THE COURT:  Could you pull the microphone closer to

17   you?

18            THE WITNESS:  I'm sorry, Your Honor.

19            THE COURT:  Okay.  Good.

20            MR. YORK:  All right.

21   BY MR. YORK:

22   Q    And, again, my question is pretty simple.  And it's a

23   Class 8 unsecured claim, right?

24   A    It's not a Class 8.  It was in Class 8.  It's been

25   objected to.

Seery - Cross                              114

1  Q    Right.

2  A    So it is not in a class now at all.  We seek to disallow

3  it in its entirety, or, at worst, subordinate it to all

4  creditor claims.

5  Q    Understood.  But it has been asserted as a Class 8 general

6  unsecured claim, right?

7  A    He asserted it as that, yes.

8  Q    Okay.  And is it fair to say that in the adversary

9  complaint, if you go to Page -- I'm sorry, Paragraph 4 --

10  Highland alleges that:  However, even if Mr. Daugherty's claim

11  is not disallowed in its entire -- I think that should be

12  entirety.  Right?

13  A    It should be, yes.

14  Q    It remains contingent on the outcome of the 2008 audit.

15  Correct?  Did I read that correctly?

16  A    You did read that correctly, yes.

17  Q    And the next sentence says, It is unclear when, how, or if

18  the 2008 audit will finally be resolved.  Correct?

19  A    Correct.

20  Q    And in fact, if you go to, then, Page #7 of the complaint

21  and you look at Footnote 6, at the very end of that footnote

22  it indicates that Highland has an understanding that the

23  resolution may not be expected until approximately 2029.  Is

24  that correct?

25  A    The litig... I can't read it because it's small, but the

Seery - Cross                                    115

1    litigation may not be resolved.  The IRS has already issued a

2    final determination on the audit.

3    Q    How do you know that?

4    A    I was advised that by another partner.

5    Q    Who?

6    A    Kurt Plumer.

7    Q    Have you seen the FPAA that was issued by the IRS?

8    A    No, I have not.

9    Q    Have you asked for it?

10   A    Yes.

11   Q    You did, personally?

12   A    My lawyers did.

13   Q    Your lawyers did?

14   A    Yes.

15   Q    Okay.  But you -- but you did not, right?  Just to be

16   clear.

17   A    No, I did not.  My lawyers, acting at my direction, did.

18   Q    Asked the tax matters partner for Highland for that

19   information?

20   A    Asked Mr. Daugherty.

21   Q    Asked Mr. --

22   A    I think asked you, I'm sorry.

23   Q    Oh, asked me for that information?

24   A    Yes.

25   Q    Well, so tell me, why is Mr. Daugherty -- first off, do

Seery - Cross                              116

1    you know if Mr. Daugherty has received the FPAA?

2    A    I don't know.

3    Q    Okay.  Do you know if anybody else has received an FPAA?

4    A    I was told there was a final determination.  I don't know

5    if they've actually received an FPAA.  But I do know that Mr.

6    Daugherty has produced a document where the IRS has requested

7    additional information for him.  Since they hadn't done that

8    for 17 years, I suspect that they've reached a final

9    determination of the audit.

10   Q    All right.  So you don't know whether an FPAA has actually

11   been issued?

12   A    I --

13   Q    True?

14   A    I don't know.  And for the Court's benefit, that's a Final

15   Partnership something Determination.

16   Q    Okay.  What -- where --

17             THE COURT:  F-A --

18             THE WITNESS:  F-P-P -- I think it's --

19             MR. YORK:  F-P-A-A.

20             THE WITNESS:  -- F-P-A-A.

21             THE COURT:  Okay.  The court reporter will no doubt

22   ask, so good.

23   BY MR. YORK:

24   Q    Tell me, where in the universe is it that -- is it Mr.

25   Daugherty's obligation to provide Highland with the FPAA?

Seery - Cross                              117

1   A   I don't -- I don't think there's any such obligation that

2   I've seen.

3   Q   And in fact, the IRS audit is handled by the tax matters

4   partner for Highland Capital, correct?

5   A   The IRS audit for Highland Capital's -- from Highland

6   Capital's position is handled by that.  The IRS handles their

7   side.

8   Q   Right.  From Highland's side.  Okay.  And that tax matters

9   partner is doing that on behalf of Highland Capital, right?

10  A   I think at this point it's doing it on behalf of the old

11  Highland Capital, not Reorg Highland Capital.  We don't have

12  any liability with respect to it, nor do we have any

13  visibility as to what's going on in the tax audit.

14  Q   So even though, under the partnership agreement, that's

15  the tax matters partner that's referred to, Highland Capital

16  cannot compel that tax matters partner to provide that

17  information to them, if an FPAA actually exists?

18  A   I don't think so.  That partnership agreement is the pre-

19  effective date partnership agreement.

20  Q   All right.

21  A   The new Highland Reorg Debtor doesn't have these partners

22  and is not a tax matter partner for those -- those audits.

23  Q   So let's go back, then, to Paragraph 4 of the adversary

24  complaint that was filed.  And I want to look at the next

25  sentence that Highland wrote there.  It says:  Moreover, if

Seery - Cross                                    118

1   the claim is not disallowed, it will need to be estimated,

2   after taking into account the likely outcome of the 2008

3   audit, including adjustments that result therefrom.

4        Did I read that correctly?

5   A   You read that correctly.

6   Q   Have -- has anyone at Highland conducted any analysis as

7   of today to determine what Mr. Daugherty's potential liability

8   would be from that IRS audit if that audit was completed today

9   and all interest and penalties were assessed as of today?

10  A   Yes.

11  Q   How much?

12  A   It would be $1.475 million, the amount of his prepetition

13  claim in his proof of claim.  Since it's unsecured, whatever

14  happens with the IRS is not a concern of Highland.  His claim

15  is that he didn't get that amount as a refund.  Either he got

16  that amount or he got some -- some lower amount.  It would be

17  a petition -- prepetition-date amount.  And under Texas law,

18  he would be entitled to prejudgment interest from 2009 to the

19  petition date at a rate of five percent.

20  Q   Which would be how much?

21  A   It would be approximately $2.2 million in aggregate.

22  Q   Okay.  And there would be -- you're saying there would be

23  no penalties or any other -- any other interests or

24  assessments that would -- Mr. Daugherty would be liable for

25  that Highland would also then be liable for under that claim?

Seery - Cross                          119

1    A    No.  There would not.  It would not impact his claim

2    against Highland.  His claim against Highland is simply:  I

3    did not get this refund.

4         He got the refund.  He's now claiming it might be

5    adjusted.  If the IRS otherwise has penalties, interest

6    against him for his tax attributes somewhere between 2009 and

7    2019, that wouldn't be subject to his proof of claim and it

8    wouldn't be the responsibility of Highland.

9    Q    Even if Highland had promised at the time that that refund

10   was made that it would -- it would make him whole with respect

11   to any IRS audit whatsoever?

12   A    It simply --

13              MR. MORRIS:  Objection to the form of the question.

14              THE WITNESS:  It simply didn't do that.

15              MR. MORRIS:  Yeah.

16              THE COURT:  Okay.  Overruled.

17              THE WITNESS:  We can -- you could litigate the claim,

18   but that's just not what it says.

19   BY MR. YORK:

20   Q    So you talked earlier about the Class 9 consent that was

21   obtained, and no one from Highland reached out to Mr.

22   Daugherty to try to seek his consent.  Right?

23   A    That's correct.

24   Q    Why not?

25   A    Because I didn't want to.

Seery - Cross                           120

1  Q    Why?

2  A    Because Mr. Daugherty is an extremely difficult person to

3  deal with.  The last time I dealt with Mr. Daugherty on the

4  phone with respect to anything, I had extreme difficulty and

5  got sucked into a stalking lawsuit that I had to testify to

6  that is a complete mess that I want nothing to do with.  So

7  originally my counsel said, have no communication with him.

8  But with respect to this, we were objecting to his claim.  We

9  knew he would try to hold this up.  You have tried to do that

10 and demanded $20 million.  So that's why we didn't reach out

11 to you.  We just paid the 9 and we have a fully-reserved

12 amount on the 8.

13 Q    You thought that the stalking case that you were pulled

14 into was completely fabricated, didn't you?

15 A    I thought that at the time.  I'm not as sure anymore.

16 Q    Oh, really?

17 A    Yeah.

18 Q    Okay.  And you actually also told Mr. Daugherty that Mr.

19 Ellington, who brought that case, was a complete liar and POS,

20 right?

21 A    I don't know if I used POS, but I do not think Mr.

22 Ellington is an honest person.

23        MR. MORRIS:  Your Honor, at some point I'm going to

24 on relevance grounds.  I think we've got a settlement

25 agreement before the Court that we're trying to get approved

Seery - Cross                          121

1  today, not to take discovery on any other matters.

2            THE COURT:  Okay.  I'm going to overrule to the

3  extent there was an objection, but I think it's appropriate to

4  worry that we're straying down a road that is not relevant.

5  So, --

6            MR. YORK:  Understood.

7            THE COURT:  -- reign it in.

8            MR. YORK:  All right.

9  BY MR. YORK:

10  Q   You'd agree that the -- under the terms of the proposed

11  settlement, there will be some interim distributions will be

12  made to the HMIT entities in cash totaling approximately $23

13  million.  Correct?

14  A   Not necessarily, no.

15  Q   Why not?

16  A   Because there's an initial distribution.  I believe it's

17  $10 million.

18  Q   Yes.

19  A   And then subsequent distributions are predicated on

20  whether there are threats, either outstanding litigation or

21  threats as defined in the agreement.

22  Q   And so long as those threats don't occur, then those

23  interim -- those additional interim distributions will be

24  made, right?

25  A   Yes.  The Indemnity Trust would make those distributions

Seery - Cross                                    122

1    at those times, and then I have to make -- it's a double

2    trigger, because it has to be no threats and I have to

3    determine that the Indemnity Trust had sufficient assets to

4    meet its obligations for both actual and contingent

5    indemnification obligations.

6    Q    But at a minimum, the HMIT entities will receive at least

7    $10 million?

8    A    Yes.

9    Q    On an interim basis?

10   A    Yes.

11   Q    All right.  And you'd agree with me that, under the terms

12   of the plan, the plan provides that the classes get paid in

13   order of priority, correct?

14   A    That's correct.

15   Q    All right.  And if you turn to Daugherty Exhibit 4, which

16   is the confirmation order, at Page 45.  And Subsection A there

17   in the middle of that has a sentence that says:  Accordingly,

18   as the holders of the equity -- excuse me.  Strike that.  Let

19   me start over.  Are you there yet, Mr. --

20   A    Now I am.

21   Q    All right.  Accordingly, as the holders of equity

22   interests that are junior to the claims in Class 8 and Class 9

23   will not receive or retain under the plan on account of such

24   junior claim interest in any property unless and until the

25   claims in Class 8 and Class 9 are paid in full, plus

1   applicable interest, --

2        Did I read all that correctly?

3   A    Yes.

4   Q    Okay.  And the term "Claim" there is a capitalized term,

5   right?

6   A    Yes.

7   Q    It's not -- it doesn't say allowed claims.  It just says

8   claims.  Right?

9   A    That's correct.

10  Q    All right.  All right.  Now, if you'd turn with me to the

11  Claimant Trust Agreement, which is Daugherty Exhibit 5, and go

12  to Section 5(c).  Excuse me.  5.1(c).  I apologize.

13  A    Yes.

14  Q    And this is -- this is -- relates to the contingent trust

15  interests associated with the Class 10 and Class 11 limited

16  partnership interests in Highland, correct?

17  A    Generally, yes.

18  Q    All right.  And you'd agree with me that, in the -- about

19  four lines down, it says:  The Claimant Trustee shall allocate

20  to each holder of allowed Class 10-B and C limited partnership

21  interests and each holder of allowed Class 11 Class A limited

22  partnership interests a contingent trust interest equal to the

23  ratio that the amount of each holder's allowed Class 10 or

24  Class 11 interest bears to the total amount of the Class 11 or

25  -- Class 10 or Class 11 interest, excuse me, as applicable

Seery - Cross                                    124

1    under the plan.

2         Did I read all of that correctly?

3    A    I believe you did, yes.

4    Q    All right.  And under the terms of the proposed

5    settlement, the HMIT entities are getting an allowed Class 10

6    interest, correct?

7    A    That's correct, yes.

8    Q    All right.  And then the next sentence goes on to say:

9    The contingent trust interest shall not vest and the equity

10   holder shall not have any rights under this agreement unless

11   and until the Claimant Trustee files with the Bankruptcy Court

12   a certification that all GUC beneficiaries have been paid

13   indefeasibly in full, including, to the extent applicable, all

14   accrued and unpaid postpetition interest consistent with the

15   plan and all disputed claims have been resolved.  The GUC

16   Payment Certification.

17        Did I read that correctly?

18   A    You did, except you used the article "The" before

19   "contingent trust interest" at the start of the sentence.

20   Q    Fair enough.  And the GUC beneficiaries there would be the

21   general unsecured creditor beneficiaries, correct?

22   A    That's correct.

23   Q    And this certification has not been issued yet by the

24   Claimant Trustee in this bankruptcy, correct?

25   A    That's correct.

1  Q   In part because of Mr. Daugherty's remaining unresolved

2  Class 8 claim, correct?

3  A   In part, yes.

4  Q   And also in part because of the remaining Class 9 claimant

5  holders who still have money owed to them on their Class 9

6  claims?

7  A   In part, yes.

8  Q   Okay.  Does the term of the proposed settlement agreement

9  provide those Class 9 consent holders with releases from the

10 HMIT entities?

11 A   No.

12 Q   It does not?

13 A   No.

14 Q   At all?

15 A   No.

16 Q   Even if they were in their capacity serving as board

17 members for Highland Capital?

18 A   Certain of the Class 9 holders are also on the Oversight

19 Board.  In their capacity as Oversight Board members, yes,

20 they get -- they get broad releases.  UBS, for example, is

21 not.  There are no releases in there for the two UBS entities.

22 Q   Would you now -- you can set that binder aside.  And if

23 you'd turn with me to Exhibit 60 in the -- Highland's exhibit

24 list.

25 A   Six zero?

Seery - Cross                          126

1    Q    Yes, sir.

2    A    Yes.

3    Q    This is a copy of the tolling agreement extending

4    objection deadline between -- that's on -- dated July 27th of

5    2022 between Mr. Daugherty and Highland Capital Management, LP

6    and Highland Claimant Trust.  Correct?

7    A    Yes.  That's what it appears to be, yes.

8    Q    All right.  If you would, go with me to Page 2 at the

9    bottom.  There is a Footnote #3.  Do you see that?

10   A    Yes.

11   Q    And that footnote relates to, up above, a defined term

12   called a "Reserved Claim," the Reserved Claim being what was

13   discussed earlier in Mr. Daugherty's settlement agreement with

14   Highland, right?

15   A    That's correct, yes.

16   Q    And it states in here that that Reserved Claim means "the

17   contingent and unliquidated claim as referenced in Proof of

18   Claim #205."

19        Did I read that portion of the footnote correctly?

20   A    Yes.

21   Q    All right.  And it goes further to say that the amount

22   listed there of 2.65 million three hundred -- two point six --

23   let me start ever.  $2,650,353 is the amount estimated as of

24   October 23, 2020.  Correct?

25   A    That's correct.

Seery - Cross                              127

1   Q   All right.  It doesn't say it's -- anywhere in there that

2   it's a fully -- it fully reserves that unliquidated contingent

3   claim.  Correct?

4   A   In what you just read, no.

5   Q   All right.  And if you go to Page 1 -- or, I'm sorry, to

6   Page 3, Paragraph 1, the covenant to reserve where Highland

7   agrees to reserve $2,650,353 on account of the reserved claim,

8   does it say anywhere in there that that is -- fully reserves

9   that contingent unliquidated claim anywhere?

10  A   It says exactly what it says.  And you read it.

11  Q   That's not my question.  Does it say --

12  A   I don't -- well, it says, Further agree to reserve $2.650

13  [million] on account of the reserved claim in disputed claim

14  reserve.

15  Q   All right.  Does it say anywhere in there that that is the

16  fully-reserved amount of that claim?

17  A   Not in that sentence, no.

18  Q   Thank you.  All right.

19          MR. YORK:  Your Honor, give me one second.  Let me

20  confer.

21          THE COURT:  Okay.

22      (Pause.)

23  BY MR. YORK:

24  Q   Mr. Seery, UBS is one of the consent holders, Class 9

25  consent holders related to the HMIT settlement.  Correct?

Seery - Cross                                    128

1  A    There are two UBS entities, UBS AG 66 and UBS Securities,

2  LLC.

3  Q    All right.  Did either of those entities sit on the

4  Unsecured Creditors' Committee in this bankruptcy?

5  A    A UBS entity did.  I'm not sure which of those did, or

6  whether it was both with one counsel.  I don't -- there's a

7  UBS entity on that Creditors' Committee.

8  Q    Is the -- are the members of the Unsecured Creditors'

9  Committee within the definition of the Highland released

10 parties under the proposed HMIT settlement?  Do you know?

11 A    I don't know.  The members of the Creditors' Committee, I

12 believe, have exculpation anyway, so I don't -- I don't -- I

13 don't know if it captures the old members of the Creditors'

14 Committee.  I don't -- for example -- I don't think so.  I

15 don't -- I don't know.

16             MR. YORK:  Pass the witness.

17             THE COURT:  All right.  Mr. Lang?

18             THE WITNESS:  Do you have a separate binder?

19             MR. LANG:  No.

20             THE WITNESS:  Okay.  Will you be using Mr.

21 Daugherty's binder?

22             MR. LANG:  No.

23                      CROSS-EXAMINATION

24 BY MR. LANG:

25 Q    All right, Mr. Seery.  Just to be clear, the Class B and C

Seery - Cross                               129

1    -- or the Class A interests and the -- of Highland under the

2    plan, they have 99.5 percent of the -- Highland Capital

3    Management.  Correct?

4    A    Could --

5    Q    Sorry.  The Class B and C --

6    A    Limited partnership interest.

7    Q    -- shareholder -- limited partnership interests were 99

8    point -- or, were .5 percent of Highland Capital Management?

9    A    I -- I'm not trying to be difficult.

10   Q    No, it's fine.  It's a terrible -- terrible --

11   A    I don't -- I just don't -- I don't understand your

12   question.  I apologize.

13   Q    Okay.  So, at the time of the petition, --

14   A    Yes.

15   Q    -- Hunter Mountain Investment Trust owned 99.5 percent of

16   Highland Capital Management?

17   A    It owned 99-1/2 percent of the limited partnership

18   interest in Highland Capital Management.

19   Q    And the remainder -- and HMIT has the Class 10 claims.

20   Correct?

21   A    You said something, the remainder?  The --

22   Q    Oh, sorry.  The remaining interests are owned by the Class

23   11 claims under the plan.

24   A    The remaining partnership interests are among those

25   entities I testified earlier to, which are Dugaboy, Strand, --

Seery - Cross                                    130

1  Q    And Okada?

2  A    -- Mark Okada individually, and two Mark Okada and Pamela

3  Okada trusts.

4  Q    Okay.  And the total assets in the estate right currently

5  you testified are between $65 to $70 million?

6  A    I -- off the top of my head, I don't recall, but it --

7  rough range, it could be in that general vicinity.  That does

8  not include the payments that have to be made to the 9s and

9  expenses.  So I believe there's documents in here that we

10 could go through, if you like.

11 Q    And I believe you testified that the remaining unpaid 9s

12 are owed approximately $20 million?

13 A    Approximately $20 million, yes.

14 Q    Okay.  And the plan does not say that the equity claims

15 for Class 10 and 11 are to be determined by the capital

16 account values of the limited partnership interests in the

17 Debtor LP?

18 A    That's correct.  It says to set an amount.  It doesn't

19 tell you how to do the amount.

20 Q    Okay.  And under the settlement agreement, Class 10

21 interests will be allowed in the amount of $336,940,230.58?

22 A    Approximately $336 million, yes.

23 Q    $336 million.  Fair.  And this is the capital account

24 balance as of -- HMIT's capital account balance as of the

25 petition date, less, I believe, the HMIT note?

Seery - Cross                                    131

1   A    That's correct.  So that amount is the net amount.

2   Q    The net?  And do you know how the capital account balances

3   were calculated --

4   A    Yes.

5   Q    -- on the petition date?

6   A    Yes.

7   Q    And how were they calculated?

8   A    So, you take the 2018 year-end capital account amount, and

9   then there's activity in the company that gets passed through

10  through the partnership.  The partnership agreement -- in this

11  instance, the prepetition Debtor partnership agreement passed

12  through profits and losses on a pro rata basis.  There was

13  activity in the first half of the year that affected that

14  capital account.  You can see that reflected in the year-end

15  auditeds as well as the K-1 statement that -- for 2018 that

16  was given to HMIT.  That would be their 2018 year-end.  That

17  then, from an accounting perspective, was used and brought

18  down to the petition date.  And between the petition date and

19  year-end 2019, there was additional capital activity, the

20  biggest one of which was the reserve -- full reserve for the

21  $50-plus million for the HMIT note.  And so then you'll see

22  the 2009 auditeds that are signed off by Mr. Waterhouse.  And

23  in those interim months, then you also see the gross amount of

24  the partner capital each month in the monthly operating

25  reports.

Seery - Cross                                    132

1    Q    And correct me if I'm wrong, but I believe you testified

2    that the capital account balances continued to go down after

3    2019.  So you have the petition date, you have the next year,

4    and did they continue to --

5    A    I don't think I testified to that.  What I testified to is

6    that there was economic activity in 2019 that affected the

7    year-end '18 to the petition date.  And then from the petition

8    date there was year-end activity -- there was activity from

9    the petition date to year-end '19 that would affect the

10   capital account as reflected in the 2018 auditeds -- they

11   weren't auditeds -- 2018 tax returns signed off by Waterhouse.

12   The biggest part of that activity was the application or the

13   reserve for the Hunter Mountain Note.

14   Q    And was there any activity after the 2019 tax return?

15   A    There was postpetition activity in the partnership,

16   certainly.

17   Q    And did it reduce the capital accounts during those years?

18   A    I assume it would have reduced all of the capital accounts

19   pro rata.

20   Q    Okay.  And why'd you use the petition date as the date to

21   determine the value of the capital accounts?

22   A    Because this is bankruptcy and that's the date on which

23   you fix all your claims and interests.

24   Q    If you used -- have you ever used equity ownership

25   percentages to determine the payment to the equity versus

Seery - Cross                                133

1    their capital account balances?

2    A    In this case, or elsewhere?

3    Q    Elsewhere.

4    A    I think that's standard.  I can't cite you a specific

5    thing, but typically when a partnership liquidates or a

6    partnership is sold, amounts get distributed pursuant to the

7    capital accounts and -- and -- in up to amounts in the capital

8    accounts.

9    Q    You would agree, if you use the percentage of ownership,

10   being 99.5 percent for Class 10 and the .5 percent for Class

11   11, would potentially leave money for the Class 11 creditors

12   to recover?

13   A    I don't think so.  No, I don't agree with that.

14   Q    Why do you say that?

15   A    Because Class 11 is subordinated to Class 10.

16   Q    Okay.  So explain how, if $60 million exists and you pay

17   $20 million to the Class 9, --

18   A    Roughly.  Yeah.

19   Q    Rough.  Just rough math.

20   A    Okay.

21   Q    That leaves $40 million.

22   A    Okay.

23   Q    Correct?  And if the ownership interests or the allowed

24   claim for HMIT was 99.5 percent, wouldn't that leave .5

25   percent of $40 million for the remaining creditors?

Seery - Cross                          134

1   A    That doesn't make any sense, because 99-1/2 percent of a

2   senior thing means you get everything.  So that Class 10 has

3   to be paid in full before the 11.

4        In addition, there's already an agreed-upon amount on

5   HCLOM for $10 million.  So how do I give HCLOM $10 million and

6   99-1/2 percent to somebody else?  There has to be numbers.

7   Q    But to be clear, the plan does not say that the equity

8   claims are determined on capital accounts.  Correct?

9   A    That's correct.

10  Q    All right.

11            MR. LANG:  No further questions.

12            THE COURT:  All right.  Any redirect?

13            MR. MORRIS:  Just one moment, Your Honor.

14       (Pause.)

15            MR. MORRIS:  We have no questions, Your Honor.

16            THE COURT:  All right.  Any redirect from --

17            MR. PHILLIPS:  No, Your Honor.  Thank you.

18            THE COURT:  -- the one question?

19       Okay.  Thank you, Mr. Seery.  You are excused from the

20  witness box.

21            THE WITNESS:  Thank you, Your Honor.

22       (The witness steps down.)

23            THE COURT:  Okay.  I'm going to again take proposals.

24  I can live with a 30-minute lunch break.  I and my staff can.

25  But it's easier for us than all of you.  So do you all want to

1  negotiate for more?

2              MR. MORRIS:  I just wanted to let the Court know

3  that, with that, the Movants rest.  We're not -- we're not

4  going to call anybody else.

5              THE COURT:  Okay.

6              MR. MORRIS:  We reserve the right to cross-examine.

7  We reserve the right to call rebuttal witnesses, including Ms.

8  Deitsch-Perez and Mr. Dondero, depending on what testimony is

9  elicited.  So we reserve the right to call rebuttal witnesses.

10 But we're not calling anybody further on our direct case, and

11 we rest.

12             THE COURT:  Okay.  So let me --

13             MR. MORRIS:  I'll let them --

14             THE COURT:  -- follow up on that point.

15             MR. MORRIS:  Uh-huh.

16             THE COURT:  There had been a discussion of Mr.

17 Patrick.

18             MR. MORRIS:  Uh-huh.

19             THE COURT:  Limited to one total hour.  Thirty

20 minutes collectively, Debtor and HMIT.  Thirty minutes

21 collectively, Dugaboy and Daugherty.

22             MR. MORRIS:  You know what, Your Honor.

23             THE COURT:  You're -- you're not asking --

24             MR. MORRIS:  No, maybe I -- I forgot that you had

25 told us we could do it, too.  So let's take the lunch break,

1   let us figure it out, we'll let you know when we come back.

2          THE COURT:  Well, I'm clarifying because I'm deciding

3   --

4          MR. MORRIS:  Yeah.

5          THE COURT:  -- who gets to go first.

6          MR. MORRIS:  Understood.

7          THE COURT:  Each witness.

8          MR. MORRIS:  Understood.

9          THE COURT:  And I presume --

10          MR. MORRIS:  Understood.

11          THE COURT:  -- the Debtor/HMIT would go first.

12          MR. MORRIS:  Yeah.

13          THE COURT:  And then with regard to Dondero, --

14          MR. MORRIS:  Yeah.

15          THE COURT:  -- you all would go first.

16          MR. MORRIS:  So I withdraw what I said.  Let us

17   confer during the lunch break and we'll figure out who's going

18   first, whether we do rest or whether we put Mr. Patrick on for

19   a short direct.

20          THE COURT:  Okay.  Which leads me to our lunch break.

21   Do people want to negotiate for more than 30 minutes?  I don't

22   want to make someone collapse if --

23          MR. MORRIS:  Thirty minutes, or 1:30?

24          MR. PHILLIPS:  1:30.

25          MR. MORRIS:  1:30, Your Honor.  It's nice and round.

1          MR. PHILLIPS:  One clarification, Your Honor.

2     Because I don't -- I don't -- if one side doesn't take the

3     half hour, does that go over to the other side, or --

4          THE COURT:  No.

5          MR. PHILLIPS:  No?

6          THE COURT:  I don't think -- I'm just giving --

7          MR. PHILLIPS:  Great.  Thank you.

8          THE COURT:  And my law clerk said maybe I was

9     confusing about that earlier today.

10          MR. MORRIS:  Yeah.

11          THE COURT:  One hour total, but 30 minutes each.  And

12     if one collective team doesn't use the whole 30 minutes, we're

13     not --

14          MR. MORRIS:  Yeah.

15          THE COURT:  -- giving it to the other side.  Okay?

16          MR. PHILLIPS:  That was my question.

17          MR. MORRIS:  Understood, Your Honor.

18          THE COURT:  And while I'll let you all discuss

19     whatever you want, what I envisioned is you all would go first

20     with Mr. Patrick, --

21          MR. MORRIS:  Uh-huh.

22          THE COURT:  -- and then Dugaboy and Daugherty would

23     go first on Mr. Dondero.  But if you all collectively think it

24     makes sense to do something different, I'll hear.

25          MR. MORRIS:  No.  That makes sense, Your Honor.

 1          MR. PHILLIPS:  Thank you, Your Honor.

 2          THE COURT:  All right.  So we'll come back at 1:30 --

 3          MR. YORK:  Yes.

 4          THE COURT:  -- and resume.

 5          MR. YORK:  Thank you so much.

 6          THE COURT:  Okay.  Thank you.

 7          THE CLERK:  All rise.

 8      (A luncheon recess ensued from 12:51 p.m. until 1:33 p.m.)

 9          THE CLERK:  All rise.

10          THE COURT:  Please be seated.  All right.  We're back

11  on the record in the Highland Capital matter, the Rule 9019

12  motion for approval of a settlement.  When we broke, we were

13  waiting to talk about Mr. Patrick and Mr. Dondero as

14  witnesses.  Are they going -- is Patrick going to be your

15  witness?

16          MR. MORRIS:  No, Your Honor.  We're going to reserve

17  our 30 minutes for rebuttal.

18          THE COURT:  Okay.  Thank you.

19      All right.  I'll hear from the Objectors now.

20      (Pause.)

21          MR. YORK:  Sorry, Your Honor.  I didn't realize they

22  were going to observe.  So, --

23          THE COURT:  Well, yes.  If you understood what I was

24  saying before the break, I presumed they might want to go

25  first with Mr. Patrick, but it was -- you're the one who

1   wanted him, so if they want to go second, they can go second.

2           MR. YORK:  Well, --

3           THE COURT:  Well, I say "you're."  I'm sorry.

4           MR. LANG:  No, it's okay.

5           THE COURT:  Mr. Lang wanted to go --

6           MR. YORK:  Yeah.  So are we definitely doing Mark

7   Patrick now?

8           MR. PHILLIPS:  No.

9           MR. YORK:  Oh, okay.

10          MR. PHILLIPS:  We just rested.

11          THE COURT:  Okay.

12          MR. MORRIS:  They can call whoever they want.

13          THE COURT:  They have rested.  If you don't want to

14  go forward with any witnesses, you don't have to.

15          MR. YORK:  Oh, we --

16          THE COURT:  But you had wanted to go forward -- you

17  wanted to question Patrick and I said, if he's going to be a

18  witness, then Dondero should also be a witness.  Okay?  And at

19  most an hour collectively for each witness.  If you don't want

20  to call either one of them, you don't have to call either one

21  of them.

22          MR. LANG:  We're going to.  I think that they were

23  just going to call Daugherty first.  I didn't know if you had

24  an order that you wanted to do this in.

25          THE COURT:  Well, no.  I don't care.  I guess I don't

 1 | care.  Was Daugherty listed?  I mean, --

 2 |         MR. YORK:  Yes.

 3 |         THE COURT:  I'm sorry.  Did you say Daugherty or

 4 | Dondero?

 5 |         MR. LANG:  Daugherty.

 6 |         THE COURT:  Okay.  I'm sorry.  So you want to call

 7 | Daugherty?

 8 |         MR. YORK:  Yes.

 9 |         THE COURT:  And you listed him as a witness?

10 |         MR. YORK:  Yes.

11 |         THE COURT:  So you may call Daugherty.

12 |         MR. YORK:  All right.

13 |         MR. MORRIS:  Yes.  I --

14 |         MR. YORK:  We'll call Patrick Daugherty, then.

15 |         THE COURT:  Okay.

16 |         MR. MORRIS:  I don't believe Dugaboy did, but --

17 |         MR. YORK:  Right.

18 |         MR. MORRIS:  -- if they -- if they want to call him,

19 | by all means.

20 |         THE COURT:  Okay.

21 |         MR. MORRIS:  Yep.

22 |         THE COURT:  All right.  Mr. Daugherty, if you could

23 | approach the witness box, I will swear you in.  Please raise

24 | your right hand.

25 |     PATRICK DAUGHERTY, PATRICK DAUGHERTY'S WITNESS, SWORN

1          THE COURT:  All right.  Please be seated.

2          THE WITNESS:  Oh, wow.  A lot of water up here.

3          THE COURT:  Plenty of water for everyone.

4                      DIRECT EXAMINATION

5    BY MR. YORK:

6    Q    Good afternoon, Mr. Daugherty.  Could you state your name

7    for the record, please?

8    A    Patrick H. Daugherty.

9    Q    Mr. Daugherty, are you a creditor in the Highland Capital

10   bankruptcy?

11   A    Yes, I am.

12   Q    All right.  And would you turn to, in the Daugherty

13   exhibit binder, turn to Exhibit 1, please?

14   A    Yes.

15   Q    And this is a settlement agreement between you and

16   Highland Capital Management relating to claims -- your proof

17   of claim that you made in this bankruptcy, correct?

18   A    Yes.

19   Q    And we looked earlier.  You were in the courtroom for Mr.

20   Seery's testimony, correct?

21   A    I was.

22   Q    All right.  And we talked in Section 9 about the defined

23   Reserved Claim in there.  Do you remember that?

24   A    I did.

25   Q    All right.  Can you describe what --

Daugherty - Direct                        142

1   A    I consider it the Compensation Claim, but yes.

2   Q    Can you describe what the Reserved Claim is?

3   A    Yeah.  Basically, it, background, it dates back to the

4   financial crisis of 2008, 2009.  Highland was on the brink of

5   filing for bankruptcy.  We had a creditor bank led by Bank of

6   America and Scotia, and we were in default.  And so the banks

7   came in, declared default, and basically put a limit or

8   terminated our ability to pay cash bonuses.  And that -- right

9   after Lehman Brothers failed, so call it September 2008 and

10  going into 2009.

11       And the problem with that is we were losing people right

12  and left.  We had about 22 senior-level guys.  We were down --

13  and I say guys.  I think there were some women, too.  But we

14  were down to about 12 people.  And they were trying to stem

15  the tide of people running out of the doors in order to save

16  the value of Highland.  We started the year at about $40

17  billion under management, and by that time, we were -- I think

18  we were as low as $19 or $20 billion under management.

19       Hedge funds were rolling up.  CLOs did fine.  Private

20  equity did fine.  Retail funds were having problems.  And

21  separate accounts were okay.  But we were definitely a firm in

22  crisis and trying to hold on to people.

23       So the nature of this compensation claim, you know, every

24  year, everybody except Dondero and Okada would get what's

25  called a compensations and award letter.  Because Dondero and

Daugherty - Direct                         143

1    Okada were really the only partners.  I think you can kind of

2    see that, given your experience.  They were called the

3    founding partners.  They were the only ones that got true

4    distributions from the firm annually.  Guys like us, you know,

5    the other 12 or so, we got cash bonuses and incentive comp and

6    deferred comp.  And, you know, obviously, cash compensation

7    was a big part of our compensation, and they were prohibited

8    from the banks from paying it.

9        So Dondero, with the help of Rick Swadley and some of the

10   other tax people, I don't know if we used out outside firms or

11   not, they came up with this scheme, if you will, where

12   Highland was going to go and use whatever they came up with

13   with the partnerships and whatnot and then generate a tax

14   refund to the senior-level guys.  As or in lieu of the cash

15   bonuses that couldn't be paid, they were going to go make

16   these elections and then we were going to get this money.

17       And if you look at our awards agreement, it says you're

18   going to get $x$ amount of money.  And it's in the line that

19   historically is the cash bonus.

20       Also, when we got like our email or whatever that year

21   from Patrick Boyce, our CFO, he was like, Congratulations,

22   your bonus this year was $x$.  And it was whatever that amount

23   was on your compensation and award letter.

24       Well, several of us had the same accountant, John Garvey,

25   at Bland Garvey.  Me, Joe Daugherty, and Davis Deadman.  And

Daugherty - Direct                          144

1    we took this concept to our accountant and he's like, man,

2    that's really precedent.  And so you guys are going to have to

3    basically protect yourselves from -- sorry, go ahead.  Make

4    your objection.  I'm sure I'm --

5            MR. MORRIS:  I just, I just don't remember what the

6    question was at this point and he's testifying to --

7            THE WITNESS:  Why I got this thing.

8            THE COURT:  It was --

9            THE WITNESS:  My apologies.

10           MR. MORRIS:  -- to conversations and hearsay.

11           THE COURT:  What is the --

12           MR. YORK:  Let me ask a question and I'm going to try

13   to --

14           THE COURT:  -- proof of claim about, was the essence

15   of the question.

16           MR. YORK:  Yeah.  Right.

17           THE COURT:  So I sustain.  We're getting a little

18   narrative, shall we say.

19           THE WITNESS:  My apologies.

20           MR. YORK:  So, --

21           THE WITNESS:  I'll tighten it up.

22   BY MR. YORK:

23   Q    All right.  So, Mr. Daugherty, what you were getting under

24   this scheme, as you describe it, was a cash bonus that was

25   masked as a refund, correct?

1   A    Look, Highland paid for it however they're going to pay

2   for it.  They're the one who created whatever that they did.

3   But for us, it was a cash bonus.

4   Q    Okay.

5   A    But given that I was -- what I was just alluding to, there

6   were concerns about the tax impacts if the IRS didn't agree

7   with Highland.  And so what we did is we negotiated for and

8   got from Dondero -- really, I mean, Jim ultimately made the

9   decisions at Highland.  He said, look, if you don't -- if this

10  doesn't work, if it doesn't go through, we'll make you whole.

11  And so we got that provision in the compensation and award

12  letter that says if the actual refund deviates materially from

13  the refund, then you'll get substitute compensation.  And that

14  was enough for us, --

15  Q    And --

16  A    -- and that's what led to this claim.

17  Q    And was it your understanding that, in terms of making you

18  whole, that was not just whatever you had to pay back for the

19  refund, but also interest and penalties?

20  A    Yeah.

21          MR. MORRIS:  Objection.  Leading.

22          THE COURT:  Sustained.

23          THE WITNESS:  That's fair enough.

24  BY MR. YORK:

25  Q    What was your understanding as to what that 'make you

Daugherty - Direct                          146

1  whole' constituted?

2  A    It was basically to put me and the others back in the

3  position of getting to that number that was listed in the

4  document.  So if there were any interest, penalties, pullbacks

5  from the IRS, then we would be made whole at that -- we'd get

6  back the net of that number.  However, if the IRS was fine

7  with it, we wouldn't get anything.

8  Q    So there's a chance, depending on how the IRS audit turns

9  out, if the IRS says what Highland did was fine, then you

10  don't owe the IRS anything, right?

11  A    Yeah.  That's been a critical thing, that I may not owe

12  the IRS anything, and certainly I wouldn't expect Highland to

13  give me anything.

14  Q    And at that point, what's been reserved as your reserved

15  claim would effectively at that point, from the IRS

16  perspective, the IRS audit perspective, would be a zero dollar

17  amount, right?

18  A    Yeah.  I mean, more so.  I mean, Jim Seery offered to buy

19  me out with an amount of the reserved claim.  And I said,

20  listen, I'm not looking for a windfall here.  What I'm looking

21  for is to be made whole, --

22  Q    Right.

23  A    -- it's my insurance policy on what I earned back in 2008,

24  because the alternative is I will have ended up working for

25  free in 2008, plus have to pay penalties and interest going

Daugherty - Direct                          147

1   forward that could wipe out my net worth.

2   Q    All right.

3   A    So I wanted the insurance policy aspect of it.

4   Q    So you heard Mr. Seery's testimony earlier where he said

5   the total amount you would owe was somewhere in the range of

6   $1.4 to $1.5 million if there was --

7   A    He's wrong about that, if that's what he said.

8   Q    Why?

9   A    At the time -- I think the number he was referencing was

10  in our claim number that I filed back in, I want to say,

11  October 2020.  And the $1.45 million, what was in the

12  compensation -- was the number in the compensation and awards

13  letter.

14      The other number that I spoke about from the gallery out

15  there was one point -- I don't know, whatever the interest --

16  whatever I guessed the interest might be.  And then I didn't

17  have anything for penalties.  So, at that particular time,

18  took those numbers and said, okay, if the IRS says no way on

19  all this, this is what I'd have to pay, not including

20  penalties.

21  Q    All right.  So you've seen today and you listened to the

22  testimony about the footnote in Highland's adversary complaint

23  against you in which they say that the resolution may not be

24  until 2029 of this IRS audit?

25  A    That's correct.  I've heard that.

Daugherty - Direct                        148

1   Q    All right.

2   A    I've seen it and heard it.

3   Q    All right.  As you've sat here today, have you done any

4   calculation back of the napkin to try to estimate what your

5   potential exposure would be to the IRS in terms of interest

6   and penalties as a result of that audit dispute if it wasn't

7   resolved until 2029?

8   A    Yeah.  I listened to the judge.  I went and ran '33

9   because that was a number that was just thrown out.  At '33,

10  if it's 2033, it's $7.4 million, and if it's 2029 it's $5.7

11  million.

12  Q    What sort of financial impact would that have on you?

13  A    The latter would pretty much wipe me out.  I'm sorry.  The

14  former would -- the $5.7 million would wipe me out.  The

15  latter would cause me to file for bankruptcy.

16  Q    Okay.  Mr. Seery also discussed his -- that he had heard

17  through the grapevine that the IRS audit had been resolved.

18  Has anyone from Highland ever told you that the IRS audit is

19  resolved?

20  A    No one's told me that from anywhere, anyhow, anyway.

21  Q    Have you had a conver... have you had -- so nobody at all,

22  right?

23  A    No one at all.

24  Q    Have you -- did you have a conversation recently with Kurt

25  Plumer over it?

1   A    I did.  I had lunch with him at Hillstone.

2   Q    Did he mention it at all?

3   A    No.

4   Q    All right.  Could you turn with me to, in your exhibit

5   binder, Exhibit 8, please?

6   A    Yeah.

7   Q    All right.  Can you just identify for us what this

8   document is?

9   A    This is a letter I got from the IRS dated November 20th,

10  2024, basically telling me that the case is open and I may owe

11  money.

12  Q    And specifically, if we look at the first paragraph, it

13  says, "Why You're Receiving This Letter," in bold, right?

14  A    It does.

15  Q    And then below that it says:  We might have to adjust your

16  tax return based on our examination of the Highland Capital

17  Management listed above.

18       Did I read that part correctly?

19  A    Yes.

20  Q    And so is it your understanding that your -- that this is

21  related to the IRS audit of Highland?

22  A    That is my understanding.

23  Q    And that your tax return, your personal tax return may be

24  adjusted as a result of that?

25  A    Mine and my wife's.

Daugherty - Direct                    150

1    Q    Which would mean you're subject to interests and penalties

2    as well?

3    A    As is she.

4    Q    Okay.  And is this the only letter you've ever received

5    from the IRS?

6    A    No.

7    Q    Related to the Highland Capital Management audit?

8    A    No.

9    Q    All right.  Do you receive these periodically?

10   A    Yes.  The initial one came I want to say about five months

11   after we filed the returns in two thousand -- it was for the

12   calendar year 2008, so it was April 15th, 2009, I want to say.

13   Maybe it was -- I think the first one came around October,

14   late October 2009.

15   Q    And --

16   A    Like this.  I can't -- I don't remember it verbatim.

17   Q    Is this the last communication you have received from the

18   IRS relating to Highland's IRS audit?

19   A    This was it.  Yeah.

20   Q    Okay.  Has anyone from the IRS ever told you that an FPAA

21   has been issued --

22   A    No.

23   Q    -- with respect to the Highland's audit?

24   A    No.  I don't even know what that -- I didn't even know

25   what that was.

1    Q    And you've never received an FPAA from the IRS, right?

2    A    I have not.

3    Q    And you've never -- nobody else has ever sent you an FPAA

4    related to the Highland audit, right?

5    A    No.

6               MR. MORRIS:  I'm being kind, but this is just --

7               THE COURT:  It's leading.

8               MR. MORRIS:  -- testifying from the podium.

9               THE COURT:  Sustained.

10              THE WITNESS:  Yeah.

11   BY MR. YORK:

12   Q    All right.  Mr. Daugherty, would you turn -- we'll switch

13   topics real quick to the tolling agreement.  Would you turn in

14   Volume 1 of the Highland exhibits to Exhibit 60, please?

15   A    Volume 1, and then which one, I'm sorry?

16   Q    Exhibit 60.

17   A    Yeah.  Yes, I'm there.

18   Q    Why did you enter into -- well, back up.  Strike that.

19   Start over.  This is the tolling agreement extending a claim

20   objection deadline between you and Highland Capital and the

21   Highland Claimant Trust as of July 27th, 2022, correct?

22   A    That is correct.

23   Q    And is it your signature on Page 6 or 7 of the document on

24   the left-hand side?

25   A    It appears to be, yes.

1  Q    All right.  Why did you enter in this tolling agreement?

2  Why did you enter into --

3  A    I'm sorry, what was your question?

4  Q    Why did you enter into this tolling agreement?

5  A    Jim Seery had reached out to me in 2022 and said that they

6  had a problem with -- the Court had an objection deadline that

7  was running and that was somewhat inconsistent with the

8  settlement agreement that we had just gotten approved in early

9  March of 2022 that said they couldn't object, they being

10 Highland, object to the legitimacy or amount of my

11 compensation claim.

12     So he said, look, you know, we're in a little bit of a

13 predicament here.  We can go to the Court or we can try and

14 work this out.  And I'm like, hey, I'm fine to work it out.  I

15 don't want the estate to be burdened or any way.  So we went

16 back and forth on the document, and ultimately I felt that it

17 was the right thing to do.  The spirit of our settlement was,

18 you know, I -- they couldn't -- they couldn't challenge this

19 part of my claim, but the *quid pro quo* was I'm not going to be

20 able to beat them out on a technicality by running in here,

21 saying, ah, the objection deadline, you know, expired.

22     So his solution seemed to be a reasonable one.  And we

23 worked with their counsel, I think Demo and to some degree

24 Morris, to work that out for them.

25 Q    How did the estimate come about in Footnote 3?

Daugherty - Direct                                153

1   A    I don't know.  Nobody ever asked me about it.  There was

2   no -- Mr. Morris is right, there was no negotiation about it.

3   Because, frankly, I didn't see that as my problem.  They had

4   something to fulfill pursuant to the plan.  And there was no

5   back and forth on that reserve amount with Seery whatsoever.

6   He just said, This is what we're doing and, you know, we're

7   going to put this -- and my perception is I didn't have any

8   right to challenge it other than what was in my settlement

9   agreement.  And I looked at that as a one-time right to go and

10  seek an estimate, and I didn't want to do it that early in the

11  process.

12  Q    Would you take a look with me at the last recital that's

13  on Page 3 of the document?  All right.  It says, --

14  A    Oh.  You're going to make me read.  All right.

15  Q    It says:  Whereas, solely to avoid the expense,

16  inconvenience, and uncertainty associated with litigation, and

17  without any party admitting liability, fault, or wrongdoing,

18  or releasing or waiving any rights or defenses with respect to

19  the reserved claim, the parties desire to enter into this

20  agreement to extend the claim objection deadline solely with

21  respect to the reserved claim to January 11th, 2023 at 5:00

22  p.m. Central Time, defined as the Objection Deadline.

23       Did I read that part correctly?

24  A    You did.

25  Q    What was your understanding of this recital provision

1   being put in here?

2   A   Well, I think I just kind of summarized it.  There was a

3   problem that the parties didn't, you know, fully recognize

4   could occur that would give me a windfall, and so this was to

5   kind of solve that on an interim basis until we got to a final

6   resolution on this tax refund thing.

7        I mean, the honest truth, God -- Judge.  Not God, Judge.

8   But the honest-to-God's truth is Seery and I had a very good

9   relationship, and we were going back and forth, and his view

10  was that this thing could get resolved in 2022.

11  Q   Did you have an understanding as to whether or not you

12  were reserving all rights with respect to your reserved claim

13  under the terms of the tolling agreement?

14  A   Absolutely I did.  Both in emails and in the document.

15  Q   All right.

16       MR. YORK:  Pass the witness.

17       THE COURT:  All right.  Any cross?  I'm assuming

18  Dugaboy did not have questions.  And, Mr. Daugherty, I should

19  have --

20       MR. LANG:  No, we do not.

21       THE COURT:  Okay.  Thank you.  Cross?

22                     CROSS-EXAMINATION

23  BY MR. MORRIS:

24  Q   Good afternoon, Mr. Daugherty.  Take your time.

25  A   How are you, Mr. Morris?

Daugherty - Cross                    155

1    Q    Good.  I just have a few questions.  You have been paid in

2    full on your Class 9 claim, correct?

3    A    Evidently, yes.

4    Q    And that Class 9 claim was for $3.7 million, correct?

5    A    I believe it was $3.75 million.

6    Q    Thank you for the clarification.  Do you recall how many

7    payments you received that resulted in your receipt of $3.75

8    million?

9    A    I don't.

10   Q    When you received those payments, did you tell Mr. Seery

11   -- did you send it back to Mr. Seery out of any concern that

12   your Class 8 claim has not been resolved?

13   A    No.

14   Q    When you received those payments, did you object to Mr.

15   Seery or to anybody else that it was improper for the other

16   Class 9 holders to receive the payments when your Class 8

17   claim had not been resolved?

18   A    I had no idea what they were receiving.

19   Q    Did you have any reason to believe that you were receiving

20   a benefit that the other Class 9 claim holders were not

21   receiving?

22   A    Again, I had no idea what they were receiving, so I can't

23   compare the two.

24   Q    Okay.  But it is true that you accepted without protest

25   your Class 9 payments, even though your Class 8 claim had not

Daugherty - Cross                        156

1    been resolved, correct?

2    A    I think that's accurate.

3    Q    Okay.  I think you mentioned in your proof of claim it had

4    $1.4 million; is that right?

5    A    Again, I'm cuffing it.  If you could grab it, I'll -- I

6    want to say it was -- the proof of claim had two components,

7    as I mentioned.  There was a, as I mentioned, there was the

8    compensation award amount from my compensation letter of like

9    $1.475 million.

10    Q    Uh-huh.

11    A    Don't quote me on that, but close enough.

12    Q    Approximate.

13    A    And then an interest component that would take me up to

14    that particular time if the IRS reversed it.

15    Q    Okay.

16    A    But no penalties were included.

17    Q    And that approximately $1.45 million, that's money that

18    you received back in 2009?

19    A    I didn't get that full amount in 2009.  That was -- I

20    don't want to broaden this up too much, but many times what

21    was promised was not what was delivered.  So I got a lesser

22    amount from the IRS.

23    Q    How much less did you receive?

24    A    I want to say, on a net basis, it was just under $1.2

25    million.

Daugherty - Cross                                 157

1    Q    Okay.  And so it's true that you've had the benefit of the

2    $1.2 million for 15 years now?

3    A    When you say the benefit, what do you mean?

4    Q    It went into your pocket 15 years ago.

5    A    Yeah, but it's a contingent liability I have back to the

6    IRS, so I can't say that it's, you know, not without

7    reservations.

8    Q    But you've had possession of that million and a half

9    dollars now for 15 years, correct?

10   A    Right.  And with it comes an obligation --

11   Q    Okay.

12   A    -- contingent back to the IRS.

13   Q    Your claim is a prepetition claim; is that right?

14   A    What do you mean by my claim?  Are you talking about the

15   compensation one?

16   Q    Yes.

17   A    Yeah.  I mean, that -- that contractual obligation

18   originated in, well, yeah, February 2009.

19   Q    It's not an administrative claim, right?

20   A    I don't believe so, no.

21   Q    It's just -- it's just a claim that existed prior to the

22   petition date.  Fair?

23   A    That is fair.

24   Q    Okay.  With respect to the reserve, you did agree to that

25   amount of the reserve, fair?

Daugherty - Cross                                         158

1   A    I did not.  I mean, I -- I signed the document, but I did

2   not agree to that amount.

3   Q    Well, --

4   A    I did not negotiate for it or anything like that.

5   Q    Well, but if you turn to Exhibit 60 that you just looked

6   at, --

7   A    sure.

8   Q    -- and you go towards the end of the document, that is

9   your signature on the first Page 7, right?

10  A    Yeah.  I've already admitted that.

11  Q    And Paragraph 1 of the agreement that you signed

12  specifically set the reserve at the amount set forth in

13  Paragraph 1, correct?

14  A    That much is true.

15  Q    Okay.  And you --

16  A    You just said, did I agree to it, and I'm like, it was in

17  the document.

18  Q    It's in the agreement that you signed, correct?

19  A    For sure.

20  Q    Okay.  And you've never asked for that amount to be

21  adjusted, correct?

22  A    I've spoken many times to Mr. Seery and told him that it

23  will need to be adjusted upward as years go by.  We've had

24  quite a dialogue along those lines.

25  Q    Okay.  But he's never agreed to do that, correct?

Daugherty - Cross                          159

1   A    He said when the time comes, we'll figure out -- listen,

2   we had a very collaborative relationship up until like the

3   last year.  And so it was like, hey, I'm not going to press

4   you.  You don't -- he's fighting off Dondero right and left.

5   You know, and I'm like, I don't want to get in the middle of

6   all this.  You go do what you've got to do.  We'll both sit

7   tight.  In fact, there was dialogue to that very effect.

8   Q    Uh-huh.

9   A    And so this was just all part of sitting tight, thinking

10  that the right thing would be done when we got final analysis

11  to this.

12  Q    Okay.  So would you just agree with me that, since signing

13  this agreement, you haven't come to court to seek an

14  adjustment --

15  A    No.

16  Q    -- of the reserve?

17  A    I did not want to be a burden.

18  Q    Okay.  And since signing this agreement back in 2022, you

19  and Mr. Seery have not come to an agreement on any adjustment

20  to the reserve, correct?

21  A    We have not.

22  Q    Okay.  Do you believe that you have claims against

23  Highland's employees?

24         MR. YORK:  I'm going to object on relevance grounds.

25  Also, outside the scope.

1          THE COURT:  What is the relevance?

2          MR. MORRIS:  We're going to get to the $20 million

3   demand in a moment.  I'm laying the foundation.  But we have

4   anybody on anybody --

5          THE COURT:  But what's the $20 million demand?

6          MR. MORRIS:  I'll get to it in a moment.

7          THE WITNESS:  There's --

8          THE COURT:  I can't figure out if --

9          MR. MORRIS:  I can make a proffer if you'd like.

10          THE COURT:  -- that's relevant.

11          MR. MORRIS:  I can make a proffer, Your Honor.  I'll

12   tell you.  I'll tell you right now.

13      On June 5th, Mr. York called me and said that Mr.

14   Daugherty asserts that he has claims against the Highland

15   employees, and if Highland didn't pay him $20 million he was

16   going to sue them, and he was going to file this objection

17   together with a petition in the Supreme Court opposing

18   Highland's request to stay the issuance of a mandate in the

19   Fifth Circuit.

20          MR. YORK:  First off, if Mr. Morris is going to

21   become a witness, we've got a problem here.  Secondly, any

22   sort of communications between us would be 408.  And third,

23   it's not relevant to the issue we're here on today.

24          THE COURT:  Okay.

25          MR. MORRIS:  My response to that, Your Honor?

 1              THE COURT:  All right.  I'm going to allow a little

 2      latitude, --

 3              MR. MORRIS:  Yeah.

 4              THE COURT:  -- but I'm still unclear --

 5              MR. MORRIS:  It's about -- it's about three

 6      questions.

 7              THE COURT:  Okay.

 8              MR. MORRIS:  It's about three questions.

 9              THE COURT:  You may proceed.

10      BY MR. MORRIS:

11      Q    Do you believe you have claims against Highland's

12      employees?

13      A    Me personally, no.

14      Q    Okay.  Do you -- did you authorize your lawyer to call me

15      and to demand $20 million in exchange for a release and your

16      standing down from filing any objection to this motion?

17      A    I'm not aware that that ever happened.  Nobody demanded

18      anything of you.

19      Q    Really?

20      A    Yeah.

21      Q    Do you know that your lawyer used the number $20 million

22      to me?

23      A    Oh, I've read the emails back and forth between you.

24      Q    So why don't you explain to Judge Jernigan what your

25      understanding is as to what your lawyer meant when used $20

1   million to me.

2   A    I can't say for sure what he meant, but I can tell you

3   from my perspective what I understood.

4   Q    What did you understand?

5   A    I have another entity that I picked up in the settlement

6   with Highland called the Highland Employee Retention Asset

7   Fund.  And again, pursuant to the settlement agreement, I mean

8   -- I guess supposedly, I guess, when I think about it, I do

9   have claims individually, because it's with me, that

10  agreement.

11       But it said that Highland had to turn over all the books

12  and records of the HERA fund.  And Mr. Morris was on many of

13  those emails.  And they had turned over some of the books and

14  records, but they didn't turn over any of the books and

15  records that implicated Thomas Surgent and David Klos in

16  defrauding HERA in allocating Highland's expenses when they

17  were litigating me, against me, back to HERA.

18       So I do have a settlement agreement with Highland and

19  these employees, but Highland Employee Retention Assets needs

20  their books and records.  And we've made it very clear to you

21  on numerous emails where you, you know, kind of muscled up on

22  us and said this is all you're going to get and tough if you

23  don't like it or whatever.

24       And so the deeper we get into this, we did get discovery

25  from others, we found that Highland's been withholding

Daugherty - Cross                                    163

1   material information.

2       So as it relates to -- I mean, you're doing that little

3   squeaky thing, and I think he's a fantastic lawyer, but the

4   reality is you guys have created some damages to HERA that you

5   may be accountable for.  Your clients, not you.

6   Q    Okay.  In the four years since we signed the settlement

7   agreement, you've never asserted a breach of contract claim,

8   have you?

9   A    Well, because we thought you were complying with it.  So

10  if you want to go into the details there, in 2022, we were --

11  asked for more information.  2023, we asked for more

12  information.  2024, we asked for more information.  And so

13  those are continuing breaches.

14      Again, I -- I don't want to go to war with Highland.

15  You're too damn good of an attorney, you're scaring me a

16  little bit.  But --

17  Q    I don't want to.

18  A    You know, listen.  You know I think well of you.

19  Q    I appreciate that.

20  A    But, you know, I mean, I just wanted the information.  I'm

21  not looking to go to war with you guys.  I got enough battles

22  that I've got to fight.  And so, you know, I guess a number

23  was thrown out or whatever.  I don't know the full context of

24  it.  But it wasn't -- it wasn't for this IRS compensation

25  issue.

Daugherty - Cross                         164

1  Q    But what was the -- my last question.  What was the $20

2  million demand for?

3  A    Again, it's just a number.  Y'all were having settlement

4  negotiations.  So, I mean, you work off of it.

5  Q    All right.

6            MR. MORRIS:  I have no further questions, Your Honor.

7            THE WITNESS:  Yeah.

8            THE COURT:  All right.  Any redirect?

9            MR. PHILLIPS:  I have no questions, Your Honor.

10           THE COURT:  All right.  Okay.

11           MR. YORK:  Apologies.  I wanted to make sure.

12           THE COURT:  Yes.

13           MR. YORK:  No redirect, Your Honor.

14                     EXAMINATION BY THE COURT

15           THE COURT:  Okay.  If you've watched Highland

16 hearings, you know the judge sometimes has questions.  I am

17 still trying to understand the 1.4, the 1.2, the 1.475.  I

18 understand broadly that, in essence, a cash bonus was

19 negotiated back in early 2009, I think you said.

20           THE WITNESS:  Yes.

21           THE COURT:  After 2008.  And so that's, in essence,

22 what was contractually negotiated.  But I understand there was

23 a hook, if you will, we're calling it a contingency, whatever

24 word you want to use, where if one day there was an IRS audit

25 and I guess Highland had extra liability for 2008, that this

Daugherty - Examination by the Court                 165

1    -- I don't know if I understood it or not.

2              THE WITNESS:  Do you want me to try and guess what

3    you're asking, or --

4              THE COURT:  Try to guess what I'm asking.  Again, I'm

5    --

6              THE WITNESS:  The liability -- so, Highland chose to

7    use this tax scheme as a currency to pay us a cash bonus.

8    From our perspective, we weren't stupid.  We're like, well,

9    okay, that's great, but if the IRS says --

10             THE COURT:  Okay, I just want to know what -- you say

11   you were contractually entitled to $1.4 million.

12             THE WITNESS:  That's what I was supposed to get for

13   that bonus year.

14             THE COURT:  Okay.  But there was a tax contingency,

15   if you will, where -- that's where I want you to jump in.

16             THE WITNESS:  So, Highland had a tax problem.  They

17   came up with this mechanism to use whatever they were doing

18   with the IRS to create the cash to pay us a bonus.  We looked

19   at it and said, well, this looks fishy -- by the way, every

20   year before that and after that, I've just gotten a cash

21   bonus.  But for this one year, when the banks are saying, no,

22   no, no, we get this.  And so we looked at this and said, look,

23   this sounds fishy, but if you can't pull it off, we need to be

24   made whole.  I can't be in a situation where here I am in 2025

25   and I may have to pay $5, $6 million to the IRS for the

Daugherty - Examination by the Court          166

1   pleasure of working at Highland.

2          THE COURT:  Okay.  See, that's where my disconnect

3   is.

4          THE WITNESS:  Uh-huh.

5          THE COURT:  Because I thought this all turned on a

6   Highland tax return.

7          THE WITNESS:  Oh, no, no.  So, Highland did the

8   planning and the creation of the scheme, and I guess

9   ultimately it was Highland's tax return, but it flowed through

10  to us as pass-throughs.  K-1s, what have you.

11         THE COURT:  Right.

12         THE WITNESS:  So I guess it's both.

13         THE COURT:  Okay.  You were a partner.

14         THE WITNESS:  Well, that's debatable, too.  That's

15  debatable, too, because I had a --

16         THE COURT:  Okay.  I thought you weren't, but --

17         THE WITNESS:  Well, I wasn't --

18         THE COURT:  But you got -- okay.  Let me just skip

19  to, --

20         THE WITNESS:  Yeah.

21         THE COURT:  -- I guess, the important part.  You did,

22  you got paid?  You said $1.2 million?

23         THE WITNESS:  Yeah.  I got a refund back from the IRS

24  for around that amount.  Slightly under $1.2 million.

25         THE COURT:  So the contingency you are worried about

1   that you think gives you a contingent claim against Highland

2   is, what, the IRS comes back and says --

3          THE WITNESS:  And they say, Give us that money back

4   plus interest plus penalties or we're taking your house.  And

5   it's a very real threat, because this has gone on, as you've

6   noted, forever.  And I went from having a one-point-whatever

7   bonus to possibly having to pay six, seven, eight, I don't

8   know how long this lasts, million dollars back to the IRS for

9   an election that was made by them.  As a substitute for paying

10   me a cash bonus the regular way, they did it this way.  And

11   that's why we put and negotiated for that term in the

12   compensation agreement that said, if for whatever reason the

13   actual refund is different, we get made whole.

14          THE COURT:  Okay.  I may be overthinking this, I do

15   do that sometimes, but I'm still, I'm trying to understand why

16   your claim would escalate up to, you know, you said maybe $5.7

17   million if, in 2029, this all plays out with the IRS.

18          THE WITNESS:  That --

19          THE COURT:  Because you've gotten the benefit of that

20   money and --

21          THE WITNESS:  Well, no, because if the IRS says --

22          THE COURT:  -- return on that.

23          THE WITNESS:  Sorry.  I didn't mean to interrupt.

24          THE COURT:  You know what I'm saying?  So I'm trying

25   to figure out why it would grow in the way that you're

Daugherty - Examination by the Court          168

1  suggesting.

2          THE WITNESS:  Can I respond?

3          THE COURT:  Yes.

4          THE WITNESS:  So I've gotten money that the IRS says

5  is not mine.  Right?  And the IRS says --

6          THE COURT:  And you've had the use of it.

7          THE WITNESS:  Oh, yes.

8          THE COURT:  You've presumably invested it and --

9          THE WITNESS:  Well, no, I mean, you can't --

10          THE COURT:  Well, you've had the ability to.  Uh-huh.

11          THE WITNESS:  But you don't want to take risk with

12  something that's not yours, so you're kind of limited, right?

13  But I have, I have that amount of money.  Here's the problem,

14  Your Honor, with that.  If the IRS says, Give us back our

15  money, here's the interest, here's the principal.  Oh, by the

16  way, if it's $7, $8 million, I can't -- I don't have that.

17  I've got to file for bankruptcy in order to give the IRS back

18  money that I'm having to pay them for the pleasure that I had

19  of working for Highland in 2008 when I helped save the company

20  and create a lot of the assets that paid all these people in

21  the room.  MGM Studios, Trussway.

22          THE COURT:  Okay.

23          THE WITNESS:  Okay.

24          THE COURT:  Yeah.  We are going beyond this.

25          THE WITNESS:  Fair enough.

1          THE COURT:  I was just, I'm zeroing in on this

2    because I'm trying to figure out, I mean, it matters to me if

3    that reserve is likely fair enough, the reserve I'm told you

4    agreed to is fair enough.  And I'm having trouble figuring

5    out, I mean, if you've had the use of this money for 17 years

6    or whatever that is, why you would get this extra interest

7    add-on that you're -- $5.7 million or whatever it would be.

8    You know, $3 million more.

9          THE WITNESS:  Can I answer that question?

10          THE COURT:  Uh-huh.

11          THE WITNESS:  Because the IRS didn't look at it as my

12    money.  They looked at it as their money.  And so if you look

13    at the plain language of the compensation award letter, if the

14    actual amount deviates from the amount that was granted, then

15    Highland was going to give me substitute compensation to make

16    me whole.  Making me whole includes the penalties and the

17    interest that I would owe the IRS.  Because if you look at it

18    any other way, I had to pay money to work at Highland.

19          THE COURT:  Do I have that letter in my evidence?

20          THE WITNESS:  You should.  Drew?

21          THE COURT:  Do I?  Maybe I'll just cut this off and

22    look at the letter.

23          MR. YORK:  It's at Daugherty 2, and it's at the back

24    of --

25          THE WITNESS:  There's multiple letters, but this is

Daugherty - Examination by the Court          170

1  one of them.

2            THE COURT:  The letter that you say this claim stems

3  from.

4            THE WITNESS:  Sure.

5            THE COURT:  I'll just cut it off and look at that.

6            THE WITNESS:  Yeah, you can tell her where it is.

7            MR. YORK:  So I think it's at the back of the

8  statement on PD-2.  It's at the last page, Your Honor.

9            THE COURT:  Which one?

10           MR. YORK:  P -- Daugherty 2.

11           THE COURT:  Oh, 2?  I've got emails.

12           THE WITNESS:  P-2?  I don't think so.

13           THE COURT:  Okay.  We can move on.

14           MR. YORK:  That's fine.  We'll work this out.

15           THE COURT:  Before we're done here today, I want to

16  look at the letter to better understand how the claim could

17  grow substantially to --

18           MR. YORK:  Yeah.

19           THE COURT:  -- $5.7 million by 2029.  Okay.  Thank

20  you.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  You're excused.

23           THE WITNESS:  Oh, I found -- I just found it and then

24  I closed it.

25           THE COURT:  Okay.  Well, you can --

Patrick - Direct                    171

1          THE WITNESS:  My bad.

2          THE COURT:  -- call my attention to it when you find

3    it.

4          THE WITNESS:  All right.

5        (The witness steps down.)

6          THE COURT:  All right.  Your next witness?

7          MR. YORK:  I believe we're calling Mark Patrick.

8          THE COURT:  All right, Mr. Patrick.  All right.

9    Please raise your right hand.

10      MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

11         THE COURT:  All right.  Please be seated.

12       And, Courtney, you're going to start the clock going.  I

13   show 2:12.  I don't know if my clock's right.

14      You may proceed.

15         MR. LANG:  And, Your Honor, may I hand the witness --

16   this is from Mr. Morris' opening.  May I use this as Exhibit

17   3?

18         THE COURT:  Oh, okay.  You're talking about the back

19   page of his PowerPoint?

20         MR. LANG:  Yes.  Org chart.

21         THE COURT:  Yes.  I've got it in front of me.  And

22   for the record, I'm going to put this PowerPoint, even though

23   it's not an exhibit *per se*, as a demonstrative aid in the file

24   for this matter.  And so it's the last item of the Highland

25   PowerPoint.  All right.

Patrick - Direct                    172

1          MR. LANG:  Yes.

2                    DIRECT EXAMINATION

3    BY MR. LANG:

4    Q    Mr. Patrick, does this Hunter Mountain Investment Trust

5    org chart that I just handed you accurately reflect the

6    structure of the Hunter Mountain Investment Trust ownership

7    today?

8    A    Just give me a few moments to review.

9    Q    Sure.

10          MR. LEWIS:  Your Honor, I had mentioned early on that

11   we object to this whole line of questioning because it's

12   outside the scope of the objection of Dugaboy.  And I don't

13   want to interrupt, but I want to make sure that my objection

14   is continuing, because this has nothing to do with the

15   objection presented by Dugaboy.

16          THE COURT:  All right.

17          MR. PHILLIPS:  So we object to the question.

18          THE COURT:  Okay.  So the record will reflect

19   basically a running objection from Hunter Mountain?

20          MR. PHILLIPS:  We would appreciate that, Your Honor.

21          THE COURT:  Okay.  In light of the failure of Dugaboy

22   to disclose Mark Patrick as a witness, as well as the failure

23   to challenge in a written objection his authority.  Okay.  So

24   I recognized that this was quite a persuasive objection, but

25   given the magnitude, I would say, of what is going on here,

Patrick - Direct                                    173

1   potentially a settlement that could come very close to ending

2   this long-running plan implementation process, I'm erring, if

3   it's an error, I'm erring on the side of allowing this.  All

4   right.  But you have a running objection that the record will

5   reflect if one day there is an appeal.

6          MR. MORRIS:  And, Your Honor, the Highland Claimant

7   Trust and the Highland Litigation Subtrust and Highland

8   Capital Management, LP join Mr. Phillips' objection.

9          THE COURT:  Okay.  Understood.

10          MR. PHILLIPS:  Thank you very much, Your Honor.

11          THE COURT:  All right.

12   BY MR. LANG:

13   Q   Mr. Patrick, have you had time to study this Hunter

14   Mountain Investment Trust org chart?

15   A   Yes, I have.

16   Q   And does this accurately show the ownership structure for

17   Hunter Mountain Investment Trust today?

18   A   I'm not sure, without reviewing the underlying corporate

19   documents on some of these entities that you have listed here.

20   Q   Did you help prepare this chart?

21   A   No.

22   Q   No?  Okay.  So Hunter Mountain Investment Trust is owned

23   by Beacon Mountain, LLC, correct?

24   A   Yes.

25   Q   And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

1    correct?

2    A    Correct.

3    Q    And CLO Holdco, LLC is owned by CLO Holdco, Limited?

4    A    That's correct.

5    Q    And CLO Holdco, Limited is owned by Charitable DAF Fund,

6    LP?

7    A    Correct.

8    Q    And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?

9    A    The ultimate beneficial owner is DFW Charitable

10   Foundation.  To my -- to the best of my recollection, I would

11   say that appears accurate.  I'm just not a hundred percent.

12   Q    Okay.  And --

13   A    But I am a hundred percent that DFW Charitable Foundation

14   is the ultimate beneficial owner.  And I'm a hundred percent

15   that Dugaboy Investment Trust has no interest in it.  And I'm

16   also a hundred percent that The Dallas Foundation or any --

17             MR. LANG:  Judge, I haven't asked --

18             THE WITNESS:  -- or any other nonprofit has any --

19             MR. LANG:  -- any of these questions.

20             THE COURT:  Okay.  There's an objection,

21   nonresponsive.  I sustain.

22   BY MR. LANG:

23   Q    Mr. Patrick, before December of 2024, Charitable DAF Fund,

24   LP was owned by Charitable DAF Holdco, correct?

25   A    (Pause.)  I'm just waiting for a relevancy.  I don't

Patrick - Direct                     175

1   understand how that's relevant to my authority --

2          THE COURT:  Okay.  You're not allowed to make a

3   relevancy objection.  Okay.

4          MR. PHILLIPS:  Your Honor, I think the problem is

5   that, if I could, we have made an objection.  And our

6   objection, our running objection is founded on relevancy and

7   founded on improper process.  So I would like to just tell the

8   Court, and so my client representative can hear it, that the

9   fact that I'm not standing up every time there's a problematic

10  question, --

11         THE COURT:  Okay.

12         MR. PHILLIPS:  -- because every question is

13  problematic, my objection is being maintained to every

14  question that's being asked.

15         THE COURT:  Okay.  You understand that, right?

16         THE WITNESS:  I --

17         THE COURT:  There's a running relevancy objection.

18  You're the witness.  You can't make the objection.  But it's

19  on the record for whatever use it might have down the road.

20         MR. PHILLIPS:  I have objected to every question

21  that's coming in connection with this line of questioning on

22  the basis of relevance.

23         THE COURT:  I got it.  I think we all have it.

24         MR. PHILLIPS:  I'm just --

25         MR. LANG:  Understood.

Patrick - Direct                    176

1            THE COURT:  Yes.  And you're thinking he's eating

2   into your 30 minutes?

3            MR. LANG:  Yes.

4            THE COURT:  Okay.  We've got it.

5            THE CLERK:  I stopped the time.

6            MR. LANG:  So -- thank you.

7            THE COURT:  Did you stop the time for a minute?

8            THE CLERK:  Yes, I did.

9            MR. LANG:  Thank you.

10           THE COURT:  Okay.

11  BY MR. LANG:

12  Q    So, to my question, before December of 2024, Charitable

13  DAF Fund, LP was owned by Charitable DAF Holdco, correct?

14  Charitable DAF Holdco, Limited?

15  A    And where is that on the chart?

16  Q    I'm asking, before December of 2024, Charitable DAF Fund,

17  LP was owned by Charitable DAF Holdco, Limited.

18  A    Can you show me a corporate document so I know the precise

19  corporation you're referring to?

20  Q    You're the -- you are the manager of -- or the control

21  person of CDHGP Limited, correct?

22  A    Again, I'd have to refresh my recollection, but I am the

23  control person over CDMC.

24  Q    Okay.  And CDMC --

25  A    As well as Charitable DAF Fund.  I'll represent that to

Patrick - Direct                           177

1   you.

2   Q    Okay.  Was there a transaction in December of 2024 where

3   Charitable DAF Holdco, Limited sold its interest or

4   transferred its interest in Charitable DAF Fund, LP to CDMC

5   FAD, LLC?

6   A    I know you're trying to help other litigation and --

7            MR. PHILLIPS:  Mark.

8            THE COURT:  Okay.  Nonresponsive.

9            THE WITNESS:  Your Honor, he's using your time to

10  fish for other litigation to support that --

11           THE COURT:  Okay.  Okay.  We have a running objection

12  to relevance.  I'm going to say that one more time.  Okay.

13  Just answer the question as best you can.

14           THE WITNESS:  I'd have to review the corporate

15  documents to refresh my recollection for that time period.

16  BY MR. LANG:

17  Q    Up until December of 2024, Charitable DAF Fund, LP was

18  owned 100 percent by Charitable DAF Holdco, Limited, wasn't

19  it?

20  A    I don't know what entity you're referring to without a

21  refreshment of corporate documents of that entity.  There

22  could be a lot of entities called that.

23  Q    You're aware that there is a proceeding in the Caymans

24  investigating the December 2024 transaction that sold -- where

25  Charitable DAF Holdco, Limited sold its interest in -- and or

Patrick - Direct                                    178

1   transferred its interest in Charitable DAF Fund, LP to CDMC

2   FAD, LLC?

3   A    There are several parts to that question.  So the answer

4   is no.

5   Q    Are you aware of a proceeding pending in the Caymans

6   involving Charitable DAF Holdco, Limited?

7   A    Again, I don't know what entity you're referring to.  Show

8   me a -- show me a corporate document.

9            MR. LANG:  Your Honor, this was on the Foundation's

10  exhibit list.  We cross-designated any document designated as

11  an exhibit by any other party in this case.  And I'd like to

12  hand this to the witness.

13           MR. MORRIS:  Which exhibit is it?

14           THE COURT:  Which is -- yes.

15           MR. LANG:  It was on the -- it was on the DAF -- or,

16  the Foundation's exhibit list.

17           MR. MORRIS:  They haven't been admitted into evidence

18  and they've withdrawn their objection.  We object, Your Honor.

19           THE COURT:  Yes, they've not been admitted.

20           MR. LANG:  Okay.  Well, can I --

21           MR. PHILLIPS:  We object to that, Your Honor.  We

22  object to any witness --

23           MR. LANG:  We cross-designated every --

24           THE COURT:  I already discussed at the beginning what

25  we were admitting and that was not disclosed.

Patrick - Direct                              179

1          MR. LANG:  Okay.

2          THE COURT:  As I recall, I said you've only

3   designated the plan and settlement agreement, and the answer

4   was yes.

5          MR. LANG:  Okay.

6   BY MR. LANG:

7   Q   And we're aware that the Joint Official -- are you aware

8   that there is a Joint Official Liquidator appointed over a

9   Charitable DAF entity in the Cayman Islands?

10          MR. PHILLIPS:  Objection to form.

11          THE WITNESS:  Again, without more specific --

12          THE COURT:  Overruled.  Yes.

13          THE WITNESS:  -- specificity, there could be a

14   thousand different actions that you're referring to, in my

15   mind.

16   BY MR. LANG:

17   Q   Are you aware that the Joint Official Liquidators in the

18   Caymans are investigating transactions involving Charitable

19   DAF Fund, LP and Charitable DAF Holdco, Limited?

20   A   Again, again, I don't specifically know what you're

21   referring to.

22          MR. PHILLIPS:  Your Honor, may I -- excuse me.  I

23   don't know that my running objection includes an objection to

24   form for each of the questions.  This objection is to form of

25   the questions about, quote, --

Patrick - Direct                    180

1           THE COURT:  What's wrong with the form?

2           MR. PHILLIPS:  -- investigation.

3           THE COURT:  What is wrong with the form of that

4    question?  I'm not clear.

5           MR. PHILLIPS:  My objection to form is that the

6    question is an open-ended question with an undefined term,

7    investigation.

8           THE COURT:  Overruled.  I don't think that's a vague

9    term.  So you may answer.

10          THE WITNESS:  If you show me some document, some

11   complaint or something, I'll be very happy to verify whatever

12   questions related to that.  But just giving me verbal words of

13   entities and names and actions, I don't know precisely what

14   you are talking about.

15   BY MR. LANG:

16   Q   Mr. Patrick, who set up the entities in the Hunter

17   Mountain Investment Trust org chart that is sitting in front

18   of you?

19   A   I'm sorry.  Repeat the question?

20   Q   Who set up the various entities that are in the org chart

21   that is on your -- on the stand?

22          MR. PHILLIPS:  Objection to form.  Set up.  What does

23   that mean?

24          THE WITNESS:  It -- yeah, it's very --

25          THE COURT:  I think we know what it means.  Creating,

1  perhaps.

2  BY MR. LANG:

3  Q    Created?

4  A    Who?  Are you asking if I created it?

5  Q    Did you participate in creating them?

6  A    Did I participate?  In which ones?

7  Q    CDMC FAD, LLC.

8  A    What do you mean by participate?

9  Q    Were you involved in creating -- did you initiate the

10 creation of CDMC FAD, LLC?

11 A    Lawyers were.

12 Q    Did you engage in any capacity on behalf of any entity?

13 Were you involved in engaging the lawyers to set up CDMC FAD,

14 LLC?

15 A    Yes, I engaged lawyers to set up entities.

16           MR. LANG:  Objection.  Nonresponsive.

17           THE COURT:  Sustained.

18           MR. LANG:  Did you --

19           THE COURT:  He asked about this one particular

20 entity, I think.

21 BY MR. LANG:

22 Q    Did you --

23 A    Which entity, again, did you ask?

24 Q    CDMC FAD, LLC.

25 A    Yes, I believe I hired a lawyer.

Patrick - Direct                              182

1   Q   And when did CDMC FAD, LLC become a hundred percent owner

2   of Charitable DAF Fund, LP?

3   A   Around the end of March of 2025.  I believe.

4   Q   And were you involved in the transaction between -- in

5   which CDMC FAD, LLC obtained a hundred percent interest in

6   Charitable DAF Fund, LP?

7   A   What do you mean by involved?  How?

8          THE COURT:  Okay.  I can see what's happening here or

9   I have an impression of what's happening here.  I feel like

10  you're slowing down this process where I've given 30 minutes

11  to this lawyer.  Okay?  And I feel like you're feigning

12  confusion.  I don't mean to be insulting, but that's how it

13  comes across.  Okay?  So I need you to speed up your answers

14  and not be confused about things you shouldn't be confused

15  about.  Okay?

16         THE WITNESS:  Okay.

17         THE COURT:  I feel like it's late 1980s *Dondi*.  Does

18  anyone know what I mean by that?  Okay.  We've been there,

19  done that, in the federal courts, and we don't like the

20  looking at -- you're not looking up at the ceiling.  That's

21  what they did in *Dondi*.  Confusion.  Delay.  Okay?

22      So I don't mean to chastise you.  I'm just telling you

23  that you're going to make us be here a lot longer, and nobody

24  wants that, because I will give him extra time for this.

25  Okay?

Patrick - Direct                                183

1              THE WITNESS:  Understood.

2              THE COURT:  Thank you.

3    BY MR. LANG:

4    Q    Okay.  So you were involved in the transaction in which

5    CDMC FAD, LLC acquired 100 percent ownership interest in

6    Charitable DAF Fund, LP in or around March of 2025, correct?

7    A    Correct.

8    Q    Who did CDMC FAD, LLC obtain its interests in Charitable

9    DAF Fund, LP from in March of 2025?

10   A    From an -- from an entity called Charitable DAF Holdco,

11   Ltd.

12   Q    Charitable DAF Holdco, Ltd., the entity that I asked about

13   earlier, correct?

14   A    Of the same name.

15   Q    Yes.  And Charitable DAF Holdco, Ltd. has had Joint

16   Liquidated -- Liquidators, Joint Official Liquidators

17   appointed over it in the Cayman Islands, correct?

18   A    Yes.

19   Q    And those Joint Official Liquidators were appointed over

20   Charitable DAF Holdco, Limited in or around May 6th, 2025?

21   A    In May is what I recall.

22             MR. LANG:  Your Honor, we'll pass the witness.

23             THE COURT:  All right.  Do we have any questions?

24             MR. YORK:  No questions, Your Honor.

25             THE COURT:  Okay.  Any cross?

Patrick - Cross                    184

1        MR. MORRIS:  Just briefly, Your Honor.

2                     CROSS-EXAMINATION

3  BY MR. MORRIS:

4  Q    Mr. Patrick, do you know who initiated the proceedings to

5  get the appointment of the Joint Official Liquidators in the

6  Cayman Islands?

7  A    The director and myself, we initially filed for a

8  voluntary joint liquidation in May.

9  Q    And did there come a time when the Cayman court appointed

10  the Joint Official Liquidators?

11  A    Yes.

12  Q    Do you know who asked the court to appoint the Joint

13  Official Liquidators?

14  A    We did, as well as other -- it was an agreement with the

15  participation holders of that entity.

16  Q    And who are the participation holders of that entity?

17  A    It was the DFW Charitable Foundation as a 51 percent

18  holder as well as the Highland Dallas Foundation, Highland

19  Santa Barbara Foundation, and the Highland Kansas City

20  Foundation.

21  Q    And those three foundations that you just mentioned, do

22  you know who controls them?

23  A    Jim Dondero.

24  Q    Is it your understanding that Mr. Dondero was funding the

25  litigation in the Cayman Islands?

Patrick - Cross                                    185

1   A    Yes.

2   Q    The Joint Official Liquidators, are you aware of any

3   statement that they've ever made that you are not authorized

4   to act on behalf of any of the HMIT entities?

5   A    Yeah, they've never made a statement that I'm not

6   authorized to act under any of those entities.

7   Q    Okay.  Did you receive a letter last night that was

8   purportedly authored by the Joint Official Liquidators?

9   A    Yes.

10  Q    Did you review that letter?

11  A    Yes.

12  Q    Did that letter refer to today's hearing?

13  A    Yes.

14  Q    Are you aware of the Joint Official Liquidators making any

15  appearance in this proceeding?

16  A    No, I'm not aware they made any appearance in this

17  proceeding.

18  Q    Based on your recollection of the contents of that letter,

19  did the Joint Official Liquidators challenge your authority to

20  enter into the settlement agreement on behalf of the HMIT

21  entities?

22  A    No, they did not, because there's no ownership interest.

23  Q    Okay.  And what do you mean by that?

24  A    The entity in liquidation owns nothing.  And the DFW

25  Charitable Foundation is the ultimate beneficial owner.

Patrick - Cross                              186

1   Q    Are you aware that The Dallas Foundation filed an

2   objection to the settlement agreement on behalf of Empower

3   Dallas Foundation, the Okada Family Foundation, and Crown

4   Global?

5   A    Yes.

6   Q    Are you aware that that objection was withdrawn?

7   A    Yes.

8   Q    Was the withdrawal of that objection the product of

9   negotiations that your counsel had with lawyers for The Dallas

10  Foundation and Crown Global?

11  A    Yes, it was.

12  Q    Did The Dallas Foundation or Crown Global require you to

13  surrender your control position of the HMIT entities as a

14  condition to the withdrawal of their objection?

15  A    To give up my control?  No.

16  Q    They didn't ask you to do that, did they?

17  A    No.  No.

18  Q    You are the control person for each of the HMIT entities

19  that are party to the settlement agreement, correct?

20  A    That is correct.

21  Q    Are you aware of any requirement in any of the governance

22  documents --

23        MR. CURRY:  Your Honor, I'm not questioning, but I'm

24  going to object to the line of questioning here about what was

25  asked and what was not received into negotiations, because,

Patrick - Cross                               187

1  frankly, you're getting an imperfect picture there.  And I

2  don't think it should be misrepresented.  The communications

3  didn't happen with Mr. Patrick.

4          THE COURT:  Okay.  I don't know if that objection was

5  a confidential settlement communications.

6          MR. CURRY:  It's a combination of foundation and that

7  he's going into confidential settlement discussions.

8          MR. MORRIS:  Your Honor, it's a very simple question.

9  I'll ask it again.

10         THE COURT:  Okay.  We'll let --

11  BY MR. MORRIS:

12  Q   To the best of best of your knowledge, Mr. Patrick, did

13  The Dallas Foundation or any of the entities on whose behalf

14  it filed its objection require you to surrender your position

15  as the control person of the HMIT entities in exchange for the

16  withdrawal of their objection?

17  A   No, they did not.

18  Q   Thank you.  Are you aware -- are you familiar with the

19  governance documents for the HMIT entities?

20  A   Yes, I am.

21  Q   Are you aware of any restriction on your ability to act on

22  behalf of those HMIT entities with respect to -- withdrawn.

23  Are you required to obtain the consent of anyone in order to

24  enter into the settlement agreement on behalf of the HMIT

25  entities?

Patrick - Cross                                188

1  A    No, I am not.  I'm the sole authority and control person

2  for that entity.

3  Q    And do you believe that you're entering into the

4  settlement agreement on behalf of the HMIT entities in good

5  faith?

6  A    Yes, I do.

7  Q    Have you received legal counsel before entering into the

8  agreement?

9  A    Yes, I have.

10 Q    Do you believe that you've negotiated the best terms that

11 you could get on behalf of the HMIT entities?

12 A    Yes, I do.

13 Q    Do you believe that you received the information that you

14 believed you required in order to make an informed decision

15 before you entered into the settlement agreement on behalf of

16 the HMIT entities?

17 A    Yes, I did.

18          MR. MORRIS:  I have no further questions, Your Honor.

19          THE COURT:  All right.  Mr. Phillips, anything from

20 you?

21          MR. PHILLIPS:  No questions.

22          THE COURT:  Okay.  Any redirect?

23          MR. LANG:  Briefly.

24          THE COURT:  Uh-huh.

25          MR. LANG:  Your Honor, because they mentioned the

Patrick - Redirect                    189

1   letter of last night from Grant Thornton, the Liquidators, I'm

2   going to offer that into evidence as the letter that we talked

3   about this morning.  But Mr. Morris directly asked him if he

4   reviewed it and asked him questions about it.

5            THE COURT:  Response?

6            MR. MORRIS:  No objection, Your Honor.  Go right

7   ahead.

8            THE COURT:  I'll admit it.

9            MR. LANG:  This is --

10           THE COURT:  Do I have it in my notebook?

11           MR. LANG:  -- Dugaboy --

12           THE COURT:  Okay.

13                    REDIRECT EXAMINATION

14  BY MR. LANG:

15  Q   Mr. Patrick, I've handed you --

16           THE COURT:  We're going to call this Dugaboy 3?

17           MR. LANG:  Dugaboy 3.

18           THE COURT:  Okay.

19      (Dugaboy Investment Trust's Exhibit 3 is admitted into

20  evidence.)

21  BY MR. LANG:

22  Q   Mr. Patrick, I've handed you a letter.  It's from Grant

23  Thornton dated June 24th, 2025.  Do you see that?

24  A   Yes.

25  Q   And is this a true and correct copy of the letter that you

Patrick - Redirect                              190

1   received or that you reviewed from the Joint Liquidators that

2   you referred to in your answers to Mr. Morris' questions?

3   A    Well, it's a PDF.  I mean, I'm assuming it's from the

4   Official Liquidators.

5   Q    But this is the letter you were referring to in your

6   testimony a few minutes ago?

7   A    Yes.

8   Q    And do you see on the second paragraph it says that, on

9   May 6th, 2025, the Grand Court of Cayman Islands Financial

10  Services Division appointed Margot MacInnis and Sandipan

11  Bhowmik, each of Grant Thornton Special Services (Cayman)

12  Limited, as the Joint Official Liquidators of the company.  Do

13  you see that?

14  A    Yes.

15  Q    And do you see on the second page, it says:  Since our

16  appointment, we have been diligently investigating these

17  transactions, including a corporate transaction that occurred

18  in or around December 2024 where the company transferred a

19  hundred percent of its interest in the Fund to CDMC FAD, LLC,

20  which resulted in the company being the sole member of CDM and

21  subsequent redemptions of the company's interests in CDM.

22       Do you see that?

23  A    Yes.

24  Q    Is that your understanding of what is happening in the

25  Caymans right now, is investigating these transactions?

1    A    Correct.

2              MR. LANG:  Pass the witness.

3              MR. MORRIS:  May I just have that letter, please?

4              THE COURT:  Any recross?

5              MR. MORRIS:  Yeah, just real brief.

6                        RECROSS-EXAMINATION

7    BY MR. MORRIS:

8    Q    None of the transactions that you were just asked about

9    has anything to do with any of the HMIT entities, correct?

10   A    That's absolutely correct.

11   Q    Okay.  And now that we have the letter in the record, if

12   you could look at the third paragraph.  Do you see --

13   A    Yeah.

14   Q    Do you see it refers to the Highland Dallas Foundation,

15   Highland Santa Barbara Foundation, and Highland Kansas City

16   Foundation?

17   A    Yes.

18   Q    Are those the three entities that you referred to earlier

19   that are, to the best of your understanding, controlled by Mr.

20   Dondero?

21   A    Yes.

22   Q    Okay.  And this is the letter that you said you reviewed

23   and concluded that the Joint Official Liquidators weren't

24   challenging your authority to enter into the agreement on

25   behalf of the HMIT entities; do I have that right?

Patrick - Examination by the Court                    192

1  A    Yes.  Yes, you do.

2              MR. MORRIS:  I have no further questions, Your Honor.

3              THE COURT:  Okay.  I have a question or two.

4                        EXAMINATION BY THE COURT

5              THE COURT:  And again, I apologize if I sounded harsh

6  earlier.  I recognize different people present different ways

7  when they testify.  It just appeared to me that maybe we were

8  slowing things down unnecessarily.  All right?

9              THE WITNESS:  I apologize, too.  I'm just a little

10 emotionally upset they're using this proceeding for a benefit

11 someplace else.

12             THE COURT:  Okay.  My question, very general

13 question:  Do you think this settlement is fair and equitable

14 as far as HMIT is concerned?

15             THE WITNESS:  Absolutely.

16             THE COURT:  And could you tell me why?

17             THE WITNESS:  Yeah.  There was no obvious pathway for

18 HMIT to, in my mind, to receive the residual interest of the

19 bankruptcy estate without a settlement with the Debtor.

20 Otherwise, it just seemed to me that it would go on forever.

21 And then I balanced that against the existing litigation and

22 the probability of the outcome weighted against the costs, and

23 determined that it made sense from HMIT's perspective to enter

24 into the settlement agreement.

25             THE COURT:  Okay.  And you understand that, as part

Patrick - Examination by the Court                193

1   of this, you're giving up some litigation claims that have

2   been waged now for a couple of years or more?

3           THE WITNESS:  That is correct, but I'm also receiving

4   the Kirschner Litigation, which I did negotiate to receive.

5           THE COURT:  Okay.  And there was a note that the

6   estate -- I've heard it called at some point the $57 million

7   note that HMIT owed Highland, a December 2015 note -- that

8   basically gets credited against the capital account.  You

9   understand that?

10          THE WITNESS:  Yes, I do.

11          THE COURT:  Okay.  And then you understand that if I

12  approve this deal, I'm not sure why there's going to be

13  $500,000 to HMIT and then also another $10 million to HMIT,

14  but subsequent payments could get held up if there are

15  litigation threats to the Highland Claimant Trust.  You

16  understand that, correct?

17          THE WITNESS:  Yes, I do.

18          THE COURT:  Okay.  I just, I have to ask.  I'm

19  confused about what's going on here.  I thought that -- well,

20  let me just ask this:  Would you consider yourself crossways

21  with Mr. Dondero now?

22          THE WITNESS:  No, but I'll answer the question.  Upon

23  advice of counsel, I quit Skyview Group.  And upon advice of

24  counsel, I terminated the back office services that Skyview

25  Group was providing to the DAF.

1           THE COURT:  Okay.  Well, you said you're getting

2    maybe a little emotional because of other litigation.  I'm

3    just trying -- I don't understand what all that other --

4           THE WITNESS:  Unrelated -- well, unrelated to that.

5    They're clearly trying to use this forum to benefit their

6    Cayman actions.  They hired U.S. counsel called Reed Smith,

7    and they've been begging for an organization chart to issue a

8    variety of frivolous lawsuits against the operating DAF

9    entities.  So I do apologize, but that's a little upsetting to

10   me because I know we're going to -- that I've just fed them a

11   list of targets in another unrelated matter.

12          THE COURT:  Okay.  Reed Smith.  Here we go again with

13   -- they've made an appearance for Mr. Seery in this

14   litigation.

15          MR. MORRIS:  Exactly.  And we have raised that issue.

16          THE COURT:  Okay.

17          MR. MORRIS:  And I'm surprised to hear that they

18   think they still have the ability to do this.  But we will

19   pursue that later.

20          THE COURT:  Okay.  All right.  I had nothing further.

21   Thank you, Mr. Patrick.

22      (The witness steps down.)

23          THE COURT:  All right.  So where are we now?  I said

24   that, again, just trying to balance the playing field, if

25   Dugaboy was given the ability to question Mr. Patrick, then I

1    would allow I guess you want to call it rebuttal in the form

2    of the Debtor, Reorganized Debtor/Claimant to call Mr.

3    Dondero.  Do you choose to call him?

4              MR. MORRIS:  I'm not.

5              THE COURT:  Oh, and I guess I'll allow you, --

6              MR. MORRIS:  Yeah.

7              THE COURT:  -- if you want to put on your client

8    representative, Mr. Lang.

9              MR. LANG:  We call Jim Dondero.

10             THE COURT:  All right.  Yes, we are timing.

11        Please raise your right hand, sir, Mr. Dondero.

12   JAMES "JIM" DONDERO, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

13             THE COURT:  All right.  Thank you.  The time is

14   running.

15             THE WITNESS:  Thank you for the time.

16                        DIRECT EXAMINATION

17   BY MR. LANG:

18   Q   Mr. Dondero, do you claim that Mr. Patrick lost authority

19   to enter into the 9019 settlement -- or, the settlement

20   agreement that's the subject of the 9019 motion today?

21   A    Yes.

22   Q   And when do you claim Mr. Patrick lost authority to enter

23   into that settlement agreement?

24   A    I think it's best if I give a timeline.  He left Sky --

25   can I give a --

Dondero - Direct                    196

1          MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

2          THE COURT:  Overruled.  He can give a timeline.

3          THE WITNESS:  He left Skyview in October, November,

4    walked out the door, never talked to anybody again, never

5    talked to the charities again except through counsel.  Never

6    collected severance, anything else.  Just walked out the door.

7       As part of Skyview's review of what he'd been working on

8    and what was the nature and what might have been happening,

9    they discovered numerous abnormalities.  They discovered--

10         THE COURT:  Do we have an objection?

11         MR. MORRIS:  We do.  We're not going to use this

12   opportunity to smear Mr. Patrick.  If the notion is that the

13   breach of the ability to act with authority occurred in May,

14   he should start his timeline in May.

15         THE COURT:  Well, I assumed he was just giving

16   background to explain.

17         THE WITNESS:  Yes.

18         THE COURT:  So I'll overrule.

19         THE WITNESS:  Thank you.  I'm going to just give you

20   a little bit of background.  Everything that I'm stating is in

21   the public record.  I won't do anything to besmirch Mark

22   Patrick.  It's all in the public record.  It's all in the

23   Cayman pleadings.  But there was affidavits regarding

24   embezzlements by vendors where he would request overbilling

25   and the money sent to his house.

Dondero - Direct                          197

 1              MR. PHILLIPS:  Your Honor, we're talking about

 2   documents outside the scope, not identified, not listed.

 3   Objection.

 4              THE WITNESS:  It's all --

 5              MR. PHILLIPS:  This is not a timeline.

 6              THE COURT:  This --

 7              THE WITNESS:  It's --

 8              THE COURT:  Sustained.  We don't have anything in the

 9   record.  This is --

10              THE WITNESS:  Okay.  It's all in the public arena.

11   And so is the insider trading.

12              MR. PHILLIPS:  Objection, Your Honor.

13              THE WITNESS:  So, --

14              THE COURT:  Okay.  I sustain.

15              THE WITNESS:  Okay.  All right.

16        And then, yeah, and then there was monies missing.  There

17   were large amounts of monies missing from the estate.  There

18   was unexplained $16 million of expenses in '23.

19              MR. PHILLIPS:  Objection, Your Honor.  They're --

20              THE COURT:  Okay.  Explain the relevance, Mr. Lang.

21              MR. LANG:  I thought he was just giving a background.

22              THE COURT:  It's getting rather --

23              THE WITNESS:  Okay, Your Honor.  Well, --

24              THE COURT:  -- colorful, shall we say.  All right?

25              THE WITNESS:  Okay.  Without giving specifics

Dondero - Direct                              198

1   regarding the embezzlement or --

2            MR. PHILLIPS:  Your Honor?

3            MR. MORRIS:  We move to strike, Your Honor.

4            MR. PHILLIPS:  We move to strike all of this.

5            MR. MORRIS:  We move to strike all of this.

6            THE COURT:  Okay.  I grant.  We don't have any

7   evidence of embezzlement.

8            THE WITNESS:  Okay.  All right.  Without detailing

9   any of the bad acts that we -- that it looked like happened

10  from the investigation, we took all the bad acts and all the

11  investigations and we gave them to the three underlying

12  charities.  Let's remember the DAF is a legacy charity I set

13  up 15 years ago, or actually, Mark Patrick did the

14  documentation back when he was a loyal employee.  And it was

15  three -- around $300 million and about $600 million of

16  liability, I mean, legal claims and other things that were

17  meant to be a family legacy, where the donations would help

18  the community.  We've given out more than $50 million over the

19  years.  And the recognition would help our various companies

20  or our families.  That's what it was.  Okay?

21       Went to the three underlying charities who were the

22  beneficiaries of the DAF as it existed:  Santa Barbara, Dallas

23  Foundation, Kansas City.  These are large charities that have

24  been around for a hundred years.  I don't control them by any

25  form or fashion.  As a matter of fact, the Hunts are $4

Dondero - Direct                    199

1   billion out of the $6 billion in Kansas City.  I think I'm a

2   hundred million or whatever.  The DAF was a hundred million.

3   I think the Hunts would be disturbed to hear that I control

4   it.

5       Anyway, so all those charities were beneficiaries.  And so

6   we went to them with all the investigative results.  And at

7   first, they tried to verify, they tried to have an audience

8   with Mark Patrick.  They wanted details.  They wanted what --

9   financials.  They wanted to know what was happening.  And

10  nothing was forthcoming from Mark Patrick.  He didn't think he

11  owed them any fiduciary responsibilities.

12          MR. PHILLIPS:  Objection.  Hearsay.

13          THE WITNESS:  No, that's --

14          THE COURT:  What is the out-of-court statement?  I'm

15  not sure.

16          MR. MORRIS:  Mark Patrick thinks that he doesn't owe

17  any fiduciary duties.

18          MR. PHILLIPS:  They did an investigation.  They tried

19  to do *x*.  They tried to do *y*.

20          THE COURT:  Oh, okay.  Technically not hearsay, but I

21  think we're getting --

22          THE WITNESS:  Okay.

23          THE COURT:  -- a little far beyond the subject

24  matter.  So if we could reign it in, please.

25          THE WITNESS:  Okay.  In February, they were noted,

Dondero - Direct                           200

 1   they were notified, or, in particular, Dallas Foundation was

 2   notified that their Empower subsidiary, which owned a hundred

 3   percent of the HMIT interests that we were talking about, was

 4   transferred to an undisclosed company for a million dollars.

 5   Without any transparency, without any understanding of who the

 6   new owner was, they filed for receivership in Cayman.  To the

 7   best of the charity's knowledge and based on all the

 8   documentation --

 9              MR. PHILLIPS:  Your Honor, objection.

10              THE COURT:  Okay.  Let me try to understand the

11   relevance.  Do you think I opened this up by asking if there

12   was a falling out essentially between you and Patrick?  Is

13   that why you're going into this?  Or --

14              THE WITNESS:  No, no, no.  No.  The falling-out is

15   much bigger than this.  But I'm just saying the day

16   receivership was filed was the day Mark Patrick lost

17   authority.  And I think anybody would look at it that way.  It

18   was for liquidation in the Cayman --

19              THE COURT:  Okay.  That's his view and we'll either

20   see the --

21              THE WITNESS:  Okay.

22              THE COURT:  -- documents that support that or not.

23              THE WITNESS:  All right.  So, your -- yes.  Because

24   the question was when do I think he lost authority.  I -- you

25   could make the argument he lost it a lot sooner, because for

Dondero - Direct                    201

1  months beforehand the charities had written him letters saying

2  they wanted their assets distributed in kind, they lost faith

3  in --

4            THE COURT:  Okay.

5            THE WITNESS:  Yeah.

6            MR. PHILLIPS:  Again, Your Honor, objection.

7            THE COURT:  This is hearsay.  Okay.  I sustain.

8            THE WITNESS:  Okay.  Well, they did.

9       So, eventually, and it takes a lot to get four little old

10  ladies at different charities to get together and agree to

11  file a charity in liquidation, but they did in the Caymans.

12  Okay?  And then lo and behold, the response from Mark Patrick

13  was, ha-ha, there are no assets there anymore, I moved them

14  all to my living room --

15            MR. PHILLIPS:  Move to strike, Your Honor.

16            THE WITNESS:  -- at DFW.

17            MR. PHILLIPS:  There's no evidence in the record of

18  this.  There was no evidence of any statement.  Move to

19  strike.

20            THE COURT:  There's not, right?

21            THE WITNESS:  Well, no, there is, because what Mark

22  Patrick --

23            THE COURT:  Sustained.  I don't have it.

24            MR. PHILLIPS:  Your Honor, there is no evidence of

25  any of this.

Dondero - Direct                          202

1          THE WITNESS:  Well, Mark Patrick's testimony, he said

2  -- he said that our receivership was right after his

3  receivership.  He had liquidated and taken all the assets out

4  from Dallas, Santa Barbara, and whatever, and moved it all to

5  his charity.  So when we tried -- when the poor charities in

6  Texas in the U.S. tried to file for liquidation, his response

7  was ha-ha.  And there were no assets there, you know, because

8  he had already filed --

9          MR. PHILLIPS:  Objection.

10          THE WITNESS:  He -- he --

11          THE COURT:  Okay, I've sustained the objection to the

12  ha-ha.  Okay.

13          THE WITNESS:  Okay.  But he had, he had filed --

14          MR. PHILLIPS:  Your Honor, please, move to strike.

15          THE COURT:  Okay.  Let's strike everything after that

16  last question.  Ask your next question.

17          MR. LANG:  I don't remember what the first question

18  was.

19  BY MR. LANG:

20  Q   What happened -- or, what's your understanding of the

21  proceedings in the Caymans?

22          MR. PHILLIPS:  Your Honor, objection.  Form.

23  Understanding of the proceedings in the Caymans?

24          MR. LANG:  His understanding is, I mean, his

25  understanding.  What's his endgame?

Dondero - Direct                              203

1            THE COURT:  All right.  I sustain.

2            MR. LANG:  Okay.

3            THE WITNESS:  The Cayman Islands --

4            MR. PHILLIPS:  Your Honor?

5            MR. LANG:  Hold --

6            THE COURT:  I sustained, so --

7            THE WITNESS:  Oh, sustained.  Sorry.  Okay.

8    BY MR. LANG:

9    Q    What is your endgame with respect to your objection over

10   the authority of Mr. Patrick to enter into the settlement

11   agreement that is subject of the 9019?

12   A    The three charities in the U.S. are affected materially.

13   Dallas Foundation can't make payroll as of October.  Dallas

14   Foundation --

15           MR. PHILLIPS:  Your Honor, I'll object to this

16   testimony.  The Dallas Foundation has withdrawn its objection

17   on behalf of -- Dallas Foundation appearing on behalf of

18   Empower, the Okada Family Foundation, and Crown Global.  The

19   Dallas Foundation is no longer a party here and did not even

20   object in its -- an individual capacity.  Object.

21           THE COURT:  I sustain the objection.  They had an

22   objection.  They withdrew it.

23       Moreover, as I announced early on today, I was really

24   questioning their standing to weigh in.

25       So in light of all of that, I'm not going to allow

1    testimony regarding the impact there has been on Dallas

2    Foundation as a result of something Mark Patrick may have

3    done.  Okay?

4             THE WITNESS:  Okay.  I can answer it differently.

5             THE COURT:  Well, wait for your question.  Okay.

6    BY MR. LANG:

7    Q    Well, what -- what is the --

8    A    What is my goal?

9    Q    Well, yes, what is your goal?

10            THE COURT:  Okay.  Yes.  Why are you objecting?  Why

11   is Dugaboy objecting?  How about that?

12            MR. LANG:  Safely.

13            THE WITNESS:  Safely.  Without stating where the

14   assets are or might be, they are not with the three charities

15   they were with a year ago.  They have zero.  And I would like

16   to get those assets back.

17        (Pause.)

18            THE COURT:  Okay.  Go ahead.  I have a couple of

19   questions, but maybe you'll hit on them.

20            MR. LANG:  Oh.

21   BY MR. LANG:

22   Q    Mr. Dondero, are you asking the Court to -- are you

23   objecting to the settlement agreement that is the subject of

24   the 9019, asking the Court to allow the Joint Liquidators in

25   the Caymans to weigh in on the settlement agreement?

Dondero - Direct                                          205

1  A    Yes.  Or described a little differently, there's no

2  irreparable harm --

3           MR. PHILLIPS:  Objection.  Nonresponsive.

4  BY MR. LANG:

5  Q    Well, let me ask you this:  Are you asking --

6           THE COURT:  Let him answer.

7           MR. LANG:  Yes.

8           THE COURT:  Go ahead and answer.

9  BY MR. LANG:

10  Q    Go ahead.

11  A    There's no irreparable harm for a bit of delay to get to

12  the bottom of where the assets are and what bad deeds have

13  occurred.

14  Q    Is that the reason why you're objecting, is to delay this

15  for 45 days or so?

16  A    Well, I believe the HMIT million-dollar transaction in

17  February was a steal.  I believe it was a stolen asset that he

18  -- Mark Patrick's trying to monetize.  And I don't believe

19  it's monetized at nearly its fair value.  And so I believe

20  that it needs to be reviewed.

21  Q    Are you asking the Court to -- are you objecting simply to

22  allow the Liquidators in the Caymans time to review this

23  transaction and the settlement agreement?

24  A    Yes.  There needs to be more time.

25  Q    Okay.

1            MR. LANG:  I'll pass the witness.

2            THE COURT:  All right.  Cross?

3                         CROSS-EXAMINATION

4   BY MR. MORRIS:

5   Q    Good afternoon, Mr. Dondero.

6   A    How's it going?

7   Q    Okay.  You referred to the three underlying charities as

8   being The Dallas Foundation, The Highland Santa Barbara

9   Foundation, and The Highland Kansas City Foundation.  Do I

10  have that right?

11  A    The three are The Dallas Foundation, Santa Barbara, Kansas

12  City.  There's a holding company or there's an entity below

13  it, below each one that I'm on the board of, but it's separate

14  and distinct from the overall charity.

15  Q    Okay.  But the ones that are separate and distinct that

16  have the Highland name, --

17  A    Yes.

18  Q    -- those are the ones that you control, correct?

19  A    No.  I'm on the board.  There's three or four people on

20  the board.

21  Q    Okay.  But --

22  A    But we don't control.  Otherwise, you know, we would have

23  not recommended the settlement.

24  Q    Does the Hunt family make their contributions to The

25  Dallas Foundation, The Santa Barbara Foundation, and The

Dondero - Cross                              207

1  Kansas City Foundation, or do they make them to The Highland

2  Dallas Foundation, The Highland Santa Barbara Foundation, and

3  The Highland Kansas City Foundation?

4  A    Most families do it through DAF, so they probably have

5  their own -- they're just involved with Kansas City, as far as

6  I know.  I don't know if they're involved in any of these

7  others.  But they probably have a Hunt Kansas City.

8  Q    But the ones with the Highland name are the ones who

9  initiated the proceeding in the Cayman Islands to get the

10 Joint Official Liquidators appointed over this entity down

11 there, right?

12 A    Yes, I believe so.

13 Q    And you personally funded that litigation, correct?

14 A    The charities can't make payroll.

15 Q    And the charities, did you tell the charities what's

16 happening here?

17 A    Yes.  They're aware.

18 Q    When did you tell the charities what's happening here?

19 A    They've known it for weeks.

20 Q    And they haven't filed any objection in this court,

21 correct?

22 A    They thought it was best for Dallas to file it.

23 Q    And Dallas settled; isn't that right?

24 A    To the surprise of all the other charities.

25 Q    Okay.  So today, there's actually no charity who is

Dondero - Cross                                    208

1   objecting to the settlement agreement, correct?

2   A    Because it was -- she got bludgeoned in depositions over

3   the weekend and it happened last night and nobody was aware of

4   it.

5   Q    I didn't bludgeon anybody.

6   A    Well, --

7   Q    I don't bludgeon people.

8   A    She switched course after a Sunday full-day deposition or

9   half-day deposition.

10  Q    Okay.  So the charities that you speak of aren't

11  objecting, correct?

12  A    Well, if we had more time.  We only had six hours' notice

13  that Dallas fell away.  I think they probably would object.

14  Q    And you say -- you began to have concerns about Mark

15  Patrick going all the way back to 2023, right?

16  A    2023?  A little bit, yeah.

17  Q    And then you had real concerns in 2024, right?

18  A    Yeah.  I mean, he's an odd duck, but he was really odd

19  towards the end.

20  Q    Did you file a declara... is one of those public documents

21  you mentioned in the Cayman Islands, that's your affidavit,

22  right?

23  A    I believe so.

24  Q    Do you want to grab Binder 3 of 3?

25  A    Sure.

1    Q    And turn to Exhibit 119?

2    A    Yes.

3    Q    Okay.  And this is the declara... this is the affidavit

4    that you filed in the Cayman Islands?

5    A    Yes.

6    Q    And if you turn to Page 4, in Paragraph 25 you begin to

7    recite events concerning Mark Patrick that concerned you,

8    correct?

9    A    Yes.  I'm glad you're bringing this into evidence.

10   Q    Yes.  And in the two years since you started having

11   concerns, has anybody sued Mark Patrick for breach of

12   fiduciary duty?

13   A    No.

14   Q    Have you recommended to any of these charities:  Mark

15   Patrick is doing wrong, let's go sue him?

16   A    We were unaware on 90 percent of it until he left.

17   Q    You were aware of everything that's in your declaration.

18   It says in 2023, you have notice of these emails.  Right?  And

19   you did an investigation in 2024, correct?

20   A    Yes.  But it took a while to get the affidavits from third

21   parties.

22   Q    You had the whole investigation done in 2024 and nobody

23   sued Mark Patrick, right?

24   A    We didn't sue him.  Correct.

25   Q    You're just mad that you lost control.  Isn't that right?

Dondero - Cross                                           210

1   A    No.

2   Q    Turn to Paragraph 33, please.  You accuse Mr. Patrick of

3   misusing material nonpublic inside information.  Is that

4   right?

5   A    Yes.

6   Q    What material nonpublic inside information did he abuse?

7   A    I wasn't involved in the specifics.  My understanding is

8   that he had an awareness of a tender or some financial

9   transaction and then was providing inside information to

10  attorneys and then had them do something.  But I don't -- I

11  don't know the specifics.

12  Q    Sir, under oath, in this affidavit that you submitted to

13  the Cayman Islands, you accuse Mark Patrick of obtaining and

14  abusing material nonpublic inside information.  Can you just

15  tell Judge Jernigan what you had in mind?

16  A    Whatever it says I have in mind.  I'm just saying I didn't

17  remember the specifics.  I can read it, though, if you'd like

18  me to read it.

19  Q    Well, was it something about a put option?

20  A    Yes.

21  Q    Did he tell The Dallas Foundation that it had a put

22  option?  Does that refresh your recollection?

23  A    I don't remember the details.

24  Q    Do you remember who the counterparty was to the put

25  option?

Dondero - Cross                                    211

1   A    Counterparty.  One of the mutual funds.

2   Q    Does it refresh your recollection that it was the Dugaboy?

3   A    No.

4   Q    Do you remember, sir?

5   A    I don't remember.

6   Q    I'm going to try.  I'm going to try and refresh your

7   recollection.  Do you remember that Mark Patrick suggested to

8   The Dallas Foundation that it could recover millions of

9   dollars if it simply exercised the put option with Dugaboy?

10  A    My recollection is it was a mutual fund, and it wasn't

11  millions of dollars, but it would disrupt the transaction that

12  was already in place.  That's my recollection.

13  Q    Okay.

14  A    And I don't see Dugaboy anywhere in here, by the way.

15  Q    I know.  I was wondering if you could just -- I asked you,

16  but it doesn't sound like you know specifically what the

17  material nonpublic --

18  A    Well, --

19  Q    -- inside information is that you accused Mr. Patrick of

20  abusing at that time.

21  A    I know it's been reported.  We can get you the details.

22  Q    Okay.  You, in fact, acted on behalf of HMIT, didn't you?

23  A    Who is HMIT?

24  Q    Apologies.  You personally -- there's no question in your

25  mind that Mark Patrick is the Administrator at HMIT, correct?

Dondero - Cross                                     212

1    A    I'm sorry, I'm drawing a blank on HMIT.  What is HMIT?

2    Q    I apologize.  Hunter Mountain Investment Trust.

3    A    Oh.  Okay.

4    Q    I'm calling it HMIT.

5    A    Okay.  All right.  Sorry.

6    Q    I probably not saying it clearly.  I apologize.  H-M-I-T.

7    HMIT, that's what I call it.  Is there something better that

8    you prefer?

9    A    No, that's fine.  Yeah.

10   Q    Okay.  So HMIT.  Mark Patrick is the Administrator at

11   HMIT, right?

12   A    I believe his status, his dirty hands, I believe he's

13   trying to monetize a stolen asset.

14          MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

15          THE COURT:  Sustained.

16          THE WITNESS:  No, I -- I saw it.  I don't agree --

17          MR. PHILLIPS:  Objection, Your Honor.

18          THE COURT:  Sustained.

19          MR. PHILLIPS:  Move to strike.

20          THE COURT:  Granted.

21          THE WITNESS:  I do not agree.

22   BY MR. MORRIS:

23   Q    Okay.  Has he -- he was at one time the Administrator.

24   You would agree with that, right?

25   A    Yes.

Dondero - Cross                                              213

1  Q    And did he stop becoming the Administrator in your mind

2  when the Joint Official Liquidators were appointed?

3  A    Yes.  I believe.

4  Q    Okay.  So, in your mind, that's when it happened?

5       Can you describe for the Court the relationship between

6  the entity in the Cayman Islands and HMIT?

7  A    The entity in the Cayman Island, as far as we knew, was

8  the org structure that all the assets were either in or

9  controlled by in the organizational structure before all the

10 HGEQ things that you went over earlier with Mark Patrick.

11 Q    Okay.  I'm not asking -- it's my fault.  Do you believe

12 the entity in the Cayman Islands controls HMIT?

13 A    HMIT was one of the assets that were owned by the

14 charities until it was moved for a million dollar to who know

15 who.

16 Q    And do you know how many layers there are between the

17 Cayman Islands entity and HMIT?

18 A    I do not.

19 Q    Is it fair to -- in your view, do you believe that the

20 Cayman Islands entity had a direct -- withdrawn.  Do you

21 believe that the Cayman Islands entity had an indirect

22 ownership interest in HMIT?

23 A    We believed it was direct.

24 Q    Direct.  So it was the owner?

25 A    Well, it was -- it was the direct before it got moved in

Dondero - Cross                                    214

1  February.

2  Q    Hasn't Beacon always been the owner of -- the beneficial

3  owner of HMIT?

4  A    Then it was Beacon that was moved.  There was -- charities

5  were notified in February that, for $1 million, the HMIT was

6  sold to an undisclosed, unknown person.

7  Q    Do you believe that the entity in the Cayman Islands ever

8  had the ability to control Hunter Mountain Investment Trust?

9  A    Yeah.  It was an asset in the portfolio.

10  Q    And do you believe that that gives it the right to control

11  HMIT?

12  A    Yes.  I think the Liquidators will prove that.  I think

13  they can go back in time on bad acts and bad behavior and they

14  can regroup assets to their rightful owners.

15  Q    So your concern here is not with corporate authority, it's

16  with the bad acts.  Is that fair?

17  A    Well, no.  I think you lose your corporate authority when

18  you're fiducially irresponsible or commit corporate crimes.

19  Q    Okay.  But you've never -- you've never brought a lawsuit

20  accusing him of that.  Fair?

21  A    I think you'll see a litany of stuff come out of the

22  Cayman Islands.

23              MR. PHILLIPS:  Objection.  Nonresponsive.

24              MR. MORRIS:  I'm sure we might someday.

25              THE COURT:  Sustained.

Dondero - Cross                         215

1            THE WITNESS:  Yeah.  But, no.  But I have not, no.

2    BY MR. MORRIS:

3    Q    Yeah.  But you personally, have you ever been the

4    Administrator of Hunter Mountain Investment Trust?

5    A    Not that I'm aware of.

6    Q    Have you ever had any role whatsoever with respect to the

7    Hunter Mountain Investment Trust?

8    A    Not that I -- not that I recall.

9    Q    Okay.  Do you recall last December we were here on some

10   litigation concerning HCLOM's scheduled claim?

11   A    You have to give me more of a clue.

12   Q    Remember HCLOM had that $10 million scheduled claim and

13   Highland had filed a bad faith motion and we were all here in

14   court and we wound up settling that matter and HCLOM got a

15   Class 10 interest for $10 million?

16   A    Yes, I vaguely remember that.

17   Q    Okay.  And you were here and you were representing HCLOM,

18   right?

19   A    Okay.  I don't remember specifics, but, yes, go ahead.

20   Q    Okay.  And do you recall that Highland required Hunter

21   Mountain Investment Trust's consent as part of the

22   transaction?

23   A    Vaguely.

24   Q    And you personally authorized that consent back in

25   December, didn't you?

Dondero - Cross                          216

1    A    No.

2    Q    Who did?

3    A    Whoever would have spoke for HMIT at the time.

4    Q    Okay.  Let's take a look at Exhibit 68, please.

5    A    So, Binder 2?

6    Q    Yes, please.

7    A    Sorry, this says Pat Daugherty.  This is 1 of 3.  This

8    one.  Okay.  Did you say 68?

9    Q    Yes.

10   A    It's not in here, either.  68.

11   Q    So you see that's an order of the Court?

12   A    Yes.

13   Q    And this resolves HCLOM's claim?  Take your time.

14   A    I'll leave it in case someone else needs it.  Okay.

15   Q    And do you see on the last page of the document there's an

16   electronic signature by Deborah Deitsch-Perez at the Stinson

17   firm as counsel for Hunter Mountain Investment Trust and

18   Dugaboy Investment Trust?  Do you see that?

19   A    I'm sorry.  I went to the very last page with Mark and I.

20   Is there another page?  Oh, okay.  Yes.  Okay.

21   Q    So you see Stinson has signed both on behalf of you

22   personally and HCLOM, and at the bottom, Stinson and Ms.

23   Deitsch-Perez has also signed on behalf of Hunter Mountain

24   Investment Trust and the Dugaboy Investment Trust?  Do you see

25   that?

Dondero - Cross                                    217

1    A    Yes.  But then it's separate on 69, right?

2    Q    Yeah.  We're just looking at 68.

3    A    Okay.

4    Q    Do you know who authorized Ms. Deitsch-Perez to sign her

5    name and tell the Court that the Dugaboy Investment Trust had

6    approved this form of order both as to form and substance?

7    Who acted on behalf of Dugaboy?

8    A    I have no idea.  I hope she keeps it straight when she's

9    signing stuff.

10   Q    Well, on whose behalf are you here today?

11   A    Dugaboy's.

12   Q    And are you a representative of Dugaboy?

13   A    Representative?  I'm primary beneficiary until I pass.

14   Q    And who's the trustee of Dugaboy?

15   A    I believe it's my sister at the moment.

16   Q    Does she know you're here today testifying on behalf of

17   Dugaboy?

18   A    She knows I'm in court.  I didn't -- I wasn't specific.

19   Q    Did you talk to her about the Dugaboy -- does she -- does

20   she even know about the Dugaboy objection?

21   A    I don't know.

22   Q    Okay.  So how about Hunter Mountain Investment Trust?  Do

23   you know who authorized Ms. Deitsch-Perez to sign this

24   document on behalf of Hunter Mountain Investment Trust?

25   A    When was this?  In December or January?

Dondero - Cross                                        218

1    Q    Yeah.

2    A    I'm assuming -- I'm assuming Mark Patrick.

3    Q    Late December.

4    A    I'm assuming Mark Patrick.  But I don't know.

5    Q    Did you hear about a week later that Mr. Phillips called

6    your lawyer and accused her of signing this document without

7    authority from Hunter Mountain Investment Trust's authorized

8    representative, Mr. Patrick?

9    A    In hindsight, he's been in on it for a while, so --

10   Q    What do you mean, he's been in on it for a while?

11   A    I think he knows the plan Mark Patrick's been putting in

12   place for quite a while.

13   Q    But this document was signed without his knowledge or

14   consent; isn't that right?

15   A    I don't know.

16   Q    And you had to sign a new agreement with Mark Patrick as

17   the authorized representative of HMIT.  Didn't you do that,

18   sir?

19   A    I don't know.

20   Q    Okay.  Let's take a look at guess I guess probably Exhibit

21   69.  So this is an intercreditor and participation agreement.

22   Do you see that?

23   A    Yes.

24   Q    And it's dated January 10th, 2025, correct?

25   A    Yes.

Dondero - Cross                                    219

1   Q    And even though you -- even though Skyview had completed

2   this investigation in which it was alleged that Mr. Patrick

3   misused material nonpublic inside information and he had

4   terminated his relationship with Skyview, you still entered

5   into this agreement with him as the authorized representative

6   of HMIT, correct?

7   A    Those were different work streams, you know, so they were

8   -- but yes.

9          MR. PHILLIPS:  Objection.  Nonresponsive.

10         THE COURT:  Sustained.

11  BY MR. MORRIS:

12  Q    That is -- that is your signature on the last page,

13  correct?

14  A    Yeah.  I mean, --

15  Q    It's a simple question.  That's your signature, right?

16  A    Yes.

17  Q    And you understood that you were signing an agreement with

18  Mark Patrick, correct?

19  A    Yes.

20  Q    And you signed this agreement in order to avoid Mr.

21  Phillips filing a motion in this court for reconsideration of

22  an order that she signed not knowing that Hunter Mountain had

23  given its consent without authority.  Isn't that right?

24  A    No, I had no -- none of that --

25  Q    So what's your memory?  Why do you think you entered into

Dondero - Cross                                    220

1    this agreement?

2    A    Because the lawyers put it in front of me as a finished

3    product from what had been going on recently.

4    Q    And you had no understanding of what it was?

5    A    Not with the innuendo and agenda that you were describing.

6    No.  I mean, I just -- I knew what it generally involved.

7    That's it.

8    Q    But you would agree with me that you entered into an

9    agreement knowing that Mark Patrick was signing on behalf of

10   Hunter Mountain, correct?

11   A    Yes.

12   Q    I mean, it's right below your name, right?

13   A    Yes.

14   Q    You couldn't have missed it.

15   A    Yes.  That part, I'll agree with.

16   Q    Okay.  And you signed the agreement with Mark acting as

17   the authorized agent and representative of Hunter Mountain,

18   notwithstanding all of the bad acts that you supposedly were

19   aware of at the time.  Correct?

20   A    Object to aware of at the time.  They were all coming

21   together in parallel work paths.

22             THE COURT:  Okay.

23             MR. PHILLIPS:  Object.  Nonresponsive.

24             THE COURT:  Sustained.  Like I told Mr. Patrick, the

25   witness does not get to object.

1              THE WITNESS:  Okay.

2    BY MR. MORRIS:

3    Q    And just to close the loop, Mr. Dondero, you fully funded

4    The Dallas Foundation's objection, correct?

5    A    And I made additional donations so that they could pursue

6    bad actors and get their money back.

7    Q    You funded the litigation so that The Dallas Foundation

8    could pursue their objection, correct?

9    A    I made additional donations so that they could get some

10   assets back so that they could be a charity again and make

11   donations.

12   Q    Do you get a tax deduction for that donation?

13   A    Yes.

14   Q    Okay.  That's nice.

15        Let's just finish up with the Joint Official Liquidators.

16   Have you spoken to them?

17   A    I do not believe so.

18   Q    Has anybody acting on your behalf spoken with the Joint

19   Official Liquidators?

20   A    I don't know.  I think the Joint Official Liquidators are

21   an accounting firm.  I think they're Grant Thornton.  I think

22   people have spoken to the attorneys down there, but I don't

23   know -- I haven't spoken to Grant Thornton and I don't know if

24   anybody else has.

25   Q    Okay.  Did you see the letter that your counsel marked as

Dondero - Cross                               222

1  the exhibit, the one that was sent last night?

2  A   I've not heard it -- I've not read it, but I've heard you

3  guys read it today.

4  Q   Yeah.  Are you aware of the Joint Official Liquidators

5  saying at any time that they didn't believe Mark Patrick had

6  the authority to enter into the settlement agreement on behalf

7  of the HMIT entities?

8  A   I have not.

9  Q   Okay.

10          MR. MORRIS:  No further questions, Your Honor.

11          THE COURT:  All right.  Mr. Phillips?

12          MR. PHILLIPS:  Yeah.

13          THE COURT:  Wait.  What are we at timewise?

14          THE CLERK:  So their 30 minutes is over.  If you

15  intended to give them 30 minutes for Patrick and --

16          THE COURT:  Yes.  Yes.  They collectively got 30

17  minutes.

18          THE CLERK:  For both of those --

19          THE COURT:  Yes.

20          THE CLERK:  -- witnesses.  Okay.  Yes, they're out.

21          THE COURT:  How much did Mr. Morris use?

22          THE CLERK:  Well, I don't know.  I just was --

23          THE COURT:  No, no, no, no.  30 minutes for each side

24  for each Patrick and Dondero.

25          MR. MORRIS:  About eight minutes.

Dondero - Cross                        223

 1              THE CLERK:  Yes.  Mr. Morris -- I think Mr. Phillips

 2     may have asked one question, but Mr. Morris mostly -- 30

 3     minutes.

 4              THE COURT:  No.  On this witness, Phillips hadn't

 5     gone.

 6              THE CLERK:  No, not this witness.

 7              THE COURT:  Okay.  That's all I care about, this

 8     witness.

 9              THE CLERK:  I don't know this witness.

10              THE COURT:  Okay.  Do you have a question, Mr.

11     Phillips?

12              THE CLERK:  I was doing 30 minutes for the total.

13              THE COURT:  No, no, no, no, no.

14              MR. PHILLIPS:  Your Honor, I can resolve this.  I can

15     resolve this.  We have no questions.

16              THE COURT:  Okay.  Thank you.  Where are we?  Mr.

17     Lang, any redirect?

18              MR. LANG:  I'm not sure.

19              THE COURT:  Okay.

20              THE WITNESS:  The last one.

21              MR. PHILLIPS:  Your Honor, the witness is telling the

22     lawyer what question to ask.

23              THE COURT:  Okay.

24              MR. LANG:  I believe I've already asked, which is the

25     endgame.

 1          THE COURT:  Okay.  Just let's move on.  Anything

 2  else?  What was the question?

 3                      REDIRECT EXAMINATION

 4  BY MR. LANG:

 5  Q   Mr. Dondero, what are you looking to accomplish through

 6  this objection?

 7          MR. PHILLIPS:  Asked and answered.

 8          THE COURT:  Sustained.  Sustained.  He did.  He was

 9  asked and answered.

10  BY MR. LANG:

11  Q   The endgame in general.

12          MR. PHILLIPS:  Asked and answered.

13          THE COURT:  Answered and answered.  Move on.

14          THE WITNESS:  No, no.  No, I haven't.  No, I --

15          MR. PHILLIPS:  Asked and answered.  Move to strike.

16          THE COURT:  You asked him this on your direct

17  earlier.

18          MR. LANG:  I did.

19          THE WITNESS:  But, in general, regarding the --

20          MR. PHILLIPS:  Your Honor?

21          THE WITNESS:  Not just this.

22          THE COURT:  Sustained.  Ask another question.

23          MR. LANG:  I don't have any more questions.

24          THE COURT:  Okay.  I have a question.

25                   EXAMINATION BY THE COURT

Dondero - Examination by the Court          225

1          THE COURT:  Here is something that I want to

2    understand.  What I have before me is whether a settlement

3    with Hunter Mountain, a settlement between the Highland

4    entities, the Claimant Trust, the Subtrusts, and the Hunter

5    Mountain entities, seven of them, is fair and equitable, is in

6    the best interest of the estate.  If you were the director,

7    the manager, the representative of Hunter Mountain estate,

8    what would your answer be?

9          THE WITNESS:  It's not in the ZIP Code.

10         THE COURT:  It's not in the ZIP Code?

11         THE WITNESS:  Of fair.  Yes.

12         THE COURT:  Okay.  Why do you think it's not in the

13   ZIP Code of fair?

14         THE WITNESS:  Okay.  We filed in Delaware on a $100

15   million judgment.  Pachulski was our counsel.  They told us --

16         THE COURT:  I know all this.

17         THE WITNESS:  It just --

18         THE COURT:  I'm talking about the settlement in front

19   of me right now.

20         THE WITNESS:  -- we'd be in and out in three months,

21   right?  We got liquidated instead.  We got liquidated for over

22   $850 million, which not enough people talk about.  Okay?  It

23   would've been $950 million if Seery had done a good job, but

24   it was $850 million we got liquidated for.  Okay?  The POCs

25   were pumped up.  People who supposedly had no claim, all of a

Dondero - Examination by the Court                    226

1    sudden, $300 million.

2       There's $700 million missing or misallocated from the

3    estate.  Okay?  There was -- all the original creditors, all

4    the original creditors sold 99 percent of their interest for

5    $160 million.  The Farallon and Stonehill went to the beach.

6    There was enough money on the balance sheet.  Seery could have

7    given them the $160 million and tossed us the keys.  Instead,

8    he had relations, deep relations, undisclosed business

9    relationships with Farallon and Stonehill, --

10              THE COURT:  Okay.  I do want you to know --

11              THE WITNESS:  No, but --

12              THE COURT:  -- I've read all this many times.

13              THE WITNESS:  Okay.  But so -- so these --

14              THE COURT:  I promise I read every piece of paper

15   submitted.

16              THE WITNESS:  Okay.  So, so he sold the POCs to them,

17   and it's been -- they've tripled their money in two and a half

18   years.  The professional fees have been $300-odd million.

19   There's interrelationships between all the professionals --

20   Farallon, Stonehill, Grosvenor, the Hellman & Friedman guys,

21   the Millennium guys who took whatever.  All this stuff has to

22   come out.

23       We're on the edge of a giant RICO case eventually.  We're

24   -- that's -- we're on the edge of a giant RICO case.  And they

25   should not be giving up their rights for $10, $20 million.

Dondero - Examination by the Court                227

1   It's crazy for them to give up their rights at Dallas

2   Foundation for 10 or 20 million bucks.

3        There's $700 million missing.  All the original creditors

4   sold for $160 million.  The estate was sold for over $850

5   million.  Where'd all the money go?  Where'd all the money go

6   and why?  You know.

7        We get updates quarterly, once in a while, well, this much

8   went out to this law firm, this much went out to this,

9   whatever, but no one looks at the gross amount and where'd all

10  the money go?  And why?  Why did it have to -- why did it have

11  to go down like that?  Why do we have to fire --

12            THE COURT:  Okay.  I know you have an objection.

13            THE WITNESS:  -- all the employees?

14            THE COURT:  This is narrative.

15            MR. MORRIS:  Yeah.  And --

16            THE COURT:  I understand all --

17            MR. MORRIS:  -- I'm not going to cross-examine him,

18  but this is -- this is not accurate.

19            THE COURT:  I understand all of these arguments.  You

20  know, I --

21            THE WITNESS:  But I'm just --

22            THE COURT:  Your lawyers at least know, if you don't

23  know, that we wrote a 100-plus-page opinion on the motion of

24  Hunter Mountain to sue for all of this.  Okay?  So I promise

25  I've heard this and looked at it.  But right now, Hunter

Dondero - Examination by the Court                228

1   Mountain, through Mark Patrick, you question his authority,

2   but they are ready to lay down their swords and not pursue

3   that motion for leave to sue based on the claims trading, and

4   --

5           THE WITNESS:  Have you seen all the insider trading,

6   Farallon, Stonehill?  Have you seen the trading and claims on

7   insider information?  Have you seen all that stuff?

8           THE COURT:  I've seen the allegations but I --

9           THE WITNESS:  Well, why would you release all those

10  people right now before the RICO?

11          THE COURT:  So I -- Dugaboy -- you've been asked what

12  is your goal?  Dugaboy a .18 limited partnership interest --

13          THE WITNESS:  Correct.

14          THE COURT:  -- that is subordinated to Hunter

15  Mountain.  I'm just trying to understand the scenario where it

16  makes sense to keep fighting for years to come.

17          THE WITNESS:  Well, RICO transcends this, right?  I

18  mean, RICO brings everybody in.  Until we get --

19          THE COURT:  Okay.  You think it's -- and my question,

20  why is this not fair and equitable and in the best interest of

21  the estate, you think it's better to litigate several more

22  years and maybe have a chance, you know, --

23          THE WITNESS:  At $600 mill.  At $600 million.

24          THE COURT:  -- Hunter Mountain would have a chance to

25  --

Dondero - Examination by the Court          229

1          THE WITNESS:  $600 million.  Yes.

2          THE COURT:  Okay.

3          THE WITNESS:  Versus $20 million now.  But you have

4   to remember, it's all part of -- you have to pay attention to

5   this Mark Patrick stuff.

6          MR. PHILLIPS:  Your Honor?

7          THE COURT:  Okay.  Yes.  I asked my question.  I'm

8   trying to understand why Dugaboy, why its position is this is

9   not fair and equitable and in the best interest and in the

10  range of reasonableness.  Those are the buzz words that a

11  judge has to focus on.

12         THE WITNESS:  It's not fair to the charities.  I

13  still think no one's ever seen --

14         THE COURT:  The charities aren't parties here.

15         THE WITNESS:  Not yet.  Give them a little time.

16  They just heard about the settlement yesterday.

17         THE COURT:  Well, isn't that what the Cayman Islands

18  is all about?  What I do doesn't necessarily affect what's

19  happening there.

20         THE WITNESS:  Well, no, but you're saying they're not

21  here today.  If you delayed this three weeks, they'd be here.

22  It's just a couple --

23         THE COURT:  They were here and they chose to

24  withdraw.

25         THE WITNESS:  One.  One.  Just one charity.  But the

Dondero - Examination by the Court          230

1   others, if you give them some time, they'll be here.

2          THE COURT:  Okay.  Okay.  I think you've answered my

3   question, your theory of how this should play out and how you

4   want it to play out.  Okay.  All right.

5          THE WITNESS:  Thank you.

6          THE COURT:  That's all.  Thank you.

7          THE WITNESS:  Thank you for the time.

8          THE COURT:  Uh-huh.

9       (The witness steps down.)

10          THE COURT:  All right.  I think that concludes our

11   evidence, correct?

12          MR. YORK:  Yes, Your Honor.  At least from

13   Daugherty and --

14          THE COURT:  Okay.  The Objectors rest.  Any rebuttal?

15          MR. PHILLIPS:  No, Your Honor.

16          THE COURT:  Okay.

17          MR. YORK:  Your Honor, would it be okay if we took a

18   five-minute comfort break?

19          THE COURT:  Yes.  We may as well turn it into a 10-

20   minute break because that's what's going to happen.  All

21   right.  We'll be back at 3:40.

22          THE CLERK:  All rise.

23       (A recess ensued from 3:30 p.m. until 3:44 p.m.)

24          THE CLERK:  All rise.

25          THE COURT:  Please be seated.  We're back on the

1    record in Highland Capital.  I will hear closing arguments.

2    And I dangled something out there before lunch and I've never

3    heard any follow-up.  I guess no agreement with Daugherty

4    could be reached on the reserve?

5            MR. YORK:  Haven't had that conversation, Your Honor.

6            THE COURT:  You didn't have that conversation?  Oh,

7    well.  Why didn't you have that conversation?

8            MR. YORK:  We were, during the lunch break, working

9    busily to prepare the rebuttal to Mr. Seery's testimony, --

10           MR. MORRIS:  Yeah.

11           MR. YORK:  -- Your Honor.  And so --

12           THE COURT:  Okay.  You told me you'd talk about it.

13           MR. MORRIS:  May I proceed, Your Honor?

14           THE COURT:  I guess I don't matter.  Do I not matter

15    when I suggest something like that?

16        Okay.  Go ahead.

17        CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

18           MR. MORRIS:  Good afternoon, Your Honor.  John

19    Morris; Pachulski, Stang, Ziehl & Jones; for Highland Capital

20    Management, LP and the Highland Claimant Trust and on behalf

21    of the Highland Litigation Subtrust.

22        I know that we've got Bob Loigman in the courtroom, but I

23    know that -- at least I hope he joins me in this closing

24    argument.  I suspect he does.

25        I don't want to be too long here, Your Honor.  We don't

1   have a high burden.  This is a 9019 motion, for goodness'

2   sakes.  I've never been involved in such a contentious 9019

3   motion in my life.  We had three depositions on Friday.  We

4   had two on Sunday.  I think we had two on Monday.  For a 9019,

5   I've had one witness sit multiple times.

6       It's been an extraordinary experience.  But at the end of

7   the day, nobody's really challenging the settlement agreement.

8   You've got people challenging, you know, the Cayman Islands.

9   You've got people challenging, is it -- you know, can you jam

10  it in under the plan?  We're not jamming anything under the

11  plan.  We're following the plan provisions.

12      Nobody's challenging the bona fides of the motion.  Nobody

13  is challenging whether it's the product of good-faith, arm's-

14  length negotiations.

15      You heard Mr. Seery testify at length about the process.

16  You've got 55 different documents in the record proving that

17  this agreement is the product of arm's-length, good-faith

18  negotiations between parties represented by sophisticated

19  counsel that resulted from an exchange of information, an

20  exchange of proposals, back and forth, and here we are.

21      It's also in the best interests of the estate.  Really not

22  challenged by anybody.  Nobody is contending that Highland is

23  getting a raw deal here.  Nobody.  And the proof that Highland

24  is getting fair consideration and that this settlement is in

25  the best interest of the Claimant Trust and its stakeholders,

1    it's obvious we are terminating costly, wasteful, and I dare

2    say frivolous litigation.  We are disposing of several

3    illiquid assets.  We are getting litigation protections that

4    will inure to the benefit of the released parties, the

5    Highland release parties and it will, we believe, provide the

6    protection that we deserve.

7        It's not just releases.  It's covenants not to sue.  It's

8    all kinds of bells and whistles in there.  Substantial

9    benefits to the estate.  And so nobody's really objecting to

10   that.

11       Nobody's really objecting to the fairness of the

12   settlement to the HMIT parties except for Mr. Dondero, and

13   he's just mad that peace is breaking out.  He's just mad

14   because he's not going to be able to litigate anymore.  It's

15   not relevant to a 9019 motion.  But even if it was, it's

16   ridiculous.  It's just ridiculous.

17       The settlement is fair and reasonable and in the best

18   interest of the creditors.  It's the product of good-faith,

19   arm's-length negotiations.  And on that alone, it should be

20   approved.

21       We've had a lot of testimony today about Mark Patrick's

22   authority.  The only actual evidence that concerns Mark

23   Patrick's authority are the exhibits in the binder and Jim

24   Seery's testimony about the diligence that he did.  And the

25   exhibits in the binder all prove that Mark Patrick has the

1   authority to act and bind the HMIT entities to the settlement

2   agreement.  It's Paragraph 7 of the HMIT trust agreement

3   itself.

4        Did the objecting parties point you to one single document

5   to support their speculative argument, because it's not

6   anything more than that, that somehow Mark Patrick isn't

7   authorized to do this?  There is not a scintilla of evidence

8   that Mark Patrick is not authorized to do this.

9        And if Your Honor had any concerns about Mr. Patrick, I

10  think he answered them at the end.  That he understood exactly

11  what the terms of the agreement are.  That he had a reasonable

12  opportunity to consult with counsel and to negotiate.  That he

13  knows exactly what he's doing on behalf of these entities.

14  That he believes the best path forward from the HMIT entities

15  is to grab the value today instead of letting it waste.

16       We welcome Mr. Patrick to the table.  It makes a lot of

17  sense.  We've been trying to get to this point forever.

18       Mr. Daugherty.  You know, I have no gripes with Mr.

19  Daugherty.  I don't know quite what's motivating him these

20  days, but he admitted and the evidence is clear that when he

21  was a Class 9 claim holder, I forget if it's two or three or

22  four occasions, he accepted $3.7 million in multiple payments,

23  without any concern at all as to whether or not it violated

24  the plan, even though his Class 8 claim had remained

25  unresolved.

1    He didn't send the money back.  He didn't say, Mr. Seery,

2    you can't do this because it violates the plan.  He knowingly

3    and willingly accepted the benefits of being a Class 9 claim

4    holder.  And now he comes and objects on the basis that

5    somehow it's not fair to him as a Class 8 holder?  This is

6    what we call estoppel.  Right?

7        I wasn't in a position to really make the argument because

8    I didn't quite understand it until today.  Like, how does he

9    come in today and say you can't do this, Your Honor?  You

10   can't allow Class 9 and 10 to get a nickel until he's done,

11   when he himself has accepted millions of dollars before his

12   claim is resolved?  That doesn't sound right to me.  And I

13   don't think the Court should accept that argument.

14       Just quickly, because I don't want to give it any weight,

15   frankly, but this whole business of the Cayman Islands and the

16   JOLs, the only facts Your Honor has to take into account are

17   that they were appointed before this motion was filed.

18   They've never appeared here.  They've never objected.  And

19   there is no evidence in the record to suggest, let alone to

20   prove, that the JOLs contend that Mark Patrick does not have

21   the authority to enter into the settlement on behalf of the

22   HMIT entities.  There's no evidence of any kind.

23       What you need to know and need to remember, though, is

24   that whole proceeding in the Cayman Islands is being brought

25   on behalf of not The Kansas City Foundation or The Dallas

1   Foundation, but The Highland Kansas City Foundation, The

2   Highland Dallas.  It's Mr. Dondero, and he's funding it, and

3   it says it in Paragraph I think 47 or 48 of his declaration.

4   He's funding all of that.  And he funded The Dallas

5   Foundation's objection here.

6        And that's why he's upset, because they settled last night

7   without telling him because they didn't want any part of this,

8   Your Honor.  That's the truth.  That's why they're not here.

9   And they, right, they're the people who suggested that maybe

10  something untoward happened and maybe someday -- because this

11  is the way their objection is characterized.  Complete

12  speculation.

13       If you go back and look at the objection, it's someday,

14  somebody might do something and might someday set it aside.

15  That wasn't a proper basis at the time, but we know that Mark

16  Patrick remains in control of the HMIT entities today because

17  nobody has told the Court otherwise.  And we know that The

18  Dallas Foundation has withdrawn its objection.  As I asked Mr.

19  Patrick, have you been, you know, removed or clipped or

20  terminated or in any way restricted in your capacity as the

21  Administrator and control person of the HMIT entities as a

22  result of the settlement, and the answer was no.

23       There's nothing to see here, Your Honor, except the

24  opportunity for the Highland Claimant Trust and its affiliated

25  entities in moving this case forward in an enormously positive

1  and constructive direction.

2       We have the opportunity today to put to rest a lot of

3  pending litigation.  We have the opportunity today to put to

4  rest a lot of future potential litigation that undoubtedly

5  would have come to pass had these entities remained under the

6  indirect control of Mr. Dondero, because we know that that was

7  the case.

8       If you remember, Your Honor, we sat here two years ago,

9  June 8th, 2023, on the evidentiary hearing on Hunter

10  Mountain's motion for leave to bring the claims trading case.

11  And if Your Honor will remember, Mr. Patrick at that time was

12  forced to admit that the entirety of that case came in from

13  Mr. Dondero, that he had no knowledge of any facts that

14  related to anything.

15       I would ask Your Honor to go and compare The Dallas

16  Foundation's objection with Mr. Dondero's declaration that he

17  filed in the Cayman Islands.  I'm not going to say they're

18  verbatim, but they are largely, largely the same.  This is

19  just Jim Dondero being Jim Dondero, and that is not a basis to

20  overrule or deny the motion under Rule 9019.

21       It's a product of good faith negotiations, it is clearly

22  in the best interests of the estate, and we respectfully

23  request that as soon as possible Your Honor grant motion.

24            THE COURT:  Okay.

25            MR. MORRIS:  Thank you, Your Honor.

1          THE COURT:  Any closing from the Movant, Co-Movant?

2          MR. PHILLIPS:  Your Honor, thank you very much.

3   Louis M. Phillips on behalf of the --

4          THE COURT:  I don't know if you're the Co-Movant.

5   You're a party to the proposed settlement.

6          MR. PHILLIPS:  I'm not a Co-Movant.

7          THE COURT:  Okay.

8          MR. PHILLIPS:  I'm a party to the settlement.

9          THE COURT:  Uh-huh.

10         MR. PHILLIPS:  I didn't quite make it to that status

11   to be a Co-Movant.

12     CLOSING ARGUMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

13         MR. PHILLIPS:  But anyway, we appreciate the Court's

14   time.  We appreciate the Court's attention.  This was, as the

15   evidence established, we provided and were provided an immense

16   amount of information.

17      Much of the information, certainly the information about

18   Mr. Patrick's control of the HMIT entities, was provided by

19   us.  It was reviewed by Mr. Seery.  And Mr. Seery made a very

20   strong case for the amount of diligence he did on our side of

21   the equation.  It's not nearly as relevant to Your Honor's

22   decision about whether to approve the settlement whether we

23   got a good deal or not, but the deal we got, we think, is very

24   fair.

25      The deal we got was negotiated with counsel, with

1    businesspeople who are very sophisticated.  We have agreed on

2    the methodology and of the calculation of our Class 10 claim.

3    The Debtor and the Debtor estate or the Claimant Trust or

4    whoever held the HMIT note got full value for the HMIT note.

5    Any additional value from the HMIT note would come back to

6    HMIT.  The Kirschner Litigation would be for the benefit of

7    HMIT.  The Dugaboy Note would be for the benefit of HMIT.

8         All of that is being put into a package and is being

9    resolved, affiliated, administered in a very effective and

10   efficient manner.  We are getting some money.  We appreciate.

11   We tried to get more.  We couldn't.  They tried to pay less.

12   We made a deal.

13        So, Your Honor, I echo and thank Mr. Morris for all of his

14   comments.  I appreciate counsel being involved here today.  We

15   think this is a fair and equitable settlement.  There is no

16   question under 9019 that this settlement should be approved.

17   And the suggestion that this Court should allow itself to just

18   be a vehicle for continued litigation, when we have analyzed

19   it, perhaps from a different perspective, and made the

20   decision that it is time to make our deal now, it is time to

21   take HMIT out of the litigation picture and into the fold of a

22   party in interest of a fixed claim with fixed treatment that's

23   different from the plan, authorized by the plan.  And we

24   appreciate it.

25        Thank you, Your Honor.

 1              THE COURT:  Thank you.  All right.  Mr. Loigman, we

 2    didn't mean to ignore you.

 3       CLOSING ARGUMENT ON BEHALF OF MARC S. KIRSCHNER, LITIGATION

 4                           TRUSTEE

 5              MR. LOIGMAN:  Thank you, Your Honor.  Robert Loigman,

 6    Quinn Emanuel.  You didn't ignore me.  Louis was just quicker

 7    to jump up than I was.

 8         And I step up solely because you asked whether the Co-

 9    Movant had anything to add.  And we have nothing further to

10    add to what Mr. Morris said.  We agree with it wholly.  We

11    think this is a fair and complete settlement, and we would ask

12    that the Court approve the settlement under the 9019 motion.

13              THE COURT:  Thank you.

14              MR. LOIGMAN:  Thank You, Your Honor.

15              THE COURT:  All right.  The Objectors?

16              MR. MORRIS:  Your Honor?

17              THE COURT:  Oh.

18              MR. MORRIS:  Just to clarify, the motion was made

19    under 9019 and Section 363.  I just don't want that to get

20    lost.  That's all.

21              THE COURT:  Okay.  363, use of property.  Okay.

22         The Objectors?

23            CLOSING ARGUMENT ON BEHALF OF PATRICK DAUGHERTY

24              MR. YORK:  Thank you, Your Honor.  I'll be very

25    brief.

1     I certainly appreciate that the Court desires to have this

2  bankruptcy wrapped up, given how long it's gone on now, for

3  six -- approximately six years in this court.  The fact of the

4  matter is that the settlement agreement that Highland proposes

5  to enter into with Hunter Mountain Investment Trust entities

6  violates the express terms of the plan, the confirmation

7  order, and the Claimant Trust Agreement.

8     And they have not pointed to any language in there or to

9  argue otherwise.  Their only argument has been that they've

10  set a reserve aside.  And there's no provision in any of those

11  documents that provides that that's an excuse for them to

12  violate the express terms of the confirmation order, the plan,

13  or the Claimant Trust Agreement, including specifically the

14  language that Class 10 claims are not to receive or retain

15  anything under the plan on account of their interest unless

16  and until the Class 8 and Class 9 claims are paid in full plus

17  applicable interest.  And --

18          THE COURT:  I really want to understand that

19  argument.  Mr. Seery correctly testified that, pretty much in

20  every Chapter 11 plan we see, there's a disputed claim

21  reserve.  Well, I guess unless we have really unsophisticated

22  creditors who don't insist on that.  But we had sophisticated

23  creditors.  So why doesn't that mechanism, which I would call

24  tried and true, we see it in most cases, why doesn't that

25  resolve this issue you're raising?

1             MR. YORK:  Well, --

2             THE COURT:  And I focused in more than maybe I needed

3     to about the nature of Mr. Daugherty's remaining claim, his

4     Class 8 claim.  What was the scope?  What's the maximum amount

5     it could be?  When might it be resolved?  Because I think we

6     have a tried-and-true mechanism that addresses his concerns.

7     Tell me why it doesn't.

8             MR. YORK:  Well, --

9             THE COURT:  Really, I want to understand what you

10    think I'm missing.

11            MR. YORK:  Well, so I think twofold, Your Honor.  The

12    first is that the dispute reserve that exists normally would

13    be for whatever the amount of the disputed claim is.  And here

14    we're dealing with, as both sides have acknowledged, a claim

15    that they at best could estimate, but they don't know for

16    certain, given all of the machinations that could come out of

17    the IRS audit.

18        And secondly, specifically with respect to the

19    confirmation order, if it had said that the net 10 and 11

20    claims could be paid as long as the allowed 8 and 9 claims

21    were paid, then the dispute reserve would provide that

22    protection.  But that's not what the language in the

23    confirmation order says.  It says claims, not allowed claims.

24    And therefore it's referring to all claims, including disputed

25    claims.  And --

1          THE COURT:  But we have a disputed claim reserve.

2   Okay.  We have a disputed claim reserve.

3          MR. YORK:  There is, yes, there is a reserve.

4          THE COURT:  So is it your argument that I can't

5   approve a settlement like this until Mr. Daugherty's claim has

6   been resolved with certainty, which might be in 2033 or

7   whatever?  I can't keep a bankruptcy estate open, allowing

8   administrative expenses to continue to accrue, because of one

9   contingent unliquidated claim that may never even develop.

10         MR. YORK:  Your Honor, I appreciate the Court's

11  frustration with that, but that's the way that the documents

12  are written in terms of the confirmation order.  And so it's

13  an --

14         THE COURT:  So the disputed claim reserve is

15  meaningless?

16         MR. YORK:  No, it is not -- a disputed claim reserve

17  exists, but it does not, under the terms of the confirmation

18  order, in terms of allowing the payment of Class 10 and Class

19  11 claims, those can't be done until the Class 8 claims are

20  resolved.

21         THE COURT:  You would have -- just a moment -- you

22  would have me keep this estate open for as long as it takes,

23  2033, whatever, without allowing Class 10 and Class 11

24  theoretically to get anything?

25         MR. YORK:  At least under --

1          THE COURT:  Let's just let the -- with all respect to

2     Mr. Seery, he's charging a handsome amount.  It was agreed to

3     or approved by the Court.  Let's just let him continue

4     accruing until 2033 because of Mr. Daugherty's prospect of the

5     IRS saying you owe $1.4 million plus interest and penalties,

6     when he's gotten the use of that all?  Help me.  This doesn't

7     make sense to me.

8          MR. YORK:  Sure.  One way this could be solved is

9     that the payments to -- the cash payments, for example, that

10    are to be made to the HMIT entities, under the proposed

11    settlement could be held in abeyance until the resolution of

12    the Class 8 claim.  The Court could modify the proposed

13    settlement based on that.  That's one way to deal with the

14    issue, for example.

15         THE COURT:  Do what?  Hold it in abeyance?

16         MR. YORK:  Yes.  For -- the payments to be made to

17    the Hunter Mountain Investment Trust under the proposed

18    settlement could be -- could be done in accordance with the

19    terms of the confirmation order.  We'll just hold those

20    payments until such time.

21         THE COURT:  We who?  Put it in the Court Registry?

22         MR. YORK:  Or --

23         THE COURT:  Where it will earn 0.18 percent?

24         MR. YORK:  No.  No.  It can remain within the

25    Claimant Trust until the time at which the Class 8 claim is

 1   finally and fully resolved.

 2          THE COURT:  Okay.  Meanwhile, I've approved the

 3   extension of the Trusts for one year, with Dugaboy saying, we

 4   don't think this should happen again and again and again.  We

 5   reserve our rights.  That's not a good solution.

 6          MR. YORK:  Your Honor, I understand the Court's

 7   frustration, but this is the terms of the plan and the

 8   confirmation order that were entered.  Highland needs to

 9   follow it.

10          THE COURT:  Okay.  What about the estoppel argument

11   that I heard Mr. Morris make?

12          MR. YORK:  Well, sure.  So, the first time they raise

13   it is here today.  And the one thing that -- the difference is

14   that allowing this settlement to go forward is an effective

15   liquidation of the estate versus where things are now, in

16   which any payments that were made is not an effective

17   liquidation.  It doesn't expose anyone that would have

18   priority to Class 10 with respect to anything that happens in

19   the future from, you know, not having sufficient funds to deal

20   with it.  That's all.

21          THE COURT:  Okay.

22          MR. YORK:  Thank you, Your Honor.

23          THE COURT:  Thank you.  All right.  Mr. Lang?

24      CLOSING ARGUMENT ON BEHALF OF DUGABOY INVESTMENT TRUST

25          MR. LANG:  I'll be brief.  Your Honor, there are

1  three issues that we've raised.  One is the capital account

2  balance being used for the claim for the Class 10 holders.

3  The plan does not specify that the capital account balance is

4  to be used.  Allowing the $336 million claim to Class 10

5  ensures that Class 11 will not ever receive a dime.  That's

6  guaranteed.

7      Alternatively, upon the satisfaction of the Class 9, the

8  $20 million approximately owed to Class 9, the holders of HMIT

9  should receive 99.5 percent of the total residual.  We think

10  that would be a more fair outcome to the Class 11 claimants.

11          THE COURT:  Wait, say again?

12          MR. LANG:  That, so, of total assets, $70 million

13  approximately, $20 million is owed to Class 9.

14          THE COURT:  Uh-huh.

15          MR. LANG:  Of the remainder from that, HMIT should

16  receive 99.5 percent of those assets, whatever they are, the

17  value, rather than a $336 million claim.  That was the

18  objection.

19          THE COURT:  But I didn't get any evidence of a

20  separate way of competing -- of doing that.  I heard credible

21  testimony from Mr. Seery about why he used the math he used

22  and I didn't hear any countervailing evidence of, wait, this

23  is a more fair, realistic way of computing it.  And what I did

24  hear is the .5 percent limited partnership interest of Dugaboy

25  is subordinated in its payment rights under the limited

1   partnership agreement of Highland.

2        MR. LANG:  It's subordinated under the plan, but yes,

3   the plan does not say to use --

4        THE COURT:  Under the partnership agreement is the

5   reason the plan did it, is what I've been presented.

6        MR. LANG:  I believe Mr. Seery -- and I could be

7   wrong -- I think I heard him say that he has used the other

8   method, but I could have misheard him in the testimony.

9        THE COURT:  Well, that's not what I heard.  I heard

10   him emphasizing the fact that the Class 8 interests, including

11   that of Dugaboy, are subordinated with regard to payment

12   rights under the Highland partnership agreement.  And so

13   that's why he didn't think it made sense to just apply

14   percentages.

15        MR. LANG:  That's what he testified to.

16        THE COURT:  So I'm just -- anyway, I'm just trying to

17   figure out what the countervailing evidence is here to suggest

18   his methodology is wrong.

19        MR. LANG:  I believe the partner -- or, the plan says

20   that the Class 10, when the GUC certification is a Class 10,

21   and the Class 11 received pro rata, it doesn't specify the

22   account balance is to be used as the number to determine what

23   they receive.

24        THE COURT:  Okay.  You want to point out what you are

25   focused on?

1          MR. LANG:  I believe it's under Treatment.

2          THE COURT:  Okay.

3          MR. LANG:  Section --

4          THE COURT:  I don't want to hunt.  I want you to tell

5    me what the language is that you think is supportive of that.

6          MR. LANG:  And the second -- I guess the secondary

7    issue that we probably should just get to is the release.  We

8    think it's broad, and just Dugaboy and Dondero are carved out.

9    And Mr. Morris did send me a proposal last -- yesterday

10   evening that I haven't gotten to.  But that is an objection

11   that we have, is just to make sure that the -- that nobody can

12   argue that the release covers any claim Dugaboy might have, if

13   any.

14         THE COURT:  Okay.  I think many hours ago I remember

15   this being mentioned.  I guess it was a little bit more broad

16   than just -- I think it was Highland employees.  I don't know.

17      What is the agreement, Mr. Morris, if you're awake there,

18   on --

19         MR. MORRIS:  I am awake, Your Honor.  Apologies.

20         THE COURT:  Okay.  I didn't mean to be flippant.

21         MR. MORRIS:  Yeah.

22         THE COURT:  I get punchy and --

23         MR. MORRIS:  That's okay.  With respect to the

24   release?

25         THE COURT:  Right.

1          MR. MORRIS:  We don't have an agreement.  We have an

2   agreement -- well, I sent a proposal last night, but it didn't

3   get responded to.  If they want to accept that proposal,

4   that's terrific.

5          THE COURT:  Okay.  I don't know what the agreement

6   says.  Are you saying you want to accept what they proposed

7   last night?

8          MR. LANG:  No, I have edits to it.  I just couldn't

9   --  I was tied up on another filing last night.  I have not

10  been able to get to it today.

11         THE COURT:  Okay.  I'm going to make a ruling today.

12  Okay?  If it means y'all sit here in the courtroom a while,

13  fine.  But just like all of you, I have a mountain of other

14  stuff waiting for me, so I really want to rule today.  So, --

15         MR. LANG:  Understood.

16         THE COURT:  Yeah.

17         MR. LANG:  Maybe we can work on it as soon as I'm

18  done and I can get back to 'em --

19         THE COURT:  Okay.

20         MR. LANG:  -- and get back to you.

21     Your Honor, the -- it's on Page 23 of the plan.  It talks

22  about the Class 10 and Class 11, where the partnership

23  interests, that their treatment, they shall receive as pro

24  rata share of the contingent Claimant Trust interests.  And

25  all we're asking is that be used or applied as a 99.5/.5

1   distribution.

2        (Pause.)

3            THE COURT:  I'm sorry.  Go ahead.

4            MR. LANG:  Oh, sorry.  I thought you were looking for

5   it.

6        And the last issue is authority.  The only point of the

7   authority argument, Your Honor, is that the Joint

8   Administrators were appointed down in the Caymans to

9   investigate the transaction that moved basically the entire

10  ownership, because it's owned a hundred percent down to HMIT,

11  out.  They're investigating the transactions.  They have not

12  stipulated to authority.  They're looking at everything.

13  They've requested a 45-day delay on this motion.  And that's

14  all that -- not even asking to deny the 9019.  They were just

15  asking time to basically bless this transaction so that nobody

16  could come back and make an issue of it.  But I understand

17  your desire to rule today.

18            THE COURT:  Okay.  Any rebuttal?

19            MR. MORRIS:  Yeah, briefly, Your Honor.

20     REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

21            MR. MORRIS:  I just want to point the Court to two

22  provisions of the operative documents that I think --

23            THE COURT:  Okay.

24            MR. MORRIS:  -- will resolve even further the issues

25  that we've presented today.

1      The Claimant Trust Agreement -- and I apologize, I don't

2    know if the whole document is in evidence, but I will

3    respectfully suggest to the Court that the Claimant Trust

4    Agreement provides in Article 5, Section 5.1(c), --

5              THE COURT:  Okay.  Let me catch up.

6              MR. MORRIS:  Yes.

7          (Counsel confer.)

8              THE COURT:  It's not Debtor's Exhibit 5.

9              MR. MORRIS:  Yeah.

10             THE COURT:  Daugherty's Exhibit 5?

11             MR. MORRIS:  It's Daugherty Exhibit 5?

12             MR. YORK:  Yes.

13             THE COURT:  Okay.

14             MR. YORK:  So we have a full copy at Daugherty --

15             THE COURT:  I've got it.  Daugherty's Exhibit 5.

16             MR. MORRIS:  Okay.  So if you could just go to Page

17   27, Your Honor.  And this is in response to Mr. Lang's

18   argument about the calculation of the allowed claim.  You'll

19   see it deals with contingent trust interests.  And the very

20   last sentence says the equity trust --

21             THE COURT:  Wait.  What page again?

22             MR. MORRIS:  27.

23             THE COURT:  Okay.

24             MR. MORRIS:  Do you see Section C in the middle is

25   Contingent Trust Interests?

1          THE COURT:  No.

2          THE CLERK:  It's 26 of the Claimant Trust Agreement,

3     27 of the --

4          THE COURT:  Ah, it's 26.  Yes.  On the bottom, it's

5     26; on the top, it's 27 of 38.

6          MR. MORRIS:  Okay.

7          THE COURT:  Okay.

8          MR. MORRIS:  And at the end of Section C, it says

9     explicitly:  The equity trust interests distributed to allowed

10    holders of Class A limited partnership interests -- that's

11    Dugaboy --

12         THE COURT:  Uh-huh.

13         MR. MORRIS:  -- shall be subordinated to the equity

14    interests distributed to the allowed holders of Class B and C.

15    That's Hunter Mountain.  Okay?

16         So the trust agreement provides for exactly what we're

17    doing here.  Dugaboy is in fact subordinated to HMIT.  It

18    doesn't get paid until HMIT gets paid in full.  And Mr. Seery

19    I think compellingly testified as to the reasonable

20    calculation that he did based on very objective numbers to

21    determine each respective limited partner's capital account.

22         With respect to Mr. Daugherty, the plan, which is on the

23    docket at 1943, has a definition of Disputed Claim Reserve.

24    And it states, among other things, that the amount of the

25    disputed claim upon which the disputed claim --

1            THE COURT:  Give me the page number.

2            MR. MORRIS:  I apologize, Your Honor.

3            THE COURT:  I've got it right in front of me.

4            MR. MORRIS:  It's Page 7 of the plan.

5            THE COURT:  Okay.  All right.  I'm there.  The

6  Defined Term.

7            MR. MORRIS:  So the Defined Term "Disputed Claim,

8  Claims Reserve Amount" in the middle says:  The amount of the

9  disputed claim upon which the disputed claims reserve is

10 calculated shall be -- they've got an A and then a B -- the

11 amount agreed to by the holder of the disputed claim and the

12 Claimant Trustee or Reorganized Debtor, as applicable.  And

13 then it says D:  Or is otherwise ordered by the Bankruptcy

14 Court, including an estimated -- an order estimating the

15 disputed claim.

16      And that last provision is vital, Your Honor, because that

17 is the hook upon which you can always hang your hat when you

18 decide that we are not going to wait until 2023 [sic] when the

19 IRS audit may be resolved, because you have the ability, as

20 ordered by the Bankruptcy Court, including estimating the

21 amount of the disputed claim.  Which is one of the causes of

22 action that we've asserted in the complaint.  It's either to

23 subordinate -- actually, it's to disallow, to subordinate, or

24 to estimate.  Because this case does have to end, Your Honor.

25 We actually think he should be bound by the definition in B.

1   It is an agreed-upon amount.

2       I've heard the testimony from Mr. Daugherty that there was

3   no negotiation, but he didn't deny that he signed a document

4   that is called an agreement that sets forth the disputed claim

5   amount.  And that is an agreement, and I think that satisfies

6   that definition.  And even if it didn't, at some point this

7   case has to end.

8       Thank you, Your Honor.

9           THE COURT:  Okay.  Thank you.

10      All right.  Well, it's been a long day and even a longer

11  case.  I think a lot of people were on the receiving end of a

12  little bit of my grumpiness at times today, and I apologize

13  for that.

14      I always feel compelled to say to the lawyers and parties

15  when I rule from the bench that I can assure you it's not

16  knee-jerk.  I can assure you my law clerk and I have read

17  every piece of paper submitted.  And we come in here I think

18  well-prepared and we just want to listen to the evidence to

19  see if it supports -- who it supports.  So I am going to rule

20  from the bench.

21      I first want to make clear that with regard to the motion

22  before the Court, the motion which was filed May 19th at

23  Docket Entry 4216, pursuant to Bankruptcy Rule 9019 and

24  Bankruptcy Code Section 363, the Court is being asked to

25  approve a very broad settlement that is between what are

1  defined as the HMIT entities, seven entities in all; Hunter

2  Mountain Investment Trust; as well as Beacon Mountain, LLC;

3  Rand Advisors, LLC; Rand PE Fund 1, LP; Rand PE Fund

4  Management, LLC; Atlas IDF, LP; and Atlas IDF GP, PLLC.  So

5  this proposed compromise and settlement is between all of

6  those Hunter Mountain entities as well as the Reorganized

7  Debtor, the Highland Claimant Trust, the Highland Litigation

8  Subtrust, and the Highland Indemnity Trust.

9      I first will note that notice has been fulsome, reasonable

10  under the circumstances, to provide due process to anyone

11  affected by the proposed compromise.

12      The Court would note that the legal standard is a very

13  well-known and established legal standard here.  Among other

14  things, the Court is to look at whether the settlement is

15  fair, reasonable, and in the best interest of the estate;

16  whether it would appear reasonable business judgment has been

17  exercised; is the compromise and settlement within the range

18  of reasonableness?

19      And this involves looking at, among other things, the

20  probability of success in the litigation -- that would be all

21  the various litigation involving HMIT, if it were to go

22  forward; the complexity and likely duration of further

23  litigation and attendant expense, inconvenience, and delay;

24  and all other factors bearing on the wisdom of the compromise.

25  We know that's *Cajun Electric*, *Jackson Brewing*, *Foster*

1   *Mortgage*, among other cases.  I probably left out *AWECO*.

2        Anyway, applying all of those legal standards here, I do

3   think the evidence was very thorough in showing that the

4   compromise is a product of good faith and arm's-length

5   negotiations.  Indeed, it was almost shocking to this Court

6   when I saw the motion, having the history I have with all of

7   the contested issues, adversary proceedings that have

8   transpired over the past few years between Hunter Mountain and

9   the Debtor.

10       I do think the evidence is that it's fair and equitable

11  and in the best interest of the estate and within the range of

12  reasonableness, given due regard for all of the expense,

13  delay, and likelihood of success.

14       I'll just briefly recount that, as noted early today,

15  there was an Exhibit B attached to the 9019 motion that listed

16  nine unresolved pending pieces of litigation that the Highland

17  entities are embroiled in.  Two of those are now gone.  This

18  was filed May 8th, and as of January 25th, they're gone.  So

19  seven pieces of litigation, of which two will go entirely away

20  if I approve this settlement.  The Kirschner adversary claims

21  against Hunter Mountain will go away.

22       We have very little, very little, relatively speaking,

23  left in this bankruptcy case to resolve if I approve this

24  settlement.  That alone is very, very significant.  Again, we

25  have large shall I say issues with Hunter Mountain.  Highland

1  says Hunter Mountain owes the Highland entities something like

2  $57.69 million on a note that Hunter Mountain is payor on

3  dated December 21st, 2015.

4      The flip side of that is that Hunter Mountain was sued by

5  Kirschner in the Kirschner action on various claims, including

6  this $57 million note.  We have had Hunter Mountain file

7  multiple motions for leave to sue Highland, the Claimant

8  Trust, Mr. Seery.  And those have been denied, but are in

9  appeal status or remand status or some further litigation

10  status.

11      And again, we have numerous issues.  Hunter Mountain

12  having sought valuation.  The Court denied that.  It's on

13  appeal.

14      So, so much goes away, so much further litigation goes

15  away and we make a monumental step in ending this long-running

16  case if I approve this settlement.

17      Now, on the flip side of this, I know that Dugaboy,

18  through the voice of Mr. Dondero today, expressed that Hunter

19  Mountain is, I forget the words he used, but not -- this isn't

20  close to being fair and equitable as far as he was concerned

21  for Hunter Mountain.  That Hunter Mountain, in addition to

22  being through with litigation in this bankruptcy-land, would

23  be paid $500,000 within five days.  They would also be paid

24  separately $10 million as an initial distribution, with the

25  hope of two more $6.5 million distributions in '27 and '28.

1   And it would get a note, which I think has $24 million -- I

2   think it was less than that, $17 or $18 million left on it,

3   perhaps, on which Dugaboy is a maker.  The debtor is one of

4   the two payees.  The Debtor gives up its rights in that note.

5       It looks like Hunter Mountain is getting a lot.  And

6   again, the way this estate has been liquidated, there is money

7   that can flow to it as a Class 10 equity here, as the evidence

8   has shown.

9       So I am approving the settlement.  I am specifically

10  overruling the remaining objections of both Dugaboy and Mr.

11  Daugherty.

12      As far as Mr. Daugherty's argument that the settlement

13  violates the absolute priority rule or violates the terms of

14  the plan or the confirmation order or the trust agreement by,

15  putting words in his mouth, skipping over the full payment of

16  whatever his Class 8 claim is going to be and allowing a

17  subordinate class, Class 10, to get paid, I have flipped and

18  studied the wording of the plan and the confirmation order and

19  the defined term for Disputed Reserve.  And I referred to a

20  disputed reserve as a tried-and-true provision in Chapter 11

21  plans.  I think it does what needs to happen for precisely

22  this kind of situation, that as long as an appropriate amount

23  is being held in reserve, and the Court can decide what is an

24  appropriate amount, we don't have to hold up a bankruptcy

25  estate for years and years.

1    So the disputed claim reserve is what allows me to find

2    this is fair and equitable and this isn't some sort of

3    violation of the absolute priority rule.  I think this is

4    precisely the reason the disputed claim reserve mechanism is

5    in place, so that we can get on with the business of getting

6    more people paid sooner.

7    And based on the evidence I've heard, it is an appropriate

8    amount, I think.  We're doing a lot of crystal-balling, what

9    may or may not ever happen when, but I think, based on all the

10   persuasive evidence I've heard, the Daugherty objection should

11   be overruled.

12   As far as Dugaboy, I, as noted, am overruling that

13   objection.  I didn't have any persuasive evidence, solid

14   evidence to show me that Mark Patrick doesn't have appropriate

15   corporate governance authority to enter into this settlement

16   agreement.

17   I realize there's a lot swirling around in the Cayman

18   Islands, and that's going to play out however it plays out.

19   But as of today, I don't have any evidence that he doesn't

20   have authority currently to enter into the settlement.  And it

21   speaks volumes that The Foundation backed down.  It would seem

22   that they have been convinced that the lack-of-authority

23   argument was not one they wanted to press today.  So that is

24   overruled.

25   I feel like we have all seen this movie many times before.

1   I wanted to understand, perhaps I went deeper than I needed

2   to, I know Mr. Phillips thinks I went deeper than I needed in

3   hearing some of the testimony from Mr. Patrick and Mr.

4   Dondero, but I'm just trying to understand what's happening

5   here.  Why people who were so lockstep and friendly for years

6   of this case suddenly, when we're right on the brink of maybe

7   the case being put to bed -- I'm optimistic; it's not quite

8   that close -- all of a sudden they're at loggerheads.

9        And so how many times have I seen this over the years,

10  whether it's a breakdown in business and personal

11  relationships, Mr. Daugherty, Mr. Terry, Grant Scott, now Mark

12  Patrick?  I'm probably leaving out someone.  I don't know.  I

13  feel like I'm watching the same movie.  Okay, now these two

14  have parted ways.  Now these two have parted ways.

15       And then, as I recall, when Grant Scott withdrew his

16  objection to the HarbourVest settlement all these years ago,

17  2020, 2021, which he had been lodging for Charitable DAF, I

18  think it was, --

19            MR. MORRIS:  Yes, Your Honor.

20            THE COURT:  -- then what happens?  Well, I think Mark

21  Patrick came in to work or replace Grant Scott, and then a

22  bunch of people ended up getting sued in a different court

23  regarding the settlement I approved, the HarbourVest

24  settlement I approved.

25       So why am I saying this?  I just, I'm trying to understand

1   things I'll never understand.  I wanted to maybe hear

2   something that would make me better understand what's happened

3   now between Hunter Mountain, Mark Patrick, and Dondero and

4   Dugaboy, because it sure seems like they were on the same team

5   for many years.  But it was very likely irrelevant, as Mr.

6   Phillips kept getting up and down and saying.  I just was

7   seeing if it would lead to something relevant that would bear

8   on the wisdom of this compromise, since that's one of my other

9   legal standards.  I'm supposed to consider all factors that

10   might bear on the wisdom of the compromise.  And so I guess

11   that's where I was going in allowing all of that to come in.

12       All right.  Well, while everyone is not thrilled with this

13   compromise and settlement, I heartily congratulate the human

14   beings that made it happen, and they know who they are.  Maybe

15   I do, maybe I don't.  But I think it's rather amazing.  And I

16   hope that we are not coming to court for hearings in 2032.  I

17   don't know who among us will be alive.  I'm not going to be

18   alive by then.  Certain people might cheer if that's the case.

19   But I congratulate the human beings who made this happen.  And

20   you know who you are.  Maybe I do, maybe I don't, but I

21   congratulate you.

22       All right.  So I reserve the right to supplement or amend

23   this oral bench ruling in a more fulsome written order.  I am

24   asking Mr. Morris and his team to be the scriveners on that

25   order.  And obviously, you're going to run it by the other

1 | lawyers here who participated today.

2 |    Is there anything else before we wrap it up?

3 |         MR. MORRIS:  Just one other thing, Your Honor.  And I

4 | greatly appreciate your comments.

5 |    When we draft the order, are we authorized to say that

6 | this settlement is approved not only pursuant to 9019 but to

7 | 363?  Because there are asset sales that are part of this.  We

8 | moved under that provision, and I didn't hear Your Honor

9 | reference that, --

10 |         THE COURT:  Okay.

11 |         MR. MORRIS:  -- but we would like to include that in

12 | the order.

13 |         THE COURT:  You may.  And that is precisely why I

14 | said I reserve the right to supplement or amend, because many

15 | times I get out of here and look at this transcript and, ooh,

16 | I forgot to say whatever.

17 |         MR. MORRIS:  Yeah.

18 |         THE COURT:  So I meant to say that and I didn't, so

19 | you may add that.

20 |         MR. MORRIS:  And I assume all Your Honor wants is a

21 | fairly simple form of order that incorporates --

22 |         THE COURT:  I do not want a 40-page order.

23 |         MR. MORRIS:  Right.

24 |         THE COURT:  Okay?

25 |         MR. MORRIS:  Just an order that incorporates your

263

1  comments on the record, and to the extent that Your Honor

2  wants to amend that, you'll do so at your leisure?

3          THE COURT:  Yes.

4          MR. MORRIS:  Perfect.

5          THE COURT:  All right.

6          MR. MORRIS:  Thank you.

7          THE COURT:  Thank you all.  We're adjourned.

8          MR. PHILLIPS:  Thank you, Your Honor.

9          THE CLERK:  All rise.

10      (Proceedings concluded at 4:38 p.m.)

11                        --oOo--

12

13

14

15

16

17

18

19

20                     CERTIFICATE

21     I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **06/27/2024**

24  _____    _____
    Kathy Rehling, CETD-444                      Date
25  Certified Electronic Court Transcriber

264

1

INDEX

PROCEEDINGS                                                    4

2

OPENING STATEMENTS

3

By Mr. Morris                                                48
By Mr. Phillips                                              62

4

By Mr. York                                                  64
By Mr. Lang                                                  79

5

WITNESSES

6

Claimant Trust's Witnesses

7

James P. Seery

8

- Proffer of Testimony by Mr. Morris                         11
- Direct Examination by Mr. Morris                           83
- Cross-Examination by Mr. Phillips                         110

9

- Cross-Examination by Mr. York                             111
- Cross-Examination by Mr. Lang                             128

10

Patrick Daugherty's Witnesses

11

Patrick Daugherty

12

- Direct Examination by Mr. York                            141
- Cross-Examination by Mr. Morris                           154

13

- Examination by the Court                                  164

14

Dugaboy Investment Trust's Witnesses

15

Mark Patrick

16

- Direct Examination by Mr. Lang                            171
- Cross-Examination by Mr. Morris                           184

17

- Redirect Examination by Mr. Lang                          189
- Recross-Examination by Mr. Morris                         191

18

- Examination by the Court                                  192

19

James "Jim" Dondero

20

- Direct Examination by Mr. Lang                            195
- Cross-Examination by Mr. Morris                           206

21

- Redirect Examination by Mr. Lang
- Examination by the Court                                  224

22

- Recross-Examination by Mr. Morris

23

24

25

INDEX
Page 2

EXHIBITS

Claimant Trust's Exhibits (Motion to Extend Duration)

1 through 67                                    Received   11

Claimant Trust's Exhibits (Motion to Approve Settlement)

1 through 123, 126                              Offered   43
10                                            Withdrawn   45
12                                             Received   44
13                                             Received   44
57                                            Withdrawn   45
59                                             Received   46
64-69                                          Received   46

Dugaboy Investment Trust's Exhibits

Plan and Settlement Agreement               Received   47
Exhibit 3                                   Received  189

Patrick Daugherty's Exhibits

1-42                                         Received   47

CLOSING ARGUMENTS

By Mr. Morris                                            231
By Mr. Phillips                                          238
By Mr. Loigman                                          240
By Mr. York                                              240
By Mr. Lang                                              245
By Mr. Morris                                            250

RULINGS

Motion for an Order Further Extending Duration of Trusts   21
(4213)

1
                                INDEX
                               Page 3
2

3   RULINGS, cont'd.

4   Motion for Entry of an Order Pursuant to Bankruptcy    28/254
    Rule 9019 and 11 U.S.C. § 363 Approving Settlement
5   with HMIT Entities and Authorizing Actions Consistent
    Therewith (4216)
6
    END OF PROCEEDINGS                                         263
7

8   INDEX                                                     264-266

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 15



**From:** Andrew Johnstone <aj@j-law.ky>
**Date:** 12 February 2025 at 4:24:27 PM GMT-5
**To:** Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>
**Subject: Charitable DAF Fund LP**


Dear Mr Murphy

We act for the Charitable DAF Fund 2 LP (**DAF 2**).

We further understand that you hold directorships in certain entities related to the Charitable DAF Fund LP (**DAF 1**), including Charitable DAF Holdco, Ltd.

We would be grateful if you could confirm your availability for an in-person meeting with us to discuss matters related to DAF 1 and DAF 2. Our client would like this meeting to take place as soon as possible, and we would therefore be grateful if you could let us know when you are free to meet this week, alternatively early next week.

Many thanks

**Andrew Johnstone**
Founder | Partner

<image001.png>    **+1 (345) 929-3000**
www.j-law.ky | **LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

# EXHIBIT 16

EXHIBIT

6

CAUSE NO. _____

| | |
|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., et al., | |
| *Plaintiffs*, | |
| v. | IN THE TEXAS BUSINESS COURT |
| MARK PATRICK, et al., | 1ST DIVISION |
| *Defendants.* | DALLAS, TEXAS |

## DECLARATION OF JAMES DAVID DONDERO

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, DECLARE under penalty of perjury:

1.     I am the President of NexPoint Advisors, L.P. (*NexPoint*), an investment advisor registered with the U.S. Securities and Exchange Commission (*SEC*). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2.     I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

3.     I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding $16 billion in value.  I was formerly the President of Highland Capital Management, L.P. (*Highland*), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or

Copy from re:SearchTX

my affiliates. In December 2015, I divested my majority stake of Highland (*2015 Transaction*).

## THE FUND

4.    In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

5.    In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the *Supporting Organizations*) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the *Charities*).

6.    The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (*ARLPA*), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (*Articles*), govern the Fund and its partners.

7.    The LP held 100% of the economic interest in the Fund. The Fund's general partner, Charitable DAF GP, LLC (the *GP*), a Delaware company incorporated on 25 October 2011, held management shares.

8.    The LP issued 100 management shares (the *Management Shares*) with the only voting rights for any and all shareholders in the LP.  In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in

Copy from re:SearchTX

the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the **Control Position**).

9. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

10. The governing documents of the Fund plainly state in multiple places that all of the powers of the Control Position exist solely for the purpose of benefitting the Supporting Organizations and their Charities. This ubiquitous language was created for an express purpose. The expectation by the founders of the Fund (myself included) at the time it was formed was that the governing documents would ensure that the Control Position would be bound through his or her fiduciary obligations to safeguard and advance the interests of the charitable organizations that held actual beneficial ownership of the Fund.

**GRANT SCOTT**

11. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

12. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr. Scott as the Control Person. However, Mr. Scott had complete discretion in adopting or rejecting the

investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr. Scott was paid $60,000 per annum.

13. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

## MARK PATRICK

14. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax- deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr. Patrick served that role at Highland from 2008 until his departure in February 2021.

15. In March 2021, Mr. Patrick was hired by Skyview as Tax Counsel and continued to perform substantially similar tax counsel duties for me. At Mr. Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

16. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr. Patrick working with outside counsel. Mr. Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

Copy from re:SearchTX

17. In March 2021, Mr. Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the bankruptcy of Highland filed in 2019, and he did not believe he was equipped to handle those disputes. Mr. Patrick suggested to Mr. Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr. Patrick was my attorney and Mr. Scott was my trusted friend, and I was happy for Mr. Scott to pass the Control Position to Mr. Patrick.

18. On 25 March 2021, Mr. Scott: (i) resigned as director of the LP, (ii) appointed Mr. Patrick as director of the LP, and (iii) transferred to Mr. Patrick the Management Shares for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

19. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr. Murphy, Mr. Patrick's vote counts as the tiebreaker for corporate voting.

## MR. PATRICK'S CONTROL OF THE FUND

20. In the initial period following Mr. Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr. Patrick was free (as Mr. Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

21. Subsequently, however, communications between Mr. Patrick, Skyview, and me began to become less frequent, and over time I came to suspect that Mr. Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the

Copy from re:SearchTX

Fund, but rather for his own personal enrichment.

22. On 28 June 2023, Mr. Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms. Short learned that the directors of the entity were Mr. Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr. Patrick had made the grant request without disclosing his and/or his family's involvement.

23. Ms. Short discussed the matter with Mr. Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms. Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms. Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on September 5, 2023, but Mr. Patrick was informed that further payments were unlikely. I was informed of this process by Ms. Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

24. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (**Fortaris**). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr. Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

Copy from re:SearchTX

25. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr. Cronin was known to me personally. In September 2023, Mr. Cronin and I met, and he informed me that he had been approached by Mr. Patrick with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick as a supplement to Mr. Patrick's compensation. Mr. Cronin informed me that he had asked Mr. Patrick if this arrangement would amount to fraud, and that Mr. Patrick's response had been: "*you can't steal from yourself.*"

26. Mr. Cronin informed me that he understood from this statement that Mr. Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr. Cronin further informed me that he was uncomfortable about Mr. Patrick's proposal and that he subsequently communicated this to Mr. Patrick, whereupon Mr. Patrick cut off all further communications between them.

27. Mr. Cronin's allegations that Mr. Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my attorneys in the United States that, had Mr. Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr. Cronin contacted me, I met with Mr. Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations about the matter and Mr. Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr. Patrick's powers or remove him from his position.

Copy from re:SearchTX

28. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr. Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the ***Expense Summary***) which indicated substantial increases in expenditures during Mr. Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

    (a) Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023 – and increased even further to around $2.25 million in the first half of 2024 alone.

    (b) Expenses overall for the first half of 2024 were around $18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. $18.6 million).

29. The Expense Summary reinforced my concern that Mr. Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

30. In August 2024, I became aware of yet another issue concerning Mr. Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the

Copy from re:SearchTX

Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading.   Mr. Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

31. I was informed that my director of charitable giving had been contacted by Ms. Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms. Diaz stated that on August 28, 2024, Mr. Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr. Patrick through his employment at Skyview and constituted MNPI, which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr. Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr. Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr. Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

32. Upon receipt of the allegations against Mr. Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr. Patrick's knowledge, so as to avoid potentially tipping off Mr. Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr. Patrick's actions constituted a serious breach of his compliance and employee obligations. On October 1, 2024, as part of the finalization of the investigation report, Skyview's chief compliance officer interviewed Ms. Diaz about the allegations against Mr. Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on October 11,

Copy from re:SearchTX

2024 and concluded that Mr. Patrick had attempted a serious breach of U.S. securities laws.

33.   On October 2, 2024, Mr. Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr. Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr. Patrick became aware of the investigation into his behavior and resigned before the report was published.

34.   On the same day that Mr. Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr. Patrick as my counsel, I believe that Mr. Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

### FUNDING OF PROCEEDINGS

35.   As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations for the purpose of understanding how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. I am only one of three votes, and the other two votes on each board are held by the respective Charity. Historically, the boards have had no hesitation in exercising their powers to chart

Copy from re:SearchTX

independent courses even if those decisions differ from my preferences.

36.    The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*REMAINER OF PAGE INTENTIONALLY LEFT BLANK\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Copy from re:SearchTX

My name is James David Dondero, my date of birth is June 29, 1962, and my address is 300 Crecent Court, Dallas, Texas 75201. I declare under penalty of perjury that the foregoing is true and correct. Executed in Dallas County, State of Texas, on the 1st day of July 2025.

JAMES DAVID DONDERO

Copy from re:SearchTX