# EXHIBIT 17



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO.: FSD 116 of 2025 (JAJ)**

**IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

### FIRST AFFIDAVIT OF MARK ERIC PATRICK

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1.  I am a registered director, president and sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation (**DFW**). DFW is the majority Participating Shareholder of Charitable DAF Holdco, Ltd. (**Holdco** or **Company**) of which I am both a director and the sole Management Shareholder. The remaining Participating Shareholders of Holdco are Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., and HCMLP Charitable Fund (collectively, **Highland Foundations** and also referred to as the **Supporting Organisations**).

2.  In addition, I am the sole director of CDH GP Ltd. (**GP**), a Cayman Islands limited company incorporated in or around 7 February 2024 which is the general partner of Charitable DAF Fund LP (**DAF**).

3.  This affidavit is provided pursuant to the Orders of Justice Asif KC handed down at the directions hearing on 23 May 2025 (**Directions Order**) made with respect to an

application of the joint official liquidators (**JOLs**) of Holdco issued by Summons dated 22 May 2025 (**JOLs Summons**), and amended as of 30 May 2025 seeking sanction from the Court for the engagement of Cayman attorneys, Cayman conflict counsel and US legal counsel (**Application**).

4.    I am duly authorized to provide this affidavit for and on behalf of DFW to:

(a)    Oppose the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest;

(b)    Address the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs; and

(c)    Oppose the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 herein.

5.    In this affidavit I refer to the supervision hearing on 6 May 2025 (**Supervision Hearing**) at which this Honourable Court brought the voluntary liquidation of Holdco under its supervision on uncontested basis and refer to the order appointing the JOLs on 6 May 2025 as the **Appointment Order**.

6.    The contents of this affidavit are, save where stated otherwise, within my own knowledge and are true. Where the contents of this statement are not within my own knowledge, they are true to the best of my knowledge and belief and I have indicated the source of my information.  In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

7.    There is now produced and shown to me a paginated bundle of documents marked "**MP1**". References in this affidavit are to pages in MP1 are in the form [**MP1/page number**].   The majority of the documents comprised in MP1 are materials that I and Mr Paul Murphy requested that our US attorneys compiled and made available in a data room to the JOLs following their appointment.  As such, much of the material referred to in this affidavit is already and has been available since around

9 May 2025 to the JOLs.  To illustrate this fact, I exhibit an index to the documents in the data room that was made available to the JOLs (**MP1/ page 1 - 3**).

8.  I respond in this affidavit to the Second and Third Affidavits of Ms MacInnes dated 13 and 26 May 2025 respectively (**MacInnes 2** and **MacInnes 3** respectively), that were filed by the JOLs in support of the Application which I have reviewed.  I have also reviewed the unsworn, undated and unsealed affidavit of Mr Andrew Johnstone of Johnstone Law (**Johnstone 1**) which was served on Baker and Partners (Cayman) Limited (**Baker & Partners**) as legal counsel to DFW on 26 May 2025.  To the extent that any assertion made in Johnstone 1, MacInnes 2 or 3 go unanswered in this my first affidavit in these proceedings, that should not be taken as my agreement, acceptance or acquiescence of the position asserted by Ms MacInnes or Mr Johnstone.

9.  There will be matters in this affidavit which relate to certain decisions and actions Mr Murphy and I have taken as directors of Holdco. I have noted that certain critical remarks have been made by Johnstone Law about the fact that I have a played a central role in controlling and managing several entities within the charitable structure of which the Company previously formed part. These remarks are unfounded in circumstances where the DAF Structure and the entities within it have always operated through a single human agent. This was by design so that Mr Dondero was able to draw on the economies of having a single point of contact across the entire structure. My role was exactly the same as that occupied by my predecessor, Mr Grant Scott, however my approach was and remains to ensure that each entity's role in the DAF Structure was professionally managed.

10.  In light of the foregoing insofar as this affidavit deals with matters relating to my role in managing Holdco with Mr Murphy as well as other entities within the structure that is because of the architecture of the structure itself.

11.  In light of the wider context in which the position of DFW should be considered, I have reviewed the evidence prepared by Johnstone Law in connection with the winding up of Holdco and filed on behalf of the Highland Foundations namely the

First Affidavit of Mr James Dondero filed on 16 April 2025 (**Dondero 1**), the First Affidavit of Ms Julie Diaz (**Ms Diaz**) filed on 16 April 2025 (**Diaz 1**) and the Second Affidavit of Ms Diaz filed on 29 April  2025 (**Diaz 2**), which was relied on by the Highland Foundations for the purposes of the Supervision Hearing.  On my review I note there are a number of mischaracterisations and inaccuracies in the evidence relied on by the Highland Foundations.

12.    These create an inaccurate picture of DAF, the DAF Structure (as defined below) and Mr Dondero's dealings with the same.  To ensure the facts are accurately before the Court on these matters, and where not otherwise addressed in the content of my affidavit, I include in Sections E and F below specific responses to the inaccuracies set out in Dondero 1 and Diaz 1. I realise that the purpose of the Application is not to resolve complex issues of law or fact. However, I believe it is critical for this Honourable Court to have an understanding of the relevant contextual issues, even if disputed, in order to determine both the question of whether the proposed engagement of Johnstone Law will at the very least undermine the appearance of neutrality in dealing with these issues.

13.    Equally, the objection of DFW to the engagement by the JOLs of US legal counsel at this juncture requires the Court to appreciate the facts and circumstances which required Mr Murphy and I to implement the DAF Restructuring (defined at paragraph 18 below).

14.    This affidavit proceeds as follows:

    (a)    Objections to the JOLs' Summons

    (b)    Professional background and dealings with Holdco / DAF

    (c)    Function of Holdco and DAF Structure

    (d)    DAF as alter ego of Mr Dondero

    (e)    Responses to First Affidavit of Ms Diaz

    (f)    Responses to First Affidavit of Mr Dondero

## A.  OBJECTION TO JOLS' SUMMONS

15.  In summary, DFW:

    (a)  Opposes the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest.

    (b)  Does not object to the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs, subject to the conflict committee of Maples confirming that on considering the ability of Maples to act for the JOLs they gave specific consideration to the prospect that Maples would need to review and opine on the issuance

    (c)  Opposes the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 below.

16.  DFW objects to the appointment of Johnstone Law as Cayman Islands legal counsel to the JOLs.  This opposition is based on Johnstone Law's immediately prior engagement by the Highland Foundations in seeking the just and equitable winding up of Holdco and the appointment of provisional liquidators, on the erroneous basis that the DAF Restructuring was a fraudulent scheme which resulted in assets in excess of US$250 million in value being misappropriated from the Company, to the detriment of the Highland Foundations.  For the avoidance of doubt and as explained in Section C of my confirmatory affidavit, the Highland Foundations never had a traditional ownership economic interest in the DAF and its assets; they only had a right to discretionary dividends if and when paid.

17.  The Highland Foundations are companies that are owned and controlled by Mr Dondero who is the President, Individual Member and Director of each of the Highland Foundations.  The complaints and allegations made by the Highland

Foundations and the arguments advanced on their behalf by Johnstone Law ignore the real prospect that it is Holdco which may have causes of action against the Highland Foundations and/or Mr Dondero, for the reasons articulated below (see also Section D).

18.  At the Supervision Hearing the Highland Foundations, through Johnstone Law characterised the following steps as a fraudulent scheme:

(a)  The allotment of 318 Participating Shares in Holdco to DFW on 7 February 2025 which constituted DFW the single majority Participating Shareholder of Holdco.

(b)  On 27 March 2025, redeeming Holdco's interest in CDMCFAD LLC.

(c)  On 2 April 2025, distributing the proceeds of the aforementioned redemption to the Highland Foundations in their capacity as Participating Shareholders.

19.  I refer to these steps collectively as the **DAF Restructuring**.

20.  I reject any suggestion that the DAF Restructuring was improper, inappropriate or fraudulent.  As I explain in further detail below, the DAF Restructuring was necessary to protect the DAF and its charitable intent from the retaliatory actions that can be traced back to Mr Murphy's and my refusal to accept Mr Dondero's demands to use the DAF's assets to invest in several opportunities that were inappropriate, arguably unlawful and to his personal benefit. I also discuss Mr Dondero's attempts to influence me to transfer approximately US $1.5 million to an offshore firm owned by Mr Dondero to settle outstanding legal fees which were not related to the DAF at paragraph 116(a) below.

21.  For the avoidance of doubt and without waiving legal privilege, the DAF Restructuring and each of the steps forming that transaction, was / were undertaken with the benefit of thorough and extensive legal, tax and financial advice from third-party professionals and for the principal purposes of: (i) ensuring the DAF structure continues to fulfill its charitable purpose of supporting

community-focused, non-profit foundations; and (ii) protecting DAF and the DAF Structure from being used by Mr Dondero or attacked by his creditors as his *alter ego*.

22.   As a result of Mr Dondero's conduct, the Highland Foundations may not retain their non-profit status under the laws of the US.  According to tax advice I sought for and on behalf of Holdco, the Highland Foundations were susceptible to being found as the *alter ego* of Mr Dondero or facilitating other claims against entities within the DAF Structure based on *alter ego* theories which are set out further at Section D, paragraph 78 onwards and paragraphs 145 onwards of this affidavit.  Significantly, the Highland Foundations may also have liability as co-conspirators if Mr Dondero is found to have used them in a way which contravenes the US Internal Revenue Code (**IRC**).  It was in recognition of this risk that Participating Shares were issued to DFW.  As stated in the resolutions authorizing the issuance and allotment to DFW, this was necessary to ensure that DAF could continue to further its charitable mission where, upon advice, it seemed the Highland Foundations could not. I refer to the first affidavit of My Murphy and to Section V(ii) which addresses the DWF share issuance.

   *(i)*   *Objections to Johnstone Law on the basis of a conflict of interest*

23.   The question of Johnstone Law's ability to advise the JOLs independently and impartially was a matter I instructed counsel for DFW to raise at the Supervision Hearing.  While I had not opposed the making of a supervision order, nor found at that stage there was a need to object to the appointment of Ms MacInnes or Mr Bhowmik as JOLs, it was my firm belief that due to Mr Johnstone's prior engagement for the Highland Foundations he and his firm would not be sufficiently independent to act as legal counsel to the JOLs.  My reasonable belief was founded on both my prior experience of how Mr Dondero conducts his arrangements and litigates aggressively (I refer the Court to the examples of such behaviour in Section D *DAF As Alter Ego of Dondero* (below) and to Section IV of Mr Murphy's affidavit); and on the allegations of fraud and misconduct which have been central to the

applications persuade by the Dondero controlled and managed Highland Foundations.

24. At the Supervision Hearing, and as is set out in the letter from Baker & Partners to the JOLs dated 14 May 2025 and exhibited at **MP1/ pages 4 – 7** (**14 May Letter**), the pleadings before the Court charcterised the DAF Restructuring as a *"fraudulent Scheme"* and that the former directors (myself and Mr Murphy) appeared to be *"implementing a calculated and ultimately fraudulent scheme to dissipate the Company's assets to prevent thorough independent investigation"*.

25. The pleadings prepared by Johnstone Law characterise the Highland Foundations as *"victims of the apparent fraud"* and, with specific regard to the skeleton argument that Johnstone Law filed in support of the *ex parte* application for the appointment of provisional liquidators,  Johnstone Law addressed the proposition that *"There is no  hard evidence of fraud or defalcation"* by clearly refuting that suggestion as *"not true"* and that *"it will not take the Court long to see that Mr Patrick and Mr Murphy's blocking tactics hide more nefarious conduct"* (see 14 May Letter at **MP1/ pages 4 - 7**).

26. Johnstone Law also prepared and filed Diaz 2 which was given in support of the Highland Foundations application for the voluntary liquidation of the Company to be brought under the supervision of the Grand Court.  In this respect, the terms of relief and basis for the need for supervision was allegedly due to a *"cloud hanging over Mr Patrick and Mr Murphy, as directors of Holdco"* (**Diaz 2, para 15(b)**).  Ms Diaz goes on to incorrectly described the Highland Foundations / Supporting Organisations as *"the owners of 100% of the economic interest in the Company"* and that the need for supervision of the Grand Court is primarily for a *"(a) proper investigation"*  *"...(e) into the allegations of misconduct on the part of the management of the company"* (**Diaz 2, para 15.(a), (e)**).  Ultimately and as I consider to be indicated by the terms of the **Diaz 2 (paragraph (f)**, the  case advanced by Johnstone Law for the Highland Foundations envisaged and anticipated that transactions undertaken by Holdco would likely need to be set aside.

27. While I was not present at the Supervision Hearing I am informed by and understand that in accordance with my instructions, counsel for DFW foreshadowed the potential conflict of interest at the Supervision Hearing. After the DAF Restructuring, and subject any claims accruing to the Company, Holdco has no or de minimis assets. The central issue in the liquidation of Holdco is whether the DAF Restructuring was lawfully carried out by myself and Mr Murphy acting in the best interests of Holdco and exercising our powers as directors for a proper purpose. It simply cannot be the case that Mr Johnstone can review the DAF Restructuring impartially and with a fair-mind having already formed the view that that transaction amounted to a calculated and fraudulent scheme.

28. From my consideration of **Johnstone 1 (paragraphs 14,15 and 17)** I understand that:

    (a)  Mr Johnstone appeared as legal counsel to the Highland Foundations at the Supervision Hearing,

    (b) After Justice Asif KC made the Supervision Order the engagement of Johnstone Law was terminated and at the same time the Highland Foundations consented to the engagement of Johnstone Law by the JOLs.

    (c) I understand that the engagement with the JOLs is dated 7 May 2025. Having read MacInnes 2 I understand that the letter of engagement was executed by the JOLs on 13 May 2025 (see **MM2/ page 4**).

    (d) Mr Johnstone asserts that he "*no longer [has] obligations to the SOs (save for my ongoing duties of confidentiality), and as former client, rather than current clients*" (**Johnstone 1, paragraph 39**) and that there is no "*suggestion that in my capacity as attorney to the SOs, I obtained confidential information that would make it unfair for me to know represent the JOLs*" (**Johnstone 1, paragraph 40**).

29. As is discussed in detail in Section IV of Mr Murphy's affidavit and Section D below, it was necessary for Mr Murphy and I to implement the DAF Restructuring so as to preserve the DAF assets and charitable standing of the DAF Structure.  Given the potential civil and criminal consequences which may befall Holdco, DAF and its assets there is a real possibility that on investigation into the restructuring claims of Holdco are identified against the Highland Foundations and / or Mr Dondero.

30. I believe it is highly likely that Mr Johnstone holds confidential information relating to the operations of the Highland Foundations (being owned and controlled entities of Mr Dondero) that are highly relevant to the central issue in the liquidation, as presented by the Highland Foundations themselves.

31. It appears that the very real potential for Mr Johnstone and his firm's duty of confidentiality to the Highland Foundations as former clients, to conflict with the obligations to their current clients the JOLs has not been addressed in the discussions between Johnstone Law and the Highland Foundations; nor between Johnstone Law and the JOLs.

32. Significantly Mr Johnstone is *"happy to confirm I have never been instructed by James Dondero and/or JP Seville"*.  This statement itself may refer to the specific terms of any engagement letters entered into by Mr Johnstone and/or his law firm, however, Johnstone Law has  recently been engaged by the Highland Foundations who are under the ownership and control of Mr Dondero in his capacities as the individual member, president, and director of each, not to mention the influence he may wield by promising additional donations.  Furthermore, Mr Dondero has put in evidence for and on behalf of the Highland Foundations in support of the petition to wind up Holdco and it was in that engagement and in part on the evidence of Mr Dondero that Mr Johnstone formed the view that *"it appeared on the evidence available that a fraud had been perpetrated"* (**Johnstone 1, paragraph 35**). Furthermore, as I refer to in paragraph 187 below, there is reason to be concerned that Johnstone Law has been engaged by entities likely to be controlled, owned or associated with Mr Dondero.

33.  Insofar as the question of Johnstone Law / Mr Johnstone's independence is addressed in MacInnes 2, Ms MacInnes does not confirm that the JOLs have made independent enquiry or sought the views of legal counsel on the issue of conflict, save for relying on the view of Mr Johnstone.

34.  **Johnstone 1, paragraph 41** notes that Mr Johnstone is *"surprised"* that the engagement of his law firm has elicited such opposition from DFW because it is usual for attorneys who have previously acted for the petitioners to take on the role of advising the liquidators.  Mr Johnstone explains *"This has the advantage that the attorneys already have considerable understanding of the case, and so do not approach the task from a 'standing start', which saves time and costs"*.  This point is also supported at **paragraph 11(a) of MacInnes 2** where Ms MacInnes states it to be her professional experience that liquidators frequently engage the firm of attorneys who acted for the petitioner upon their appointment, and the mere fact that a firm has previously acted for a petitioner does not of itself provide a basis for asserting that a firm lacks independence.

35.  I do not accept this is correct in the context of liquidations arising from the breakdown of a shareholder relationship as is the case with Holdco. This evidence disregards the complex issues which arise in the context of this matter.  I am informed by Cayman counsel and understand this issue will be addressed in submissions that while that general position as stated in Johnstone 1 and MacInnes 2 may be true where the winding up petition is premised on an undisputed debt, the position here is markedly different.  There is a clear and contentious dispute brought by the Highland Foundations in the terms of the just and equitable petition that was filed against Holdco.

36.  Insofar as MacInnes 2 asserts that the JOLs have concluded that Johnstone Law is independent and that the position of DFW in objecting to their appointment is without substance I note that:

    (a)  It is Mr Johnstone himself who has informed the JOLs that his prior engagement by the Highland Foundations and that his own law firm had

no conflict in acting.  The JOLs do not appear to have made independent enquiry into the potential conflict nor taken independent advice on the point (**Paragraphs 11(b)-(d) of MacInnes 2**).

(b)    Johnstone Law has also confirmed that they *"have no preconceptions before accepting an engagement by the JOLS, and are not subject to any external pressure or influence"* (**paragraph 11(c) MacInnes 2**). However, it remains the case as per Mr Johnstone's own evidence that he is of the view that a fraud has been perpetrated and *that "that does appear to be an obvious explanation for what has occurred, and because those were my instructions"* (**Johnstone 1, paragraph 35**). I do not accept that fraud was the *"obvious explanation"* let alone a reasonable one had Mr Johnstone considered whether any underlying factual basis was reasonably credible. He does not appear to have considered the extraordinary legacy of the very person behind the Highland Foundations or the person funding his engagement, here Mr Dondero.

37.    In the circumstances I fail to see how it could be considered reasonable or fair-minded (as **Johnstone 1 s**uggests at **paragraph 42**) for Johnstone Law's engagement to be sanctioned.

38.    I am further informed by the Cayman attorneys to DFW that during the Supervision Hearing, Mr Johnstone submitted to the Court that the submissions of Baker & Partners with regard to the terms of Order ought not to be given weight because DFW is controlled by a person subject to investigation – that person being myself - and suggested I would seek to limit the powers of the liquidators.  I refute the negative assertions that have been cast on my character advanced by Johnstone Law in written argument, and further at the Supervision Hearing.   Additionally, recognizing that there is an investigation which needs to be conducted into the DAF Restructuring and its propriety, the conclusory view of Mr Johnstone that DFW's views should not be given weight because of that investigation itself indicates a

position of partiality which DFW believes requires that the JOLs have the benefit of independent, unconnected legal counsel.

39. The engagement of Johnstone Law specifically was not a matter that was before the Court at the Supervision Hearing.  I understand from legal counsel to DFW that it was submitted at the Supervision Hearing that the identity of Cayman Islands attorneys for the JOLs was not then known, and that Reed Smith were identified during the Supervision Hearing as US legal counsel.

40. However, the terms of the Draft Supervision Order provided to the Court on 6 May 2025 did seek sanction for the JOLs to engage attorneys.  I exhibit at **MP1/ page 9 - 11** a copy of the original draft order that was circulated on 6 May.  It was this general sanction to engage attorneys that was denied and for which this Honourable Court directed the JOLs to make a sanction application for the specific firms to be engaged and the terms on which that engagement would proceed. Neither Johnstone 1 nor MacInnes 2 or 3 address the non-disclosure of Johnstone Law as proposed Cayman counsel to the JOLs.  However, in the absence of independent legal counsel being identified I understand that (i) Johnstone Law's engagement with the Highland Foundations terminated after Supervision Hearing and (ii) Johnstone Law had issued a letter of engagement dated 7 May 2025 to Grant Thornton.  There is a necessary inference that at the time of the Supervision Hearing Johnstone Law had been selected to act as Cayman legal counsel to the JOLs.

41. The concerns of DFW have been further compounded by steps immediately taken by the JOLs following their appointment.

42. Firstly, the clear overreach of their powers under the Appointment Order, insofar as the JOLs have sought to exercise authority and jurisdiction over entities which are neither Holdco, nor entities that are owned or controlled by Holdco.  In this regard I refer to correspondence issued by the JOLs to Skyview Group (**Skyview,** legally incorporated as Highgate Consulting Group, Inc. and doing business as Skyview Group) dated 9 May 2025, in which the JOLs purported to have authority to request books and records from Skyview not only of Holdco but also to its current and

former subsidiaries (**Skyview Notice**).  In doing so the JOLs also sought to exercise their powers in the jurisdiction of the United States where, I am informed by legal counsel, the JOLs have no legal standing or authority.  A copy of the notice and correspondence issued to Skyview is exhibited at **MP1/ page 12 - 18**.

43.  These steps are value destructive to DAF and its direct and indirect subsidiaries (**DAF Structure**) insofar as the JOLs have caused banks and other service providers to the DAF and related entities to freeze the operative accounts of the DAF. As an example, email correspondence from Hancock Whitney is exhibited at **MP1/ page 19 - 26**.  In turn, this prevents DAF from operating its business (i) making (and receiving payments on) investments and (ii) carrying out its charitable purpose and fulfilling obligations which DAF has assumed to support selected charities.

44.  Second, on 12 May 2025 Baker & Partners issued a letter to the JOLs identifying the impropriety and overreach of the requests set out in the Skyview Notice.  No response to that correspondence has been received.  I exhibit at **MP1/ page 27 – 29** a copy of the correspondence issued to the JOLs in response to the Skyview Notice.

45.  Following the Supervision Hearing Mr Doug Mancino, a leading US tax attorney whose CV is exhibited at **MP1/ page 30 - 41**, informed me that he had agreed to a meeting with the JOLs.  That meeting took place virtually on 12 May 2025 (**12 May Meeting**).  I understand from Mr Mancino that Mr Johnstone of Johnstone Law was present at the virtual meeting. Mr Mancino also informed me that he was not informed during the call who Mr Johnstone was or in what capacity he was attending, that Mr Johnstone had represented (or was representing) the Highland Foundations, or that the JOLs had purported to engage Mr Johnstone as their counsel pursuant to a letter of engagement dated 7 May 2025 (despite the court requiring the JOLs to seek court approval for the appointment of legal counsel).  I understand there to be a factual dispute relating to the 12 May Meeting and that Mr Mancino will directly address the assertion made in **MacInnes 3 (paragraph 12)** that at that meeting Mr Macino was informed that Mr Johnstone attended in his capacity as the JOLs' attorney.

46. On 14 May 2025, Baker & Partners wrote to ask who Mr Johnstone acted for while attending the 12 May Meeting.  That same letter outlined to the JOLs the concern of DFW which arose from the representations made during the course of these proceedings by Mr Johnstone (see **MP1/ page 4 - 7**).  As the letter of 12 May 2025 to the JOLs makes clear, DFW has serious and justifiable concerns that where conduct which Mr Johnstone has described as a fraudulent scheme are the very actions that will inevitably be investigated and considered by the JOLs, there is not only the appearance of a conflict but a serious question over the ability of Johnstone Law to impartially advise the JOLs on matters concerning the legality and propriety of the DAF Restructuring.

47. This extends to the very real possibility that on an independent and thorough investigation into the DAF Restructuring, causes of action may have accrued to HoldCo against the Highland Foundations and potentially Mr Dondero.  DFW's position will be deeply prejudiced if the JOLs are unable or unwilling to act or even unable or unwilling to consider acting against the Highland Foundations and Mr Dondero. The timing of Johnstone Law's termination as counsel for the Highland Foundations as of 6 May, and appointment by the JOLs pursuant to a letter of engagement dated 7 May, in circumstances where Johnstone Law had already made accusations of fraud makes it difficult, if not impossible, to believe that Johnstone Law can advise the JOLs with a view to ensuring they investigate the affairs of Holdco fairly and independently.

48. Following the 12 May Meeting and the correspondence that was issued by Baker & Partners for DFW and on behalf of the Management Shareholder and directors by Kobre & Kim issued on 14 May 2025 (see **MP1/ page 42 - 44**) Johnstone Law made the Letter Application seeking the sanction of their appointment as legal counsel to the JOLs, without first seeking the formal views of DFW.  I do not know if the Highland Foundations who are also participating shareholders of Holdco were notified.

49. I am informed by my legal counsel, without waiving privilege, that the usual course in making a sanction application is for the stakeholders of the liquidation to be

consulted with, and for a hearing to be set down for that application to be heard, including the views of stakeholders. While I also understand that there may be circumstances in which it may be appropriate to seek to have a sanction application determined on the papers, the views of the stakeholders interested in the application should provide their consent to proceeding with an application without sanction. The fact that the Court properly directed that DFW and all relevant stakeholders be given notice of the application and a hearing set down only indicates that this sanction application was not one suitable to be determined on the papers.

50.   I note at **paragraph 20 of Johnstone 1** that the application for sanction of Johnstone Law was initially *"made by letter to the Court dated 14 May 2025 (**Letter Application**)"*. At the time of swearing this affidavit I understand that a copy of the Letter Application has been requested from Johnstone Law but not yet provided to DFW. I refer the Court to **MP1/ page 49 - 47** being a letter from Baker & Partners dated 20 May 2025 (**20 May Letter**) relating to the sanction application made by the JOLs and making specific requests for *"copies of all correspondence between Johnstone Law and the Grand Court regarding the proposed sanction application"*.

51.   I note that **Johnstone 1 (at paragraph 55)** outlines requests for documents and information that were made by Baker & Partners in the 20 May Letter but lists only 3 or the 4 categories that were requested. Johnstone 1 makes no reference to the request that was made by Cayman counsel for DFW for a copy of Johnstone Law's correspondence with the Court, which would necessarily include the Letter Application.

52.   Significantly, if the concerns of myself and Mr Murphy regarding Mr Dondero's dealings with DAF are found on an independent investigation to have been well founded, there is a real prospect that Holdco would have actions against the Petitioners in respect of distributions that were made which did not actually comply with the charitable purpose for which the assets of DAF ought to have been deployed. Even in the absence of such causes of action, if my concerns about Mr Dondero, the Highland Foundations are vindicated through an independent

**Page 17 of 64**

investigation, the JOLs will be required to reach adverse conclusions about Johnstone Law's former clients. Given Johnstone Law at the very least holds confidential information about those parties, it is reasonable to infer that Johnstone Law will be strongly predisposed (or have the appearance of being strongly predisposed) towards their former clients. Indeed, Johnstone Law has already characterised his former clients as the *"victims of fraud."* (**Supplementary Skeleton Argument, 28 April 2025, para, 17**).

53.  Once again, this raises a justifiable concern that Johnstone Law is not in a position to act independently in advising the JOLs to commence proceedings against the former clients of Johnstone Law or take adverse positions against them. Given the pervasive nature of the required investigation into the history of the DAF Structure, its connection with Mr Dondero and indeed DAF Restructuring, I do not see how the issue can be cured by the appointment of Maples as *ad hoc* conflict lawyers.

54.  As I explain in further detail below a serious underlying concern of DFW as well as a concern Mr Murphy and I have held as directors appointed by the Management Shareholder to exercise its entitlements and functions, is that Mr Dondero historically misused DAF, the DAF Structure, and its assets for his own personal U.S. tax advantages and gain and intends to leverage the liquidation of Holdco to ultimately wrongfully require the DAF Structure and its assets.

55.  Furthermore, I understand from the evidence filed by the Highland Foundations that Mr Dondero is funding the JOLs' fees and is privately financing these proceedings including meeting the fees of the Highland Foundations. In circumstances where Johnstone Law has been remunerated by Mr Dondero and indeed where they appear to have acted with certain entities associated with him, this inevitably gives rise to the real prospect that without instructing independent counsel, Johnstone Law and by extension the JOLs may not be in a position to reach fair and impartial findings against Mr Dondero or indeed the Highland Foundations with respect to any investigations of misuse or attempted misuse of the DAF Structure.  Such findings would almost certainly be contrary to the position adopted by Johnstone Law on behalf of the Highland Foundations (and ultimately Mr Dondero).

56.  Mr Dondero is a serial litigant. Since 2007 he has been locked in substantial litigation with UBS and since 2019 has been pervasively involved in the now infamous "Highland Bankruptcy" Chapter 11 proceeding in Texas. Mr Dondero is currently exposed to a summary judgment determination from the Southern District of New York which may imminently result in an award against him in the amount of US\$1.2 billion (as more fully discussed below in paragraph 153). I believe the prospect of such a significant adverse judgment against Mr Dondero provides ample reason for him to seek to have the DAF Restructuring unwound and seek to control – directly or indirectly – that process. In simple terms Mr Dondero may need access to significant liquidity in the short term.

*(ii) Engagement of Maples*

57.  I note from the Amended Summons provided by Johnstone Law on 26 May that the JOLs now seek sanction for the appointment of Maples as conflict legal counsel to the JOLs. As noted in **MacInnes 3 (paragraph 19-24)**, Maples were previously retained by the Company to provide advice in connection with the power and ability of the directors of Holdco to issue and allot shares in Holdco to DFW.

58.  Given the centrality of the DAF Restructuring and the DFW share issuance to the liquidation of Holdco, I was concerned that Maples would be in a position of conflict to the extent that Maples were instructed by the JOLs to assess or impunge the validity and propriety of the issuance of shares from Holdco to DFW. However, I also understand from both the terms of MacInnes 3 that Maples have cleared conflicts and do not regard the previous advice provided to the Company as presenting a conflict of interest.

59.  In the circumstances, I on behalf of DFW would not object to the engagement of Maples by the JOLs providing confirmation could be provided that the conflict committee had, on considering the engagement for the JOLs, specifically addressed the ability of Maples to advise on the validity and propriety of the share issuance to DFW by Holdco.

*(iii) No requirement for US Counsel at this stage*

60.   DFW objects to the application for sanction by the JOLs to engage US counsel at this juncture. As is accepted by the JOLs, Holdco presently holds no assets in Cayman or anywhere else.

61.   The issues that are raised by the Highland Foundations and which have been assumed by the JOLs, concern the validity and potential ability to unwind the DAF Restructuring.

62.   In due course DFW intends to seek a declaration as to the validity of the DAF Restructuring from this Honorable Court and to make that application within the liquidation.  Until such time as a determination has been made that would result in assets being conveyed to the Holdco estate, DFW objects to the sanction and engagement of US counsel for the reason that it is neither proportionate nor necessary.

## B.  PROFESSIONAL BACKGROUND AND DEALINGS WITH HOLDCO /DAF

63.   I am a US tax attorney and have practiced as US tax counsel from 1998 until 2008. I hold a bachelors degree from the University of Miami Herbert Business School (BBA, Finance, Cum Laude); an LLM in Taxation from the New York University School of Law and am a Juris Doctor from the Boston University (Cum Laude).

64.   For a significant part of my career through until October 2024 I have been employed by companies connected with or controlled by Mr Dondero. From January 2008 to February 2021 I was employed as Tax Counsel by Highland Capital Management, L.P. (**Highland**).  During my employment with Highland, I provided tax consulting advice to Highland and engaged outside tax lawyers to provide legal advice to Highland relating to the management of its tax liabilities and the ability to make use of tax efficient structures.

65.   Contrary to the assertion made by Mr Dondero (**Dondero 1, paragraph 17**) I have not and did not represent Mr Dondero as his personal tax counsel while employed at Highland or at any time thereafter.  During this time, I held a license to practice

law but my role within Highland was as a tax professional and not as an attorney and I was assigned to the tax department, not the legal department. To the extent that Mr Dondero required tax or trust advice in respect of his assets, external tax counsel were hired to fulfil that role. It is well understood in the U.S. that attorneys who are employed by a company represent the company and not its officers or directors.

66.    Highland was an entity formerly owned and controlled by Mr Dondero, which was later placed into Chapter 11 Bankruptcy in the United States (**Highland Bankruptcy**). It is my understanding that the bankruptcy of Highland in 2019 was precipitated by Highland incurring significant exposure in what has been characterised as vexatious and oppressive litigation which Mr Dondero was instrumental in prosecuting. In particular in 2019 it was expected that a judgment would be made against Highland in favour of certain of its investors in the amount of US$189.3m. Highland was not in a position to satisfy this judgment and Mr Dondero placed the Company into Chapter 11. Following the collapse of Highland, Mr Dondero set up a new investment manager under the name NexPoint. Skyview was formed to provide back-office services to NexPoint and its managed funds.

67.    I was employed by Skyview from March 2021 to October 2024.

68.    I note that Mr Dondero refers to many of the former back-office employees of Highland becoming employees of the newly formed Skyview (**Dondero 1, paragraph 7**), Mr Dondero does not accurately describe the business of Skyview. From my time employed by Skyview I understand that almost all the clients of Skyview are entities owned and controlled by Mr Dondero.

69.    Further, the Chief Executive Officer and owner of Skyview is Mr Scott Ellington, a longtime business associate of Mr Dondero and former General Counsel of Highland. During my employment at Skyview it was well understood by those working there including myself, that Mr Dondero had actual control of Skyview. By way of example, the compensation determination for all of Mr Dondero's companies' employees is carried out in January-to February. During this time the

Head of Human Resources and a member of the Executive Board of Skyview would attend Mr Dondero's office at the Crescent where he would set the pay of every Skyview employee.

70. I provided tax advice to Skyview. In September 2021 my title was formally changed from "Tax Counsel" to "Managing Director, Tax". I requested this title change to make it objectively clear that I was not providing any legal services for Skyview, Mr Dondero, nor any of Mr Dondero's companies, which met no resistance from Skyview.

71. Contrary to the assertions made in **Diaz 1, para 25(b)**) and **Dondero 1, para 18**, at no point during my tenure at Skyview was I retained by Mr Dondero to advise in respect of his personal tax liability. As with my employment at Highland, external legal counsel was engaged to advise Mr Dondero in respect of his personal tax affairs and trusts. I submitted my resignation to Skyview by letter dated 2 October 2024, a copy of which I exhibit at **MP1/ page 48**. The significance of my resignation which I explain in further detail below has a direct correlation to the rapid deterioration of the ensuing interactions with the Highland Foundations.

72. During the course of my employment with Highland I, along with outside advisor Mr Douglas Mancino (**Mr Mancino**), was instrumental in the establishment of Holdco, DAF and the DAF Structure. Mr Mancino and I exchanged a series of letters exhibited at **MP1/ pages 49 – 52, 53 – 55, 56 – 58 and 59 - 61** commissioned a memorandum exhibited at **MP1/ page 62 - 66** and had in-depth discussions regarding the most advantageous structures, compliance implications, and outreach to potential recipients of the Participating Shares. This runs contrary to **paragraph 9 of Dondero 1**, where Mr Dondero over-states his involvement in establishing the DAF.

73. Contrary to the assertions made at **paragraphs 8 and 9 of Dondero 1**, Mr Dondero does not have the ability to use or influence the DAF to donate to charitable organizations. Furthermore, DAF entities are all for-profit entities and to the best of my knowledge and belief, Mr Dondero has never donated to.

74. At best, Mr Dondero is an indirect donor to DAF. Specifically, Mr Dondero donated assets to Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"), which was a charitable remainder trust and was required by law to donate all its assets to a charity by a certain date. My understanding is that a few years later, Trust #2 placed all its assets to an entity it owned called CLO HoldCo, Ltd. Trust #2 then contributed CLO HoldCo, Ltd. to Charitable DAF HoldCo, Ltd. in exchange for 300 participating shares in Charitable DAF HoldCo, Ltd. Trust #2 in turn gifted these 300 participating shares to the Highland Foundations. Mr Dondero's "donation" was in fact to Trust #2[1]. I am also aware that Mr Dondero or his trusts have made other donations to Highland Dallas Foundation from my work at Highland and Skyview.

## C.  FUNCTION OF HOLDCO AND DAF STRUCTURE

75. The DAF Structure was established in late October 2011 to provide a permanent capital offshore structure that would manage assets on a long-term basis, during which it would make discretionary distributions to the benefit of various charitable entities and their charitable endeavors. The structure was established for the purpose of reorganizing investment assets from Trust#2 and distributing such assets to non-profits when the trust expired per its term, and reducing the burden to pay US federal tax. It was never an investment fund.

76. In my experience these structures serve to mitigate the tax exposure of assets under management, while also permitting any donors of assets to have non-binding input on the investment of such donations and charitable contributions to charitable entities. It is important to stress that these arrangements, to avoid material tax liability and violations of criminal tax laws, must be conducted at arm's length and with strict adherence to the principle that the donor must totally relinquish dominion and control over the contributed assets.

---

[1]    In 2011, Mr Dondero also owned and controlled Charitable DAF GP, LLC, a Delaware limited liability company, which was the General Partner of Charitable DAF Fund, LP and effectively had control over the DAF Structure (other than Charitable DAF HoldCo, Ltd.). Mr Dondero could not maintain control of the General Partner because, in order for his charitable deduction that he obtained when he donated assets to Trust #2 to remain legally valid, he had to cede dominion and control of the transferred assets.

77. From my background as a tax professional advisor I am aware of the importance of avoiding inferences of "dominion and control".  These derive from the fact that under U.S. tax law, when someone donates to charity, they must forfeit "dominion and control" of the donated assets, meaning the donor must completely and irrevocably transfer ownership and control of the property to the charity. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used, directly or indirectly (such as with the DAF Structure). This includes relinquishing any power to change the use or disposition of the donated assets.

78. Furthermore, for the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. I exhibit at **MP1/ page 16 - 83** a memorandum of advice prepared by Corrington for Holdco addressing the issue of dominon and control of assets provided to charity (**Carrington Memo**).

79. The charitable distributions to DAF were to be made through the Highland Foundations as the Supporting Organisations of the DAF Structure.  I know from my involvement in establishing the DAF Structure that Mr Dondero is the President, Director, and Individual Member of each Supporting Organisation and wields further influence as a purported donor to the Highland Foundations.     If, for example, the IRS were to make a finding that Mr Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he has benefited from and impose civil penalties, as outline in the Carrington Memo (ref to page in exhibit).

80. The charitable distributions made would be from the DAF through Supporting Organisations exempt from federal taxation under Section 501(c)(3) of the US  IRC providing the DAF structure was administered and managed independently of any donor (including Mr Dondero's in his capacity as an indirect donor through the charitable remainder trust).   At the time Mr Dondero and I discussed the establishment of the DAF Structure, I informed Mr Dondero that the structure required the complete divestiture of assets and that the terms of the DAF and its

related entities could not provide Mr Dondero with any dominion or control over the structure or the distributions made by DAF.

81.    For example, when I articulated to Mr Dondero that the investment income reported to each of the foundations which held the DAF was US $22,875,944 to Highland Dallas Foundation, Inc.; US $22,961,382 to Highland Santa Barbara Foundation, Inc.; and US $22,883,319 to Highland Kansas City Foundation, Inc., Mr Dondero's response was "*They don't think of that money as their own do they???*". In fact, the Highland Foundations as Participating Shareholders were only entitled to cash distributions, if and when made.  Following my review of this correspondence I was concerned that Mr Dondero had evaluated the prospects of DAF to advance financing to his current and future projects in a way which may be contrary to Mr Dondero relinquishing dominion and control in respect of the DAF Structure.  A copy of this email exchange is exhibited at **MP1/ page 84 - 85**.

82.    In fact, the Carrington Memo at **MP1/ page 76** advised that there was a "*significantly heightened risk that the IRS could severely penalize and/or revoke the tax-exempt status of one of more*" of the Supporting Organisations which could in turn imperil the status and assets of the DAF, for the reasons which I explain below.

83.    My concerns which arose at a later date (again, the justifications for which are articulated more fully below) were that should Mr Dondero attempt, through his control of the Highland Foundations, to exert dominion and control over the cash and property that he previously (indirectly) donated to DAF (and for which I understand he claimed personal charitable deductions for U.S. tax purposes) and the IRS  were to make that determination, then the IRS would likely disallow the income and gift tax deductions that Mr Dondero took, and impose civil penalties, such as, a penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663, as referred to in the Carrington Memo (insert page ref from exhibit).

84.    In addition and as mentioned above, I understand that significant penalties can be imposed on self-dealings between a private foundation (such as each of the

Highland Foundations) and a "disqualified person". The term disqualified person"
includes an officer, director, or trustee of a foundation.  Given Mr Dondero's
involvement with the Highland Foundations, and further to the evidence which I
give below, by late 2024 I harbored concerns that the IRS may consider Mr Dondero
to be a "disqualified person" with respect to each and every Highland Foundation,
which could expose each of those entities to revocation by the IRS of its tax-exempt
status and possible criminal prosecution.

85.    To the extent that the DAF's assets could have been used in such a way, my further
       concern was that creditors of Mr Dondero could view the DAF as Mr Dondero's
       financial alter ego under U.S. law.  In tun that could expose DAF and its assets to
       creditor claims unrelated to the DAF Structure. Such claims could risk depleting
       the pool of assets held by DAF, which would result in depriving current and future
       charities from the benefit of those assets.  I note that significant amounts of DAF's
       liquid assets are held in the U.S. and whilst I understand (without waiving privilege)
       that concepts of alter ego are different under Cayman Islands law, that would not
       prevent attachment of DAF's assets held in the U.S.

86.    Quite simply, the assertions made on behalf of the Highland Foundations by the
       evidence of Ms Diaz show a fundamental misunderstanding of the corporate
       structure and charitable purpose of DAF.  Primarily, the Highland Foundations
       assume that DAF was a "consolidated entity" when in fact the fundamental
       scheme of the corporate group intentionally, and necessarily, delineated between
       control of and economic interest in the DAF Structure.

87.    In this regard, Holdco was incorporated and registered as a Cayman Islands
       exempted limited company on 27 October 2011 with registration number 263805
       (see **MP1/ page 86**).  Since its incorporation and until the DAF Restructuring in
       March 2025 (discussed below) Holdco was the Limited Partner of DAF through
       which it indirectly owned the entities in the DAF Structure.  However, Holdco did
       not hold voting, control, or management rights in respect of DAF. Its sole purpose
       was to act as a conduit through which discretionary, charitable donations would
       pass.

88. DAF, an exempted Cayman Islands limited partnership was controlled and operated by its former general partner, Charitable DAF GP, LLC (**Original GP**) between October 2011 through to the Restructuring.  From February 2024 DAF has been operated by the GP.   The Original GP was arranged in Delaware and also registered in the Cayman Islands under Part IX of the Companies Act (as revised). The control of the Original GP and the Replacement GP are also explained below.

89. The characterization by the Highland Foundations through the evidence of Ms Diaz of DAF as a 'Fund' (**Diaz 1, paragraph 12**) is therefore misleading and liable to create confusion.  DAF is not an investment fund but is a charitable vehicle and properly understood, DAF:

   (a)   Did not solicit capital from investors;

   (b)   Had / has no subscription agreements through which interests are taken up.   Notably, the Highland Foundations did not "subscribe" to DAF in the way, I am informed by counsel (without waiving privilege), commonly used by investment funds in the Cayman Islands, but were granted Participating Shares in Holdco by way of a gift at the inception of the DAF Structure.

   (c)   Holdco as Limited Partner had restrictive rights in its participation and management of DAF, including restricted rights to information.

   (d)   Had no entitlement to make capital calls against the Supporting Organisations or indeed against Holdco;

   (e)   Does not have a registered investment advisor;

   (f)   There are no investment hurdles or reporting requirements;

   (g)   There are no marketing brochures, private placement memorandums or other materials relating to solicitation for investments;

   (h)   The economic substance filing lists business of Holdco; and

(i)    There is no wind down date or term within which shareholders are entitled as of right to distributions.

90.    Accordingly, to describe DAF as a fund, as the JOLs, Mr Johnstone, Mr Dondero and MS Diaz assert, is incorrect.  Holdco was a passive holder and would receive cash distributions from time to time but purposefully did not enjoy any governance or fixed economic rights over the entities comprising the DAF Structure.

91.    The constitutional documents of Holdco and DAF maintained the necessary distinction between the economic interest in the DAF Structure and control over the same.  In the evidence of Ms Diaz the Highland Foundations incorrectly rely on the Amended and Restated Memorandum and Articles of Association of Holdco dated 19 January 2015 (**2015 Articles**) (**Diaz 1, paragraph 15**).  The Articles have been amended and restated twice since the 2015 Articles both as of 24 January 2024 and again since 20 February 2025 (**2025 Articles**).  It is the 2025 Articles which regulate the affairs of Holdco and are exhibited at **MP1/ page 87 - 123**.

92.    Notwithstanding that the Holdco constitution has been amended, the provisions relating to the rights and interest of the shareholders of Holdco have not been modified.  Holdco has issued both Participating Shares and Management Shares. The interests and rights conferred by these shares maintain a distinction between control of Holdco and an economic interest in Holdco.

93.    Management Shares are *"voting, non-participating share in the capital of"* Holdco *"that shall be non-redeemable at the option of the holder but redeemable by"* Holdco.  As stipulated in Art. 11 of the 2025 Articles, the Management Shares *"shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of"* Holdco.  Notably, Management Shares *"confer no other right to participate in the profits or assets of"* Holdco.

94.    In contrast Participating Shares, being those held by the Highland Foundations, are *"a non-voting, participating non-redeemable share in the capital of"* Holdco. Specifically, Participating Shares confer the right upon the Participating Shareholders to participate in the profits or assets of Holdco in accordance with

the terms of the 2025 Articles (**Art. 12, 2025 Articles**), which is subject to the sole discretion of the Directors of Holdco.

95.    The distinction between Management and Participating Shareholder rights is evident throughout the 2025 Articles:

(a)    it is for the Directors of Holdco to exercise their sole discretion to consider if a dividend ought to be paid to the Participating Shareholders, or whether the available funds ought to be set aside as a reserve.  The Participating Shareholders have no ability to vote on whether a distribution would be made from Holdco (**Arts 102, 105, 2025 Articles**).

(b)    Participating Shares do not confer the right to remove or appoint directors to Holdco.  The right to appoint Directors to Holdco is reserved for the Management Shareholder and Directors, whereas the ability to remove Directors of Holdco is limited solely to the Management Shareholder (**Arts 64, 65, 69, 2025 Articles**).

(c)    The Directors of Holdco have discretion to issue further shares in Holdco, and by the 2025 Articles the dilution of the Participating Shares *"shall not be deemed to be materially adversely varied or abrogated by [the]...issue of further Participating Shares"* (**Arts 7, 14, 2025 Articles**).

(d)    Participating Shares do not confer a general right to inspect any account or book or document of Holdco, except in very limited circumstances being if such a right is granted by law or the Directors of Holdco otherwise authorize such inspection (**Art 111, 2025 Articles**).

96.    At the time the DAF Structure was being established the limited nature of the Participating Shareholders' rights caused some charities who may have benefitted from the structure to reject the proposed gift of Participating Shares. I travelled and met with various charities, including  the Greater Houston Community Foundation and Communities Foundation of Texas.  These charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These

charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point.

97.   In contrast, the Dallas Foundation, the Great Kansas City Community Foundation and the Santa Barbara Foundation also undertook extensive due diligence and, through the Highland Foundations, accepted the Participating Shares by way of a gift in full knowledge of the very limited rights conferred by these shares.  Having regard to **paragraph 20(b) of Diaz 1**, it appears that the Highland Foundations are seeking to assert some form of fixed or proprietary economic interests in DAF which they knew were at best (i) discretionary; (ii) subject to dilution; and (iii) not controlling rights.  The assertion of the Highland Foundations in these respects are refuted. The Highland Foundations were cognizant of these limitations when they accepted the gift of Participating Shares. For example, I recall meeting with Mary Jalonick (now-retired former president of The Dallas Foundation, which is supported by the Highland Dallas Foundation, Inc.), who understood the limitations. The current effort by the Supporting Organisations therefore subverts the intention, understanding and terms of the agreement of the parties at the time the Particiapating Shares were gifted by the Company.

98.   The Highland Foundations, Ms Diaz and Mr Dondero were and/or should each have been well aware of the ability of Holdco to issue new Participating Shares. In July 2015, I understand that Mr Dondero had encouraged Grant Scott to cause Holdco to issue 5 Participating Shares to Community Foundation of North Texas (now known as North Texas Community Foundation) in exchange for US$.05. A copy of the correspondence admitting North Texas Community Foundation as a Participating Shareholder is attached at **MP1/ page 120 - 128**. I am aware that Mr Dondero was frustrated with (what he considered to be) the "woke", liberal, California-based Santa Barbara Foundation and their priorities, so Mr Dondero and Lane Britian requested that I find a replacement charity. At the time, I spoke with the El Paso Foundation and the Miami Foundation, who both rejected the gift of Participating Shares. North Texas Community Foundation was willing to accept a modest number of shares (5) to be held in a donor-advised fund account.

99. I explained to Mr Dondero in November 2014 that the Highland Foundations did not think of DAF's assets as their own and understood they were only entitled to discretionary cash distributions, if and when made. A copy of the email correspondence is exhibited at **MP1/ page 84 - 85**.

100. The operations of DAF are regulated by the Second Amended and Restated Exempted Limited Partnership Agreement of DAF, dated 11 March 2024 (**Amended LPA**). Again, the Highland Foundations rely on an outdated version of the governance document for the DAF. A copy of the Amended LPA is exhibited at **MP1/ page 129 - 146**.

### D.  DAF AS ALTER EGO OF JAMES DONDERO

101. From October 2011 until March 2021, Mr Scott was Managing Member and Sole Member of the Original GP and was the holder of the Management Shares issued in Holdco. As such Mr Scott was the control person over DAF and the related structure (**Control Person**). The function of the Control Person was and is to ensure DAF made independent investment decisions for the ultimate benefit of charitable beneficiaries and the charities they support. From my professional experience and expertise I understood that if the Control Person fails to act independently, the charitable and tax-exempt status of the supporting organisations would be compromised. The mere illusion of lack of independence could also expose DAF and its assets to adverse tax treatment and penalties from the Internal Revenue Service as well as creditors and other adverse parties if independence were not maintained.

102. Prior to 2021 Mr Scott and Mr Dondero were longstanding friends and acquaintances. I am aware from my associations with both Mr Scott and Mr Dondero that they were college roommates and that Mr Scott acted as Best Man at Mr Dondero's wedding with Rebecca (Becky) Dondero in 2005, which ended in divorce and extensive public litigation all the way to the Supreme Court of Texas. Mr Scott and Mr Dondero continued to be friends following the divorce litigation.

103. In or around March 2021 I approached Mr Scott to assume the role as Control Person of the DAF.  This required me to take on the directorship of the Original GP and be registered as holder of the Management Shares issued by Holdco. I assumed the role of Control Person as of 24 March 2021.  Therefore, the concept of their being a sole human agent in control of the DAF is one that has represented the status quo since its inception in 2011. The aspersions and innuendos cast by Johnstone Law on behalf of the Highland Foundations and more recently the JOLs are therefore inappropriate and are also consistent with their prevailing inaccurate view that DAF should be regarded as a "consolidated entity."

104. At this time I understood from my conversations with Mr Scott that he and Mr Dondero had suffered a falling out because Mr Scott refused to take a step at the request of Mr Dondero which would have caused him to breach his fiduciary duties to DAF.

105. It is my understanding and belief that Mr Scott's refusal to act at the direction of Mr Dondero angered him and that, as a result of Mr Scott's opposition to Mr Dondero's instructions, Mr Dondero wanted Mr Scott to resign. I exhibit an email from Mr Scott to John Kane on 30 January 2021 at **MP1/ page 147** which, contrary to the assertion made by Mr Dondero at **paragraph 20** of **Dondero 1** that Mr Scott informed him that he wished to resign in March 2021, Mr Dondero and Mr Scott reached a mutual agreement on a call on 30 January 2021 that Mr Scott would resign as a result of being at a "*cross-roads*" with Mr Dondero. In fact, Mr Dondero had stated to Mr Scott that *"The releases and non objection to the plan was all Seery cared about ... accusations of non independence was tweaking and always alleged against all trustees, very hard to prove ... not a real threat but Seery got a lot for it, look what you signed"*.  Mr Scott is not prepared to provide me with a copy of the unredacted email due to privilege but has intimated that he would be prepared to give evidence in these proceedings.  My understanding is that Mr Dondero did not have the power to remove Mr Scott from his position, but he nonetheless encouraged Mr Scott to resign because he was displeased that Mr Scott had done something to benefit Seery as outlined above (the Highland Capital Management, L.P. chief restructuring officer after Mr Dondero was ousted from Highland Capital Management).

106. The appointment and subsequent resignation of Mr Scott as described by Mr Dondero in **paragraphs 14 and 20-21** of **Dondero 1** is misleading. Contrary to the impression conveyed at **paragraph 14, Dondero 1** while Mr Dondero may have known and regarded Mr Scott for many years as a person of *"great integrity"* Mr Dondero did not select and nor could he select the Control Person of the DAF. To have such a level of decision-making in respect of the DAF Structure would have compromised the charitable standing and purpose of the structure from the outset.

107. At **paragraphs 20-21** of **Dondero 1**, Mr Dondero deposes that Mr Scott volunteered his resignation due to the fact that he was ill-equipped to handle various disputes which had arisen in connection with the Highland Bankruptcy proceedings on foot in the United States. Mr Dondero further and wrongly deposes to the effect that he was consulted on the transfer of Control Person from Mr Scott to myself, and that he was *"happy for Mr Scott to pass the Control Position"* to me.

108. For the avoidance of doubt, Mr Dondero was not consulted regarding my assumption as Control Person. This was a matter communicated by email between Mr Scott and myself. Mr Dondero learnt that I had been appointed as the Control Person on or after the relevant corporate transfers as of 25 March 2021. Once again, the impression wrongly conveyed by Mr Dondero is that the DAF and DAF Structure are subject to or under his control.

109. Mr Dondero's account of how I came to act as the Control Person in these proceedings directly contradicts testimony he gave under oath on June 1, 2021. In that testimony Mr Dondero testified to the fact that I had replaced Mr Scott a month after it happened and Mr Dondero did not know beforehand (see extracts from Mr Dondero's deposition dated 1 June 2021 at **MP1/ page 148 - 158**). Mr Dondero was clear that he learned of my appointment after the fact and that I was the one who told him. As set out in the transcript exhibited at **MP1/ page 149 - 150** Mr Dondero says, "*And unbeknownst to me, [Mark and Grant] agreed, and [Grant] sent over the appropriate documentation...and Grant signed it, and Mark Patrick became the trustee.*" Mr Dondero goes on to say that, prior to learning about me taking over for

Grant Scott, Dondero had no knowledge discussions were underway pursuant to which that would occur.

110. After assuming the role of Control Person I quickly formed the belief that Mr Scott had created potential liabilities for DAF and the DAF Structure as a result of failing to manage DAF and its assets independently of Mr Dondero, particularly where I suspected that Mr Scott had simply been authorizing investments proposed by Mr Dondero without due consideration for their appropriateness or any financial due diligence.

111. As set out in my evidence below, I have good reason to consider these investments may in fact have been for Mr Dondero's personal benefit and/or to further Mr Dondero's commercial interests, which were not aligned with the best interests of DAF, or the charitable purposes it was intended to serve. In effect, during Mr Scott's tenure as Control Person both the Highland Foundations and DAF were in effect under the common control of Mr Dondero which enabled Mr Dondero to utilize DAF and its assets as a private line of credit. As examples, (i) NexBank Capital Inc. (**NexBank**), which is a privately held bank where Mr Dondero has a significant ownership interest, sold land to DAF for tax benefits to NexBank, emails of which are exhibited at **MP1/ PAGE 159 - 162** and (ii) Highland (then under the control of Mr Dondero) sold or caused to be sold so many assets to DAF that DAF had no money to fund other proposed Highland investments, emails of which are exhibited at **MP1/ page 163 - 168**.

112. I knew that should this be the case, this would have profound legal, compliance, and tax consequences for DAF and DAF's assets. I also became aware that Mr Scott's compensation for DAF was determined by Mr Dondero without consulting any compensation study or expert advice, a copy of which communication is exhibited at **MP1/ page 169 - 170**.

113. My concerns that Mr Scott may have come under pressure to authorize transactions which may not have been in the best interest of the DAF (but rather Mr Dondero) were duly reinforced when I was unduly pressured by Mr Dondero. In mid-

2024, Mr Dondero (via his employees at NexPoint) proposed various investment opportunities that involved using DAF's assets, which would have been to the benefit of Mr Dondero and/or his affiliates but which in my opinion were not suitable investment opportunities for DAF. These unsuitable investment opportunities included rescue financing for a NexPoint fund in connection with an SASB refinancing and a NexPoint-led Delaware Statutory Trust investment regarding storage facilities. In response to DAF turning down these investment opportunities, Mr Dondero (through his assistant) demanded in August 2024 that I meet him three times per week to discuss DAF management and investments. In accordance with my fiduciary duties to DAF, I refused these demands but strongly suspected Mr Dondero sought to exert control over DAF, contrary to its tax compliance requirements and charitable purpose.

114. My review of the investments and dispositions from DAF revealed that Mr Scott had historically approved every related party transaction between DAF and entities owned or controlled by Mr Dondero. If I were to characterise the history of the way in which Mr Dondero treated DAF and the DAF Structure from 2011 until my appointment in March 2021, Mr Dondero used DAF through influencing Mr Scott's position as Control Person to (i) generate income for Mr Dondero's commercial gain; (ii) provide liquidity to Mr Dondero and his affiliate entities to advance his commercial interests and/or to reduce the tax exposure of Mr Dondero affiliated entities; and (iii) take high risk positions for below market returns in order to generate significant profit for his affiliate entities whilst retaining the upside for Mr Dondero's affiliate entities and continuing to enjoy significant personal tax benefits.

115. With respect to point (i) above:

    (a) I understand that Highland had previously charged investment manager fees to DAF. From my review of the investment management arrangement it does not appear that Mr Scott took any step during tenure as DAF's Control Person to independently review or assess the fees that were being charged to DAF.

(b)   As mentioned above, NexPoint is an alternative investment firm founded by Mr Dondero in 2012 and in which Mr Dondero admits he holds an interest (**Dondero 1, paragraph 7**). I also recall in the first month of my tenure as DAF's Control Person, that Mr DC Sauter (general counsel of NexPoint) and Mr Isaac Leventon demanded DAF pay NexPoint a 2% base fee and 20% upside for managing DAF investments. I rejected this demand whilst fully appreciating that paying management fees would be a way for Mr Dondero to circumvent the "dominion and control" issues which would otherwise arise from a tax perspective. I was clear that my role as the DAF's Control Person was not to rubber-stamp Mr Dondero's proposals but rather to advocate for the DAF and its charitable purposes.

(c)   When Mr Dondero or his entities needed capital and wanted to offload an illiquid or undesirable investment at a premium rate, such assets have been sold or donated to the DAF. By way of an example, the DAF currently has exposure of US $85 million to a syndicated debt facility where the borrower's sole investment is two wavelength spectrum licenses issued by the Federal Communications Commission. Such licenses are illiquid and speculative. In this case, I believe Mr Dondero (through both Highland and NexPoint entities) and his affiliates realised they were overleveraged in that investment and required DAF to buy it at par. I do not believe that DAF would be able to sell it at par because a maturity date extension signed in January 2025 required the borrower to pay steep fees and provide an increased interest rate, which are characteristic of troubled debt holdings.

116.   With respect to point (ii) above:

(a)   I recall that in November 2023, Mr Dondero attempted to exert influence over me as the Control Person, by asking me to transfer (on behalf of DAF) approximately US$1.5 million to offshore entities owned by Mr Dondero which I believed would be provided to Sentinel Reinsurance,

Ltd., a Cayman Islands limited company, (Sentinel) (or another entity above it in the Sentinel Structure) which I believe was then majority owned by Mr Dondero. I understand that the transfer was to settle the payment of outstanding legal fees which were wholly unrelated to DAF and its charitable purposes. The effect of this request would have meant that funds would be diverted from DAF and its charitable beneficiaries to further Mr Dondero's unrelated commercial interests.  On the basis of advice received from Parsons McEntire McCleary PLLC and without waiving privilege, I determined the proposed transfer would be "impermissible and illegal" (as stated in the Carrington Memo at pages **MP1/ page 68**).  It is important to note that at this time there were a number of outstanding lawsuits being conducted in the US in which the DAF Structure was being characterized as the alter ego of Mr Dondero. In accordance with my fiduciary obligations to DAF and in light of the real risk posed to the integrity of the DAF Structure by Mr Dondero's attempts to exert control, I refused to effect the transfer as directed.

(b) Similarly in the fiscal year 2024, I noted that Mr Dondero was experiencing liquidity issues and did not want Skyview Group to pay my bonus compensation.  As such, Mr Dondero directed human resources at Skyview to email Shawn Raver (at the time, an independent consultant who helped me with DAF matters) and instruct him to have the DAF advance 90% of my bonus with Skyview paying the remaining 10%.  Under this arrangement, such payments were likely characterized as director fees and is yet another example of how DAF was used by Mr Dondero to resolve third party liquidity issues.

(c) I understand that NexPoint (and other Dondero entities) had at various intervals sold to DAF its undesirable land situated in flood plains land and directed that investment funds related to Mr Dondero would sell other under or non-performing assets to the DAF to generate liquidity for Mr Dondero's entities.   Again, the viability of these transactions does not appear to have been independently evaluated by Mr Scott in his

capacity as the Control Person.  As a general matter, DAF's balance sheet was full of former NexPoint and other Mr Dondero-affiliated investments.

117. I also understand that Mr Dondero directed Mr Scott to send US $1 million of DAF funds to the Tall Pine Group, in order to pay Mr Dondero's affiliates (such as Mr Ellington and Isaac Leventon) their bonuses at a time when paying those bonuses was blocked by the US Courts in the Highland Bankruptcy (see an invoice issued by Tall Pine Group LLC issued on 3 April 2020 at **MP1/ page 171**).  Mr Scott caused DAF to make the US $1 million payment, which was flagged in the Highland bankruptcy proceedings as part of a larger US $17 million fraudulent transfer (see **MP1/ page 172 - 305**).  With respect to point (iii) above, examples of the value destructive dealings and transactions that were imposed on DAF are set out in a report prepared by ValueScope dated 20 November 2024 (**ValueScope Report**).  The ValueScope Report is exhibited at **MP1/ page 307 - 315**.

118. In summary, I observed that NexPoint would devise a scheme whereby it needed capital to consummate an initial investment and would engage DAF to provide bridge financing in exchange for a fixed rate of return with no upside beyond the fixed rate of return or repayment timeline.  Under this arrangement, NexPoint would retain the upside (typically the common equity interests) and DAF would receive a preferred equity that would be extinguished upon repayment with a fixed interest rate.  From industry experience, I do not believe that other lenders would agree to transactions on these terms, which is why I believe NexPoint would attempt to solicit funding from DAF.  In effect, the DAF provided access to millions of dollars of its own assets to support NexPoint's (and by extension Mr Dondero's) commercial ventures.

119. The ValueScope Report also provides an overview of transactions and events (in terms similar to those described above) concerning DAF, which includes reference to the:

(a) **The Campus at Legacy (TCAL) transaction** - This was characterised in the ValueScope Report as "NexPoint's request to DAF shifted US $45 million of downside risk to DAF, while NexPoint retained full upside. Development of TCAL would accrue significant benefits to NexPoint and Dondero by enhancing their adjacent Texas Research Quarter…project" (**TRQ**) (**MP1/ page 308**). By way of background:

  (a)    In September 2024, NexPoint requested that DAF acquire the TCAL property, which was advertised primarily as a land investment comprising approximately 80 acres, and featuring two office buildings generating approximately US $800,000 in annual net operating income at 59.4% occupancy.

  (b)    NexPoint had TCAL under contract for US $45 million and it was anticipated that the acquisition would close in November 2024. After closing, I understand (see **MP1/ page 308**) that NexPoint intended to control the TCAL property and gradually wind down the tenant leases, with a view to demolishing the site to construct new life science manufacturing facilities.

  (c)    TCAL would also be integrated into TRQ, a planned 135-acre life sciences innovation district centered around the former Electronic Data Systems campus in Plano, Texas, United States, which borders the TCAL property.

  (d)    I understand that NexPoint and its related entities owned substantial debt and equity interests in the TRQ properties.

  (e)    Due to insufficient cash flows generated from the office buildings on the TCAL property, DAF requested a two-year ground lease with NexPoint as the master tenant as part of the property acquisition. Additionally, DAF required that NexPoint be contractually obligated to purchase TCAL from DAF at the end of the ground lease and requested a security interest.

(f)     However, NexPoint declined, which would have left DAF with full downside exposure and limited upside potential.

(b) **Preferred Dividend Financing**

(a)     In August 2024, NexPoint approached DAF to provide NexPoint Storage Partners (**NSP**), which was managed by NexPoint Advisors, with US $11 million in unsecured financing. DAF was told that the funds were required as a bridge loan for the sale and refinancing of NSP properties. However, DAF learned after conducting some due diligence that the real use was to make a US $6.4 million payment on an upcoming preferred equity dividend payment NSP owed to an investor, Extra Space Storage. DAF ultimately turned down the deal, but this is another example of how Mr Dondero tried to use DAF as a personal banking facility to support his commercial ventures whilst I was the Control Person.

(b)     I also understand from the ValueScope Report that there was a failure to reduce risk in the deal by providing collateral, reducing outstanding NexPoint DST exposure, or by providing any put options.

(c)     The deal structure and the purpose for the funds also changed several times during the 2-week negotiation period.

(c) **Small Bay II DST bridge loan** – with respect to DST investments, the ValueScope Report states that: *"all three DST Investment made under prior leadership failed to be repaid from DST equity raise proceeds after full syndication, as opposed to full repayment on all new DST bridge loans that have been syndicated since Mark Patrick become the control person"* (see **MP1/ page 311**).  By way of background and in relation to the Small Bay II DST bridge loan:

(a)     In or around June 2024, Mr Dondero caused NexPoint to demand that DAF roll over its equity from a prior transaction while, simultaneously, Mr Dondero's trust, The Dugaboy Investment Trust (**Dugaboy**), (of which

Mr Dondero's family are the income beneficiaries and his sister, Nancy Dondero, is the trustee) which held a subordinate class of equity in the prior transaction, was paid at closing in full.  In other words, Dugaboy received a payment in full despite being at a lower position in the payment waterfall, and DAF rolled over its investment. The return to Dugaboy was listed at US $13,650,280 and DAF rolled over two classes of equity totaling $6,404,958.

(b)   As seen from the ValueScope Report, across the various investments DAF has made in NexPoint entities or NexPoint-related deals, DAF has also faced challenges in obtaining various repayments from NexPoint.

(c)   These DST investments followed a similar pattern: DAF provided a DST bridge loan to ensure that the Delaware Statutory Trusts were adequately capitalised from inception, and DAF was to be repaid through the sale of trust equity interests to DST investors.

(d)   However, NexPoint would regularly fall behind on these repayments to DAF by several months at a time (which were funds raised from investors). As a result, I negotiated a clause in the Small Bay II DST bridging loan agreement, which required NexPoint to pay DAF the funds that were raised within 5 business days (see an LLC Agreement of NREA SB II Holdings LLC dated 13 June 2024, exhibited at **MP1/ page 316 – 350, and page 319** which provides for the five business day window). Ultimately, Mr Dondero was upset over my handling of the transaction and exercising independence to act for the DAF, as DAF obtained multiple benefits and protections by fighting NexPoint on Small Bay II, as outlined in the ValueScope Report.

(e)   At the date of the ValueScope Report, NexPoint had not made any repayments and had retained at least US $8.26 million in funds with respect to Small Bay II and US $0.7 million in funds with respect to Polo Glen DST (described below) that it was contractually obligated to pay to

DAF. In a settlement related to the Highland bankruptcy, I negotiated with Mr Dondero to cause Mr Dondero to release the US $8.26 million (as detailed further in HCLOM Claim Narrative at **MP1/ page 351 – 354)**.

**(d) Polo Glen DST**

(a)   DAF made another bridge loan (which I refer to as the Polo Glen DST bridge loan) in December 2019 part of which, has remained unpaid for approximately five years.

(b)   As far as I am aware, there remains about US $0.7 million which NexPoint has refused to repay to DAF, despite having collected enough in asset management and various other fees to honour the repayment.

(c)   As further stated in the ValueScope Report, I also negotiated a put option to NexPoint and related parties in June 2024 as an option to reclaim the outstanding balance, which NexPoint failed to honour when it was exercised.

120.  In this respect, and contrary to the perception which Mr Dondero seeks to convey in **Dondero 1**, Mr Dondero frequently sought to utilize DAF as a means of generating liquidity for his other commercial ventures which placed DAF and the DAF Structure at risk of being characterized as the alter ego of Mr Dondero. Not only does Mr Dondero seem to be ignorant of the risks he was creating for DAF and the untenable position he was creating for anyone occupying the Control Position, but to compound his flawed thinking, once I pushed back (with the approval of Mr Muphy as independent/oversight director) on his demands, he has proceeded to retaliate by actively taking adversarial position against me and Mr Murphy through the Highland Foundations.  The JOLs do not seem to be remotely attuned to what is happening and have unconditionally adopted a position that can easily be traced back to Mr Dondero through the Highland Foundations for whom Johnstone Law has acted.  DAF is further at risk of being found to be the alter ego of Mr Dondero's *alter ego* given how it has been utilised in legal proceedings arising from Mr Dondero's actions. As observed in the ValueScope Report: "*All DAF litigation arises*

from Dondero.  Dondero adversaries have sued DAF, claiming that DAF is an alter ego of Dondero and his various entities.  Certain causes place all of DAF's assets at risk to Dondero creditors and aggrieved parties.  DAF must vigorously defend itself and its assets, which can be costly and time-consuming".  The extensive suits in which the DAF has been caught up are divided between those that are cases brought or initiated by adversaries of Dondero and those that were actions at the recommendation of Dondero (see **MP1/ page 313**).

121. DAF's participation in numerous litigious proceedings will also inevitably result in the depletion of DAF's assets, which is to the detriment of the charitable purposes that DAF is meant to support.  Mr Dondero has also been described as a "vexatious litigant" due to numerous and frivolous lawsuits brought by him either directly or indirectly, as discussed further in Mr Murphy's First Affidavit filed which is also being filed in opposition to this sanction application.

122. For the Court's benefit, a summary of these proceedings are as follows:

*Turnover Proceedings - New York County Supreme Court (Index No 650744/23)*

123. This claim was brought by UBS Securities LLC and UBS AG London Branch (collectively, **UBS**) to collect on a $1.1 billion judgment UBS had obtained against various Dondero entities. The UBS claim against DAF related to assets acquired by CLO Holdco in December 2010. Mr Dondero is a defendant in these proceedings.

124. Only DAF was dismissed as a defendant in these proceedings by the New York Supreme Court for lack of personal jurisdiction over CLO Holdco. The lawsuit proceeds against the other defendants. Whilst that outcome was positive for DAF, as I have alluded to above insofar as DAF's assets are within the U.S. I understand that if DAF is found to be the alter ego of Mr Dondero, those assets may be at risk of attachment by UBS (see further below).

125. With respect to **paragraph 54** of **Diaz 1**, Ms Diaz omits the fact that Mr Dondero, together with various entities he owns, are being sued by UBS in this action for US $1.1 billion for, among other things, a Cayman Islands Monetary Authority-

regulated company issuing a fraudulent after-the-event insurance policy in order to move assets from an advised fund of Mr Dondero to his company, Sentinel. Mr Dondero's motion to dismiss and motion for discovery in that action were both recently denied, and proceedings have been fast tracked for summary judgment[2].

126. As such, Mr Dondero will soon face the prospect of having to find and possibly liquidate the necessary assets in order to satisfy a potential billion dollar judgment. This is an important fact to omit, especially where DAF has a significant value of assets under management, which Mr Dondero has repeatedly exploited or tried to exploit in the past, to DAF's actual or potential commercial detriment.

127. Should a judgment be made against Mr Dondero, there is a risk that DAF's assets could be paid for distribution to creditors and/or UBS, if (a) Mr Dondero assumes control of the DAF; or (b) should creditors successfully argue that the DAF is in fact Mr Dondero's financial alter ego. It is for these additional reasons that establishing independence between DAF and Mr Dondero was critically important to obtain.

*Turnover Proceedings - Bankruptcy Court, Northern District of Texas (Index No 20-03060)*

128. These proceedings were brought by Acis Capital Management (**Acis**) and Josh Terry (**Mr Terry**) as part of Acis Bankruptcy (**Acis Bankruptcy**).

129. An action against Mr Scott was also brought in the Acis Bankruptcy, and Mr Scott was indemnified by DAF as former Control Person.

*Declaratory Judgment - District Court, Southern District of New York (Index No 5. 21-11059)*

130. This action was brought by  Mr Terry, a former business partner of Mr Dondero, alleging that DAF and CLO Holdco did not have standing to bring claims related to

---

[2]    Please note that summary judgment in these proceedings could result in three different outcomes: (1) the Turnover Petition is granted and the property is delivered up to UBS; (2) the Turnover Petition is declined; or (3) the Court finds that there are facts at issue which would result in discovery being ordered and a hearing is listed.

Acis's management of assets held by Highland CLO Funding, Ltd. (of which CLO Holdco held a 49.015% interest).

131. Acis and Mr Terry sought this relief on the basis that, prior to my accession as DAF's Control Person, DAF had fallen into a pattern of commencing multiple lawsuits and then dismissing them before discovery commenced.

132. Notably, I understand that attempts to settle this litigation were hindered by Mr Dondero and / or NexPoint's involvement each of which was against any settlement because I believe they wanted the litigation against Mr Terry to continue.

### Derivative Action - Royal Court of Guernsey (Civil Number 2479)

133. These proceedings were brought on behalf of a Guernsey domiciled entity called HCLOF seeking the distribution of cash being withheld from HCLOF by Acis , Mr Terry and U.S. Bank**, National Association.**

### Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03073)

134. The purpose of these proceedings was to seek an Order to reverse the cancellation of DAF's ownership interest in Highland Crusader Fund II, Ltd.

### Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03076)

135. In these proceedings, DAF was sued by the Litigation Trustee of the Chapter 11 Proceedings of Highland (**Highland Bankruptcy**) in connection with certain contributions received by DAF in 2016.

### Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (19-34054)

136. These proceedings concerned general matters related to the Highland Bankruptcy, including recovery of redemptions payable that were withheld by Highland.

### General Litigation - District Court, Northern District of Texas (24-00498)

137. This action (styled Highland Employee Retention Assets LLC v. James Dondero et. al.) was brought by Patrick Daugherty (former partner of Highland), who sued

Hunter Mountain Investment Trust, an entity managed by Rand Advisors, LLC, which is a DAF subsidiary, related to actions undertaken by Mr. Dondero.

### *The Business Court of Texas First Division (25-BC01B-0004)*

138.  Separately, Atlas IDF, LP, a Delaware limited partnership and, a DAF controlled entity, is suing an entity affiliated with Mr Dondero (NexPoint Real Estate Partners, LLC) and Dugaboy to collect on US $13 million in demand notes, which were guaranteed by Dugaboy (the validity of these guarantees is now being contested in litigation). I understand that through Deborah Dietsch-Perez (Mr Dondero's counsel), Mr Dondero has attempted to delay the hearing in that matter on the basis that he anticipates gaining control of DAF as a result of these Cayman liquidation proceedings (which would enable him to control Atlas in those proceedings). DAF performed a valuation study and discovered that the notes have a heavy discount due to concerns with collectability. In other words, the valuation experts were concerned that Mr Dondero would not pay his debts. Upon demand (with ten days' grace provided), they were not paid; given they are demand notes, that was a default.

139. Mr Dondero has since tried to acquire Atlas's demand notes for US $600,000 (see **MP1/ page 355 to 356**).

140. Atlas will continue to litigate against Mr Dondero for the collection of the demand notes in full.

### *United States District Court for the Northern District of Texas, Dallas Division (3:25-cv-477)*

141.  I am also aware of another example whereby Mr Dondero is utilising these Cayman liquidation proceedings in an attempt to delay collection efforts by DAF. In this case DAF is suing another entity affiliated with Mr Dondero to collect on a $1 million debt obligation. Mr Dondero controls an entity, Highland Capital Management Services, Inc., that defaulted on an approximately $1 million promissory note because Mr Dondero directed payment to a personal friend of his, Patrick McCabe (**Mr**

**McCabe**), who Mr Dondero may have believed that DAF owed money to, although I am not aware of any DAF obligation to or demand for payment from McCabe.

142. Broadly speaking, if Mr Dondero is successful at controlling the proceedings brought by DAF, I harbour concerns that he will direct the Highland Foundations to cease litigation and enter into settlements on terms that favour him. As a result, the Highland Foundations would provide Mr Dondero with an improper "private benefit" to the detriment of DAF.

143. Otherwise, I believe DAF has actively settled the other cases it had involvement with in 2025, and that its litigation expenses only relate to those cases mentioned above.

144. Shortly after my appointment as Control Person, Mr Dondero encouraged me to cause DAF to enter into litigation relating to Dondero's former company (Highland - in bankruptcy), which led to me being found liable for sanctions for breaching a gatekeeper order for filing a lawsuit recommended by Mr Dondero. This was later overturned by the U.S. 5th Circuit Court of Appeals.  DAF and I were  frequently referred to as:

    (a)    as an alter ego of Dondero,

    (b)    part of Dondero's web of entities, and

    (c)    under the direct control and influence of Dondero.

145. I also exhibit a letter from Seyfarth Shaw LLP to the IRS dated 20 March 2025 at **MP1/ page 357 - 374** (**Seyfarth Letter**), which notifies the IRS that Mr Dondero has an inappropriate donor relationship with representatives of the Highland Dallas Foundation (**HDF**), which is the Supporting Organization of the Dallas Foundation (which is a tax-exempt community foundation under US law, and whose president is Julie Diaz), which potentially jeopardizes the tax exempt status of HDF. Specifically, the Seyfarth Letter drew the IRS' attention to the fact that Mr Dondero

exerts direct control over HDF as a director, substantial contributor and president, and indirectly through his and his associates' influence over Highland Dallas' supported organization representatives on the HDF Board of Directors and the Dallas Foundation itself.

146. The Seyfarth Letter also provided the IRS with background on Holdco as HDF is a Participating Shareholder of Holdco, and ergo, Mr Dondero's attempts to control Holdco could have impacted HDF financially.

147. Having appreciated the precarious situation DAF and the DAF Structure had been placed in as a result of the conduct of Mr Dondero both generally and in exercising control over the structure, I immediately took the following actions to protect and mitigate against what I would characterise as "Dondero-recommended transactions":

(a) I hired independent law firms (law firms that had not been previously engaged by Mr Dondero) to negotiate with Mr Dondero's investment professionals and counterparty lawyers on every transaction. This is something which, to the best of my knowledge and belief, Mr Scott never did during the decade he acted as the Control Person.

(b) In order to verify any potential investment was properly underwritten, I hired and consulted with investment analysts such as ValueScope to make independent judgments before agreeing to a transaction. I believe that Mr Scott did not take steps to independently verify the potential investment opportunities presented to DAF by Mr Dondero. The ValueScope Report demonstrates the increased value and performance of DAF after I assumed the role of Control Person and retained investment analysts such as ValueScope to negotiate the financial terms for proposed transactions (see *Historical Performance*, ValueScope Report, **MP1/ page 310**). In particular the ValueScope Report notes that *"Under Mark Patrick's leadership, the DAF has delivered higher returns on bridge lending deals to NexPoint DSTs, all*

*while managing risks more effectively than in transactions executed before Mark took over".*

(c) DAF retained Paul Murphy as an independent director of Holdco and other DAF entities.

(d) We adopted institutional grade investment committee guidelines.

(e) We formed an investment committee to advise on investments with best-in-class managers, including the former Head of Harvard's fixed income portfolio.

(f) By terminating Skyview Group's servicing contract, the DAF saved US $1 million annually in service fees.

148. I took these steps knowing that the IRS would look favourably on any and all attempts made by the DAF to maintain its independence from Mr Dondero under the circumstances.

149. However, I realized that, despite the protocols I had established early in 2021, as the variety of litigation against the DAF was filed (including also DAF's litigation against a Guernsey entity, HCLOF referred to above at [x]), that a common theme and refrain was clear: the DAF was regarded as Mr Dondero's alter ego regardless of my legitimate actions to establish systems and protocols to attenuate that conclusion.

150. Additionally, I followed the various legal actions by UBS against Dondero relating to the Sentinel Fraud (as defined below), and I realized by early 2023 that both the Kirschner complaint against the DAF and potentially a future and significant claim to be brought by UBS (which eventually materialized) could jeopardize the DAF's assets and expose them to Mr Dondero's creditors and adversaries.

151. It is important to ensure the Court is appraised on the prior business dealings of Mr Dondero insofar as they demonstrate that in conducting his business affairs, Mr Dondero has previously placed himself in positions of influence and control for the

purposes of personal gain through unlawful transaction. This is demonstrated by the adverse rulings that were made against Mr Dondero (amongst others) during the course of the bankruptcy of Sentinel (a Cayman Islands based reinsurance company which is ultimately owned by Mr Dondero and Mr Ellington).

152. In summary, UBS Securities LLC and UBS AG London Branch (**UBS Entities**) alleged that the specific transfers of assets to Sentinel during 2017 (set out and defined below as the **2017 Transfers**) were executed after the UBS Entities obtained an order for summary judgment against Highland and other entities owned or otherwise affiliated with Mr Dondero. I refer to case *UBS Secs. LLC v Highland Cap. Mgmt. , L.P. ,* (index No. 650097/2009) (Supreme Court of the State of New York, New York County) (the **Underlying Action**).

153. In the Turnover Petition (as defined below) the New York court accepted that the 2017 Transfers took place at a time when the named respondents in the Underlying Action anticipated a US $1.2 billion judgment against them. The judgment was awarded in UBS' favour in the Underlying Action, but since the entry of the judgment, UBS has only been able to collect a fraction of the interest (and none of the principal) on that judgment. The assets compromising the 2017 Transfers were transferred pursuant to an attendant Asset Purchase Agreement, as payment of the premium for an after-the-event insurance policy (the **ATE Policy**) to insure Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland CDO Holding Company against liability in the Underlying Action. It was also claimed that the ATE Policy was outside the usual course of business for Sentinel, as Sentinel had never previously issued this type of policy or one as large as the ATE Policy and would not have had the means to pay on the ATE Policy without the assets received following 2017 Transfers (the **Sentinel Fraud**).

154. In connection with the Sentinel Fraud, Stephanie Vitiello (author of the Vitiello memo) and other affiliates of Mr Dondero received an indemnity for their role in the Sentinel Fraud, a copy of which indemnity is attached at **MP1/ page 375 - 384**. It is my understanding that UBS's counsel also used this indemnity as evidence of

Stephanie Vitiello and other affiliates of Mr Dondero participating in the Sentinel Fraud.

155.   In *UBS Securities LLC, UBS AG London Branch v. James Dondero, Scott Ellington, Highland COO Holding Company, Highland COO Opportunity Masters Fund, L.P., Highland Financial Partners, L.P., Highland Special Opportunities Holdings Company, CLO HoldCo, Ltd., Mainspring, Ltd., Motage Holdings, Ltd* (Index No. 6507 44/2023), the Supreme Court of the State of New York, New York County made a decision and order on 26 March 2025 (the **Turnover Petition**), finding that the Turnover Petition sufficiently alleged that:

(a)   Mr Dondero and Mr Ellington undertook fraudulent conveyances under DCL 276, when they devised and implemented a scheme to move all the remaining assets of, but not limited to, Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland Financial Partners, L.P. that could be subject to an impending judgment to Sentinel (the **2017 Transfers**). To the extent that Mr Dondero and Mr Ellington sought to dismiss these claims, their motions were denied.

(b)   Mr Dondero was the alter ego of another corporate vehicle called Mainspring, Ltd and that it was sufficiently alleged that Mr Dondero "*used Mainspring to enter into fake service agreements in order to pay HCM [Highland Capital Management, L.P.] insiders bonuses that they were otherwise ineligible to receive in HCM's bankruptcy*" and "*used Mainspring to reward HCM employees who were loyal to him*".

(c)   Mr Dondero "*used his dominance over Mainspring "to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury*"", with respect to allegations that Mr Dondero used his position as the ultimate beneficial owner of Mainspring, "*to compel Sentinel to issue dividends, thereby draining assets that would have otherwise been available for collection by UBS*".  To the extent that Mr Dondero pursued a motion to dismiss claims which sought to hold him liable as the alter ego of Mainspring, that motion was dismissed by the Court.

**Page 51 of 64**

156. In 2022, at a hearing in the Bankruptcy Court for the Northern District of Texas, where the Sentinel fraud was discussed, Judge Stacey Jernigan (**Judge Jernigan**) noted that she may make a referral to the U.S. attorney given the criminal conduct by Mr Dondero, Mr Ellington, and others to fraudulently hide assets from UBS and lie about it. I exhibit at **MP1/ page 385 – 517,** HCMLP Motion to Withdraw, Case No. 19-34054-sgj-11, Adversary Proceeding 21-3020-sgj.

157. I am also aware that Mr Dondero has a hatred of Judge Jernigan, who has consistently ruled against Mr Dondero. I understand it has been reported that a SEC whistleblower complaint was made against Judge Jernigan and I believe Mr Dondero subsequently directed an employee of one of his entities, Lucy Bannon (who is also an officer of the Highland Dallas Foundation) to leak the SEC whistleblower complaint to the press so they would cover it (see **MP1/ page 670 – 677**).

158. The actions by UBS (which I anticipated) underscore the need for clear independence between Dondero, his entities and affiliates on the one hand, and the DAF, including Holdco on the other.

159. In the middle of 2023, DAF's exposure to Dondero owned and controlled investments exceeded US $100 million. I successfully worked to reduce this exposure throughout 2024. At the end of 2024, exposure was about US $8 million. It was my belief that this exposure posed a material risk to the DAF because it could be used as alter ego evidence. This risk is also reflected in the ValueScope Report.

160. My actions to reduce the DAF's exposure to Dondero owned and controlled investments from US $100 million to US $8 million in the span of 18 months required DAF to turn down multiple deal proposals from Mr Dondero and his entities. In turn this led to increasing frustration from Mr Dondero at the beginning and throughout this period.

161. I managed the DAF while balancing (i) the legal and compliance need to reduce exposure (based on advice of Mr Alex McGeoch and Mr Mancino) to Mr Dondero owned and controlled investments and (ii) avoiding upsetting Mr Dondero and his

affiliates as I was acutely aware of Mr Dondero's litigious nature and believed that Mr Dondero would stop paying amounts due on DAF investments if a clean break between Mr Dondero and DAF was implemented.

162. These concerns were clearly well founded. Immediately following my resignation from Skyview (which was made on advice (privilege in which is not waived) and in order to assert more independence from Mr Dondero to better protect the best interests of the DAF) Mr Dondero directed the entities he controlled to cease all payments to DAF, including US $8 million Mr Dondero owed on a deal called Small Bay II (referred above).  In the following months, DAF sent letters attempting collection on three other investments. Mr Dondero has not met any of his obligations under them, requiring DAF to commence three lawsuits against Mr Dondero's entities for payment, each of which are ongoing.

163. Mr Dondero has, several times, commenced extensive, harassive litigation and/or engaged in other misconduct against his former employees and business partners. At **MP1/ page 553**, in the "Plaintiff Highland Employee Retention Assets LLC First Amended Complaint" records that Mr Dondero engaged in similar behavior against Joshua Terry, examples of Dondero and his affiliates' behavior is shown, which includes lying, fraud, and other types of misconduct and/or vexatious litigation against his former business partners Joshua Terry and Patrick Daugherty.

164. For the reasons set out herein, the background leading to the DAF restructuring is both factually and legally complex, as I understand counsel for DWF advanced at the Supervision Hearing.

### E.  RESPONSES TO FIRST AFFIDAVITS OF MS DIAZ

165. Save where already covered above, I address inaccuracies in Diaz 1 below. Paragraph references in this section are to paragraphs in Diaz 1.

166. With respect to Ms Diaz's evidence, she is wrong to describe and refer to DAF as a Fund for the reasons set our section x to above.

167. With respect to **paragraph 27 of Diaz 1**, this statement is inaccurate and misleading. I had informed several people affiliated with Highland Dallas Foundation, including Lucy Bannon and Lauren Short (NexPoint employees involved in personal relationships and charitable giving) that my daughter had formed this charity and I had asked whether they could donate US $5,000. Furthermore, no director or officer of Creative HEARTS TX has received or will receive any compensation, as these roles are strictly voluntary.

168. I understand that Ms Bannon and Ms Short approached Mr Dondero and obtained his approval.  Creative HEARTS TX was then added to the approved list of charities of the Highland Dallas Foundation, which I had not requested. However, these facts may not have been known to Ms Diaz at the time she swore Diaz 1 and I have done nothing ethically and legally wrong and/or inappropriate as Ms Diaz suggests.

169. With respect to paragraph 28, Fortaris is owned by Kevin Cronin, a private investigator used by Mr Dondero and a trusted advisor of Mr Dondero. As I explain further in this affidavit, Mr Dondero determined my compensation whilst I worked at Skyview.  After I assumed the role of Control Person of DAF I performed my functions as an employee of Skyview and as Control Person simultaneously.  Accordingly, I was concerned that Mr Dondero would attempt to exert influence over my actions at DAF by controlling my compensation received from Skyview.

170. My concerns were well founded in this regard. As mentioned above, the Court found that it was sufficiently alleged in the Turnover Petition that Mr Dondero had rewarded those who were loyal to him, which was suggestive that Mr Dondero had controlled remuneration as a means of leverage.  I also exhibit at **,MP1/ page 708** a confidential update with respect to Mr Dondero's negotiations with the Santa Barbara Foundation (**SB Foundation**) which illustrates how Mr Dondero threatened to withdraw US $1 million of funding to the SB Foundation because it elected to reject channeling funds to causes identified by Mr Dondero in favour of community causes. In response to the threat of having funding withdrawn, SB Foundation

agreed that a full slate of grants would be presented that were desirable to Mr Dondero, and would be allocated to the US $1 million funding.

171. This emerging pattern of coercing others through financial control compounds my concerns that Mr Dondero may leverage the private funding which he is providing to run this liquidation, as a means of influencing the direction of the liquidation itself. He could do so by threatening to withhold funding (which the JOLs and their counsel depend on to cover their costs and expenses) from the JOLs and/or their counsel, thereby placing undue pressure on the JOLs and/or their counsel, which may affect the JOLs and/or their counsel's ability to conduct themselves impartially in this liquidation.

172. As previously mentioned, I had identified that it was imperative that DAF was and was seen to be operated independently from Mr Dondero. Given my employment at Skyview it was my view that I should be paid from DAF in respect of services I provided to DAF and its related entities as the Control Person. Not only would the compensation need to be provided independently of Skyview but the level of compensation would need to be based on an objective third party compensation valuation. An independent compensation review was provided for the role as Control Person. This was then independently verified by Mr Murphy.

173. Given my concerns that the influence and control that was being asserted by Mr Dondero over DAF may have given was giving rise to allegations of DAF being an alter ego of Mr Dondero, I sought to consider ways in which my remuneration in respect of DAF could properly be paid without being subject to Mr Dondero's oversight, precisely because of the alter ego risk. I recall having two brief telephone conversations with Mr Cronin, as I explored whether my compensation (which would be paid by DAF) could be routed through Fortaris. I believed that, given historical payments by Mr Dondero's entities to Mr Cronin and Fortaris, payments by DAF to Fortaris would not raise suspicion with the Skyview employees monitoring DAF's finances. I shared with Mr Cronin an organisational chart and legal advice from Alex McGeoch, a tax expert at Hunton Andrews Kurth LLP, asserting that DAF can independently compensate me.

174. My intention in raising this suggested compensation structure with Mr Cronin was to insulate DAF from potentially significant tax liabilities if the charitable structure of DAF was not operated separately from Mr Dondero.  In any event, this arrangement did not come to fruition because Mr Cronin told Mr Dondero about my proposal. However, any actions I took in relation to Mr Cronin were taken in good faith.

175. I may have flippantly said something similar to Dondero 1 where Mr Cronin said "*you can't steal from yourself*". The context was that I was speaking to Mr Cronin and attempting to describe that, in my capacity as DAF's control person, I would be authorizing paying myself and that I was not "stealing" funds from anywhere. The basis for that statement was the written legal advice from Alex McGeoch (long-time DAF counsel) that I provided to Mr Cronin and attached at **MP1/ page 645**.

176. With respect to **paragraphs 29 to 30 of Diaz 1**, I believe that Mr Mancino did not mention material non-public information in his conversation with Mr Rosenberg and only mentioned the share price of NHT, which was public information of a public company. This did not constitute a MNPI and I note that Ms Diaz only says that it "could have" been.  Counsel at Eversheds Sutherland, a respected firm with securities law expertise, concluded that the material shared was not MNPI and did not constitute a breach of Skyview's policies and procedures, a copy of which is attached at **MP1/ page 647 - 650**.

177. With respect to paragraphs 31 to 35, Mr Mancino sent Holland & Knight a letter on February 14, 2025 informing them the numbers, specifically that "millions in director fees", were incorrect. He also said that the legal fees (the vast majority were DAF expenses) did not exceed US $10 million in 2024 and that they would continue to fall in 2025 and 2026.

178. My compensation was based on my role as CEO, CIO, and GC of DAF, and not my sole role as a director. As such these fees have been misclassified as "Director fees". It was also calculated based on a third-party independent report which took into account compensation packages for similar roles and responsibilities. The

final decision to approve my compensation was reviewed by Mr Murphy, in his capacity as an independent director, following his consultation with the third party expert. My compensation was only made after Mr Murphy executed written resolutions taking into account all of the relevant matters.

179. Both Mr Dondero and Ms Diaz make much of my "irresponsible management" of DAF by spending too much on expenses. However, US $6 million of the alleged US $18.3 million in expenses are not in fact expenses. Rather, Mr Dondero purposefully omitted that there was also US $6.1 million in income from a NexPoint-led transaction that more than offset the US $6 million in expenses, so Mr Dondero falsely inflated the expense number by omitting the offsetting income and the net gain to DAF from the transaction and those expenses. These are lease payments a DAF subsidiary receives in connection with an investment led by Mr Dondero called Skorpios (also known as NexPoint Life Science III). DAF is both lessee and lessor and generates around US $6.1 million per year from the arrangement. As such, DAF nets a profit each year (US $127,937 in 2024 and US $131,775 is anticipated in 2025, increasing substantially each year and maxing out at $364,815 in year 14), which is reflected in the spreadsheet attached at **MP1/ page 651 - 669** and provided by NexPoint.

180. I also met with Ms Diaz and Torrey Littleton on October 10, 2024 and Ms Diaz did not raise any concerns with respect to those now raised in Diaz 1. At that meeting, I also suggested that I would like audited financials of DAF (which had never been provided before) within the next two years and I had hired a third party accounting service provider for that purpose. On the same day, I also had a phone call with Debbie Wilkerson, the CEO of the Highland Kansas City Foundation, Inc. who similarly did not raise any concerns with me. Furthermore, on November 20, 2024, ValueScope and Mr Mancino spent several hours presenting to Holland & Knight (counsel to the Highland Foundations) on the finances of DAF, its investments, and its outlook which I understand from discussing with ValueScope and Mr Mancino afterward was received very positively by Holland & Knight.

181.  The next communication from the Highland Foundations that I received was the No Confidence Letter (as defined in Diaz 1) which was not actually received until December 2024 and left me in disbelief given that no questions or concerns had been raised with me previously. I was left confused why they had not voiced any concerns with me directly despite repeated affirmative outreach. Regardless, following the No Confidence Letter, on December 11, 2024, Mr Murphy presented to Holland & Knight regarding the DAF's corporate governance and investments, and which I understand was so well received, that Mr Murphy was invited by Michael Stockham, a partner at Holland & Knight, to provide the same presentation directly to the Highland foundation CEOs. The ValueScope Report also shows that the DAF had outperformed the S&P 500 during my tenure at DAF, and the Highland Foundations had been receiving quarterly financial updates from ValueScope for years.

182.  With respect to paragraph 38, Ms Diaz had received an asset list via the ValueScope DAF quarterly financial update on January 7, 2025 and I found her request for the same information again on 23 January 2025 to feel quite orchestrated. Historically, these reports were the only information the Highland Foundations received and, in any event, exceeds what they are entitled to under the organizational documents given their status as passive discretionary holders.

183.  With respect to paragraphs 46 to 49, the Highland Foundations were not entitled to notice but this change was done to use a Cayman (instead of Delaware) General Partner and to create more independence from Mr Dondero, for all the reasons above. I understand that under Cayman Islands law, a general partner of an exempted limited partnership must be a Cayman-registered entity whether as an exempted company or a company registered under Part IX of the Companies Act.

184.  With respect to **paragraphs 50 to 52 of Diaz 1**, Ms Diaz omits to explain Highland Foundations' role in opening the Texas AG (as defined in Diaz 1) investigation but in any event, the Texas AG has taken no action outside of sending an initial letter to request that certain DAF entities preserve documents. I believe the Highland Foundations and Mr Dondero reached out to the Texas AG to open an investigation

and use that as a data point in this matter. Mr Dondero's propensity to abuse a "complaint" filing is well known. As an example, refer to the SEC whistleblower complaint against Judge Jernigan described at **MP1/ page 670 - 677**.  DAF is actively attempting to cooperate with Texas AG, but the Texas AG has been non-responsive to repeated requests to meet with me and my advisors.

185.  As such, there is no dispute between myself and Mr Dondero, but simply a dispute between Mr Dondero and the assets under DAF's management which he seeks to control. To illustrate that point, in November 2024, I was offered through Mr Dondero's attorneys at the Ashcroft Law Firm (and its partner Johnny Sutton), a Caribbean Island and large sums of money if I agreed to step down from the DAF during a call on 22 November 2024**.**  It was also intimated to me by Ashcroft that this offer was also made on behalf of the Highland Foundations.  I believe Mr Dondero's intention in causing his attorneys to propose this was to remove me and insert someone who would not second guess his investment recommendations and would permit Mr Dondero to again use DAF (as was the case under Mr Scott's tenure as Control Person) for Mr Dondero's personal benefit. Needless to say, I turned down Mr Dondero's offer.

186.  For these reasons, it is vitally important that the JOLs obtain independent counsel to ensure they are properly and impartially advised. The central issues in this liquidation concern the actions I took, with Mr Muphy's oversight, to attenuate direct and indirect influences from Mr Dondero, including through his control of the Highland Foundations whom Johnstone Law previously represented.

187.  Furthermore, I understand that Mr Andrew Johnstone of Johnstone Law contacted My Murphy on February 12, 2025, purporting to represent *"Charitable DAF Fund 2 LP (**DAF 2**)."* .  I understand that Mr Murphy referred this enquiry to Walkers, who were legal counsel to Holdco and DAF at the relevant time.

188.  The purpose of this unsolicited outreach was unclear but it is evident that Johnstone Law as DAF 2 lawyers wanted to discuss DAF's assets. Why they wanted to do so and to what end has never been revealed. Critically, even assuming DAF 2

was a legitimate entity (presumably another exempted limited partnership), there is nothing in Johnstone Law's email to indicate (a) who the general partner of DAF 2 was (b) who the limited partners of DAF 2 were and (c) what possible interest any of them would have in confidential information concerning the assets of DAF. As if these concerns were not concerning enough, it subsequently transpired that DAF 2 does not even exist.

189. Following an entity search, Walkers determined that DAF 2 did not exist. I understand that Walkers followed up with Johnstone Law to clarify which entity they represented and where it was domiciled. Johnstone failed to respond to repeated follow ups and failed to provide context. It is my belief that through Johnstone Law, as was the case with Ashcroft, Mr Dondero was seeking to access Mr Murphy as a director of Holdco with a view to exercising control over DAF and its assets.

### F.  RESPONSES TO FIRST AFFIDAVIT OF MR DONERO

190. With each section that to the extent I do not specifically respond to the assertions made in Dondero 1 above, I wish to address the inaccuracies of that evidence below. Paragraph references in this section are to references in Dondero 1.

191. With respect to **paragraph 13 of Dondero 1**, there are no restrictions in the organizational documents of DAF that prevent the admission of additional charitable beneficiaries. Furthermore, DAF exists to benefit charities, not only the Highland Foundations.

192. With respect to **paragraphs 29 to 30 of Dondero 1**, I own shares in Holdco in my personal capacity, and any reference to me owning the DAF would be a reference to my ownership of the GP and the HoldCo Management Shares. However, it is completely inaccurate to say that I could pay myself however I pleased; that represents a fundamental misunderstanding of exempted limited partnerships generally but also misunderstands the nature of the DAF structure. I expressed to Mr Dondero that DAF needs to independently determine the value of my services without Mr Dondero's input, or input from an entity controlled by Mr Dondero. My

reasons for this were to reduce any susceptibility to coercion from Mr Dondero (both directly and indirectly), which could have been exercised by interfering with my compensation, and create independence for DAF.

193. In relation to **paragraph 31 of Dondero 1**, it is highly unlikely that the expense summary could have been produced in June 2024 because, due to a lag in reporting times, June numbers would not have been available until later in the year. I received June 2024 numbers in October 2024.

194. With respect to **paragraph 35 of Donder 1**, the Vitiello memo **referred to in Dondero 1** correctly concludes that I did not engage in insider trading under U.S. securities laws. This is in relation to a put option that was not exercised under a contract. Failure to exercise the put option jeopardizes Highland Dallas Foundation's tax-exempt status and, according to the Seyfarth Letter at **MP1/ page 361**, may have been an attempt to protect Mr Dondero from having to address the precipitous fall in fair market value shortly after the gift was made, as there would have been a requirement to file Form 8282 "*Donee Information return*" that would have revealed this information.

195. By way of background with respect to the Put Option, and as explained in the Seyfarth Letter at **MP1/ page 360**:

> *Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.*

> *One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").*

*Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on , December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026...*

196. The Seyfarth Letter concluded that based on public filings with the U.S. Securities and Exchange Commission, REIT had approximately 29,353,66- Units, of which 82.52% were owned by entities affiliated or controlled by Mr Dondero. Furthermore, I understand that the REIT is to be dissolved which means that if the Put Option is not exercised before that point, then, according to the Seyfarth Letter, this will result in a US $9 million "*inappropriate windfall to both Dugaboy and Mr Dondero*".

197. As explained in the Seyfarth Letter at **MP1/ page 360**:

*"The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,505,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy."*

198. It was public information that NHT had declined from a price per unit of $7.67 in December 2019 (when the donation occurred) to $0.20 in August 2024, representing a 99.7% decline. In fact, whilst the figures quoted in the Seyfarth Letter vary slightly, it was calculated that as of 22 November 2024, 1,500,000 Units were only worth $22,500, which is less than 1% of the Put Option value of US $9,285,000. Additionally, NHT disclosed on August 2, 2024 (26 days before I spoke with the Dallas Foundation) in a document titled "Management's Discussion and Analysis

of Financial Condition and Results of Operations that there was "a potential risk about [its] ability to continue as a going concern and, therefore, realize its assets and discharge its liabilities in the normal course of business." A copy of the NHT disclosure is attached at **MP1/ page 678 - 707**. Therefore, the information I disclosed was not "material" or "non-public" and would not have resulted in a violation of U.S. securities laws even if traded upon by Highland Dallas Foundation. This is also confirmed by the Eversheds Memo exhibited at **MP1/ page 647 - 650**.

199. Furthermore, and with reference to the Seyfarth Letter, it is important to not lose sight of the fact that the Put Option was in effect an interest free loan of US$9,285,000 for Mr Dondero and Dugaboy while the Put Option remains outstanding and unexercised.

200. For the purpose of responding to the JOLs' sanctions applications, I do not expand here on the factual inconsistencies which I have identified between the Vitiello memo and Dondero 1 and Diaz 1, but reserve all my rights to do so during the course of these liquidation proceedings.

201. With respect to **paragraph 36 of Dondero 1**, my resignation was not abrupt.  It was the culmination of actions I had been working toward to create independence between the DAF and Mr Dondero for almost two years.  I was not aware of any investigation or any accusation of wrongdoing on my part.  The Vitiello memo was finalized after my resignation, not before.

202. With respect to **paragraph 37 of Dondero 1**, the Skyview services agreement required 180 days' notice to terminate, and was not terminated effective until March 31, 2025. Whilst I have 4 years of investment management experience, DAF also has a wealth of other investment advisors, including:

   (a)   Investment committee

   (b)   Investment advisors

   (c)   Investment houses and banks with investment functions

(d)    Real estate advisors

(e)    Security and portfolio monitoring

203. With respect to **paragraphs 38 to 39 of Dondero 1**, Hunter Mountain's interest was sold to a DAF subsidiary based on an independent third-party valuation report and because it was sold to a DAF subsidiary, there was no dissipation of assets.

204. Furthermore, Mr Dondero's proposal that he is a potential buyer of Hunter Mountain is misleading. Mr Dondero's attorneys (Ms Dietsch-Perez at Stinson) have argued that Hunter Mountain owes Dugaboy and other trusts US $65 million in debt obligations. These debt obligations were released by the plain language of a settlement agreement entered into in 2022, although I understand that Mr Dondero disputes this. Given this dispute, it is doubtful whether Mr Dondero would have paid any meaningful amount for Hunter Mountain, outside of credit bidding the debt he believes he is owed.

205. As mentioned above, a valuation study was performed on the Hunter Mountain interests, and the purchase price is in accordance with this valuation study. The seller made an attempt to find other buyers by contacting distressed asset buyers, but there was little interest given that there was a contingent claim in the Highland Bankruptcy that would not be paid out until litigation ceased.

206. For the purpose of responding to the JOLs' sanctions applications, I do not expand further on the issue here but I again reserve all my rights to do so during the course of these liquidation proceedings.

**CONCLUSION**

207. For the reasons stated above, I respectfully request that the JOLs' sanction application is denied.



| | | | | |
|---|---|---|---|---|
| **SWORN** to at | Wise | Texas | ) | |
| on this | 4th | day of | June | 2025 | ) |
| | | | | ) | **MARK      ERIC      PATRICK** |

**BEFORE ME:** *Shannara Franzel*          132662714
                                              08/27/2028

**NOTARY PUBLIC**

NOTARY PUBLIC
STATE OF TEXAS

Shannara Franzel

ID NUMBER
132662714
COMMISSION EXPIRES
August 27, 2028

Electronically signed and notarized online using the Proof platform.

# EXHIBIT 18

 ND COURT OF THE CAYMAN ISLANDS

SERVICES DIVISION

CAUSE NO.: FSD 116 of 2025 (JAJ)

**IN THE MATTER OF SECTION 107 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF ORDER 5 OF THE COMPANIES WINDING UP RULES (2023 CONSOLIDATION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

—————————————————————

**SUMMONS**

—————————————————————

Let all parties concerned attend before the Honourable Justice Asif KC in Chambers at the Law Courts, George Town, Grand Cayman on                    2025, upon an application by DFW Charitable Foundation (**DFW**) being  a non-profit, charitable corporation registered in the State of Delaware, United States of America, under s.501(c)(3) of Title 26 of the United States Code (the Internal Revenue Code 1986) and a contributory of the Company, Charitable DAF Holdco, Ltd (in official liquidation) for the following orders and directions, namely that:

1.  Margot MacInnis and Sandipan Bhowmik, the current Joint Official Liquidators of the Company (**Previous JOLs**) be removed as joint official liquidators and Jeffery Stower and Neema Griffin of Teneo (Cayman) Ltd, Ground Floor, Harbour Place, 103 South Church Street, P.O. Box 10245, George Town Grand Cayman, KY1-1003, Cayman Islands be appointed as the replacement joint official liquidators of the Company (**Replacement JOLs**).

This Summons was issued by Baker & Partners (Cayman) Limited, PO Box 636, Buckingham Square, 720 West Bay Road, Cayman Islands, KY1-1107 for and on behalf of DFW Charitable Foundation.

2. Save for paragraph 2 of the Order dated 6 May 2025 appointing the Previous JOLs (**Appointment Order**), the Appointment Order shall apply mutatis mutandis to the Replacement JOLs.

3. The Previous JOLs shall, forthwith, deliver to the Replacement JOLs the Company's books and records and a copy of the Previous JOLs' liquidation files.

4. The Previous JOLs shall, within 28 days of the Replacement Order, prepare and deliver to the Court a report and accounts.

5. Such other orders and directions as this Court considers appropriate.

6. Further or other relief.

7. An order that the costs of and occasioned by this Summons be provided for.

Dated this 19th day of August 2025

*Baker & Partners (Cayman) Limited*
_____

**Baker & Partners (Cayman) Limited**

**TO:**       The Registrar of the Financial Services Division

**AND TO:**    Maples & Calder (Cayman) LLP, Attorneys-at-Law for the Previous JOLs

           Kobre & Kim (Cayman), Attorneys-at-Law Paul Murphy

           Campbells, Attorneys for Mark Patrick (Management Shareholder of the Company) and CDM CFAD LLC; CDH GP, Ltd (as General Partner for and on

This Summons was issued by Baker & Partners (Cayman) Limited, PO Box 636, Buckingham Square, 720 West Bay Road, Cayman Islands, KY1-1107 for and on behalf of DFW Charitable Foundation.

**FSD2025-0116**                    **Page 3 of 3**                    **2025-08-19**

behalf of Charitable DAF Fund, LP and in its capacity as General Partner); CLO Holdco, Ltd.

Carey Olsen, Attorneys-at-Law for Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.

TIME ESTIMATE: The estimated length of the hearing of this Summons is 2 days

This Summons was issued by Baker & Partners (Cayman) Limited, PO Box 636, Buckingham Square, 720 West Bay Road, Cayman Islands, KY1-1107 for and on behalf of DFW Charitable Foundation.

**FSD2025-0116**                                              **2025-08-19**

# EXHIBIT 19



Fourth Affidavit
Mark Eric Patrick
On behalf of DFW Charitable Foundation
Sworn on 19 August 2025
Exhibit MP4

**IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION**

**CAUSE NO.: FSD 116 of 2025 (JAJ)**

**IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**FOURTH AFFIDAVIT OF MARK ERIC PATRICK**

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1. I am duly authorized to provide this fourth affidavit in these proceedings on behalf of DFW Charitable Foundation (**DFW**).

2. I am the same Mark Patrick who swore and filed my first affidavit for and on behalf of DFW in these proceedings of on 4 June 2025 (**DFW Affidavit**) made in support of DFW's position at the sanction hearing heard by the Grand Court on 24 June 2025 (**Sanction Hearing**).

3. As set out in the DFW Affidavit, I am the registered director and sole shareholder of DFW which is the majority Participating Shareholder of Holdco.

---

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

4. The contents of this affidavit are, save where stated otherwise, within my own knowledge and are true. Where the statements made in this affidavit are not within my own knowledge, they are true to the best of my belief, and I have indicated the source of my information. In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

5. There is now produced and shown to me a paginated bundle of documents marked "**MP4**". References in this affidavit are to pages in MP4 are in the form [**MP4/Tab [xx]/page [xx]**].

6. I address herein certain facts and matters that have taken place during the conduct of the liquidation and in light of the events described in Ms MacInnis' Fifth Affidavit filed on 15 July 2025 (**MacInnis 5**), Ms MacInnis' Sixth Affidavit sworn on 11 July 2025 (**McInnis 6**), the First Affidavit of Ms MacInnis filed in the FSD Proceedings (as defined below) and sworn on 15 July 2025 (**FSD Affidavit 1**) and Second Affidavit of Ms MacInnis filed in the FSD Proceedings, sworn on 24 July 2025 (**FSD Affidavit 2**).

7. DFW reserves the right to provide further evidence to supplement the issues canvassed in this affidavit in support of the application for removal of the Current JOLs.

8. This affidavit proceeds as follows:

    (a) Introduction and Background

    (b) Dondero Control and Influence over the Highland Foundations

    (c) JOLs lack the requisite impartiality and independence:

        (i) Misuse of *ex parte* jurisdiction of the Court

        (ii) Advancement of the interests of the Highland Foundations / Mr Dondero

        (iii) Funding Arrangements:

            1. Misleading representations

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

2

2.    Inappropriate in all the circumstances

(iv)   Leveraging of the Cayman liquidation and profligate litigation

(d)   Appointment of Replacement JOLs

(e)   Conclusion

## A.   INTRODUCTION AND BACKGROUND

9.    This affidavit is made in support of a summons dated and filed on [] August 2025 (**Removal Summons**) which seeks the removal and replacement of the current joint official liquidators Ms Margot MacInnis and Mr Sandipan Bhowmik (**Current JOLs or JOLs**) of Grant Thornton Specialist Services (Cayman) Limited on the terms set out in the Removal Summons.   As set out in paragraph 1 of the Removal Summons and paragraphs 193 to 198 below, on seeking the removal of the Current JOLs DFW nominates Mr Jeffrey Stower and Ms Neema Griffin as replacement JOLs (**Replacement JOLs**).   Their qualifications are set forth in paragraphs 195 to 196 below.

10.   In connection with these matters and for the reasons I set out herein, DFW is of the view that the JOLs have failed to conduct the liquidation of the Company with the requisite independence such that there is a complete breakdown of trust and confidence between the Court's officers and DFW.

11.   For the reasons I depose to herein, it is my belief that the conduct of the Current JOLs is such that a fair-minded, objective stakeholder would reasonably conclude that the Current JOLs are lacking the impartiality and independence required for the office such that they should be removed. I provide further detail in respect of these matters in **Section C** below but in summary, the JOLs have:

a.  Persistently and without proper cause invoked the Courts jurisdiction *ex parte*

b.  Failed to provide full and frank disclosure on making applications on an *ex parte* basis

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

    c.  Adopted and pursued the agenda of the Highland Foundations / Mr Dondero to the prejudice of DFW

    d.  Failed to engage meaningfully with proposed terms of a Protocol

    e.  Made misleading representations regarding the Funding of the JOLs and their advisors

    f.  Failed to safeguard the Cayman liquidation process and prevent profligate litigation

    g.  Failed to disclose relevant US claims pending against Mr Dondero and Mr Ellington

    h.  Operated the liquidation of the Company to the advantage of the Highland Foundations / Mr Dondero

12.  The conduct of the JOLs since their appointment has demonstrated not a circumspect attitude as to the DAF Restructuring and all relevant parties but a biased, concluded view that the transactions comprising the DAF Restructuring were improper exercises by myself and My Murphy of the powers and authority vested in us as directors of the Company. This is compounded by the fact that in the same breath that the Current JOLs purported to be investigating the DAF Transactions as referred to in their First Report to Contributories as of 2 July 2025 (**First Report**), they had prepared and would imminently seek leave to commence the FSD Proceedings (as defined and addressed in the following paragraph 13). In all the circumstances, it is my honest belief that a fair-minded objective stakeholder would reasonably consider the Current JOLs to lack the requisite impartiality and independence to effectively fulfil the duties conferred on them by their office.

13.  I have given three affidavits in these liquidation proceedings and note that, since my third affidavit was filed the following procedural developments that are relevant to the conduct of the Company's liquidation have occurred:

    (a)  **24 June 2025:**

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

(i) Without setting out the legal basis on which they had any interest in the proceedings, the JOLs sought to intervene in a settlement agreement in the Dallas Bankruptcy Court which is accretive to the asset base in the DAF Structure by asking the Dallas Bankruptcy Judge to adjourn the settlement hearing for 45 days and that the judge "*may consider whether a brief adjournment of the Settlement Motion Hearing would be appropriate to afford the JOLs additional time to progress their investigation of the HMIT Entities.*" I exhibit at **MP4/Tab 1/Pages 1 to 3** a copy of that correspondence issued by the JOLs and referred to as the **HMIT Adjournment Letter**.

(ii) This application was made in circumstances where Mr Dondero, on behalf of his family trust – The Dugaboy Trust - had made an identical application on 9 June 2025 which was refused (discuss this further at paragraph 52(b) herein).

(iii) The JOLs request was heavily relied on by The Dugaboy Trust in opposing the settlement application but was rightly ignored by the Dallas Bankruptcy Court and the settlement agreement was approved.

(b) **2 July 2025:**

(i) The Current JOLs issued the First Report

(ii) the Highland Foundations issued a Petition in the Dallas Business Court seeking temporary restraining orders (TRO) and temporary injunction (TRI) and the emergency appointment of a receiver (**TRO Proceedings**).

(iii) The Dallas Business Court heard the TRO Proceedings and declined to make the orders sought by the Highland Foundations and those proceedings remain pending.

(c) **4 July 2025**: the Current JOLs prepared an *ex parte* application seeking leave of the Court to commence proceedings on the (**FSD Sanction**) in the

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

5

form set out in the Writ of Summons subsequently filed on 15 July 2025
(**Writ**) and supported by the fifth affidavit of Ms MacInnis (**MacInnis 5**).

(d)     **9 July 2025:** the JOLs convened and conducted the First Meeting of
        Contributories and constituted a Liquidation Committee.

(e)     **11 July 2025:** the Current JOLs issued an *ex parte* Summons seeking
        sanction for the JOLs to enter into a funding agreement with a Cayman
        incorporated LLC by the name of Crossvine Litigation Funding LLC
        (**Crossvine**) (**Funding Application**), which is supported by the sixth
        affidavit of Ms MacInnes (**MacInnis 6**).

(f)     **15 July 2025:** the Current JOLs:

        (i)     Filed the Writ, supported by two Affidavits of Ms MacInnis and
                exhibits (respectively, **FSD Affidavit 1** and **FSD Affidavit 2**; **FSD
                Exhibit 1** and **FSD Exhibit 2**) (exhibited at **MP4/Tab 2, Tab 3, Tab
                4** and **Tab 5 at pages 4 to 1617**) and referred to herein as the **FSD
                Proceedings**);

        (ii)    Made an application for an injunction in support of the FSD
                Proceedings pursuant to a Summons (**Cayman Injunction**).

(g)     **21 July 2025:**

        (i)     The Current JOLs filed a Petition seeking Chapter 15 Recognition of
                their appointment as liquidators of the Company.

        (ii)    The CDM Entities, as defendants to the FSD Proceedings, issued a
                Summons for Directions in respect of the Cayman Injunction.

(h)     **31 July 2025:** The Parties to the FSD Proceedings presented a Consent
        Order to the Hon. Justice Parker providing a procedural timetable for the
        hearing of the Cayman Injunction along with the summons issued by DFW

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation,
whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107,
Cayman Islands (Ref: DFWC.001.001)

on 9 June 2025, and the Summons issued by the CDM Entities dated 12 July 2025[1].

14.   I repeat **sections B, C** and **D** of the **DFW Affidavit** and refer this Honourable Court to **paragraphs 18 to 22, 29, 87 to 96** of the **DFW Affidavit** for background concerning the DAF Restructuring.  My evidence canvassing the nature of the dispute relating to the DAF Restructuring can be found at **paragraphs 38, 46, 56, 61** to **62** of **DFW Affidavit**.

15.   Furthermore, the validity of the Assignment Agreement (as defined and described further at paragraphs 71 to 73 of Mr Paul Murphy's First Affidavit sworn and filed on 4 June 2025 (**Murphy 1**)) is also in dispute.

16.   I also exhibit at **MP4/Tab 6/pages 1618 to 1620** an opinion obtained by CDMCFAD, LLC (**CDM**) from a tax, assurance an advisory firm called Weaver dated 30 May 2025(**Weaver Opinion**).  The Weaver Opinion considers the fairness of the redemption proceeds paid to the Highland Foundations in their capacity as Participating Shareholders following the Company's redemption of its Limited Partnership interest.

17.   The Weaver Opinion concurs with both the ValueScope and FTI conclusions mentioned in **FSD Affidavit 1**.  The Weaver Opinion goes further and indicates that the redemption payments made to the Participation Shareholders in the amount of US $1.6 million to the Participating Shareholders (other than DFW), was fair consideration for the Company's redemption of its limited partnership interest in DAF LP (see **MP4/Tab 6/page 1620**).

18.   A copy of the Weaver Opinion was provided to the Current JOLs on 1 July 2025 when it was uploaded to a data room hosted by US attorneys, Shields, and which the Current JOLs have access to. The Current JOLs have had the benefit of the Weaver Opinion for some 4 weeks but fail to make any mention of this in their First Report, creating substantial doubt over the assertions made by the Current JOLs in the FSD Proceedings.  Further I note that in the evidence for leave to bring the Injunction

---

[1]   At the time of swearing this affidavit, the Cayman Injunction has not been listed but the Court has been asked to list the matter for 11-12 November 2025.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

Application, no mention is made of the Weaver Opinion notwithstanding its relevance to the veracity of the claims that are asserted in the Writ which the Injunction Application has been brought to protect.

19. In essence, the dispute at the core of the liquidation of the Company centres on the validity of the DAF Restructuring, which has been mischaracterised as invalid or void and it is wrongfully allegedly by the Current JOLs to be part of a scheme to defraud the Highland Foundations of their alleged interests in the DAF Structure (see **paragraph 14, Diaz 2**).

20. The JOLs have, in certain material instances, simply parroted the complaints expressed by the Highland Foundations in the just and equitable Petition filed on 10 April 2025 - under the influence of Mr Dondero - without properly engaging with the evidence. For example, at **paragraphs 20 and 23, MacInnis 5**, it is asserted that the DAF Restructuring deprived the Highland Foundations, as the Indirect Charitable Owners of *"their interests in the Charitable DAF Fund LP (**Fund**)"* and that the Highland Foundations were the *"ultimate beneficial owners of the Fund and its substantial investment assets"*. These allegations are lifted from the Highland Foundations allegations set out in the just and equitable petition dated 10 April 2025 which was supported by Dondero 1 and Diaz 1. However, the assertions made in MacInnis 5 do not take into account the evidence outlined in Murphy 1 and the DFW Affidavit which the JOLs have had the benefit of since 4 June and which outline in clear terms (i) that the assets of DAF LP were neither the assets of either the Company nor the Highland Foundations; and (ii) that Dondero was also fully aware that assets and investments held through DAF LP were not the assets or property of the Highland Foundations.

21. Furthermore, at **paragraph 49.1, MacInnis 5**, Ms MacInnis refers to the directors' remuneration of US $600,000 per annum. This again mirrors Ms Diaz's summary of the position (see **paragraph 32(a)** of Diaz 1 which, in turn, is copied directly from Mr Dondero's expense report). Mr Dondero has wrongfully sought to contrast my remuneration described at **paragraph 49.2, MacInnis 5**, with Mr Scott's remuneration (see paragraph 15 of Dondero's 1) in a misplaced attempt to establish that I pose a risk to the Company's assets. The Current JOLs have since adopted that position too, for example, at paragraph 169 of the Writ and Statement of Claim where it is expressly

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

averred that *"[b]y contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000".* Neither Mr Dondero nor the JOLs have offered any objective evidence to support the inference that Mr Scott was reasonably remunerated during his tenure. In fact, and contrary to the statements of Ms MacInnis, email correspondence between Mr Dondero and Highland Capital Management's General Counsel J.P Sevilla on 31 July 2014 illustrates the arbitrary manner in which Mr Scott's renumeration was determined by Mr Dondero (see **MP4/Tab 7/Pages 1621 to 1622**). This correspondence also suggests that Mr Scott may have been paid from DAF LP's assets for services rendered to unrelated companies such as the Get Good Trust and other trusts. It also fails to take into account the engagement and payment of supposedly third-party service providers, like Highland Consulting Group, Inc. d/b/a Skyview Group (**Skyview**). Skyview – an entity controlled and managed by Scott Ellington, charged baseline fee of US $250,000 but incurred actual costs for administrative services which averaged US $1.5m a year. The engagement was terminated on 2 October 2024. I exhibit at **MP4/Tab 8 and Tab 9/pages 1623 to 1640** Skyview's Service Agreement and Termination Agreement. These are only two of several examples where DAF LP and its subsidiaries have been treated as a bank account by Dondero to pay the bonuses and salaries of individuals not employed by the Company or by the Fund or where entities affiliated or controlled by Mr Dondero and/or Mr Ellington were only too happy to charge large administrative fees as long as it ultimately inured to their personal benefit.

22. Similarly, there is no objective evidence to show that my compensation is unreasonable despite the allegations to the contrary. The only independent evidence on this point is outlined below in the following paragraph, which for reasons known only to the Current JOLs, they have chosen to disregard arbitrarily finding that my defences and justifications on this point not to be *"availing or credible."*[2].

23. I have responded to the allegations in respect of my remuneration in detail (see, for example, **paragraph 173, DFW Affidavit**) and outlined how I followed best practice by commissioning an independent, third-party assessment of the appropriate compensation for my role, which Mr Murphy then reviewed. A report prepared by

---

[2] See Footnote 8 of the Chapter 15 Verified Affidavit.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

Heidi Jensen O'Brien of Mercer, a firm which specializes in preparing reports for charitable organisations and are regularly commissioned by advisers and the Internal Revenue Service (**IRS**), is exhibited to **MM-5, pages 555 to 574** and **FSD Exhibit 1, MP4/ Tab 4/pages 1068 to 1087** (**Mercer Report**). At **paragraph 66, MacInnis 5**, Ms MacInnis does not engage with the substance of the report or its methodology, instead she finds cause to query the timing of the report primarily and the fact that *"the effect of the transactions pursued in reliance on the…Report resulted in a significant cash outflow from the Company."* This is a conclusory, pejorative statement that fails to stand up to scrutiny nor is it based on expert independent US evidence.

24. The Writ misrepresents my compensation position when compared with the role that was assumed by Mr Scott. As is deposed to in the DFW Affidavit, Mr Scott's role and activities in respect of the Company were limited and his remuneration reflected this limitation. When I assumed the role of Control Person, which included but was not limited to being the registered director of the Company, I took on the responsibility of managing the DAF asset investments; administering the structure and managing significant litigation which had been instigated or induced by the conduct of Mr Dondero (I outline the extensive litigation in the **DFW Affidavit** (**paragraphs 123-141**, and at **paragraphs 35.6, 35.8-3.17**).

25. In contrast, and as set out in the Mercer Report, which is exhibited at **MM-5, pages 555 to 574**, during Mr Scott's tenure these functions were performed by Highland Capital Management (a Mr Dondero related entity) and then Skyview (which was also under the *de facto* control of Mr Dondero). The Company paid some US $28.5 million over the course of 2014 to 2020. I exhibit at **MP4/Tab 10/page 1641** a summary of fees paid from the DAF Structure to Highland Capital Management / Skyview. As addressed in the Mercer Report, my rate of compensation reflects not only my role as Director to the Company but also the wider investment management functions I undertook which Mr Scott never assumed (but rather outsourced to Highland Capital Management to the ultimate benefit of Mr Dondero). Specifically, the Mercer Report acknowledged "*the complexity of my role*" at page 3 of their report, in that I held the following roles with the Company:

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

(a)   Chief Executive Officer (which involved managing the Company's operational issues, managing the DAF corporate structure and determining charitable disbursements);

(b)   Chief Investment Officer (which involved complex fund management and investment strategy);

(c)   Legal (which involved handling complex and contentious litigation and asset recovery); and

(d)   Compliance (which involved navigating regulations internationally and across multiple states domestically).

26.   Conversely, Mr Scott did not devote his full time and attention to the role of Management Shareholder or General Partner.   Mr Scott was and still is to the best of my knowledge, a practicing patent attorney.   This was not a full-time job for him and during the same period, Mr Scott also functioned as trustee for some of Mr Dondero's personal trusts, notably the Get Good Trust as reflected in **MP4/Tab 7/page 1621**.

27.   Mr Scott was also not involved in active investment management.  My understanding is that Mr Scott's duties consisted primarily of approving wires sent for his sign off by Mr Dondero's assistants.  I refer to the potential liabilities for the Company and the DAF Structure which I believed were created by Mr Scott's inability to maintain independence from Mr Dondero by virtue of simply authorizing transactions and investments proposed by Mr Dondero at **paragraphs 110 to 143, DFW Affidavit**.

28.   On a proper and impartial consideration of the Mercer Report and upon a more meaningful and fuller investigation, the differences in roles this would be apparent to the Current JOLs.  It is my belief that they have elected:

(a)   to present a misleading account of the very different roles fulfilled by myself and Mr Scott and suggest incorrectly that these roles were in fact the same.  I infer that the purpose of this approach is to sustain the allegation that during my management and supervision significant value has been

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

taken out of the DAF Structure, which is in fact contrary to the evidence before the Court (**DFW Affidavit at paragraph 181**); and

(b)   not to have regard to the evidence, diligence, and professional judgment by Mercer in issuing its report. Instead, they cite the US $60,000 paid to Mr Scott (and arbitrarily determined by Mr Dondero) as if it carries more evidential weight than the Mercer Report which was produced independently and featured heavily in the Company's authorisation process.

29.   Separately, Mr Dondero's written evidence in **Dondero 1** regarding the manner in which Mr Scott came to leave his role as control person directly contradicts his sworn oral evidence given during his deposition in separate proceedings (see **paragraph 109 of the DFW Affidavit** sworn on 4 June 2025).   And yet, the Current JOLs have not seen cause to stop and consider what weight (if any) should be given to the information provided by the Highland Foundations / Mr Dondero.   I pause here to note that not only has Mr Dondero provided inconsistent evidence and testimony, as explained further at **paragraph 35.15-35.20, Murphy 1**, he has been described as a vexatious litigant, held in contempt of court, and e restrained by a gatekeeper injunction to prevent vexatious litigation, a matter which he appealed all the way to the U.S. Supreme Court.

30.   In truth, and as deposed to in the DFW Affidavit and Murphy 1, the steps taken to implement the DAF Restructuring were necessary to (i) protect assets diverted from the charitable structure to the satisfaction of Mr Dondero's personal creditors; and (ii) ensure the assets of the structure could be applied in accordance with the terms of the ARLPA insofar as discretionary distributions were made to entities that were "*Indirect Charitable Owners*" providing those persons fulfilled the qualifying criteria of being eligible to receive distributions from the DAF Structure.

31.   As stated in the Company's Memorandum and Articles of Association, dated 20 February 2025 (Article 21) "*If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.*" (see **Exhibit MP1/page 99**). It is my honest belief that had Mr Murphy and I sought to procure the voluntary transfer of the shares held by the Highland Foundations notwithstanding

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

there was a basis and need for us to do so, that request would have been refused. This would further have exposed Mr Murphy and me to retaliatory action from the conduits of Mr Dondero's wishes, and placed us in the position of needing to take action outside of the control and influence of the Highland Foundations in order to fulfil our fiduciary obligations to the Company.

32. A "*Restricted Person*" within the Articles means "*…. any Person holding Participating Shares….which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.*" Specifically, the "*Restricted Person*" clause (b) also requires each Participating Shareholder to be an entity or organization exempt from taxation under Section 501(c)(3) of the Code. With leave of the Court I make reference to **FSD Affidavit Mancino 1 (**exhibited at **MP4Tab 11/Pages 1642 to 1687)** at paragraphs 42 to 46 and 154 to 155 below which illustrates the real and immediate concerns which required implementation of the DAF Restructuring and further highlights how the Current JOLs are unable to consider the DAF Restructuring from an independent and unbiased perspective.

33. As is deposed to in the DFW Affidavit and Murphy 1, the information and advice with which I and Mr Murphy were presented at the relevant time indicated that the Highland Foundations came within the meaning of "*Restricted Persons*" which disqualified them from being entitled to receive distributions from the DAF Structure, due to their associations with Mr Dondero which in turn placed the Company at risk of penalties and liabilities. These were not concerns limited to the Supporting Organisations but of material concern to the Company of which Mr Murphy and I were directors, for example:

   (a) The actions previously taken by Mr Dondero and the Highland Foundations could expose the Company, and its now former directors, to potential breaches of US tax laws and regulations especially where Mr Dondero was seeking to exert "*dominion and control*" over the DAF Assets (**paragraph 46.1, Murphy 1**);

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

(b)   I believe that Mr Dondero evaluated the prospects of the DAF Structure financing his current and future projects in a way which was contrary to Mr Dondero relinquishing dominion and control in respect of that structure (**paragraph 81, DFW Affidavit**);

(c)   The Company had received advice from Carrington Coleman that "*there was a significantly heightened risk that the IRS could severely penalize and /or revoke the tax-exempt status of one or more*" of the Supporting Organizations which would in turn imperil the assets of the DAF (**paragraph 82, DFW Affidavit**);

(d)   Mr Dondero has an inappropriate donor relationship with the representatives of the Dallas Foundation, which is the Supported Organization of the Highland Dallas Foundation (which is a tax-exempt community foundation under US-tax law, and whose president is Julie Diaz), which potentially jeopardizes the tax-exempt status of the Highland Dallas Foundation (**paragraph 145, DFW Affidavit**).

## B.   DONDERO CONTROL AND INFLUENCE OF THE HIGHLAND FOUNDATIONS

**Governance and structure**

34.   I set out in **paragraphs 17, 22, 29, 32,** of the **DFW Affidavit** the relationship between Mr Dondero and the Highland Foundations.  In response to the **FSD Affidavit 1** sworn by Ms MacInnis, I set out herein how the Highland Foundations should be regarded more factually as an instrument of Mr Dondero in the context of this liquidation and the FSD Proceedings, and I identify the inaccuracies in the JOLs' evidence.

35.   As I explain at **paragraph 17 of the DFW Affidavit**, Mr Dondero controls the Highland Foundations.   Ms MacInnis attempts to sanitize this relationship in **paragraphs 13-22, FSD Affidavit 1** (see **MP4/Tab 2/page 8 to 13**) to state that Mr Dondero has only 1 of 3 of the board of directors' voting rights for each of the Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc. However, in doing so Ms MacInnis ignores

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

that Mr Dondero is also the President of each of the Highland Foundations, as also deposed to at **paragraph 17, DFW Affidavit**.

36. Under the By-laws governing the Highland Foundations which are exhibited to the FSD Affidavit 1 and referred at **FSD Affidavit 1, Paragraph 18.1 and 18.6** (see **MP4/Tab 2/page 9 and 11**), the President is also the Chief Executive Officer of each of the Highland Foundations and has all powers that are delegated by the Board of Directors. Publicly available information confirms this. My understanding, based on advice of Delaware counsel, is that under the governing law of the Highland Foundations an officer including the President may generally cause a corporation (including the Highland Foundations) to take a wide variety of actions, including bringing lawsuits. It is striking that in the FSD Proceedings, the Current JOLs (see **paragraphs 13-22, FSD Affidavit 1** at **MP4/Tab 2/page 8 to 13**) contest at length that Mr Dondero has control over the Highland Foundations due to being only one of three Directors on each of their respective Boards but fail to address the matters which I raise immediately above.

37. It is also my belief that Mr Dondero has leveraged his influence as a donor to the Highland Foundations and President of those foundations to procure both proceedings before the Grand Court and the Dallas Business Courts with a view to taking control over the assets held in the DAF Structure to (i) bring an end to litigation which Mr Murphy and I have properly instituted against Mr Dondero and entities related to him; and (ii) access assets of value to meet potentially significant liabilities accruing to Mr Dondero, not least in the Turnover Petition proceedings instigated by UBS. I refer the Court to **paragraphs 123-127, DFW Affidavit** for a summary of those proceedings.

38. Structurally, the Highland Foundations are the conduits through which specific charitable foundations were supported. For example, the Highland Dallas Foundation provides donations to the Dallas Foundation. To the best of my knowledge, Mr Dondero does not have direct *de jure* control over the Dallas Foundation but in my experience, he is able to exert significant influence over the charitable foundations who previously received distributions from the DAF, through his control of the Highland Foundations. On several occasions, I witnessed Mr Dondero promising additional financial donations to the Highland Foundations in order to extract favors from them, including tax write-offs that benefited him personally like the NHT put option of US

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

$9,285,000 described below at paragraph 41. It is immaterial whether Mr Dondero in fact controls the underlying charities, as my concerns as the Company's director stemmed from the extent to which Mr Dondero wielded control and tried to influence to cycle the value of his settling donation from Trust #2 out of the DAF structure and back to businesses and transactions which were either related to or of benefit to him.

39. While FSD Affidavit 1 may give the appearance, at first blush, that the Highland Foundations are independent, in reality and far from keeping it a secret, Mr Dondero's control of the Highland Foundations is public knowledge and seemingly accepted by the Current JOLs. For example, in Highland Dallas Foundation's 2019 and 2020 tax filings, it listed *"300 Crescent Court, Suite 700, Dallas, Texas"*, which was the same address as Highland Capital Management while under Mr Dondero's control and is the newest address for NexPoint, Mr Dondero's current investment group.

40. The JOLs also confirm at **paragraph 11.2 and in footnote 4, FSD Affidavit 1** (see **MP4/Tab 2/Pages 7 and 15**), that NexPoint is an investment management firm of which Mr Dondero is the President, and that Mr Dondero caused the Highland Dallas Foundation to assume the name *"NexPoint Philanthropies Dallas Inc."* in June 2024, rather than do business under the 'Highland' name. This was previously deposed to at **paragraph 66, DFW Affidavit**.

41. The Current JOLs also ignore my evidence at **paragraphs 194 to 199**, of the **DFW Affidavit**, where I set out how Highland Dallas Foundation, Inc. has failed to request US $9,285,000 owed to them by Mr Dondero's personal trust, at a time when, according to Ms MacInnis at **paragraphs 53 to 59**, of the **FSD Affidavit 1** (see **MP4/Tab 2/Pages 31 to 34**), there are holes in the charities balance sheets and they are unable to pay their overheads.

**No economic interest justification**

42. In response to Ms MacInnis' sworn evidence in the FSD Affidavit 1, and so far as her evidence relates to matters of U.S. non-profit corporation and tax law, and the U.S. Internal Revenue Code (the **Code**), Mr Mancino of Seyfarth Shaw LLP (**Seyfarth**), who is considered to be one of the United States' most pre-eminent tax attorneys, swore

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

an affidavit in the FSD proceedings on 30 July 2025 exhibited at **MP4/Tab 11/Pages 1642 to 1687 (FSD Affidavit Mancino 1)**.

43.    A copy of Mr Mancino's Curriculum Vitae is exhibited at **DM-1, pages 1 to 12**, filed in these liquidation proceedings.

44.    In Mancino 1, he seeks to correct material factual errors and overstatements, and legal errors or distortions of U.S. tax and nonprofit corporation law made throughout FSD Affidavit 1.

45.    Such corrections include:

   (a)    Each Supporting Organisation was incorporated as a "nonprofit nonstock" corporation under the Delaware General Corporation Law (**DGCL**) in order to meet the organisational requirements for eligibility to be a charitable organisation for U.S. Federal income tax purposes under section 501(a) of the Code (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1645**).

   (b)    Nonstock corporations are not authorized to issue capital stock. And, under section 114(d)(3) of the DGCL, a nonprofit nonstock corporation does not have membership interests, which means that the Supporting Organisations, being the Dallas Foundation, the Greater Kansas City Community Foundation and the Santa Barbara Foundation do not have any right to share in the profits and losses of their respective Supporting Organisation, and no Supported Organisation has a right to receive distributions of the Supporting Organisation's assets (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1645**).

46.    Holland & Knight LLP expressly acknowledged on a call with Mr Mancino in November 2024 that the then Participating Shareholders of the Company such as the Highland Foundations had no rights (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Pages 1647**).   I also note at **paragraphs 64 to 66, Murphy 1** that similar comments were made by representatives of Holland & Knight to Mr Murphy at a presentation he delivered by video conference to Michael Stockham (a litigation partner) and David Rosenberg (non-profit tax partner) on 11 December 2024, who attended on behalf of

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

the Highland Foundations. Mr Stockham commented that he had read the constitutional documents of the Company and anticipated that Walkers (the Company's former Cayman counsel) would tell him that the Highland Foundations essentially had no rights in the Company.

(a) Each Participating Shareholder, upon agreeing to accept the gift of Participating Shares, relinquished any right it might have to any or any specific amount of dividends, any access to information absent a decision of the Directors to exercise discretion to provide information, any right to inspect any of the Company's books and records, any right to compel an audit, and other items enumerated above and otherwise contained in the Amended and Restated Memorandum and Articles of Association (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1644**).

(b) DFW Charitable Foundation is a U.S. tax-exempt organisation classified as a private non-operating (i.e., grant-making) foundation. It played a stewardship role as a controller of the assets formerly held by the Company and disseminating them for proper charitable purposes (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1652**).

(c) My status as sole member is a common practice with U.S. private foundations. This was disclosed to the IRS multiple times in the application for recognition of its section 501(c)(3) exemption filed with the IRS (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1652**).

(d) Mr Mancino also lists out the various restrictions placed on private foundations which represent serious guardrails which debunk the Current JOLs' assertions that DFW is little more than a "creature company" of mine (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Pages 1652 to 1653**).

47. It is unclear at present what U.S. tax and non-profit corporation advice the Current JOLs have obtained and from whom when the FSD Proceedings were conceived, as there is no mention in the FSD Affidavit 1 affidavit of any specialist tax advice being

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

obtained. However, a thorough investigation should have made these points apparent to the Current JOLs.

48.   The original allegations of "bad acts" attested to by Mr Dondero have been thoroughly refuted in evidence submitted in the DFW Affidavit.  Mr Dondero testified under oath that "*we took all the bad acts and all the investigations and we gave them to the [Highland Foundations].*"[3] The DFW Affidavit addresses and refutes these allegations.

49.   Mr Dondero testifies that he (together with, I understand, his employees at NexPoint and his affiliates at Skyview Group) built a case and facilitated investigations and provided this case to the Highland Foundations.  From the outset, before any of the correspondence between myself and DAF, on the one hand, and the Highland Foundations, on the other, Mr Dondero admits and seems to take pride in convincing the Highland Foundations to institute, winding up proceedings without first discussing with me.  I described this at **paragraph 185,** of the **DFW Affidavit** and extensively in my **First Affidavit as Sole Holder of the Management Share** sworn on 4 June 2025.

**Hunter Mountain Claim**

50.   The control and influence of Mr Dondero over the Highland Foundations is not simply a matter of conjecture and supposition but a matter of factual evidence arising from depositions and sworn testimony of Ms Diaz and Mr Dondero conducted on 22 and 25 June 2025, respectively.   These depositions were held in connection with a settlement agreement entered into between HMIT and the Highland Capital Trustee in Bankruptcy in May 2025 (**Hunter Mountain Settlement**). In proceedings titled *In Re Highland Capital Management, L.P,* (case number Case No. 19-34054-sgj11) (**Hunter Mountain Claim**).   HMIT's sole beneficiary is an entity called Beacon Mountain, LLC, which is a subsidiary within the DAF Structure.  A copy of the Hunter Mountain Settlement is exhibited at **MP4/Tab 12/Pages 1688 to 1699**.

51.   Under the terms of the Hunter Mountain Settlement, the DAF Structure will receive:

   (a)   a cash payment in the amount of US $500,000.00

---

[3] See Highland Capital bankruptcy hearing transcript at pg. 198 lines 10-12 and 22-23.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

19

(b)  the rights to a promissory note payable by Dugaboy (being the personal family trust of Mr Dondero (**DFW Affidavit, paragraph 119(b)**) in an original principal amount of US $24,268,621.69;

(c)  future cash payments as provided therein; and

(d)  the assignment of approximately US $300 million in legal claims to pursue matters covered in the Amended Kirschner Complaint, including actions against Mr Dondero, Mr Ellington and entities owned or controlled or affiliated with Mr Dondero and Mr Ellington.

52.  Mr Dondero has repeatedly sought, both directly and indirectly, to prevent and delay the consummation of the Hunter Mountain Settlement:

(a)  As deposed to at **paragraphs 75-80**, **Murphy 1**, in November 2024 HCLOM (being an affiliate / controlled party of Mr Dondero) sought to intervene in the Highland Capital Bankruptcy so as to dilute the recoveries of HMIT from Highland Capital, by asserting a claim under a disputed promissory note in the amount of US $12.6 million. It is my belief that the dilution of these recoveries was attempted in bad faith in order that Mr Dondero could place HMIT under financial pressure so as to limit its ability to contest arbitral proceedings commenced by Dugaboy in respect of a promissory note in the amount of US $62.6 million.

(b)  On 9 June 2025, Dugaboy sought from the Dallas Bankruptcy Court an adjournment to the Hunter Mountain Settlement Hearing for a period of 90 days. Justice Jernigan rightly denied this request for the reason that Dugaboy / Mr Dondero had *'de minimis'* status in the Highland Capital Bankruptcy to be heard in respect of the Hunter Mountain Settlement.

(c)  On 9 June 2025, the Dallas Foundation also filed an objection to the Hunter Mountain Settlement (**DF Objection**) (**see MP4/Tab 13/Pages 1700 to 1714**). During the course of her deposition on 22 June 2025, Ms Diaz, as President and Chief Executive Officer, was questioned in respect of the

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

reasons for the objection it became apparent that there was no basis for the DF Objection to be sustained:

(d)   Ms Diaz knew of no lawful basis on which the objection to the Hunter Mountain Settlement could be asserted by Highland Dallas Foundation.

(e)   Ms Diaz, who admitted to approving the filing of the DF Objection also admitted to not having read the Hunter Mountain Settlement to which the DF Objection related.

(f)   In the DF Objection, Ms Diaz referred to the ability of the JOLs (*"Cayman Court-appointed fiduciary"*) to scrutinise the transactions which comprise the DAF Restructuring and claw-back or bring avoidance actions. However, it transpired during deposition that Ms Diaz has no expertise or understanding in respect of the potential claw-back or avoidance actions or of Cayman law and what would be required.

(g)   Ms Diaz had no basis for the assertion made in the DF Objection that Mr Patrick was acting outside the scope of his authority when entering into the Hunter Mountain Settlement.

(h)   Ms Diaz was questioned in a deposition she gave in the proceedings with Case No. 19-34054-sgj11 (**Highland Bankruptcy Proceedings**) on 22 June 2025 (see **MP4/Tab 14/Pages 1715 to 1815**) with respect to the allegations that I disclosed material non-public information as set out in Diaz 1 filed in support of the Petition for winding up the Company dated 9 April 2025, **paragraphs 28 to 30, Diaz 1**. I vigorously refute those allegations (see **paragraphs 176-177, DFW Affidavit**) and it is the case that Ms Diaz had no basis for making this allegation but was following the instructions of Mr Dondero in making such an assertion (see **MP4/Tab 14/Page 1791**):

> *"I'll just tell you the quote he gave us, which was Jim Dondero's spiraling out of control and you need to do this because nothing appears to be what it is" and "I don't know [my basis for alleging material nonpublic information]."*

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

21

    (i)     As deposed to at paragraph 13 (a)(i) above, on 24 June 2025 the JOLs issued the HMIT Adjournment Letter on 24 June 2025 in which they sought to intervening in the Highland Bankruptcy Proceedings. This interference was without the JOLs having any legal basis for doing so and presented in terms that reflected the previously failed attempts by Dugaboy and the DF Objection to prevent the Hunter Mountain Settlement.

53. As a result of the deposition of Ms Diaz, the DF Objection was withdrawn. The Hunter Mountain Settlement was approved by Justice Jernigan on 30 June 2025.

    (a)    Following the withdrawal of the DF Objection, at the hearing to approve the settlement before Justice Jernigan on 25 June 2025, Mr Dondero gave clear evidence demonstrating the extent to which he can control the Foundations (see **MP4 Tab 15/Pages 1816 to 2081**, for example:

    (b)    As to the question of why the other Foundations had not filed objections to the Hunter Mountain Settlement in line with the DF Objection, Mr Dondero stated: *"[Ms. Diaz] got bludgeoned in depositions over the weekend and it happened last night and nobody was aware of it"*. In other words, the only reason why the objection was withdrawn by the Dallas Foundation was because it had acted independently of Mr Dondero's influence and control, and at the time to his knowledge the DF Objection was to stand such that the other Foundations would not need to also object.

    (c)    Mr Dondero was questioned specifically in relation to the withdrawal of the DF Objection and stated that:

*"we only had six hours' notice that [Dallas Foundation withdrew its objection]"* and *"if we had more time…[Highland Foundations] probably would object."*

    (d)    In other words, had Mr Dondero had an opportunity to speak with the Highland Foundations, he believes he could have successfully persuaded them to file similarly meritless objections to the Hunter Mountain Settlement Agreement.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

(e)     The efforts of Mr Dondero to stymie the Hunter Mountain Settlement have not abated, and on 17 July 2025 Dugaboy issued a motion to delay the implementation of this settlement for a period of 90 days (**Dugaboy Stay**, exhibited at **MP4/ Tab 16/Pages 2082 to 2177**) "*so that it and other parties can investigate the allegations made in the recently filed request for a stay of all Highland bankruptcy proceedings made by the Texas Attorney General, and the complaint (the "JOL Petition") the Joint Official Liquidators ("JOL") of Charitable DAF HoldCo LTD ("Holdco") filed on July 15, 2025, by. That Petition, annexed hereto as Exhibit A, outlines a massive fraudulent scheme*".

(f)     On 21 July 2025, Justice Jernigan denied the request to stay the Highland Bankruptcy proceedings based on this objection.

## C.   PARTIALITY AND LACK OF INDEPENDENCE

54.   DFW harbours serious concerns regarding the Current JOLs' objectivity and independence which has culminated in a complete collapse of DFW's trust and confidence in the Current JOLs, arising in particular from the following conduct:

    a) Persistent and unnecessary use of *ex parte* proceedings

    b) Failure to provide full and frank disclosure

    c) Funding Arrangements:

        a) Terms of the Funding Agreement

        b) Crossvine is James Dondero

        c) JOLs failure to disclose source of funding

        d) Conflict of Interest in Dondero funding liquidation

        e) Involvement of Scott Ellington

    d) Lack of engagement with Proposed CDM Protocol

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

    e) Leveraging of the Cayman liquidation & Advancement of Dondero interests:

        a) Failure to Sanction Highland Foundations

        b) Solvency determination

        c) Avoidance of the DFW Summons

        d) Interference in Texas Bankruptcy Proceedings

    f) Inadequate or incomplete investigations:

        a) Limited Interviews

        b) No investigations into US Federal Tax status concerns

        c) No investigation into Dondero related litigation

        d) Utilisation of the DAF LP structure for benefit of Dondero

    *e)*   *Persistent and unnecessary use of ex parte proceedings*

55.    To the best of my knowledge and belief, since their appointment on 6 May 2025 the Current JOLs have made at least two and perhaps three *ex parte* applications to the Court. In those instances, the circumstances either did not warrant the application in the first place, or did not warrant that the application be made on an *ex parte* basis.

56.    It is my view that the Current JOLs have proceeded *ex parte* not for the preservation of matters in the FSD Proceedings but to deprive DFW of the ability to participate in the proceedings that are envisaged and to obtain a tactical advantage by avoiding due process where possible. From my familiarity with Dondero's litigation strategy (or that of Dondero related entities) this is consistent with his modus operandi.

    i.    <u>*Sanction of legal counsel:*</u> I address the sequence of events surrounding the proposed sanctioning of Johnstone Law as legal counsel to the Current JOLs in the **paragraphs 23 to 51, DFW Affidavit**. I do not propose to repeat those

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

events in detail and will leave counsel to make submissions from the facts, but it is important to note that the procedural conduct deployed by Johnstone Law on the instructions of the JOLs demonstrated from the outset a biased disposition to the position of the Highland Foundations at the expense (literally and figuratively) of DFW.  In particular it is relevant to note that:

a.  As of 6 May 2025, Johnstone Law had consulted with the Dondero-controlled Highland Foundations and Current JOLs to settle and agree the engagement of Johnstone Law as legal counsel to the Current JOLs.  The terms of the consent provided to Johnstone Law from the Highland Foundations did not permit Johnstone Law to disclose to the Current JOLs confidential information which Johnstone Law came into by reason of their prior engagement by the Highland Foundations.  This is deposed to in Johnstone 1.

b.  As of 6 May 2025, the proposed engagement of Johnstone Law by the Current JOLs was not shared with DFW nor the Court, notwithstanding that the JOLs had attempted to obtain the blanket power to engage legal counsel by the terms of the Supervision Order without providing terms to the Court or disclosing in pleadings which firm/firms were to be engaged.

c.  The Current JOLs, through the Letter Application (defined in **paragraph 50, Johnstone 1**) sought to have the Court sanction the engagement of Johnstone Law as legal counsel to the Current JOLs on an *ex parte* without notice basis (at least to DFW and myself as Management Shareholder), and without a hearing in circumstances where they knew the consent of DFW would not be forthcoming for reason of the submissions made by DFW at the Supervision Hearing, as subsequently committed to writing in correspondence dated 14 May 2025 issued to Johnstone Law by Baker & Partners (I refer the Court to the **paragraph 48, DFW Affidavit**).

d.  DFW only became aware that the current JOLs had sought to sanction the engagement of Johnstone Law in the manner described immediately above

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

when, by an email sent on 21 May 2025 from Johnstone Law to DFW's Cayman Islands' legal counsel seeking to agree to directions for a hearing which had been directed by His Honourable Justice Asif KC to consider the sanction of legal counsel. I infer from his Lordship's direction that the Letter Application was not procedurally appropriate in the circumstances, and in my view indicative of an attempt to undermine the position of DFW by denying the procedural fairness which DFW as a stakeholder in the liquidation of the Company would be entitled to.

e. Despite requesting a copy of correspondence between Johnstone Law and the Grand Court regarding the proposed sanction application (I refer to **paragraph 50, DFW Affidavit**), DFW was not provided with a copy of the Letter Application. In fact, legal counsel to DFW was only able to consider the Letter Application when served with the hearing bundles for the Sanction Hearing of 24 June by Maples (the now sole Cayman attorneys to the JOLs). Clearly Maples had been provided with a copy but I do not believe that counsel to any other stakeholder was so provided. I would invite the JOLs to confirm if the Highland Foundations were provided with a copy of the Letter Application prior to service of the hearing bundles by Maples.

f. When I was finally able to consider the Letter Application, I was struck by how similar the substance of that correspondence was to the Second Affidavit of Ms MacInnis, suggesting that the evidence of the Current JOLs was heavily if not entirely drawn from the Letter Application which was prepared by legal counsel which DFW maintains is conflicted having first been engaged by the Highland Foundations, who I know to operate under the significant influence of Mr Dondero, and which is deposed to at **paragraphs 56.i and 57.ii herein**.

g. Although the JOLs eventually resiled from seeking sanction for the engagement of Johnstone Law on the business day before the Sanction Hearing (24 June), it is my belief that the manner in which the Current JOLs sought to obtain sanction for the engagement of Johnstone Law on

**THIS AFFIDAVIT is** filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

an *ex parte* basis in the face of known opposition is indicative of conduct which lacks the requisite independence and impartiality.

ii.   *Sanction of FSD Proceedings*

a.   The JOLs again applied *ex parte* without notice for the Court's sanction to commence the FSD Proceedings (***ex parte* Application 2**).   On 22 July 2025 Maples provided a heavily redacted note of the remote hearing for *ex parte* Application 2 (***ex parte* Note**).  A copy of that note is **exhibited at MP4/Tab 17/Pages 2182 to 2185**, along with a substantially redacted copy of MacInnis 5 which was sworn in support of that application (**Tab 17/Pages 2186 to 2234**).

b.   The extent to which the *ex parte* Note has been redacted makes it incomprehensible such that I cannot ascertain the documents and information that were provided to the Court to obtain leave; the specific leave sought and relief granted by the Court.  The Note refers to *"a new affidavit of Michael Murillo"* but which has also not been served on or otherwise provided to DFW.  Finally, DFW has not been provided with a copy of the 4 July Summons by which *ex parte* Application 2 was brought nor a copy of the Order as made.  I am informed by DFW's Cayman Islands legal counsel to DFW that those documents have been made the subject of confidentiality orders.

c.   On 20 July 2025 DFW, through Baker and Partners, specifically raised a query with Maples as to whether the Highland Foundations were put on notice of the JOLs' *ex parte* sanction application, which went unanswered in Maples' response received on 22 July 2025 (see **MP4/Tab 18/Pages 2235 to 2240**).  While I note that **paragraph 9 of MacInnis 5** states *"For the following reasons, the JOLs have brought this Application ex parte and respectfully request that is it not appropriate for any of the Company's shareholders to be on notice of the Application"*, it is not apparent what directions were given in this respect, nor if the Highland Foundations were otherwise made aware of *ex parte* Application 2.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

d.  Also at **paragraph 9, MacInnis 5** seeks to justify proceeding *ex parte* for leave to commence the FSD Proceedings as to *"Communicate the substance of this application, together with evidence and submissions which addresses its merits would seriously undermine the proper course of the Proposed Proceedings in the event that they are sanction".* No explanation for this position is given in this regard and, in circumstances where the DFW Summons had been filed with the Court more than a month before, the preparation of the FSD Proceedings (which had clearly been in progress for some time) are unnecessary and in my view a clear attempt of Dondero – through the JOLS - to procure costly litigation that enable an application for an injunction to be made.

e.  I understand that *ex parte* Application 2 was granted on 14 July 2025 and on 15 July 2025 the Current JOLs commenced the FSD Proceedings which are:

(i)  outside of the liquidation proceedings;

(ii)  before a new judge who is unfamiliar with the context of the Current JOLs' appointment and the Company's history or liquidation generally;

(iii) has none of the evidence before him which is already before His Honourable Justice Asif KC;

(iv) with respect to the Cayman Injunction, it is expressly stated by Maples in their correspondence to the Court sent on 15 July 2025 (see **MP4/Tab 19/Pages 2241 to 2244**) to coincide with the timetable of litigation commenced by the Highland Foundation in the Dallas Business Court, which I discuss further below.

iii.    <u>*Sanction of Funding Agreement*</u>

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

a.  At paragraphs 58 to 79 below, I address the Current JOLs' conduct with regard to the question of how the liquidation of the Company has been funded, will be funded and by whom.

b.  That the Current JOLs would need to secure funding for the liquidation is not a controversial or new point.  Since the Highland Foundations issued the just & equitable winding up Petition, the spectre of Mr Dondero as a funder to those proceedings has been present. In Dondero 1, Mr Dondero himself stated that he would personally provide the funding to the Highland Foundations to pursue the winding up of the Company. As set out in paragraph 68 below, the fact that Mr Dondero has been financing the legal actions of the Highland Foundations recently commenced in respect of the DAF Restructuring was confirmed by Ms Diaz under oath on 22 June 2025. The transcript of the Diaz Deposition was included in a Supplemental Bundle filed by DFW with the Court prior to the Sanction Hearing of 24 June and was at the same time provided to the Current JOLs.

c.  I understand from the terms of MacInnis 6 that *an ex parte* application was also made for the purpose of sanctioning the Funding Agreement.  I also understand from the terms of MacInnis 6 that the Funding Agreement is structured in such a way that Mr Dondero is ultimately funding the liquidation and the FSD Proceedings (see **paragraph 11, MacInnis 6**).

d.  The *ex parte* Note which relates to *ex parte* Application 2 does not, so far as it is possible to discern, address the Funding Agreement.  At the date of swearing this affidavit it does not appear that Maples have provided a Summons, Order or note relating to the sanction of the Funding Agreement.

e.  Prior to the Funding Agreement being Sanctioned it was also confirmed by Ms Diaz in US proceedings under oath that Dondero is funding the Highland Foundations in the proceedings which have been instituted in connection with the DAF assets and investments.  The funding of the liquidation and FSD Proceedings by Dondero directly or indirectly, is a matter of controversy and a situation which DFW would vehemently

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

contest. By proceeding to obtain sanction of the Funding Agreement on an *ex parte* basis the JOLs, have wrongfully deprived DFW of the procedural right to dispute the fact or terms of the Funding Agreement, including the identity of the funding party.

f. Given the paucity of information provided by the JOLs and their legal counsel as regards the application to sanction the Funding Agreement, I am unable to discern whether the JOLs disclosed to the Court the fact that Dondero had been (and is likely to continue to be) funding the Highland Foundations. This fact which seems material to the propriety of the Funding Agreement is not addressed in the terms of MacInnis 6.

iv. *Attempt to seek Cayman Injunction ex parte*

a. The Current JOLS were initially seeking to have the hearing of the Cayman Injunction listed for a date less than 2 weeks from the date on which the Cayman Injunction and FSD Proceedings were filed and served on the parties, including DFW.

b. It is apparent from Maples' letter to Court dated 15 July 2025 which seeks a listing of the Cayman Injunction that the Current JOLs were willing to proceed on an *ex parte* basis, to do so regardless of the defendants' ability to attend and that the urgency was in part justified to align that hearing with a hearing in the TRO Proceedings issued by the Highland Foundations.

c. For the reasons explained in paragraphs 98 to 100, in light of both the voluntary Rule 11 Agreement which DFW and the CDM Entities had provided in the TRO Proceedings as of 2 July 2025 and the ongoing willingness of the CDM Entities to enter into a protocol with the Current JOLs, there was simply no basis for the Cayman Injunction to be issued nor to be treated as an urgent application.

d. On 21 July 2025 the CDM Entities filed a Summons seeking directions in response to the Cayman Injunction which provided *inter alia* undertakings on behalf of DFW and the CDM Entities to the JOLs and preserved the

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

Rule 11 Agreement (discussed at paragraphs xx to xx herein) and provided that under correspondence of the same dated to Maples (a copy of the CDM letter dated 21 July 2025 is **exhibited at MP4/Tab 20/Pages 2245 to 2257**). This correspondence from Campbells to Maples highlighted in particular the comments made by the Dallas Business Court at the hearing of the TRO Proceedings that he was *"struggling to find evidence in the record that there is an immediate threat of irreparable harm"*.

e.   As observed in the letter from Campbells on behalf of the CDM Entities dated 21 July 2025 the only inference which could be drawn was that *"the unsustainable assertions of urgency are made in the hope of gaining a perceived strategic advantage in the contemplated litigation"*.

f.   As matters transpired, the Current JOLs and defendants to the FSD Proceedings and Cayman Injunction entered into a Consent Order approved by Parker J in the FSD Proceedings on 31 July 2025 **exhibited at MP4/Tab 21/Pages 2258 to 2273**.  I exhibit at **MP4/Tab 22 to Tab 24/Pages 2274 to 2296** relevant correspondence between Campbells and Maples dated 21, 23, 24 and 27 July 2025.

### *b)   Lack of full and frank disclosure*

57.   The JOLs have failed to provide full and frank disclosure on seeking *ex parte* relief from the Court as they have failed to bring pertinent evidence which is available to them to the attention of the supervising Judge.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

i.  *DFW Summons*

   a.  As the Court will be aware, on 9 June 2025 DFW issued a Summons (**DFW Summons**) which sought directions and orders from the Court to provide that (i) the JOLs enter into a Protocol with the CDM Entities and (ii) that an inter partes proceeding be established in the liquidation for the validity of the DAF Restructuring to be determined.

   b.  Neither the evidence filed in support of the Current JOLs leave to commence the FSD Proceedings nor the evidence in support of the Cayman Injunction make no mention of the DFW Summons.  The substantially redacted note of the Hearing as provided by Maples to Baker & Partners on 22 July 2025 does show that scant reference was made to the filing of the DFW Summons and correctly refers to the fact that that Summons as not yet been listed.

   c.  The JOLs only disclosed the existence of the DFW Summons in the FSD Proceedings in FSD Affidavit 2.  That evidence was sworn on 24 July 2025 following a Summons for Direction filed by the CDM Entities on 21 July 2025 (**CDM Directions**), and only after sanction for the FSD Proceedings and Cayman Injunction to be commenced had been granted.

   d.  The *ex parte* Note provided by Maples shows that Ms Moran of Maples did make mention of the DFW Summons during the ex parge hearing, despite the evidence failing to bring this to the attention of the Court.  Ms Moran goes on to dismiss the DFW Summons on the basis that *"this matter is not suitable to be argued inter partes.  Rather there is public interest in allowing the JOLs to ensure that a Cayman Islands vehicle has not been used as a vehicle of fraud"*.  I find this ironic in light of the Current JOLs apparent failure to investigate Mr Dondero's misuse of the DAF assets and the federal tax concerns which caused myself and Mr Murphy to implement the DAF Restructuring as has previously been explained to this Court.

   e.  A further reason cited for the FSD Proceedings being issued despite the DFW Summons being extant is that *"North Texas Fund – who is not yet*

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

32

FSD2025-0116                                                              2025-08-19

*participating, and their rights would not be protected in an inter partes between defendants and the Supporting Organisations"*.  In respect of these matters, the Note discloses that the honourable Asif J KC stated he *"will deal with that when it comes up in due course"*.

f.   While it is properly for counsel to develop argument, the very question of the correct procedural vehicle to determine the validity of the DAF Restructuring ought to be determined is a matter which required argument on an inter partes basis before the FSD Proceedings were commenced, and this appears to have been obfuscated in the presentation of matters in *ex parte* Application 2.

### ii. Prior engagement of Leading Counsel

a.   On 22 July 2025, and along with the *ex parte* Note, Maples provided to DFW a copy of the MacInnis 5 affidavit in the heavily redacted form exhibited at [**MP4/Tab 17/pages 2186 to 2234**]. Quite clearly certain of the redactions applied by the Current JOLs' by their legal counsel relate to references to professionals who the Current JOLs have obtained advice in seeking to commence the FSD Proceedings. While I understand that the Current JOLs seek to redact information which may be relevant to the FSD Proceedings of which DFW and myself personally are (amongst others) defendants, I do not consider that there is a justifiable basis to redact the name of legal counsel who advise the Current JOLs in connection with of the liquidation proceedings or the FSD Proceedings.

b.   On 30 July 2025 DFW was notified from Maples' correspondence to the Court exhibited at [**MP4/Tab 25/page 2297**] that Mr Andrew Ayers KC would be attending the hearing of the Injunction Summons on behalf of the Current JOLs. I am advised, without waiving privilege to that advice, that no notice of Mr Ayers KC's engagement was provided despite requirements to do so under this Court's practice directions.

c.   Mr Ayers KC acted for the Petitioners in these liquidation proceedings and was in attendance at the Supervision Hearing along with Johnstone Law.  I also

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

understand that on or around 12 May 2025 Johnstone Law filed an application for the general admission of Mr Ayers KC to the Grand Court, that application being granted on or around 27 May 2025 having been sponsored and supported by Johnstone Law.   In circumstances where the engagement of Johnstone Law was resisted because there was a conflict of interest resulting the prior engagement of Johnstone Law by the Highland Foundations (and financial backing of Mr Dondero), Mr Ayres KC equally stands in a position of conflict in these matters and is not in a position to provide the JOLs with independent advice in either the FSD Proceedings or these liquidation proceedings.

d.   I invite the JOLs and their legal counsel to provide an account of the decision to deliberately conceal the engagement of Mr Ayres KC which appears to be because they knew or were concerned that DFW would object to the engagement of Mr Ayres KC, as would be its right as a stakeholder in the Company's liquidation.   This development comes barely a month after Johnstone Law was stood down as counsel for the Current JOLs, the Current JOLs having spent the first almost 2 months of their appointment and in excess of US $1.4 million in trying to justify the engagement of counsel who were clearly inappropriate in all the circumstances.

e.   On 13 August Baker & Partners wrote to Maples to raise that question of Mr Ayres engagement directly.   A copy of the letter from Baker & Partners issued on 13 August 2025 is **exhibited at MP4/Tab 26/pages 2298 to 301**.   Maples responded for the JOLs in defensive terms on 15 August 2025 and have failed to address the enquiries of DFW as set out in the 13 August correspondence.   A copy of Maples letter dated 15 August 2025 is exhibited at **MP4/Tab 27/pages 2302 to 2302**.

### iii. Weaver Opinion

a.   On 1 July 2025 the JOLs were provided with the Weaver Opinion (detailed at paragraph 16 to 18 above).   Weaver opined that the proceeds paid to the Highland Foundations in their capacity as Participating Shareholders following the DAF Restructuring was fair.   However, in seeking to obtain injunctive relief

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

in the FSD Proceedings and in seeking leave to bring those proceedings, the Current JOLs failed to disclose the existence and terms of the Weaver Opinion.

### iv. Mercer Report

b. Notwithstanding that the Current JOLs have the Mercer Report and make reference to that report, they fail to draw the Court's attention to the recommendations of Mercer which demonstrates that the level of compensation afforded to me is in line with market standards for the roles I have assumed, as **exhibited at MP4/Tab 4/pages 1068 to 1087**.

### v.  Nature of DAF LP business

c. The JOLs also mischaracterised DAF LP as passive, whereas I explain at paragraphs 179 to 180 how this is not the case. Looking upward, towards distribution, the Company would act as a conduit of funds that were declared by the Directors to be dividends and distributable as charitable donations. Looking downwards, DAF LP has a number of investments in real estate projects, litigation and securities which require active management.

d. Once again, the diverse portfolio of duties that I assumed when taking on the role of 'Control Person' is recognized in the Mercer Report and reflected in my compensation. It is not simply a case of holding office and paying out distributions as the Current JOLs suggest.

### vi. Failure to disclose DFW responses filed in FSD 116 of 2025 (JAJ)

a. On a review of the JOLs' skeleton argument filed in the FSD Proceedings with respect to the Cayman Injunction (see **MP4/Tab 28/Pages 2304 to 2362**) (the hearing of which was adjourned by way of a Consent Order made on 31 July 2025, exhibited at **MP4/Tab 21/Pages 2258 to 2273**), I note that it was advanced on behalf of the JOLs at paragraph 25 (see **MP4/Tab 28/Pages  2310 to 2311** that:

*Although the Company does not yet have full details of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as*

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

*follows (and without prejudice to any further facts and matters relating to directors' fees or expenses):*

*[...]*

*(2) Expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).*

b.  The drafting of sub-paragraph 2 closely resembles the drafting of paragraph 31(b) of the Highland Foundations' Winding Up Petition filed on 23 April 2025 in these liquidation proceedings.  I further note that the JOLs completely omitted to disclose to the Court in the FSD Proceedings what DFW's response to that allegation was.

c.  In summary, at **paragraph 179, DFW Affidavit**, I explained that US $6 million of the US $18.3 million which are alleged to be expenses are not in fact expenses. Rather, Mr Dondero / the Highland Foundations and now the JOLs, have failed to take into consideration that there was also US $6.1 million in income from the same NexPoint-led transaction that more than offset the US $6 million in expenses. Omitting the income and net gain to DAF LP from that transaction which offsets the amount now claimed by the JOLs to a considerable degree, falsely inflates the expense number.

d.  A full explanation can be found at **paragraph 179, DFW Affidavit**, but there is no indication in either FSD Affidavit 1 or FSD Affidavit 2 that the JOLs have investigated DFW's response to this claim which was also alleged in these liquidation proceedings by the Highland Foundations.  The absence of any response to DFW's evidence, in addition to their failure to disclose DFW's response to an identical allegation made in these liquidation proceedings as part of the JOLs' full and frank obligations in the FSD Proceedings, suggests to me that the JOLs' have not investigated DFW's response to this allegation. In fact, as the JOLs' closely repeat what was advanced in the Highland Foundations' Winding Up

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

Petition, I also believe this suggests a lack of objectivity and partiality on the JOLs' part.

### v.  Non-disclosure of Liquidation Committee

a.  When Ms MacInnis swore her fifth affidavit on 10 July 2025 in support of *ex parte* Application 2, she stated at **paragraph 9.1, MacInnis 5** that "*A liquidation committee has not yet been established with respect to the Company*".

b.  I am advised (without waiving privilege with respect to that advice) that MacInnis 5 runs contrary to the outcome of the Meeting of Contributors held on 9 July 2025 and that no minutes of that meeting have been circulated.

c.  Ms MacInnis later confirms in her affidavit in support of the Funding Agreement at **paragraph 6, MacInnis 6**, that a Liquidation Committee had in fact been formed the day prior on 9 July 2025.

d.  No explanation for the discrepancies between the statements made in MacInnis 5 and MacInnis 6 have been volunteered, and no correction was made to this misrepresentation in MacInnis 6.

### c.  *Funding Arrangements*

64.  Since their appointment, the Current JOLs had until recently refused to confirm how the liquidation is being funded.  Counsel for myself acting as Management Shareholder, and counsel for DFW had repeatedly raised the significant question of how and by whom the Current JOLs were being funded.  This was more recently pressed by both Campbells in their letter of 29 June 2025 and Baker & Partners' letter of 18 July 2025 (exhibited at **MP4/Tab 29** and **Tab 30/Pages 2363 to 2376**).

65.  As mentioned above, on 4 July 2025, I understand that the Current JOLs issued *ex parte* Application 2, and did so without notice to at least DFW.  I further understand that the JOLs filed an *ex parte* without notice Summons seeking the Court's sanction to enter into the Funding Agreement (**Funding Sanction Summons**).  This application was again made without consultation with or notice to DFW.  Even if it is accepted that sanction to commence the FSD Proceedings would be justified (which I do not as the

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

**FSD2025-0116**                          37                          **2025-08-19**

disclosure of that application would in no way have negated the making of the application) I cannot see the proper basis on proceeding with the Funding Sanction Summons *ex parte*, other than for the Current JOLs to obtain sanction of a funding arrangement they knew would be open to justified challenge and opposition.

66. In support of the Funding Sanctions Summons, Ms McInnis filed partially redacted McInnis 6 and exhibit MM-6. **MM-6/pages 1 to 14** exhibit a significantly redacted funding agreement made between Crossvine and the JOLs, dated 11 July 2025 (the **Funding Agreement**). This appears to place the Current JOLs in a position of conflict of interest in respect of their obligations to Crossvine, Ellington and Dondero as the funding parties, and DFW as the majority stakeholder of the purportedly solvent liquidation (or at least a significant stakeholder if the liquidation is in fact insolvent).

### i. *Terms of the Funding Agreement*

67. In summary, and from what can be discerned from a review of the partially redacted MacInnis 6 and exhibit MM-6, the Funding Agreement provides that:

    (a) A lump sum will be provided to the Current JOLs by Crossvine for the purposes of funding the Company's liquidation (see **paragraph 11, MacInnis 6**) and the FSD Proceedings (see **paragraph 9.1, MacInnis 6**).

    (b) The amount of funding has been redacted and it is entirely unclear at present from MacInnis 6 and MM-6 whether the Current JOLs can afford to give a cross-undertaking in damages in the FSD Proceedings as required (see **paragraph 9.3, MacInnis 6**).

    (c) There are incremental increases in returns for Crossvine with respect to the amounts which will be paid to it should the Current JOLs make any successful recoveries in the Civil Proceedings. For example, **paragraph 9.7(b)(iii), MacInnis 6** states that were the Current JOLs recover in excess of US $270 million (which the JOLs claim are the Company's rights in the assets held by DAF LP), Crossvine will receive an additional 30% of the amount advanced.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

68. The basis of the Funding Agreement which are discernible from the heavily redacted evidence that has been provided are markedly different from the terms Mr Dondero had initially agreed to sworn on oath as set out in Dondero 1.

69. In Mr Dondero's First Affidavit sworn on 9 April 2025 and filed on 16 April 2025 in the Liquidation Proceedings (see **pages 9 to 10, Dondero 1**), Mr Dondero swore with respect to his funding of the liquidation proceedings at paragraph 47 that:

> "*I have not and will not at any time receive a benefit, not do I have control of these proceedings, because of this funding arrangement… My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support*". [emphasis added]

70. Notwithstanding this evidence, two days later the prospective uplift, three month avoidance period and terms of non-disclosure on the part of Crossvine were built into the Funding Agreement. In my view and based on my years of experience in managing businesses affected by Mr Dondero the ostensible altruism professed to by Mr Dondero in his affidavit of 9 April should be viewed as circumspect, and even more so having regard to the persistent refusal of the Mr Dondero-funded Current JOLs who had previously refused to enter into a protocol which does not assure that litigation against Mr Dondero is effectively desisted with.

### ii. Crossvine is James Dondero

71. The Current JOLs confirm at **paragraph 11, MacInnis 6** that Crossvine "*is a special purpose vehicle incorporated for the purpose of ultimately Mr Dondero (through the structure outlines above) funding the liquidation of the Company and the JOLs pursuing the Proposed Proceedings*".

72. The Current JOLs also confirm at **paragraph 9.8, MacInnis 6** that the Funding Agreement grants certain information rights to Crossvine with respect to the progress of these proceedings, without detailing what those rights are.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

73. This is highly concerning to DFW in light of the fact that Crossvine is another alter ego of Mr Dondero. Should these information rights extend to rights to view disclosure in these proceedings, DFW is firmly of the view that the disclosure information will be abused for collateral purposes by Mr Dondero in other jurisdictions in which he is litigating in.  For a comprehensive summary of the litigation currently on foot, see paragraphs 159 to 188 below.  Having known Mr Dondero and Mr Ellington for more than ten years, I know that, should these proceedings move adversely to Mr Dondero and Mr Ellington's personal interests, they will not hesitate to default on their obligations to meet their funding commitments, which effectively means that if the JOLs do not aggressively allege fraud and wrongdoing, they will not be paid. This grants Mr Dondero and Mr Ellington significant and improper control over the Current JOLs, who cannot accept money from Mr Dondero and Mr Ellington and be considered to remain fair and impartial.

### iii. JOLs' failure to disclose knowledge of funding

74. In Ms Diaz's deposition at **MP4/Tab 14/Pages 1736 to 1738** , Ms Diaz revealed that it has always been the agreement that Mr Dondero would fund the Company's liquidation on behalf of at least the Highland Dallas Foundation, and this decision was made prior to litigation in the Cayman Islands commencing:

> *"Q: Did you learn, when you read Mr. Dondero's declaration in the Cayman Islands, that he's actually funding that litigation on behalf of the supporting organizations?*
>
> *A. No, that's not when I learned that.*
>
> *Q. That's not when you learned it or -- withdrawn. Are you aware that he's funding that litigation?*
>
> *A. Yes.*
>
> *Q. When did you learn that he was funding that litigation?*
>
> *A. Before we got into litigation.*

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

*Q. Is he funding this litigation on behalf of the Dallas Foundation?*

*A. Yes, he is.*

*Q. And how much money did he provide for the funding of this litigation?*

*A. We have not agreed on an amount. As with any of our fundholders', legal expenses will get paid through by the fund. So that's a very common business practice. And it would go until the legal issues ceased.*

*Q. But he's made a commitment to fund -- to personally fund the expenses of the Dallas Foundation in connection with this litigation; is that right?*

*A. Yes."*

75. It should be noted at the outset that the Funding Agreement was executed 2 days after the first meeting of the Company's contributories which was held at the Current JOLs' offices and virtually on 9 July 2025, during which a Liquidation Committee was formed. DFW is represented on the Liquidation Committee by Ms Jennifer Colegate of Baker & Partners. A letter of authorisation given by DFW is exhibited at **MP4/Tab 31/Page 2377**.

76. Neither the existence of discussions concerning the negotiation of the Funding Agreement, nor copies of the draft Funding Agreement, were disclosed at that meeting. This suggests a deliberate attempt to avoid giving the Company's contributories, and in reality the only non-Dondero influenced and controlled contributories i.e. DFW and myself as Management Shareholder an opportunity to review and scrutinize the draft Funding Agreement, its terms and to consider in all the circumstances if the funding as proposed and from whom is appropriate.

77. In fact, the Current JOLs misled the Company's contributories in their First Report as at 2 July (and provided to DFW on 3 July, see **MP4/Tab32/Pages 2378 to 2398**), when they stated at page 13:

*"6.4.1 As there are insufficient assets with which to meet the fees and expenses of the liquidation, the JOLs are currently exploring third party funding options. The*

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

> *JOLs will seek sanction for any funding agreement from the Court in due course…. Should any third party be interested in funding the liquidation, expressions of interest may be sent to <u>CDAF.Core@uk.gt.com</u>.*"

78.  Furthermore, the JOLs confirmed at **paragraph 13.3, MacInnis 6** that they did not approach any other litigation funders for quotes, despite signalling that it was exploring more than one funding option (i.e. more than one source of funding).  That representation is false, misleading and calculated to avoid transparency.

79.  This intentional concealment of vital developments and key contractual documents which should be available to the Company's contributories for scrutiny in the liquidation severely undermines DFW's trust and confidence in the Current JOLs.  As is clear from the terms of MacInnis 6 and the Funding Agreement, the ultimate identity of the funder has not changed since the Highland Foundations petitioned for the winding up of the Company.  Just as Mr Dondero sits behind the legal proceedings instigated by the Highland Foundations in respect of the Company, Mr Dondero sits behind the JOLs in respect of the liquidation and associated litigation now commenced in the Cayman Island.

80.  In light of the extensive litigation to which Mr Dondero is exposed to, the Current JOLs have wrongfully thought it prudent and in the best interests of the estate to accept funding from an inescapably conflicted financier, who has a track record of defaulting on financial obligations.

### iv. Conflict of Interest in Mr Dondero funding liquidation

81.  It is DFW's position in these liquidation proceedings that Mr Dondero was cycling the donations he made to the charitable enterprises through the Fund. There is evidence before this Court (**see paragraphs 110 to 120, 145 to 146, 170, 194 to 199, DFW Affidavit**) that Mr Dondero exerted a huge amount of control and influence over key personnel such as Ms Diaz, Mr Scott and staff at the Highland Dallas Foundation to direct how his donations were spent.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

82.  Abusing the charitable structure put the tax exempt status of the Highland Foundations at risk, which necessitated the DAF Restructure and the voluntary liquidation of the Company.

83.  It is therefore notable that Mr Dondero, who previously swore in these proceedings that he would not seek any benefit from the funds recovered on the charities' behalf, now seeks through entities he controls a bounty fee for any recoveries in excess of US $50 million made by the Current JOLs in the FSD Proceedings.

84.  If the Court is willing to grant the relief sought in DFW's Removal Summons and replace the JOLs, this will assist in ensuring that the liquidation is insulated to a significant extent from Mr Dondero's influence, on the understanding that the liquidation will be funded from the assets within the DAF Structure, which will ensure the Replacement JOLs' independence.

85.  As previously deposed above, the Current JOLs were aware or at least on notice as of the 24 June 2025 that Dondero was funding the Highland Foundations legal actions as per the transcript of Ms Diaz's deposition in the US Bankruptcy Court proceedings which s included in the Supplementary Bundle by Cayman attorneys to DFW.

### v. Involvement of Scott Ellington

86.  I understand from **paragraph 10.1, MacInnis 6** that Mr Scott Ellington is one of the managers of Crossvine, and its sole shareholder is a Texas non-profit called Crossvine Foundation, which is also co-managed by Mr Ellington.

87.  Ms MacInnis also confirms at **paragraph 11, MacInnis 6** that Crossvine has been established in order for Mr Dondero to fund the FSD Proceedings and these liquidation proceedings.

88.  As stated at **paragraph 69, DFW Affidavit**, Scott Ellington is the Chief Executive Officer and owner of Skyview (Mr Patrick's former employer), the former General Counsel of Highland and a long-standing business associate of Mr Dondero. Despite the appearance of Mr Ellington's ownership and control of Skyview, I deposed at **paragraph 69, DFW Affidavit** that it was in fact Mr Dondero who had actual control

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

of Skyview and that it was he (rather than Mr Ellington) who determined the compensation of every Skyview employee with Skyview's Head of Human Resources.

89.  Mr Ellington, together with Mr Dondero, also owns a Cayman Islands based reinsurance company called Sentinel Reinsurance, Ltd (**Sentinel**), and is personally embroiled in the Sentinel Fraud (as described below). As explained in detail at **paragraphs 151 to 156, DFW Affidavit**, UBS Securities LLC and UBS AG London Branch (**UBS Entities**) alleged that certain specific transfers of assets to Sentinel during 2017 were executed after the UBS Entities obtained an order for summary judgment against Highland and other entities owned or otherwise affiliated with Mr Dondero (**2017 Transfers**).

90.  Evidence with respect to the Sentinel Fraud is already before this Court but in summary, a New York court made a preliminary finding that those transfers took place at a time when it was anticipated that a US $1.2 billion judgment would be made in UBS' favour. The assets compromising the 2017 Transfers were transferred pursuant to an attendant Asset Purchase Agreement, as payment of the premium for an after-the-event insurance policy (**ATE Policy**) to insure Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland CDO Holding Company against liability in the Underlying Action (as defined at **paragraph 123 in the DFW Affidavit**). The ATE Policy was outside the usual course of business for Sentinel, as Sentinel had never previously issued this type of policy or one as large as the ATE Policy and would not have had the means to pay on the ATE Policy without the assets received following the 2017 Transfers. This scheme has been termed the **Sentinel Fraud**.

91.  Mr Ellington is named personally as a defendant in UBS Securities LLC, UBS AG London Branch v. James Dondero, Scott Ellington, Highland COO Holding Company, Highland COO Opportunity Masters Fund, L.P., Highland Financial Partners, L.P., Highland Special Opportunities Holdings Company, CLO HoldCo, Ltd., Mainspring, Ltd., Montage Holdings, Ltd (Index No. 6507 44/2023) (**Turnover Proceedings**). In those proceedings, the Supreme Court of the State of New York, New York County made a decision and order on 26 March 2025 finding that the petition sufficiently alleged that the 2017 Transfers undertaken by Mr Dondero and Mr Ellington were

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

fraudulent conveyances to Sentinel. The New York Supreme Court also held that to the extent that Mr Dondero and Mr Ellington sought to dismiss these claims, their motions were denied, which allowed the US $1.1 billion UBS case to move forward against Mr Dondero and Mr Ellington personally and entities (including Cayman entities) they own and/or control.

92. The Sentinel Fraud was also discussed at a hearing in the Bankruptcy Court for the Northern District of Texas in 2022, where Judge Stacey Jernigan  implied (after verbalizing certain various implicated criminal statutes) that she may make a referral to the U.S. attorney given the criminal conduct by Mr Dondero, Mr Ellington, and others to fraudulently hide assets from UBS and lie about it (see **paragraph 156, DFW Affidavit**).

93. I also deposed at **paragraph 117, DFW Affidavit** that Mr Ellington has previously received moneys from  DAF LP (which is intended for charitable purposes) in the form of a bonus via the Tall Pine Group, at a time when Mr Ellington's ability to receive a bonus had been blocked by the US Courts in the Highland Bankruptcy (see an invoice issued by Tall Pine Group LLC issued on 3 April 2020 at **MP1/ page 171**). This bonus payment, which derived from US $1 million payment from DAF LP to the Tall Pine Group, had been flagged in the Highland bankruptcy proceedings as part of a larger US $17 million fraudulent transfer (see **MP1/ pages 172 to 305**).

94. DFW finds it extraordinary that the Current JOLs were satisfied with the due diligence performed on Mr Ellington, despite that allegations of fraud have been made and found against him, and being on notice by virtue of the evidence filed in these liquidation proceedings that he has a history of being unjustly enriched from the Funds' assets.

95. Taken all together, DFW has grave concerns that Crossvine is the alter ego of Mr Dondero, and has been established as a vehicle by Mr Dondero to fund (a) efforts to claw back a percentage of his own donations from DAF LP and/or entities affiliated with it; (b) efforts to prevent the implementation of the Hunter Mountain Settlement; and (c) efforts to regain control over the Fund, all through the JOLs and by harnessing the powers conferred to them by Appointment Order; and (d) obstruct, impede or

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

prevent almost US $300 million in litigation claims against him and others arising from the Kirschner Complaint.

### d)  Failure to meaningfully engage with a Protocol

96.  Since 16 May 2025, DFW's attorneys and the attorneys of CDMCFAD, LLC (**CDM**) (Campbells LLP) have been attempting to agree a protocol with the JOLs as noted in a letter from Campbells to Maples, dated 29 June 2025 at **MP4/Tab 29/pages 2363 to 2371**.  It was CDM who first volunteered a transactional reporting protocol to the Current JOLs in an attempt to assure the JOLs that the businesses of CDM were being operated in an open and transparent way.

97.  A few days after this draft protocol was proposed, I caused HMIT to enter into the Hunter Mountain Settlement (discussed further at paragraphs 50 to 53 above) which led to a Settlement Motion (defined and discussed at paragraphs 94 and 97 below) seeking the US Bankruptcy Court's approval of the Hunter Mountain Settlement Agreement.

98.  No response was received by the Current JOLs to the protocol suggestion.   Instead, they wasted time in seeking to justify the appointment of Johnstone Law so that as of 24 June 2025 (the hearing of the Sanction Summons) no substantive response to the proposed protocol had been received from the JOLs.

99.  As the Court observed at the Sanction Application on 24 June 2025 "*something along the lines of the protocol that is floating around seems a sensible way forward*".  The Court further observed that "*if there is agreement on a protocol, then the liquidators won't need to pursue Chapter 15 because they'll be confident that the assets are safeguarded.*"  A copy of the transcript may be found at **MP4/Tab 33/pages 2399 to 2487** and the specific extracts at **MP4/Tab 33/Page 2454**.

100.  At around that time, a Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, Case No. 19-34054-sgj11 (Bankr. N.D.Tex.) [Dkt. 4216] (the **Settlement Motion**) was before the Texas Bankruptcy Court. I have set out above in this affidavit (paragraphs 47 to 50 above) the clear benefits and advantages to the

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

Company and its contributories and/or creditors by HMIT entering into the Hunter Mountain Settlement.

101. Incredulously, and immediately following the Sanction Hearing of 24 June 2025 rather than following the recommendation of his Honourable Justice Asif KC with respect to entering into a protocol with CDM, on that same day the Current JOLs instead issued the HMIT Adjournment Letter to the attorneys acting in Texas Bankruptcy proceedings and to the US Bankruptcy Trust of Highland Capital, Mr J Seery in connect with the Hunter Mountain Settlement. Notwithstanding that the Hunter Mountain Settlement would result in significant value returning to the DAF Structure the Current JOLs demanded that the Bankruptcy Court defer consideration of the Hunter Mountain Settlement for a period of 45 days to afford the JOLs an opportunity to continue its investigations. A copy of this correspondence is exhibited at **MP4/Tab 1/Pages 1 to 3**.

102. This request closely followed a failed attempt by Dugaboy to object to the approval of the Hunter Mountain Settlement, which was sanctioned by a Court Order dated 30 June 2025 and referred to as the **9019 Order**. Copies of this Objection and the 9019 Order are at **MP4/Tab 34 and Tab 35/Pages 2488 to 2499**. The making of the 9019 Order resulted in the assignment of approximately US $300 million in legal claims to pursue matters covered in the Amended Kirschner Complaint to HMIT and its affiliates. For the benefit of the Court, the 23 defendants to the Amended Kirschner Complaint include Mr Dondero; his long-standing business associate, Mr Ellington, NexPoint Advisors LP; Highland Dallas Foundation; Okada Family Trust; and Dugaboy. A copy of the Dugaboy Motion to Stay the 9019 Order is exhibited at **MP4/Tab 16/Pages 2082 to 2177**. Mr Dondero and Mr Ellington attempt now to use the office of the Current JOLs and these proceedings in the Cayman Islands to prevent the Kirschner claims from moving forward against them. This is a collateral attack with an improper purpose.

103. The stay sought by Dugaboy was not granted and following a review of the First Report at page 12 (see **MP4/Tab 32/Page 2390**) on 1 July 2025, the Highland Foundations (of which the supported organisation the Dallas Foundation had previously withdrawn its objection from the Settlement Motion to approve the Hunter Mountain Settlement independently of Mr Dondero) filed the **TRO Proceedings**. The matter came on for a

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

hearing on 2 July 2025 at which the Highland Foundations failed to persuade the Texas Court that there was any real risk of irreparable harm or dissipation of assets with the Judge concluding that:

> "*I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone. Your concern is you don't want to move further [sic] away. But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that.*" [see **MP4/TAB 36/Page 2541**].

104. The relevant assets at issue are also further secured by the Rule 11 Agreement pursuant to which the parties named in the TRO Petition, including but not limited to DFW, CDM (and its affiliated entities) and myself personally, have voluntarily agreed to (i) operate in the ordinary course of business; (ii) ensure that the proceeds of any assets remain in the relevant entity (i.e., are not transferred to any other entity within or outside the group); and (iii) not engage in any corporate restructuring.

105. With respect to the Rule 11 Agreement mentioned above, it is pertinent to note that during hearing the TRO Petition the Judge of the Dallas Business Court accurately recognised that the complaints brought by the Highland Foundations related to the DAF Restructuring and transactions that had taken place. There was no evidence before the Honourable Judge in those proceeding that there would be a further restructuring. As the impetus for the DAF Restructuring in the first place is no longer hanging over the DAF Structure, I was comfortable providing the Rule 11 Agreement which includes an undertaking that there will not be a further restructuring of the DAF LP.

106. A hearing in the TRO Proceedings had been scheduled for 4 August 2025. As matters have transpired, the Dallas Business Court has received arguments on jurisdiction in respect of the TRO Proceedings and a ruling remains extant on that issue. There is no threat of immediate harm either there or here. Notwithstanding, legal counsel to CDM and its affiliates made consistent and concerted attempts to reach agreement in respect of the proposed protocol. As recorded in their letter on behalf of CDM to Maples dated 29 June 2025 (see **MP4/Tab 29/Pages 2363 to 2371**) the Current JOLs elected to make the without notice *ex parte* Application 2 to commence the FSD Proceedings, which

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

were issued on 15 July 2025.  Chapter 15 Petition Proceedings were subsequently filed on 21 July 2025 in the United States Bankruptcy Court, the District of Delaware (see **MP4/Tab 37/Pages 2578 to 2659**) (**Chapter 15 Petition Proceedings**), which would have been unnecessary had the Current JOLs engaged meaningfully in discussions to settle a protocol with the CDM Entities.

107.  In their Verified Petition of the Chapter 15 Petition Proceedings, the JOLs asserted that they act "*on behalf of the Highland Foundations*". The advancement of selective stakeholder interests raises serious questions as to the JOLs' independence, balanced against their prior reluctance to agree a protocol which offered voluntary reporting mechanisms that would have delivered many of the same safeguards the Current JOLs now seek in the FSD Proceedings, without incurring the considerable costs now being borne by the liquidation estate.

108.  The terms of protocol as proposed between the JOLs and CDM did not include a stay on the pursuit of current or prospective claims against Mr Dondero and his affiliates that were assigned to HMIT by the terms of the Hunter Mountain Settlement. However, the recent legal actions in the form of the TRO Proceedings and the FSD Proceedings which have been taken by the JOLs at the instigation of the Highland Foundations (who are under the influence of Mr Dondero) do impede the conduct of proceedings against Mr Dondero and entities affiliated with him.  I discuss the timing of these proceedings and the partiality of them at paragraphs xx to xx below.

109.  For the avoidance of doubt, it is not the case that the parties reached an impasse following which the FSD Proceedings and the Chapter 15 Petition Proceedings became the only options available to the Current JOLs – they failed to reply to Campbells' letter dated 29 June 2025 which contained the most recent proposals as to how best safeguard the DAF assets pending the further investigations as demanded by the Current JOLs.  Notably, at this point the representations of the Current JOLs were consistent with them continuing to investigate the DAF Restructuring, which I consider to be misleading and fundamentally different to the commencement of proceedings as set out in the FSD Proceedings.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

110. The Current JOLs' apparent willingness to act in lockstep with the Highland Foundations evident in the alacrity of the FSD Proceedings being commenced is even more concerning given its obvious prejudice to DFW and the former directors of the Company by virtue of the serious nature of claims which the Current JOLs have issued having had less than 3 months in office to investigate the allegations of the Highland Foundations before those actions were issued.

111. As outlined in Campbells' letter dated 21 July 2025 (see **MP4/Tab 20/Pages 2245 to 2257**), Mr  Murphy and I have made every effort to agree a protocol to preserve the relevant assets pending the outcome of the JOLs' intended investigations, and we have no intention to either dissipate assets and/or misappropriate assets regardless of the adoption of a protocol and/or the continuation of the Rule 11 Agreement.

112. The Current JOLs remained intransient on insisting on matters which would effectively deprive the defendants in the FSD Proceedings from defending those proceedings.  As matters transpired, it was only late on 30 July 2025, and less than 24 hours before the Injunction Summons was to be heard by Parker J that counsel for the JOLs acceded to the terms of a Consent Order and  undertaking (**FSD Consent Order**) in substantially the same terms as the Protocol which had been proposed by the CDM Entities in the months since the JOLS were first appointed.  While the breadth of undertakings provided address additional procedural matters, such as the adjournment of the Chapter 15 application, the substantial terms and oversight of the operations of the DAF assets and investments as provided for in the FSD Consent Order could have been agreed between DFW, the CDM Entities and the Current JOLs much earlier and certainly before they had elected to incur the expense of the FSD Proceedings and Cayman Injunction.

### e) Leveraging of Liquidation Proceedings: Advancement of Dondero Interests

#### i.  Failure to Sanction Highland Foundations

113. It is notable that the Current JOLs will not challenge the Highland Foundations' proprietary claim in the TRO Proceedings (which competes with the Current JOLs' interests in the Company's assets) despite the clear advantages that the Hunter

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

Mountain Settlement offers to the Company and the DAF Structure more generally (as discussed at paragraphs 50 to 53 above).

114.   This failure is despite the correspondence sent from Baker & Partners on 8 July 2025 and 18 July 2025 on behalf of DFW, which sought to establish whether the Current JOLs' would seek to sanction the Highland Foundations from commencing litigation in Texas, in the United States to advance claims against assets which they regard as the Company's and which the JOLs ought, as officers of the Court and trustees of the liquidation process, to be defending.  Copies of that correspondence are exhibited at **MP4/Tab 30 and Tab 38/Pages 2372 to 2376 and 2660 to 2661**.

115.   Instead, the Current JOLs have launched the FSD Proceedings which are being openly brought to protect the Highland Foundations' alleged claims in the Company's assets in a coordinated manner, for example the Writ at paragraph 17 states: "*On 10 July 2025, the JOLs filed this claim and contemporaneously issued the Injunction Summons. The timing of the application was in part driven by the urgent need to preserve the Fund's assets, in circumstances where the Supporting Organisations had filed a TRO Motion in the Texas Proceedings, and a hearing on that motion was anticipated to take place on or around 29 July 2025*". The Current JOLs were also openly seeking a hearing date which coincides with a hearing in the TRO Proceedings in order to support the Highland Foundations' efforts to freeze the Fund's assets.  I discuss this approach in more detail at paragraphs 138 below.

116.   The FSD Proceedings have been launched despite what I regard inadequate investigations by the Current JOLs and without interviewing either myself or Mr Murphy before reaching a pre-determined view that the Funds' assets in fact belong to the Highland Foundations. Without interviewing myself or Mr Murphy and having interviewed the Highland Foundations, it is unclear to me how the Current JOLs could claim to be fair and independent.

117.   This is another example of the Current JOLs lacking objectivity and adopting a course of conduct underpinned by disparity in the treatment between a contributory of the same class, which has completely compromised DFW's trust and confidence in the Current JOLs' ability to administer this liquidation in a fair and impartial manner.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref:  DFWC.001.001)

### ii. Solvency determination

2. On 18 July 2025, Baker & Partners wrote to the Current JOLs to raise concerns with respect to the JOLs' declaration in the First Report that the Company was solvent (see **MP4/Tab 30/Pages 2372 to 2376**). Baker & Partners noted that neither the reason or the basis for that determination had been provided, either in the JOLs' First Report or at the Meeting of Contributories held on 9 July 2025, in which Baker & Partners were in attendance.

3. Baker & Partners stated that they found the Current JOLs' determination "*highly questionable*" given the fact that the Current JOLs had stated at **paragraph 13, MacInnis 2**, that "*there no assets in the estate from which the JOLs may, with sanction, fund their investigations*" and at **page 13** that:

   "a. the JOLs and their staff have incurred fees and expenses in the aggregate of US$461,145.11; and

   b. legal costs and disbursements in the amount of US$978,916.00."

4. I understand from my prior dealings with the Company as a former director that the Highland Foundations are not creditors of the Company. This is further reflected in the Report of the Current JOLs. Accordingly, I understand from Cayman legal counsel that the Highland Foundations would have no entitlement to participate in the Liquidation Committee in the Company's insolvent liquidation.

5. For this reason, a declaration that the Company is still solvent confers a significant advantage to the Highland Foundations, whereas a declaration of insolvency would remove their ability to participate in these proceedings.

6. Maples responded substantively to Baker & Partners by a letter on 23 July 2025 (see **pages MP4/Tab 39/Pages 2662 to 2665**), which stated that the solvency determination "*reflects the position that if the Company is successful in the Proceedings, the parties with the economic interest in the liquidation will be its participating shareholders*".

7. In other words, the JOLs have predetermined their claims to the Fund's assets before completing an adequate investigation and before waiting for the determination of the

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

DFW Summons, in which DFW sought to have the validity of the DAF Restructuring (and therefore the scope of the Company's assets) determined in these liquidation proceedings.

8.   The Current JOLs failed to substantively engage with the DFW Summons until the His Honourable Justice Asif KC expressly directed them to do so by email direction dated 16 June 2025 (**MP4/Tab 40 30/Page 2666**)  From the timing of the various sanction applications and issuance of the FSD Proceedings, it is in my view apparent that the Current JOLs had no genuine intention in engaging with DFW to seek an economical and efficient resolution to any questions over the DAF Restructuring.

9.   That omission is remarkable given the vigour with which the Current JOLs have pursued adverse proceedings against DFW, myself, Mr Murphy and affiliated parties in both Cayman and the United States.

### iii. JOLs' avoidance of DFW Summons

10.  At the Sanction Hearing on 24 June 2025, the transcripts of which is exhibited at **MP4/Tab 33/Pages 2399 to 2487** Leading Counsel for DFW addressed the rationale for the DFW Summons that DFW intended to provide an appropriate roadmap for the resolution of the key issues relating to this liquidation, namely: (i) the validity and efficacy of the DAF Restructuring; (ii) the security and safeguarding of the relevant assets, the DAF Assets; and (iii) the identification of which of the potential parties to the summons have an entitlement to the DAF Assets and the nature of that entitlement. The Current JOLs' FSD Proceedings cut across DFW Summons, the procedural vehicle which DFW put forward as a sensible way to resolve the central issues in this liquidation.  This means that related issues which underpin the Current JOLs allegations of (including, but not limited to) unlawful means conspiracy, unconscionable receipt and unjust enrichment are now being side-stepped in this liquidation and are placed for determination before a new justice, who is unfamiliar with these proceedings or the relevant facts and evidence which is already before the Court, for determination.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

11.  Whilst the Current JOLs have repeatedly stated that they were at the investigation only stage, the speed with which they have commenced proceedings in the Cayman Islands and in Delaware, and attempted to interfere with the bankruptcy proceedings in Texas undermines the purpose of the DFW Summons and failing to agree to a protocol (which would have been the more cost efficient means of resolving the scope of the liquidation and any misconceived concerns around dissipation of potential assets) contradicts any assertion that the Current JOLs are acting disinterestedly or independently.

### iv. JOLs' interference in the Texas Bankruptcy Proceedings

12.  DFW is concerned that these liquidation proceedings are being leveraged by Mr Dondero (through the Highland Foundations) to circumvent obstacles that have arisen in overseas litigation which is not progressing in Mr Dondero's favour, or which Mr Dondero is unable to successfully oppose.

13.  Specifically, in the Hunter Mountain Claim (referred to above at paragraphs 103) I caused the HMIT and its affiliated entities (**HMIT Entities**) to enter into the Hunter Mountain Settlement.

14.  On 24 June 2025, which was the eve of the Settlement Motion and the day of the Sanction Hearing, the Foundation Parties and HMIT Entities entered into a Settlement Term Sheet (**Term Sheet**) which was executed by Ms Diaz as the Chief Executive Officer of the Dallas Foundation (and who has filed evidence in these liquidation proceedings).

15.  At the same time, and as mentioned above, the Current JOLs also wrote to the trustees of the Highland Capital Management L.P., on 24 June 2025 requesting an adjournment of the Settlement Motion to afford the Current JOLs additional time to progress their investigations of the HMIT Entities, or alternatively, that distributions were deferred to the HMIT Entities so that the Current JOLs could continue their investigations without risk of asset dissipation in connection with the protocol discussions (see **MP4/Tab 1/Pages 1 to 3**).

16.  It is important to note that approval from the US Bankruptcy Court had been sought before entering into the settlement with HMIT became effective, and could in no way

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

have constituted an attempt at asset dissipation under the supervision of a US Bankruptcy Court.

17.  The DF Objection (mentioned at paragraphs 49 and 50 above) was withdrawn by virtue of the *"Stipulation Withdrawing Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorising Actions Consistent Therewith"* which was filed in the United States Bankruptcy Court For the Northern District of Texas, Dallas Division on 25 June 2025 (the **Stipulation**), exhibited at **MP4/Tab 41/Pages 2667 to 2677**.

18.  The Stipulation was subsequently entered on 27 June 2025. As set out in correspondence from Kelly Hart Pitre to David Curry of Okin Adams Bartlett Curry LLP dated 11 July 2025 (see **MP4/Tab 42/Pages 2678 to 2681**, the **KHP Letter**), in accordance with the Term Sheet, the Foundation Parties had agreed to participate in an initial confidential settlement meeting which was scheduled for 2 July 2025.

19.  The Term Sheet also provided that Mr Shawn Raver, the Company's former assistant general counsel and chief operating officer was required to:

(a)  review the current "DAF" structure with the Dallas Foundation;

(b)  provide a projected quarterly expense budget to the Foundation Parties (as defined therein);

(c)  continue to provide expense reporting every forty-five (45) days, commencing 5 August 2025; and

(d)  show and present a balance sheet for the DAF as of 30 September 2024, 31 December 2024, and 31 March 2025, including transfers of assets among entities within the DAF corporate structure.

20.  As stated in the KHP Letter, Mr Raver prepared the balance sheets as required and prepared a May 2025 working balance sheet, which was beyond the scope of his requirements under the Term Sheet.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

21.   The Highland Dallas Foundation, together with The Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc. instead of conducting the 2 July 2025 meeting as planned, filed the TRO Petition the day before the planned meeting and alleged, incredibly, a lack of transparency.  Despite this showing of bad faith, the meeting scheduled for the morning of 2 July 2025 went ahead as scheduled with Ms Diaz appearing by Zoom, and Mr Raver presented all of the information discussed**.**

22.   As mentioned above, the Current JOLs make no secret of the fact that they are timing the hearing of the Injunction Summons intentionally to coincide with the hearing of the TRO Petition.  In Maples' letter to the covering letter Court when filing the Civil Proceedings, Maples (at **MP4/Tab 19/Pages 2241 to 2244**), say the following:

   (a)   **Page 2**: "*...we would be most grateful if you are able to confirm if the Honourable Justice Parker has availability to hear the Application on one of the above dates (with our client's preference being 28 or 29 July 2025 in light of the timetable in the Texas Proceedings referred to below)*";

   (b)   **Page 2**:   "*The JOLs have recently become aware that the Supporting Organisations (being the holders of Participating Shares in the Company) issued: (i) a Petition against the First, Third, Fourth and Fifth Defendants to the Proceedings, and the original general partner of the Fund (the "**Texas Petition**" and the "**Texas Defendants**"); and (ii) an application for a temporary restraining order ("**TRO Motion**"), before the Texas Business Court...*"

   (c)   **Page 3:** "*In filing the Texas Petition and TRO Motion, the Supporting Organisations are acting independently of the JOLs. The JOLs were informed of the Texas Petition and TRO Motion only after they were filed by the Supporting Organisations.*"

   (d)   **Page 3:** "*If the jurisdiction challenge is successful, the temporary restraints provided for in the Rule 11 Agreement will be revoked, and the Company will be left with no protection against dissipation of the Fund's assets by the Defendants...*"

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref:  DFWC.001.001)

(e)  **Page 3:** "*Accordingly, if the Application is not determined until after the Court's summer recess ends in mid-September 2025, the Company would be significantly prejudiced because there is a real risk that the temporary (albeit incomplete protection provided by the Rule 11 Agreement will no longer be in place by then....The JOLs' therefore have grave concerns that without injunctions being granted by the Honourable Court pending trial, the Defendants may take steps to further dissipate or otherwise harm the value of those assets unjustifiably*."

23.  It is remarkable that: (a) the Current JOLs first sought to interfere with the implementation of the Hunter Mountain Settlement Agreement, which can only be in the best interest of the Company; (b) have "tag-teamed" with the Highland Foundations' legal strategy to freeze the Fund's assets; (c) are co-ordinating the FSD Proceedings with the TRO Proceedings, despite the fact that they and the Highland Foundations are claiming to have competing proprietary interests in the same assets; and (d) the Current JOLs intervene to obstruct and/or prevent US $300 million in claims arising from the Kirschner Complaint to be alleged against their funders, Mr Dondero and Mr Ellington.

24.  By adopting this co-ordinated buttressing litigation strategy, the Currrent JOLs have lost all objectivity with regards to their Court appointed duties,  especially as a draft protocol has been in circulation since 16 May 2025 and no reasons for the failure to agree the last draft Protocol have been provided (see paragraphs 122 above).

25.  The reasons for this co-ordinated approach with the Highland Foundations I understand stems from the Current JOLs' concerns that the Company's assets were removed to the detriment of the underlying charities (rather than to the detriment of the Company, which is where the JOLs' concerns should objectively lie (see **paragraph 42, MacInnis 5**)).

26.  Indeed, Ms MacInnis in **DFW Affidavit 1** at **paragraphs** 52 to 59 (as set out below), goes into great detail with regards to the effects certain of the Company's transactions have had on the charities, and the resulting impacts these transactions will have on the

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

balance sheets of the Supporting Organisations (see also **paragraphs 42 to 49, MacInnis 5**):

"*Impact on Charities*

[53] The **<u>JOLs continue to investigate the impact that the Relevant Transactions have on the Charities.</u>** *The Relevant Transactions have reduced the ability the Supporting Organisations and the Charities to meet their charitable objectives …*

*A Hole in the Charities' Balance Sheets*

[57] *The JOLs are also* **concerned that the other Supporting Organisations and Charities will also have similar holes** *in their balance sheet as a result of the Relevant Transactions.*

[…]

[59] *The* **JOLs are, therefore, concerned that the Relevant Transactions (particularly the LP/LLC Exchange) will reduce the funds available to the Charities** *to meet their obligations to the Supporting Organisations*. **[emphasis added]**"

27.   Again, and with respect to Ms MacInnis and Grant Thornton, but I am advised (without waiving privilege in connection with that advice) that the Current JOLs' focus should be on investigating whether the transactions had a detrimental effect on the Company; it is not for the JOLs to bring such claims on the Highland Foundations behalf.

28.   The Current JOLs have demonstrated a clear partiality towards the Highland Foundations by bringing the FSD Proceedings and seeking to align the timetable in those Cayman proceedings with the timetable of the TRO Proceedings brought by the Highland Foundations.

29.   In light of the strong suggestion that the JOLs are favouring and promoting the interests of one set of contributories over another, I repeat that DFW has lost all trust and confidence in the Current JOLs, and that they have lost their independence and objectivity with regards to the fair, efficient and proper administration of this liquidation.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

### f) Inadequate or incomplete investigations

### *ii. Absence of Interviews*

30. The Current JOLs have consistently refused to engage in any substantive dialogue with DFW or its representatives.

31. Contrary to **paragraph 24, MacInnis 5**, which states that the Current JOLs have "*conducted an extensive and detailed investigation into the Company's affairs, albeit those investigations are not complete*" DFW has never been invited to participate in any meeting with the Current JOLs.

32. Neither I nor Mr Murphy have been interviewed or asked to provide any information in connection with the Current JOLs' investigations. Whilst myself and Mr Murphy cancelled our initial meeting to speak with the JOLs, the issue of their' retention of Johnstone Law was a live one and the prospect that Johnstone Law would have attended that meeting was very real. However, since Johnstone Law's engagement was terminated by the Current JOLs, the Current JOLs have not asked to meet with, or interview us.

33. This stands in stark contrast to the apparent depth of interaction between the Current JOLs and the Highland Foundations, as evidenced by the detail included in the Current JOLs' affidavit in support of the Injunction Summons and in the Statement of Claim in the Civil Proceedings which is outlined as follows:

   (a) **Paragraph 11 of MacInnis 5**: states that the JOLs have discussions with Ms Julie Diaz, Mr Grant Scott and Mr Joe DePaolo of the Highland Foundations to understand the way in which the Company operated historically. However, how the Company operated and its connection with the DAF Structure is not something that the Highland Foundations as Participating Shareholders could have assisted with;

   (b) **Paragraph 15.2 to 15.5 of MacInnis 5**: states that the JOLs have been provided with documents which are concerned with how an individual can establish a Supporting Organisation and the agreement governing the

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

relationships between a Supporting Organisation and their respective charities. This is unrelated to the investigations they are meant to undertake with respect to the Company, but have collected, reviewed and exhibited documents which relate to the Supporting Organisations, such as:

(c)   Certificates of incorporation;

(d)   By-laws;

(e)   Procedures for Establishment and Operation of Funds and Supporting Organisations;

(f)   Internal Revenue Service correspondence confirming that the Supporting Organisations are exempt from federal income tax;

(g)   The Internal Revenue Code 1986 (as amended);

(h)   A Legal Relationship Agreement (as defined in MacInnis 5); and

(i)   An Operating Agreement.

(j)   It appears that the scope of the Current JOLs' investigations has gone well beyond the affairs of the Company itself and has extended to investigating the genesis of the Company's stakeholders which is unconnected with the liquidation. Furthermore, it also appears that the Current JOLs' have misdirected their investigations with regards to the tax exempt status of the Supporting Organisations, as it is the nature of the DAF Structure and the effects of the DAF Restructure which should determine the Supporting Organisations' treatment for tax purposes.

34.   Moreover, the Current JOLs appear to have repurposed their investigatory powers under the Companies Act into a litigation-driven evidence-gathering exercise, and commenced proceedings in multiple jurisdictions within the space of a few weeks from their appointment.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

### ii. No investigation into federal tax status concerns

35.  The Current JOLs' investigations have not touched at all upon whether the DAF Structure was indeed exposed to US federal tax laws, despite extensive evidence given in my affidavit. They brush this aside with reference to a Haynes & Boone memo that focuses on whether the DAF constitutes a "donor advised fund" under the U.S. Internal Revenue Code.  As the Current JOLs admit, it is not; the Haynes & Boone memo misstated the facts (as the JOLs implicitly acknowledged) and addressed issues of no relevance given this is not a "donor advised fund."  It is also unclear whether the Current JOLs have obtained their own independent tax advice with respect to these concerns.

36.  If so, the Current JOLs have not disclosed this advice, or the identity of their advisor.

37.  The Current JOLs have also not responded to the extensive evidence I gave with respect to this issue at **paragraphs 188 to 199, DFW Affidavit** and respectfully, Ms McInnis does not have the expertise to address matters on the tax laws of the United States.

38.  Additionally, Mancino 1 exhibited at **MP4/Tab 11/Pages 1642 to 1687** corrects material factual errors and overstatements, and legal errors or distortions of U.S. tax and nonprofit corporation law made throughout FSD Affidavit 1.

39.  Such corrections include:

     (a)   All entities affiliated with Highland Foundations including not only the Company but also The Dallas Foundation are exposed to material risks and associated defence cost should the audit be commenced.

     b)  The Highland Foundations' failings Mr Mancino refers to in his evidence has in fact resulted in the inurement of its net earnings to Mr Dondero in violation of one of the most fundamental requirements of section 501(c)(3) of the Code.

     c)  The Highland Foundations are operating primarily to serve Mr Dondero's private personal interests, which is also a U.S. tax violation.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

d) Myself and Mr Murphy held a reasonable belief that the Highland Foundations were no longer a section 501(c)(3) organisation due to the various dealings the Highland Foundations' had with Mr Dondero and his affiliated companies (**MP1 at pages 172 to 305**).

e) The real issue is not the possible imminent revocation of the Highland Foundations' tax exempt status occurring, but rather what a rationale reasonable person would do today acting as a fiduciary in the exercise of his/her duty of care to mitigate future consequences of such a revocation.

f) It is demanded from myself and Mr Murphy as directors of the Company that we act in accordance with our fiduciary duties of care because we had present knowledge and advice of expert counsel that the tax exemption risks to Highland Foundation were real, materially high, and not speculative.

156. In other words, to have played an "audit lottery" would have run contrary to our obligations as directors.

157. Troublingly, the Current JOLs do not have appeared to address the contents of Mr Mancino's letter 20 March 2025 (and updated on 1 May 2025) to the IRS at all (the **IRS Letter**). Rather than treat concerns raised by an expert in this field as a focal point of their investigations, the Current JOLs have instead elected to dismiss the IRS Letter as simply a calculated tactic "*to manufacture grounds on which the Relevant Transactions could be justified after the fact*" (see **paragraph 76.2, FSD Affidavit 1**).

158. It would seem that the Current JOLs have lost their objectivity with respect to this aspect of the investigation, by dismissing leading expert advice on this matter and without seemingly obtaining independent tax advice of their own, as the Current JOLs not experts in U.S. tax law themselves. The Current JOLs (see e.g. Ms MacInnis 15 July Affidavit at paragraph71) also ignore valuable advice Mr Murphy and I received from other tax advisors to the extent it was not written and provided to them. While much of it was written, some of it was not; notably, Mr Mancino advised favourably on every step of the DAF Restructuring, yet his advice is not referred to at e.g. Ms MacInnis 15 July Affidavit at paragraph 71 because the Current JOLs have based their

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

conclusions on written materials available to them and have not spoken with me or Mr
Murphy to confirm that those written materials encompass all advice and context.

### *iii. No investigations into Dondero related litigation*

159. As highlighted at **paragraphs 66, 120 to 143 of DFW Affidavit**, Mr Dondero is
involved in extensive and various litigation. Indeed, Highland Capital Management,
L.P submitted in *Highland Capital Management, L.P. v NexPoint Advisers, L.P. and
NexPoint Asset Management, L.P.* before the Supreme Court of the United States that
Mr Dondero and his entities are subject to multiple contempt findings and have filed
more than fifty appeals to the district court and Fifth Circuit as 27 May 2025.

160. Furthermore, the Company (whether directly or indirectly) itself is involved with both
value protective and value adding litigation as a result of Mr Dondero's prior conduct
and breaches, which are summarised as follows:

**CLO Holdco Note**

161. CLO HoldCo, Ltd. (**CLOH**) is the obligor on a promissory note (the **CLOH Note**)
currently valued at approximately US $40 million in principal and interest, with a
maturity date in December 2025.   The note was previously held by Sentinel
Reinsurance Ltd. (**Sentinel**), a Cayman Islands reinsurance company owned by Mrs
Dondero and Mr Ellington but was assigned to UBS Securities LLC (**UBS**) as part of a
settlement whereby Sentinel received a US $10 million cash payment in exchange.
CLOH has engaged legal counsel to assess its obligations and potential defences in
relation to this claim.   The underlying transaction forms part of the broader Sentinel
Fraud allegations concerning fraudulent conveyances intended to shield assets from a
US $1.2 billion judgment against Mr Dondero and his affiliates.

**Dondero Note Arbitration**

162. As mentioned above, Mr Dondero's personal trust, Dugaboy, filed an arbitration action
alleging HMIT owes Mr Dondero's personal trust US $62.6 million pursuant to a
promissory note.  Further details of this litigation can be found at paragraph 52(a)
above.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation,
whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107,
Cayman Islands (Ref: DFWC.001.001)

**UBS New York State Court lawsuit**

163. As outlined in **paragraphs 123 to 127, DFW Affidavit**, UBS named CLOH as a co-defendant in the US $1.1 billion New York State Court action against Mr Dondero (amongst others).

164. CLOH is the only defendant to successfully obtain dismissal.

165. UBS is appealing that dismissal and may also amend its complaint to allege that CLOH is an alter ego of Mr Dondero, which could expose all DAF assets to collection by UBS in pursuit of its US $1.2 billion judgment.

166. It is therefore essential that the Highland Foundations are not controlled by Mr Dondero because it could lead to substantial harm to DAF's assets.

167. CLOH also believes UBS may amend its petition for leverage in the negotiations for payment on the CLOH Note.

**Defense of Highland Capital bankruptcy settlement**

168. HMIT and its affiliates entered into the Hunter Mountain Settlement Agreement in May 2025, details of which are described above at paragraphs 49 to 50.

169. The Hunter Mountain Settlement represents a massive victory for HMIT and DAF. I believe the Current JOLs either have lost all objectivity with respect to the benefits which will flow from this settlement. The JOLs should be in favour of such huge amounts of funds returning to the DAF Structure, rather than seeking to delay or interfere with it.

170. With respect to value-add litigation, the matters presently on foot are as follows:

**Kirschner Claims**

171. I understand from legal counsel engaged in this litigation that the Kirschner claims involve actions for damages in excess of US $300 million against entities related or affiliated with Mr Dondero and Mr Ellington. All DAF Entities were dismissed as

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

defendants to this action. A copy of the Kirschner Complaint - Chapt 11 Highland Cap Mgmt v Dondero is exhibited at **MP4/Tab 43/Pages 2682 to 2815**.

172. Following approval of the Hunter Mountain Settlement Agreement, HMIT (an entity within the DAF structure) acquired these claims on 7 July 2025, which include a multitude of actions asserted against Mr Dondero, Mr Ellington and their affiliates for a variety of alleged fraudulent activities and schemes that siphoned assets from HCMLP to the pockets of Mr Dondero, Mr Ellington and others.

173. As an example, the Kirschner Complaint describes Mr Dondero's fraudulent activities with respect to Sentinel and by which Mr Dondero ultimately mislead the Cayman Islands Monetary Authority.

174. Highland (in its capacity as a debtor) temporarily stayed prosecution of these claims because Highland believed it had sufficient assets in the bankruptcy estate to pay all creditors at par.

175. I believe HMIT and DAF will receive substantial value from prosecuting these claims, which will benefit charitable causes.

**Atlas Demand Note Lawsuit**

176. I described this matter at **paragraphs 138 to 140, DFW Affidavit**. To reiterate, this is a lawsuit by Atlas IDF, LP (**Atlas**) against NexPoint Real Estate Partners, LLC (**NREP**) for US $13.9 million in promissory notes payable on demand.

177. NREP, a Mr Dondero-controlled entity, has refused to pay on the demand promissory notes despite a demand for payment. Atlas' counsel is actively suing to collect on the notes.

178. NREP has counterclaimed and sued myself and Mr Raver personally, who are indemnified in the matter by Atlas and certain DAF entities. It is important to note that by an order of the Business Court of Texas dated 14 August 2025 exhibited at **MP4/Tab 44/Pages 2816 to 2818**, the claims against myself and Mr Raver were dismissed in their entirety.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

179. Dugaboy is also a guarantor of this debt obligation. While Atlas is not a DAF subsidiary, DAF is affected because Rand Advisors, LLC (**Rand Advisors**) manages DAF assets, and Charitable DAF Holdings Corp. owns and controls Atlas's general partner and receives investment management fees which benefit DAF.

**Liberty Lawsuit vs. HCMSI**

180. I described this matter at paragraph 141, DFW Affidavit.

181. Liberty CLO HoldCo, Ltd. (**Liberty**) sued Highland Capital Management Services, Inc. (**HCMSI**) for breach of a promissory note with a principal balance of approximately US $1.3 million.

182. HCMSI, a Mr Dondero-controlled entity, defaulted on its payment obligation under the note to Liberty. Liberty's counsel is actively suing to collect on the note.

**NexPoint Polo Glen**

183. This is a lawsuit by Liberty against NexPoint Polo Glen (**Polo Glen**) for breach of contract in the amount of approximately US $700,000.

184. Polo Glen, another Mr Dondero-controlled entity, has refused to satisfy its contractual obligations to repurchase Liberty's membership interest pursuant to a put option agreement.

185. Liberty's counsel is actively pursuing to collect on the breach of contract.

186. The Current JOLs have not adduced any evidence which reveals the existence of the litigation referenced above which represents significant gains for the Company and/or the DAF Structure. As a result, I have had to provide extensive evidence in this regard to appraise the Court. This should have been disclosed by the Current JOLs if they had conducted a thorough investigation.

187. Should the Highland Foundations be successful in the TRO Petition, then the ability for this litigation (the majority of which is against Mr Dondero) will be unable to proceed, to the detriment of the Company, the DAF Structure and ultimately the contributories or

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

creditors of the Company.  It is unclear whether the Current JOLs had an appreciation of this when they elected to file the FSD Proceedings.

188.  If they did, then they arguably acted against the best interests of the minority of the Company's contributories rather than the Company. If they did not, then this confirms that they have conducted a wholly inadequate investigation and are failing in their duties to be fair and independent.

### iv. Use of DAF Structure for the benefit of Dondero

189.  Extensive evidence given by both myself at **paragraphs 111 to 115 and 151 to 156, DFW Affidavit** and the Current  JOLs at **paragraph 29, FSD Affidavit 1** (see pages 82 to 83 and 94 to 96 of DFW 1) clearly suggests that the Fund, and more broadly, the charitable structure, was being used to cycle Mr Dondero's donations to purchase interests in businesses related to Mr Dondero or into transactions which lend more favourable commercial terms to entities related to Mr Dondero, whilst all under the shield of US federal tax exemptions.

190.  It is also clear from a review of DFW Affidavit 1 that the JOLs have not questioned or sought to look behind these interests before filing the FSD Proceedings.   Their investigations appear to extend only to identifying which interests DAF LP's fund structure has in connection with Mr Dondero's related businesses.   They do not appear to have taken on board DFW's concerns raised in DFW Affidavit at all.

191.  Furthermore, the Current JOLs incorrectly state at **paragraph 27, FSD Affidavit 1** that DAF LP relied on mostly passive investment vehicles which betrays that the Current JOLs' investigations are still embryonic and have not been sufficiently thorough.   For example, wealth creation for DAF LP derives from an array of sources, including:

   a)  The Hunter Mountain Settlement Agreement secures rights in the Kirshner claims which has a value of up to US $300 million, which DAF LP and its related entities will benefit from.

   b)  Debt collection claims against Mr Dondero's companies also represents millions of dollars in returns for the Fund's related entities. ;

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref:  DFWC.001.001)

192. One of the Fund's related entities, Rand Advisors which operates as an investment management business, manages investor assets worth over US $100 million. These investors are unrelated to DAF LP or the parties in the FSD Proceedings. The management fees which are paid to Rand Advisors are redistributed to DAF LP.

## D.  REPLACEMENT JOLs

193. For all the reasons set out above, DFW as a creditor in what it believes is the Company's insolvent liquidation, and as the Company's largest contributory has lost all trust and confidence in the Current JOLs' conduct of this liquidation, which requires them to act fairly, independently, impartially and in the best interests of the Company, rather than a class of the Company's minority contributories.

194. It is therefore proposed that Ms Neema Griffin and Mr Jeffrey Stower of Teneo (whose experience and qualifications are set out below) are appointed as Replacement JOLs as proposed in the terms of the draft Order which is being filed with this application.

195. Ms Griffin is a Managing Director with Teneo Cayman's Advisory business. She has over 18 years of financial advisory and insolvency experience with a specialism in contentious and complex insolvencies, involving high value litigation, fraud investigations and international asset tracing, personal bankruptcies and fund insolvencies. Her wider financial advisory experience includes solvency reviews, M&A mandates and regulatory advisory. Since moving to the Cayman Islands, her industry focus has been on financial services. Ms Griffin is an insolvency appointment taker in the Cayman Islands and is a UK licensed insolvency practitioner. Ms Griffin's sworn Consent to Act is exhibited at **MP4/Tab 45/Pages 2819 to 2823**.

196. Mr Stower is a Senior Managing Director with Teneo in the Cayman Islands. He has over 25 years of experience in Restructuring & Insolvency, the last 16 of which have been spent in the Cayman Islands with a focus primarily on the financial services industry. Mr Stower has a wealth of experience in both cross-border restructurings, inspectorships and insolvencies involving hedge funds, private equity funds, insurance companies, listed holding companies and a range of other offshore structures, acting in a variety of roles including appointments as official liquidator, provisional liquidator,

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

voluntary liquidator and controller. He is a qualified insolvency practitioner in the Cayman Islands and is a Fellow of INSOL International. Mr Stower's sworn Consent to Act is exhibited at **MP4/Tab 46/Pages 2824 to 2428**.

197. Ms Griffin and Mr Stower's Consents to Act confirm that they:

   a. Are free of conflicts and clear to act;

   b. Meet the requirements of independent under the Insolvency Practitioners' Regulations (**IPR**);

   c. Meet the residency requirements of the IPR; and

   d. Have the requisite experience to conduct the liquidation of the Company as evident by their resumes exhibited to their Consents to Act.

198. At paragraphs xx t xx above I address the concerns which I, as the sole director of DFW have in connection with the funding of the Current JOLs. I am aware and understand that the Company has limited assets from which the fees and expenses of the Replacement JOLs could be paid.

On their appointment, DFW would be in a position to fund the immediate costs of the Replacement JOLs but, in recognising that the Highland Foundations consider the Replacement JOLs to be under a conflict of interest if funded by DFW, I also recognise that the Replacement JOLs would be best serve by securing third-party funding for the necessary investigations. However, this is properly a matter for the Replacement JOLs to evaluate and seek sanction of in due course.

### E.   CONCLUSION

199. For the avoidance of doubt, DFW objects to any proposal put forward by the JOLs that the costs awarded to DFW in connection with the Sanctions Summons should be offset against any possible recoveries the Current JOLs may make in the future. DFW is entitled to its costs pursuant to the terms of the Order made on 24 June 2025 in these proceedings, the terms of the Order do not provide that DFW's costs should be

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

contingent on speculative recoveries being made by the Current JOLs, or upon certain milestones in these proceedings being reached by the Current JOLs.

**SWORN** to at Galveston    Texas    )

on this  19th   day of   August          2025          )



)

MARK ERIC PATRICK                        BEFORE ME:


NOTARY PUBLIC

> Kenneth Wyatt Lightfoot IV
>
> ID NUMBER
> 13433248-0
> COMMISSION EXPIRES
> April 28, 2027

04/28/2027


Electronically signed and notarized online using the Proof platform.


**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)