IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>HIGHLAND CAPITAL<br>MANAGEMENT, L.P.,<br><br>　　Reorganized Debtor.<br>_____<br><br>MARC KIRSCHNER, et al.,<br><br>　　Plaintiffs,<br><br>v.<br><br>JAMES D. DONDERO, et al.,<br><br>　　Defendants.<br>_____ | **Case No. 19-34054-sgj-11**<br>Chapter 11<br><br>Dallas, Texas<br>October 17, 2025<br>9:30 a.m. Docket<br><br><br><br>**Adversary Proc. 21-3076-sgj**<br><br>STATUS CONFERENCE<br><br>MOTION FOR PRELIMINARY<br>INJUNCTION [379]<br><br>MOTION TO COMPEL RE:<br>DISCOVERY [380] |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For Hunter Mountain<br>Investment Trust: | Sawnie A. McEntire<br>Ian Salzer<br>Danielle E. Ball<br>PARSONS MCENTIRE MCCLEARY, PLLC<br>1700 Pacific Avenue, Suite 4400<br>Dallas, TX  75201<br>(214) 237-4300 |
| For James Dondero,<br>Strand Advisors, et al.: | Amy L. Ruhland<br>PILLSBURY WINTHROP SHAW PITTMAN,<br>　LLP<br>401 W. 4th Street, Suite 3200<br>Austin, TX  78701<br>(512) 580-9658 |
| For Scott Ellington<br>Isaac Leventon: | Debra A. Dandeneau<br>BAKER & MCKENZIE, LLP<br>452 Fifth Avenue<br>New York, NY  10018<br>(212) 626-4875 |

APPEARANCES, cont'd.:

For Highland Capital      Deborah Rose Deitsch-Perez
Management Fund Advisors,  Michael Aigen
LP and NexPoint Advisors   STINSON, LLP
LP:                     2200 Ross Avenue, Suite 2900
                     Dallas, TX  75201
                     (214) 560-2201

Recorded by:         Michael F. Edmond, Sr.
                     UNITED STATES BANKRUPTCY COURT
                     1100 Commerce Street, 12th Floor
                     Dallas, TX  75242
                     (214) 753-2062

Transcribed by:      Kathy Rehling
                     311 Paradise Cove
                     Shady Shores, TX  76208
                     (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

DALLAS, TEXAS - OCTOBER 17, 2025 - 9:37 A.M.

THE CLERK:  All rise.  The United States Bankruptcy Court for the Northern District of Texas, Dallas Division, is now in session, the Honorable Stacey Jernigan presiding.

THE COURT:  Good morning.  Please be seated.

MS. DANDENEAU:  Good morning.

MR. MCENTIRE:  Good morning.

THE COURT:  All right.  We have some settings in a Highland adversary proceeding, Adversary Proceeding 21-3076.  The calendar shows a couple of motions, but I think what we all agreed to happen, through filings and communications with my courtroom deputy, was for us to have a status conference, and then we may or may not roll into the motions.  I'll let you all correct me if I have the wrong understanding.  But let's start by getting lawyers appearances.

MS. DEITSCH-PEREZ:   Thank you, Your Honor.  I believe Your Honor's recitation was correct.  And this is Deborah Deitsch-Perez.  I represent NexPoint and HCMFA.  I will let the others --

THE COURT:  Okay.  Other appearances, please.

MS. DANDENEAU:  Good morning, Your Honor.  Debra Dandeneau from Baker & McKenzie.  I'm here on behalf of the Individual Defendants, Scott Ellington and Isaac Leventon.

THE COURT:  Okay.  Thank you.

MS. RUHLAND:  And good morning, Your Honor.  I'm Amy

Ruhland from Pillsbury, and I'm here on behalf of Mr. Dondero, Strand Advisors, GetGood Trust, and the Dugaboy Investment Trust.

THE COURT:  Okay.  Thank you.

MS. DEITSCH-PEREZ:  Okay.  And not to ignore the others here, Mr. Aigen is here assisting, and Fred Jones, paralegal.

THE COURT:  Okay.

MS. DEITSCH-PEREZ:  That accounts for the crowd.

THE COURT:  Okay.  Thank you all.

MR. MCENTIRE:  Good morning, Your Honor.  Sawnie McEntire and Ian Salzer and Danielle Ball on behalf of Plaintiff Hunter Mountain.  We are here.

I would like to amend, at least make one comment in response to your preliminary remarks.

THE COURT:  Could you make sure you talk into the microphone?

MR. MCENTIRE:  I'll come up here.

THE COURT:  Okay.  Even better.

MR. MCENTIRE:  We did agree to have a status conference first.  In fact, I think we've dedicated almost an hour to address the issues that the Defendants wanted to raise.

We had an understanding that we would have these motions heard today, and we issued our notice of -- a notice of

scheduling accordingly.  We were going to have the status conference first.  And I'll just say it's up to you if you want to consider the motions, but it was our understanding that the motions were set for today.

THE COURT:  Okay.  All right.  I was a little confused on the pleadings, but let me just ask.  Is there anyone on the video who wished to make an appearance?

(No response.)

THE COURT:  All right.  Well, let's then at least begin with a scheduling conference, a status conference, and then we'll to figure out if we're going to do more than that as the discussion evolves.

So let me, just to make sure we are all on the same page before we begin talking about scheduling orders, what may or may not makes sense, let me just recap for the record where I think we are, and then you will all correct me if you think I got something wrong.

So, this adversary proceeding, of course, has been pending since 2021.  Early on, there were -- I was going to say there were motions to withdraw the reference.  Maybe it was just one motion that multiple parties filed.  But that was in January 2022.  We had at least one motion to withdraw the reference.

This Court issued a Report and Recommendation to the district court on April 6, 2022, recommending that the district court -- and the district judge is Judge Scholer --

recommending that the trial, if ultimately occurring, should happen in the district court because it did appear we had a lot of noncore claims, parties who hadn't filed proofs of claim or didn't have pending proofs of claim anymore who would have jury trial rights.

So I recommended what I've said many times is sort of the usual protocol in the Northern District of Texas when an adversary proceeding has noncore claims and no consent, that the district court can utilize the bankruptcy judge as a magistrate and have the bankruptcy judge handle pretrial matters, but anything that fully disposes of a claim, such as maybe a motion for summary judgment or even a motion to dismiss, the bankruptcy judge would do a Report and Recommendation and let the district court have the final say-so on that.

So that's where we were in April 2022.  So that was before Judge Scholer for a few months.  And then a year later, April of 2023 -- April 4th, to be exact -- this Court granted an unopposed motion of the Litigation Trustee, who was the Plaintiff still at that time, a motion to stay the adversary proceeding.  And the order contemplated everything would be stayed except I think there was language in there saying the parties still hoped that Judge Scholer might rule on the Report and Recommendation.

But for whatever reason, the district court

administratively closed, abated her matter, her pending action, and closed it up.  And so it has been a closed matter at the district court level for more than a couple of years. All right.  So I think that was perhaps September 30th, 2023 that the district court did what it did.  But I'm not -- it was 2023.

So this adversary proceeding has been stayed or abated, obviously, for more than two years, but then we had the settlement that was presented to this bankruptcy court involving Hunter Mountain -- let's call them HMIT -- and the Reorganized Debtor and the Litigation Trustee that involved a lot of consideration back and forth.  But one aspect of that settlement would be that HMIT was receiving, as part of the settlement, any of the claims or causes of action that had belonged to the bankruptcy estate or the Reorganized Trust as part of the settlement.

And so we had a contested hearing, the Court approved that compromise and settlement, and thereafter, in September, we had a hearing on a motion of HMIT to substitute in as Plaintiff, and the Court granted that.  It seemed like that was consistent with the settlement that the Court already approved.  And so HMIT is now the party plaintiff in this adversary proceeding.

So we had some discussion, obviously, when we were here on September 3rd.  I keep saying -- it was September 3rd, right?

MS. DEITSCH-PEREZ:  Yes.

THE COURT:  About the possibility of these motions being filed -- motion for TRO, motion for discovery, other activity.  And then we heard from some of the Defendants, well, wait, the stay hadn't even been lifted, ended, in this adversary proceeding because there's a process, there's a process that was described in the Court's order way back in 2023 that any party who wanted the stay ended had to file a notice of intent to lift stay and give intent of its intention to go forward in the adversary.  And that notice would provide that the stay would lift upon the expiration of 30 days following the notice.

So the notice was filed September 30th, and by my calculation that means, October 3rd, the stay ended in this adversary.  So that's where we are.

And as we kind of discussed a little at that September 3rd status conference, I thought the first order of business needed to be this Court issuing a Supplemental Report and Recommendation to Judge Scholer saying, guess what, the abatement is over and life has changed in the following respects with regard to the adversary proceeding.  These Defendants are no longer defendants.  The Plaintiff, there's been a substitution.  And if I perceived any problem with jurisdiction, I should report that to her.  Alternatively, if I perceived she should just take the whole entire adversary

proceeding, even pretrial matters, I should perhaps report on that. Because, as we all noted, the adversary is a different adversary in many respects.

So that's what I want to discuss first off the bat, what a Supplemental Report and Recommendation to Judge Scholer ought to say. And to help the discussion, I'll just tell you where my brain is after reading some of the filings and after kind of pondering this a bit. What my brain thinks is there is probably still federal subject matter jurisdiction because of the time-of-filing rule.

And I will tell you that I've been through this before with a post-confirmation adversary proceeding, where I made a recommendation, actually, that the adversary be remanded to state court because it seemed to involve only state law claims and causes of action, there was going to be zero impact on a confirmed plan, the debtor, the reorganized debtor, wasn't even in the lawsuit, the adversary, anymore. And it happened to be Judge Brantley Starr in that matter. He said no. Time of filing. You look at was there federal subject matter jurisdiction at the time of filing.

But my second part is, upon my recommendation, he just took the whole thing, because I felt like, what is the point in the bankruptcy judge at this point having a role? There could be efficiencies, but there wasn't going to be an impact on creditor recovery or a confirmed plan.

10

Now, I know we have some nuance here where there are appeals, maybe, that -- well, I don't know that anything could really change with the plan at this point, except that gatekeeper thing that I understand is on appeal, or petition for writ of cert at the Supreme Court.  But I don't even think that, if anything was changed, would impact the plan.

So this has all been a long speech telling you that my gut, after thinking about this some, is I should do a Supplemental Report and Recommendation to Judge Scholer, telling her it's unabated now, and I think she should know, in reading the Report and Recommendation she never ruled on in 2023, life has changed in these following respects.

There was a chart, if I recall, in the original Report and Recommendation, saying, here are the 21 counts, or whatever the number is, I don't know, I think it was 30-something counts, here are the 21 or so Defendants, and just giving a revised, maybe redlined, chart, but then also updating on all creditors have been provided for now in the plan.  I know we have one reserved claim.

And so this is really, to me, it's almost like a shareholder derivative suit.  I'm making that analogy because we have a former 99.5 percent equity owner now asserting what used to be claims, causes of action, belonging to the estate. And we have, I think, several of what constituted the .5 percent equity owners as Defendants, as well as affiliates,

insiders.

So I'm inclined to say, just take the whole thing, Judge Scholer.  I'm a little bit worried about offending her, because that's not the usual protocol, but this is not the usual adversary.  So that's what I'm thinking.  So I think I should start with the Plaintiffs.

THE COURT:  Thank you.

THE COURT:  And maybe my speech wasn't necessary.  Maybe that's everything you all were going to argue about, at least on --

MR. MCENTIRE:  Your Honor, it was substantially correct, --

THE COURT:  Okay.

MR. MCENTIRE:  -- except your conclusion.  I'm just joking.

THE COURT:  Okay.

MR. MCENTIRE:  I'd like to address your points.  First of all, the Court does have subject matter jurisdiction.  We agree.  You have related-to jurisdiction.  In your Report and Recommendations, on Page 6 and 7, you did have a chart and you went through and identified multiple -- mixed claims of core and noncore claims.  I think it's indisputable that you have subject matter jurisdiction.

Then the issue becomes the withdrawal of the reference.  As you know, the settlement that was undertaken that you

approved had tremendous benefit to the estate.  We brought years and years and years of litigation to an end.  Releases were executed.  It actually paved the way to a whole -- what we think is a final resolution of the bankruptcy proceeding.  And so it had a tremendous benefit.

And as part of the consideration of that settlement, my client received the assignment of the claims, whether you describe it as a derivative action or otherwise.  We hold them individually at this point.

You are familiar with the parties.  You are familiar with the issues.  You have heard evidence on many of these issues, evidence that the United States District Court has not considered.  You are generally familiar with the so-called Sentinel allegations.  You expressed concerns about the Sentinel allegations and the fact that it actually implicated some potentially criminal behavior.  You are very deeply invested in the background information.

When we met back here, when you approved the settlement -- the substitution, excuse me, the substitution -- back in early September, you did say that you were contemplating a Supplemental Report.  We agree with that, too.  But I also held nothing back.  I made it very clear at the end of that hearing, at the conclusion of that hearing, that we were contemplating an emergency TRO and equitable relief.  I wanted to be very clear at that point.

We can't afford to do a do-over here, Your Honor.  We believe, and the public records actually reflect, that tens of millions of dollars are being funneled out of, for instance, Dugaboy, as we speak.  Over a hundred million dollars in the last year and a half or two years.  Until now, Hunter Mountain has never had standing to press these issues.  So we find ourselves where we filed a motion, even when the stay was still in place, because we felt it was an emergency and we thought that the Court had the authority, the power to hear it, notwithstanding the stay, because we were not addressing the merits of the claims, we were addressing the emergency relief we were requesting.

You denied our request for expedited hearing and you pushed it out after the stay was lifted.  We immediately issued a notice to lift stay on September 3rd, which makes the stay lifted on October 3rd.  Your date calculations were correct.  We wanted to move as quickly as we could.  We wanted October 10th as our hearing date, as quickly as we could, because we do believe that money is being moved around.

The UBS case, by way of example, is now ripe for ruling.  Ms. Deitsch-Perez may disagree with me, but the Court has taken it off the docket and is considering it on for submission.  And that is an over one billion dollars -- it's one of the reasons -- it's not --

THE COURT:  By the way, I don't know exactly what you

mean.  I know that UBS, --

MR. MCENTIRE:  Yes.

THE COURT:  -- there's litigation in New York.

MR. MCENTIRE:  It is.  It's --

THE COURT:  And there was for a long time before the bankruptcy, and after plan confirmation, or they were allowed, pursuant to a settlement with UBS, --

MR. MCENTIRE:  Right.

THE COURT:  -- to go forward.  But I don't know. Nobody reports to me what's happened in that litigation.  I think you had something in the exhibit notebook, --

MR. MCENTIRE:  We did.

THE COURT:  -- which I didn't know if I was going to get to it today or not, --

MR. MCENTIRE:  Sure.

THE COURT:  -- so I have not looked at that exhibit.

MR. MCENTIRE:  Let me put it in the context and why it's relevant.  It's relevant to the motivation of why money is being moved so rapidly, because a decision is about to be handed down, we believe, that implicates both Scott Ellington and Jim Dondero.  And very significant sums.  And that's one of the reasons why we believe an exigency exists, and that's why we cannot afford to do a do-over in the United States District Court.

So we've come to you and asked for emergency relief while

the stay was pending.  You said no, we're going to put you off until after the stay is lifted.  We immediately issued the notice of hearing for after the stay was lifted.

What they are asking for now in their briefing schedule before you is another four -- three or four months of delay, delay, when we think that we're being, as a Plaintiff who now stands in the shoes of the Litigation Trustee, we're being severely injured.  And that's why we request and urge the Court, do not immediately withdraw reference on all issues. You have the authority to exercise your "magistrate-type" authority.

They have never -- they being the Defendants, counsel -- have never taken any steps to remove the abatement in federal court.  So we're going through a whole series of new steps.

THE COURT:  Why would a defendant want to do that?

MR. MCENTIRE:  Well, --

THE COURT:  I don't mean to be flippant, but --

MR. MCENTIRE:  To bring the issue --

THE COURT:  -- I'm just trying to fit that statement into its significance.

MR. MCENTIRE:  Well, I find it significant because if they wanted -- if they wanted to get immediate relief on these motions that they say they want to urge, that would be one thing they would want to do.

But, rather, they --

THE COURT:  What do you mean, the motions to dismiss from way back when?

MR. MCENTIRE:  Motions -- the motions to dismiss.

THE COURT:  Okay.

MR. MCENTIRE:  Which not have been ruled upon.  So they're all before the Court.  And I think, frankly, fully briefed.

THE COURT:  Well, but -- well, okay.  And just so we're all clear, again, I've followed the usual protocol --

MR. MCENTIRE:  Yeah.

THE COURT:  -- with regard to those motions to dismiss, where, as long as there's a Report and Recommendation not ruled on --

MR. MCENTIRE:  Yes.

THE COURT:  -- by the district court, I tend not to go ahead hear a motion to dismiss because, for all I know, the district court may say no, I'm going to take the whole thing, I'll hear that.  And I don't want to interfere with that prerogative of --

MR. MCENTIRE:  Understood.

THE COURT:  -- my boss, the district court, --

MR. MCENTIRE:  Understood.

THE COURT:  -- which is essentially what they are.

MR. MCENTIRE:  But what we have here is we have an application, a motion seeking emergency relief, emergency

discovery, and a request to set a preliminary injunction hearing.  And we cannot afford to start this whole process over again.  From a purely evidentiary perspective, we believe we have evidence right now of what was happening.

And it's not -- our request for your rulings is not addressing the merits of the underlying claims.  So that's something that could be preserved.  This is to address an interim remedy, which you have the authority to do.

THE COURT:  And maybe we should go ahead and talk about the next issue on my brain now, even though we haven't talked about are we going to have the TRO hearing yet.

My initial reason for not setting the emergency hearing on the TRO request was twofold.  It was, one, I thought we needed to get past October 3rd, when the abatement ceased.  But I also thought this was an extraordinary remedy.  It's a pre-judgment remedy.  And I knew that couldn't happen on -- TROs, they're always expedited, right?  But when it's talking about pre-judgment orders clamping down on assets of defendants, we have to be clear, super-clear, there's authority to do that.  And I think part of it was also seeking appointment of a receiver.

I need a lot of clarity.  There's a Fifth Circuit case from many years ago involving -- what was the name of the case?  It was Ondova and Netsphere and a fellow named Jeff Baron, who was a former owner of the Chapter 11 debtor,

Ondova.  And I had a Chapter 11 trustee in Ondova go to the district court and ask for a receiver over Mr. Baron's assets because he had assets all over the world and he was secreting them and he was going to be liable to the estate for millions of dollars.  And that went up through the Fifth Circuit, and the Fifth Circuit said, you can't get a receiver over an individual if there's not a judgment against him yet.

So you may be arguing a different statute than perhaps was argued there.  But I'm just letting you know, I'm super -- I don't know what the word is -- cautious on this.

MR. MCENTIRE:  Sure.

THE COURT:  And that was certainly part of my reason for we're not going to do an expedited hearing on this.  Do you agree it's extraordinary relief?

MR. MCENTIRE:  I think it's very extraordinary.

THE COURT:  Okay.

MR. MCENTIRE:  And so I understand all of your concerns.  And that's why this is a tiered process.  It's a staged process.  We first have to get a TRO, and then we have an evidentiary hearing, and that is when you would make the determination of either a preliminary injunction or a receiver, not today.  That's not before the Court today.

But before the Court today is our request for emergency discovery relief so we can get the depositions that we think will take us past the red zone and into the end zone on

proving what we believe is occurring.  And we believe we have credible proof today before the Court, more than a *prima facie* case, that establishes, even under relaxed standards, that we have a right to a TRO.

And so with what happens here, I recognize your concern. I respect your concern.  But any further delay is simply going to allow further movement of assets and funds.  With each passing day, with each passing week, we know entities have been created this year; we know that as much as $30 million has moved or is about to move or already has moved outside of the country; we have the court in New York that's about, we believe, is likely to come down with a ruling.

And so the Defendants in this case -- NexPoint, Dugaboy, Mr. Dondero in particular, Mr. Ellington -- have every motivation in the world to keep moving assets.  If I have a do-over in the United States District Court, we're looking -- we're probably looking not until December or January to get this thing -- get the thing unabated, you're going to have to send your new Supplemental Report up, we're going to have to get it unabated.  And we're looking at months and months of further delay.

We came before you, we filed it before you, because of your history in the case and your knowledge of the parties and the claims.  There is efficiency here because of your understanding and background.  And I would request that you

20

hear our motions today.

Thank you.

THE COURT:  All right.  Thank you.

Mr. Deitsch-Perez?

MS. DEITSCH-PEREZ:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. DEITSCH-PEREZ:  You're absolutely right.  This is a very different case than it was when Marc Kirschner was pursuing these claims for the benefit of the estate.  And so it is absolutely correct that you should -- and the district court would be benefited by a new Report and Recommendation, taking into account everything that has happened.

The only thing that we would suggest, to make your job easier, is that you allow the parties to -- and you could put page limits on it so we don't take up a lot of your time -- but allow the parties to give you some guidance on all of the ways in which we think it's different.

Your reversal by Judge Starr may be -- may not really governing be now because of the *Royal Canin* case, and if you -- Ms. Dandeneau can speak a little bit more to the jurisdictional issue.

THE COURT:  I can't remember.  What year was that?

MS. DEITSCH-PEREZ:  This year.

THE COURT:  Oh, it was this year?

MS. DEITSCH-PEREZ:  Yeah.  Yeah.

THE COURT:  Okay.

MS. DEITSCH-PEREZ:  Beginning of this year.

THE COURT:  Okay.

MS. DEITSCH-PEREZ:  So it is after your decision and Judge Starr's decision.  And so I think that makes a difference.

And while I don't -- you certainly have your finger more on the pulse of these bankruptcy jurisdictional issues probably than anyone in this courtroom, but it would probably be useful for us to put in a little bit of briefing to give you the benefit of our thoughts so that you could give Judge Scholer a new Report and Recommendation.  We think that would be useful.

And so we think at least the motion to withdraw the reference should be briefed so that you can give a report to Judge Scholer so we know where this case is going, or if, in fact, you or she thinks there's even jurisdiction anymore in these circumstances.  Because while Hunter Mountain refers to itself as the former equity, right now they're actually in the position of John Smith.  John Smith bought some claims in the bankruptcy.  They were assigned them.  They're not the Debtor. They're not these estate.  They're not even really pursuing these in their capacity as former equity.  They're just a claims holder.

And just, you know, Mr. McEntire has said a lot about his

concerns, but I think if you read all of the papers, what's really clear here is this offshore issue is very different than what they're talking about.  What's happening here, and you've seen this from other things before you, is Hunter Mountain, Mr. Patrick, has made off with $270 million of funds that were supposed to be for charities.  And he knows and the papers show Mr. Dondero is, through an entity, funding the charities so the charities don't have to go out of pocket to try and get their money back.  And he is desperate to stop that.

So Mr. McEntire said, oh, there are hundreds of millions of dollars that are leaving.  No.  This is not a case like *Stanford*, where there was a Ponzi scheme and there was really money disappearing.  They've pointed the evidence in the record, if you can call it that, is a couple million dollars of money spent on actual services, goods and services.  That is not hiding things.

And I'm getting ahead of myself, I'm sure, but I'm responding to what Mr. McEntire said.  The whole issue about New York, that New York case has been pending since, in one form or another, since 2008.  The current issues here, UBS, represented by Latham, no shrinking violets there, they've been pursuing this for years without seeking a TRO or an attachment or pre-judgment anything.

And in fact, they touted the fact that there was going to

be a September 22nd argument and that was really important. It wasn't the trial. It was an argument. And if he had bothered to read the opinion that the judge had written before that, it was likely going to be an argument on, okay, which issues -- which things are there an issue of fact on? Because she denied our motion to dismiss, saying there were issues of fact.

Well, issues of fact doesn't mean there is going to be an imminent judgment against someone for a billion dollars. It means there has to be a trial. Except that she also said at the end of the opinion, UBS ought to be really careful about what it wishes for. Because UBS was saying there should be no discovery.

It chose this particular procedure. Not a plenary action, but a very narrow procedure in New York, and so it needed to put into its papers every single fact and piece of evidence it needed to win.

And so, you know, we can speculate about what it means that it went off calendar.

THE COURT: And I don't mean to get too off topic, but I think it is on topic.

MS. DEITSCH-PEREZ: Yeah.

THE COURT: Again, I have not seen what is currently going on with UBS in New York. So I remember they got --

MS. DEITSCH-PEREZ: Right. There's no emergency.

THE COURT:  -- the big judgment, over a billion-dollar judgment, --

MS. DEITSCH-PEREZ:  Uh-huh.

THE COURT:  -- against affiliates of Highland many years ago.  And then the bankruptcy was filed.  They couldn't go against Highland.

MS. DEITSCH-PEREZ:  Uh-huh.

THE COURT:  But again, pursuant to a settlement of their claims, they got certain claims or rights that otherwise might have belonged to Highland.  I assume what you're talking about now is they're trying to chase down assets regarding that Sentinel transaction --

MS. DEITSCH-PEREZ:  Ah.

THE COURT:  -- as part of trying to collect on their judgment against affiliates?

MS. DEITSCH-PEREZ:  Let me explain.

THE COURT:  Okay.

MS. DEITSCH-PEREZ:  It's sort of -- the Sentinel money, they've recovered already.  They got that.  They did something with Sentinel.  Sentinel still has to exist because it still is subject to discovery and requests and all kinds of things.  So that's why the Defendants are paying to keep it alive.

But all that's going on in New York now, because that part was paid, is they're seeking to take that billion-dollar

judgment against funds that collapsed because of the 2008 financial crisis, they're trying to take that and make Mr. Dondero and Mr. Ellington, who was not even general counsel at the time, he was some low-level lawyer, trying to get them to pay that billion dollars.

THE COURT:  Okay.  They're trying to pierce the corporate veil and --

MS. DEITSCH-PEREZ:  They are trying to, like, triple-pierce.

THE COURT:  -- hold them personally accountable? Okay.  So, see, I just --

MS. DEITSCH-PEREZ:  Right.

THE COURT:  I want you all to know there's really no reason for me --

MS. DEITSCH-PEREZ:  Right.

THE COURT:  -- to be paying attention to that, so I haven't been.

MS. DEITSCH-PEREZ:  So, but that's by long way of saying to say there's an imminent risk of a billion-dollar judgment being issued against Mr. Dondero is ludicrous.  There are things you could speculate from the fact that the judge took the oral argument on what we ought to be doing, how we should structure it going forward.  There are different ways you could speculate about that.  It could mean that she said --

THE COURT: So she has under advisement a what type of motion?

MS. DEITSCH-PEREZ: That's what's completely unclear. She just said, Come in and argue.

We moved to dismiss.

THE COURT: Okay.

MS. DEITSCH-PEREZ: The Defendants moved to dismiss.

THE COURT: Okay.

MS. DEITSCH-PEREZ: She denied the motion to dismiss, saying there are issues of fact here. So I can't dismiss, but there are issues of fact.

We asked for discovery. She said, you can't have discovery now. Let me think about it.

Then she said, without telling us what it was for, she said, Come in and have an argument.

We assumed that it was to sort of set out, okay, what things -- which of these allegations do I think there's a fact issue on and have to be tried? And then depending on what they are, I may or may not give you discovery on those. That's what we prepared to go in and argue.

She took it off calendar. That could mean a couple of things. It surely doesn't mean she's about to issue a billion-dollar judgment, when she just said there were fact issues. So it could mean she's decided, I don't need to hear anymore from the lawyers, they've already told me this *ad*

*nauseam*, I'm just going to write an opinion and tell them -- a scheduling order and tell them what I want to do, and we'll see them in a year for trial.

Or -- and this is my personal favorite speculation -- she said, you know what, I told them, I told UBS that if they chose this procedure, they had to put in every fact in the petition and the attachments.  And if there were issues of fact, that means they haven't satisfied that burden.  My hope is that she's going to write an opinion saying, I'm granting summary judgment to Dondero and Ellington because UBS did not meet the burden of the procedure it chose.

But in any event, for Mr. McEntire, who's not remotely involved in that proceeding anymore, to come in and say, oh, there's about to be a billion-dollar judgment and that's a justification for a TRO, is laughable.

And then he comes up here and says to you, with a straight face, hundreds of millions of dollars have been transferred.  There's nothing in this record on that.  And that's speculation in his head.  And you don't get a TRO or discovery because you're speculating about what someone might do.

Let's look at what this case is.  Highland is about to be a hundred-cent-on-the-dollar case for the unsecured creditors.  How often does that happen?  So what does that tell you about whether or not these parties leave assets in

28

the bucket?  They do.  And if you go look on the public website for NexPoint, for example, my client, NexPoint, they have $17 billion under advisement with a billion dollars of their own in that fund.

These are not -- this is not like *Stanford* or any of those other cases they cite.  There's not a single, solitary case that they cite where a plaintiff seeking money damages who has not -- who is not seeking to freeze the very assets at issue or has proven that there is no money to pay the plaintiff if they prevail, there is not a single, solitary case that they cite that would grant a TRO or discovery in these circumstances.

I'm getting ahead of myself because I don't think Your Honor should hear the motions because you're absolutely right, there are serious issues about jurisdiction in light of *Royal Canin*, which is subsequent to Your Honor's case, and there are serious issues about whether the case should be here or in the district court.

And I know you probably feel bad about dumping a big case on Judge Scholer.  It must be tough to be in that position, because she's not going to like it.  But she might not hate it because, if you recall, there are pretty good -- there's a good motion to dismiss.  And so this may not be the big ball of wax it appears to be.  The transactions -- if, in fact, Hunter Mountain persists in saying it's not amending its

complaint, even though the facts it relies on in its motion are nowhere in the amended complaint, but if it's saying we're sticking with the amended complaint, those are transactions from years and years and years and years ago. And so there are very serious statute of limitations issues that are exacerbated now, which is why, if it comes to it, we'll want to do new motions to dismiss, because Mr. Kirschner was relying on the golden creditor rule, which is really special -- which is controversial to begin with and special for an estate.  And so now that John Smith is the Plaintiff, effectively, it shouldn't apply and there shouldn't be a claim that survives.

Is there anything else you'd like to know about, or would you like to know more about jurisdiction, because Ms. Dandeneau, who's much more expert than I am, could address that further?

THE COURT:  Well, I think that would be useful, because I've told you all what my frame of mind was, that time-of-filing rule probably applied here and subject matter jurisdiction was not, poof, gone.

But, again, I just feel like, since there's no really impact on creditors or a plan at this point, that it would make more sense to ask, recommend to Judge Scholer, just take the whole thing at this point.

So it sounds like -- you had said that you all would like

30

to do more briefing on that.  I guess what I'm inclined to do is I could do a Supplemental Report and Recommendation maybe today.  I'm not going to promise that.  Things always take longer than you think.  But in days, anyway.  And then you all would have the ability to object to that Supplemental Report and Recommendation and make your arguments, no, we don't think the time-of-filing rule applies, and they could respond yes, it does, and --

MS. DEITSCH-PEREZ:  Can I make one comment on that?

THE COURT:  Uh-huh.

MS. DEITSCH-PEREZ:  I think you underestimate your influence with Judge Scholer.  And so we would rather take a shot at explaining to you why we think there's no jurisdiction, so if you agree with us you can tell her that. I think that -- so if you don't have the benefit of that insight, hmmm, and come out differently, I think that will weigh heavily on the scales, and you might think differently after you see the briefing.

So we can do it faster than we proposed in the status memo.

THE COURT:  Yes, I --

MS. DEITSCH-PEREZ:  Because we had proposed November 18, December 18, and January 9th, but that's because we were thinking we would be doing both the motion to withdraw the reference and the motion to dismiss.

If you'd want to give us shorter deadlines on that, I am sure we could accommodate that.

THE COURT:  Okay.  We'll talk about that once we're --

MS. DEITSCH-PEREZ:  Okay.  And --

THE COURT:  -- done here and figure out what we're going to do.

MS. DEITSCH-PEREZ:  Okay.  And my last comment is -- although maybe I'm stealing Ms. Dandeneau's thunder, because she gave me this point -- just in terms of efficiencies, you know, Mr. McEntire was saying there was some efficiency in being here, even though you haven't heard about this case for four years.  There is less efficiency if it stayed here because obviously you would be doing a Report and Recommendation and then the district judge would have to be deciding it.  So that's a known inefficiency by proceeding here.  But I will now --

THE COURT:  The jurisdictional ping-pong, as we sometimes call it.

MS. DEITSCH-PEREZ:  Yes.

THE COURT:  Okay.

MS. DEITSCH-PEREZ:  So I will now cede the floor.

THE COURT:  All right.  Ms. Dandeneau?

MS. DANDENEAU:  Good morning again, Your Honor.

THE COURT:  Good morning.

MS. DANDENEAU:  For the record, Debra Dandeneau from Baker & McKenzie, and I represent Mr. Ellington and Mr. Leventon.

Your Honor, I'm not sure that there's that much I need -- I have to add to this conversation.  I do think, with respect to the case -- which, again, I call *Royal "Canine"* because it is a pet food company -- I do think it is worth at a minimum Your Honor taking a look at that decision.  Recognize that we always felt it was a -- we felt that there was no post-confirmation jurisdiction even when Mr. Kirschner was pursuing that.  We know that Your Honor disagreed with that.  But certainly there is this very well-developed concept in the bankruptcy world at some time you have to cut -- at some point you have to cut the cord.  At some point, you cannot keep coming back to the bankruptcy court to have the bankruptcy court solve all the problems, and that's even when a debtor is pursuing matters or when there is maybe potentially an effect on distributions to creditors.

And as Your Honor noted, we're not there anymore.  We believe that this, especially in light of *Royal Canin*, changes -- that the whole dynamics are changed.  We're talking about a proceeding that is exclusively among nondebtors.  There is no -- it's as if there was a party who purchased in a 363 sale some kind of asset wanting to come to the bankruptcy court to bring an action to -- because it now is the holder of that

asset.

And so, Your Honor, in *Royal Canin*, they basically said a new -- you can -- and admittedly, in that -- in that situation, what happened was the plaintiff amended the complaint to take away causes of action so that -- and keep -- because they wanted to be out of federal district -- they wanted to be out of federal court, they took away all the federal court causes of action. And the Court said, an amendment to the complaint, and also referred to including a new plaintiff, changes, resets the table.

That's what we're seeing here. They have one little footnote that says, unless the entity is a successor in -- you know, a successor in interest and basically referred to a case which is very different. It was somebody that was a statutory, a legal successor in interest, not by virtue of any kind of independent action of acquiring rights from somebody else.

And so that's why we think it's very important for Your Honor to consider, because it does change the table. If that's correct, there may be -- there may -- the Court may decide, and not your issue to decide, but the district court may also decide, in that light, maybe there's no -- essentially, if there was no bankruptcy court jurisdiction, if we find that, maybe that whole case has to be dismissed on that basis.

And so we do think it's a significant issue, and that's why, Your Honor, we would -- we're happy to do whatever is easier for you.

THE COURT:  Okay.  I'm going to drill down a little more --

MS. DANDENEAU:  Yes.

THE COURT:  -- on the *Royal Canin* case, because I have not gone back and read it.  I've just read descriptions. Are you saying that it basically upsets the doctrine of time of filing?  I mean, that's a doctrine, it's been called hornbook law.

MS. DANDENEAU:  I know.

THE COURT:  And I'm just surprised I haven't seen 4,000 articles about *Royal Canin* if it really upsets a doctrine that's --

MS. DANDENEAU:  It is certainly our --

THE COURT:  -- hundreds of years old, maybe.

MS. DANDENEAU:  It is certainly our view, Your Honor, because the Court, which often doesn't really go beyond the very specific facts before it, as we know in many cases, but specifically said if there's a -- if there's a new plaintiff, if there's -- we reassess the jurisdictional basis.  And that wasn't even the case before -- that wasn't even the case before it.

So I do believe that that is a -- it was a big statement

by the Supreme Court about how we should take a look at the time-of-filing rule.

THE COURT:  Okay.  And just to recap the facts there, I can't remember what the substantive claims were, but you said there were federal claims --

MS. DANDENEAU:  Right.

THE COURT:  -- that had been dismissed?

MS. DANDENEAU:  Right.

THE COURT:  An amended complaint was filed, and it deleted the federal claims?

MS. DANDENEAU:  Correct.  It deleted the federal claims.  And so -- because the defendant had essentially withdrawn the case to federal court, would prefer to be in federal court rather than the state court.  So as soon as it was before the federal court, then the plaintiff was like, hmm, I don't need these federal claims, I'm going to take the federal claims away.

And, of course, the defendant tried to argue, well, there was jurisdiction in the federal court before, so that's why we should stay in the federal court.  And that was the issue that went up to the Supreme Court, and the Supreme Court said, nope, it's now amended, those claims are gone, and so now we have to reassess the jurisdiction.

THE COURT:  Okay.  Well, I do plan to read it.  My law clerk just handed it to me.  I'm not going to make you sit

and wait for me to read it.  But thank you.  And anything different you want to say about --

MS. DANDENEAU:  No, Your Honor.

THE COURT:  -- the scheduling and --

MS. DANDENEAU:  No, Your Honor.  Again, I do think, if it's helpful to Your Honor, we would appreciate the opportunity to give you our position on *Royal Canin*, and also why, this little footnote that you'll find in there that talks about a successor in interest, why, under the circumstances of this case, Hunter Mountain should not be considered to be a successor in interest to the Litigation Trustee.  I mean, among other things.  As you may recall, we discussed at the last conference before Your Honor, Hunter Mountain specifically did not step into the shoes in terms of privilege and other issues.  I'm not even sure if he has access to the discovery materials that the Debtor had, that Mr. Kirschner had in this action.

So we would -- that's why we would welcome the opportunity to provide a little bit more background on our views, and of course have Hunter Mountain provide its views on that.  But, again, we want to do what's helpful for Your Honor.

THE COURT:  Okay.  It's Footnote 6, according to my law clerk.

MS. DANDENEAU:  Oh.  I wasn't thinking that *Royal Canin* was going to be like a big issue today, so I don't have

it with me. I apologize.

THE COURT: Well, we'll see where we need to go on that.

MS. DANDENEAU: Okay.

THE COURT: All right.

MS. DANDENEAU: Thank you, Your Honor.

THE COURT: Ms. Ruhland, did you want to say anything?

MS. RUHLAND: No, Your Honor. They've covered everything, at least for purposes of the status conference. And there may be a couple of issues I want to weigh in on behalf of my clients a little bit later in the hearing if we get to those issues.

THE COURT: Okay. Thank you. All right.

MR. MCENTIRE: May I? I have a few brief --

THE COURT: Well, I'll hear further from you on -- I guess we're really still talking about this notion of a Supplemental Report and Recommendation, and do I allow additional briefing before I prepare one.

MR. MCENTIRE: Could you -- can we have access to the PowerPoint, the system real quick?

THE COURT: Oh.

MR. MCENTIRE: I just want to put a slide up.

THE COURT: Okay.

MR. MCENTIRE: Just one.

(Pause.)

MR. MCENTIRE:  We have a fundamental disagreement over what the *Royal Canin* case says.  And I really think that the way it's written supports our interpretation.  And I would encourage the Court to look specifically at Footnote #6 on Page 37 of the case, where it adopts the *Freeport-McMoRan* case, which is a first-filed case.  And it cites the proposition, and I'll read it:  The general rule does not apply where an amendment merely substitutes a successor-in-interest for the first-named defendant.  In that situation, the former steps into the latter's shoe, and the diversity jurisdiction founded on the initial complaint thus continues.

This is not a reset table.  We substituted in under Rule 25.  Nothing changed.  This case does not upset existing extant Fifth Circuit authority in the *Double Eagle* case, which is a case on all pars with our situation.  Jurisdiction stays.  In that case, the debtor assigned it to a creditor, and the creditor took the assignment of the claims, and the first-filed rule applied and jurisdiction retained.  And it was related-to jurisdiction.

So that was the *Double Eagle* case.  And that actually superseded cases that they had cited in their original briefing.

So we feel very strongly that the Court has jurisdiction.  I don't think further briefing is really necessary.  Again,

I'm concerned about the delays, because all this does is foster delay with delay.

There's been a lot of rhetoric in this room today.  My motion is supported by evidence.  Verified petition.  I mean, verified motion.  And what I heard Ms. Deitsch-Perez say is, well, it's just not ripe.  Or she provided explanations.  But there's no proof of that.

What's before the Court is a verified motion for a temporary restraining order, which the Court may and we ask should consider today.

I would also like to make another point.

THE COURT:  And I want to go to that.

MR. MCENTIRE:  Sure.

THE COURT:  Again, part of what I need to do here is understand, appreciate, whether there might be something that is really immediate and irreparable harm, where a court just should weigh in immediately, even with these questions swirling around about jurisdiction and district court/ bankruptcy court.

Again, I didn't know where we were going to go today, so I didn't look at the evidence yet because I want to wait and do that when it's appropriate, and I don't know if it's appropriate today or later.

But tell me, what is the threat of immediate and irreparable harm and what is your evidence on that?

MR. MCENTIRE:  We have a tape recording we've referred to that suggests that up to --

THE COURT:  A tape recording?

MS. DEITSCH-PEREZ:  There is no tape recording submitted into evidence, and if it's an illegal wiretap it's not admissible.  Mr. Patrick has not been at Skyview for more than a year.

MR. MCENTIRE:  Well, --

THE COURT:  Okay.  Well, illegal wiretap, that has --

MR. MCENTIRE:  This has nothing to do with --

THE COURT:  That's sensational, but we do know what the rule is in Texas, --

MR. MCENTIRE:  There's no --

THE COURT:  -- only one person has to consent, --

MR. MCENTIRE:  This --

THE COURT:  -- which is a little bit surprising.  But anyway, --

MR. MCENTIRE:  There's no illegal wiretap.

THE COURT:  Okay.

MR. MCENTIRE:  This was done by a third party, and we obtained a copy of it.  Mr. Patrick was not even involved. And --

THE COURT:  Okay.  Well, let's stop right now.  Just describe to me what --

MS. DEITSCH-PEREZ:  It's not --

THE COURT:  -- not what the evidence is; what is the threat of immediate and irreparable harm?

MR. MCENTIRE:  Okay.

THE COURT:  I need to be clear.

MS. DEITSCH-PEREZ:  The -- the --

MR. MCENTIRE:  The threat of immediate --

MS. DEITSCH-PEREZ:  It's not in the record.  They've -- they've said it --

THE COURT:  There's no tape in the record?

MS. DEITSCH-PEREZ:  There's no tape in the record.

THE COURT:  Okay.  So I don't want to hear about the tape.  Just tell me what the threat --

MR. MCENTIRE:  If I could please, just let me finish my comment.

THE COURT:  Okay.  Everybody, let's be calm.

MR. MCENTIRE:  Sure.

THE COURT:  Without referring to the tape, because you don't have it here today if I did go forward on the motion for TRO, --

MR. MCENTIRE:  I have verified pleadings, Your Honor. I have verified pleadings that discusses all of my evidence.

THE COURT:  Okay.  Okay, Ms. Deitsch-Perez, just a moment.

MR. MCENTIRE:  Okay.

THE COURT:  Pleadings aren't evidence.  So I want to

42

know, what do you have evidence of that you think demonstrates immediate and irreparable harm?

MR. MCENTIRE:  Well, first of all, the allegations that are verified in a complaint or a petition are evidence. Hearsay is admissible for purposes of --

THE COURT:  No, I know.

MR. MCENTIRE:  -- for a TRO.

THE COURT:  A verified document.

MR. MCENTIRE:  That is correct.

THE COURT:  An affidavit, a declaration.  Yes, that is evidence.

MR. MCENTIRE:  That is.  And we --

THE COURT:  But --

MR. MCENTIRE:  We --

THE COURT:  But I --

MR. MCENTIRE:  Go ahead.  I'm sorry.

THE COURT:  What does that reflect?

MR. MCENTIRE:  The verification reflects that -- that Mr. Patrick was approached by Mr. Dondero.  Mr. Dondero told him he wanted to take some money and put it back into the Sentinel structure to keep it going.  Mr. Patrick refused. Later that same -- within in a matter of days, over $7 million was funneled out to various entities, some of which went directly to Sentinel.  We understand all that went to -- in connection with Sentinel.

THE COURT:  Okay.

MR. MCENTIRE:  That's a verified allegation.

THE COURT:  And time frame?

MR. MCENTIRE:  That was in late '23, 24.  We just found --

THE COURT:  Now, see, this is -- and I will just tell you, this is another thought flowing through my head --

MR. MCENTIRE:  Sure.

THE COURT:  -- with regard to this TRO request. Remember I told you first was I knew I shouldn't do a hearing before October 3rd because of the 30-day stay.  And then the next thing was I had concern should the bankruptcy judge be doing it as opposed to the district judge.

But then here's the third thing:  This has been pending, this lawsuit, for four years, and now there's immediate and irreparable harm?  I mean, we're talking about something that --

MR. MCENTIRE:  We, no, --

THE COURT:  -- happened two years ago.

MR. MCENTIRE:  No, we have evidence that the --

THE COURT:  What is that saying about --

MR. MCENTIRE:  We have evidence that --

THE COURT:  -- that ship has sailed?

MR. MCENTIRE:  We have evidence that, again, we have evidence of more recent activities, even this year.

First of all, Hunter Mountain.  Hunter Mountain was not the Plaintiff until less than 30-45 days ago.

THE COURT:  I know.  It was the Defendant.

MR. MCENTIRE:  It was a --

THE COURT:  A Defendant.

MR. MCENTIRE:  A Defendant.  And we had no standing to bring these issues.  So we are here today --

THE COURT:  What does that mean, you had no standing?

MR. MCENTIRE:  Well, we weren't the Plaintiff.

THE COURT:  You had no motivation, but --

MR. MCENTIRE:  Certainly, --

THE COURT:  -- you had standing.

MR. MCENTIRE:  -- I'll -- motivation may be an accurate description.

THE COURT:  Uh-huh.

MR. MCENTIRE:  There was not a reason for us to bring it forward at that time.  We are not a Plaintiff.  We've inherited these claims.  We've purchased these claims through a negotiated settlement.  We want to protect the integrity of these proceedings.

Some of the activities that we describe are also -- occurred in 2025, as recently as April of this year.  New corporations are being set up.  We understand that up to $30 million --

THE COURT:  And, again, I really don't want to sound

dismissive, but I've been hearing for years about new corporations.  It was sort of the --

MR. MCENTIRE:  Right.

THE COURT:  I don't know if business model is the right thing to say.  I mean, there were, I heard many times, 2,000 entities in the Highland umbrella of companies.  Whether that number was a hundred percent accurate, I'll maybe never know, but I've been hearing that from lawyers for years.

MR. MCENTIRE:  Okay.

THE COURT:  So, new corporations are being set up.

MR. MCENTIRE:  This is --

THE COURT:  That may be sinister or it may not be. Is there a threat of immediate and irreparable harm such that I should enter an extraordinary remedy?  I'd better have some --

MR. MCENTIRE:  The threat of a --

THE COURT:  -- pretty strong evidence.

MR. MCENTIRE:  Understood.  So what we have here is a situation where we are confident you have jurisdiction.  We have here a situation where we are confident that you made the correct ruling on your recommendation, your Report and Recommendations, and that the reference should not be withdrawn.

The table has not been reset, as Ms. Dandeneau suggested. It's the same table.  We did not add any new causes of action.

We have not amended the complaint to add new causes of action. All the additional so-called claims are nothing more other than to support an equitable remedy.  The first-filed rule still applies.  You have jurisdiction.  You have the authority to move forward.

And accordingly, we would like you to consider the evidence that we have attached into our memorandum and which we have incorporated into our verified complaint to consider a TRO today.  And that would be our request.

The last thing I want to do is talk about the UBS matter very quickly.  I was also involved in that case.

THE COURT:  Representing whom?

MR. MCENTIRE:  CLOH.  My client was dismissed on a jurisdictional grounds.  So I do have a familiarity.  And I want to take all of the speculation out of the equation. Several things have happened.  That is a -- this is called a summary proceeding.  It's akin to a summary judgment.

THE COURT:  That's a procedure, but what is the underlying either cause of action or remedy?

MR. MCENTIRE:  The causes of action are --

THE COURT:  Or remedy?

MR. MCENTIRE:  -- fraudulent transfer.  Fraudulent transfers, piercing the corporate veil.  Mr. Dondero and Mr. Ellington are being -- the allegations are that they -- that they're basically alter egos and that they are liable for all

of the fraudulent transfers.  And --

THE COURT:  And fraud -- alter egos of which entities?

MR. MCENTIRE:  Of when Mr. Dondero was operating Highland.  And they -- as part of the Sentinel program, insurance program, they set up the bogus insurance company --

THE COURT:  Well, --

MR. MCENTIRE:  -- to start moving money out.

THE COURT:  Okay.  Again, maybe I'm getting bogged down here, but there were two nondebtor Highland affiliates that were judgment debtors.  And I can't even remember the names now.  And so is the argument that they made fraudulent transfers --

MR. MCENTIRE:  Yes.

THE COURT:  -- or Highland?

MR. MCENTIRE:  Both.  Well, that's the -- the affiliates also made fraudulent transfers.  There are allegations to that effect as well, --

THE COURT:  Okay.

MR. MCENTIRE:  -- involving a --

THE COURT:  But this has to -- well, so the argument is Mr. Dondero and Mr. Ellington were alter egos of those two nondebtor affiliates?

MR. MCENTIRE:  Of those entities.  Yes.

THE COURT:  Okay.  Well, --

48

MR. MCENTIRE:  Let me -- let me finish.  They moved to dismiss the matter, saying that the alter ego liability did not exist.  That was denied.  They wanted to do discovery.  That was denied.

The hearing, as I understand it, was scheduled to be a dispositive hearing on the 22nd or the 29th of September.  That docket entry was removed.  The Court now has that under submission.

THE COURT:  Probably because this is intensely factual, right?

MR. MCENTIRE:  I'm sorry?

THE COURT:  I'm guessing that the motions thus far have to have been denied because it's all factually intensive.

MR. MCENTIRE:  Their motion to dismiss was denied.  I'm trying to recall the specific grounds.  I don't recall the --

THE COURT:  Ms. Deitsch-Perez?

MS. DEITSCH-PEREZ:  It was denied because there were issues of fact.  And --

MR. MCENTIRE:  And they're not entitled to do discovery, Your Honor.

MS. DEITSCH-PEREZ:  No.  What she said is it was premature.

THE COURT:  Okay.

MS. DEITSCH-PEREZ:  And it's up on -- and in New

York, you can bring interlocutory appeals, and they're very common, so --

THE COURT:  Okay.  I do know about that from --

MR. MCENTIRE:  And the appeal is underway, but she did not stay the case.  So she has the authority to make a ruling tomorrow.  The case is not stayed.

THE COURT:  Okay.  Again, I'm just, I'm drilling down here because I want to know, do we have an emergency to justify a TRO hearing sooner rather than later, or not?

MR. MCENTIRE:  Well, --

THE COURT:  My reaction to all of this is there is no way an alter ego ruling is going to be made any time in the near future.  I mean, those are, again, so fact-intensive.  And then layer on top of that the ability for an interlocutory appeal.  I --

MR. MCENTIRE:  It's on appeal now.  But she has refused to stay the case.  The case has not been stayed.  So she has the authority to make a dispositive ruling any day.

THE COURT:  Well, I'm talking about that ruling she might make would then be subject to an interlocutory appeal.

MR. MCENTIRE:  It would.

THE COURT:  So --

MR. MCENTIRE:  The concern is this.  I'm not here -- let's try to get this --

THE COURT:  I mean, what are you worried about?

MR. MCENTIRE:  I'm trying to get the train back on the --

THE COURT:  Are you worried about UBS getting assets --

MR. MCENTIRE:  No.

THE COURT:  -- sooner than --

MR. MCENTIRE:  The fact --

THE COURT:  -- Hunter Mountain, --

MR. MCENTIRE:  No.  No.

THE COURT:  -- if it prevails at the end of the day, or --

MR. MCENTIRE:  Although that is a concern, that's not why I'm here.

THE COURT:  Okay.

MR. MCENTIRE:  I am concerned here because it provides the motivation for the movement of money, because that is a robust lawsuit up there.  And it's robust and it's ripe for ruling.  And --

THE COURT:  Okay.  Is this not a complicated question, though, whether I can, going back to the very beginning, impose a TRO that is essentially a pre-judgment remedy of an extraordinary nature, almost like freezing the assets of Defendants who have not had their day in court?  And I'm trying to think back.  I know there is a tool in TUFTA, and I don't know if we're talking about TUFTA or DUFTA.

It's probably not that different.  But there is a tool, when you're talking about fraudulent transfers, because that's some of what we're talking about in this adversary, there's a tool to allow the trial court to enter the pre-judgment remedy to keep -- what I have always perceived it to mean, if we're talking about an asset, a certain -- a closet full of gold, if you're thinking there was a fraudulent transfer away from a debtor of a block of gold, --

MR. MCENTIRE:  I understand.

THE COURT:  -- and you think -- and you can show likelihood of success on the merits, this was a slam-dunk fraudulent transfer and he's about to transfer it to his safe in the Cayman Islands, --

MR. MCENTIRE:  I understand.

THE COURT:  -- isn't it the classic fact pattern that the TUFTA remedy is meant --

MR. MCENTIRE:  Understand.

THE COURT:  Not just the defendant is moving fungible money around.  I'm just, I'm struggling here --

MR. MCENTIRE:  Sure.

THE COURT:  -- and I'm wanting help.

MR. MCENTIRE:  And I detect the Court's concern.

THE COURT:  Yes.

MR. MCENTIRE:  And we could debate the issue.

I will tell you this.  TUFTA specifically and expressly

52

contemplates our situation here, because you don't have to actually trace and link all of the assets to a particular pot of gold.  If you are concerned about protecting the integrity of the process, you can attach -- it's really not an attachment -- it's simply an injunction to prevent the movement of assets.

Our proposed order, Your Honor, does not want to interfere in the ordinary course of business.  Our proposed order allows them to continue in their ordinary course of business, fulfilling their duties every day to their clients, doing what they do in their ordinary course of business.  We're only asking to restrain the improper fraudulent transfers of monies.

Now, with that said, I have a --

THE COURT:  Oh, that's going to be --

MR. MCENTIRE:  I have a recommendation.

THE COURT:  That's going to be easy to monitor, right?

MR. MCENTIRE:  No.  We have a -- we have a disclosure request.

THE COURT:  I know, but they have periodic reports.

MR. MCENTIRE:  That's right.  And this is something -- we were sensitive to the fact that we're not out here to enjoin the ordinary course of business.  You know, we're not strangers to the process.  And so we've tried to craft the

relief we were requesting accordingly.

But I have a recommendation and a suggestion.  It appears to me -- and I may be wrong -- that you're not going to consider our TRO motion today.  I think I'm reading the cards pretty clearly.

THE COURT:  You are.

MR. MCENTIRE:  I would ask the following, then.  I would like you to set down a preliminary injunction hearing for 30 days or 45 days from now.  And I would like you to allow us to do discovery.  And they can do their briefing.  And we will have a date certain in the event you decide to hear the matter, so we don't have to do another do-over.

If you decide to issue another Report and Recommendation, then -- and you keep the case, after reading the *Royal Canin* case and these other materials, then I welcome that.  We would like you to stay involved.  And what I would recommend, let's get a date certain on the calendar while we have a preliminary injunction hearing set sometime between now and the 1st of December and give us an opportunity to do some discovery and come back here.

In the interim, if you decide to change your mind and you want to send it up -- well, not change your mind -- if you decide ultimately to send it up to the federal court, then we'll follow your lead.  I just don't want to lose the opportunity, while we're here now, and postpone this process

for 60 or 90 days or 120 days.

THE COURT:  Okay.  I know what I want to do, so I really want to stop.

What I think is the prudent course here is, today, I'm not going to make any sort of ruling.  This is all I'm going to do.  I am going to require briefing.  And we're not going to go this side, then this side, then this side.  I am just going to require by November 18th that the parties -- by 11:59 p.m. on November 18th -- the parties file post-hearing briefing on subject matter jurisdiction at this juncture, specifically focusing on did *Royal Canin* change the landscape on time-of-filing rule or not?  Does that apply here or not?  So, that one issue.  Because, as everyone knows, that's the first thing any court is supposed to try to be sure on:  Is there subject matter jurisdiction?

I guess the next thing is just state your position.  You don't have to give argument one way or another.  But just state your position so I can quote it in the Supplemental Report and Recommendation, you either do want the bankruptcy court acting as a magistrate on pretrial matters or you don't. Again, I don't need argument on that.

And obviously, first and foremost, I need to know about subject matter jurisdiction.  That may be a moot issue, but let's assume subject matter jurisdiction still exists.  One-sentence statement, either you think the district court should

yank the whole thing or still use the bankruptcy judge as a magistrate.

The third issue is I want briefing on -- again, and I just want to focus on the law here -- the availability and the standards of this remedy.  What is the statute you're relying on?  And I think HMIT -- we tabbed it in your -- I think you're relying on TUFTA, Section 24.008(a)(3)(B), and maybe the Civil Practice and Remedies Code, Section 24.001.  But any case law as well.

And what is the legal authority that supports the idea of giving a type of pretrial TRO or preliminary injunction that HMIT is seeking?  Just legal standard.  And the Defendants will obviously argue whatever authority or case law you think, no, you can't get it in a context like this.

Because that's a huge issue.  I was just thinking through how many times in my life have I had fraudulent transfer causes of action and someone asked for this kind of relief.  And I could only remember it in sort of the blocks of gold situation.  Now, I may not be remembering, but we're talking about a specific asset that is the subject of a fraudulent transfer cause of action and I think it's about to go away to someplace where it will be impossible, if we win establishing it's a fraudulent transfer, impossible to ever get it back.  And even then, it's like, well, you can always get the value of the thing.  Even then, it's kind of a hard call.

So I need to be educated, because it just doesn't come up that much.  And I think it's even harder here because of the receiver request.  And I'm remembering that *Jeff Baron* case from years ago.  It's even more complicated because of the length of this adversary.  You know, immediate and irreparable harm.  And it's kind of hard to think in terms of immediate.

So this is complicated, and so those are the three issues. And it's really two briefing issues, but just three points: subject matter federal jurisdiction, mostly focusing on *Royal Canin* and did it result in an upheaval of a hornbook doctrine. And just a statement about should this Court, if there is subject matter jurisdiction, be a magistrate or not.  And then, third, the legal authority that applies to the TRO relief.

And, again, that's going to guide me on I may put in the Supplemental Report and Recommendation, if you do find you have jurisdiction and if you do take the whole thing, I think you need to give them a super-quick hearing on the TRO request, or I don't.  Or I think you need to let me have a really super-quick hearing on the TRO, even with kind of the jurisdictional ping-pong in play.

So November 18th, 11:59.  No you, you, and you.

Question?

MS. DANDENEAU:  Your Honor, I am so sorry -- again, for the record, Debra Dandeneau -- to complicate this, because

those questions are very well defined.  We also have some issues from a bankruptcy perspective and 105 and the authority of a court under *Zale* and its progeny to issue an injunction that is really kind of protecting essentially a nondebtor who, in this case, is seeking affirmative recovery.  So, different, admittedly, from *Zale* and some of the other Fifth Circuit precedents.

So the question is whether we should raise that now, or just address these specific questions.  We're happy, again, to do whatever Your Honor thinks is helpful here.

THE COURT:  Okay.  Well, I'm trying to keep this -- it's wrong to say as simple as possible, because nothing is simple about this.  I don't see how in the world *Zale* is relevant here.  And maybe it would be helpful if you would tell me why you think it's relevant.

MS. DANDENEAU:  All right.  Your Honor, should I come to the podium?

THE COURT:  Yes, that would be good.  I'm just trying to keep it simple, even though that's not a good word.

MS. DANDENEAU:  I know, and that's why I apologized, --

THE COURT:  Yes.

MS. DANDENEAU:  -- because I did not mean to upset the simplicity of -- and the clear direction of your questions.

The question that we have here is Section 105 really is designed to basically offer -- the Court has its powers under 105 to assist in furthering the provisions of the Bankruptcy Code.  We think particularly with respect to certain of the causes of action, number one, they are not brought under the Bankruptcy Code, and so issuing an injunction to further, for example, a state law claim against one of the Defendants -- and I would note, for example, Mr. Leventon, there are no bankruptcy causes of action asserted against our client, Mr. Leventon -- but whether that even should be -- that power even should be used.

And in *Zale* -- again, admittedly, I actually think the Fifth Circuit has been at the forefront of saying, we don't -- we don't do things -- it's usually in the context of a 524 discharge -- of saying, we don't really do things to help out nondebtors, to protect nondebtors in this case.  And *Zale* admittedly was an injunction that was seeking to protect claims against nondebtors.

THE COURT:  Officers, directors.  Uh-huh.

MS. DANDENEAU:  Officers -- well, it was -- and officers and directors.  And the same thing, even the recent Fifth Circuit decision in *Highland Capital*.

But we think now, given the posture of this case, we think we have a reasonable argument that, really, a logical extension of those cases is that -- and when we look at

105(a), the Court's equitable powers do not extend to, number one, to protecting nondebtors, especially with respect to causes of action that arise completely independently of the Bankruptcy Code; and number two, even if one were to conclude that the Court's power does extend that far, shouldn't you be applying the test in *Zale*, which requires both unusual -- a showing of unusual circumstances, which are very much linked to the effect on the estate or how connected this is with the estate, as well as the traditional four factors?

And so, again, Your Honor, I wasn't going to mention it, --

THE COURT:  Okay.

MS. DANDENEAU:  -- but I didn't want somebody to come and say, oh, well, you didn't talk about that, that's kind of a -- kind of similar to a jurisdictional issue.

THE COURT:  Okay.  When I do the Supplemental Report and Recommendation to Judge Scholer, whatever it says, certainly, if you want to file an objection to the Supplemental Report and Recommendation and say something like, she didn't mention *Zale*, but hey, we think that's something you should consider, have at it.

But for this post-hearing briefing that I'm going to make due on November 18th, I don't want that covered.  And I'll just let you know, in the for-what-it's-worth category, I don't think that's germane.  Creative lawyers think of

60

creative arguments, and I respect that, but this is, to me,

about a pre-judgment remedy.  That's fundamentally at the

heart of this.  Does TUFTA or DUFTA allow it?  Is there any

other authority, whether you say it's Texas Practices and

Remedy Code, and then I know *Zale* is what it is, third parties

who are nondebtors, it's a rare situation where they are

entitled to anything close to a release or a discharge.  And I

just don't see that as germane, so I don't want it in the

briefing.

MS. DANDENEAU:  Thank you, Your Honor.

THE COURT:  Okay.

MS. DANDENEAU:  And we agree, we think that the

briefing will show that it's going to be dispositive and we

won't get to the point of arguing this further.  But, of

course, if we do have to, and I hope we don't, I reserve my

right to try to convince you otherwise.

THE COURT:  Okay.  Thank you.

MS. DANDENEAU:  Thank you.

THE COURT:  All right.  So, November 18th, 11:59 p.m.

And let me, because I know in this case and adversary

proceedings, we have frequent motions to extend page limit,

and I haven't even said what the page limit is.  Let's do a

page lament of 40 pages.  And please, no appendices or

attachments.  This is just legal issue, no facts.  Again, it's

a legal authority thing, not telling me what happened.  Okay?

And I very much want this to be resolved one way or another sooner rather than later.  We all know four years plus for an adversary is extremely long, and we could be looking at years, years, years.  So I'm going to do my part to, soon after I get the November 18th briefing, look at it and get a Supplemental Report and Recommendation.  And you'll see what I do, and you'll have I guess your own roadmap from that what you should do next.

All right.  Thank you.  We're adjourned.

MS. DANDENEAU:  Thank you, Your Honor.

THE CLERK:  All rise.

(Proceedings concluded at 11:02 a.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling**                                           **10/20/2025**

_____          _____

Kathy Rehling, CETD-444                                          Date
Certified Electronic Court Transcriber

62

INDEX

PROCEEDINGS                                                            3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                               54

END OF PROCEEDINGS                                                    61

INDEX                                                                 62