Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
deborah.deitschperez@stinson.com
michael.aigen@stinson.com

*Counsel for Defendant NexPoint Advisors, L.P.
and NexPoint Asset Management, L.P.
f/k/a Highland Capital Management Fund
Advisors, L.P.*

Debra A. Dandeneau (Admitted pro hac vice)
Blaire Cahn (Admitted pro hac vice)
**BAKER & MCKENZIE LLP**
452 Fifth Ave New York, NY 10018
Telephone: 212-626-4100
debra.dandeneau@bakermckenzie.com
blaire.cahn@bakermckenzie.com

*Counsel for Scott Ellington and Isaac Leventon*

Amy L. Ruhland
Ryan J. Sullivan
**PILLSBURY WINTHROP SHAW
PITTMAN LLP**
401 W 4th Street, Suite 3200
Telephone: (512) 580-9600
amy.ruhland@pillsburylaw.com
ryan.sullivan@pillsburylaw.com
*Counsel for Defendant James Dondero, The
Dugaboy Investment Trust, Get Good Trust,
and Strand Advisors, Inc.*

Michelle Hartmann
State Bar No. 24032402
**BAKER & MCKENZIE LLP**
1900 North Pearl, Suite 1500
Dallas, Texas 75201
Telephone: 214-978-3000
michelle.hartmann@bakermckenzie.com

*Counsel for Scott Ellington and Isaac
Leventon*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>**HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>    **Reorganized Debtor.** | **Chapter 11**<br><br>**Case No. 19-34054-sgj11** |
| **MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; FRANK WATERHOUSE; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY** | **Adv. Pro. No. 21-03076-sgj** |

**INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; SAS ASSET RECOVERY, LTD.; AND CPCM, LLC,**

      **Defendants.**

## DEFENDANTS' POST-STATUS CONFERENCE BRIEF

# TABLE OF CONTENTS

I.    OVERVIEW OF DEFENDANTS' POSITIONS ................................................................ 1

II.    RELEVANT FACTS ......................................................................................................... 3

III.    ARGUMENT ..................................................................................................................... 7

    A.    Under *Royal Canin,* the Time-of-Filing Rule Does not Apply when the Plaintiff Changes; Instead, the Court Must Reassess Jurisdiction ................................ 7

        1.    The Supreme Court's *Royal Canin* Decision .......................................... 7

        2.    Under *Royal Canin*, the "Time-of-Filing Rule" Does not Apply when the Plaintiff Changes the Parties or the Claims .............................................. 9

        3.    The Fifth Circuit's Extension of the Time-of-Filing Rule to Federal Question Cases in *Double Eagle* was Superseded by *Royal Canin* ....................................... 11

        4.    Post-*Double Eagle*, in the Context of Standing, the Fifth Circuit Has Reviewed Jurisdiction Following a Change in Plaintiff ......................................... 14

        5.    The "Successor-in-Interest" Exception Does not Apply when the Plaintiff Changes the Parties .................................................................. 16

        6.    In any Event, HMIT Is not a "Successor in Interest" to Kirschner ...................... 20

            a.    Courts have generally found a successor in interest to be one that accepts both the rights and obligations of its predecessor with no change in substance to those rights—essentially "stepping into the shoes" of the other. .................................................................. 20

            b.    The facts demonstrate that HMIT is not a successor in interest that is simply "stepping into the shoes" of the Litigation Trustee ........................... 23

    B.    The Court Should Recommend Withdrawal of the Reference for All Purposes ........... 24

    C.    The Court Lacks Authority to Issue the Preliminary Injunctive Relief Requested in HMIT's Motion ................................................................................. 25

        1.    The Legal Framework for Injunctive Relief .......................................... 26

        2.    The Court Lacks Jurisdiction to Grant Injunctive Relief Based on Allegations Outside of the Live Pleadings ....................................................... 28

        3.    The Court May Not Grant an Asset Freezing Injunction Where the Assets to Be Frozen Have No Nexus to the Allegations and Assets at Issue .............................. 30

        4.    The Court May Not Issue an Asset-Freezing Injunction Absent Evidence that the Defendants Are Insolvent or Incapable of Paying a Judgment ........................ 32

IV.    CONCLUSION ............................................................................................................... 35

CORE/3524885.0002/233543841.25

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Aldrich v. ADD Inc.*,
  437 Mass. 213 (Sup. Jud. Ct. Mass. 2002) ...........................................................22

*Allied Home Mortg. Corp. v. Donovan*,
  830 F. Supp. 2d 223 (S.D. Tex. 2011) ................................................................20

*Amegy Bank N.A. v. Monarch Flight II*,
  No. H-11-3218, 2011 WL 6091807 (S.D. Tex. Dec. 7, 2011) ..........................................31, 33

*American Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP*,
  362 F.3d 136 (1st Cir. 2004) ..........................................................................17

*Bank of Am., N.A. v. Mega World Builder Corp.*,
  No. 4:24-CV-3021, 2024 WL 472948 (S.D. Tex. Nov. 8, 2024) .....................................29, 31

*Bank of La. v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Tex., Inc.)*,
  266 F.3d 388 (5th Cir. 2001) ............................................................................9

*Briar Capital Working Fund Capital, L.L.C. v. Remmert (In re S. Coast Supply Co.)*,
  91 F.4th 376 (5th Cir. 2024) ........................................................................14, 15

*Broadstreet, Inc. v. Sec. & Exch. Comm'n*,
  No. 4:24-CV-00803, 2024 WL 5348632 (N.D. Tex. Nov. 17, 2024) ..................................26

*Bucklew v. St. Clair*,
  No. 3:18-CV-2117, 2019 WL 2251109 (N.D. Tex. May 15, 2019), *report and
  recommendation adopted*, 2019 WL 2249719 (N.D. Tex. May 24, 2019)............................28

*Cajun Services Unlimited, LLC v. Benton Energy Serv. Co.*,
  2020 WL 3000361 (E.D. La. Jan. 23, 2020).........................................................32

*Caterpillar Inc.* v. *Williams*,
  482 U.S. 386 (1987)......................................................................................8

*Clapper v. Am. Realty Investors, Inc.*,
  No. 3:14-CV-2970, 2015 WL 264711 (N.D. Tex. Jan. 21, 2015) ..........................................33

*ConnectU LLC v. Zuckerberg*,
  522 F.3d 82 (1st Cir. 2008) ........................................................................10, 14

*Conolly v. Taylor*,
  27 U.S. 556 (1829)......................................................................................13

*De Beers Consolidated Mines, Ltd. v. United States*,
  325 U.S. 212 (1945)....................................................................................27

*Double Eagle Energy Services L.L.C. v. MarkWest Utica EMG, L.L.C.*,
936 F.3d 260 (5th Cir. 2019) ........................................................................11, 12, 13, 14, 15

*In re Fredeman Litig.*,
843 F.2d 821 (5th Cir. 1988) ...................................................................................27, 28, 32

*Freeport-McMoran Inc. v. K N Energy, Inc.*,
498 U.S. 426 (1991)..............................................................................................................16, 18

*French v. Fisher*,
No. 1:17-CV-248, 2018 WL 3603107 (W.D. Tex. July 2, 2018)...........................................29

*Garrison v. Doe*,
No. 3:24-CV-00700, 2024 WL 3822747 (N.D. Tex. May 21, 2024) ...............................28, 29

*Grupo Dataflux v. Atlas Global Group, L.P.*,
541 U. S. 567 (2004)..............................................................................................................10, 12, 13

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999).......................................................................................................................27

*Idaho v. M.A. Hanna Co.*,
819 F. Supp. 1464 (D. Idaho 1993) ............................................................................................21

*Infinite Fin. Sols., Inc. v. Strukmyer, LLC*,
No. 3:14-CV-354, 2014 WL 12586282 (N.D. Tex. July 29, 2014).........................................28

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) ...................................................................................30, 31, 33

*Loveless v. Grady Cnty. Crim. Just. Auth.*,
No. CIV-24-00879, 2025 WL 1541050 (W.D. Okla. May 30, 2025) .....................................29

*McLean v. Greenfield*,
No. 3:24-CV-00447, 2025 WL 492494 (N.D. Tex. Jan. 13, 2025), *report and
recommendation adopted sub nom. McLean v. Greenfield*, 2025 WL 488418
(N.D. Tex. Feb. 13, 2025).............................................................................................................27

*McMoran Oil & Gas Co. v. KN Energy, Inc.*,
907 F.2d 1022 (10th Cir. 1990) ...............................................................................16, 18

*Murphree v. Commc'ns Techs., Inc.*,
460 F. Supp. 2d 702 (E.D. La. 2006).........................................................................................21

*Netsphere, Inc. v. Baron*,
703 F.3d 296 (5th Cir. 2012) ...................................................................................27, 28, 30, 32

*Newby v. Enron*,
Nos. H-01-3624, H-01-3913, 2002 WL 32151683 (S.D. Tex. Sept. 17, 2002).....................32

CORE/3524885.0002/233543841.25

*New Rock Asset Partners, LP v. Preferred Entity Advancements, Inc.*,
  101 F.3d 1492 (3rd Cir. 1996) ................................................................14

*Owen Equip. & Erection Co. v. Kroger*,
  437 U.S. 365 (1978).........................................................................17, 18, 19

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
  600 F.3d 562 (5th Cir. 2010) .................................................................26

*Philadelphia Nat'l Bank v. Farrier*,
  46 Pa. D. & C. 3d 657 (Penn. 1988) ......................................................22

*Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*,
  621 F.2d 683 (5th Cir. 1980) .................................................................30

*In re Pugh*,
  No. 19-20696, 2019 WL 4180281 (Bankr. E.D. Wis. Sept. 3, 2019)......................22

*Rockwell Int'l Corp. v. United States*,
  549 U.S. 457 (2007)...........................................................................8, 9, 10

*Royal Canin U.S.A., Inc. v. Wullschleger*,
  604 U.S. 22 (2025)...................................1, 2, 7, 8, 9, 10, 11, 12, 13, 16, 17, 18, 19, 20, 23, 24

*In re S. Coast Supply*,
  91 F.4th at 385–86 ............................................................................14, 15

*S. Tex. Lighthouse for the Blind, Inc. v. Fed. Supply Servs. Int'l, LLC*,
  No. 2:19-CV-193, 2020 WL 5154097 (S. D. Tex. Aug. 28, 2020) ...................31, 33

*Sargeant v. Al Saleh*,
  512 S.W.3d 399 (Tex. App.—Corpus Christi 2016) .............................................33

*Sharp v. SSC Farms I, LLC(In re SK Foods, L.P.)*,
  Nos. 09-29162-D-11, 09-2692-D, 10-2014-D, 10-2016-D, 2010 WL 9476207
  (E.D. Cal. Apr. 5, 2010)........................................................................33

*Sitaram v. Aetna U.S. Healthcare of N. Texas, Inc.*,
  152 S.W.3d 817 (Tex. App.—Texarkana 2004)..................................................20

*Spear Mktg. v. BancorpSouth Bank*,
  791 F.3d 586 (5th Cir. 2015) .................................................................13

*Spraggins v. Caliber Home Loans, Inc.*,
  No. 3:20-CV-01906-S-BT, 2020 WL 8366645 (N.D. Tex. Dec. 31, 2020),
  *report and recommendation adopted*, No. 3:20-CV-1906-S-BT, 2021 WL
  311869 (N.D. Tex. Jan. 29, 2021)..............................................................21

*Tolliver v. Thompson*,
   No. 21-1768, 2023 WL 2572286 (D. Del. Mar. 20, 2023) ....................................................29

*Trend Micro Corp. v. WhiteCell Software, Inc.*,
   No. C 10-02248-WHA, 2010 U.S. Dist. LEXIS 124991 (N.D. Cal. 2010)............................19

*Tujague v. Adkins*,
   No. 4:18-CV-631, 2018 WL 4816094 (E.D. Tex. Oct. 4, 2018) ............................................33

*Unisys Corp. v. Dataware Prods., Inc.*,
   848 F.2d 311 (1st Cir. 1988) .................................................................................................33

*United States v. Horn*,
   29 F.3d 754 (1st Cir. 1994) ...................................................................................................18

*Valdez v. Celerity Logistics, Inc.*,
   999 F. Supp. 2d 936 (N.D. Tex. 2014) ...................................................................................21

*Matter of Walker*,
   51 F.3d 562 (5th Cir. 1995) ...................................................................................................16

*Walker v. Doe*,
   No. 6:24-CV-00633, 2025 WL 1502634 (W.D. Tex. Jan. 3, 2025) ..................................31, 33

*Wattstock, LLC v. Alta Power, LLC (In re Wattstock, LLC)*,
   No. 3:23-CV-0270, 2024 WL 923004 (N.D. Tex Mar. 4, 2024)................................12, 13, 25

*Western Surety Company v. PASI of LA, Inc.*,
   334 F. Supp. 3d 764 (E.D. La. 2018) .................................................................................28, 32

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) ...................................................................................................................26

*Wullschleger v. Royal Canin U.S.A., Inc.*,
   75 F.4th 918 (8th Cir. 2023) .............................................................................................10, 14

**Statutes**

11 U.S.C. § 363.................................................................................................................................4

28 U.S.C. § 1334(b) .......................................................................................................................12

38 U.S.C. § 4303(4)(D).................................................................................................................21

6 Del. Code § 1307(a)(3).............................................................................................................26

**Other Authorities**

Black's Law Dictionary (12th ed. 2024)........................................................................................21

CORE/3524885.0002/233543841.25

Federal Rule of Bankruptcy Procedure 7065 .......................................................................25, 26

Federal Rule of Civil Procedure 65 ............................................................................................26

CORE/3524885.0002/233543841.25

## DEFENDANTS' POST-STATUS CONFERENCE BRIEF

In response to the Bankruptcy Court's request for briefing on certain topics raised at the status conference that took place on October 17, 2025, Defendants NexPoint Advisors, L.P., NexPoint Asset Management, L.P. f/k/a Highland Capital Management Fund Advisors, L.P., James Dondero, The Dugaboy Investment Trust, Get Good Trust, Strand Advisors, Inc., Scott Ellington, and Isaac Leventon (collectively, "Defendants") provide the following responses.

## I.   OVERVIEW OF DEFENDANTS' POSITIONS

On October 17, 2025, the Court held a status conference on the motions of Hunter Mountain Investment Trust ("HMIT") for Temporary Restraining Order, Preliminary Injunction, and Appointment of Receiver ("TRO Motion") [Dkt. 379], and for Expedited Discovery [Dkt. 380].  At that status conference, the transcript for which is found at Dkt. 408, the Court requested that the parties provide simultaneous briefing on three topics:

(1)    The Bankruptcy Court's jurisdiction at this juncture, specifically focusing on whether the Supreme Court's opinion in *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025) changed the time-of-filing rule, as interpreted by the Fifth Circuit in *Double Eagle*.

(2)    Whether the Bankruptcy Court should continue acting as a magistrate in this litigation for pre-trial purposes, or whether the Bankruptcy Court should instead recommend withdrawal of the reference to the District Court for all purposes.

(3)    The legal authority for (or absence of legal authority for) the pre-trial temporary injunctive relief that HMIT is seeking in its TRO Motion.

As set forth below in greater detail, although the Supreme Court in *Royal Canin* did not rewrite the "time-of-filing rule," *Royal Canin* clearly states that the time-of-filing rule does not apply when a plaintiff voluntarily changes the parties or the claims in a pending action.  In those circumstances, the court must reassess subject matter jurisdiction based on the "new" operative complaint.  In a footnote, the Supreme Court seemingly carved out one narrow exception to this general rule: a court need not reassess subject matter jurisdiction when the defendant is merely a

CORE/3524885.0002/233543841.25

"successor in interest" of the prior party.  As with the time-of-filing rule, this exception was developed exclusively in connection with diversity jurisdiction.  Accordingly, the exception does not apply in this federal question case.  Moreover, even if the successor in interest exception also applied when there is a change in plaintiff, to fit within this exception HMIT would have to show that it has the same bundle of rights and obligations in the litigation as its supposed predecessor. That is not the case here, and, therefore HMIT cannot be a "successor in interest."  Consequently, *Royal Canin* requires the Court to reassess subject matter jurisdiction because HMIT is a new plaintiff.  See Section III.A, *infra*.

Further, because this proceeding among non-debtors no longer has any conceivable effect on the bankruptcy estate or the payment of creditors under Highland's Fifth Amended Plan of Reorganization (as Modified), the Bankruptcy Court should recommend that the reference be withdrawn for all purposes—including for pre-trial purposes—to the District Court.  See Section III.B, *infra*.

Finally, under the facts of this case, no legal authority allows this Court or the District Court to issue the extraordinary and overbroad injunctive relief that HMIT seeks.  A court only has jurisdiction to issue an asset-freezing injunction when the request for injunctive relief is based on claims and allegations set forth in the operative complaint.  That is not the case here, because HMIT refuses to amend in a futile effort to avoid a renewed evaluation of subject matter jurisdiction.  But HMIT's refusal dooms its motion for injunctive relief because the operative pleading does not support it.  See Section III.C.2, *infra*.  Moreover, not only must HMIT show likelihood of success (which it does not) and irreparable harm (which it does not), but the extraordinary remedy of asset freezing is only even available when the assets to be frozen are the subject matter of the case—the proverbial gold bars in the closet—or when a defendant is so demonstrably insolvent or unable to pay a judgment that failing to freeze assets would result in

CORE/3524885.0002/233543841.25

irreparable harm.  None of these critical requirements is met here.  See Sections III.C.1, III.C.3 and III.C.4 *infra*.

## II.    <u>RELEVANT FACTS</u>

The Trustee for Highland's Litigation Sub-Trust, Marc S. Kirschner ("Kirschner"), commenced this litigation against Defendants and numerous other parties, including HMIT, on October 15, 2021.  Dkt. 1.  Kirschner filed an Amended Complaint and Objection to Claims ("Amended Complaint") on May 19, 2022.  Dkt. 158.  The Amended Complaint alleges 36 claims for relief against 21 separate defendants.  Most of those claims are state-law claims.  However, the Amended Complaint also asserts 12 claims under federal law for avoidance of fraudulent transfers against one or more defendants.  *See* Amended Complaint at Counts I–II, XII–XIII, XVIII–XXIII, XXXII–XXXIII.  Those claims allege, inter alia, that between 2010–2019, *Highland* made specific distributions, entered into specific agreements, or transferred specific assets at a time when *Highland* was insolvent and for less than reasonably equivalent value.  *See, e.g.*, Amended Complaint, Dkt. 158 at ¶¶ 173–186 (fraudulent distributions made between April 2010–March 2019), ¶¶ 263–314 (2011 novation agreement made for less than reasonably equivalent value), ¶¶ 304–323 (2016 transfer of assets at a time when Highland was insolvent and for less than reasonably equivalent value), ¶¶ 325–347 (2015 entry into a consulting agreement and payments pursuant to that agreement for less than reasonably equivalent value), ¶¶ 409–417 (payment of invalid expenses prior to bankruptcy).

The Amended Complaint alleges that Defendants herein were, many years ago, the *transferees* of one or more of allegedly fraudulent transfers.  The Amended Complaint says nothing about Defendants' solvency, creditworthiness, or ability to pay a judgment.  Nor does the Amended Complaint seek injunctive relief.

CORE/3524885.0002/233543841.25

After months of discovery and motion practice, Kirschner sought and obtained a stay of this proceeding on April 4, 2023, acknowledging that "pursuit of th[e] litigation *may* prove unnecessary" for purposes of creditor recovery. *See* The Litigation Trustee's Motion to Stay the Adversary Proceeding, Dkt. 324 at ¶ 18 (emphasis in original); Order Granting the Litigation Trustee's Motion to Stay the Adversary Proceeding ("Stay Order"), Dkt. 338. Indeed, the most recent quarterly reports filed in the Highland bankruptcy case show that unsecured creditors will be paid in full, and the estate already has made payments to former equity. *In re Highland Cap. Mgmt., L.P.*, Case No. 19-34054, Dkt. 4438 at p.7; Dkt. 4439 at p.7 (quarterly Post-Confirmation Reports).

The case remained dormant for over two years. Then, on June 30, 2025, this Court entered an order approving a 9019 settlement and section 363 sale between Hunter Mountain and its affiliates (the "HMIT Entities") and Highland, the Claimant Trust, the Litigation Sub-Trust, and the Indemnity Trust (the "Highland Entities"). *See* Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Settlement Order"), Dkt. 4297. As part of the HMIT Settlement, Kirschner sold and assigned the Litigation Sub-Trust's claims (the "Kirschner Claims") in this adversary proceeding to HMIT. *See* Settlement Agreement & General Release ("HMIT Settlement Agreement"), Dkt. 4217-1 at § 8(a). However, HMIT did not acquire Kirschner's attorney-client or work product privileges by virtue of the assignment. *Id.* at § 8(c). Nor did HMIT acquire Kirschner's other rights or obligations vis-à-vis Highland's estate. *See id.*

With respect to the transfer of the Kirschner Claims, the 9019 Settlement Agreement prominently provides:

THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND

CORE/3524885.0002/233543841.25

> THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY
> REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER…

HMIT Settlement Agreement, Dkt. 4217-1 at § 8(c).  The same section also makes clear that, other than written discovery and documents produced in discovery, the Highland Entities would not transfer any "documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims."  The HMIT Settlement Agreement also required the Litigation Sub-Trust to "dismiss, with prejudice, HMIT and Rand PE [Fund I, LP] from Counts I, II, III, and XXIV of the Amended Complaint."  *Id.* at § 2(a).

Thereafter, on July 25, 2025, HMIT filed a Motion to Substitute, seeking to alter the Amended Complaint to substitute Hunter Mountain for Kirschner as the plaintiff in the litigation. Dkt. 357. The Court issued an order approving the substitution on September 5, 2025.  Order Granting Motion to Substitute, Dkt. 377.

On September 3, 2025, HMIT filed a Notice of Intent to Lift Stay, effectively lifting the stay of this litigation as of October 3, 2025.  Dkt. 375. Less than two weeks later, HMIT filed its TRO Motion.  Dkt. 379.  In that motion, HMIT argued that pre-trial temporary injunctive relief was warranted because "Dondero and Ellington are involved in transferring or seeking to transfer substantial assets using affiliates they control."  *Id.*, Dkt. 379-1 at ¶ 5.  Specifically, HMIT vaguely identified four alleged transfers:

- "Transfers of millions of dollars in 2025 to Crossvine Litigation Funding LLC ('CLF'), a Cayman entity created in April 2025 and controlled by Ellington and funded by Dondero;"

- "Efforts to liquidate or transfer a stock ownership position (held directly or indirectly by Dondero) involving multi-family housing and thereby moving over $30 million to a 'charity' under Dondero's control and which, upon information and belief, is located in the Cayman Islands;"

- "Dondero's highly improper, if not illegal demand to the Charitable DAF Fund, LP ('DAF') which indirectly owns HMIT, to send $1.5 million dollars to an offshore

entity to bolster and 'maintain the Sentinel structure,'" a demand the "DAF rejected;"[1] and

- "[M]ultiple wires [also apparently made years ago] in connection with this proposed scheme, including a $3 million wire to Atreyu Pipeline Logistics, LLC, an entity controlled by Ellington," and "as much as $7 million . . . transferred by Dugaboy, NexPoint, and/or Ellington (acting through Skyview."

*Id.* at ¶ 5. Notably, HMIT did not provide evidentiary support for these supposed transfers, did not explain how any of the transfers relate to the allegations at issue in this adversary proceeding, and did not argue—much less provide evidence to demonstrate—that any of the transfers would render Defendants incapable of paying a monetary judgment in this litigation.[2]

On the basis of these scant allegations, HMIT asked the Court to issue a temporary restraining order and preliminary injunction broadly restraining and enjoining Defendants "and all persons acting in concert with them" from:

- "transferring, selling, liquidating, dissipating, assigning, alienating, tampering with, withdrawing, concealing, mortgaging, encumbering, granting a lien or security interest or other interest in, or otherwise harming or reducing the value of, or disposing of, any funds or other assets under the Defendants' individual or joint control including, among other things, their subsidiaries, businesses, physical assets, real property, cash and equity interests ('Assets')";

- "transferring any Assets to other entities owned or controlled, directly or indirectly, by the Defendants, whether such entity is currently existing or newly created"; or

- "transferring any Assets owned or controlled by the Defendants, directly or indirectly, to any account, entity or individual located outside the United States of America or beyond the jurisdiction of this Court."

*See* Proposed Order Granting Temporary Restraining Order and Setting Hearing on Plaintiff's Motion for Temporary Injunction and Appointment of Receiver ("Proposed TRO Order"), Dkt.

---

[1]  At the status conference, HMIT's counsel acknowledged that Dondero's supposed request was not new but made in "late 2023."  Hearing Transcript dated Oct. 17, 2025 ("Hr'g Tr."), Dkt. 408 at 42:18–43:23.

[2]  To demonstrate its entitlement to relief, HMIT apparently hoped to rely on the one-sentence "Verification" of the TRO Motion (but not the Amended Complaint itself) supplied by Mark Patrick attesting that all facts alleged in the TRO Motion were true to the "best of [his] knowledge and belief."  *See* Verification, Dkt. 379-1.

379-3 at ¶¶ 1–3.  HMIT also asked the Court to appoint a receiver "to preserve Defendants' assets." TRO Motion, Dkt. 379-1 at ¶¶ 58–59.[3]

Defendants filed their Opposition to the TRO Motion on October 6, 2025.  Dkt. 389.  The Court held a status conference and hearing on the TRO Motion on October 17, 2025, at which the Court requested briefing on the topics listed above.  *See* Hr'g Tr., Dkt. 408 at 54:2–56:14.

## III.   ARGUMENT

### A.   Under *Royal Canin*, the Time-of-Filing Rule Does not Apply when the Plaintiff Changes; Instead, the Court Must Reassess Jurisdiction

#### 1.   The Supreme Court's *Royal Canin* Decision

On January 15, 2025, the Supreme Court of the United States issued its unanimous decision in *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22 (2025).  In that case, the respondent (Wullschleger) sued the petitioner (Royal Canin) in state court, alleging that Royal Canin had engaged in deceptive marketing practices.  *Id.* at 22.  Royal Canin removed Wullschleger's case to federal court based on federal question jurisdiction.  After removal, Wullschleger amended her complaint to eliminate all the federal law claims, leaving only the state law claims behind, and petitioned the district court for a remand to state court.  *Id.*  The district court denied Wullschleger's petition, but the Eighth Circuit reversed.  The Eighth Circuit held that Wullschleger's amendment had eliminated any basis for federal question jurisdiction, and thus, the court had no supplemental jurisdiction over Wullschleger's state law claims.  *Id.*  The Supreme Court agreed with the Eighth Circuit: "When a plaintiff amends her complaint to delete the federal law claims that enabled removal . . . the federal court loses supplemental jurisdiction over the state claims, and the case must be remanded to state court."  *Id.*

---

[3] There are myriad reasons why HMIT's request for the appointment of a receiver is legally baseless, but because this Court's request for post-trial briefing only asked for briefing on the injunctive relief sought by HMIT, Defendants generally do not address HMIT's separate request for appointment of a receiver, other than in passing.  See n.18 *infra*.

CORE/3524885.0002/233543841.25

Although *Royal Canin* specifically addresses a court's supplemental jurisdiction in removal cases, the Supreme Court relied upon a longstanding rule that applies across the board: "When a plaintiff files a complaint in federal court and then *voluntarily amends* the complaint, *courts look to the amended complaint to determine jurisdiction*." *Id.* at 32 (quoting *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007)) (emphasis added).  In multiple contexts—involving both cases filed in federal court and those removed to federal court—courts conceive of amendments to pleadings as potentially jurisdiction-changing events.  The amended complaint becomes the operative one, and in taking the place of what has come before, it can either create or destroy jurisdiction.  *Id.* at 34–35.[4]

In support of its conclusion, the Supreme Court reasoned that "[t]he plaintiff is 'the master of the complaint,' and therefore controls much about her suit."  *Id.* (quoting *Caterpillar Inc.* v. *Williams*, 482 U.S. 386, 398–99 (1987)).  The plaintiff's control over a suit extends beyond the time the first complaint is filed.  "If a plaintiff amends her complaint, the new pleading 'supersedes' the old one," and the cause proceeds on the amended petition.  *Id.* at 35.  "So *changes in parties, or changes in claims, effectively remake the suit. And that includes its jurisdictional basis*: The reconfiguration accomplished by an amendment may bring the suit either newly within or newly outside a federal court's jurisdiction."  *Id.* at 35–36 (emphasis added).[5]

---

[4] As the Supreme Court noted in *Royal Canin,* some courts had held otherwise "holding that a post-removal amendment cannot divest a federal court of jurisdiction"  *Royal Canin*, 604 U.S. at 30.  *Royal Canin* expressly resolved that split by rejecting that contrary view.  *Id.*

[5] If HMIT argues that *Royal Canin*'s references to the impact of "changes in parties" is mere dictum, it is important to note that the Supreme Court expressed awareness of the dangers of dicta that amounts to "drive-by jurisdictional rulings" and distinguished such dicta from analysis with elaboration that is relevant, indeed critical to the underpinnings of a case.  *Royal Canin*, 604 U.S. at 41–43.  Given the Court's pointed commentary, it is not likely its repeated guidance concerning the impact of a change in parties was thoughtless "drive-by" dictum.

This rule announced by the Supreme Court applies equally in the bankruptcy context, including to adversary proceedings like this one.  Indeed, *Royal Canin* specifically states that the rule "that jurisdiction follows the amended (*i.e.*, now operative) pleading *applies across the board*."  *Id.* at 37 (emphasis added).  The rule is particularly fitting in the post-confirmation context, where the scope of a bankruptcy court's jurisdiction is extremely limited and differs markedly from the broad "related to" jurisdiction enjoyed by a bankruptcy court prior to confirmation of a chapter 11 plan.  *See Bank of La. v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390–91 (5th Cir. 2001).  Applied here, the voluntary and strategic change in plaintiff from Kirschner to HMIT "effectively rema[de] the suit," and the Court must now analyze the operative complaint—with HMIT as the sole plaintiff—to determine whether the Court has jurisdiction over the case.

### 2.   Under *Royal Canin*, the "Time-of-Filing Rule" Does not Apply when the Plaintiff Changes the Parties or the Claims

In reiterating that courts must look to the operative complaint to determine jurisdiction, the Supreme Court specifically noted that this general rule is distinguishable from the "so-called time-of-filing rule" that "operat[es] in diversity cases."  *Royal Canin*, 604 U.S. at 36 n.5.  The time-of-filing rule specifically applies to *diversity* cases and evaluates a party's citizenship "at the time the suit is brought, and never again later."  *Id*.  Indeed, the Supreme Court noted only two narrow instances when the time-of-filing rule applies: (1) in diversity cases amending the amount in controversy and (2) in diversity cases changing the citizenship of the original parties.  The Supreme Court emphasized that these limited circumstances concern only the "actual state of things" or "facts on the ground," rather than (as in this case) choices made by the plaintiff about which "claims and parties [to include] in a complaint."  *Royal Canin*, 604 U.S. at 36 n.5 (citing *Rockwell*, 549 U.S. at 473).  Thus, in a diversity case, if the plaintiff moves from a state affording complete diversity to the state in which the defendant resides, jurisdiction is not reevaluated;  if a plaintiff's

damages turn out to be below the jurisdictional limit, jurisdiction is not reevaluated.[6]   However, if

the plaintiff adds or subtracts parties or claims, the logic of *Royal Canin* requires a jurisdictional

reanalysis, even if the plaintiff seeks to thwart that analysis by refusing formally to amend.

A plaintiff's selection of claims and parties is not synonymous with the "facts on the

ground" or the "state of things" at the time the complaint is filed. *See Rockwell*, 549 U.S. at 473

("The state of things and the originally alleged state of things are not synonymous.").   As the

Eighth Circuit explained, the "state of things," which is subject to the time-of-filing rule, refers to

the actual facts on the ground, such as when "one party destroys diversity by moving to another

state after filing" or when a party changes the amount-in-controversy post-filing. *Wullschleger v.*

*Royal Canin U.S.A., Inc.*, 75 F.4th 918, 923 (8th Cir. 2023).   In (subtle) contrast, "[w]e treat

changes to the '*alleged* state of things' differently." *Id.*   A plaintiff can add a federal claim after

removal to cure lack of subject matter jurisdiction or replace a diverse defendant with a non-diverse

one to divest the court of jurisdiction.   In these instances, "the facts on the ground have not

changed, but the facts in the complaint have." *Id.*

Although *Royal Canin* resolved a circuit split by siding with the minority view espoused

by the Eighth Circuit, the opinion is not ground-breaking.   Prior Supreme Court precedent likewise

holds the time-of-filing rule inapplicable to situations in which parties are added to the lawsuit.

*See Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U. S. 567, 574 (2004) (applying the time-of-

filing rule to citizenship in a diversity case and noting the distinction from situations where there

is a change of party); *Rockwell*, 549 U.S. at 474   ("Thus, when a plaintiff files a complaint in

---

[6] The Court explained the narrow practical reasons for the time-of-filing rule.   It limits the need to be concerned with a party's citizenship to the time of the initial complaint, eliminating the need to track the locations of the parties, and "responds to the difficulties of assessing a suit's value and the likelihood that the calculation will change over the course of litigation" and the waste that "constant litigation" over such matters would entail. *Royal Canin*, 604 U.S. at 38 n.8.   As the Third Circuit noted even before *Royal Canin*, "whereas a uniform, easily administered test is a practical necessity in diversity cases, no comparable need exists in federal question cases." *ConnectU LLC v. Zuckerberg*, 522 F.3d 82, 94 (1st Cir. 2008).

federal court and then voluntarily amends the complaint, courts look to the amended complaint to

determine jurisdiction.").[7]

### 3.    The Fifth Circuit's Extension of the Time-of-Filing Rule to Federal Question Cases in *Double Eagle* Was Superseded by *Royal Canin*

Before the Supreme Court's recent clarification regarding the narrow application of the

time-of-filing rule, the Fifth Circuit in *Double Eagle Energy Services L.L.C. v. MarkWest Utica

EMG, L.L.C.*, 936 F.3d 260 (5th Cir. 2019), extended the time-of-filing rule to bankruptcy

jurisdiction, noting, "[a]lthough courts have not often considered the time-of-filing rule" for

bankruptcy cases, "it applies to bankruptcy jurisdiction no less than it applies to diversity or federal

question jurisdiction." *Double Eagle*, 936 F.3d at 263.  In that case, one year after Double Eagle

Energy Services ("Double Eagle") filed for chapter 11, Double Eagle sued MarkWest for breach

of contract. *Double Eagle*, No. 19-30207, Brief of Appellant, Dkt. 22-2 at 4.  After confirmation

of Double Eagle's plan of liquidation, Double Eagle assigned its claim against MarkWest to one

of its creditors, GBT. *Id.* at 4.  The Bankruptcy Court entered an order that, among other things,

fully transferred all of Double Eagle's rights and interests in the adversary proceeding to GBT.

*See In re Double Eagle Energy Services L.L.C.*, No. 17-80717, Order on Motion to Sell Movable

and Immovable Property of the Estate to Secured Creditors, Dkt. 264 at 2.  MarkWest then sought

to dismiss the case, arguing in part that the assignment of the claim destroyed the court's subject

matter jurisdiction.  The magistrate judge agreed, and the district court adopted the magistrate's

recommendation, dismissing the case for lack of subject matter jurisdiction.  *Double Eagle*, 936

F.3d at 263.

---

[7] Notably, in none of its pleadings has HMIT identified any authority for the proposition that the time-of-filing rule applies where a defendant swaps sides and becomes the plaintiff.  Defendants could not locate any such authority either.  The complete reshuffling of parties in this proceeding warrants reevaluation of bankruptcy court jurisdiction.

On appeal, MarkWest argued that sometimes a bankruptcy court might have jurisdiction at the outset of the proceeding, but subsequent events can call that power into question. *Double Eagle*, No 19-30207, Brief of Appellees, Dkt. 27-2 at 21. According to MarkWest, the bankruptcy estate's approval of the transfer of its rights and interest in the adversary proceeding to GBT, a non-debtor, "extinguished 'related to' jurisdiction over this claim and divested the District Court of any jurisdiction it may have had." *Id.* at 5, 22. In briefing the issue, the parties focused on whether the post-filing change in events automatically divested the court of jurisdiction, rather than whether a change in parties would reset the jurisdictional analysis. *See, e.g., id.* at 1. Consequently, the Fifth Circuit did not consider the question of whether a change in parties should prompt the court to reassess jurisdiction. Instead, the Fifth Circuit focused on a different question: What happens if a lawsuit, when filed, is related to a bankruptcy, but then something happens that dissolves the bankruptcy connection? *Double Eagle*, 936 F.3d at 263.

The Fifth Circuit found that the district court erred by failing to focus on and apply the time-of-filing rule to 28 U.S.C. § 1334(b) (governing jurisdiction in bankruptcy cases). Relying on *Grupo Dataflux*, the Fifth Circuit began its opinion by stating:

> The time-of-filing rule—that subject matter jurisdiction is determined when a federal court's jurisdiction is first invoked—is "hornbook law." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004).

*Id.* at 263. The Fifth Circuit then extended the time-of-filing rule to bankruptcy jurisdiction, finding that "[t]his means that the related-to-bankruptcy jurisdiction that existed at the outset of this case never went away." *Id.* at 264. That conclusion does not comport with *Royal Canin*. Instead, *Royal Canin* makes clear that some events that occur post-filing—including a change of parties—require the court to reassess jurisdiction.[8]

---

[8] For all of the same reasons, *Royal Canin* also undermines the reasoning in *In re Wattstock, LLC*, No. 3:23-CV-0270, 2024 WL 923004, at * 2 (N.D. Tex Mar. 4, 2024) because, in *Wattstock*, the district court assumed that it continued to have subject matter jurisdiction. There, the bankruptcy court had

Unfortunately, the Fifth Circuit's reliance on *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567 (2004) ("*Dataflux*"), seems misplaced, considering *Royal Canin*.  Nothing in *Dataflux* or any other established precedent had extended the time-of-filing rule to federal question jurisdiction until *Double Eagle*.  In fact, in *Dataflux,* the Supreme Court limited the time-of-filing rule to a change in the status *of an existing party* in a diversity case: "This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure.  It measures all challenges to subject-matter jurisdiction *premised upon diversity of citizenship* against the state of facts that existed at the time of filing . . . ."  *Dataflux*, 541 U.S. at 570–71 (emphasis added).  Indeed, the Supreme Court in *Dataflux* acknowledged that a change in parties *could* change the jurisdictional landscape*:* "To our knowledge, the Court has never approved a deviation from the rule articulated by Chief Justice Marshall in 1829 that '[w]here there is *no* change of party, a jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit.'"  *Dataflux*, 541 U.S. at 574 (quoting *Conolly v. Taylor,* 27 U.S. 556 (1829)) (emphasis in original).

Defendants have not located any Supreme Court cases applying the time-of-filing rule to federal question jurisdiction.  And although the Fifth Circuit previously extended the time-of-filing rule to federal question cases, that application appears to be limited to the removal context and is now in direct contrast to the rule espoused in *Royal Canin*.  *See, e.g., Spear Mktg. v. BancorpSouth Bank*, 791 F.3d 586, 592 (5th Cir. 2015) ("It is this court's established precedent that once a case is properly removed, the district court retains jurisdiction even if the federal claims are later

---

recommended that the case be remanded to state court because the debtor was no longer a party and the case no longer had any potential to affect distributions to creditors (*id.*), but the district court decided to retain the case.  Significantly, even if *Royal Canin* were not now governing, *In re Wattstock* would not be controlling because in that case, unlike here, significant discovery and motion practice had transpired using federal standards that might well have been different in state court.  *Id.*  By contrast, this case has been dormant for years and virtually no decisions have been made.

CORE/3524885.0002/233543841.25

dropped."); *but see Wullschleger v. Royal Canin U.S.A., Inc.*, 75 F.4th 918, 924 (8th Cir. 2023) (noting that "it is not even clear that the time-of-filing rule applies in federal-question cases, and certainly not to the extent it does in diversity cases").[9]

Accordingly, and as discussed above, *Dataflux's* narrow application of the time-of-filing rule to diversity cases does not extend to federal question cases in which a plaintiff voluntarily assigns its claims and thereby changes a party in the case. *Royal Canin* is consistent with *Dataflux*, and *Dataflux* is consistent with *Conolly v. Taylor*: The "hornbook" time-of-filing rule does not apply here. Accordingly, under *Royal Canin*, the Court must consider the effect of a change in party on the Court's subject matter jurisdiction.

### 4.    Post-*Double Eagle*, in the Context of Standing, the Fifth Circuit Has Reviewed Jurisdiction Following a Change in Plaintiff

Even before *Royal Canin*, more recent case law from the Fifth Circuit demonstrates that the court's application of the time-of-filing rule in bankruptcy cases is not absolute. In *Briar Capital Working Fund Capital, L.L.C. v. Remmert (In re S. Coast Supply Co.)*, 91 F.4th 376 (5th Cir. 2024), the Fifth Circuit reassessed the court's subject matter jurisdiction over a proceeding after a Chapter 11 debtor's creditor purchased preference claims by an assignment in the Chapter 11 plan. As in *Double Eagle*, the parties in *In re South Coast Supply* did not make an argument that the change in parties should have prompted the court to reassess jurisdiction. Rather, the parties focused on whether the new plaintiff had standing to bring the claims.

---

[9] *Accord ConnectU LLC v. Zuckerberg*, 522 F.3d 82, 92 (1st Cir. 2008) (internal citations omitted) (the time-of-filing rule applies "most obviously in diversity cases, where the rule originated, and where heightened concerns about forum-shopping and strategic behavior offer special justifications for it [and] these concerns are not present in the mine-run of federal question cases" where courts must be careful not to indiscriminately and inappropriately insert the rule); *New Rock Asset Partners, LP v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1503–04 (3rd Cir. 1996) (rejecting application of the time-of-filing rule outside of diversity context and analyzing other cases similarly doing so).

In *South Coast Supply*, after filing its chapter 11 case, the Debtor (South Coast) brought a preference action against its CEO, Remmert, seeking to avoid allegedly preferential transfers made to Remmert prior to the petition date. 91 F.4th at 379. South Coast's Chapter 11 plan substituted Briar Capital as the assignee of South Coast in the preference action against Remmert. *Id*. at 380. Under the plan, if Briar Capital recovered on any of the avoidance actions in an amount exceeding the debt owed to it by South Coast, Briar Capital would keep the funds recovered for itself. After plan confirmation, the district court withdrew the reference. Briar Capital then moved for leave to amend the complaint to change the plaintiff from South Coast to Briar Capital as assignee (and to slightly increase the amount sought from Remmert). *Id*. Remmert sought to dismiss for lack of subject matter jurisdiction, arguing that Briar Capital did not have standing to pursue the preference action as a creditor of the estate because all recovery would go to Briar Capital, and the preference claims could not be sold. The district court agreed, finding that because a successful recovery would not benefit South Coast's estate or its unsecured creditors, Briar Capital lacked standing to bring the preference claims against Remmert. *Id*. "Therefore, the district court dismissed the suit for lack of subject matter jurisdiction." *Id*.

The Fifth Circuit reversed the district court, holding that the preference claims could be sold as property of the estate, and that Briar Capital "ha[d] standing to pursue the preference claim as it validly purchased the claim outright." *In re S. Coast Supply*, 91 F.4th at 385–86. Although *South Coast Supply* addresses a different issue, if the "time of filing" rule adopted in *Double Eagle* were absolute, the Fifth Circuit simply could have relied on that rule. Instead, the Fifth Circuit did not even reference *Double Eagle*, but instead considered whether the new plaintiff, Briar Capital,

had standing to pursue the assigned preference claims, implicitly acknowledging that the change in parties required the court to reassess its jurisdiction.[10]

### 5. The "Successor-in-Interest" Exception Does not Apply when the Plaintiff Changes the Parties

In footnote 6, the Supreme Court in *Royal Canin* noted one surviving exception to the general rule that a change in parties requires a reassessment of the court's subject matter jurisdiction: when a new defendant in a diversity case is a "successor in interest" that steps into the shoes of the original defendant, rather than a totally new party. *Royal Canin*, 604 U.S. at 37 n.6.

> That general rule does not apply when an amendment merely substitutes a successor-in-interest for the first-named defendant. In that situation, the former steps into the latter's shoes, and the diversity jurisdiction founded on the initial complaint thus continues.

*Id*. (citing *Freeport-McMoran Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428–29 (1991)).

The language and context of this footnote make clear that the exception is a narrow one, in two respects. First, the plain language of the footnote discusses only the assessment of citizenship for purposes of diversity jurisdiction. As discussed above, the diversity context is the only application of the time-of-filing rule after *Royal Canin*. Second, the Court expressly cabined the exception to cases where—rather than the plaintiff voluntarily choosing to add or remove parties in the case—the underlying "facts on the ground" change because a substituted party that is a true successor in interest "steps into the . . . shoes" of the original party.

---

[10] Notably, because the causes of action in *South Coast Supply* were preference claims that arose under the Bankruptcy Code, bankruptcy subject matter jurisdiction over the claims was not an issue. Here, by contrast, the vast majority of claims are state-law claims. The only possible basis for federal court jurisdiction is a handful of claims based on 11 U.S.C. §§ 544, 548 and 550. And even the section 548 claims that may arise under the Bankruptcy Code are essentially recitations of state-law claims under DUFTA or TUFTA. An Article I bankruptcy court has no jurisdiction over supplemental state law claims. *Matter of Walker*, 51 F3d 562, 568–73 (5th Cir. 1995). That is yet another reason the reference should be withdrawn for all purposes.

The Supreme Court's discussion preceding footnote 6 makes this clear. The Supreme Court explained that "an amendment can either destroy or create jurisdiction in an original diversity case," citing as a key example that "[t]he addition of a non-diverse party in such a case typically destroys diversity jurisdiction, requiring the case's dismissal." *Royal Canin*, 604 U.S. at 37 (citing cases). For that proposition, the Court cited two diversity cases, both of which exemplify situations in which the plaintiff uses (or misuses) its role as "master of the complaint" to add parties.

The first, *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365 (1978), was a wrongful death suit against a (diverse) defendant power company, which in turn filed a third-party complaint against its equipment supplier. After the power company filed for summary judgment, the plaintiff chose to amend her complaint to add the supplier as a defendant and ultimately proceeded to trial only against the supplier. *Id.* at 368. However, during trial, when details of corporate citizenship came to light, it was established for the first time that the supplier was not diverse. *Id.* at 368. The Supreme Court found that when plaintiff chose to amend the complaint to add the supplier, "[c]omplete diversity was destroyed just as surely as if she had sued [the supplier] initially." *Id.* at 374. The fact that, procedurally, the supplier was originally brought into the case properly as a third-party defendant had no effect on the jurisdictional calculus once the plaintiff amended her complaint. *Id.* at 370.

The second case, *American Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP*, 362 F.3d 136 (1st Cir. 2004), involved environmental litigation founded on diversity jurisdiction. The plaintiff, AF&F, amended its complaint solely to substitute a new (non-diverse) corporate affiliate entity as the defendant, in place of the original (diverse) defendant, after learning that the affiliate had "acquired all of [the original entity's] assets and liabilities [leading] AF&F to conclude that [the affiliate] was [the] ultimate successor in interest." *Id.* at 138 & n.1. The First Circuit—after

first noting that the procedural vehicle for such a substitution should have been a motion under Rule 25(c)—found that the amendment deprived the court of diversity jurisdiction because the acquisition at issue occurred *prior* to the filing of the suit. *Id*. at 140. In other words, while there was a change in the facts on the ground with respect to the real party in interest, such a change offered no jurisdictional safe harbor because it was not a *post-filing* change. Rather, it was the plaintiff who chose to file suit against the wrong party, when the plaintiff could (and should) have brought the original case against the non-diverse affiliate in state court. Examining the case law at length and relying on *Owen*, the court reasoned that "although an exact precedential match has proven elusive, closely related case law and general policy concerns lead us to the ineluctable conclusion that the swapping of parties defeated the court of jurisdiction." *Id*. at 142. As the court emphasized, "parties cannot confer subject matter jurisdiction on a federal court 'by indolence, oversight, acquiescence, or consent.'" *Id*. at 139 (quoting *United States v. Horn*, 29 F.3d 754, 768 (1st Cir. 1994)). So too here, the Litigation Trustee cannot confer subject matter jurisdiction by consent where there has been no post-filing change in the facts on the ground, such as a substitution of a new person as Litigation Trustee, but only a sale of claims to an entirely different party.

*Royal Canin*'s citation in footnote 6 to *Freeport-McMoRan Inc. v. K N Energy, Inc.*, 498 U.S. 426 (1991), provides further support for a narrow reading of the exception. In *Freeport*, a gas company (McMoRan) filed an action against an energy company (K N Energy) for breach of contract, basing jurisdiction on the diversity of those parties. *Id*. at 427. After the suit was filed, McMoRan transferred its interest in the underlying contract to a non-diverse affiliate, FMPO, "for business reasons unrelated to the litigation," and added FMPO as a plaintiff pursuant to Rule 25(c). *Id*. at 427. The related Tenth Circuit decision clarifies that "McMoRan transferred its interest in the lawsuit because [FMPO] was the real party in interest . . . . [FMPO] succeeded to the producing properties and gas purchase contract upon which the lawsuit was based." *McMoran Oil & Gas*

CORE/3524885.0002/233543841.25

*Co. v. KN Energy, Inc.*, 907 F.2d 1022, 1025 (10th Cir. 1990).  In short, the assignee succeeded to

***all*** the obligations, rights and liabilities inherent in the contract.  By contrast here, HMIT merely

acquired claims, with no representations or warranties; it has none of the obligations and liabilities

of the Litigation Trustee, none of the restrictions to which the Litigation Trustee agreed, and none

of the Litigation Trustee's rights other than particular claim ownership. See Sections III.A.6.a and

III.A.6.b *infra*. Thus, HMIT does not qualify for the very limited exception acknowledged in

footnote 6 of *Royal Canin* for a true successor in interest.

Moreover, that Rule 25(c) may provide a broad procedural right to substitute or add a party

upon "any transfer" of interest is neither the start nor the end of the jurisdictional inquiry.  As the

Supreme Court stated in *Owen*, "it is axiomatic that the Federal Rules of Civil Procedure do not

create or withdraw federal jurisdiction."  *Owen*, 437 U.S. at 370.  Thus, in *Trend Micro Corp. v.*

*WhiteCell Software, Inc.*, the court expressly found that a post-filing change in parties pursuant to

Rule 25(c) required a reassessment of federal question subject matter jurisdiction.  No. C 10-02248

WHA, 2010 WL 4722504, at *4 (N.D. Cal. Nov. 15, 2010) ("While it is true that FRCP 25(c)

provides a procedural mechanism to substitute parties (or continue against the original party) in

the event that an interest is transferred in the midst of litigation, nothing in FRCP 25(c) purports

to preserve subject-matter jurisdiction under the Declaratory Judgment Act or Article III where the

transfer itself eliminates a substantial controversy, between parties having adverse legal interests,

of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").  Likewise,

HMIT's use of FRCP 25 to jump to the other side of the "v" in this case provides no shield to the

constitutional requirements of subject matter jurisdiction.

### 6.    In any Event, HMIT Is not a "Successor in Interest" to Kirschner

In any event, *Royal Canin*'s footnote 6 exception does not apply because HMIT cannot be considered a successor in interest to Kirschner.[11]

### a.    Courts have generally found a successor in interest to be one that accepts both the rights and obligations of its predecessor with no change in substance to those rights—essentially "stepping into the shoes" of the other.

Although the term "successor in interest" is not defined in *Royal Canin*, its application in a variety of different legal contexts demonstrates that a successor in interest is one that is essentially the same entity as its predecessor, assuming all of its rights and obligations.

In the corporate context, courts have drawn a distinction between a successor and an assignee, finding that a party that purchases the rights, but not the obligations, of another, is not a successor in interest.  *See Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 233 (S.D. Tex. 2011) ("There is no successor in interest when the acquiring corporation did not expressly agree to assume the liabilities of the party to the agreement because 'successor' has a specialized meaning beyond simple acquisition.") (internal quotations omitted); *see also Sitaram v. Aetna U.S. Healthcare of N. Texas, Inc.*, 152 S.W.3d 817, 826 (Tex. App.—Texarkana 2004) (drawing a distinction between a successor and an assignee and noting, "[w]ith respect to corporations, 'successor' does not ordinarily mean an assignee.  Rather, a 'successor' is normally used in respect to corporate entities to describe the status of a corporation which has become vested with the rights and has assumed the burdens of another corporation by amalgamation, consolidation, or duly authorized legal succession, and does not contemplate acquisition by ordinary purchase from

---

[11] HMIT may contend it is a successor because it acquired its claims in a section 363 sale.  However, being a section 363 purchaser does not make the purchaser a successor in interest; in fact, the aim of such sales is generally to avoid successorship.  HMIT's status as a class 10 claim holder is also irrelevant to whether it is a successor because it did not acquire its rights to pursue the Kirschner claims as a class 10 claimholder. If it had, the only other class 10 claim holder, Highland CLO Management, would have received a share of the Kirschner claims, and it did not.

CORE/3524885.0002/233543841.25

another corporation."); *Idaho v. M.A. Hanna Co.*, 819 F. Supp. 1464, 1477 (D. Idaho 1993) (recognizing that courts have imputed forum contacts of a predecessor in the personal jurisdiction context where "a successor corporation by merger or consolidation is essentially the present corporate embodiment of the predecessor" to prevent "formalistic changes from immunizing the successor from suit in the forum where its predecessor clearly would have been subject to personal jurisdiction").

This "essentially-the-same-entity" test also arises in the labor and employment context, where courts have focused on substantial continuity of operations between the preceding and succeeding employer. *See, e.g.*, *Valdez v. Celerity Logistics, Inc.*, 999 F. Supp. 2d 936, 942–44 (N.D. Tex. 2014) (recognizing that the successor liability analysis in both the labor relations and employment discrimination context considers substantial continuity of business operations from predecessor to successor as the relevant criterion for imposing successor liability).

Under 38 U.S.C. § 4303(4)(D), whether the term 'successor in interest' applies with respect to the definition of employer is determined on a case-by-case basis. The factors considered are: "(I) Substantial continuity of business operations. (II) Use of the same or similar facilities. (III) Continuity of work force. (IV) Similarity of jobs and working conditions. (V) Similarity of supervisory personnel. (VI) Similarity of machinery, equipment, and production methods. [and] (VII) Similarity of products or services." *See Murphree v. Commc'ns Techs., Inc.*, 460 F. Supp. 2d 702, 706 (E.D. La. 2006) ("In general, an employer is a successor in interest where there is a substantial continuity in operations, facilities, and workforce from the former employer.").

In the property or mortgage context, courts have declined to afford successor-in- interest status to parties that purchase property through a quitclaim deed. *See Spraggins v. Caliber Home Loans, Inc.*, No. 3:20-CV-01906-S-BT, 2020 WL 8366645, at *10 (N.D. Tex. Dec. 31, 2020), *report and recommendation adopted*, No. 3:20-CV-1906-S-BT, 2021 WL 311869 (N.D.

Tex. Jan. 29, 2021) (finding Spraggins was not a statutory successor in interest where she received rights to the property through a general warranty deed and could thus not "step into the shoes of the Borrower"); *In re Pugh*, Case No. 19-20696-, 2019 WL 4180281, at *4 (Bankr. E.D. Wis. Sept. 3, 2019) (distinguishing rights obtained via quitclaim versus rights obtained via succession and finding that the debtor was not a successor in interest of the property estate owner under the applicable statutes because he only held a quitclaim deed from the representative of the estate); *Aldrich v. ADD Inc.*, 437 Mass. 213, 218–19 (Sup. Jud. Ct. Mass. 2002) (stating that the "mere purchase of an asset does not make the purchaser the 'successor' of the seller"); *Philadelphia Nat'l Bank v. Farrier*, 46 Pa. D. & C. 3d 657, 661 (Penn. 1988) (finding that a company "has not stepped into the shoes of [the mortgagor] and assumed all of his liabilities" when the company had paid the mortgagor a small sum of money in exchange for a quitclaim deed and had not assumed all liabilities).

Finally, *Black's Law Dictionary* defines "successor in interest" as "[s]omeone who follows another in ownership or control of property. A successor in interest retains the same rights as the original owner, with no change in substance." Black's Law Dictionary (12th ed. 2024).

Based on the above, a successor in interest is more than just a mere assignee or purchaser. A successor in interest is one that "steps into the shoes" of another and is essentially the same party. This definition comports with the Supreme Court's *dicta* that changes in the "facts on the ground"[12] do not amount to an amendment of the parties or claims that requires the court to review the complaint anew. Where a party in a case is substituted with a successor in interest, the court is not prompted to reassess jurisdiction because there is effectively no legal distinction between

---

[12] *See Royal Canin*, 604 U.S. at 36 n.5 (noting that the time-of-filing rule "concerns only the actual 'state of things' relevant to jurisdiction—meaning, the facts on the ground, rather than (as addressed here) the claims and parties that the plaintiff includes in a complaint").

the predecessor and its successor in interest.  If the term were interpreted more broadly, then the exception would swallow the rule reaffirmed in *Royal Canin*: A change in parties requires the court to reassess its subject matter jurisdiction over a case.

> **b.**   **The facts demonstrate that HMIT is not a successor in interest that is simply "stepping into the shoes" of the Litigation Trustee.**

Under the parameters outlined above, HMIT is not the successor in interest of the Litigation Trustee.  HMIT is simply a purchaser of the Kirschner Claims "as is."  HMIT (i) did not become a successor or party to the Litigation Sub-Trust Agreement (Dkt. 2572-5) or an amended version thereof, (ii) did not assume any of Kirschner's liabilities or take on any of his obligations (including any duties imposed by the Litigation Sub-Trust), and (iii) did not even succeed to the same rights that Kirschner had.  Accordingly, HMIT is not "stepping into the shoes" of the Litigation Trustee.

*First*, HMIT did not become a party to the Litigation Sub-Trust Agreement.  That agreement specifically contemplates what a "successor" to Kirschner might be in defining the "*Litigation Trustee*":

> Marc S. Kirschner, and any successor Litigation Trustee that may be appointed pursuant to the terms of the Litigation Sub-Trust Agreement, who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

Kirschner has not ceased his role as Litigation Trustee, and HMIT has not been appointed as his "successor."  *See* Motion to Substitute, Dkt. ¶357 at 3.

*Second*, HMIT did not take on Kirschner's duties and obligations.  For example, the Litigation Trustee must obtain the consent of the Claimant Trust Oversight Board with respect to commencement or settlement of any Estate Claims.  *See* Litigation Sub-Trust Agreement (*In re Highland Cap. Mgmt., L.P.*, Case No. 19-34054, Dkt. 2572-5) at § 3.3(b)(ii) and (iii).  The Litigation Trustee may be replaced by the Claimant Trust Oversight Board.  *See id.* at § 3.7.  The Litigation Trustee also has a duty to maintain books and records subject to the Investment Advisors

CORE/3524885.0002/233543841.25

Act. *Id*. at § 3.11. The Litigation Trustee must make annual reports to the Claimant Trust
Oversight Board and the Debtor's Claimant Trust and may be instructed to provide an annual
budget. *Id*. at § 3.12. There are limits on the compensation the Litigation Trustee may earn. *Id*.
at § 3.13. The Litigation Trustee must make timely distributions of any litigation recoveries. *Id*.
at 6.1. HMIT is not burdened with any of these obligations.

*Third*, HMIT did not succeed to the rights held by Kirschner. Similar to a quitclaim deed,
Kirschner transferred, sold, and assigned the Kirschner Claims to HMIT "as is and with all faults."
HMIT Settlement Agreement, *In re Highland Cap. Mgmt., L.P.*, Case No. 19-34054, Dkt. 4217-1
at § 8(b). HMIT is "not relying on any representations or warranties of any kind whatsoever,
express or implied, from the Highland Entities or their representatives as to any matters concerning
the Kirschner Claims and Amended Complaint . . ." *Id*. Additionally, other than written discovery
and documents produced in discovery, the Highland Entities did not transfer any "documents
regarding the Kirschner claims including any attorney-client communications and any documents
subject to the attorney work-product doctrine or similar privileges or immunities concerning the
Kirschner Claims." *Id*. at § 8(c). It was expressly "understood and agree that the Highland Entities
are retaining and not transferring or waiving the Kirschner Privileges." *Id.*

In summary, *Royal Canin* makes clear that the Court must reassess its subject matter
jurisdiction in this non-diversity case because there has been a change in plaintiff, and no exception
applies in this context that would require a different result.

**B.      The Court Should Recommend Withdrawal of the Reference for All Purposes**

At the status conference, the Court asked the parties to give their position on whether this
Court should continue to act as magistrate in this adversary proceeding for pre-trial purposes or
refer the case to the district court for all purposes. For the reasons that follow, it is Defendants'
position that the reference should be withdrawn for all purposes.

CORE/3524885.0002/233543841.25

Generally, when an adversary proceeding contains "related to" claims integral to the

bankruptcy proceedings, there are efficiencies achieved that at least have the potential to outweigh

the inherent inefficiency of what this court has called the "jurisdictional ping-pong." Hr'g Tr.,

Dkt. 408 at 31:18–19. Here, trial would have to occur in the district court in any event, but now,

resolution of the claims cannot have any conceivable impact on the underlying bankruptcy estate

or its creditors.[13] Moreover, there are significant arguments that the Bankruptcy Court lacks

jurisdiction altogether. In these circumstances, the Bankruptcy Court's retention of the case to act

as a magistrate would not further judicial economy.

### C. The Court Lacks Authority to Issue the Preliminary Injunctive Relief Requested in HMIT's Motion

HMIT has invoked Federal Rule of Bankruptcy Procedure 7065, Section 105 of the

Bankruptcy Code, the Texas Uniform Fraudulent Transfer Act ("TUFTA"), and the Delaware

Uniform Fraudulent Transfer Act ("DUFTA") as the legal bases for its TRO Motion. *See* TRO

Motion, Dkt. 379-1 at ¶ 35; Plaintiff's Reply in Support of its Emergency Verified Motion for

Temporary Restraining Order ("TRO Reply"), Dkt. 391 at 8. At the hearing on the TRO Motion,

HMIT's counsel focused in particular on TUFTA, arguing that "TUFTA specifically and expressly

contemplates [the] situation here, because you don't have to actually trace and link all of the assets

to a particular pot of gold." Hr'g Tr., Dkt. 408 at 51:25–52:3. Instead, HMIT took the position

that, so long as the Court "is concerned about protecting the integrity of the process, [it] can attach"

or issue "an injunction to prevent the movement of assets." *Id.* at 52:3–6. HMIT is wrong, and

---

[13] This is precisely the reason this Court recommended remand to the state court of a proceeding entirely among non-debtors in the *Wattstock* case. *See* Hr'g Tr., Dkt. 408 at 9:11–25. In that case, Judge Starr ultimately retained jurisdiction because of all the determinations that had already been made using federal law over the years of active litigation of the case. *In re Wattstock, LLC*, 2024 WL 923004, at * 2. Here, by contrast, this case has been dormant for years, and there are no such efficiencies to be gained by a discretionary retention of the case in bankruptcy court. Additionally, the impact of *Royal Canin* on the *Wattstock* case is discussed in Section III.A, *supra*.

none of the cited legal authorities permits the type of injunctive relief sought by HMIT under the circumstances presented. Further, because HMIT argues it may obtain an injunction "even without demonstrating the debtor's insolvency or tracing particular assets," HMIT expressly declines to provide any evidence to satisfy either requirement. *See* TRO Reply at 7–8.

### 1.    The Legal Framework for Injunctive Relief

It is well-settled that preliminary injunctive relief under Federal Rule of Civil Procedure 65 (made applicable in adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7065) is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). To obtain a TRO or preliminary injunction under the Rule, a movant must show that (1) there is a substantial likelihood that the movant will prevail on the merits of one or more asserted claims, (2) there is a substantial threat of irreparable injury, (3) the balance of harms tips in the movant's favor, and (4) the public interest supports an injunction. *See, e.g.*, *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 568–69 (5th Cir. 2010); *see also Broadstreet, Inc. v. Sec. & Exch. Comm'n*, No. 4:24-CV-00803, 2024 WL 5348632, at *2 (N.D. Tex. Nov. 17, 2024) (same four factors apply equally to TROs and preliminary injunctions).

These requirements are no different when a party seeks a provisional remedy under TUFTA. TUFTA provides that, "subject to applicable principles of equity and *in accordance with applicable rules of civil procedure*," a creditor aggrieved by a fraudulent transfer may obtain an "injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property." *Id.* at § 24.008(a)(3)(A).[14] Critically, the availability of provisional injunctive relief under TUFTA presupposes that the moving party has alleged and established a

---

[14] DUFTA contains a substantially similar provision. 6 DEL. CODE § 1307(a)(3).

prima facie claim for fraudulent transfer and can meet the other requirements for relief under Rule

65. *See In re Primera Energy, LLC*, No. 15-51396, Adv. Pro. No. 15-05047, 2015 WL 6556887,

at *3–4 (Bankr. W.D. Tex. Oct. 28, 2015).

Moreover, when it comes to an asset-freezing injunction, there are several additional legal

hurdles that constrain courts' power.  First, it is black-letter law that a court may not freeze a

defendant's assets to protect a future judgment if those assets bear no relationship to the operative

complaint.  As the Fifth Circuit has repeatedly held, "'[t]he general federal rule of equity is that a

court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so

that they may be preserved to satisfy a potential money judgment.'" *Netsphere, Inc. v. Baron*, 703

F.3d 296, 309 (5th Cir. 2012) (quoting *In re Fredeman Litig.*, 843 F.2d 821, 824 (5th Cir. 1988)).

Indeed, since as far back as 1945, the Supreme Court has held that a court may not issue a

"so-called injunction sequestering [an] opponent's assets pending recovery and satisfaction of a

judgment . . . No relief of this character has been thought justified in the long history of equity

jurisprudence." *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 222–23 (1945).

This precept remains good law.  *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,

527 U.S. 308, 310, 333 (1999) (holding that a federal district court does not have the power "to

issue a preliminary injunction preventing the defendant from transferring assets in which no lien

or equitable interest is claimed"); *see also McLean v. Greenfield*, No. 3:24-CV-00447, 2025 WL

492494, at *2 (N.D. Tex. Jan. 13, 2025), *report and recommendation adopted sub nom. McLean*

*v. Acting Warden Greenfield*, 2025 WL 488418 (N.D. Tex. Feb. 13, 2025) (the "party moving for

a preliminary injunction must necessarily establish a relationship between the injury claimed in

the party's motion and the conduct asserted in the complaint").  Ultimately, as discussed further

below, the issue is one of the court's jurisdiction.  As the Fifth Circuit in *Netsphere* explained, it

is a "jurisdictional principle that a court's equitable powers do not extend to property unrelated to the underlying litigation . . . ." 703 F.3d at 310.

Further, because of the irreparable harm requirement for the issuance of injunctive relief, an asset-freezing injunction is impermissible in the absence of evidence that the defendant is insolvent or is unlikely to have sufficient assets to pay a judgment without the requested provisional relief. *See In re Fredeman Litigation*, 843 F.2d 821, 826 (5th Cir. 1988); *Western Surety Company v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 796 (E.D. La. 2018).

Against this legal backdrop, the Court has no power to issue the injunctive relief sought by HMIT.

### 2.     The Court Lacks Jurisdiction to Grant Injunctive Relief Based on Allegations Outside of the Live Pleadings

Applying the legal principles above, the relief sought by HMIT is unavailable as a matter of law because HMIT's request for injunctive relief relies on allegations entirely absent from the Amended Complaint. Because a court lacks jurisdiction over issues outside of the live pleading, it cannot grant a motion for injunctive relief that raises new or different issues from those alleged in the complaint. *See Netsphere*, 703 F.3d at 310; *Infinite Fin. Sols., Inc. v. Strukmyer, LLC*, No. 3:14-CV-354, 2014 WL 12586282, at *9 (N.D. Tex. July 29, 2014) ("Even when a motion for a preliminary injunction is predicated on a complaint, if the motion raises issues different from those presented in the complaint, the court has no jurisdiction over the motion."); *Bucklew v. St. Clair*, No. 3:18-CV-2117, 2019 WL 2251109, at *3 (N.D. Tex. May 15, 2019), *report and recommendation adopted*, 2019 WL 2249719 (N.D. Tex. May 24, 2019) ("Because [plaintiff] seeks injunctive relief unrelated to the claims in her lawsuit, jurisdiction is lacking.").

Indeed, the case law is legion that a motion for "injunctive relief based on different conduct from that described in [the plaintiff's] complaint" or that seeks relief not specifically demanded in the operative complaint must fail. *See, e.g.*, *Garrison v. Doe*, No. 3:24-cv-00700, 2024 WL

CORE/3524885.0002/233543841.25

3822747, at *4 (N.D. Tex. May 21, 2024), *report and recommendation adopted*, (N.D. Tex. Aug. 13, 2024) (denying motions for injunctive relief that "reference[d] 'more incidents' and appear[ed] to assert new claims"); *French v. Fisher*, No. 1:17-CV-248, 2018 WL 3603107, at *1 (W.D. Tex. July 2, 2018) (denying motion for TRO and preliminary injunction "because it was based on allegations that [were] not in the Second Amended Complaint"); *see also Loveless v. Grady Cnty. Crim. Just. Auth.*, No. CIV-24-00879, 2025 WL 1541050, at *3 n.4 (W.D. Okla. May 30, 2025) (denying request for injunctive relief because it was not specifically pleaded in live complaint); *Tolliver v. Thompson*, No. 21-1768, 2023 WL 2572286, at *1 (D. Del. Mar. 20, 2023) (denying motion for injunctive relief because plaintiff did not include a demand for the specific relief in her amended complaint).

This rule alone is sufficient to preclude the injunctive relief HMIT seeks. The operative Amended Complaint does not contain any mention of injunctive relief, whether by way of affirmative claim, a prayer for relief, or otherwise. Nor does the Amended Complaint allege any need for a sweeping provisional remedy to prevent future fraudulent transfers. Worse still, the transfers that HMIT seeks to remedy are not at issue in the Amended Complaint, post-date the Amended Complaint by several years, and have nothing to do with the actual transfers at issue. As set forth above, the Amended Complaint alleges 12 claims for avoidance of fraudulent transfers made by *Highland* to Defendants as *transferees*. See Section II, *supra*. By contrast, HMIT seeks to remedy transfers made *by Defendants* to other third-party entities. *See generally* TRO Motion, Dkt. 389-1; Proposed TRO Order, Dkt. 389-3. To the extent that such transfers have occurred or may occur, they are not alleged (or even at issue) in the Amended Complaint, and so this Court has no jurisdiction to enjoin them.[15]

---

[15] Despite being informed by Defendants' prior briefing of this fundamental failing in its pleading, HMIT resists amending the Amended Complaint, because HMIT acknowledges that amendment triggers a renewed jurisdictional analysis. This is because (assuming all other requirements for such relief were met)

### 3.   The Court May Not Grant an Asset Freezing Injunction Where the Assets to Be Frozen Have No Nexus to the Allegations and Assets at Issue

Second and relatedly, the Court may not issue an asset-freezing injunction because HMIT cannot demonstrate that the assets to be frozen are traceable to assets (or even allegations) at issue in the Amended Complaint.

Again, it is axiomatic that federal courts take a "cautious approach to equitable powers," which "do not extend to property unrelated to the underlying litigation." *Netsphere*, 703 F.3d 296, 309 (5th Cir. 2012).  For that reason, the Fifth Circuit has long held that an asset-freezing injunction is permissible only "when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686–87 (5th Cir. 1980)).  Indeed, *Janvey*—a case cited by HMIT in support of its position (*see* TRO Motion at 15–18)—stands in stark contrast to the facts of this case.  In *Janvey*, at the request of the Securities and Exchange Commission, the court appointed a receiver for Stanford Group companies utilized in perpetrating a Ponzi scheme.  647 F.3d at 589.  The receiver sought to marshal the Stanford estate's assets.  *Id.*  As part of that process, the receiver sued additional parties—including Stanford Group's employees—to recover fraudulent transfers made by Stanford Group to those parties.  The receiver also sought a preliminary injunction freezing the employees' assets pending the outcome of trial.  *Id.* at 591 ("the Receiver moved for a preliminary injunction to continue the freeze as to the funds named in the April 6th Order. The Receiver claimed that the three named classes of funds represented payments by Stanford to the Employee Defendants *from the proceeds of the Ponzi*

---

HMIT would only be entitled to injunctive relief if its complaint contained the allegations on which it bases its claim to injunctive relief.  As a result, if the Court entertains HMIT's TRO Motion, then the Court must deem it amended, triggering a reevaluation of subject matter jurisdiction.

*scheme* and therefore constituted fraudulent transfers…") (emphasis added).   Thus, in *Janvey*, unlike here, the underlying claims at issue were directly related to the asset-freeze sought.   Indeed, the receiver presented specific evidence that the asset freeze would extend only to funds held by the employees that constituted proceeds from the Ponzi scheme at issue in the underlying complaint.  *Id.* at 591, 596, 598.   In its holding approving the trial court's issuance of an injunction under TUFTA, the Fifth Circuit in *Janvey* expressly relied on the receiver's allegation and evidence that the injunction sought dissipation of specific proceeds transferred from Stanford to the employees in the Ponzi scheme.  *Id.* at 603.   Further, in *Janvey*, unlike here, the evidence demonstrated that there was an "extremely limited array of assets" remaining to satisfy a judgment. Under those circumstances, a limited asset-freezing injunction was appropriate.[16]

In this case, unlike *Janvey*, there is no obvious nexus between the assets that HMIT seeks to freeze and assets at issue in the Amended Complaint.   Nor does HMIT make any effort to trace the transfers it has now identified to assets or proceeds received by Defendants as a result of Highland's fraudulent transfers.   Rather, HMIT expressly disclaims the obligation to even make such a showing.  *See* TRO Reply at 7–8.   In the absence of such evidence, an asset-freezing injunction is inappropriate.   In fact, in another case cited by HMIT to support its request for injunctive relief, *S. Tex. Lighthouse for the Blind, Inc. v. Fed. Supply Servs. Int'l, LLC*, the court refused to enter an asset-freezing injunction because the plaintiff failed to establish any link

---

[16] In several other cases cited by HMIT where an asset-freezing injunction issued, the courts likewise required a direct connection between the allegations at issue in the complaint and the asset to be frozen.  *See, e.g.*, *Walker v. Doe*, No. 6:24-CV-0063, 2025 WL 1502634, at *6 (W.D. Tex. Jan. 3, 2025) (ordering that defendant's bank account be frozen in the amount of $20,000—the exact amount that plaintiff alleged defendant stole pursuant to a bank scam); *Bank of Am., N.A. v. Mega World Builder Corp.*, No. 4:24-CV-3021, 2024 WL 472948, at *1–2, 7 (S.D. Tex. Nov. 8, 2024) (in a lawsuit alleging breach of several loan agreements, enjoining defendants from transferring any of the collateral securing the loans); *Amegy Bank N.A. v. Monarch Flight II*, No. H-11-3218, 2011 WL 6091807, at *7 (S.D. Tex. Dec. 7, 2011) (freezing any sale or transfer of defendant's farm based on evidence that defendant had used proceeds from the sale of collateral pledged to pay down the loan at issue to instead pay down loans on the farm).

CORE/3524885.0002/233543841.25

between the claims at issue and the property to be frozen. No. 2:19-CV-193, 2020 WL 5154097, at *2 (S. D. Tex. Aug. 28, 2020). Citing the Fifth Circuit's directive, the district court held that "a court does not have the power to exercise jurisdiction over property not subject to the claims in the case simply to secure or preserve funds for the satisfaction of a potential later judgment." *Id.* at *6–7 (quoting *Netsphere*, 703 F.3d at 311).[17] Thus, HMIT's insistence that it need not "actually trace and link all of the assets to a particular pot of gold" to obtain an asset-freezing injunction is contrary to longstanding Fifth Circuit precedent.[18]

### 4. The Court May Not Issue an Asset-Freezing Injunction Absent Evidence that the Defendants Are Insolvent or Incapable of Paying a Judgment

Finally, contrary to HMIT's arguments, the Court may not award an asset-freezing injunction to protect a future judgment in the absence of evidence demonstrating that Defendants are insolvent or would be incapable of paying a judgment in the absence of an asset freeze. *See In re Fredeman Litig.*, 843 F.2d at 826 (5th Cir. 1988); *Western Surety Co.*, 334 F. Supp. 3d at 796 (E.D. La. 2018). Even after an adverse verdict, prior to entry of judgment, an asset freezing injunction is impermissible without a proof of "impending insolvency." *Cajun Services Unlimited, LLC*, 2020 WL 3000361, at *6 (E.D. La. Jan. 23, 2020). Hyperbole that amounts to little more than an assertion that "defendants are scoundrels who will try to escape judgment"—more or less

---

[17] *See also In re Primera Energy*, 2015 WL 6556887, at *4 ("Plaintiffs must still provide the nexus of the requested equitable relief and Defendants' specific assets in which Plaintiffs would have an interest if successful on their claims."); *Newby v. Enron*, Nos. H-01-3624, H-01-3913, 2002 WL 32151683, at *5 (S.D. Tex. Sept. 17, 2002) (denying requested injunctive relief because plaintiffs failed to show "a sufficient nexus between the assets sought to be frozen and the equitable relief plaintiffs request").

[18] The same is true for any attempt by HMIT to appoint a receiver. A court cannot impose a receivership over the assets of non-parties or that is not directly related to the underlying claims. The seminal case on this point in the Fifth Circuit is the one referred to by this Court at the status conference. *Netsphere Inc. v. Baron*, 703 F.3d 296 (5th Cir 2012). Dkt 408, Hr'g Tr. 17:22-18:10. In *Baron*, the Fifth Circuit determined that, as with injunctive relief, "the jurisdictional principle that a court's equitable powers do not extend to property unrelated to the underlying litigation applies with equal force to receiverships." *Id.* at 310.

CORE/3524885.0002/233543841.25

what HMIT contends here—is insufficient.  *Id.*  (citing *Fredeman*, 843 F.2d at 826); *see also Clapper v. Am. Realty Investors, Inc.*, No. 3:14-CV-2970, 2015 WL 264711 at *5–6 (N.D. Tex. Jan. 21, 2015) (denying injunction in the absence of evidence that the defendants would be insolvent or unable to satisfy a judgment but for the pre-judgment injunction).

In virtually every case cited by HMIT where the courts awarded an asset-freezing injunction, the moving party presented specific evidence that the defendant either was insolvent or could become insolvent in the absence of the asset freeze.  *See, e.g.*, *Amegy Bank*, 2011 WL 6091807, at *7 (movant presented evidence that main collateral for loan was worth less than outstanding loan amounts and other assets were insufficient to satisfy debt); *Bank of Am.*, 2024 WL 4729482, at *6–7 (bank presented evidence that defendant was likely to become insolvent before final judgment); *Janvey*, 647 F.3d at 601 (movant presented evidence of an "extremely limited array of assets" available to satisfy the judgment); *Sharp v. SSC Farms I, LLC*, Nos. 09-29162-D-11, 09-2692-D, 10-2014-D, 10-2016-D, 2010 WL 9476207, at *18 (E.D. Cal. Apr. 5, 2010) (trustee presented evidence that debtor was insolvent at time of transfers at issue); *Unisys Corp. v. Dataware Prods., Inc.*, 848 F.2d 311, 313–14 (1st Cir. 1988) (issuing post-judgment asset freeze against debtor and its two officers only after finding that debtor had insufficient assets to pay the judgment).[19]

---

[19] These cases are among the "12 cases" that HMIT supposedly cites as support for this Court's legal authority to issue an asset-freezing injunction. *See* TRO Reply, Dkt. 391, at 2 n.4, 7 n.9. In all but one of the other cases from this circuit, the assets frozen were specifically traceable to the underlying litigation. *See, e.g.*, *Sargeant v. Al Saleh*, 512 S.W.3d 399, 415 (Tex. App.—Corpus Christi 2016) (movant presented evidence that assets to be frozen "were related to the subject of the suit"); *Tujague v. Adkins*, No. 4:18-CV-631,2018 WL 4816094, at *3 (E.D. Tex. Oct. 4, 2018) (injunction issued to ensure funds at issue in litigation could be returned); *Walker*, 2025 WL 1502634, at *6) (defendant's account frozen in the exact amount of the alleged amount stolen).  In the last case cited by HMIT—*S. Tex. Lighthouse for the Blind*, 2020 WL 5154097, at *2—the court *denied* the request for injunctive relief in part because the assets to be frozen were not at issue in the underlying litigation.  Finally, finding no help within the Fifth Circuit, HMIT relies on an unpublished case from the Eastern District of California.  *Sharp v. SSC Farms I, LLC (In re SK Foods, L.P.)*, Nos. 09-29162-D-11, 09-2692-D, 10-2014-D, 10-2016-D, 2010 WL 9476207 (E.D. Cal. Apr. 5,

---

CORE/3524885.0002/233543841.25

Indeed, if—as HMIT claims—its request for injunctive relief is predicated on some unalleged fraudulent transfer by Defendants, then the absence of evidence of insolvency is even more problematic. To obtain provisional injunctive relief under TUFTA, a moving party must demonstrate the existence of a fraudulent transfer to be remedied.  Under TUFTA, a transfer is fraudulent only where the debtor made a transfer (1) "with actual intent to hinder, delay, or defraud any creditor of the debtor," or (2) "without receiving reasonably equivalent value in exchange for the transfer or obligation" at a time when the debtor was insolvent or reasonably believed it would become insolvent. TEX. BUS. & COMM. CODE § 24.005(a)(1)–(2).  HMIT's TRO Motion does not present either evidence of actual intent to defraud or evidence of reasonably equivalent value (or lack thereof).  Even if it did, the receipt of reasonably equivalent value, insolvency, and inability to pay are relevant considerations in determining that actual intent. *See id.* at § 24.005(a)(5), (8), (9).

What HMIT has really argued is it needs "emergency" relief because other allegedly imminently looming judgments and financial obligations make the transfers at issue problematic. *See* TRO Motion, Dkt. 389-1 at ¶¶ 1–3; Hr'g Tr., Dkt. 408 at 14:17–24.  Yet HMIT presented *no evidence* that any targeted Defendant is insolvent or would be unable to pay a judgment if one were ever awarded.  And the publicly-available evidence is to the contrary.  As counsel for NexPoint Advisors, L.P. and NexPoint Asset Management, L.P. pointed out at the TRO hearing, NexPoint currently has approximately $17 billion in assets under management with nearly a billion dollars of its own money invested. *See id.* at 28:1–4; *see also* NexPoint Homepage, https://www.nexpoint.com.  The transfers that HMIT identifies are comparatively miniscule.

---

2010).  Even there, the court denied an injunction as to claims for monetary damages and only granted the injunctive relief on claims that sought the return of specific property transferred. *Id.* at *20.

There is no risk of insolvency or inability to pay, and therefore no asset-freezing injunction may issue.

## IV.    **CONCLUSION**

For the foregoing reasons, HMIT's motion for a TRO should be denied, and the Court should recommend withdrawal of the reference for all purposes, with the additional recommendation that the case should be dismissed for lack of subject matter jurisdiction.


November 18, 2025                          Respectfully submitted,

                                                **STINSON LLP**

                                                */s/ Deborah Deitsch-Perez*
                                                Deborah Deitsch-Perez
                                                Texas State Bar No. 24036072
                                                Michael P. Aigen
                                                Texas State Bar No. 24012196
                                                2200 Ross Avenue, Suite 2900
                                                Dallas, Texas 75201
                                                Telephone: (214) 560-2201
                                                Facsimile: (214) 560-2203
                                                deborah.deitschperez@stinson.com
                                                michael.aigen@stinson.com

                                                *Counsel for Defendants NexPoint Advisors,
                                                L.P. and NexPoint Asset Management, L.P.
                                                f/k/a Highland Capital Management Fund
                                                Advisors, L.P.*

                                                /s/ Amy L. Ruhland
                                                Amy L. Ruhland
                                                Texas Bar No. 24043561
                                                amy.ruhland@pillsburylaw.com
                                                PILLSBURY WINTHROP SHAW
                                                PITTMAN LLP
                                                401 W 4th Street, Suite 3200
                                                Austin, TX 78701
                                                (512) 580-9600

                                                *Attorneys for James Dondero, The Dugaboy
                                                Investment Trust, Get Good Trust, and The
                                                Strand Advisors, Inc.*

CORE/3524885.0002/233543841.25

/s/Debra A. Dandeneau
Michelle Hartmann
State Bar No. 24032402
BAKER & MCKENZIE LLP
1900 North Pearl, Suite 1500
Dallas, Texas 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099
Michelle.hartmann@bakermckenzie.com

and

Debra A. Dandeneau
Blaire Cahn
BAKER & MCKENZIE LLP
452 Fifth Ave
New York, NY 10018
Telephone: 212-626-4100
Facsimile: 212-310-1600
Debra.dandeneau@bakermckenzie.com
Blaire.cahn@bakermckenzie.com
(Admitted pro hac vice)

*Counsel for Scott Ellington and Isaac Leventon*

CORE/3524885.0002/233543841.25

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on November 18, 2025, a true and correct copy of this document was served electronically via the court's CM/ECF system.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3524885.0002/233543841.25